1    XAVIER BECERRA
     Attorney General of California
2    PEGGY S. RUFFRA
     Supervising Deputy Attorney General
3    JILL M. THAYER
     Deputy Attorney General
4    State Bar No. 166428
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
     Telephone:  (415) 703-5954
6    Fax:  (415) 703-1234
     E-mail:  Jill.Thayer@doj.ca.gov
7    *Attorneys for Respondent*

8

9              IN THE UNITED STATES DISTRICT COURT

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

13   **CRAIG RICHARD CHANDLER,**       17-cv-00325-EMC

14                  Petitioner,    **EXHIBITS**

15      v.

16

17   **SCOTT FRAUENHEIM, Warden,**

                  Respondent.

18

19

20      Exhibit 3       State Court Reporter's Transcript (Vols. 7-9)

21

22

23

24

25

26

27

28

# EXHIBIT 3
# (Vol. 7)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   499

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

THE PEOPLE OF THE STATE OF          )
CALIFORNIA,                         )
                                    )
        Plaintiff - Respondent,     )
                                    )
        v.                          )     No. C1223754
                                    )
CRAIG RICHARD CHANDLER,             )
                                    )
        Defendant - Appellant.      )
_____/

COPY

VOLUME 7

PAGES 499 - 554

JULY 11, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:        OFFICE OF THE ATTORNEY GENERAL
                                 BY:  KAMALA D. HARRIS,
                                 Attorney General of the State
                                 of California

FOR DEFENDANT-APPELLANT:         In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    500

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF SANTA CLARA

3    BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4    DEPARTMENT NO. 37

5

6    ---o0o---

7    THE PEOPLE OF THE
     STATE OF CALIFORNIA,                 )
8                                         )
                    PLAINTIFF,            )
9                                         )     CASE NO.  C1223754
          v.                             )
10                                        )
                                          )
11    CRAIG RICHARD CHANDLER,             )
                                          )
12                                        )
                    DEFENDANT.            )
13   _____/

14

15   ---o0o---

16

17   REPORTER'S TRANSCRIPT OF PROCEEDINGS

18

19   JULY 11, 2013

20

21   ---o0o---

22

23

24   APPEARANCES:

25   FOR THE PEOPLE:            ALISON FILO
                                Deputy District Attorney

26

27   FOR THE DEFENDANT:         BRIAN MADDEN
                                Attorney at Law

28   OFFICIAL COURT REPORTER:   JAMIE L. MIXCO
                                C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   501

1

INDEX

2

EXAMINATION

3

**Witness Name**                                                    **Page**

4

**HILDA KELLER**

5
   Direct By Ms. Filo   ........................................503
   Cross By Mr. Madden   ......................................511
6
   Re-Direct By Ms. Filo   ...................................519

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    502

1   San Jose, California                    July 11, 2013

2                          PROCEEDINGS

3           THE COURT:  Thank you.  Record will reflect both

4   counsel are present, Mr. Chandler is present, and we're here

5   for initially the 402 hearing, Ms. Filo.

6           MS. FILO:  Thank you, Your Honor.

7           THE COURT:  Okay.  Ready to proceed?

8           MS. FILO:  Yes, Your Honor.  The People call Hilda

9   Keller.

10                      HILDA KELLER,

11          Being called as a witness on behalf of the People,

12  having been first duly sworn, was examined and testified as

13  follows:

14          THE CLERK:  Miss, could you please state your full

15  name and spell both for the record.

16          THE WITNESS:  Hilda, H-i-l-d-a; Keller,

17  K-e-l-l-e-r.

18          THE COURT:  Thank you, ma'am.  You could pull that

19  microphone a little closer to you so you don't have to lean

20  over.  Pull your chair up a little bit.  That might be a

21  little better.

22          As you may know, the lawyers are going to ask you

23  questions.  It's important to also listen to the question and

24  make every effort to just answer what is being asked.  If the

25  question calls for yes or no, you need to verbally say yes or

26  no.  And I think for the purposes of this hearing, that's

27  sufficient.

28          Thank you, Ms. Filo.

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   503

1        MS. FILO:  Thank you, Your Honor.

2                DIRECT EXAMINATION

3   BY MS. FILO:

4   Q.   Good morning, Ms. Keller.

5   A.   Good morning.

6   Q.   We're here on the case of the People v. Craig Chandler.

7   I understand that you used to be an elementary school teacher

8   at O.B. Whaley School in the Evergreen School District; is

9   that accurate?

10  A.   Yes.

11  Q.   From years -- during what time period did you work at

12  O.B. Whaley?

13  A.   2000 to 2005 or '6, I believe.

14  Q.   Okay.  Are you still an elementary school teacher?

15  A.   Yes.

16  Q.   You still work for Evergreen School District?

17  A.   Yes.

18  Q.   Could you tell me why you left O.B. Whaley School?

19  A.   Partly for my daughter and partly for Craig Chandler.

20  Q.   Okay.  So you said that you left the school -- part of

21  the reason that you left the school was because of Mr.

22  Chandler?

23  A.   Yes.

24  Q.   What did you mean by that?

25  A.   Um, he made me feel uncomfortable.

26  Q.   In what way?

27  A.   Um, in a way that is in appropriate.  I just didn't like

28  to be around him or, um, see him.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   504

1   Q.   When you say that he was inappropriate, could you

2   describe for me what that meant to you or what it means to

3   you?

4   A.   Um, inappropriate in a way of how co-workers should

5   behave themselves at work, and he seemed to cross those

6   boundaries.

7   Q.   Okay.  There is lots of ways people could cross

8   boundaries.  They could be violent, they could be -- there is

9   a myriad of ways that someone could be inappropriate.  What

10  are you talking about with respect to Mr. Chandler?

11  A.   Um, I would say more of, um, inappropriate in a -- where

12  I had to file a sexual harassment complaint.

13  Q.   Okay.  So when you say he crossed boundaries, he crossed

14  boundaries in the arena of approaching you in a sexual way?

15  A.   Yes.

16  Q.   The way you perceived it was with sexual intent?

17  A.   Yes.

18  Q.   Okay.  Could you give me some examples of what you mean

19  when you say that he would interact with you in a way that

20  had sexual intent?

21  A.   Um, he would put his hands on my hips, he would talk to

22  me about his marriage, and he would come into my classroom

23  and make comments about my physical anatomy, so --

24  Q.   Okay.  You said that you were at the school from about

25  2000 to 2005?

26  A.   Um-hum.

27  Q.   Was Mr. Chandler there the entire time you were there?

28  A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  505

1   Q.    Do you know when Mr. Chandler came to the school?

2   A.    I believe a year after.

3   Q.    Okay.  So maybe 2001 or so?

4   A.    Yes.

5   Q.    When Mr. Chandler came to O.B. Whaley school as a

6   teacher, where was your classroom located?

7   A.    My classroom was located in -- right near the office in

8   a courtyard that is adjacent to the library and also across

9   from the office.

10  Q.    Where was Mr. Chandler's classroom during that time

11  period?  So from -- if it was the same, and if it's not,

12  please let me know.  But where was Mr. Chandler's classroom

13  in relationship to your classroom between the years 2001 and

14  2005?

15  A.    In a portable behind or aside my building.

16  Q.    Okay.  So distance-wise, could you give me an estimate

17  how far away that was?

18  A.    It was close.

19  Q.    Okay.  So in the context of a normal elementary school,

20  he had a close classroom to yours as opposed to one that was

21  all the way on the other side of the school?

22  A.    Yes.

23  Q.    Okay.  So you said that he would come into your

24  classroom, he would put his hands on your hips, you mentioned

25  a number of things.  But towards the end of your time at O.B.

26  Whaley, how often were these incidents occurring, where you

27  came home that day and said, I don't like this.  This isn't

28  right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   506

1    A.    Um, they were sporadic.

2    Q.    Okay.  Once a day?  Once a week?  Once a month?

3    A.    No.

4    Q.    How often?

5    A.    I could only remember about about five incidents.

6    Q.    Total?

7    A.    Total.

8    Q.    Was there any one incident that stands out in your mind

9    as being particularly inappropriate or particularly

10   offensive?

11   A.    Yes, the last incident.

12   Q.    Okay.  Could you tell me about that incident?

13   A.    Um, I was -- it was recess, we were all excused.  We

14   were going to -- I went to the women's restroom, and our

15   mailboxes are right by the doors of the women's restroom and

16   the men's restroom.  He was standing there at the mailboxes

17   and he had called me over and he had asked me if I was going

18   to have a boob job.  And I just was surprised of -- What?

19   What are you talking about?  And then he said, "Well, I heard

20   that you were going to get a boob job."  I'm all, "No," and

21   then he said, "Well, good because they are perfect the way

22   they are," or, "they are right the way they are."  He just

23   made a comment about my breasts.

24   Q.    Okay.  You said that he would comment on your anatomy.

25   That was one incident where he commented on your anatomy.

26   Was there another incident where he made some reference or

27   comment related to any part of your body?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   507

1    Q.    Okay.  Did he make a comment to you about your feet?

2    A.    He didn't make a comment about my feet.  He went into my

3    classroom and want -- he wanted to take pictures of my feet.

4    Q.    Okay.  When did that happen?  Do you remember?

5    A.    I can't pinpoint the time, but I do remember the day.  I

6    do remember the incident, yes.

7    Q.    Okay.  So you described this sort of last incident

8    occurred where he talked about your breasts?

9    A.    Um-hum.

10   Q.    Was this episode, where he came into your classroom and

11   the issue of feet was discussed, was that closer in time to

12   the end of your tenure at O.B. Whaley or the beginning?  Do

13   you remember?

14   A.    It was the beginning, because it was in the classroom

15   that is closest to the office where that incident happened.

16   Q.    Do you move classrooms at some point?

17   A.    I did, yes.

18   Q.    So you remember that incident being --

19   A.    In that classroom.

20   Q.    In the classroom by the office?

21   A.    Yes.

22   Q.    Tell me about that incident, everything you could

23   remember about that incident in the classroom?

24   A.    Well, I usually keep my door open, and that day he came

25   into the classroom and closed the door behind him.  I was at

26   my desk, and it's further back by the white boards and the

27   door's, like, as if we're standing from that door to this

28   desk.  He closed it behind him and he just stood there.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   508

1      He didn't say anything, and so I was kind of like:

2  Okay.  What are you doing here?  And in my mind, I was like:

3  Okay.  Hi.  He's all, "Oh, hey."  And he started making his

4  way over to the desk and he started talking about how he's

5  taking a class, a massage therapy or development class or --

6  I don't know what kind of class, but it had to do with feet,

7  and that he needed to get some massage hours in, like feet

8  massage hours in.  And when he had asked me, he's all, "I'm

9  taking this class, you know, could I take pictures of your

10 feet?  And I also need hours, so I was wondering if I could

11 give you a foot massage."  I said, "No."  And then I just got

12 a little kind of -- felt kind of weird and uncomfortable, and

13 so I just stood up and started walking towards the door and I

14 was telling him, "Well, I'm wearing boots, you know."  So as

15 I was walking towards the door, okay, and then he walked out.

16 Q.   Okay.

17 A.   So --

18 Q.   You said that that made you feel weird?  It made you

19 feel uncomfortable?

20 A.   Um-hum.

21 Q.   Why?  What about that interaction and that discussion

22 about taking pictures of your feet or massaging your feet,

23 what was it about that that made you feel uncomfortable?

24 A.   I don't know him.  He was not -- he's a co-worker of

25 mine.  Nobody that I had a friendship with or relationship

26 with.  And it was after, like, the hips, you know, him

27 putting his hands on my hips and him closing the door, him

28 stumbling, like, his words, his mannerisms made me very

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    509

1    uncomfortable, so I tried to make light of it and just say,

2    "Oh, no.   I'm wearing boots," you know, and that's how I

3    remember that, because it just made me -- it just made me

4    remember how uncomfortable I felt at that point in time.

5    Q.   Okay.   Did you perceive those comments -- I would like

6    to touch your feet, I would like to take pictures of your

7    feet, did you perceive that this had a sexual motivation?

8    A.   Yes and no.

9    Q.   Okay.

10   A.   Yes, because of the prior interactions that I've had

11   with him.   And then, no, because I thought maybe he is taking

12   a class.   Maybe I'm taking it to that next level where I'm

13   feeling uncomfortable or trying to protect myself.

14   Q.   Okay.   It was because of the context of the way he had

15   treated you in general that you believed it was sexually

16   motivated?

17   A.   Yes.

18   Q.   And your only thought that it wasn't sexually motivated

19   is maybe there was some -- maybe he was telling you the

20   truth?

21   A.   `Yes.

22   Q.   Okay.

23            MS. FILO:   Thank you, Your Honor.   That's all I

24   have.

25            THE COURT:   Thank you, Ms. Filo.

26            Ms. Keller, I'm going to ask you to step outside

27   the courtroom for a moment.   I want to hear comments from

28   counsel before I give you an opportunity to cross in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   510

1    event that we're going to do that.

2              THE WITNESS:  Okay.  Thank you.

3              THE COURT:  The witness has stepped outside the

4    courtroom with a gentleman that was here with her.  They both

5    stepped outside.  And based on what we've heard at this

6    point, I was going to invite comments from counsel.  I am

7    also prepared to express some of my own thoughts.  If you

8    want to hear what I'm thinking at this point, I will be happy

9    to share with you.  If counsel wishes to make comments, I

10   will hear any comments at this point.

11             MR. MADDEN:  Your Honor, I'm interested in making

12   comments, but I would rather clarify a couple of things on

13   cross-examination before I do that.

14             THE COURT:  Okay.  Then --

15             MR. MADDEN:  I want to have a clear factual basis

16   in my mind for my comments.

17             THE COURT:  That's fine.  I wanted to just have her

18   step out first in the event counsel wishes to make any

19   comments at this point.  But we'll bring her back in.  I will

20   allow you to ask her some questions on cross then.

21             MR. MADDEN:  Great.

22             THE COURT:  Ms. Filo, would you mind asking her to

23   come back in?

24             MS. FILO:  No.

25             THE COURT:  Thank you.

26             Thank you, Ms. Filo.

27             Ms. Keller is back on the witness stand.  Mr.

28   Madden, you wish to cross-examine?

1          MR. MADDEN:  Yes.  Thank you.

2                    CROSS-EXAMINATION

3     BY MR. MADDEN:

4     Q.   Ms. Keller, my name is Brian Madden.  I'm Craig's

5     attorney.  I don't have a lot of questions for you, but the

6     first thing I want to ask you about is the matter that I'm a

7     little bit confused about.  I don't think because of your

8     testimony, but because of a portion of the police report.

9     A.   Yes.

10    Q.   Have you had an opportunity to review the police report

11    in this case?

12    A.   Yes.

13    Q.   Okay.  And do you have that near you?

14    A.   No.

15         MR. MADDEN:  I'm going to approach, if that's all

16    right, Your Honor?  This is from pages 406 to 407 of my

17    discovery package.

18         THE COURT:  Okay.  I don't have a problem with

19    that, but what was the reason that you wanted to approach?

20         MR. MADDEN:  I wanted to have her just look at the

21    paragraph that I'm referring to, even though she's read it.

22         THE COURT:  Oh.

23         MR. MADDEN:  Just to confirm that's what I'm

24    talking about.

25         MS. FILO:  Your Honor, maybe I could avoid all of

26    this.  It's my mistake.  Ms. Keller did indicate to me that

27    the last sentence in the second paragraph, which she stated:

28    He again walked up behind her and put his hands on her hips.

1    Yesterday, when I spoke with the attorney that is

2    coordinating all of the school district people, I was

3    informed that last sentence in the police report is not

4    accurate.  She did not intend or believe that she ever said

5    that.  So if there is an error, it's Det. Pierce's error.

6    She wanted to be clear that that was not part of the incident

7    that involved this discussion about her feet.

8              THE COURT:  Okay.

9              Mr. Madden, was that the area you were wanting to

10   address?

11             MR. MADDEN:  Indeed it was.  I want to pursue it a

12   little bit.

13             THE COURT:  Sure.  Go ahead.

14             MR. MADDEN:  That's where I want to be.

15   BY MR. MADDEN:

16   Q.   Ms. Keller, as Ms. Filo was speaking, you were shaking

17   your head vertically.  I assume you agree with what Ms. Filo

18   said; is that correct?

19   A.   Correct.

20   Q.   I'm not trying to be hopefully too tough on you or

21   fussy, but if I ask -- if you are shaking your head either

22   yes vertically or horizontally, and if I ask, "Does that mean

23   yes or no," I'm not trying to be mean.  We need to have a

24   record.  Madam court reporter could only get down words.

25   Okay?

26   A.   Yes.

27   Q.   There is no reason why you would know about this.  If

28   you slip, we'll correct you.  It's nothing to worry about.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   513

1    A.   Okay.

2    Q.   All right.

3         Just so that I'm crystal clear, the incident

4    involving your classroom, when we say the "classroom

5    incident," we're talking about an incident in your classroom;

6    correct?

7    A.   Correct.

8    Q.   And there is only one of those?

9    A.   Yes.

10   Q.   Okay.  And that the police report is correct insofar as

11   it states that on that occasion, Mr. Chandler touched your

12   hips or any other part of your body?

13   A.   No, he did not.

14   Q.   Okay.  So that incident was nothing more than a

15   conversation that made you feel uncomfortable?

16   A.   Yes.

17   Q.   And I'm assuming that that conversation was relatively

18   brief?  Like a couple of minutes, I'm guessing?

19   A.   Yes.

20   Q.   All right.  Okay.

21        Now, the -- just so I understand, you testified

22   that there was an incident of him touching your hips.  That

23   was on one occasion?

24   A.   On two occasions.

25   Q.   Okay.  And the hip incidents occurred where and when?

26   A.   Um, one was during a Friday lunch.  A lot of us teachers

27   have, like, food.  We bring food on Fridays, and during that

28   recess break, people would go and get some food.  And so

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    514

1    we're all in the line doing whatever it is:   eating or

2    getting food.   He came behind me, put his hands on both of

3    my -- put his hands on my hips and moved accordingly, like

4    move to the side.

5    Q.    He moved to the side or you moved to the side?

6    A.    No.   He moved to the side.

7    Q.    He was behind you, you feel his hands on his hips, and

8    then he put his hands on the hip, move to the side like

9    towards the side or something?

10   A.    No, just moved.   He didn't move next to me.   He just

11   moved.

12   Q.    Hands were --

13   A.    Hands on my hips.

14   Q.    Very briefly on your hips?

15   A.    He had his hands on my hips.

16   Q.    I'm interested in the period of time you remember them

17   being there?

18   A.    They were there.

19   Q.    I don't mean they weren't there.   I mean, were they

20   there for just a second or two?

21   A.    Yes.

22   Q.    This was a momentary kind of thing?

23   A.    Um-hum.

24   Q.    All right.   Do you remember what -- so you were in at

25   least a couple of different classrooms when you were O.B.

26   Whaley?

27   A.    Two.

28   Q.    Do you remember the classroom numbers?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   515

1    A.    No.  Unfortunately, I don't.

2    Q.    Okay.  The classroom that you were describing where this

3    incident occurred in your classroom, that was the first or

4    the second classroom that you were assigned to?

5    A.    That's the first.

6    Q.    That would be -- do you remember approximately during

7    the tenure when you switched to the other class?  Does that

8    question make sense?

9    A.    Yes.  I'm trying to think whether I was in that

10   classroom for two years or just one year.

11   Q.    But that was the first class you remember being assigned

12   to?

13   A.    Yes.

14   Q.    Okay.

15   A.    Well, let me -- I was a kindergarten teacher first.

16   Q.    At O.B. Whaley?

17   A.    At O.B. Whaley.  That was before Chandler was at O.B.

18   Whaley, then I moved into that classroom, the first grade

19   classroom.

20   Q.    The kindergarten -- there is sort of a kindergarten wing

21   at O.B. Whaley?

22   A.    Yes.

23   Q.    That is separate from the other part of the school?

24   A.    Yes.

25   Q.    Actually has its own little playground?

26   A.    Yes.

27   Q.    You were over there teaching kindergarten, and you

28   started in approximately 2000?

1    A.   So about 2003 I want to say, because I was -- I started

2    2000, I was kinder for two years, then I looped up with my

3    first-graders to that classroom.

4    Q.   The classroom that we have been talking about?

5    A.   Yes.

6    Q.   Earlier?

7    A.   Yes.

8    Q.   Okay.  So at that point you're a first grade teacher?

9    A.   Yes.

10   Q.   Okay.  So if your tenure was on or about and between

11   2000 and 2005 or 2006, that would suggest to me that must

12   have been around 2002 or 2003?  I won't hold you to it.

13   We're just estimating.

14   A.   Yeah, I believe so.

15   Q.   Okay.  This incident involving the massage, it was -- so

16   I'm clear, it was -- was that ever repeated ever again while

17   you were at O.B. Whaley?

18   A.   No.

19   Q.   Okay.  And would it be a fair statement with respect to

20   Mr. Chandler's actions, verbal actions to you on that date

21   that we talked about in your classroom, you certainly felt

22   uncomfortable, but in your own mind you were not certain that

23   what he was doing was sexual in nature, but you thought it

24   could have been?

25   A.   That's why I said yes and no.

26   Q.   Okay.  All right.

27        So turning again to the incident itself in your

28   classroom.  Other than wanting to photograph your feet and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    517

1    other than offering to give you a massage -- was that a foot

2    massage?

3    A.    Yes.

4    Q.    Okay.  There was no other conversation or no other

5    comment made by Mr. Chandler about your feet?

6    A.    No.

7    Q.    Nothing that was overtly sexual?

8    A.    In what regards?

9    Q.    Well, you said you had mixed feelings.  What I'm saying,

10   those were -- his only comments, the ones that you talked

11   about, there weren't any other comments?

12   A.    About feet; right?

13   Q.    Yes.

14   A.    No, that was it.

15   Q.    Okay.  So he asked you essentially two questions:  One

16   connected with taking photographs of your feet, and one

17   connected with giving you a foot massage?

18   A.    Those were the questions, but there was a conversation.

19   There was more, you know, yes.

20   Q.    All right.  So you then said no and start to walk out?

21   A.    Yes.

22   Q.    He walked out, I assume, in front of you?

23   A.    He walked -- no.  I started walking in front of him,

24   like leading him out.

25   Q.    Okay.  Then he followed you?

26   A.    Yes.

27   Q.    Okay.  Then did you -- he left the class and did he walk

28   away and you watch him, or did you both walk away together?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   518

1    A.    Yes.

2    Q.    If you remember?

3    A.    I don't remember.  I just -- he just left after that.

4    Q.    Okay.  So was the incident in the -- I don't think it's

5    a teacher's lounge.  What is that room called?  Or is it a

6    teacher's lounge?

7    A.    That's what we call it, the teacher's lounge.

8    Q.    Okay.  That incident involved touching from behind,

9    putting his hands on your hips briefly, are you comfortable

10   with the word "briefly"?

11   A.    A little more than briefly.  It lingered uncomfortably,

12   that's how it was for me.

13   Q.    Maybe I'm -- given how long ago this occurred, I

14   appreciate that you may not have total clarity on this.

15   Could you give me an estimate of the length of time his hands

16   were on your hip in terms of seconds?

17   A.    No, I can't give you.  All I know it was enough for me

18   to be aware and be, like, what?  And him walk away.

19   Q.    Did you -- I'm sorry.

20         Did I cut you off?  Go ahead.

21   A.    It just made me alert, like, that's how the reason why I

22   remember.  When someone touches you briefly, like, on your

23   shoulders and stuff, you don't really remember those

24   incidents.  But when someone that you don't know or don't

25   even expect for that to happen put their hands on your hips,

26   you know, that just alerted me.  So I know it wasn't like

27   a -- just a second touch; it was like a one, two, three,

28   four, five, you know, and then he lingered off.  So --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   519

1    Q.   When you said he lingered off, you mean he walked off?

2    A.   He walked off.

3    Q.   Do you remember where he went?

4    A.   No.

5    Q.   Okay.  But it's your recollection that at or about the

6    time that that happened, there were other people around other

7    than you and Mr. Chandler?

8    A.   Yes.

9    Q.   Other teachers?

10   A.   Yes.  It was in public, yeah.

11   Q.   Public place?

12   A.   Public place.

13   Q.   And basically there was, I assume, what amounts to sort

14   of a buffet table, where people sort of potluck, bring snacks

15   and goodies on Friday?  That's traditional; right?

16   A.   Yes.

17   Q.   Okay.  Thank you.

18             MR. MADDEN:  I have no further questions.

19             THE COURT:  Redirect?

20             MS. FILO:  I could be very brief, Your Honor.  I

21   will try.

22             THE COURT:  Sure.

23                    REDIRECT EXAMINATION

24   BY MS. FILO:

25   Q.   Ms. Keller, you mentioned this incident in the lunch

26   room?

27   A.   Yes.

28   Q.   This incident with the feet?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   520

1  A.    Yes.

2  Q.    And this last incident where he rubbed against your

3  breasts?

4  A.    Yes.

5  Q.    You said there were five incidents total?

6  A.    Yes.

7  Q.    What were the other incidents?

8  A.    The other incident where he put his hands on the hips,

9  this was also towards the end of the year at the volunteer

10  parent luncheon.  Same scenario.  We were there with food at

11  the table and we were serving the parents and he came behind

12  me, again, putting his hands on my hips.

13        The other one would be when we had library and I

14  had computer lab at the same time, and he would come talk to

15  me every once in a while.  And when he came in to talk to me

16  about his marriage and I felt it was inappropriate.

17  Q.    Okay.  So can you to the best of your ability describe

18  for me the order in which those things happened?  So we know

19  this comment about the breast happened last.  Where would --

20  the lunch room, computer lab, feet, and parent luncheon,

21  where would those things fall?  Do you remember which

22  incident happened first?  Maybe we should start with that.

23  A.    Um, the hips.

24  Q.    Was that at the Friday lunch or the parent luncheon?

25  A.    That was the Friday lunch.

26  Q.    Okay.

27  A.    Luncheon, yeah.

28  Q.    So that happened first, and the reference to the breast

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   521

1  happened last, and it's the computer lab, discussion of the

2  feet, and the parent luncheon?

3  A.   So I would say the computer lab would be the second one,

4  then the third one will be the feet, and then the last one

5  would be another hands on the hips -- not the last one, but

6  the fourth one would be the hands on the hip, and the last

7  one would be the breast incident.

8  Q.   Okay.

9  A.   So that's all I know.  That's all I remember.

10  Q.   Did all of these incidents occur after you moved into

11  the first grade classroom?

12  A.   No.  The last one was when I was already in the last --

13  the classroom way out in the corner of the first grade.  When

14  I moved to the portables.

15  Q.   Okay.  So did any of these incidents occur while you

16  were teaching kindergarten?

17  A.   No.

18  Q.   When did you -- you said you looped up from kindergarten

19  to first grade.

20  A.   Yes.

21  Q.   Do you know when that happened?  You thought it was

22  about 2003; is that right?

23  A.   2003, yes.

24  Q.   You believed you left the school in 2005?

25  A.   I don't remember what year, to be honest.

26  Q.   Okay.

27  A.   2005, 2006.

28  Q.   So, I guess what I'm trying to figure out is these

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   522

1    incidents were somewhat condensed towards the last two to

2    three years at your time at O.B. Whaley?

3    A.   Yes.

4    Q.   I want to be -- ask you one last question.

5    A.   Yes.

6    Q.   If Mr. Chandler were not in fact taking a massage class,

7    would that take away any reservations you have about that

8    conversation being sexually motivated?

9    A.   Yes.  If he did not have a massage class, then I would

10   think, yeah, what's going on?

11   Q.   There would be no other explanation in your mind --

12   A.   No.

13   Q.   -- for how or why he would make those comments to you?

14   A.   Yes.

15   Q.   Even if he was taking that massage class, you still have

16   some kind of creepy feelings about him?

17   A.   Yes, because of what has happened before.

18   Q.   And since?

19   A.   And since, yes.

20   Q.   Thank you.

21        MS. FILO:  Nothing further, Your Honor.

22        THE COURT:  Recross, Mr. Madden?

23        MR. MADDEN:  No, Your Honor.

24        THE COURT:  I have one question.  Just wanted to

25   clarify this.  When Mr. Chandler asked if he could take

26   photos of your feet when he came into the classroom, did he

27   say "photos of your feet and massage your feet?"  Or, "Photos

28   of your toes and massage your feet?"  Or, "Photos of your

1  toes and feet?"  Do you know specifically what he said?

2          THE WITNESS:  I remember feet.

3          THE COURT:  Okay.  Thank you.

4          Based on my last question, any comments by counsel?

5          MR. MADDEN:  No.

6          THE COURT:  More questions?  Excuse me?

7          MR. MADDEN:  No.

8          THE COURT:  All right.

9          Ma'am, you could step down.  Thank you very much.

10  And once again, I will ask you to step outside the courtroom

11  and wait.

12          THE WITNESS:  Okay.

13          MR. MADDEN:  Your Honor, I have no objection to the

14  witness being excused.  We didn't excuse her; right?

15          THE COURT:  No.  I wanted her to stick around.

16  Just so both counsel understands, the reason I asked about

17  the toes because in your motion it says, "Could I take

18  pictures of your toes and massage your feet?"  I was pretty

19  confident her testimony was "take pictures of your feet and

20  massage the feet."  I wanted to make sure it was clear based

21  on her recollection.

22          The witness has stepped outside the courtroom at

23  this time.  I will hear any comments from counsel.  Mr.

24  Madden?

25          MR. MADDEN:  Yes, Your Honor.  You don't have an

26  objection, I will go to the podium so I could have --

27          THE COURT:  Sure.

28          MR. MADDEN:  So I'm not altogether clear about

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   524

1  where we are from an evidentiary standpoint.  We have had a

2  previous ruling from the Court.  My recollection is that you

3  indicated that you were, or that you were inclined to allow

4  at that time -- based on the evidence that you had on the

5  moving papers, that you were inclined to allow Ms. Keller to

6  testify concerning basically the foot incident in her

7  classroom.

8          THE COURT:  Correct.

9          MR. MADDEN:  The People essentially in their moving

10  papers addressed just that issue.  Although in their moving

11  papers they discuss the two other incidents, two other

12  conversations, those were not addressed in their moving

13  papers.  So I feel like I'm kind of shooting a moving target

14  here.

15          THE COURT:  Let me interrupt you, and maybe it

16  might be more efficient if I heard from Ms. Filo about what

17  you're asking to be allowed to be presented to the jury.  And

18  then that would eliminate Mr. Madden talking about everything

19  that he could focus or is necessary.

20          MS. FILO:  Sure.

21          THE COURT:  Thank you, Ms. Filo.

22          MS. FILO:  Your Honor, I think our reasoning

23  remains the same, and that is that there is conduct that

24  seems to be and comments that seemed to be directed at Ms.

25  Keller's feet, and that that in Ms. Keller's mind was

26  perceived to be a sexual overture.  And she's testified, and

27  I think it's clear, that that was part of a context.  I mean,

28  it has to be put in some context.  Ms. Keller clearly

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   525

1    believed that Mr. Chandler was approaching her and talking to

2    her and touching her or proposing to touch her in a manner

3    that was sexually motivated that she felt was inappropriate

4    and uncomfortable.

5              She's a grown woman who certainly appears to be

6    with all capacity and ability, and there is no reason to

7    believe that her perception is inaccurate.  So, yes, I think

8    that the People are entitled, not only to get in this comment

9    about the feet, but at least the fact that there was part of

10   a broader relationship and part of a bigger picture that

11   should be presented to the jury in order to explain why she

12   felt the way that she did.

13             So we're talking about five incidents.  Those are

14   the incidents that Ms. Keller's described.  They are

15   relatively brief and limited.  She's just done a 402 hearing

16   in half an hour.  So from the purposes of -- or from the

17   perspective of 352, this is limited testimony that involves

18   five incidents that created an overall impression in her mind

19   of sexually motivated comments and behavior by Mr. Chandler

20   towards her.  That would explain why this particular interest

21   in her feet is relevant for purposes of our trial in this

22   case.

23             THE COURT:  Okay.  Thank you.

24             Mr. Madden.

25             MR. MADDEN:  Your Honor, let me start with the fact

26   that on this record, what we have is a question, one

27   question:  Could I -- if we're reducing it to a simplest

28   form, Could I photograph your feet?  Could I massage your

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    526

1    feet?  Two questions.  I don't believe on this record that

2    the Court can possibly conclude with confidence that he has

3    a, quote, foot fetish, because, really, that's what the

4    purpose of all of this is, and then to try to tie it into an

5    interest in children.

6            It's two questions.  He didn't ask to lick her

7    feet:  Oh, your feet are beautiful.  Could I touch your feet?

8    I really like feet.  I'm really into feet.  I'm really into

9    your feet.  Nothing.

10           I might point out, I think the obvious, the State

11   of California licenses massage therapists.  My guess is that

12   almost everyone in this courtroom -- not everyone -- has had

13   a massage at some point, including a massage of their feet.

14   An interest in massaging feet is not something that is per se

15   a fetish.

16           We have in my moving papers a declaration by our

17   expert, Dr. O'Donohue, indicating what one would have to show

18   to show a fetish, and it is a far cry from the record in this

19   case at this time.  I think that's very important.

20           I think it's also important in light of the fact

21   that what was initially in the police report, that is, that

22   this classroom also included him approaching her and putting

23   his hands on her hips, she needed to clarify that that is

24   incorrect.  And I think that minus that allegation that's in

25   the police report, it makes it even -- well, that would have

26   made it much more easy to connect the two, but without it,

27   the connection is much more tentative and speculative.

28           Most importantly here, and I said it repeatedly in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   527

1   argument and in my moving papers, this conduct, and even as

2   acknowledged by Ms. Keller, is in her own mind she's not

3   certain.  Maybe it is, maybe it isn't.  But the key thing we

4   have to remember is Ms. Keller is an adult woman, and Mr.

5   Chandler's unwanted advances, unwanted comments, comments

6   that crossed over the line in terms of a co-worker, that

7   really be best described in the general category of sexual

8   harassment, may be sexual harassment.  It is not a crime

9   within anything, within the definition of any crime in the

10  Penal Code.  Is it inappropriate?  Of course.  It's not a

11  crime.

12          It is essentially at worse repeated efforts of

13  seeking, inviting, encouraging, hoping for a consensual

14  liaison with the adult woman.  There is no connection to

15  sexual interest in children or children's feet for the

16  reasons Dr. O'Donohue addressed and the reasons that we

17  stated in our moving papers.

18          The problem is this has to come in under 1101(b).

19  All of this stuff is 1108 stuff, which it doesn't come in

20  then because it's not a crime.  It's not 1101(b) stuff, it's

21  not admissible under 1101(b) because of the connection, and

22  the connection also has to be looked at in terms of probative

23  value.  Its relevance, its materiality has to be looked into

24  probative value.  The interest -- as I said before, an

25  interest in the part -- any body part of an adult woman does

26  not translate into the same interest and the same body part

27  of a child.  Otherwise, it would necessarily follow that

28  every man who has an interest in any part of a woman's body

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    528

1   necessarily has the same sexual interest in a child's body

2   for those parts, and that is simply not correct and that's

3   the danger of admitting this evidence in this case.

4          The probative value of it is minuscule.  In fact, I

5   submit to the Court, as I said in my moving papers, it has no

6   probative value.  They are not connected.  It's apples and

7   oranges to let a jury hear this.  Nothing more than to throw

8   mud up on the wall.  He's a bad actor in terms of sexually

9   harassing a teacher, therefore, we're not sure what this foot

10  thing is all about.  This is one uncomfortable incident.

11  Other things showed it was harassment, therefore, he's kind

12  of a creep and he must have molested these kids.

13          This is a tenuous connection, on tenuous

14  connection, on tenuous connection, incredibly prejudicial,

15  not probative.  And I would urge the Court, not only to not

16  allow it, I would urge the Court to reconsider, based on this

17  evidence, of what was not happening at the -- in that

18  classroom, i.e., any touching.  And there was no specific

19  thing about toes or anything.  It was just a simple request

20  that could very well have been legitimate.  But to allow that

21  to come into evidence is speculative and I don't see how the

22  Court could possibly allow that.  Thank you.

23          THE COURT:  Thank you, Mr. Madden.

24          Any additional comments, Ms. Filo?

25          MS. FILO:  I do have a few, Your Honor.  Those --

26  these would be those.  When counsel says that on this record

27  there is not enough, what I would remind the Court is it's

28  not going to be just this record.  We're going to have

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   529

1   children who are going to come into court and talk about Mr.

2   Chandler's behavior with their feet.  So that is the

3   connection.

4         And what Mr. Madden is saying is that this is

5   ambiguous conduct.  I suppose all of the conduct in this case

6   could be arguably ambiguous.  That's the defense's entire

7   argument, that this was an educational exercise; this was a

8   Helen Keller moment; that all of this has an innocent

9   explanation, and they are entitled to argue that.  And if the

10  jury accepts that, then so be it.

11        But what Ms. Keller has unequivocally said in the

12  context of this relationship, she believed it to be sexually

13  motivated.  This is not 1108 evidence.  The People aren't

14  suggesting that it's admissible under 1108.  We never claimed

15  that it was a crime.  And Mr. Madden continues to assert that

16  a sexual interest in an adult foot is not the same sexual

17  interest in a child's foot.  I would agree with him.  What he

18  said is having intercourse what an adult woman doesn't mean

19  you want to have intercourse with a child.

20        My suggestion would be that if he's having

21  intercourse with both an adult woman and a child, the intent

22  is the same.  This is -- it's not the age that connects them,

23  it's the activity, it's the behavior.  So, yes, I think that

24  if you are having -- if you are repeating a behavior with an

25  adult and a child, and both of them are sexually motivated,

26  that's the nexus, that's the connection.  I'm not suggesting

27  that anyone who touches the feet of an adult wants to touch

28  the feet of a child, but this defendant did.  He did touch

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   530

1    those feet, so that's the nexus.  That is the connection.

2            And I think the evidence is highly probative, and I

3    think it's -- there is no possibility that the jury is going

4    to be confused or misled.  This is a clear connection of an

5    interest in a specific body part that is not otherwise

6    defined as sexual.

7            THE COURT:  Mr. Madden, any final comments?

8            MR. MADDEN:  Yes.  I think Ms. Filo was being --

9    just make one comment.  Her representation that this witness

10   said it was sexually motivated, it was not her testimony.

11   She said, "Maybe yes, maybe no."  That was her testimony in

12   her own words.  Ms. Filo is misstating what she said, and I

13   think it's very -- that's very important to the Court's

14   decision in this case.  Thank you.

15           THE COURT:  Okay.  First of all, let me just say

16   that the Court's ruling is not simply based on the 402

17   testimony, but I have taken into consideration everything

18   that's been presented to me in the past, including the moving

19   papers.

20           First of all, I think this is a unique situation,

21   because as Mr. Madden is arguing about body parts, I think

22   the feet are a unique body part, unlike any other part of the

23   body.  I disagree with Mr. Madden, that this particular

24   incident is not probative.  I think it is probative.  I want

25   to make this clear, I will allow Ms. Keller to testify about

26   the incident in the classroom, because it's not only the

27   comments by Mr. Chandler, it is the only incident that I

28   think occurred when he comes into the classroom, closes the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   531

1   door, there is no one in the classroom, and this occurs.  So
2   I think that's relevant based on everything I know.  So that
3   I will allow.

4           I won't allow any reference to sexual harassment.
5   I will allow her to testify how it made her feel:  that it
6   was uncomfortable.  What I'm struggling with are the other
7   contacts with her, where those were clearly -- but for the
8   foot incident, those other conducts wouldn't be relevant in
9   this case.  So what I'm struggling right now is to allow her
10  to testify that, you know, she had contact with Mr. Chandler
11  and that those contacts factor -- you know, just regular
12  contact with them factoring in her comfort level.

13          My point is, I don't think the other contacts are
14  relevant.  I think the fact that based on this one particular
15  incident, it made her feel weird and uncomfortable is
16  relevant.  I think, quite frankly, in fairness to the
17  defense, if you ask the question:  Is it sexual?  She says
18  yes/no, I think that may help both sides because it's
19  unclear.  Now, obviously, if she testifies, you get that
20  information out, and Mr. Madden chooses to go in a lot more
21  detail about contacts with Mr. Chandler, then, you know,
22  obviously I wouldn't restrict that.

23          But for the People's, I guess, direct, I am
24  restricting it to that.  I will allow some vague reference:
25  Did other context factor into this?

26          MS. FILO:  Your Honor, may I, for instance, ask the
27  witness:  Based on your entire relationship with Mr.
28  Chandler, do you believe that this contact or these comments

```
1    were sexually motivated?
2             THE COURT:  Well, you are going to ask her:  Was
3    this conduct that occurred, did you feel sexually motivated?
4    Yes.  And then that question.
5             MS. FILO:  Okay.
6             THE COURT:  Because I don't want it to be before or
7    afterwards.
8             MS. FILO:  Okay.  That's fine.
9             MR. MADDEN:  Your Honor, I need some clarification.
10            THE COURT:  Sure.
11            MR. MADDEN:  I need some guidance.  So what I'd
12   like to know specifically is what the People will be limited
13   to.  The People will be allowed to ask the question:  Did you
14   feel this conduct was sexually motivated?
15            THE COURT:  Well, I would think based on when she
16   testified --
17            MR. MADDEN:  I'm sorry.  Or:  Does this make you
18   feel uncomfortable?
19            THE COURT:  How did it make you feel?  It made --
20   her testimony here was weird or -- weird and uncomfortable.
21   Did you believe it was sexually motivated?  Then she answers
22   the question.
23            MR. MADDEN:  You'll allow that?
24            THE COURT:  Yes.
25            MR. MADDEN:  Well, she said, "Maybe yes, maybe no."
26            THE COURT:  Correct.
27            MR. MADDEN:  So did you believe --
28            THE COURT:  Right.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    533

1              MR. MADDEN:    -- that it was sexually motivated?

2    Her answer, Maybe yes, maybe no.

3              THE COURT:  She could explain.

4              MR. MADDEN:  Then she could explain that and talk

5    about the other incidents?

6              THE COURT:  No.  I mean, she just testified why she

7    felt that way because she said she felt it was.  And then she

8    said if he had a massage class, maybe not about the other

9    incidents.

10             MR. MADDEN:  So in her direct, the People will not

11   be allowed to inquire about any of the other four incidents;

12   correct?

13             THE COURT:  Not get the details out of it.  But as

14   you put it, Ms. Filo, her other contacts with her playing a

15   part in this generally.  I mean, it's not just one isolated

16   incident.  She's known him for a few years, and having that

17   past relationship has a factor.  I mean, you might have

18   someone who is, for lack of a better word, a jokester, always

19   doing these things.  No, it wasn't sexually motivated at all

20   because I know him.

21             MR. MADDEN:  So the People can't inquire directly

22   about the other four incidents?  This witness will not be

23   allowed to talk about the other four incidents?

24             THE COURT:  Not on direct.

25             MR. MADDEN:  If I choose to explore them, then --

26             THE COURT:  That's your --

27             MR. MADDEN:   -- all bets are off.

28             THE COURT:  Correct.  Then obviously, Ms. Filo, you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   534

1    could go into it.

2              MS. FILO:  Okay.  Is it --

3              THE COURT:  And --

4              MS. FILO:  Your Honor, if I might?  I think I

5    usually feel like the best way to address this, if the

6    witness is still here, is that to have her come in and

7    explain to her on the record just so there is no confusion

8    about what I am instructing her or what I'm telling her is

9    the limitation of her testimony so that she knows and

10   understand that and that's on the record.

11             MR. MADDEN:  I have no objection to that.  But just

12   so I am clear, is she going to be able to answer anything

13   after she's asked:  Did you believe it was sexually

14   motivated?  And she says:  Maybe yes, maybe no, that's the

15   end of the inquiry unless I get into it.

16             THE COURT:  No.  I will allow Ms. Filo to ask:

17   Explain what you mean by that.  Because I can't just leave it

18   out like that.  I don't think that's fair.

19             MR. MADDEN:  What will she be allowed to talk

20   about?

21             THE COURT:  What she testified here in court.

22             MR. MADDEN:  To all five incidents now?

23             THE COURT:  To exactly what she said, which was --

24             MR. MADDEN:  I see.

25             THE COURT:  Yeah.

26             And, Ms. Filo, as far as you bringing her in and

27   getting this clarified, that's fine with me.  I have no

28   problem with that.  Because knowing you, I'm confident you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   535

1    are going to explain to her the Court's ruling, and you do it

2    with every single witness, I'm certain.  And if she comes in

3    here and the witness says something they are not supposed to

4    do, is that a reflection on you?  No.  But if you feel more

5    comfortable doing it, I have no problem with that.

6            MS. FILO:  I'm concerned, Mr. Madden seems very

7    concerned, about making sure this is, like I say, a closed

8    universe.  I want to make sure that he's satisfied that I

9    have made these representations to her.

10           THE COURT:  If that's your request, that's fine.  I

11   have no problem with that.

12           MS. FILO:  Thank you.

13           THE COURT:  But I want her in the courtroom.  I

14   will not put her on the stand or anything like that.

15           MS. FILO:  That's fine, Your Honor.  I will just

16   bring her in.

17           THE COURT:  Record will reflect that Ms. Keller has

18   entered the courtroom.  Ma'am, thank you very much for your

19   patience.

20           Ms. Filo.

21           MS. FILO:  Thank you, Your Honor.  I wanted to just

22   put on the record, Ms. Keller, the Court's ruling.  So I want

23   to make sure that you understand it and that I ask you the

24   appropriate questions at the time that you testify.  The

25   Court is going to allow me to ask you about this incident

26   where Mr. Chandler came into the courtroom, he closed the

27   door behind him, asked about massaging your feet and taking

28   pictures of your feet, about how that made you feel,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    536

1    uncomfortable/inappropriate, and that -- and whether or not

2    that was -- you believed that was sexually motivated.

3             And then lastly, whether or not your belief about

4    his motivations is based on your entire relationship and

5    knowledge of Mr. Chandler during the time that you knew him.

6    He's not going to allow us to talk about the other four

7    incidents, so I'm not going to be asking you questions about

8    that, and I'm going to ask you, if possible, not to refer to

9    those in your answers.

10             MS. KELLER:  Okay.

11             MS. FILO:  If you feel like answering one of my

12    questions would require you to reference one of those

13    incidents, please let me or the Court know and we'll take a

14    break and work it out.

15             MS. KELLER:  Thank you.

16             THE COURT:  Also, ma'am, there will be no reference

17    to any sexual harassment claim that you may have filed.  Ms.

18    Filo will be allowed to ask you all of the general questions

19    like, your classroom, where it was located, when you came,

20    those general types of things.  But as she just said, I'm

21    basically restricting the testimony to that classroom

22    incident.

23             MS. KELLER:  Okay.

24             THE COURT:  So I'm not restricting what you testify

25    about that, but that's the area.  Then the defense attorney

26    will cross-examine you, and if he asks you about one of those

27    other incidents, well, that is his choice and you will be

28    allowed to testify to those.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   537

1              MS. KELLER:  So --

2              THE COURT:  If you are uncertain about a question

3     that, for example, Mr. Madden asks you:  Did he ever put his

4     hands on your hips, for example, you could look at me and

5     say, May I answer that question?  And I will say yes.

6     Whenever you have some concerns, just look at me and say, May

7     I answer that question?

8              MS. KELLER:  Okay.

9              THE COURT:  And if I'm not sure, I will ask the

10    attorneys to approach sidebar.  And if necessary, I will ask

11    the jury to step out and we'll clear it up.  Okay?

12             MR. MADDEN:  Your Honor, may I add a couple of

13    points to make sure we're all on the same page?

14             THE COURT:  Sure.

15             MR. MADDEN:  Ms. Keller, it's my understanding that

16    pursuant to the Court's ruling, should -- Ms. Filo will be

17    allowed to ask the question, talk about the classroom

18    incident, how you physically describe it, verbally describe

19    it.  She'll be allowed to ask the question, "Do you believe

20    it was sexually motivated?"  And then I assume your response

21    would be, as it was this morning, "I don't know.  Maybe yes,

22    maybe no."

23             MS. FILO:  Your Honor, I'm going to object.  I

24    don't think it's appropriate at this point for counsel to

25    tell the witness what her answer should be to any of the

26    questions.

27             MR. MADDEN:  I'm not telling her.  I'm going on the

28    record, making sure I understand this is what she said this

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   538

1  morning.  That's what I expect the Court's ruling -- concerns

2  what she'll be answering.

3          THE COURT:  Well, it is, but she already testified

4  and I don't think we need to go over all of her testimony

5  again.

6          MR. MADDEN:  Okay.

7          THE COURT:  Obviously, there may be different ways

8  you answer questions, but it's similar.  But, you know, the

9  parameters is the point we just wanted to make on the record.

10          MR. MADDEN:  All right.

11          THE COURT:  Okay.  Thank you, Ms. Keller.  You are

12  excused and free to leave.

13          MS. KELLER:  Thank you.

14          THE COURT:  Counsel, I'm going to take a

15  five-minute restroom break.

16          (Whereupon, the Court recessed.)

17          THE COURT:  We're back on the record.  Both counsel

18  are present, Mr. Chandler is present, and we're continuing

19  with two additional issues.  Ms. Filo.

20          MS. FILO:  Thank you, Your Honor.  People have

21  decided not to attempt to solicit expert testimony from Dr.

22  (Redacted), so we could probably take that off of our list.

23          THE COURT:  Okay.

24          MS. FILO:  I would say this, if -- obviously, the

25  People reserve the right in rebuttal.  If there is some issue

26  raised by the defense in the course of cross-examination, in

27  the course of the examination of their expert that causes us

28  some concern about inconsistencies and statements, obviously

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   539

1    the People reserve their right in rebuttal to call an expert

2    that might explain those inconsistencies or give some context

3    to these inconsistencies.

4              THE COURT:  Okay.  Thank you.

5              MS. FILO:  So that will be issue No. One.

6              Issue No. 2 I had raised with the Court the other

7    day, and I don't remember if we put it on the record, I think

8    we did not, so --

9              THE COURT:  Right.  We did not.

10             MS. FILO:  Maybe I should give a statement for the

11   record, and it is this:

12             Lyn Vijayendran was the principal of O.B. Whaley

13   Elementary School in the 2011/2012 school year.  In October

14   of 2011, Victim No. 2 -- actually, Victim No. 2's mother came

15   to the principal and told her that Mr. Chandler had been

16   keeping Becky behind and putting things in her mouth and that

17   Becky didn't like it.  Ms. Vijayendran then retrieved Becky,

18   had Becky come in and give a statement to her about what had

19   happened.  Becky gave a statement to Ms. Vijayendran.  That

20   statement is memorialized in three pages of notes that Ms.

21   Vijayendran took.

22             We have already gotten a ruling from the Court that

23   that statement is admissible under 1360.  Subsequent to that,

24   Ms. Vijayendran did go and have a conversation of some sort

25   with Craig Chandler.  At the end of that conversation, what

26   she told Mr. Chandler was -- I'm sorry.  I should say, at

27   some point in that conversation, she told Mr. Chandler that

28   he should not have children in the classroom alone.  We know

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   540

1    a lot more about these conversations because Ms. Vijayendran

2    is the subject of a prosecution that went to jury trial in

3    November of last year.  Ms. Vijayendran herself testified,

4    and she was ultimately convicted of failing to report an

5    incident of suspected child abuse.

6            So what my request was of the Court was for a sort

7    of a pre-ruling, and I just wanted to make sure that in

8    eliciting the statement from Ms. Vijayendran to Mr. Chandler

9    to the effect that he should no longer have or should never

10   have children in the classroom alone, that that would not

11   then open the door to Mr. Chandler, or Mr. Madden on behalf

12   of Mr. Chandler, getting in his entire explanation of the

13   activity or what they are going to allege is the test which

14   caused a child to be in the classroom alone.

15           Is that sufficiently clear for both the Court and

16   the record?

17           THE COURT:  Yeah, it is to me.  When she made this

18   comment, should not have -- generally, should not have

19   children in the classroom alone, was there any response to

20   that statement?

21           MS. FILO:  Not that I know of.

22           THE COURT:  Okay.

23           Mr. Madden.

24           MS. FILO:  I guess I should say not that I know of,

25   or not that I would be intending to solicit.  I mean, I'm not

26   attempting in any way to get in some statement that he

27   promised he never would or that he would never do it again.

28   I'm not -- I'm not aware that that was his response.  In

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    541

1    fact, I don't think it was.  And if it were, I would not be

2    attempting to elicit it.

3            THE COURT:  The response as, Okay.  Won't happen

4    again, that type of thing.

5            MS. FILO:  Right.

6            THE COURT:  Well, I'm a little confused now,

7    because you're saying that to your knowledge there was no

8    response to that statement --

9            MS. FILO:  Correct.

10           THE COURT:  -- specifically?  Okay.  All right.

11           Mr. Madden.

12           MR. MADDEN:  First of all, counsel is incorrect on

13   that last point.  There was a give and take in a discussion

14   about that.  I'm not quoting with precision, but I'm

15   paraphrasing on just that subject alone, Mr. Chandler

16   indicated that wasn't fair.  All the teachers do that.  I

17   mean, there was a response and there was a discussion about

18   it.  And when I am making that representation, I have a

19   transcript.  I'm not going to pull out a page and line.  I'm

20   not that quick at this point.  However, there is a record and

21   I was present during Ms. Vijayendran's testimony.

22           Here's my fundamental problem with the People's

23   position.  You can't introduce part of a statement and then

24   argue that everything that -- the defense can't go into it

25   because it goes beyond the scope.  This flies in the face of

26   Evidence Code 356.  It flies in the face of it.

27           I will give the Court some perspective here.  On

28   the day that the complaining witness in Count 2, who is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   542

1    referred to as Becky, she came to school with her mother and

2    there were a number of conversations that morning.  Those

3    conversations included conversations with initially Becky's

4    mother, then Becky, then Becky and her mother, and then I

5    think Becky again, interspersed with calls to Carole Schmitt,

6    the head of Human Resources for the Evergreen School

7    District, directing Ms. Vijayendran how she should proceed.

8              Ultimately was asked to:  All right.  You need to

9    talk to the child.  You need to find out more specifics.  She

10   did make some handwritten notes.  There are other notes that

11   she created at a later time.  There also was a directive from

12   her superior, Carole Schmitt, to talk to Mr. Chandler, to

13   interview him, find out what he has to say about that.  And

14   there were -- that was a relatively lengthy conversation in

15   Ms. Vijayendran's office.

16             At the end of that conversation -- and there was

17   give and take in that conversation.  Mr. Chandler openly

18   discussing exactly what he did on the incident involving

19   Becky, why he did it, what the purpose was.  And it was at

20   the end of that conversation, Ms. Vijayendran did not -- I'm

21   just representing what her testimony was, not her state of

22   mind.  Her testimony was that she did not feel that what Mr.

23   Chandler did was inappropriate in the sense of being sexual.

24   She did not see any sexual connection whatsoever.  She put

25   that it was inappropriate in the sense of putting something

26   in a child's mouth while blindfolded alone, and she thought

27   that that was inappropriate, but she didn't see that as

28   sexual.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   543

1       Part of what she said, she did make some reference

2  to what -- how he should go into the future.  There was a

3  give and take between them about -- because Mr. Chandler

4  clearly told her he had not completed this lesson, that he

5  wanted to continue with it.  That he had been doing it, in

6  effect, since he had been at O.B. Whaley.  It's a really good

7  lesson plan; that it teaches empathy for disabled children,

8  which was essentially the history why he began doing this,

9  and that it was a good lesson.  And there was actual

10  discussion between them, and I'm not going to say it was

11  argument, but Mr. Chandler did not agree with Ms. Vijayendran

12  and all of the advice that she was giving him.

13       In addition to that, he told Ms. Vijayendran that

14  he was going to be giving a lesson plan in the next day or

15  so, and she gave him some guidance.  And Mr. Chandler left

16  that with the understanding of what he was to do, how he was

17  to modify it, and he was going to show that to her a day or

18  two later.  All right.

19       So what I'm saying is, I'm trying to put in context

20  of this a simple statement -- this is what I would refer to

21  cherry-picking of the highest order.  You want to pick at the

22  statement "never be alone with the kid again," and not allow

23  Chandler to talk about the sum and substance of the

24  conversation connected with that give and take flies in the

25  face of Evidence 356.  I should be able to inquire about the

26  entire conversation.

27       THE COURT:  Well, what I see as the relevant point

28  here is you have a principal telling the teacher, "Do not be

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   544

1  alone in the classroom with a student," and the relevance is

2  that this statement was made to the teacher.  And there is

3  evidence that he -- at least according to this witness that

4  said the statement, that appeared to me he heard it, he

5  understood it, or at least heard it.  So everything else I

6  don't think is admissible as to -- pursuant to 356, because

7  having him explain everything doesn't leave the jury with a

8  misleading perception of what occurred.  All it is a comment

9  from the principal saying, "Don't be alone with the

10  students."  We can't look at this in a vacuum because there

11  is going to be a lot of other information presented.

12          When I asked Ms. Filo was there a response, I

13  thought it would be fair to say yes/no.  Just some

14  acknowledgement of the statement to give some meaning.  Since

15  there is no statement specifically to that comment, then

16  there has to be some way, without getting into what

17  specifically was said, that there was at least some

18  acknowledgment that he heard it.  Whether he understands it

19  or agreed with it or was fair or unfair, at least with this

20  witness making that statement, I don't think -- for lack of a

21  better word, I really don't like the term, but opens the door

22  pursuant to 356.  Over Mr. Madden's objection --

23          Yes, go ahead.

24          MR. MADDEN:  I apologize.  Before I get a ruling,

25  Your Honor, I would like to be clear about my position.

26          THE COURT:  Sure.

27          MR. MADDEN:  356 of the Evidence Code states:

28          Where a part of an act, declaration, conversations,

1  or writing is given in evidence by one party, the whole on

2  the same subject may be inquired into by the adverse party.

3  When a letter is read, the answer may be given.

4  When a detached act, declaration, conversation, or writing is

5  given in evidence, any other act, declaration, conversations,

6  or writing which is necessary to make it understood may be

7  given in evidence.

8  So when part of a declaration, which is what she's

9  offering, very small part of this conversation comes in on

10  the same subject -- excuse me.  When part of a declaration --

11  so when a part of a declaration comes in, the whole on the

12  same subject could come in.  All right.

13  I want to cite a case, but I want to make sure I

14  have the right site first, Your Honor.

15  THE COURT:  What's the name?

16  MR. MADDEN:  *People v. Arias*, A-r-i-a-s, is a 1996

17  case, at 13 Cal.4th, page 92.  And this case goes on to state

18  clearly that -- the fact that any of these statements may be

19  self-serving doesn't matter.

20  THE COURT:  I agree.

21  MR. MADDEN:  It's okay under *Arias*.  We're trying

22  to prevent -- *Arias* says:

23  We're trying to prevent the use of *Arias* -- not

24  saying that:

25  We're trying to prevent the use of selected,

26  arguably, and from -- the use of selected, arguably, and

27  inculpatory aspects of the conversation from creating the

28  misleading impression that the only relevant thing Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   546

1   Chandler said was inculpatory.

2           It's -- I believe *Arias* supports our position, and

3   I would -- I just think that any ruling that precludes us

4   from asking Ms. Vijayendran about her conversation with Mr.

5   Chandler flies in the face of 356 and in the face of *Arias*

6   and in light of the People's offer of proof.

7           THE COURT:  I will simply note that, as you said,

8   356 allows further inquiry:

9           One, when it relates to same subject, which is the

10  case here;

11          and two, it is necessary to make the already

12  introduced conversations or statements understood.

13          The purpose -- and I'm citing *People v. Riccardi*,

14  R-i-c-c-a-r-d-i, 54 Cal.4th 758:

15          The purpose of Section 356, rule of completeness is

16  to avoid creating a misleading impression.

17          And for the reasons I stated earlier, the statement

18  is from a principal to a teacher going forward, Do not have

19  student -- or shouldn't have a student in your classroom

20  alone.  And having him explain everything, I don't think

21  leads a misleading impression because the relevance of that

22  statement is just acknowledgement that it was said by the

23  principal.

24          And I appreciate, Mr. Madden, you disagree with the

25  Court's ruling, but, you know, that is the ruling.  And if

26  you ask:  What did Mr. Chandler say in response?  Objection.

27  Hearsay.  I will sustain it.  Obviously, you don't have to

28  make the objection in front of the jury.  This is a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   547

1    continuous objection on your part.

2            MR. MADDEN:  If I understand the Court's ruling, I

3    will not be allowed to even ask her about Mr. Chandler's

4    response to that directive, that alleged directive?

5            THE COURT:  Well, as I understand it, there wasn't

6    a response --

7            MR. MADDEN:  I disagree.

8            THE COURT:  -- acknowledging it.  I mean, what his

9    response was is basically giving a detailed explanation:

10   This is not fair.  Other students do it.

11           MR. MADDEN:  No.  Prior to that, he gave a complete

12   statement on his activities.

13           THE COURT:  Okay.

14           MR. MADDEN:  I believe that this statement by Ms.

15   Vijayendran was at the end of their conversation.

16           THE COURT:  Correct.

17           MR. MADDEN:  In response to that particular

18   directive, there was a disagreement, an expressed

19   disagreement by Mr. Chandler to Ms. Vijayendran on that

20   directive itself.  How could we not be allowed to go into the

21   disagreement itself?

22           THE COURT:  Because the only relevance I see to the

23   statement is that he heard it and he acknowledged it.  This

24   is the principal telling him, "Don't be alone in the

25   classroom with a student going forward."

26           MR. MADDEN:  That isn't what she said.

27           THE COURT:  Well, I thought the statement was --

28           MR. MADDEN:  It's more.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   548

1          THE COURT:  -- you should not have children in the

2     classroom alone.

3          MR. MADDEN:  Blindfolded, putting things in their

4     mouth with the door closed.

5          THE COURT:  Is that the full statement, Ms. Filo?

6          MS. FILO:  Judge, I don't have the advantage of the

7     transcript.  I guess what -- I don't remember that being the

8     statement.  What I remember being the statement was, that he

9     should not have children in his classroom alone.  That in and

10    of itself was violative of the preferred practices at this

11    school.  I think Ms. Vijayendran will testify to that.

12         MR. MADDEN:  I don't believe she's going to testify

13    to it because that was not the preferred practice of the

14    school.  There was no preferred practice, and it's -- if you

15    limit me that way, the jury is getting this simplistic and

16    erroneous factual portrayal of -- to have -- for this to be

17    fair, Chandler needs to be able to ask her more about this

18    conversation.

19         Minimally, like you are saying -- I have to accept

20    the rule about, okay, let's just say -- I understand the

21    Court's ruling.  You can't ask her about the content of the

22    conversation before you get to that subject.  But what I'm

23    saying, at a bear minimum I should be allowed to talk about

24    and ask her questions about the conversation directly

25    connected with that being alone and the details of it,

26    because I'm not sure she even knows the details about it, or

27    will have recollection of it.

28         And, for example, what I just told you is that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   549

1    I'm -- this is a pretty tight paraphrase -- that it wasn't

2    simple edict, that you can't be alone with the children.

3    Again, there was a discussion of what circumstances can you,

4    what circumstances can't you.  There was a give and take on

5    that subject.  Not to allow me to inquire about that is

6    totally unfair and giving part of something without being

7    able to explore the whole of it.  I'm not saying that you

8    have to rule -- well, actually I think I disagree with the

9    Court's ruling, but I respectfully disagree.

10           THE COURT:  Yes.

11           MR. MADDEN:  That boat has sailed so to speak in

12    the ruling standpoint.  But I see very much alive the issue

13    of all communication between Ms. Vijayendran and Mr. Chandler

14    on the subject of being alone from that point forward and

15    under what terms and conditions and who said what to whom on

16    that limited subject.  That seems, to me, to preclude that is

17    preventing Mr. Chandler from his rights under Evidence Code

18    356.  That's clearly relevant.

19           MS. FILO:  I guess I don't understand why it's

20    relevant.  I mean, if a principal tells a teacher, "Don't be

21    alone in a class, don't blindfold kids, don't have the door

22    closed when you have the kids in the classroom," his

23    statement back to her, "But I should be allowed to do that or

24    other teachers" --  I mean, what's the relevance of that?

25           MR. MADDEN:  Because I believe there was a

26    conversation that included further discussion about the terms

27    or conditions in which it would be okay to have children in

28    your class again, including, for example, for tutoring or

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   550

1   whatever.

2             MS. FILO:  But that's not what's at issue.  What's

3   at issue in the case subsequent to that direction and

4   declaration, he had a child in his classroom blindfolded,

5   putting things in her mother.  That's what is relevant.

6             MR. MADDEN:  The specific directive -- I submit to

7   the Court, it's the defense's position based on previous

8   evidence that I read, including the police reports, including

9   the transcript of her testimony at the preliminary

10  examination, is that -- including her written notes.

11            MS. FILO:  She didn't testify at the prelim.  She

12  was --

13            MR. MADDEN:  I misspoke.  At her own trial.  I

14  misspoke.  Thank you for the correction.

15            That she specifically advised him that you're not

16  to have children in your classroom with the doors closed,

17  with the door closed with them blindfolded, putting things in

18  their mouth.

19            MS. FILO:  Fine.  I'm happy to elicit that

20  statement from Ms. Vijayendran:  You are not to have children

21  in your classroom alone with the door closed, blindfolded,

22  putting things in their mouth.  I'm happy to elicit that.

23            MR. MADDEN:  I'm not offering that as her

24  statement.  I will have to fish it out from various sources.

25  I'm not saying that should be the Court's ruling right now,

26  but subject to our research on the content of exactly what

27  was said, and either at her trial or at the police, or her

28  statements to the police, then we could work that out.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   551

1    THE COURT:  Let me say this.  At this point, I feel

2   comfortable ruling that she could say that she told Mr.

3   Chandler he should not have children in the classroom alone.

4   Any response by Mr. Chandler would not be allowed as hearsay.

5   That does not restrict you, Mr. Madden, to ask her, Is this a

6   policy?  Talk about all of this, the basis for her

7   statements.  I mean, if you want to go into it because you

8   are saying that it's okay to have children in the classroom,

9   it's okay to do this, I mean, that's fine if you want to go

10   into her reasons why she told him or he made that statement.

11   I'm assuming that she's going to testify after we get the

12   1360 statement in and the child testifies.

13    Is that correct as far as the order?

14    MS. FILO:  Your Honor, it was my intention to, yes,

15   put in the child's 1360 statement.

16    THE COURT:  So at this stage, that's the Court's

17   ruling, unless I get other information that would suggest to

18   the parties that I should modify it in some way.  This is

19   over Mr. Madden's objection.  It's a continuing objection

20   throughout the trial, and you would not have to object in

21   front of the jury if you choose to.

22    MR. MADDEN:  Just so the Court repeat for me what

23   I'm allowed to do.

24    THE COURT:  Okay.  You can ask any question of her

25   that is relevant, but any question concerning:  What did Mr.

26   Chandler say in response to that, I would sustain an

27   objection as hearsay other than maybe he -- you know, he

28   acknowledged your statement.  Did it appear that he

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   552

1    understood it.  But his actual comments at this point I'm

2    going to be excluding.

3            MR. MADDEN:  I can't ask that question at all, what

4    his response was?

5            THE COURT:  Well, if you ask it, I will sustain the

6    objection, but I'm just giving you a pretrial ruling.

7            MR. MADDEN:  Then am I -- you already indicated I'm

8    precluded from asking her any questions about the

9    conversation between Chandler and her.

10           THE COURT:  Yes.  On this particular question that

11   the People are eliciting, any response to what Mr. Chandler

12   says, I will sustain the objection.

13           MR. MADDEN:  My understanding at this time, subject

14   to changing your mind, but at this time this is the only

15   question that the People intend to ask Ms. Vijayendran?

16           MS. FILO:  No, Your Honor.  We intend to ask Ms.

17   Vijayendran -- I mean --

18           THE COURT:  Well, I'm assuming she's going to

19   testify.  She was at the principal's office.  She talked to

20   some of the students.  I'm assuming there is going to be a

21   lot more.

22           MR. MADDEN:  Maybe I'm missing something.  It's my

23   understanding the People have no intention of asking -- at

24   this time of asking Ms. Vijayendran in this trial anything

25   about Mr. Chandler's statement to her concerning his

26   interaction with Becky.

27           MS. FILO:  Yes.  I want to be abundantly clear,

28   this is why I brought it off the record last time.  The

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    553

1   People do not intend to introduce any statements by Mr.

2   Chandler.  Not his statement to the police, not his statement

3   to Ms. Vijayendran.  If he made any statements to the

4   children, We're going to play a game.  This is about Helen

5   Keller.  We intend to elicit none of that.  And I don't think

6   any of it could be elicited by the defense, so we intend to

7   elicit no statements by Mr. Chandler.  And the only reason I

8   brought this particular issue up was because I understand it

9   was part of a -- at the end of a conversation where Mr.

10  Chandler explained his behavior, and I believe that

11  explanation is hearsay and the People don't intend to elicit

12  it.

13          THE COURT:  Right.  I think it's clear that you are

14  not intending to offer any statements concerning Mr.

15  Chandler.  Okay.

16          MS. FILO:  I want to make sure the defense is

17  precluded from introducing any type of that conversation as

18  well.

19          THE COURT:  Okay.  At this point, I believe we're

20  going to recess until Monday morning at 9.  I will order both

21  lawyers and Mr. Chandler here at 9:00 o'clock.  We'll proceed

22  with opening remarks.

23          And, Ms. Filo, if you need to come in tomorrow or

24  this afternoon to make any arrangements as far as setting up

25  the courtroom, kind of coordinate it with our clerk.

26          We'll go off the record.

27          (Whereupon, the Court recessed.)

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   554

1  STATE OF CALIFORNIA      )
                            )
2  COUNTY OF SANTA CLARA    )

3

4          I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5          The foregoing is a full, true, and correct

6  transcript of the testimony given and proceedings had in the

7  above-entitled action taken on the above-entitled date; that

8  it is a full, true, and correct transcript of the evidence

9  offered and received, acts and statements of the Court, also

10  all objections of counsel, and all matters to which the same

11  relate; that I reported the same in stenotype to the best of

12  my ability, being the duly appointed and official

13  stenographic reporter of said Court, and thereafter had the

14  same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16  237(a)(2) in that all personal juror identifying information

17  has been redacted if applicable.

18

19          Dated:

20

21                      _____

22                           Jamie L. Mixco, C.S.R.
                             Certificate No. 12708
23

24  ATTENTION:
    CALIFORNIA GOVERNMENT CODE
25  SECTION 69954(D) STATES:

26  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
    MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27  A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
    ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28  PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
    PERSON."

# EXHIBIT 3
# (Vol. 8)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   555

1      TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2              SIXTH APPELLATE DISTRICT

3

4                   ---o0o---

5

6   THE PEOPLE OF THE STATE OF      )
    CALIFORNIA,                     )
7                                   )
         Plaintiff - Respondent,    )
8                                   )
         v.                         )      No. C1223754
9                                   )
    CRAIG RICHARD CHANDLER,         )
10                                  )
         Defendant - Appellant.     )
11   _____/

                                       COPY

12

13

14                  VOLUME 8

15               PAGES 555 - 667

16               JULY 15, 2013

17

18                   ---o0o---

19           REPORTER'S TRANSCRIPT ON APPEAL
         FROM THE JUDGMENT OF THE SUPERIOR COURT
20            OF THE STATE OF CALIFORNIA
          IN AND FOR THE COUNTY OF SANTA CLARA
21    BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

22                   ---o0o---

23   APPEARANCES:

24

25   FOR PLAINTIFF-RESPONDENT:      OFFICE OF THE ATTORNEY GENERAL
                                    BY:  KAMALA D. HARRIS,
26                                  Attorney General of the State
                                    of California
27
     FOR DEFENDANT-APPELLANT:       In Propria Persona
28

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   556

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          IN AND FOR THE COUNTY OF SANTA CLARA

3      BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4              DEPARTMENT NO. 37

5

6                ---o0o---

7 THE PEOPLE OF THE
   STATE OF CALIFORNIA,          )

8                       )
            PLAINTIFF,      )

9                       )     CASE NO.  C1223754

10      v.                  )
                      )

11 CRAIG RICHARD CHANDLER,      )
                      )

12                       )
            DEFENDANT.      )

13 _____/

14

15                ---o0o---

16

17        REPORTER'S TRANSCRIPT OF PROCEEDINGS

18

19             JULY 15, 2013

20

21                ---o0o---

22

23

24 APPEARANCES:

25 FOR THE PEOPLE:             ALISON FILO
                          Deputy District Attorney

26

27 FOR THE DEFENDANT:          BRIAN MADDEN
                          Attorney at Law

28 OFFICIAL COURT REPORTER:     JAMIE L. MIXCO
                          C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   557

1

# INDEX

2

## EXAMINATION

3

**Witness Name**                                                          **Page**

4

**LUISANA DOE**

5
   Direct By Ms. Filo   .......................................561
   Cross By Mr. Madden   ...................................574

6
   Re-Direct By Ms. Filo   .................................591
   Re-Cross By Mr. Madden   ................................598

7
   Further Re-Direct Examination By Ms. Filo   ............601

8
**ISABELL DOE**
   Direct By Ms. Filo   ....................................605

9
   Cross By Mr. Madden   ...................................626
   Re-Direct By Ms. Filo   ................................658

10

11

## PEOPLE'S EXHIBITS

12
**Exhibits**      **Description**                                       **Page**
1 Marked     cd of Isabell's interview                             661

13
1-a Marked   Transcript of Isabell's interview                     661

14

## DEFENSE EXHIBITS

15

16
**Exhibits**      **Description**                                       **Page**
B Marked      Isabell's attendance records                         597
A-1 through  photographs                                            626

17
A-13 Marked

18

19

20

21

22

23

24

25

26

27

28

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   558

1    San Jose, California                        July 15, 2013

2                          PROCEEDINGS

3            THE COURT:  Thank you, ladies and gentlemen.  The

4    record will reflect that both counsel are present, Mr.

5    Chandler is present, all members of the jury are present.

6            And at this time, Ms. Filo, are you ready to

7    present opening remarks?

8            MS. FILO:  I am.

9            THE COURT:  You may proceed.

10           MR. MADDEN:  Could we have a few minutes, Your

11   Honor?  My client's family was not aware the doors are open.

12   May I let them in?

13           THE COURT:  Yes.

14           MR. MADDEN:  Thank you.  I apologize, Your Honor.

15           THE COURT:  Thank you.

16           Ms. Filo, when you are ready.

17           MS. FILO:  Thank you, Your Honor.

18           (Whereupon, the People present opening statements.)

19           THE COURT:  Thank you, Ms. Filo.

20           Mr. Madden, do you wish to give opening remarks at

21   this time?

22           MR. MADDEN:  I do.  If I could take --

23           THE COURT:  Okay.  Thank you.  You may proceed

24   whenever you are ready.

25           (Whereupon, the defense presents opening

26   statements.)

27           THE COURT:  Thank you, Mr. Madden.

28           Ladies and gentlemen, we're going to take a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   559

1    ten-minute break.  I'm going to ask the members of the jury

2    to report to the jury assembly room on the second floor and

3    we'll call you back promptly in ten minutes.

4              I'm going to ask the people in the audience, if you

5    would please remain in the courtroom until the jury has

6    exited the courtroom.

7              So all members of the jury, you are excused.

8    Please leave your notes on your chair, any personal

9    belongings.  They will be there when you return.

10             The jury is leaving the courtroom.  For those of

11   you in the courtroom, I want to emphasize the importance of

12   turning your phones off before you come into the courtroom,

13   because if your phone goes off while we're in session, that

14   may result in you being excluded from this trial.

15             So we'll be in recess for ten minutes.

16             (Whereupon, a brief recess was taken.)

17             THE COURT:  Record will reflect the jury is

18   present, both counsel are present, Mr. Chandler's present.

19             Ms. Filo, your first witness.

20             MS. FILO:  Thank you, Your Honor.  The People call

21   Luisana.

22             THE COURT:  Yes.

23             MS. FILO:  Your Honor, may I move this so I have

24   a --

25             MR. MADDEN:  I will do it.  Sorry.

26                       LUISANA DOE,

27             Being called as a witness on behalf of the People,

28   having been first duly sworn, was examined and testified as

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    560

1    follows:

2              THE CLERK:  For the record, ma'am, please state and

3    spell your full name.

4              THE COURT:  Hold on, ma'am.  One minute.

5              First and last name, Ms. Filo?

6              MS. FILO:  Um, Your Honor, may we approach really

7    quickly?

8              THE COURT:  Yes.

9              MR. MADDEN:  I have no objection to not using the

10   last name.

11             MS. FILO:  That will be great, Your Honor.

12             THE COURT:  Okay.

13             Ma'am, what I would like you to do is just state

14   your first name for the record and spell your first name for

15   the record as well.

16             THE WITNESS:  Luisana, L-u-i-s-a-n-a.

17             THE COURT:  Thank you, ma'am.  The lawyers are

18   going to be asking you some questions.  Very important that

19   you wait until they finish the question before you begin your

20   answer, so two people are not speaking at the same time, even

21   if you know what they are going to ask you.  Make every

22   effort to only answer the question that is being asked.  If

23   your question calls for yes or no -- if the question calls

24   for a yes or no response, you need to verbally say yes or no.

25   And if you hear one of the lawyers say objection, don't

26   answer the question.  I will rule and I will let you know if

27   you could answer it or not.  Okay?

28             THE WITNESS:  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   561

1              THE COURT:  Thank you.

2              Direct examination.

3              MS. FILO:  Thank you, Your Honor.  May I approach

4    and get the -- I'm not sure the microphone is on.

5              THE COURT:  Thank you.

6                        DIRECT EXAMINATION

7    BY MS. FILO:

8    Q.   Good morning, Luisana.

9    A.   Good morning.

10   Q.   Are you nervous?

11   A.   Very.

12   Q.   Very nervous.  Tell me what you're nervous about?

13   A.   This whole situation.  I'm pretty nervous.

14   Q.   Okay.  You and I have talked a little bit, and I know

15   you heard me talk to Isabell about the rules of testifying;

16   right?

17   A.   Yes.

18   Q.   What are the rules that I have given both you and

19   Isabell about testifying?

20   A.   You said to say -- rule number one is to always say the

21   truth, and I don't remember.  I just remember that.

22   Q.   Well, that's the most important one anyway.  Okay.

23             Luisana, you remember me saying to try not to talk

24   over each other, so that our fine court reporter could take

25   everyone down?

26   A.   Oh; yes, yes.

27   Q.   You remember me telling you to try to use words, real

28   words?

```
 1   A.   Yes, use real words.

 2   Q.   Like yes or no?

 3   A.   Yes.

 4   Q.   And not um-hum or nah-uh?

 5   A.   Yes.

 6   Q.   Okay.  Other than that, I told you to come in and do

 7   your absolute best to tell the truth?

 8   A.   Yes.

 9   Q.   Okay.  Luisana, how many children do you have?

10   A.   Four.

11   Q.   What are their ages?

12   A.   I have a nine-year-old, a five-year-old, my

13   eight-year-old, and a three-year-old.

14   Q.   Boy, girl, girl, boy?  What you got?

15   A.   I have boy, girl, boy, girl.

16   Q.   Your eight-year-old -- I'm sorry -- your nine-year-old,

17   what is your nine-year-old's name?

18   A.   Anthony.

19   Q.   What is your eight-year-old's name?

20   A.   Isabell.

21   Q.   Your five-year-old?

22   A.   Justin.

23   Q.   Your three-year-old?

24   A.   Giselle.

25   Q.   You are an intact family living together; is that

26   correct?

27   A.   Yes.

28   Q.   I want to talk to you about your second child, Isabell.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   563

1  Tell me about Isabell?

2  A.    Isabell is a very friendly little girl.  She's a smart

3  little girl.  She's approachable.  She's just herself.  A

4  very fun little girl.

5  Q.    What grade will Isabell start this coming school year?

6  A.    What grade?

7  Q.    What grade will she start this year?

8  A.    She's starting her fourth grade.

9  Q.    Fourth grade?

10  A.    Um-hum.

11  Q.    Okay.  So she'll start fourth grade for the 2013/2014

12  school year?

13  A.    Correct.

14  Q.    And for the 2012/2013 school year, she was in third

15  grade?

16  A.    Correct.

17  Q.    And for the 2011/2012 school year, she was in second?

18  A.    Correct.

19  Q.    Okay.  So, Luisana, I want to talk to you about

20  Isabell's second grade year.  That would have been that 2011

21  to 2012 school year.  Okay?

22  A.    Okay.

23  Q.    Where did Isabell attend school that year?

24  A.    O.B. Whaley Elementary.

25  Q.    How long had Isabell been going to O.B. Whaley

26  Elementary when she started her second grade year?

27  A.    When she started?

28  Q.    Right.  So had she gone to kindergarten there?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   564

1  A.    Yes.  She started her kindergarten year there and

2  attended first grade and second grade.

3  Q.    Okay.  So she was used to the campus, she had other

4  friends on campus, things like that?

5  A.    She did.

6  Q.    Who was Isabell's second grade teacher when she began at

7  O.B. Whaley that year?

8  A.    Chandler.

9  Q.    And do you see Craig Chandler in the courtroom today?

10  A.    I do.

11  Q.    Okay.

12        MR. MADDEN:  I will stipulate identification, Your

13  Honor.

14        MS. FILO:  Thank you, Your Honor.

15        THE COURT:  Okay.  Court will -- I mean, record

16  will reflect in-court identification of Mr. Chandler.

17        MS. FILO:  Thank you.

18  BY MS. FILO:

19  Q.    Can you tell me what Isabell's attitude had been about

20  school during her kindergarten, first grade, beginning of

21  second grade?  What was her attitude about school?

22  A.    She was looking forward to it every single day.  Every

23  single day she was ready to go.  Woke up with a smile every

24  day.  There -- she was always ready, always ready to be there

25  and learn and ready to notice stuff.  One happy person.

26  Q.    All right.  So she wasn't the kid who was constantly

27  trying to get out of school or trying to figure out how to

28  stay home for the day, anything like that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   565

1    A.   No, never.

2    Q.   Okay.  Luisana, was there a point at which you saw

3    Isabell's attitude towards school change a little bit?

4    A.   I did.

5    Q.   Do you know when that was?

6    A.   It started before they went to break.  That's when she

7    was more, like, happy she was going to have a break.  So

8    that's when it didn't -- that's when -- before the school

9    break, during that -- almost towards the end of the school,

10   the year -- I apologize.  That's when I started noticing that

11   she was just feeling not so good.

12   Q.   Okay.  And, Luisana, when you are talking about the

13   break, we're talking -- you're talking about the winter sort

14   of holiday break; is that right?

15   A.   Yes, the winter break.

16   Q.   And that's usually what?  Two, two and a half weeks in

17   the December/January time frame?

18   A.   It's about two weeks.

19   Q.   And it usually spans kind of Christmas and New Year's,

20   then the kids come back to school sometime in January?

21   A.   Yes.

22   Q.   Okay.  So it was just prior to that winter break you

23   said?

24   A.   Yes.

25   Q.   Was it a dramatic change or was it --

26   A.   No.  No, it wasn't dramatic.

27   Q.   Okay.  But it was noticeable?

28   A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   566

1  Q.   So you had your winter break with your family?

2  A.   Yes.

3  Q.   Anything traumatic occur during that winter break?

4  A.   No, no.

5  Q.   Happy family time over that break from school?

6  A.   Yes, that was it.  We -- nothing out of the ordinary.

7  Everything was normal.

8  Q.   Isabell returned to school after that break?

9  A.   Yes.

10  Q.   What was her attitude about going to school that morning

11  she had to wake up and go back to school after the winter

12  break?

13  A.   She was more like dragging herself.  Although she did

14  get up, she did go to school, but it was more like a slower

15  type of getting ready.  She was -- usually she's quick, up

16  and ready, will eat breakfast, and she was ready to go.  And

17  it was just taking her longer than usual.

18  Q.   And what about over the next few days?  What was

19  Isabell's attitude about going to school over those next few

20  days?

21  A.   She didn't want to go.

22  Q.   What was she saying to you?

23  A.   She was telling me that she wasn't feeling good.  She

24  felt sick.

25  Q.   Did she go to school anyway?

26  A.   She did.

27  Q.   Luisana, I want to ask you about Monday morning, January

28  9, 2012.  That morning, tell me how you got ready and what

1    the kids were doing that morning?

2    A.    That morning, we got up.  I got up as usual.  I went to

3    wake up my daughter, my kids, and time for them to get ready.

4    She was still -- Isabell was complaining that she was still

5    feeling sick, but I said:  Come on, mamas, it's okay.  Get

6    ready.  You might get better over there.  If you feel sick,

7    go to the nurse's room and you could call me.  Anthony got

8    ready as well, and --

9    Q.    Luisana, do you normally walk your children to school?

10   A.    I do.

11   Q.    And at that time, the distance between your house and

12   O.B. Whaley was how far?

13   A.    I would say about 300 feet.  I don't know.

14   Q.    Not very far?

15   A.    No.

16   Q.    Okay.  So that morning, Isabell did get ready for school

17   eventually?

18   A.    Yes, she did.

19   Q.    Did you make it to school --

20   A.    We did not.

21   Q.    -- with her?  On your normal walk, did you make it to

22   school?

23   A.    No.

24   Q.    Why not?  What happened?

25   A.    Well, that day, we stepped out of the door and that's

26   when Isabell pulled me back and she said that she didn't want

27   to go to school.  And it was that look, that look in her face

28   that I knew something was wrong, and she pulled me back.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   568

1   We're holding hands and she pulled me back:  Mom, I don't

2   want to go to school.  I said:  What's wrong?  She said:

3   Because, mom, I just don't.  And that's when I asked her why.

4   And that's when she said:  Because Mr. Chandler's doing stuff

5   to me.

6   Q.   What did you do, or what did you say when Isabell told

7   you:  Mr. Chandler is doing stuff to me?

8   A.   I said:  What?  And I quickly went back in the house and

9   I sat her on the couch and I was on -- I was kneeling on the

10   floor, and I said:  What happened?  Who -- what do you mean?

11   Tell me why are you saying this?  And she started crying.

12   Well, more she started crying and she was explaining to me

13   what was going on.

14   Q.   What did Isabell explain to you?  When you said:

15   Isabell, you need to tell me what happened.  What is it that

16   happened?  What did she say?

17   A.   She said that Mr. Chandler was putting something in her

18   mouth.

19   Q.   Did she describe what it was that he was putting in her

20   mouth?

21   A.   I asked her:  What was it?  What did you feel, or did it

22   taste like anything?  And she told me that it was round and

23   she just said that she gags.

24   Q.   Did she -- what were you like as she was describing this

25   to you?

26   A.   Going crazy, yelling.

27   Q.   Why were you going crazy?  Why were you yelling?

28   A.   She's my baby girl.  Because as an adult, I already -- I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   569

1   already pictured, and she has no idea.  It was too much.

2   Maybe I shouldn't have reacted the way I did in front of her.

3   Now it's just -- I think it's just a mom's instinct, your

4   reaction.

5   Q.   I want to be clear, Luisana, you said from the moment

6   you looked at Isabell before she said one word, you knew

7   something was wrong?

8   A.   I did.

9   Q.   You said that Isabell told you that the thing was round

10  and it made her gag?

11  A.   Um-hum.  I asked her.

12  Q.   Did she say anything else about what was in her mouth?

13  A.   I don't remember.

14  Q.   Okay.  Did she tell you how long ago this had happened?

15  A.   I asked her how long that it had been, and she didn't

16  know how to give me a date.  Well, she didn't -- she just

17  said -- I asked her if it was before break, and she said yes.

18  Q.   Okay.  Now, what is Isabell's birthday?

19  A.   November 11th, 2003.

20  Q.   So at the time that Isabell is giving this information

21  to you, she's just two months -- not even quite two months

22  past her 7th birthday?

23  A.   Yes.

24  Q.   What did you do with this information that you received

25  from Isabell?  What do you do next?

26  A.   I just -- I got in my truck and I drove to school.

27  Q.   Did you leave the children at home?

28  A.   I did.  Um-hum.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    570

1    Q.    Okay.  You drove to school and what did you do when you

2    got to the school?

3    A.    I was yelling like crazy, and the principal was there.

4    I was just yelling and crying, and that's when I was talking

5    to the principal.

6    Q.    Okay.  Was that Ms. Peery?

7    A.    Yes, Ms. Peery.  I think that's her name.

8    Q.    Okay.  Did Ms. Peery say anything to you that caused you

9    immediate alarm?

10   A.    Oh, yes.

11   Q.    What did she say?

12   A.    Because I -- soon as I told her:  What the "F" is Mr.

13   Chandler doing to my daughter?  She said:  What do you mean?

14   And I said:  Yes, my daughter's telling me that he did this,

15   this, and that.  She said:  Oh, my God.  Not again.  So that

16   gave me -- that immediately let me know that it had happened

17   before.  And so I thought it was -- within that moment, I

18   said:  What did you mean not again?  Like -- and she just

19   said that she just had a meeting with some parents with the

20   same situation and they had resolved it and they had talked

21   about it.  And I just said:  No, I don't believe it.  No, no.

22   This isn't happening.

23   Q.    Luisana, you said that Isabell described it being round

24   and it kind of gagging to her.  Did she tell you anything

25   more about -- let me ask you this.

26          Was she able to see what Mr. Chandler was putting

27   in her mouth?

28   A.    No.  I asked.

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    571

1   Q.   Why not?  Did she tell you why she couldn't see things?

2   A.   She said that he would blindfold her.

3   Q.   Did she tell you whether or not this was happening

4   when -- during the day?  Like, what were the circumstances

5   surrounding this?

6   A.   During recess.

7   Q.   Did she indicate that the whole class was involved in

8   this?

9   A.   No.

10  Q.   Did she tell you that she was alone with Mr. Chandler?

11  A.   Yes.

12  Q.   So she told you she was alone blindfolded when a round

13  object was put in her mouth that caused her to gag?

14  A.   Yes.

15  Q.   Do you have any doubt in your mind what Isabell was

16  communicating to you?

17  A.   No.

18  Q.   What did you do after you left the school?

19  A.   I went back home.  And because they asked me if I could

20  take Isabell back so that she could go and say what she had

21  told me, I said yes.  So I took her.  I called my sister to

22  see if she could come and watch my kids and I told her what

23  was going on and she came right away.  I went back to the

24  school with Isabell and we sat down in the office area and

25  Isabell was telling them what was happening.

26  Q.   Did she largely repeat to Ms. Peery what she had already

27  told you?

28  A.   The same thing.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   572

1   Q.   Luisana, since that time, Isabell has been -- you have

2   been interviewed by law enforcement?

3   A.   Just when everything was happening.

4   Q.   You were interviewed that kind of first day when the

5   police were ultimately --

6   A.   Um-hum.

7   Q.   Who called the police?

8   A.   I did.

9   Q.   Why?

10  A.   Because I felt I had to.  I felt that -- I mean,

11  obviously, the principal didn't do anything and that's her

12  job.  And somebody had to do it.  I mean, me as a mother,

13  it's my responsibility to watch over her, regardless if the

14  principal decides to call or not.  I mean,  --

15  Q.   So you were interviewed by law enforcement.  Did law

16  enforcement come out and interview Isabell?  They come out

17  that day in uniform and interview her briefly?

18  A.   Yes, um-hum.

19  Q.   And then you brought her down to the -- did you bring

20  her down someplace else to be interviewed by law enforcement?

21  A.   Yes.

22  Q.   In the Bank of America building, kind of not very far

23  from here?

24  A.   Yes, it's not far from here.

25  Q.   Okay.  Isabell has had to come to testify at a

26  preliminary hearing?  Yes?

27  A.   I'm sorry.

28  Q.   That's okay.  She had to come and testify at a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   573

1   preliminary hearing?

2   A.   Yes.

3   Q.   And she's being called to testify here in this

4   proceeding?

5   A.   Yes.

6   Q.   Luisana, what has this done, this entire situation done

7   to your family?

8   A.   Oh, it's changed so much.  How we live.  It's affected

9   my children, my oldest son, my marriage.  It has affected my

10  daughter tremendously, our way of -- my way of thinking.  My

11  prospective of seeing things that happen are gone at the

12  moment, and it's very hard.  It's very difficult to deal

13  with.

14  Q.   Luisana, if you had the opportunity to turn back the

15  clock and have Isabell in an entirely different school with

16  an entirely different teacher, is there -- how long would it

17  take you to make that decision?  Would you turn back the

18  clock and do it and have her be in someone else's class with

19  some other school?

20  A.   With the same situation, you mean?

21  Q.   No.  I mean, if you could start all of this over, I

22  mean, if you had the opportunity to just never have had this

23  happen in your life, would that be your choice?

24  A.   I prefer it never ever happening.  I thank God it

25  happened in the way just because it won't affect anybody

26  else.  And if it had to happen like this and it -- I had to

27  do the call, it's okay.  But just to know that it may not

28  happen ever again, it pleases me.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   574

1    Q.   Thank you, Luisana.

2              MS. FILO:  I have nothing further.

3              THE COURT:  Thank you, Ms. Filo.

4              Cross-examination, Mr. Madden?

5              MR. MADDEN:  Thank you, Your Honor.  Would this be

6    an acceptable place to do the cross-examination, Your Honor?

7              THE COURT:  Yes.

8                        CROSS-EXAMINATION

9    BY MR. MADDEN:

10   Q.   Luisana, let me first apologize for calling you by your

11   first name.  I hope you're okay with that?

12   A.   I'm fine.  Thank you.

13   Q.   We have never met; correct?

14   A.   No.

15   Q.   All right.  So I'm going to ask you some questions.  I

16   want you to do the best you can to answer them.  It's clear

17   to me that you have been very emotional about this and your

18   life since basically January the 9th of 2012; right?

19   A.   Correct.

20   Q.   Okay.  Now, I'm going to ask you to do me a favor, if

21   you can.  Do your best to speak up.  You have kind of a soft

22   voice, and I know that it might be difficult.  If I can't

23   hear you, because I have old ears, I may ask you to speak up

24   a little bit.  I'm not trying to be mean.  I want to make

25   sure I understand what you are saying.  Okay?

26   A.   Sure.

27   Q.   Also, if you need a break, let the Court know, and this

28   isn't going to be a marathon session.  I just want you to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   575

1   answer the questions as best you can.  Okay?

2   A.   Yes.

3   Q.   All right.  If I ask a question and you don't understand

4   it, please tell me that you don't understand and I'll re-word

5   the question, if I can, so that you could understand it.

6   Okay?

7   A.   Okay.

8   Q.   I will assume that if you answer my question, you

9   understood the question.  Okay?

10  A.   Okay.

11  Q.   Unless you tell me otherwise.

12  A.   Okay.

13  Q.   All right.  Now -- so you live very close to O.B. Whaley

14  School; correct?

15  A.   I lived, yes.

16  Q.   All right.  And the year that your daughter was with

17  Ms. Chandler -- Mr. Chandler, that is the only year that he

18  was her teacher; correct?

19  A.   Yes.

20  Q.   Okay.  She was in the second grade then; right?

21  A.   Yes.

22  Q.   Okay.  And did you understand that to be a combo class?

23  A.   Yes.

24  Q.   Meaning, half second-graders and half third-graders;

25  correct?

26  A.   Yes.

27  Q.   All right.  Did you walk all of your children to school

28  every day?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   576

1    A.    Yes.  Most of the time, when it wasn't raining.

2    Q.    Okay.  I'm not going to pin you down on exact things.  I

3    wouldn't expect you to remember that.  But your normal

4    routine would be at that time to have walked your children to

5    school, and how many kids were at O.B. Whaley then?

6    A.    At that time, two.  Yeah, just my older son and Isabell.

7    Q.    Okay.  How old was he at the time Isabell was in Mr.

8    Chandler's class?

9    A.    Seven.

10   Q.    What grade was he in?  Second grade?

11   A.    Second grade.

12   Q.    Okay.  Now, you were an active parent; correct?  An

13   active school parent?

14   A.    Yes.

15   Q.    You walked your children to school?

16   A.    I did.

17   Q.    You attended school functions?

18   A.    When they had special occasions, like celebrations and

19   talent shows and stuff, yes.

20   Q.    Give me an example of celebrations.

21   A.    The talent shows, awards.

22   Q.    Okay.  How about back-to-school night?

23   A.    Never miss one.

24   Q.    All right.  Then how about -- was there another time

25   when parents would meet to go over progress reports for how

26   the kids were doing?

27   A.    I believe we did.

28   Q.    Okay.  I'm not going to hold you to it.  If you don't

1    remember, that's okay.  Do you know approximately what time

2    of the school year the events that you just described

3    happened, assuming they all happened between August and

4    January, the 9th?

5    A.    Um, the last show, it was a talent show, and I'm not too

6    sure if it was November, October.  I'm not quite sure.

7    Q.    In the Halloween/Thanksgiving area?

8    A.    Around that area.

9    Q.    That would have been kind of a big thing?

10   A.    Yes.

11   Q.    Okay.  Children perform in the auditorium, that kind of

12   thing?

13   A.    Yes.

14   Q.    Isabell participated in something at the talent show?

15   A.    With her class.

16   Q.    Okay.  The whole class?  It was in -- is that Mr.

17   Chandler's class?

18   A.    Yes.

19   Q.    Okay.  Did you talk with Mr. Chandler at any time about

20   Isabell and her performance in the class and whether or not

21   she could maybe have an individual performance the next time

22   they had one?

23   A.    No.

24   Q.    You don't remember that?

25   A.    No.

26   Q.    When you say you don't remember something, I want to

27   make sure I understand.  One interpretation of the response

28   "I don't remember" means:  Maybe I did, maybe I didn't.  I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    578

1    just don't remember?

2    A.    No.  Was your question:  Did Mr. Chandler talk to you

3    about Isabell participating alone?

4    Q.    Actually -- I'm sorry.  I cut you off.  Finish.

5    A.    I understood your question was:  Did Mr. Chandler ask

6    you if Isabell could do a participation on her own?

7    Q.    If I asked that, I asked the wrong question.  What I

8    meant to ask you was, did you ever approach Mr. Chandler

9    after the talent show and discuss with him your desire to

10   have your daughter perform in an individual -- as an

11   individual participant in the next talent show?

12   A.    I don't remember that.

13   Q.    Okay.  Fair enough.

14          Now, as a busy mother and with four children, you

15   were and are busy; right?

16   A.    Very busy.

17   Q.    Very.  Did Isabell have any attendance problems?  When I

18   say attendance problems, did she have any trouble getting to

19   school on time in the mornings?

20   A.    No.

21   Q.    Did she have any history of being tardy?

22   A.    I don't remember her being tardy.  Maybe.  I don't

23   remember that.

24   Q.    Okay.  You went to the back to -- back-to-school night

25   at the beginning of the school year; right?  The year that

26   Isabell was in Mr. Chandler's class?

27   A.    Yes.

28   Q.    All right.  And I assume that he laid out for you and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   579

1   the other parents what his rules and expectations were?

2   A.   Um --

3   Q.   Concerning attendance?

4   A.   I don't remember exactly, but he mentioned at the

5   beginning.

6   Q.   All right.  Did you -- strike that.

7            Were you aware of the four different groups of

8   students within Mr. Chandler's class?

9   A.   No.

10  Q.   All right.  Were you aware that the third-graders were

11  separated from the second-graders and they were on the other

12  sides of the classroom?

13  A.   I don't know how he had it structured.  I just know that

14  it was a combined class.

15  Q.   Okay.  But you don't really -- the details that I'm just

16  suggesting here, you don't remember.  I'm not saying you

17  should.

18  A.   He never mentioned it to parents that second-graders

19  were here, third-graders -- is that what you are saying,

20  or --

21  Q.   I'm just asking you to give me information, if you

22  remember?

23  A.   No.

24  Q.   Okay.  Do you recall your daughter Isabell ever talking

25  about suffering consequences as a result of being tardy?

26  A.   No.

27  Q.   Did she ever discuss with you the loss of points for her

28  group --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   580

1    A.    No.

2    Q.    -- if she was tardy?

3    A.    No.

4    Q.    You didn't know anything about the point system?

5    A.    She never mentioned anything to me.

6    Q.    Did Isabell have any difficulty, or did she ever have a

7    tendency to forget to do either her entire homework or parts

8    of her homework?

9    A.    She always had her homework done.

10   Q.    Okay.  You're not aware of her losing any points because

11   of not having her homework turned in?

12   A.    She always turned her homework in.

13   Q.    Okay.  All right.

14         How many times, then, would you -- how many times

15   do you remember meeting Mr. Chandler and talking with him

16   about your daughter from August of that year until January,

17   the 9th?

18   A.    Maybe twice.  I don't --

19   Q.    Do you recall speaking with him at the progress report

20   meeting?

21   A.    Yes.

22   Q.    That would have been, I assume, during the evening?

23   A.    Yes.

24   Q.    Or perhaps late afternoon?

25   A.    Perhaps.

26   Q.    Okay.  And do you recall him telling you that it was

27   important that Isabell be on time and important that she do

28   her homework?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    581

1              MS. FILO:  Objection, Your Honor.  Hearsay.

2              THE COURT:  Any response, Mr. Chandler -- I'm

3    sorry -- Mr. Madden?  I apologize.

4              MR. MADDEN:  I'm so rattled I lost the question,

5    Your Honor.

6              THE COURT:  You're asking her if she recalls

7    certain statements Mr. Chandler made to her, and there was a

8    hearsay objection.

9              MR. MADDEN:  Let me ask the question this way.

10             THE COURT:  Objection is sustained.

11   BY MR. MADDEN:

12   Q.   Does that help you remember whether or not you had any

13   discussion with Mr. Chandler concerning how important it was

14   for Isabell to be on time?

15             MS. FILO:  Objection.  Hearsay.

16             THE COURT:  Sustained.

17   BY MR. MADDEN:

18   Q.   All right.  Let me get to the day that you testified to

19   I think that you just broke.  Okay?

20   A.   Um-hum.

21   Q.   I know that this is the most painful day, but you'll

22   forgive me if I have to ask you questions about this.  Okay?

23   A.   Yes.

24   Q.   All right.  So I want to make sure I understand this.

25   You really had a limited amount of information from your

26   daughter when you broke; correct?

27   A.   Well, after she told me what was being done to her.

28   Q.   Well, she actually didn't know what was being done to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    582

1  her; right?

2  A.    She -- she doesn't know.

3  Q.    Okay.  Fair enough.  So -- but in your mind, you did

4  know?

5  A.    Of course.

6  Q.    Okay.  And that's what caused you to break?  You knew

7  what she didn't know?

8  A.    From what she explained, I knew.

9  Q.    I understand.  You formed an opinion based on the

10  limited information that she gave you; correct?  And the

11  opinion was Mr. Chandler had put his penis in your daughter's

12  mouth?

13  A.    Yes.

14  Q.    All right.  Now, the information you had at that point

15  from your daughter, I'm going to give you a list here.  Let

16  me know if this is complete.  First of all, she didn't want

17  to go to school that day?

18  A.    Um-hum.

19  Q.    Correct?

20  A.    Yes.

21  Q.    You started to go to school, she held you back

22  physically, and she was upset; correct?

23  A.    Yes.

24  Q.    All right.  Then she said:  Mr. Chandler, he's doing

25  something to me; correct?

26  A.    Yes.

27  Q.    All right.  And that's when you essentially said:  What?

28  A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   583

1    Q.    So right then, you had a daughter that appeared to be

2    upset, saying he's done something to me, and you were

3    essentially at that point on high alert?

4    A.    Yes.

5    Q.    Okay.   Then you went back into your house, you sat her

6    on the couch, and you kneeled down in front of her?

7    A.    Yes.

8    Q.    Had you ever done that before, to ask her to have a

9    conversation with her?

10   A.    No.

11   Q.    All right.   At that time, were you crying?

12   A.    No.

13   Q.    Okay.   But then she told you:   He covers my eyes and he

14   puts something in my mouth; correct?

15   A.    Yes.

16   Q.    And that's when you broke?

17   A.    I think my voice went louder.

18   Q.    Okay.   But at this point she was upset, she had said

19   he'd done something to her, and now it's getting worse:   He

20   put something in my mouth?

21   A.    Um-hum.

22   Q.    Correct?

23   A.    Yes.

24   Q.    And covered my eyes?

25   A.    Yes.

26   Q.    At that point you had heard enough.   You knew what had

27   happened?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   584

1    Q.    Okay.   Then you asked her other questions.   You asked

2    her a question:   Is it like something hard; correct?

3    A.    Yes.

4    Q.    And she said:   Uh, kind of; right?

5    A.    Yes.

6    Q.    You asked:   Is it liquid?   And she said no; correct?

7    A.    Yes.

8    Q.    You asked her if it was candy, and she said no; correct.

9    A.    Yes.

10   Q.    You asked her if it was a pill, and she said no;

11   correct?

12   A.    I don't -- I don't remember asking if it was a pill.

13   Q.    All right.   Do you remember talking to a uniformed

14   police officer at your house later in the morning of January

15   9th after you called the police?

16   A.    Yes.

17   Q.    Now, I'm assuming he was a patrol officer wearing a San

18   Jose Police Department uniform?

19   A.    Yes.

20   Q.    I believe that he arrived with another member of the San

21   Jose Police Department and they interviewed Isabell upstairs

22   in her room.   Would that be correct?

23   A.    Yes.

24   Q.    All right.   Were you there for that?

25   A.    Not when they were interviewing her.

26   Q.    Okay.   But you had a conversation with them before they

27   interviewed her, telling them what Isabell had told you that

28   morning?

```
 1   A.    Um, they took me on the side and they took Isabell to
 2   the top.
 3   Q.    Okay.  But at some point you told the uniformed police
 4   officers what Isabell had told you?
 5   A.    Yes.
 6   Q.    And you told them that before they interviewed Isabell;
 7   correct?
 8   A.    Um, I think we were interviewed at the same time in
 9   different --
10   Q.    Fair enough.  You also asked her if he touched her
11   anywhere; right?
12   A.    Yes.
13   Q.    And, I assume, you pointed to her vaginal area, perhaps
14   her buttocks area, perhaps her breast area; correct?
15   A.    I pointed to private parts.
16   Q.    Does that mean her vaginal area?
17   A.    Yes.
18   Q.    Okay.  And that's typically what children would call
19   that; correct?  Private parts?
20   A.    Yes.
21   Q.    That's how she referred to them around the house?
22   A.    Yes.
23   Q.    Okay.  She said no; correct?
24   A.    She said -- she said no.  Yeah, she said no.
25   Q.    Okay.  And you asked her what her hands did; correct?
26   A.    I did.  I didn't ask her where your hands were.  I said:
27   What would you do?  What were you doing at that moment?
28   Q.    Exactly.  And she said nothing; correct?
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   586

1    A.    Yes.

2    Q.    All right.  So you were essentially asking her the

3    question about liquid, trying to form an opinion as to

4    whether or not Mr. Chandler ejaculated into her mouth or on

5    her; correct?

6    A.    Repeat your question, please.

7    Q.    Yes.  The reason that you asked about liquid was because

8    you thought Mr. Chandler had put his penis in her mouth and

9    you wanted to know if anything came out of it; correct?

10   A.    Yes.

11   Q.    She said no; right?

12   A.    She said -- she said no.

13   Q.    Okay.  You asked her what he said to her or told her

14   while he was doing this; right?

15   A.    Yes.

16   Q.    And she told you, that is, Isabell told you:  He tells

17   me to move my tongue; correct?

18   A.    Yes.

19   Q.    All right.  When you were answering Ms. Filo's questions

20   earlier, you volunteered something that I want to ask you

21   about.  And you said -- referring to, I think, the fact that

22   you broke:  Maybe I shouldn't have reacted as I did in front

23   of her.  That's what I wrote down.  You remember saying that?

24   A.    Yes.

25   Q.    Okay.  Could you tell me what you meant by that?

26   A.    I don't like to alarm her when situations -- or when

27   this situation that has happened.  She -- she's very quick at

28   sensing when something is wrong.

1    Q.    Yes.

2    A.    That's why I said I shouldn't have reacted the way I did

3    because she knows now something bad happened.

4    Q.    Because of the way that you reacted?

5    A.    It --

6    Q.    Please understand, I'm not blaming you.  No one is

7    blaming you and you shouldn't blame yourself.

8            Let me ask you this.  Would it be a fair guess on

9    my part that that was the first time in her life that she had

10   ever seen you in that state?

11   A.    Yes.

12   Q.    Totally emotional, angry, deathly afraid, deeply, deeply

13   concerned for your daughter's safety?

14   A.    She seen it.

15   Q.    I'm sorry?

16   A.    Yes.

17   Q.    Okay.  Now, that must have -- and I think that's what

18   you are referring to -- that must have scared her to death;

19   correct?

20            MS. FILO:  Objection, Your Honor.  Calls for

21   speculation.

22   BY MR. MADDEN:

23   Q.    Did she appear to be scared?

24   A.    Since the beginning, yes.  She was very nervous telling

25   me what was going on.  She was -- she was scared.

26   Q.    Right.  Okay.  Did you -- you asked your daughter

27   whether or not he made any noises while he was doing this;

28   correct?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   588

1    A.    Yes.

2    Q.    Would it be a correct assumption on my part that you

3    asked her about the word "noises" because in your own mind,

4    having concluded that he had put his penis in her mouth, you

5    wanted to know if there were any sounds or noises that she

6    could describe that were consistent with male sexual

7    activity?

8    A.    I asked her what was -- did he say anything?  Was he

9    saying anything to maybe conclude what was in my mind.

10   Q.    And she said he didn't say anything; correct?

11   A.    She just said that he would say:  Isabell, move your

12   tongue around.  Move your tongue around, Isabell.

13   Q.    All right.  However, other than those words, you

14   specifically asked if he was making any other noises;

15   correct?

16   A.    I don't --

17   Q.    Do you recall advising Officer Koenig that she wasn't

18   making -- that your daughter told you that Mr. Chandler was

19   not making any noises during this?

20   A.    I don't remember any, yeah.

21   Q.    Okay.  When she described the object as the object in

22   her mouth as round; correct?

23   A.    I believe so.

24   Q.    I'm sorry, you have to speak up.

25   A.    I believe so.

26   Q.    Okay.

27            MR. MADDEN:  Excuse me, Your Honor.

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   589

1   BY MR. MADDEN:

2   Q.   You testified earlier that you believe your daughter

3   said she gagged?

4   A.   She didn't say "I gagged."  I asked her:  Did you gag?

5   Did it -- did you kind of choke?  Did you feel like you were

6   choking, and she said yes.

7   Q.   Did you ever tell a police officer in response to that

8   question no?

9   A.   I don't remember.

10  Q.   All right.  Do you recall talking to Officer Pierce?

11  A.   Yes.

12  Q.   You recall talking to him about the subject of your --

13  whether or not your daughter said she had choked?  You don't

14  remember?

15  A.   I don't remember.

16  Q.   Okay.  You don't recall telling him no?

17  A.   I don't remember.

18  Q.   Okay.  In terms of how your daughter reacted after she

19  saw that you had broken, I assume you were on your knees in

20  front of her; correct?

21  A.   I was.  After she told me what had happened, I stood up

22  and I was just holding my head.

23  Q.   All right.  What do you remember your daughter's

24  reaction being after you broke in front of her?

25  A.   She was crying.

26  Q.   A lot harder than she was before; correct?

27  A.   The same as always.

28  Q.   Same as always.  Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   590

1    Do you recall asking your daughter after Mr.

2  Chandler put the object in her mouth, whether or not he said

3  anything to her?

4    MS. FILO:  Objection, Your Honor.  Asked and

5  answered.

6    MR. MADDEN:  I don't believe that question has been

7  asked, Your Honor.

8    THE COURT:  Although I believe it has been asked

9  and she answered it, I will allow you to do it one last time.

10    You may answer the question, ma'am.

11    THE WITNESS:  Could you repeat the question,

12  please?

13  BY MR. MADDEN:

14  Q.   Probably not, but I will try to rephrase it.

15    I'm not asking questions about what Mr. Chandler

16  said while the object was in your daughter's mouth, but after

17  he had taken the object out of her mouth.  Did he give her --

18  did she say that he gave her any instructions or said

19  anything about what you should do or not do?

20  A.   I don't remember that.

21  Q.   Okay.

22    MR. MADDEN:  I have no further questions at this

23  time, Your Honor.  I think I may be done, but I would like

24  this witness subject to recall.

25    THE COURT:  Ms. Filo, you have redirect?

26    MS. FILO:  I do.

27    THE COURT:  Okay.  Lengthy or brief?

28    MS. FILO:  I hope brief.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   591

1          THE COURT:  Okay.  We'll see.

2                  REDIRECT EXAMINATION

3    BY MS. FILO:

4    Q.   Luisana, were you ever notified by the school that

5    Isabell was chronically tardy?

6    A.   I don't -- don't think she was chronically tardy.

7    Q.   I mean, you know, I took my kid to Disneyland and I got

8    this huge note we were all going to be suspended, like, one

9    day.  They give you these huge notes.  I mean, were you ever

10   notified by the school there was some huge problem about

11   tardies?

12   A.   I know there was always a huge -- yes, I do.  There was

13   always a huge problem now that I remember.  Even if they were

14   one minute late, they would be marked tardy.  I mean -- and

15   that's how it was.

16   Q.   But what you mean is, I think what I'm hearing you say

17   is, that it was a big issue with the school that tardies were

18   taken seriously.  But what I'm asking is, did you ever get a

19   letter sent home that said your daughter Isabell is tardy all

20   of the time?

21   A.   I don't remember.

22   Q.   Okay.  And I mean, attendance records are taken?

23   A.   Yes.

24   Q.   Would you defer to the attendance records as to how

25   often Isabell was tardy?

26   A.   Whatever they have.  I can't go back and remember if

27   that's how many times that she was tardy or not.

28   Q.   Okay.  So if I said to you that she was tardy six times

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   592

1   over a four-month period, would that seem about right to you?

2   A.   I wouldn't know what to say.

3   Q.   Okay.

4   A.   Maybe.  I don't know.

5   Q.   I guess what I want to get at, were you ever called into

6   the principal's office and said:  Luisana, you got to get

7   your kid to school on time?

8   A.   No.

9   Q.   Did you get certified letters in the mail that said you

10   got to get your kid to school on time?

11   A.   I don't remember that, no.

12   Q.   Okay.  And were you notified of homework problems

13   that -- I mean, you say that Isabell got her school work in.

14   She had her homework done?

15   A.   She always did.  She always did.

16   Q.   So did you ever get a note from Mr. Chandler that said:

17   Hey, by the way, Isabell got these big problems not getting

18   her homework done?

19   A.   Oh, no.  Never.

20   Q.   You weren't notified by e-mail there was any problems

21   with school work?

22   A.   No, never.  No.

23   Q.   You had no reason to believe that there was anything

24   wrong --

25   A.   No.

26   Q.   -- with Isabell's work?

27   A.   No, never.

28   Q.   Did you ever get a notice from Mr. Chandler that said:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   593

1    Hey, by the way, we're going to do this new program at

2    school, and just want to let you know I'm going to be

3    blindfolding the kids and I'm going to put some food in their

4    mouth?

5    A.    No.

6    Q.    Were you given the opportunity to tell Mr. Chandler:

7    Hey, by the way, my kid is allergic to nuts?

8    A.    No.

9    Q.    You had no idea that this was going on?

10   A.    No, not a clue.

11   Q.    Okay.  When you were asking Isabell about these various

12   things, you said:  Is it food?  Was it candy?  Was -- you

13   went through a list of things; right?

14   A.    Yes.

15   Q.    Why?

16   A.    To not assume before because I didn't want to assume.  I

17   needed to make sure it's not what I was thinking.

18   Q.    Okay.  So you went through some questions:  It wasn't

19   candy; right?

20   A.    Yes.

21   Q.    Wasn't chocolate?

22   A.    Um-hum.

23   Q.    It didn't have a smell?

24   A.    Yes.

25   Q.    I mean, you went through some reasonable questions to

26   try to figure out, I mean, is there some other explanation

27   for this?

28   A.    Not to my understanding, no.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   594

1   Q.   Because you asked those questions; right?

2   A.   I asked her and to make sure I didn't want to -- I mean,

3   I already was thinking stuff and I had to -- I asked her and

4   I didn't want to conclude that it was what I was thinking.

5   Q.   In fact, there has to be a part of the mom that is

6   thinking:  Please, God, let there be some other explanation

7   for this?

8   A.   I wish there was.

9        THE COURT:  Excuse me, Ms. Filo.  I do not want to

10  restrict your redirect.  So at this time, we're going to take

11  the afternoon recess -- excuse me -- the --

12       MS. FILO:  I have one last question.  If you will

13  let me ask that one last question, I will be done.

14       THE COURT:  I wasn't sure how long, but go ahead.

15       MS. FILO:  Thank you.

16  BY MS. FILO:

17  Q.   Luisana, if you told Det. Pierce that Isabell told you

18  that the item did not make her choke or gag, was that a

19  misstatement?  If, in fact, I have a transcript that says:

20  Luisana, did Isabell tell you that the thing made her choke,

21  and you answered no to that, would that be a misstatement?

22  That's inaccurate because she did tell you that the item made

23  her choke or gag?

24       MR. MADDEN:  Objection.  Compound question.

25       THE COURT:  Sustained.  If you could rephrase.

26       MS. FILO:  Sure.

27  BY MS. FILO:

28  Q.   Did Isabell tell you that the thing in her mouth made

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   595

1   her choke or gag?

2   A.   She told me that.

3   Q.   Okay.  And if there is any transcript anywhere that

4   indicates something different, it's just incorrect; it was a

5   misstatement?

6   A.   I don't know.

7   Q.   Okay.

8   A.   I --

9   Q.   You have no other explanation for why that would be

10  there because Isabell did, in fact, tell you that the item

11  made her choke or gag?

12  A.   I believe that's what she said.

13  Q.   Okay.

14          MS. FILO:  That's all I have.  Thank you.

15          THE COURT:  Thank you.

16          Recross, Mr. Madden?

17          MR. MADDEN:  You know, I'm going to have more

18  questions.  Perhaps it would be a good time to recess.

19          THE COURT:  Okay.  Thank you.

20          Ladies and gentlemen, we're going to take the

21  morning recess.  I'll order all members of the jury to report

22  to the jury assembly room on the second floor at 1:30 and

23  we'll continue with the trial testimony.

24          Please remember my admonition, not to discuss or

25  form any opinions on this case until it's finally submitted

26  to you for your deliberations.  Very important that you not

27  discuss this or get any other outside information about this

28  case other than what's presented in this courtroom.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   596

1        So we'll be in recess until 1:30.  I will order all

2   members of the jury and counsel back here at 1:30.

3        Ladies and gentlemen, thank you very much for

4   allowing the jury to exit the courtroom before you exit.

5        (Whereupon, the Court took the noon recess.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   597

<u>AFTERNOON PROCEEDINGS</u>

1

2       THE COURT:  Thank you, ladies and gentlemen.

3   Record will reflect all members of the jury are present, both

4   counsel are present, Mr. Chandler is present, our witness is

5   on the witness stand.  And I believe you were finished, Ms.

6   Filo?

7       MS. FILO:  Yes.

8       THE COURT:  Okay.

9       Mr. Madden, you were going to begin recross?

10      MR. MADDEN:  Yes.  Thank you, Your Honor.  Your

11  Honor, I would like to have an exhibit marked as Defense B.

12      THE COURT:  Okay.

13      MR. MADDEN:  I have a series of photographs that

14  I'm going to have part of A.  I'm not forgetful.  I'm doing

15  this intentionally.

16      THE COURT:  So you have an exhibit you want marked

17  as?

18      MR. MADDEN:  B.

19      THE COURT:  B.  A available?

20      MR. MADDEN:  A is over against the file cabinet.

21      THE COURT:  Okay.  Then at your request, we'll mark

22  it as Defense Exhibit B.

23      (Whereupon, Defense Exhibit B was marked for

24  identification.)

25      MR. MADDEN:  Thank you, Your Honor.

26      THE COURT:  Welcome.

27      MR. MADDEN:  Sorry to be difficult.

28      THE COURT:  That's fine.

1          MR. MADDEN:  It's okay to approach the witness,

2     Your Honor?

3          THE COURT:  Yes.  Thank you.

4                    RECROSS-EXAMINATION

5     BY MR. MADDEN:

6     Q.    Luisana, I'm going to give you a document.  I'm going to

7     stay here just for a second because I'm guessing you have

8     never seen it.  This has been represented to me as your

9     daughter's attendance records of your -- we're talking

10    about -- and please excuse me.  I'm going to point.  The

11    tardies are noted with the letter "L" with a circle around

12    them?

13    A.    Um-hum.

14    Q.    And I want to go -- it looks like it came from a

15    computer, but there appear to be two tardies in the month of

16    August, beginning of the school year; there appears to be two

17    in September, towards the end of September; there appears to

18    be three on consecutive days the third week of October; and

19    then the last, there appears to be -- strike that.  There

20    appears to be two tardies during the week of January the 2nd

21    through the 6th; correct?  Where I'm pointing to is where it

22    says Tuesday and F for Friday.

23    A.    Okay.

24    Q.    Are you with me?  Sort of?

25    A.    Um --

26    Q.    Okay.  I'm going to get away from you here and give you

27    a little space.  Let me get to my copy so I could ask you

28    questions.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   599

1          So as you see that document, does that help you

2     remember that maybe your daughter did have a bit of an

3     attendance problem or tardy problem?  I apologize, that's the

4     wrong word.

5     A.    If this is what the record has at school, then I abide

6     by it.

7     Q.    All right.  We'll assume for now the record is correct?

8     A.    Yes.

9     Q.    Okay.  And you acknowledged at the preliminary

10    examination, where you testified to Mr. Schumb, who was then

11    representing Mr. Chandler, that the tardy problems were as a

12    result of you not being able to get her to school on time

13    rather than her not wanting to go; is that correct?

14    A.    Yes.

15    Q.    Okay.  Did your daughter ever tell you -- in describing

16    the object in her mouth, did she ever describe that object as

17    curved?

18    A.    I don't remember.

19    Q.    Okay.  All you remember is round; correct?

20    A.    Yes.

21    Q.    Okay.  And as you spoke with your daughter about the

22    object in her mouth, she always described it as the same

23    object; correct?

24    A.    Yes.

25    Q.    She never described multiple objects?

26    A.    No.

27    Q.    Okay.  A time did come, from the time that your daughter

28    told you about Mr. Chandler on the 9th of January, sometime

1   from that date forward, your daughter at some point was told

2   by you that Mr. Chandler did something bad; right?

3   A.    Could you repeat that, please?

4   Q.    I'll rephrase it.  That wasn't a very good question.

5         Did you ever tell your daughter that what Mr.

6   Chandler did to you was bad?

7   A.    No.

8   Q.    You recall telling Mr. Schumb at the preliminary

9   examination that:  I didn't talk with her about what Mr.

10  Chandler did was bad until she had come to court or had to

11  come to court?

12  A.    No.  I told her that we had to come to court -- I didn't

13  tell her that what Mr. Chandler did was bad when this -- when

14  the whole situation was happening.

15  Q.    I'm going to read a response and let me know if this

16  helps you remember.

17        Quote, I didn't talk to her about what Mr. Chandler

18  did was bad until she had to come to court.

19  A.    Yes.

20  Q.    So at some point you did tell her that what he did was

21  bad?  I don't mean that day.  I meant the time for you was on

22  your way to court to testify at the preliminary examination

23  in this case.

24  A.    I didn't point out Mr. Chandler.  I remember --

25  Q.    It's okay if you don't remember?

26  A.    I don't remember exactly the words I said, yeah.

27  Q.    All right.  Just to be fair to you, no one's memory gets

28  better with time, does it?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    601

1  A.    No.

2  Q.    Mine certainly doesn't.  So sometimes we forget, and if

3  I ask you a question and you don't remember, there is no

4  reason to stress out about it.  Just tell me you don't

5  remember.  Okay?

6  A.    Okay.

7          MR. MADDEN:  I have no further questions.  Thank

8  you.

9          THE COURT:  Thank you, Mr. Madden.

10          Ms. Filo, any additional questions?

11          MS. FILO:  Yes, Your Honor.  Thank you.

12                 FURTHER REDIRECT EXAMINATION

13  BY MS. FILO:

14  Q.    Luisana, you had a lot of questions on cross-examination

15  and then now on recross, suggesting that you were the one who

16  created some fear in Isabell; that it was your hysteria, your

17  upset, your using a word like "bad," that you created the

18  fear in Isabell.

19          MR. MADDEN:  Your Honor, I object to counsel's

20  statement as suggesting.  I was asking a question --

21          THE COURT:  Hold on.  What's the objection?

22          MR. MADDEN:  Pardon me?

23          THE COURT:  What's your objection, your legal

24  objection?

25          MR. MADDEN:  Misstates the evidence.

26          THE COURT:  Okay.  Well, I'm just going to sustain

27  the objection, not necessarily on that basis, but it was long

28  and compound.  If you'd rephrase.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   602

```
 1              MS. FILO:  Thank you.
 2    BY MS. FILO:
 3    Q.    Luisana, I want to make sure I'm correct, you noticed
 4    some changes in Isabell's behavior about going to school
 5    prior to her telling you what was happening in Mr. Chandler's
 6    courtroom [sic]; is that correct?
 7    A.    Yes.
 8    Q.    That day, when you looked down at your daughter, what
 9    was the look in her eyes when she told you:  Mommy, I need to
10    tell you something?
11    A.    She was crying, she was scared.  She knew she had to ask
12    me for help.
13    Q.    She did not at any level say to you in a happy way:
14    Hey, mommy, we're playing a fun, fun game in Mr. Chandler's
15    classroom and I want to tell you about it?
16    A.    No, never.
17    Q.    The way she approached you was with fear?
18    A.    Yes.
19    Q.    Reluctance?
20    A.    Oh, yes.
21    Q.    Okay.  You said at some point that she had tears in her
22    eyes?
23    A.    She did.
24    Q.    When did that start?  When did you see these tears in
25    your little girl's eyes?
26    A.    When she pulled me back.  When we stepped out of the
27    door and she pulled me back to tell me that.  When she said:
28    Mr. Chandler's doing stuff to me, that's when I seen the
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   603

1    tears.

2    Q.    Did she tell you whether or not it was something that

3    she liked or didn't like?

4    A.    She didn't.  I didn't ask her that, but her way of

5    talking obviously is something that she does not like.

6    Q.    Okay.  There was no doubt in your mind that what she was

7    telling you, you perceived it as being something that she

8    felt was bad?

9    A.    I perceived it like that.

10   Q.    Thank you.

11   A.    It was bad.

12   Q.    Thank you.

13           THE COURT:  Thank you.

14           MS. FILO:  Nothing further.

15           THE COURT:  Recross, Mr. Madden?

16           MR. MADDEN:  No, Your Honor.

17           THE COURT:  Okay.  Ma'am, at this time, you may

18   step down.  You are excused, subject to recall.  At a later

19   time, Ms. Filo, if she hasn't already done it, she will

20   explain to you what that means.  Otherwise, you are free to

21   leave.  If you'd hand me that document, please.

22           THE WITNESS:  Sure.

23           THE COURT:  Thank you.

24           MS. FILO:  At this time, the People call Isabell.

25   There is a second chair up there?

26           THE COURT:  There is.

27           MS. FILO:  Thank you.

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   604

```
1                      ISABELL DOE,

2             Being called as a witness on behalf of the People,

3    having been first duly sworn, was examined and testified as

4    follows:

5             MS. FILO:  Your Honor, I'm going get the witness a

6    little closer, if that's all right?

7             THE COURT:  That's fine.  Thank you.

8             Ms. Filo, put it down some more.

9             MS. FILO:  Sure.

10            THE COURT:  Thank you.

11            MS. FILO:  Is that good?

12            THE WITNESS:  Yeah.

13            THE COURT:  Okay.

14            MS. FILO:  Your Honor, may I approach the witness

15   from here?

16            THE COURT:  Of course you may.

17            MS. FILO:  Thank you.

18            THE COURT:  Is your name spelled I-s-a-b-e-l-l-a?

19            THE WITNESS:  Um, no.

20            THE COURT:  Oops.  Well, is it Isabella?  Is that

21   your name?

22            THE WITNESS:  You could call me that if you want.

23            THE COURT:  Thank you.  Could you spell your name

24   for me?

25            THE WITNESS:  I-s-a-b-e-l-l.

26            THE COURT:  Okay.  Thank you very much.

27            And, ma'am, your name?  First name?

28            SUPPORT PERSON:  Yes, Yesenia.
```

1    THE COURT:  You understand, I'm sure Ms. Filo told
2  you, not to encourage or suggest any answers.
3    SUPPORT PERSON:  Um-hum.
4    THE COURT:  Okay.  Ms. Filo talked to you about
5  what is going to happen today, so I will let her go over
6  that.  Okay?  She's going to ask you -- she's going to ask
7  you some questions.  Now, as you're here answering the
8  questions, at any time if you want to break, let me know, or
9  simply tell Ms. Filo:  Could I have a break, and I'll give
10  you a break to use the restroom or do whatever you need.
11  Okay?  If you don't, that's fine.  Okay?
12    THE WITNESS:  Okay.
13    THE COURT:  Ms. Filo.
14    MS. FILO:  Thank you, Your Honor.
15                    DIRECT EXAMINATION
16  BY MS. FILO:
17  Q.   Okay.  Isabell, I'm going to come stand right next to
18  you.  Is that okay?
19  A.   Yeah.
20  Q.   All right.  Okay.
21       Ms. Isabell, do you remember who I am?
22  A.   Ms. Alison.
23  Q.   Ms. Alison.  What does Ms. Alison do?
24  A.   Helps people.
25  Q.   Okay.  Isabell, I want to ask you some questions today,
26  and you and I have talked a little bit before about what the
27  rules are when we're in court; right?
28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   606

1   Q.   Yeah.  What did I tell you about what the rules are in

2   court?

3   A.   Um, use real words, no talking over each other, and I

4   forgot the last one.

5   Q.   The most -- single, most important rule -- what's the

6   single, most important rule?

7   A.   I forgot.

8   Q.   Okay.  To tell the --

9   A.   Truth.

10  Q.   Right.  Okay.  So, Ms. Isabell, if I asked you is my

11  jacket red, what would you say?

12  A.   No.

13  Q.   Because my jacket is not red, is it?

14  A.   (Shakes head side to side.)

15  Q.   What color is my jacket?

16  A.   Black.

17  Q.   Okay.  If I said that I have dark hair, would that be

18  the truth or would that be a lie?

19  A.   Truth.

20  Q.   Because I have dark hair?

21  A.   (Shakes head up and down.)

22  Q.   Yeah?

23  A.   (Shakes head up and down.)

24  Q.   What's the real word?

25  A.   Um --

26  Q.   Yes or no; right?

27  A.   Yes.

28  Q.   Okay.  All right.  So you are going to promise me that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   607

1    you are only going to say the truth; right?

2    A.    Yes.

3    Q.    We're only going to talk about things that are real.  Do

4    you know the difference between real and make-believe?

5    A.    Yes.

6    Q.    Yes.  So if I started talking to you about fairies, am I

7    talking about something real or not real?

8    A.    Not real.

9    Q.    If I started to talk to you about what you had for lunch

10   today -- did you have lunch?

11   A.    Yes.

12   Q.    Would that be something real?

13   A.    Yes.

14   Q.    Okay.  So could you promise me that we're only going to

15   talk about what's real and what's the truth?

16   A.    Yes.

17   Q.    All right.  Good deal.

18         So, Ms. Isabell, how old are you right now?

19   A.    Eight.

20   Q.    Eight years old.  Do you know when your birthday is?

21   A.    November 11th.

22   Q.    November 11th.  So you're going to start what grade

23   coming up?

24   A.    Fourth.

25   Q.    Fourth grade.  What do you learn in fourth grade?

26   A.    Um, division, hard stuff.

27   Q.    Hard stuff.  I seem to remember that math was not your

28   favorite subject?

1    A.    It sort of wasn't.

2    Q.    Wasn't?  But it's getting better?

3    A.    Yeah.

4    Q.    All right.  So you learned division, and what other

5    kinds of stuff are you learning in school?

6    A.    Times.

7    Q.    Multiplication tables?

8    A.    (Shakes head up and down.)

9    Q.    What are you up to?  What number?

10   A.    I don't remember.

11   Q.    Okay.  So you're in fourth grade now.  Who was your

12   teacher when you were in third grade?

13   A.    Ms. Tanner.

14   Q.    Ms. Tanner.  Did you like Ms. Tanner?

15   A.    Um-hum.

16   Q.    Yeah?

17   A.    Yeah.

18   Q.    What school -- where did Ms. Tanner teach?  What school

19   was that?

20   A.    Forbes Elementary.

21   Q.    Forbes?  And then what about for second grade?  Who was

22   your teacher in second grade?

23   A.    Mr. Chandler.

24   Q.    Okay.  And what school was that at?

25   A.    O.B. Whaley.

26   Q.    Okay.  And was O.B. Whaley close to your house?

27   A.    Yes.

28   Q.    Where you used to live?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   609

1    A.    Yes.

2    Q.    Yeah.   Who lived in that house with you?

3    A.    Me, my mom, and my two brothers and my sister.

4    Q.    Okay.   So your whole family lived there, yeah?

5    A.    Yeah.

6    Q.    Okay.   And you have an older brother?

7    A.    Yes.

8    Q.    What is your older brother's name?

9    A.    Anthony.

10   Q.    Did Anthony go to O.B. Whaley too?

11   A.    Yes.

12   Q.    What grade was Anthony in?   Is he one grade ahead of you

13   or two grades ahead of you?

14   A.    One grade ahead of me.

15   Q.    Okay.   So when you were going to O.B. Whaley school, how

16   did you get to school every day?

17   A.    I walked.

18   Q.    Who did you walk with?

19   A.    With my older brother.

20   Q.    Did you walk with anybody else?

21   A.    No.

22   Q.    Did your mom go with you to school sometimes?

23   A.    Yes.

24   Q.    Okay.   How many times would your mom go with you?   Like,

25   a lot or a little?

26   A.    A little.

27   Q.    A little.   Was your house pretty close to O.B. Whaley or

28   was it way far away?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    610

1    A.    Pretty close.

2    Q.    Pretty close.  Okay.  So you and your brother would walk

3    to school and your mom went with you sometimes?

4    A.    Yes.

5    Q.    Okay.  And you said you were in Mr. Chandler's

6    classroom; right?

7    A.    Yes.

8    Q.    Do you know what classroom that was?

9    A.    Um, I don't remember.

10   Q.    Okay.  Do you know -- you were in second grade; right?

11   A.    Yes.

12   Q.    Were there just second-graders in that class with Mr.

13   Chandler?

14   A.    Second- and third-graders.

15   Q.    Okay.  So was it a combo class they called it?

16   Combination class where they have both second and third

17   grade?

18   A.    I don't know.

19   Q.    But they had third-graders in there too?

20   A.    (Shakes head up and down.)

21   Q.    Yeah?

22   A.    Yes.

23   Q.    Okay.  So, Isabell, I want to ask you about being in Mr.

24   Chandler's class.  Okay?

25   A.    Okay.

26   Q.    Could you tell me about some things that you did in Mr.

27   Chandler's class that were really fun?

28   A.    I really can't remember.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    611

1    Q.    Okay.  Can you remember anything that happened in Mr.

2    Chandler's class that you didn't like?

3    A.    Yes.

4    Q.    What do you remember that you didn't like happening in

5    Mr. Chandler's class?

6    A.    He always keep me in at recess.

7    Q.    Okay.  So when you went to school at O.B. Whaley and you

8    were in Mr. Chandler's class, do you remember what time you

9    had to be at school in the morning?

10   A.    No.

11   Q.    Did you have a recess in the morning before lunchtime?

12   A.    Yes.

13   Q.    And then you had lunch recess?

14   A.    Yes.

15   Q.    Did you have an afternoon recess?

16   A.    No.

17   Q.    And then so you went from lunch until you got out of

18   school?  No recess?

19   A.    Yes.

20   Q.    Okay.  So the only recess you had was in the morning; is

21   that right?

22   A.    Well, I didn't have morning either.

23   Q.    You didn't have morning either.  Why not?

24   A.    Sometimes.

25   Q.    Okay.  But there was a scheduled one?

26   A.    Yeah.

27   Q.    Okay.  So there was a scheduled recess in the morning

28   and then there was a lunch break; is that right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   612

1    A.    Yes.

2    Q.    Okay.  So you said that Mr. Chandler wouldn't let you go

3    to recess?

4    A.    Well, I don't know if he won't let me or let me go.

5    Q.    Okay.  So when you said that something happened that you

6    didn't like in Mr. Chandler's classroom, tell me what you

7    said again?

8    A.    He always keep me in at recess.

9    Q.    Okay.  What happened when he kept you in at recess?

10   A.    He put me in a chair and put a blindfold on me.

11   Q.    Okay.

12           MR. MADDEN:  Your Honor, I apologize.  I can't

13   hear.

14           THE COURT:  Okay.  I'm going to suggest --

15           MR. MADDEN:  I think one of the problems is the

16   child's looking at Ms. Filo and away from the microphone.

17           MS. FILO:  Here, why don't I turn it a little.  I

18   could try -- I will scoot you over a little bit.  Let's

19   try that.  Is that going to be better?  Maybe?

20           THE COURT:  Could -- I'm going to ask my reporter

21   to read back the last answer.  I believe it was:  He put me

22   in a chair -- if I could get it completely.

23           (Whereupon, the record was read.)

24   BY MS. FILO:

25   Q.    Isabell, do you know how many times that happened?

26   A.    I can't remember.

27   Q.    Was it more than one time?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   613

1  Q.   You said he would put you in a chair.  Do you know what

2  kind of chair you mean?

3  A.   I don't know what it's called, but --

4  Q.   So in Mr. Chandler's classroom, were there chairs for

5  the children to sit in?

6  A.   Yes.

7  Q.   And then -- do you see Ms. Jamie's chair down there?

8  See how it has rollers on it?

9  A.   Yes.

10  Q.   Did Mr. Chandler have a chair that had rollers on it?

11  A.   Yes.

12  Q.   Did you sit in the chair with rollers?

13  A.   Yes.

14  Q.   Okay.  And you said that he blindfolded you?

15  A.   Yes.

16  Q.   What did he use to blindfold you?  Do you know?

17  A.   Well, he had this blindfold and he put it on me, or if

18  not.  Sometimes I bring my scarf and he put it on me.

19  Q.   Sometimes you would wear scarves to school?

20  A.   (Shakes head up and down.)

21  Q.   I think I see a picture with you and a scarf.  You like

22  scarves, yeah?

23  A.   Yeah.

24  Q.   Sometimes he put the scarf on you?

25  A.   Yeah, like on my eyes.

26  Q.   Covering your eyes?

27  A.   Yes.

28  Q.   And then you said that sometimes it was a blindfold,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   614

1   yeah?

2   A.   Yes.

3   Q.   What kind of blindfold?  Do you know?

4   A.   No.

5   Q.   Do you know what color it was?

6   A.   I think it was blue.

7   Q.   Okay.  Where did the blindfold come from?  Do you know?

8   A.   No.

9   Q.   Never saw where it came from within the classroom?

10  A.   No.

11  Q.   Okay.  How did the blindfold stay on?  Did you have to

12  tie it or did it just stay on?

13  A.   It just stayed on.

14  Q.   Was it elastic?  Do you know what elastic is?

15  A.   Yeah.

16  Q.   Like swim goggles, kind of --

17  A.   Yes.

18  Q.   It was like that?

19  A.   Yes.

20  Q.   So were you in the classroom with Mr. Chandler by

21  yourself?

22  A.   Yes.

23  Q.   And what happened?  When you were sitting in the chair

24  and you had the blindfold on, what happened next?

25  A.   He put his hand behind me and started, like, pushing it

26  back and forth.

27  Q.   Okay.  You said that he would push your head.  What was

28  he pushing your head -- do you know what he was pushing your

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   615

1  head for?

2  A.   No.

3  Q.   No.  Okay.  Did he have you touch anything when you had

4  the blindfold on?

5  A.   No.

6  Q.   Did he do anything else while you had the blindfold on?

7  A.   Well, he put something in my mouth.

8  Q.   Okay.  Could you talk to me about what he put in your

9  mouth?  What did he put in your mouth?

10  A.   I don't know.

11  Q.   Okay.  Could you describe it for me?

12  A.   It was, like, curvy.

13  Q.   Curvy?  Okay.  And do you know -- do you know how big it

14  was?

15  A.   No.

16  Q.   Okay.  Was it -- could you tell me anything else about

17  it?

18  A.   I don't remember.

19  Q.   Okay.  Isabell, this curvy thing, was it something you

20  could put all the way in your mouth?  Like, if I had a little

21  M&M, right, I could put the whole M&M in my mouth and I could

22  close my mouth; right?

23  A.   Yes.

24  Q.   You could do that too; right?

25  A.   Yeah.

26  Q.   I bet you put lots of M&Ms in your mouth sometimes?

27  A.   Yes.

28  Q.   Okay.  Was this something you could put in your whole

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   616

1    mouth?

2    A.    No.

3    Q.    No.   Why not?

4    A.    It was big.

5    Q.    Okay.   So did -- because your mouth is kind of round;

6    right?

7    A.    Yes.

8    Q.    How much of your mouth did it take up?

9    A.    Almost the whole thing.

10   Q.    Okay.   And was it -- you said it was curvy?

11   A.    Yes.

12   Q.    Curvy?

13   A.    Yes.

14   Q.    And you said you couldn't put your mouth all the way

15   around it; right?   You couldn't close your teeth on it?

16   A.    No.

17   Q.    No.   Because it was too big?

18   A.    Yes.

19   Q.    Do you know how big it was?

20   A.    No.

21   Q.    Because you don't know where the end of it was?

22   A.    No.

23   Q.    Okay.   Did it smell like anything?

24   A.    Um, I don't know.

25   Q.    Okay.   Did it taste like anything?

26   A.    No.

27   Q.    Okay.   Did you -- did he say anything to you while this

28   thing was in your mouth?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   617

1   A.   No.

2   Q.   No.   What were you supposed to do with the thing in your

3   mouth?   Anything?

4   A.   No.

5   Q.   How long was the thing in your mouth?

6   A.   I don't know.

7   Q.   Okay.   But you said that he pushed your head?

8   A.   Yeah.

9   Q.   Did he push your head while the thing was in your mouth?

10  A.   Yeah.

11  Q.   Okay.   Can you show me what you mean when you say he

12  pushed your head?   What does that mean?

13  A.   Like, he was going like this.

14  Q.   Okay.   So you took your flat hand; right?

15  A.   Yeah.

16  Q.   And you put it on the back of your hand -- head?

17  A.   Yes.

18  Q.   And you were pushing your head forward; is that right?

19  A.   He was doing it.

20  Q.   He was pushing your head.   You are just demonstrating

21  what he was doing?

22  A.   Yes.

23  Q.   Okay.   And he was doing that while the thing was in your

24  mouth?

25  A.   Yes.

26  Q.   Okay.   You said that this happened more than one time;

27  right?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   618

1    Q.    Was it always the same or was it ever different?

2    A.    Always the same.

3    Q.    Okay.  Always the same thing in your mouth?

4    A.    Sometimes it will be candy.

5    Q.    Okay.  So sometimes he used candy?

6    A.    Yes.

7    Q.    Did he always use this curved thing and just sometimes

8    added candy, or was it sometimes just candy?

9    A.    Sometimes just candy.

10   Q.    Okay.  What happened when -- what happened -- how did it

11   end?  When the curvy thing was in your mouth, how did it end?

12   A.    Well, he told me:  Hold on, and then he go behind his

13   desk.  Then I heard like a zipper, and then, um, he said:

14   Okay.  You could go now, and then I left.

15   Q.    Okay.  And where would you go?

16   A.    Sometimes I still would be in school, so I just go

17   outside to recess.

18   Q.    Okay.  So, Isabell, after -- do you remember -- did your

19   family celebrate Christmas?

20   A.    I don't remember.

21   Q.    Okay.  Do you get a Christmas tree and things like that

22   at your house?

23   A.    Yeah.

24   Q.    Yeah.  Did you celebrate Christmas the year you were in

25   Mr. Chandler's class?

26   A.    I don't remember.

27   Q.    Okay.  But you have a school break right around the

28   holiday, yes?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   619

1    A.    Yes.

2    Q.    Okay.  Do you remember coming back to Mr. Chandler's

3    classroom after your Christmas break?

4    A.    Um, I don't know.

5    Q.    Okay.  Do you remember telling your mom what Mr.

6    Chandler -- that Mr. Chandler was doing this in his

7    classroom?

8    A.    Yes.

9    Q.    Yeah?  Why did you tell your mom?

10   A.    Because I didn't like it, and then he kept on doing it

11   and then I never got recess.

12   Q.    Okay.  Are you okay?  Want some water?  Yes?  Okay.

13   Here's some water.  Are you okay?

14   A.    (Shakes head up and down.)

15   Q.    Yeah?

16   A.    (Shakes head up and down.)

17   Q.    Okay.  So you decided to tell your mom that day because

18   you didn't like it?

19   A.    Yes.

20   Q.    Okay.  When you talked to your mom, did you -- what did

21   you -- do you remember what you told her?

22   A.    I don't remember.

23   Q.    Okay.  When you were in Mr. Chandler's classroom and he

24   had this blindfold on you and he was putting something in

25   your mouth, what did it feel like?  What were you thinking?

26   A.    Nothing.

27   Q.    Nothing.  Did you like it?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   620

1    Q.   No.   Why didn't you just tell him:  Hey, I don't like

2    this.  I don't want to do this anymore?

3    A.   Because I was scared.

4    Q.   What were you scared of?

5    A.   Because I thought that he was still going to do it to me

6    either way.

7    Q.   Okay.

8              MR. MADDEN:  I'm sorry, Your Honor.  I didn't hear

9    that.

10             THE COURT:  I believe she said:  I thought he would

11   do it to me either way -- anyway.

12   BY MS. FILO:

13   Q.   So you didn't think you could tell Mr. Chandler to stop?

14   A.   Yeah.

15   Q.   That day, when you told your mom, do you know what made

16   you tell her that day?

17   A.   Um, I don't know.

18   Q.   Okay.  But you finally got brave enough to say what

19   happened?

20   A.   Yes.

21   Q.   Okay.  So, Isabell, this may be kind of a hard question.

22   But when you told your mom, how soon before that had Mr.

23   Chandler done this thing to you?  Does that make sense?

24   Like, if you told your mom on a Monday, how long ago had Mr.

25   Chandler done this thing?

26             MR. MADDEN:  Objection, Your Honor.  Compound

27   question.

28             THE COURT:  Overruled.  You may answer the

```
 1   question.  You could answer the question, if you understand
 2   it.
 3              THE WITNESS:  I don't understand.
 4              THE COURT:  Okay.
 5   BY MS. FILO:
 6   Q.   Okay.  You said that it happened more than one time;
 7   right?
 8   A.   Yeah.
 9   Q.   Do you know how often it was happening?  Like, could you
10   give me your kind of best -- do you know what an estimate is?
11   A.   Yes.
12   Q.   Your best estimate?  Like, once a day?  Once a week?
13   Once a month?  Just once during the school?  Could you give
14   me any estimate of how many times it happened?
15   A.   Um, once a week.
16   Q.   Okay.
17              MR. MADDEN:  I'm sorry.  The answer was?
18              THE COURT:  Once a week.
19   BY MS. FILO:
20   Q.   Isabell, you have had to come to court once before;
21   right?
22   A.   Yes.
23   Q.   And you had to talk to some police officers?
24   A.   Yes.
25   Q.   Yeah?  You remember talking to Det. Sean over there?
26   A.   Yes.
27   Q.   Back when he didn't have all of that crazy hair?
28   A.   Yes.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    622

1    Q.    Yes.  So, Ms. Isabell, has this been any fun for you?

2    A.    No.

3    Q.    No.  It's not fun to come to court, is it?

4    A.    No.

5    Q.    No.  Okay.  Ms. Isabell, I think that may be all the

6    questions I have for you, but I want to go back and check my

7    notes for just a minute.  Okay?

8    A.    Okay.

9    Q.    Okay.  Thank you very much.

10         Ms. Isabell, you said that -- you said that when

11   the thing was in your mouth, you don't remember Mr. Chandler

12   saying anything to you?

13   A.    No.

14   Q.    Do you remember telling the police officer that he --

15   that Mr. Chandler would tell you to move your tongue around?

16   A.    Yes.

17   Q.    Okay.  So do you know right now as you sit here which

18   one it is?  Did he tell you to move your tongue around or

19   not?

20   A.    He told me to move my tongue around.

21   Q.    Okay.  Did he say anything else you can remember?

22   A.    No.

23   Q.    Okay.  You also said that sometimes he would -- he would

24   give you candy?

25   A.    Yeah.

26   Q.    Did he ever give you candy after he was done putting

27   this curve thing in your mouth?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   623

1          MR. MADDEN:  Objection.  Misstates the evidence.

2     She said "curvy."

3          THE COURT:  I'm going to overrule the objection,

4     allow the answer to remain.  If you would clarify that, Ms.

5     Filo.

6          MS. FILO:  Sure.

7     BY MS. FILO:

8     Q.   You said that he sometimes would give you a candy;

9     right?

10    A.   Yeah.

11    Q.   Did he give you the candy after he was done with the

12    curved thing -- curvy thing?

13    A.   Sometimes.

14    Q.   Okay.  Did he ever say anything to you about talking to

15    other people about what was happening in the classroom?

16    A.   No.

17    Q.   Isabell, do you know whether the door to the classroom

18    was open or closed?

19    A.   It was closed.

20    Q.   Did you talk to your friends like on the playground

21    about what was happening in Mr. Chandler's room?

22    A.   No.

23    Q.   How come?

24    A.   Because then they will be asking me why, why, why, and

25    then I get annoyed.

26    Q.   You get annoyed.  Okay.  So you didn't talk to your

27    friends on the playground or any place else about what was

28    happening in Mr. Chandler's room?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  624

1    A.    No.

2    Q.    Okay.  Isabell, do you know who Becky is?

3    A.    I don't remember.

4    Q.    Okay.  Do you know Laurie?

5    A.    No.

6    Q.    How about -- these are all people from your school, from

7    O.B. Whaley, your old school, O.B. Whaley.  Do you remember

8    someone named Wendy?

9    A.    No.

10   Q.    How about Arleth?

11   A.    No.

12   Q.    No.  Were those girls anybody that you talked to about

13   what was happening in Mr. Chandler's room?

14   A.    No.

15   Q.    No.  So you told your mom?

16   A.    Yes.

17   Q.    And you told Det. Sean?

18   A.    Yes.

19   Q.    And you told me when we came to court?

20   A.    Yes.

21   Q.    Is that it?

22   A.    Yes.

23   Q.    Okay.  Thank you very much, Isabell.  I think that's all

24   the questions I have.  Okay?

25   A.    Okay.

26         THE COURT:  Thank you, Ms. Filo.

27         Isabell, Mr. Madden, who is sitting over there, is

28   going to ask you some questions.  Are you okay?  Do you need

JAMIE L. MIXCO, C.S.R. NO. 12708

1  a break?  The gentleman that's sitting there with the

2  glasses.

3         MR. MADDEN:  Looks like she might need a break,

4  Your Honor.

5         THE COURT:  Do you need a break, or do you want to

6  hear his questions first?

7         THE WITNESS:  Well, whichever.

8         THE COURT:  How are you doing?

9         THE WITNESS:  Good.

10         THE COURT:  Okay.  So are you okay about him asking

11  you questions right now?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.  Now, if you get tired and you

14  need a break, you need to let me know.  Okay?

15         THE WITNESS:  Okay.

16         THE COURT:  Promise?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.

19         Cross-examination, Mr. Madden?

20         MR. MADDEN:  Thank you, Your Honor.

21         Your Honor, before I start asking questions, this

22  will be the time for me to request that the 13 photographs on

23  the white board I'm putting against the bench, I would like

24  marked Defense A-1 through A-13, in the order that they face

25  madam clerk.  Make sense?

26         THE COURT:  Okay.  Mr. Madden, all 13 photographs

27  are on one board?

28         MR. MADDEN:  13 separate boards.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   626

1          THE COURT:  Okay.  Got you.

2          MR. MADDEN:  But they are all of the same subject.

3          THE COURT:  Then they will be marked A-1 through

4    13.  Thank you.

5          (Whereupon, Defense Exhibits A-1 through A-13 were

6    marked for identification.)

7          MR. MADDEN:  I will let madam clerk work on that.

8                        CROSS-EXAMINATION

9    BY MR. MADDEN:

10   Q.   And, Isabell, I will start asking you some questions.

11   So my name is Brian Madden, and I'm Mr. Chandler's lawyer and

12   I'm going to ask you some questions.  Okay?

13   A.   Okay.

14   Q.   All right.  If I ask a question that you don't

15   understand, tell me that you don't understand it and I will

16   try to ask the question in a way that you do understand it?

17   A.   Okay.

18   Q.   I don't want you to be shy about interrupting me if you

19   don't understand the question.  Okay?

20   A.   Okay.

21   Q.   All right.  You've done a good job so far, and I want to

22   tell you that if I ask you a question and you don't know the

23   answer, or you don't remember the answer, it's okay to tell

24   me that you don't know or that you don't remember.  Okay?

25   A.   Okay.

26   Q.   All right.  But if I ask you a question and you do

27   remember, I want you to tell me what you remember.  Okay?

28   A.   Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    627

1    Q.    All right.  I'm going to move over here a little bit to

2    my left.  I'm going to talk to you from -- you know what this

3    thing is called?

4    A.    No.

5    Q.    It's called a podium.  So let me ask you some questions

6    about your -- a year that you were at O.B. Whaley in Mr.

7    Chandler's class.  Okay?

8    A.    Okay.

9    Q.    And you were in the second grade for that year; right?

10   A.    Yes.

11   Q.    Okay.  Those answers are perfect.  And you are speaking

12   nice and loud.  I appreciate that.  I don't hear so well

13   because you could tell that I'm old, so it probably isn't

14   your voice.  Sometimes it's just my ears.  I'm asking you to

15   speak up, I'm not trying to be rude to you.  Okay?

16   A.    Okay.

17   Q.    All right.  Now -- so you remember that most of the time

18   you went to school with your brother --

19   A.    Yes.

20   Q.    -- right?  All right.  Now, you were late sometimes?

21   A.    Yes.

22   Q.    And when you were late, how did that work?  What did you

23   have to do?

24   A.    I sometimes have to do worksheets.

25   Q.    I'm sorry, that's a good answer.  It wasn't a good

26   question.

27          When you got to school and if you were late, did

28   the school make you go to the office, or how did that work if

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   628

1   you were tardy?

2   A.   I would have to go to the office.

3   Q.   Okay.  And then get a piece of paper that you would take

4   back to Mr. Chandler's class; right?

5   A.   Yes.

6   Q.   And then you were supposed to take that paper home to

7   your mother that night; right?

8   A.   I don't know.

9   Q.   Okay.  Fair enough.

10          Now, did the second-graders sit on one side of the

11   classroom and the third-graders on the other?

12   A.   Yes.

13   Q.   You remember that?

14   A.   Yes.

15   Q.   All right.  And were the desks sort of formed in kind of

16   a square?  Like, four different squares for four groups of

17   children?

18   A.   I don't remember.

19   Q.   Okay.  Do you remember there being like a projector in

20   the middle of the class that went towards the white boards in

21   front of the class that had a pull-down screen, like the one

22   here in the courtroom?

23   A.   Yes.

24   Q.   Okay.  And so if you were to -- imagine that I was

25   standing in -- you remember what room number it was, the

26   classroom of Mr. Chandler?

27   A.   No.

28   Q.   Do you remember the No. 18?  It's okay if you don't?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   629

1    A.    No.

2    Q.    All right.  I will tell you it was 18.

3          Now -- so if I'm in the back of the class, would

4    you be on the left side of the class facing the front board

5    or the right side of the class?

6    A.    Left.

7    Q.    All right.  That's where the second-graders were; right?

8    A.    Yes.

9    Q.    All right.  So then on the right-hand side were two

10   groups of third-graders; right?

11   A.    Yes.

12   Q.    All right.  Now, there were actually four groups of kids

13   and they had animal names; right?

14   A.    Yes.

15   Q.    Could you remember what they are?

16   A.    Zebra, lyon -- I forgot the other two.

17   Q.    Tiger, gorilla?

18   A.    Yeah.

19   Q.    Okay.  Do you remember what group you were in?

20   A.    Zebra.

21   Q.    All right.  And do you know how many other kids were in

22   the zebra group, if you remember?

23   A.    I don't remember.

24   Q.    Okay.  Do you remember the names of any of the kids in

25   your zebra group?

26   A.    No.

27   Q.    Okay.  Now, did each group get points for doing certain

28   things?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   630

1   A.   Yes.

2   Q.   What kinds of things would you get points for?

3   A.   For winning, like, group --

4   Q.   Putting my finger next to my ear.  I can't hear you.

5   Could you speak a little louder?

6   A.   Yes.  I don't remember what for.

7   Q.   Okay.  And then did the group that got the most points

8   get some privileges, or did they get to do things that the

9   other kids didn't get to do?

10  A.   We will get something from the treasure box.

11  Q.   The treasure box.  All right.  So the treasure box was a

12  place where candy and treats were stored; right?

13  A.   Yes.

14  Q.   You must have gotten something from the treasure box?

15  A.   Yes.

16  Q.   All right.  But the points were given to the student in

17  the group for doing good things; right?

18  A.   Yes.

19  Q.   Now, if your group, for example, the zebra group, they

20  would get points for being on time for school; right?

21  A.   I don't remember.

22  Q.   They would get points for turning their homework in?

23  A.   Yeah.

24  Q.   They would get points for volunteering?

25  A.   I don't remember.

26  Q.   Now, did the group with the most points also get to pick

27  the toys that they were going to use every day at recess

28  first?  They would get the first choice?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   631

1  A.   Yes.

2  Q.   All right.  So the group that had the most points got to

3  line up first and go to recess; right?

4  A.   I don't know.

5  Q.   Okay.  But good things happened to the people that got

6  points; right?

7  A.   Yes.

8  Q.   All right.  Now, if somebody was late to school or tardy

9  or didn't do their homework, that means that the whole group,

10  for example, the zebra group, wouldn't get any points that

11  day; right?

12  A.   I don't know.

13  Q.   Does that sound like it's something that maybe happened?

14  A.   I think.

15  Q.   All right.  So when you were late for school or didn't

16  turn your homework in, was there any consequence for not

17  being on time or for not turning in your homework?

18  A.   I don't remember.

19  Q.   Do you remember that children were required at recess --

20  children who didn't turn their homework in or who were late

21  for school, that they had to sit some special place outside

22  during recess?

23  A.   Yes.

24  Q.   That was called what?

25  A.   I don't know.

26  Q.   The wall?

27  A.   I don't know.

28  Q.   Okay.  But they had to stay in a place and sit by

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   632

1  themselves during recess; right?

2  A.   Yes.

3  Q.   All right.  And that didn't feel very good, did it?

4  A.   No.

5  Q.   You had to do that sometimes, didn't you?

6  A.   No.

7  Q.   Never did?

8  A.   No.

9  Q.   All right.

10       MR. MADDEN:  I think those photographs are ready.

11  Your Honor, I'm trying to figure out a way to do this.  I

12  guess I could use the easel.

13       THE COURT:  With the photos?  Yes.

14       MR. MADDEN:  Your Honor, you have a suggestion for

15  a position where all of the jurors and the Court and the

16  witness could see this?

17       THE COURT:  I'm not concerned with me, Mr. Madden,

18  but we have to set it in such a place --

19       MR. MADDEN:  I'm thinking in the corner.  If

20  everyone -- I have to lean forward a little bit.  Something

21  you could all see if you had to?  All right.

22  BY MR. MADDEN:

23  Q.   Could you see what I'm touching here?

24  A.   Yes.

25  Q.   Okay.

26       MR. MADDEN:  High-tech, Your Honor.

27  BY MR. MADDEN:

28  Q.   All right.  So I'm going to put these photographs up,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   633

1    starting with this first one, this is Defense A-1.  You don't

2    need to worry about the numbers.

3             THE COURT:  I don't think we have a pointer, Mr.

4    Madden.

5             MR. MADDEN:  That's all right.  Okay.

6             THE COURT:  Actually, we do.

7    BY MR. MADDEN:

8    Q.   So I'm going to ask you some questions about this

9    photograph.  Okay?

10   A.   Okay.

11   Q.   All right.  Could you tell me what part -- I'm going to

12   tell you all of these photographs are of Room 18 and were

13   taken during the year that you were in Mr. Chandler's class.

14   Okay?

15   A.   Okay.

16   Q.   I'm not trying to trick you.  All right?

17   A.   Okay.

18   Q.   Could you tell me what this first photograph shows?

19   What part of the classroom does it show?

20   A.   Behind.

21   Q.   The back?

22   A.   Yes.

23   Q.   Okay.  So over here in the right corner it looks kind of

24   light.  That is where the door comes into the class; right?

25   A.   Yes.

26   Q.   So the entrance is actually in -- the front door to that

27   class opens?

28   A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   634

1    Q.   Where that light is; right?  It will be sort of in this

2    area?

3    A.   Yes.

4    Q.   Thank you.

5         And this would be the back wall, and looks like

6    there appears to be books here and cabinets and mailboxes and

7    I will bet that's Mr. Chandler's desk that I just pointed to?

8    A.   Yes.

9    Q.   Okay.  And the door that is across this photograph,

10   where does that go?

11   A.   To the other classes.

12   Q.   All right.  Well, not to the other classes, but to

13   another class; right?

14   A.   Yes.

15   Q.   There is another classroom right on the other side of

16   that door; right?

17   A.   Yes.

18   Q.   Did you ever see a teacher go from Mr. Chandler's class

19   into that other class?

20   A.   No.

21   Q.   Did you ever see a teacher go from the other class into

22   Mr. Chandler's class?

23   A.   Yes.

24   Q.   Who did you see do that?

25   A.   My brother's teacher.

26   Q.   What is her name?

27   A.   I don't remember.

28   Q.   I'm going to try a name.  I might have the pronunciation

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   635

1    wrong, but is it Ms. Catangay or Cabinay (phonetic)?

2    A.   Ms. Catangay.

3    Q.   That's much better.  All right.  Thank you for the help.

4         And then this looks like -- in this picture, it

5    looks like the student's desk to me is like corner or half of

6    one; right?

7    A.   Yes.

8    Q.   And this probably is one of the desks in the zebra

9    group; right?

10   A.   Yes.

11   Q.   So your group was towards the back of the class to the

12   left?

13   A.   Yes.

14   Q.   Okay.  All right.  How often did you see -- pronounce

15   her name for me again?

16   A.   Catangay.

17   Q.   Catangay.  How many times you think you saw her come

18   through that door?

19   A.   Probably, like, two times.

20   Q.   Okay.  Do you know if that door was locked?

21   A.   I don't know.

22   Q.   Okay.  So let me show you A-2.  This pretty much shows

23   the same corner of the classroom, but a little different

24   angle; right?

25   A.   Yes.

26   Q.   In fact, now we could see another student's desk, which

27   is probably part of another group, one of the third-graders;

28   right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   636

1   A.   Yes.

2   Q.   All right.  And I see a sign hear saying "Group prizes

3   at the end of the year."  Is the group one of the animals?

4   A.   Yes.

5   Q.   All right.  So whoever gets the most points is going to

6   get prizes; right, the best prizes?

7   A.   Yeah.

8   Q.   So the idea is everybody in the group get as many points

9   as you can; right?

10   A.   Yes.

11   Q.   All right.  Let's move along to A-3, and this photograph

12   again shows mostly Mr. Chandler's desk and a carpeted area

13   and that appears to be Mr. Chandler's chair?

14   A.   Yes.

15   Q.   Was there another place in the room that had another

16   chair that looked like that?

17   A.   I don't remember.

18   Q.   Do you remember kind of a horseshoe-type table where

19   students would come over and Mr. Chandler would sit in the

20   inside of that?

21   A.   Yes.

22   Q.   You remember that now?

23   A.   Yes.

24   Q.   There was probably -- I bet there was another chair like

25   this in that area; right?

26   A.   I think it was like that.

27   Q.   You're not sure?

28   A.   Yeah, I'm not sure.

1  Q.   Fair enough.

2        This picture is kind of hard to look at because

3  it's blurry, so don't look at it too long.  That shows the

4  door open and you could see the next classroom right on the

5  other side; right?

6  A.   Yes.

7  Q.   In fact, there was a teacher's desk right on the other

8  side; right?

9  A.   Yes.

10  Q.   Okay.  Can't see in that picture, though, can you?

11  A.   I can.

12  Q.   You can?  I'm not seeing it right.  Want to go point to

13  it for me?

14  A.   What?

15  Q.   You said there is -- I think you think I meant this

16  desk; right?

17  A.   Oh.

18  Q.   I meant the other teacher's desk.  You can't see that in

19  this photograph, can you?

20  A.   No.

21  Q.   But it's basically on the other side of that wall;

22  right?

23  A.   Yeah.

24  Q.   You looked in that room before; right?

25  A.   Yeah.

26  Q.   Sure.  This photograph is A-5, and this one mainly shows

27  kind of like a cabinet; right?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   638

1   Q.   Now, is this where Mr. Chandler kept his school

2   supplies, or do you know?

3   A.   I don't know.

4   Q.   Okay.  Did you ever see that cabinet open?  I'm going to

5   show you now on the easel A-6.  Did you ever see that --

6   during the time that you were in Mr. Chandler's class, do you

7   remember ever seeing that cabinet open like that?

8   A.   I can't remember.

9   Q.   Okay.  Maybe you did, maybe you didn't; right?

10   A.   Yes.

11   Q.   Okay.  I will put up A-7.  We could see the same

12   cabinet.  Now we could see over to the right corner the room.

13   We could see the light over there.  The door in that class is

14   open in that picture, huh?

15   A.   Yes.

16   Q.   How could you tell?

17   A.   Because there is light.

18   Q.   Exactly.  Then there -- what were these books about?  Do

19   you know?

20   A.   I can't remember.

21   Q.   Okay.  You know -- do you remember anything about this

22   black pot?

23   A.   No.

24   Q.   Okay.  What about this red -- looks like a red plastic

25   tub, do you remember what that was for?

26   A.   It kept our balls in there for recess.

27   Q.   Your voice is dropping down a little bit.  You are doing

28   really good.  Probably running out of gas a little bit here.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   639

1    I think pretty soon you are going to raise your hand and want

2    a recess; right?  Let us know.

3    A.    (Shakes head up and down.)

4    Q.    So is that where -- by balls, I mean there were lots of

5    different balls that Mr. Chandler had for the kids; right?

6    A.    Yes.

7    Q.    Those balls were used when you went to recess?

8    A.    Yes.

9    Q.    Other things in there too?  Jump ropes and things like

10   that?

11   A.    Yes.

12   Q.    And when we talked before about lining up for recess,

13   the group with the most points got to have the first choice

14   of what toys they wanted to use for recess; right?

15   A.    I think.

16   Q.    Okay.  I'm going to ask you about -- I've got six more

17   photographs, then I'm going to ask if you want to recess.

18   All right?  Okay?

19   A.    Okay.

20   Q.    This gets us to A-8.  Now we could see the front door;

21   right?

22   A.    Yes.

23   Q.    It's actually in the back of the class, but there is

24   only one door to go outside; right?

25   A.    Yes.

26   Q.    All right.  And then this area here with all of the

27   hooks, I'm going to guess is the area where the kids --

28   what's it called?  Put their coats or jackets?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   640

1    A.    Yes.

2    Q.    All right.  What about this thing on the wall here?  It

3    looks like a bunch of cards.  Do you know what those are for?

4    A.    If you get like a red card.

5    Q.    Okay.  Then this also -- this photograph also shows the

6    zebra group; right?

7    A.    Yes.

8    Q.    Okay.  You were in the zebra group; right?

9    A.    Yes.

10   Q.    So I'm seeing on this -- I see the name on a red card

11   Wilmer, I see on the red card a name Marcus, and I see on a

12   red card the name Natalie.  Are those people who were in your

13   zebra group?

14   A.    Yes.

15   Q.    Okay.  It gets us to A-9.  Remember, we just talked

16   about Wilmer and Marcus and Natalie?

17   A.    Yes.

18   Q.    Now we could see even more people in the zebra group;

19   right?

20   A.    Yes.

21   Q.    We're getting to somebody who I think you know.  That

22   would be you; right?

23   A.    Yes.

24   Q.    Your desk would be right where I'm pointing, with kind

25   of the rainbow marker; right?

26   A.    Yes.

27   Q.    On it is the word "Isabell"?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    641

1    Q.   All right.  Okay.  Then over to the -- as we look at

2    this photograph, to the left of the photograph would be the

3    sidewall of the -- left sidewall of the classroom, and on

4    there is where the computers were; right?

5    A.   Right.

6    Q.   Okay.  Then can't quite see it here, but beyond there

7    was an area where the sink was; right?

8    A.   Right.

9    Q.   Okay.  You are getting an A so far.

10              Now, let's look at A-10.  All right?  So A-10

11   actually shows the left-hand corner of the classroom with the

12   sink, looks like some plastic bottles and cups.  That's the

13   area we were talking about, the sink area?

14   A.   Yes.

15   Q.   Okay.  Now, this group is not -- this is -- these are

16   second-graders; right?

17   A.   Yes.

18   Q.   But they aren't in your group?

19   A.   No.

20   Q.   All right.  That would be Alfredo, Diego, Jayden, and

21   another name I can't see; is that right?

22   A.   Right.

23   Q.   Those were all second-graders?

24   A.   Yes.

25   Q.   Okay.  Now, do you know what -- these letters that say

26   AR Tree, do you know what that means?

27   A.   No.

28   Q.   Was that like an advanced reading tree, where if you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    642

1    read extra books you would get credit and you get points?

2    A.    I don't know.

3    Q.    Okay.  You don't remember that?

4    A.    (Shakes head side to side.)

5    Q.    Okay.  Now, by the way, in this photograph you could

6    only see part of an animal and some numbers below it.  It

7    looks like a zebra to me; is that right?

8    A.    Yes.

9    Q.    That will be your group; right?

10   A.    (Shakes head up and down.)

11   Q.    Then on the next photograph, A-11, I think we could see

12   one more animal.  Now I think we could say what the animal

13   name was for the group in front of you on the left side, the

14   other second grade group, what is that?

15   A.    Tiger.

16   Q.    A tiger.  All right.  The name of the second grade group

17   was tiger in the front and zebra in the back?

18   A.    Yes.

19   Q.    All right.

20          Now, if we look at -- I'm going to let you look at

21   this one because it's kind of far away.  I'm going to let you

22   look at it first before we show it to everyone else.  We see

23   the tiger, the zebra, and I don't quite see what this is?

24   A.    Lyon.

25   Q.    A lyon.  And this looks like a gorilla to me; right?

26   A.    Right.

27   Q.    So now we know what the four groups are.  We are sure;

28   right?

1    A.    Yes.

2    Q.    Okay.  So what I just showed you, I will show now to

3    Court and to the jury.  What I was talking about are the

4    animals on the wall here, and I see there are points under

5    each of the animals.  Obviously, those points were kept every

6    day; right?

7    A.    Yes.

8    Q.    You earned points or lost points every day; right?

9    A.    Yes.

10   Q.    You got points for doing things and you didn't get

11   points if anybody in the group was late or doesn't do their

12   homework; right?

13   A.    Right.

14   Q.    Okay.  Then we also talked earlier about a projector

15   being in sort of the middle of the class and a screen that

16   you would pull down in front of the white board, like the one

17   in the courtroom; right?

18   A.    Right.

19   Q.    That photograph shows that; correct?

20   A.    Correct.

21   Q.    Thank you.

22         Then finally, we'll put up A-13, and this appears

23   to show the right front corner of the classroom; right?

24   A.    Right.

25   Q.    All right.  And, in fact, in this photograph we could

26   actually see parts of all of the groups; right?

27   A.    Yes.

28   Q.    In terms of the student desk, in other words, you've got

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   644

1    the tigers on the left, zebras after them; right?  Then you

2    have the two third grade groups on the right-hand side of the

3    class; right?

4    A.    Right.

5    Q.    All right.  So do you see -- is this a TV or TV screen?

6    A.    Yes.

7    Q.    Monitor?  Okay.

8          This black thing that I'm pointing to here, do you

9    know what that is?

10   A.    The treasure box.

11   Q.    Yeah.  You know -- you knew what that was right away;

12   right?

13   A.    Yes.

14   Q.    All right.  So that was up by the white board.  Did it

15   always stay there or Mr. Chandler sometimes move that places?

16   A.    I can't remember.

17   Q.    Okay.  Time for you to take a break, you let us know?

18   A.    Okay.

19   Q.    You want to?

20   A.    Sure.

21   Q.    Actually, you need to ask the man who is running this

22   courtroom?

23         THE COURT:  Actually, Isabell, I think it would be

24   a good time to take a break right now.  So we're going to

25   take a 20-minute break.

26         I will order all members of the jury to report to

27   the jury assembly room on the second floor and we'll call you

28   back up in approximately 20 minutes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   645

1    All members of the jury, you are excused at this

2  time.   You may leave the courtroom.

3    The individuals in the audience, thank you for

4  allowing the jury to leave the courtroom prior to you

5  exiting.   We'll be in recess for 20 minutes.

6    (Whereupon, a brief recess was taken.)

7    THE COURT:   Record will reflect that all members of

8  the jury are present, both counsel are present, Mr. Chandler

9  is present, and our witness, Isabell, is on the witness

10  stand.

11    Mr. Madden, you were continuing with your cross.

12    MR. MADDEN:   Thank you, Your Honor.

13  BY MR. MADDEN:

14  Q.   You get something to drink?

15  A.   Yes.

16  Q.   Good.   All right.   When you were first answering Ms.

17  Filo's questions this afternoon, when she asked you how many

18  times this occurred, where you put this object in your mouth,

19  you said you couldn't remember how many times, but it was

20  more than one --

21  A.   Yes.

22  Q.   -- right?

23  A.   (Shakes head up and down.)

24  Q.   Now, did -- at any time when this object was in your

25  mouth, did you ever cry?

26  A.   No.

27  Q.   Okay.   Did you ever yell or scream?

28  A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   646

1  Q.   Now, you told your mother that there was only one thing

2  that he put in your mouth and it was the same thing every

3  time; right?

4  A.   Yes.

5  Q.   Do you remember being in class blindfolded in front of

6  other class members when Mr. Chandler put things in your

7  mouth that you were supposed to guess what they were?

8  A.   I can't remember.

9  Q.   Okay.  I want you to think really hard.  Is that

10 something that may have happened or you just forgot or it

11 never happened?

12 A.   Wait.  Can you repeat the question?

13 Q.   That was a bad question.  I'm sorry.  Yes, I will try.

14         Did you ever tell a police officer or anybody in

15 this case that Mr. Chandler sometimes put candy in your mouth

16 and asked you to guess what it was?

17 A.   Yes.

18 Q.   You did tell that to somebody?

19 A.   Yes.

20 Q.   You remember who you told that to?

21 A.   Det. Sean.

22 Q.   Det. Sean.  Now, we have Det. Pierce who is the

23 gentleman --

24         MS. FILO:  Sean.

25 BY MR. MADDEN:

26 Q.   Oh, you call him Det. Sean.  I'm sorry.  Everyone is

27 working on first names but me.

28         What about crackers?  Did you ever tell Det. Sean

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   647

1    that you remember some crackers being in your mouth?

2    A.    I don't remember.

3    Q.    Okay.  You remember anything like chips or anything like

4    that?

5    A.    No.

6    Q.    You remember any other food?

7    A.    No.

8    Q.    All right.

9          But anyway, no matter what it was that he put in

10   your mouth, nothing -- no liquid ever came out of it while it

11   was in your mouth; right?

12   A.    No.

13   Q.    That's right?

14   A.    Right.

15   Q.    Okay.  So this thing in your mouth, you said it was kind

16   of hard but kind of soft?

17   A.    (Shakes head up and down.)

18   Q.    Could you help me with what you meant by that?

19   A.    I can't describe it.

20   Q.    Do you remember anything in your mouth that tasted like

21   strawberry?

22   A.    No.

23   Q.    Okay.  Do you remember telling any police officer that

24   there was something in your mouth that you remember tasting

25   like strawberry?

26   A.    No.

27   Q.    You don't remember that?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    648

1   Q.   Is it possible that you said that, you just don't

2   remember; is that right?

3          MS. FILO:  Objection, Your Honor.  Asked and

4   answered.

5          MR. MADDEN:  She's shaking her head vertically,

6   Your Honor.

7          THE COURT:  Well, I'm going -- if you could

8   rephrase the question.  I think it's a difficult question to

9   ask an eight-year-old.  One other thing, Mr. Chandler --

10  excuse me again -- Mr. Madden, because you asked a question

11  about in the classroom and candy, and your questions are kind

12  of general right now, if we could make a distinction during

13  recess or in the classroom.

14         MR. MADDEN:  Okay.

15  BY MR. MADDEN:

16  Q.   Do you remember doing a taste game in the classroom with

17  the rest of your classmates?

18  A.   Yes.

19  Q.   All right.  And the whole class was there?

20  A.   Yes.

21  Q.   And were you a volunteer?

22  A.   Yes.

23  Q.   You raised your hand to volunteer?

24  A.   Yes.

25  Q.   All right.  On that day what you did, was it fun?

26  A.   Sort of.

27  Q.   Okay.  Why was it fun?

28  A.   Sort of don't remember.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   649

1    Q.    Okay.  And could you tell me how many things did you

2    taste in front of the whole class?

3    A.    One.

4    Q.    Just one?  Was that the same thing that you tasted when

5    you were alone with Mr. Chandler at recess?

6    A.    No.

7    Q.    Something different?

8    A.    Yes.

9    Q.    What was the thing you tasted in the classroom?

10   A.    It was candy.

11   Q.    Do you know what kind of candy?

12   A.    I can't remember.

13   Q.    I think that you said that when you were in the

14   classroom and you were tasting -- let me start again.

15         When you were in the classroom and tasting things,

16   were you blindfold?

17   A.    Yes.

18   Q.    All right.  And was his hand in the back of your head?

19   A.    Wait.  Are you talking about -- when?

20   Q.    I'm talking about when you were in the classroom tasting

21   candy?

22   A.    In front of the class?

23   Q.    Yes.

24   A.    No.

25   Q.    Was Mr. Chandler standing next to you when you tasted

26   the candy?

27   A.    I don't know.

28   Q.    Did he put the candy in your mouth?

1    A.    Yes.

2    Q.    All right.  He told you to taste it; right?

3    A.    Yes.

4    Q.    He told you to move your tongue and taste it?

5    A.    No.

6    Q.    Did you move your tongue and taste it?

7    A.    Yes.

8    Q.    And you guessed what it was after you moved your tongue;

9    right?

10   A.    Yes.

11   Q.    Okay.  Did you get it right?

12   A.    Yeah, I think.

13   Q.    How do you know?

14   A.    I don't.  I'm not sure.

15   Q.    All right.  What about crackers?  Do you remember having

16   crackers, cheese crackers, or peanut butter crackers put in

17   your mouth?

18   A.    No.

19   Q.    You don't remember like kind of spitting those out?  You

20   didn't like them?

21   A.    Yes.

22   Q.    You do remember now?

23   A.    Yes.

24   Q.    Okay.  Now, that was also in front of the whole class?

25   A.    No.

26   Q.    That was with Mr. Chandler alone?

27   A.    Yes.

28   Q.    Okay.  Were -- when you were alone with Mr. Chandler in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   651

1  the classroom with the object in your mouth, were you ever in

2  any pain?

3  A.    No.

4  Q.    Okay.  So you weren't uncomfortable when you were in the

5  classroom -- excuse me -- when you were in the classroom

6  alone with Mr. Chandler?

7           MS. FILO:  Objection, Your Honor.  Misstates the

8  testimony.

9           THE COURT:  I will sustain.  If you could rephrase.

10           MR. MADDEN:  All right.

11  BY MR. MADDEN:

12  Q.    You said when you were in the classroom alone with Mr.

13  Chandler, you were not crying, you were not in any pain;

14  right?

15  A.    Right.

16  Q.    Okay.  Now, when you were in the classroom alone with

17  Mr. Chandler, it was recess; right?

18  A.    Could you repeat that?

19  Q.    Yes.  When you were alone with Mr. Chandler with the

20  object in your mouth, that was at your morning recess time,

21  wasn't it?

22  A.    Yes.

23  Q.    Okay.  And so when Mr. Chandler was done, he told you

24  simply you may go to recess; right?

25  A.    Yes.

26  Q.    He never told you anything about not telling anybody

27  what he just did, did he?

28  A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   652

1   Q.   All right.  He never told you don't tell your friends?

2   A.   No.

3   Q.   He never told you don't tell your parents?

4   A.   No.

5   Q.   Then you went to recess; right?

6   A.   Yes.

7   Q.   Then I believe you had told the police officer that you

8   had about 15 minutes left to play; right?

9   A.   I had, like, barely 10 minutes to play.

10  Q.   Do you remember telling a police officer that you had

11  15?

12  A.   I think it was 15.

13  Q.   Okay.  Thank you.

14        When you were answering Ms. Filo's questions

15  earlier, you said something that I didn't really hear, and I

16  want to go back and ask you about that.  Did you mention

17  anything -- did I hear you mention anything about a zipper?

18  A.   Yes.

19  Q.   And what did you remember about a zipper?

20  A.   It was like a pant's zipper.

21  Q.   And did you see a zipper being pulled down, or did you

22  hear it?

23  A.   I heard it.

24  Q.   And when did you hear it?

25  A.   When he was done.

26  Q.   When he was done?

27  A.   (Shakes head up and down.)

28  Q.   All right.  Have you ever told anybody before today that

1    you ever heard the sound of a zipper?

2    A.    What do you mean?

3    Q.    Today, you said you heard the sound of a zipper being

4    zipped; is that right?

5    A.    Yes.

6    Q.    Today is the first day you ever said that to anybody;

7    right?

8    A.    Yes.

9    Q.    All right.  Because many people, many police officers

10   asked you questions about what you heard and you never

11   mentioned anything about any zipper; right?

12             MS. FILO:  Objection, Your Honor.  Vague.

13             THE COURT:  Sustained.

14   BY MR. MADDEN:

15   Q.    Do you remember a police officer coming to your house

16   with another police officer the day that you told your mom

17   about Mr. Chandler?

18   A.    Yes.

19   Q.    He was wearing a uniform?

20   A.    Yes.

21   Q.    All right.  And did you tell him this happened one time?

22   A.    Yes.

23   Q.    All right.

24             Be patient with me.  Just going through my notes,

25   Isabell.  Just trying to get through this as fast as I can.

26             Now, you also -- when you -- let me try that -- I

27   will start again.

28             On the day that you told your mom about Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   654

1   Chandler, you also talked with Ms. Peery, the principal;

2   correct?

3   A.   Yes.

4   Q.   In her office?

5   A.   Yes.

6   Q.   All right.  You told her that it only happened one time?

7   A.   No.

8   Q.   You did not tell her?  What did you tell her?

9   A.   I told her that it happened more than one time.

10  Q.   But you also told her it happened one time; right?

11           MS. FILO:  Objection, Your Honor.  Asked and

12  answered.

13           THE COURT:  Sustained.

14  BY MR. MADDEN:

15  Q.   Do you also remember the game being played in front of

16  the whole class that involved feeling things?

17  A.   Yes.

18  Q.   And the students volunteered, had things -- objects put

19  against their foot or their lower leg or their hands, and

20  they had -- they were blindfolded; right?

21  A.   Right.

22  Q.   And they had to guess what the object was; right?

23  A.   Right.

24  Q.   All right.  Now, do you consider candy to be the same

25  thing as food?

26  A.   What did you mean by that?

27  Q.   Is candy a kind of a food or is it different than food?

28  A.   Different than food.

1    Q.    Okay.  The crackers, did you consider the crackers to be

2    food?

3    A.    I don't know.

4    Q.    Okay.  What did the crackers taste like?

5    A.    I don't remember.

6    Q.    Okay.  Did they have any filling in them, you know, like

7    cheese or peanut butter?

8    A.    I think one of them had peanut butter.

9    Q.    Okay.  I guess I didn't bring my crackers.

10            MR. MADDEN:  Your Honor, I'm going to have a bag

11   containing maybe a half a dozen chips next in order.  I think

12   this would be Defense C.  Am I right?

13            MS. FILO:  Your Honor, may we approach?

14            THE COURT:  Yes.

15            (Whereupon, there was a discussion at the bench.)

16   BY MR. MADDEN:

17   Q.    Did you say earlier that you remember hearing the sound

18   of keys?

19   A.    Yes.

20   Q.    And when did you hear the sound of keys?

21   A.    When he zipped up his zipper.

22   Q.    Oh, when he zipped up his zipper.  Did you see him zip

23   up his zipper?

24   A.    No.

25   Q.    All right.  Have you ever told that to anybody before

26   today?

27   A.    Yes.

28   Q.    Who did you tell that to?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   656

1   A.   I told it to a police.

2   Q.   To whom?

3   A.   Hmm?

4   Q.   Who did you say it to?  The police?

5   A.   (Shakes head up and down.)

6   Q.   Was that Sgt. Pierce or Officer Pierce?

7   A.   Yes.

8   Q.   That you heard the sound of keys as he was zipping up

9   his zipper?

10   A.   Yes.

11   Q.   So there is two sounds there at the same time?

12   A.   Yes.

13   Q.   Now, when you were with Mr. Chandler alone and you

14   were -- the object was no longer in your mouth -- let me ask

15   that question again.

16        Did you take the object out of your mouth or did

17   Mr. Chandler take the object out of your mouth when you were

18   alone with him?

19   A.   Mr. Chandler did.

20   Q.   All right.  And then you took your blindfold off?

21   A.   Yes.

22   Q.   You just did that without being told to?

23   A.   Yes.

24   Q.   All right.  And what was he doing when you took it off?

25   A.   Nothing.

26   Q.   Was he sitting or standing?

27   A.   Standing.

28   Q.   Okay.  When he put the blindfold or the scarf on you,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   657

1  did he keep his hand in the back of your head holding the

2  scarf so that you couldn't see?

3  A.   I think.

4  Q.   You think that's what happened?

5  A.   Yep.

6  Q.   Okay.  And did he do the same thing with the

7  blindfold -- I think you said it was blue -- that he would

8  kind of hold that?  Maybe it was loose and held that too?

9  A.   No.  Well, it was pretty tight.

10 Q.   It was pretty tight.  Okay.  All right.

11        When you were taking the blindfold off, Mr.

12 Chandler never said anything like:  Wait, wait.  Not yet?  He

13 never said anything like that, did he?

14 A.   No.

15 Q.   Okay.  Do you remember how Mr. Chandler kept his keys

16 when you were in his class?

17 A.   No.

18 Q.   You don't know if he kept them in his pocket?

19 A.   No.

20 Q.   Do you remember if he had a -- you know what a lanyard

21 is?

22 A.   No.

23 Q.   Like a string or piece of leather around your neck with

24 the keys on it.  You don't remember if that was something he

25 did?

26 A.   No.

27 Q.   You don't remember, do you?

28 A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   658

1    Q.    Okay.   I think I'm done for now, Isabell.   Thank you

2    very much.

3              THE COURT:   Redirect, Ms. Filo?

4                   REDIRECT EXAMINATION

5    BY MS. FILO:

6    Q.    Isabell, I'm going to try to be real brief.   Okay?

7    A.    Okay.

8    Q.    Are you getting tired?

9    A.    (Shakes head side to side.)

10   Q.    No?

11   A.    (Shakes head side to side.)

12   Q.    Okay.   Isabell, you answered some questions from the

13   patrol officers that came to your house; right?   They had the

14   uniform on?

15   A.    Yes.

16   Q.    Did you do your absolute best when you talked to those

17   patrol officers to tell them nothing but the truth?

18   A.    I'm not sure.

19   Q.    When you talked to those officers, did you tell them the

20   truth?

21   A.    Yes.

22   Q.    Did you try really hard to tell them the truth?

23   A.    Yes.

24   Q.    Okay.   And how about when you talked to Det. Sean?   When

25   you went and you met with Det. Sean, did you do your absolute

26   best to tell him the truth?

27   A.    Yes.

28   Q.    And when you came to court and testified in May of last

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   659

1    year, did you do your absolute best to tell the truth?

2    A.   Yes.

3    Q.   When you came to court today, have you done your

4    absolute best to tell the truth?

5    A.   Yes.

6    Q.   Is it hard for you to remember some things?

7    A.   Yes.

8    Q.   Yes.  So when you talked to Det. Sean a year and a half

9    ago, did you remember things better then or not -- or do you

10   remember things better now?

11   A.   I remember things better then.

12   Q.   Okay.  But when you talked to him then, you told him the

13   truth?

14   A.   Yes.

15   Q.   And when you talked to us today, you told us the truth?

16   A.   Yes.

17   Q.   Okay.  Ms. Isabell, that's all the questions I have.

18   Okay?

19   A.   Okay.

20   Q.   Thank you.

21          THE COURT:  Recross, Mr. Madden?

22          MR. MADDEN:  Nothing, Your Honor.  Thank you.

23          THE COURT:  Isabell, thank you.  You are done and

24   you may step down.

25          And, Ms. Filo, I'm not sure if you need a minute.

26          MS. FILO:  I do, Your Honor.

27          THE COURT:  You need to approach?

28          MS. FILO:  Actually, could I just have two minutes,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   660

1    Your Honor?

2              THE COURT:  Sure.

3         MS. FILO:  Thank you.

4         THE COURT:  We're off the record.

5         (Whereupon, there was a discussion off the record.)

6         MS. FILO:  Your Honor, at this time, it's the

7    People's intention to play the MBI tape.  It may take me just

8    a second to get it up and running.

9         THE COURT:  Okay.  And do you know the estimate of

10   how long it is?

11        MS. FILO:  It is 43 minutes.

12        THE COURT:  Okay.

13        MS. FILO:  Is that -- do you want me to do it?

14        THE COURT:  That's fine.  Yeah.  Off the record.

15        (Whereupon, there was a discussion off the record.)

16        MS. FILO:  Your Honor, at this time, I do have --

17        THE COURT:  You're going to be playing a CD?

18        MS. FILO:  I am, Your Honor.

19        THE COURT:  And is that CD going to be marked as

20   People's 1?

21        MS. FILO:  Please.

22        THE COURT:  Okay.  And the exhibits will be marked

23   1 -- for the court 1-a.

24        MS. FILO:  Thank you.

25        THE COURT:  And then you are going to pass out the

26   exhibits for all members of the jury?

27        MS. FILO:  I am.

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   661

1          (Whereupon, People's Exhibits 1 and 1-a were marked

2     for identification..

3          THE COURT:  And as she's doing that, ladies and

4     gentlemen, I want to remind you that the evidence is the

5     playing of the CD.  The transcript is an aid for you.  It's

6     my understanding that both attorneys earlier and agreed and

7     will stipulate that these transcripts could go into the jury

8     room when the jury starts deliberating.  So you will have

9     those transcripts for your review when the jury starts

10    deliberating.

11         So I would ask you in light of it -- it's audio and

12    video, Ms. Filo?

13         MS. FILO:  It is, Your Honor.

14         THE COURT:  Okay.  Obviously, you could follow the

15    evidence in any manner you choose.  I would ask you and

16    suggest to you that it's important to view the screen since

17    it is both audio and video.

18         THE JUROR:  We're one short, Your Honor.

19         THE COURT:  And there is a stipulation, Counsel,

20    that my court reporter need not attempt to record the actual

21    playing of the CD?

22         MR. MADDEN:  No, we're not letting her get away

23    with that, Your Honor.  Yes, we'll stipulate.

24         THE COURT:  I will note that Mr. Madden stipulates,

25    as does Ms. Filo.  Correct, Ms. Filo?

26         MS. FILO:  Yes, Your Honor.

27         THE COURT:  And the transcript will be a part of

28    the court file.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    662

1        (Whereupon, a tape was played, not reported.)

2        MS. FILO:  Your Honor, if I might, this is actually

3   a six-minute break.  I could forward the tape through.

4        THE COURT:  You are okay with that, Mr. Madden?

5        MR. MADDEN:  I am.

6        THE COURT:  Thank you, Ms. Filo.

7        (Whereupon, a tape was played, not reported.)

8        MS. FILO:  Your Honor, this is another two-minute

9   break.  With counsel's permission, I will --

10        THE COURT:  If there is no objection, you may

11   advance it.

12        MR. MADDEN:  No objection, Your Honor.

13        (Whereupon, a tape was played, not reported.)

14        THE COURT:  Record will reflect that we have

15   completed playing the CD, People's 1.  I would ask, members

16   of the jury, if you could pass those transcripts to your

17   right and Ms. Filo will collect them.  Once you have done

18   that, we're about to take our evening recess, and I'm going

19   to order all members of the jury to report to the jury

20   assembly room tomorrow morning at 9:00 a.m.  We'll continue

21   with the trial.

22        Also, please remember my admonition, that you are

23   not to discuss this case with anyone or express or form any

24   opinions until the case is finally submitted to you for your

25   deliberations.  You should not do any research or read or

26   listen to any news reports or media.  If someone hands

27   something like that to you, or you come across that, it's

28   very important that you just set that aside.  You're more

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   663

1    than welcome to look at these types of items at the

2    conclusion of the trial when you are excused.  So please

3    remember that admonition.

4            All members of the jury, you are excused at this

5    time.  Please leave your notebooks on your chairs.  They will

6    be there for you when you come back.  I promise you no one

7    will have access to them when you are gone.

8            The record will reflect that the jury has left the

9    courtroom.  Both counsel and Mr. Chandler is present.  This

10   afternoon we had a sidebar conversation out of the presence

11   of the jury.  Mr. Madden has requested that he have an item

12   that was in a clear plastic bag marked as defense next in

13   order.  It was a food item.  And I indicated to Mr. Madden I

14   was not inclined to allow him to do that pursuant to 352.

15   And I will allow, Mr. Madden, first of all, if you'd like to

16   supplement the record, you may do so at this time.

17           MR. MADDEN:  Thank you, Your Honor.  The items

18   within the exhibit consist of pork rinds, a chip-type snack.

19   I believe the Court indicated in its ruling that it was ruled

20   against me on 352 grounds.  I will indicate to start that

21   this witness is describing objects physically consistent with

22   those; that they are similar length, they are certainly

23   curvy, they have certainly a roundness to them.

24           I will also indicate to the Court that Mr. Chandler

25   had a -- this is in terms of my good faith, Mr. Chandler was

26   interviewed by Det. Pierce for several hours on the evening

27   of the 9th and specifically mentioned pork rinds.  He also

28   mentioned crackers and also mentioned another type of candy.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   664

1 Officer Pierce the next day re-interviewed Isabell and asked

2 about all of those items.

3 Mr. Chandler had told Det. Pierce the evening

4 before that he gave her pork rinds, but she didn't get it.

5 She guessed beef jerky.  And that the next day, apparently

6 with that information, Det. Pierce re-interviewed Isabell,

7 went through all of those things, and she confirmed two of

8 the three, but she didn't confirm beef jerky.  But of course

9 it wasn't beef jerky.

10 What I'm saying is that I, in good faith, believe

11 that these items are the items -- the item that was put in

12 her mouth when she was alone with Mr. Chandler, and that she

13 should be allowed to look at it, to hold the outside of the

14 bag.  I will not ask her to put it in her mouth and taste it.

15 I would ask her questions such as, has she ever had something

16 like this.  I had never tasted a pork rind until this case.

17 I know what they taste like now.  Many people are quite fond

18 of them.  It's my understanding that Mr. Chandler has been

19 eating rinds since he was a little boy.  They were offered in

20 his class.  I think there is plenty of relevance to this.

21 I'm at a loss as to why the probative value is outweighed by

22 the prejudicial effect.  If she even recognizes it and she

23 says it's consistent or not.

24 THE COURT:  Thank you.

25 Ms. Filo, do you wish to respond?

26 MS. FILO:  Your Honor, the child has now been asked

27 on multiple occasions could she describe the object, and

28 she's given us the best description that she possibly can.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   665

1   Handing her a myriad of items doesn't seem in any way to

2   confirm or deny.  She's repeatedly said that she didn't ever

3   see the object.  She never saw what was in her mouth, so

4   handing her a bag of anything and saying could this have been

5   it is not going to help her because she never saw the item.

6   What she did was feel it in her mouth, and that's the only

7   description that she's been able to give us.

8           So I mean, there is no relevance.  There is no

9   nexus between handing her a bag full of items and asking her,

10  you know, could this or could this not have been the item

11  when she's not able to answer that based on its presentation

12  to her.

13          MR. MADDEN:  I disagree, Your Honor.  There is no

14  reason why she can't use her sense of sight, even though she

15  didn't have it at the time, and her sense of what she felt on

16  her tongue, a taste to see if the surface of that is

17  consistent with what she felt, to see if the weight of it,

18  the kind of hard, kind of soft would apply.  I would have no

19  objection to her crushing it.  I have a hard time seeing the

20  prejudicial effect of that.

21          THE COURT:  Thank you.  As I mentioned at sidebar,

22  I was not going to allow this pursuant to 352.  That ruling

23  will remain.  As far as the Court is concerned, the

24  relevance, in my opinion, would only apply in this particular

25  situation if she was allowed to put that particular food item

26  in her mouth.  I will not require her to do that with that

27  particular item, or any other item.  And for those reasons,

28  the objection is sustained.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   666

1          We'll be in recess until tomorrow morning at 9 a.m.

2   I will order both counsel and Mr. Chandler here at 9:00

3   o'clock and we'll continue with the trial.

4          (Whereupon, the Court took the evening recess.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   667

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA CLARA    )

 3

 4        I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

 5        The foregoing is a full, true, and correct

 6   transcript of the testimony given and proceedings had in the

 7   above-entitled action taken on the above-entitled date; that

 8   it is a full, true, and correct transcript of the evidence

 9   offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and official

13   stenographic reporter of said Court, and thereafter had the

14   same transcribed into typewriting as herein appears.

15        I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted if applicable.

18

19        Dated:

20

21                            _____

22                            Jamie L. Mixco, C.S.R.
                              Certificate No. 12708
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."
```

# EXHIBIT 3
# (Vol. 9)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    668

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,                                )
                                                                       )
    Plaintiff - Respondent,                                            )
                                                                       )
    v.                                                                 )     No. C1223754
                                                                       )
CRAIG RICHARD CHANDLER,                                               )
                                                                       )
    Defendant - Appellant.                                             )
_____/

COPY

VOLUME 9

PAGES 668 - 794

JULY 16, 2013

---oOo---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---oOo---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:        OFFICE OF THE ATTORNEY GENERAL
                                 BY:  KAMALA D. HARRIS,
                                 Attorney General of the State
                                 of California

FOR DEFENDANT-APPELLANT:         In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   669

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

DEPARTMENT NO. 37

---oOo---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) ) | |
| PLAINTIFF, | ) ) | |
| v. | ) ) | CASE NO.   C1223754 |
| CRAIG RICHARD CHANDLER, | ) ) ) | |
| DEFENDANT. | ) ) | |

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JULY 16, 2013

---oOo---

APPEARANCES:

FOR THE PEOPLE:           ALISON FILO
                          Deputy District Attorney

FOR THE DEFENDANT:        BRIAN MADDEN
                          Attorney at Law

OFFICIAL COURT REPORTER:  JAMIE L. MIXCO
                          C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   670

# INDEX

## EXAMINATION

| Witness Name | | Page |
|---|---|---|
| **KIM TO** | | |
| Direct By Ms. Filo | ........................................ | 672 |
| Cross By Mr. Madden | ..................................... | 680 |
| Re-Direct By Ms. Filo | ................................... | 682 |
| **BECKY DOE** | | |
| Direct By Ms. Filo | ........................................ | 683 |
| Cross By Mr. Madden | ..................................... | 697 |
| Re-Direct By Ms. Filo | ................................... | 704 |
| **DET. SEAN PIERCE** | | |
| Direct By Ms. Filo | ........................................ | 709 |
| **LYN VIJAYENDRAN** | | |
| Direct By Ms. Filo | ........................................ | 723 |
| Cross By Mr. Madden | ..................................... | 733 |
| Re-Direct By Ms. Filo | ................................... | 766 |
| Re-Cross By Mr. Madden | ................................. | 770 |
| **LEA PEERY** | | |
| Direct By Ms. Filo | ........................................ | 774 |
| Cross By Mr. Madden | ..................................... | 783 |
| Re-Direct By Ms. Filo | ................................... | 788 |

## PEOPLE'S EXHIBITS

| Exhibits | Description | Page |
|---|---|---|
| 3 Marked | document | 724 |
| 4 Marked | preliminary transcript of Becky Doe | 791 |

## DEFENSE EXHIBITS

| Exhibits | Description | Page |
|---|---|---|
| C Marked | document | 734 |

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   671

1    San Jose, California                        July 16, 2013

2                            PROCEEDINGS

3              THE COURT:  Thank you, ladies and gentlemen.

4    Record will reflect all members of the jury are present, both

5    counsel are present, and Mr. Chandler is present.

6              Ms. Filo, you ready to call your next witness?

7              MS. FILO:  Thank you, Your Honor.  The People call

8    Kim To.  Your Honor, I will state for the record that Ms. To

9    is going to require the services of a Cantonese interpreter,

10   who is here.

11             THE COURT:  Thank you.

12                            KIM TO,

13             Being called as a witness on behalf of the People,

14   having been first duly sworn, was examined and testified as

15   follows:

16             THE CLERK:  For the record, ma'am, please state and

17   spell your full name.

18             THE WITNESS:  T-o.  K-i-m.

19             THE COURT:  Thank you, ma'am.  The lawyers are

20   going to ask you questions.  It's important that you wait

21   until the question is interpreted from English into Cantonese

22   and give your answer in Cantonese.  Please make every effort

23   to try to answer only the question that is being asked.

24   Thank you.

25             Before we begin direct, ladies and gentlemen, with

26   the next witness and possibly others, an interpreter will

27   provide you with a translation of the testimony.  You must

28   rely on the translation provided by the interpreter, even if

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   672

1    you understand the language spoken by the witness.  Do not

2    re-translate any testimony for other jurors.  If you believe

3    the court interpreter translated testimony incorrectly, let

4    me know immediately by writing me a note and giving it to our

5    courtroom deputy.  This should be done before the witness is

6    excused.

7         Ms. Filo, when you are ready, direct examination.

8         MS. FILO:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MS. FILO:

11   Q.   Good morning, Ms. To.

12   A.   Good morning.

13   Q.   Do you have a daughter named Becky?

14   A.   Yes.

15   Q.   And how old is Becky?

16   A.   Ten years old.

17   Q.   What grade will she start this fall?

18   A.   Fifth grade.

19   Q.   And what's --

20   A.   You mean this month?  This school term?

21   Q.   Correct.

22   A.   Yes.

23   Q.   Fifth grade?

24   A.   Yes.

25   Q.   Where did Becky attend school for her third grade year?

26   A.   O.B. Whaley.

27   Q.   When she first began her third grade year, what was the

28   name of her teacher?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   673

1    A.    I forgot the teacher's name.  Maybe you will have to say

2    the name and see if I can recall.

3    Q.    Was his name Craig Chandler?

4    A.    Yes, because I have limited English.

5    Q.    You are doing fine.

6          Ms. To, Becky started third grade with Mr.

7    Chandler.  Did she move to another classroom in October of

8    2011?

9    A.    Yes.

10   Q.    Why?

11   A.    Yes, because one day my daughter came home and told me,

12   and I talked to the principal.  And after our talk with the

13   principal, she was transferred to another class.

14   Q.    Okay.  You said that one day Becky came home and told

15   you something?

16   A.    Yes.  She came home from school and she told me.

17   Q.    What did she tell you?

18   A.    She told me that the school teacher asked her to go into

19   a room, and then I talked to the principal.

20   Q.    You said the teacher asked her to go into a room, what

21   kind of room?

22   A.    She only told me that during the recess the teacher

23   asked her to go into a room and -- I don't know.

24   Q.    Okay.  What did she tell you happened in the room?

25   A.    She told me that the teacher blindfolded her, and I was

26   very scared after hearing that.

27   Q.    Why were you scared?  What were you scared of?

28   A.    Because my daughter told me that she was blindfolded

1    and -- I don't know.

2    Q.   You didn't understand why?

3    A.   I could not recall what my daughter told me, but then

4    the moment that she told me that she was blindfolded, I was

5    scared.

6    Q.   Okay.  Did Becky talk to you about Mr. Chandler putting

7    anything in her mouth?

8    A.   It happened a long time ago, and then it seems that my

9    daughter told me so, but for a long time now I forgot what

10   she told me.

11   Q.   Okay.  So you said it seems so, do you remember Becky

12   telling you that Mr. Chandler put something in her mouth

13   while she was blindfolded as you sit here today?

14   A.   I don't quite remember clearly putting something in her

15   mouth.  The only thing that I remember clearly was that Becky

16   told me she was blindfolded.

17   Q.   Okay.  Did Becky tell you that while she was blindfolded

18   something was put in her mouth and some sort of liquid came

19   out, some sort of water came out?

20   A.   Um, she was not -- she told me that she was not quite

21   sure whether it was candy or something, because at that time

22   she was blindfolded, so she's not affirmative.

23   Q.   Okay.  But did she tell you that some liquid came out of

24   her mouth?

25   A.   For sure, I don't remember.  I don't remember.

26   Q.   Okay.  Did Becky -- did Becky show you what she was

27   wearing that day?

28   A.   She was wearing a black sweater.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   675

1    Q.   Ms. To, I'm going to show you a photograph.  It's going

2    to be up on the screen.

3            MS. FILO:  And, Your Honor, by stipulation, counsel

4    and I agree that a hard copy of what's being viewed will be

5    submitted to the court as an exhibit this afternoon.

6            THE COURT:  Right.

7            MR. MADDEN:  So stipulated, Your Honor.

8            THE COURT:  Thank you, Mr. Madden.  And this is

9    going to be marked later as People's 2.

10   BY MS. FILO:

11   Q.   Ms. To, is what's projected on the screen there a

12   photograph of the jacket, the sweatshirt, that your daughter

13   was wearing when she came home and told you that she had been

14   in the classroom or in a room with Mr. Chandler?

15   A.   Yes, it is the jacket.  It has been a long time now.

16   Q.   Okay.  And when you last -- sorry.  When Becky came home

17   that day, there was a stain on that jacket; right?

18   A.   Yes.

19   Q.   Where was the stain?

20   A.   I do not recall now.

21   Q.   Was it on the front?  On the back?  On the arms?  Do you

22   remember anything?

23           MR. MADDEN:  Objection.  Compound question.

24           THE COURT:  Overruled.  You may answer it.

25           THE WITNESS:  For sure, I don't remember where was

26   the stain on the jacket.

27   BY MS. FILO:

28   Q.   Okay.  Could you give me your best estimate?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   676

1    A.    It could be in the front.

2    Q.    In the front?  Okay.

3          Ms. To, did you --

4    A.    I'm not quite sure, though.  It seems to be in the

5    front.

6    Q.    Ms. To, was there -- what did the stain look like?

7    A.    The stain looked like snots, the discharge from the

8    nose, a little bit white and very little.

9    Q.    Was it something you were concerned about?

10   A.    Um, basically, Becky was a little school girl.  I have

11   no other thought besides the fact that she might make her

12   jacket dirty in some way and I don't think of other things.

13   Q.    Okay.  Ms. To, do you remember talking to a police

14   officer in this case?  His name was Russ Chubon or Chubon?

15   A.    I don't quite remember the name.

16   Q.    Do you remember speaking to a police officer?

17   A.    Yes.

18   Q.    Do you remember going to a building where the Bank of

19   America is on the bottom floor?

20   A.    Yes.

21   Q.    And when you spoke with the officer there, did you have

22   a clear memory of what Becky told you?

23   A.    It happened for just a short period of time.  After I

24   talked to the police officer, I still can remember clearly,

25   but now it has been a long time.  It happened a long time

26   ago, therefore I don't quite remember.

27   Q.    Completely fair.  Ms. To, do you remember -- let me

28   withdraw that.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    677

1            Did you tell Officer Chubon that Becky told you

2   that a student was sent to get her to bring her back to the

3   classroom?

4   A.   I don't remember.

5   Q.   Okay.  Did you tell Officer Chubon that Becky told you

6   that the door to the room was closed?

7   A.   Yes, I believe that I told him.  Yes.

8   Q.   Because that is what Becky told you; is that correct?

9   A.   Yes.

10  Q.   Okay.  Did you tell Officer Chubon that her eyes were

11  covered and something soft was rubbed across her feet?

12  A.   Yes.  Yes, I remember that my daughter told me that she

13  was blindfolded.

14  Q.   And that something was rubbed on her feet?

15  A.   Yes.

16  Q.   Okay.  Did you tell Officer Chubon that Becky told you

17  that Mr. Chandler put something in her mouth?

18  A.   I do not remember.

19  Q.   You don't remember telling Officer Chubon that?

20  A.   I do not remember.

21  Q.   Ms. To, you said that you talked to the principal about

22  what Becky had told you; is that correct?

23  A.   Yes.

24  Q.   Is her name Lyn Vijayendran?

25  A.   Yes.  I don't quite recognize the name.  Her name could

26  be Lee -- something like that.

27  Q.   Did you actually bring this jacket that's up on the

28  screen to Ms. Vijayendran to show her the stain that was on

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   678

1   the jacket?

2   A.   Yes.

3   Q.   Why?

4   A.   She asked me.

5   Q.   Did you tell Officer Chubon that there was something

6   that had dried to an off-white color on the front of your

7   daughter's black jacket?

8   A.   Yes.  Basically, I did not notice about this matter, but

9   he asked me if there was a white stain on the jacket, on

10   front of the jacket, so I have to take the jacket out.

11   Q.   I'm sorry.  You didn't notice the stain?

12   A.   I did not notice, but then when my daughter told me that

13   there was a stain, then I just put the jacket in the laundry

14   basket.  And then the next day when I met with Officer

15   Chubon, he asked me, then I remember to pick it up from the

16   laundry basket, the jacket.

17   Q.   Okay.  So, Ms. To, your conversation with the principal

18   was in October of 2011; correct?

19   A.   Yes, it has been a long time.  I don't remember the

20   date.

21   Q.   Okay.  And your conversation with Officer Chubon was in

22   January of 2012; is that right?

23   A.   Do you mean the officer?

24   Q.   Yes.

25   A.   I been there to meet the officer, but I am not sure what

26   day was it.

27   Q.   Okay.  All I'm trying to ask you, there was some time

28   that passed between your conversation with the principal and

1  your conversation with Officer Chubon.  It wasn't the next

2  day.  It was many weeks.  Yes?

3  A.   Yes, there was a time frame.

4  Q.   Okay.  So when you brought this jacket to the principal,

5  what happened with it after your conversation with the

6  principal?

7  A.   The principal gave it back to me and then I brought home

8  to laundry.

9  Q.   And did you wash it several times before giving it to

10  Officer Chubon?

11  A.   Yes.  I washed the jacket when I was given it back from

12  the principal the next day.  And I believe that when I

13  brought this jacket to the police officer, the jacket has

14  been washed.

15  Q.   Okay.  Ms. To, was Becky transferred from Mr. Chandler's

16  classroom the day that you met with the principal?

17  A.   One day after I talked to the principal, then Becky was

18  transferred to classroom number 15.  It was the day after.

19  Q.   So the next day she went to a new classroom?

20  A.   Yes.

21  Q.   Ms. To, have you been reluctant to participate in the

22  court process?

23  A.   It is correct.

24  Q.   How come?

25  A.   The reason is that my daughter has been transferred to

26  another school, and then she was she still small and I don't

27  want my daughter to deal with this because the matter is not

28  black and white.

1    Q.    You don't want her to deal with this?

2    A.    The matter happened, but in fact I don't know whether it

3    is the fact or not.  And furthermore, I don't want her to

4    keep thinking about the old stuff.

5    Q.    You don't want her to remember?

6    A.    Basically, it is not that I don't want my daughter to

7    remember, but now she's going to school, she's going to

8    school in another area, and I want the things that is in the

9    past put it behind me and I don't want her to keep thinking

10   about that matter.

11   Q.    Okay.

12         MS. FILO:  That's all the questions I have.  Thank

13   you very much, Ms. To.

14         THE COURT:  Thank you, Ms. Filo.

15         Cross-examination, Mr. Madden?

16         MR. MADDEN:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18   BY MR. MADDEN:

19   Q.    Good morning.

20   A.    Good morning.

21   Q.    Ms. To, my name is Brian Madden.  I'm Mr. Chandler's

22   lawyer and I'm going to ask you some questions.

23         When your daughter was in Mr. Chandler's class, was

24   it your habit to speak with her every day after school to

25   talk about what happened in school that day?

26   A.    Yes.

27   Q.    And the day that your daughter told you about Mr.

28   Chandler blindfolding her and putting something across her

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   681

1  feet and in her mouth, what she told you was in response to

2  you asking her:  How was your day?

3  A.   Yes.

4        MR. MADDEN:  I always know my question was too long

5  when I have a long translation, Your Honor.

6  BY MR. MADDEN:

7  Q.   Now, based on what Becky told you that afternoon, you

8  were scared for her?

9  A.   As a parent, when your daughter tells you that somebody

10  blindfolded her, you get scared.  And that is why I talked to

11  the principal the next day.

12  Q.   Of course.  I understand.  Even though you were scared,

13  is it correct that your daughter did not appear to be scared?

14  A.   Yes, she was just a small kid.  What did she know?

15  Q.   I understand.  She didn't appear to be upset or afraid

16  or concerned about what happened in school that day?

17  A.   My daughter was a small kid.  She does not appear that

18  she know anything, and then I keep telling her:  It is all

19  right.  It is all right.  Just to console her.

20  Q.   Why did you have to console her?

21  A.   The reason that I have to console her is so that she

22  would not be so scared to go to school.

23  Q.   Did she tell you she was scared to go to school?

24  A.   No.

25  Q.   Thank you very much, Ms. To.

26        THE COURT:  No further questions, Mr. Madden?

27        MR. MADDEN:  No, Your Honor.

28        THE COURT:  Ms. Filo, redirect?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   682

1      MS. FILO:  Thank you, Your Honor.

2                    REDIRECT EXAMINATION

3   BY MS. FILO:

4   Q.   Ms. To, did you teach Becky to respect her teachers?

5   A.   Yes, I did.

6   Q.   Did you tell her that she was supposed to do as she was

7   told at school?

8   A.   Yes.

9   Q.   Becky is a trusting little girl?

10  A.   Yes.

11  Q.   Thank you.

12       MS. FILO:  Nothing further.

13       THE COURT:  Thank you.

14       Recross, Mr. Madden?

15       MR. MADDEN:  Nothing, Your Honor.  Thank you.

16       THE COURT:  May this witness be excused?

17       MR. MADDEN:  She may.

18       MS. FILO:  Yes, Your Honor.

19       THE COURT:  Thank you, Ms. To.  You are excused.

20  You may step down and you are free to leave.

21       Ms. Filo.

22       MS. FILO:  Yes, Your Honor.  People call Becky.

23  Your Honor, Becky has asked that an advocate be present with

24  her while she testifies, and Elvia Ricas (phonetic) is going

25  to sit with her on the stand, if that is acceptable to the

26  Court?

27       THE COURT:  Would counsel approach first, please.

28       MS. FILO:  Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   683

1          (Whereupon, there was a discussion at the bench.)

2          THE COURT:  Ms. Filo, if you could bring her in,

3    please.

4          MS. FILO:  Thank you.

5                         BECKY DOE,

6          Being called as a witness on behalf of the People,

7    having been first duly sworn, was examined and testified as

8    follows:

9          THE COURT:  Becky, would you spell your first name?

10         THE WITNESS:  B-e-c-k-y.

11         THE COURT:  Thank you.  I'm going to ask you to --

12   could you pull your chair up a little bit.  Thank you very

13   much.  And I'm going to ask you to talk in the microphone so

14   everyone could hear you.

15         Ma'am, I will remind you, you are not to encourage,

16   suggest, or prompt any response by Becky.  Okay?  Thank you.

17         I know that Ms. Filo has talked to you about asking

18   you questions and how it works here in the courtroom, so I'm

19   going to simply let her begin with direct.  Okay?

20                    DIRECT EXAMINATION

21   BY MS. FILO:

22   Q.    Okay.  Hi, Becky.

23   A.    Hi.

24   Q.    How are you?

25   A.    I'm good.

26   Q.    Good.  Becky, you and I have talked before about the

27   rules of testifying; right, when you come to court?

28   A.    Yes.

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   684

1   Q.   What are the rules?

2   A.   Um --

3   Q.   Do you remember?

4   A.   She can't do anything.

5   Q.   She can't do anything, that's right.  You remember the

6   number one, most important rule about being in court?

7   A.   I pretty much forgot.

8   Q.   That you have to tell the --

9   A.   Truth.

10  Q.   Right.  Good answer.  Okay.  And you remember that you

11  need to use real words; right?

12  A.   Yes.

13  Q.   Like, yes or no, or I don't know, because Ms. Jamie here

14  is taking down everything we say and --

15  A.   Yes.

16  Q.   When you say uh-huh or nah-uh, she doesn't know what to

17  type.  Okay?

18  A.   Yes.

19  Q.   Could you remember that?

20  A.   Yes.

21  Q.   It's your big American Idol moment.  You get to talk

22  into the microphone.  All right?

23  A.   Yes.

24  Q.   So we could all hear you.  Okay, Ms. Becky?

25          THE COURT:  Excuse me, Ms. Filo.  Would you push

26  the microphone over a little.

27  BY MS. FILO:

28  Q.   Okay.  Becky, how old are you right now?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   685

1    A.    I'm 10.

2    Q.    And when is your birthday?

3    A.    March 4, 2003.

4    Q.    Okay.  So what grade are you going to be in this year

5    when you go back to school?

6    A.    I'm going to be in fifth grade.

7    Q.    Fifth grade.  Oh, my goodness.  Becky, what are you

8    going to learn in the fifth grade?  Do you know?

9    A.    Lots of science.

10   Q.    Do you like science?

11   A.    No.

12   Q.    What's your favorite thing to do at school?

13   A.    Math.

14   Q.    Math.  All right.

15          So, Becky, you remember that when we come to court

16   we're only going to talk about things that are real; right?

17   A.    Yes.

18   Q.    So if I started asking you about fairies, would that be

19   real or make-believe?

20   A.    Make-believe.

21   Q.    Okay.  And we're only going to talk about things that

22   are real in court?

23   A.    Yes.

24   Q.    Okay.  So, Becky, do you remember being in third grade?

25   A.    Yes.

26   Q.    Do you know who your teacher was when you started third

27   grade?

28   A.    Mr. Chandler.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   686

1  Q.   And did you -- did you move to a different classroom?

2  A.   Yes.

3  Q.   What classroom did you move to?

4  A.   Room 15.

5  Q.   Room 15.  Who was the teacher there?

6  A.   Ms. Jaeger.

7  Q.   So, Becky, when you were in Mr. Chandler's classroom,

8  could you tell me something you did in the classroom that was

9  fun?

10  A.   I forgot.

11  Q.   Okay.  You were in third grade at the time; right?

12  A.   Yes.

13  Q.   Were there also second-graders in that classroom?

14  A.   Yes.

15  Q.   So it was what they call a combination class, a combo

16  class?

17  A.   Yes.

18  Q.   Okay.  Who was your best friend when you were in Mr.

19  Chandler's classroom?

20  A.   I had two.

21  Q.   Who were they?

22  A.   Vivian and Jenny.

23  Q.   Vivian and Jenny.  And were they people that you played

24  with on the school -- at school?

25  A.   Yes.

26  Q.   You played at recess?

27  A.   Yes.

28  Q.   Okay.  And did you have lunch with them every day?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   687

```
 1   A.    Yes.  Not every day.

 2   Q.    Not every day, but lots of days?

 3   A.    Yes.

 4   Q.    Yeah.  Okay.  And were they in your same classroom?

 5   A.    Yes.

 6   Q.    Okay.  So, Becky, I want to ask you about why you

 7   transferred, why you went from Mr. Chandler's room to Mrs.

 8   Jaeger's room.  Could you tell me why you did that?

 9   A.    I don't know.

10   Q.    You don't know?

11   A.    No.

12   Q.    Okay.  Do you remember telling your mom about something

13   happening in Mr. Chandler's room?

14   A.    No.

15   Q.    No?  Did you talk to your mom about being called in at

16   recess time?

17   A.    I actually don't know.

18   Q.    You don't know?

19   A.    No.

20   Q.    Okay.  Do you remember one of your classmates, Michaela,

21   telling you to come into the classroom, into Mr. Chandler's

22   classroom?

23   A.    I think so.

24   Q.    Okay.  What do you think happened?

25   A.    I forgotten.

26   Q.    You've forgotten?

27   A.    Yes.

28   Q.    Okay.  So you don't remember Michaela calling you into
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   688

1    the classroom?

2    A.    I just remember that.

3    Q.    You remember that?

4    A.    (Shakes head up and down.)

5    Q.    What happened once you got into the classroom?

6    A.    Um, I think I sat.

7    Q.    Sat?  Okay.  Where did you sit?

8    A.    I can't remember.

9    Q.    You don't remember at all?

10   A.    No.

11   Q.    Okay.  How about if I show you a picture, would that

12   help?

13   A.    Maybe.

14   Q.    All right.  Let's see what we got.  Okay.

15         So, Becky, this has been marked as Defense Exhibit

16   A-1.  Do you recognize what's in that picture?

17   A.    Yes.

18   Q.    Yeah?  What is that?

19   A.    A classroom.

20   Q.    Is that Mr. Chandler's classroom?

21   A.    Yes.

22   Q.    So there is this desk right here in the -- all the way

23   on the left-hand side of the picture, there is a desk right

24   there.  Whose desk is that?

25   A.    I think Mr. Chandler's.

26   Q.    Okay.  And there is a red bucket here.  Do you know what

27   that was for?

28   A.    Um, I think toys.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   689

1    Q.    Okay.  And all of the books are here.  What are these

2    books?

3    A.    Um, some non-fiction and some fiction books.

4    Q.    Okay.  That's where you got the books that you would

5    read in class sometimes?

6    A.    Yes.

7    Q.    Okay.  There is some student -- these look like student

8    desks.  Are those student desks over here?

9    A.    Yes.

10   Q.    Yes.  Okay.  So when Michaela came in and got you and

11   asked you to come to the classroom, where did you go?  Where

12   were you in the classroom?  Were you any place in this

13   picture?

14   A.    Um, I don't know.

15   Q.    You don't know?

16   A.    No.

17   Q.    Okay.  You said that you were sitting?

18   A.    Yeah, but I don't know where I was sitting.

19   Q.    You don't?

20   A.    I think the picture is cutoff.

21   Q.    You think the picture is a little cutoff?

22   A.    Yes.

23   Q.    Okay.  Let me see if I could find another one that might

24   have more.

25           Okay, Becky, this is just Exhibit A.  This may be

26   our very first one.  Was it any place on this picture?

27   A.    I think I was in that chair.

28   Q.    Which chair?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   690

1    A.    The first desk.

2    Q.    This one right here?

3    A.    Yes.

4    Q.    Okay.  What --

5               MR. MADDEN:  Your Honor, would Ms. Filo please

6    identify on the record where she pointed?

7               MS. FILO:  Your Honor, on the bottom left-hand

8    corner of the photograph there is a blue -- what appears to

9    be a blue pencil box and a blue chair.

10              THE COURT:  Thank you.

11              THE WITNESS:  Yeah.

12   BY MS. FILO:

13   Q.    You think you were right where this blue chair was?

14   A.    No.

15   Q.    Where were you?

16   A.    I think I was sitting right -- I think near the desk.

17   Q.    Near the student desk or Mr. Chandler's desk?

18   A.    Between.

19   Q.    Okay.  So right in here?

20   A.    Yes.

21   Q.    Okay.  That's the area in between these two desks?

22   A.    Yes.

23   Q.    Okay.  You said you were sitting there?

24   A.    Yeah.

25   Q.    What were you sitting on?

26   A.    A chair.

27   Q.    Whose chair?

28   A.    I don't know the name.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   691

1   Q.   You don't know the name?

2   A.   Because I can't see the name tag.

3   Q.   Okay.  But you think it was a chair like this student

4   chair here?

5   A.   Yeah.

6   Q.   Okay.  So Mr. Chandler's chair has rollers on it.  See

7   that?

8   A.   Yes.

9   Q.   Did you sit in this chair?

10  A.   No.

11  Q.   It did not have rollers?

12  A.   No.

13  Q.   Okay.  So you said you sat in this -- in a chair right

14  here in front of Mr. Chandler's desk?

15  A.   Yes.

16  Q.   What happened when you sat in the chair?

17  A.   I don't know.

18  Q.   You don't know.  Could you remember anything?

19  A.   No.

20  Q.   No?  Do you remember talking to the police officers in

21  this case?

22  A.   A little bit.

23  Q.   A little bit?

24  A.   Yes.

25  Q.   Do you remember going to a building about a block away

26  from here and there is a bank on the bottom floor?

27  A.   No.

28  Q.   You don't remember that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   692

1    A.    No.

2    Q.    Do you remember being in a letter room and you were --

3    there is some pictures on the walls, like paintings on the

4    walls?

5    A.    No.

6    Q.    You don't remember that?

7    A.    No.

8    Q.    Do you remember talking to Det. Sean?

9    A.    Yes.

10    Q.    Yeah?  Where did you talk to him?

11    A.    I don't know.

12    Q.    You don't remember?

13    A.    I have no remember (verbatim).

14    Q.    Do you remember what you said to Det. Sean?

15    A.    No.

16    Q.    No?

17    A.    No.

18    Q.    Do you remember telling him that Mr. Chandler put a

19    blindfold on you?

20    A.    No.

21    Q.    No?  Do you remember whether Mr. Chandler did put a

22    blindfold on you?

23    A.    No.

24    Q.    No?

25    A.    No.

26    Q.    Did Mr. Chandler put something in your mouth?

27    A.    I don't know.

28    Q.    You don't know?

1   A.   No.

2   Q.   Are you sure you don't know?

3   A.   I think I forgot.

4   Q.   You think you forgot?

5   A.   Yes.

6   Q.   How come you think you forgot?

7   A.   I think it has been two or three years, that's why.

8   Q.   Yeah?  Well, what do you remember?  Could you tell me

9   what you do remember about talking to Det. Sean?

10  A.   Um, nothing.

11  Q.   You don't remember anything about talking to Det. Sean?

12  A.   I remember talking to him, but other than what I said --

13  Q.   You don't remember what you said?

14  A.   Yes.

15  Q.   Do you remember -- you said you remember sitting in the

16  classroom; right?

17  A.   Yeah.

18  Q.   And you remember what kind of chair you were sitting in,

19  but you don't remember anything else?

20  A.   Yeah.  Yes.

21  Q.   Do you remember a blindfold?

22  A.   No.

23  Q.   Do you remember him putting anything on your feet?

24  A.   No.

25  Q.   Do you remember him putting anything in your mouth?

26  A.   No.

27  Q.   Do you remember how many times you were brought into the

28  classroom?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   694

1   A.   No.

2   Q.   Do you remember whether anyone else was there?

3   A.   No.

4   Q.   Do you remember if the door was open or closed?

5   A.   I think mostly closed.

6   Q.   Mostly closed?

7   A.   Yes.

8   Q.   Okay.  Do you remember anything coming out of your

9   mouth?

10   A.   No.

11   Q.   Do you remember anything getting on your jacket or your

12   pants?

13   A.   I think my jacket.

14   Q.   Okay.  What got on your jacket?

15   A.   I don't know, but I remember something in my jacket.

16   Q.   You remember something on your jacket?

17   A.   Yes.

18   Q.   What was it?

19   A.   I think water.  I don't know.

20   Q.   Okay.  Why do you think it was water?

21   A.   Um, I think I felt something wet on there.

22   Q.   Okay.  Where did you feel something wet?

23   A.   Like, on the corner -- not the corner.  Near the corner

24   of the jacket.

25   Q.   Okay.  You felt something wet on the jacket?

26   A.   Yes.

27   Q.   Where did the wet thing come from?

28   A.   I don't know.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   695

1    Q.    Did it come from your mouth?

2    A.    Um, I don't know.

3    Q.    Okay.  And you don't know -- you don't know what the wet

4    thing was?

5    A.    No.

6    Q.    And you don't know if it came from your mouth?

7    A.    No.

8    Q.    Where else -- where did it come from?

9    A.    I don't know.

10   Q.    Okay.  So, Becky, you have -- you've had to come to

11   court before; right?

12   A.    Yes.

13   Q.    And you answered a lot of questions before; right?

14   A.    Yes.

15   Q.    Did you do the best that you could to tell the truth

16   then?

17   A.    Yes.

18   Q.    And when you talked to the police officers, did you do

19   your absolute best to tell the truth?

20   A.    Yes.

21   Q.    So why do you think you don't remember anything?

22   A.    Because I have been learning a lot.

23   Q.    Been learning a lot.  Your brain is full?

24   A.    Yes.

25   Q.    Yeah, that happens.  Becky, has your mom or your dad

26   ever -- do you know what the word "encourage" means?

27   A.    No.

28   Q.    No.  Have they ever asked you to forget about being in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   696

1   Mr. Chandler's class?

2   A.   Um, because sometimes I have dreams about it.

3   Q.   Yeah?  What kind of dreams?

4   A.   Like, mostly something else, and then I have to think

5   about it and then I forgot.

6   Q.   Okay.  Do you like to think about being in Mr.

7   Chandler's class, or do you not want to think about being in

8   Mr. Chandler's class?

9   A.   No.

10   Q.   No what?

11   A.   I don't like thinking about that.

12   Q.   How come?

13   A.   Because some -- because I mostly want to think about

14   school, like learning.

15   Q.   Okay.  And you don't want to think about Mr. Chandler's

16   classroom?

17   A.   Yes.

18   Q.   How come?

19   A.   Um, I don't know, but my brain tells me to.

20   Q.   Your brain tells you to forget?

21   A.   Yes.

22   Q.   Did something bad happen there?

23   A.   I don't know.

24   Q.   Okay.  But your brain just tells you not to remember?

25   A.   Yes.

26   Q.   Okay.  Could you remember anything else that you haven't

27   told me?

28   A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   697

1    Q.    What else do you remember?

2    A.    Um, I just remember sitting, and then I just remember,

3    like, just sitting.

4    Q.    You just remember sitting?

5    A.    Yes.

6    Q.    You don't remember anything else that happened?

7    A.    Yes.

8    Q.    That's it?

9    A.    Um-hum.

10   Q.    Okay.  All right.  Becky, that's all the questions I

11   have.

12               THE COURT:  Thank you, Ms. Filo.

13               Cross-examination, Mr. Madden?

14               MR. MADDEN:  Your Honor, we are going to take a

15   recess?

16               THE COURT:  In about 15 or 20 minutes.

17               MR. MADDEN:  Okay.

18               THE COURT:  Are you doing okay?

19               THE WITNESS:  Yes.

20               THE COURT:  Okay.  If you need a break, let me know

21   and I'll take a break earlier than what I said.

22               THE WITNESS:  Yes.

23               MR. MADDEN:  One moment, please, Your Honor.  I

24   apologize.

25               THE COURT:  That's fine.

26                        CROSS-EXAMINATION

27   BY MR. MADDEN:

28   Q.    Good morning, Becky.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   698

1    A.    Good morning.

2    Q.    My name is Brian Madden.  I'm Mr. Chandler's attorney

3    and I'm going to ask you some questions.  Okay?

4    A.    Yes.

5    Q.    We've never met before; right?

6    A.    I think -- I think no.

7    Q.    I think you're right.  All right.

8          Now, I would like to first ask you some questions

9    about Mr. Chandler's classroom.  Okay?

10   A.    Yes.

11   Q.    Do you think you remember what the classroom looked

12   like?  Where the students were, where your desk was, those

13   kinds of things?

14   A.    No.

15   Q.    Okay.  Do you remember if the children were -- let me

16   stop.  Strike that question, please.  That means I want to

17   start over.

18          You were in what grade when you were in Mr.

19   Chandler's class?

20   A.    Third.

21   Q.    Third.  Okay.  There were also second-graders; right?

22   A.    Yes.

23   Q.    And did the third-graders sit on one side of the

24   classroom and the second-graders on the other?

25   A.    I don't know.

26   Q.    Okay.  Were there four groups of children in Mr.

27   Chandler's class?

28   A.    I don't know.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   699

1    Q.   Do you remember whether the groups were called tigers,

2    zebras, gorillas -- I'm forgetting the fourth one.  Do you

3    remember?

4    A.   Yes.

5    Q.   Which group were you in?

6    A.   Lyons, I think.

7    Q.   Lyons.  Okay.

8         So if you could imagine walking into Mr. Chandler's

9    class, the door would be in the back of the class; right?

10   A.   I forgot.

11   Q.   Let me see if I could help you.  That was not helpful.

12   I'm sorry.

13        Do you remember where your desk was in the class?

14   What part of the class?

15   A.   No.

16   Q.   Okay.  Sorry, Becky, I'm trying to find a picture that

17   will perhaps help you remember.

18        Okay.  Let's start with a photograph that has

19   previously been marked A-1.  Do you recognize that picture?

20   A.   Yes.

21   Q.   Do you know what recognize means?

22   A.   Yes.

23   Q.   All right.  So the class door, when you went into room

24   18, if you went through that door, you would be looking or

25   walking in -- this is the back of the class; right?

26   A.   Yes.

27   Q.   And that's where Mr. Chandler's desk was, in the back of

28   the class?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   700

1    A.    Yes.

2    Q.    Okay.  And the door that's in this photograph that I'm

3    pointing to, the brown door with the words "expository

4    writing" on the door, where did that door go?

5    A.    I think mostly that leads to the -- a classroom.

6    Q.    Could you say that again but a little louder and a

7    little slower?

8    A.    It leads to a classroom.

9    Q.    Thank you.  I have old ears.  I don't hear so well.

10          So it leads to another classroom?

11   A.    Yes.

12   Q.    Do you know who the teacher was in that classroom?

13   A.    No.

14   Q.    Do you ever remember seeing that teacher come into Mr.

15   Chandler's classroom through that door?

16   A.    No.

17   Q.    Do you ever remember Mr. Chandler going through that

18   door into the other classroom?

19   A.    No.

20   Q.    Okay.  You're not saying he didn't do that, you're just

21   saying you don't remember?

22   A.    Yes.

23   Q.    Okay.

24          MS. FILO:  Objection, Your Honor.  Misstates the

25   testimony.

26          THE COURT:  Sustained.

27          MR. MADDEN:  Thank you.

28          THE COURT:  The answer is stricken.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   701

1    BY MR. MADDEN:

2    Q.    Now, I'm going to show you a photograph, A-13.  Let me

3    get a pointer.  So if what we were just talking about with

4    the last picture was the back of the class, would this

5    photograph with the white boards in it and the projector,

6    would that be the front of the class?

7    A.    Yes.

8    Q.    Okay.  Now, I see you could see them on the ceiling

9    here, some appears to be animals hanging down.  Looks like to

10   be tigers over here, looks like it might be lyons over here,

11   and maybe gorillas over here.  Does that sound familiar?

12   A.    Yes.

13   Q.    Okay.  And you think you were in what group?

14   A.    The lyons.

15   Q.    Okay.  I'm not -- you think you might have been in the

16   lyons?

17   A.    Yes.

18   Q.    All right.  But whether it was lyons or not, that would

19   mean at the time you were in Mr. Chandler's class, your desk

20   would be in the group that I'm circling with the marker,

21   which is what would be the group in the right, front corner

22   of the classroom; right?

23   A.    Yes.

24   Q.    Okay.  And do you -- I'll tell you this photograph was

25   taken a few months after you were out of Mr. Chandler's

26   classroom.  Okay?

27   A.    Okay.

28   Q.    So can you tell me, if you remember, where in this group

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   702

1  your desk was?

2  A.   No.

3  Q.   Okay.  But you do remember that you were in the front of

4  the class?

5  A.   Yes.

6  Q.   Okay.  Thank you.

7          Now, do you remember if -- when you were in Mr.

8  Chandler's class, do you remember what happened to children

9  when they got in trouble?

10  A.   No.

11  Q.   When I say got in trouble, I mean maybe not just

12  trouble.  Maybe not turning in your homework, not doing your

13  homework, maybe being tardy?

14  A.   No.

15  Q.   You don't remember that?

16  A.   No.

17  Q.   Do you remember ever having to sit on a wall during

18  recess?

19  A.   No.

20  Q.   It looked like you were thinking about that for a

21  minute.  You think maybe you had to sit on the wall one time?

22  A.   Not me.  Other people.

23  Q.   Other people.  But you do remember other people having

24  to sit on the wall?

25  A.   Yes.

26  Q.   Why did they have to sit on the wall?

27  A.   I think when they don't do their homework.

28  Q.   Okay.  How about if they teased someone and made them

1  cry?

2  A.   I don't know.

3  Q.   You don't know?

4  A.   No.

5  Q.   Did you -- do you remember a time when you kind of got

6  in trouble for making your friend Jenny cry?

7  A.   No.

8  Q.   You don't remember having to sit on the wall because you

9  made her cry?

10  A.   No.

11  Q.   The kids who sat on the wall, that was during the

12  morning recess?

13  A.   I think recess, yes.

14  Q.   Yes.  And what was the rule?  That children who were

15  sitting on the wall had to sit there on the wall while the

16  other children were at recess; right?

17  A.   Yes.

18  Q.   The other children weren't allowed to talk with them;

19  right?

20  A.   Yes.

21  Q.   Okay.  I'm going to move these so you'll be able to

22  leave, but not right yet.

23       THE COURT:  Actually, Mr. Madden, I think this will

24  probably be a good point to take a morning recess.

25       MR. MADDEN:  That will be perfect.

26       THE COURT:  Okay.  Thank you, ladies and gentlemen.

27  I will order all members of the jury to report to the jury

28  assembly room on the second floor.  Please remember the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   704

1   Court's admonition, not to discuss or form any opinion on

2   this case until it's finally submitted to you, and we'll be

3   in recess for about 15 minutes.

4             All members of the jury, you are excused.

5             MS. FILO:  Your Honor, may we approach?

6             THE COURT:  Yes.

7             (Whereupon, a brief recess was taken.)

8             THE COURT:  Record will reflect all members of the

9   jury are present, both counsel are present, Mr. Chandler is

10  present in the courtroom, Becky is on the witness stand.

11            Mr. Madden, you were continuing with cross.

12            MR. MADDEN:  I have no further questions at this

13  time.

14            THE COURT:  Redirect, Ms. Filo?

15            MS. FILO:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MS. FILO:

18  Q.   Becky, you said that you don't have any memory of

19  talking to your mom about anything happening in Mr.

20  Chandler's class; is that correct?

21  A.   Yes.

22  Q.   You came to court once before.  Do you remember that?

23  A.   Yes.

24  Q.   And you sat in a chair just like that?

25  A.   Yes.

26  Q.   And you testified?

27  A.   Yes.

28  Q.   And the judge was a lady judge?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   705

1   A.    Yes.

2   Q.    Yes.  And when you came and testified, you promised to

3   tell the truth; right?

4   A.    Yes.

5   Q.    And did you tell the truth?

6   A.    Yes.

7   Q.    Okay.

8             MS. FILO:  Your Honor, at this time, I would like

9   to read from the preliminary hearing transcript page 31,

10  lines 13 through 28.

11            THE COURT:  Okay.  You may do so.

12            MS. FILO:  Question --

13            MR. MADDEN:  One moment, please, Ms. Filo.  I'm

14  sorry.  Which volume?

15            MS. FILO:  It's Becky's testimony.

16            MR. MADDEN:  Thank you.  What page?

17            MS. FILO:  Page 31.

18            MR. MADDEN:  I got it.  Thank you.

19            MS. FILO:  "QUESTION:  Okay.  Why did you think --

20            why did you think:  Hey, I need to talk to my mommy

21            about that?

22            "ANSWER:  Because I don't think it was fun and I

23            don't think it was -- I don't think it was -- I

24            think it was inappropriate.

25            "QUESTION:  You think it was inappropriate?

26            "ANSWER:  You nodded your head.

27            "QUESTION:  Did it make you feel bad to play the

28            game?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   706

1          "ANSWER:  Yes.

2          "QUESTION:  Okay.  So you thought you need to tell

3          an adult about this?

4          "ANSWER:  Yes.

5          "QUESTION:  Good for you.

6          "ANSWER:  Because I tell everything to my mom, but

7          not my dad."

8    BY MS. FILO:

9    Q.    Do you remember testifying to that?

10   A.    Yes.

11   Q.    Yeah?  Was that all true?

12   A.    Yes.

13   Q.    So what was it that was not fun?  What was it that you

14   thought that was inappropriate?

15   A.    I can't remember.

16   Q.    Okay.  But when something is inappropriate, you tell

17   your mom?

18   A.    Yes.

19   Q.    Not your dad?

20   A.    Sometimes.

21   Q.    Sometimes?

22   A.    Yes.

23   Q.    Is your dad here in the courtroom today?

24   A.    Yes.

25   Q.    Is there something you don't want your dad to hear?

26   A.    No.

27   Q.    No?  You're okay talking to your dad?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   707

1   Q.   But you testified before that you didn't want your dad

2   to know?

3   A.   I didn't say that.

4   Q.   Well, you said, "I tell everything to my mom, but not my

5   dad"?

6   A.   Um, I tell my dad sometimes.

7   Q.   Okay.  But you didn't tell him about what happened in

8   Mr. Chandler's classroom?

9   A.   I don't know.

10   Q.   Okay.  Becky, has anyone told you to come to court today

11   and just say "I don't know" to every question we ask you?

12   A.   No.

13   Q.   Has anybody told you to say "I don't remember"?

14   A.   No.

15   Q.   Do you remember me coming to your house one time?

16   A.   Yes.

17   Q.   And I gave your mom and dad some papers?

18   A.   Yes.

19   Q.   And it made your parents really upset, didn't it?

20   A.   Yes.

21   Q.   In fact, your mom was crying; right?

22   A.   No.

23   Q.   You were crying?

24   A.   Yes.

25   Q.   Yeah?  Why were you crying?

26   A.   I don't know.

27   Q.   You don't know?

28   A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   708

1   Q.   But something about me being there and giving your

2   parents some papers made you cry?

3   A.   I don't know.  I can't remember.

4   Q.   Okay.  Nobody has told you that the best thing to do is

5   just forget about Mr. Chandler's classroom?

6   A.   No.

7   Q.   No?  Okay.  Thank you, Becky.

8            THE COURT:  Recross, Mr. Madden?

9            MR. MADDEN:  Nothing, Your Honor.

10           THE COURT:  Okay.  May she be excused?

11           MS. FILO:  Subject to recall, Your Honor.

12           THE COURT:  Okay.  Thank you, Becky.  You could

13   step down.  You are excused, subject to recall.  You could

14   leave.  Thank you very much.

15           Do you have another witness, Ms. Filo, or --

16           MS. FILO:  I could, Your Honor.

17           THE COURT:  Okay.  How long is your next witness

18   expected?

19           MS. FILO:  Thirty minutes, maybe.

20           THE COURT:  Okay.  We'll call your next witness.

21           MS. FILO:  People call Det. Sean Pierce.

22                    DET. SEAN PIERCE, SJPD

23           Being called as a witness on behalf of the People,

24   having been first duly sworn, was examined and testified as

25   follows:

26           THE CLERK:  For the record, sir, could you please

27   state your full name and spell both for the record.

28           THE WITNESS:  Sean, S-e-a-n.  Pierce, P-i-e-r-c-e.

1          THE COURT:  Thank you, Detective.

2          Direct examination, Ms. Filo.

3          And, Detective, you may want to adjust that

4    microphone.

5                    DIRECT EXAMINATION

6    BY MS. FILO:

7    Q.   How are you currently employed?

8    A.   I'm a police officer for the City of San Jose.

9    Q.   How long have you been employed as a police officer for

10   the City of San Jose?

11   A.   Seventeen years.

12   Q.   How does one become a police officer with the City of

13   San Jose?

14   A.   Well, there is a long testing process, and then if you

15   are selected, you go to a police academy.  Once you are done

16   with the police academy, then you go to a field training

17   program.

18   Q.   In that field training program, you ride with other

19   officers, or attached to other officers so you could learn

20   from them?

21   A.   You are assigned an FTO, so you ride with that person

22   for I believe it's -- well, when I went through it, it was 16

23   weeks.  I don't know what it is now.

24   Q.   FTO is field training officer?

25   A.   Field training officer, yes, you are assigned, and they

26   sit in the passenger seat, observe, and document everything

27   you do.

28   Q.   So we think of police officers wearing uniforms and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   710

1  coming to respond to 9-1-1 calls.  You're currently a

2  detective; is that correct?

3  A.   That's correct.

4  Q.   And what do -- what unit are you assigned?

5  A.   Child exploitation detail.

6  Q.   How do you become a detective with the San Jose Police

7  Department?

8  A.   They have a job opening and you put in your interest and

9  then they have a test.

10  Q.   For how long have you been assigned to the child exploit

11  unit with the San Jose Police Department?

12  A.   This is my second tour.  I was in child exploitation

13  detail in 2001 to 2004, and now I have been in it since

14  November of 2011.

15  Q.   What sort of training and experience do you have to have

16  in order to become a detective with the child exploit unit?

17  A.   To become a detective you don't need any training.

18  Anybody can apply.  You get all your training once you are in

19  the bureau.

20  Q.   That's what I meant.  What about that training?

21  A.   Um, once you are in the bureau -- we're child

22  exploitation detail, but we're also a national task force,

23  Internet crimes against children task force.  We're kind of

24  two, and we get training -- I mean, I've had hundreds and

25  hundreds of hours of training.  We travel all over the

26  country for different training on interviewing, on Internet

27  crimes, and how to investigate the crimes.

28  Q.   Could you give me an estimate in your career how many

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   711

1  hours of training you've had in the interviewing of child

2  victims of sexual assault?

3  A.   Well, on-the-job training and in training, hundreds of

4  hours.  I was also -- in between my two tours in child

5  exploit, I was attached to the Megan's Law detail, which also

6  works in the sexual assault unit, and we're on-call duties.

7  So on those on-call duties, we also handle the child exploit

8  cases.

9  Q.   Approximately how many suspected victims of child sexual

10  assault have you had the opportunity to interview?

11  A.   Hundreds.  I have no idea what the count would be.

12  Q.   So I also think of police officers as being kind of

13  clean-cut, almost military style.  Why do you look like that?

14  A.   We work with our Internet crimes against children task

15  force part of the unit.  We work in an undercover capacity on

16  the Internet, and I currently work undercover cases, sting

17  operations on Craigslist, where we offer children for sale,

18  for sex, and we also buy children for sex through the

19  Internet.  So that's why we have the undercover look.

20  Q.   Det. Pierce, were you assigned to investigate a

21  suspected sexual assault child molestation case in January of

22  2012?  The suspect was identified as Craig Chandler?

23  A.   I do -- I was.

24  Q.   How does a case come to be assigned to you?  How does

25  that process work?

26  A.   Well, on the child exploitation part of our unit, we are

27  attached to the sexual assault unit, which handles all sexual

28  assaults in the city.  The child exploitation detail is a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   712

1   four-man team, and we specifically handle only -- we call

2   them institutional cases.  That would be any cases involving

3   teachers, priests, coaches, potential multiple victims, or

4   high-profile cases.  So that's why we would get assigned this

5   particular case.

6   Q.   Okay.  Is that because of your sense of training and

7   experience?

8   A.   Yes.

9   Q.   When you got the call to respond to this case, what's

10  going through your mind as an investigator?

11  A.   Well, when we got the case, the only thing we had was

12  that the suspect was a teacher.  So we have a certain

13  protocol how we handle cases involving the potential of

14  multiple victims.

15  Q.   What is that protocol?

16  A.   We try to -- when there is multiple victims, we try to

17  interview everyone as soon as possible, everyone that could

18  be a victim as soon as possible.  So in this instance, and

19  all of the other cases that we handle, we will send a team

20  out to wherever it is.  It may be a school, a day care, a

21  church, and we'll send a team out there and we conduct all of

22  the interviews simultaneously with other detectives.

23  Q.   Why?

24  A.   We don't want to taint any of the interviews.  If you

25  interview one kid and then two weeks later you interview

26  another kid.  We like to interview them all at the same time

27  so no one has a chance to talk to each other.

28  Q.   And to the best of your ability, did you do that in this

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   713

1    case?

2    A.    Yes.  I believe we interviewed -- the first day I think

3    there was about 40 kids interviewed.

4    Q.    Were you able to go to the school, to O.B. Whaley, and

5    get a list of essentially all of the children that had been

6    students of Craig Chandler?

7    A.    Yes.

8    Q.    How did you then interview them all?  What did you do?

9    A.    So the way we handled this one is we make contact with

10   the principal of the school.  They are made aware of the

11   situation in this case.  They already knew.  We arrange to

12   have a classroom setup so we could interview, and then my

13   sergeant coordinates the interviews.  He would have the kids

14   go to each individual classroom which had a detective in that

15   classroom and then they would interview the child.

16   Q.    So you said the first day you were able to interview

17   almost 40 children?

18   A.    I don't know the exact number.  I think there was a

19   total of 70.  I think it was 77 children interviewed.  A vast

20   majority was interviewed the same day.

21   Q.    Okay.

22   A.    It was a two-day process.

23   Q.    And you had different detectives in different rooms?

24   A.    That's correct.

25   Q.    So to be able to interview as many people as possible at

26   the same time?

27   A.    That's correct.

28   Q.    If a child gave any information to you or to one of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  714

1  detectives that was suspicious, what was the protocol from

2  that point forward?

3  A.   We had a list of questions that were asked to every

4  student, and if there was any disclosure, if the victim

5  disclosed any allegation against him, the interview was

6  stopped immediately, the parents were notified, and then the

7  child was transported to the Children's Interview Center.

8  Q.   All of those interviews, to the best of your knowledge,

9  were recorded?

10  A.   Yes, I believe so.

11  Q.   Okay.  You said if there was any disclosure, they

12  were -- those interviews were stopped and they were taken to

13  the Children's Interview Center?

14  A.   That's correct.

15  Q.   What is the Children's Interview Center?

16  A.   The Children's Interview Center is an off-site office

17  building where we conduct interviews of children.  Our

18  protocol is usually children under the age of 14.  It's a

19  little bit better environment than bringing the child to a

20  police department.  They don't feel intimidated.  It's like a

21  house setting.  There is stuff for them to do.  There is

22  coloring books, stuffed animals, waiting room, a TV.  They

23  are able to sit and watch TV before they get interviewed.

24  Q.   The idea to try to make the child as comfortable as

25  possible?

26  A.   That's correct.

27  Q.   Does that facility have the ability to audiotape and

28  videotape interviews?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   715

1    A.   It does.

2    Q.   Okay.  So, for instance, yesterday we watched a video of

3    Isabell who was interviewed by you, was that taken at the

4    Children's Interview Center?

5    A.   It was.

6    Q.   Det. Pierce, you are responsible -- you are the

7    investigating officer assigned to this case; is that correct?

8    A.   That's correct.

9    Q.   So other officers will submit their reports to you?

10   A.   Yes.

11   Q.   And you create out of that sort of the master report?

12   A.   That's correct.

13   Q.   In this particular case -- strike that.

14        In most cases, when you bring over a case for

15   filing to the District Attorney's Office to file those

16   charges, does the police report go with the charges to the

17   court?

18   A.   No.  Like, you mean --

19   Q.   I'm sorry.  That's probably a bad question.

20        When you bring over a regular case, just your

21   average case, you bring over a charging sheet; right?  An

22   issuing sheet?

23   A.   Um-hum.

24   Q.   Then you attach the police report to it?

25   A.   Yes.

26   Q.   And it's redacted to protect names and things like that?

27   A.   Yes.

28   Q.   And that entire packet goes to the court and becomes

1  part of the court file?

2  A.    That's correct.

3  Q.    In this case, were you asked to craft sort of an

4  abbreviated statement of the case to the court so that the

5  entire police report wouldn't even be on file with the court?

6  A.    Yes, we did an abbreviated case.

7  Q.    Det. Pierce, you have been to the O.B. Whaley campus?

8  A.    I have.

9  Q.    Many times?

10  A.    Yes.

11  Q.    Could you describe for me where Mr. Chandler's classroom

12  was in relation to the rest of the school?

13  A.    It was in the back of the school, the very -- as you've

14  seen in some of the pictures, where you saw a picture of the

15  classroom, it says room 18.  If you were to turn around,

16  there would be a fence to the neighborhood behind.

17  Q.    Okay.

18  A.    So the very back of the school.

19  Q.    Okay.  The classroom itself, there is actually somewhat

20  of -- I mean, a pretty good picture --

21          MS. FILO:  Your Honor, if I may approach?

22          THE COURT:  Yes.

23  BY MS. FILO:

24  Q.    I think this is A-13.  I see no windows in that

25  classroom.  Are there any windows in the classroom?

26  A.    There -- if you were facing -- if you open the door and

27  you are facing into the classroom, there are windows on the

28  right, but they are all covered.

1    Q.    Okay.  And is that what's pictured here in A-1?

2    A.    That's correct.

3    Q.    So there are windows up on the top.  There are three

4    windows pictured in the top of A-1?

5    A.    That's correct.

6    Q.    Then there appears to be something below them, it's

7    white paper, and then the overlay on top of it are purple and

8    blue sort of diamond cutouts?

9    A.    Yes.

10   Q.    Are those windows?

11   A.    Yes, they appear to be windows.  You see on the bottom

12   there is actually a latch underneath the purple.

13   Q.    These appear to be windows, but they are covered?

14   A.    They are covered.

15   Q.    These windows that are covered would have been at eye

16   level?

17   A.    Yes.

18   Q.    But these ones on top are not?

19   A.    They are not.

20   Q.    Were you -- you were not the evidence collector in this

21   case; right?

22   A.    I was not.

23   Q.    What is an evidence collector?

24   A.    An evidence collector is someone that is responsible for

25   collecting any evidence on scene, and they would be -- I

26   believe is going to be the same person who took these photos,

27   or, if not, similar photos.  So they would take photos and

28   then they do the collecting of the evidence.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   718

1   Q.   Okay.  They are the designated -- they call them the

2   finder?

3   A.   The finder, yes.

4   Q.   They are responsible for collecting it, identifying it,

5   tagging it, booking it into evidence, those kinds of things?

6   A.   That's correct.

7   Q.   Okay.  I just want to make sure that was not you?

8   A.   It was not me, no.

9   Q.   Were you involved in what was -- what pictures -- I'm

10  sorry -- what evidence was collected, were you -- did you

11  have any input on that process?

12  A.   No.

13  Q.   Okay.  What about pictures taken?  Did you have any

14  input on what pictures were taken?

15  A.   No.

16  Q.   You said that you used a standardized form; is that

17  right?

18  A.   That's correct.

19  Q.   Was the form created for this case or is this a general

20  form?  Could you explain the form to me?

21  A.   This is kind of a general form, but they are all

22  different based on the case.  It was created by Sgt.

23  Lombardo, so he gets the allegations of the case and then he

24  will make a sheet of questions that pertain to this case that

25  they should be asked.

26  Q.   Okay.  You didn't by chance bring a blank one of those,

27  did you?

28  A.   I don't -- I may have one in my briefcase.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   719

1    Q.    Okay.  We'll get one.

2              MS. FILO:  Your Honor, if I may?  We'll get one

3    that is redacted.

4    BY MS. FILO:

5    Q.    The interviews that you personally conducted at the

6    Child Interview Center, in all of those you used your

7    training and experience in interviewing those children; is

8    that correct?

9    A.    That's correct.

10   Q.    What are some of the guidelines about interviewing

11   children?  What are some sort of the golden rules of

12   interviewing children?

13   A.    Basically, we don't want to ask leading questions.  We

14   let the child do the talking.  We do have a -- we go by a

15   sheet of questions that might want to be asked, but they

16   don't pertain to every case.

17   Q.    Okay.  So the theory is that you're to let the child do

18   more talking than you are doing?

19   A.    That's correct.

20   Q.    Okay.

21             MS. FILO:  Your Honor, I think that's all I have

22   with Det. Pierce at the moment.

23             THE COURT:  Thank you, Ms. Filo.

24             Cross-examination on this area, Mr. Madden?

25             MR. MADDEN:  Yes.  Your Honor, I think my

26   cross-examination is probably going to take about 45 minutes.

27   I'm happy to begin it.  Since we have another task to do, I

28   would -- at the recess -- I would like to have permission to

1    resume this afternoon or another time.

2             THE COURT:  Ms. Filo, are you okay with that

3    process?

4             MS. FILO:  That's fine with me.

5             THE COURT:  At 1:30, are we going to do the reading

6    at that time or continue with cross?

7             MS. FILO:  Your Honor, I actually have two

8    witnesses who are scheduled to be here at 1:30, civilian

9    witnesses.  Maybe we could approach briefly.

10            (Whereupon, there was a discussion at the bench.)

11            THE COURT:  As I understand it, both counsel do not

12   object to the witness's cross-examination being interrupted

13   as we address other witnesses and other issues.

14            Correct, Counsel?

15            MR. MADDEN:  That's correct, Your Honor.

16            MS. FILO:  Yes, Your Honor.

17            THE COURT:  Okay.  Thank you.

18            Ladies and gentlemen, what we're going to do is

19   we're going to recess at this time until 1:30.  First, let me

20   order all members of the jury to report to the jury assembly

21   room at 1:30 on the second floor.  The reason we're breaking

22   at this time is because I am going to have the lawyers go

23   over Becky's prior testimony that was given under oath at the

24   preliminary examination, and it's going to be that testimony,

25   or prior testimony is going to be read to you this afternoon.

26   So I want to make sure it's prepared and ready to go when we

27   return.  Then we'll have two additional witnesses, and then

28   we'll see where we're at as far as recalling this particular

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   721

1    witness or recessing for the afternoon.  We'll address that

2    this afternoon.

3            I wanted to explain to you as a courtesy the reason

4    we're breaking early so we could address that issue.

5            So, all members of the jury, you are excused at

6    this time.  Remember to leave your notebooks on your chair or

7    any personal belongings.  They will be there when you return

8    undisturbed.

9            (Whereupon, the jurors exited the courtroom.)

10           THE COURT:  Jury's left the courtroom.  I will

11   order both counsel and Mr. Chandler here at 1:30.  We'll go

12   off the record.

13           (Whereupon, the Court took the noon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   722

1               AFTERNOON PROCEEDINGS

2          THE COURT:  Thank you, ladies and gentlemen.

3    Record will reflect all members of the jury are present, both

4    counsel are present, Mr. Chandler is present in the

5    courtroom.

6          And, Ms. Filo, you ready to proceed?

7          MS. FILO:  Thank you, Your Honor.  The People call

8    Lyn Vijayendran.

9               LYN VIJAYENDRAN,

10        Being called as a witness on behalf of the People,

11   having been first duly sworn, was examined and testified as

12   follows:

13        THE CLERK:  For the record, ma'am, please state

14   your first and last name and spell both for the record.

15        THE WITNESS:  My first name is Lyn, L-y-n.  Last

16   name is Vijayendran, V-i-j-a-y-e-n-d-r-a-n.

17        THE COURT:  Thank you, ma'am.  The lawyers are

18   going to be asking you some questions.  It's important that

19   you let them finish their question before you begin your

20   answer.  I will ask you to make every effort to simply answer

21   what is being asked.  If one of the lawyers say objection,

22   don't answer the question.  I will rule.  If I overrule the

23   objection, I will let you know if you could answer it.  If I

24   sustain the objection, the lawyer will ask you another

25   question.  Okay?

26        THE WITNESS:  Okay.

27        THE COURT:  Thank you.

28        Direct examination.

1          MS. FILO:  Thank you, Your Honor.

2                   DIRECT EXAMINATION

3    BY MS. FILO:

4    Q.   Ms. Vijayendran, were you the principal of O.B. Whaley

5    Elementary School in the 2011/2012 school year?

6    A.   Yes, I was.

7    Q.   How long had you been a principal of O.B. Whaley at that

8    time?

9    A.   That was the my fourth year, I believe.

10   Q.   Ms. Vijayendran, I want to ask you about Friday being

11   October 14th and a student of O.B. Whaley at that time named

12   Becky.  Do you remember Becky?

13   A.   Yes.

14   Q.   Could you tell me up until October 14th how much

15   interaction you had with Becky's parents?

16   A.   Um, a decent amount of interaction.  She wasn't a

17   student that got in trouble, so I didn't see them in that

18   regard, but her mother -- actually, I don't know that I ever

19   met her father.  Her mother was around school often

20   volunteering, helping out, things like that, walked her kids

21   to school in the morning.

22   Q.   And Becky at that time was a student in Mr. Chandler's

23   class?

24   A.   Correct.

25   Q.   So on October 14th of 2011, did Becky's mother come to

26   you?

27   A.   I don't remember if that's the exact date, but somewhere

28   in that range.  She did come to me in the morning to talk.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  724

1  Q.  Okay.  It was in the morning of that day?

2  A.  Yes.

3  Q.  So, Ms. Vijayendran, I'm going to show you a document,

4  which I'm going to ask the Court to mark as the People's next

5  in order.

6      THE COURT:  That will be 3.

7      (Whereupon, People's Exhibit 3 was marked for

8  identification.)

9      MS. FILO:  For the record, this appears to be three

10  pages of handwritten notes, and if I -- may I approach the

11  witness, Your Honor?

12      THE COURT:  Yes.  Thank you.

13  BY MS. FILO:

14  Q.  Ms. Vijayendran, do you recognize those notes?

15  A.  I do, yes.

16  Q.  Whose handwriting is on the notes?

17  A.  That's mine.

18  Q.  And on the top of it it says "Friday, October 14th,"

19  yes?

20  A.  Yes.  To be honest, I think, if I remember correctly,

21  that was the day that she came to talk to me about.  I

22  believe it was the following week, earlier in the week, that

23  she came to talk to me, but I'm not positive of that.

24  Q.  Say it one more time.

25  A.  I think that the Friday the 14th was the day that she

26  wanted to talk to me, but I believe it was the following

27  week, early in the week, that we actually had the

28  conversation.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   725

1  Q.   I understand that --

2  A.   I'm not positive, but I think that.

3  Q.   You think that when Becky came to talk to you, it was

4  sometime the week following October 14th?

5  A.   That's how I remember it, but like I said, it was a long

6  time ago.

7  Q.   Okay.  So just for the jury's benefit, I have a copy of

8  those notes up on the screen.

9          So, Ms. Vijayendran, can you tell me how these

10 notes came to exist?  What was the surrounding context?

11 A.   Um, Becky's mother came to see me in the morning

12 requesting that her daughter get a new class, have a class

13 change.  And when I asked her that's not -- you know, that's

14 not an unusual request, but not something we generally do,

15 what the circumstances are that was -- that made her come to

16 talk to me.  She started explaining to me about an incident

17 that occurred with her daughter.  This was just the mom and I

18 having a conversation at this time.  So when I asked her to

19 get her daughter to come talk to me, these were the notes of

20 part of the conversation.

21 Q.   Okay.  To the best of your recollection, what was it

22 that Becky's mom told you about what had happened between her

23 daughter and Mr. Chandler?

24 A.   That Becky had been in the room alone with him, and that

25 there had been -- she had her eyes covered and something was

26 put in her mouth.

27 Q.   Okay.  It was at that point where you said:  I would

28 like to talk to Becky.  I want to find out more about this?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   726

1    A.    Yes.

2    Q.    Okay.  So did Becky then come in and see you?

3    A.    Yes.

4    Q.    Was Becky already at school or was she at home or where

5    was she?

6    A.    I'm not sure.  This was in the morning before school

7    started.  She was not in class.  I don't know if she was --

8    I'm not sure.

9    Q.    Okay.  But it was before school had started?

10   A.    Correct.

11   Q.    So Becky came to you, and the notes that you took, you

12   took contemporaneous with your discussion with Becky; is that

13   right?

14   A.    Correct.  Yes, these notes are not everything that we

15   talked about, but they were being written throughout the

16   conversation, not after the fact.

17   Q.    So you wrote -- I'm going to go through this and I want

18   to make sure that these are the things that Becky told you.

19   "Michaela told Becky, quote, Mr. Chandler needs you, and

20   Becky went to the room"?

21   A.    Yes.

22   Q.    Mr. Chandler said, "Ms. V. is going to come."  Did the

23   children occasionally call you Ms. V.?

24   A.    Yes.

25   Q.    Vijayendran is kind of a mouthful.  Okay:  "Becky was

26   standing up.  Mr. Chandler went in the closet and took out

27   the blindfold.  It was blue with a black string band."

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   727

1    Q.    And those were the descriptions that Becky was able to

2    give you at the time?

3    A.    Yes.

4    Q.    "He handed you the blindfold.  He went to the basket

5    where the balls and jump ropes are.  He took a blue and white

6    blanket out of the basket.  Becky put the blindfold on

7    herself after Mr. Chandler told her to."

8              So she referenced both a blue and white blanket and

9    a blindfold?

10   A.    Yes.

11   Q.    "Mr. Chandler said, quote, lie down on the floor right

12   there, end quote.  And Becky did."

13   A.    Yes.

14   Q.    "Mr. Chandler took the blanket and put it over Becky's

15   head.  Becky was wearing silver flats, and Mr. Chandler asked

16   her to take them off/took them off.  Becky was able to

17   describe to you what she was wearing."

18   A.    Yes.  Throughout these notes, I was asking her

19   questions, and so that was probably a question that I asked

20   her.

21   Q.    Okay.

22   A.    But, yes, she was able to give me that description.

23   Q.    Okay.  "Becky's pants were capri sweatpants/pants

24   silverish gray."  There is a star next to that.  Is there any

25   reason for that that you could remember?

26   A.    I have no idea.  I'm sorry.

27   Q.    Okay.  That's okay.

28              "Becky told Mr. Chandler she was hot and he didn't

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   728

1    answer.  Becky felt something gooey.  She said it felt like
2    maybe it was his tongue on her feet," and then you list four
3    things:  "The bottom of her foot, 20 seconds or so, then
4    Becky felt the same thing on her pants.  She felt Mr.
5    Chandler moving and he told her to 'open your two legs,'" and
6    that's in quotes.  So when Becky gave you quotes, some of
7    these descriptions you put them in quotation?
8    A.    Yes.
9    Q.    Those were her exact words?
10   A.    If they are in quotations, yes.
11   Q.    Okay.  You then said, "Mr. Chandler lifted the blanket
12   up to about her nose, and then Becky felt something in your
13   mouth.  First, Mr. Chandler said, 'I'm going to put something
14   in your mouth,'" and that's also in quotations?
15   A.    Yes.
16   Q.    And then in quotes, "First, he put the gooey something
17   in my mouth, then he wiggled my body back and forth and my
18   head."  That's also in quotation?
19   A.    Correct.
20   Q.    "Becky felt some salty water in her mouth and then it
21   dripped out into her hand and her jacket.  She wiped her hand
22   on her jeans.  Mr. Chandler removed the blindfold and
23   blanket.  Becky did not see where he put them."
24          Then you write, "The bell rang, Becky stood up.
25   Mr. Chandler opened the door, then walked to the sink and got
26   a damp paper towel.  He cleaned up her pants, then he opened
27   a Wonka candy and put it in Becky's mouth.  Becky then walked
28   back to her seat."

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   729

1    A.    Yes.

2    Q.    Could you remember anything else about the conversation

3    you had with Becky that day that is not reflected in these

4    notes?

5    A.    Um, it's -- I don't recall the exact details of the

6    conversation at this point.  This was the general outline of

7    the conversation.  So each part of each of those parts were

8    quite a bit expanded.  This was probably about a third of the

9    conversation, but the progression of events, this is how I

10   remember it.

11   Q.    Okay.  And do you know approximately how long it was

12   that your conversation with Becky lasted?

13   A.    It was at least -- no, I don't remember.  At least 45

14   minutes, I would guess.

15   Q.    What was Becky's demeanor while she was talking to you?

16   A.    She was the same as she usually was.  She was friendly,

17   willing to talk.  Um, I talked to her a lot, and her demeanor

18   was very similar to what it was every day that I saw her.

19   Q.    Backtracking a little bit.  When you spoke with her

20   mother, what was her mother's demeanor?

21   A.    Her mother was -- I'm trying to think of the right word

22   to describe her.  Her mother was a little bit anxious, not

23   overly upset by any means, but just kind of -- didn't like

24   the fact that her daughter was in the classroom by herself

25   with this teacher.  Annoyed by it, perhaps.

26   Q.    Ms. Vijayendran, there has been some discussion in this

27   case about the sweatshirt that Becky was wearing apparently

28   at the time that this incident with Mr. Chandler occurred.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   730

1    Do you remember a discussion with either Becky or her mom

2    about this sweatshirt?

3    A.   I do, yes.

4    Q.   With whom did that conversation take place?

5    A.   I think just with mom.  I don't remember talking about

6    that with Becky.

7    Q.   How did it come up with mom?

8    A.   Um, mom said that that's how the conversation between

9    she and Becky had begun, was that there was a mark on the

10   sweatshirt and she asked -- when she was doing the laundry,

11   she asked Becky how that got there, and that's how -- when

12   Becky shared that she was in the classroom during recess.

13   Q.   And did you actually see this sweatshirt?

14   A.   I did.

15   Q.   How did that come to happen?

16   A.   The mom brought it to me to see.

17   Q.   In response to your request or just on her own?

18   A.   Just on her own.

19   Q.   Did it still have this mark on it?

20   A.   Um, it did.  Yes.

21   Q.   Do you remember where the mark was?

22   A.   I don't recall now.

23   Q.   Do you remember?

24   A.   On the front somewhere.

25   Q.   On the front.  Okay.

26        Do you remember what it looked like?

27   A.   No.  It was a darker color, a hoodie, it was like a

28   zipped up hoodie sweatshirt.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   731

1  Q.   You mean what the sweatshirt looked like?

2  A.   Yeah.

3  Q.   Okay.  So, Ms. Vijayendran --

4          MS. FILO:  May I approach, Your Honor?

5          THE COURT:  Yes.

6  BY MS. FILO:

7  Q.   So I'm going to show you what's been marked as Exhibit

8  2.  Does that look at all familiar to you?

9  A.   It looks familiar, but I wouldn't be able to say that

10  that's the sweatshirt, to be honest with you.  That would be

11  a common sweatshirt for lots of the kids at the school to

12  have.

13  Q.   Okay.  You remember it being dark in color?

14  A.   I do, yes.

15  Q.   Do you remember what the stain looked like?

16  A.   It looked like spit.

17  Q.   And big?  Small?  Could you give any estimate?

18  A.   Quarter size, maybe.

19  Q.   So --

20  A.   Yeah.

21  Q.   Quarter size?

22  A.   Quarter, size of a quarter.

23  Q.   And it looked like spit?  Sort of whitish/clearish?

24  A.   Yeah, like somebody had liquid in their mouth and then

25  it -- when it would spit out of their mouth, it made a little

26  mark.

27  Q.   Okay.  Anything else you could remember about your

28  conversation with Becky that you haven't told us about today?

1   A.   No.

2   Q.   Okay.  And anything else about the conversation with her

3   mother that you could remember that I haven't asked you

4   about?

5   A.   Um, no.

6   Q.   Mom did ask that Becky be moved to a different

7   classroom?

8   A.   Correct.

9   Q.   And as the principal, do you have the authority to grant

10  those requests?

11  A.   Yes, I do.

12  Q.   Did you do that in this case?

13  A.   I did.

14  Q.   Ms. Vijayendran, after you had this conversation with

15  Becky, did you notify the police about what -- the police or

16  the Child Protective Services -- about what Becky had told

17  you?

18  A.   No, I did not.

19  Q.   Did that have anything to do with whether or not you

20  believed Becky was telling you the truth?

21  A.   No.  Are you asking if maybe I didn't believe her,

22  that's why I didn't call?

23  Q.   Yeah.  Did you have any reason to believe Becky was not

24  telling you the truth?

25  A.   No.  No, that was not the reason.

26  Q.   Ms. Vijayendran, after you had this conversation with

27  Becky, did you tell Craig Chandler that he was not to have

28  students in his classroom alone, particularly blindfolded,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   733

1  with the door closed?

2  A.   I told him he was not to have students in his classroom

3  alone with the door closed blindfolded.  And I told him if he

4  had students in his room alone doing work -- I highly

5  recommended he not have students in his room alone, but that

6  if he did, that they would be sitting at a desk working and

7  the door should be open.

8  Q.   Thank you.

9       MS. FILO:  Nothing further, Your Honor.

10      THE COURT:  Thank you.

11      Cross-examination, Mr. Madden?

12      MR. MADDEN:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. MADDEN:

15  Q.   Ms. Vijayendran, my name is Brian Madden.  I'm Mr.

16  Chandler's attorney.  We've never met before; right?

17  A.   I don't believe so.

18  Q.   All right.  Now, I want to, if I can, establish what I

19  understand to be documents connected with your conversations

20  with Becky.  Okay?

21  A.   Okay.

22  Q.   So we talked about one, which was up on the screen, and

23  this document has been previously marked as an exhibit by the

24  District Attorney.  And it represents your handwritten notes

25  concerning your approximate 45-minute conversation with Becky

26  in mid-October in your office?

27  A.   Correct.

28  Q.   Mid-October of 2011?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   734

1   A.   I believe it was 2011.  I'd have to look.

2   Q.   I got the same problem sometimes.  All right.  I think I

3   have it right.

4        All right.  So we've got handwritten notes.  Now,

5   did you create any other notes of that conversation?

6   A.   I did, the following January.

7   Q.   All right.

8   A.   I have -- there is a set of typed notes that I have.

9   Q.   So if my math is correct, about three months later?

10  A.   Yes.

11  Q.   All right.  That's the ballpark?

12  A.   Yep.

13  Q.   Okay.

14       MR. MADDEN:  And, Your Honor, I would like to have

15  these marked as defense next in order.  I believe Ms. Filo

16  has a copy.

17       THE COURT:  That will be Defense C; is that

18  correct?

19       MR. MADDEN:  I think we might be, I guess.  Is that

20  C?

21       THE CLERK:  It is C.

22       (Whereupon, Defense Exhibit C was marked for

23  identification.)

24       MR. MADDEN:  I'm going to approach, if that's all

25  right, Your Honor?

26       THE COURT:  Yes.

27  BY MR. MADDEN:

28  Q.   I'm going to bring those in front of you, if I may?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   735

1   A.   Sure.

2   Q.   I will ask you some questions about that shortly, but

3   let me compile the rest of the list.  And then you testified

4   in a legal proceeding in either October or November of 2012;

5   correct, about this subject?

6   A.   Um, yes.

7   Q.   Okay.  I think you were doing what I do sometimes, was

8   listening and reading at the same time?

9   A.   I was thinking about the year you said, actually.  But,

10  yes.

11  Q.   All right.  So let me ask the question again.  You

12  testified at a legal proceeding on or about November or

13  October of 2012?

14  A.   Yes.

15  Q.   And you understand that there was a court reporter like

16  today, who was taking down notes; correct?

17  A.   Yes.

18  Q.   Have you ever read a transcript of your testimony at

19  that proceeding?

20  A.   No.

21          MR. MADDEN:  Okay.  So I'm going to -- I have that

22  in front of me, and I would like this marked as defense next,

23  Your Honor.

24          MS. FILO:  Your Honor, I'm going to object as it's

25  lacking foundation.

26          MR. MADDEN:  I'm offering it as an exhibit.  I'm

27  not offering it into evidence at this point.

28          THE COURT:  Could counsel approach?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   736

1          (Whereupon, there was a discussion at the bench.)

2          THE COURT:  Based on the sidebar conversation, the

3    Court does not believe it's necessary to have the preliminary

4    examination transcript marked as an exhibit.  So that request

5    will be denied.

6          MR. MADDEN:  Thank you, Your Honor.  One moment,

7    please.

8          May I approach, Your Honor?

9          THE COURT:  Yes.

10   BY MR. MADDEN:

11   Q.   I will not have this marked, but I'm going to provide

12   you with a copy of what I refer to at least a volume of it.

13   Okay?  You don't have to read it.  That's the good news.

14          So then would that be a complete catalog of the

15   writings on the subject of your conversations with Becky?

16          MS. FILO:  Objection, Your Honor.  Vague.

17          THE COURT:  Sustained, because the transcript is

18   not her writings.  It's her testimony.  So I will sustain the

19   objection.

20          MR. MADDEN:  I apologize, Your Honor.

21          THE COURT:  That's fine.

22   BY MR. MADDEN:

23   Q.   Let me rephrase the question.

24          The handwritten notes, your typed notes, and that

25   transcript recording of your testimony would be all of the

26   documents that would contain reference to your conversation

27   with Becky?

28   A.   Um, I don't know whether that's true or not.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   737

1    Q.    There may be additional documents?  I'm not trying to

2    trick you.

3    A.    No.  I don't know.  I mean, I didn't write any other

4    documents that I could --

5    Q.    Close enough.  We could move along.

6    A.    Okay.  Thank you.

7    Q.    I wanted to make sure we're complete.

8              THE COURT:  So it's clear, the only documents you

9    generated was People's Exhibit 3 and the typewritten notes in

10   front of you, which is Defense C?

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.  To your knowledge?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Thank you.

15   BY MR. MADDEN:

16   Q.    So let's talk more about the typewritten notes, see if

17   we could flesh that out a little bit.

18             I believe you stated that you created the

19   typewritten notes sometime in January of --

20   A.    2012.

21   Q.    -- 2012.  Okay.

22             And you indicated in your previous testimony, if I

23   was hearing you correctly, that your handwritten notes

24   reflected maybe a third of what you discussed with Becky?

25   A.    Correct.

26   Q.    These are just little highlights that you are jogging

27   down during the conversation?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   738

1    Q.   And would these typewritten notes, which appear to

2    consist of four single-spaced pages, be a much more accurate

3    and detailed statement of the conversation?

4    A.   Um, I wouldn't necessarily say that, no.  They are a

5    different set of notes.  These were done later, so they were

6    done more from memory, but they are more detailed.  So --

7    Q.   Yes.

8    A.   So I wouldn't say they are more accurate, though.  No.

9    Q.   Okay.  You have read both of them prior to coming to

10   court today?

11   A.   Right.  Yes.

12   Q.   Would you agree with me that there are differences,

13   material differences?

14   A.   Yes.

15   Q.   Between the two?

16   A.   Yes.

17   Q.   All right.  So I'm going to ask you about those

18   differences at this point.

19   A.   Sure.

20   Q.   But not until I get my notepad.  All right.  I'm sorry.

21   I have to get one more.

22          I would like to first cover the subject of the word

23   "tongue."  All right?

24   A.   Okay.

25   Q.   So the handwritten notes make specific reference to a

26   tongue; correct?

27   A.   Yes.

28   Q.   Did you address that subject in the notes?

1   A.    In the typed notes?

2   Q.    Yes.

3   A.    Yes.

4   Q.    And your typed notes on that subject are quite different

5   than the handwritten notes; correct?

6   A.    The handwritten notes is the -- if I remember, I should

7   look back, but it's in quotation, I believe.

8   Q.    Yes, please.

9   A.    I'm trying to find that part.  I apologize.

10   Q.    I have the same problem.  Take your time.

11   A.    Okay.  So it's not in quotations, but it says she

12   said -- so in the typed notes, it's expanded.  There is more

13   of my conversation from again the -- from my memory.

14   Q.    You are thumbing through a document now.  Are you

15   looking at the typewritten notes?

16   A.    Yes, I have both of them here.

17   Q.    You have both of them in front of you?

18   A.    Yes.

19   Q.    All right.  Let's talk about the expansion of that

20   subject.  Please tell the ladies and gentleman of the jury

21   what you said in the typewritten notes about the subject

22   tongue?

23   A.    She -- it's -- I don't think I do reference it in the

24   typed notes.

25   Q.    I'm sorry?

26   A.    I don't think -- I can't find it in the typed notes.

27   Q.    All right.

28   A.    Am I looking at the wrong --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   740

1    Q.   No.  I think I may have misled you.  I think we're going

2    to have to refresh your recollection having you look at your

3    testimony.  So what I'm going to ask you to do --

4              MS. FILO:  Your Honor, I'm going to object.

5              THE COURT:  Hold on.  The objection is sustained.

6    Mr. Madden, you asked her to refer to the typewritten notes.

7    She's done it.  There is nothing in there.

8              MR. MADDEN:  I understand that.

9              THE COURT:  But I don't see any need to refresh her

10   recollection unless you ask her another question.

11             MR. MADDEN:  Let me get to the part where I'm going

12   and I will jump ahead.  You are correct, Your Honor.  I

13   apologize.

14   BY MR. MADDEN:

15   Q.   If you would turn to page 204 of that transcript.

16             MS. FILO:  Your Honor, I'm going to object.  There

17   is no question pending.  There is no --

18             MR. MADDEN:  I want her to read something, then I

19   will ask her questions.

20             MS. FILO:  That's not how it works.

21             THE COURT:  I will sustain the objection.  Maybe we

22   could ask her the question first.

23             MR. MADDEN:  All right.

24   BY MR. MADDEN:

25   Q.   Do you recall clarifying with Becky whether or not the

26   object that touched her foot or her feet was a tongue?

27   A.   Yes, I do.

28   Q.   What do you remember about that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   741

1   A.    That I -- she said that initially it felt like a tongue.

2   When I asked her:  Do you think it was a tongue?  She said,

3   no, she didn't think it was a tongue.  It felt scratchy like

4   a tongue.

5   Q.    So she told you after you questioned her about it that

6   it was not a tongue?

7   A.    Correct.

8   Q.    All right.  That doesn't appear in your typewritten

9   notes, but it is in your memory and you're testifying about

10  it today and you testified about it on an earlier occasion;

11  correct?

12  A.    Yes, that's from memory.

13  Q.    All right.  Is there any need for you to refer to the

14  transcript, or are you comfortable with your testimony, or do

15  you need to make sure?

16  A.    I'm comfortable with it, but I looked at it as well.

17  Q.    It's in the transcript; right?

18  A.    Yes.

19  Q.    All right.  I apologize for misleading you and the

20  Court.

21         You made reference to the words "scratchy."  You

22  said she said it felt scratchy like a tongue, but it wasn't a

23  tongue?

24  A.    Correct.

25  Q.    All right.  And I think that you indicated that she felt

26  the same thing on her pants or her calf; is that correct?

27  This would again be on page 204.

28         THE COURT:  Um, ma'am, if you would answer the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   742

1    question, if you recall?  If you don't, then we'll follow a

2    different procedure.

3            THE WITNESS:  Okay.

4            THE COURT:  Okay.  I would ask you not to refer to

5    the transcript without letting us know.  Okay?

6            THE WITNESS:  Okay.

7            THE COURT:  That's fine.

8            THE WITNESS:  I already looked at that part.  I

9    would not have remembered that from the conversation.  It

10   does say that in the transcript.  My apologies.

11           MS. FILO:  Objection, Your Honor.  I will ask that

12   testimony be then stricken.

13           THE COURT:  The objection is sustained.  The last

14   answer is stricken.

15           MR. MADDEN:  Your Honor, I'm sorry.  May we

16   approach?

17           THE COURT:  Yes.

18           (Whereupon, there was a discussion at the bench.)

19   BY MR. MADDEN:

20   Q.   I'm sorry, Ms. Vijayendran, let me rephrase the

21   question.  I want to make sure I understand your position.

22   You really don't have a memory right now of the part about

23   something being scratchy?

24   A.   No.  The scratchy part I do remember.  The part that I

25   had already looked, but I don't think I would have remembered

26   off the top of my head was the part of the calf, the second

27   part of your question.

28   Q.   So if I did -- what I should have done, I should have

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   743

1  asked you if looking at that transcript might refresh your

2  recollection, but you already looked at the transcript?

3  A.    Yes.

4  Q.    And the transcript did refresh your recollection;

5  correct?

6  A.    It's -- yes.  It says that I referred to the calf.

7  Q.    You read page 204 before I asked you to; right?

8  A.    Yes.

9  Q.    Okay.  On that subject?

10  A.    Yes.

11  Q.    All right.  I apologize.  Now, by the way, in terms of

12  O.B. Whaley School, when you were there, which was for

13  approximately four years?

14  A.    Correct.

15  Q.    You were the principal for that period of time?

16  A.    Yes.

17  Q.    All right.  Was there a dress code at O.B. Whaley?

18  A.    Um, student?

19  Q.    Student dress code?

20  A.    Student dress code?  A loose dress code, yes.

21  Q.    Was it a combination of what clothes you were supposed

22  to wear, if you were to wear your own clothes, versus a

23  uniform?

24  A.    It was optional uniform.  At O.B. Whaley, most students

25  didn't wear it, so then --

26  Q.    That was my next question.

27  A.    Yeah.

28  Q.    All right.  So the uniform will be something like a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   744

1   parochial school?

2   A.   It was, yes.  Navy and white.

3   Q.   Okay.  In terms of casual clothes, if you chose not to

4   wear a formal uniform, were girls allowed to wear -- what

5   were they supposed to wear?

6           MS. FILO:  Objection, Your Honor.  Relevance.

7           MR. MADDEN:  I think it's relevant, Your Honor.

8           THE COURT:  I'm going to sustain the objection.

9   BY MR. MADDEN:

10  Q.   Were children -- were girls allowed to wear pants or

11  trousers to school?

12  A.   Yes.

13  Q.   Did they have to be a certain length below the knee?

14  A.   Um, below the knee, no.  They couldn't be very short

15  shorts.

16  Q.   Okay.  They could wear shorts?

17  A.   Uh-huh, yes.

18  Q.   But not short shorts?

19  A.   Correct.

20  Q.   And then what about the top?  Blouses, they had to cover

21  the shoulders?

22          MS. FILO:  Objection, Your Honor.  Relevance.

23          THE COURT:  Sustained.

24          MR. MADDEN:  All right.

25  BY MR. MADDEN:

26  Q.   Okay.  With respect to your reference in the handwritten

27  notes to open your legs, you remember that reference?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   745

1   Q.   All right.  You see it?

2   A.   Yes.

3   Q.   Okay.  And your handwritten notes, are your comments on

4   that subject different than on your handwritten notes?

5   A.   In the typed notes, you mean?

6   Q.   Yes.

7   A.   Are they different?  Again, the typed notes are expanded

8   from my memory compared with the handwritten notes, which

9   were being done while I was talking to the child.  So, yes,

10  there are some differences.

11  Q.   There is an expansion on that subject; correct?

12  A.   Correct.

13  Q.   And tell me what that expansion involved?  You are

14  reading your typewritten notes now?

15  A.   I am.  Is that okay?

16  Q.   Of course.

17  A.   Okay.  She told me, as it's in quotation, that he

18  initially -- he asked her to "open your two legs."

19  Q.   Yes.

20  A.   So I asked her some follow-up questions to that, and I

21  asked her -- I don't remember my exact words, but based on my

22  notes, to talk about that a little more, and then she said

23  that he asked her to move her legs.  And I said:  Which one

24  was it?  Open your two legs or move your legs?  And she said

25  she couldn't remember which one it was.

26  Q.   But with respect to the legs, you distinctly recall her

27  giving two different statements about that?

28  A.   Yes, she said she couldn't remember.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   746

1  Q.   But your handwritten notes don't reflect the second

2  statement, do they?

3  A.   That's correct.

4  Q.   But on the other hand, the handwritten notes only

5  reflect perhaps one-third of the entire conversation?

6  A.   That's correct.

7  Q.   All right.  So that's a detail upon reflection when you

8  wrote your handwritten notes that you added; correct?

9  A.   The typed notes?

10  Q.   Yes.  I'm sorry.  Please forgive me.

11  A.   Yes.

12  Q.   And as the principal at that time interviewing the girl,

13  Becky, you thought there was a world of difference between a

14  directive to open your legs versus move your legs; correct?

15  A.   Um, I think there are differences between those two,

16  yes.

17  Q.   All right.  And, in fact, you followed up to ask Becky

18  on that very same subject:  Was he ever between your legs;

19  right?

20  A.   I asked her if she felt anything between her legs.

21  Q.   And she said?

22  A.   No.

23  Q.   Okay.  With respect to the drink, did Becky talk about

24  the vessel from which the drink came from?

25  A.   I don't -- I don't remember that clearly, what she said,

26  except that she was describing gooey.

27  Q.   I'm sorry?

28  A.   I don't remember exactly what she described in that part

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   747

1   of the conversation, but she was using the word "gooey."

2   Q.   Do you think it might help refresh your recollection or

3   help you to remember if you were to look at your trial

4   transcript testimony on that subject?

5   A.   Probably.

6   Q.   All right.  I'm going to ask you to read pages 207 and

7   208.  Please do that now and take your time.  Let me know

8   when you're done?

9   A.   Okay.

10  Q.   Does that help you remember the subject of a bottle?

11  A.   It's pretty much how I remembered it, yes, that she used

12  the word "gooey" to describe it.

13  Q.   I'm talking about the word "bottle."  What did she tell

14  you about bottle?

15  A.   Um, in the transcript it says that I said if I --

16          MS. FILO:  Objection, Your Honor.

17          THE COURT:  Sustained.  We don't want you to read

18  the transcript.  If it helps you remember, then you could

19  answer the question.

20          THE WITNESS:  Okay.  I don't remember the part of

21  that conversation that clearly, so --

22  BY MR. MADDEN:

23  Q.   Do you remember Becky talking about a bottle

24  being gooey?

25          MS. FILO:  Objection, Your Honor.  Asked and

26  answered?

27          MR. MADDEN:  No, it hasn't been, Your Honor.

28          THE COURT:  Overruled.  You may answer the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   748

1   question.

2   THE WITNESS:  I remember her using the word

3   "gooey," but the rest of the conversation at that point is

4   not that clear.  I apologize.

5   MR. MADDEN:  May I approach the witness, Your

6   Honor?

7   THE COURT:  Yes.

8   MS. FILO:  Counsel, could I see what you are

9   referencing?

10  MR. MADDEN:  Sure.

11  BY MR. MADDEN:

12  Q.  I would like you to re-read page 208, lines 3 through 7.

13  MS. FILO:  Your Honor, I'm go object to the form of

14  the question.

15  THE COURT:  Sustained.

16  BY MR. MADDEN:

17  Q.  If you were to re-read the transcript, you think it may

18  refresh your recollection -- let me try that again.

19  Do you think that may refresh your recollection as

20  to the subject of a bottle?

21  MS. FILO:  Asked and answered, Your Honor.

22  THE COURT:  You could answer that question.  If you

23  read it, will it help to review it again to refresh your

24  memory?  It's yes or no.

25  THE WITNESS:  No.

26  THE COURT:  Thank you.

27  BY MR. MADDEN:

28  Q.  These are your words; right?

1   A.   Yes.

2   Q.   This was your testimony; correct?

3   A.   Yes.

4   Q.   This testimony was given under oath; correct?

5   A.   Yes.

6   Q.   But you have no memory of using the word "bottle" to

7   describe the vessel from which the water came?

8              MS. FILO:  Your Honor, objection.  This is now --

9              THE COURT:  Sustained.

10  BY MR. MADDEN:

11  Q.   So let me ask you about Becky's demeanor during this

12  conversation.  You knew Becky quite well; correct?

13  A.   Yes.

14  Q.   You were the principal, but I get the impression you

15  were a very active principal.  You were out of your office a

16  lot?

17  A.   I'd like to think so.

18  Q.   All right.  That's what your job is; right?

19  A.   Yes.

20  Q.   And you circulated among the classrooms, on the

21  playground, the lunch area?

22  A.   Yes.

23  Q.   You were available to the students?

24  A.   Yes.

25  Q.   You enjoyed interacting with the students?

26  A.   Yes.

27  Q.   You actually knew Becky pretty well, probably better

28  than you do a lot of the kids; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   750

1  A.   Yes.

2  Q.   I take it, that was because she was a very friendly,

3  talkative, pleasant, curious child?

4  A.   Yes.

5  Q.   All right.  She was never reluctant to speak with you?

6  I mean, on prior occasions?

7  A.   No.

8  Q.   She wasn't reluctant to speak with you on that morning?

9  A.   No.

10  Q.   She wasn't upset?

11  A.   She didn't appear to be upset to me.

12  Q.   All right.  She wasn't crying?

13  A.   No.

14  Q.   She wasn't emotional at all?

15  A.   No.

16  Q.   That's correct?

17  A.   That's correct.

18  Q.   Okay.  Thank you.

19       Would it be fair to say, it's the same as if we had

20  been in my office talking about what she was doing at her

21  yearly talent show?

22  A.   Yes.

23  Q.   Do you remember her perhaps when she came in giving you

24  a hug?

25  A.   I don't remember that, but it's very likely because

26  that's often what she did.

27  Q.   She was a hugger?

28  A.   Yes.

1    Q.    All right.  And she hugged you a lot in the morning when

2    she was in line; right?

3    A.    She would usually say good morning and sometimes a hug

4    with it, yes.

5    Q.    Okay.  And her demeanor was important to you during that

6    conversation; correct?

7    A.    Yes.

8    Q.    Why was it important to you?

9             MS. FILO:  Objection, Your Honor.  Relevance.

10            THE COURT:  Overruled.  You may answer that

11   question.

12            THE WITNESS:  Answer it?

13            THE COURT:  Yes.

14            THE WITNESS:  Yes, her demeanor was important to me

15   because she -- I was trying to gauge what had occurred in the

16   classroom, and her demeanor, the fact that she was -- seemed

17   to be her happy, normal self, I took that into account when

18   trying to determine what had occurred.

19   BY MR. MADDEN:

20   Q.    That was relevant to you?

21   A.    Correct.

22   Q.    All right.  And when did you get your teaching

23   credential?

24   A.    In 1998.

25   Q.    All right.  So you've been in the profession -- had been

26   in the profession for more than a dozen years then; correct?

27   A.    Yes, about.

28   Q.    I may be wrong on my math here.

1        During that time, you had reported other children

2   who you -- had reported people who you suspected of sexually

3   abusing children; correct?

4   A.   Um, yes.

5   Q.   All right.  And part of your decision to do that was

6   because of the interaction you had with those other children;

7   correct?

8   A.   Correct.

9   Q.   In which they talked about what had or hadn't happened

10  to them; correct?

11  A.   Correct.

12  Q.   And, in fact, over that period of time, you had several

13  occasions to make formal reports of sexual abuse; correct?

14        MS. FILO:  Your Honor, I'm going to object.  May we

15  approach?

16        THE COURT:  Yes.

17        (Whereupon, there was a discussion at the bench.)

18  BY MR. MADDEN:

19  Q.   I want to ask you about another subject.  I would like

20  to talk about the Helen Keller lesson plan.  All right?

21  A.   Okay.

22  Q.   Is the Helen Keller story an appropriate story to be

23  telling second- or third-graders?

24  A.   Yes.

25  Q.   Why is it an appropriate story?

26  A.   It's a commonly used story in that grade level.

27  Q.   All right.  So there is nothing unusual about a lesson

28  plan that involves the Helen Keller story; correct?

```
 1   A.    That's correct.

 2   Q.    By the way, with respect to lesson plans, generally at

 3   O.B. Whaley, when you were the principal, were teachers

 4   required to submit lesson plans to the administration?

 5   A.    No.

 6   Q.    So the teachers were on their own; correct?

 7   A.    They were expected to have them, but they didn't need to

 8   submit them.  Correct.

 9   Q.    All right.  And the teachers basically -- it's not like

10   it's anarchy, but they have to teach to the standards;

11   correct?

12   A.    Yes.

13   Q.    And at that age, it involves principally language arts,

14   math, and what else?

15   A.    Science, social studies, art, PE.  Within each of those,

16   there is different strands.

17   Q.    Okay.

18         MR. MADDEN:  Your Honor, before I ask my next

19   question -- I apologize.  We have to approach again.  I need

20   a ruling before I ask that question.

21         THE COURT:  Okay.

22         (Whereupon, there was a discussion at the bench.)

23         MR. MADDEN:  I think I may be done, Your Honor.

24   Just one moment, please.

25   BY MR. MADDEN:

26   Q.    I would like to talk about the stain that you saw on the

27   jacket.  Okay?

28   A.    Um-hum.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   754

1   Q.   Have you ever heard the term "mother shoulder"?

2   A.   Yes.

3   Q.   Do you recall ever using the word "mother shoulder" to

4   describe the stain that you saw on Becky's jacket?

5   A.   I think it was used in the previous trial.  I don't

6   remember if it was by myself or by somebody else, but --

7   Q.   You have a baby now yourself; right?

8   A.   I do, yes.

9   Q.   All right.  So tell me what you understand "mother

10  shoulder" to be?

11  A.   Spit up.

12  Q.   From a baby?

13  A.   Yes.

14  Q.   All right.  And I apologize for the indelicacy what I'm

15  about to ask, but I want to ask you this.  Are you familiar

16  with seeing a semen stain at anytime in your life?

17  A.   Um, probably.

18  Q.   All right.  And if you think back on the stain that you

19  saw, you looked at it and you did not think it was a semen

20  stain, did you?

21  A.   That's -- no, I did not.

22  Q.   That's correct?

23  A.   That's correct.

24  Q.   Thank you.

25          MR. MADDEN:  I have no further questions.

26          THE COURT:  Okay.  Ladies and gentlemen, we're

27  going to take the afternoon recess at this time.  I'm going

28  to order the jury to report to the jury assembly room on the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   755

1  second floor, and it's my expectation we'll call you up at

2  about 3:00 o'clock.  I have to address some points and I'm

3  pretty confident we'll be able to call you back at 3:00

4  o'clock.

5          So please remember the admonition that I've given

6  you on prior occasions.  You're excused at this time.  We'll

7  call you back soon.

8          (Whereupon, the jurors were excused and the

9  proceedings were had outside the presence of the jury.)

10         THE COURT:  Record will reflect the jury has left

11 the courtroom.  Both counsel are present.  Mr. Chandler is

12 present.  We had a sidebar conversation concerning Ms. Filo's

13 concern and objection that the Court had previously ruled,

14 that she would not be allowed to ask Ms. Vijayendran about

15 her misdemeanor conviction.

16         And as I understand it, Ms. Filo, you felt, I

17 believe, that you should be allowed to go into that in light

18 of the fact that Mr. Madden had asked a number of questions

19 concerning her experience of having reported people in the

20 past, and the evidence is clear that she did not report in

21 this particular case.  Generally, that's the subject we're

22 going to talk about; correct?

23         MS. FILO:  Correct.

24         THE COURT:  You may make some comments at this

25 time.

26         MS. FILO:  Thank you, Your Honor.  When counsel is

27 asking the witness:  You've had an opportunity to report

28 before and that's based on your interaction with the child

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    756

1   and the way that the child was acting and your observations

2   of the child and you made these reports to law enforcement or

3   Child Protective Services in the past, what he's doing is

4   leaving the jury with the impression that she -- that nothing

5   is wrong with her failure to report, and that it somehow

6   reflects on the information that Becky gave her; that it is a

7   reflection of that information.  And that is fundamentally

8   misleading to the jury.

9           First of all, that was her impression, and she has

10  unequivocally testified that when she finished her

11  conversation with Becky, she believed that this act was

12  sexual in nature.  It was the first thing that she thought

13  of.  It was that Mr. Chandler talked her out of that belief,

14  and she was convicted by a jury for failing to report the

15  information she was given.

16          So to suggest somehow that she's made all of these

17  reports in the past, knows how to do it, all of those sorts

18  of things is -- I can't imagine -- I think the jury has to be

19  told that this entire episode has been explored; that this

20  entire -- that the entire circumstances have been explored

21  and she was convicted for failing to report that.  To suggest

22  that somehow she knows how to report, she has done it before,

23  that was all based on conversations and observations.  I

24  think it's fundamentally unfair to leave the jury with that

25  impression without telling them that she's been criminally

26  convicted for failing to report these allegations.

27          THE COURT:  Mr. Madden.

28          MR. MADDEN:  Thank you, Your Honor.  I disagree

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   757

1   with counsel.  I understand her argument, but I want to

2   indicate in the clearest way that the purpose of my asking

3   her that question was simply to show that Becky's demeanor,

4   her demeanor, was inconsistent with the demeanor of children

5   who have been sexually abused.

6          In other words, my earlier questions that I asked

7   her on the subject, as a principal, as a teacher, we don't

8   have the specifics, but on several occasions I believe she

9   confirmed that she had reported.  And on those occasions at

10  her prior testimony she indicated that those much greater

11  details, which has not been mentioned here at all, that those

12  children all had very similar demeanors.  In other words,

13  they included such things as they were upset, they were

14  crying, they were withdrawn, they didn't want to talk about

15  it, they were afraid.  All the things that are almost common

16  sense for any child who has been traumatized, as the People

17  are suggesting these five children were traumatized, as the

18  People are suggesting.

19         What I'm saying is that Becky's demeanor, and,

20  quite frankly, like the demeanor of almost all of these

21  children, is inconsistent with the demeanor of children who

22  have been sexually traumatized in horrible, horrible ways,

23  which is what the People are suggesting here.

24         THE COURT:  Well, what about Ms. Filo's comment,

25  that she felt after talking with Becky she should report, but

26  she was talked out of it by your client?

27         MR. MADDEN:  That was not her testimony, and I have

28  no objection to the Court reading her testimony on that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   758

1  subject.   That's a total misstatement of her testimony.

2          THE COURT:   Her testimony of what?

3          MR. MADDEN:   At her own trial.

4          THE COURT:   Okay.

5          MR. MADDEN:   That's -- she did not say that

6  Chandler talked her out of it.   She said quite the reverse.

7  She said that she talked to Becky.   She was directed to get

8  that -- to talk to Chandler.   She gave Chandler next to no

9  information about the subject and had him in an open-ended

10 way, open-ended question, tell me about everything that

11 happened, and Chandler went into great detail.

12          I'm not asking her any of those questions.   I'm not

13 going there, but what I'm saying is -- representing to the

14 Court, is that her decision about what to do in this case was

15 not made quickly or calmly or she changed her mind, like

16 Chandler got her to change her mind.   She did, as all good

17 people who are properly investigating cases do, to keep an

18 open mind until she listens to both sides.   When she heard --

19 after she talked to Becky at length on two separate occasions

20 and after she spoke with Chandler, she decided there was no

21 sexual component to the case at all.

22          So I vigorously disagree with Ms. Filo's

23 characterization of that testimony.   If the Court's concerned

24 about it, I'm more than happy to have the Court read her

25 testimony on that subject.

26          THE COURT:   My concern is that you talked about

27 Becky's demeanor.

28          MR. MADDEN:   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   759

1        THE COURT:  That's fine.  But then you went with

2    other victims that she talked to, or other people that she

3    interviewed, and then mandated -- and then reported it, quite

4    frankly.  That's the problem I'm having, because now you are

5    bringing in other people, and she's reported those other

6    folks.  So basically you're leaving the inference with the

7    jurors that she didn't report with this particular case

8    because it was her opinion that there was no sexual abuse.

9        MR. MADDEN:  There is no need for the jury to hear

10   about her conviction on that subject.  It's a simple matter

11   of:  Here's my opinion.  Here's what the child was.  I've

12   seen children before who are abused.  She was not acting like

13   an abused child.  That's it.

14       THE COURT:  Okay.

15       Ms. Filo.

16       MS. FILO:  Right.  But the only reason that's

17   relevant, the only reason it makes any difference is because

18   defense wants to suggest that that means she wasn't abused.

19       MR. MADDEN:  No.

20       MS. FILO:  That there was no reasonable inference

21   that she was abused.  And my -- I mean, I will never forget

22   this as long as I live, Ms. Vijayendran's testimony, I asked

23   her at her trial:  Ms. Vijayendran, are you telling me that

24   after you had this conversation with Becky, there was not a

25   thought in your mind that this was a sexual encounter?  And

26   her specific answer, which I blew up on a PowerPoint and was

27   published by CNN, was:  "I would have been crazy not to have

28   thought that."  Those were her exact words in response to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   760

1   that question.

2           So my concern now is that this whole idea of this

3   child acted differently than this child, that was the whole

4   purpose of Ms. Vijayendran's trial.  Mr. Geffon, who

5   represented her, is sitting in court right here.  I could

6   tell you that was his entire strategy, was that this child

7   acted fundamentally different than every other child.  And

8   Mr. Madden is now trying to compare those two, and a jury has

9   rejected that comparison.  I think it's unfair to leave this

10  jury with the impression that there was some -- that it

11  somehow reflects on whether or not Becky was or was not

12  molested.

13          THE COURT:  Mr. Madden.

14          MR. MADDEN:  I disagree with Ms. Filo.  Mr.

15  Geffon's strategy was to basically throw Mr. Chandler under a

16  bus and suggest to the jury that somehow Chandler had

17  hoodwinked her.  He had been able to convince her that black

18  was white.  The jury rejected that strategy.  It's my

19  position that Mr. Chandler did not molest Becky and that Ms.

20  Vijayendran's instinct was correct.

21          THE COURT:  Her -- but that's inconsistent with

22  what Ms. Filo has just said.  Her testimony was that --

23          MR. MADDEN:  No, I disagree with her.  And I --

24  again, I've got the transcript there.  I have no objection to

25  the Court look -- it's is one thing to offer an opinion that

26  someone is not acting as an abused child.  It's another for a

27  person who has had experience in reporting people for

28  sexually abusing children who has had several occasions of

1  familiarity with children who have been abused.  Finding a

2  common thread and it's not here.  That has nothing to do with

3  her trial.

4          THE COURT:  The problem I have, Mr. Madden, we had

5  testimony from Ms. Filo's direct:  Did you mandate -- I mean,

6  did you report?  No.  Then you went into Becky's demeanor.

7  Okay, fine.  But then you went the next step and you started

8  the comparison with all of these other children.

9          MR. MADDEN:  I think it's important to note that

10  she asked the question, "Did you report?"  Why did she have

11  to ask that question?  Once she asked the question "Did you

12  report," then I have to sit there and not respond?

13          THE COURT:  Well, to me, it seems like it would

14  benefit your client, which is the point you were trying to

15  make, which is fine.  But then you expanded it by doing this

16  comparison with other children, sort of thinking -- sort of

17  suggesting to the jurors that nothing happened here.  That's

18  why I didn't report it.  In other cases, it's obvious to me

19  my opinion and I would have reported it.  Here, in my

20  opinion, there was sexual abuse going on.  That's the

21  inference I have, and I don't believe the jury will have the

22  same one.

23          MR. MADDEN:  I don't believe I have waived any

24  right to ask her about Becky's demeanor, and comparing that

25  to the demeanor of others who have been molested has nothing

26  to do with her conviction.

27          THE COURT:  Well --

28          MR. MADDEN:  Or her prosecution.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   762

1          THE COURT:  I mean, you are absolutely right.  You

2    have the right to cross-examine, but then you take the risk

3    that other evidence that you don't want may come in.  Now,

4    I'm concerned about bringing the conviction in.  But I think

5    as an alternative remedy, we've already had testimony that

6    she said "I didn't report."  We know she's a mandated

7    reporter, and I think that in fairness to the People, she

8    should be asked:  After you spoke with Becky, should you have

9    reported?  And the answer would be yes and we leave it like

10   that.  Otherwise, I can't see how I could keep -- prevent the

11   people from bringing the conviction in because of the

12   inference that you left with the jury.

13          MR. MADDEN:  Could you repeat that again, Your

14   Honor?  I was thinking about something else while you were

15   speaking.  I apologize to you.

16          THE COURT:  I said as an alternative to allowing

17   the conviction coming in, leaving the unfair inference with

18   the jurors, is the question:  After interviewing Becky,

19   should you have reported?  And the answer would be yes, based

20   on her prior testimony from apparently the trial.  And I

21   think that would be a fair remedy as opposed to bringing in

22   the conviction because I would like to avoid that.

23          Ms. Filo, your position on that.

24          MS. FILO:  Your Honor, I will submit it to the

25   Court.  I mean, I'm happy to use the witness's words herself.

26   I asked her in her trial, "Did you believe that this was

27   sexually in nature?"  And her answer was, "I would have been

28   crazy not to have thought that."

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   763

1    THE COURT:  I would prefer:  After talking -- after

2    interviewing -- after interviewing Becky, should you have

3    reported?  Yes.  Because I think that is --

4    MR. MADDEN:  I will submit the matter, but I want

5    the record to be clear that I believe that I was well within

6    my right to do it because Ms. Filo was allowed to ask the

7    question.

8    THE COURT:  Did you report?

9    MR. MADDEN:  Did you report, yeah.

10    THE COURT:  Okay.  Let me ask Ms. Filo one last

11    question.

12    MR. MADDEN:  I think that's what opened the door

13    for me to -- from where I went.

14    THE COURT:  Ms. Filo, am I correct in my

15    recollection that she was asked "Do you remember," and she

16    said no.

17    MS. FILO:  That's correct, Your Honor.  And Mr.

18    Geffon is here in court, and he's just commented to me that

19    his concern is that Ms. Vijayendran still believes that she

20    had an obligation, or that she was to investigate further

21    before making any decision about reporting.  And ultimately,

22    that is what the jury cutoff, is that -- that opportunity is

23    what the jury in her trial really cutoff.  Mr. Geffon is

24    here.  Maybe he could explain it better than I can.

25    THE COURT:  Cutoff?

26    MS. FILO:  I think that the -- her argument in her

27    trial was that after she talked to Becky she should have

28    reported it, period.  And that is ultimately what the jury

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   764

1    decided in that case.  I think Ms. Vijayendran would still

2    believe today that she didn't do anything wrong by continuing

3    on her investigation and by talking to Mr. Chandler.  So my

4    concern is asking her the question:  Do you believe that you

5    should have reported after talking to Becky?  I think to this

6    day she believes that she was right or had the obligation to

7    continue investigating.  Even in light of the jury's verdict,

8    she would still believe.

9         THE COURT:  I understand that, but I'm trying to

10   reach a middle ground here.  But after talking to Becky, did

11   she believe she should report?  Yes.  The fact that she feels

12   she should investigate, that becomes a lot that we don't need

13   to hear in this particular trial.

14        Mr. Geffon, you are --

15        MR. GEFFON:  Your Honor, I apologize for

16   interjecting.  I realize you have enough lawyers to talk to,

17   but my concern is that knowing Ms. Vijayendran and what her

18   thinking was, if asked the question:  Do you think that you

19   should have reported after talking to Becky, I believe her

20   answer would be no.  And I think it's because she believed

21   that she didn't know what had happened yet.  She went on to

22   do other things.

23        With all due respect to the People, I don't know if

24   the jury rejected the idea that she should have gone on with

25   her investigation, or if the jury simply decided:  You know

26   what, even given the explanation that you heard, you should

27   have known that was not a realistic explanation.  So I don't

28   know what the jury ultimately decided, but they clearly found

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    765

1    her guilty.

2              There is no question that Ms. Filo was correct,

3    that when she finished her conversation with Becky, she

4    believed Becky was describing a sexual act.  That is

5    absolutely her testimony.  But whether she should have

6    reported it at that moment, I think is -- unfortunately for

7    the Court's prospective ruling is a complicated question.

8              THE COURT:  Suggestions?

9              MS. FILO:  My concern is that Ms. Vijayendran did

10   believe it was a sexual act, and now Mr. Madden has asked her

11   a series of questions to suggest she didn't believe it was

12   sexual; that she didn't believe it was abuse.  She had seen

13   victims of abuse.  She knows what they look like.  She knows

14   what they act like.  She knows what they talk like.  He left

15   them with the impression that she did not believe she was

16   dealing with victim of abuse when she unequivocally did think

17   that.

18             THE COURT:  Well, then it sounds to me then the

19   question should be as an alternative to the conviction:

20   After interviewing Becky, do you believe she was describing a

21   sexual act?

22             MS. FILO:  I'm fine with that.

23             THE COURT:  I'm going to make that ruling over the

24   defense's objection as a less severe ruling of allowing the

25   conviction to come in because I don't think that should

26   occur.

27             And, you know, obviously, Mr. Madden, if you want

28   to put more on the record, you may do so, but it's clear this

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   766

1  is over your objection.  But I think in fairness to the

2  People, I will allow that one question.  Obviously, we have

3  evidence before the jury that she didn't report, and I think

4  counsel should use caution in what their questions are

5  because we're pretty close to letting more information in and

6  I would hope to avoid that.

7          So we're going to take a recess.  We'll bring the

8  jury up at -- we'll call them up at ten after three.

9          (Whereupon, a brief recess was taken.)

10         THE COURT:  We'll go back on the record.  Record

11 will reflect that all members of the jury are present, both

12 counsel are present, Mr. Chandler is present, our witness is

13 on the witness stand.

14         Ms. Filo, redirect?

15         MS. FILO:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17 BY MS. FILO:

18 Q.   Ms. Vijayendran, I want to ask you a little bit about

19 the typed notes that you prepared.  Could you tell me when

20 did you prepare these typed notes?

21 A.   Sometime in -- excuse me -- sometime in January 2012.

22 Q.   Okay.  It was after Mr. Chandler's arrest in this

23 matter; is that true?

24 A.   That's true, yes.

25 Q.   And were you -- were you directed to write the notes, or

26 how did the notes come to?

27 A.   I was asked by my school district to give an account of

28 what happened that day.  And so, yes, I was asked to write

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   767

1    the notes.

2    Q.    The things that are referenced in here -- I guess what

3    I'm trying to figure out is, do you have an independent

4    recollection as you sit here today of what's in these notes,

5    or are you relying on the notes themselves to tell you what

6    your memory was?

7    A.    Some of both.

8    Q.    Okay.  Could you tell me, for instance, what in these

9    notes you do not have an independent recollection of as you

10   sit here now?

11   A.    Are you talking about both sets of notes or specifically

12   the typed ones?

13   Q.    No, just the typed ones.  The handwritten ones were made

14   contemporaneous with your conversations with Becky?

15   A.    Yes.

16   Q.    The typed notes were something you prepared several

17   weeks later?

18   A.    Yeah, correct.

19   Q.    In those typed notes, are there things in there as you

20   sit here today you wouldn't remember?

21   A.    Um, possibly.  It's hard to say after I have already

22   seen them.  I think I have an independent recollection of the

23   general outline of how things happened, but when it comes to

24   specific words, things like that, I may not have such a clear

25   memory.

26   Q.    Okay.  So these typed notes, they were just your

27   recollection in January of 2012?

28   A.    I believe so.  I'm not positive whether I had my -- I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   768

1    don't remember exactly when I got the handwritten notes back

2    in my possession because I was not at school when this

3    occurred.  So I believe this was just from recollection.  I

4    didn't have these other ones in front of me, but I'm not

5    positive of that.

6    Q.   Okay.  And the handwritten -- so if you had to decide

7    between them, for instance, the handwritten notes or the

8    typed notes, what's in quotations, for instance, that would

9    be the exact words that Becky used?

10   A.   Um, if it's in quotations, yes.

11   Q.   Do you know why the school district asked you to prepare

12   these notes?  Did they say anything to you?

13   A.   Um, I don't remember exactly what the reason was.  Just

14   other than trying to figure out what had occurred.

15   Q.   Ms. Vijayendran, you left O.B. Whaley School in 2011 to

16   begin your first maternity leave; correct?

17   A.   Correct.

18   Q.   Do you know when you left the school?

19   A.   I actually -- I would say it was probably beginning of

20   2012 when my actual leave started, but we have two weeks of

21   winter break before then.  So it was the last -- you know,

22   around Christmastime in December we were on vacation.  That

23   wasn't officially leave for me yet.  Then my leave would have

24   begun that first day back at school, which was the Tuesday

25   probably after New Year's.  I don't remember the day.

26   Q.   So you were on campus up until the time that the break

27   started?

28   A.   Yes.

1  Q.   And when you -- do you remember where you were when you

2  made these typed notes?  Were you at home?

3  A.   At home.

4  Q.   At home?

5  A.   Um-hum.

6  Q.   You said you don't remember if you had these handwritten

7  notes with you?

8  A.   Correct.

9  Q.   Did one of the officers come and interview you at your

10  home?

11  A.   Yes.

12  Q.   About the allegations in this case?

13  A.   Yes.

14  Q.   Did you tell those officers:  You know, I have some

15  notes relating to my conversation with Becky, and I could

16  tell you where they are in my office?

17  A.   I believe so.

18  Q.   Do you know whether the officers -- or do you have any

19  memory of the officers bringing these notes to you?

20  A.   I don't have any memory of that.  No.

21  Q.   Okay.  Ms. Vijayendran, while you were talking to Becky

22  sometime after October 14th, when this conversation occurred,

23  when Becky is giving you information like, he told her to

24  spread his legs, or put something gooey in her mouth, when

25  she's using those words, is your concern that what Becky is

26  describing is an act of sexual molestation?

27  A.   There were times that I was concerned that that was the

28  case, yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    770

1    Q.    At the time, did you have any other explanation for that

2    behavior?

3    A.    No.

4    Q.    Thank you.

5              THE COURT:  Thank you, Ms. Filo.

6              Recross?

7              MR. MADDEN:  Just a moment, please, Your Honor.

8              THE COURT:  Yes.

9                        RECROSS-EXAMINATION

10   BY MR. MADDEN:

11   Q.    Ms. Vijayendran, turning your attention again to the

12   typed notes, that's four single-spaced pages; correct?

13   A.    Correct.

14   Q.    All right.  And I believe you testified earlier that the

15   handwritten notes covered maybe one-third of your

16   conversation with Becky; correct?

17   A.    That's an approximate guess, but, yes.

18   Q.    Would you -- strike that.

19              Did your typed written notes attempt to cover 100

20   percent of the conversation with Becky?

21   A.    Um, because it was based on recollection, I think it --

22   it was not possible to recover 100 percent, but I made an

23   attempt to include more.

24   Q.    You attempted to write down everything that you

25   remembered and all of the details that you could remember?

26              MS. FILO:  Your Honor, I'm going to object.  May we

27   approach briefly?

28              THE COURT:  Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   771

1           (Whereupon, there was a discussion at the bench.)

2    BY MR. MADDEN:

3    Q.   Ms. Vijayendran, I just wanted to stay on the subject of

4    your writing this document.  Was it your intent and was it

5    your purpose in writing this four-page document to accurately

6    describe the contents of your interaction and conversation

7    with Becky?

8           MS. FILO:  Your Honor, objection.  Relevance to

9    what her intent was.

10          THE COURT:  Mr. Madden, I'll let you -- allow you

11   to reask the question.  If you could just rephrase it.

12          MR. MADDEN:  All right.

13   BY MR. MADDEN:

14   Q.   Tell me -- I don't want to get into who directed you to

15   write it, but what were you trying to do in that report?

16          MS. FILO:  Objection, Your Honor.  Relevance.

17          THE COURT:  I'll allow you to answer the question.

18          THE WITNESS:  I was trying to write an account of

19   that particular day and what had occurred.

20   BY MR. MADDEN:

21   Q.   In other words, a report; correct?

22   A.   Correct.

23   Q.   As opposed to your handwritten notes, which were

24   basically brief handwritten writings taken during the

25   conversation with Becky; right?

26   A.   Correct.

27   Q.   This was a more complete and thorough description of

28   that conversation or those conversations with Becky; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   772

1    A.   It was a more complete and hopefully thorough

2    description of the day in its entirety.

3    Q.   All right.   I'm referring right now to your conversation

4    with Becky and I'm limiting it to that.   Okay?

5    A.   Yeah.

6    Q.   Is there anything else you would add to that?

7    A.   No.

8    Q.   I'm sorry.   And when you wrote it, the events were

9    sufficiently fresh in your mind to where you felt comfortable

10   writing the report as accurate; correct, and complete with

11   reference to your conversations with Becky?

12   A.   Based on my recollection at that time, yes.

13   Q.   And at that time, did you believe you had a full and

14   complete recollection of your conversation with Becky in

15   October?

16   A.   Um, I wouldn't say that I even then believed that I had

17   the entire conversation documented in this report because

18   there were things that I wasn't -- that weren't as clear in

19   my mind as time had passed, but I did my best to create a

20   report that based on my recollection had the details in it

21   that I remembered.

22   Q.   And what you did write about your conversation with

23   Becky was in your mind at the time an accurate description?

24   A.   Correct.   If I didn't remember something, I didn't put

25   it in here.

26   Q.   All right.   Thank you.

27        THE COURT:   Redirect?

28        MS. FILO:   No, Your Honor.   Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   773

1         THE COURT:  Okay.  Ma'am, you may step down.  You

2  are excused at this time, subject to recall.

3         MS. FILO:  Thank you, Your Honor.

4         THE COURT:  Could you hand me those documents,

5  please?

6         THE WITNESS:  Yes.

7         MS. FILO:  Your Honor, the People --

8         THE COURT:  I was going to say your next witness.

9         MS. FILO:  Lea Peery, Your Honor.

10               LEA PEERY,

11         Being called as a witness on behalf of the People,

12  having been first duly sworn, was examined and testified as

13  follows:

14         THE CLERK:  For the record, ma'am, please state and

15  spell your first and last name.

16         THE WITNESS:  My first name is Lea, L-e-a.  Last

17  name is Peery, P-e-e-r-y.

18         THE COURT:  Thank you.  The lawyers are going to be

19  asking you some questions.  Please let them finish the

20  question before you start your response.  Make every effort

21  just to answer the question that is being asked.  If the

22  question calls for a yes or no, please verbally say yes or

23  no.  Finally, if you hear one of the lawyers say objection,

24  don't answer until I rule, and I will let you know if you

25  could answer the question or not.  Okay?

26         THE WITNESS:  Thank you.

27         THE COURT:  Direct.

28         MS. FILO:  Thank you, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   774

1                          DIRECT EXAMINATION

2       BY MS. FILO:

3       Q.   Good afternoon, Ms. Peery.  How are you presently

4       employed?

5       A.   I'm the principal of Cedar Grove Elementary School.

6       Q.   Is that in the --

7       A.   Evergreen.

8       Q.   -- Evergreen School District?

9       A.   Yes.

10      Q.   Were you previously employed as the assistant principal

11      at O.B. Whaley School in the Evergreen School District?

12      A.   Yes.

13      Q.   Were you employed in that capacity in the 2011/2012

14      school year?

15      A.   Yes.

16      Q.   Were you made aware of any allegations of impropriety in

17      October of 2011 between a student named Becky and Craig

18      Chandler?

19      A.   No.

20      Q.   When did you first become aware of that?

21      A.   The day that I called Lyn, on January 9th.

22      Q.   So you had not heard anything about that incident prior

23      to January of 2012?

24      A.   No.

25      Q.   Okay.  Ms. Peery, on January -- on or about January 9,

26      2012, did a woman named Luisana come into the front office?

27      A.   Yes.

28      Q.   Just so you know, we're not using her or her child's

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   775

1  last name.

2  A.    Okay.

3  Q.    Okay.  So do you know what time Luisana came into the

4  office?

5  A.    It was a little after the beginning of the school day,

6  so around 8:45-ish.  We started at 8:30 at O.B. Whaley.

7  Q.    What was Luisana's demeanor?

8  A.    She was very upset.  She was crying.  She was pretty

9  emotional.

10  Q.    What -- do you ask her what was going on?

11  A.    Yes.  I asked her what was wrong?  What was the problem?

12  I had received a call before that on the walkie-talkie that

13  she had called the school, so I was heading to the office.

14  And she had been -- she was on her way, so I kind of knew

15  that she was coming, but I didn't know why.  So when I asked

16  her what was wrong, then she started crying.

17  Q.    What did she tell you?

18  A.    She said that her daughter did not want to come to

19  school.  She was scared to come to school.  She didn't want

20  to.  She wasn't like that before.

21  Q.    Did she tell you why she was scared to come to school?

22  A.    She said that -- she said that her daughter was

23  uncomfortable coming to school, and then she started

24  describing.  She was crying, so she started describing why

25  she didn't want to come to school.

26  Q.    What did she describe?

27  A.    She said that the teacher put things in her mouth and

28  blindfolded her.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   776

1   Q.   When you heard that, did you say to her:  Oh, no.  Not

2   again?

3   A.   No.

4   Q.   What -- did she give you anymore information about what

5   Isabell had told her?

6   A.   She was crying, and she said -- she started talking

7   about the teacher, saying:  I want to go yell at him.  I want

8   to go talk to him.  She was more -- she was talking back and

9   forth about what -- Isabell was upset.  She didn't want to

10  come to school:  I'm upset, you know, but she didn't -- could

11  you rephrase that?  I think I lost my train of thought there.

12  I'm sorry.

13  Q.   I think you got it.  That's okay.

14       What did you do in response to Luisana coming in

15  and telling you what had happened between Isabell and Mr.

16  Chandler?

17  A.   I asked her to go and get -- go get her daughter.  Could

18  I use her first name?

19  Q.   You can.

20  A.   Go get Isabell so I could talk to her because I wanted

21  to find out exactly what was going on from Isabell.  And so

22  she said okay.  So she was going to go back and get her.  And

23  then I was telling her that I was going to have the assistant

24  principal at -- the acting assistant principal come in and

25  assist with interviewing Isabell, and then I was going to

26  contact the district office with her concerns.

27  Q.   Did you, in fact, interview Isabell or talk to Isabell

28  that morning?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   777

1    A.    Yes.

2    Q.    What did Isabell tell you?

3    A.    Isabell said that she would have to -- she stayed in at

4    recess and had a blindfold on her and that she would have to

5    have things puts in her mouth, different things.

6    Q.    What was she like when she was describing this to you?

7    Isabell?

8    A.    She seemed comfortable, but I had a relationship with

9    her and her brother, you know, at school, so she seemed --

10   she didn't seem nervous.  She seemed comfortable talking with

11   me.

12   Q.    She said that she was blindfolded and some things were

13   put in her mouth.  Did she describe to you what those things

14   were?

15   A.    She said that she had to move her tongue around, and

16   then when Mr. Lara -- Mr. Lara was taking the notes and I was

17   asking the questions and the school psychologist came in the

18   middle.  And I asked her briefly:  Did it only happen once?

19   And then she remembered, well, it happened another time, and

20   she said -- I asked her:  What did it -- what did it feel

21   like?  I think I asked that question.  And she said it -- it

22   was big and round.  That was it.

23   Q.    Luisana had described her daughter as being scared and

24   upset.  By the time you talked to her, was she scared or

25   upset, or did she appear that way to you?

26   A.    She wasn't.  She did not appear scared.  She seemed a

27   little -- possibly nervous, you know.  She was in the

28   principal's office, so she'd never been in the principal's

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   778

1   office before for any reason.

2   Q.   Isabell, was she a problematic student in any way?

3   A.   No, not at all.

4   Q.   Do you remember her having any attendance problems at

5   school?

6   A.   No.

7   Q.   Never been a discipline problem or anything like that at

8   the school?

9   A.   No.

10   Q.   Mr. Chandler ever report to you that she was causing

11   trouble in class?

12   A.   No.

13   Q.   Would that have been inconsistent with the child and

14   student that you know Isabell to be?

15   A.   Repeat that, please.

16   Q.   Sure.  If someone had reported that she was problematic,

17   would that be inconsistent with the child and the student

18   that you know Isabell to be?

19   A.   Yes.

20   Q.   Okay.  Ms. Peery, do you all keep records of attendance

21   at -- did you all keep records of attendance at O.B. Whaley?

22   A.   Yes.

23        MS. FILO:  Your Honor, I would like to have marked

24   as People's next in order, one-page document that is entitled

25   "PowerSchool Daily Attendance."

26        MR. MADDEN:  Is that for Isabell?

27        MS. FILO:  Yes.

28        MR. MADDEN:  It's already an exhibit.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   779

1        MS. FILO:  Is it?

2        MR. MADDEN:  It's Defense A.

3        MS. FILO:  Oh.

4        THE COURT:  It is Defense A.  There is attendance

5   record, which was marked Defense A, involving Isabell.

6        MR. MADDEN:  I'm assuming it's the same.

7        THE CLERK:  It's B, Your Honor.

8        THE COURT:  That's A-1 through 13.

9        MR. MADDEN:  I'm sorry.

10        THE COURT:  You're right.  It's B.

11        MR. MADDEN:  I apologize.

12        THE CLERK:  Do you have it in your possession

13   because it's not here?

14        MR. MADDEN:  I'm not saying it's not possible.  If

15   you don't have it, I'm a likely suspect.  Why don't you mark

16   your copy as Defense A, substitute it.  If you need another

17   one, I will get you one.

18        THE COURT:  Well, could you take a look?  I don't

19   want to --

20        MR. MADDEN:  I don't want to waste the Court's

21   time.  I won't have it handy.  I have no intention of

22   referring to it this afternoon.

23        THE COURT:  Yeah, but it's a court exhibit.

24        MR. MADDEN:  I know.

25        THE COURT:  Hold on.  We'll go off the record.

26        (Whereupon, there was a discussion off the record.)

27        THE COURT:  We'll go back on the record, and Ms.

28   Filo has Defense Exhibit B, which is the same document?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   780

1        MS. FILO:  Yes.

2        THE COURT:  Okay.

3        MS. FILO:  Well, actually, if I could have just a

4   minute, Your Honor?

5        THE COURT:  Yes.

6        MS. FILO:  May we approach briefly, Your Honor?

7        THE COURT:  Yes.

8        (Whereupon, there was a discussion at the bench.)

9        THE COURT:  Based on our sidebar conversations,

10   counsel has asked and are prepared to stipulate that, Ms.

11   Filo, you have an exact copy of Defense B, which has been

12   marked.  And both counsel stipulate that your copy could be

13   substituted in as Defense B, and that will be the new Defense

14   B, but it's basically an identical copy; correct?

15        MS. FILO:  Thank you, Your Honor.

16        THE COURT:  Mr. Madden, you stipulate to that?

17        MR. MADDEN:  I do, and thank you.

18        THE COURT:  Okay.  So we'll make the exchange.  Do

19   you have the --

20        MS. FILO:  I've already done that.

21        THE COURT:  -- first B?

22        MS. FILO:  It's gone to counsel.

23        THE COURT:  If you'd give it to our clerk, please.

24   Thank you.

25        You may proceed.

26        MS. FILO:  Thank you.  May I approach, Your Honor?

27        THE COURT:  Yes.  Thank you.

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   781

1    BY MS. FILO:

2    Q.   Ms. Peery, what is this document that I'm handing you?

3    Do you recognize that?

4    A.   It's the attendance log that we use for SAR meetings to

5    monitor attendance.

6    Q.   What meetings?

7    A.   SAR meetings.  It's the school advisory -- it's a

8    meeting -- let me put it in general terms.  We meet if there

9    is excessive tardies.  If there is a certain amount of

10   excessive tardies, the parents are notified, so it's an

11   attendance log.

12   Q.   Okay.  Do you know whether or not Isabell was ever the

13   subject of any sort of meeting with respect to her attendance

14   at school?

15   A.   I know that there is a certain criteria, and if they hit

16   that criteria, she could have received a letter in the mail

17   about that.

18   Q.   Okay.  So I just want to make sure that I'm reading the

19   document right.  An "L" indicates tardy; is that correct?

20   A.   Yes.  Unexcused tardy.

21   Q.   Okay.  So we have one, two, three, four, five, six

22   unexcused tardies in the time period from January -- I'm

23   sorry -- August 15th to January 1; is that correct?

24   A.   Yes.

25   Q.   Six?

26   A.   Yes, that's it.  And then -- but the ones that we report

27   on are past 30 minutes, and I don't see any.  I see one "N."

28   So she wouldn't have met -- you need three N's before you --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   782

1    when you first get the letter.

2    Q.   Okay.  So in her second week of school, she had an "N",

3    which meant she was more than 30 minutes late to school?

4    A.   Yes.

5    Q.   So she had -- so I guess in fairness, it's one, two,

6    three, four, five, six, seven total tardies in four months of

7    school?

8    A.   Yes.

9    Q.   Okay.  Anything as a principal that you find

10   particularly alarming about that number of tardies?

11   A.   No.

12   Q.   And the "L," the unexcused tardy, that "L" could be that

13   the student was three minutes late to school?

14   A.   Yes.

15   Q.   Okay.  Ms. Peery, you are aware, are you not, that the

16   school district has been the subject of civil litigation as a

17   result of the allegations in this case?

18   A.   Yes.

19   Q.   So the school district itself has been sued?

20   A.   Yes.

21   Q.   Could you remember anything else about your

22   conversations with Isabell that day that you haven't -- that

23   I haven't asked you?

24   A.   I think I told you everything that she said.

25   Q.   That you could remember?

26   A.   That I could remember.

27   Q.   Okay.

28        MS. FILO:  That's all the questions I have.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   783

1        THE COURT:  Cross, Mr. Madden?

2        MR. MADDEN:  Thank you, Your Honor.

3                  CROSS-EXAMINATION

4   BY MR. MADDEN:

5   Q.   Is it pronounced Ms. Peery or Ms. Peery?

6   A.   Peery.

7   Q.   Thank you.

8        Ms. Peery, my name is Brian Madden.  I'm Craig

9   Chandler's attorney.  You're obviously familiar with how the

10  attendance records are kept?

11  A.   Yes.

12  Q.   All right.  Could you tell me at the time of these

13  incidents, is there a bell in the morning at a certain time

14  to start school?

15  A.   Yes.

16  Q.   And do you know what time that would be?

17  A.   It was -- I believe it was 8:30.

18  Q.   Okay.  And then for purposes of attendance, is there

19  another period of time that follows that where there is

20  another bell?

21  A.   No.

22  Q.   Okay.  Is there any significance to the time 8:45 a.m.

23  concerning attendance or tardies?

24  A.   Teachers are supposed to use their discretion on tardies

25  as far as students.  Since we're a walking school, Whaley was

26  a walking school, some students would come in a couple

27  minutes later and some teachers would mark them tardy two

28  minutes late and some teachers would not.  So the 15 minute

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   784

1    -- normally, 15-minute tardies are already logged in by most

2    teachers.

3    Q.   I think I understand what you said, but I'm going to ask

4    more questions to make sure that I do.

5    A.   Okay.

6    Q.   So actually, if you were 30 seconds late, you're

7    technically late?

8    A.   You are late.

9    Q.   I'm sure there are no teachers at O.B. Whaley that give

10   children a 30-second tardy; right?  Not in your experience?

11   A.   Not in my experience.

12   Q.   All right.  But I'm assuming, then, that the individual

13   teachers are free to make their own decisions about calling

14   in tardies when students arrive sometime after 8:30, but at

15   or before 8:45?

16   A.   The students at O.B. Whaley would come into the front

17   office, get a tardy slip, and then have to walk to their

18   classroom at the actual time they arrived at school, which

19   then at that point, if the attendance was already put in the

20   system -- let's say she got there at 8:40, ten minutes late,

21   and if the teacher had already marked her tardy, then the

22   secretary has to change it on the time.  Is that what -- I

23   might be unclear.

24   Q.   I think it may be me.

25   A.   Okay.

26   Q.   I think I'm going to try to ask some different

27   questions.  How did teachers keep track of tardies?

28   A.   They log into PowerSchool, and this is the document that

1    they have.  So some teachers might log in two minutes, some
2    might log in five minutes.
3    Q.    So the way that they report tardies is through their
4    computers?
5    A.    Yes.
6    Q.    Okay.  But the teacher has an option, if he or she
7    wants, not to give -- not to enter late into a computer any
8    time up to 8:45; correct?
9    A.    I believe it was 8:45, yes.
10   Q.    So more softhearted teachers may wait a longer period of
11   time than others; correct?
12   A.    I don't know if it would be considered softhearted, but
13   some would, you know.
14   Q.    Fair enough.  I agree.  But that was a subjective call
15   by the teachers as to what time during that 15-minute window
16   you would type in late?
17   A.    Yes.
18   Q.    But in no event was it to be later than 8:45, because at
19   8:45 your attendance records need to be entered; correct?
20   A.    That's what we asked.
21   Q.    Okay.  At least that was what they were supposed to do?
22   A.    Yes.
23   Q.    Okay.  So it's possible that even though a student has
24   entries of unexcused tardies, official ones, there may have
25   been other times when a student was tardy somewhere in the 15
26   minutes or less, and it wasn't entered because teachers had
27   authority not to enter it?
28              MS. FILO:  Objection, Your Honor.  Calls for

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   786

1   speculation.

2             THE COURT:   Sustained.

3   BY MR. MADDEN:

4   Q.   All right.   Would it be fair to state that the printout

5   that you have -- is that in front of you?

6   A.   Yes.

7   Q.   All right.   Nothing more than a reflection of the actual

8   tardies typed in by a teacher?

9   A.   Yes.

10  Q.   But it doesn't necessarily mean that there weren't other

11  tardies that were not entered into; correct?

12  A.   The teachers are responsible for entering the tardies.

13  So from this document, it looks like she was only absent -- I

14  mean, only tardy.

15  Q.   According to the official calendar?

16  A.   Exactly.

17  Q.   Okay.   So I want to make sure I understand your

18  testimony.   Isabell seemed comfortable when she spoke with

19  you?

20  A.   Yes.

21  Q.   She didn't seem nervous?

22  A.   She seemed comfortable speaking with me.   She seemed a

23  little nervous about being in the principal's office.

24  Q.   Just because she was there?

25            MS. FILO:   Objection, Your Honor.   Calls for

26  speculation.

27            THE COURT:   Sustained.

28  ///

1    BY MR. MADDEN:

2    Q.   All right.  Her mother, on the other hand, was much more

3    than nervous; correct?

4    A.   Yes.

5    Q.   Angry?

6    A.   She was emotional; she was worried.

7    Q.   I'm sorry, I cut you off.  Please finish.

8    A.   She was worried.

9    Q.   Did she ever use profanity in your presence concerning

10   her interaction with you that morning?

11   A.   Yes.

12   Q.   And that would imply or strongly suggest that she was

13   angry; correct?

14   A.   She was upset, yes.

15   Q.   Difficulty accepting the word "angry"?

16   A.   Well, she was emotional, she was crying, she was -- she

17   wasn't yelling.  She did use profanity.

18   Q.   At you?

19   A.   Not towards me.

20   Q.   Towards whom?

21   A.   Towards -- she was towards the teacher.  She was upset.

22   Q.   Okay.  With respect to your conversation with Isabell

23   concerning the number of times that this occurred, she first

24   told you it happened one time; correct?

25   A.   Yes.

26   Q.   And then she gave you a different response or

27   contradictory response after that?

28   A.   She was being interviewed by myself and Mr. Lara and

1    then the psychologist came in the middle, so she went back

2    and reviewed the beginning again.  And then I asked:  Did it

3    only happen once?  And then she -- that's when she continued.

4    So she stopped and went back to the beginning because the

5    psychologist arrived later and then finished.

6    Q.   So when she went back, she said it happened another

7    time?

8    A.   After I said "Did it only happen once," she said -- um,

9    that's when she said:  No.  There was another time.  And that

10   was I believe -- yeah.

11   Q.   All right.  So she gave you two responses:  One response

12   was one time, and the second response was in effect that it

13   happened two times?

14   A.   Yes.

15   Q.   Okay.  Thank you.

16            MR. MADDEN:  I have no further questions, Your

17   Honor.

18            THE COURT:  Thank you.

19            Redirect, Ms. Filo?

20                      REDIRECT EXAMINATION

21   BY MS. FILO:

22   Q.   Ms. Peery, you said that Isabell was nervous about being

23   in the principal's office.  How did you know that it was the

24   location that was making her nervous, or do you know?

25   A.   I don't.  She didn't verbalize she was nervous about

26   being in the principal's office, but she just seemed -- not

27   scared, but she seemed uncomfortable, a little uncomfortable.

28   Q.   Okay.  Is it equally as possible that she was nervous

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   789

1   about the subject matter?

2   A.   Yes.

3   Q.   Ms. Peery, do you know who Isabell's friends were at

4   school?  Do you know who she palled around with at school?

5   A.   I knew a few of the girls.

6   Q.   Could you give me their names?

7   A.   She -- it's been a while.  I know there was a little

8   girl that she used to hang around with Laurie, and that's the

9   only one I could remember right now.

10  Q.   And what about Becky?  Do you know Becky?

11  A.   Yes.

12  Q.   And were Becky and Isabell friends that you saw?

13  A.   I really didn't notice that.

14  Q.   Never saw them palling around together at school?

15  A.   No.  Becky had another group of girls that she was

16  really, really close to.

17  Q.   Okay.

18        MS. FILO:  Your Honor, could I just have a moment?

19        THE COURT:  Yes.

20        MS. FILO:  I think that's all I have, Your Honor.

21        THE COURT:  Recross, Mr. Madden?

22        MR. MADDEN:  Nothing, Your Honor.

23        THE COURT:  May this witness be excused?

24        MS. FILO:  Yes, Your Honor.

25        MR. MADDEN:  Yes.

26        THE COURT:  Okay.  Thank you, ma'am.  You are

27  excused and free to leave.  And if you could hand me that

28  document, please.  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   790

1        MS. FILO:  Your Honor, could I just have one minute

2 with her?

3        THE COURT:  Of course.

4        MS. FILO:  Thank you, Your Honor.

5        Your Honor, at this time by stipulation, the People

6 would submit a reading to the jury of Becky's preliminary

7 examination hearing.

8        THE COURT:  Okay.  You have your reader?

9        MR. MADDEN:  Before we start, may we approach the

10 bench briefly?

11        THE COURT:  Of course.

12        (Whereupon, there was a discussion at the bench.)

13        THE COURT:  We'll go back on the record.  Ms. Filo,

14 it's my understanding that you have a reader?

15        MS. FILO:  I do.

16        THE COURT:  If you'd come forward and take the

17 witness stand.  And could you state your name for the record?

18        THE READER:  Soula Ellenikiotis.

19        THE COURT:  Could you spell it, please?

20        THE READER:  S-o-u-l-a.  E-l-l-e-n-i-k-i-o-t-i-s.

21        THE COURT:  Thank you.

22        And, Ms. Filo, as you know, I want to remind you if

23 you could read slowly after the answer is given, pause

24 briefly, then the next question.  And as I understand it,

25 your reader is going to be reading the testimony of Becky?

26        MS. FILO:  Correct.

27        THE COURT:  And you'll be asking the questions as

28 the prosecutor?

1    MS. FILO:  Thank you, Your Honor.  And I'm happy to

2  stipulate that the transcript itself could be used and that

3  it not need be reported.

4    THE COURT:  Mr. Madden?

5    MR. MADDEN:  So stipulated.

6    THE COURT:  Well, pursuant to a stipulation, then

7  we won't have it recorded.  We'll mark it as an exhibit,

8  People's 5 [sic].

9    MS. FILO:  Thank you.

10    (Whereupon, People's Exhibit 4 was marked for

11  identification.)

12    MR. MADDEN:  One moment, please, Your Honor.  May I

13  consult with Ms. Filo?

14    THE COURT:  Yes.

15    (Whereupon, there was a discussion off the record.)

16    THE COURT:  You both stipulate to that?

17    MS. FILO:  Yes, Your Honor.

18    MR. MADDEN:  Yes.

19    THE COURT:  So the portion of Becky's preliminary

20  examination transcript will be marked as People's 4, and do

21  you have page numbers, Ms. Filo?

22    MS. FILO:  I do, Your Honor.  It will run from page

23  7 to page 56 of the preliminary hearing transcript.

24    THE COURT:  Okay.  The other thing I request, once

25  you are done with your direct, if you'd note for the record

26  you will begin cross, redirect, recross, and that's the only

27  concern I have.  Okay?

28    MS. FILO:  Thank you, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   792

1   THE COURT:  So you could read at whatever speed you

2   like since it's not going to be transcribed by my court

3   reporter pursuant to stipulation; correct, Mr. Madden?

4   MR. MADDEN:  Yes.

5   THE COURT:  Ms. Filo.

6   MS. FILO:  Thank you.

7   THE COURT:  Okay.

8   MS. FILO:  Your Honor, I should tell the jury, at

9   time of the preliminary hearing we referred to the witness as

10  B. instead of Becky, but the reference is to the witness who

11  testified this morning Becky.

12  THE COURT:  You agree with that qualification, Mr.

13  Madden?

14  MR. MADDEN:  I do.

15  THE COURT:  Okay.  Thank you.

16  (Whereupon, the record was read, not reported.)

17  THE COURT:  Excuse me, Ms. Filo.  You could

18  continue with a few more questions.  If you want to find a

19  place to -- that is logical.

20  MS. FILO:  We could do it now, Your Honor.  I have

21  about 20 pages left.

22  THE COURT:  Okay.

23  Ladies and gentlemen, we're going to take the

24  afternoon recess at this time.  I will order all members of

25  the jury to report to the jury assembly room on the second

26  floor, and tomorrow at 9:00 o'clock we'll finish with the

27  reading of the transcript and continue with the witnesses.

28  Please remember the Court's admonition and we'll

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   793

1    see you tomorrow at 9:00 a.m.

2              (Whereupon, the jurors exited the courtroom and the

3    proceedings were had outside the presence of the jury.)

4              THE COURT:  The jury has left the courtroom.  Ms.

5    Filo, I'm assuming you have no objection that the exhibit,

6    Defense Exhibit B, Mr. Madden's copy of the attendance

7    record, that we could return that copy to him since we

8    substituted another copy of the other court exhibit.

9              MS. FILO:  I have no objection.

10             THE COURT:  We will return that to Mr. Madden at

11   this time.

12             MR. MADDEN:  Thank you, Your Honor.  I have a

13   question about Mr. Chandler.  Apparently, Mr. Chandler was

14   not allowed to shave last night.  Do we need to do anything

15   about that?

16             THE COURT:  Put it on the minute order that

17   defendant be allowed to have showers and shave.

18             MR. MADDEN:  Thank you.

19             THE COURT:  And be dressed out, whatever we need to

20   put.  Thank you.

21             We'll recess at this time.  I'll order both counsel

22   and Mr. Chandler here tomorrow at 9:00 o'clock and we'll

23   continue.

24             MS. FILO:  Thank you, Your Honor.

25             (Whereupon, the Court took the evening recess.)

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   794

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA CLARA    )

 3

 4           I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

 5           The foregoing is a full, true, and correct

 6   transcript of the testimony given and proceedings had in the

 7   above-entitled action taken on the above-entitled date; that

 8   it is a full, true, and correct transcript of the evidence

 9   offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and official

13   stenographic reporter of said Court, and thereafter had the

14   same transcribed into typewriting as herein appears.

15           I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted if applicable.

18

19           Dated:

20

21                            _____

22                            Jamie L. Mixco, C.S.R.
                              Certificate No. 12708
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."
```

JAMIE L. MIXCO, C.S.R. NO. 12708