1  XAVIER BECERRA
   Attorney General of California
2  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
3  JILL M. THAYER
   Deputy Attorney General
4  State Bar No. 166428
    455 Golden Gate Avenue, Suite 11000
5   San Francisco, CA  94102-7004
    Telephone:  (415) 703-5954
6   Fax:  (415) 703-1234
    E-mail:  Jill.Thayer@doj.ca.gov
7  *Attorneys for Respondent*

8                IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12

13  **CRAIG RICHARD CHANDLER,**              17-cv-00325-EMC

14                        Petitioner,        **EXHIBITS**

15        **v.**

16  **SCOTT FRAUENHEIM, Warden,**

17                        Respondent.

18

19

20      Exhibit 3        State Court Reporter's Transcript (Vols. 10-13)

21

22

23

24

25

26

27

28

# EXHIBIT 3
# (Vol. 10)

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

THE PEOPLE OF THE STATE OF          )
CALIFORNIA,                         )
                                    )
     Plaintiff - Respondent,        )
                                    )
     v.                             )          No. C1223754
                                    )
CRAIG RICHARD CHANDLER,             )
                                    )
     Defendant - Appellant.         )
_____/

COPY

VOLUME 10

PAGES 795 - 935

JULY 17, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:          OFFICE OF THE ATTORNEY GENERAL
                                   BY:  KAMALA D. HARRIS,
                                   Attorney General of the State
                                   of California

FOR DEFENDANT-APPELLANT:           In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   796

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           IN AND FOR THE COUNTY OF SANTA CLARA

3    BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4                    DEPARTMENT NO. 37

5                      ---o0o---

6

7   THE PEOPLE OF THE
    STATE OF CALIFORNIA,            )
8                                   )
                 PLAINTIFF,         )
9                                   )     CASE NO.  C1223754
         v.                         )
10                                  )
                                    )
11   CRAIG RICHARD CHANDLER,        )
                                    )
12                                  )
                 DEFENDANT.         )
13   _____/

14

15                     ---o0o---

16

17       REPORTER'S TRANSCRIPT OF PROCEEDINGS

18              JULY 17, 2013

19

20                     ---o0o---

21

22

23
    APPEARANCES:
24
    FOR THE PEOPLE:          ALISON FILO
25                           Deputy District Attorney

26
    FOR THE DEFENDANT:       BRIAN MADDEN
27                           Attorney at Law

28   OFFICIAL COURT REPORTER:    JAMIE L. MIXCO
                                 C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   797

# INDEX

## EXAMINATION

**Witness Name**                                                    **Page**

**LAURIE DOE**
  Direct By Ms. Filo  ........................................800
  Cross By Mr. Madden  .....................................821
  Re-Direct By Ms. Filo  ..................................833

**DR. LYNN DOE**
  Direct By Ms. Filo  ......................................853
  Cross By Mr. Madden  .....................................859
  Re-Direct By Ms. Filo  ..................................869

**MARY MONTGOMERY**
  Direct By Ms. Filo  ......................................873
  Cross By Mr. Madden  .....................................878
  Re-Direct By Ms. Filo  ..................................888
  Re-Cross By Mr. Madden  .................................888

**ARMANDO LARA**
  Direct By Ms. Filo  ......................................892
  Cross By Mr. Madden  .....................................900
  Re-Direct By Ms. Filo  ..................................918

## PEOPLE'S EXHIBITS

**Exhibits**     **Description**                          **Page**
5 Marked      cd                                          835
5-A Marked                                                835
6 Marked      cd                                          836
6-A Marked    transcript of Becky's interview             836

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   798

```
 1   San Jose, California                    July 17, 2013
 2                         PROCEEDINGS
 3          THE COURT:  Thank you, ladies and gentlemen.
 4   Record will reflect all members of the jury are present, both
 5   counsel are present, Mr. Chandler is present in the
 6   courtroom.
 7          And as I recall, Ms. Filo, we were continuing with
 8   the reading of the preliminary examination transcript of
 9   Becky's testimony; correct?
10          MS. FILO:  We were, Your Honor.  And before we
11   excuse the reporter for the remainder of the reading, Mr.
12   Madden and I wanted to put on the record in front of the jury
13   that the exhibits that were used at the preliminary hearing
14   are the same as two of the exhibits that are being used in
15   this proceeding.  And if I may approach, I'll --
16          THE COURT:  Yes.
17          MS. FILO:  For the jury's clarification, the one
18   that has -- the picture that has the three post-its on it,
19   that are titled 1, 2, and 3 are from the preliminary hearing.
20   They were Exhibit A in the preliminary hearing, and the --
21   what is now A-1 in the trial is from the preliminary hearing,
22   and it was Exhibit B.  So as we're reading this transcript,
23   the one with three post-its on it is actually preliminary
24   hearing Exhibit A.  The one with the two post-its on it, it
25   is Exhibit B from the preliminary hearing.  In this
26   proceeding, they are A-2 and A-1 respectively.
27          THE COURT:  Thank you.  You may proceed, Ms. Filo,
28   when you are ready.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   799

1        MS. FILO:  Thank you, Your Honor.

2        (Whereupon, the record was read, not reported.)

3        THE COURT:  We'll go back on the record.  The

4   record will reflect that we just concluded reading pages 7

5   through 56 of Becky's preliminary examination testimony.

6        Ms. Filo, could you give me the date of the

7   testimony?

8        MS. FILO:  May 21st, 2012.

9        THE COURT:  Okay.  Thank you.

10       MS. FILO:  And that exhibit, the transcript has

11  been marked as People's Exhibit 4.

12       THE COURT:  Correct.  Thank you.

13       And at this time, Ms. Filo, you ready to call your

14  next witness?

15       MS. FILO:  Yes, Your Honor.  Thank you.  The People

16  call Ms. Laurie.

17                   LAURIE DOE,

18       Being called as a witness on behalf of the People,

19  having been first duly sworn, was examined and testified as

20  follows:

21       MS. FILO:  Your Honor, the witness is accompanied

22  by advocate Elvia Ricas (phonetic).

23       THE COURT:  Okay.  Ma'am, you understand you're not

24  to encourage, prompt, or suggest any of the answers?

25       MS. RICAS:  Yes.

26       THE COURT:  Okay.

27       Good morning, Laurie.

28       THE WITNESS:  Good morning.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   800

1          THE COURT:  Could you spell your first name for me?

2          THE WITNESS:  L-a-u-r-i-e.

3          THE COURT:  Very good.  We're going to ask when you

4   answer questions to talk into the microphone so we could hear

5   you.

6          THE WITNESS:  Okay.

7          THE COURT:  I know you talked to Ms. Filo about her

8   asking you questions today, so I'm going to let her start

9   with her questions.  Okay?

10         THE WITNESS:  Yes.

11         THE COURT:  And while we're asking you questions,

12  if there is any time that you get tired and you want a break,

13  let me know and let Ms. Filo know and I will take a break for

14  you.  Okay?

15         THE WITNESS:  Okay.

16         THE COURT:  Thank you.

17         Ms. Filo.

18         MS. FILO:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20  BY MS. FILO:

21  Q.   Okay.  Laurie, I have some questions for you.  Okay?

22  A.   Um-hum.

23  Q.   Okay.  How old are you right now?

24  A.   Nine.

25  Q.   And when is your birthday?

26  A.   November 18th.

27  Q.   Do you know what year you were born?

28  A.   I think it was in 2003.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   801

1   Q.   Okay.  So you're going to be ten this year?

2   A.   Yes.

3   Q.   And you're going into what grade?

4   A.   Fifth.

5   Q.   Fifth grade.  So, Laurie, you know the difference

6   between telling the truth and telling a lie; right?

7   A.   Yes.

8   Q.   So if I told you that I had blond hair, would that be

9   the truth or would that be a lie?

10  A.   A lie.

11  Q.   A lie.  Because I don't have blond hair, do I?

12  A.   No.

13  Q.   And if I said that I'm wearing a black shirt, would that

14  be the truth or would that be a lie?

15  A.   That would be the truth.

16  Q.   Because I'm wearing a black shirt; right?

17  A.   Yes.

18  Q.   Okay.  So when you raised your right hand, you promised

19  to tell us the absolute truth; right?

20  A.   Yes.

21  Q.   Okay.  Could you promise me that you are going to do

22  that today?

23  A.   Yes.

24  Q.   And, Ms. Laurie, do you know the difference between real

25  things and make-believe things?

26  A.   Yes.

27  Q.   Yeah?  So what did you have for breakfast this morning?

28  A.   McDonald's.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    802

1    Q.    McDonald's.  And if I said, Ms. Laurie, you went to

2    McDonald's this morning, that would be a real thing; right?

3    A.    Yes.

4    Q.    Okay.  But if I said, Laurie, fairies came to visit you

5    this morning, would that be a real thing or a make-believe

6    thing?

7    A.    A make-believe.

8    Q.    Okay.  So we're going to promise today that we're only

9    going to talk about true things and things that really

10   happened.  No lies and no make-believe; is that fair?

11   A.    Yes.

12   Q.    Okay.  Laurie, are you super nervous about testifying

13   today?

14   A.    Yes.

15   Q.    Yeah?  How come?

16   A.    Because it was kind of scary for me to be here.

17   Q.    Kind of scary to be here?

18         THE COURT:  Thank you, Ms. Filo.  If you'd pull it

19   over because she's sort of facing you.

20   BY MS. FILO:

21   Q.    You know what I'm going to do, I'm going to scoot you a

22   little bit over.  Okay.  We're going to make this -- this is

23   your big moment where you get to talk into the microphone.

24   Okay?

25   A.    Okay.

26   Q.    So are you super nervous?

27   A.    Yes.

28   Q.    How come?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    803

1    A.    Because it's actually very scary for me, because I --

2              MR. MADDEN:  Your Honor, I'm sorry.  Laurie, excuse

3    me, I can't hear.

4    BY MS. FILO:

5    Q.    How about I stand right in front of you.  Okay?  Could I

6    stand right here and you could talk right like this?

7              MR. MADDEN:  I apologize, Your Honor.  I'm thinking

8    the opposite.  Ms. Filo stood a little bit away, Laurie will

9    be inclined to speak a little louder.

10   BY MS. FILO:

11   Q.    Could you speak up a little bit, Laurie?  Could you try

12   really, really hard?

13             MR. MADDEN:  May we approach the bench, Your Honor?

14             THE COURT:  No.  I'm trying to get the microphone

15   to her right, so when she's facing Ms. Filo she could talk

16   into the microphone.

17             MR. MADDEN:  Yeah.  I think if we keep the

18   microphone between her and Ms. Filo, that will be the best

19   that we could do.  Hopefully that will be good enough.

20             THE COURT:  Okay.  I think this will work, Ms.

21   Filo.  I don't want you blocking the jurors from her.

22             MS. FILO:  Could everyone see, Laurie?  No.

23   BY MS. FILO:

24   Q.    I'm trying to get close to you so I could hear you and

25   you could talk right into the microphone.

26             THE COURT:  I'm sorry, Laurie.  I really apologize.

27   I don't want you to be interrupted having to be asked

28   questions more than once.  This is a problem that we'll fix

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   804

1    at noon.

2              MS. FILO:  Okay.

3              MR. MADDEN:  Your Honor, may I move?

4              THE COURT:  Yes, you may.  I don't want your view

5    blocked.

6    BY MS. FILO:

7    Q.   Laurie, you said you are going to start the fifth grade?

8    A.   Yes.

9    Q.   All right.  And you said you were nervous about

10   testifying.  You were just going to tell me why.  Why are you

11   so nervous?

12   A.   Because I'm a little girl.  This is so strange for me

13   being in court because I normally think about, like, older

14   people go here.

15   Q.   This is -- seems like a place where only adults go;

16   right?

17   A.   Yes.

18   Q.   Kids go to playgrounds and fun places?

19   A.   Yeah.

20   Q.   Not courtrooms; right?

21   A.   No.

22   Q.   All right.  Well, how about this?  Kids talk to adults;

23   right?

24   A.   Yes.

25   Q.   Okay.  Well, this is a really special place where kids

26   get to tell adults what to do.  So if I say something that

27   you don't understand, you get to tell me:  Ms. Alison, I do

28   not understand you.  Or, you get to tell me:  Ms. Alison,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   805

1  that question is not right.  I'm going to tell you that you

2  get to tell me what is right and what's wrong.  Okay?

3  A.   Okay.

4  Q.   Okay.  So, Laurie, I want to ask you where you -- where

5  did you go to school when you started third grade?

6  A.   O.B. Whaley.

7  Q.   And who was your teacher?

8  A.   Third grade; right?

9  Q.   Third grade.

10  A.   Mr. Chandler.

11  Q.   Mr. Chandler.  Okay.  And was that class -- did it have

12  second-graders and third-graders in it?

13  A.   Yes.

14  Q.   But you were one of the third-graders?

15  A.   Yes.

16  Q.   Did the third-graders sit on one side and the

17  second-graders sat on the other side of the room?

18  A.   Yes.

19  Q.   Who was your best friend in third grade?

20  A.   Well, I actually have three friends in second grade.

21  Q.   Second grade or third grade?

22  A.   Second grade.

23  Q.   Who was your best friends in second grade?

24  A.   Veronica.

25  Q.   Veronica?

26  A.   Lea.

27  Q.   Lea?  Okay.

28  A.   And Melanie.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   806

1    Q.    Melanie.  Okay.  Did they go with you to Mr. Chandler's

2    class in third grade?  Were they in a different classroom?

3    A.    They were in the same classroom.

4    Q.    Were they still your best friend in third grade?

5    A.    Second grade.

6    Q.    No?  In third, you were in Mr. Chandler's classroom for

7    third grade; right?

8    A.    Yes.

9    Q.    So were Veronica and Lea and Melanie, were they in Mr.

10   Chandler's classroom?

11   A.    Yes.

12   Q.    And they were your best friends in Mr. Chandler's

13   classroom?

14   A.    Yes.

15   Q.    So tell me some of the fun things you would do with your

16   best friends?

17   A.    Well, we would, like, play tag a little bit and then go

18   out to the playground and do some things that just pop out of

19   our heads, like, what should we do?

20   Q.    You just get to pick whatever you want to do; right?

21   A.    Yeah.

22   Q.    Yeah?  Okay.  So, Laurie, I want to ask you about being

23   in Mr. Chandler's classroom.  Do you remember what his

24   classroom looked like?

25   A.    A little bit.

26   Q.    Okay.  So if you look right behind you, we have two

27   pictures.  They are marked in the corners A-1 and A-2.  Do

28   you recognize what's in those photographs?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   807

1   A.   Yes.

2   Q.   What does that look like?

3   A.   It looks like his desk where he would normally sit down.

4   Q.   Okay.  So that's where Mr. Chandler would sit, at that

5   desk right there?

6   A.   Yes.

7   Q.   All right.  And then in A-2, there is a picture of

8   this -- looks like a child's desk.  Is that a child's desk?

9   A.   Yes.

10   Q.   And is that where the students sat in desks like this?

11   A.   Yes.

12   Q.   So Mr. Chandler's desk was different.  It's the one in

13   the middle of the picture of A-2?

14   A.   Yes.

15   Q.   All right.  And back behind here in A-2 there is a big

16   cabinet.  Do you see that?

17   A.   Yes.

18   Q.   Okay.  And what kind of things were in the cabinet, do

19   you know?

20   A.   No.

21   Q.   No?  Okay.  Did you ever -- did you ever get stuff out

22   of the cabinet?

23   A.   No.

24   Q.   No?  All right.

25        So, Laurie, I want to ask you about whether or not

26   you ever -- whether or not you were ever in Mr. Chandler's

27   classroom with a blindfold on?

28   A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   808

1   Q.   Did that happen?

2   A.   Yes.

3   Q.   That's one of the real things that happened?

4   A.   Yes.

5   Q.   Okay.  Can you tell me how come you were in the

6   classroom with a blindfold on?

7   A.   I don't remember.

8   Q.   Okay.  Do you -- were you -- were you there by yourself?

9   A.   Yes.

10   Q.   With Mr. Chandler?  Just the two of you?

11   A.   Yes.

12   Q.   When was this?  When during the day did this happen?

13   A.   During lunch recess.

14   Q.   Lunch recess.  Do you know how many times you were in

15   the classroom with Mr. Chandler by yourself with a blindfold

16   on?  Do you know how many times that happened?

17   A.   I don't really remember that either.

18   Q.   Okay.

19        MR. MADDEN:  I'm sorry, Your Honor.  I didn't hear

20   that.

21        MS. FILO:  I don't really remember that either.

22   BY MS. FILO:

23   Q.   Do you know if it was more than one time?

24   A.   Um, I don't remember.

25   Q.   Okay.  That's a totally fair answer.  Okay.  Laurie, if

26   you don't remember something, you could tell me:  I don't

27   remember.  All right?

28   A.   All right.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   809

1    Q.   Okay.  So you said that you were in the classroom with

2    the blindfold on.  What happened when you were in the

3    classroom with Mr. Chandler with the blindfold on?

4    A.   Well, I don't really remember that much, but I do

5    remember it was, like, this game we tried in the class.

6    Q.   Okay.  So had you already done the game in the class?

7    A.   Yes.

8    Q.   So you had done the game in the class, but then you came

9    in to do the game by yourself?

10    A.   Yes.

11    Q.   How did you get in the classroom?

12    A.   Miss -- a yard duty let me in the classroom.

13    Q.   So the yard duty came and got you?

14    A.   Yes.  She told me that I had to go in the classroom or

15    something, but I don't really remember what she said at that

16    time.

17    Q.   Okay.  So the yard duty came and got you and brought you

18    into the classroom; is that right?

19    A.   Yes.

20    Q.   Do you know what classroom number was Mr. Chandler's?

21    A.   I think it was number 18.

22    Q.   Okay.  When you went into the classroom, was the door

23    open or closed?

24    A.   Open.

25    Q.   Okay.  And after you went inside, did it stay open or

26    did it close?

27    A.   It closed.

28    Q.   Okay.  And then can you tell me what happened after

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   810

1   that?

2   A.   Well, he put the blindfold on and then I was just

3   sitting on the chair.

4           MR. MADDEN:  I apologize, Your Honor.

5           THE COURT:  Then she was just sitting on the chair.

6           MR. MADDEN:  Before that.

7           THE COURT:  He put the blindfold on me.

8   BY MS. FILO:

9   Q.   Okay.  I'm going to put this right in front of you.

10  Okay?

11          So he put the blindfold on you and then you were

12  sitting in a chair; right?

13  A.   Yes.

14  Q.   Then what happened?

15  A.   I don't remember.

16  Q.   Okay.

17  A.   But I do remember, like, this game about this woman who

18  couldn't see at all, but she was a teacher.

19  Q.   Okay.  So did -- did he have you touch anything?

20  A.   He had me feel things.

21  Q.   Did you -- what did you feel them with?

22  A.   My feet.

23  Q.   Your feet?

24  A.   (Shakes head up and down.)

25  Q.   Okay.  Did you have your shoes on?

26  A.   No, my socks.

27  Q.   Your socks were on?

28  A.   (Shakes head up and down.)

1  Q.    And what did the thing feel like that he put on your

2  feet?

3  A.    Well, I don't exactly remember.

4  Q.    Okay.  Where were your feet?  Were your feet down on the

5  ground?  Where were they?

6  A.    On a student's table.

7  Q.    So he had you sit in a chair and put your feet up on the

8  desk?

9  A.    Yes.

10  Q.    A little desk; right?  Like the one that's in the

11  picture on A-2?

12  A.    Yeah.

13  Q.    Do you remember anything about what it felt like?

14  A.    No.

15  Q.    No?  And did you always have your socks on?

16  A.    Yes.

17  Q.    Okay.  And then did he have you -- did he do anything

18  else?

19  A.    No.

20  Q.    No?  Did he have you taste anything?  Put anything in

21  your mouth?

22  A.    I don't remember.

23  Q.    You don't remember?

24  A.    No.

25  Q.    No?  Do you remember how many times this happened?

26  A.    Not really.

27  Q.    Okay.  You don't know if it was just one time or more

28  than one time?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   812

1   A.   Yes, I don't know.

2   Q.   You don't know.  Okay.  Do you know if he put just one

3   thing on your feet or was it more than one thing?

4   A.   I think it was more than one thing.

5   Q.   Okay.  Did you hear anything when he put something on

6   your feet?

7   A.   No.  But when I started getting inside the classroom and

8   I had the blindfold on, I heard a cabinet open.

9   Q.   You heard a cabinet open?

10  A.   Um-hum.

11  Q.   Is that when you already had the blindfold on?

12  A.   Yes.

13  Q.   Do you know where the blindfold came from?

14  A.   No.

15  Q.   You didn't see where it came from in the classroom?

16  A.   No.

17  Q.   No?  It was just there?

18  A.   Yes.

19  Q.   Okay.  And you said that you heard a cabinet open?

20  A.   Yes.

21  Q.   Did you hear anything else while you had the blindfold

22  on?

23  A.   No.

24  Q.   No?  Laurie, you talked to the police officers in this

25  case; right?

26  A.   Yes.

27  Q.   Yes?  So when you -- do you remember where you talked to

28  them?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   813

1    A.    It was in the school office in this room where a lot of

2    bugs and stuff in there.

3    Q.    Okay.  And then did you go talk to them someplace else

4    away from school?

5    A.    Yes.  It was in the building, but I don't remember

6    exactly.

7    Q.    Okay.  But you remember talking to a police officer kind

8    of in a room.  Did it have sort of pictures on the wall and a

9    big window?

10   A.    Yes.

11   Q.    Yes?  Okay.  And when you talked to the officers in the

12   case, did you do your absolute best to tell them the truth?

13   A.    Yes.

14   Q.    Okay.  So, Laurie, you went several months ago up to San

15   Francisco.  Do you know where San Francisco is?

16   A.    Yes.

17   Q.    The big city with lots of big buildings?

18   A.    Yes.

19   Q.    Yes?  Did you talk to a woman there?

20   A.    Yes.

21   Q.    Yes?  And did you tell her the truth about what happened

22   in Mr. Chandler's classroom?

23   A.    Yes.

24   Q.    Yes?  What did you tell her?

25   A.    I don't specifically know.

26   Q.    You don't really remember what you told her?

27   A.    No.

28   Q.    Can you tell me -- do you remember anything that you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  814

1  told her?

2  A.  No.

3  Q.  Do you remember telling her that Mr. Chandler put

4  something in your mouth?

5  A.  I don't really remember.

6  Q.  You don't remember?

7  A.  No.

8  Q.  No?  Laurie, does it make you upset to think about Mr.

9  Chandler's classroom?

10  A.  Sort of.

11  Q.  How come?

12  A.  Because it's something really difficult for me.  I don't

13  think -- really want to remember about it.

14  Q.  Okay.  How come you don't want to remember?

15  A.  Well, sometimes I forget things because my parents try

16  to make me feel happy.  And sometimes some things just get

17  off of my brain and some of them still stay there.

18  Q.  Okay.  Could you tell me about anything in your brain

19  that still stayed there that makes you sad about Mr.

20  Chandler's classroom?

21  A.  Well, one thing is that my mom really trusted all of my

22  teachers.  She trusted Mr. Chandler.  But when she heard that

23  that, she got really sad and I got really disappointed and I

24  felt bad for my mom.

25  Q.  Okay.  Are you okay?

26  A.  (Shakes head up and down.)

27  Q.  Do you want some water?

28  A.  No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   815

1    Q.    No?  So is it only because you just didn't want to

2    disappoint your mom?

3    A.    No.  It was because -- because I tried to be happy and

4    like life.  And my dad said, if you have to get, like, happy

5    before everything turns bad and you don't have a good time in

6    your life.

7    Q.    Okay.  So you said that you tried to forget some of the

8    things in Mr. Chandler's classroom; is that right?

9    A.    Well, I tried to forget the things that actually very

10   hurtful, and -- well, I don't really know a lot of stuff,

11   because like I told you, my parents try to make me feel

12   happy.

13   Q.    Okay.  So are there some things that you just don't want

14   to remember about Mr. Chandler's classroom?

15   A.    Well, I still have some things, but some of them I

16   really don't remember.

17   Q.    Okay.  So you said you still have some things that you

18   remember?

19   A.    Yes.

20   Q.    Could you tell me maybe other things that you remember?

21   A.    Um, I remember, like, one day I accidentally, like,

22   opened -- like, my mom was giving me lunch, and when it was

23   lunchtime and when I opened the lid, the food just fell down.

24   And I went to my mom and I told her, and then the teacher,

25   Mr. Chandler, gave me -- to me and my mom, who was really

26   nervous, he said:  Do you want a peanut butter and jelly

27   sandwich or something?  And my mom didn't exactly know why he

28   was nervous until, like, right now.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   816

1    Q.    Okay.  So I guess what I want to know, is there anything

2    else about being in Mr. Chandler's classroom, not about how

3    your mom reacted or your dad reacted, but anything else about

4    being in Mr. Chandler's classroom that you thought was bad?

5    A.    I -- not really.

6    Q.    Okay.  So, Laurie, I want to ask you a little bit about

7    what the last two years have been like, or the last year and

8    a half have been like for you.  Okay?  Have you -- did you

9    talk to any of your friends about what Mr. Chandler did about

10   bringing you into the classroom?

11   A.    No.

12   Q.    No?  Was this something that you wanted your friends to

13   know about?

14   A.    Well, not really.

15   Q.    No?  How come?

16   A.    Because sometimes I like to keep, like, some stuff away

17   from my friends, because sometimes when I tell some people, I

18   know some people say it helps you.  It's much better.  But

19   for me, it kind of stressed me.  It was kind of a hurt

20   feeling.

21   Q.    Okay.  Laurie, have other kids been not nice to you

22   about what happened with Mr. Chandler?

23   A.    I do not remember.

24   Q.    You don't remember?

25   A.    No.

26   Q.    Were kids being not nice to you on the playground

27   whenever -- or making fun of you?

28   A.    No.

1   Q.   No?  Okay.  So, Laurie, have you told us everything that

2   you could remember about being in Mr. Chandler's classroom

3   the time that you were blindfolded and he put something on

4   your feet?

5   A.   Yes.

6   Q.   Okay.  Did he ever have you touch anything with your

7   hands?

8   A.   No.

9   Q.   No?  And did he ever have you -- did he ever put

10  anything on your face or on your cheeks?

11  A.   No.

12  Q.   And you don't remember anything about whether he put

13  anything in your mouth?

14  A.   No, I don't remember.

15  Q.   Okay.  So, Laurie, I want to ask you one last time.

16  When you talked to the police officers, you did your best to

17  tell them the truth?

18  A.   Yes.

19  Q.   Were you nervous about talking to the police officers?

20  A.   Well, I was scared, nervous, and confused because I

21  didn't know what was going on there.  And I didn't -- I kind

22  of had my brain kind of fuzzy and I'm a little kid, so I'm

23  kind of afraid to talk to police.

24  Q.   Okay.  Did you not tell them something because you were

25  scared?

26  A.   No.  I was scared because I didn't know what was going

27  on at that time.

28  Q.   Okay.  Have you ever had to talk to police officers

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   818

1    before?

2    A.    No, not really.

3    Q.    No?  Okay.  And then you went up to San Francisco and

4    you met with a woman there; right?

5    A.    Yes.

6    Q.    Yeah?  And did you tell her what happened in Mr.

7    Chandler's classroom?

8    A.    Yes.

9    Q.    Yes?  Was it easier for you to talk to her than it was

10   for you to talk to the police officers?

11   A.    It was kind of the same.

12   Q.    Okay.  What did you mean?

13   A.    I mean, that I was still scared and confused because my

14   mom always told me that this would end one day and that I

15   wouldn't have to worry anything about this.  And that kind of

16   got me confused and I was scared that I have to talk to her

17   because my parents had to be just waiting there and I would

18   have to be in the room alone with her.

19   Q.    Okay.  But she was a nice lady; right?

20   A.    (Shakes head up and down.)

21   Q.    Yes?

22   A.    Yes.

23   Q.    Okay.  And when you talked to her, did you do your

24   absolute best to tell her the truth about what happened in

25   Mr. Chandler's classroom?

26   A.    Yes.

27   Q.    How long ago did you talk to that lady?  Was it a long

28   time ago or just a little time ago?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   819

1    A.   I do not remember.

2    Q.   You don't remember.  Okay.

3         When you talked to her, did you do your best to

4    remember everything that happened in Mr. Chandler's room?

5    A.   Yes.

6    Q.   Yes?  Okay.

7         Laurie, so have you told me everything you could

8    remember about being in Mr. Chandler's room with the

9    blindfold on?

10   A.   Yes.

11   Q.   Yes?  Okay.  One last question.  You said that you

12   haven't talked to any of your friends about what happened in

13   Mr. Chandler's room --

14   A.   Yes.

15   Q.   -- is that right?

16   A.   Yes.

17   Q.   Okay.  And have you talked to any of the kids at school

18   about what happened in Mr. Chandler's room?

19   A.   Well, I did tell my friend it was kind of weird that

20   they had told me that I had to go inside the class, and my

21   friends were like:  Yeah, that was weird.

22   Q.   When you told them that you had to go in at lunchtime?

23   A.   Well, they were there with me.  They were -- and then

24   when I finished, they were in the class.  And then we had to

25   do work and we have to choose our partners, like a group,

26   and -- well, they said:  You want to be in our group?  I'm,

27   like, okay.  And then they were like:  That's kind of weird

28   you had to come in here.

1  Q.   Oh; they thought it was weird that you had to come in by

2  yourself?

3  A.   Yes.

4  Q.   Yes?  Okay.  Did you think it was weird?

5  A.   Well, I was kind of scared, so I didn't actually think,

6  like, if it was weird or not.

7  Q.   You were kind of scared?

8  A.   (Shakes head up and down.)

9  Q.   What were you scared off?

10  A.   I don't know.  I was just kind of scared to go in the

11  room by myself with someone.

12  Q.   Okay.  All right.  Laurie, I think that's all the

13  questions I have.  Okay?  Mr. Madden is going to ask you some

14  questions now.  Could you answer his questions just like you

15  answered mine?

16  A.   Yes.

17  Q.   Okay.  Thank you, Laurie.

18       THE COURT:  So, Laurie, like Ms. Alison just told

19  you, Mr. Madden is going to ask you some questions.  But

20  before he starts, would you like to take a short break?

21       THE WITNESS:  Yes.

22       THE COURT:  Okay.  We'll take a short break before

23  he starts his questioning and it will be for about 15

24  minutes.  I'll order all members of the jury to report to the

25  jury assembly room on the second floor, and we'll make every

26  effort to call you back up at 10:30.  Thank you.

27       (Whereupon, a brief recess was taken.)

28       THE COURT:  Record will reflect all members of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   821

1   jury are present, both counsel are present, Mr. Chandler is

2   present.  And, Ms. Filo, you could call Laurie back.  Thank

3   you.

4           MS. FILO:  Sorry.

5           THE COURT:  Okay.  Laurie has returned to the

6   courtroom, and I think we kind of fixed the microphone, so

7   you could move it around wherever you want so that you could

8   talk right into it.  Okay?

9           Mr. Madden, when you are ready.

10          MR. MADDEN:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12  BY MR. MADDEN:

13  Q.   Good morning, Laurie.

14  A.   Good morning.

15  Q.   My name is Brian Madden.  I'm Mr. Madden and I'm going

16  to ask you some questions.  Okay?

17  A.   Okay.

18  Q.   All right.

19          THE COURT:  It's kind of hard, so you could --

20  there you go.  Thank you.

21  BY MR. MADDEN:

22  Q.   Now, I want to tell you that I'm sure that I do not hear

23  as well as you do.  Okay?

24  A.   Okay.

25  Q.   And I've had a little bit of trouble hearing everything

26  that you said, so I'm standing here.  I'm hoping that we're

27  close enough to where you'll lift your voice just a little

28  bit if you can so that I could hear what you are saying.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   822

1   Okay?

2   A.   Okay.

3   Q.   All right.  Now, if I ask you a question and you truly

4   do not remember or know the answer, just tell me that.

5   That's perfectly fine.  Okay?

6   A.   Okay.

7   Q.   But if I ask you a question and you do know the answer,

8   I want you to tell me what the answer is.  Okay?

9   A.   Okay.

10   Q.   All right.  Now, this happened kind of a long time ago;

11   right?

12   A.   Yes.

13   Q.   All right.  And I'm sure that you remembered it better

14   when you were speaking to the police officers than you do

15   now; right?

16   A.   Sort of.

17   Q.   Okay.  In other words, as we get older, we forget

18   certain things; right?

19   A.   Yes.

20   Q.   All right.  You've had that experience?

21   A.   Yes.

22   Q.   So if talking about something that happens the same day,

23   you remember what it is; right?

24   A.   Yes.

25   Q.   But if you are talking about something six months later,

26   a year later, sometimes you've forgotten what it was; right?

27   A.   Yes.

28   Q.   Okay.  So that's what I'm going to -- one of the things

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   823

1    I'm going to ask you about.  Okay?

2    A.    Okay.

3    Q.    All right.  Now, the first thing I want to ask you

4    about, and this was the part I was having trouble hearing, I

5    think you mentioned something about a girl who couldn't see

6    or couldn't hear.  And I think you were talking about

7    something that -- you were talking about or learning this in

8    Mr. Chandler's class.  Am I right?

9    A.    Sort of, kind of.

10   Q.    Okay.  Tell me what you remember about that.

11   A.    Well, it was when they -- like any normal day in school

12   that we were learning with the whole class.  And then he

13   taught us about this teacher who couldn't see and the kids

14   and the other teachers were laughing at her.  And the way

15   that she knew where stuff was by feeling them and she knew

16   what they were by just touching them and --

17   Q.    Was this something that you were talking about in Mr.

18   Chandler's class?

19   A.    Well, yes.

20   Q.    Okay.  And was the whole class listening to this?

21   A.    Yes.

22   Q.    And was he reading to you from a book?

23   A.    Yes.

24   Q.    Okay.  And was it a book about this -- I think you said

25   it was a teacher who couldn't see or couldn't hear?

26   A.    Um, yes.

27   Q.    And that she had to use her other senses, her sense of

28   feel and her sense of taste, to figure out what was going on

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  824

1 around her?

2 A.   Well, it was only the feel of things.

3 Q.   I'm sorry.  I need you to speak up a little bit because

4 I didn't hear what you just said.

5 A.   She only used the sense of feeling things.

6 Q.   Feeling things?

7 A.   Yes.

8 Q.   You don't remember anything about taste then?

9 A.   No.

10 Q.   Okay.  And would Mr. Chandler read that book to the

11 class?

12 A.   Yes.

13 Q.   Okay.  But besides reading the book, he also talked

14 about it with the class; right?

15 A.   Yes.

16 Q.   Okay.  Now, do you remember talking about -- or Mr.

17 Chandler talking about using a stick or something to feel

18 your way around?

19 A.   No.

20 Q.   You don't remember that?

21 A.   No.

22 Q.   Okay.  Now, you remember being alone with Mr. Chandler

23 one time; right?

24 A.   Well --

25 Q.   I'm sorry.  Let me -- I'm going to ask another question.

26 You don't have to answer that.  That was a bad question.

27        You remembered being with Mr. Chandler when you had

28 a blindfold on one time; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   825

1  A.   Well, I only remember that I had to go to the classroom

2  and the yard duty took me over there, but I didn't exactly

3  know why I had to go there.  But I really don't know.

4  Q.   Well, I think I understand what you just said.  But what

5  I'm really trying to ask you and what I'm trying to learn is,

6  is it true that you only remember being in his class one time

7  with the blindfold when you had to feel objects with your

8  feet?

9  A.   Well, I -- I don't really.

10  Q.   You don't really?

11  A.   No.

12  Q.   You don't really know?

13  A.   No.

14  Q.   Okay.  Maybe it was one time?

15  A.   I don't know.

16  Q.   Okay.  Well, do you remember coming to court in May of

17  last year and having to sit in a courtroom and talk about

18  this?

19  A.   Yes.

20  Q.   You remember that; right?

21  A.   Um-hum, yes.

22  Q.   That was a little more than a year ago; right?

23  A.   I don't know.

24  Q.   That's okay.  That's my fault.  I shouldn't have asked

25  that question.

26        And do you remember on that occasion that you said

27  you were only alone with Mr. Chandler one time when you were

28  blindfolded and felt something with your feet?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   826

1   A.   Well, I don't really remember.

2   Q.   That's okay you don't remember.

3          Did Mr. Chandler ever put anything in your mouth?

4   A.   I don't remember.

5   Q.   You don't remember?

6   A.   I don't really remember or know if he did or not.

7   Q.   Okay.  Well, let me see if I could help you.  Do you

8   remember the lady that you talked with at O.B. Whaley School,

9   the first police officer you spoke with at the school?

10  A.   The first police?

11  Q.   Well, there was a woman that you spoke with who came to

12  the school; right?

13  A.   Yes.

14  Q.   Yes?

15  A.   Wait.  A police?

16  Q.   With the police department?

17  A.   Yes.

18  Q.   All right.  Her name was Lisa?

19  A.   I don't remember --

20  Q.   Okay.

21  A.   -- her name.

22  Q.   Okay.  And do you remember telling her that Mr. Chandler

23  never put anything in your mouth?

24  A.   I don't really specifically know what I told her.  I

25  don't remember.

26  Q.   Okay.  You don't specifically know and you don't

27  remember; right?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   827

1    Q.    Okay.  That's fine.  That's fine.

2          Did Mr. Chandler -- on the time that you were with

3    him in his classroom feeling objects on your feet, when he

4    was finished with that, did he ever tell you not to tell

5    anybody?

6    A.    I don't remember that.

7    Q.    Okay.  Do you remember being asked that same question

8    when you were next door about a year ago in the other

9    courtroom?

10   A.    No, I don't remember.

11   Q.    Do you remember telling the judge in that case and the

12   lawyers in that case that he never told you anything about

13   not telling anyone?

14   A.    Well, I don't remember specifically what I told them.

15   Q.    The last word is you don't remember specifically what

16   you told?

17   A.    Um, I don't specifically know what I told them.

18   Q.    Okay.  You don't remember?

19   A.    No.

20   Q.    Okay.  Thank you.

21          I think I remember when you were talking before the

22   recess from the witness stand that the only thing that you

23   remember hearing in Mr. Chandler's classroom when you were

24   blindfolded was the opening of cabinet doors; right?

25   A.    Yes.

26   Q.    All right.  You don't remember hearing anything else?

27   A.    No.

28   Q.    And do you remember police officers asking if you heard

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   828

1    any sounds like a zipper or belt or anything like that?

2    A.    No.

3    Q.    You don't remember that question being asked?

4    A.    No.

5    Q.    And you then would not remember your answer to that

6    question?

7    A.    No.

8    Q.    Do you remember telling the police officer that you

9    never heard the sound of any belt or zippers or anything like

10   that?

11   A.    No.

12   Q.    No, you don't remember?

13   A.    (Shakes head side to side.)

14   Q.    Okay.  That's fine.  That's fine.

15         Now, the cabinet that you heard open, I want to --

16   I'm going to go to -- for the record, this is A-2.  I will

17   get a pointer.  I'll be right back.  Was there -- let me ask

18   another question.  I apologize.

19         The cabinet that you were talking about, is that --

20   I'm putting this pointer around -- is that what you mean by

21   the cabinet?

22   A.    I didn't know which cabinet it was.

23   Q.    Okay.  Fair enough.  And do you know this cabinet is the

24   one that is right behind Mr. Chandler's desk; right?

25   A.    Yes.

26   Q.    And do you know if that was the cabinet where he kept

27   supplies?

28   A.    Well, I don't know what's in there, but I think there is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   829

1    some, like, supplies in there.

2    Q.   Okay.  Well, let me see if I could help you.  Did you

3    ever see erasers in the classroom?

4    A.   Well, there is, like, erasers for us to use.

5    Q.   For what?

6    A.   For us to use in the class.

7    Q.   For the students to use?

8    A.   Yes.

9    Q.   Okay.  And did you ever see any glue sticks in the

10   classroom?

11   A.   Um, on our desk, yes.

12   Q.   Any place in the classroom you remember seeing glue

13   sticks; right?

14   A.   Yes.

15   Q.   Okay.  How about paper clips?  Did you remember seeing

16   any paper clips in the classroom?

17   A.   Only Mr. Chandler's desk.

18   Q.   Yes?  And pens, writing pens, do you remember seeing

19   those?

20   A.   On the teacher's desk.

21   Q.   Okay.  And then the teacher's desk would be the desk

22   that's in the same photograph that I just pointed to, that's

23   this desk here; right?

24   A.   Yes.

25   Q.   Okay.  And do you remember seeing any scissors in the

26   classroom?

27   A.   Yes.

28   Q.   Do you remember where you saw those?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   830

1    A.    On our desks.

2    Q.    Whose desks?

3    A.    I mean, like, in this box.

4    Q.    A box.  And where was the box?

5    A.    I don't know -- remember.

6    Q.    Okay.  That's all right.  Was that in the area of Mr.

7    Chandler's desk or the cabinet, if you remember?

8    A.    I don't know.

9    Q.    Okay.  Do you remember telling the police that when you

10   were alone with Mr. Chandler blindfolded with your shoes off

11   but your socks on, you felt the objects that I just talked

12   about?

13   A.    Um, what was the question again?

14   Q.    I'll try to ask a shorter question.

15         Do you remember telling the police that you felt or

16   guessed that Mr. Chandler -- one of the things Mr. Chandler

17   touched your foot or feet with was an eraser?

18   A.    I don't remember.

19   Q.    Okay.  That's fine.  Do you recall telling the police

20   that one of the objects that you felt against your foot was a

21   paper clip?

22   A.    Not really.

23   Q.    Okay.  Not really.  When you said "not really," you

24   don't really remember?

25   A.    No.

26   Q.    Okay.  And do you remember telling the police that you

27   felt a glue stick against your foot?

28   A.    Um, a little bit.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   831

1    Q.    Do you remember that a little bit?  Do you remember

2    telling the police that you were sure it was a glue stick;

3    right?

4    A.    Yes.

5    Q.    Okay.  How long is a glue stick?

6    A.    I don't remember.

7    Q.    Okay.  If I asked you to use your two fingers and just

8    sort of make-believe how long it was, do you think you could

9    do it, or you just don't remember?

10   A.    Um, I think about, like, an inch or two.

11   Q.    About an inch or two?

12   A.    (Shakes head up and down.)

13   Q.    Okay.  I'm sorry.  I'm just checking my notes.  I'll be

14   right with you.

15           So I'm going to read some words to you and see if

16   that helps you remember how many times you were alone with

17   Mr. Chandler.  Okay?  I want you to just listen for a second.

18   All right?

19           MR. MADDEN:  Your Honor, I'm reading from the

20   preliminary transcript Vol. 2 of 3, dated May 22, 2012, and

21   I'm on page 210.

22           Do you have that, Ms. Filo?

23           MS. FILO:  Yes.

24   BY MR. MADDEN:

25   Q.    Okay.  And the question was asked:

26           "Okay.  How many times did you stay in the room

27   with Mr. Chandler and put the blindfold on?"  And the answer

28   was:  "Once."

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   832

1          Do you remember saying that?

2    A.    I don't remember much.

3    Q.    Okay.  My question is, do you remember saying the words

4    that I just read?

5    A.    Um, I -- not really.

6    Q.    Okay.  That's fine.  That's fine.  Thank you.

7          So when you were -- when we were talking about the

8    teacher who couldn't see, I think you said earlier this

9    morning that she felt things.  Is that what you said?

10   A.    Yes.

11   Q.    All right.  And do you remember Mr. Chandler telling you

12   that you were going to be blindfolded?

13          MS. FILO:  Objection, Your Honor.  Calls for

14   hearsay.

15          THE COURT:  Sustained.

16          MR. MADDEN:  I'll rephrase that question, Your

17   Honor.

18   BY MR. MADDEN:

19   Q.    But as you sit here this morning, you don't really

20   remember very much about this at all; right?

21   A.    Yes.

22   Q.    I'm sorry?

23   A.    No, not really.  I don't really remember that much.

24   Q.    Okay.  And you're saying that because you're telling the

25   truth.  You really just don't remember; right?

26   A.    Yes, I really just don't remember.

27   Q.    Okay.  And did Mr. Chandler ever have you touch anything

28   with your hands when you were alone with him with the

1   blindfold on?

2   A.   No.

3   Q.   Okay.  Just your feet; right?

4   A.   Just my feet.

5   Q.   Okay.  Do you remember if you were wearing long pants

6   that day?

7   A.   No, I don't remember.

8   Q.   Okay.

9         MR. MADDEN:  Thank you, Your Honor.  I have no

10  further questions.

11        THE COURT:  Thank you, Mr. Madden.

12        Ms. Filo, redirect?

13        MS. FILO:  Very briefly.

14                    REDIRECT EXAMINATION

15  BY MS. FILO:

16  Q.   Laurie, has anybody ever told you how to answer our

17  questions?

18  A.   No.

19  Q.   No?  So has anybody ever told you that you need to tell

20  the police officers that this happened or that happened?

21  A.   (Shakes head side to side.)

22  Q.   No?  You are shaking your head no?

23  A.   No.

24  Q.   Okay.  So nobody has ever tried to give you answers.

25  Does that make sense?

26  A.   Um, not really.

27  Q.   Not really?  Okay.  Has everybody always just told you

28  to tell the truth?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   834

1    A.    Yes.

2    Q.    And that's all that has mattered?

3    A.    Yes.

4    Q.    Okay.  And nobody has given you any words that you are

5    supposed to say; right?

6    A.    No.

7    Q.    No?  And nobody's told you that good things will happen

8    if you say this or bad things will happen if you say that?

9    A.    No, nobody.

10   Q.    Just to tell the truth; right?

11   A.    Yes.

12   Q.    Okay.  And every time you talked about Mr. Chandler's

13   classroom, have you done your absolute best to tell the

14   truth?

15   A.    Yes.

16   Q.    Okay.  You never lied about anything?

17   A.    No.

18   Q.    No?  Okay.  Laurie, that's all the questions I have.

19   Thank you very much.

20             THE COURT:  Thank you.

21             Recross, Mr. Madden?

22             MR. MADDEN:  None, Your Honor.

23             THE COURT:  Okay.  Laurie, thank you very much.

24   You are done and you could step down and you're excused.

25             MS. FILO:  Your Honor, may I have just two minutes?

26             THE COURT:  Yes.

27             MS. FILO:  Thank you.

28             THE COURT:  Off the record.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   835

1              (Whereupon, there was a discussion off the record.)

2              MS. FILO:  Your Honor, at this time --

3              THE COURT:  We'll go back on the record.

4              MS. FILO:  At this time, the People would offer the

5    CIC statement or MBI statement of Laurie.

6              THE COURT:  Okay.

7              MS. FILO:  It will take me just a second to get it

8    fired up.

9              THE COURT:  And this is both video and audio;

10   correct?

11             MS. FILO:  I hope so.

12             THE COURT:  Video and audio?

13             MS. FILO:  I hope so.

14             THE COURT:  Okay.  We'll mark that as People's 5.

15             MS. FILO:  I have transcripts for the jury.

16             THE COURT:  And the transcripts will be marked as

17   5-A.

18             (Whereupon, People's Exhibits 5 and 5-A were marked

19   for identification.)

20             THE COURT:  And I'm assuming there is a stipulation

21   that my court reporter not attempt to record the playing of

22   People's 5, the CD, Mr. Madden?

23             MR. MADDEN:  Yes.

24             THE COURT:  Ms. Filo?

25             MS. FILO:  Yes.

26             THE COURT:  Okay.  Once again, ladies and

27   gentlemen, the transcripts are an aid.  The evidence is the

28   CD, which will be played.  And it's my understanding, I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   836

1  believe that counsel's going to stipulate that the

2  transcripts will be introduced into evidence as well, so you

3  will have copies of that for your review and consideration

4  during deliberations.

5            (Whereupon, a tape was played, not reported.)

6            MS. FILO:  Your Honor, for all practical purposes,

7  that's it.

8            THE COURT:  Okay.  Thank you.

9            MS. FILO:  And, Your Honor, the risk of putting

10 everyone to sleep, I have another one.  I have Becky's CIC

11 interview and corresponding transcript.

12           THE COURT:  Okay.  And, ladies and gentlemen, if

13 you'd pass your transcripts of Laurie's interview to your

14 right, Ms. Filo will collect them.  And then we'll have the

15 CD of Becky's interview marked as People's 6, and the

16 transcript will be 6-A.

17           (Whereupon, People's Exhibits 6 and 6-A were marked

18 for identification.)

19           THE COURT:  Ms. Filo, while we're passing them out,

20 do you have the transcript for the Court, 5-A, of Laurie's

21 that we could mark at this time?

22           MS. FILO:  Yes.

23           THE COURT:  And one for Becky, 6-A, if you have an

24 extra copy?  Thank you.

25           (Whereupon, a tape was played, not reported.)

26           THE COURT:  Ms. Filo, could you put it on pause for

27 a moment?  You know how much longer we have?

28           MS. FILO:  That's it, Your Honor.  It's finished.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   837

1          THE COURT:  Okay.  Thank you.  We'll turn the

2     lights on.  We're back on the record.  People's 6, the

3     interview of Becky, has just completed playing.  And at this

4     time, we'll take the noon recess.

5          I'll order all members of the jury to report to the

6     jury assembly room on the second floor at 1:30, and we'll

7     continue with the trial at 1:30.  And I'll order both counsel

8     and Mr. Chandler to return to this courtroom at 1:15.  And

9     thank you, ladies and gentlemen, for passing your transcripts

10    to your right, and you are excused.  See you at 1:30.

11          (Whereupon, the Court took the noon recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   838

1                    AFTERNOON PROCEEDINGS

2          THE COURT:  We'll go on the record on the matter of

3  the People v. Chandler.  Record will reflect both counsel are

4  present, Mr. Chandler is present, the jury is not present in

5  the courtroom at this time.

6          This morning, I met with counsel informally and it

7  was a request to address an issue concerning our next witness

8  that we're going to call.

9          Ms. Filo.

10         MS. FILO:  Your Honor, I think actually it was Mr.

11  Matiasic that wanted to really address the Court, but I guess

12  maybe at this point the best thing to do is at least put on

13  the record the sequence of events as I understand them.

14         Mr. Madden in some of our motion in limines made

15  some reference to a statement made in the context of civil

16  litigation.  That seemed to be in conflict with the

17  statements that had been made by the witness Laurie prior to

18  our motions in limine.

19         So it became apparent to me there is -- there was

20  additional information out there, and when we discussed this

21  sort of informally, what we concluded is that -- the way this

22  would play out is that we would call Laurie as a witness, she

23  would give her testimony, and then on the stand, she would be

24  confronted with potential inconsistent statements by Mr.

25  Madden.  And that in confronting her about those inconsistent

26  statements, ultimately she would be ordered, or the guardians

27  would be ordered, to disclose the name of the person to whom

28  those statements had been made.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  839

1          So in order to avoid that production in front of

2     the jury, we did that informally.  The Court actually ordered

3     Mr. Matiasic to provide the name of the professional to whom

4     Laurie gave these additional statements.  So once that had

5     been done, I coordinated with Mr. Matiasic and with the

6     psychiatrist to whom these statements were made to have her

7     here in court today.  And I guess I will leave that as the

8     state of the event thus far.

9          THE COURT:  I think what you said is accurate, and

10    I believe that, yeah, I did make that order.  And I think I

11    also indicated it -- eventually, based on what I was told, I

12    thought if that were the case, that the Court would have to

13    conduct an in-camera review.  I was hoping to do it before

14    trial, so that if there was any disclosure, that we could at

15    least work with counsel and the witness to try to -- if the

16    witness was going to have to be called as a witness, try to

17    make it as convenient as possible for that particular person

18    as opposed to during the trial, where our flexibility will be

19    limited.

20          But everything you said is accurate.  We were

21    provided with the name, we were provided with some records,

22    and the Court reviewed them in-camera.  And based on that

23    review, I made a determination that portions of it were

24    relevant and I disclosed that to both counsel by way of a

25    redacted copy.

26          Mr. Madden, do you wish to supplement the record?

27          MR. MADDEN:  I think both you and Ms. Filo have

28    accurately stated the history of this matter to date.

1          THE COURT:  I know that, number one, calling the

2   doctor as a witness and also calling her without compensating

3   her for her fees to be here is a concern.  And there is an

4   objection to having her called as a witness without being

5   paid, but I don't want to speak for counsel.  And again, I

6   apologize because I didn't want to mispronounce your name.

7          MR. MATIASIC:  That's okay, Your Honor.  It's

8   Matiasic.

9          THE COURT:  Thank you very much.  I apologize.  I

10  know you want to be heard and this is the time.

11         MR. MATIASIC:  Great.  Thank you, Your Honor.  I

12  appreciate the opportunity to be heard.  I agree with the

13  recitation of facts as recited by counsel previously, and

14  obviously I came down here on July 3rd; wherein, I voiced my

15  objection over disclosing both the name and the report.  The

16  Court indicated what its ruling is going to be, and we

17  respect that.

18         I think now we're moving into a second phase in

19  terms of how this information is going to be utilized,

20  namely, having Dr. (Redacted) being called up on the stand as

21  a witness.  We want to reiterate our objection; that we think

22  it's one thing to have her name and the information disclosed

23  to counsel here.  It's another thing to entirely have her

24  take the stand, you know.  We think this is violative of the

25  attorney/client privilege and work product, namely, my

26  work-product doctrine.

27         As I indicated before, this was not a doctor who

28  treated Laurie in the normal course of treatment.  This is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   841

1   someone with whom she saw at my behest.  This was my

2   consultant.  Someone that I chose based upon her specialty to

3   have Laurie see her.  It was for purposes of evaluating the

4   factual underpinning what happened to Laurie so that Dr.

5   (Redacted) could communicate that to me.

6         So I think, you know, we like to have our ongoing

7   objection that this is violative attorney/client privilege

8   and my work-product doctrine.  Also, I think Dr. (Redacted)

9   can't possibly be called as a percipient witness.  She didn't

10  receive -- as indicated before, this is not a scenario where

11  she was walking on the street, saw some type of attack

12  happen, and called in to court as a percipient witness to

13  recall what happened.  Everything she heard was in her

14  capacity as a consultant; it was in her capacity as a

15  psychiatrist, who was retained by an attorney, initially.

16        So she is an expert witness, and I think that

17  compels her to be paid her hourly fee associated with being

18  an expert witness.  So, you know, as I indicated previously

19  in chambers, the defense raises issue.  They are the ones

20  that wanted this information, wanted Dr. (Redacted) in today.

21  I think it were appropriate for the defense to pay her fee.

22  If not, the prosecution certainly has issued a subpoena as

23  well.  Perhaps they should split a reasonable hourly fee as

24  determined by the Court, but Dr. (Redacted) should be paid.

25        If either the prosecution or the defense is not

26  willing to pay her hourly fee, you know, we request pursuant

27  to Evidence Code 730 that the Court order that she be paid an

28  expert witness fee in the amount of her normal hourly rate of

1    $400 an hour.

2              THE COURT:  I will hear from Mr. Madden or Ms.

3    Filo, if you wish to respond.

4              MR. MADDEN:  I will be happy to.

5              THE COURT:  Go ahead.  Let me clarify something.

6    As I understand it, Ms. Filo, you subpoenaed her and you're

7    calling her as a witness in your case in chief?

8              MS. FILO:  We did issue the subpoena, Your Honor.

9    And what I said to Mr. Madden before we went on the record,

10   I'm a little bit conflicted at this point because Laurie has

11   actually testified consistent with her MBI statement and her

12   statement to the police.  I mean, actually what she's

13   testified to here is entirely consistent with what she has

14   already said.  The only way that I think Dr. (Redacted)

15   testimony would be admissible, the only way that it would be

16   brought up at this point is really as a prior inconsistent

17   statement by the defense.

18             I don't think we -- the prosecution would have the

19   ability to pierce the work-product doctrine that Mr. Matiasic

20   has described.  I think it's actually the defendant's

21   criminal due process rights that are going to be the highest

22   order of priority here.  So I actually think it's really the

23   defense's interest in eliciting prior inconsistent statements

24   that would ultimately cause the Court to have disclosed or to

25   order this information disclosed.  I mean, the reality is we

26   wouldn't have known about it had Mr. Madden not raised it,

27   argued it, and suggested it to the Court.  I didn't know the

28   statement existed until Mr. Madden brought it up.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   843

1          THE COURT:  Okay.  Thank you.

2          Mr. Madden.

3          MR. MADDEN:  I'm not exactly sure where to begin.

4   This is indeed somewhat convoluted.  However, I don't think

5   it's difficult to unwind.  To begin with, my client's rights

6   in a criminal case to have access to any and all inconsistent

7   statements made by and any consistent statements made by a

8   complaining witness is paramount to any civil rights to these

9   obligations or privileges associated with Mr. Matiasic's

10  case, including his consultant/expert Dr. (Redacted).  That

11  is clear.

12          She's not being -- first of all, I have not

13  subpoenaed her.  Ms. Filo did that.  And I'm sensing here

14  she's having some misgiving about that.  Had she not

15  subpoenaed Dr. (Redacted), I would have.  She indicated --

16  she indicated she was going to call her as her witness.  I'm

17  certainly -- that is not her position.  Dr. (Redacted) is

18  here, and I'm comfortable with the fact she's here and she's

19  subjected to questioning by certainly me and Ms. Filo,

20  assuming Ms. Filo wants to question her.

21          She's not a percipient witness in the sense of

22  viewing any of these molestations; that's obvious.  Certainly

23  obvious to the Court, since the Court did an in-camera review

24  of her evaluation and is only allowing us to see those

25  relevant parts.  And that has nothing to do with her opinion

26  about the effect of any of these events on Laurie, which, as

27  I understand it, is basically her role with Mr. Matiasic.

28  She basically has been retained to provide him or to help him

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    844

1  prove money damages in the underlying civil case against the

2  school district and Mr. Chandler.

3         Since she's just been -- so the percipient witness

4  is, she was the recipient of a statement from Laurie that I

5  absolutely disagree with Ms. Filo concerning categorizing

6  this witness as being consistent.  It is clear from this

7  report that Laurie gave -- it appears that she gave Dr.

8  (Redacted) several statements that are inconsistent with all

9  the statements she's previously given, specifically she's

10  clearly always stated through stages of this criminal

11  prosecution and investigation --

12         THE COURT:  Excuse me.  May I just cut you off for

13  a minute?  There is no question that what the doctor has to

14  say is not relevant, in my mind.  No question at all.  Okay.

15         MR. MADDEN:  What do you mean?  About her opinions?

16         THE COURT:  No.  Not -- she's not being called as

17  as an expert, but basically there is no question what Laurie

18  told her is not relevant in this case.  It is relevant.

19         MR. MADDEN:  Yes.

20         THE COURT:  Okay.  I guess my specific comment to

21  counsel is to have a response to Mr. Matiasic -- I'm horrible

22  with names.  I apologize.

23         MR. MATIASIC:  That's fine.  No problem.

24         THE COURT:  I don't need anything more to address

25  about the privilege, but basically the issue I'm focusing on

26  is compensation, if any, should be ordered.

27         MR. MADDEN:  Again, for purposes of determining

28  compensation, she actually -- that's the use -- that's the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   845

1  true and correct use of the term "percipient witness."  In

2  this case, percipient to the statement, not to the event.

3  She's being -- only going to be asked questions about what

4  Laurie told her.

5          THE COURT:  But the statements she got, or

6  received, I should say, were primarily as a result and

7  because of her profession and her expertise.

8          MR. MADDEN:  Yes.

9          THE COURT:  But for that statement wouldn't have

10  occurred.

11          MR. MADDEN:  That doesn't entitle her to

12  compensation as an expert in this case.  It certainly

13  entitles -- she's certainly entitled to compensation in a

14  civil case, but not in this case.  That's not true.  She's

15  entitled to a witness fee, and I don't know what it is.  It

16  used to be $35.  I haven't looked at it for a long time.  I

17  know it's not a significant amount, but she's entitled to

18  that.  I believe she's entitled to mileage also.  That's what

19  she's entitled to as a subpoenaed witness.

20          I don't have to pay her for a couple of reasons:

21  One, I didn't subpoena her; and number two, even if I did,

22  this will be like having to pay a police officer to come in

23  and talk about an inconsistent statement she's given.  It

24  doesn't trigger any right, any duty on my, or Mr. Chandler's

25  part, to pay for that.

26          THE COURT:  Okay.  First of all, I agree with a lot

27  of what counsel says, you know, she's clearly not a

28  percipient witness to any events.  Basically, her role would

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   846

1   be to recount statements Laurie gave to her during the time

2   she met her in her office.

3           I think it would be fair to ask her was Laurie's

4   demeanor sad, articulate, cooperative, that type of thing you

5   would ask any lay person.  I think that because of, as Ms.

6   Filo said, Mr. Chandler's due process rights, I believe that

7   I am in a position where I would have to compel the doctor to

8   testify.  The fact that I don't get the sense Ms. Filo would

9   be calling her as a witness, but since she's here and has

10  taken the time driving here, I think it should occur this

11  afternoon.

12          What bothers me, as, doctor, you may appreciate,

13  everything I do in the courtroom has to be authorized by some

14  statute or case, and I can't make any orders without any

15  authorization.  And I did spend some time looking at Evidence

16  Code 730 and I was giving some serious consideration ordering

17  the parties to compensate her for her time here.  And I was

18  thinking that under all of the circumstances, what would be

19  fair would be to order each side to pay half of it.

20          I don't think I have the authority to do so, and

21  I'm disappointed about that because, as counsel said earlier

22  off the record, it creates a chilling effect where

23  professions like Dr. (Redacted) are not inclined to be

24  involved in therapy or consultations with potential victims

25  who also potentially have a criminal case pending.  And I

26  think that's unfortunate, and I think unfortunately I don't

27  think I have any authority to do anything other than order

28  the basic witness fees pursuant to the Government Code, which

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   847

1    is I believe it's 68093.

2            I know this is frustrating, not only to Dr.

3    (Redacted) and counsel, but if there was any basis for me to

4    order fees, either from the defense or the prosecution or

5    both, I would do it.  I simply do not have any authority and

6    I don't think that it would be appropriate for me to do so.

7    I apologize for that.  I think it's unfortunate.

8            Doctor, you will be asked to testify, and I will

9    not allow the attorneys to even get close to asking you any

10   opinions as it relates to your profession.  It will simply be

11   your recollection of what was said by Laurie and maybe her

12   demeanor during the time that you met with her.

13           Either counsel have any comments they like to make

14   as well?  I know this is over your objection, Counsel, and

15   it's a continuing objection.  And I know that you've spent a

16   lot of time looking at this, you've done everything you

17   possibly could to give me some basis to prevent this from

18   happening, and unfortunately there is simply -- as anything

19   that exists, I asked research to take a look at it as well

20   and they couldn't come up with anything that would give me

21   any authority to do anything.

22           Yes.

23           MR. MADDEN:  Your Honor, I need one point of

24   clarification.  I think I understand the Court's ruling.  I

25   don't want to delve into the area that the Court will not

26   allow.  I will ask you this.  First of all, Ms. Filo rather

27   have me call her as a witness, I'm happy to do that.

28   Whatever you want to do.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   848

1        I basically intend -- if she were my witness, I

2    will be treating it the same way.  I want to establish a

3    context.  I don't know yet, but I want to establish, you

4    know, when this evaluation took place, how long it lasted,

5    and then go through the report as to the points in the report

6    that you have provided to the Court -- I mean, to counsel.

7        THE COURT:  I may have provided a lot more of the

8    report because I thought it was relevant, but I'm focusing on

9    Laurie's statements.

10        MR. MADDEN:  I think they need to be put in some

11    context.  I mean, bring in an expert, she's -- my

12    understanding, she's not seeing her for treatment.  She only

13    saw her for one day and afternoon.

14        THE COURT:  Right.

15        MR. MADDEN:  That's all.

16        THE COURT:  That's fine.

17        MR. MADDEN:  That concerns the civil case in this

18    case.  That has nothing to do with this particular case.  It

19    has nothing to do with her ongoing therapy, if she has any.

20        THE COURT:  Right.

21        MS. FILO:  My only concern about that is this, and

22    I do think that Mr. Matiasic's conversations with the doctor

23    are clearly privileged.  So I mean, even --

24        THE COURT:  I agree.

25        MS. FILO:  My concern --

26        MR. MADDEN:  I will not be asking about that.

27        MS. FILO:  -- you know, that she was hired by Mr.

28    Matiasic, who is the civil lawyer --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   849

1          THE COURT:  That's not relevant.

2          MR. MADDEN:  All right.

3          THE COURT:  No.

4          MR. MADDEN:  You don't want me to get into that

5     area.

6          MS. FILO:  She's a psychiatrist.  She specializes

7     in X, Y, and Z.  This is what she met with Laurie on this

8     date, and this is what Laurie told her.  This is her

9     demeanor.

10          THE COURT:  I don't think we need to go into her

11     qualifications.  She's a psychiatrist, she's a doctor, I

12     think that is sufficient.  All we're getting from her is the

13     statements that Laurie made and then her demeanor, at least

14     what I observed and stuff, and that's it.

15          MR. MADDEN:  I think I should be allowed -- I have

16     no trouble with that, but I think I should be allowed to

17     identify what material she had.  I'm not talking about

18     conversations with attorneys, but what documents she

19     reviewed.

20          THE COURT:  I'm not going to allow that because all

21     I'm allowing that's relevant is Laurie's statements.

22          MR. MADDEN:  All right.

23          THE COURT:  I mean, those documents might be

24     relevant in her evaluation what have you.  So, you know,

25     obviously the fact that you are asking to be able to go into

26     that is denied.

27          MR. MADDEN:  Well, I'm anticipating -- it's my

28     expectation that she hasn't seen any of the discovery

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   850

1  documents in the criminal case yet, anything that we talked

2  about in this trial.  It's my guess.

3          THE COURT:  Okay.

4          MR. MADDEN:  But she states opinions about events.

5  I don't mean opinions about therapy or damages, but she goes

6  into detail as to the specifics of the allegations.  And

7  although I -- obviously, that's relevant and fair game for

8  me.

9          THE COURT:  No.  It's relevant to the civil case

10  because she's doing a report for them.  All I'm saying, Mr.

11  Madden, what's relevant is Laurie's statements and her

12  demeanor.  Her understanding of the case and what's going on

13  and why I'm evaluating, I allowed that in there because I

14  thought it gave some meaning to the statement and relevance.

15          MR. MADDEN:  But I can't talk about it?

16          THE COURT:  Right.  This witness because she's not

17  being compensated is only for statements.

18          MR. MADDEN:  Okay.

19          THE COURT:  Okay.  So that's clear.  I hope I don't

20  get in a position where I have to interject my own objection.

21  I think in fairness to the doctor, those are my narrow

22  parameters.

23          MR. MADDEN:  I understand the Court.

24          THE COURT:  I would like to call the jury up

25  real soon because I know she has to get going.

26          MR. MATIASIC:  Thank you for your discussion here.

27  As I understand the Court's ruling, since, you know, is only

28  going to be talking about specifically what was communicated

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   851

1  to Laurie, what her demeanor was like, nothing else.  If

2  that's the case, I don't see the need to even have the

3  doctor's full name introduced.  The reason I say that is,

4  obviously, it will be giving the civil lawyer, who has been

5  attending the trial on behalf of the school district, who is

6  getting a free peek, 2034 free peek.

7          THE COURT:  Could I stop you right there?

8          MR. MATIASIC:  Sure.

9          THE COURT:  We all know who the name of the doctor

10  is.  I will allow this, and I think this is fair.  The

11  doctor, if she has no objection, we'll do doctor, so her last

12  name will be deleted from the record.  I don't think that

13  harms Mr. Chandler's right to a fair trial at all, and it at

14  least assists you with your work product, your privilege, and

15  that's sort of privilege.

16          MR. MATIASIC:  Except, Your Honor, the fact that

17  the lawyer for the school district is here and would get

18  access to her last name.  I mean --

19          MS. FILO:  I'm happy to call her doctor.

20          THE COURT:  That's what I'm thinking.

21          MR. MATIASIC:  That will be fine.

22          THE COURT:  We'll treat her like some of the

23  alleged victims and refer to them as Doe, but it will be

24  Doctor -- I don't know.

25          DR. LYNN:  Dr. Doe.

26          THE COURT:  Whatever your first name is.  I think

27  that's a fair compromise for everyone.  I would like to get

28  the jury up right away so we could get going because I know

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   852

1   she has some time restraints.

2            (Whereupon, the Court recessed.)

3            THE COURT:  Thank you, Ms. Filo.

4            MS. FILO:  Yes, Your Honor.  We could call the next

5   witness.

6                      DR. LYNN DOE,

7            Being called as a witness on behalf of the People,

8   having been first duly sworn, was examined and testified as

9   follows:

10           THE COURT:  Good afternoon, Doctor.

11           THE WITNESS:  Good afternoon.

12           THE COURT:  As you know, the lawyers are going to

13  be asking you some questions.  I would ask you to please make

14  every effort to let them finish the answer and make every

15  effort to answer the question that is being asked.  And for

16  the purposes of this trial and the record, you are in

17  agreement that we're going to refer to you by your first

18  name, which is?

19           THE WITNESS:  Dr. Lynn is fine.

20           THE COURT:  Lynn?

21           THE WITNESS:  Yeah.

22           THE COURT:  Dr. Lynn?

23           THE WITNESS:  Yeah.

24           THE COURT:  Ladies and gentlemen, the reason we're

25  referring to the witness as Dr. Lynn is unrelated to the

26  trial, what's going on here.  And I'll order any prior

27  reference that may have occurred using the doctor's last name

28  be stricken.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   853

1              Ms. Filo.

2              MS. FILO:  Thank you, Your Honor.

3                        DIRECT EXAMINATION

4     BY MS. FILO:

5     Q.   Good afternoon, Doctor.  Could you tell me whether or

6     not you have met a nine-year-old little girl named Laurie?

7     A.   Um, related to this case, yes, I can.  And I have met

8     her.

9     Q.   And when did that meeting take place?

10    A.   Um, the meeting took place on November 29th, 2012.

11    Q.   Okay.  Where did the meeting take place?

12    A.   Um, I don't want to give too many circumstances.

13              THE COURT:  Just your office.

14              THE WITNESS:  My home office, which is a child

15    psychiatric evaluation office.  I have two of them; one at a

16    well-known place where I work, and the other where I met with

17    Laurie, was in my home office, which has a garden and a

18    playroom and a lot of toys.  And the room that I met with her

19    in is in the middle of a garden and is really very pleasant.

20    Q.   Is it in the city of San Francisco?

21    A.   Yes, it is.

22    Q.   Doctor, how long was your meeting with Laurie?

23    A.   Um, with Laurie and her family, so that's her two

24    parents, the entire meeting lasted maybe about three and a

25    half hours.

26    Q.   Okay.  Initially, how did you find Laurie in -- being

27    able to talk to you or opening up to you?

28    A.   Well, she was pretty scared and with her family and in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   854

1   my waiting room and didn't want to come in and kind of

2   gripping the couch which is there and holding on to a toy

3   that she had brought with her.  I forget which particular toy

4   it was.  And her parents -- then I suggested that her parents

5   and she and I, all of us, go in together and we sit on the

6   floor together and kind of talk a little bit together to make

7   her comfortable there.  And that was so that she could see

8   her parents doing this, I could do this with her, and it

9   would set the stage for making it easier for her to talk with

10  me.

11          So we did that and we all sat on the floor together

12  for a while.  I got a little bit of information about their

13  family.  I don't have to disclose that here.  And we talked a

14  little bit about various toys and things, and then Laurie

15  agreed that she would stay with me alone.

16  Q.   Okay.  Just getting her to talk about sort of easy

17  things or noncontroversial things to begin with?

18  A.   That's right.  I also disclosed myself.  I teach a lot

19  about how to do this, and one of the things I've learned, I'm

20  much older now, but sitting on the floor and maybe disclosing

21  something that has been very difficult for me, talking about

22  when I was her age, what it was like.  I think I told her

23  that my mother taught elementary school, which she did, and

24  what that was like for me, and some of the struggles, that

25  kind of thing.  And you try to humanize yourself, connect

26  with the child, and really develop a rapport and make them

27  less scared about being there.

28  Q.   She was actually able to let her parents then leave the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   855

1    room and stay with you alone?

2    A.   She was.

3    Q.   Did you ask her about being a student in Craig

4    Chandler's classroom?

5    A.   I did.

6    Q.   Was there any reaction from Laurie when you mentioned

7    Mr. Chandler's name?

8    A.   Yes.

9    Q.   What was that reaction?

10    A.   Um, she became pretty tearful, looked like -- kind of a

11    blank look came over her face, which in our business we might

12    say was somewhat disassociating, moving out of her body and

13    the place she was in at the present time.  And then her hands

14    started shaking.  And then I said again:  Why don't we sit on

15    the floor.  Why don't we go back to playing with other

16    things.  I might have had her draw a picture of her family,

17    which I have with me, and she calmed down a little bit.

18              So then I started to talk to her a little bit more

19    about it and say that it's really tough to talk about these

20    things.  And she nodded and she was crying.  And it's

21    upsetting to even tell this story.  I wasn't counting on

22    that.  But she told me that she was alone in the room with

23    Mr. Chandler a number of times, approximately 10 she thinks.

24    I say greater than 5, less than 10, giving parameters, and

25    she said that one, you know.  Then I say 10 to 20, and then

26    one to 5 to try to give choices for a kid.  And she said she

27    was alone with him 5 times when he blindfolded her.

28              She was very upset during this period, and I know I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   856

1  brought the redacted report, but I'm going to look just in my

2  own notes a little bit so I could get the best description of

3  this.

4          She said that during those times when she was

5  blindfolded, that something hard and gooey had come into her

6  mouth, something gooey had come into her mouth, and she had

7  been asked to touch something that was hard.  And she was

8  very embarrassed about all of this.  She did not want to tell

9  anybody about this ever again.  And she had been able to talk

10  to a judge, some judge, I wonder if it was you, about this a

11  little bit.  But she did not want to tell the police about

12  this.  She did not want to tell anybody about this because

13  it's incredibly embarrassing and humiliating.  She didn't use

14  the word "humiliating," but embarrassing to have this happen,

15  and she was crying through the whole thing.

16  Q.   Doctor, did Laurie talk to you at all about what life

17  has been like for her since these things happened to her?

18  What life has been like for her on the school playground, for

19  instance?

20  A.   Um, she told me that she hated school after this because

21  of a lot of different things.  She was afraid to go back

22  there.  I don't know if I could say this, but she's in a

23  different school now and she feels better about that.  When I

24  saw her in November, she didn't even want to go back to the

25  school and say goodbye, not even for five minutes, you know.

26  So her parents had offered, as good parents do, you know,

27  thinking we'll take you by, you'll be able to work through

28  how you felt about this, and she didn't even want to do that.

1    So she felt very badly.

2            She has a sibling, I believe, who was in the

3    school.  He's also suffered from hearing some of the stories,

4    and kids also would make fun of her, say bad things about

5    this.  And she thought they could read her mind, but she

6    wasn't going to tell anybody these things, so she was going

7    to keep it inside of her, but she wondered why they were

8    calling her bad names.

9    Q.   Did she talk to you at all about kids pointing at her,

10   teasing her and making fun of her that she had been raped or

11   anything like that?

12   A.   She did.  She said those things, yes.

13   Q.   That the children -- and how did she feel about that?

14   A.   She felt terrible about that.  She didn't understand

15   what these sexual things were.  She used the word "slut" with

16   me.  Is she a slut?  You know, that's a big word for a little

17   kid to know, but clearly she connects what happened with Mr.

18   Chandler with that word.

19   Q.   And she was -- I want to make sure, she was clear with

20   you that she never wanted again to talk about what happened

21   in Mr. Chandler's classroom.  This was not something she was

22   ever going to talk about?

23   A.   That's correct.

24   Q.   Did she tell you anything more about what happened to

25   her while she was blindfolded?  You said that it was --

26   A.   Yeah.

27   Q.   -- hard and gooey?

28   A.   Um, that she touched something that was hard.  I asked

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   858

1  her -- at this point we were talking about it, and she knew

2  that this was a sexual part, or she was guessing this or

3  thinking this or worried about this, so we talked about that.

4  We didn't know what this hard thing was, but we talked about

5  that possibility.  And then the sticky stuff in her mouth,

6  she had no idea what that was, really.

7  Q.  Did she say anything about what Mr. Chandler did with

8  his thing when it was in her mouth?

9  A.  Um, I got -- that was a lot of information for me to get

10  from a little kid, and she didn't say anything.  I may have

11  asked her, but she's crying and it's hard to know -- you also

12  want to leave the interview open-ended so you don't put words

13  in her mouth.  And, you know, again, I wanted to follow her

14  lead here.

15  Q.  Okay.  So you were very careful during this discussion

16  not to put words in her mouth and let the information come

17  from Laurie as opposed to the other way around?

18  A.  That's correct.

19  Q.  Did Laurie give you any idea as to why she thought she

20  was chosen by Mr. Chandler for this activity?

21  A.  Yes, and this isn't unlike other girls that I've worked

22  with.  She was a very good student who tried hard, and she

23  felt like she was chosen because she was always trying to be

24  good, be there and be available and do what he would say,

25  and, you know, she saw herself -- she didn't use the adult

26  word "compliant," but somebody who would go along with

27  things.

28  Q.  Thank you, Doctor.

1    MS. FILO:  I have nothing further, Your Honor.

2    THE COURT:  Thank you.

3    Cross-examination?

4    MR. MADDEN:   Thank you.

5                    CROSS-EXAMINATION

6  BY MR. MADDEN:

7  Q.   Doctor, my name is Brian Madden.  I'm Mr. Chandler's

8  attorney.  I would like to go through your report with you

9  because it's not totally clear to me what you're saying.  So

10 let's start, if we may, with -- before we get to that.  The

11 sum total of information that you have about Laurie's

12 allegations was arrived at during the afternoon that you met

13 with her on August [sic] the 29th at your office; correct?

14 A.   That's correct.

15 Q.   All right.  You didn't review any documents or anything?

16 A.   No documents.  Nothing.

17 Q.   All right.  Let's start with -- I think it's the bottom

18 of page one, beginning with, "she reported to me."

19 A.   Um, I think I have it.  Yes.

20 Q.   Okay.

21 A.   But --

22 Q.   So I'm going to -- "She reported to me that Mr. Chandler

23 had met with her in the classroom and blindfolded her.  She

24 believed this happened at least one time, but may have

25 happened up to five times;" is that correct?

26 A.   That's correct.

27 Q.   So somewhere between one and five times?

28 A.   That's correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   860

1   Q.   That she was blindfolded?

2   A.   Um, yes.  Yes and --

3   Q.   Could we stay with the blindfolding?

4   A.   Yes, the blindfolding.  Yes, I may have written that

5   incorrectly.  She was blindfolded five times.  Yes, that's

6   correct.

7   Q.   What is correct?

8   A.   That between one and five times she was blindfolded.

9   Q.   Well, between one and five times is not five times, is

10   it?

11   A.   No, it's not.

12   Q.   All right.  So --

13   A.   The reason why --

14   Q.   Hang on.  There is not a question in front of you right

15   now.

16   A.   Okay.

17   Q.   Thank you.  Then in the next sentence you state:  "She

18   reports there were a number of episodes" -- let me stop right

19   there.  I take it, episodes is your word, not hers?

20   A.   That's correct.

21   Q.   It would be unusual for a girl her age to be using the

22   word "episode;" correct?

23   A.   Some do, but yes.

24   Q.   Yes, it would be unusual?

25   A.   Yes.

26   Q.   And, yes, she did not use that word?

27   A.   That's correct.

28   Q.   All right.  Where she and Mr. Chandler were alone in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   861

1  classroom, and she listed those greater of five times,

2  possibly between five and ten times.  Is that -- did I read

3  that correctly?

4  A.   That's correct.

5  Q.   Is this different than the times that she was

6  blindfolded?

7  A.   That's correct.  She was actually alone with him on

8  occasions when she wasn't blindfolded.

9  Q.   Okay.

10  A.   It was between the one and five times that she was

11  blindfolded.  I have separate notes that document that there

12  were separate episodes that occurred.  I did not -- this was

13  taken by the court, my reports, so you don't have all of my

14  notes.

15  Q.   What was taken by the court?

16  A.   Or my redacted report was made available to the report,

17  but I have separate notes regarding the activities that

18  occurred with Mr. Chandler.

19  Q.   All right.  We'll get to those in a minute.

20       Let's get back to the blindfolded episodes.  If you

21  said it was between one and five times, that means it could

22  only have been once; correct?

23  A.   Um --

24  Q.   Could have been?

25  A.   Um, no.  It was actually a misconstruction of my

26  writing, because I have separate episodes listed on my notes,

27  which indicate that a number of things happened.

28  Q.   Your misconstruction or my misconstruction?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   862

1    A.    My misconstruction on my notes.

2    Q.    So your report is wrong?

3    A.    There is one that could be misconstrued.  What I'm

4    saying, I have separate writing that indicates that there

5    were four separate -- there were five separate episodes that

6    occurred around the touching.

7    Q.    We're talking about around the blindfold right now?

8    A.    We are talking about that, but it would indicate that

9    she had been blindfolded because her eyes were never open

10   through any of this, by her report, and it would indicate

11   that she was blindfolded closer to the five times than the

12   one time.

13   Q.    But the report says one to five times?

14   A.    It does, but I probably should have said directly

15   that -- put in the specifics regarding these other things,

16   and that it would have been clear that it was closer to the

17   five times.

18   Q.    Didn't you --

19   A.    The report does not contain everything, Mr. Madden.

20   Q.    Didn't you feel that the number of times that she was

21   blindfolded was significant?

22   A.    Um, I did.  And that's how she answered the question;

23   that it was one to five times.  So that's how I reported it

24   here, but then she described separate episodes where she had

25   been blindfolded by Mr. Chandler.

26   Q.    All right.  So let's get to the sentence -- the last

27   sentence on page one.  She reports there were a number of

28   episodes where she and Mr. Chandler were alone in the

1   classroom, and she listed those at greater than five times,

2   possibly five to ten times?

3   A.   That's correct.

4   Q.   So these are times that she was alone with Mr. Chandler

5   in the classroom, but not blindfolded; correct?

6   A.   That's correct.

7   Q.   Is she alleging that any sexual episodes happened when

8   she wasn't blindfolded?

9   A.   Um, no, she's not.

10   Q.   So she told you that all of the sexual episodes happened

11   when she was blindfolded?

12   A.   That's correct.

13   Q.   And again, she never used the words "sexual episodes."

14   That's your conclusion; correct?

15   A.   Well, it's your word.

16   Q.   I think it's your word?

17   A.   If you are taking the word out of there.

18   Q.   I'm taking the word out of your report?

19   A.   Okay.  Sexual episodes is my word, yes.

20   Q.   All right.  She said that Mr. Chandler moved her hand

21   during the time, singular, that she was blindfolded and

22   touched things; is that correct?

23   A.   Yes, that's correct.

24   Q.   So she touched things while she was blindfolded between

25   one and five times with her hands?

26   A.   From my separate notes, I know that there were two

27   episodes of the hard touching, the touching the hard thing,

28   and then two episodes of something sticky in her mouth.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   864

1   Q.   And those happened when she was blindfolded?

2   A.   That's correct.

3   Q.   She also said she was unsure about what has going on?

4   A.   She did say that.  And I think she was trying very hard

5   to show me that she wasn't a slut or involved in this sexual

6   behavior.  I think she had a great deal more knowledge, as

7   children often do, than they show themselves to have.  I

8   think it was very frightening to her.

9   Q.   Would it be a safe assumption, that since you didn't

10  review any documents prior to this interview, that you

11  started with the assumption that she had been sexually

12  abused?

13  A.   That was not my assumption, Mr. Madden.

14  Q.   It was not?

15  A.   No.

16  Q.   Did you consider what you were doing here was an attempt

17  to determine in your own mind whether or not she had been

18  sexually abused?

19  A.   I am asked to interview the child.  I'm extremely good

20  at it.  I have done it for more than 35 years and children

21  talk to me.  They feel comfortable with me.  And I was asked

22  to do that.  And then I'm not allowed to tell -- I think I'm

23  capped on what I was then asked to do, but make

24  recommendations regarding treatment for her based on what had

25  happened to her.  That's what I was asked to do.

26  Q.   You're like a doctor, a medical doctor, which is what

27  you are, taking a history assuming what the person telling

28  you is correct.  You don't challenge it; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   865

1   A.   Um, in many ways I look to see whether or not the child

2   is telling me the truth.  So I've written quite a bit about

3   children -- veracity of children and sexual abuse complaints.

4   I think it's important to know that when children come

5   forward with sexual abuse complaints or stories, that they

6   will often retract them; that they will feel shy about

7   telling their story; that it's very scary for them.  And

8   there is a whole range of other things I'm looking to make

9   the child comfortable, but I'm aware of these other issues

10   that go on.

11        In general, though, veracity of children, when they

12   put forward a complaint about sexual abuse is 97 percent in

13   most of the studies, so that tells you something about

14   children coming forward with complaints.

15   Q.   So again, you assumed that she was sexually abused, even

16   though you considered no documents concerning the

17   investigation of this case, or prior courtroom testimony, any

18   inconsistent statements she's given, nothing?

19   A.   Mr. Madden, that is not true.

20   Q.   Miss --

21   A.   I did not assume that.  That's your assumption being put

22   on to me, and it's unfortunate -- let me finish.  And I would

23   like you to call me doctor, not Miss, you know.

24   Q.   I apologize.

25   A.   But it's very important that children have somebody that

26   could listen to them.  I did not know what I would find when

27   I met with this little girl.

28   Q.   I understand that.  Let's continue with your report, if

1   we may, with the next sentence.  She said that something

2   were -- moved around in her mouth by Mr. Chandler.  Okay.

3           Did she tell you that Mr. Chandler put things in

4   her mouth?

5   A.   Something wet and sticky he put in her mouth.

6   Q.   Anything else?

7   A.   I think that's the only thing that she told me about.

8   Q.   All right.

9   A.   There was something hard there, too.  She said that,

10  but, you know, whether or not that went into her mouth or

11  rubbed up against her mouth, I don't know.  I would like to

12  say she was having a horrible time when she told me this.

13  Q.   All right.

14  A.   And was shaking the whole time.  It was terrible.

15  Q.   Could you tell me how much of the three and a half hours

16  was spent getting a history from Laurie concerning her

17  physical interaction with Mr. Chandler?

18  A.   At least an hour, maybe more.

19  Q.   All right.  Had you been aware of any prior inconsistent

20  statements that Laurie had given to others in the course of

21  the criminal case that were inconsistent with what she told

22  you?  Would you have asked her about it?

23  A.   Um --

24          MS. FILO:  Objection, Your Honor.  Calls for

25  speculation and relevance.

26          MR. MADDEN:  Part of her evaluation, Your Honor.

27          THE COURT:  I'll allow the first part, if she was

28  aware of any prior inconsistent statements.

1          THE WITNESS:  Um, I did not know that there were

2     inconsistent statements.  Maybe I should say that expressed

3     or whether or not there were.  I might have asked if I had

4     suspected that, but I would try to ask in a way that would

5     keep it open for the child, you know, frame it in such a way.

6     I wouldn't say:  You made prior inconsistent statements, but

7     maybe try to get her to talk a little bit about the first

8     time or second time she talked about this.

9          I think I say here in my report she felt like she

10    was able to tell a little bit to the judge.  That's the one

11    bit I did get out of her about that, because she told me that

12    she testified during a court situation.  Of course with kids,

13    even going to a policeman or doing a police interview could

14    be a court situation, and she thought she had told some of

15    her story then.  But she knew -- she told me she had never

16    told as much of her story as she told me.

17    BY MR. MADDEN:

18    Q.   Oh, okay.  So, Doctor, it was your understanding that

19    you were getting a much greater and much fuller story than

20    she ever told anyone?

21    A.   I didn't -- I don't know.  I know that this is a story

22    she told me, and this is the one I'm relating to you.  I

23    don't know about her prior histories of disclosure, even at

24    this point.

25    Q.   Okay.  Now, you are not seeing her?  You've only seen

26    her one time; right?

27    A.   That's correct.

28    Q.   You talked about -- all the allegations you talked about

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    868

1    were within an hour approximately of the time you spent with

2    her?

3    A.    I think I took a break.  We took a break to have some

4    drinks, like orange juice and stuff, and then came back in.

5    And I think the full time -- the hard part was about an hour,

6    and then there was an additional half hour where we talked a

7    little bit, went back and talked about the school and other

8    things related to what I've written in the report earlier.

9    Q.    All right.  And you're not seeing her in therapy?

10   A.    I'm not.

11   Q.    So if you had been made aware that previous to

12   speaking -- previously to speaking with her, she consistently

13   and repeatedly said Mr. Chandler never put anything in her

14   mouth, would you have pursued that?

15   A.    Um, I think you asked me a variant of that earlier, Mr.

16   Madden, and I would try not to put words in a kid's mouth.

17   But I might have asked what happened during an earlier time

18   and if she remembered that.  Often kids are very anxious when

19   they are talking about this and you don't want them to

20   confuse, you know, and report a lot of different tellings at

21   the same time, so you try to get the story.

22   Q.    Had you been aware of it, you would have explored it;

23   correct?

24   A.    I might have.  As I said, depending upon her clinical

25   state.

26   Q.    All right.  Had you been aware of that previously she

27   never said she touched anything with her hands, would you

28   have explored that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   869

1   A.   Same response as to the other.  It would depend upon her

2   state at that time, but I would have asked, yes.

3   Q.   And apparently, because it's not in your report, she

4   never mentioned to you that Mr. Chandler put any objects on

5   her feet?

6   A.   I don't remember anything related to that.

7   Q.   Take your time.  Go through your notes.

8   A.   Yeah, I don't remember any mention of feet.  No, but she

9   may have been talking about her feet.  You know, one thought

10   I have, she may have started off talking about her feet, and

11   then when she started to cry and shake and talk about the

12   other stuff, that dropped away.  So I don't know of anything

13   about a feet part.

14   Q.   And there is nothing in your notes that mentions the

15   word "feet;" correct?

16   A.   Nothing that I could see, no.  But I didn't write

17   everything down because I'm trying hard to listen.

18   Q.   All right.  Just let me check my notes, Doctor.  I think

19   I may be done.

20        I am.  Thank you very much.

21   A.   Thank you.

22        THE COURT:  Ms. Filo?

23        MS. FILO:  Very briefly, Your Honor.

24                    REDIRECT EXAMINATION

25   BY MS. FILO:

26   Q.   Doctor, you said that you may or may not have explored

27   prior disclosures or inconsistencies in your conversation

28   with Laurie; is that accurate?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   870

1  A.   Yes.  I remembered that I had talked with her about -- I

2  wrote in my report that she had talked to the judge, and I

3  remember her saying that she talked to the judge.  She tried

4  to talk to the judge she said, but that it was hard for her.

5  So I didn't -- I didn't go back into:  What was your story

6  with the judge?  How does this compare with mine?  That kind

7  of thing.  I didn't do that.

8  Q.   Okay.  So would one factor for you in deciding whether

9  or not you're going to explore previous disclosures be

10  whether you believe you're getting information from the child

11  then at the time of this conversation?

12  A.   Um, yes.  At this point, you know, I worked a lot with

13  judging a child's veracity.  I had no reason to doubt this

14  story.  This is a girl who does not want to disclose this

15  type of behavior because she's very afraid of how other

16  people will see her, as a sexual person, a little sexual

17  person, and as a person.  So I had no reason to doubt her.

18  And she was fragile when she left the interview.  I wanted

19  her to, you know, have time with her family and feel better.

20        I think there have been times when there have been

21  dramatically different stories.  That wasn't what I was asked

22  to evaluate in this case.  Then I would have the child come

23  back, and then I might -- we might make a sticker chart and

24  kind of work out the different times, draw pictures so that

25  we would have the different stories on different pages and

26  try to figure out in a kid way what the different stories

27  were.

28  Q.   Okay.  So there is nothing about the fact that a child

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   871

1    has failed to disclose in the past that necessarily makes you

2    think that that child is being dishonest with you at that

3    time?

4    A.   Nothing.

5    Q.   In fact, that's common?

6    A.   That's common because disclosure is a gradual process

7    with sexual abuse, and it takes a long time.  It takes boys

8    even longer than girls to disclose.  It's fortunate sometimes

9    that kids are brave and they do disclose.

10   Q.   One last question.  Doctor, you seemed to get a little

11   bit emotional when you were talking about Laurie.  You've

12   told us that you taught in this area, that you been doing

13   this for a long time.  What is it about this conversation

14   with this little girl that caused that reaction in you?

15   A.   I think because when you work with children, you have to

16   try to put yourself in their shoes, in their minds, in their

17   bodies when they are going through this.  I think that's what

18   leads to the disclosure, is actually that ability to try to

19   put yourself in their bodies.  And I think because of that, I

20   carry a lot of the feelings, you know, with -- that she

21   transferred to me after this disclosure.  So I carried them

22   with me and I have a lot of emotion that goes with it.

23        I'm also a person.  I'm a mom of many kids and love

24   children who tries to get close to children.  So I'm an

25   emotional person.  But you're right, it's not often that I

26   feel emotional on the witness stand.  That's not usual.

27   Q.   Thank you, Doctor.

28        MS. FILO:  No further questions.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   872

1        THE COURT:  Recross?

2        MR. MADDEN:  Nothing, Your Honor.

3        THE COURT:  Thank you, Doctor.  You may step down.

4   I appreciate your cooperation.

5        Ms. Filo, who do you have scheduled next?

6        MS. FILO:  Mary Montgomery.

7        THE COURT:  Okay.

8                    MARY MONTGOMERY,

9        Being called as a witness on behalf of the People,

10  having been first duly sworn, was examined and testified as

11  follows:

12       THE CLERK:  For the record, ma'am, could you please

13  state your first and last name and spell both for the record.

14       THE WITNESS:  Mary Montgomery.  M-a-r-y,

15  M-o-n-t-g-o-m-e-r-y.

16       THE COURT:  Thank you, ma'am.  As you know, the

17  lawyers are going to be asking you some questions.  I would

18  ask you to make every effort to let them finish the question

19  before you begin your answer.  Listen to the question

20  carefully and only answer the question that is being asked.

21  If the question calls for a yes or no response, we need

22  verbal yes or no as opposed to head shake or uh-huh or

23  nah-uh.  If you hear objection, please don't answer the

24  question.  I will rule.  If I overrule the objection, you are

25  allowed to answer.  If I sustain, they will ask you another

26  question.

27       You could put that microphone anywhere you want.

28  You could adjust it if you feel comfortable.  You could pull

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   873

1   the chair up if you like as well.  Thank you.

2          Direct examination.

3          MS. FILO:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5   BY MS. FILO:

6   Q.   Good afternoon, Ms. Montgomery.  Are you an elementary

7   school teacher?

8   A.   I'm a retired elementary school teacher.

9   Q.   Did you recently retire?

10  A.   I retired June of 2012.

11  Q.   Congratulations.

12  A.   Thank you.

13  Q.   How many years were you a teacher?

14  A.   I was a teacher at O.B. Whaley School for 15 and a half

15  years.

16  Q.   Do you know what classroom you were assigned to in the

17  2011/2012 school year?

18  A.   Room 19.

19  Q.   And that was immediately next door to room 18?

20  A.   Yes.

21  Q.   And was Craig Chandler the assigned teacher to room 18?

22  A.   Yes.

23  Q.   Ms. Montgomery, I want to ask you about an incident that

24  occurred, that I think it was during that school year, where

25  you heard something that caught your attention.  Could you

26  tell me -- could you tell me about that incident?

27  A.   Um, I heard a knock on the door.  It sounded like it was

28  on Mr. Chandler's door.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   874

1  Q.   Okay.  Was it a -- what time of day was it?

2  A.   It was after second lunch, so I would say had to be

3  sometime after 12:45.  Maybe somewhere between 12:45 and 1:00

4  o'clock.

5  Q.   Okay.  You said that was after second lunch?

6  A.   Correct.

7  Q.   Did everyone -- all of the students at this school have

8  a designated lunch period?

9  A.   Yes.

10 Q.   They were either in first lunch or second lunch?

11 A.   Or third lunch.

12 Q.   Or third lunch.  Okay.

13       And during the lunchtime, where were the students

14 allowed to be?

15 A.   Well, they were in the cafeteria.  From the cafeteria,

16 they would go out onto the playground.  Then after the

17 playground, the teacher would pick them up and take them back

18 to the classroom.

19 Q.   So the teacher got a break -- during the time that their

20 students had lunch, the teacher got a break too; is that

21 right?

22 A.   Yes, that's when we had our lunch break.

23 Q.   Okay.  And was someone else assigned to sort of monitor

24 the kids while teachers had lunch?

25 A.   Yes, on the playground.

26 Q.   Okay.  When you heard this knocking at the door, were

27 your students in session?

28 A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   875

1  Q.   And what about Mr. Chandler's students?  Were they in

2  session or were they on their lunch break?

3  A.   No.  They were in session again.

4  Q.   Okay.  And you said that you heard a knock.  What kind

5  of knock was it?

6  A.   Well, I mean it was a knock on the door.  I mean, it was

7  not enough that I could hear it.  It wasn't -- it was loud

8  enough that I could hear it.

9  Q.   Okay.  Did the knocking become incessant at some point?

10  Loud?

11  A.   Well, I mean it got a little bit louder, yes.

12  Q.   Did you -- did it get to the point where you actually

13  went to your door to figure out what was going on?

14  A.   It got my attention, yes, to go to the door.

15  Q.   Okay.  What did you see when you got to your door?

16  A.   I saw Mr. Chandler's students outside in the area behind

17  the classrooms.

18  Q.   Okay.  So his students were just out and about behind

19  the classroom; is that right?

20  A.   Um, well, they were in the area behind our two

21  classrooms.

22  Q.   Okay.  So I want to be clear, your classroom, classroom

23  19, was at the back of the school; is that right?

24  A.   Yes, toward the back wall.

25  Q.   And just 20 feet beyond your classroom door and Mr.

26  Chandler's classroom door, there is a fence that actually

27  goes to the neighborhood; right?

28  A.   That's correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   876

1  Q.   Okay.  So were Mr. Chandler's students in that area

2  between the sort of neighborhood fence and the wall with the

3  doors to the classrooms?

4  A.   Yes.

5  Q.   Okay.  You said that a student was knocking on the door.

6  You recognized the student?

7  A.   Yes, I did.

8  Q.   That student had been a previous student of yours?

9  A.   That's correct.

10  Q.   Did you ask him:  What are you doing?

11  A.   I asked him where was Mr. Chandler.

12  Q.   Okay.  What did he say?

13  A.   He said he's in the room.

14  Q.   And did you ask him:  Why can't you go in, or why don't

15  you go in?

16  A.   Well, I asked him was the door stuck.

17  Q.   And what did he say to you?

18  A.   Well, he pushed down on the door handle.

19  Q.   And you could see that no movement was happening?

20  A.   Correct.

21  Q.   It was locked?

22  A.   Yes.

23  Q.   Okay.  And at some point, did you then see the door

24  open?

25  A.   Yes, Mr. Chandler came out of the door.

26  Q.   Okay.  You saw Mr. Chandler actually open that door?

27  A.   Yes, he opened it from the inside and walked out.

28  Q.   Okay.  Did he -- you didn't see anyone else walk out of

1    the room?

2    A.   No.  He was by himself.

3    Q.   Okay.  And did -- what happened with the students when

4    Mr. Chandler walked out?

5    A.   Well, they were standing waiting for him.  They knew

6    where he was.

7    Q.   They were waiting to come back into the classroom?

8    A.   Um, I'm not sure if they waited to come back in, or they

9    were waiting for him to come out and join them.  I'm not

10   totally sure.

11   Q.   Okay.  But they were outside the classroom while he was

12   in the classroom with the door locked?

13   A.   That's correct.

14   Q.   All right.  You didn't notice if any of the students

15   were missing, did you?

16   A.   No.  There were a lot of kids, no.

17   Q.   Okay.  Thank you, Ms. Montgomery.  That's all I have.

18   One more question.  Do you know when this happened?

19   A.   No.  I just know it was sometime between when school

20   started in the fall and sometime, you know, at the end of

21   December.

22   Q.   All right.

23   A.   Yeah.

24   Q.   Sometime in that first semester we would call it?

25   A.   Right.

26   Q.   Thank you.

27        MS. FILO:  Nothing further, Your Honor.

28        THE COURT:  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   878

1           Cross, Mr. Madden?

2                 MR. MADDEN:  Thank you, Your Honor.

3                       CROSS-EXAMINATION

4   BY MR. MADDEN:

5   Q.   Ms. Montgomery, my name is Brian Madden.  I'm Mr.

6   Chandler's attorney.  So you were at O.B. Whaley since 1996?

7   A.   Correct.

8   Q.   That was a good guess.  And do you have a recollection

9   of when Mr. Chandler began teaching at O.B. Whaley?

10  A.   I want to say maybe five years after I was hired.

11  Q.   Sometime after 2001, 2002, 2003, something like that?

12  A.   Possibly.

13  Q.   Okay.  And you were in room 19, if you remember, for how

14  long prior to --

15  A.   The -- oh, gosh.  I was in that room for exactly 15

16  years.

17  Q.   All right.  You must have liked it?

18  A.   They didn't move me out, so I guess they liked me in

19  there.

20  Q.   All right.  So room 18 was occupied by Mr. Chandler for

21  some period of time also prior to 2012; correct?

22  A.   Correct.

23  Q.   You've been there for -- I won't hold you to it -- if

24  you could give me an estimate how long he had been in room

25  18?

26  A.   I would think it was more than five years.

27  Q.   Okay.

28  A.   Yes.

1    Q.   And so your rooms were adjoining?  You shared a front

2    wall; would that be right?

3    A.   Correct.

4    Q.   You said "correct," but I think I'm wrong.  The front

5    wall of his classroom would have been the back wall of yours?

6    A.   Um, repeat that, please.

7    Q.   I think I gave you another bad question.

8    A.   Okay.

9    Q.   Let me see if I could improve on that by going to a

10   photograph.

11            MR. MADDEN:  May I approach, Your Honor?

12            THE COURT:  Yes.  Thank you.

13   BY MR. MADDEN:

14   Q.   If you take a look -- we could probably use the

15   photographs that are visible to everybody right now, and one

16   is Defense Exhibit A-1, which has previously been represented

17   as the back of Mr. Chandler's classroom.  Okay?

18   A.   Yes.

19   Q.   And then there is a door here that has been represented

20   as going to another classroom?

21   A.   Yes.

22   Q.   Is that right?

23   A.   That's correct.

24   Q.   All right.  And with respect to the door between this

25   classroom -- we're concerned with the doors between

26   classroom.  Was there a door between Mr. Chandler's classroom

27   and your classroom?

28   A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   880

1   Q.   Okay.  How about room 19?  Did you also have a door that

2   went into an adjacent classroom?

3   A.   Yes.

4   Q.   Okay.  Do you remember who the teacher would have been

5   on the other side of that door?

6   A.   Yes, Ms. D'Arcy.

7   Q.   D'Arcy?

8   A.   Yes.

9   Q.   Do you know who the teacher would have been on the other

10  side of Mr. Chandler's door?

11  A.   Yes.

12  Q.   Who would that have been?

13  A.   Mrs. Catangay.

14  Q.   Catangay?

15  A.   Yes, Catangay.

16  Q.   Okay.  This also -- this door is also depicted in A-2,

17  and I'm pointing to the door here.  The door between your

18  classroom and the next classroom, Ms. D'Arcy's classroom,

19  that doorknob, does it have a lock on it at all?

20  A.   No.

21  Q.   All right.  And Mr. Chandler's door didn't have a lock

22  on it either; right?

23  A.   That's correct.

24  Q.   All right.  How about your classroom?  You had windows

25  in your classroom?

26  A.   At the top.

27  Q.   Okay.

28  A.   Yes, windows at the top.

1    Q.    I'm going to have you take a look at the photograph A-1.

2    There appears to be a window at the top of the back of Mr.

3    Chandler's wall.  Was your classroom identical?

4    A.    Exactly.

5    Q.    So the area below the top of the windows looks like it

6    must have been painted over perhaps years ago?

7    A.    Yes.

8    Q.    All right.  The four classrooms:  Mr. Chandler, yours,

9    Ms. Catangay, and Ms. D'Arcy, those were four rooms within

10   one building; right?

11   A.    Correct.

12   Q.    Okay.  They are all essentially the same size?

13   A.    Correct.

14   Q.    1/4 of a square?

15   A.    Correct.

16   Q.    All right.  Okay.  I think that's -- as I look at

17   Defense Exhibit A-13, this has previously been described as a

18   white board at the front of Mr. Chandler's classroom and this

19   would be the wall that he shares with your classroom?

20   A.    Correct.

21   Q.    Okay.  I got it.

22              Did you have a good relationship with Craig

23   Chandler?

24              MS. FILO:  Objection, Your Honor.  Relevance.

25              THE WITNESS:  Yes.

26              THE COURT:  I'll allow the answer to remain.

27              MR. MADDEN:  That's preliminary, Your Honor.  Thank

28   you.

1    THE COURT:  I'll allow the answer to remain.

2  BY MR. MADDEN:

3  Q.    Did you answer the question?

4    THE COURT:  She said "yes."

5    MR. MADDEN:  Thank you.

6  BY MR. MADDEN:

7  Q.    You and Mr. Chandler were friends?

8  A.    We were professional friends.

9  Q.    Yes.  I don't mean social friends, but you were friendly

10  with each other?

11  A.    Yes.

12  Q.    Okay.  For years, you worked adjacent to each other;

13  correct?

14  A.    Next door to each other.

15  Q.    I'm sorry.  Next door to each other?

16  A.    Yes.

17  Q.    And was it common for Mr. Chandler -- strike that.

18    Was it unusual for Mr. Chandler to occasionally

19  have his students playing outside of his classroom?

20  A.    Could you repeat that, please?

21  Q.    Yes.  Was it unusual for Mr. Chandler to have his kids

22  playing outside of his classroom?

23  A.    No.

24  Q.    That was something he commonly did?

25  A.    He did it often.

26  Q.    Okay.  And are you familiar with Mr. Chandler's

27  schedule?  What he did on Fridays, for example?

28  A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   883

1    Q.   Okay.  I didn't -- I don't think we heard -- what grade

2    did you teach during the time Mr. Chandler was there?

3    A.   I taught second grade for, oh, eight years, and then I

4    taught -- no for ten years, and then I taught first grade for

5    five years.

6    Q.   Okay.  So the student that you were talking about that

7    you recognized was a former student of yours, who either was

8    a second- or a third-grader in Mr. Chandler's class?

9    A.   That's correct.

10   Q.   You know the name of the child?

11   A.   Yes, I do.

12   Q.   Who is that?

13   A.   His name is Chris.

14   Q.   Chris?

15   A.   Yes.

16   Q.   Okay.  And so where were you when you first noticed the

17   sound of knocking?

18   A.   I was in my classroom.

19   Q.   Okay.  Was your door open or closed?

20   A.   It was closed.

21   Q.   Okay.  And you think it was mid-afternoon?

22   A.   Yes.

23   Q.   All right.  But you really have no memory as to what

24   point in the school year it was, from the beginning of the

25   school, which is typically in mid-August, to Christmastime;

26   right?

27   A.   No, I don't have any recollection.

28   Q.   Okay.  Did you -- let me withdraw that question.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   884

1        Was Chris in any way upset when you observed him at

2   the room 18 door?

3   A.   No.

4   Q.   Were there children around him?

5   A.   There was some children standing in the background, yes.

6   Q.   All right.  They were basically just doing what kids do?

7   Playing?

8   A.   Um, most of them were not playing.  They were just sort

9   of standing, waiting, and a couple of kids were like, you

10  know, handling a ball.  But they weren't -- there was not a

11  lot of activity.  No.

12  Q.   Was it the whole class or just a group smaller than the

13  whole class?

14  A.   No.  It appeared to be the whole class.

15  Q.   Okay.  Did they appear to be lined up?  You said they

16  appeared to be waiting for Mr. Chandler?

17  A.   Yes.

18  Q.   Okay.  And so you had walked out of your door; correct?

19  A.   Yes.

20  Q.   And then you walked down, and how close did you get to

21  Mr. Chandler's door?

22  A.   I did not walk out of my classroom.  I mean, I opened my

23  door, but I stood in the threshold.

24  Q.   Okay.

25  A.   So that I could watch my class, too.

26  Q.   So you could watch your class.  And then you saw Chris

27  down at the door with the other kids apparently waiting for

28  Mr. Chandler; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   885

1    A.    Yes, they were standing in the background.

2    Q.    Okay.  So when I hear you use the word "standing," when

3    I think of kids at that age, I don't associate kids that age

4    as standing around.  I think of constant movement.  So my

5    question is, were they lined up at all?

6    A.    No, they weren't lined up.  They had some balls with

7    them, but it looked like they were possibly out there getting

8    ready to, you know, play or do something of that sort.

9    Q.    Maybe go someplace with Mr. Chandler?  To PE or

10   something?

11            MS. FILO:  Objection, Your Honor.

12            THE WITNESS:  Or maybe he'd have it right there.

13   They often played in that little section.

14   BY MR. MADDEN:

15   Q.    Did the PE right there in the section where they were?

16   A.    Correct.

17   Q.    Okay.  So it looked like they were waiting for Mr.

18   Chandler to join them?  They had toys or balls that you

19   associate with PE?

20            MS. FILO:  Objection, Your Honor.  Calls for

21   speculation.

22            THE COURT:  Sustained.

23   BY MR. MADDEN:

24   Q.    You saw balls; correct?

25   A.    Correct.

26   Q.    I may have said toys too soon.  Were there any other

27   toys that you remember?

28   A.    No, no.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   886

1  Q.   Okay.  And so Chris -- you were from your threshold.

2  Did you have a conversation with Chris?

3  A.   I just asked him a few questions.

4  Q.   You have a nice, soft voice.  Were you yelling at him or

5  just talking?

6  A.   No.  He was close enough that he could understand me

7  without me screaming because the doors -- the space between

8  the doors is not very long.

9  Q.   How long would you estimate that distance to be?

10  Greater or lesser than the distance between you and me right

11  now?

12  A.   I would say possibly the same distance.

13            MR. MADDEN:  You have a survey, Your Honor?

14            THE COURT:  From the witness stand to the railing

15  is 28 feet.

16  BY MR. MADDEN:

17  Q.   So 20, 25 feet, something like that?  About the distance

18  between me and you?

19  A.   I would say so.

20  Q.   Okay.  And again, he wasn't upset?

21  A.   No.

22  Q.   And you saw him push down on the door?

23  A.   Yes.

24  Q.   And shortly after that it opened; correct?

25  A.   Correct.

26  Q.   Mr. Chandler came out?

27  A.   Correct.

28  Q.   He was alone?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   887

1    A.    He was alone.

2    Q.    There was no one else in the classroom?

3    A.    I didn't go to the classroom.

4    Q.    All right.  So you don't know if he was alone or not?

5    A.    When I saw him he was alone.

6    Q.    I understand that.  You don't know if there was anyone

7    else in the classroom with Mr. Chandler is what I'm trying to

8    say?

9    A.    I didn't walk up to the classroom.

10   Q.    Okay.  I understand.  After this event, did you -- were

11   you in any way, shape, or form upset?

12   A.    No.

13   Q.    Why not?

14   A.    There was nothing about it that made me feel

15   uncomfortable.

16   Q.    Okay.  So I'm assuming, since you weren't uncomfortable,

17   you never had a discussion with Craig about that event after

18   the event?

19   A.    You mean at that time -- at that moment in time or

20   later?

21   Q.    Either that time or anytime after?  The next day or the

22   next week or anything like that?

23   A.    No.  We didn't actually discuss the event, no.

24   Q.    That would be logical since you weren't in any way

25   concerned about it; correct?

26   A.    No.  I wasn't concerned about it.

27   Q.    Okay.  Thank you.

28         MR. MADDEN:  I have no further questions.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  888

1    THE COURT:  Redirect?

2    MS. FILO:  I have one question.

3                    REDIRECT EXAMINATION

4    BY MS. FILO:

5    Q.   Ms. Montgomery, were children to be outside without

6    supervision?

7    A.   They should have had supervision.

8    Q.   So this particular incident was notable to you because

9    the kids were outside -- second- and third-graders were

10   outside with no supervision?

11   A.   He was not with them.

12   Q.   Thank you.

13              MS. FILO:  Nothing further.

14              THE COURT:  Recross?

15              MR. MADDEN:  I had a couple of questions.  Thank

16   you, Your Honor.

17                    RECROSS-EXAMINATION

18   BY MR. MADDEN:

19   Q.   With respect to the windows, were the windows -- the

20   whole building configured?  That is, every two classrooms --

21   Ms. D'Arcy and Ms. Catangay, were those windows identical to

22   the windows in yours and Mr. Chandler's classroom?

23   A.   Correct.

24   Q.   They were painted the same way?

25   A.   The bottom windows?  Are you referring to the bottom?

26   Q.   Yes.  I'm sorry, yes.

27   A.   They are actually boarded.  There is no plate glass

28   there.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   889

1  Q.    There is actually wood there?

2  A.    That's correct.

3  Q.    All right.  As you look, for example, at the

4  photograph -- excuse me -- on the easel, I think it's been

5  pointed out that there appears to be two handles that must

6  have been an open window at sometime; right?

7  A.    You could still open it and get air.

8  Q.    Oh, you could?

9  A.    Yes, but there is no plate glass there.

10 Q.    So it still opens up, but it's really a piece of wood

11 covering the window that you will be opening up?

12 A.    Correct.

13 Q.    Okay.  Was that done at sometime after you were a

14 teacher at O.B. Whaley or before you got there?

15 A.    Before.

16 Q.    Okay.  Thank you.

17           MR. MADDEN:  I have no further questions.

18           THE COURT:  Ms. Filo?

19           MS. FILO:  Nothing further, Your Honor.

20           THE COURT:  This is not real important, but I was

21 just curious.  How does the window open?  Does it slide up?

22           THE WITNESS:  There is a handle that you pull down

23 and you pull it in towards you.

24           THE COURT:  Window's pulled in?

25           THE WITNESS:  Correct.

26           THE COURT:  So from the top it comes up like that?

27           THE WITNESS:  Well, it --

28           THE COURT:  It opens from the bottom?

1      THE WITNESS:  I could show you with a tissue box.

2      THE COURT:  No.  Apparently, I was just curious.

3      I'm sorry, Counsel.  If you want to follow up on

4  it, fine.  I was just -- there was testimony of a window.  I

5  was curious if the windows open in different ways.  So I'm

6  sorry.  I satisfied my own curiosity.  Counsel wish to follow

7  up?

8      MS. FILO:  No, Your Honor.

9      THE COURT:  Sorry, Ms. Montgomery.  You could show

10  me at the break, because we're going to take a recess right

11  now, ladies and gentlemen.

12      MS. FILO:  Your Honor, before you excuse the jury,

13  could we approach very briefly?

14      THE COURT:  Is Ms. Montgomery free to leave?

15      MS. FILO:  Yes.

16      THE COURT:  Thank you, ma'am.  You are excused and

17  free to leave.

18      (Whereupon, there was a discussion at the bench.)

19      THE COURT:  Ladies and gentlemen, we're going to

20  take the recess right now, and the reason is because we did

21  start earlier, before 1:30, before you came up to the

22  courtroom because I had to address other issues.  And the

23  reason I'm telling you this and the need for break is because

24  the next witness will be relatively short.  And after we're

25  done with that witness, we'll be recessing for the afternoon.

26      So I didn't want any of you to think, well, we take

27  a recess, we come back, why didn't we just finish up because

28  it wasn't that long?  But it's real important that I give my

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   891

1  staff a break.  Every witness is a little different.  Right

2  now I think it's very important to give my court reporter a

3  break.  What she does is, I think, very, very difficult.  So

4  just by way of explanation, we'll call you back up in 15

5  minutes, 3:15.

6                 (Whereupon, a brief recess was taken.)

7                 THE COURT:  Record will reflect all members of the

8  jury are present in the courtroom, both counsel are present,

9  Mr. Chandler is present in the courtroom.

10                 Ms. Filo, your next witness.

11                 MS. FILO:  Thank you, Your Honor.  The People call

12  Armando Lara.

13                        ARMANDO LARA,

14            Being called as a witness on behalf of the People,

15  having been first duly sworn, was examined and testified as

16  follows:

17                 THE CLERK:  For the record, sir, could you please

18  state your full name and spell both for the record.

19                 THE WITNESS:  Armando Lara; A-r-m-a-n-d-o, L-a-r-a.

20                 THE COURT:  Thank you, sir.  The lawyers are going

21  to be asking you questions.  It's important that you let them

22  finish their question before you begin your answer.  I would

23  ask you to please make every effort to listen to the question

24  and only answer what is being asked.  If the questions call

25  for a yes or no response, you need to verbally say yes or no

26  as opposed to shaking your head up and down.  If you hear a

27  lawyer say objection, don't answer the question.  I will rule

28  and let you know if you could answer it or not.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   892

1          You could scoot your chair up if you like and

2     adjust the microphone if you wish.

3          Direct examination.

4          MS. FILO:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6     BY MS. FILO:

7     Q.   Good afternoon, Mr. Lara.  How are you presently

8     employed?

9     A.   I'm the assistant principal at O.B. Whaley School.

10    Q.   How long have you been the assistant principal at O.B.

11    Whaley School?

12    A.   This last year was my first year officially as assistant

13    principal.  Prior to that, I was acting assistant principal

14    starting the first week in January of 2010.

15    Q.   Okay.  Sorry.  2010?

16    A.   I'm sorry.  It's 2011.  Perhaps -- this is 2013, so it

17    has been a year and a half.  So 2012, I guess; right?

18    Q.   Did you become the acting assistant principal when Lyn

19    Vijayendran went on maternity leave?

20    A.   Yes.

21    Q.   So if I told you that that was in the 2011/2012 school

22    year, would that be --

23    A.   Yes, you are right.

24    Q.   Okay.  So, Mr. Lara, Ms. Vijayendran went on maternity

25    leave when the winter break essentially started of that year;

26    is that correct?

27    A.   Yes.

28    Q.   So when you came back to school that year, which

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    893

1    calendar year now would have been 2012, January 2012, that's

2    when you began as the acting assistant principal?

3    A.    Correct.

4    Q.    Did you have a dual duty at the school?

5    A.    Yes, I did.

6    Q.    What was your second duty?

7    A.    I was responsible to teach the study island course,

8    which is the literacy class.

9    Q.    Reading program?

10   A.    Yes.

11   Q.    Mr. Lara, on the morning of January 9, 2012, were you

12   called to the office to assist Lea Peery in sort of the

13   investigation of a parent who would come in with a concern?

14   A.    Yes.

15   Q.    Okay.  That again was January 9, 2012?

16   A.    Correct.

17   Q.    Was it a Monday morning?

18   A.    No.  I believe it was a Tuesday.  I think it was a

19   holiday on Monday.  I could be mistaken, but I think it was a

20   Tuesday.

21   Q.    It was early in the week?

22   A.    Yes.

23   Q.    And you are aware that on that day, January 9, 2012, the

24   San Jose Police Department was called and responded to the

25   school as a result of the parent complaint that was raised

26   with Ms. Peery; is that correct?

27   A.    Yes.

28   Q.    Mr. Chandler was on campus that January 9th when the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   894

1   police ultimately responded to investigate this claim?

2   A.    Could you repeat that, please?

3   Q.    Sure.  Mr. Chandler, was he was working -- he was on

4   campus when the police ultimately responded to O.B. Whaley

5   School; is that right?

6   A.    I don't believe -- I don't remember.  I know that the

7   day that the police arrived there, I don't think he was there

8   on that day.

9   Q.    Okay.  Do you know what time the police got out to the

10  school?

11  A.    It was mid-morning.  It was not -- I don't believe it

12  was the first thing in the morning.

13  Q.    Mr. Lara, I would like to ask you about the day

14  following, okay?  So the police were called on January 9th.

15  Were you on campus at O.B. Whaley Elementary School on the

16  morning of January 10th?

17  A.    Yes.

18  Q.    What time did you get to school that morning?

19  A.    I got there earlier than usual.  I can't remember the

20  exact time that I came in, but I opened the school and

21  disarmed the alarm system.  We were expecting reporters to be

22  there.  That was the only reason that I was earlier than --

23  even the janitor wasn't there.

24  Q.    Okay.  And what time -- do you know exactly or

25  approximately what time that was?

26  A.    I don't remember.  It was dark and it was before 6

27  because usually our janitor starts 6, 6:30.  He wasn't there

28  yet.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   895

1   Q.   Okay.  At about 6:45 that morning, did you see Craig

2   Chandler come onto the campus?

3   A.   Yes, I did.

4   Q.   Did you see Mr. Chandler carrying anything?

5   A.   He had a grocery bag.

6   Q.   Okay.  Grocery bag.  Plastic?  Paper?

7   A.   Plastic, I believe.

8   Q.   What time does school normally start in the morning?

9   A.   8:30.

10  Q.   What time do you normally get to the campus?

11  A.   Around between 7 and 7:30.

12  Q.   Do you know what time Mr. Chandler would normally get

13  onto the campus?

14  A.   No.  That was my first week, or my second week in

15  administration, so prior to that, I didn't really have any --

16  you know, observing teachers coming or leaving.

17  Q.   Okay.

18  A.   Or near the office where we would see them.

19  Q.   All right.  So at about 6:45 in the morning you saw Mr.

20  Chandler come onto the campus carrying this grocery bag?

21  A.   Yes.

22  Q.   Were any other teachers on the campus at this time?

23  A.   No.  That was only him and Dan Deguara and I were on

24  campus.

25  Q.   Who is Dan Deguara?

26  A.   He's the director.  I can't remember his exact title,

27  but he's under the -- in the district office.

28  Q.   Okay.  So he's not somebody who would normally be on

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   896

1   campus?

2   A.   No.

3   Q.   No other teachers were on campus at that hour?

4   A.   Not that I'm aware of.

5   Q.   Okay.  You said that you saw him carrying a plastic

6   grocery-type bag.  Do you know what color it was?

7   A.   I don't remember.

8   Q.   Okay.  Did it appear to have anything in it?

9   A.   It had something, but I couldn't tell.

10   Q.   Okay.  Do you remember talking to Officer Pierce, Det.

11   Pierce right to my right?

12   A.   I have talked to him.

13   Q.   He might have looked a little different back then.  Do

14   you remember telling Det. Pierce that there appeared to be

15   something heavy in the bag?

16   A.   Yes, there was something in there.

17   Q.   Okay.  Did you and Mr. Deguara go to -- did you see

18   where Mr. Chandler went?

19   A.   To his classroom.

20   Q.   Did you go -- did you and Mr. Deguara go to Mr.

21   Chandler's classroom?

22   A.   I was coming back from making some copies, back into the

23   office.  My office space was Lyn's, Ms. Vijayendran's former

24   office.  I was heading back into my office and that's where

25   Dan was at.

26   Q.   So did you and Dan then go to Mr. Chandler's classroom?

27   A.   Yes.

28   Q.   Okay.  Do you have any idea how much time passed from

1  the time that Mr. Chandler came onto campus to the point at

2  which you and Mr. Deguara went to the classroom?

3  A.   I don't know the exact number of minutes that passed in

4  between.

5  Q.   Okay.  Could you give me an estimate?  Long time?  Short

6  time?

7  A.   It was a short time.

8  Q.   When you got to Mr. Chandler's classroom, was the door

9  open or closed?

10  A.   It was locked; closed and locked.

11  Q.   Closed and locked.  Do you know how those doors -- how

12  do the doors lock in those classrooms?

13  A.   You must unlock them from the inside with your key, or

14  any other key.  Any key locks or unlocks doors from the

15  inside.

16  Q.   From the inside?

17  A.   From the inside.  You could only unlock it from the

18  outside with the key.

19  Q.   Okay.  So you can lock it from the inside, but only

20  unlock it from the outside?

21  A.   No.  You can unlock it from the outside.

22  Q.   Okay.

23  A.   So let's say I have my own classroom, I could get in my

24  own classroom and open my own classroom.  However, if I'm in

25  the office and I need to lock that door, I can unlock it with

26  my key.  You could unlock any door from the inside with any

27  key.

28  Q.   I see.  Okay.  How would you -- can you lock the door

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   898

1    from the inside?

2    A.    Yes.

3    Q.    Okay.  Is it just like a push button?

4    A.    No, you use your key.  In fact, that's the only way you

5    could lock it from the inside.

6    Q.    Okay.  I think I got it now.

7           So you said that you found Mr. Chandler's classroom

8    door closed and locked?

9    A.    Yes.

10   Q.    How did you get in?

11   A.    Dan opened it with his key.

12   Q.    He has like a master key of some sort?

13   A.    I have a master key for that school, but I didn't open

14   it.  He has a district key that opens any of the school

15   doors.

16   Q.    Okay.  What did you see when you got into the classroom?

17   A.    Mr. Chandler was near his desk.

18   Q.    Did you see this -- the plastic grocery bag that you

19   described?

20   A.    I don't remember seeing it.

21   Q.    Did you see anything -- did you see anything else that

22   was out of the ordinary?

23   A.    He was moving -- well, once Dan told him that he needed

24   to leave, he started walking around the classroom.

25   Q.    Okay.  Walking around the classroom.  Did he do anything

26   as he was walking around the classroom?

27   A.    If I recall correctly, he asked if he could take

28   personal belongings, and he was told yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   899

1    Q.   Did you see him put anything into this bag that you

2    talked about?

3    A.   I don't remember.  He took some stuff.  He opened the

4    closet and his desk, and the teaching wall, there is like

5    shelves there, he took stuff.  I don't know what he took, and

6    honestly, I don't remember what he put it in, but he did --

7    he took some stuff.

8    Q.   Okay.  Did you tell Det. Pierce that you saw Mr.

9    Chandler pick up a bottle of Lysol and a container of Clorox

10   Handi Wipes and put those in the bag?

11   A.   I don't remember the exact brands at this point.  This

12   has been almost 18 months.  I remember seeing some cleaning

13   supplies taken.

14   Q.   Taken?

15   A.   They were on top of the shelf, you know, towards the

16   back of the room and he took them.

17   Q.   Took them out of the classroom?

18   A.   Um-hum, exactly.

19   Q.   Okay.  Did he open up cabinets and look in cabinets

20   while you were there?

21   A.   Yes.

22   Q.   Do you remember him taking anything from any of the

23   cabinets?

24   A.   He took some objects.  I don't remember what they were.

25   Q.   Nothing caught your attention?

26   A.   No.  It was really quick, so all of this happened very

27   quickly.

28   Q.   All right.  At that time, Mr. Chandler was escorted off

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   900

1  the campus?

2  A.   Yes.

3  Q.   Okay.

4       MS. FILO:  That's all I have, Your Honor.  Thank

5  you.

6       THE COURT:  Thank you.

7       Cross-examination?

8       MR. MADDEN:  Thank you.

9                    CROSS-EXAMINATION

10  BY MR. MADDEN:

11  Q.   Good morning -- I'm sorry -- good afternoon.  It's been

12  a long day.

13  A.   Good afternoon.

14  Q.   How long have you been at O.B. Whaley in any capacity?

15  A.   I completed my 11th year as employed with the Evergreen

16  School District.  Prior to that, I worked approximately two

17  years for another program.  So I have been 13 years total at

18  that site.

19  Q.   At O.B. Whaley?

20  A.   At O.B. Whaley School.

21  Q.   Thirteen years prior to today?

22  A.   Yes.

23  Q.   Okay.  So you were actually at O.B. Whaley before Mr.

24  Chandler was hired to teach there?

25  A.   Yes.

26  Q.   Okay.  Were you a teacher there at some time?

27  A.   Yes, I was a teacher there.

28  Q.   What grade did you teach?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   901

1    A.    Fourth and fifth.

2    Q.    Okay.  Then you moved into basically an administrative

3    career?

4    A.    I moved first into teaching literacy, and I did two

5    years of that prior to moving into administration.

6    Q.    Okay.  So you basically then had known Mr. Chandler as a

7    fellow teacher/professional for almost nine years prior to

8    this incident?

9    A.    Yes.  I met him since he was hired for the school.

10   Q.    Okay.  And are you a person that typically arrives to

11   school -- strike that.

12         When you were a teacher, did you typically go to

13   school early to prepare for the day, or did you get there

14   just before the day started?

15   A.    No.  Usually, I'm there earlier than at least an hour

16   before school starts.

17   Q.    So it was custom and habit while you were a teacher

18   anyway to get there at least an hour before school started?

19   A.    Exactly.

20   Q.    And you go to your classroom?

21   A.    Yes.

22   Q.    And would you spend that hour then preparing for your

23   teaching for that day?

24   A.    Yes.

25   Q.    Some teachers prepare the night before and some teachers

26   prepare the day of; is that correct?

27   A.    Yes.  It all depends on what is your preference.

28   Q.    Your preference was to go early and prepare that day for

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   902

1    what you were going to do?

2    A.    Yes.

3    Q.    You had your lesson plan, schedule, things like that?

4    A.    Yes.

5    Q.    Okay.  Now -- so school started -- the first bell was at

6    8:30?

7    A.    Some intervention courses start before, but officially

8    the school starts at 8:30 for all children.

9    Q.    Thank you for that clarification.

10           But generally speaking, for regular teachers the

11   school day starts at 8:30?

12   A.    8:30.

13   Q.    Okay.  So, then since you've known Mr. Chandler for

14   years or -- strike that.

15           You drove to school?

16   A.    I'm sorry.  Could you repeat that?

17   Q.    How did you travel to school?  By car?

18   A.    Yes.

19   Q.    Okay.  And in front of the school there is a faculty

20   parking lot; correct?

21   A.    Yes.

22   Q.    That's where all the teachers park?

23   A.    Correct.

24   Q.    And typically when you got there when you were teaching,

25   would your car be one of the first cars, or were there

26   typically other teachers there?

27   A.    There were some teachers who got there before me.

28   Q.    Mr. Chandler was one of those teachers; right?

1    A.   I don't remember.

2    Q.   All right.  You have no memory of him also being a

3    person who liked to prepare in the morning?

4    A.   Honestly, I don't remember.  You know, I get off my car

5    and go to my classroom.

6    Q.   Okay.  So you have no memory one way or the other

7    whether or not Mr. Chandler was a teacher who typically

8    arrived early in the morning before school?

9         MS. FILO:  Objection.  Asked and answered.

10        THE COURT:  Sustained.

11        MR. MADDEN:  Thank you, Your Honor.

12   BY MR. MADDEN:

13   Q.   Now, I want to ask you some questions about the locks

14   that -- I'm not sure I understand, but I may.  So the doors

15   into the classrooms are not standard locks, like residential

16   locks?

17   A.   No.

18   Q.   All right.  They are like keyed on both sides?

19   A.   Yes.

20   Q.   And I'm assuming that they are keyed on both sides

21   because maybe, for one reason, you don't want kids

22   inadvertently locking doors or teachers out or anything like

23   that; right?  It's a safety concern?

24   A.   It's a safety concern.

25   Q.   All right.  There is probably unfortunately the reverse

26   safety concern when locking it from the inside; right?

27   A.   I don't know.

28   Q.   Well, for example, a teacher like Mr. Chandler would

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   904

1   have a key to the outside of his door; right?

2   A.   Yes.

3   Q.   No other teacher would have that -- they couldn't get

4   into his classroom with their keys?

5   A.   Except the administration with the master key.

6   Q.   Exactly.  The administration at O.B. Whaley, and

7   apparently in the district there is a key that will open

8   every door in the district?

9   A.   Exactly.

10   Q.   Okay.  So on the other hand, if a teacher was in another

11   -- any other classroom, on the inside of any classroom, not

12   just theirs, but any classroom, their key to their own room

13   would open the interior door of every classroom; correct?

14   A.   It will lock it or unlock.

15   Q.   All right.  That's also a safety purpose; correct?

16   A.   Yes.

17   Q.   For example, should there be intruders at the school,

18   should there be an emergency, a teacher could go into a

19   classroom and close and lock the door?

20   A.   And lock the door.

21   Q.   All right.  So those are the two safety purposes for

22   that system; correct?

23   A.   Yes.

24   Q.   So you can't -- from the inside, you cannot lock that

25   door if you are a child; correct?

26   A.   Unless you have a key.

27   Q.   Exactly.  And if you are an adult, if you are a teacher,

28   you have to go across the classroom and put the key in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   905

1   door and lock it; correct?

2   A.   Yes.

3   Q.   All right.  Now, let's talk a little bit about the

4   windows.  We had an earlier witness, Ms. Montgomery, who is

5   retired, testified that the windows in the building that

6   contains Mr. Chandler's old classroom, 18, and

7   Ms. Montgomery's class, which I think was 19, there are two

8   more classrooms in that building; right?

9   A.   Yes.

10  Q.   And there are doors connecting those rooms that don't

11  have locks; right?

12  A.   They didn't have locks.  They do have locks now.

13  Q.   At the time Mr. Chandler was there, they did not have

14  locks?

15  A.   They didn't have locks.

16  Q.   All right.  Why has that change been made?

17  A.   Those rooms have been adopted by the YMCA after school

18  program, and the teachers didn't want children or other

19  adults to come into their classroom.

20  Q.   I see.  All right.

21          So the entire time that Mr. Chandler was at O.B.

22  Whaley, the door between his classroom and the other

23  classroom had no lock on it?

24  A.   That's my understanding.

25  Q.   All right.  Now, the windows at O.B. Whaley in that

26  particular building, and I guess all of the buildings, there

27  seem -- the windows seem to have been customized at some

28  point where glass was taken out and wood placed inside that;

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   906

1  correct?

2  A.   Well, since I got hired at that school, they have been

3  like that.  I don't know when that change happened.

4  Q.   The way they were on January 10th, day of Mr. Chandler's

5  escort from the campus, these windows were like that then;

6  right?

7  A.   Yes.

8  Q.   Had been the entire time he was the teacher?

9  A.   Yes.

10 Q.   Do you know why that happened?

11 A.   No.

12 Q.   All right.  Do you remember whether it had anything to

13 do with vandals in the neighborhood or anything like that?

14      MS. FILO:  Objection, Your Honor.  Calls for

15 speculation.

16 BY MR. MADDEN:

17 Q.   Does that help --

18      THE COURT:  Sustained.

19 BY MR. MADDEN:

20 Q.   Does that help you remember if I were to suggest they

21 were done?

22 A.   I wasn't there when the change happened by the district

23 office, so I can't really respond to that.

24 Q.   Okay.  That was before your time?

25 A.   Yes.

26 Q.   Okay.  So you remember seeing Mr. Chandler -- did you

27 see him drive up on the 10th, January 10th?

28 A.   No.  I saw him right outside K, the kindergarten

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   907

1    classroom, right on the side of the office.  I was coming

2    back from making copies, so he was already walking towards

3    his classroom when I saw him.

4    Q.    Assuming Mr. Chandler parked in the teacher's parking

5    lot, the most direct line would have been from the parking

6    lot right along the route where you saw him; correct?

7    A.    Yes.

8    Q.    All right.  And you remember him carrying a bag?

9    A.    Yes.

10   Q.    You don't remember the size of the bag, do you?

11   A.    It's like a regular grocery bag, plastic bag.

12   Q.    Well, can you give me an approximation of the size?

13   A.    It was pretty standard, you know, like where you get at

14   Safeway, or just a grocery bag.

15   Q.    Okay.  Could you put your hands out and sort of frame it

16   in for me, tell me what you are talking about?  I mean, when

17   I think of a Safeway bag, I'm thinking of a paper bag.

18   A.    No, it's not.  It was like ten-by-eight inches or so.

19   It was a regular bag, but what it had -- it was like

20   something, you know, in that frame (indicating).

21   Q.    Typically it's a standard white plastic bag; right?

22   A.    Yes.

23   Q.    Went over to Zanotto's, you get a sandwich, you get one

24   of those; right?

25   A.    Yes.

26   Q.    You have no idea what was in that bag; right?

27   A.    No.  I couldn't see.

28   Q.    All right.  There would be nothing unusual about a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   908

1   teacher carrying a plastic bag to school in the morning,

2   perhaps?

3   A.    No.  Some people carry stuff in there.  They bring stuff

4   that they purchase or perhaps their lunch.  It's not

5   untypical to see that.

6   Q.    Okay.  So in the time that went by from you talking to

7   Dan until you and Dan going to Mr. Chandler's class was, I

8   think in your testimony, a short time?

9   A.    It was.

10  Q.    Would that be perhaps less than ten minutes?

11  A.    I believe it was less than ten minutes.

12  Q.    Perhaps less than five minutes?

13  A.    I don't think so.

14  Q.    Okay.  And so you walked together; correct, to the door?

15  A.    Yes.

16  Q.    Mr. Deguara opened the door; right?

17  A.    Yes.

18  Q.    He knock first or anything?

19  A.    I don't remember if he knocked or not.

20  Q.    Okay.  And so he went in first because he had the key?

21  A.    Yes.

22  Q.    You were right behind him?

23  A.    Um-hum.

24  Q.    Lights were on?

25  A.    Yes.

26  Q.    Mr. Chandler, was he seated at his desk?

27  A.    He was standing.

28  Q.    He was standing then?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  909

1  A.    Yes.

2  Q.    All right.  Tell me where he was standing.

3  A.    Near his desk.

4  Q.    All right.  So I'm going to ask you to look at the

5  photograph just off your right shoulder.  Actually, you could

6  look at both.  I want to identify them for the record.

7          MR. MADDEN:  May I approach, Your Honor?

8          THE COURT:  Yes.  Thank you.

9  BY MR. MADDEN:

10  Q.    Want I'm pointing out at the easel is A-1, that appears

11  to be Mr. Chandler's desk; right?

12  A.    Yes.

13  Q.    Were you looking at this one?

14  A.    Yes.

15  Q.    This also depict -- this is a different angle of it?

16  A.    Yes.

17          MR. MADDEN:  For the record, that's A-2.

18  BY MR. MADDEN:

19  Q.    So when you say he was standing near his desk, do you

20  have any memory?

21  A.    I believe he was in this area here.  In this area here.

22  Q.    All right.  Indicating between the desk and the yellow

23  post-it one?

24  A.    Yes.

25  Q.    Okay.  So within a foot or two of his chair?

26  A.    Yes.

27  Q.    Okay.  Did you see anything on his desk?

28  A.    He had many things.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   910

1    Q.    Do you remember seeing anything on his desk?

2    A.    There was stuff on his desk.

3    Q.    By stuff, like papers?  Books?

4    A.    Yes.

5    Q.    Okay.  I see a container here of some sort.  Do you know

6    what that is?

7    A.    Looks like a hand sanitizer.

8    Q.    Okay.  Do you remember if that was there when you walked

9    in?

10   A.    I don't.  I don't remember.

11   Q.    I don't expect you to.  I'm just asking the question.

12   A.    I don't remember.

13   Q.    Then this appears to be perhaps a water bottle.  You

14   don't have any memory of that either; right?

15   A.    No.

16   Q.    Okay.  And Mr. Chandler wasn't cleaning anything or

17   anything like that at that point, was he?

18   A.    No.  He grabbed the stuff, but I didn't see him cleaning

19   when I first --

20   Q.    Let's do it a question at a time.  He was right next to

21   his desk and there were documents, papers, teacher stuff on

22   his desk; right?

23   A.    Yes.

24   Q.    It appears as if he had been working; right?

25   A.    I cannot say that.  He was standing, so I don't know if

26   there was stuff there, but I never went into that classroom.

27   I stood on the frame of the door, so I couldn't tell.

28   Q.    Okay.  But if he was preparing for a class, it would

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   911

1   have been normal for a teacher to have been at his desk and

2   documents and books and papers; right?

3   A.   Depends on who he's preparing for.

4   Q.   But there is only one desk in the class; right?

5   A.   Yes, there is only one teacher's desk.

6   Q.   By the way, when you open that door to Mr. Chandler's

7   class, when you open up you are looking at his desk right

8   across the room; right?

9   A.   Yes.

10   Q.   Now, Mr. Deguara announced to him that he was on

11   mandatory administrative leave.  He had to leave the school

12   and be escorted; right?

13   A.   Yes.

14   Q.   And then Mr. Chandler remained standing; right?

15   A.   He asked if he could remove personal belongings from the

16   classroom.

17   Q.   And did either you or Mr. Deguara respond to that?

18   A.   Dan did.  Mr. Deguara did.

19   Q.   Do you remember what he said?

20   A.   He said yes.

21   Q.   Okay.  And then Mr. Chandler started gathering some

22   things, but you don't really remember what it was; right?

23   A.   No.

24   Q.   Some things you remember, some things you don't

25   remember; is that fair?

26   A.   Yes.

27   Q.   Okay.  But there were items that he removed from the top

28   and the -- or the inside of his desk?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   912

1    A.    He opened the drawer of his desk.

2    Q.    Okay.  Did he remove anything from the drawer?

3    A.    He removed something from there.  He removed something

4    from the closet.

5    Q.    All right.

6    A.    Behind his desk.

7    Q.    I have difficulty with the description of it as a

8    closet.  I think it's a closet, but it's been referred to as

9    a cabinet.  I'm pointing to this portion of A-2 that has a

10   sign in white that says "group prizes."  Is that what you are

11   referring to as his closet?

12   A.    Yes.

13   Q.    Okay.  And then I'm going to point to A-1, this shows

14   the closet; correct?

15   A.    Yes.

16   Q.    All right.  And so then if he went to his closet or his

17   cabinet, that would necessarily mean that he had to have

18   opened the doors?

19   A.    Yes.

20   Q.    Okay.  So that when he was standing there, the doors to

21   his closet were closed when you walked in?

22   A.    Yes.

23   Q.    Okay.  Did you get close enough to see him taking

24   anything from the cabinet?

25   A.    No.  He never moved from the frame of the door.

26   Q.    But did you see him -- but the closet where the doors

27   were open, did they block your view of seeing in the closet?

28   A.    Yes, they do.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   913

1   Q.   So you don't know whether or not he took any items from

2   his cabinet?

3   A.   He put something in the bag.  I can't tell what it was.

4   Q.   Okay.  So you remember him taking something from his

5   desk and something from his closet?

6   A.   And the teaching wall.

7   Q.   And the teaching wall.  So there were three areas from

8   which he obtained items and put them in the bag?

9   A.   The cleaning supplies, he took them -- they are right

10  there where you see the black pot.

11  Q.   The black pot?

12  A.   Right here, just underneath, like on the counter top.

13  Q.   Okay.  Let me see if I could get a better picture of

14  that.  By the way, this photograph, A-6, shows the closet

15  with the doors open; right?

16  A.   Yes.

17  Q.   Okay.  And have you ever looked at this photograph

18  before -- ever looked in his closet?

19  A.   Before?

20  Q.   Yes.

21  A.   No.

22  Q.   Before today -- I won't ask you any questions about it

23  then.

24  A.   I saw it.  We cleaned it up, but it was not until after.

25  Q.   When you say you cleaned it up, what do you mean?

26  A.   We emptied his classroom.

27  Q.   Everything in his classroom?

28  A.   Everything in his classroom.

1    Q.    And when you say "we," who is "we"?

2    A.    There was Lea Peery and Kathy Sheppard, who is the

3    assistant superintendent, and there was Maria

4    (unintelligible), who is the regular noon duty supervisor,

5    and one of the custodians.

6    Q.    Do you remember when you did that?

7    A.    This was after the San Jose Police Department authorized

8    us to clean the room.  It was a Saturday morning, but I can't

9    remember the date.

10   Q.    Was it a Saturday morning reasonably close to January

11   the 10th, or was it weeks or months later?

12   A.    I will say it was days or weeks.  It was not until we

13   got authorization to do so.

14   Q.    All right.  And so you emptied everything from the

15   classroom and put them in what?  Containers?  Boxes?

16   A.    We put it in boxes, and everything was taken by the

17   district office to the warehouse.  That was my understanding.

18   Q.    All right.  So all of the books, all of the papers,

19   everything in the drawers?

20   A.    Everything was taken out.  That was an empty room after

21   that.

22   Q.    You took everything.  How many boxes did you have?

23   A.    I can't remember.  There was many of them.

24   Q.    Maybe 60?

25   A.    I will say -- I don't remember, you know.  The district

26   must have a record of it.  All of them were numbered, so --

27   Q.    Were they put on a big pallet out of that --

28   A.    We left them near the door by the -- where the hangers

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   915

1    are at, we just did a huge pile, and then the district

2    maintenance person came in and took them.

3    Q.   I'm still trying to go back and find a better picture of

4    that black pot over here.  I'm not sure if I have one.  Maybe

5    this photograph is something different.  This is A-8, and

6    would this be the area where you --

7    A.   We left all of the boxes there.

8    Q.   That was basically filled?

9    A.   They were numbered with his name and numbered how many

10   boxes.

11   Q.   Okay.  So as far as you're concerned, you are satisfied

12   that -- with the exception of whatever items Mr. Chandler

13   took with him, the personal items, everything else that was

14   left behind was put in boxes?

15   A.   That's my understanding.

16   Q.   Went to the district office?

17   A.   Yes.

18   Q.   All right.  Let me keep looking here.  You called this a

19   wall back here, something -- I forgot what you called it.

20   I'm looking at -- sorry.  I'm referring to A-1, this entire

21   back wall of the classroom, did you call it something?

22   A.   No.  I said teaching wall.  That is where the white

23   board is at.  It has some shelves and closet space behind it.

24   Q.   You meant -- but when you said the teaching wall, you

25   mean the front of the class?

26   A.   Yes.  That picture doesn't show that.

27   Q.   I was 180 degrees wrong.

28        So this would be the teaching wall?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  916

1   A.   That one.

2   Q.   Okay.  Thank you.

3        A-12; right?  That's the teaching wall?

4   A.   Yes.

5   Q.   This also appears to have had --

6   A.   Shelves underneath.

7   Q.   Yeah.  And did Mr. Chandler walk around the whole room,

8   kind of opening and keeping --

9   A.   He went around, yes.

10  Q.   How long you think he was in the classroom gathering

11  things before he left the school?  You said it was a short

12  time?

13  A.   It was less than five minutes.

14  Q.   So there wasn't a long time frame to take anything?

15  A.   No.

16  Q.   Appeared to be in kind of a daze?

17  A.   I don't know.

18  Q.   I mean, like he would open everything and kind of stand

19  there and look at it?

20  A.   It was -- initially, it was just fast, randomly looking

21  at different parts of his room.

22  Q.   Okay.  So I think this is probably the best photograph.

23  Get back to our conversation.  I don't think there is a

24  better one.  Probably good enough.  This would be A-7.

25       You remember seeing him pick up what is loosely

26  referred to as cleaning supplies; right?

27  A.   (Shakes head up and down.)

28  Q.   Those were somewhere in the area of this black pot?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   917

1    A.    On the counter top right by the -- right there.

2    Q.    Where I'm pointing?

3    A.    Yes.

4    Q.    In other words, there appears to be a cabinet with a

5    Formica-type cabinet top with a book on it, two red plastic

6    boxes, a black pot, some sort of file holder with books or

7    papers in it; right?

8    A.    Yes.

9    Q.    There appears to be enough room on the right-hand corner

10   there to hold the items you are talking about?

11   A.    Exactly.

12   Q.    That's where those were when you walked in, I suppose?

13   A.    They were there already.

14   Q.    Okay.  They are already there?

15   A.    Yes.

16   Q.    Okay.  So during the process of taking whatever he took,

17   he picked up a box of wipes?

18   A.    A bottle type of --

19   Q.    Okay.  And again, when you walked in, he wasn't in the

20   process of cleaning anything; right?

21   A.    No.

22   Q.    And you certainly didn't smell the smell of Lysol or

23   Clorox or anything like that, did you?

24   A.    Not from the door frame where I was standing.

25   Q.    Right.

26   A.    I never made it into his classroom.

27   Q.    Okay.  Let me just review my notes, Mr. Lara.  You may

28   be done, but if you could just give me a moment.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   918

1          Thank you, Mr. Lara.

2          MR. MADDEN:  I have no further questions.

3          THE COURT:  Redirect, Ms. Filo?

4          MS. FILO:  Just one.

5                    REDIRECT EXAMINATION

6    BY MS. FILO:

7    Q.   Mr. Lara, I want to make sure I'm clear.  You said that

8    you did see him pick up the cleaning supplies and put those

9    in the bag.  You just don't remember as you sit here today

10   the brand; is that right?

11   A.   Yes.

12   Q.   Okay.

13          MS. FILO:  That's all I have.  Thank you.

14          MR. MADDEN:  Thank you, Your Honor.

15          THE COURT:  Recross on that area?

16          MR. MADDEN:  No, Your Honor.

17          THE COURT:  Mr. Lara, thank you very much, sir.

18   You are excused and free to leave.  You may step down.

19          THE WITNESS:  Thank you.

20          THE COURT:  Ladies and gentlemen, as I mentioned

21   before our break, we're going to take a recess at this time.

22   I will order all members of the jury to report to the jury

23   assembly room on the second floor tomorrow morning at 9:00

24   a.m. and we'll continue with the trial.

25          Please remember to leave your notebooks on your

26   chair.  They will be here when you return.  Thank you very

27   much.

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   919

1    (Whereupon, the jurors were excused and the

2  proceedings were had outside the presence of the jury.)

3    THE COURT:  Record will reflect the jury has left

4  the courtroom.  Both counsel and Mr. Chandler is present in

5  the courtroom.  The juror has returned.  That's fine.

6    THE JUROR:  I forgot something.

7    THE COURT:  That's fine.  The juror that returned

8  has left the courtroom.  Again, both counsel and Mr. Chandler

9  are present in the courtroom.  And I believe, Ms. Filo, you

10  wanted to raise an issue out of the presence of the jury.

11    MS. FILO:  I did, Your Honor.  I actually -- I now

12  have two issues to raise with the Court.  But the first is

13  Mr. Madden made a reference in his opening statement to the

14  police report that was generated as a result of an allegation

15  by a woman named Annie Doi Pham, D-o-i.  Last name Pham,

16  P-h-a-m.  He made a reference in his opening statements that

17  that report was, quote, buried by the San Jose Police

18  Department.

19    And it's my understanding that Mr. Madden feels

20  this area is appropriate for -- is appropriate to be explored

21  in the context of this trial.  And I am making a motion at

22  this time to exclude any reference to discovery issues that

23  officers, if they should be called, not be questioned about

24  them, and to make a specific motion that he be prevented from

25  making any argument whatsoever that reference any discovery

26  inappropriate with respect to that report or any other

27  report.  If there are any issues with respect to discovery,

28  they are not to be raised with the jury.  They should be

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   920

1   addressed to the Court and resolved by the Court.

2           THE COURT:  Okay.  Thank you.

3           Mr. Madden, any response?

4           MR. MADDEN:  I'm not exactly sure where the motion

5   is.  I take it, there are no moving papers?

6           THE COURT:  Correct.  We discussed this informally,

7   and at least at sidebar, as I understand it, counsel could

8   correct me, during this investigation an officer interviewed

9   Ms. Pham.  She basically alleged that she had sex with Mr.

10  Chandler in the classroom.  The information I had is that it

11  was not consensual.  I understand that you have investigation

12  that sheds more light on that, and the officer that took this

13  report used a different case number in the investigation, or

14  at least the interview of this particular witness, which was

15  different than the police report case number by you by the

16  San Jose Police Department in the alleged child molest

17  investigation.  And as I understand it, that particular

18  report was not turned over to the defense.

19           It's my understanding that Mr. Madden, he became

20  aware of this in some manner, made a request for that police

21  report.  And as I understand it, after the request, Ms. Filo,

22  you provided the report?

23           MS. FILO:  Correct.

24           THE COURT:  Okay.  I want to get it chronologically

25  correct, and I'm not sure the date when that report was

26  turned over to Mr. Madden.

27           MS. FILO:  So, Your Honor, just for clarification

28  sake, the police report was generated on or about January

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   921

1   19th, 2012.  Mr. Madden had Ms. Pham's interview on or about

2   January 17th, 2013.  He sent me a copy of his investigator's

3   report somewhere in -- I believe it was around the first week

4   of May 2013.  And upon receiving that report, his

5   investigator's report, having a conversation with Mr. Madden,

6   I provided the January 19th report to Mr. Madden.

7           MR. MADDEN:  I would like to be heard on that.

8           THE COURT:  Sure.

9           MR. MADDEN:  That is consistent with my

10   recollection for some points, but not all.

11           THE COURT:  Okay.

12           MR. MADDEN:  The dates were approximately right.  I

13   believe I sent my investigator's report concerning her

14   interview of Ms. Pham on or about the last third of April.

15   But since I don't have my file with me, I'm not prepared to

16   represent that with certainty, but it's not that far from the

17   date Ms. Filo was suggesting.  It was certainly something

18   that I was obliged to -- since she was going to be on my

19   witness list, it was material that I had to turn it over to

20   the prosecutor, and I did.

21           There was not an immediate response from the

22   prosecutor's office.  In fact, I was surprised that there was

23   no response because I would have thought the information that

24   I sent would have prompted an immediate phone call, and I

25   don't think it was for several weeks that we had a phone

26   call, the phone conversation.  And I think I expressed my

27   surprise that she hadn't called me to talk about this report,

28   and she made a reference during that phone call of:  What did

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   922

1   you mean?  The crazy lady?  She said:  That's all in the

2   report.  And I said:  What did you mean crazy lady?  And it's

3   not in my report that I have.  And there was this pause or

4   this silence on the phone.

5            At the end of that pause, at the end of that

6   silence, I asked Ms. Filo to -- I told her again that it was

7   not in my discovery packet, which consisted at that time of

8   approximately 406 or 412 pages of police reports and

9   documents, and I asked her to fax me over the report.  And

10  she did, but it was not -- it was a different police report

11  number and it was not connected with this case.  I've had

12  additional conversations with Ms. Filo, and I don't want to

13  speak for her.  I'm more than willing to have her recite the

14  facts as she recalls them.

15           But my concern, and it was legally more my concern,

16  quite frankly, it was either that in May of last year, more

17  than a year ago, the People at the preliminary examination

18  presented evidence from -- somebody from the lab, a DNA

19  expert, who testified concerning identifying semen stains of

20  Mr. Chandler in the classroom.  And at the time of that

21  preliminary examination, the People -- the police were well

22  aware of the identity of Ms. Pham, and they submitted the DNA

23  evidence to Judge McKay McCoy for the sole purpose of

24  creating an inference that the semen stain in the classroom

25  was the result of Mr. Chandler molesting one or more of these

26  five complaining witnesses.  I was, and remain angered, that

27  they could allow that inference to be made, knowing there was

28  another inference that could be drawn that the semen stain in

1  the classroom could be as the result of consensual sexual

2  intercourse, or any kind of sexual intercourse with an adult

3  female.

4         And that knowledge, as I understand it today, it's

5  my understanding, and I may be wrong, this is from my

6  conversations with Ms. Filo, that there wa a discussion

7  between the officer who took that statement, who was Officer

8  Latrendress, I think is the pronunciation of her name.  It's

9  L-a-t-r-e-n-d-r-e-s-s.  I think her first name is Tina.  Was

10 one of the investigators, one of the active investigators of

11 her case, and her name appears on several locations in this

12 report in terms of interviewing witnesses.  That's my

13 understanding that -- I shouldn't say it's my understanding.

14 It's my assumption -- it would be hard for me to believe that

15 if the report that -- let me strike that.  Go back a sentence

16 or two.

17        It's my understanding that Ms. Latrendress

18 inadvertently learned of this allegation of sexual

19 intercourse with Mr. Chandler with Ms. Pham because Ms. Pham

20 is the mother of one of the children who were interviewed in

21 this case.  Not one of the complaining witnesses, but one of

22 the children who was interviewed.  And that she apparently

23 volunteered in a way that apparently was not very credible to

24 Officer Latrendress, and I'm assuming to Officer Pierce, and

25 that report was not made part of this case.

26        It was a very brief -- although I don't have it

27 with me.  I think it's less than a one-page report, I

28 believe.  It's a couple of paragraphs that was audio

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    924

1    recorded.  I think it was a 12-minute interview, and she

2    gave -- she claimed that she had been raped in Mr. Chandler's

3    classroom at back-to-school night.  But I would submit that I

4    don't think was very credible.  I don't think it was very

5    credible to the police.

6            THE COURT:  Let me interrupt you, Mr. Madden,

7    before I hear from Ms. Filo.  You made a lot of comments.

8    You made your understanding of what had occurred and made

9    some assumptions.  But based on your understandings and

10   assumptions, what are you asking for?  What kind of remedy

11   are you asking for?

12           MR. MADDEN:  Number one, this is not my motion at

13   this point.  This is Ms. Filo's.  She's asking that I not

14   refer to it.

15           THE COURT:  Right.  And I need a response as to

16   that.

17           MR. MADDEN:  What I'm looking for is that I think

18   that to the extent, if any, that there was intentional

19   burying of this report, I should be able to comment on that.

20   That is fair game as a defendant in this case.

21           THE COURT:  Okay.

22           Ms. Filo, you want to respond?

23           MS. FILO:  Sure.  So, Judge, I mean, these are --

24   first of all, I will tell you that Officer Pierce and every

25   other police officer in the San Jose Police Department will

26   testify that a separate case number will be pulled for an

27   entirely different crime, even though it originates out of

28   another investigation.  If it's a robbery that resulted in a

1  burglary, the burglary will have a separate case number than

2  the robbery.  I mean, there is just -- it will just not be

3  the evidence ever that this would have been assigned the same

4  case number.  So happy to prove that if the Court requires

5  it.  But I could assure you, as an officer of the court, and

6  my offer of proof to you, is that that will be unequivocally

7  the way it's done in every single case.

8          More importantly, there are two issues to deal

9  with, two lines of analyses:  1054 and *Brady*.  This is

10  clearly without a doubt not a 1054 violation.  This is not a

11  statement of a witness, it's not a writing, it's not a

12  declaration, any of the things that 1054 will require.  The

13  only issue is whether or not this was *Brady* material.

14          First and foremost, until two weeks ago, three

15  weeks ago, there was no case law in the State of California

16  that suggested that *Brady* was actually a pre-prelim right.

17  *Brady* under the Federal Constitution, under Prop 115, has

18  always been a due process trial right that the defendant has.

19  So there is some very recent case law that suggests that

20  there is a pre-prelim *Brady* right.  It didn't exist at the

21  time of this prelim, for starters.

22          Secondly and more importantly, the People have no

23  obligation to put on exculpatory evidence at a prelim.  We

24  don't have an obligation to put it on.  This wasn't a grand

25  jury proceeding.  We don't have the *Johnson* obligation.  We

26  don't have the obligation to put on exculpatory evidence.  We

27  put on the evidence to establish probable cause.

28          Mr. Chandler at the preliminary hearing chose to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  926

1   put on no evidence.  That's his right.  He's totally entitled

2   to do that.  But the idea that the defendant had an

3   alternative explanation for semen being found in the

4   classroom, i.e., the defendant himself had sex with an adult

5   woman, is uniquely within the knowledge of the defense.  They

6   know about it.  Of course they know about it.  He did it.  So

7   it is absurd to me that we would have to produce a report

8   pre-prelim that would suggest that the -- tells the defendant

9   what he knowingly did.

10        So now we're at trial, and the question is, is

11   there some *Brady* violation?  I would challenge counsel to

12   find a single case, any case in the State of California, or

13   anywhere, which suggests that information that the defense

14   has, and has had since January of this year -- actually, has

15   had since the very day Craig Chandler had sex with this woman

16   in the classroom, because it's in his head, he's the

17   defendant, they've had that knowledge since that day, but

18   certainly since January of 2013 constitutes any type of *Brady*

19   violation.

20        What they want to do is suggest we committed some

21   misconduct by not providing them with the report.  We didn't

22   have the information that it was *Brady*.  It was inconceivable

23   to any of us that a rape allegation constituted exculpatory

24   evidence, but it doesn't matter.  It doesn't matter

25   subjectively what I thought or what anyone in my office

26   thought because the defendant had the information.  There can

27   be no *Brady* issue when the defense has the information.

28   Doesn't matter where they get it from.  If they have it, no

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   927

1  *Brady*, end of inquiry, end of discussion for any purposes at

2  this trial.

3         THE COURT:  I have a question.  Mr. Madden made

4  reference to a conversation he had with you over the phone

5  about, I think his investigation or something, and he

6  mentioned that your response -- he made reference to "a crazy

7  lady," but he also mentioned that you said, "It's in the

8  report."  And my question is, do you recall that, and what

9  did you mean by that?

10        MS. FILO:  I do recall.  I mean, I recall the

11 conversation and I recall saying "the crazy lady," and I did

12 remember that there was a report out there.  And to be honest

13 with you, at the time that I had that conversation with Mr.

14 Madden, with 400-some-odd pages of discovery just in police

15 reports alone, I just didn't remember whether that had been

16 produced to him or not.  I assumed that it had, but I didn't

17 know the answer to that.

18        THE COURT:  That's the reason I asked that

19 question, because your comment seems to create a reasonable

20 inference that he had it and that's why I asked that

21 question.  I'm assuming you were done?

22        MS. FILO:  Yes.

23        THE COURT:  Mr. Madden.

24        MR. MADDEN:  Your Honor, *Brady* has nothing do with

25 the defense.  It has everything to do with the prosecution

26 and you only analyze it from that standpoint.  I don't have a

27 dog in that hunt.  It's Ms. Filo's or her office's

28 obligation, period.  She's dead wrong on that.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    928

1          What I'm troubled by is that, number one, I have to

2     put this in context for you.  Ms. Pham said nothing about a

3     rape when she first talked with my investigator.  My

4     investigator generated a written report, brought it out to

5     her to get to her to read it, to date it, and to sign it as

6     being accurate, an accurate reflection of what she told my

7     investigator when my investigator took the statement.

8               THE COURT:  What did she tell the police officer?

9               MR. MADDEN:  Hang on.

10              THE COURT:  I mean, what she told your investigator

11    to me, as far as *Brady*, I don't see how that is relevant to

12    this issue.

13              MR. MADDEN:  I don't understand -- well, let me

14    finish.

15              THE COURT:  Okay.

16              MR. MADDEN:  I'm upset because the People through

17    gross negligence -- I'm going to withdraw that comment.

18    That's inappropriate because I don't have enough information.

19              THE COURT:  Okay.

20              MR. MADDEN:  But I'm troubled when the police or

21    the District Attorney's Office, or both, are not providing me

22    with information that is potentially exculpatory to my

23    client, and obviously this information is potentially

24    exculpatory.

25              THE COURT:  Okay.  Let's assume --

26              MR. MADDEN:  And -- hang on.  My investigator does

27    not have a statement -- she has a statement, but it does not

28    talk about rape, and then she goes back to sign it and makes

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   929

1    some changes that she felt like it was rape, but it was

2    really not very convincing.  I would submit to the Court

3    about as convincing as Ms. Pham was to Officer Latrendress

4    concerning that first part about being raped.

5              But I do not believe -- well, I know that the

6    attorneys who represented Mr. Chandler at the time, I think

7    Ms. Filo will agree, did not have that report.  How it just

8    seems completely wrong to me that they are bringing in a DNA

9    expert, asking a lower court judge to draw an inference from

10   DNA evidence when they either knew or clearly should have

11   known that they had evidence of a statement of a different

12   inference that could be drawn from that, that they asked to

13   be drawn from the DNA expert.  Does that make sense?

14             THE COURT:  It does make sense.  But you have all

15   of this information now.  You had it before the case was

16   assigned to trial.  You have this woman on your witness list.

17   As I understand it, she's a part of your defense and will be

18   called.  So even --

19             MR. MADDEN:  Let me interrupt you.

20             THE COURT:  Even if I conclude there was a *Brady*

21   violation, and I'm not even suggesting there was any bad

22   faith here on the part of Ms. Filo, but let's assume that I

23   accept that point, I don't see how at this point Mr.

24   Chandler's right -- due process right to a fair trial has

25   been impacted in any way.

26             MR. MADDEN:  This isn't my motion.  All right.

27   This is the People's motion.

28             THE COURT:  I know, and that was very crucial to me

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   930

1    to decide what you will be allowed to ask the officer about

2    this.  I mean, you are trying to suggest that there was some

3    wrongful conduct on the part of the prosecution; that they

4    didn't disclose this information to you, and basically your

5    words that this report was buried.  And, quite frankly, based

6    on everything I heard at this point, I don't think that's

7    appropriate.  I think it's very fair for you to ask the

8    officer that took the report:  Did you take this report?  For

9    example, what case number?  Did you assign a different case

10   number?  Why did you use a different case number?  And

11   explains why he does that.

12          MR. MADDEN:  She.

13          THE COURT:  Or she did that.  And beyond that, I

14   don't see how any further questions or suggestions have an

15   impact on Mr. Chandler's right to a fair trial because his

16   defense is ready and prepared to go forward, and I think it

17   was ready before the case was even assigned to trial.  And if

18   it had not been, you would obviously be allowed to have a

19   continuance for more time to prepare.

20          So that's my concern, Mr. Madden.  I appreciate

21   you're angry and your dealings with the prosecutor's office

22   and maybe San Jose Police Department may be impacted in some

23   manner.  But what is the remedy here, assuming there was any

24   wrongdoing that you articulated?  Because that's *Brady*.

25   Right on point, *Brady* basically says, what's the due process

26   violation for a fair trial?  And it's just not present here

27   that I could see.

28          MR. MADDEN:  I'm prepared to submit it, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   931

1          THE COURT:  Okay.  So that's the Court's ruling.  I

2   will rule that there will be no suggestion that reports were

3   buried, they were trying to hide things.  I think it's fair

4   to bring out the fact that a different police report number

5   was used.  I mean --

6          MR. MADDEN:  That's all that I could do?

7          THE COURT:  What else do you want to do?

8          MR. MADDEN:  What does that get me?

9          THE COURT:  Well, it gets you --

10          MR. MADDEN:  Nothing.

11          THE COURT:  But see, what you want is this

12   witness -- availability of this witness.  This witness to

13   testify, the evidence to present, as a part of your defense,

14   that Mr. Chandler had sex with this woman and that is an

15   alternative or another explanation why there is semen on

16   these chairs.

17          MR. MADDEN:  See, what's going to happen when that

18   comes in, the People will -- I guarantee you they will argue

19   he raped her.  More dirt to throw on Mr. Chandler.  They

20   never believed that he did it.

21          THE COURT:  And that's why initially this wasn't

22   really relevant, or they would be allowed to call her as a

23   witness in the trial.

24          MR. MADDEN:  They are not calling her.

25          THE COURT:  Exactly.

26          MS. FILO:  That's -- it's not my witness.

27          MR. MADDEN:  Yes, but they are going to question

28   her and suggest that she was raped when they don't believe

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   932

1    she was.

2              THE COURT:  Well, I don't know what they believe,

3    but the circumstances of the sexual encounter, I think, are

4    relevant because there has to be some sort of framework of,

5    like, where the sex was happening, how it occurred, what

6    parts of the classroom.  That has to have some impact

7    relating to the semen evidence.  And again, I don't know what

8    the police report says or the investigation report, but it's

9    a collateral issue beyond the sex.  But I think in fairness

10   to both sides, there has to be some cross in this area.  But

11   for the defense calling her, and I think it's reasonable

12   under the circumstances, this evidence would never be

13   allowed.  I would keep it out if the People tried to bring it

14   in.

15             MS. FILO:  Right.  That's my point, Your Honor.

16             THE COURT:  I appreciate, Mr. Madden, that this

17   whole issue and the history is upsetting to you and

18   frustrating, but that's the Court's ruling, and it's over

19   your objection that you should be allowed to go in more

20   detail about the facts and circumstances of how this report

21   was generated and ultimately you received it.

22             MR. MADDEN:  Thank you, Your Honor.

23             MS. FILO:  Thank you, Your Honor.  I have one

24   other, I hope, quick issue to resolve.  I confirmed with Det.

25   Pierce.  While Armando Lara was testifying -- as the Court

26   knows, Det. Pierce did interview Mr. Chandler on the 9th --

27   on January the 9th.  It was a two hour or so interview,

28   something like that.  The interview concluded and was over.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    933

1    It was apparently after-hours at the police department, so

2    Det. Pierce actually had to walk Mr. Chandler out of the

3    building.  As he walked him out of the building, he told Mr.

4    Chandler, and it is reflected in this report, that he was not

5    to go onto the campus and he was in fact supposed to call the

6    principal in the morning and get further instructions.

7              MR. MADDEN:  Your Honor, if the People are

8    suggesting they are going to offer that testimony, I would

9    like to be heard.  To begin with, Officer Pierce has no

10   authority to tell anybody where to go to work, number one.

11   Mr. Chandler had no obligation -- Officer Pierce has the

12   authority to investigate or to arrest, but that's it.  That

13   directive means nothing and is not relevant to this case.

14   His authority -- he has no authority to make.  Not only that,

15   it's my understanding that Mr. Chandler was represented by

16   counsel at that time who told him to go to work the next

17   morning.  So I just object to that coming in.  It's just --

18   he has no authority to make that.

19             MS. FILO:  Your Honor, it's an active crime scene

20   at that point, and he has every authority to tell people who

21   can and cannot enter an active crime scene.

22             MR. MADDEN:  Not when you take them outside and

23   they are free to leave.  It is -- was it blocked off?  I

24   mean, come on, crime scene?

25             MS. FILO:  What do you mean, crime scene?  That's a

26   crime scene.  The police have --

27             MR. MADDEN:  It wasn't marked off as a crime scene.

28             MS. FILO:  It's a classroom.  It's locked.  He

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   934

1   spoke to the principal that night and told her --

2            MR. MADDEN:  There is no evidence that Mr. Chandler

3   received any information, any directive from anybody at the

4   district or the school about not coming to work in the

5   morning, and that's why his attorney told him to go to work

6   in the morning.

7            THE COURT:  And specifically, what did Officer

8   Pierce tell him after the interview?

9            MS. FILO:  What he told him is:  Do not go back

10  onto the campus.  You should contact the principal in the

11  morning to get further instruction about what to do with your

12  employment, but do not go back onto campus.

13           THE COURT:  Okay.  Thank you.  I'm going to give

14  this some thought.  I will take it under submission.  I won't

15  make any ruling without, you know, consulting with counsel,

16  but --

17           MR. MADDEN:  In effect, the People are seeking to

18  get evidence of this order, this phantom order, from a person

19  who has no authority to make it, and asking the jury to draw

20  a negative inference that Mr. Chandler had some nefarious

21  reason for going to work the next morning.  That's just not

22  the case and this should not be allowed.

23           THE COURT:  Thank you.  We'll be in recess until

24  tomorrow morning at 9:00 a.m.  I will order counsel here and

25  Mr. Chandler here at 9:00 a.m. and we'll continue.  Thank

26  you.

27           (Whereupon, the Court took the evening recess.)

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   935

1   STATE OF CALIFORNIA        )
                               )
2   COUNTY OF SANTA CLARA      )

3

4            I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5            The foregoing is a full, true, and correct

6   transcript of the testimony given and proceedings had in the

7   above-entitled action taken on the above-entitled date; that

8   it is a full, true, and correct transcript of the evidence

9   offered and received, acts and statements of the Court, also

10  all objections of counsel, and all matters to which the same

11  relate; that I reported the same in stenotype to the best of

12  my ability, being the duly appointed and official

13  stenographic reporter of said Court, and thereafter had the

14  same transcribed into typewriting as herein appears.

15           I further certify that I have complied with CCP

16  237(a)(2) in that all personal juror identifying information

17  has been redacted if applicable.

18

19           Dated:

20

21                    _____

22                       Jamie L. Mixco, C.S.R.
                         Certificate No. 12708
23

24  ATTENTION:
    CALIFORNIA GOVERNMENT CODE
25  SECTION 69954(D) STATES:

26  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
    MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27  A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
    ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28  PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
    PERSON."

# EXHIBIT 3
# (Vol. 11)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   936

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | |
| ) | |
| Plaintiff - Respondent, ) | |
| ) | |
| v. ) | No. C1223754 |
| ) | |
| CRAIG RICHARD CHANDLER, ) | |
| ) | |
| Defendant - Appellant. ) | |

COPY

VOLUME 11

PAGES 936 - 1069

JULY 18, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:     OFFICE OF THE ATTORNEY GENERAL
                             BY:  KAMALA D. HARRIS,
                             Attorney General of the State
                             of California

FOR DEFENDANT-APPELLANT:     In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   937

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           IN AND FOR THE COUNTY OF SANTA CLARA

3     BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4               DEPARTMENT NO. 37

5

6                   ---o0o---

7  THE PEOPLE OF THE
    STATE OF CALIFORNIA,        )

8                     )

9            PLAINTIFF,   )
                     )    CASE NO.  C1223754

10      v.              )
                     )

11  CRAIG RICHARD CHANDLER,   )

12                     )
            DEFENDANT.   )

13  _____/

14

15

16                   ---o0o---

17        REPORTER'S TRANSCRIPT OF PROCEEDINGS

18               JULY 18, 2013

19

20                   ---o0o---

21

22

23

APPEARANCES:

24
    FOR THE PEOPLE:           ALISON FILO
25                     Deputy District Attorney

26
    FOR THE DEFENDANT:        BRIAN MADDEN
27                     Attorney at Law

28  OFFICIAL COURT REPORTER:    JAMIE L. MIXCO
                          C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   938

# INDEX

## EXAMINATION

**Witness Name**                                                                     **Page**

**NOEMI GONZALEZ**
   Direct By Ms. Filo   ........................................940
   Cross By Mr. Madden   .....................................951
   Re-Direct By Ms. Filo   ..................................977

**ARLETH DOE**
   Direct By Ms. Filo   ......................................987
   Cross By Mr. Madden   ....................................1023
   Re-Direct By Ms. Filo   ..................................1051
   Re-Cross By Mr. Madden   .................................1057

**HILDA KELLER**
   Direct By Ms. Filo   ......................................1058

## PEOPLE'S EXHIBITS

**Exhibits**      **Description**                                    **Page**
7 Marked        document                                           1009

1  San Jose, California                        July 18, 2013

2                         PROCEEDINGS

3          THE COURT:  Thank you, ladies and gentlemen.

4  Record will reflect all members of the jury are present, both

5  counsel are present, Mr. Chandler is in the courtroom.

6          And, Ms. Filo, your next witness.

7          MS. FILO:  Thank you, Your Honor.  The People call

8  Noemi Gonzalez.

9                       NOEMI GONZALEZ,

10         Being called as a witness on behalf of the People,

11  having been first duly sworn, was examined and testified as

12  follows:

13         THE CLERK:  For the record, could you please state

14  your full name and spell both for the record.

15         THE WITNESS:  Noemi, N-o-e-m-i.  Gonzalez,

16  G-o-n-z-a-l-e-z.

17         MS. FILO:  Your Honor, if I might, I ask to move a

18  little closer to see if I could get the microphone a little

19  closer to --

20         THE COURT:  Yes, please do so.  If you could pull

21  your chair up a little closer to the microphone.  Your voice

22  is soft.  Good morning.

23         THE WITNESS:  Good morning.

24         THE COURT:  Most people that are asked to come to

25  court and testify as witnesses are nervous, so that's okay.

26         THE WITNESS:  Yeah.

27         THE COURT:  Okay.  Ms. Filo is going to ask you

28  some questions.  You just need to listen to the question and

1    make every effort to just answer what she's asking.  Don't

2    give your answer until she's done with her question, even if

3    you know what she's going to be asking you.

4              THE WITNESS:  Okay.

5              THE COURT:  Okay?  So that way two people are not

6    talking at the same time.  If she's asks you a question that

7    calls for a yes or no response, and you go (nods head), she's

8    going to say:  Does that mean yes?  Or, if you go uh-huh,

9    she's going to say:  Does that mean yes?  So the easiest way

10   is just to say yes if it's yes or no because we're recording

11   what's being said.  And finally, if you hear on of the

12   lawyer's say objection, don't answer the question.  I will

13   let you know if you could answer it or not.  Okay?

14             THE WITNESS:  Okay.

15             THE COURT:  Okay.

16             Direct.

17             MS. FILO:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19   BY MS. FILO:

20   Q.   Good morning, Noemi.

21   A.   Good morning.

22   Q.   You are a little bit nervous about testifying?

23   A.   Yes.

24   Q.   You've never had to testify in court before?

25   A.   No.

26   Q.   Okay.  So the judge explained kind of the rules of

27   testifying in court, and you and I talked for a few minutes

28   before you took the stand and I kind of gave you all of those

1   rules, too?

2   A.   Yeah.

3   Q.   Yes?

4   A.   Yes.

5   Q.   Sometimes it's easier to start talking and we'll get

6   through it.  Okay?

7        Noemi, I want to ask you some questions about a

8   conversation you had with a young girl named Arleth?

9   A.   Yes.

10  Q.   Who is Arleth to you?

11  A.   She's my cousin.

12  Q.   Okay.  How often do you see Arleth?

13  A.   Um, I used to see here, like, every day because she used

14  to live with us, but she moved.  So I kind of, like, see her,

15  like, four times a week sometimes.  It depends.

16  Q.   You said that you used to live together?

17  A.   Yeah.

18  Q.   Where was Arleth going to school when you all lived

19  together, do you know?

20  A.   O.B. Whaley.

21  Q.   So Arleth is about to start sixth grade; right?

22  A.   Yes.

23  Q.   And how old are you, Noemi?

24  A.   I'm 15.

25  Q.   Okay.  So you are going into your sophomore year?

26  A.   Yes.

27  Q.   Okay.  Noemi, I would like to ask you about a ti

28  Arleth was -- she was in fourth grade but had -- str

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   942

1      Do you know who Arleth's teacher was in third

2  grade?

3  A.   In third grade?  When that happened or --

4  Q.   Yes.

5  A.   Yeah, it was Mr. Chandler.

6  Q.   Okay.  Was there a time in fourth grade when Arleth came

7  to you and said:  I want to talk to you a little bit about

8  Mr. Chandler?

9  A.   No.

10  Q.   Okay.  Did you go to Arleth and say:  I want to talk to

11  you about Mr. Chandler?

12  A.   No.

13  Q.   Okay.  Did you have a conversation with Arleth about Mr.

14  Chandler?

15  A.   Yes.

16  Q.   I have my times wrong?

17  A.   Yes.

18  Q.   Okay.  Why don't you tell me what you remember about

19  that conversation?

20  A.   Okay.  When that happened, about that -- in the news

21  that -- what he was doing, like, it was one day that we were

22  just sitting there, and then I -- we just started talking

23  about it, and she started telling me all of this stuff that

24  he would do -- he would make her do to him, and then -- yeah,

25  that's how she started telling me everything.

26  Q.   Okay.

27  A.   Yeah.

28  Q.   So do you remember when that conversation was?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   943

1    A.    Not exactly.

2    Q.    It was when there were some news articles and there was

3    in things on the television?

4    A.    Yes.

5    Q.    About Mr. Chandler being arrested?

6    A.    After that, after that -- the news and everything, like,

7    I would ask her -- I was like:  Did he ever do stuff to you?

8    She never told me anything.  But after, like, a week or so,

9    like, we were just talking, and then she just started telling

10   me everything, and that's when I told my aunt and -- yeah.

11   Q.    Okay.  Up until that time, had you and Noemi -- I'm

12   sorry -- you and Arleth been pretty close?

13   A.    Yeah.

14   Q.    She would talk to you about stuff?

15   A.    (Shakes head up and down.)

16   Q.    Yes?

17   A.    Yes.

18   Q.    Okay.  And you said it was almost a week after this was

19   on the news that Arleth came and talked to you?

20   A.    Yes.

21   Q.    Do you remember how that conversation started?

22   A.    Not really.  No.

23   Q.    You talked to the police in this case; is that right?

24   A.    Yes.

25   Q.    Did you tell the police officer that the way Arleth

26   started this conversation was to say, "Noemi, if I tell you

27   something, am I going to get arrested"?

28   A.    Yeah, yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   944

1    Q.    Is that how the conversation started?

2    A.    Yes.

3    Q.    So what did she -- she said, "Am I going to get

4    arrested"?

5    A.    Yes, she thought that.

6    Q.    Is that how this conversation began?

7    A.    Well, okay, so we were -- it's because we were talking

8    about it and then she started telling me this stuff.  And

9    then I asked her, I was like:  Why didn't you tell me

10   nothing?  She's like:  Well, it's because I thought I would

11   get arrested for that.  I was like:  No, that couldn't

12   happen.  And -- yeah.  So she ended up telling me stuff.

13   Q.    Okay.  Noemi, you said that she sort of started telling

14   you what had happened with Mr. Chandler?

15   A.    Yes.

16   Q.    What did she tell you?

17   A.    She told me at break -- at recess, when they have

18   recess, right, and at recess he would tell her to go and then

19   he would make her do stuff to him and then after he would

20   give her a lollipop.  And I would, like -- that would

21   happen -- that happened, like, five or six times she said or

22   more.  And -- yeah, she said that it wasn't only her, but it

23   was some other kids too.  There was more than her.

24   Q.    Did she describe what he was having Arleth do to him?

25   A.    Yes.

26   Q.    What did she say?

27   A.    She said that he would close her eyes and that she

28   would -- he would put something in her mouth and she said it

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   945

1  was, like, hairy and, like -- and she would describe it, but

2  I don't -- okay.  Do I have to describe it?

3  Q.   Please.

4  A.   And then she said that it tasted like pee and -- yeah.

5  Q.   Okay.  So she said it tasted like pee and it was hairy?

6  A.   Yes.

7  Q.   Did Arleth tell you why she -- did Arleth tell you that

8  she couldn't see what was happening?

9  A.   Yes, because he covered her eyes when he would do that

10  stuff, when he would make her do that stuff to her.

11  Q.   Did she tell you that she was actually able to peek?

12  A.   Yeah.

13  Q.   She was able to see something?

14  A.   A little bit.

15  Q.   Did you actually have her draw for you?

16  A.   No.

17  Q.   No?  She just described it to you?

18  A.   Yeah.

19  Q.   Could you tell me anything else about what her

20  description was to you?  You said hairy and it tasted like

21  pee.  Did she give you any other description of what it

22  looked like or felt like?

23  A.   Not that I remember.

24  Q.   Okay.  So you asked her why she didn't tell you this

25  stuff before?

26  A.   Yes.

27  Q.   And she told you because she thought she would get

28  arrested?

1   A.   Yes.

2   Q.   Did she tell you anything more about that?

3   A.   No.

4   Q.   Just thought she would get in trouble?

5   A.   Yes.

6   Q.   Noemi, is Arleth sophisticated?

7   A.   What do you mean?

8   Q.   I mean, she wouldn't know that she's not going to get in

9   trouble; right?  That's something you had to tell her?

10  A.   Yes.

11  Q.   You had to tell her that if something bad happened to

12  her, it's not her fault and she's not going to get in

13  trouble?

14  A.   (Shakes head up and down.)

15  Q.   Is that something you had to tell her in this

16  conversation?

17  A.   Yes.

18  Q.   Does she tell you anything about how many times this

19  happened to her?

20  A.   She said, like, five, six, or more times; five or six or

21  more.

22  Q.   Did she tell you anything more about -- did she tell you

23  she was alone?  Did she give you any other descriptions?

24  A.   She said she was alone in the room with him.

25  Q.   Did she tell you anything about what Mr. Chandler was

26  doing while this thing was in her mouth?

27  A.   No.  She said -- no, I don't remember.

28  Q.   No?  Or, you don't remember?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   947

1   A.   No, she didn't say anything.

2   Q.   Okay.  Do you -- did you tell the police officers that

3   Arleth had told you there would be moaning while this was

4   happening?

5   A.   Yeah.

6   Q.   Is that what she said?

7   A.   Yeah.

8   Q.   Noemi, how many conversations did you have with Arleth

9   about this subject?

10   A.   It was, like, two times.

11   Q.   Did both of those conversations happen before you talked

12   to the police?

13   A.   Um-hum, yes.

14   Q.   Do you remember where the first conversation took place?

15   A.   Well, the first one, it was -- like, it wasn't, like, a

16   long conversation.  It was, like, a short conversation, but

17   it was at my house and -- yeah.

18   Q.   And where was the second conversation?

19   A.   Um, it was at my mom's friend's house.

20   Q.   How did that conversation occur?

21   A.   We were in the sidewalk.  We were, like, by the sidewalk

22   sitting because she was taking care of us, but we were just,

23   like, talking, and, yeah, that's how she started telling me

24   stuff.

25   Q.   Okay.  So you said you had a short conversation with

26   Arleth at your house?

27   A.   Yeah.

28   Q.   Did you do anything as a result of that conversation?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   948

1    A.    No.

2    Q.    Did you tell your aunt after?

3    A.    Yes.

4    Q.    So you did tell your aunt after that conversation?

5    A.    Yes.

6    Q.    That's Arleth's mom?

7    A.    Yes.

8    Q.    How long after that short conversation at your house was

9    this second conversation at your mom's friend's house?

10   A.    I don't remember.  It was a long time.  It was more than

11   a week or two, yeah.

12   Q.    But you think it was before you talked to the police?

13   A.    Yes.

14   Q.    After this short conversation you had at your house, you

15   said that you told your aunt?

16   A.    Yes.

17   Q.    How did you tell your aunt?

18   A.    Um, well, I told her if she remembered about what

19   happened at the teacher and -- about the teacher, and then

20   she said yeah.  And I started telling her what she told me

21   and she had to do something about it.  So, yeah, she did.

22   She called the police and stuff.

23   Q.    Did that conversation take place over the phone or in

24   person?

25   A.    Over the phone.

26   Q.    So as soon as -- is it accurate, that as soon as you had

27   that conversation with Arleth, you picked up the phone and

28   called your aunt?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   949

1  A.   Yes.

2  Q.   You knew this was something that you needed to tell

3  someone?

4  A.   Yes.

5  Q.   Did Arleth specifically identify what she saw as a guy's

6  thing?

7  A.   Did she, like, see it or -- what do you mean?

8  Q.   When she was talking to you, did she say:  What I saw

9  was a guy's thing?

10 A.   Yes.

11 Q.   She used those words?

12 A.   She didn't -- it was like that.  She said -- well, she

13 just described how it looked, how it, like, taste, and how

14 it, like, felt right inside her mouth, but she said she could

15 only see a little bit of it.  She couldn't see completely all

16 of it.  So, yeah, she was -- thought it was it.

17 Q.   Did Arleth even know the word "penis"?

18 A.   No.

19 Q.   So in the police report, if it says "a guy's thing," is

20 that -- are those your words or those her words?

21 A.   No.  Her words.

22 Q.   Noemi, you said that you had a second conversation with

23 Arleth at your mom's friend's house?

24 A.   Yes.

25 Q.   Could you remember anything more about that

26 conversation?  Was that conversation longer than the first

27 one?

28 A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   950

1    Q.    And do you remember anything more about what Arleth said

2    in that conversation?

3    A.    No.

4    Q.    Nothing that was strikingly different than what she told

5    you the first time?

6    A.    No.

7    Q.    After the police were called and you talked to the

8    police in this case, have you had any other conversation with

9    Arleth about what happened with Mr. Chandler?

10   A.    Yeah, we did, but I just told her, like, I was there for

11   her, like, you know, because she was, like, crying and stuff

12   after that happened.  But that's, like, only -- like, I only

13   tried to help her.  That's, like, the only conversation we

14   had after that.

15   Q.    So she hasn't given you any more details about what

16   happened?

17   A.    No.

18   Q.    Has she talked to you about the court process or

19   anything like that?

20   A.    No, not really.

21   Q.    Hasn't talked to you about having to come to court or

22   anything?

23   A.    No.  Only if I asked her.  But, no, she didn't tell me

24   about that.

25   Q.    And what you have told her is:  I'm there for you and

26   it's going to be okay?

27   A.    Yes.

28          MS. FILO:  I think that's all I have, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   951

1          THE COURT:  Thank you.

2          Cross-examination?

3          MR. MADDEN:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. MADDEN:

6    Q.    Do I have the correction of your first name?  Correct

7    when I say Noemi?

8    A.    Yes.

9    Q.    All right.  Noemi, my name is Brian Madden.  I'm Mr.

10   Chandler's lawyer.  I'm going to ask you some questions, and

11   it's important that you understand the questions that I ask

12   before you answer it.  Okay?

13   A.    Okay.

14   Q.    So if I ask you a question and it's a confusing

15   question, or you don't understand the question, I don't want

16   you to answer that.  Okay?  I want you instead to tell me:  I

17   don't understand the question, and then I'll try to use other

18   words so that you understand the question.  Okay?

19   A.    Okay.

20   Q.    On the other hand, if I ask you a question and you

21   answer, I'm going to assume that you understood the question.

22   Okay?

23   A.    Okay.

24   Q.    Is that fair?

25   A.    Yes.

26   Q.    Okay.  I'm going to try to do one other thing.  I have

27   trouble with it sometimes.  I want to try to wait until

28   you've given your whole answer before I ask another question.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   952

1    A.    Okay.

2    Q.    All right.  And I would like you to do the same thing.

3    Okay?

4    A.    Okay.

5    Q.    The reason for that is that the lady in front of you is

6    a court reporter.  She has to write down every word that I'm

7    saying and every word that you're saying.  And if we're

8    talking at the same time, she can't get everything down.

9    Okay?

10   A.    Okay.

11   Q.    So if I asked you to "wait" or to "stop," that's why I'm

12   doing it.  Okay?

13   A.    Okay.

14   Q.    I want to tell you that I'm guilty of doing the same

15   thing sometimes, so don't feel bad about it.  Okay?

16   A.    Okay.

17   Q.    All right.

18         So Arleth is your cousin?

19   A.    Yes.

20   Q.    Am I correct, that Arleth's mother is your mother's

21   sister?

22   A.    Yes.

23   Q.    Okay.  And I'm not sure that I heard your testimony

24   correctly, but did you state that at one time you lived

25   either with Arleth's family or that you lived next to them?

26   I didn't understand.

27   A.    No.  She lived with us.

28   Q.    Okay.  Just Arleth, herself?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   953

1    A.    No, and my aunt and her sister and her dad.

2    Q.    The family lived together?

3    A.    Yes, they lived together.

4    Q.    All right.  For how long?

5    A.    Um, it was for years, but I don't remember how many

6    years.  It was for years.

7    Q.    All right.  So when this event about your cousin

8    speaking with you occurred, she was nine?

9    A.    Yes.

10   Q.    Okay.  And how old do you think that she was when she

11   didn't live with your family anymore?

12   A.    Um, I don't remember.  I don't know.

13   Q.    Could you give me an estimate?

14   A.    Like, ten; nine or ten.  I don't really know.  I don't

15   even know how old she is.  No, I don't remember.

16   Q.    All right.  When she was in the third grade at O.B.

17   Whaley School, was her family living with your family?

18   A.    Yes.

19   Q.    Okay.  When she was in the fourth grade, was her family

20   living with your family?

21   A.    Yes.

22   Q.    You know what my next question is; right?  When she was

23   in the fifth grade --

24   A.    Oh, no.

25   Q.    Okay.  So her family had their own place sometime in her

26   fifth grade?

27   A.    Yes.

28   Q.    Was that house near your house?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   954

```
 1   A.   It's -- yeah.  It's not that close, but it's not, like,
 2   really far, far.
 3   Q.   Is it a place where you could walk?
 4   A.   No.
 5   Q.   You have to drive?
 6   A.   Yeah.
 7   Q.   All right.  You probably could walk but you don't;
 8   right?
 9   A.   Yeah.
10   Q.   All right.  So, then, would I be correct in assuming
11   that you were actually very close to Arleth?
12   A.   Yes.
13   Q.   She looks up to you?
14   A.   Yes.
15   Q.   All right.  Now, do you remember seeing TV coverage
16   about a teacher being arrested at O.B. Whaley School?
17   A.   Yes.
18   Q.   And do you remember when that was?  When you saw that TV
19   coverage?
20   A.   No.
21   Q.   Did it appear to be right about the time that the
22   teacher was arrested?
23   A.   Yes.
24   Q.   Okay.  And it was on the TV a lot; right?
25   A.   Yes.
26   Q.   Maybe every day?
27   A.   Yes.
28   Q.   All right.  And when did you learn that your cousin had
```

1  been a former student of the man who was arrested, Mr.

2  Chandler?

3  A.   Um, like, after the second conversation, that's when I

4  knew that she was affected by that, too.

5  Q.   No, I didn't -- maybe you misunderstood the question, or

6  maybe I didn't ask it properly, but let me try it again.

7       Your mother, did you see your mother and her

8  sister, Arleth's mother, talk about the TV coverage?

9  A.   Yes.

10  Q.   Did you see and watch the TV coverage together?  That

11  is, you and Arleth's mother and your mom?

12  A.   Not all together.  But, yeah, we would sometimes --

13  like, we would all watch it.

14  Q.   And you found that very disturbing; right?

15  A.   Yes.

16  Q.   Of course.  And were you aware that Arleth's mother was

17  questioning Arleth every day about whether or not the teacher

18  had done anything to her?

19       MS. FILO:  Objection, Your Honor.  Calls for

20  speculation.

21       MR. MADDEN:  I asked if she was aware.

22       THE COURT:  Well --

23       MR. MADDEN:  I'm sorry.  Let me rephrase.

24       THE COURT:  You are assuming facts that are not in

25  evidence at this point, so I will sustain the objection.

26  BY MR. MADDEN:

27  Q.   Did you ever hear, or were you present at any time when

28  Arleth's mother was questioning Arleth about whether Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   956

1    Chandler did anything to her?

2             MS. FILO:  Objection, Your Honor.  Calls for

3    hearsay.

4             MR. MADDEN:  No.  I asked her if she was present.

5             THE COURT:  What's your point?

6             MR. MADDEN:  I'm just asking if she was present

7    when that conversation occurred.

8             THE COURT:  I'm going to sustain the objection.

9    Calls for hearsay.

10            MR. MADDEN:  It doesn't, Your Honor.  I'm asking --

11            THE COURT:  Well, I disagree.  Objection is

12   sustained.

13            MR. MADDEN:  The next question might ask for

14   hearsay, but that one doesn't.

15            THE COURT:  You could ask a question.

16            MR. MADDEN:  All right.

17            THE COURT:  Actually, why don't you approach.

18            (Whereupon, there was a discussion at the bench.)

19            THE COURT:  Objections are sustained.  He's going

20   to ask another question.

21            MR. MADDEN:  All right.

22   BY MR. MADDEN:

23   Q.   Do you remember the day that you called Arleth's mother

24   to tell her what Arleth had told you?

25   A.   No.

26   Q.   I believe you testified earlier that you got on the

27   phone and called Arleth's mother after you spoke with Arleth?

28   A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   957

1   Q.   Do you remember what day that was?

2   A.   You mean the date or --

3   Q.   No.  I'm asking -- not asking you the date.  You

4   remember the day?

5   A.   Yeah.  I thought it was the date, that's why I said no.

6   Q.   Okay.  I won't expect you to know the date?

7   A.   Okay.

8   Q.   But I would like to ask you if you could give me your

9   best estimate of how many days it was from when you first saw

10  TV coverage and you made the call to Arleth's mother?

11  A.   I don't really remember.  Like, more than two -- one or

12  two weeks.  More than one or two weeks.

13  Q.   Okay.  This happened some time ago?  More than a year

14  and a half ago?

15  A.   Yes.

16  Q.   I don't want to be unfair and ask you to give a specific

17  time.  You're just giving your best estimate; right?

18  A.   Yes.

19  Q.   Approximately one to two weeks later?

20  A.   Yes.

21  Q.   Okay.  Fair enough.

22        Now, when you called Arleth's mother, it was after

23  a second conversation that you had with Arleth about Mr.

24  Chandler; correct?

25  A.   No.

26        MS. FILO:  Objection.  Misleads the testimony.

27        THE COURT:  I'm going to allow the answer to

28  remain.  Her answer was "no."

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   958

1  BY MR. MADDEN:

2  Q.   Okay.  Maybe I didn't understand your testimony.  I

3  thought you testified that you had two separate conversations

4  with Arleth on different days about Mr. Chandler?

5  A.   Yes.

6  Q.   That is correct?

7  A.   Yes.

8  Q.   And the first conversation -- who was there the first

9  conversation?

10  A.   It was just me and her.

11  Q.   Okay.  Where were you when you had that conversation?

12  A.   At my house.

13  Q.   All right.  How did she -- she was at your house because

14  she was living there or --

15  A.   Yeah.

16  Q.   Okay.

17  A.   Yes.

18  Q.   All right.  What did she tell you during that

19  conversation?

20  A.   She started -- well, she didn't tell me what she told me

21  in the second conversation, but she -- okay.  Do I keep on

22  going?

23  Q.   Go ahead.  Finish your answer.

24  A.   But she didn't tell me, like, everything completely.

25  Q.   All right.  What did she tell you?

26  A.   She told me that -- she just told me that he would cover

27  her eyes and he would, like, put stuff in her mouth, but she

28  didn't really describe it until the second conversation.  She

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   959

1   just told me everything.

2   Q.   Okay.  When you had that conversation, was she crying?

3   A.   No.

4   Q.   Was she upset?

5   A.   Yeah, she was kind of upset.

6   Q.   All right.  And were you crying?

7   A.   No.

8   Q.   Did you ever tell her anything like:  Arleth, I know

9   something more happened.  You have to tell me?

10  A.   Yes.

11  Q.   You started telling her that at the very first

12  conversation; right?

13  A.   Yes.

14  Q.   You also told her things like that in the second

15  conversation; right?

16  A.   Yes.

17  Q.   You were trying to help; right?

18  A.   Yes.

19  Q.   And you probably told her:  Arleth, I know something

20  happened.  You have to tell me?

21  A.   Yes.

22  Q.   Do you remember the matter being on the TV every day for

23  at least a week?

24  A.   Yes.

25  Q.   All right.  Do you remember ever seeing -- strike that.

26  Strike that means I'm going to start over.

27          Do you remember Arleth giving you a letter from the

28  school about Mr. Chandler?

1    A.    Yes.

2    Q.    And do you remember when or what day she gave you that

3    letter?

4    A.    No.

5    Q.    Was that -- if you remember, do you think that was on

6    one of the days that you had a conversation with Arleth, one

7    of the two?

8    A.    Um, I don't remember that.  I don't think so.  No, I

9    don't remember.

10   Q.    The day you had the long conversation with Arleth about

11   the details that you testified about this morning, did you

12   get the letter on that day?

13   A.    No.

14   Q.    Did you read this letter?

15   A.    Yes.

16   Q.    And was the letter in English or Spanish?

17   A.    It was --

18   Q.    Or both?

19   A.    It was both.

20   Q.    Okay.  And it was all about Mr. Chandler; correct?

21   A.    Yes.

22   Q.    The school was investigating?

23   A.    Yes.

24   Q.    That he had been placed on leave and he had been

25   arrested?

26   A.    Yes.

27   Q.    All right.  The day of the second conversation, I

28   believe those present were you and Arleth and a woman who was

1    taking care of you?

2    A.    No.  She was inside the house.

3    Q.    What was her name?

4    A.    Claudia.

5    Q.    Could you spell that, please?

6    A.    C-l-a-u-d-i-a.

7    Q.    Okay.  And did she have a nickname?

8    A.    No.

9    Q.    Okay.  Was she a relative of your family?

10    A.    She's a friend of my mom.

11    Q.    Okay.  And you were at Claudia's house?

12    A.    Yes.

13    Q.    And was she basically babysitting you and Arleth?

14    A.    Yes.

15    Q.    Anybody else?

16    A.    And my cousins and my brother.

17    Q.    Okay.  And was she present during your conversation with

18    Arleth?

19    A.    No.

20    Q.    You said she was in the house?

21    A.    Yes.

22    Q.    So your conversation with Claudia [sic] was outside?

23    A.    With Claudia or Arleth?

24    Q.    I'm sorry.  Thank you for correcting me.  With Arleth?

25    A.    Yes, it was outside.

26    Q.    On a curb or something?

27    A.    Yeah.  It was like the sidewalk.

28    Q.    Okay.  Is this where you read the letter?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   962

1   A.   No.

2   Q.   Okay.  Now, when during the week or two that you were

3   asking -- let me withdraw that.

4        Were there only two days that you asked your cousin

5   Arleth about Mr. Chandler?

6   A.   Yes.

7   Q.   There were -- you didn't talk to her about it any other

8   days during that week or two?

9   A.   No.

10  Q.   Okay.  So on the day that -- on the second day at

11  Claudia's house, you were successful in getting Arleth to

12  speak with you; right?

13  A.   Yes.

14  Q.   You had not been successful the first time?  At least

15  you didn't get very much information; right?

16  A.   No.

17  Q.   But after the first time, you were convinced in your

18  head that she had been sexually molested by Mr. Chandler;

19  right?

20  A.   Yes.

21           MS. FILO:  Objection, Your Honor.  Relevance.

22           THE COURT:  Sustained.

23           MS. FILO:  Answer be stricken, please.

24           THE COURT:  If there was an answer, I will strike

25  it.

26  BY MR. MADDEN:

27  Q.   Would it be fair to state that on the second day, you

28  were pushing her a lot more than you were on the first day?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   963

1    A.    Yes.

2    Q.    You remember speaking with a Det. Pierce at your school?

3    A.    Yes.

4    Q.    I think you only spoke with Det. Pierce one time;

5    correct?

6    A.    Yes.

7    Q.    And if you remember, would that have been on or about

8    January 17th?

9    A.    I don't remember.

10   Q.    Was it about a week after the matter had first been on

11   TV?

12   A.    Yes.

13   Q.    Okay.  And Det. Pierce asked you a number of questions;

14   right?

15   A.    Yes.

16   Q.    Some of those questions included asking you what Arleth

17   told you; right?

18   A.    Yes.

19   Q.    And he also asked you what you told Arleth; correct?

20   A.    Yes.

21   Q.    All right.  Now, you didn't tell him everything that you

22   told Arleth, did you?

23   A.    Well, he told me to tell him everything, so I did.

24   Q.    So -- all right.

25          Do you remember Det. Pierce asking you how many

26   times it happened?

27   A.    No.

28   Q.    Do you remember telling Det. Pierce in response to that

1  question:  She said, like -- well, she told me that one

2  day -- one day it was --

3       MS. FILO:  Objection, Your Honor.  Calls for

4  hearsay.  May we approach?

5       THE COURT:  Yes.

6       (Whereupon, there was a discussion at the bench.)

7       THE COURT:  I believe that the next question is to

8  see if she -- it will help her recall her recollection.  I'm

9  not sure if somebody has a handy, clean copy.

10       MR. MADDEN:  If Ms. Filo does, I will be happy to

11  do that.  If not, I marked off my writing on the page, Your

12  Honor, with stickies.  There are some Sharpie marks, but

13  it's -- she could read it.

14       THE COURT:  Ms. Filo -- first, I guess you should

15  ask the question.

16       MR. MADDEN:  All right.

17  BY MR. MADDEN:

18  Q.   Noemi, if I were to show you a transcript of the

19  conversation that you had, the recorded conversation that you

20  had with Det. Pierce, do you think that might help you

21  remember what you told Det. Pierce?

22  A.   Yes.

23  Q.   Okay.

24       MR. MADDEN:  May I approach, Your Honor?

25       THE COURT:  Yes.  Thank you.

26  BY MR. MADDEN:

27  Q.   All right.  Noemi, I'm going to show you a paper that

28  says at the bottom "Reporter's transcript of audio CD."

1   Lower right-hand corner is page 9, and you don't have to read

2   the whole page.  I'm going to give you the lines I want you

3   to read.

4           MR. MADDEN:  This isn't matching up, Your Honor.

5   It might be on page 8, Ms. Filo.  Your Honor, there is a

6   pagination difference.  Mine may run together, so it's out of

7   sequence.  I'm going to have to use this one.  I don't know

8   what page it is in the transcript, but let's try this.

9   BY MR. MADDEN:

10  Q.   So I'm reading now from a page from the -- again, the

11  reporter's transcript of the audio CD of Noemi Gonzalez.  I'm

12  referring to page -- it's actually page 8.  And, Noemi, what

13  I would like you to do is read -- I'm going to point, I

14  apologize.  I'm going to ask you to read from line 17, which

15  has the words "Det. Pierce," and then read down to 22; 17 to

16  22.  Okay?

17  A.   In my mind or --

18  Q.   Just read it to yourself.

19  A.   Okay.

20  Q.   Then -- take your time, and then when you are finished,

21  just let me know and I'll ask you some questions.

22  A.   Okay.

23  Q.   Okay.  All right.

24           Now, do those words help you remember how many

25  times you told Det. Pierce this happened?

26  A.   Yes.

27  Q.   And how many times did you tell Det. Pierce it happened?

28  Two; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   966

1   A.    Yes.

2   Q.    All right.  Not five or six; right?

3   A.    Nah-uh.

4   Q.    Okay.  Now, at one point in the conversation between you

5   and Arleth, the second conversation, after she told you all

6   of these things, you asked her in effect:  Did he tell you

7   not to tell anybody?

8   A.    No, I didn't ask her that.

9   Q.    She didn't say that he asked her that; right?

10  A.    That he asked her that?

11  Q.    I think I confused you.  I'm going to go back and start

12  again.  One of us is confused.  It may be me.

13          Did Arleth tell you that Mr. Chandler never told

14  her not to tell?

15  A.    No.

16  Q.    She didn't say that?

17  A.    No.

18  Q.    I'm going to show you this transcript again.

19          MS. FILO:  Objection, Your Honor, to the form of

20  the question.  Actually, there is no question.

21          THE COURT:  I'll sustain the objection and

22  approaching at this point.

23          MR. MADDEN:  All right.

24          THE COURT:  She basically said no.

25  BY MR. MADDEN:

26  Q.    Did you ever ask Arleth if Mr. Chandler ever said

27  anything to her about not telling anyone?

28  A.    Like, he would tell her:  Don't tell anyone?  Yeah.

1   Q.   I'm asking you if you asked that question?

2   A.   That's what I'm asking you.  You asked that?

3   Q.   Tell me again what you understand the question to be.

4   A.   You asked if he ever told her to not tell anyone.

5   Q.   No, no, no.  I'm asking if Arleth told you anything

6   about what Mr. Chandler said?

7   A.   To her?

8   Q.   Yes.

9   A.   Well, I don't remember.  I don't remember that.

10  Q.   You don't remember that?

11  A.   Yeah, I don't remember.

12  Q.   Okay.  I want you to --

13       MR. MADDEN:  Now it's time to approach, Your Honor.

14       THE COURT:  If you read a document, do you think

15  that would help you remember?

16       THE WITNESS:  Yeah.

17       THE COURT:  Okay.  You may.

18       MR. MADDEN:  Thank you, Your Honor.

19  BY MR. MADDEN:

20  Q.   It's the same transcript, Noemi, but this time I'm going

21  to have you look at page 8, line -- lines 8, 9, and 10, just

22  those three lines.  Take your time and you could read that.

23  Let me know when you are done.

24       Okay.  Does that help you remember?

25  A.   Yeah.

26  Q.   All right.  In fact, she told you that Mr. Chandler

27  never told her not to tell; right?

28  A.   Right.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   968

1   Q.   Okay.  You had to help Arleth with the words to describe

2   what Mr. Chandler did; right?

3   A.   Yes.

4   Q.   You had to suggest words to her; right?

5   A.   Yes.

6   Q.   And it would be like:  Did he do this or did he do that?

7   A.   Yes.

8   Q.   All right.  For example, you asked her, "Was he

9   moaning;" right?

10  A.   Yes.

11  Q.   All right.  She didn't volunteer that.  She said that

12  after you asked her if he was moaning; right?

13  A.   Yes.

14  Q.   Okay.  Because there is no way a little girl would

15  understand what moaning meant; right?

16  A.   Yes.

17  Q.   All right.  And you had to help her by using the word

18  "hairy;" right?

19  A.   No, she said that.

20  Q.   You didn't ask her:  Was there hair around it, or was it

21  hairy, or did you see hair?

22          MS. FILO:  Objection.  Asked and answered and

23  compound.

24          THE COURT:  Okay.  I will sustain the compound

25  objection.

26          MR. MADDEN:  On the compound basis?

27          THE COURT:  Yes.

28          MR. MADDEN:  I agree with that.  Thank you, Your

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   969

```
 1   Honor.
 2   BY MR. MADDEN:
 3   Q.    Did you help her by asking her, "Did you see hair"?
 4             MS. FILO:  Objection.  Asked and answered.  The
 5   witness already testified exactly what the child told her.
 6             THE COURT:  Overruled.  You may answer that
 7   question.
 8             THE WITNESS:  Do I answer it?
 9             THE COURT:  Yes, you could answer if you asked that
10   question.
11             THE WITNESS:  No.  She told me that.  I didn't ask
12   her.
13   BY MR. MADDEN:
14   Q.    Okay.  Did Arleth have any eyesight problems when she
15   was in the third grade?
16   A.    Like, does she wear glasses?
17   Q.    Did she have trouble seeing?
18   A.    Well, she wears glasses.
19   Q.    Do you know if she was wearing glasses in the third
20   grade?
21   A.    Yeah.  Yeah, she was, I think.
22   Q.    Are you certain of that?
23   A.    I'm not certain.  I think.
24   Q.    Okay.  But before she got glasses, everyone kind of knew
25   that she had a very difficult time seeing; right?
26             MS. FILO:  Objection, Your Honor.  Calls for
27   speculation.
28             THE COURT:  Sustained.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   970

1  BY MR. MADDEN:

2  Q.   Did you observe Arleth before she got glasses having a

3  difficult time seeing things?

4  A.   Yes.

5  Q.   What did you observe?

6  A.   Well, she couldn't see that well.  Like, she could see

7  close up, but not, like, far.  She could see from close, but

8  not from far.

9  Q.   She had to squint her eyes even to look at the TV,

10  didn't she?

11  A.   Well, if it was far.

12  Q.   Okay.  Now, Arleth -- strike that.

13          Did you have to help Arleth when she was talking to

14  you about Mr. Chandler with a word to describe a man's penis?

15  A.   Yes.

16  Q.   And you asked her, "Was it a guy's thing;" right?

17  A.   Yes.

18  Q.   So that was your word, not hers; right?

19  A.   No, it was hers.

20  Q.   But you asked her, "Was it a guy's thing;" right?

21  A.   Yes.

22  Q.   All right.  Do you know at that time what her word was

23  for the male penis?

24  A.   It was a guy's thing.  She didn't know the word "penis."

25  Q.   I understand that.  Did she ever use the word "weenie"?

26  A.   Yes.

27  Q.   That was her word to describe a guy's thing, wasn't it?

28  A.   No, it was -- she also said a "weenie."  She was trying

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   971

1  to describe it, but she said a "weenie" or "a guy's thing."

2  She said both of those things.

3  Q.   Did you have any discussion with Arleth about Mr.

4  Chandler humping her?

5  A.   I don't remember.

6  Q.   If I were to show you the transcript, would it help you

7  remember whether or not Arleth told you that?

8  A.   Yeah.

9        MS. FILO:  Objection, Your Honor.  May we approach

10  again?

11       THE COURT:  Yes.

12       (Whereupon, there was a discussion at the bench.)

13       THE COURT:  Mr. Madden, as I understand it, you are

14  going to reask your last question, so that it's clear for

15  both sides.

16       MR. MADDEN:  Thank you, Your Honor.

17  BY MR. MADDEN:

18  Q.   Noemi, did you tell Det. Pierce during your interview

19  with him that Arleth told you that Mr. Chandler humped her?

20  A.   I don't remember.

21  Q.   All right.  So if I showed you this transcript, would it

22  help you remember whether or not you said that to Det.

23  Pierce?

24  A.   Yes.

25  Q.   Yes?

26  A.   Yes.

27  Q.   Okay.  I'm sorry.  Old ears.

28       MR. MADDEN:  May I approach again, Your Honor?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   972

1          THE COURT:  Yes.

2   BY MR. MADDEN:

3   Q.   So, now I would like to show you page 7 of the same

4   transcript, and I would like you to read lines 21, 22, 23,

5   24, 25 and the first line on the next page.  Okay?  See where

6   I'm pointing?  21 through one.  Okay?  Sorry to point.

7   Please take your time.

8          Are you done?

9   A.   Yes.

10  Q.   Okay.  I'm going to come get the transcript.

11          Does that help you remember whether or not you said

12  that to Det. Pierce?

13  A.   Yes.

14  Q.   And, in fact, you did say that to Det. Pierce; right?

15  A.   Yes.

16  Q.   All right.  Thank you.

17          At some point in your conversation with Arleth,

18  that is the second conversation we're talking about, you

19  asked Arleth to draw you a picture; right?

20  A.   No.

21  Q.   You never asked Arleth to draw you a picture?

22  A.   Um, not that I remember.

23  Q.   Okay.  Did you ever tell Det. Pierce that you asked

24  Arleth to, like, draw me a picture?

25  A.   Did I ask her that?

26  Q.   Did you tell Det. Pierce that?

27  A.   I don't remember.

28  Q.   All right.

1          MR. MADDEN:  May I approach, Your Honor?

2          THE COURT:  Would it help you remember to look at

3   the transcript?

4          THE WITNESS:  Yeah.

5          THE COURT:  Yes.

6   BY MR. MADDEN:

7   Q.   At this time, I would like you to look at page 8, lines

8   20 through 22.  Just read those to yourself.  Make sure I

9   have the right ones.  I'm sorry.  20, 21, and 22.

10  A.   Yes.

11  Q.   Okay.  Does that help you remember whether or not you

12  said that to Det. Pierce?

13  A.   Yes.

14  Q.   You did tell him that you asked her to draw you a

15  picture?  You remember that now; right?

16  A.   Yes.

17  Q.   What did you do with that picture?

18  A.   But because we were in the sidewalk, so there was, like,

19  a little stick, and I told her to draw it for me, and then

20  she just -- like, she didn't really -- you can't draw on the

21  sidewalk with the stick.  So she tried to, like, drawing,

22  but -- yeah.

23  Q.   Like an imaginary drawing?

24  A.   Yes.

25  Q.   Why did you ask her to draw a picture?

26  A.   Because I wanted to make sure it was what I thought it

27  was.

28  Q.   What you thought it was?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   974

1    A.    Yes.

2    Q.    But she didn't know what it was; right?

3    A.    No.  She's a little girl.

4    Q.    Right.  Okay.  What did you remember about the drawing,

5    the imaginary drawing?

6    A.    Well, it looked like a penis.

7    Q.    I'm sorry?

8    A.    It looked like a penis.

9    Q.    It looked like a penis?

10   A.    Yes.

11   Q.    An erect penis?

12   A.    A what?

13   Q.    An erect penis?  Do you know what that means?

14   A.    No.

15   Q.    All right.  A penis that was hard?

16   A.    No.  I just know it looked like a penis.

17   Q.    Could have been?

18   A.    Yes.

19   Q.    Okay.  So you earlier testified that -- strike that.

20         So this second conversation was really a

21   conversation where you were more aggressive and you were

22   pushing her to tell you more information; right?

23         MS. FILO:  Objection, Your Honor.  Asked and

24   answered.

25         MR. MADDEN:  It has been --

26         THE COURT:  It has been discussed.

27         MR. MADDEN:  But not this specific question.

28         MS. FILO:  Exact words have been used before.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   975

1        THE COURT:  It's --

2        MR. MADDEN:  If it has --

3        THE COURT:  Hold on, Counsel.  Quit arguing.

4        You may answer the question.

5        THE WITNESS:  Again?

6        THE COURT:  Yes.

7        THE WITNESS:  What was your question again?

8        MR. MADDEN:  Madam Court Reporter, may I impose on

9    you?

10        (Whereupon, the record was read.)

11        THE WITNESS:  Yes.

12   BY MR. MADDEN:

13   Q.   It wasn't a situation where you were just having a

14   casual conversation and she started talking about Mr.

15   Chandler?

16   A.   No.

17        MR. MADDEN:  I think I'm done, Your Honor.  I need

18   to check my list.

19   BY MR. MADDEN:

20   Q.   Did you draw anything for her?

21   A.   No.

22   Q.   You didn't help her by drawing anything?

23        MS. FILO:  Objection, Your Honor.

24   BY MR. MADDEN:

25   Q.   To see and ask her:  Did it look like this?

26        MS. FILO:  Asked and answered.

27        THE COURT:  Sustained.

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  976

1  BY MR. MADDEN:

2  Q.  Did Arleth tell you that she was biting the thing in her

3  mouth?

4  A.  I don't remember.

5  Q.  If I showed you the transcript, would -- and you saw the

6  words of your statement to Det. Pierce, would it perhaps help

7  you remember whether or not Arleth told you that?

8  A.  Yes.

9      MR. MADDEN:  I'm almost there, but may I approach?

10     THE COURT:  So we're clear, you're not being shown

11 something to remind you what Arleth told you, but what you

12 remember what you told Officer Pierce.

13     MR. MADDEN:  Okay.  Thank you, Your Honor.

14     THE COURT:  Welcome.

15 BY MR. MADDEN:

16 Q.  I would like you to read from page 7, lines 6, 7 and 8.

17 Read these three lines here:  6, 7, and 8.  Take your time

18 here.

19     Does that help you remember?

20 A.  Yes.

21 Q.  And you did tell Pierce, Det. Pierce, that Arleth was

22 biting the thing in her mouth?

23 A.  Yes.

24 Q.  Okay.

25     MR. MADDEN:  Thank you, Your Honor.  I have no

26 further questions.

27     THE COURT:  Redirect, Ms. Filo?

28 ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   977

1                     REDIRECT EXAMINATION

2   BY MS. FILO:

3   Q.   Noemi, you had three conversations about this topic, am

4   I correct?  One at your house, one at Claudia's house, and

5   one with Det. Pierce; is that right?

6   A.   Yes.

7   Q.   Are those three conversations distinct in your head?

8   Does that make sense?  Like, do you remember what information

9   you got from conversation one versus two versus three?

10            MR. MADDEN:  Objection.  Compound question.

11            THE COURT:  Overruled.  You may answer the

12   question.  Did you understand the question?

13            THE WITNESS:  No.  I was going to ask her.

14   BY MS. FILO:

15   Q.   Are you clear about what information you got in

16   conversation one versus conversation two versus conversation

17   three?

18   A.   Yes.

19   Q.   You remember exactly what information you got in each

20   conversation?

21   A.   Not exactly, but I remember parts of it, yeah.

22   Q.   Okay.  So there are parts that you remember getting, but

23   otherwise the information goes like this?  It --

24   A.   Yes.

25   Q.   -- combines; is that right?

26   A.   Yes.

27   Q.   Okay.  Was it important to you in any way to remember,

28   well, I got that piece of information in conversation one,

1  and that conversation -- and that piece of information in

2  conversation two?  Did it matter?

3  A.   Yes.

4          MR. MADDEN:  Objection.  Compound question.

5          THE COURT:  Although it is compound, her answer was

6  yes.  If you could clear it up.

7          MS. FILO:  Okay.

8  BY MS. FILO:

9  Q.   Why would it matter to you which conversation you got

10  the information from?

11  A.   Where would it matter?

12          MR. MADDEN:  Objection.  She never said it did

13  matter.

14          THE COURT:  She said yes.  She's trying to clear it

15  up, so if you could --

16          THE WITNESS:  Where it mattered or why it mattered?

17  BY MS. FILO:

18  Q.   Yeah.  I mean, I guess I'm trying to figure out why

19  would it make any difference to you what conversation this

20  information came from?

21  A.   Because I wanted to find out what was -- what happened

22  to her.

23  Q.   Okay.  So you're just trying to get all of the

24  information?

25  A.   Yes.

26  Q.   It doesn't make any difference to you whether you got

27  that information in conversation one or conversation two?

28  A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   979

1  Q.   No, it didn't matter to you; right?

2  A.   No.

3  Q.   Because you're just a cousin trying to figure out what

4  happened?

5  A.   Yes.

6  Q.   Okay.  The second conversation you had with Arleth, you

7  said you don't remember exactly how close in time it happened

8  to the first conversation; is that correct?

9  A.   Yes.

10  Q.   But you do believe it was prior to the police being

11  called?

12  A.   What do you mean?

13  Q.   You said that you picked up the phone -- after the first

14  conversation with Arleth, you picked up the phone, you called

15  your aunt and said there is something I need to tell you?

16  A.   It was the second conversation, not the first.  It was

17  the second conversation I called my aunt.  The first

18  conversation was at my house.  My aunt was there, but I

19  didn't really tell her anything.  I was -- like, I wanted to,

20  like, figure out more.  I was going to ask her more stuff.

21  And then, like, the second conversation, that's when I asked

22  her and I made her tell me everything, and that's when I

23  called my aunt, after that.

24  Q.   Okay.  So it wasn't after the first conversation that

25  you called your aunt?

26  A.   No.

27  Q.   It was after the second conversation?

28  A.   Yes.

1  Q.   And you don't remember how close in time those things

2  happened?

3  A.   No.

4  Q.   Okay.  So, Noemi, you got a lot of questions by Mr.

5  Madden that you were putting words in Arleth's mouth; that

6  you were telling her what to say?

7           MR. MADDEN:  Objection, Your Honor.  That's not a

8  question.  It's a speech.

9           THE COURT:  Okay.  If you'd rephrase.

10           MS. FILO:  Sure.

11  BY MS. FILO:

12  Q.   You were asked, you know, isn't it true that you -- you

13  asked her to -- whether it was hairy; right?

14  A.   Yes.

15  Q.   And you said:  No.  She told me that?

16  A.   Yes.

17  Q.   You said that she used the word, "guy thing"?

18  A.   Yes.

19  Q.   You didn't give her that word?

20           MR. MADDEN:  Objection.  That wasn't her testimony.

21  She said she did and she said it --

22           THE COURT:  Mr. Madden, just state your legal

23  objection.  If you could rephrase it.  It's sustained.

24           MR. MADDEN:  I apologize, Your Honor.  Misstates

25  the evidence.

26           THE COURT:  Okay.  If you'd reask the question.

27           MS. FILO:  Sure.

28  ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   981

1    BY MS. FILO:

2    Q.    Did she tell you "it was a guy's thing"?

3    A.    Yes.

4    Q.    She used those words?

5    A.    Yes.

6    Q.    Did you give her those words to feedback to you?

7    A.    Um, I asked her -- I was -- like, I was asking her

8    questions; right?  And I was like:  Oh, so is it like a guy's

9    thing?  She's like:  Yeah, a guy's thing.  She was saying

10   that, and she -- I couldn't really, like, get what she was

11   saying at first, so I was like:  Could you describe it more?

12   She's like:  Yeah.  It's like a guy's thing, like a wee-wee.

13   That's what she said.

14   Q.    Okay.  Noemi, at the time of these conversations, you

15   were a little girl too?  You were 13?

16   A.    Yes.

17   Q.    Mr. Madden asked you what an erect penis was and you

18   didn't know the answer to that?

19   A.    No.

20   Q.    Okay.  You got some questions about the news coverage,

21   what was on the television; right?

22   A.    Yes.

23   Q.    Do you remember what was on the television?  What the

24   content of those news reports were?

25   A.    Well, I just remember that it was about Mr. Chandler and

26   that, like, he had done sexual things to other kids and stuff

27   like that.

28   Q.    But you didn't know what those sexual things were, did

1  you?

2  A.   No.  They never put it up on the TV, so I never knew.

3  Q.   Okay.  So it's not like the news said that Mr. Chandler

4  had been touching children?

5  A.   No.

6  Q.   Or had been undressing in front of children?  There were

7  no details in the news reports; right?

8  A.   No, there wasn't.

9  Q.   And when Arleth first talked to you about this, her

10  first concern was that she was going to get arrested?

11  A.   Yes.

12  Q.   She thought she was going to get in trouble for this?

13  A.   Yes.

14  Q.   Was part of your trying to get more information from her

15  because she was reluctant to tell you?  She didn't want to

16  tell you?

17        MR. MADDEN:  Objection.  Speculation.

18        THE COURT:  Overruled.  It's a question.  Was she

19  reluctant to tell you?

20        THE WITNESS:  What do you mean "reluctant"?

21  BY MS. FILO:

22  Q.   Was she scared?

23  A.   Yeah.

24  Q.   She was scared to give this information?

25  A.   Yes.

26  Q.   Noemi, you also got an awful lot of questions about the

27  conversation you had with Det. Pierce.  Do you remember all

28  of those questions?

1    A.    Yes.

2    Q.    Do you remember how long your conversation was with Det.

3    Pierce?

4    A.    Um, like, 15 minutes.  I don't really remember because

5    when it was -- when I was going to go to class, they just

6    called me in and I went and -- yeah.

7    Q.    Okay.  Let me ask you this.  Was your conversation with

8    Arleth longer or your conversation with Det. Pierce longer?

9    A.    My conversation with Arleth.

10   Q.    Okay.  Do you remember that conversation with Det.

11   Pierce was recorded?

12   A.    Yes.

13   Q.    So would you -- do you know what the word "defer" means?

14   A.    No.

15   Q.    Okay.  Would you agree that the recording says what you

16   said?

17   A.    Yes.

18          MR. MADDEN:  Your Honor, it doesn't matter what she

19   agrees.

20          THE COURT:  Okay.  I'm going to allow the answer

21   "yes" because it sounded like it's preliminary for

22   foundation.

23          Go ahead.

24          MR. MADDEN:  All right.

25   BY MS. FILO:

26   Q.    You're not trying to deny anything that was on the

27   recording; right?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   984

1   Q.   You would agree that whatever your words were, they

2   were?

3   A.   Yes.

4   Q.   And you tried to do your best to tell the truth to Det.

5   Pierce?

6   A.   Yes.

7   Q.   You're trying to do the best you can to tell the truth

8   today?

9   A.   Yes.

10  Q.   You've never lied to anybody on purpose about what this

11  is?

12          MR. MADDEN:  Objection.  Leading.

13          THE WITNESS:  No.

14          THE COURT:  Although I believe it was leading, I

15  will allow the answer, which was "no."

16  BY MS. FILO:

17  Q.   You said that you were concerned that what Arleth was

18  telling you was a sex act; right?

19  A.   Yes.

20  Q.   What made you concerned about that?

21  A.   Well, I was concerned because it was going to affect

22  her, obviously, and also me because I'm her cousin, and my

23  mom and everyone.  So I tried my best to figure out what was

24  happening.

25  Q.   Okay.  What was it about what she was telling you that

26  made you think this was a sex act?

27  A.   Well, when she started telling me -- when she described

28  it to me.  When she told me what he would do to her, it made

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   985

1    me think that it was a sex act.

2    Q.   You were in school too at the time; right?

3    A.   Yes.

4    Q.   Anything like that ever happen to you?

5    A.   No.

6    Q.   You have never been pulled into a teacher's classroom

7    blindfolded and things put in your mouth, have you?

8    A.   No.

9    Q.   No?  But it was the words she was using that made you

10   think this was a sex act?

11   A.   Yes.

12        MS. FILO:  That's all the questions I have, Your

13   Honor.

14        THE COURT:  Thank you.

15        Recross?

16        MR. MADDEN:  Nothing.  Thank you, Your Honor.

17        THE COURT:  Thank you.  You may step down.  You are

18   excused.  You may leave the witness stand.

19        At this time, ladies and gentlemen, we're going to

20   take the morning recess.  I will order all members of the

21   jury to report the jury assembly room on the second floor and

22   we'll call you back at approximately 11:00 o'clock on the

23   court clock.

24        We'll be in recess.

25        (Whereupon, a brief recess was taken.)

26        THE COURT:  Record will reflect all members of the

27   jury are present in the courtroom, both counsel are present,

28   Mr. Chandler is present.

1    Ms. Filo, your next witness?

2    MS. FILO:  Thank you, Your Honor.  The People call

3  Arleth.

4                    ARLETH DOE,

5    Being called as a witness on behalf of the People,

6  having been first duly sworn, was examined and testified as

7  follows:

8    MS. FILO:  Your Honor, the witness is accompanied

9  by an advocate.

10   THE COURT:  Thank you.

11   Good morning.

12   THE WITNESS:  Good morning.

13   THE COURT:  Could you spell your first name for me?

14   THE WITNESS:  A-r-l-e-t-h.

15   THE COURT:  Okay.  And the lawyers are going to ask

16 you questions, and I'm assuming Ms. Filo talked to you about

17 how she's going to ask the questions and the rules in the

18 court, so I'm going to simply let her begin.  Okay?

19   THE WITNESS:  Okay.

20   THE COURT:  During this process, if for some reason

21 you want to take a break, just let me know or ask Ms. Filo,

22 and I will give you a break.

23   THE WITNESS:  Okay.

24   THE COURT:  Thank you.

25   Direct.

26   MS. FILO:  Thank you, Your Honor.  May I approach?

27   THE COURT:  Yes.

28  ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   987

1                    DIRECT EXAMINATION

2    BY MS. FILO:

3    Q.   Arleth, I'm going to scoot this microphone a little

4    closer to you.  Okay?  Could you talk right into there for

5    me?

6    A.   Yeah.

7    Q.   Okay.  All right.

8              Arleth, you and I have talked before about the

9    rules of testifying.  Do you remember those?

10   A.   Yes.

11   Q.   What rules did we talk about?

12   A.   That we have to be correctly.

13   Q.   You have to what?

14   A.   We have to be correctly.

15   Q.   Okay.  Did we talk about telling the truth?

16   A.   Yeah.

17   Q.   And we only tell the truth in court?

18   A.   Yeah.

19   Q.   And we talked about using real words?

20   A.   Yeah.

21   Q.   Like yes or no or I don't know?

22   A.   Yes.

23   Q.   And did we talk about letting me finish before you

24   begin?

25   A.   Yes.

26   Q.   So that Ms. Jamie here could take everything down?

27   A.   Yeah.

28   Q.   Yeah?  Do you remember talking about all of those

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   988

```
1    things?

2    A.   Yeah.

3    Q.   Okay.  Arleth, are you a little bit nervous being here

4    today?

5    A.   Yes.

6    Q.   How come?

7    A.   I don't know.

8    Q.   You don't know?

9    A.   (Shakes head side to side.)

10   Q.   Okay.  Is it being in a courtroom that makes you scared?

11   A.   Not really.

12   Q.   Not really?

13   A.   (Shakes head side to side.)

14   Q.   You are shaking your head no?

15   A.   No.

16   Q.   What is it that makes you nervous?

17   A.   Being in front of people.

18   Q.   Being in front of people.  Yeah, that makes a lot of

19   people nervous.  Do you know what I want to ask you about?

20   A.   No.

21   Q.   No?  Do you know that I'm going to ask you some

22   questions about being in Mr. Chandler's classroom?

23   A.   Yes.

24   Q.   Yeah?  Does that make you nervous?

25   A.   A little bit.

26   Q.   How come?

27   A.   Because -- I don't know.

28   Q.   You don't know?
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   989

1    A.    (Shakes head side to side.)

2    Q.    Just makes you nervous to talk about that?

3    A.    Yeah.

4    Q.    Okay.  All right.  Well, you remember that if you don't

5    understand one of my questions, you just need to stop me.

6    Okay?

7    A.    Okay.

8    Q.    What are you going to say?

9    A.    Um, may you repeat the question?

10   Q.    All right.  Great job.  If you don't understand

11   something, you just say:  Ms. Alison, I don't know what you

12   are saying.  Could you say it differently.  Okay?

13   A.    Okay.

14   Q.    Promise me?

15   A.    Yeah.

16   Q.    All right.  Okay.  Arleth, how old are you right now?

17   A.    Eleven.

18   Q.    When is your birthday?

19   A.    June 20th.

20   Q.    Do you know what year you were born?

21   A.    2002.

22   Q.    Okay.  So you are going to start what grade in about a

23   month?

24   A.    Fifth.  I don't understand you.

25   Q.    Okay.  See, there you go.  Just tell me you don't

26   understand.  What grade did you just finish?

27   A.    Fifth.

28   Q.    You just finished fifth grade?  You are going to go to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   990

1   sixth grade; right?

2   A.   Yeah.

3   Q.   Yes?  Okay.  So, Arleth, could you tell me who your

4   teacher was for fifth grade?

5   A.   Ms. -- I forgot her name.

6   Q.   Okay.  And do you know who your teacher was for fourth

7   grade?

8   A.   Ms. Ketman.

9   Q.   Ketman?

10  A.   Yeah.

11  Q.   K-e-t-m-a-n?

12  A.   K-e-t-m -- I forgot how to spell it.

13  Q.   Okay.  But I'm close, Ketman; is that right?

14  A.   Yeah.

15  Q.   Okay.  And then do you know who your teacher was for

16  third grade?

17  A.   Chandler.

18  Q.   Mr. Chandler?

19  A.   Yeah.

20  Q.   Okay.  Where did you go to school when Mr. Chandler was

21  your teacher?  What was the name of the school?

22  A.   O.B. Whaley.

23  Q.   Okay.  All right.  So when you were in the third grade

24  with Mr. Chandler, do you remember who your best friends were

25  at school?

26  A.   Um, Melissa.

27  Q.   Melissa, okay.  Who else?

28  A.   I don't remember.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   991

1  Q.    Okay.  But you remember Melissa?

2  A.    Yeah.

3  Q.    And was Melissa in Mr. Chandler's class, too?

4  A.    Yeah.

5  Q.    Yes?  All right.  Arleth, did you ever -- were you ever

6  in Mr. Chandler's classroom alone with Mr. Chandler?

7  A.    Yes.

8  Q.    Yes?

9  A.    (Shakes head up and down.)

10  Q.    Arleth, there is a picture right behind you.  It's a big

11  blown-up picture and it's been marked as Defendant's A-2.  Do

12  you recognize what's in that picture?

13  A.    Um, his class.  The class.

14  Q.    Mr. Chandler's class?

15  A.    Yeah.

16  Q.    So there is kind of a big wooden desk right in the

17  middle of that picture.  Do you know whose desk that is?

18  A.    Mr. Chandler's --

19  Q.    Okay.

20  A.    -- desk.

21  Q.    And then there is in the bottom left-hand corner what

22  looks like a student desk.  Is that what that is?

23  A.    Yeah.

24  Q.    Okay.  And is that what you remember Mr. Chandler's

25  classroom looking like when you were in his classroom?

26  A.    Yeah.

27  Q.    Yes?

28  A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   992

1   Q.   Okay.  So you said that you were in Mr. Chandler's

2   classroom with Mr. Chandler alone; is that right?

3   A.   Yeah.

4   Q.   How many times did that happen?

5   A.   Five or six.

6   Q.   Okay.  Arleth, when you -- how did you come to be alone

7   in the classroom with Mr. Chandler?  Why were you alone in

8   there?

9   A.   Because he told me to go after recess.

10   Q.   So he told you to come back to the classroom?

11   A.   Yeah.

12   Q.   During recess?

13   A.   Yeah.

14   Q.   Do you know what recess that was?  Was it morning or

15   lunchtime or afternoon?

16   A.   Like, the afternoon recess.

17   Q.   Okay.  You said he would have you come into the

18   classroom; is that right?

19   A.   Yeah.

20   Q.   Were you by yourself with Mr. Chandler then?

21   A.   Yes.

22   Q.   What happened -- do you remember the very first time

23   that ever happened?

24   A.   No.

25   Q.   Okay.  So you remember it happening more than once?

26   A.   Yes.

27   Q.   But you don't have a memory of the first time it

28   happened?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   993

1   A.   No.

2   Q.   Do you have a memory of the last time it happened?

3   A.   Yes.

4   Q.   Could you tell me what happened the very last time you

5   were alone with Mr. Chandler in his classroom?

6   A.   Um, he put me -- something in my eye, like to cover my

7   eye.

8   Q.   Okay.  He put something to cover your eyes?

9   A.   Yes.

10  Q.   What -- do you know what it was?

11  A.   No.

12  Q.   No?

13  A.   I did, but I don't know what it's called.

14  Q.   Could you describe it for me?

15  A.   Um, just put -- he just put it on you, like something

16  like that.

17  Q.   Okay.  You said it covered your eyes?

18  A.   Yeah.

19  Q.   What was in the back of it?

20  A.   Something so it's not going to fall.

21  Q.   Something so it wouldn't fall off?

22  A.   Yeah.

23  Q.   Like a string or a tie or something?

24  A.   Like a string.

25  Q.   Okay.  And what was it made out of?  Was it made out

26  of -- do you know what it was made out of?

27  A.   No.

28  Q.   Was it made out of cloth?  Like, fabric like --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   994

1  A.    It was soft.

2  Q.    Soft.  Okay.  And it would cover your whole eyes?

3  A.    Yeah.

4  Q.    Okay.  Do you know where that thing came from?  Where in

5  the classroom it came from?

6  A.    Um, the closet.

7  Q.    Okay.

8        MS. FILO:  So, Your Honor, may I approach?

9        THE COURT:  Yes.  Thank you.

10 BY MS. FILO:

11 Q.    In this picture, in Defense A-2, you said the closet.

12 Is that this big cabinet here that says "group prizes"?

13 A.    Yes.

14 Q.    Is that what you mean?

15 A.    Yes.

16 Q.    That's where the blindfold came from?

17 A.    Yes.

18 Q.    Okay.  What happened once he got the blindfold?

19 A.    He said to put it on me.

20 Q.    Were you standing up or sitting down or what were you

21 doing?

22 A.    I was standing up.

23 Q.    Okay.  So you put this thing on your eyes?

24 A.    Yes.

25 Q.    And then what happened?

26 A.    Then I sat down.

27 Q.    Do you know where you were in the classroom when you sat

28 down?

1    A.    Yes.

2    Q.    Could you show me?

3    A.    Right -- little bit more over there.

4    Q.    Okay.  So there is a number three on this picture on the

5    bottom right-hand corner; right?

6    A.    Yeah.

7    Q.    Is where you were not even pictured here?

8    A.    A little more like that.

9    Q.    It was off the picture?

10   A.    Yeah.

11   Q.    You can't even see where you were from this picture?

12   A.    Yeah.

13   Q.    Correct?

14   A.    Yes, correct.

15   Q.    Okay.  All right.  So you said you sat down.  Do you

16   know what you sat on?

17   A.    A chair.

18   Q.    A chair.  Did you already have the blindfold on when you

19   sat down?

20   A.    No.  I sat down and then I put the blindfold on.

21   Q.    Okay.  Do you know what kind of chair it was?

22   A.    Like the one from over there.

23   Q.    Okay.  So you want to -- so I will give you this.  Could

24   you point to it?

25   A.    (Indicating).

26   Q.    It was a chair from over here?

27   A.    Yeah.

28   Q.    Do you know what chair it was, or you just know this is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   996

1   where it came from?

2   A.    It was like that kind of chair.

3   Q.    This kind of chair?  The blue one right here?

4   A.    Yeah.

5   Q.    Okay.  How did he get the chair from over -- from where

6   it is in the picture on the left-hand side over to where you

7   sat?

8   A.    I just came in and it was right there already.

9   Q.    It was there?

10  A.    Yeah.

11  Q.    Okay.  And then you put a blindfold on?

12  A.    Yes.

13  Q.    And then what happened when the blindfold was on?

14  A.    He put me something -- put something in my mouth.

15  Q.    He put something on your mouth?

16  A.    Yeah.

17          MR. MADDEN:  Your Honor, I'm sorry.  I didn't hear

18  that.

19          THE COURT:  He put something on my mouth; is that

20  correct?

21          (Whereupon, the record was read.)

22          THE COURT:  He put something in my mouth, according

23  to the court reporter.

24  BY MS. FILO:

25  Q.    Was it -- let me just be clear.  Was it inside your

26  mouth or on your mouth?

27  A.    It was on my mouth.  He put something on my mouth.

28  Like, first it was, like, a candy, type of candy.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   997

1   Q.   Okay.  So was it on your tongue or on your lips or where

2   was it?

3   A.   Inside my mouth.

4   Q.   Okay.  So he put a piece of candy in your mouth?

5   A.   Yeah.

6   Q.   Did you know what kind of candy it was?

7   A.   A lollipop.

8   Q.   Okay.  And did he put -- how long was the lollipop in

9   your mouth?

10   A.   Like, little bit of time.

11   Q.   Okay.  Did he put anything else in your mouth?

12   A.   He put, like, something -- I don't know.  Something.  I

13   don't know what it was.

14   Q.   Okay.  So he did put something else in your mouth?

15   A.   Yes.

16   Q.   That was not a lollipop?

17   A.   Yes.

18   Q.   Do you know what it felt like?

19   A.   Um, squishy.

20   Q.   Squishy?

21   A.   Yeah.

22   Q.   Do you know how big it was?

23   A.   No.

24   Q.   Do you know what shape it was?

25   A.   Like a circle.  I think a circle.

26   Q.   Okay.  But you don't know how big it was?

27   A.   No.

28   Q.   Okay.  Was it something you could -- you could put all

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  998

1  the way in your mouth?  You could close your mouth around?

2  Does that make sense?

3  A.    Yeah, but kind of.  You could close your mouth a little

4  bit.

5  Q.    So you could only close your mouth a little bit?

6  A.    Yeah.

7  Q.    Okay.  You said it felt kind of squishy?

8  A.    Yes.

9  Q.    Did it have any taste?

10  A.    No.

11  Q.    No taste?

12  A.    (Shakes head side to side.)

13  Q.    Could you remember anything else that it felt like other

14  than squishy?

15  A.    It was soft, like slippery.

16  Q.    Slippery?

17  A.    Yeah.

18  Q.    What did -- what did the thing do while it was in your

19  mouth, if anything?

20  A.    Um, it threw like some water, like, a type of drink.

21  Q.    Okay.

22           MR. MADDEN:  Your Honor, I'm sorry.  I can't hear.

23           THE COURT:  Okay.  Could you say your answer again?

24           THE WITNESS:  Yeah.  It threw like a type of drink,

25  something.

26  BY MS. FILO:

27  Q.    It threw like a type of drink?

28  A.    Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   999

1   Q.   Okay.  So the thing that was in your mouth, some sort of

2   drink came out of that?

3   A.   Yes.

4   Q.   Do you remember what the drink tasted like?

5   A.   No.

6   Q.   No?  Do you remember whether it tasted good or bad?

7   A.   I don't know.

8   Q.   Don't --

9   A.   I don't remember.

10   Q.   You don't remember?  Okay.

11          While that thing was in your mouth, did it just

12   stay in your mouth or did it move at all?

13   A.   It just stayed in my mouth.

14   Q.   So you -- I want to make sure I ask this carefully.

15   Okay?

16   A.   Okay.

17   Q.   So did the thing not move or do you not remember whether

18   it moved?

19   A.   It didn't move.

20   Q.   Okay.  Do you remember whether the drink was hot or

21   cold?

22   A.   It was normal.

23   Q.   Okay.

24          MR. MADDEN:  I'm sorry, Your Honor.  I didn't hear

25   the last answer.

26          THE COURT:  It was normal.

27   BY MS. FILO:

28   Q.   Arleth, how many -- you said that you were alone with

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1000

1    Mr. Chandler about five or six times; is that right?

2    A.    Yes.

3    Q.    Did you have this blindfold on each of those five or six

4    times?

5    A.    Yes.

6    Q.    Arleth, you start school usually in -- do you know what

7    month you -- sorry -- what month you usually start school?

8    A.    No.

9    Q.    No?  You're just about to go back to school; right?

10   A.    Yeah.  Well, in a month.  In August.

11   Q.    In August.  Okay.  When you started in Mr. Chandler's

12   classroom, do you think you started sometime in August?

13   A.    I don't remember.

14   Q.    Okay.  Do you remember how soon after you started school

15   did you first come into the classroom and have this blindfold

16   on?

17   A.    No.  Some days passed a little bit.

18   Q.    Okay.  Do you know if it was towards the beginning of

19   the year, the middle of the year, or the end of the school

20   year?

21   A.    Like, beginning of the year.

22   Q.    It was the beginning.  Okay.

23            When this thing was in your mouth, did you hear

24   anything?

25   A.    Yes.

26   Q.    What did you hear?

27   A.    Um, just to keep on licking it.

28   Q.    Is that what Mr. Chandler said to you?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1001

1   A.   Yes.

2   Q.   Did he say anything else to you?

3   A.   No.

4   Q.   Did he tell you whether you should bite it or not?

5   A.   No.  He just told me what I just said.

6   Q.   To lick it?

7   A.   Yeah.

8   Q.   Okay.  And to keep doing that?

9   A.   Yeah.

10  Q.   Did you know -- did you know why this was happening?

11  A.   No.

12  Q.   No?  How did it make you feel?

13  A.   It made me -- like something was wrong.

14  Q.   Something was wrong?

15  A.   Yes.

16  Q.   Okay.  Why did you think something was wrong?

17  A.   Um, because in my other classes they didn't do that.

18  Q.   Okay.  Nothing like this had ever happened to you

19  before?

20  A.   No.

21  Q.   No?  Okay.

22       So I think the time you were -- you were just

23  talking about, that was last time you remember something

24  happening?

25  A.   Yes.

26  Q.   Okay.  What about the times before that?  Do you

27  remember anything?  Were they the same or were they

28  different?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1002

1  A.    The other times?

2  Q.    Yes.

3  A.    They were different -- kind of the same.

4  Q.    Okay.

5  A.    Sometimes that happened, sometimes it didn't.

6  Q.    Okay.  Say it again.

7  A.    Sometimes that happened and sometimes that didn't

8  happen.

9  Q.    Okay.  How about the times that it didn't happen?  What

10 happened when -- when you're saying something didn't happen,

11 what happened on those times?

12 A.    Um, we did exercise.

13 Q.    Like what?

14 A.    Um, I was on the floor.

15 Q.    On the floor?

16 A.    Yeah.

17 Q.    Tell me about that.

18 A.    That he was at the back of me.

19 Q.    Okay.  What do you mean?

20 A.    I don't know.  Like, we were just doing exercise on the

21 floor.

22 Q.    Exercises on the floor?

23 A.    Yeah.

24 Q.    Okay.  Were your eyes covered or could you see?

25 A.    I could see.

26 Q.    You could see those times?

27 A.    Yeah.

28 Q.    And what were you -- how many times did that happen?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1003

1   A.   Two times.

2   Q.   Two times you remember?

3   A.   Yeah.

4   Q.   All right.  And tell me what you remember about those

5   exercises.  You said you were on the floor; right?

6   A.   Yes.

7   Q.   Were you lying down?  Were you on your knees?  Were you

8   on your back?  Were you --

9   A.   On my knees.

10   Q.   On your knees?

11   A.   Yeah.

12   Q.   Were you just on your knees or were your hands on the

13   ground, too?

14   A.   My -- like, my -- I was on my knees and my hands on the

15   ground, too.

16   Q.   Okay.  So you are on your hands and knees like a baby

17   crawling?

18   A.   Yeah.

19   Q.   And where was Mr. Chandler?

20   A.   At the back of me.

21   Q.   What was he doing?

22   A.   He was just holding my leg.

23   Q.   He was holding your leg?

24   A.   Yes.

25   Q.   Where was he holding your leg?

26   A.   Like, all the way down on my feet.

27   Q.   Okay.  So he was holding your feet?

28   A.   Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1004

1    Q.    Did you have your shoes on or off?

2    A.    On.

3    Q.    And so he was holding -- was he holding your shoes or

4 was he holding your ankle or your calf or your knee?  Where

5 was he holding?

6    A.    Like, my shoes.

7    Q.    Right where your shoes were?

8    A.    Yes.

9    Q.    What was he having you do?

10    A.    Just to stay there.

11    Q.    He just wanted you to stay there?

12    A.    Yeah.

13    Q.    What was he doing?

14    A.    Um, with his head, he was pushing back, like pushing me

15 all the way back.

16    Q.    Okay.  You said he used his head, and what part of your

17 body did his head touch?

18    A.    The back of me.

19    Q.    Like your bottom?

20    A.    Yeah.

21    Q.    So he was pushing your bottom with his head?

22    A.    Yes.

23    Q.    And he was holding your feet?

24    A.    Yeah.

25    Q.    Did he ever tell you why he was doing that?

26    A.    No.

27    Q.    Did you see anything happen while he was pushing you

28 like that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1005

1   A.   Yeah.  I saw water dripping.

2   Q.   Water dripping?

3   A.   (Shakes head up and down.)

4   Q.   Where did you see the water?

5   A.   At the back of me.

6   Q.   Do you know what the water looked like?

7   A.   No.

8   Q.   No?  Do you know where the water came from?

9   A.   I just know it just came from the back of me.

10  Q.   Okay.  Did it -- did you see where the water landed?

11  A.   Yeah.

12  Q.   Where did it land?

13  A.   Like -- like, where he was.

14  Q.   Okay.  So behind you?

15  A.   Yeah.

16  Q.   Okay.  How long did that happen?

17  A.   Um, like -- for, like, 15 seconds.

18  Q.   Not very long?

19  A.   Yeah, not very long.

20  Q.   Did -- what happened after he was done pushing you from

21  the back?

22  A.   We did -- I don't know what's it called.  We jumped.  We

23  put our hands, like, in the air.

24  Q.   Jumping jacks?

25  A.   Yeah, that.

26  Q.   Okay.  You think that happened two times?

27  A.   Yeah.

28  Q.   You were in the classroom alone with Mr. Chandler when

1   this happened?

2   A.   Yes.

3   Q.   All right.  So there were another -- few times where you

4   were sitting down with your eyes covered; is that right?

5   A.   Yes.

6   Q.   Okay.  Were those times the same as you have already

7   described for us?

8   A.   Sometimes.

9   Q.   Okay.  What did you mean "sometimes"?

10  A.   Like, sometimes he did that and sometimes we did

11  different, like, exercises.  And then, like, one day then we

12  just did exercises and then he just gave me a lollipop and

13  then I left.

14  Q.   Okay.  So one day you just did an exercise and you left?

15  A.   Yeah, it was two times.

16  Q.   What was two times?

17  A.   To do exercises.

18  Q.   Okay.  Twice the -- you did these exercises; right?

19  A.   (Shakes head up and down.)

20  Q.   But then you said there was this time you were sitting

21  in the chair and you put a blindfold on; right?

22  A.   Yeah.

23  Q.   How many times did that happen, do you know?

24  A.   Like, rest of the times.

25  Q.   Okay.  So another two or three times?

26  A.   Yeah.

27  Q.   Okay.  You told us that this last time that you had the

28  blindfold on, you were sitting in the chair, that he put

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1007

1   something in your mouth that was a circle, you don't remember

2   any taste, it was slippery, it stayed in your mouth, and then

3   some drink came out that was normal temperature; right?

4   A.   Yeah.

5   Q.   Did that happen each other time that he had you sitting

6   in a chair blindfolded?

7   A.   Like, one time it didn't happen.

8   Q.   Tell me about that time.

9   A.   Like, well, when he put that inside and then he didn't

10  do anything else.  It was just inside my mouth.

11  Q.   So this drink came out?

12  A.   Yeah.

13  Q.   But was it the same thing?  Could you feel it was the

14  same thing?

15  A.   Yes.

16  Q.   So at least one time the drink came out; right?

17  A.   No.  One time the drink didn't come out.

18  Q.   I got it.  Okay.  But you know it was the same thing

19  that he put in your mouth?

20  A.   Yes.

21  Q.   It's just one time the drink didn't come out, and the

22  other times it did?

23  A.   Yes.

24  Q.   Okay.  Arleth, you said you had this -- your eyes

25  covered; right?

26  A.   Yes.

27  Q.   Were you ever able to peek?

28  A.   No.  But, like, I looked down a little bit and I could

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1008

1   see a little bit.

2   Q.   So you didn't ever, like, move the blindfold so you

3   could peek?

4   A.   No.

5   Q.   But you were able to look underneath it a little bit?

6   A.   Yeah.

7   Q.   What did you see?

8   A.   Like, a circle.

9   Q.   A circle?

10  A.   Yeah.

11  Q.   Did you see anything else?

12  A.   No.

13  Q.   No?  Do you remember if you saw anything else?

14  A.   No, I don't remember.

15  Q.   You don't remember?  Okay.

16          Arleth, do you remember that you met with some

17  police officers from the police department?

18  A.   Yes.

19  Q.   Yes?  And did you do your absolute best to tell them the

20  truth?

21  A.   Yes.

22  Q.   Do you remember that they asked you to draw that thing

23  that you saw?

24  A.   Yeah.

25  Q.   Yeah?  So if I showed you a picture --

26          MS. FILO:  May I approach, Your Honor?

27          THE COURT:  Yes.

28          MS. FILO:  Your Honor, this has been previously

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1009

1   published to the jury, and I'll mark it as an exhibit when I

2   have a clean copy, if the Court is okay with that?

3          THE COURT:  I do.  And just so it's clear for the

4   record, what you are showing her and what we're going to be

5   marking later, a clean copy, will be People's 7; correct?

6          MS. FILO:  Correct.  Like I say, it was published

7   to the jury in opening statement.

8          THE COURT:  Right.

9          (Whereupon, People's Exhibit 7 was marked for

10  identification.)

11  BY MS. FILO:

12  Q.   Arleth, do you remember drawing this object for the

13  police?

14  A.   Yes.

15  Q.   When you were able to peek underneath the blindfold, is

16  that what you saw?

17  A.   Yes.

18  Q.   You said it was round; right?

19  A.   Yes.

20  Q.   What are these lines around it?

21  A.   Like, type of hair.

22  Q.   Hair?

23  A.   Yeah.

24  Q.   Okay.  Do you remember what color this hair was?

25  A.   No.

26  Q.   Don't remember now?

27  A.   No.

28  Q.   Okay.  Arleth, did you see anything else when you sort

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1010

1  of looked underneath the blindfold?

2  A.   No.

3  Q.   No?  Did you have your glasses on then?

4  A.   No.

5  Q.   No?  Okay.  Arleth, why didn't you have your glasses on?

6  A.   Because I had to take them off because -- or else I

7  couldn't put -- cover my eyes.

8  Q.   Did Mr. Chandler tell you to take your glasses off?

9  A.   Yeah.

10  Q.   Yeah?  Okay.  All right.  Ready for a little test?

11  A.   Yes.

12  Q.   Could you take your glasses off for me?  All right.

13  Ready?  Okay.  So I've written something on a post-it note.

14  I'm going to put it right here.  Could you see what number

15  that is?

16  A.   Yes.

17  Q.   What is it?

18  A.   Four.

19  Q.   Okay.  Now, I'm going to take a step back and show you

20  another number.  Could you see what number that is?

21  A.   I think it's eight.

22  Q.   Eight?  Okay.  Good job.  So if I step back here, now

23  could you see which one I'm holding up?

24  A.   No.

25  Q.   No?  It's blurry back here; right?

26  A.   Yeah.

27  Q.   But when I stand up close to you, could you read those

28  for me?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1011

1   A.   Yeah, eight and four.

2   Q.   Okay.  This you see just fine?

3   A.   Yeah.

4   Q.   So you just have trouble seeing far away?

5   A.   Yes.

6   Q.   But when something is close to you, you could see just

7   fine?

8   A.   Yeah.

9   Q.   Okay.  Arleth, you were -- you remember talking to the

10  police department; right?

11  A.   Yes.

12  Q.   Do you remember whether it was a male police officer or

13  a female police officer?

14  A.   It was a male.

15  Q.   Man?

16  A.   Yeah.

17  Q.   Okay.  Do you remember where you talked to them?

18  A.   On the police department it was, like, a room.

19  Q.   It was a room?  What did the room look like?

20  A.   It was little.

21  Q.   Little room?

22  A.   Yeah.

23  Q.   Okay.  It is kind of little.  Do you remember when you

24  talked to them?

25  A.   Kind of.

26  Q.   What do you remember about when you talked to them?

27  A.   Like, he just told me that how many times that happened

28  and -- I don't remember.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1012

1    Q.   Okay.  Do you remember what time of year it was that you

2    talked to the police officers?

3    A.   No.

4    Q.   Do you remember whether it was a month ago or six months

5    ago or a year ago or two years ago?  Do you remember?

6    A.   No.

7    Q.   No?  Do you remember what grade you were in when you

8    talked to them?

9    A.   In fourth.  Like, in fourth.

10   Q.   You were in fourth grade?

11   A.   Yeah.

12   Q.   Okay.  So you were talking to the police officer when

13   you were in fourth grade; right?

14   A.   I'm not sure, but I think that I was in fourth.

15   Q.   Okay.  And you were talking about being in Mr.

16   Chandler's class, which was a year before that?

17   A.   Yeah.

18   Q.   And you're now going into sixth grade; right?

19   A.   Yes.

20   Q.   So being in Mr. Chandler's classroom, that's almost

21   three years ago now; right?

22   A.   Yes.

23   Q.   Because you went through your whole fourth grade year

24   and your whole fifth grade year; right?

25   A.   Yes.

26   Q.   And you are about to start your sixth grade year?

27   A.   Yes.

28   Q.   You said this blindfolding thing with Mr. Chandler, that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1013

1   happened at the beginning of the year?

2   A.    Yeah.

3   Q.    Okay.  Arleth, did you -- I lost my own train of

4   thought.  Sorry.

5           How did you first tell somebody about being

6   blindfolded in Mr. Chandler's class?  Who did you first tell?

7   A.    First my cousin.

8   Q.    Cousin?  Is that Noemi?

9   A.    Yes.

10  Q.    Are you and Noemi pretty good friends?

11  A.    Yeah.

12  Q.    You trust Noemi?

13  A.    Yeah, yes.

14  Q.    Yes?  She's a little bit older than you?

15  A.    Yes, she's bigger.

16  Q.    She's bigger?

17  A.    (Shakes head up and down.)

18  Q.    Okay.  How did you tell Noemi?  What -- how did you

19  start talking?

20  A.    I was in the house.

21  Q.    In whose house?

22  A.    Claudia's house.

23  Q.    Claudia's house?

24  A.    Yeah.

25  Q.    Okay.  And what were you talking about?

26  A.    Like, then I started talking about -- and then my cousin

27  told me that what was happening, and then the -- like, some

28  days we heard on the news what was happening.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1014

1   Q.   Okay.  So I've got to back up a little bit.  Okay?  So

2   can you tell me which one of those things happened first?

3   You said you talked to Noemi, you saw there were things on

4   the news, and you told her what was happening.  Do you know

5   what order those things happened?

6   A.   First, I told her what, and then we started talking and

7   I just told her that -- like, we were, like, drinking

8   something and it reminded me of something.

9   Q.   Okay.

10          MR. MADDEN:  I'm sorry.  I didn't hear the last

11   part, Your Honor.

12          THE COURT:  I believe she said we were drinking

13   something and then it reminded me of something; is that

14   accurate?

15          MR. MADDEN:  Thank you.

16   BY MS. FILO:

17   Q.   Okay.  So when you were at Claudia's house, you were

18   drinking something?

19   A.   Yes.

20   Q.   That made you remember being in Mr. Chandler's class?

21   A.   Yes.

22   Q.   Is that how you started talking about being in Mr.

23   Chandler's class?

24   A.   Yes.

25   Q.   That's how you started talking to Noemi?

26   A.   Yes.

27   Q.   Arleth, why hadn't you told anybody about being

28   blindfolded in Mr. Chandler's class before?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1015

1   A.   Because I didn't -- like, I thought it was normal.

2   Q.   You thought it was normal?

3   A.   Yeah.

4   Q.   Yeah?  You just said a little while ago that you thought

5   it was wrong.  That had never happened in any other class

6   before; right?

7   A.   Yeah, because, like, I didn't know it was -- I didn't

8   know what was it.

9   Q.   You didn't know what it was?

10  A.   Yeah.

11  Q.   Okay.  Were you worried that you were going to get in

12  trouble?

13  A.   No.  A little bit.

14  Q.   A little bit?  Do you remember asking Noemi:  Hey,

15  Noemi, if I tell you something, am I going to get arrested?

16  A.   Yeah.

17  Q.   Why did you ask her that?

18  A.   Because -- well, I told her I thought that -- that was,

19  like, something wrong, what he did.

20  Q.   Okay.  So when you talked to her, you knew that what you

21  were talking about was something bad; right?

22  A.   Yeah.  And I didn't know it was bad, but then I wanted

23  to make sure, then I told her.

24  Q.   You were worried that you were going to get in trouble?

25  A.   Yeah.

26  Q.   Yeah?  Is that why you hadn't told anybody before?

27  A.   Yeah.

28  Q.   Okay.  Arleth, when you were talking to Noemi, did you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1016

1    tell her everything that had happened in Mr. Chandler's, or a

2    little bit?  How much did you --

3    A.    A little bit.

4    Q.    Just a little bit?

5    A.    (Shakes head up and down.)

6    Q.    Okay.  Did she ask you some questions?

7    A.    No.  She asked me -- yeah, she did.

8    Q.    Okay.  What kind of questions did she ask you?

9    A.    She just said:  What happened?  Was it in his classroom?

10   And that's all I remember.

11   Q.    Okay.  Was she telling you what to say?

12   A.    No.

13   Q.    No?  You used your own words?

14   A.    Yeah.

15   Q.    Do you know -- you know the difference, right, when

16   someone's trying to get you to say something?

17   A.    Yeah.

18   Q.    If somebody is trying to trick you into saying something

19   that's not true?

20   A.    Yeah.

21   Q.    Yeah?  So if I said, Noemi, it's really the truth that

22   your jacket is black, what would you say?

23   A.    No.

24   Q.    Well, that's not what happened; right?

25   A.    No.

26   Q.    Even though I'm a lawyer and I'm a grownup, you would be

27   able to say to me:  Ms. Alison, that is not true?

28   A.    Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1017

1    Q.    Right?

2    A.    (Shakes head up and down.)

3    Q.    Okay.  So did Noemi say anything to you where you said:

4    No, that's not how it went, Noemi?

5    A.    Um-hum.

6    Q.    No?

7    A.    I just told her what he did to me.

8    Q.    So you used your words and she heard what you were

9    saying?

10   A.    Yeah.

11   Q.    Do you remember using the word "weenie" with her?

12   A.    Yeah.

13   Q.    Yeah?  Was that your word?

14   A.    Yeah.

15   Q.    She didn't give you that word, did she?

16   A.    No.

17   Q.    No?  When you were able to look underneath that

18   blindfold, is that what you think you saw?

19   A.    Yeah.

20         THE COURT:  Ms. Filo, I will let you ask a few

21   questions.  When you reach a time it would be good to take

22   the afternoon break, just let me know.

23         MS. FILO:  I think this is fine, Your Honor.

24         THE COURT:  Okay.

25         Ladies and gentlemen, we're going to take the noon

26   recess.  I will order all members of the jury to report to

27   the jury assembly room on the second floor at 1:30 and we'll

28   continue with the trial at that time.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1018

1              We'll be in recess.  Thank you.

2              (Whereupon, the Court took the noon recess.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1019

1                    AFTERNOON PROCEEDINGS

2            THE COURT:  Thank you, ladies and gentlemen.

3   Record will reflect all members of the jury are present, both

4   counsel are present, Mr. Chandler is present in the

5   courtroom, as well as our witness is on the witness stand.

6            Ms. Filo, you were continuing with direct.

7            MS. FILO:  Thank you, Your Honor.

8   BY MS. FILO:

9   Q.  Arleth, I think I'm almost done.  Okay?  I have a few

10  more questions.

11           Do you remember those couple of times that you were

12  in the classroom and you said you were on your hands and

13  knees?  Remember that?

14  A.  Yeah.

15  Q.  Do you remember what you were wearing by chance?

16  A.  Could you repeat it?

17  Q.  Sure.  Do you remember what you were wearing to school

18  those days?

19  A.  Um, it's, like, type of jeans.

20  Q.  Okay.  Pants?

21  A.  Yeah, but I don't know, like, how it's called.

22  Q.  Okay.  But it wasn't like shorts or a skirt or anything

23  like that?

24  A.  No.

25  Q.  Okay.  Arleth, I want to ask you a little bit about --

26  you remember being interviewed by the police department;

27  right?

28  A.  Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1020

1   Q.   Do you remember anything that was on the news about Mr.

2   Chandler?

3   A.   No.

4   Q.   No?  Did you see any of the news stuff?

5   A.   No.  I just heard that -- what happened.  That's all.

6   Q.   Okay.  Do you know who you heard that from?

7   A.   I mean, like, I just saw, but then I heard it 'cause --

8   from my neighbor that -- in the news, because we were playing

9   and then I saw the video and I didn't want to play, so I --

10   Q.   Okay.  So you were playing with your neighbor?

11   A.   With my friends.

12   Q.   With your friend?

13   A.   (Shakes head up and down.)

14   Q.   Did your friend go to O.B. Whaley School too?

15   A.   No.

16   Q.   Okay.  How old was the friend that you were playing

17   with?

18   A.   She's ten.

19   Q.   But she went to a different school?

20   A.   Yeah.

21   Q.   So you were playing with her and then tell me what

22   happened.

23   A.   And then I'm -- her mom said:  Oh, is that your school?

24   And then I saw him and I'm, like, yeah.

25   Q.   Okay.  So was the television on at your friend's house?

26   A.   Yeah.

27   Q.   And did a story come up on the news while you were at

28   your friend's house?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1021

1  A.   No.

2  Q.   No?

3  A.   (Shakes head side to side.)

4  Q.   Okay.  Maybe I'm not understanding.  Did your friend's

5  mom just ask you about something?

6  A.   No.  She just told me if that's my school.

7  Q.   She just asked you if you went to O.B. Whaley?

8  A.   Yeah.

9  Q.   Did you know at that point that Mr. Chandler was the

10  person that was on the news, or did you just know that O.B.

11  Whaley was on the news?

12  A.   I just saw his picture.  That's all.

13  Q.   You saw his picture on the TV screen?

14  A.   Yeah.

15  Q.   Okay.  Arleth, do you remember more, or did you remember

16  more about being in Mr. Chandler's classroom alone when you

17  were interviewed by the police department?

18  A.   I don't understand.

19  Q.   Okay.

20        MS. FILO:  Your Honor, could I use the easel?

21        THE COURT:  Yes.

22        MS. FILO:  All right.

23  BY MS. FILO:

24  Q.   So, Arleth, if this is 2013 -- that's not going to work.

25  So we're in 2013 now; right?

26  A.   Yes.

27  Q.   That's now; right?

28  A.   Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1022

1    Q.    And you were interviewed by the police department in

2    2012; right?

3    A.    Yeah.

4    Q.    And you were in Mr. Chandler's class in 2010 and 2011;

5    right?

6    A.    Yeah.

7    Q.    That's when you were in third grade?

8    A.    Yes.

9    Q.    So your discussion with the police was a lot closer to

10   being in third grade than we are now; right?

11   A.    Yeah.

12   Q.    Because this was 2 1/2, 3 years ago, and this was 1 1/2

13   years ago; right?

14   A.    Yeah.

15   Q.    Is that right?

16   A.    Yes.

17   Q.    Okay.  So when you talked to the police, did you

18   remember things a little bit better -- your memory fades over

19   time; right?

20   A.    Um, wait.  Could you repeat it?

21   Q.    Sure.  Do you remember yesterday a lot better than you

22   remember a year ago?

23   A.    Yeah.

24   Q.    Yes.  Because your memory fades; right?  You don't

25   remember things as well as more time goes on; right?

26   A.    Yes.

27   Q.    Okay.  When you talked to the police, did you do your

28   absolute best to tell them the whole truth and nothing but

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1023

1  the truth?

2  A.   Yeah.

3  Q.   You didn't tell any lies to them; right?

4  A.   Yeah, I didn't tell them any lies.

5  Q.   Okay.  Arleth, has this -- has this process been

6  difficult for you?  Coming to court, is that hard for you?

7  A.   Yeah.

8  Q.   It's not something you like to do; right?

9  A.   No.

10 Q.   No?  Like, if you could be home playing with your

11 friends, that will be way better; right?

12 A.   Yeah.

13 Q.   Yeah?  I don't blame you.  Me too.  Okay.

14      And have any of the kids -- have any of the kids on

15 the school ground made fun of you for being a part of this

16 case?

17 A.   No.

18 Q.   No?  And have you talked to any other kids about being

19 part of this case?

20 A.   No.

21 Q.   Okay.  All right.  Arleth, I think that's all the

22 questions I have.  Thank you very much.

23      THE COURT:  Thank you, Ms. Filo.

24      Cross-examination, Mr. Madden?

25      MR. MADDEN:  Thank you, Your Honor.

26              CROSS-EXAMINATION

27 BY MR. MADDEN:

28 Q.   I'll be right there, Arleth.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1024

1          Arleth, my name is Mr. Madden.  I'm Mr. Chandler's

2    lawyer, and I'm going to ask you some questions.  Okay?

3    A.    Okay.

4    Q.    And you could hear me okay?

5    A.    Yes.

6    Q.    Good.  I could hear you.  If I ask you a question and

7    you don't understand it, you want to tell me that you don't

8    understand it before you give me an answer, and then I'll try

9    to change the question so you do understand it.  Okay?

10   A.    Okay.

11   Q.    Sometimes I'm thinking about too many things at one time

12   and I ask a question that I think is good, but it doesn't

13   make any sense when you hear it.  You know what I mean?

14   A.    A little bit.

15   Q.    Okay.  So if you don't understand the question, it's not

16   your fault; that's mine.  Okay?

17   A.    Okay.

18   Q.    And don't be embarrassed to tell me you don't

19   understand?

20   A.    Okay.

21   Q.    It's important that we communicate.  Okay?

22   A.    Yes.

23   Q.    What I mean by communicate, it's important that we

24   understand what each other is saying.  Okay?

25   A.    Yes.

26   Q.    All right.  So this morning, when you described the

27   thing that was in your mouth, I think the last time it was

28   put in your mouth, you described it as a circle; is that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1025

1    right?

2    A.    Yes.

3    Q.    And by a circle, do you mean like perfectly round?

4    A.    No.

5    Q.    What did you mean?

6    A.    Like, it's like a circle, but like an oval.  I don't

7    know.

8    Q.    Okay.  Did you ever use the word, like an ice cream cone

9    to describe the shape?

10   A.    No.

11   Q.    Okay.  Do you remember answering questions from Mr.

12   Chandler's attorney in May of last year in this same

13   courthouse?

14   A.    Kind of, yeah.

15   Q.    Good.  This is only the second time that you've had to

16   come on the witness stand and sit behind the microphone;

17   right?

18   A.    Yeah.

19   Q.    Okay.  So that -- I'm just telling you that was in this

20   same building, was on May 22nd.  You remember what the man

21   looked like who was asking you questions?

22   A.    Yeah.

23   Q.    Kind of big with a mustache?

24   A.    Yes.

25   Q.    Okay.  Do you remember his name?

26   A.    No.

27   Q.    Good.  It's not important.

28          Now, did you tell Ms. Filo on that day, or did you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1026

1    answer her questions:  Did it have a shape?  And did you say:

2    A cone, like ice cream?

3    A.    I don't remember.

4    Q.    Okay.  Now, does that -- well, so you say "circle"

5    today, but you may have said "cone" on May 22nd?

6            MS. FILO:  Objection, Your Honor.  Misstates the

7    testimony.

8            THE COURT:  Sustained.

9            MR. MADDEN:  Thank you.

10   BY MR. MADDEN:

11   Q.    You ever eat ice cream cones?

12   A.    Could you repeat it?

13   Q.    Sure.  Do you ever eat ice cream cones?

14   A.    Yes.

15   Q.    Okay.  Me too.  When I think of ice cream cones, I think

16   of two types.  I think of what I call an old fashioned kind

17   of ice cream cone and one that has -- comes to a point at the

18   bottom.  Do you know which kinds I'm talking about?

19   A.    Yeah.

20   Q.    Okay.  Let me -- these don't need to be marked.  I know

21   you don't see that well.

22           MR. MADDEN:  May I approach, Your Honor?

23           THE COURT:  Yes.

24   BY MR. MADDEN:

25   Q.    I'm going to show you two boxes, one has some cones that

26   I would describe as old fashioned, and these appear to come

27   to a point; right?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1027

1   Q.   Okay.  Does seeing these boxes, or these pictures, help

2   you remember anything about the shape of the object being

3   like a cone?

4   A.   No.

5   Q.   Okay.  And this object had no taste when it was in your

6   mouth; right?

7   A.   No.

8   Q.   That's right?

9   A.   Yeah.

10  Q.   Okay.  When the object was in your mouth, it just stayed

11  there; right?

12  A.   Yes.

13  Q.   It didn't move one way or another?

14  A.   No.

15  Q.   It didn't move up and down or back and forth?

16  A.   No.

17  Q.   Okay.  Now, this morning I believe you said that while

18  these things were going on, you felt normal; right?

19  A.   Yeah.

20  Q.   All right.  It wasn't until after Mr. Chandler was

21  arrested and after you saw things on the news that you began

22  to think that maybe it was bad?

23  A.   Yeah.

24  Q.   Okay.  Is that fair?

25  A.   Huh?

26  Q.   Let me withdraw that question.

27          You didn't cry or anything during any of the times

28  that you were alone with Mr. Chandler, did you?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1028

1   A.   No.

2   Q.   You didn't tell him that you were upset?

3   A.   No.

4   Q.   You didn't spit anything out of your mouth?

5   A.   Wait.  Yeah.

6   Q.   I'm sorry?

7   A.   Yeah.

8   Q.   Yeah, you did?

9   A.   Yeah.

10  Q.   What was that?

11  A.   It was --

12  Q.   I'm sorry?

13  A.   The type of drink.

14  Q.   A type of drink.  What type of drink was that?

15  A.   I don't know.

16  Q.   Did you ever see any plastic bottles on Mr. Chandler's

17  desk with drinks in them?

18       MS. FILO:  Objection, Your Honor.  Vague as to

19  time.

20       THE COURT:  Sustained.

21  BY MR. MADDEN:

22  Q.   At any of the times that you were alone with him?

23  A.   No.

24  Q.   Okay.  I would like to talk about the times that you

25  were doing exercises.  Okay?

26  A.   Okay.

27  Q.   So there were two times that you were alone with Mr.

28  Chandler and you were doing exercises; right?

```
 1   A.    Yes.
 2   Q.    You described one where you were down on the floor with
 3   your hands on the floor and your knees on the floor; right?
 4   A.    Yeah.
 5   Q.    And did you get in that position on both the days that
 6   you did exercises?
 7   A.    I don't know what the word means.
 8   Q.    Which one?
 9   A.    The -- I don't know how to say it.
10   Q.    That's okay.  Go ahead and finish.
11   A.    I don't know how to say it.
12             THE COURT:  Position?
13             THE WITNESS:  Yeah.
14             MR. MADDEN:  Okay.  Thank you, Your Honor.
15   BY MR. MADDEN:
16   Q.    I'm using the word "position" to mean exactly how you
17   were placed on the ground.  In other words, where your hands
18   were, where your knees were, where your head was, that kind
19   of thing.  That's what I mean by position.  Okay?
20   A.    Okay.
21   Q.    All right.  Now, you remember today that what he pushed
22   you with -- when you were on the ground doing that exercise
23   when your feet and your knees were on the ground, he pushed
24   you with his head; is that right?
25   A.    Yes.
26   Q.    All right.  And that's what you told the police, that he
27   pushed you with his head; right?
28   A.    Yes.
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1030

1    Q.   Did you tell the court about a year ago next door that

2    what he pushed you with was a bouncy ball?

3    A.   At first it -- on one day, he pushed me with his head,

4    and then the other time, I don't know, like, when, but then

5    it was a ball.

6    Q.   So one day he pushed you with his head?

7    A.   Yeah.

8    Q.   And another day he pushed you with a bouncy ball?

9    A.   Yeah.  It was with a different day.

10   Q.   Okay.  It was the same thing?  Only one day it was his

11   head and one day it was a bouncy ball?

12   A.   Yeah.

13   Q.   And so he was behind you with his hands on either your

14   ankles or your shoes?

15   A.   My shoes.

16   Q.   Did you tell the court a year ago that it was his -- he

17   was holding your ankle?

18   A.   I don't remember.

19   Q.   Okay.  And then how long did he hold on to your shoes?

20   For just a second or for a long time?

21   A.   Like, 15 seconds.  Not that much.

22   Q.   The whole exercise lasted 15 seconds?

23   A.   Yeah, only that exercise.

24   Q.   Okay.  The one when you were on the ground, that lasted

25   15 seconds?

26   A.   Yeah.

27   Q.   Okay.  And did you ever do that exercise where you are

28   on your hands and knees on a rainy day in the classroom with

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1031

1  the rest of the students?

2  A.   No.

3  Q.   Some days you couldn't go to PE because the weather was

4  bad; right?

5  A.   Yeah.

6  Q.   On those days, you did some kind of fun things in the

7  class?

8  A.   Yes.

9  Q.   Some of those things were exercises; right?

10  A.   I don't remember.

11  Q.   Okay.  You also on those days perhaps played indoor

12  games; correct?

13  A.   Yes.

14  Q.   You and all of the kids; right?

15  A.   Yes.

16  Q.   Then some days when the class -- maybe in the afternoon,

17  like today, when you get tired, maybe he had everyone do a

18  couple of exercises to wake up?

19  A.   Sometimes, yeah.

20  Q.   Okay.  Now, on the two days that he had you do the

21  exercises, did you do jumping jacks on both days?

22  A.   Only on one day.

23  Q.   So one day you did two things; right?

24  A.   Yeah.

25  Q.   And another day you only did one thing?

26  A.   Yeah.

27  Q.   Okay.  But on both of those days, there was no

28  blindfold; right?

1    A.    Yeah.

2    Q.    That's correct?

3    A.    That's correct.

4    Q.    Okay.  And did Mr. Chandler during those exercises tell

5    you not to look?

6    A.    Um, I'm not sure.

7    Q.    You don't remember him saying:  Don't look or anything;

8    right?

9    A.    No.  Like, I don't know.  I don't remember.

10   Q.    Okay.  So the days that you were blindfolded, you were

11   not doing any exercises?

12   A.    Only one time I didn't because he told me to get up and

13   then we did exercises.

14   Q.    One of the times you were blindfolded?

15   A.    Yeah.

16   Q.    Okay.  So I want to talk a little bit about the

17   blindfold?

18   A.    Okay.

19   Q.    Now, did you know what the word "blindfold" meant at the

20   time you were in Mr. Chandler's class?

21   A.    No.

22   Q.    Do you know what the word means now?

23   A.    Yeah.

24   Q.    What does it mean?

25   A.    Something that you cover your eyes.

26   Q.    Sure.  Okay.  You've seen pictures of them?

27   A.    Yeah.

28   Q.    Okay.  Do you like Halloween?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1033

1   A.   Yes.

2   Q.   Kids wear lots of masks and things on Halloween; right?

3   A.   Yes.

4   Q.   Sometimes masks that just -- there is holes in it for

5   their eyes, but if they were -- it was solid, it wasn't

6   holes, it would be a blindfold, wouldn't it?

7   A.   Yeah.

8   Q.   Is that what we're talking about?  It's something that's

9   like a mask on your face?

10  A.   Yeah.

11  Q.   Is there a place that goes over your nose?

12  A.   I don't know.  Yeah.

13  Q.   Okay.

14          THE COURT:  Excuse me, Counsel.  Could you approach

15  briefly?

16          MR. MADDEN:  Yes.

17          (Whereupon, there was a discussion at the bench.)

18          THE COURT:  Sorry for the interruption, Mr. Madden.

19  When you are ready.

20          MR. MADDEN:   Thank you.

21  BY MR. MADDEN:

22  Q.   Let's get back to the mask.  All right?

23  A.   Okay.

24  Q.   I'm calling it a mask.  A blindfold, all right?

25  A.   All right.

26  Q.   So Mr. Chandler never put it on you; right?

27  A.   The blindfold?

28  Q.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1034

1  A.   No.

2  Q.   You always put it on yourself?

3  A.   Yeah.

4  Q.   He didn't adjust it or anything?

5  A.   What does that word mean?

6  Q.   I'm sorry.  So it was a blindfold covering, I would

7  assume, your eyes and probably went down to your -- covered

8  your cheeks and covered your nose; right?

9  A.   It was -- it didn't cover.  It was almost like my

10 glasses, but it was a little bit more, like, down.

11 Q.   Good.  That's a good description.  A little bit more

12 than your glasses?

13 A.   Yeah.

14 Q.   Okay.  And it had a string that --

15 A.   The back.

16 Q.   In the back.  And was it a string that stretched or was

17 it like just a regular string?

18 A.   It stretched.

19 Q.   Okay.  So once you put it on, was it tight enough you

20 could take your hands off and it would stay right against

21 your face?

22 A.   Yeah, it would stay there.

23 Q.   In other words, it was not loose?

24 A.   No.

25 Q.   Okay.  Now, when the thing was in your mouth, you didn't

26 hear any noises?

27 A.   Wait.  Yeah.

28 Q.   What did you hear that was a noise?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1035

1    A.    He just told me to keep on licking it.

2    Q.    I'm sorry, to what?

3    A.    He told me to keep on licking it.

4    Q.    I don't mean did he say anything.  I mean, did you hear

5    any noises?  Not words, but any other noises?

6    A.    No.

7    Q.    Okay.  Now, the liquid that came out in your mouth, that

8    wasn't hot.  It wasn't cold.  It was just normal; right?

9    A.    Yeah.

10   Q.    And did it appear to be water?

11   A.    I wasn't sure if it was water.

12   Q.    Okay.  One time it spilled a little?

13   A.    Yeah.

14   Q.    When you say it spilled a little, does that mean it

15   spilled a little bit out of your mouth?

16   A.    Yes.

17   Q.    Okay.  On the days when you were alone with Mr. Chandler

18   and blindfolded, when everything was done, did Mr. Chandler

19   say anything to you about telling anyone?

20   A.    No.

21   Q.    He never said that at all; right?

22   A.    Yeah, correct.

23   Q.    So there were two times when you were on your hands and

24   knees; right?

25   A.    Yes.

26   Q.    Two different times?

27   A.    Yeah.

28   Q.    One time he pushed you with a ball and one time he

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1036

1  pushed you with his head?

2  A.   Yes.

3  Q.   Right?

4  A.   Yes.

5  Q.   Now, on one of those times you saw some liquid?

6  A.   Yes.

7  Q.   And I want to talk with you about that time.  Do you

8  remember if at that time he had pushed you with his head or

9  with a ball?  If you remember?

10  A.   Yeah, I don't remember.

11  Q.   Okay.  Thank you.  That's fine.  That's another thing,

12  that if I ask you a question and you really don't remember,

13  that's okay.  All right?

14  A.   All right.

15  Q.   So tell me about what you saw when you saw the liquid?

16  A.   Um, I only saw it out of the back of me.

17  Q.   I'm sorry?

18  A.   I saw it out the back.

19  Q.   You saw it out the back?

20  A.   Yeah.

21          MR. MADDEN:  Now, is it okay if I get down on the

22  ground?

23          THE COURT:  If you want, yes.

24          MR. MADDEN:  I don't really want to, but I don't

25  see any other way.

26  BY MR. MADDEN:

27  Q.   So if I'm -- I got my toes on the ground, I've got my

28  knees on the ground, and now I have my hands on the ground

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1037

1   and I'm trying to look up and see you.  You could see me;

2   right?

3   A.   Yeah.

4   Q.   All right.  Not for long.

5        So if I'm trying to see something behind me, I have

6   to either look around my left shoulder or my right shoulder

7   as I turn, or I have to look down between my legs.  Which one

8   did you do?

9   A.   I looked down between my legs.

10  Q.   Okay.  So you got your head bent over towards the floor

11  and you are looking behind you?

12  A.   Yeah.

13  Q.   And what part of Mr. Chandler could you see when you

14  looked between your legs?

15  A.   I could only see his pants.  That's all.

16  Q.   I'm sorry?

17  A.   Only his pants.

18  Q.   Okay.  Was he standing or was he on the ground or

19  sitting, or how did he appear to be?

20  A.   He was on the ground.

21  Q.   He was on the ground?

22  A.   Yeah.

23  Q.   How was he on the ground?

24  A.   Like, with his knees.

25  Q.   Okay.  You are going to tell me how to be like he was?

26  A.   Yeah, like that.

27  Q.   Just like this?

28  A.   Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1038

1   Q.    Then he was -- how far behind you was he?

2   A.    Like, closer.

3   Q.    So at that time, was his -- was the ball touching you or

4   his head touching you?

5   A.    I don't remember.

6   Q.    Okay.  So if you're looking between your legs backward

7   and he's on his knees, all you're seeing is his knees and his

8   pants; right?

9   A.    Yes.

10  Q.    Okay.  So his pants didn't appear to be down or anything

11  like that, did they?

12  A.    No.

13  Q.    Okay.  Did you tell the court about a little over a year

14  ago when you came down, that he was -- when he was behind

15  you, he was sitting down?

16  A.    With his knees.

17  Q.    I'm sorry?

18  A.    With his knees.

19  Q.    If you did say he was sitting down a year ago, you meant

20  that he was on his knees?

21  A.    Yeah.

22  Q.    Okay.  So you see Mr. Chandler's knees and his pants.

23  Did you see what he was doing?

24  A.    No.

25  Q.    Okay.  Wasn't saying anything to you, was he?

26  A.    No.

27  Q.    You were fully dressed; right?

28  A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1039

1    Q.    In jeans?

2    A.    Yes.

3    Q.    With your shoes and socks on?

4    A.    Yes.

5    Q.    So how long did this whole thing last again?  Fifteen

6    seconds?

7    A.    Yes.

8    Q.    Okay.  And did you see any liquid while you looked

9    between your legs?

10   A.    I just saw, like -- yeah, liquid falling.

11   Q.    And did you see it hit the ground?

12   A.    Yeah.

13   Q.    And where was it on the ground?  Behind you?

14   A.    Behind me.

15   Q.    All right.  And in front of Mr. Chandler's legs or

16   behind his legs?

17   A.    Behind.

18   Q.    Behind his legs?

19   A.    Yeah.

20   Q.    I'm going to kneel down again, except this is the

21   position his legs were in; right?

22   A.    Yes.

23   Q.    And was he facing the same direction that I'm facing?

24   In other words, towards you?

25   A.    Yes.

26   Q.    And so the liquid was behind him?

27   A.    Yeah.

28   Q.    I'm pointing behind my back to the ground.  That's what

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1040

1    you saw?

2    A.    Yeah.

3    Q.    Okay.  Now, did you ever see the class play a game with

4    Mr. Chandler, where they sat in the chair and he put

5    something in their mouth and asked them to guess what it was?

6    A.    Yes.

7    Q.    You did see that?

8    A.    Yes.

9    Q.    And the children were blindfolded; right?

10   A.    I don't remember.

11   Q.    Okay.  Do you remember what color the liquid was that

12   you saw?

13            MS. FILO:  Objection, Your Honor.  Vague as to

14   time.

15            MR. MADDEN:  I'm sorry.

16   BY MR. MADDEN:

17   Q.    When you said you looked between your legs and saw

18   liquid behind Mr. Chandler's legs, do you remember what color

19   that liquid was?

20   A.    No.

21   Q.    Okay.  Do you remember the year that you were in Mr.

22   Chandler's class studying about and talking about a girl who

23   couldn't see or hear?

24   A.    No.

25   Q.    Okay.  Do you remember the names of any children in your

26   class that you saw play the tasting game when you were in Mr.

27   Chandler's class?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1041

1   Q.    Could you give me the name or names of the people that

2   you remember?

3   A.    Suzanne.

4   Q.    Yes.  Who they are, yes?

5   A.    Suzanne.

6   Q.    I'm sorry.  Old ears again.  Anybody else?

7   A.    That's all I remember.

8   Q.    How about Kevin?

9   A.    Yeah, he was in my class.

10   Q.    Do you remember seeing him play the taste game?

11   A.    I'm not sure.

12   Q.    And you also -- let me try that again.  Excuse me.

13         Do you remember when you were in Mr. Chandler's

14   class playing a feeling game where you had to feel objects on

15   your feet and try to guess what they were?

16   A.    Yes.

17   Q.    Okay.  That was in front of the whole class?

18   A.    Yes.

19   Q.    Did you ever do that in front of the whole class?

20   A.    Yes.

21   Q.    I'm sorry?

22   A.    Yes.

23   Q.    Okay.  Do you remember any of the objects that were put

24   against your feet that you guessed?

25   A.    Yes.

26   Q.    Could you tell me what you remember they were?

27   A.    It was a marker.

28   Q.    A marker?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1042

1    A.    Yeah.

2    Q.    Like the one I'm holding?

3    A.    Like an Expo marker.  An Expo marker.

4    Q.    Expo marker.  I don't know what that is.  I'll move

5    along.  Anything else?

6    A.    A water bottle.

7    Q.    A water bottle.  Okay.  That game was actually played on

8    the floor; right?

9    A.    Yes.

10   Q.    The kids would get on the floor to do that; right?

11   A.    Yes.

12   Q.    The whole class?

13   A.    Yeah.

14   Q.    Okay.  The day that you saw the whole class do that, was

15   everyone having fun?

16   A.    Yeah, only some kids.

17   Q.    Only some kids did it, or only some kids had fun?

18   A.    Only some kids did it.  Not all of them.

19   Q.    Right.  In other words, the whole class was there, but

20   only a few kids were chosen to demonstrate; right?

21   A.    Yeah.

22   Q.    All right.  And the times that you were alone with Mr.

23   Chandler in the classroom, those times were all before you

24   saw the whole class game; right?

25   A.    I don't remember.  I'm not sure.

26   Q.    Okay.  Fair enough.

27         And last year, you told the court that those times

28   were before the classroom demonstration; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1043

1  A.   Yes.

2  Q.   Okay.  Do you play the taste game in front of the whole

3  class?

4  A.   Yes.

5  Q.   All right.  Because that's what you practiced with Mr.

6  Chandler; right?

7  A.   Yes.

8  Q.   All right.  Do you remember different tastes of things

9  that he put in your mouth the day in front of the whole

10  class?

11  A.   I just remember that it was lollipops.

12  Q.   You remember --

13  A.   That --

14  Q.   I'm sorry.  You know what I'm trying to say, lollipop.

15  You remember what flavor the lollipop was?

16  A.   No.

17  Q.   Do you remember last year you told the court the flavors

18  were grape, strawberry, and coconut?

19  A.   Yeah, I remember.

20  Q.   Three different lollipops, three different flavors;

21  right?

22  A.   Yes.

23  Q.   You had to guess?

24  A.   Oh, yeah, we had to guess.

25  Q.   Did you get it right?

26  A.   Some.

27  Q.   Some.  Okay.  Now, the time that -- with Mr. Chandler

28  alone and he put the thing in your mouth, you put your own

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1044

1   blindfold on; right?

2   A.   Yes.

3   Q.   And you took your own blindfold off; right?

4   A.   Yes.

5   Q.   How did you know when to take it off?

6   A.   Because he told me.

7   Q.   You didn't take it off until he told you to?

8   A.   Yes.

9   Q.   All right.  Do you think that you remember a time that

10  you -- after you took it off, that you saw him doing

11  something with his pants?

12  A.   Yes.

13  Q.   Do you know that or do you think it?

14  A.   I saw.

15  Q.   What did you see?

16  A.   Well, when he was in the closet when he was putting

17  something --

18  Q.   He was kind of --

19  A.   When he was -- like, it was already time to go, and then

20  I just heard something.

21  Q.   How did you know it was time to go?

22  A.   Because it was already, like, off.  The recess was

23  already done, and it was already time for the kids to go in.

24  Q.   Okay.  So I'm going to make sure that I understand what

25  you mean.  Is this photograph, which is A-5 for the record,

26  when you say closet, is that what you mean?

27  A.   Yeah.

28  Q.   Okay.  And this photograph, A-6, the same closet only

1    with the doors open?

2    A.   I don't remember.

3    Q.   Okay.  So I think you pointed earlier -- could you point

4    for me again where you were when you saw Mr. Chandler doing

5    something with his pants?  Could you put the black part of

6    this tip?

7    A.   (Indicating.)

8    Q.   You were standing right by the closet?

9    A.   No.  I was like here, a little bit more over there.

10   Q.   I'll take that for you.  Thank you.

11           Let me see if I have another one that will get

12   that.  I think this one.  This is People's A-1 -- excuse

13   me -- Defense A-1.  Can I get you to point again where you

14   think you were?

15   A.   Like right there.  (Indicating.)

16   Q.   So you are pointing to an area between the corner of the

17   cabinet and a little sticker with a 2 on it with PXB; right?

18   A.   Yeah.

19   Q.   Between these two points?  All right.  Thank you.

20           And were the cabinet doors open or closed?

21   A.   They were closed.

22   Q.   They were closed.  So you have a full view of Mr.

23   Chandler; right?

24   A.   No.  Like, they were closed and then he opened it.

25   Q.   Uh-huh.

26   A.   The closet.

27   Q.   Then did you see Mr. Chandler, or was your view of Mr.

28   Chandler blocked then?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1046

1   A.   No.  Like, the closet was closed, but then he opened it

2   and then I just saw, like -- I don't know, but I saw, like,

3   him pulling his pants.

4   Q.   Well, did you -- you indicated where you were when you

5   saw Mr. Chandler do something with his pants; right?

6   A.   Yes.

7   Q.   Mr. Chandler was then down by the closet; correct?

8   A.   Yes.

9   Q.   And at the time you saw Mr. Chandler, were the closet --

10  how were the doors?  Were they all the way open or closed or

11  a little bit open?

12  A.   Like, first I just saw him pulling his pants, and then

13  he opened it, the closet.

14  Q.   And he already told you to take off the mask, and then

15  you looked and he's there pulling his pants?

16  A.   Yeah.

17  Q.   I mean, like I'm pulling my pants with just -- pulling

18  the waist up?

19  A.   Yeah.

20  Q.   So the pants weren't down?

21  A.   Like, I don't know, but then I just, like, heard a

22  noise, like a zipper or something.

23  Q.   You heard a noise like a zipper?

24  A.   Yeah.

25  Q.   When did you hear that noise?

26  A.   When he first -- he pulled his pants and then he opened

27  the closet and then that's when I heard the noise.

28  Q.   Could you -- was your view of Mr. Chandler ever blocked

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1047

1  by the closet doors?

2  A.   First, when he pulled his pants and then he closed it

3  and then I heard it, that -- like the noise.

4  Q.   I'm sorry.  I'm still confused.  That's probably my

5  fault.

6       You saw him pull his pants up.  Now -- here's what

7  I'm doing, I've got my two -- three fingers on my hips at my

8  belt that I'm tugging my pants up.

9       MS. FILO:  Your Honor, objection.  This is asked

10  and answered.  Could we approach?

11       THE COURT:  Approach?

12       MS. FILO:  Yes.

13       THE COURT:  Yeah.

14       (Whereupon, there was a discussion at the bench.)

15  BY MR. MADDEN:

16  Q.   All right.  I think I understand now, Arleth.  When you

17  heard the zipper, could you see Mr. Chandler?

18  A.   No.

19  Q.   Okay.  On the one time that you saw under the blindfold?

20  A.   Yeah.

21  Q.   Okay.  Did you somehow move the blindfold so that you

22  could see under it?

23  A.   No.  Like, you could see -- you could a little bit see

24  under it.

25  Q.   Do you remember saying next door to the court that you

26  tried to move it with your eyes?

27  A.   Yeah.

28  Q.   You didn't move it with your eyes, did you?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1048

1    A.    A little bit.

2    Q.    That wasn't possible, was it?

3    A.    (Shakes head side to side.)

4    Q.    You are shaking your head no?

5    A.    No.

6    Q.    Okay.  Not too much longer, Arleth.  Are you okay?  Need

7    a break?

8    A.    No.  I'm okay.

9    Q.    Let his honor know you need a break at any time.  We'll

10   take a break.  Okay?

11   A.    Okay.

12   Q.    Now, after you saw this on the news at your friend's

13   house, that was the first day that you saw it on the news,

14   when you saw Mr. Chandler's face on the TV?

15   A.    The second time.  Second.

16   Q.    That was the second time you saw his face on the TV?

17   A.    Yeah.

18   Q.    You saw it once at your house?

19   A.    Yeah.

20   Q.    The day before?

21   A.    No, because we moved somewhere else.

22   Q.    Okay.  And did your mother start to question you at

23   about that time, asking you about whether Mr. Chandler did

24   anything to you?

25   A.    Yeah, when it was the first time.

26   Q.    Okay.  Did she talk to you every day about that?

27   A.    Not every day, but she just said, like, is everything

28   fine?  Like that.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1049

1  Q.   Okay.  Did you ever tell your mother before you talked
2  to Noemi --
3            MS. FILO:  Objection, Your Honor.  Calls for
4  hearsay.
5            MR. MADDEN:  Let me finish the question.
6            THE COURT:  Go ahead.  Finish the question.
7  BY MR. MADDEN:
8  Q.   Did you tell your mother that Mr. Chandler had never
9  touched you or done anything to you and that he was a good
10  man?
11            MS. FILO:  Objection, Your Honor.  Calls for
12  hearsay.
13            THE COURT:  Any response, Mr. Madden?
14            MR. MADDEN:  Her statement.  I'm not offering it
15  for the truth.  Did she utter the words?
16            THE COURT:  I will sustain the objection.
17  BY MR. MADDEN:
18  Q.   On any of the times that you were alone with Mr.
19  Chandler with the blindfold on, did he ever have you put your
20  head up and give you a little liquid?
21  A.   Yeah.
22  Q.   And it tasted sweet; right?
23  A.   Yeah.
24  Q.   And on another occasion, he gave you something, a little
25  liquid in it, had a salty taste; right?
26  A.   Yes.
27  Q.   And on each of those occasions, he asked you to guess
28  what it was; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1050

1  A.   Yes.

2  Q.   And did you guess right?

3       MS. FILO:  Objection, Your Honor.  Calls for

4  speculation.

5       MR. MADDEN:  Not necessarily.

6       THE COURT:  I'll sustain the objection.

7       MR. MADDEN:  All right.

8  BY MR. MADDEN:

9  Q.   Now, I asked you this before, but you did see a bottle

10 or bottles on Mr. Chandler's desk; right?

11      MS. FILO:  Objection.  Vague as to time.

12 BY MR. MADDEN:

13 Q.   At any of the times that you were alone with him?

14 A.   No.

15 Q.   When he gave you the liquid, sweet one and the salty

16 one, you had the blindfold on; right?

17 A.   Yes.

18 Q.   Okay.  And one time or -- let me try it again.

19      You remember him telling you to bite the object one

20 time?

21 A.   Yes.

22 Q.   Was that just one time?

23 A.   No.

24 Q.   Did he tell you to bite an object on more than one time?

25 A.   Yeah.

26 Q.   How many times do you think?

27 A.   Three.

28 Q.   You did bite it; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1051

1   A.   Yes.

2   Q.   And did Mr. Chandler yell or say ouch or anything like

3   that?

4   A.   No.

5   Q.   Okay.  And about a year ago next door, you said that

6   that happened one time; right?

7   A.   What happened?

8   Q.   That you bit what was in your mouth?

9   A.   Yeah, one day.

10  Q.   Three times in one day?

11  A.   No.  Like, one -- like, two times in one day.

12  Q.   Two times in one day?

13  A.   Yeah.

14  Q.   Okay.  I'm getting close, Arleth.  I'm running out of

15  paper.  Thank you, Arleth.

16            THE COURT:  Redirect, Ms. Filo?

17                  REDIRECT EXAMINATION

18  BY MS. FILO:

19  Q.   How are you doing, Arleth?

20  A.   Good.

21  Q.   Are you doing okay?

22  A.   Yes.

23  Q.   All right.  Arleth, the times that you were alone with

24  Mr. Chandler and he had the blindfold on you and he put this

25  round thing in your mouth, that happened at least three times

26  that you remember; right?

27  A.   Yes.

28  Q.   And you said one time nothing came out of the round

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1052

1  thing; right?

2  A.    Yes.

3  Q.    But the other two times it did?

4  A.    The other time.

5  Q.    The other time it did?

6  A.    Yeah.

7  Q.    Okay.  Do you -- you said you don't -- do you remember

8  what that -- the water tasted -- the liquid tasted like?

9  A.    No.

10  Q.    Okay.  You got some questions about coming to court and

11  testifying in court once before; right?  Remember when you

12  came to court before and there was a lady judge?

13  A.    Yeah.

14  Q.    And when I asked you questions, did you tell the truth

15  then?

16  A.    Yes.

17  Q.    Okay.  And how long ago was that, do you remember?

18  A.    No.

19  Q.    Now, does that seem like a long time ago or not so long

20  ago?

21  A.    Kind of.

22  Q.    Kind of a long time ago?

23  A.    Yeah.

24  Q.    Okay.  So the liquid that was in your mouth, did it

25  taste like water?

26  A.    No.

27  Q.    No?  Okay.  And do you remember whether it tasted good

28  or bad?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1053

1    A.    No, no.

2    Q.    You don't remember?

3    A.    No.

4    Q.    Okay.

5              MS. FILO:  Your Honor, at this time, I would like

6    to read from the preliminary hearing transcript page 264,

7    lines 8 through 23.

8              "QUESTION:  Okay.  Um, so if -- Ms. A, I'm going to

9              give you a cup and I promise it's perfectly safe.

10             Can you take a sip of that water for me?  What is

11             that?"

12             And you answered:  "Water."

13             "QUESTION:  Water?  Okay.  The stuff that came out

14             of the thing that was in your mouth when you were

15             in Mr. Chandler's classroom, did it taste like that

16             or did it taste like something else?

17             "ANSWER:  Something else.

18             "QUESTION:  Okay.  So it did not taste like water?

19             "ANSWER:  Yes.

20             "QUESTION:  Correct?

21             "ANSWER:  Yes.

22             "QUESTION:  Okay.  Did it taste good or bad?

23             "ANSWER:  Bad."

24   BY MS. FILO:

25   Q.    Do you remember testifying to that?  Do you remember

26   saying those words last year?

27   A.    Um --

28   Q.    It's okay if you didn't.  I just need to know.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1054

1   A.   Yes.

2   Q.   You do remember saying that?

3   A.   Yeah.

4   Q.   Was that the truth?

5   A.   Yes.

6   Q.   Okay.  Do you remember -- you said that the thing that

7   was in your mouth was squishy; right?

8   A.   Yes.

9   Q.   Could you tell me any other word that would help

10  describe what that thing was?  Did it feel like anything else

11  that you have ever had in your mouth?

12  A.   Yeah, it felt different.

13  Q.   What?

14  A.   It felt different, kind of.

15  Q.   It felt different than things you had in your mouth

16  before?

17  A.   Yes.

18          MR. MADDEN:  Your Honor, I'm sorry.  May we have

19  that read back?  I don't think that's what I heard.

20          THE COURT:  Okay.  Let's have the last two

21  questions read back.

22          (Whereupon, the record was read.)

23          MR. MADDEN:  I object, Your Honor, on misstates the

24  testimony.  She said different, kind of, which is not the

25  same thing as different.

26          THE COURT:  Okay.  I'm going to allow the answer to

27  remain, and you both could clear it up.

28          MS. FILO:  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1055

1    BY MS. FILO:

2    Q.   You said it tasted "different, kind of."  What -- did it

3    taste like anything else you ever had in your mouth before?

4    A.   No.

5    Q.   No?  Did you describe the way it felt as skin?  Do you

6    remember using that word in the past?  It felt like skin?

7    A.   Yes.

8    Q.   Yes?  And is that what you remember it feeling like?

9    A.   Yes.

10   Q.   Okay.  Arleth, you said that there were these times that

11   you were alone with Mr. Chandler when the blindfold was put

12   on you; right?

13   A.   Yes.

14   Q.   Okay.  And then you talked about this game with -- in

15   front of the whole class.  Do you remember that?

16   A.   Yes.

17   Q.   You said that Suzanne played the game in front of the

18   whole class?

19   A.   Yes.

20   Q.   And Kevin played the game in -- you don't remember if

21   Kevin played the game in front of the whole class?

22   A.   No, I don't remember.

23   Q.   Okay.  Did you play the game in front of the whole

24   class?

25   A.   Yeah, only one time.

26   Q.   One time.  And what part of the game did you play?  Do

27   you remember?  In front of the whole class?

28   A.   Only, like, I tasted something and I had to guess.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1056

1   Q.   Okay.  You tasted something, and you said you had some

2   flavors:  grape and strawberry, like candy or lollipops that

3   you had to taste?

4   A.   Yes.

5   Q.   Was that something that tasted different from what you

6   had in your mouth when you were in the classroom alone with

7   Mr. Chandler?

8   A.   Sometimes it tasted -- it was like a lollipop and it

9   tasted the same.

10  Q.   Okay.  So when he gave you a lollipop, you knew when it

11  was a lollipop; right?

12  A.   Yeah.

13  Q.   Okay.  But this thing where the liquid came out, did you

14  ever have that in your mouth when you were in front of the

15  whole class?

16  A.   No.

17  Q.   No?  That was different; right?

18  A.   Yeah.

19  Q.   Okay.  Okay.  That's all the questions I have.  Thank

20  you, Arleth.

21          THE COURT:  How are you doing?  We've gone a lot

22  longer than I normally go.  But if you want to hear Mr.

23  Madden's final questions before we take a break, we could

24  keep going if you are okay?  Or, I could take a break right

25  now.  Do you want to keep going?

26          THE WITNESS:  Yes.

27          THE COURT:  Okay.  And if you get tired, you need

28  to let me know.  Okay?  Just tell me, I'm right here.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1057

1              Mr. Madden, recross?

2                    RECROSS-EXAMINATION

3    BY MR. MADDEN:

4    Q.   Arleth, did you ever tell anybody that -- the day you

5    were alone with Mr. Chandler and something came out of the

6    object in your mouth -- that it tasted like pee?

7    A.   I don't remember.

8    Q.   Thank you.

9              MR. MADDEN:  I have no further questions.

10             THE COURT:  You're done?

11             MS. FILO:  I am.

12             THE COURT:  Okay.  You could step down.  You are

13   done.  Thank you very much.

14             Ladies and gentlemen, we're going to take the

15   afternoon recess at this time.  I will order all members of

16   jury to report to the jury assembly room on the second floor

17   and we'll call you up in approximately 15 minutes.  So we'll

18   be in recess.

19             (Whereupon, a brief recess was taken.)

20             THE COURT:  Record will reflect the jury has

21   returned to the courtroom, both counsel are present, and Mr.

22   Chandler is present.

23             Ms. Filo.

24             MS. FILO:  Thank you, Your Honor.  The People call

25   Hilda Keller.

26                    HILDA KELLER,

27             Being called as a witness on behalf of the People,

28   having been first duly sworn, was examined and testified as

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1058

1  follows:

2       THE CLERK:  For the record, ma'am, could you please

3  state your first and last name and spell both for the record.

4       THE WITNESS:  Hilda Keller.  H-i-l-d-a,

5  K-e-l-l-e-r.

6       THE COURT:  Thank you, ma'am.  The lawyers will be

7  asking you some questions.  Very important that you wait

8  until they finish their question before you begin your

9  answer, and please make every effort just to answer what is

10  being asked.  And if the question calls for a yes or no

11  response, you need to verbally say yes or no.  If you hear

12  objection, don't answer.  I will rule.  I will let you know

13  if you could answer it or not.  Okay?

14       Direct examination.

15       MS. FILO:  Thank you, Your Honor.

16                    DIRECT EXAMINATION

17  BY MS. FILO:

18  Q.   Good afternoon, Ms. Keller.

19  A.   Good afternoon.

20  Q.   You were previously employed as an elementary school

21  teacher at O.B. Whaley School; is that correct?

22  A.   Yes.

23  Q.   You are still an elementary school teacher just

24  someplace else?

25  A.   Yes.

26  Q.   Do you know from what years you were a teacher at O.B.

27  Whaley?

28  A.   From 2000 to 2005, I believe.

1   Q.    What grade did you teach there?

2   A.    Kindergarten/first grade.

3   Q.    During the period of your employment at O.B. Whaley,

4   were you a work colleague of Craig Chandler?

5   A.    Yes.

6   Q.    He was a fellow teacher?

7   A.    Yes.

8   Q.    So how many teachers were there at O.B. Whaley while you

9   were there?

10  A.    I would have to say about 30 to 35, I'm thinking.

11  Q.    So some co-workers you became really good friends with,

12  kind of good friends, occasional friends, occasional

13  acquaintances, and people you know because they happen to

14  work at the same place you do?

15  A.    Correct, yes.

16  Q.    In what category would you have put Mr. Chandler?

17  A.    Just in acquaintances.

18  Q.    Someone you knew simply because you worked together?

19  A.    Correct, yes.

20  Q.    Ms. Keller, I would like to ask you about an incident

21  that occurred in your classroom, where Mr. Chandler made --

22  you had a conversation with Mr. Chandler.  Do you remember

23  the incident that I'm talking about?

24  A.    Yes.

25  Q.    Could you tell me what you remember about that incident?

26  How did it start?

27  A.    Um, I was in my classroom at my desk with the door open.

28  I usually leave the door open to the courtyard.  Mr. Chandler

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1060

1    came into my classroom and closed the door behind him and

2    stood at the corner of the room.  As I was at my desk, which

3    was, you know, across from -- so it was, like, the door is

4    there and I'm at the desk, kind of the situation we're in

5    right now.

6            He just stood there for a minute or so, and so I

7    asked him what he was doing there, or what's going on, and he

8    started walking towards me and he was talking about how he

9    would like to take pictures of my feet and give me a foot

10   massage because he was taking a class, a massage therapy

11   class, and I said no.  I felt very uncomfortable at that

12   point in time.  I stood up and I tried to make light of it

13   like:  No, you know.  No.  I'm wearing boots, you know.  And

14   I got up and I just started walking him out the classroom and

15   opened the door and then he left.

16   Q.   Okay.  Ms. Keller, he only asked about massaging your

17   feet; is that correct?

18   A.   Yes.

19   Q.   He didn't ask if he could rub your shoulders or your

20   neck or --

21   A.   No.

22   Q.   Give you a head massage?  It was your feet?

23   A.   Yes.

24   Q.   Did you think that was unusual?

25   A.   Absolutely, yes.

26   Q.   Was there anything else about the content of that

27   conversation that you found uncomfortable or unusual?

28   A.   The whole situation was unusual.  It was uncomfortable.

1   Coming in to ask to take pictures of my feet and asking if he

2   could massage them is not an appropriate conversation that

3   you have with a colleague.

4   Q.   At the time of this specific conversation, were you

5   concerned that the comment was sexually motivated?

6   A.   Yes.

7   Q.   And in light of what became the entirety of your

8   interaction --

9           MR. MADDEN:   May we approach the bench, Your Honor?

10          THE COURT:   Let me hear the question first.

11          MR. MADDEN:   I would rather we approach the bench

12   first.

13          THE COURT:   Ask the question.

14   BY MS. FILO:

15   Q.   In light of the entirety of your relationships, your

16   interactions with Mr. Chandler, did you then believe that

17   this comment was in fact sexually motivated?

18   A.   Yes.

19   Q.   Okay.

20          MS. FILO:   That's all I have, Your Honor.

21          THE COURT:   Cross-examination?

22          MR. MADDEN:   No questions, Your Honor.

23          THE COURT:   May this witness be excused?

24          MS. FILO:   Yes.

25          THE COURT:   You may step down and exit the

26   courtroom.

27          I'm going to ask, members of the jury, could you

28   just step outside the courtroom for just a minute?  I will

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1062

1    bring you right back in.

2                (Whereupon, the jurors were excused and the

3    proceedings were had outside the presence of the jury.)

4                THE COURT:  The jury has stepped outside the

5    courtroom.  The reason I asked them to step outside the

6    courtroom is because I wanted to give you an opportunity, Mr.

7    Madden, to make the record.

8                MR. MADDEN:  Thank you.

9                THE COURT:  After I heard the question, the reason

10   I didn't at that time say let's approach is because that

11   question, in my opinion, was consistent with my pretrial

12   ruling, that Ms. Filo could ask that particular question, and

13   she did it in the order I had suggested.  So that was the

14   reason, and it's clear this is over your objection.

15               MR. MADDEN:  Thank you.  You may be right on your

16   recollection and your ruling.  What I would ask is that madam

17   court reporter read the specific question back to me because

18   I don't know -- there is a noun there.  I don't know if it's

19   conversations or the entire situation.

20               THE COURT:  Um, I will have her read it back to

21   you, but it was her entire, I think, contact with him, not

22   just the conversations.  Am I correct on that?

23               MS. FILO:  I think what I asked was it was the

24   entire interaction with him.

25               THE COURT:  Okay.  Rather than us try to speculate,

26   let's -- I will have -- if you could read back the specific

27   question Ms. Filo asked.

28               (Whereupon, the record was read.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1063

1    MR. MADDEN:  I think that goes beyond your ruling,

2    Your Honor.  She testified at the 402 hearing that her

3    opinion about whether or not it was sexually motivated

4    dependent on whether or not he was in fact in a class or

5    getting a license or whatever the situation was.  This went

6    beyond that because this question necessarily included all of

7    the things that the Court said she could not talk about.  And

8    although she couldn't talk about it directly, she was allowed

9    to formulate an opinion based on those things.  That's why I

10   think it was an improper question and that's why I objected.

11   THE COURT:  I understand.  Again, my relevance of

12   the ruling, I think that question was allowable.  I did

13   specifically order Ms. Filo not to go into any of these other

14   incidents, like the sexual harassment claim, et cetera.  She

15   did say at the 402 hearing, because the way she felt, if he

16   was in fact taking a massage class, then she might feel

17   differently about it.

18   MR. MADDEN:  Correct.  So in other words, at the

19   402 hearing, her opinion was strictly based upon her

20   conclusion about whether or not it was sexual based strictly

21   on that issue, and that was not her question.

22   THE COURT:  I think she said if there were proof

23   that he was actually engaged in that type of activity, then

24   how she felt may have been impacted by that additional

25   information.

26   MR. MADDEN:  That's not exactly how I recall it,

27   but that's --

28   THE COURT:  Generally.  So I think that would have

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1064

1  been a fair question.  But I'm not sure whether it will be

2  helpful or not because I don't know Mr. Chandler's history,

3  if there is evidence of that that exists.  So I wasn't

4  restricting that type of question or going into that area.

5       MR. MADDEN:  I understand that, and the Court was

6  clear about that at the 402 hearing and I appreciate that.

7       THE COURT:  Okay.  In light of the fact that you

8  asked to approach and I denied the request, I thought it was

9  important right now to give you an opportunity to put this on

10  the record so that we don't do it later on.  That's the

11  reason I asked the jury to step out.

12       MR. MADDEN:  I appreciate that, Your Honor.  Thank

13  you.

14       MS. FILO:  Judge, my only concern at this point --

15  I know it's 3:30.  I have Arleth's MBI tape remaining to

16  play, and I don't -- I don't have --

17       MR. MADDEN:  I agree with Ms. Filo, that would not

18  be a good thing to listen to now.

19       MS. FILO:  I don't have a super, great recollection

20  of exactly how long it is, but --

21       MR. MADDEN:  It's long.

22       THE COURT:  Is it over an hour?

23       MR. MADDEN:  I think it is.

24       MS. FILO:  All I really know is that the transcript

25  that relates to it --

26       MR. MADDEN:  Big.

27       MS. FILO:  -- is 81 pages.  In the past, we've

28  had -- I know Becky's was about 40 minutes and it's only 34

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1065

1    pages.

2         THE COURT:  Okay.  What I will do, then, if it's

3    both counsel's request, to recess and send the jury home.

4    I'm going to tell them the reason is the next thing we are

5    going to do is listen to Arleth's video/audio interview and

6    it's going to be more than an hour.  My preference is not to

7    interrupt the playing of the tape.

8         MR. MADDEN:  I will add parenthetically, that

9    I'm -- I think that we're well within the trial schedule that

10   has been laid out to the jurors.  I think we're ahead of

11   schedule.

12        THE COURT:  Thank you for letting me know that, but

13   that doesn't play in the part at all.

14        MR. MADDEN:  I thought you would appreciate the

15   information.

16        THE COURT:  I do.  So both counsel would prefer we

17   not interrupt the playing of that and we'll do it either

18   Monday or next week sometime?

19        MS. FILO:  Yes, Your Honor.

20        MR. MADDEN:  Yes.

21        MS. FILO:  It's going to take longer than an hour.

22        THE COURT:  That's fine.

23        Then before I call the jury in, because we're going

24   to be recessing at this time, we're going to be coming back

25   on Monday, for benefit of counsel, so that they can prepare

26   over the weekend, I wanted to indicate that based on our

27   discussion yesterday, I was going to allow Ms. Filo to ask

28   Officer Pierce, that after his interview with Mr. Chandler,

1  when they were leaving the building, did you order him not to

2  go back to the class?  I'm going to allow that question to be

3  asked over the defense objection.  Obviously, this gives you

4  time to provide that information where Mr. Chandler was given

5  other information that says:  No, you could go back.  I'm not

6  going to limit it in cross-examination that you have no

7  authority to restrict him.

8          MR. MADDEN:  I want to make sure I understand your

9  ruling.  A couple of areas come to my mind that I want to

10  explore:  One, I believe it's a fact that Det. Pierce

11  requested and received my client's cell phone.  He left that

12  building that night without his cell phone.

13          THE COURT:  Okay.

14          MR. MADDEN:  Therefore, Sgt. Pierce was on

15  knowledge that my client's ability to receive a phone call

16  may have been impacted by the fact that he had a cell phone.

17          THE COURT:  Okay.

18          MR. MADDEN:  I also think that if Sgt. Pierce has

19  talked about being at the police department -- I'm too

20  involved into today's testimony to remember yesterday.

21          THE COURT:  I understand.

22          MR. MADDEN:  How much did he talk about, or did he

23  give any times or periods of time that Mr. Chandler was in

24  his presence at the police department.  I don't think he gave

25  any.

26          THE COURT:  Right.  The only thing that Ms. Filo

27  indicated, that after the interview was completed and they

28  were walking out of the building, at the conclusion of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1067

1    interview, and apparently Mr. Chandler was going to go home

2    and go wherever he was going to go, Officer Pierce told him:

3    You are ordered not to go back to either the school or the

4    classroom; right?

5          MS. FILO:  Right.

6          THE COURT:  Which one?

7          DET. PIERCE:  It was the school.

8          THE COURT:  Okay.  Ordered not to go back to the

9    school.  Obviously, there is other issues that affect that.

10   You know, I think it's fair to ask him about the telephone

11   and having it left -- being left there, but I don't see the

12   relevance of the length of the interview, what was said.

13   Basically, he was just giving Mr. Chandler a directive not to

14   go back to the school.  Whether that has any validity or not,

15   he was told to be on notice by the San Jose Police

16   Department.

17         MR. MADDEN:  I'll have to call one of his

18   attorneys.

19         THE COURT:  That's why I'm making a ruling now, Mr.

20   Madden, to give you that opportunity.

21         MR. MADDEN:  Thank you.  I appreciate that.

22         THE COURT:  Even if the witness is not on the

23   witness list, because this just came to my attention, I will

24   give you an opportunity to address that concern.

25         MR. MADDEN:  Thank you very much.

26         THE COURT:  I want to make that ruling before I

27   brought the jury in.  I will bring them in, I'll excuse them,

28   we'll recess until Monday.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1068

1          MR. MADDEN:  Thank you.

2          THE COURT:  The record will reflect that the jury

3    has returned into the courtroom.  Both counsel and Mr.

4    Chandler are still in the courtroom.

5          Thank you for your patience, ladies and gentlemen.

6    The next thing that we're scheduled to do is play the audio

7    and visual interview of Arleth.  Counsel shared with me the

8    length of the interview is fairly long and it's going to take

9    longer than the time that we have this afternoon.  It's my

10   preference that the jury hear that interview in one session

11   and not have it broken up, in fairness to the parties.

12         So in light of that, we're going to recess this

13   evening, and I'm going to order the jury to return Monday at

14   9:00 o'clock on the second floor jury assembly room and we'll

15   continue with the trial.  Next week, early next week

16   sometime, I will give you an update and status of how the

17   case is proceeding.  It's my understanding it's on schedule

18   or ahead of schedule.

19         So, ladies and gentlemen, have a safe weekend.  I

20   understand it's going to have -- there is going to be good

21   weather, so enjoy.  See you Monday morning.  Thank you very

22   much for your patience and understanding as we proceed

23   through this trial.

24         I'll order both counsel here tomorrow -- excuse

25   me -- Monday at 9:00 a.m. in this department.  We'll be in

26   recess.

27         (Whereupon, the Court took the evening recess.)

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1069

1   STATE OF CALIFORNIA      )
                            )
2   COUNTY OF SANTA CLARA    )

3

4           I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5           The foregoing is a full, true, and correct

6   transcript of the testimony given and proceedings had in the

7   above-entitled action taken on the above-entitled date; that

8   it is a full, true, and correct transcript of the evidence

9   offered and received, acts and statements of the Court, also

10  all objections of counsel, and all matters to which the same

11  relate; that I reported the same in stenotype to the best of

12  my ability, being the duly appointed and official

13  stenographic reporter of said Court, and thereafter had the

14  same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16  237(a)(2) in that all personal juror identifying information

17  has been redacted if applicable.

18

19          Dated:

20

21                      _____

22                          Jamie L. Mixco, C.S.R.
                            Certificate No. 12708
23

24  ATTENTION:
    CALIFORNIA GOVERNMENT CODE
25  SECTION 69954(D) STATES:

26  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
    MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27  A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
    ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28  PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
    PERSON."

JAMIE L. MIXCO, C.S.R. NO. 12708

# EXHIBIT 3
# (Vol. 12)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1070

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


---o0o---



THE PEOPLE OF THE STATE OF      )
CALIFORNIA,                     )
                                )
       Plaintiff - Respondent,  )
                                )
       v.                       )        No. C1223754
                                )
CRAIG RICHARD CHANDLER,         )
                                )
       Defendant - Appellant.   )
_____/

COPY



VOLUME 12

PAGES 1070 - 1165

JULY 22, 2013


---o0o---


REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY


---o0o---


APPEARANCES:


FOR PLAINTIFF-RESPONDENT:        OFFICE OF THE ATTORNEY GENERAL
                                 BY:  KAMALA D. HARRIS,
                                 Attorney General of the State
                                 of California

FOR DEFENDANT-APPELLANT:         In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1071

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF SANTA CLARA

3   BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4              DEPARTMENT NO. 37

5

6                 ---o0o---

7   THE PEOPLE OF THE
    STATE OF CALIFORNIA,            )
8                                   )
                                    )
9               PLAINTIFF,          )
                                    )      CASE NO.  C1223754
10         v.                       )
                                    )
11                                  )
    CRAIG RICHARD CHANDLER,         )
12                                  )
                                    )
13              DEFENDANT.          )
    _____/

14

15                 ---o0o---

16

17       REPORTER'S TRANSCRIPT OF PROCEEDINGS

18

19              JULY 22, 2013

20

21                 ---o0o---

22

23

24   APPEARANCES:

25   FOR THE PEOPLE:            ALISON FILO
                                Deputy District Attorney
26

27   FOR THE DEFENDANT:         BRIAN MADDEN
                                Attorney at Law

28   OFFICIAL COURT REPORTER:   JAMIE L. MIXCO
                                C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1072

# INDEX

## EXAMINATION

**Witness Name**                                                      **Page**

**WENDY DOE**
   Direct By Ms. Filo   ........................................1074
   Cross By Mr. Madden   ......................................1095
   Re-Direct By Ms. Filo   ....................................1126
   Re-Cross By Mr. Madden   ...................................1130

**KRISTIN CARDOSA**
   Direct By Ms. Filo   .......................................1141

## PEOPLE'S EXHIBITS

| **Exhibits** | **Description** | **Page** |
|---|---|---|
| 8 Marked | CD | 1140 |
| 8-A Marked | transcript of 8 | 1140 |
| 9 Marked | document | 1147 |
| 10 Marked | chair | 1159 |
| 11 Marked | chair | 1159 |

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1073

1    San Jose, California                    July 22, 2013

2                        PROCEEDINGS

3          THE COURT:  Record will reflect all members of the

4    jury are present, both counsel are present, Mr. Chandler is

5    present in the courtroom as well.

6          And, Ms. Filo, you ready to continue with

7    presenting your evidence?

8          MS. FILO:  Yes, Your Honor.  Thank you, Your Honor.

9    People call Wendy.  Your Honor, may I have just a minute?

10         THE COURT:  Yes.

11         MS. FILO:  Sorry.  Thank you, Your Honor.

12         THE COURT:  Welcome.

13                        WENDY DOE,

14         Being called as a witness on behalf of the People,

15   having been first duly sworn, was examined and testified as

16   follows:

17         MS. FILO:  Your Honor, for the record, the witness

18   is accompanied by an advocate.

19         THE COURT:  Okay.  Ma'am, just a reminder, you are

20   not to encourage, promote, or suggest in any manner any

21   question or response by Wendy.  Okay?

22         THE ADVOCATE:  Yes.

23         THE COURT:  Good morning.

24         THE WITNESS:  Good morning.

25         THE COURT:  What's your name?

26         THE WITNESS:  Wendy.

27         THE COURT:  How do you spell it?

28         THE WITNESS:  W-e-n-d-y.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1074

1    THE COURT:  And how old are you?

2    THE WITNESS:  Eleven.

3    THE COURT:  Okay.  Wendy, could you move your chair

4  up a little bit?  All the way to the witness stand.  And Ms.

5  Filo is going to pull that microphone down.  Okay?  How is

6  that, Wendy?

7    THE WITNESS:  Good.

8    THE COURT:  Okay.  As you know, I'm sure Ms. Filo

9  just briefly went over, that they are going to ask you some

10  questions and the rules we have in the courtroom.  And I want

11  you to know that every eleven-year-old that I have ever

12  talked to in the courtroom has told me that they were very

13  nervous.  So if you are nervous, it's okay.  All right?

14    THE WITNESS:  Okay.

15    THE COURT:  Now, during this time, when Ms. Filo

16  asks you questions, at any time if you want a break -- we

17  call them recessES just like school when we stop for about 10

18  or 15 minutes.  Okay?  So during this time, if you ever need

19  a break or recess, let me know or let Ms. Filo know and we'll

20  take a break for you.  Okay?

21    THE WITNESS:  Okay.

22    THE COURT:  Okay.  All right.

23    Direct.

24    MS. FILO:  Thank you, Your Honor.

25               DIRECT EXAMINATION

26  BY MS. FILO:

27  Q.   Hi, Wendy.

28  A.   Hi.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1075

1  Q.   Are you a little bit nervous?

2  A.   Yes.

3  Q.   Yes?  Kind of weird to talk in front of people; right?

4  A.   Um-hum.

5  Q.   Yeah?  Okay.  Do you remember me talking to you a little

6  bit about the rules when you come to court?

7  A.   Yes.

8  Q.   What were the rules?  Do you remember?

9  A.   Always tell the truth, use real words, and --

10 Q.   Make sure I finish my question before you start your

11 answer; right?

12 A.   Right.

13 Q.   Right.  Perfect.  Okay.

14        So can you promise that you are going to do all of

15 those things for me today?

16 A.   Yes.

17 Q.   And, Wendy, you are eleven now; right?

18 A.   Yes.

19 Q.   So you know the difference between real things and

20 make-believe things; right?

21 A.   Yes.

22 Q.   Yes?  So if I talked about you coming to court, would

23 that be something that really happened?

24 A.   Yes.

25 Q.   Because you're here; right?

26 A.   Yeah.

27 Q.   And if I talked about you having lunch yesterday with

28 some fairies, would that be real or make-believe?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1076

1    A.    Make-believe.

2    Q.    All right.  You promise we're only going to talk about

3    things that are real; right?

4    A.    Right.

5    Q.    Okay.  All right.

6          Wendy, so you are about to start what grade?

7    A.    Sixth.

8    Q.    Sixth grade.  Okay.  So off to middle school with you,

9    huh?  Yes?

10   A.    Yes.

11   Q.    Okay.  Wendy, I want to ask you about when you were in

12   elementary school.  Where did you go to elementary school?

13   A.    McCollam and then O.B. Whaley.

14   Q.    O.B. Whaley.  What grades were you in when you attended

15   O.B. Whaley?

16   A.    Second, third, fourth, fifth, and sixth now.

17   Q.    Okay.  So who was your teacher last year?

18   A.    You mean fifth grade or --

19   Q.    Yes.  Who was your teacher for fifth grade?

20   A.    Ms. Balistreri and Nakano.

21   Q.    Who was your teacher for fourth grade?

22   A.    Ms. Filippini.

23   Q.    Who was your teacher for third grade?

24   A.    Mr. Chandler.

25   Q.    Okay.  So, Wendy, we have a little kind of chart up on

26   the board right there.

27          MS. FILO:  Your Honor, may I approach?

28          THE COURT:  Yes.  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1077

1   BY MS. FILO:

2   Q.   So, in 2013, just about a month ago, you finished fifth

3   grade with Ms. Balistreri; right?

4   A.   Yes.

5   Q.   And then in 2012, you were in fourth grade with

6   Ms. Filippini?

7   A.   Yes.

8   Q.   And the 2010 and 2011 year, you were in third grade with

9   Mr. Chandler; is that right?

10   A.   Yes.

11   Q.   Okay.  So, Wendy, I would like to ask you some questions

12   about being in Mr. Chandler's class.  Okay?

13   A.   Okay.

14   Q.   Okay.  Who was your best friend in Mr. Chandler's class?

15   A.   Ashley.

16   Q.   Ashley.  Okay.  And what did you do with Ashley?

17   A.   Um, we just hung out.

18   Q.   Hung out?  Go to lunch?  Go to recess?

19   A.   Yes.

20   Q.   Stuff like that?  Okay.

21        Did you have other girls that you -- or boys.  I

22   guess you could have best friends that are boys.  Other girls

23   or boys at school that you played a lot with or hung out a

24   lot with?

25   A.   Yes.

26   Q.   Who else?

27   A.   Um, Christine and Melissa.

28   Q.   Elisa?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1078

1    A.    Melissa.

2    Q.    So that was kind of your group; right?

3    A.    Yes.

4    Q.    Are they still really good friends of yours?

5    A.    Yes.

6    Q.    Yes?  Okay.

7          Wendy, when you were in Mr. Chandler's classroom,

8    do you remember anything that you learned when you were in

9    Mr. Chandler's classroom?

10   A.    Not really.

11   Q.    No?  Anything special about what you learned in third

12   grade that you could remember?

13   A.    No.

14   Q.    No?  Okay.

15         So, Wendy, I want to ask you if you were ever in a

16   classroom with Mr. Chandler all by yourself?

17   A.    Yes.

18   Q.    How many times?  Do you know?

19   A.    No.  I think it was a little over ten.

20   Q.    So, Wendy, when you say you were by yourself, what does

21   by yourself mean?  Who else was there?

22   A.    Me and Mr. Chandler.

23   Q.    Okay.  Just the two of you?

24   A.    Yes.

25   Q.    What did you do, if anything, when you were alone with

26   Mr. Chandler?

27   A.    I will have to sit in a chair blindfolded and he would

28   put something in my mouth.

1    Q.    Okay.  Do you know where -- Wendy, I'm going to look at

2    the picture that's in A-1.  Do you recognize what that is?

3    A.    Yes.

4    Q.    What is that?

5    A.    The classroom.

6    Q.    Whose classroom?

7    A.    Mr. Chandler's.

8    Q.    Where is -- where you would have to sit down in the

9    chair, is it in that picture?

10   A.    Yes.

11   Q.    Could you kind of -- there is a pointer right here,

12   could you show me where you would -- where Mr. Chandler would

13   have you sit?

14   A.    (Indicating.)

15   Q.    Okay.  Right where that number one is that says "PXB"?

16   A.    Yes.

17   Q.    Okay.  Where that post-it note is?

18   A.    Yes.

19   Q.    All right.  And, Wendy, you said that Mr. Chandler would

20   have you sit in a chair; right?

21   A.    Yes.

22   Q.    What kind of chair was it?

23   A.    Um, like a desk chair.

24   Q.    Do you know what color it was?

25   A.    Dark blue.

26   Q.    Blue?  Okay.

27          So there is a few chairs I think that you could see

28   in that picture.  Did it look like any of the chairs in A-1?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1080

1   A.    I don't understand what A-1.

2   Q.    The picture.  Sorry.

3   A.    Oh, yes.

4   Q.    Okay.  Could you show me what that -- I will give it to

5   you again.  Could you show me with this pointer what it

6   looked like?

7   A.    It looked like this one.

8   Q.    Like one of the student chairs?

9   A.    Yes.

10  Q.    Okay.  Wendy, how do you know what you were sitting in?

11  Did you -- how do you know what kind of chair it was?

12  A.    When I walked in, it was, like, in front of the bookcase

13  and he had me sit in it.

14  Q.    Okay.  So you could see it at that point?

15  A.    Yes.

16  Q.    And then you said that you -- there was a blindfold?

17  A.    Yes.

18  Q.    Tell me about the blindfold.

19  A.    It's like one of those, um, beauty school ones.

20  Q.    Okay.  Good description.  What -- do you remember what

21  color it was or anything?

22  A.    No.

23  Q.    No?  But it's -- what is it made out of?  Do you know

24  what the --

25  A.    I'm not sure.

26  Q.    Is it made out of cloth like my clothes?

27  A.    Um, it's a bit softer.

28  Q.    Okay.  Not like a Halloween mask?  Not like plastic;

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1081

1    right?

2    A.    No.

3    Q.    No?  And when you had this blindfold on, could you see

4    anything?

5    A.    No.

6    Q.    No?  Okay.  So you said that you would sit in this

7    chair; right?

8    A.    Yes.

9    Q.    And then how did the blindfold get on you?

10   A.    He would put it on me or ask me to put it on.

11   Q.    Wendy, did you know why you were doing this?

12   A.    No.

13   Q.    Did he ever tell you?

14   A.    No.

15   Q.    So you put the blindfold on and what happened next?

16   A.    Um, he would put something in my mouth.

17   Q.    Do you know what he put in your mouth?

18   A.    No, but he said it was candy.

19   Q.    Did it taste like candy?

20   A.    No.

21   Q.    No?  Did it have any taste at all?

22   A.    Like, one time or a few times it tasted like a little

23   strawberry.

24   Q.    Okay.  When you say "it," what is "it"?  You say it

25   tasted like strawberry, what is "it"?

26   A.    The thing that he called candy.

27   Q.    That didn't taste like candy?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1082

1   Q.   Do you know -- was it one thing that he put in your

2   mouth, or was it a number of things that he put in your

3   mouth?

4   A.   I think two different things.

5   Q.   Did you know what either of the things were?

6   A.   Um, I think one was, like, real candy, but I don't know

7   what the other one was.

8   Q.   So you knew that one was candy?

9   A.   Yes.

10  Q.   You could taste it and you knew that was regular candy?

11  A.   Yes.

12  Q.   What about the other thing?  Could you tell me anything

13  about the other thing?

14  A.   Um, it was kind of big and it just tasted a little like

15  strawberry.

16          MR. MADDEN:  I'm sorry, Your Honor.  It's --

17          THE COURT:  I believe she said it's kind of big and

18  it tasted a little bit like strawberry; is that correct?

19          THE WITNESS:  Yes.

20  BY MS. FILO:

21  Q.   When you say "big," could you show me what you mean?

22  A.   Um, like around this much.

23  Q.   So, just for the record, Wendy, you put kind of your

24  middle finger and your thumb, but not quite all the way

25  closed, almost like a C?

26  A.   Yeah.

27  Q.   Is that right?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1083

1   Q.   So it was bigger than what would happen if you put your

2   fingers together?

3   A.   Yeah.

4   Q.   It was bigger than that?

5   A.   Yeah.

6   Q.   Okay.  What did he do with that -- that sort of round

7   thing?  That's what he put in your mouth?

8   A.   Yes.

9   Q.   What would happen when that thing was in your mouth?

10  Did anything happen?

11  A.   Like, he would put his hand on the back of my head and

12  move it forward, back and forth.

13  Q.   Okay.  Just one hand?

14  A.   Yeah, one hand.

15  Q.   Could you show me what you mean, Wendy?

16  A.   Like that.

17  Q.   Could you do what you are telling me with your own hand

18  and your own head?

19  A.   The candy, he would put through and back out and repeat.

20  Q.   Okay.  Was he doing anything with the hand that was on

21  your head?

22  A.   Um, move it forward and backward.

23  Q.   Okay.  So he was pushing your head forward?

24  A.   Yes.

25  Q.   And you said that this C-shaped thing was going in and

26  out of your mouth?

27  A.   Yes.

28  Q.   Okay.  Wendy, how long did that happen?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1084

1    A.    Um, a few months, I guess.

2    Q.    It happened a number of times over a few months?

3          MR. MADDEN:  Objection.  That isn't what she said,

4    Your Honor.

5          THE COURT:  Okay.  If you could read me back the

6    response?

7          (Whereupon, the record was read.)

8          THE COURT:  Okay.  Could you rephrase your last

9    question?

10         MS. FILO:  Sure.

11   BY MS. FILO:

12   Q.    When you were in the classroom and you had this

13   blindfold on and this round thing was in your mouth, how long

14   did that -- how long did it go on for?

15   A.    Oh; um, like, I guess about five minutes or less.

16   Q.    Wendy, while this was happening, did Mr. Chandler say

17   anything to you?

18   A.    No.

19   Q.    Did he give you any instructions?

20   A.    Um, one time I bit down on it and he told me not to.

21   Because he said it was candy, so I thought I was supposed to

22   eat it.

23   Q.    So you bit down on it and he said "don't bite"?

24   A.    Yes.

25   Q.    Did you think anything about that direction?

26   A.    Not really.

27   Q.    Okay.

28   A.    I -- just in my head, I asked myself why since -- how

1  did he know that I did since it was candy?

2  Q.   So you thought to yourself:  How did he know that I bit

3  down?

4  A.   Yes.

5  Q.   Wendy, how did this -- how did it end?  After the five

6  minutes, what happened?

7  A.   Um, he would give me a lollipop and then I could go out

8  to recess.

9  Q.   Okay.  Did you -- how did the blindfolds go away?

10  A.   Um, I would just take it off.

11  Q.   Did you take it off on your own, or did Mr. Chandler

12  tell you to take it off?

13  A.   He told me to.

14  Q.   Okay.  And then he gave you a lollipop and then you

15  could go out to recess?

16  A.   Yes.

17  Q.   Wendy, while this was happening, was the door to the

18  classroom open or closed?

19  A.   Closed.

20  Q.   So you told us that he said to you "don't bite;" right?

21  A.   Yes.

22  Q.   Do you remember him saying anything else while this

23  thing was in your mouth?

24  A.   No.

25  Q.   Did you hear anything else while the thing was in your

26  mouth?

27  A.   Um, one time I heard, like, kind of metal hitting

28  together and then I think he placed something on the desk.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1086

1  Q.   You said you heard metal.  Do you have any idea what

2  that metal was?

3  A.   I think it was a belt.

4  Q.   A belt?

5  A.   Yeah.

6  Q.   That's what it sounded like to you?

7  A.   Yes.

8  Q.   Okay.  Do you hear anything else, Wendy?

9  A.   Yeah.  I heard footsteps and the water running.

10  Q.   Did you have a sink in your classroom with Mr. Chandler?

11  A.   Yes.

12  Q.   Was that the only place that there was water in the

13  classroom?

14  A.   Yes.

15  Q.   Okay.  Is that what you think you heard?  Like, water

16  coming from the sink?

17  A.   Yes.

18  Q.   Okay.  While you heard that, Wendy, did you still have

19  the blindfold on?

20  A.   Yes.

21  Q.   So you couldn't see where Mr. Chandler was going or what

22  he was doing?

23  A.   Yes.

24  Q.   But you could hear the water?

25  A.   Right.

26  Q.   Okay.  Wendy, did Mr. Chandler ever have you lay down in

27  the classroom?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1087

1    Q.    Could you tell me about that?

2    A.    Um, I would do this with my friend Melissa.  We would

3    lay down on the same spot where I had to sit in the chair and

4    he made us take off our shoes and socks and, like, put us in

5    this bag and then he would put something between our legs and

6    rub it together.

7    Q.    Okay.  So the bag that he put over you, he put over your

8    head?

9    A.    Yes.

10   Q.    And you said -- what kind of bag was it?

11   A.    It was a PE bag?

12   Q.    A PE bag?

13   A.    Yes.

14   Q.    Do you know -- was it soft or scratchy, or do you know

15   anything about it?

16   A.    It was soft.

17   Q.    Soft?  Okay.  Was it made of fabric, too, like clothing?

18   A.    Yes.

19   Q.    You could breathe?  You don't have any trouble

20   breathing; right?

21   A.    Yes.

22   Q.    Could you see anything that was happening?

23   A.    No.

24   Q.    You said that you were laying down on the floor; right?

25   A.    Yes.

26   Q.    Were you laying on your -- how were you laying?

27   A.    I was laying on my stomach.

28   Q.    And so your feet were -- the bottoms of your feet were

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1088

1   kind of facing the ceiling; right?

2   A.   Yes.

3   Q.   Is that right?

4   A.   Yes.

5   Q.   And did you keep your feet on the floor or did you move

6   them up, or what did you do with your feet?

7   A.   Um, he would take them and move them a little bit up and

8   then rub it together with something.

9   Q.   Okay.  So he actually rubbed your feet together?

10  A.   No.  Like, he put something between them and rubbed it

11  together.

12  Q.   So he put something in between your feet?

13  A.   Yes.

14  Q.   And then could you show me what -- like, could you show

15  me with your hands what happened with the thing that was

16  between your feet?

17  A.   Like, (Indicating.)

18  Q.   Could you lift your hands up a little bit?

19  A.   (Indicating.)

20  Q.   So he rubbed something in between your feet like this?

21  A.   Yes.

22  Q.   Do you know what shape that thing was?

23  A.   No, but it's kind of round.

24  Q.   Okay.  And did he say anything while that was happening?

25  A.   No.

26  Q.   Did he put -- what was between your feet, did he put

27  that any place else?

28  A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1089

1  Q.    Just between your feet?

2  A.    Yes.

3  Q.    And you were with Melissa when this happened; right?

4  A.    Yes.

5  Q.    Did you guys have the same bag on?  Was it one bag over

6  two of you?

7  A.    No.  We both got our own.

8  Q.    Okay.  So each of you had a bag on?

9  A.    Yes.

10  Q.    And did you take your socks and your shoes off before

11  the bag was on your head or after?

12  A.    Before.

13  Q.    And so you saw Melissa take off her shoes and socks,

14  too?

15  A.    Yes.

16  Q.    And then he had you both lay down?

17  A.    Yes.

18  Q.    And covered your eyes?

19  A.    Yes.

20  Q.    Wendy, do you know about how many times that happened,

21  where he had you lay down on the ground?

22  A.    Um, I think somewhere around 15, I think.

23  Q.    Okay.  So this is going to be kind of a complicated

24  question and I'll do my best to make it clear.  Okay?

25  A.    Okay.

26  Q.    Do you know whether or not the feet -- this thing with

27  your feet happened before he had you sit in the chair, did it

28  happen while you were -- over time while you were also in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1090

1  chair, or after you were in the chair?  Does that make sense?

2          MR. MADDEN:  Objection, Your Honor.  Compound

3  question.

4          THE WITNESS:  No.

5          THE COURT:  I will allow the answer to remain.  So

6  did that make sense?  And she said "no."

7          MS. FILO:  Okay.  I'll try again.

8  BY MS. FILO:

9  Q.  So you said that the -- when you would lay down on the

10  ground, that happened 15 times?

11  A.  Around 15.

12  Q.  Okay.  And in the chair you said about 10 times; right?

13  A.  Yes.

14  Q.  So what I'm trying to figure out is, did all of the 15

15  times with the feet happen before any of the 10 times with

16  the -- where you were sitting in the chair?

17  A.  Um, before.

18  Q.  Okay.  So all of the feet stuff came first?

19  A.  Yes.

20  Q.  And then you moved on to the chair?

21  A.  Yes.

22  Q.  Okay.  But when you were in the chair, Melissa wasn't

23  there?

24  A.  Um, sometimes she was.

25  Q.  Okay.  How many times was Melissa there?  Do you know?

26  Maybe I don't need a number.  Could you say sometimes?  Half

27  the time?  More than half the time?  Could you give me

28  anything like that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1091

1          MR. MADDEN:  Objection, Your Honor.  Compound

2   question.

3          THE COURT:  Overruled.  You may answer.

4          THE WITNESS:  More than half.

5   BY MS. FILO:

6   Q.   More than half the times?

7   A.   Yes.

8   Q.   Okay.  But there were times that you were there all

9   alone without Melissa?

10  A.   Yes.

11  Q.   Wendy, did you ever talk to anybody while you were in

12  third grade about what was happening with Mr. Chandler and

13  this blindfold?

14  A.   Um, one time when we were done, we were walking through

15  the hallway and Melissa said that she saw Mr. Chandler, um,

16  like, pick his belt up from the desk.

17  Q.   Is that the only time you ever talked to anybody about

18  what was happening with this blindfold while you were still

19  in third grade?

20  A.   Yes, I think so.

21  Q.   Okay.  Because after that, you've now talked to a number

22  of people; right?

23  A.   Yes.

24  Q.   Okay.  You've talked to -- you had to come to court once

25  before?

26  A.   (Shakes head up and down.)

27  Q.   Yes?

28  A.   Yes.

```
 1   Q.   And you talked to the police officers; right?

 2   A.   Right.

 3   Q.   Okay.  Do you know Arleth?

 4   A.   Yes.

 5   Q.   Was she in Mr. Chandler's class with you?

 6   A.   Um, no.  She went with someone else.

 7   Q.   She went with someone else?  What do you mean?

 8   A.   Um, like, after a little while, me and Melissa stopped

 9   going and then, um, two other of my friends, Arleth and

10   Christine, would go to his classroom instead.

11   Q.   Okay.  So did you talk to Arleth about this blindfold

12   thing when you were still in third grade?

13   A.   No.

14   Q.   No?  Okay.  And how about when you were in fourth grade

15   in Ms. Filippini's class, did you ever talk to your friends

16   at school about this blindfold game with Mr. Chandler?

17   A.   No.

18   Q.   No?  Okay.

19             So, Wendy, when you had this blindfold on and this

20   kind of round thing was in your mouth --

21   A.   Yes.

22   Q.   -- how did it make you feel?

23   A.   I was a little confused because, um, before anything

24   happened, Melissa said that she was going to go to the

25   classroom so that she could help Mr. Chandler, like, clean

26   the classroom and help him, but we never got to do that.

27   Q.   Okay.  So you were confused because that wasn't why you

28   thought you were supposed to be there; right?
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1093

1    A.    Right.

2    Q.    Okay.  When this -- when you were sitting in this chair

3    with this blindfold on, did you think it was fun?

4    A.    Not really.

5    Q.    No?  Did you think anything about -- other than being

6    confused, did the -- sorry.  I have to start over.  That was

7    a bad question.  Okay?

8    A.    Okay.

9    Q.    So when you're sitting there, you said you were a little

10   bit confused; right?

11   A.    Yes.

12   Q.    Did you feel any other way?  Was there any other way

13   that you felt in addition to being confused?

14   A.    No.

15   Q.    No?  Okay.

16         Wendy, do you remember who the first person was you

17   ever told about being in the classroom with Mr. Chandler and

18   the blindfold?

19   A.    Um, I think maybe Christine.  I can't remember much.

20   Q.    Okay.  Okay.

21         Wendy, I'm going to look over my notes real quick

22   and see if I missed anything.  All right?

23   A.    Okay.

24   Q.    Okay.  Okay.

25         Wendy, when did it happen during the day?  Like,

26   when during your school day did it happen that you came in

27   and laid down on the floor?

28   A.    Um, sometimes before recess in the morning, and I think

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1094

1    a few times before, like, after lunch.

2    Q.   Okay.  So when you say before recess, what does that

3    mean?

4    A.   Um, like, it's at 11, I think.  And when everyone left,

5    he would keep us back.

6    Q.   Okay.  So it was recess time?

7    A.   Yes.

8    Q.   And all of the other kids had gone to go play?

9    A.   Yes.

10   Q.   But you didn't get to go play?

11   A.   No.

12   Q.   Okay.  Okay.

13            Wendy, have you been taught to do what your school

14   teachers tell you to do?

15   A.   Yes.

16   Q.   Yes?  You don't get in trouble at school, do you?

17   A.   No.

18   Q.   No?  You're a good student; right?

19   A.   Right.

20   Q.   Good girl.  Okay.  Thank you, Wendy.  That's all I have.

21            THE COURT:  Thank you, Ms. Filo.

22            Wendy, Mr. Madden is going to ask you some

23   questions.  Are you okay to keep going?

24            THE WITNESS:  Yes.

25            THE COURT:  Okay.  Remember, if you need a break,

26   let me know.  Okay?

27            THE WITNESS:  Okay.

28            THE COURT:  And I think there is some water there

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1095

1    in case you get thirsty.

2                    THE WITNESS:  Okay.

3                    THE COURT:  Mr. Madden, cross-examination.

4              MR. MADDEN:  Thank you, Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. MADDEN:

7    Q.    Wendy, my name is Mr. Madden and we have never met;

8    right?

9    A.    Right.

10   Q.    Okay.  You could hear me okay from where I'm sitting?

11   A.    Yes.

12   Q.    Okay.  If you can't hear me or any of my questions, just

13   let me know.  You could raise your hand or say:  Wait a

14   minute, and I'll speak up.  Okay?

15   A.    Okay.

16   Q.    Also, if I ask a question and you don't understand my

17   question, don't answer a question that you don't understand.

18   Okay?

19   A.    Okay.

20   Q.    In other words, if what I'm saying doesn't make sense to

21   you, or if I'm asking a word that you don't understand, just

22   raise your hand or say:  Excuse me.  I don't understand what

23   you mean.  And if you do that, then I'll use another word or

24   ask you another question to make sure that you do understand

25   it.  Okay?

26   A.    Okay.

27   Q.    All right.  So when you were in Mr. Chandler's class at

28   O.B. Whaley School, everyone in the class was in the third

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1096

1   grade; right?

2   A.   Right.

3   Q.   Okay.  And Arleth was in that class; right?

4   A.   Right.

5   Q.   All right.  Do you know Laurie?

6   A.   No.

7   Q.   You don't remember a Laurie being in your class?

8   A.   No.

9   Q.   Okay.  Do you remember an Isabell being in your class?

10  A.   No.

11  Q.   Okay.  And do you remember a Becky being in your class?

12  A.   No.

13  Q.   Okay.  But Melissa was in your class?

14  A.   Yes.

15  Q.   Melissa was your best friend?

16  A.   Um, one of them.

17  Q.   Okay.  And is she still in your class?

18  A.   Um, she was this year.

19  Q.   Okay.  But we'll have to see next year; right?

20  A.   Right.

21  Q.   Okay.  You are going to another school next year?

22  A.   No.  Same school.

23  Q.   I'm sorry?

24  A.   I'm going to the same school.

25  Q.   They have sixth grade at O.B. Whaley?

26  A.   Yes.

27  Q.   Okay.  Now, I would like to ask you some questions about

28  adults that you have talked about this case with.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1097

1   A.   Yes.

2   Q.   All right.  Do you remember ever talking to your mother

3   about what happened in Mr. Chandler's class?

4   A.   No.

5   Q.   Okay.  So any time from the time that all of this

6   happened until now, you've never discussed this with your

7   mother?

8   A.   Um, last time I went to court I think she heard, but

9   that was the only time.

10  Q.   All right.  We'll get to that in a minute.

11          How about your father?  Did you ever talk to your

12  father about what happened in Mr. Chandler's class?

13  A.   No.

14  Q.   So during the year that you were in Mr. Chandler's

15  class, you never felt so uncomfortable about anything that

16  happened that you told your mother or your father?

17  A.   Yes.

18  Q.   That's correct?

19  A.   Yes.

20  Q.   Okay.  Thank you.

21          At any time that you were with Mr. Chandler in the

22  third grade, did you -- did he ever make you cry?

23  A.   No.

24  Q.   Did he ever make you upset?

25  A.   No.

26  Q.   Okay.  So if you didn't tell your mother and you didn't

27  tell your father the year that it happened, would then the

28  first adult that you talked about be a police officer that

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1098

1    came to O.B. Whaley School to talk to you?

2    A.    Yes.

3    Q.    Okay.  Do you remember the officer's name?

4    A.    No.

5    Q.    Okay.  Thank you.

6          And by the way, if I ask you a question and you

7    don't remember, it's perfectly fine to say that you don't

8    know or you don't remember.  Okay?

9    A.    Okay.

10   Q.    For all of us, as time goes by we don't remember as

11   well; is that right?

12   A.    Right.

13   Q.    Okay.  So, for example, what you're saying today is

14   about something that happened a long time ago; right?

15   A.    Right.

16   Q.    And you may have forgotten some things?

17   A.    Yes.

18   Q.    Okay.  So if you've forgotten, that's all you have to do

19   is tell me that you've forgotten or you don't remember.

20   Okay?

21   A.    Okay.

22   Q.    But if you do remember, I want you to tell me -- I want

23   you to answer.  Okay?

24   A.    Okay.

25   Q.    Okay.  So you talked to a police officer who came to

26   O.B. Whaley School; correct?

27   A.    Correct.

28   Q.    And do you remember where that meeting took place

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1099

1    between you and that officer?

2    A.    Um, somewhere in the office.

3    Q.    Where the principal is?

4    A.    Yes.

5    Q.    Like when you go to school, the first thing you go by is

6    the office; right?  It's kind of a building with a bunch of

7    offices in it?

8    A.    Yes.

9    Q.    Okay.  So it was a room inside that office building;

10   right?

11   A.    Yes.

12   Q.    Okay.  Was the officer wearing clothes like I'm wearing,

13   or was the officer wearing a uniform?

14   A.    I don't remember.

15   Q.    Thank you.  And did you also -- before we move on.

16          So that officer asked you a lot of things about

17   what you and Mr. Chandler did the year that you were in his

18   third grade class; right?

19   A.    Right.

20   Q.    Okay.  And then shortly after that meeting with the

21   officer at school, you went in a car to downtown San Jose;

22   right?

23   A.    Yes.

24   Q.    Into kind of a special little room?

25   A.    Yes.

26   Q.    And that room had like a child-size table and a

27   child-size chair; right?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1100

1  Q.   And it appeared to be a child's room; right?

2  A.   Yes.

3  Q.   Okay.  And the person that you spoke with in that little

4  room downtown, was that the same person that interviewed you

5  or spoke with you in the office at O.B. Whaley School?

6  A.   Yes.

7  Q.   It's the same person?

8  A.   Yes.

9  Q.   Are you sure of that?

10  A.   Yes.

11  Q.   Okay.  And that conversation downtown in the child's

12  room, did that take place on the same day as the conversation

13  at school or was it a different day?

14  A.   Um, it was the same day.

15  Q.   Okay.  Now, you also talked about this case in the

16  courtroom, a different courtroom, a little over a year ago;

17  right?

18  A.   Right.

19  Q.   And it was basically in the same building; right?

20  A.   Yes.

21  Q.   You remember it's the same because you had to go through

22  the metal detector when you came in; right?

23  A.   Yes.

24  Q.   There was a line that you had to wait in before you came

25  in; right?

26  A.   Yes.

27  Q.   All right.  And Ms. Filo was at that court hearing;

28  right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1101

1    A.    Yes.

2    Q.    She asked you questions?

3    A.    Yes.

4    Q.    And then there was a man and Det. Pierce was at that

5    hearing; is that correct?

6    A.    Um, sorry.  I didn't understand.

7    Q.    Okay.  Thank you.  Do you recognize the man that I'm

8    pointing to here, sitting right next to me?

9    A.    No.

10    Q.    Okay.  He may look a little different than he looked

11    then.  I forgot about that.  We'll leave that.

12        Do you remember answering questions by another

13    lawyer who represented Mr. Chandler?

14    A.    Yes.

15    Q.    And he was a big, tall, heavyset man with a mustache;

16    right?

17    A.    I think so.

18    Q.    Okay.  You remember his name?

19    A.    No.

20    Q.    Okay.  Now, when you were at that court hearing a little

21    over a year ago, was your memory about what happened with Mr.

22    Chandler more clear in your mind?  Was it more clear a year

23    ago than it is today?

24    A.    Um, it was more clear.

25    Q.    I'm sorry?

26    A.    It was more clear at that time.

27    Q.    Right.  And it was probably even more clear when you

28    talked to the police officer at the school and at the little

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1102

1   children's room; right?

2   A.   Right.

3   Q.   Okay.  Do you remember when you were in the third

4   grade -- I'm sorry.  Let me take that question back.

5          So when you were in the third grade, all of your

6   classmates were third-graders?  It was a third grade class;

7   right?

8   A.   Right.

9   Q.   Have you ever been in a combination grade where there

10  was students from one year and another?

11  A.   No, but I'm going to.

12  Q.   You are going to?

13  A.   Yes.

14  Q.   Maybe next year?

15  A.   Yes.

16  Q.   Okay.  The year you were with Mr. Chandler, it was just

17  third grade?

18  A.   Yes.

19  Q.   Arleth was in that class?

20  A.   Yes.

21  Q.   And you remember one of your best friends being Melissa?

22  A.   Yes.

23  Q.   Okay.  Now, if I understand what you said today, the

24  things that you did in Mr. Chandler's class when you were

25  blindfolded involved either him putting something on your

26  feet or putting something in your mouth; is that correct?

27  A.   Yes.

28  Q.   Okay.  Now, when you were putting things on your feet --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1103

1    let me take that back.

2              It was Mr. Chandler that put things on your feet;

3    right?

4    A.   Yes.

5    Q.   When he was putting things on your feet and you were

6    blindfolded, your friend Melissa was always with you; right?

7    A.   Could you repeat it, please?

8    Q.   Yes.  On the times that you were with Mr. Chandler in

9    the classroom and blindfolded, Melissa was always right next

10   to you and she was blindfolded too; right?

11   A.   She wasn't with me all the time.

12   Q.   She was not with you all the time when Mr. Chandler put

13   something on your feet?

14   A.   Oh, wait.  Yes.

15   Q.   That's correct; right?

16   A.   Yes.

17   Q.   Okay.  Now you remember.

18             THE COURT:  Well, Mr. Madden, your previous

19   question, you said all the time, basically.  You didn't

20   distinguish feet and --

21             MR. MADDEN:  I'm sorry.

22             THE COURT:  -- and mouth.

23   BY MR. MADDEN:

24   Q.   Did I confuse you?

25   A.   Yes.

26   Q.   I apologize.

27             MR. MADDEN:  So, thank you, Your Honor.

28             THE COURT:  Welcome.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1104

1  BY MR. MADDEN:

2  Q.   We're just going to right now talk about feet.  Okay?

3  A.   Okay.

4  Q.   You and Mr. Chandler were never alone, that is, just you

5  and Mr. Chandler with you blindfolded any time he put

6  anything on your feet; correct?

7  A.   Sorry.  I didn't understand.

8  Q.   I'm sorry?

9  A.   Sorry.  I didn't understand it.

10 Q.   Thank you.  I will try it again.

11          Do you remember a year ago telling the lawyers

12 that --

13          MS. FILO:  Objection, Your Honor.  Calls for

14 hearsay.

15          MR. MADDEN:  I'm trying to refresh her

16 recollection, Your Honor.

17          MS. FILO:  She doesn't say she didn't remember.

18          THE COURT:  If you could reask the question because

19 she doesn't understand it, I think.

20          MR. MADDEN:  All right.

21 BY MR. MADDEN:

22 Q.   Were you ever alone with Mr. Chandler and blindfolded,

23 just you and Mr. Chandler, when he was putting objects on

24 your feet?

25 A.   No.

26 Q.   Okay.  That means that there was someone besides you and

27 Mr. Chandler there when he was putting objects on your feet;

28 right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1105

1   A.    Yes.

2   Q.    And who was that person?

3   A.    Melissa.

4   Q.    Okay.  So on all of those occasions -- on all of those

5   times, Melissa was right next to you; right?

6   A.    Yes.

7   Q.    And when he was putting objects on your feet, he was

8   also putting objects on Melissa's feet; right?

9   A.    Yes.

10  Q.    But you were both blindfolded at the same time; is that

11  correct?

12  A.    Yes.

13  Q.    How do you know he was putting objects on Melissa's feet

14  if you were blindfolded?

15  A.    Um, he would -- like, he would do one of us first, and

16  then he said he was going to do it to the other, so he would

17  stop and go to the other person that's next.

18  Q.    Okay.  Did sometimes -- did he always start with the

19  same person or did he start with different children?

20  A.    Um, sometimes he would start with other people, like

21  different.

22  Q.    Which other people?

23  A.    Um, me or Melissa.

24  Q.    Okay.  Sometimes he started with Melissa, sometimes he

25  started with you; right?

26  A.    Yes.

27  Q.    So in all of the times that he did this, put something

28  on your feet, you were blindfolded and Melissa was

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1106

1    blindfolded; right?

2    A.    Yes.

3    Q.    You put your blindfold on or did Mr. Chandler put the

4    blindfold on?

5    A.    Um, I don't remember.

6    Q.    Do you remember if he put Melissa's blindfold on or

7    Melissa put it on?

8    A.    I don't remember.

9    Q.    Okay.  All the times that he put something on your feet

10   and when he was done, you took your blindfold off; right?

11   A.    Yes.

12   Q.    And on all of those times, he told you to take your

13   blindfold off; right?

14   A.    Yes.

15   Q.    Where was Mr. Chandler when you took your blindfold off?

16   A.    I don't remember.

17   Q.    So if you don't remember where he was, you don't

18   remember what he was doing; right?

19   A.    Right.

20   Q.    When you took your blindfold off, did you see anything

21   that was unusual?

22   A.    No.

23   Q.    Okay.  And these times that you were with Melissa with

24   Mr. Chandler putting something on your feet, was this always

25   at the morning recess?

26   A.    Not all the time.

27   Q.    What other times do you remember, other than the morning

28   recess, where this happened?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1107

1    A.    After lunch.

2    Q.    Is there a recess after lunch?

3    A.    Yes.

4    Q.    Okay.  Do you know how long the recess in the morning

5    is?

6    A.    Um, I think it's around 20 to 30 minutes.

7    Q.    Okay.  And I believe you stated earlier today that at

8    the time of the morning recess, this took about -- this whole

9    thing with you and Melissa took about five minutes?

10   A.    Yes.

11   Q.    Then after that you went to recess; right?

12   A.    Yes.

13   Q.    So in that five minutes or so, he puts things on your

14   feet and put things on Melissa's feet; right?

15   A.    Yes.

16   Q.    Okay.  Now, there were a number of different things that

17   he actually put on your feet; right?

18   A.    No.

19   Q.    All right.  Do you remember, for example, feeling the

20   top of any scissors, metal scissors, on your feet?

21   A.    No.

22   Q.    Do you remember feeling any glue sticks on the top of

23   your feet?

24   A.    I don't think so.

25   Q.    It sounds like you're not sure about that one; is that

26   right?

27   A.    Yes.

28   Q.    Okay.  Do you remember him putting any paper clips on

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1108

1  your feet?

2  A.   No.

3  Q.   Do you remember him putting any erasers on your feet?

4  A.   I'm not sure about that one.

5  Q.   He might have done that?

6  A.   Yes.

7  Q.   Okay.  So when he was putting all of these things that

8  we just talked about on your feet, he was asking you to guess

9  what they were; right?

10  A.   Um, I don't know.  I don't remember.

11  Q.   But it sounded like you're not so sure about that?

12  A.   Yes.

13  Q.   Okay.  Do you remember any of these times where you felt

14  something really light on your feet being rubbed over your

15  leg or your feet?

16  A.   No.

17  Q.   Do you remember any time after things were put on your

18  feet Mr. Chandler showing you and Melissa a purple piece of

19  cloth and a red piece of cloth?

20  A.   Yes.

21  Q.   All right.  That was -- and he told you that was

22  something that went over your feet; right?

23  A.   Yes.

24  Q.   Okay.  And you did feel something very light go over

25  your feet; right?

26        MS. FILO:  Objection, Your Honor.  Asked and

27  answered.

28        THE COURT:  Sustained.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1109

1    BY MR. MADDEN:

2    Q.   You believed Mr. Chandler when he told you that either

3    the red or the purple cloth was what he had put on your foot

4    or leg; right?

5    A.   Yes.

6    Q.   Because what he told you --

7           MS. FILO:  Objection, Your Honor.  Calls for

8    hearsay.

9           MR. MADDEN:  No.  I said if she believed.

10          THE COURT:  Well, this is another question.  I

11   haven't heard your question.

12          MR. MADDEN:  All right.

13   BY MR. MADDEN:

14   Q.   Now, when you and Melissa were laying on the floor, did

15   you always have the PE bags over your head or sometimes you

16   have the regular blindfold?

17   A.   We always had the PE bags over our heads.

18   Q.   Okay.  And did you get the PE bags yourself?

19   A.   Um, I think he handed them to us when we walked in.

20   Q.   Okay.  Now, the times that you were with Melissa and he

21   put things on your feet, were you always on the floor in

22   about the same place?

23   A.   Yes.

24   Q.   And could you tell me where that place would be looking

25   at the diagram?  I'm going to get a -- there is a pointer up

26   here that I'm going to use.

27          MR. MADDEN:  May I approach, Your Honor?

28          THE COURT:  Yes.  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1110

1   BY MR. MADDEN:

2   Q.   All right.   This is -- I'm going to say this for the

3   record.   This is just lawyer stuff.   This is Exhibit A-1.

4             This is a photograph of the -- of Mr. Chandler's

5   classroom; right?

6   A.   Yes.

7   Q.   All right.   Now, the people that took many photographs

8   took it about the same time that they came to school to talk

9   to you.   Okay?

10  A.   Okay.

11  Q.   In other words, it wasn't taken in the year that you

12  were in Mr. Chandler's class.   Do you understand what I mean?

13  A.   Yes.

14  Q.   Okay.   But I'm assuming that this is still how Mr.

15  Chandler's class looked to you when you were in the third

16  grade; right?

17  A.   Yes.

18  Q.   Does anything look any different?

19  A.   Um, that red bucket that is next to the --

20  Q.   In the middle of the diagram there appears to be a

21  plastic tub with some either rope or plastic rope handles on

22  it.   Is that what you mean?

23  A.   Yes.

24  Q.   You don't remember that being in there when you were in

25  the third grade?

26  A.   Yes.

27  Q.   Okay.   Thank you.   Anything else you could think of?

28  A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1111

1  Q.   Okay.  In the third grade, you remember the desk being

2  in the same place?

3  A.   Yes.

4  Q.   Okay.  And could you just go to the diagram with this

5  marker?  You could take a couple of steps out of your chair.

6  Be careful.  There is a step there.  Just point to the area

7  where you and Melissa were for all of the feet touchings by

8  Mr. Chandler.

9  A.   Um, it was around here.  (Indicating.)

10  Q.   Okay.  Thank you.  You could sit down.  So you are

11  pointing to a yellow post-it with the number and letters 2

12  PXB on it.  Okay?  Fair enough?

13  A.   Yes.

14  Q.   Okay.  And did you ever see Mr. Chandler go into the

15  cabinet behind his desk before he got -- before he put things

16  on your feet?

17  A.   Yes.

18  Q.   Did you see him take things out?

19  A.   No.

20  Q.   All right.  But did he go into the cabinet before he put

21  things on your feet?

22  A.   Yes.

23  Q.   Okay.  What about after he put things on your feet?

24  A.   Um, sometimes he would look inside there.

25  Q.   I'm sorry.  I'm going to ask you -- the problem is I'm

26  having -- other than the fact that I have old ears, I'm going

27  to move this microphone so that you could -- when you look at

28  me, I know that it's -- it might be distracting.  This way

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1112

1    it'll pick up your voice.  Okay?

2    A.    Okay.

3    Q.    Thank you.

4          So on the times that -- if I understand you

5    correctly, you were always in the area that you pointed on

6    the diagram sitting on the ground with Melissa; right?

7    A.    Yes.

8    Q.    And every time you took your shoes and socks off or

9    sometimes -- that's a bad question.

10         Um, did you take your shoes and socks off every

11   time he put something on your feet?

12   A.    Yes.

13   Q.    Did Melissa do the same thing?

14   A.    Yes.

15   Q.    Okay.  When you finished, sometimes -- let me ask

16   another question.  Let me ask you this question about this

17   diagram.  This is People's A-6.

18         Does that appear to you to be the inside of the

19   cabinet or closet that we're talking about?

20   A.    Yes.

21   Q.    All right.  And is this where Mr. Chandler kept his

22   supplies?  School supplies?

23   A.    Yes.

24   Q.    All right.  Like paper clips, papers, erasers, and glue

25   sticks, and markers, and things like that?

26   A.    Yes.

27   Q.    All right.  I don't think I need to stand next to you

28   right now because I'm going to ask you some other questions.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1113

1    Do you remember when you were in the third grade in

2  Mr. Chandler's class, a time when the whole class was playing

3  the taste game and the feel game?

4  A.    Yes.

5  Q.    You do remember that?

6  A.    Yes.

7  Q.    Okay.  And how many times did that happen?

8  A.    I think only one time.

9  Q.    One time?  Okay.

10    Do you remember what part of the school year it was

11  that you saw the whole class do these games?

12  A.    Um, it was the same year that I was in his class.

13  Q.    And is it correct that the game that was played by the

14  whole class was after you had done all of these practice

15  games with Melissa and Mr. Chandler?

16    MS. FILO:  Objection, Your Honor.  Misstates the

17  testimony.

18    THE COURT:  Sustained.  If you'd rephrase, Mr.

19  Madden.

20    MR. MADDEN:  All right.

21  BY MR. MADDEN:

22  Q.   Do you remember Mr. Chandler telling you and Melissa --

23    MS. FILO:  Objection, Your Honor.  Calls for

24  hearsay.

25    THE COURT:  Um, sustained.

26  BY MR. MADDEN:

27  Q.   Do you think you did the whole class game after the

28  individual sessions between you and Melissa and Mr. Chandler?

1    A.    Yes.

2    Q.    How are you doing, Wendy?

3    A.    Okay.

4    Q.    You look like you are getting a little fidgety to me.

5    Would you like to take a few minutes break?

6    A.    Yes, please.

7              MR. MADDEN:  Your Honor.

8              THE COURT:  Okay.  Ladies and gentlemen, we'll take

9    the morning break.  I'll order all members of the jury to

10   report to the jury assembly room on the second floor and

11   we'll call you back at 10:45 on the court clock.  We'll be in

12   recess.

13             (Whereupon, a brief recess was taken.)

14             THE COURT:  Record will reflect all members of the

15   jury are present, both counsel are present, Mr. Chandler is

16   present in the courtroom.

17             Mr. Madden, you were continuing with your cross.

18             MR. MADDEN:  Thank you, Your Honor.

19   BY MR. MADDEN:

20   Q.    Becky, [sic] I want to start by telling you the same

21   thing.  If you get a little fidgety or tired -- I'm sorry.

22   Excuse me.  Please forgive me for calling you Becky.

23             Wendy, if you're starting to feel tired or you need

24   to move around or take a break, just let Judge Bocanegra know

25   and we're happy to help you.  Okay?

26   A.    Okay.

27   Q.    All right.  Okay.

28             So I would like to go back to the subject of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1115

1  feel and the taste game that you saw in front of the whole

2  class.  Okay?

3  A.   Okay.

4  Q.   We'll just call that the whole class game.  Okay?

5  A.   Okay.

6  Q.   When the whole class game was played, all of the

7  students were there; right?

8  A.   Yes.

9  Q.   And you remember that being played one time?

10  A.   Yes.

11  Q.   All right.  Now, is that something you're sure about or

12  could have been more?

13  A.   I am pretty sure.

14  Q.   Okay.  And the whole class game, did you participate in

15  tasting or feeling anything yourself?

16  A.   I don't remember.

17  Q.   All right.  You might have?

18  A.   Yes.

19  Q.   Okay.  And did you see any other types of feel or taste

20  games in front of the whole class that you hadn't seen

21  before?

22  A.   No.

23  Q.   When you saw the feel game in front of the whole class,

24  did it always involve Mr. Chandler putting objects on the

25  bare feet of students?

26  A.   No.

27  Q.   What did he put the objects on?

28  A.   Huh?  Could you repeat?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1116

1    Q.   Yes.  Let me ask you -- obviously you didn't understand.

2    Must have been my fault.

3          You have talked about Mr. Chandler putting objects

4    on your feet when you were with Mr. Chandler and Melissa;

5    right?

6    A.   Yes.

7    Q.   I'm talking about the whole class game, and you

8    might have -- Mr. Chandler might have put objects on your

9    feet during the whole class game, but you're not sure if he

10   did it to you in the whole class game; right?

11         MS. FILO:  Objection, Your Honor.  Misstates the

12   testimony.

13         THE COURT:  Sustained.  She said no.

14         MR. MADDEN:  She said she did not.

15         THE COURT:  Earlier, when you asked the question:

16   If you put objects on the feet, she said no.

17         MR. MADDEN:  Fine.  Okay.

18   BY MR. MADDEN:

19   Q.   In the whole class game, the children in the class who

20   were participating, were they all blindfolded?

21   A.   Um, yes.

22   Q.   Okay.  Whether they were doing the taste game or the

23   feel game, they had their eyes covered; right?

24   A.   Yes.

25   Q.   And they had to guess either what was in their mouth or

26   they had to guess what was on their feet or their leg; right?

27   A.   They only guess what was in their mouth.  He didn't do

28   anything with their feet.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1117

1    Q.    That didn't happen at all?

2    A.    Yes.

3    Q.    This -- the whole class game?

4    A.    Yes.

5    Q.    Okay.  Sometimes I'm not paying enough attention.  All

6    right.

7          Did Mr. Chandler always put things -- was it just

8    your feet or was it also your leg?

9    A.    Just my feet.

10   Q.    And would it be just the top of your feet, the side of

11   your feet, or the bottom of your feet?

12   A.    Bottom of my feet.

13   Q.    All right.  Again, Melissa was always right next to you;

14   right?

15   A.    Yes.

16   Q.    Then after he would finish putting things on your feet,

17   he stopped and then he put things on Melissa's feet; right?

18   A.    Yes.

19   Q.    And the times that Melissa went first, he put things on

20   her feet, then he put things on your feet; right?

21   A.    Yes.

22   Q.    Now, Mr. Chandler never told you or Melissa not to tell

23   anybody about this, did he?

24   A.    Um, I think he told us one time.

25   Q.    And what did he tell you?

26   A.    He said that not to tell anyone, um, because he was,

27   like, giving us little gifts.

28   Q.    I'm sorry.  You are speaking a little bit too fast and a

1  little bit too low.  Could you slow down a little bit and

2  speak up a little bit?

3  A.   Um, he told us once to not tell anyone, because one time

4  he gave us, like, little presents and he didn't want anyone

5  to know because he thought that they might want to come and

6  do the same things so they could get gifts.

7  Q.   Okay.  Mr. Chandler never told you not to tell your

8  parents, did he?

9  A.   No.

10  Q.   All right.  Did you ever tell anybody that any of the

11  objects that Mr. Chandler put on your feet felt like skin?

12  A.   Could you repeat it, please?

13  Q.   Yes.  Did you ever tell anybody at any time that the

14  object that -- any object that Mr. Chandler put on your feet

15  felt like skin?

16  A.   Yes.

17  Q.   Okay.  Now, would that be the time that right after that

18  Mr. Chandler showed you a red cloth and a purple cloth?

19  A.   Yes.

20  Q.   Okay.  And so tell me what you remember about how the

21  cloth felt when it went on the bottom of your feet.

22  A.   I didn't feel anything that felt like cloth.

23  Q.   You felt something very light against your skin; right?

24  A.   Not really.

25  Q.   But he showed you a piece of cloth right after he did

26  that; right?

27  A.   Yes.

28  Q.   Okay.  When the class game was played, was everybody

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1119

1   having a good time?

2   A.   Yes.

3   Q.   People were laughing?

4   A.   Yes.

5   Q.   Okay.  All right.

6        So I would like to leave the feet questions and I

7   would like to start to ask you about mouth questions.  Okay?

8   A.   Okay.

9   Q.   First, at any time that Mr. Chandler put anything in

10  your mouth, did anything come out of the thing that was in

11  your mouth?

12  A.   No.

13  Q.   Okay.  Was Melissa always with you and Mr. Chandler in

14  the class when he put something in your mouth?

15       MS. FILO:  Objection, Your Honor.  Asked and

16  answered.

17       THE COURT:  Sustained.

18  BY MR. MADDEN:

19  Q.   Do you remember talking about the one time that you bit

20  on what was in your mouth?

21  A.   Yes.

22  Q.   I believe you stated before that happened, he told you

23  it was candy; right?

24  A.   Yes.

25  Q.   And I think you said that you thought it was candy and

26  that's why you bit it?

27  A.   Yes.

28  Q.   And how far did you bite into the object that was in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1120

1    your mouth?

2    A.    Only a little.

3    Q.    Do you remember testifying about a year ago that you bit

4    about halfway into it?

5             MS. FILO:  Objection, Your Honor.  Hearsay.

6             MR. MADDEN:  Asking if it refreshes her

7    recollection, Your Honor.

8             THE COURT:  Um, I'm going to sustain the objection

9    based on the way the question was asked.

10   BY MR. MADDEN:

11   Q.    The object that you bit into tasted like candy; right?

12   A.    No.

13   Q.    Just not like any candy you tasted before?

14   A.    Yes.

15   Q.    So it was a candy that you didn't recognize?

16            MS. FILO:  Objection, Your Honor.  Misstates the

17   testimony.  He is now confusing the witness.

18            THE COURT:  Sustained.

19   BY MR. MADDEN:

20   Q.    You thought that what you bit into was candy; right?

21            MS. FILO:  Objection, Your Honor.  Asked and

22   answered and misstates the testimony.

23            THE COURT:  Sustained.

24   BY MR. MADDEN:

25   Q.    Did what you bite into have a strawberry flavor?

26            MS. FILO:  Objection.  Asked and answered.

27            THE COURT:  I'll -- I believe it has been asked

28   before and answered.  I will let you answer that question one

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1121

1    more time.

2              THE WITNESS:  Could you repeat it?

3    BY MR. MADDEN:

4    Q.   Yes.

5              MR. MADDEN:  Well, may I -- excuse me, Your Honor.

6    May I impose on madam court reporter to read back?

7              THE COURT:  I believe it was what you bit on tasted

8    like strawberry.

9              THE WITNESS:  It only tasted a little like

10   strawberry.

11   BY MR. MADDEN:

12   Q.   Okay.

13             Now, the times that you were in Mr. Chandler's

14   class, you and Melissa, and blindfolded and tasting things in

15   your mouth.  Okay?

16   A.   Okay.

17   Q.   Was that just like the -- when you talked about the

18   feet?  In other words, the two of you were always together?

19   A.   Not always.

20   Q.   How many times, if you remember -- let me ask it a

21   different way.

22             Were you ever alone with Mr. Chandler in the class

23   in tasting anything in your mouth?

24   A.   Yes.

25   Q.   That was one time?

26   A.   Yes.

27   Q.   Only one time?

28             MS. FILO:  Objection, Your Honor.  Misstates the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1122

1    testimony.

2              THE COURT:  Sustained.

3    BY MR. MADDEN:

4    Q.   Only one time alone with Mr. Chandler?

5              MS. FILO:  Objection, Your Honor.  Misstates the

6    testimony.

7              THE COURT:  Sustained.

8    BY MR. MADDEN:

9    Q.   Do you remember Mr. Chandler, when you were alone in the

10   class with him, putting candy in your mouth when you were

11   blindfolded and then asking you to describe it?

12   A.   I don't remember.

13   Q.   But he might have?

14   A.   Maybe.

15   Q.   All right.  Have you ever had a candy that was -- are

16   you familiar -- strike that.

17             Are you familiar with the candy known as sour

18   strings?

19   A.   No.

20   Q.   Have you ever had a candy that was soft on the outside

21   and soft on the inside?

22             MS. FILO:  Objection, Your Honor.  Relevance.

23             THE COURT:  Sustained.

24             He's going to ask you another question.

25             THE WITNESS:  Could you repeat it?

26             THE COURT:  I'm sorry.

27   BY MR. MADDEN:

28   Q.   I'm looking at my notes right now.  I'm sorry.  I'm not

1    waiting for you.  That's my fault.

2            THE COURT:  What I said is he was going to ask you

3    another question.  Okay?  You are doing well.

4    BY MR. MADDEN:

5    Q.   Wendy, do you remember -- during your third grade year

6    with Mr. Chandler, do you remember Mr. Chandler that year

7    talking about a girl who couldn't see and who couldn't hear?

8    A.   No.

9    Q.   Do you know or remember the name Helen Keller?

10   A.   No.

11   Q.   Do you remember if Mr. Chandler ever talked about Helen

12   Keller during your third grade year?

13   A.   No.

14   Q.   Do you remember Mr. Chandler ever putting lollipops into

15   your mouth and you had to guess the flavor?

16   A.   Yes.

17   Q.   How many flavors do you remember tasting?

18   A.   I think, like, a little bit over five.

19   Q.   And could you tell me what the little bit over five

20   would have included?

21   A.   Um, blueberry, strawberry, soda, melon, um, mystery.

22   Q.   I didn't hear the last one.

23   A.   Mystery.

24   Q.   Mystery?

25   A.   Yeah.

26   Q.   Okay.  That's okay.  That's very good.

27            On the time that you bit into the candy, Mr.

28   Chandler said don't bite it; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1124

1    A.    Yes.

2    Q.    He didn't say "owe" or "ouch" or anything like that, did

3    he?

4    A.    No.

5    Q.    All right.  And the object that was in your mouth, at

6    that time when you bit it, he just left it there; right?

7    A.    Yeah.

8    Q.    Didn't pull it out?

9    A.    No.

10   Q.    Okay.  I'm still looking at my notes.  Okay?  I'll be

11   with you in a minute.

12           Now, when any of the objects was in your mouth, did

13   the object just basically stay on your tongue?

14   A.    No.

15   Q.    Where else did it go?

16   A.    It like -- um, it will go back and forth.

17   Q.    You mean you said he would take it out and put another

18   one in?

19   A.    No.  Like, it would be in my mouth and he would, like,

20   push it back and then pull it forward.

21   Q.    Push it where?

22   A.    Like, into -- a little bit deeper into my mouth.

23   Q.    Little bit deeper, but still on your tongue?

24   A.    Yes.

25   Q.    You never choked or gagged or anything like that; right?

26   A.    No.

27   Q.    Okay.  It didn't fill up your mouth; right?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1125

1    Q.   Okay.

2              MR. MADDEN:  One moment, please, Your Honor.

3              Your Honor, I would like to read from the

4    preliminary examination transcript dated -- Vol. 2 of 3,

5    dated May 22, 2012.

6              MS. FILO:  Objection, Your Honor.  Hearsay.

7              MR. MADDEN:  Page 244.

8              THE COURT:  Okay.  There is an objection, hearsay

9    objection.  The reason for reading?

10             MR. MADDEN:  Is a prior inconsistent statement.

11             THE COURT:  Okay.  Would you show the portions to

12   Ms. Filo so she could take a look at it and see if she has an

13   objection or not.

14   BY MR. MADDEN:

15   Q.   Becky, [sic] do you remember --

16             THE COURT:  Ms. Filo had an opportunity to look at

17   that portion?

18             MS. FILO:  It's fine, Your Honor.

19             THE COURT:  Okay.  Mr. Madden, you are going to

20   read certain sections of the --

21             MR. MADDEN:  Yes.  I'm going to read two lines of

22   the preliminary examination transcript.  For the record, this

23   is preliminary examination of People v. Chandler from Vol. 2

24   of 3.  This will be page 244, lines 19 and 20.

25             MS. FILO:  Your Honor, if I might?  Could I ask

26   counsel to read through to page -- sorry -- to line 28 so we

27   could get the rest of the context?

28             MR. MADDEN:  That's something you are free to do.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1126

1  I'm just reading the part that I want to read.

2          THE COURT:  I guess you could do it on redirect.

3          MR. MADDEN:  Thank you.  All right.

4  BY MR. MADDEN:

5  Q.  Do you remember this question, Wendy?

6          "Okay.  How far into it did you bite?"  And your

7  answer:  "Uh, somewhere in the middle."

8          Do you remember that?

9  A.  No.

10  Q.  Okay.  Now, the time that the candy was in your mouth

11  and you bit it, did Mr. Chandler -- while the candy was in

12  your mouth, did Mr. Chandler ever say anything to you other

13  than don't bite it?

14          MS. FILO:  Objection, Your Honor.  May we approach?

15          THE COURT:  Yes.

16          (Whereupon, there was a discussion at the bench.)

17          THE COURT:  There wasn't a legal basis for the

18  objection, Mr. Madden, on the record.  Mr. Madden, you are

19  going to ask another question.

20          MR. MADDEN:  Thank you, Your Honor.  Your Honor, I

21  have no further questions at this time.

22          THE COURT:  Thank you.

23          Redirect, Ms. Filo?

24          MS. FILO:  Thank you, Your Honor.

25                    REDIRECT EXAMINATION

26  BY MS. FILO:

27  Q.  Okay.  How are you doing, Wendy?  Are you doing okay?

28  A.  Yeah.

1  Q.    Okay.  Wendy, you said that this thing he put in your

2  mouth was -- you held up your hand like this and you made

3  kind of a C; right?

4  A.    Yes.

5  Q.    And that was the shape that it was?

6  A.    Yes.

7  Q.    Do you remember anything else about what it felt like

8  when it was in your mouth?  Do you have any other words that

9  you could use that would tell us what it felt like?

10  A.    Um, it felt like skin.  It was kind of slippery.

11  Q.    Skin and kind of slippery?

12  A.    Yes.

13  Q.    Okay.  Are those the best words that you could think of?

14  A.    Yes.

15  Q.    All right.  And then you said that he was sort of

16  pushing your head into this thing; right?

17  A.    Yes.

18  Q.    Did the thing move or did your head move?

19  A.    Um, my head and the thing.

20  Q.    Okay.  So they both kind of moved?

21  A.    Yes.

22  Q.    All right.  Were you moving your head by yourself or was

23  Mr. Chandler pushing your head?

24  A.    Mr. Chandler was pushing my head.

25  Q.    Okay.  All right.

26        So when Mr. Chandler showed you that piece of

27  cloth -- you remember what Mr. Madden asked you about that

28  piece of fabric?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1128

1    A.    Um, no.

2    Q.    Okay.  Mr. Madden asked you whether Mr. Chandler showed

3    you a piece of red fabric or cloth and a piece of purple

4    fabric; right?

5    A.    Yes.

6    Q.    Do you remember those questions?

7    A.    Yes.

8    Q.    All right.  So I just want to make sure I understand.

9    Mr. Madden -- I mean, Mr. Chandler told you that's what he

10   put on your feet; right?

11   A.    He -- yes.

12   Q.    Yes?

13   A.    Yes.

14   Q.    But that's not what it felt like; right?

15   A.    Yes.

16   Q.    Am I correct?

17   A.    Yes.

18   Q.    Okay.  Wendy, you were asked whether or not you were

19   supposed to guess what was in your mouth.  Do you remember

20   getting that question from Mr. Madden?

21   A.    Yes.

22   Q.    And do you remember whether you were supposed to guess

23   or not?

24   A.    No.

25   Q.    How about when he was rubbing something on your feet?

26   Were you supposed to guess what that was?

27   A.    No.

28   Q.    You were not supposed to guess?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1129

1    A.    I don't think so.

2    Q.    Okay.  Wendy, were you one of the people that played

3    that -- this exercise in front of the whole class, where he

4    put something in your mouth?

5    A.    No.

6    Q.    No?  You weren't one of those people?

7    A.    Wait.  Could you repeat it?

8    Q.    Sure.  So you said that you watched the whole class and

9    Mr. Chandler would take people and there was one time where

10   he took people in front of the whole class and he put things

11   in their mouth and have them guess what it was.  Do you

12   remember talking about that?

13   A.    Yes.

14   Q.    Were you one of those people that played in front of the

15   whole class?

16   A.    I don't remember.

17   Q.    You don't remember?

18   A.    No.

19   Q.    Okay.  So you remember when you bit down on this thing

20   that was in your mouth?  You remember that?

21   A.    Yes.

22   Q.    Do you know how much you bit?

23   A.    Only a little.

24   Q.    Only a little.  Okay.

25        So when you bit down, did pieces break away?

26   A.    No.

27   Q.    So it didn't break up into lots of different pieces, did

28   it?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1130

1  A.   No.

2  Q.   No?  It stayed as the thing it was?

3  A.   Yes.

4  Q.   Do you remember if it was hard or soft?  Do you have any

5  description like that?

6  A.   Um, it was sort of soft.

7  Q.   Okay.  And it didn't taste like any kind of food you

8  ever had before; right?

9  A.   Right.

10  Q.   The only word you could use to describe it is skin?

11  A.   Yes.

12  Q.   Okay.  Wendy, that's all the questions I have.

13             THE COURT:  Thank you.

14             Recross, Mr. Madden?

15             MR. MADDEN:  Thank you, Your Honor.

16                     RECROSS-EXAMINATION

17  BY MR. MADDEN:

18  Q.   Wendy, is today the first time that you ever described

19  any of the objects in your mouth as feeling like skin and

20  slippery?

21  A.   No.

22  Q.   Did you tell the police officer who came to the school

23  that?

24  A.   I think so.

25  Q.   Did you tell the police officer at the children's room

26  that?

27  A.   Yes.

28  Q.   And did you tell the court about a year ago that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1131

1    A.    Yes.

2    Q.    Okay.  Thank you.

3              THE COURT:  Anything further, Ms. Filo?

4              MS. FILO:  No.  Thank you, Your Honor.

5              THE COURT:  May this witness be excused?

6              MS. FILO:  Yes, Your Honor.

7              THE COURT:  Okay.  Wendy, thank you.  You are done

8    and you could step down and you could leave the courtroom.

9    Okay?

10             Ms. Filo, as I understand it, you're next going to

11   play some audio and video interviews?

12             MS. FILO:  Yes, Your Honor.

13             THE COURT:  And which is the first one you are

14   going to be --

15             MS. FILO:  Arleth.  It's about 45 minutes to an

16   hour.

17             THE COURT:  Okay.

18             Ladies and gentlemen, I'm not saying this because

19   of the comments I made this morning about starting on time,

20   but we had a long morning recess because Wendy did very well

21   testifying, but she wasn't feeling very well during the break

22   and needed some time.  Her stomach wasn't feeling well, so I

23   wanted to make sure she was completely comfortable going

24   forward.  And if not, we were just going to bring her back

25   another day.  Obviously, she felt better and went forward.

26             There is an issue that I have to take up sometime

27   today, and rather than start the audio, I'm going to address

28   it this morning and excuse the jury and order that you come

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1132

1    back at 1:30 to the jury assembly room on the second floor.

2    And when you return to the courtroom, we'll start the playing

3    of the video interviews.

4              So, all members of the jury, you are excused at

5    this time.  We'll see you at 1:30.

6              (Whereupon, the jurors were excused and the

7    proceedings were had outside the presence of the jury.)

8              THE COURT:  The jury has left the courtroom.  Both

9    counsel and Mr. Chandler is present.  In light of the morning

10   and how it played out, I think what I wanted to do, Counsel,

11   was take this opportunity to address the issue that Mr.

12   Madden brought up this morning concerning Officer Pierce's

13   directive to Mr. Chandler, just generally, about not

14   returning.  And I know, Mr. Madden, you wanted to put some

15   things on the record.  I had ruled tentatively before and I

16   would like to take this time to make a ruling.  And I know,

17   Mr. Madden, you had some concerns, and I think in fairness,

18   since we did this informally, we could put this on the record

19   at this time.

20             MR. MADDEN:  Yes, Your Honor.  I believe on -- not

21   Friday, but I think Thursday, the People indicated they

22   intended to call Officer Pierce to the stand to offer a

23   statement, or a part of a conversation that he had with Mr.

24   Chandler as Mr. Chandler was walking out of the San Jose

25   Police Department sometime after 8:00 p.m. on January the

26   9th.

27             I indicated to the Court that my concern is that I

28   have read -- strike that.  Last Thursday, it's my

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1133

1   recollection that Ms. Filo said or indicated that the officer

2   will be testifying that he told Chandler not to go to school

3   the next morning, which of course would have been January the

4   10th.  And my concern about that testimony is that it is not

5   contained at all in the transcript or in the videotape of Mr.

6   Chandler's interview, which was at least two hours on the

7   evening of the 9th.

8          So I listened to that interview and I have a

9   transcription of that interview.  There is no directive at

10   the end of that conversation from the officer directing Mr.

11   Chandler to do anything other than there is -- I'm giving

12   just a short paraphrase.  The officer indicated that it's

13   about 8:00 o'clock:  Here's what I'm going to do.  You are

14   going to give me your wife's phone number.  I'm going to call

15   her.  She's going to come pick you up.  Call the school or

16   call Ms. Peery to find out what you are supposed to do.  All

17   right?

18          As the Court knows, there has been evidence that my

19   client indeed went to the O.B. Whaley School and to his

20   classroom early on the morning of the 10th.  The problem that

21   I'm having is that the People are not offering -- they stated

22   that they are not going to offer any portion of Mr.

23   Chandler's interview with Det. Pierce.  What's pointed out to

24   the Court was that Mr. Chandler had been in school that day;

25   that he been called to the office; that he had a discussion

26   with the principal, Lea Peery, or multiple discussions.  He

27   was advised that the matter had been reported to the police,

28   that he was asked to wait, and he did wait for a period of

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1134

1    time, but the police officer did not arrive.

2              At or about 2:00 p.m. he left the school to go

3    home, and that he was arrested by, I believe, Officer

4    Latrendress in front of his home, handcuffed, put in a police

5    vehicle, brought down to the SAIU at the San Jose Police

6    Department, I'm assuming, sometime shortly after 2:00

7    o'clock.  I believe that Mr. Chandler was in handcuffs for a

8    minimum of two to three hours before the interview and that

9    he was interviewed for at least two more hours.

10             I want to be able to get into those facts in

11   cross-examining the officer because I think they are relevant

12   as to the mental and emotional condition Mr. Chandler was in

13   when he was released that night.  But I'm concerned about how

14   much of that I could get into without referring to the

15   statements, and I'm concerned about my ability to potentially

16   impeach Det. Pierce with what I believe he is going to state

17   he said on the way out of the building, but it is not on

18   tape.  That's my concern.

19             THE COURT:  Thank you.

20             Ms. Filo, do you wish to respond?

21             MS. FILO:  Well, I think they're kind of separate

22   issues, and I think everyone acknowledges -- I also have a

23   transcript of the recording of Mr. Chandler's interview with

24   Det. Pierce.  We have never asserted, nor has it ever been

25   claimed that this directive was captured on the tape.

26             I believe what Officer Pierce will testify to is

27   that the interview was over and he was actually escorting Mr.

28   Chandler out of the building because it was after-hours and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1135

1   he would have to walk him through the secured part of the

2   police department in order to get him to an exit.  And it was

3   during that exit process that he told Mr. Chandler not to

4   come back; that he should not go to the school the following

5   day.  It's reflected in the police report, something that was

6   produced to counsel.  It's, you know, been in everybody's

7   possession since the time that the police report was created.

8          I don't see how the defendant's having been in

9   custody for several hours is relevant to this one directive.

10  The one directive is:  Don't go back to the school.  I mean,

11  I think what Mr. Madden wants to say is that Mr. Chandler was

12  somehow fried and didn't hear this information or didn't

13  process this information.  And I don't think there is any

14  reason why the fact that Mr. Chandler was there being

15  interviewed needs to be part of that discussion.

16         The police were contacted at 9:00 o'clock that

17  morning.  I have no problem informing the jury that the

18  directive, don't go back to the school, was at 9:00 o'clock

19  that night.  Clearly, the police had been to the campus, they

20  had interviewed people, Mr. Chandler had been either sent

21  home or -- I mean, he is made aware that he is now under

22  investigation for allegations of child molestation, but I

23  have no problem telling the jury that.

24         What I object to is in any way referencing the idea

25  that there was an interview of Mr. Chandler because it then

26  makes clear to the jury they are not hearing something that's

27  been excluded under the Rules of Evidence.  So I think it's

28  unfair to have that reference be any part of the record when

1   it's just alluding to hearsay; it's just not letting in the

2   hearsay.  I mean, I have no -- I think all of those arguments

3   could be effectively made without referencing the interview

4   or the interview process.

5            THE COURT:  Mr. Madden, any final comments?

6            MR. MADDEN:  Well, there is a couple of more facts.

7   I believe the evidence is that Mr. Chandler -- the first

8   notice that he was placed on administrative leave was the

9   conversations he had with Dan Deguara in the classroom that

10  next morning.  He had no knowledge that night.  He'd never

11  spoken to Ms. Peery.  I believe the facts of the case are

12  that -- include that Mr. Chandler had voluntarily given his

13  cell phone to Det. Pierce, and it was Det. Pierce's -- and in

14  Det. Pierce's possession from that night until I believe it

15  still is.  It's never been returned to Mr. Chandler.

16            So I think those facts are important, and I think

17  that I have to be able to allow -- I think the Court could

18  perhaps fashion a remedy, if he doesn't like the word

19  "interview," we don't have to say that, but handcuffed and

20  therefore -- whatever the number of hours was.  I'm guessing

21  it was no more than six, but probably not far off.

22            THE COURT:  Okay.  Thank you.

23            Taking into consideration everything that's been

24  said at this particular hearing and the comments made on

25  Thursday, sort of trying to make a determination of the

26  relevance of the information both sides want to get into, and

27  I think at this stage of the trial, doing a 352 analysis

28  concerning this particular area, when Officer Pierce

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1137

1   testifies, I'll allow the People to ask him the time and

2   location and the directive he made to Mr. Chandler.

3           Earlier -- you didn't put this on the record, but

4   earlier, Mr. Madden, you also indicated that you thought you

5   should be allowed to get into evidence that Officer Pierce

6   told Mr. Chandler to contact Ms. Peery in the morning.

7           MR. MADDEN:  Yes.

8           THE COURT:  Do you have any responses to that

9   particular piece of evidence, Ms. Filo?  It's basically a

10  directive.

11          MS. FILO:  I'm fine with that.

12          THE COURT:  I will allow that as well.

13          Concerning Mr. Chandler's emotional and mental

14  state, at this point of the trial, I think this is

15  information that the defense may put on in their defense to

16  explain why Mr. Chandler went to the -- went to the school

17  the next morning.  How that would be presented, I can't think

18  of any way other than Mr. Chandler testifying.  And if that

19  occurred, obviously Officer Pierce is here to be recalled.

20          So over Mr. Madden's objection, I'm not going to

21  allow any other information other than the time, the

22  location, and what Officer Pierce told Mr. Chandler.  I don't

23  see it as to this particular piece of evidence being relevant

24  that he was arrested and handcuffed, because if we get into

25  the interview, then there is no statement coming in during

26  the People's case in chief.  Also, I think it's clear that

27  Mr. Chandler was aware that he was under investigation for

28  sexual misconduct that occurred, not only at the school, but

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1138

1    in his classroom.

2              So that's the Court's ruling on this particular

3    issue.

4              Yes, Mr. Madden.

5              MR. MADDEN:  I'm sorry, Your Honor.  So what -- is

6    there anything I could ask Sgt. Pierce -- Det. Pierce on

7    cross-examination?

8              THE COURT:  Not about the fact that he was

9    arrested, handcuffed, and interviewed.  I don't think that's

10   relevant to the directive at this point.  I know your

11   position is that, well, Mr. Chandler's emotional and mental

12   state is relevant to explain why he went to the school the

13   next day, but it doesn't explain it.  It's basically

14   confusing and misleading to the jury at this stage.  I'm not

15   saying it's not relevant during the defense's case in chief.

16   I think a lot more becomes relevant, depending on whether Mr.

17   Chandler testifies and what you present.

18             That's the ruling at least on that portion of

19   Officer Pierce's conduct or contacts with Mr. Chandler.  I

20   know there was other questions that were covered on direct

21   and Mr. Madden will go into that.

22             MR. MADDEN:  What about the -- from the transcript

23   interview of my client, where he did not tell him not to go

24   to school?  Could I ask the officer:  Earlier, you did not

25   mention not going to school?

26             THE COURT:  Well, I think that the question that --

27   at 8:00 o'clock, for example, when they were in the lobby

28   leaving and you told him not to go back to the school:  At

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1139

1   any other time that day, did you tell him not to go back to

2   the school?  And I believe the answer will be no.  So I think

3   that question is fair, but I think your questions are trying

4   to indirectly get into the fact that he was in the police

5   station being interviewed, and I'm keeping that out at this

6   point.

7            MR. MADDEN:  I understand, Your Honor.

8            THE COURT:  Okay.  Thank you.  Again, this is

9   obviously -- this Court's ruling is over Mr. Madden's

10  objection.

11           MR. MADDEN:  Thank you.

12           THE COURT:  See you all at 1:30.

13           MS. FILO:  Thank you, Your Honor.

14           (Whereupon, the Court took the noon recess.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1140

1                    AFTERNOON PROCEEDINGS

2           THE COURT:  Thank you, ladies and gentlemen.

3  Record will reflect all members of the jury are present, both

4  counsel are present, Mr. Chandler is in the courtroom.

5           And, Ms. Filo, you may continue.

6           MS. FILO:  Yes, Your Honor.  At this time, the

7  People would offer the interview of Arleth at the Child

8  Interview Center, which occurred on or about January 17th,

9  2012.  I have a transcript to pass out to the jurors, and

10 I'll cue up the video.

11          THE COURT:  Okay.  The CD is going to be marked

12 next in order, which is 8, and the transcript will be marked

13 a copy as 8-A.

14          (Whereupon, People Exhibits 8 and 8-A were marked

15 for identification.)

16          THE COURT:  I'm assuming, unless either counsel

17 tells me otherwise, that there is a stipulation that my court

18 reporter need not to attempt to transcribe the recording of

19 People's 8?

20          MR. MADDEN:  Yes, Your Honor.

21          MS. FILO:  So stipulated.

22          THE COURT:  Thank you.

23          (Whereupon, a tape was played, not reported.)

24          THE COURT:  The record will reflect that we just

25 completed playing the interview, which has been marked as

26 People's 8.  I will ask all members of the jury, if you'd

27 please pass your transcripts to your right and Ms. Filo will

28 pick them up.  And after you pass them, we're going to take

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1141

1    our afternoon recess.

2              I'll order all members of the jury to report to the

3    jury assembly room on the second floor, and we'll make every

4    effort to call you back up at 3:30.  And at 3:30, we'll

5    listen to Wendy's audio and visual interview at that time.

6    So we'll be in recess at this time.  Thank you.

7              (Whereupon, a brief recess was taken.)

8              THE COURT:  We'll go on the record.  Record will

9    reflect all members of the jury are present, both counsel are

10   present, Mr. Chandler is present.

11             Ms. Filo, ready to proceed?

12             MS. FILO:  Thank you, Your Honor.  The People call

13   Kristin Cardosa.

14                       KRISTIN CARDOSA,

15             Being called as a witness on behalf of the People,

16   having been first duly sworn, was examined and testified as

17   follows:.

18             THE CLERK:  For the record, ma'am, police state and

19   spell your first and last name.

20             THE WITNESS:  My name is Kristin Cardosa;

21   K-r-i-s-t-i-n, C-a-r-d-o-s-a.

22             THE COURT:  Thank you, ma'am.

23             Direct examination, Ms. Filo.

24             MS. FILO:  Thank you, Your Honor.

25                     DIRECT EXAMINATION

26   BY MS. FILO:

27   Q.   Ms. Cardosa, how are you presently employed?

28   A.   I currently work for the Santa Clara County DA's Crime

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1142

1   Laboratory.

2   Q.   What does the crime laboratory do?  What's its primary

3   function?

4   A.   We process evidence for different types of things

5   that --

6   Q.   All kinds of things; right?

7   A.   Yes.  There is different departments that we have.

8   Q.   So toxicology, ballistics, biological samples, computer

9   forensics, all kinds of things?

10  A.   Correct.

11  Q.   In what capacity do you currently work for the lab?

12  A.   I work in the forensic biology unit.

13  Q.   What does that mean?

14  A.   It means we screen evidence for any kind of biological

15  material, such as blood, semen, saliva, skin cells, and then

16  we test it for DNA analysis.

17  Q.   Okay.  Ms. Cardosa, could you tell me a little bit about

18  your education?

19  A.   Yes.  I have a Bachelor of Science degree from Santa

20  Clara University in biology.

21  Q.   What specific training do you have then to work at the

22  laboratory?

23  A.   Once you get to the laboratory, we do extensive in-house

24  training in all of the different areas that you will be doing

25  casework in.  It's approximately a year to a year and a half

26  of in-house training before you start casework.

27  Q.   What does that training include in order to work in the

28  biological sample department?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1143

1    A.    It includes testing all kinds of different samples that

2    you may come across from casework.  Anything from blood,

3    semen, saliva, et cetera.  You get very familiar with the

4    types of samples that you will be seeing.

5    Q.    Do you work with another more senior analyst who can

6    check your work?

7    A.    Yes.  There are other analysts that are currently doing

8    casework that will supervise your training.

9    Q.    Is there a testing process that you go through in order

10   to sort of establish yourself as having reached the

11   acceptable threshold of testing?

12   A.    Yes.  We take a competency test created in-house at the

13   end of your training to prove you are competent in the

14   material that you have learned, and then every six months we

15   take an external test to make sure that we are proficient in

16   what we are doing.

17   Q.    Every six months you take a proficiency test that is not

18   generated by your job.  It's actually an external test?

19   A.    That's correct.

20   Q.    You passed all of your tests?

21   A.    Yes, I have.

22   Q.    How long have you been employed by the lab?

23   A.    I have been at the lab for about seven years.

24   Q.    How long have you been in the biological samples

25   department?

26   A.    About six years.

27   Q.    Ms. Cardosa, have you previously testified in this

28   county on the identification of biological samples?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1144

1   A.   Yes, I have.

2   Q.   And the testing process you use to establish that

3   identification?

4   A.   Yes.

5   Q.   Approximately how many times?

6   A.   Approximately ten times.

7        MS. FILO:  Your Honor, at this time, the People

8   would offer Ms. Cardosa as an expert in the area of detection

9   and identification of biological sample.

10        MR. MADDEN:  I have no voir dire, Your Honor.

11        THE COURT:  Okay.  Then she'll be recognized as an

12   expert in the areas requested.

13   BY MS. FILO:

14   Q.   Ms. Cardosa, could you tell me in general how do items

15   come to the laboratory for testing?  How do you get them?

16   A.   The different agencies, the police agencies, request --

17   submit items for testing.  They get delivered by either

18   officers or their property evidence technicians.  They get

19   received by our laboratory by our property evidence

20   technicians, then they get stored at different temps, either

21   the freezer or room temp.  And then we, as criminalists, will

22   go down and request our evidence from our property evidence

23   technician.

24   Q.   So they sort of follow a chain of command -- I mean, a

25   chain of custody in order to get to you?

26   A.   Yes, they do.

27   Q.   Same thing, I guess.

28        And then you perform whatever analysis is requested

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1145

1    of you; is that correct?

2    A.   That's correct.

3    Q.   Ms. Cardosa, were you assigned to collect and identify

4    biological samples, if possible, from two chairs, blue

5    chairs -- seats that were associated with San Jose Police

6    Department case number 12-009-0244?

7    A.   Yes.

8    Q.   Once the items come into the laboratory, do they then

9    get a separate laboratory number?

10   A.   Yes.  We bar code all of our evidence that comes in, so

11   they get a separate lab bar code.  They are identified within

12   our computer system.

13   Q.   Originally, they come in with the police department

14   number.  But once they are with you, they really have a lab

15   number?

16   A.   They have a lab bar code, but a lot of times we use the

17   item numbers that the police give them.

18   Q.   Like the evidence item number?

19   A.   Correct.

20   Q.   Okay.  So, Ms. Cardosa, could you tell me how you would

21   go about determining whether or not there was a biological

22   sample present on one of the blue chairs that was submitted

23   to you for analysis?  How do you do that?

24   A.   So, in this case, if you are looking for semen, first we

25   would take an alternate light source that will allow any kind

26   of biological materials to fluoresce when you use certain

27   kinds of goggles and you are looking at the different

28   wavelengths.  So then -- you then look for fluorescent stains

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1146

1    and then we test the fluorescent stains with the chemical

2    test, which could be presumptively positive for semen, and

3    then you move on if you find presumptively positive stains.

4    Q.   Is that what you did in this case?

5    A.   Yes.

6    Q.   So the ALS device, what does it look like?  It's like a

7    light; right?

8    A.   Yes.  Ours looks like -- kind of like a flashlight.

9    They have a different bulb at the end.  It's not a normal

10   white light; it's a blue light.

11   Q.   You run that over the item that you are looking for to

12   see what fluoresces?

13   A.   Yes, that's correct.

14   Q.   Then you could use a chemical test to determine whether

15   that's presumptively positive for semen?

16   A.   Yes.  These chemical tests, they are not confirmatory

17   tests because they do react to some other different fluids

18   that occur in nature.  Some kinds of, you know, fruit juices

19   or other things may test positive, so it's only the next step

20   in the process of finding different stains.

21   Q.   It just sort of gives you an idea what to test; right?

22   Where to look?

23   A.   It gives us an idea where to take it further as to DNA

24   possibilities.

25   Q.   Okay.  Ms. Cardosa, did you draft a report relating to

26   the testing of the two chairs that were submitted to you?

27   A.   Yes, I did.

28   Q.   That is a 64-page report; is that right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1147

1   A.   Yes.   The report is three pages.   The notes are

2   included, yes.

3   Q.   Right.   So you actually draft a typed report; right?

4   A.   Yes.

5   Q.   But then attached to that are your kind of handwritten

6   notes as you are doing the process, photographs,

7   chromatograph sort of depictions?

8   A.   Yes.   All of our notes from the screening process

9   identify what the chairs look like and what we're finding,

10  including then we add our DNA notes, which can include graphs

11  and other things.

12  Q.   Okay.

13           MS. FILO:   Your Honor, at this time, I would like

14  to have a 64-page Santa Clara County Crime Laboratory report

15  reflecting laboratory number M120168 marked as the People's

16  next in order.

17           THE COURT:   Number 9.

18           (Whereupon, People's Exhibit 9 was marked for

19  identification.)

20  BY MS. FILO:

21  Q.   You have a copy of this report with you, Ms. Cardosa?

22  A.   I do.

23  Q.   Okay.   I will leave this one here in evidence and I'll

24  use my other copy.   So you said that you first used the

25  alternate light source and then you have a presumptive test;

26  correct?

27  A.   Correct.

28  Q.   Did you do that in this case?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1148

1    A.    Yes, I did.

2    Q.    So I would like to ask you specifically about SYO-02.

3    Each of the chairs was given a separate identification;

4    correct?

5    A.    Correct.

6    Q.    One of them is SYO-01; the other SYO-02?

7    A.    Correct.

8    Q.    On SYO-02, could you tell me how many areas fluoresced?

9    A.    Um, I don't know if I counted the exact number.

10   Q.    Okay.

11   A.    There were many areas throughout the chair that

12   fluoresced that I marked with a Sharpie pen.

13   Q.    Okay.  So maybe I could just do this.  I guess I'm going

14   backwards.  Maybe I should -- Ms. Cardosa, could you tell me

15   that item, SYO-01, that's the photograph of the chair that

16   you examined?

17   A.    Yes, that is.

18            MR. MADDEN:  I'm sorry.  I thought we were talking

19   about SYO-02.

20            MS. FILO:  I said I think it's best we go in order

21   to SYO-01 or SYO-02.

22            THE COURT:  Ms. Filo, would you like the lights to

23   see?

24            MS. FILO:  Sure.

25            THE COURT:  Okay.

26   BY MS. FILO:

27   Q.    That is SYO-01?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1149

1    Q.   That particular chair has a tag on the back of; is that

2    correct?

3    A.   Yes, that's correct.

4    Q.   Okay.  And then what did you find on SYO-01, if

5    anything, that was of interest to you?

6    A.   Well, I found multiple fluorescent stains I circled with

7    a black pen.  I tested all of the stains with our presumptive

8    chemical test, and I only found one area that actually tested

9    positive with our presumptive test for semen.

10   Q.   Okay.  So you said that you marked the areas that you

11   were going to test, or that you were going to look more

12   closely at in a black Sharpie pen?

13   A.   Yes.

14           MS. FILO:  So, Deputy, if we could dim those lights

15   again?  We might actually be --

16   BY MS. FILO:

17   Q.   So am I correct, it's right -- there are a number of

18   places where you actually circled in black pen?

19   A.   Yes, there are.

20   Q.   Okay.  I think it may be --

21   A.   You may have a close-up photo.

22   Q.   Yep, right there.  I don't know if it's clear on my

23   screen, of course, than it is up there.  You could almost see

24   right there.  On the left-hand side of the photograph, those

25   are black Sharpie pen marks; is that right?

26   A.   Yes, but those tested negative.

27   Q.   Okay.  There is also three circles:  one, two, three on

28   the bottom edge of this chair; is that correct?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1150

1  A.    That is correct.

2  Q.    And one of them is sort of an oval shape, that I'm

3  circling right now, is immediately to the left of this white

4  tag; correct?

5  A.    Correct.

6  Q.    Did one of those three circled areas test presumptively

7  positive for semen?

8  A.    Yes.  The one that's right next to the white tag that

9  you were just --

10  Q.    This sort of oval area that I'm circling right now?

11  A.    Yes.

12  Q.    Immediately to the left of that white tag?

13  A.    Yes.

14  Q.    Okay.  So once that item tests presumptively positive,

15  then what do you do with it?

16  A.    So then we will sample the stain and we will take it

17  through our DNA process.  And while we do that, we also make

18  a slide from the part of that sample and we will look for

19  spermatozoa.

20  Q.    Okay.  So you say you take a sample, what does that

21  mean?

22  A.    So in this case, because I couldn't cut the chair up, I

23  just took a swabbing of the actual stain.

24  Q.    So like almost with a Q-tip or something?

25  A.    Yes.

26  Q.    Then you are able to put that on a glass slide?

27  A.    Well -- so then we take the Q-tip, we put -- we take

28  that, we soak it in some water, and then we take part of the

1   water and we put it onto a slide.

2   Q.   Then what do you see in the slide?

3   A.   You could see cellular material, you could see debris,

4   we may see spermatozoa.  It depends on what is in the sample.

5   Q.   And what did you see in this case?

6   A.   There were spermatozoa confirmed from the sample.

7   Q.   Spermatozoa has distinct physical characteristics?  I

8   mean, it's very clear what it looks like when you are looking

9   at this through that microscope onto the slide; right?

10  A.   Yes.

11  Q.   Okay.  So how do you determine then whose sperm it is?

12  A.   We continue with the DNA process and we get DNA results

13  and we do a comparison.

14  Q.   Okay.  You say you do the testing, what kind of testing?

15  What is it?

16  A.   DNA involves us adding chemicals to our sample to break

17  open the cells, release the DNA, and then we make lots of

18  copies of the DNA.  We run it through our instruments.  It

19  types it for us.

20  Q.   Okay.  Do you have to have a known sample against which

21  to test what you are analyzing?

22  A.   Yes.  If we get reference samples from individuals, we

23  will then run them separately and we will compare profiles to

24  see if we could compare them and see if we could identify the

25  foreign samples.

26  Q.   In this case, were you provided with a cup that was

27  identified as something that had been used by Craig Chandler?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1152

1  Q.    From that, you're able to identify or separate out a

2  reference sample of DNA?

3  A.    Yes.  We got a secondary reference from Mr. Chandler.

4  Q.    So once you have that, you have your sample from what

5  you are trying to analyze, you could actually just feed it

6  into a computer and it will match the two; right?

7  A.    No.  We do the matching by hand.

8  Q.    I'm sorry.  Identifies what you have; is that right?

9  A.    Yes, that's correct.

10  Q.    Then by hand you match those up to each other?

11  A.    Yes.

12  Q.    And DNA has certain loci; right?  Different alleles that

13  you could figure out whether or not they match up?

14  A.    That's correct.

15  Q.    And do you have a standard or a threshold for matching?

16  Like, how much of it has to match in order for you to say

17  it's that guy?

18  A.    Yes, we do.

19  Q.    What is your threshold?

20  A.    We have a source threshold of as long as -- the

21  statistic that we do, as long as it's one in three hundred

22  billion or over, then we could call them a source of the

23  profile.

24  Q.    Say it one more time.  One in --

25  A.    One in three hundred billion.

26  Q.    Billion with a B?

27  A.    With a B.

28  Q.    All right.  So once you reach that threshold, you are

1  all confident saying this DNA came from that person?

2  A.   Yes, it's a 99 percent confidence in our rule; that once

3  it's over one in three hundred billion, that we are confident

4  saying that that is that person.

5  Q.   Okay.  And in this case, were you able to conclusively

6  determine that that white stain just to the left of the white

7  sticker on SYO-01 was, in fact, the spermatozoa of Craig

8  Chandler?

9  A.   Yes.  We -- when we do the DNA, we separate into two

10  different fractions.  So when we have spermatozoa present, we

11  try to separate out possible epithelial cell fraction from

12  the possible sperm cell fraction, because the sperm cells we

13  could do that because they are tougher and they are harder to

14  degrade.  So he was the source of the DNA from the epithelial

15  fraction as well as the sperm cell fraction.

16  Q.   Okay.  Epithelial cells are anything; right?  Any part

17  of your body that would contain DNA; is that correct?

18  A.   Correct.

19  Q.   So skin, saliva, anything that sheds DNA we consider an

20  epithelial cell?

21  A.   That's correct.

22  Q.   Okay.  But a spermatozoa is distinct; it's something

23  unique?

24  A.   It is.  It's much more structured and we're able to

25  separate it, because when we add the first chemical to the

26  sample, the epithelial cells will break open and digest and

27  the sperm cells will stay intact until we add a much harsher

28  chemical to it.  So we're able to separate the two out.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1154

1   Q.   You could separate them out and determine that they are

2   both epithelial cells and spermatozoa cells in the sample

3   that you took from this one area that we described in SYO-01;

4   correct?

5   A.   Correct.

6   Q.   What does it mean if you have a mixture of sources?

7   A.   When we have a mixture DNA profile, you will see more

8   than two alleles at each locus, and then that shows that

9   there is at least two people contributing to a mixture.

10  Q.   So every allele, every location that you are looking for

11  in the DNA, has two markers; right?

12  A.   Every individual has two alleles, yes.

13  Q.   Because one comes from your mother and one comes from

14  your father?

15  A.   Correct.

16  Q.   So you'll have, for instance, a 10 and a 12; right?

17  A.   Correct.

18  Q.   That one location you could say that's mom and dad;

19  right?

20  A.   That's correct.

21  Q.   So, for instance, if you had three alleles or three

22  markers at that one location, you would know by definition

23  that another party, a second party, was involved in creating

24  that mixture?

25  A.   That is correct.  Usually, we look at the profile as a

26  whole to see if there is a lot of spots with more than two

27  alleles.  There are rare occasions where individuals can have

28  three alleles at one location.  It's just a rare mutation,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1155

1   but if you see only that at one spot and not anywhere else,

2   you may think it might be the mutation.  But we look at a

3   profile as a whole, so if there is more DNA in one location

4   with multiple alleles, it's more likely a mixture.

5   Q.   Ms. Cardosa, with the respect to the spot you located

6   and tested on SYO-01, did there appear to be any mixture of

7   DNA?

8   A.   No.

9   Q.   This was a single profile?

10   A.   It was a single source profile.

11   Q.   Okay.  Did you test any other areas on SYO-01 for the

12   confirming presence of DNA?

13   A.   No, I did not.

14   Q.   Okay.  So, Ms. Cardosa, I would like to ask you now

15   about SYO-02.  That is a photograph of the chair that was

16   labeled as item SYO-02?

17   A.   Correct.

18   Q.   And did you do the -- did you go through the same

19   process with SYO-02?

20   A.   Yes, I did.

21   Q.   So you used the ALS device?

22   A.   Yes.

23   Q.   To see if you have areas that fluoresced?

24   A.   Correct.

25   Q.   Did you have multiple areas of fluorescence?

26   A.   Yes, I did.

27   Q.   How many locations did you test for the presumptive

28   presence of semen?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1156

1   A.   Um, I tested five that tested positive for the -- with

2   the presumptive test for semen.

3   Q.   Okay.  And again, did you circle those five areas with a

4   black marker?

5   A.   Yes, I did.

6   Q.   All right.  So again, it's a little hard to see on the

7   screen, but in that photograph, on this -- on the black metal

8   portion of the chair, there is one black circle marker;

9   right?

10  A.   That's correct.

11  Q.   And then on the left-hand side, just to the -- on the

12  edge of this photograph, there is another black circle; is

13  that correct?

14  A.   That's correct, but that one did not test positive.

15  Q.   Okay.  And the one on the metal part of the chair did?

16  A.   Yes.

17  Q.   Okay.  And then on the underside of the chair there

18  appear to be two circles to the left of the black metal bar.

19  You see those two?

20  A.   Yes.

21  Q.   And were those tested and did they return a presumptive

22  positive result for semen?

23  A.   I did not test those.

24  Q.   Okay.  On this following photograph there is a sort of a

25  horseshoe, black half circle, and then on the plastic part of

26  the chair on the bottom, almost the bottom half of that

27  circle, were those two areas tested?

28  A.   Only the one on the hard plastic was tested.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1157

1    Q.   Okay.  And did that return a presumptively positive

2    result for semen?

3    A.   Yes, it did.

4    Q.   So where were the other three stains that tested

5    presumptively positive?

6    A.   There is a circle to the right of that one on the hard

7    plastic.  That one tested presumptively positive.  And then

8    there was one located on the back of the chair next to the

9    metal towards the bottom.  So it's not in this photo, but if

10   you go down to the bottom of the chair, it was on the side of

11   the chair across from the metal.

12   Q.   Okay.

13   A.   Then there is one at the top of the chair.  It's not in

14   that photo.

15   Q.   Okay.  Got it.  So if we have any questions, we have the

16   actual chairs here; right?

17   A.   Yes, you do.

18   Q.   Okay.  So, Ms. Cardosa --

19              MS. FILO:  Who wants the pleasure of doing this?

20              Your Honor, at this time, I'm going to ask that the

21   chairs be taken out of their covering, I guess I should say.

22              THE COURT:  Could I -- when you get a chance,

23   Officer Pierce, could you lift them so I could see what they

24   are in.

25              DET. PIERCE:  They are wrapped in paper bags.

26              THE COURT:  Okay.  Inside the paper bag, is there

27   anything?  Just the chair themselves?

28              MS. FILO:  The chairs.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1158

1        DET. PIERCE:  I think it's just the chairs.  I'm

2   not sure.

3        THE COURT:  If you could just check.  While he's

4   doing that, would counsel approach briefly.

5        (Whereupon, there was a discussion at the bench.)

6        DET. PIERCE:  There is nothing else inside.  They

7   are just sitting inside the bag.

8        THE COURT:  Okay.  Thank you, Officer Pierce, for

9   opening the bags.  I was just consulting with counsel of some

10  concerns I had.  And as I understand it, there is absolutely

11  no issues we should be concerned with other than if anyone

12  handles them, they should handle them with gloves; correct?

13       THE WITNESS:  Correct.

14       THE COURT:  Am I correct, Ms. Filo, you are going

15  to be asking them to be marked?

16       MS. FILO:  Yes.

17       THE COURT:  If you will let us know which one you

18  want next in order.

19       MS. FILO:  Sure.  Let me try to do them in order,

20  Judge.  SYO-01 will have the tag in the front.

21       DET. PIERCE:  I think this is 2.

22       THE COURT:  This is off the record.

23       (Whereupon, there was a discussion off the record.)

24       THE COURT:  We'll go back on the record.  As I

25  understand it, the People are asking that a chair that has

26  a -- it's been referred to as SYO-01 be marked next in order,

27  which will be People's 10.

28       MS. FILO:  Okay.

1      (Whereupon, People's Exhibit 10 was marked for

2  identification.)

3      MS. FILO:  Your Honor, I think we've got it figured

4  out.  SYO-01 has the tag, so that will be -- I'm going to put

5  it on the cushion seat, or the back of the chair.  We know

6  there was no sample there.

7      THE COURT:  Okay.  Thank you.

8      MS. FILO:  Then People's 11 will be SYO-02.

9      THE COURT:  Yes.

10     (Whereupon, People's Exhibit 11 was marked for

11  identification.)

12     THE COURT:  That is also a small blue chair.

13     MS. FILO:  Okay.

14  BY MR. FILO:

15  Q.   So, Ms. Cardosa, can I ask you to step down off the

16  witness stand, with the Court's permission.  And there's a

17  pointer right there, right behind you?

18  A.   Here?

19  Q.   There is a wooden pointer right by your right hip.

20  A.   Oh, got it.

21  Q.   Do you need your material or --

22  A.   Yeah, I will.

23     MR. MADDEN:  Your Honor, is it okay if I move?

24     THE COURT:  Yes.  Thank you.

25  BY MS. FILO:

26  Q.   I'm going to ask maybe Det. Pierce to hold the chairs up

27  so we could figure out which is -- where everything is.

28     SYO-02.  So, Ms. Cardosa, could you just identify

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1160

1  where -- for the jury where the five stains were located that

2  tested presumptively positive for semen?

3  A.    Sure.  You want to flip it.  This side -- this side

4  right here.  So these two areas right here.

5         MR. MADDEN:  I'm sorry.  We're all trying to see.

6         THE WITNESS:  These two areas right here tested

7  presumptively positive.

8         THE COURT:  Ms. Filo, I will ask you --

9         MS. FILO:  Yes.  For the record, Your Honor, that

10  appears to be the plastic side of the chair.  If you were

11  sitting in it, it would be the -- by the subject's left

12  thigh.

13         THE COURT:  Thank you.

14         THE WITNESS:  Then it's on this side, so it's right

15  here and right here.

16  BY MS. FILO:

17  Q.    Okay.  That is the -- also, if the subject were sitting

18  in it, the left back side of the chair -- actually, the

19  underside one where the metal -- on the top of the metal

20  curvature?

21  A.    Top of the metal curb and at the bottom before it curves

22  on the seat on the plastic.

23  Q.    On the plastic?

24  A.    One on the very top of the seat.

25  Q.    Then the last one is at the very top on the underside

26  back of the rim -- plastic rim of the chair; is that correct?

27  A.    That's correct.

28  Q.    So all of them on the -- what would be the left-hand

1    side of that chair?

2    A.    That's correct.

3    Q.    Okay.  And SYO-01, I think we had a pretty decent --

4    A.    It's on the bottom side of this.  So this whole circled

5    area, you could see there is almost kind of like a whitish

6    stain in the middle of it.  That tested positive.

7              MS. FILO:  Your Honor, for the record, that's on

8    the underside of the chair where the -- where the legs would

9    be, or the base of the chair will be.

10             THE COURT:  Thank you.

11             MS. FILO:  Okay.  Thank you.

12   BY MS. FILO:

13   Q.    Ms. Cardosa, the spots that you saw on SYO-02, you said

14   that you did a confirming test on how many of those spots?

15   A.    Just one.

16   Q.    Why not do the other four?

17   A.    Well, I took that one through DNA and we do the

18   confirmatory test during that process.  And since I found

19   semen and we got a DNA profile, we didn't move any further to

20   the others.

21   Q.    Okay.  So once you determined who it belongs to, I mean,

22   that's the DNA process; right?

23   A.    Correct.

24   Q.    But the presumptive process is where you could determine

25   whether or not it is semen?

26   A.    Yes.  The presumptive gives us -- it's presumptively

27   positive.  I can do just a confirmatory test to look for

28   spermatozoa on the stain, not go to the DNA process, but we

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1162

1  just try to do things efficiently.  If we need to go back, we

2  will go back.

3  Q.   Okay.  As part of what you are doing, just physically

4  observing, just looking at it; right?

5  A.   Yes.

6  Q.   And if it's sort of in the same general location, if it

7  looks similar, if it has the same properties just visually,

8  is that some information for you about whether or not this is

9  something really different that you need to be testing?

10  A.   Yes.  Sometimes if they are in different locations or

11  they look differently, yes, we might test multiple different

12  areas.  But if they are all in the same area, we might test

13  one and see if we need to go back and test another later.

14  Q.   The process of DNA testing is rather long and

15  time-consuming and expensive.  Yes?

16  A.   Yes.

17  Q.   And I think I already asked this, but the DNA testing

18  that you did with respect to SYO-02, it was determined by the

19  same procedure to be the semen and spermatozoa of Craig

20  Chandler; is that correct?

21  A.   That's correct.

22          MS. FILO:  That's all I have, Your Honor.

23          THE COURT:  Okay.  Thank you.  Would counsel

24  approach?

25          (Whereupon, there was a discussion at the bench.)

26          THE COURT:  Based on my conversations with counsel

27  at sidebar, at Mr. Madden's request, we're going to recess at

28  this time until tomorrow morning at 9:00 o'clock.  I'm

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1163

1    advised -- and, Ms. Cardosa, you could be here tomorrow at 9

2    as well?

3             THE WITNESS:  Yes, I can.

4             THE COURT:  Thank you for your cooperation.  I will

5    order all members of the jury to report to the jury assembly

6    room on the second floor at 1:30 -- excuse me -- at 9:00 a.m.

7    I notice none of you quickly said:  Do you mean 9:00 o'clock?

8    I'll make it clear, tomorrow morning at 9:00 a.m. jury

9    assembly room on the second floor.  And at the end of the day

10   tomorrow, it's my intent to give you a status and update on

11   where the case stands.  Okay?

12            So thank you very much for your patience during

13   this process.  See you tomorrow morning at 9:00 o'clock.

14            (Whereupon, the jurors exited the courtroom and the

15   proceedings were had outside the presence of the jury.)

16            THE COURT:  The jury has left the courtroom.  Both

17   counsel and Mr. Chandler are present in the courtroom.  It's

18   my understanding, Ms. Filo, you anticipate that you may

19   finish tomorrow morning.

20            Based on that possibility, Mr. Madden, as I

21   mentioned at sidebar, I appreciate you're going to be calling

22   some students tomorrow, and I will ask you to have at least

23   ten of them here tomorrow morning, at 1:30 have at least five

24   of the students, and then between 2:30 and 3:00 have an

25   additional five.  I appreciate you are going to make every

26   effort, if you can, because as I understand it, you have

27   scheduled just the students tomorrow afternoon; correct?

28            MR. MADDEN:  Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1164

1    THE COURT:  Okay.  And based on the representations

2    of why they are being called, that is the reason I'm making

3    that order.

4    Ms. Filo, do you wish to put anything on the

5    record?

6    MS. FILO:  So the only thing I'm concerned about,

7    Your Honor, I understand that the children are going to be

8    called and Mr. Madden wants to ask what was put in their

9    mouth.  I believe that that's the subject of the inquiry, but

10   I just want to make sure that any sort of corresponding

11   instruction or description or what have you by Mr. Chandler,

12   I mean, again, would be eliciting hearsay.  So I just want to

13   make sure that we're talking about what actually happened as

14   opposed to what Mr. Chandler editorialized around that.

15   THE COURT:  I think your comments are correct.  I'm

16   sure Mr. Madden is aware of that and I'm confident things

17   will go smoothly tomorrow afternoon.  I will order both

18   lawyers and Mr Chandler here tomorrow morning at 9:00 a.m.

19   and we'll continue with the trial.

20   (Whereupon, the Court took the evening recess.)

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1165

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF SANTA CLARA    )

 3

 4            I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

 5            The foregoing is a full, true, and correct

 6    transcript of the testimony given and proceedings had in the

 7    above-entitled action taken on the above-entitled date; that

 8    it is a full, true, and correct transcript of the evidence

 9    offered and received, acts and statements of the Court, also

10    all objections of counsel, and all matters to which the same

11    relate; that I reported the same in stenotype to the best of

12    my ability, being the duly appointed and official

13    stenographic reporter of said Court, and thereafter had the

14    same transcribed into typewriting as herein appears.

15            I further certify that I have complied with CCP

16    237(a)(2) in that all personal juror identifying information

17    has been redacted if applicable.

18

19            Dated:

20

21                              _____

22                              Jamie L. Mixco, C.S.R.
                                Certificate No. 12708
23

24    ATTENTION:
      CALIFORNIA GOVERNMENT CODE
25    SECTION 69954(D) STATES:

26    "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
      MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27    A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
      ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28    PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
      PERSON."
```

# EXHIBIT 3
# (Vol. 13)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1166

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

THE PEOPLE OF THE STATE OF )
CALIFORNIA, )
                              )
    Plaintiff - Respondent, )
                              )
    v. )    No. C1223754
                              )
CRAIG RICHARD CHANDLER, )
                              )
    Defendant - Appellant. )
_____/

COPY

VOLUME 13

PAGES 1166 - 1301

JULY 23, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:    OFFICE OF THE ATTORNEY GENERAL
                                     BY:  KAMALA D. HARRIS,
                                     Attorney General of the State
                                     of California

FOR DEFENDANT-APPELLANT:    In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1167

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF SANTA CLARA

3       BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4                     DEPARTMENT NO. 37

5

6                          ---o0o---

7   THE PEOPLE OF THE
    STATE OF CALIFORNIA,            )
8                                   )
                    PLAINTIFF,      )
9                                   )     CASE NO.  C1223754
          v.                        )
10                                  )
                                    )
11   CRAIG RICHARD CHANDLER,        )
                                    )
12                                  )
                    DEFENDANT.      )
13   _____/

14

15                         ---o0o---

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18

19                     JULY 23, 2013

20

                           ---o0o---
21

22

23

    APPEARANCES:
24
    FOR THE PEOPLE:              ALISON FILO
25                               Deputy District Attorney

26
    FOR THE DEFENDANT:           BRIAN MADDEN
27                               Attorney at Law

28   OFFICIAL COURT REPORTER:    JAMIE L. MIXCO
                                 C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1168

## INDEX

### EXAMINATION

**Witness Name**                                                      **Page**

**KRISTIN CARDOSA**
   Cross By Mr. Madden  ......................................1170
   Re-Direct By Ms. Filo  ...................................1179

**RUSSELL CHUBON**
   Direct By Ms. Filo  ......................................1183
   Cross By Mr. Madden  .....................................1195
   Re-Direct By Ms. Filo  ...................................1215

**DOROTHY CATANGAY**
   Direct By Mr. Madden  ....................................1220
   Cross By Ms. Filo  .......................................1236

**VERONICA DOE**
   Direct By Mr. Madden  ....................................1240
   Cross By Ms. Filo  .......................................1250

**LY DOE**
   Direct By Mr. Madden  ....................................1253
   Cross By Ms. Filo  .......................................1262

**KEVIN DOE**
   Direct By Mr. Madden  ....................................1267
   Cross By Ms. Filo  .......................................1272
   Re-Direct By Mr. Madden  .................................1274

**DET. SEAN PIERCE**
   Continued Direct Examination By Ms. Filo  .............1276
   Cross By Mr. Madden  .....................................1277
   Re-Direct By Ms. Filo  ...................................1292
   Re-Cross By Mr. Madden  ..................................1295
   Further Redirect Examination By Ms. Filo  .............1297

### PEOPLE'S EXHIBITS

| Exhibits | Description | Page |
|---|---|---|
| 12 Marked | diagram | 1185 |
| 13 Marked | diagram | 1186 |
| 14 Marked | photograph | 1193 |
| 15 Marked | CD | 1216 |
| 15-A Marked | transcript of 15 | 1216 |
| 16 Marked | video | 1219 |
| 17 Marked | photograph | 1298 |
| 18 Marked | photograph | 1298 |
| 19 Marked | photograph | 1298 |
| 20 Marked | photograph | 1298 |
| 21 Marked | photograph | 1298 |
| 22 Marked | photograph | 1298 |

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1169

1 | 23 Marked     photograph                                         1298

2 |

3 |                        **DEFENSE EXHIBITS**

4 | **Exhibits**     **Description**                           **Page**
  | D Marked        photograph                                  1206
5 | E-1 Marked      photograph                                  1213
  | E-2 Marked      photograph                                  1213
6 | E-3 Marked      photograph                                  1213
  | E-4 Marked      photograph                                  1213
7 | F-1 Marked      photographs                                 1222
  | F-2 Marked      photographs                                 1222
8 | G Marked        document                                    1290

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1170

1   San Jose, California                          July 23, 2013

2                           PROCEEDINGS

3           THE COURT:  Thank you, ladies and gentlemen.  The

4   record will reflect all members of the jury are present, both

5   counsel are present, Mr. Chandler is present, and our witness

6   is on the witness stand.

7           Mr. Madden, you were about to begin cross.

8           MR. MADDEN:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10  BY MR. MADDEN:

11  Q.   Good morning, Ms. Cardosa.

12  A.   Good morning.

13  Q.   Thank you for coming back this morning.

14          You testified before, so I'm not going to go

15  through a lengthy discussion of your duties and obligations.

16  You know what they are.  The only thing I would ask you is

17  that should I ask a question that doesn't make any sense to

18  you, I'm very capable of that, let me know and I'll change it

19  so we're having accurate communication.  Okay?

20  A.   (Shakes head up and down.)

21  Q.   All right.  Now, the first thing I would like you to do

22  is to -- I would like to impose on you to step down from the

23  witness stand.  I want to ask you some questions about the

24  orientation of the two stains on which you found DNA, Mr.

25  Chandler's DNA; correct?

26  A.   Correct.

27  Q.   All right.  So if you could do that, I think -- I think

28  Det. Pierce volunteered to put on the rubber gloves and help

1    with this.  He'll take care of that.  The implement for you

2    is a pointer.  Thank you.

3           Now, if I could impose -- when you are ready, Det.

4    Pierce.  No rush.

5           If I could impose on you to flip People's 11, which

6    I believe is SYO-02; is that correct?

7    A.    Yes.

8    Q.    If you could flip that to the same position that

9    People's 10 is, which is SYO-01.  Okay.  All right.

10          So just a couple of quick questions.  For practical

11   purposes, these chairs appear to be identical to each other

12   or very similar; correct?

13   A.    Correct.

14   Q.    All right.  They are both blue, they are both -- there

15   is a -- what appears to be a thick plastic base on which is

16   resting a fabric seat and a fabric back; correct?

17   A.    Correct.

18   Q.    And we know that the larger piece of fabric in each

19   chair is the seat; correct?

20   A.    Correct.

21   Q.    Why we know that?  I know it's an easy one.

22   A.    Because that's the seat of the chair.

23   Q.    The small piece is obviously to support a back; right?

24   A.    Oh, correct.  Yes.

25   Q.    And the slots in here are obviously ventilation for your

26   back; correct?

27   A.    Correct.

28   Q.    All right.  Now, did you find -- on the fabric of either

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1172

1    SYO-01 or SYO-02, did you find any stains that contained

2    semen?

3    A.    I only tested the presumptive test SYO-01, the actual

4    fabric.  I didn't test the fabric from SYO-02.

5    Q.    You did no testing on the fabric of SYO-02?

6    A.    Not with the presumptive test.

7    Q.    And that would assume -- since you didn't do any

8    presumptive testing, you didn't do any DNA extraction either?

9    A.    No.  Not from the fabric, no.

10          (Whereupon, the reporter interrupted proceedings.)

11   BY MR. MADDEN:

12   Q.    I have to remember to breathe sometimes.

13          On SYO-01, you did presumptive testing on the

14   fabric; correct?

15   A.    Correct.

16   Q.    And did your presumptive testing of the fabric on SYO-01

17   fluoresce?

18   A.    Yes.  All of the areas that are circled in black

19   fluoresced with the ALS.  But then when I went to test them

20   with the presumptive test, the presumptive test was negative.

21   Q.    All right.  So then would you be comfortable stating

22   that there is no evidence of any semen stain on either chair

23   SYO-01 or SYO-02, at least to the fabric part of the chair?

24   A.    I did not test the fabric part of that chair.

25   Q.    As a scientist, you can't give an opinion to that;

26   correct?

27   A.    That's correct, but this one there is no semen on that.

28   Q.    Okay.  All right.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1173

1          Now, there were two stains that you not only did

2     the alternative light source fluorescence; correct?

3     A.    Correct.

4     Q.    But then you did a presumptive test; correct?

5     A.    Correct.

6     Q.    Then you did a DNA extraction; correct?

7     A.    Correct.

8     Q.    All right.  And on two of the stains, one on each chair,

9     you concluded that the DNA was Mr. Chandler's; correct?

10    A.    Yes.

11    Q.    And it was semen?

12    A.    Yes.

13    Q.    Okay.

14          Can I impose on Det. Pierce to first turn your

15    attention, Detective, to SYO-01, and if you, Ms. Cardosa,

16    could aid him and explain where the stain on SYO-01 is that

17    contains the semen of Mr. Chandler?

18    A.    Yes.  It's on the underside of the seat.

19    Q.    Okay.  So you flipped it over and I see what has been

20    previously referred to as a tag; right?

21    A.    Yes.

22    Q.    You testified about that in your testimony?

23    A.    Yes.  Right next to the left of the tag there is a stain

24    that was tested positive for semen, and it came back to Mr.

25    Chandler.

26    Q.    Could you point that for me?

27    A.    Right here.

28    Q.    That would be contained within what appears to be a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1174

1  black marker?

2  A.    That's --

3  Q.    Sharpie or something?

4  A.    That's correct.  I circled that.

5  Q.    All right.  And the stain that contained the semen,

6  could you point out which stain within that Sharpie you are

7  referring to?

8  A.    So this was one continuous stain.

9  Q.    Okay.

10  A.    And the sections that are missing are where I tested.

11  Q.    Okay.  So the length of the entire stain before you

12  tested it would have been approximately how big in inches?  I

13  know you're a scientist and you don't like inches, but I'm

14  not a scientist.

15  A.    It's a stain that goes in kind of a loop, so backs over

16  on itself.

17  Q.    Notwithstanding the fact that it's not a straight line,

18  could you give me an approximation of the width and the

19  length of it and inches?

20  A.    It's a very thin stain.  It's probably less than a

21  quarter of an inch.

22  Q.    Across?

23  A.    Across.

24  Q.    And width?

25  A.    And it's -- in length, it's probably four inches, five

26  inches, maybe.

27  Q.    Okay.

28  A.    If I had to guess.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1175

1   Q.   All right.  And then may I impose on Det. Pierce to do

2   the same thing with respect to SYO-02.

3        And could you direct --

4   A.   Sure.  It's on the left side of the bottom seat.

5   Q.   The left side of SYO-02.  Is it on the plastic then?

6   A.   It is on the plastic.  It is on the side of the plastic

7   right here.

8   Q.   Okay.  And that would be in the area on this chair on

9   the left side of the plastic just below the seat about

10  approximately midway --

11  A.   I would say probably, yeah, halfway.

12  Q.   Okay.  All right.

13       And can I ask you to give me an estimation of the

14  size of that stain in inches?  I will take an

15  approximation --

16  A.   I would say --

17  Q.   -- in terms of the width and length?

18  A.   I would say about the size of a nickel.

19  Q.   About the size of a nickel.  Okay.  All right.  Thank

20  you.  You may sit down.  I will take that for you, if you

21  like.  I don't think we need it.

22       Let me get to questions that are a little more

23  scientific.

24  A.   Okay.

25  Q.   Just a little more.  You did not test for saliva, did

26  you?

27  A.   I did not.

28  Q.   Okay.  Now, typically saliva contains a lot of what you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1176

1    call epithelial cells; correct?

2    A.    That's correct.

3    Q.    And when you were looking for spermatozoa

4    microscopically, you also looked for epithelial cells, didn't

5    you?

6    A.    Yes.

7    Q.    And according to your notes -- I believe this is on

8    Bates-stamped page 011.  Are you with me?

9    A.    One moment.  Yes.

10   Q.    So according to your notes, you found no epithelial

11   cells at all, did you?

12   A.    I did not see any intact epithelial cells.  No.

13   Q.    And to be specific, no epithelial cells at all in either

14   the stain you just talked about and identified on SYO-01 and

15   SYO-02 --

16   A.    That's correct.

17   Q.    -- correct?  All right.

18         So your results proved that only one body fluid

19   semen is present in both of these stains; correct?

20   A.    Correct.

21   Q.    That is what the evidence supports?

22   A.    Yes.

23   Q.    All right.  So first you detected one semen stain on

24   SYO-01; correct?

25   A.    Yes.

26   Q.    And on chair 2, we're referring to SYO-02; correct?

27   A.    Correct.

28   Q.    All right.  On chair 2, you indicated on direct that you

1    found five stains on the plastic that tested positive with

2    this presumptive test; correct?

3    A.    Correct.

4    Q.    But you only tested and confirmed the presence of semen

5    on one of those; correct?

6    A.    That's correct.

7    Q.    It is considered a presumptive test because other things

8    could cause a false positive?  In fact, on direct you

9    testified that fruit juice could give a false positive;

10   correct?

11   A.    There are certain things, yes, that can.

12   Q.    So while you said that the other four stains looked

13   similar to the ones you tested, in fact, as a scientist,

14   you're not telling us those other stains were semen, are you?

15   A.    I could not confirm they are semen.

16   Q.    The only one that we know is semen on SYO-02 is the

17   stain that you tested?

18   A.    That's correct.

19   Q.    That's on the plastic left edge of the seat portion of

20   the chair?

21   A.    Yes.

22   Q.    So a fair summary of your analysis would be:  As to

23   chair SYO-01, you found a small amount of semen on the

24   underside unmixed with any other body fluid or DNA; correct?

25   A.    Correct.

26   Q.    And as to chair SYO-02, you found the small amount of

27   semen on the left side unmixed with any other body fluid or

28   DNA; correct?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1178

1    A.    Correct.

2    Q.    All right.

3          Finally, Ms. Cardosa, I would like to give you a

4    hypothetical question.

5    A.    Okay.

6    Q.    A man and a woman have sex in a room containing the two

7    chairs, SYO-01 and SYO-02.  Immediately afterward, some semen

8    gets onto the hands of the man, and the man then moves both

9    of these chairs, transferring the semen on his hand to the

10   chairs.

11         Is that scenario a reasonable explanation for the

12   finding that you made here?

13   A.    Based on the appearance of the stains, they don't appear

14   to be transfer stains.  They appear to be directly deposited

15   onto the chairs.

16   Q.    They don't appear to be transfer stains?

17   A.    They don't.

18   Q.    Why not?

19   A.    They don't appear to be smeared or in any kind of way

20   disturbed.  They appear to be just a pure liquid placed on

21   the chairs.

22   Q.    Directly deposited from a position, then, below the

23   chairs?

24   A.    Well, if the chairs were flipped over, maybe they were

25   deposited that way.

26   Q.    That's really the only way that could happen; right?

27   A.    Possibly, yes.

28         MR. MADDEN:  I have no further questions.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1179

1          THE COURT:  Redirect?

2          MS. FILO:  Yes.  Thank you.

3                   REDIRECT EXAMINATION

4    BY MS. FILO:

5    Q.   Ms. Cardosa, you said that there was a small amount of

6    semen that you were able to locate; is that right?

7    A.   Yes.

8    Q.   Do you quantify concentration of semen -- of

9    spermatozoa?

10   A.   Yes, we do.

11   Q.   Okay.  So, for instance, on page 11 of your report, you

12   have the indicator plus one for SYO-01, and then the

13   indicator plus two for SYO-02.  What does that mean?  Plus

14   one or plus two?

15   A.   So we have guidelines in our manual of how we quantify

16   the amount of sperm that we see on the slides when we're

17   looking at them, and we try to gauge it to see how much we

18   have in our sample.  Let me refer to my manual and I will

19   give you the exact definition.

20   Q.   Sure.

21   A.   So based on our manual, plus one indicated only a

22   minimum number of spermatozoa, approximately two to ten sperm

23   heads on the slide.  Plus two would indicate spermatozoa in

24   some fields, which means you see a fair amount throughout the

25   scope of the slide that you are looking.  And we also have

26   two others, if you would like me to explain?

27   Q.   Sure.

28   A.   Plus three indicates spermatozoa in most fields.  So as

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1180

1    you are scanning the slide, you see sperm is in most of the

2    fields that you look at.  And plus four indicates many

3    spermatozoa per field, which is a very highly concentrated

4    sample.

5    Q.   You said that the stains themselves don't appear to be

6    transfer stains.  What does that mean?  What would you look

7    for if you are trying to distinguish between a transfer stain

8    and a directly deposited stain?

9    A.   So transfer stains, if you could imagine if you had

10   some -- you know, something on your hand -- like, say you had

11   ketchup on your finger, you touched something, it might look

12   smeared or disturbed.  It wouldn't look like a droplet if it

13   just hit -- you know, if you just had some ketchup hit a cup

14   or something like that.  So it doesn't -- they don't appear

15   disturbed.  They don't appear that they got, you know,

16   different concentrations along the edges.  If they are, you

17   know, one solid stain, it doesn't appear that a hand has

18   moved it or touched or disturbed it.

19   Q.   Okay.  So, Ms. Cardosa, could I ask you again to step

20   down quickly, and I don't think I need to move the chairs.

21        So, Ms. Cardosa, on the left-hand side here of

22   SYO-02 --

23   A.   Yes.

24   Q.   -- what I'm seeing appears to be droplets.  I mean,

25   that's what a lay person would call them; right?

26   A.   That's what they appear to be, yes.

27   Q.   Okay.  Even droplets that seem to get heavier on the

28   bottom?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1181

1    A.    Yes.   This one appears to get heavier as it moves down

2    the seat, which gravity would pull a droplet down.  It would

3    dry out like that.

4    Q.    Okay.  So I think of a droplet as being, you know,

5    tear-shaped; right?  That kind of --

6    A.    That's correct.  It depends on what surface it hits and

7    how -- if the surface is curved, it might not look exactly

8    like a tear shape.

9    Q.    But it should be heavier at the bottom as it's traveling

10   down the surface; correct?

11   A.    Correct.

12   Q.    The majority of the stain that I see just from the naked

13   eye is on this left-hand side of the chair; is that right?

14   A.    That's correct.  However, I don't -- these other items

15   did not fluoresce, so I don't know -- I could not confirm

16   what they are.

17   Q.    Okay.  So it's just kind of this -- I mean, the one I

18   see, that's the biggest; right?  This -- of the two markers,

19   it's the one closest to the seat of the chair?

20   A.    That's correct.  But this one is the one I sampled for

21   DNA, so most of it has been consumed.  It's not on the chair

22   right now.

23   Q.    Okay.  There was also a stain on SYO-02, kind of on the

24   backside of the chair; is that right?

25   A.    Yes, that's correct.

26   Q.    Okay.  Ms. Cardosa, just one last question.  Is there

27   any way to date when the deposits were made?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1182

1  Q.   There is no way scientifically to determine whether it

2  was made last week or last year?

3  A.   No, there is no way.

4  Q.   Okay.

5           THE COURT:  Thank you.

6           Recross, Mr. Walsh -- I'm sorry -- Mr. Madden.  I

7  don't know where Walsh came from.

8           MR. MADDEN:  I was just thinking to myself where

9  that came from.  I don't remember hearing that name in this

10 trial.

11          THE COURT:  I have a meeting with Judge Walsh.

12          MR. MADDEN:  Now I won't wonder about that the

13 whole morning.  Thank you.

14          THE COURT:  Welcome.

15          MR. MADDEN:  One moment please, Your Honor.

16          THE COURT:  Yes.

17          MR. MADDEN:  I have no further questions, Your

18 Honor.

19          THE COURT:  Okay.  Any objection to this witness

20 being excused?

21          MS. FILO:  No, Your Honor.

22          MR. MADDEN:  No.

23          THE COURT:  Thank you.  You are excused and free to

24 leave.

25          THE WITNESS:  Thank you.

26          MS. FILO:  The People call Russ Chubon,

27 C-h-u-b-o-n.

28 ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1183

1          RUSSELL CHUBON,

2          Being called as a witness on behalf of the People,

3    having been first duly sworn, was examined and testified as

4    follows:

5          THE CLERK:  For the record, sir, could you please

6    state your full name and spell both for the record.

7          THE WITNESS:  Russell Chubon; R-u-s-s-e-l-l,

8    C-h-u-b-o-n.

9          THE COURT:  Thank you.

10         Direct examination, Ms. Filo.

11         MS. FILO:  Thank you.

12                    DIRECT EXAMINATION

13   BY MS. FILO:

14   Q.   Good morning.  Mr. Chubon, you are presently employed as

15   an investigator for the Office of the District Attorney;

16   correct?

17   A.   Correct.

18   Q.   How long have you held that position?

19   A.   Six months.

20   Q.   Where were you employed prior to becoming an

21   investigator with the District Attorney's Office?

22   A.   San Jose Police Department and Santa Clara County.

23   Q.   How long were you employed by the San Jose Police

24   Department?

25   A.   Twelve years.

26   Q.   What was your last assignment within the San Jose Police

27   Department?

28   A.   I was assigned to the child exploit detail, and that's

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1184

1  within the sexual assault unit.

2  Q.    So you worked directly and were partners with Det.

3  Pierce?

4  A.    I was.

5  Q.    Detective, were you assigned to assist in the

6  investigation of the -- assist in the investigation of Craig

7  Chandler?

8  A.    I was.

9  Q.    Do you know when approximately you got that assignment?

10  A.    The morning of January 10th.

11  Q.    Were you assigned to be the finder of evidence?

12  A.    I was.

13  Q.    What does that mean?

14  A.    Um, for documenting evidence collected, one

15  officer/detective is assigned to be the finder as the person

16  that collects and books the evidence.

17  Q.    So you're responsible for documenting what you take,

18  from where you take it, identifying it, bar coding it,

19  getting it into evidence, things like that?

20  A.    Correct.

21  Q.    Handling it safely, that sort of thing?

22  A.    Correct.

23  Q.    Okay.  In discharging that obligation in this case, did

24  you go to classroom 18 at O.B. Whaley School?

25  A.    I did.

26  Q.    Do you remember when the first time was you actually

27  went into the classroom?

28  A.    It was noonish time.  The kids were, I believe, on a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1185

1   lunch break, so that gave me an opportunity to search the

2   room.

3   Q.   Okay.  Detective, I'm going to show you a diagram, which

4   I'm going to ask to be marked as People's next in order.

5              THE COURT:  I believe that will be 12.

6              (Whereupon, People's Exhibit 12 was marked for

7   identification.)

8              MS. FILO:  Your Honor, may I approach?

9              THE COURT:  Yes.  Thank you.

10  BY MS. FILO:

11  Q.   Okay.  So I hope -- Deputy, could I get you to dim the

12  lights just quickly to see if that helps us?  It's awfully

13  light, but we'll do the best we can.  Oh, there we go.

14             Detective, is that -- for all practical purposes,

15  is sort of a diagram of classroom 18?

16  A.   It is.

17  Q.   Okay.  And, of course, I lost my little handy pointer.

18             So, Detective, up here where I'm pointing there is

19  a dotted line on the far right-hand side of the diagram.  Is

20  that the door that would lead to the outside?

21  A.   It is.

22  Q.   Okay.  Then along that same wall it says "computer table

23  and sink," is that where those items were located within the

24  room?

25  A.   Yes.

26  Q.   Along the bottom of the diagram is identified as the

27  white board; is that correct?

28  A.   Yeah.  There is storage cabinets there as well.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1186

1   Q.    Both sides there is almost like bookshelves; right?

2   A.    Yes.

3   Q.    Immediately in front of the white board there is almost

4   a backward C and upside down L.  Are those student chairs?

5   A.    Yes.

6   Q.    Immediately to the left of that there is sort of a

7   horseshoe-shaped table; is that accurate?

8   A.    Yes.

9   Q.    Mr. Chandler's desk is identified in fact as his desk?

10  A.    Yes.

11  Q.    Then behind it there is a paper cabinet, a bookcase, a

12  short cabinet, and a tall cabinet; right?

13  A.    Yes.

14  Q.    And then immediate -- in between Mr. Chandler's desk and

15  the tall cabinet, there is a door that goes into another

16  classroom; is that right?

17  A.    Yes.

18  Q.    Okay.  That's essentially the condition, although not to

19  scale, that you found the room on January 10th; is that

20  accurate?

21  A.    Yes.

22          MS. FILO:  Just for purposes of orientation, Your

23  Honor, I would like to have marked as People's next in order,

24  essentially, a satellite image of the school.

25          THE COURT:  Okay.  That will be People's 13.

26          (Whereupon, People's Exhibit 13 was marked for

27  identification.)

28          MS. FILO:  May I approach, Your Honor?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1187

1     THE COURT:  Yes.  Thank you.

2  BY MS. FILO:

3  Q.   Det. Chubon, as I show you People's 13, also projected

4  up on the screen, so this area that I'm pointing to, kind of

5  right in the center of the satellite, that is O.B. Whaley

6  School; correct?

7  A.   Yes.

8  Q.   This sort of curved street that runs along the -- kind

9  of the eastern side of the school, this would be Alvin Ave.

10  Is that right?

11  A.   Yes.

12  Q.   And then along sort of the southwestern diagonal there

13  is another street; correct?

14  A.   Yes.

15  Q.   This area right in the sort of lower right-hand corner

16  of the school there is a playground; is that accurate?

17  A.   Yes.

18  Q.   And immediately adjacent to that there is a square

19  building with a large tree on the bottom right-hand corner;

20  is that accurate?

21  A.   Correct.

22  Q.   And this bottom right-hand corner of this square

23  building that I'm pointing to now, classroom 18, is that Mr.

24  Chandler's classroom?

25  A.   It is.

26  Q.   Okay.  You were actually even out at the school this

27  weekend to sort of double check and confirm because it's been

28  a while; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1188

1  A.    Monday, yes.

2  Q.    Okay.  Det. Chubon, did you go out to the school by

3  yourself on January 10th, or did you have other people with

4  you?

5  A.    There was other detectives.

6  Q.    Okay.  And did you attempt to document the room in

7  photographs?

8  A.    I did.

9  Q.    And we've had a series of photographs marked.  I don't

10  think we need to go through all of them, but those are what's

11  been marked, I think, Defense A-1 through A-13 or so.  Those

12  are the photographs you took; correct?

13  A.    Yes.

14  Q.    At the time that you took those photographs, did you

15  have any real information about what was or what was not

16  important in your investigation?

17  A.    It was very limited.

18  Q.    So at that point, all you could do is sort of get a

19  general glimpse of the classroom?

20  A.    Correct.

21  Q.    Didn't really know what you were looking for?

22  A.    Correct.

23  Q.    Okay.  Detective, were you responsible for -- strike

24  that.

25         Did you have a team from the crime scene come out

26  to the classroom?

27  A.    Later that late afternoon, yes.

28  Q.    What do they do?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1189

1   A.   Um, they are trained on several specific techniques of

2   collecting evidence, and one of the tools they use is an

3   alternative light source to look for items of evidence that

4   when the room is dark would show up with, like, a

5   fluorescence, like blood and other items, on the property of

6   something.

7   Q.   What does that alternative light source look like?  What

8   is it?

9   A.   There is different styles.  Some can be as large as a

10  large flashlight; other ones are more about the size of a

11  thermos and basically like a flashlight, and then you put on

12  some special goggles so you could detect the items that may

13  be illuminated.

14  Q.   Were you there when the crime scene was there with the

15  ALS device?

16  A.   Yes.

17  Q.   Did you have on the goggles?

18  A.   Yes.

19  Q.   Were there -- what areas of the classroom did the crime

20  scene attempt to fluoresce, for lack of a better word?

21  A.   The main focus was the area near the desk, the floor

22  around it, the pathway towards the door, pathway towards the

23  sink, and then that U-shaped teaching table.

24  Q.   Okay.  So you went through those items with the ALS, or

25  the crime scene did; is that correct?

26  A.   Yes.

27  Q.   Were there areas that fluoresced?

28  A.   There was -- not in those areas.  In other areas there

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1190

1   was -- after extra, you know, search, but nothing in those

2   areas.  No.

3   Q.   Okay.  When the search was done -- there is a chair

4   depicted at Mr. Chandler's desk in A-1, I think.  Were the

5   chairs there or were they gone?

6   A.   They had already been removed.

7   Q.   Okay.  Det. Chubon, who made a decision to remove those

8   chairs?

9   A.   I did.

10   Q.   Why did you think to take those chairs?

11   A.   Um, it was a classroom.  At least one of the victims had

12   described a chair being involved.  So after collecting items

13   of evidence that I thought could be useful, I looked around

14   the classroom and there was only two chairs that matched a

15   description.  And there was this chair and a second chair

16   that was in the U-shaped table, so I collected those.

17   Q.   Okay.  When you say "matched the description," match the

18   description of what?

19   A.   Larger than a student's chair.  And those were the only

20   two chairs in the classroom that were larger than a small

21   student's chair.

22   Q.   Both of the chairs that you seized, did they have wheels

23   on them?

24   A.   Yes.

25   Q.   Did you dismantle the wheels, or where did the wheels

26   get removed from the seats?

27   A.   They were the only two chairs in the classroom with

28   wheels.  I dismantled them at the police department.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1191

1    Q.    You took them in total, in whole, and then you

2    dismantled the legs back at the department?

3    A.    Correct.

4    Q.    And then were the seats submitted or booked into

5    evidence?

6    A.    Yes.  I took the seats, packaged them, and then

7    submitted them into evidence.

8    Q.    Okay.  So, Det. Chubon, I want to look quickly again at

9    that diagram.  So there is an X behind Mr. Chandler's desk;

10   right?

11   A.    Yes.

12   Q.    That's where one of the chairs with the wheels was

13   found?

14   A.    Yes.

15   Q.    And then there is an X on the inside of the horseshoe

16   table.  Is that where the second chair was found?

17   A.    Yes.

18   Q.    Okay.  Detective, while you were there, did -- were any

19   of the student's chairs specifically examined?

20   A.    No.

21   Q.    So you didn't go -- the crime scene didn't take the ALS

22   device and go over student chairs; is that right?

23   A.    Correct.

24   Q.    At that time in the investigation, did you have any

25   information at all that the student chairs had even been

26   involved in these episodes or incidents?

27   A.    No.

28   Q.    How were you able to determine which chair came from Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1192

1  Chandler's desk and which chair came from the horseshoe desk?

2  A.   Having looked at these pictures and the photographs of

3  the crime lab, this chair does not have a large label tag on

4  it, and the other chair, although not seen in the picture --

5  there is two pictures that -- well, there is several pictures

6  the crime lab has, but one -- and one doesn't have a tag.

7  Q.   Okay.  So the chair that is currently placed at Mr.

8  Chandler -- I'm sorry -- that is placed at Mr. Chandler's

9  desk in Defense A-1 does not have a tag; is that correct?

10 A.   Yes.

11 Q.   And that is SYO-02, which is here in the courtroom;

12 correct?  No tag?

13 A.   Yes.

14 Q.   Okay.  The SYO-01 that does have the tag, this was the

15 chair that was seized from sort of that horseshoe table; is

16 that accurate?

17 A.   Yes.

18 Q.   Det. Chubon, could you estimate for me in distance --

19 the diagram we have is not to scale -- the distance between

20 Chandler's desk and that horseshoe table?

21 A.   So from the desk to the small horseshoe table, maybe 15

22 feet.

23 Q.   Were there stationary chairs around the outside of that

24 horseshoe table?

25 A.   There was at least one.

26 Q.   Okay.  Again, Det. Chubon, at the time that you seized

27 these chairs, did you have any idea they would hold any

28 evidentiary value?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1193

1   A.   Um, small, simply to demonstrate that these are the

2   chairs that were in the classroom.

3   Q.   Seized primarily as what we would refer to as

4   demonstrative evidence?

5   A.   Correct.

6   Q.   Det. Chubon, I would like to show you a photograph that

7   I think has been previously marked.  It apparently has not

8   yet been marked as an exhibit.

9        MS. FILO:  Your Honor, with the Court's permission,

10   I will identify it for the record and then present a hard

11   copy to the Court to be submitted as an exhibit.

12        THE COURT:  Um, you're representing the

13   investigator could authenticate it?

14        MS. FILO:  I am.

15        THE COURT:  With that representation, then this

16   next photograph will subsequently be marked as People's 14.

17        MR. MADDEN:  A photograph of what, Your Honor?

18        THE COURT:  Of --

19        MS. FILO:  Your Honor --

20        THE COURT:  -- the classroom with someone standing

21   in it?

22        MS. FILO:  Correct.

23        (Whereupon, People's Exhibit 14 was marked for

24   identification.)

25        MS. FILO:  Your Honor, if I could get the deputy to

26   dim the lights quickly?  Thank you.

27   BY MS. FILO:

28   Q.   Det. Chubon, what's in that photograph appears to be Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1194

1    Chandler's desk with the sort of wheeled chair; is that

2    right?

3    A.    Yes.

4    Q.    And there is a man standing there?

5    A.    Correct.

6    Q.    Who is that?

7    A.    That is Det. -- Sgt. Michael Warden.

8    Q.    Why did you take that picture?

9    A.    Again, I wanted to demonstrate the size of the chair to

10   an adult male.

11   Q.    How tall is Det. Warden?

12   A.    Six foot one.

13   Q.    So you were trying to demonstrate where essentially the

14   back of the chair would line up with an approximately

15   six-foot-tall man?

16   A.    Correct.

17   Q.    Det. Chubon, in your entire search of that classroom,

18   did you find a blindfold?

19   A.    No.

20   Q.    You looked in cabinets; is that correct?

21   A.    Yes.

22   Q.    Closets?

23   A.    Yes.

24   Q.    You looked through drawers?

25   A.    Yes.

26   Q.    You looked through everything that you could think of to

27   look?

28   A.    I did.

1    Q.    There was no blindfold?

2    A.    Correct.

3              MS. FILO:  That's all I have, Your Honor.

4              THE COURT:  Okay.  Thank you.

5              Cross, Mr. Madden.

6              MR. MADDEN:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. MADDEN:

9    Q.    Good morning, Mr. Chubon.  My name is Brian Madden.  I'm

10   Mr. Chandler's attorney.

11   A.    Good morning.

12   Q.    So let's start with you being a finder.  So you were

13   designated as the finder in this case; correct?

14   A.    Yes.

15   Q.    Does that mean you personally handled all of the

16   evidence that was collected?

17   A.    Yes.

18   Q.    There may have been others that helped you, but you

19   touched it?

20   A.    Correct.

21   Q.    You cataloged it?

22   A.    Yes.

23   Q.    All right.  How long were you in the classroom at O.B.

24   Whaley collecting evidence?

25   A.    There was two visits to the classroom, so probably total

26   of an hour.

27   Q.    Were both of these visits on January the 9th?

28   A.    January 10th.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1196

1  Q.   I'm sorry.  I apologize.  I didn't mean to misstate your

2  testimony.  January 10th?

3  A.   Yes.

4  Q.   And the first session would have been somewhere around

5  midday when the kids were apparently at lunch?

6  A.   Correct.

7  Q.   So the classroom was empty?

8  A.   Yes.

9  Q.   So you went back to the crime scene this last weekend;

10  is that correct?

11  A.   Monday.

12  Q.   I'm sorry.  Monday of this week?

13  A.   Yes.

14  Q.   All right.  Yesterday?

15  A.   Yes.

16  Q.   All right.  You did that for the purpose of re-orienting

17  yourself with the classroom and the school grounds prior to

18  testifying?

19  A.   The classroom was closed.  I just went in to orientate

20  myself with the neighborhood and the playground.

21  Q.   All right.

22  A.   Related to this school.

23  Q.   So yesterday, you did not go back into the classroom?

24  A.   Correct.

25  Q.   Okay.  Det. Chubon, could you -- is it Chubon or Chubon?

26  A.   Either.

27  Q.   Which do you prefer?

28  A.   Chubon.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1197

1   Q.   All right.   Det. Chubon, you could see this diagram from

2   where you are?

3   A.   Yes.

4   Q.   If you can't, just let me know.   You could walk up to

5   it.   Okay?

6        So let's start from what you previously described

7   as a square building which contained classroom 18; correct?

8   A.   Yes.

9   Q.   And classroom 18 would have been in the lowest portion

10  of that building on this diagram; correct?

11  A.   Correct.

12  Q.   Do you know how many other classrooms were in that

13  building, that square building?

14  A.   In that square building, four.

15  Q.   Yes.   All of the classrooms essentially would have

16  mirrored each other in terms of how they were constructed and

17  where the doors were?

18  A.   I assume.   I could only guess.   I don't know.

19  Q.   I don't want you to guess.   You assume that's the case?

20  A.   I know what the inside of the classroom 18 looks like,

21  so --

22  Q.   Did you ever go into the classroom adjacent to room 18?

23  A.   I did.

24  Q.   All right.   And how did you get into that classroom?

25  A.   Through the interior door that connects the two rooms.

26  Q.   Did you need a key to get into that?

27  A.   No.

28  Q.   Did that door have a lock?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1198

1   A.   I don't think it did.

2   Q.   All right.  So it was an internal door?  There was no

3   lock whatsoever on it; correct?

4   A.   Not that I remember, no.

5   Q.   Okay.  You don't have any reason to doubt that; right?

6   A.   Correct.

7   Q.   All right.  Now, you described the curved-shape road as

8   on the east side of that diagram?  More or less the east

9   side; correct?

10   A.   Yes.

11   Q.   And while we're on the subject of roads, if I were to

12   aline the pointer on the lower left-hand portion of the

13   diagram, this is actually Highway 101; correct?

14   A.   Correct.

15   Q.   All right.  And then the main -- the closest exit from

16   101 to O.B. Whaley School is what exit?

17   A.   Tully.

18   Q.   Tully Road.  Okay.

19        Now, if I -- if you just -- if I use the marker,

20   we're now going at the end of Alvin Rd., turning onto another

21   road.  You don't know the name of this road?

22   A.   Correct.

23   Q.   All right.  There appears to be an open space, and in

24   the area of room 18, either five or six trees; correct?

25   A.   Yes.

26   Q.   There also appears to be the same or similar tree at the

27   southern portion of the part that is O.B. Whaley School;

28   right?

1   A.   Correct.

2   Q.   There appears to be a playground adjacent to the

3   building that contains room 18?

4   A.   Yes.

5   Q.   There appears to be a much larger playground to the top

6   of the diagram; correct?

7   A.   Correct.

8   Q.   Then there appears to be grass fields, one of which

9   obviously contains a baseball diamond; correct?

10   A.   Correct.

11   Q.   Now, as we move from the baseball diamond on Alvin

12   Ave. -- I'm not 6'1" -- and we get to the area with a red

13   roof, do you know what part of O.B. Whaley School that was?

14   A.   No.

15   Q.   If we get to what appears to be a parking lot, adjacent

16   or right next to Alvin Ave. in the southern end of the O.B.

17   Whaley property, do you know what that is?

18   A.   The parking lot is the staff parking lot.

19   Q.   Correct.  So this is where the teachers park; correct?

20   A.   Correct.

21   Q.   And then directly from the parking lot is a building,

22   appears to be square, a little larger, or perhaps it's

23   rectangular.  Do you know what this building contains?

24   A.   No.

25   Q.   Have you ever been to the office at O.B. Whaley?

26   A.   Yes.

27   Q.   Is that consistent with your recollection of where the

28   office is in relation to this diagram?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1200

1  A.   Um, when I went yesterday, a few of the buildings had
2  been demolished.
3  Q.   Huh?  Okay.
4  A.   So I'm not specific which specific classroom was the
5  administration classroom or the administration office.
6  Q.   When you were doing your investigation, did you ever go
7  inside the office?
8  A.   I did.
9  Q.   And was it to your recollection that the office was --
10 this is the main driveway to the school; correct?
11 A.   Correct.
12 Q.   If you took the main driveway straight ahead and drove
13 your car, you'd crash into the office; right?
14 A.   From memory, that is the general location of the office,
15 yes.
16 Q.   All right.  Thank you.
17       Now, when you were -- as the designated collector,
18 when it came to taking photographs, were you the person that
19 actually took the photographs?
20 A.   I did.
21 Q.   Okay.  What was your goal when you were photographing
22 the interior of the classroom?
23 A.   Try to capture the representation of what the classroom
24 looked like that could be presented, if needed, in the
25 future.
26 Q.   So in one sense, it was cursory?  In other words, you
27 weren't searching items?  You were just trying to document
28 where the items were?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1201

1    A.    Correct.

2    Q.    There were others who actually searched thoroughly

3    within cabinets or drawers or closets or whatever; correct?

4    A.    No.

5    Q.    Others didn't do that?  You did that?

6    A.    I did that.

7    Q.    Okay.  Did you photograph the interior of every closet?

8    A.    No.

9    Q.    Why not?

10   A.    There was nothing of evidentiary value on the general

11   information I had to take a picture of.

12   Q.    So it wasn't your goal when you took those photographs

13   to photograph every nook and cranny of that classroom?

14   A.    Correct.

15   Q.    You had a limited amount of information provided to you

16   by others in the San Jose Police Department; correct?

17   A.    Correct.

18   Q.    And based on that limited information, that is

19   information that was available to you on the afternoon of

20   January 10th, you started taking photographs of things that

21   you thought might be relevant; is that a correct statement?

22   A.    Correct.

23   Q.    Okay.  But again, the photographs that you took were not

24   meant to be a thorough and complete survey and mapping of

25   every nook and cranny of that classroom?

26   A.    Correct.  Just general.

27   Q.    Okay.  Now, the two chairs that you took from the

28   classroom, did you have an opportunity before you testified

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1202

1   today to look at these two chairs?

2   A.   No.

3   Q.   Could you identify from where you are these two chairs,

4   or do you need to come down and look?

5   A.   Okay.

6   Q.   All right.  Do those chairs appear to be the two chairs

7   that you took from O.B. Whaley?

8   A.   They are.

9   Q.   How do you know that?

10   A.   Well, one has a tag and one doesn't.  And based on the

11   fact that I collected two chairs, booked them into evidence,

12   they were transferred to the crime lab, subsequently released

13   and sent to court, it's my belief those are the same.

14   Q.   Mine too.  All right.

15        Now, these chairs appear to be essentially the same

16   chair in terms of blue with fabric, more or less the same

17   shape, if not identical shape; correct?

18   A.   Correct.

19   Q.   And you took these chairs off the base?  I take it,

20   there were probably four screws?

21   A.   There was some sort of screw or bolt on the bottom, yes.

22   Q.   Okay.  What did you do with those bases?

23   A.   Um, left them in our sexual assault office.

24   Q.   Okay.  Have those bases ever been sent to the crime lab

25   for purposes of DNA analysis?

26   A.   I don't know.

27   Q.   Okay.  Have you had a chance before you testified, Mr.

28   Chubon, to look at Defense Exhibit A-1 through 13?

1    A.    Um, yes.

2    Q.    Okay.  And so these don't represent all of the

3    photographs that were taken by you; correct?

4    A.    Correct.

5    Q.    However, all that are depicted in these -- in this

6    series were taken by you; correct?

7    A.    Yes.

8    Q.    Okay.  Now, do you remember seeing any exhibit that

9    either showed the U-shape table either in whole or in part?

10   A.    I think there might have been two pictures that

11   partially show that table.

12   Q.    All right.  I think I have the one you are talking

13   about.  I think I'm referring to A-13.  Let's talk about that

14   one first.  Okay?

15   A.    Okay.

16   Q.    Let me get my pointer.

17            So looking at Defense A-13, the enlarged white

18   board photograph, does this photograph depict -- where I'm

19   pointing, does that appear to be a portion of the U-shaped

20   table?

21   A.    It does.

22   Q.    Okay.  And tell me why you believe that's the case.

23   A.    Table is a U; that's half of the U.

24   Q.    Okay.  Now, there is a chair that I see in this

25   photograph; correct?

26   A.    Correct.

27   Q.    Does that appear to be any of the two chairs that you

28   took from the U-shaped table?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1204

1    A.    No.

2    Q.    Does that appear to be a smaller chair?

3    A.    Yes.

4    Q.    Perhaps a student chair?

5    A.    Perhaps.

6    Q.    Similar to what appears to be student chairs at the

7    various desks you see in this photograph; correct?

8    A.    Correct.

9    Q.    All right.  So the chair that you took from the U-shaped

10   table was taken from the inside of the table; is that

11   correct?

12   A.    It was.

13   Q.    So I can't really tell looking at A-13, but I would

14   assume that the straight ends of the U-shaped table did not

15   touch the wall; correct?

16   A.    Correct.

17   Q.    In other words, there was room or distance between the

18   end of either side of the table around which one could walk

19   or move the chair that you took; correct?

20   A.    Correct.

21   Q.    All right.  So you didn't have to move the table to move

22   the chair back inside the U?

23   A.    Correct.

24   Q.    All right.  And --

25   A.    May I make a comment about that?

26   Q.    Sure you can.

27   A.    That's a cropped picture.  That's not the complete

28   picture.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1205

1    Q.   It's a cropped picture?  Do you have --

2    A.   I do.  My picture shows a partial chair sitting in the

3    inside of the U.

4    Q.   Perfect.  Let's take a look at that.

5    A.   This is the same picture, and there is the U and there

6    is a chair in the middle.

7    Q.   All right.

8    A.   Whatever reason, that is cropped.

9         MR. MADDEN:  Can we have this marked defense next,

10   Your Honor?

11        THE COURT:  Any objection?

12   BY MR. MADDEN:

13   Q.   Do you have an extra copy of this?

14   A.   No, I don't.

15        MS. FILO:  Your Honor, I have a complete set of all

16   of the photographs that Det. Chubon took.  I'm happy to

17   present them over the lunch hour and have them marked.

18        MR. MADDEN:  That will be great.

19        THE COURT:  My only reservation, there appears to

20   be four photos on that page.

21        MS. FILO:  Right.

22        MR. MADDEN:  I'm happy having the one.

23        THE WITNESS:  I could tear it out?

24        THE COURT:  You feel comfortable with that?

25        MR. MADDEN:  Yeah, of course.  Where are the

26   scissors?

27        THE COURT:  Thank you.

28        MR. MADDEN:  May I?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1206

1            THE COURT:  Yes.

2            MS. FILO:  Your Honor, is it just a thumbnail

3  photo?  Like a smaller photo?

4            MR. MADDEN:  It looks like a color reproduction.

5            MS. FILO:  Right.  My only comment, Judge, is that

6  I have a complete set of all of those photographs.  I'm happy

7  to have them -- to print them out at the lunch hour and

8  produce them to the Court so they all could be -- could be

9  marked and admitted into evidence.

10            MR. MADDEN:  I think we could cut this out and mark

11  it.  We could substitute the larger photograph at the lunch

12  hour.  I don't have to wait until then to ask him questions.

13            THE COURT:  Okay.  Investigator, if you have no

14  problems, we'll cut that out and we'll use it for the

15  purposes of questioning this morning.  And pursuant to

16  stipulation, later we'll exchange them.

17            MR. MADDEN:  Thank you, Your Honor.

18            THE COURT:  That will be marked Defense D.

19            (Whereupon, Defense Exhibit D was marked for

20  identification.)

21  BY MR. MADDEN:

22  Q.    Thank you very much.  So I'm going to show you Defense

23  D.  So the record is clear, the small photograph you have

24  appears to extend -- as we're looking at A-13, a little bit

25  more to the right you could actually see one of the chairs

26  that you seized; correct?

27  A.    Correct.

28  Q.    Okay.  I believe you testified earlier that chair SYO-01

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1207

1  was taken from behind the U-shaped desk; is that correct?

2  A.   Um, I'm not familiar with which two -- which one is

3  SYO-01 and SYO-02 on the chairs labeling-wise?

4  Q.   Let me ask it this way.  Did you make any notation

5  anywhere on any report that would tell you for sure where

6  each of those chairs was taken from?

7  A.   In my report, no.

8  Q.   So this is from memory?

9  A.   From the photographs, one doesn't have a tag in the

10  photograph.

11  Q.   The photographs that you are referring to are the chairs

12  in the classroom of the photograph?

13  A.   Correct.

14  Q.   Are they together?

15  A.   No.

16  Q.   Which photograph are you referring to?

17  A.   There is a couple of -- a chair next to a teacher's desk

18  that doesn't have a tag -- where a chair does not have a tag.

19  Q.   And is that depicted in any of the photographs in

20  Defense A-1 through 13?

21  A.   Um, there is -- I'm not certain if that's all of the

22  pictures.

23  Q.   For example, in A-1 you could tell looking at this

24  whether or not this chair has a tag?

25  A.   I can.

26  Q.   And the tag is -- if it was there, where should it be?

27  A.   On top.

28  Q.   On top?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1208

1   A.   In the crease of the chair where somebody would sit.

2   Q.   Okay.  What about the cropped photograph?  Could you

3   form an opinion about what chair that is from looking at the

4   cropped photograph?

5   A.   No.

6   Q.   What about Defense A-2, could you form any opinion about

7   the orientation or whether or not that chair has a tag on it

8   from that photograph?

9   A.   No.

10   Q.   So you indicated -- excuse me.  My voice is giving out.

11        You indicated that you were the finder, but that

12   afternoon, that is the afternoon of the 9th, there were some

13   crime scene people that came out.  Are those the words you

14   used?

15   A.   The afternoon of January 10th I was present when some

16   crime scene technicians were there.

17   Q.   All right.  And their work appeared to be limited to

18   using ALS lights; is that correct?

19   A.   Correct.

20   Q.   Do you have any recollection of approximately when that

21   was on the afternoon of the 10th?

22   A.   Just approximate, I believe they were busy on another

23   investigation, and because the classroom had windows, we had

24   to wait for it to get a little bit darker in the late

25   afternoon, so when the lights were turned off, the classroom

26   was still dark.

27   Q.   So the natural light in the classroom was such that it

28   didn't lend itself to an ALS effort in the middle of the day?

1    A.    It would interfere, correct.

2    Q.    So that's the only reason they came in later, or also

3    because they were working another case?

4    A.    Both.

5    Q.    Now, I want to make sure I understand, you were present

6    for that ALS search; correct?

7    A.    Correct.

8    Q.    And with respect to Defense Exhibit A-2, would they

9    have -- I get the impression from your testimony they were

10   essentially trying to fluoresce the carpet; is that correct?

11   A.    The focus was the floor, yes.

12   Q.    Okay.  So they weren't -- do you recall whether or not

13   they were attempting to fluoresce objects on top of the

14   carpet or limited it to the carpet?

15   A.    I believe their focus was the carpet, the floor.

16   Q.    Okay.  You were personally present when they did that?

17   A.    Yes.

18   Q.    Did you help or aid them in suggesting spots, or was it

19   a situation where to be safe do the whole carpet?

20   A.    I think it was a collective decision amongst us.

21   Q.    To --

22   A.    To search the floor, the carpet.

23   Q.    The entire carpeted floor?

24   A.    The focus was the main areas, but, yes, the full areas.

25   Q.    So you witnessed the crime scene technicians fluoresce

26   the entire carpeted area of the classroom?

27   A.    Entire is a strong word.  From every corner to every

28   corner, I don't know if it was that complete.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1210

1   Q.   But your intent was to --

2   A.   Focus.

3   Q.   -- be that kind of complete?

4   A.   Well, to be complete, but focused on the location where

5   people walk.

6   Q.   All right.  So you were receiving information throughout

7   the afternoon from other members of the sexual assault unit;

8   correct?

9   A.   Correct.

10  Q.   Including Det. Pierce?

11  A.   Correct.

12  Q.   And so there were certain areas that appeared to be more

13  significant than others; correct?  From an evidentiary

14  standpoint?

15  A.   Correct.

16  Q.   You really hit those areas hard; correct?

17  A.   Correct.

18  Q.   You hit the other areas, but maybe not so hard?

19  A.   Correct.

20  Q.   Is that fair?

21  A.   Fair.

22  Q.   Okay.  So as we look at Defense Exhibit A-1, this

23  photograph appears to have been taken by you from the outside

24  door of the classroom 18 going across the classroom to Mr.

25  Chandler's desk; right?

26  A.   Correct.

27  Q.   All right.  So the area that is depicted in here, in the

28  carpet at least, was one of the areas that -- was one of the

1   hot areas that thoroughly fluoresced?

2   A.   Correct.

3   Q.   All right.  Was that the main area that was thoroughly

4   fluoresced, or were there others that were the hot areas?

5   A.   Around the U-shaped table, and there is the large path

6   going towards the student chairs.

7   Q.   While we're on the way, A-2 would also depict a hot

8   area; correct?

9   A.   Correct.

10   Q.   Then A-13 would partially include the area that was one

11   of the hot areas?

12   A.   Correct.

13   Q.   All right.  Being the area of the U-shaped table.  And

14   did you say the path that went in front of the U-shaped table

15   to the desk?

16   A.   Between the U-shaped table and the teacher's desk, there

17   is a large opening path that goes towards the sink area and

18   the entrance to the classroom, so that whole area, that path.

19   Q.   I think you may be incorrect about the sink.  Let me see

20   if I could help you.  Here's another one.

21          Before I get to that.  In Defense Exhibit A-7, you

22   could see from the light on this that that would suggest an

23   open classroom door when that was taken; right?  This is the

24   back of the class?

25   A.   Correct.

26   Q.   Okay.  And that -- the area that is carpeted within this

27   diagram would be one of the hot areas?

28   A.   Correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1212

1    Q.    Okay.  Let's get back to the sink.  I know it's been a

2    long time for you.  I'm not expecting you to have perfect

3    recollection.  The photograph speaks for themselves; right?

4    A.    Correct.

5    Q.    Taking a look at Defense Exhibit A-10, I'll represent to

6    you that these are the white boards in the front of the

7    class.  The area that you described as the sink in the back

8    is actually in the left front of the classroom; correct?

9    A.    The back -- the front would be based on your reference

10   point of view.

11   Q.    Okay.  If you walked into the main door of the classroom

12   and we're standing a couple of feet inside the door, if you

13   look straight across, you would see Mr. Chandler's desk, and

14   right behind that, that unlockable door is to the next

15   classroom; right?

16   A.    Correct.

17   Q.    And then if you turn left, at 90 degrees you would see

18   the front of the class and you would see this sink and what

19   appears to be vinyl tile floor along the ground as you looked

20   in a southerly direction, or that --

21   A.    Correct.

22   Q.    Okay.  So the carpet appears to cover the whole class

23   except for this swath over by the sink area and all the way

24   into the back of the class; right?

25   A.    Correct.

26   Q.    Do you recall if any areas of the vinyl tile were

27   fluoresced?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1213

1   Q.    They were?

2   A.    Yes.

3   Q.    All right.  So then the fluorescence included the floor,

4   included the carpet, but some areas you focused more on?

5   A.    Correct.

6   Q.    All right.

7         With respect to Mr. Chandler's desk, you

8   photographed the desk itself and what was on top of the desk?

9   A.    I did.

10  Q.    You opened each drawer and photographed the drawer;

11  right?

12  A.    I don't know if I photographed the interior of each

13  drawer, but I did some of them.

14  Q.    All right.

15        MR. MADDEN:  Your Honor, I would like to have four

16  photographs marked defense next in order.  I will be

17  satisfied with the letter followed by 1, 2, 3, 4.

18        THE COURT:  We'll do E-1, E-2, E-3, and E-4.

19        And as we're having those marked, we'll take the

20  morning recess, ladies and gentlemen.

21        (Whereupon, Defense Exhibits E-1, E-2, E-3, and E-4

22  were marked for identification.)

23        THE COURT:  I will order all members of the jury to

24  report to the jury assembly room on the second floor, and

25  we'll call you back at approximately 10:45 on the court

26  clock.  We'll be in recess.

27        (Whereupon, a brief recess was taken.)

28        THE COURT:  Record will reflect all members of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1214

1    jury are present, both counsel are present, Mr. Chandler is

2    present.  And, Mr. Madden, you were continuing with your

3    cross-examination.

4              MR. MADDEN:  Thank you, Your Honor.

5    BY MR. MADDEN:

6    Q.   Just a question or two, Mr. Chubon.  During the

7    afternoon of January the 10th, 2012, when the crime scene

8    technicians came to fluoresce the classroom, I understand

9    your testimony, that they did not fluoresce any of the

10   student chairs?

11   A.   If they did, it was incidental.

12   Q.   What does that mean?

13   A.   They weren't focused on every single chair, but if they

14   went by the chair, I'm sure that it may have been

15   illuminated.

16   Q.   Sort of accidentally when they were trying to do the

17   floor, is that what you mean?

18   A.   Correct.

19   Q.   To your knowledge, did the accidental fluorescing of any

20   of the chairs reveal any indication of semen stains?

21   A.   The incidental fluorescing examination does not reveal

22   any items of evidence.

23   Q.   All right.  Are you certain that they didn't fluoresce

24   every chair, or are you just assuming they did not?

25   A.   I was present.  They did not fluoresce every chair.

26   Q.   All right.  Did you direct or guide them in which chairs

27   to fluoresce?

28   A.   The focus was the floor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1215

1    Q.   Okay.

2         MR. MADDEN:  Thank you, Your Honor.  I have no

3    further questions.

4         THE COURT:  Ms. Filo, do you have any redirect?

5         MS. FILO:  Yes, Your Honor.  It's very brief.

6         THE COURT:  Okay.

7                    REDIRECT EXAMINATION

8    BY MS. FILO:

9    Q.   Det. Chubon, did you actually come to my office in the

10   last -- I don't remember if it was yesterday or last week --

11   and look at a digital copy of the photographs that you took?

12   A.   I did.

13   Q.   And when we did that, I was actually able to zoom in on

14   the chair that was placed at Mr. Chandler's desk; right?

15   A.   Correct.

16        MS. FILO:  Your Honor, if I may approach?

17        THE COURT:  Yes.  Thank you.

18   BY MS. FILO:

19   Q.   And I think specifically if you looked at Defense A-3;

20   right?

21   A.   Correct.

22   Q.   And we were able to very clearly see in A-3 that there

23   is no large white tag as there is in SYO-01; correct?

24   A.   Correct.

25   Q.   And at that point, Detective, it was just a process of

26   elimination to know that SYO-01, the chair with the tag, was

27   necessarily the one behind the horseshoe table?

28   A.   Correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1216

1  Q.    Thank you.

2              MS. FILO:  I have nothing further.

3              MR. MADDEN:  Nothing, Your Honor.

4              THE COURT:  Okay.  Thank you, Investigator.  You

5  are excused at this time.

6              THE WITNESS:  Thank you.

7              THE COURT:  Thank you.

8              MS. FILO:  Your Honor, at this time, the People

9  would offer the MBI recording from Wendy.

10             THE COURT:  I'm sorry, Ms. Filo.  What was your

11 comment?

12             MS. FILO:  At this time, the People would offer the

13 MBI recording from victim Wendy.

14             THE COURT:  That has not yet been marked?

15             MS. FILO:  It has not.

16             THE COURT:  That will be People's 15, and the

17 transcript will be 15-A.

18             (Whereupon, People's Exhibits 15 and 15-A were

19 marked for identification.)

20             THE COURT:  Ms. Filo, you are going to hand out the

21 transcripts to the jurors?

22             MS. FILO:  I am, Your Honor.

23             THE COURT:  And both counsel stipulate that the

24 court reporter need not attempt to record the playing of the

25 interview, which is People's 15?

26             MS. FILO:  Yes, so stipulated.

27             MR. MADDEN:  Yes, Your Honor.

28             THE COURT:  Okay.  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1217

1          (Whereupon, a tape was played, not reported.)

2          THE COURT:  Record will reflect that we have

3   completed the playing of the interview of Wendy, which is

4   People's 15.  And, members of the jury, if you could pass

5   your transcripts to your right, please.

6          MS. FILO:  Your Honor, I meant to state for the

7   record that interview was conducted on January 17th, 2012.

8          THE COURT:  Thank you.

9          MS. FILO:  Your Honor, may we approach?

10          THE COURT:  Yes.

11          (Whereupon, there was a discussion at the bench.)

12          THE COURT:  Ladies and gentlemen, based on the time

13   and my discussions with counsel at sidebar, we're going to

14   take the noon recess at this time.  I'll order all members of

15   the jury to report to the jury assembly room on the second

16   floor at 1:30 and we'll continue with the trial.  We'll be in

17   recess, and I'll meet with counsel in chambers.

18          (Whereupon, the Court took the noon recess.)

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1218

1                  AFTERNOON PROCEEDINGS

2            THE COURT:  Thank you, ladies and gentlemen.

3    Record will reflect all members of the jury are present, both

4    counsel are present, Mr. Chandler is present in the courtroom

5    as well.

6            MS. FILO:  We're missing one counsel.

7            THE COURT:  We don't have both counsel.  Mr. Madden

8    is not here.  Thank you, Ms. Filo.

9            MR. MADDEN:  Thank you, Your Honor.  Sorry.

10           THE COURT:  That's fine.  Counsel, yes.

11           MS. FILO:  Thank you, Your Honor.  At this time,

12   the parties have a stipulation that we would like to present

13   to the jury.

14               The prosecution and the defense stipulate that the

15   defendant's cell phone was seized by Det. Pierce on the

16   evening of Monday, January 9, 2012.  The defendant's

17   computers were seized from his home several weeks after his

18   arrest.  All devices were subjected to a forensic search, and

19   the following video taken from the defendant's iPhone was the

20   only item discovered which held evidentiary value to this

21   case.

22           THE COURT:  Mr. Madden, you enter into that

23   stipulation?

24           MR. MADDEN:  I do, Your Honor.

25           THE COURT:  Ms. Filo, as well?

26           MS. FILO:  Yes, Your Honor.

27           THE COURT:  Ladies and gentlemen, the statement

28   that Ms. Filo just said, you must accept it as true since

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1219

1    there is no dispute between the parties.

2              MS. FILO:  Your Honor, with that, the People would

3    play the video, and I'll warn the jury that it's very short.

4    I think 30 seconds.

5              THE COURT:  This is going to be --

6              MR. MADDEN:  34, I think.

7              THE COURT:  This will be People's 16, I believe.

8              (Whereupon, People's Exhibit 16 was marked for

9    identification.)

10             (Whereupon, a tape was played, not reported.)

11             THE COURT:  Okay.  Thank you.  We just completed

12   playing People's 16.

13             MS. FILO:  Thank you, Your Honor.  Your Honor, at

14   this time, subject to the resumption of Officer Pierce's

15   testimony, which I believe we're going to take up later, the

16   People rest.

17             THE COURT:  Okay.

18             MS. FILO:  I should say subject to also the

19   admission of the exhibits.

20             THE COURT:  So both sides are agreeing that we

21   could take Officer Pierce later on out of order; correct, Mr.

22   Madden?

23             MR. MADDEN:  Yes.  I have no problem with that,

24   Your Honor.

25             THE COURT:  Okay.  Because of the agreement of both

26   parties, Mr. Madden, I understand that you're prepared to

27   call your first defense witness?

28             MR. MADDEN:  I am.  The defense would call Dorothy

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1220

1  Catangay.

2                    DOROTHY CATANGAY,

3           Being called as a witness on behalf of the

4  Defendant, having been first duly sworn, was examined and

5  testified as follows:

6           THE CLERK:  For the record, ma'am, please state and

7  spell your first and last name.

8           THE WITNESS:  Okay.  My first name is Dorothy,

9  D-o-r-o-t-h-y.  My last name is Catangay, C-a-t-a-n-g-a-y.

10          THE COURT:  Thank you, ma'am.  The lawyers are

11  going to be asking you some questions.  It's important that

12  you let them finish the question before you begin your

13  answer, so that two people are not speaking at the same time.

14  I would ask you to please listen to the question and make

15  every effort just to answer what is being asked.  The

16  question calls for a yes or no, you need to verbally say yes

17  or not.  And if you hear one of the lawyers say objection,

18  don't answer the question.  I will rule.  If I overrule the

19  objection, you will be allowed to answer.  If I sustain the

20  objection, the lawyer will ask you another question.

21          There is a couple of items right there by you.

22  Could you hand these to me, please?  Thank you very much.

23          All right.  Direct examination, Mr. Madden.

24          MR. MADDEN:  Thank you, Your Honor.

25                   DIRECT EXAMINATION

26  BY MR. MADDEN:

27  Q.   Ms. Catangay, I apologize.  It sounded like I

28  mispronounced your name when I called you?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1221

1   A.   That's okay.  It's Catangay.

2   Q.   Catangay, like e-y-e, it sounds like?

3   A.   Like Cognac.  Catangay.

4   Q.   Okay.  All right.

5        So you are recently retired; correct?

6   A.   Yes.

7   Q.   When did you retire?

8   A.   June 7th was my last day.

9   Q.   And that was your last day where?

10  A.   At Evergreen School District.

11  Q.   Were you teaching at O.B. Whaley the whole time you were

12  at the Evergreen School District?

13  A.   Yes.

14  Q.   When did you begin teaching at the Evergreen School

15  District?

16  A.   Oh, in I believe 1993.

17  Q.   Okay.  And what grade did you teach?

18  A.   I taught second and third grade.

19  Q.   Okay.  In the year -- the school year 2011/2012, what

20  room are you assigned to?

21  A.   Room 16.

22  Q.   And is that room adjacent to Mr. Chandler's classroom?

23  A.   Yes, it is.

24  Q.   Or it was?

25  A.   Yes.

26  Q.   All right.  How long were you -- how many years were you

27  in room 16?

28  A.   You are asking me to do the math?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1222

1   Q.   I will take an estimate.

2   A.   Okay.  So at least 15 years.

3   Q.   All right.  And as of the 2011/2012 school year, can you

4   give me an estimate of how long Mr. Chandler had been

5   assigned to room 18?

6   A.   I believe we moved classrooms around, so I believe it

7   was at least eight years.

8   Q.   So if I'm doing my math correctly, if he was there eight

9   years in that room and you were 15, you spent at least eight

10  years as adjacent school teachers?

11  A.   Yes.

12  Q.   Okay.

13          MR. MADDEN:  Your Honor, I have a couple of

14  photographs that I would like marked defense next.  We could

15  take the next letter with the numbers 1 and 2?

16          THE COURT:  I'm sorry?

17          MR. MADDEN:  Before I do that --

18          THE COURT:  This will be -- next in order would be

19  F.

20          THE CLERK:  F-1 and F-2?

21          MR. MADDEN:  Yes.

22          (Whereupon, Defense Exhibits F-1 and F-2 were

23  marked for identification.)

24          MR. MADDEN:  For the record, Your Honor, these are

25  two photographs of partially depicting I believe classroom 19

26  at O.B. Whaley School.

27          THE COURT:  Thank you.

28          MR. MADDEN:  Thank you.  May I approach the

1    witness, Your Honor?

2              THE COURT:  Yes.  Thank you.

3    BY MR. MADDEN:

4    Q.   Ms. Catangay, I'll give you these.  We'll talk about

5    these in a moment.  I'll wait for you to put your glasses on.

6    A.   Thank you.

7    Q.   We share the same problem.  So let me first get my

8    pointer.

9              I would like to direct your attention to the white

10   board, photograph leaning against the wall to your right,

11   this has been previously identified as Defense Exhibit A-2.

12   Okay?  I'm sorry.  I didn't cover one more thing with you.

13   You will need to answer my questions with a yes or no as

14   opposed to shaking.  I'm not trying to be rude, but we have

15   to get everything down.  The court reporter could only get

16   down words.

17   A.   Okay.

18   Q.   All right.  So turning your attention to photograph A-2,

19   could you tell me what that is?

20   A.   Well, this looks like this is Mr. Chandler's classroom.

21   Q.   Correct.  All right.

22             Would this be the same subject matter only from a

23   different angle?

24   A.   Yes.

25   Q.   And would it likewise -- when I say this, I was

26   referring to Defense Exhibit A-1.  And would Defense Exhibit

27   A-3 also depict the same subject matter, that is Mr.

28   Chandler's class, but from a different angle?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1224

1   A.   Yes.

2   Q.   Okay.  So all of these photographs have a number of

3   things in common, not the least of which is Mr. Chandler's

4   desk; correct?

5   A.   Yes.

6   Q.   There appears in each of the photographs to be a door?

7   A.   Yes.

8   Q.   And this is the door to your class; correct?

9   A.   Yes.

10  Q.   All right.  Does your class -- strike that.

11       I'm going to show you two photographs marked F-2 --

12  Defense F-2 and Defense F-1.  Can you tell me what those

13  photographs depict?

14  A.   Okay.  F-2 depicts the interior of my classroom.

15  Q.   Specifically?

16  A.   With the door closed.

17  Q.   The door that you share with Mr. Chandler?

18  A.   Yes.

19  Q.   And in that photograph, the door between the two classes

20  is closed?

21  A.   It's closed.

22  Q.   And the second one?

23  A.   Okay.  The second picture the door is open between the

24  two classrooms.

25  Q.   I'm sorry.  Did you finish?

26  A.   Yes, I have.

27  Q.   Photographs F-1 and photographs F-2, do those appear to

28  be taken from your class towards the door you share with Mr.

1    Chandler?

2    A.    Yes.

3    Q.    Okay.  Now, would it be a fair statement that from a

4    standpoint of how the class is set up, that is the doors, the

5    entrances, the white boards, the sinks, that your class

6    basically is the opposite image of Mr. Chandler's classroom?

7    A.    Yes, they are opposites.

8    Q.    Okay.  Now -- I'm sorry.  During the 2011/2012 school

9    year, you taught what grade?

10   A.    Third grade.

11   Q.    Okay.  And do you remember what grade or grades Mr.

12   Chandler was teaching that year?

13   A.    Mr. Chandler had a combination classroom, second and

14   third grade.

15   Q.    Okay.  So half of his kids were doing the same things

16   your kids were doing?

17   A.    Basically, yes.

18   Q.    Okay.  Now, let me ask you some general questions about

19   your custom and habit as a teacher at O.B. Whaley.

20   A.    Um-hum.

21   Q.    It's my understanding that some teachers leave when

22   school is over, almost immediately, but they get there early

23   the next morning to prepare the lesson for that day?

24   A.    Yes.

25   Q.    Also, my understanding is that there is a different

26   approach by other teachers, where you would stay later and

27   prepare your lesson for the day, then go home and arrive

28   basically when school started?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1226

1    A.    Yes.

2    Q.    All right.  And which camp did you fall into?

3    A.    The first one, early arrival and to leave early.

4    Q.    What time typically would you get to school?

5    A.    Around 6:30; 6:15, 6:30 in the morning.

6    Q.    At that time was the parking lot filled with teachers?

7    A.    No.

8    Q.    Was it common for you to be the first or second one

9    there?

10   A.    I was usually the third one there.  The janitor, one

11   other teacher, and then I would arrive.

12   Q.    All right.  And you knew Mr. Chandler for many years;

13   correct?

14   A.    Yes.

15   Q.    And was he in the group of teachers that arrived early

16   in the morning?

17   A.    No.

18   Q.    He was not?

19   A.    No.

20   Q.    All right.

21   A.    You know, if you will rephrase your question?  Repeat

22   your question again?

23   Q.    Did you find Mr. Chandler also to be a teacher who liked

24   to get to school early?

25   A.    You mean before starting time?

26   Q.    Yes.

27   A.    Okay.  Yes, before starting time.

28   Q.    I'm sorry if I asked a poor question.  I apologize.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1227

1    So his habit was like yours?  He would get there

2   early and prepare his lessons for the day?

3    MS. FILO:  Objection, Your Honor.  Calls for

4   speculation.

5    THE COURT:  Well, I'm going to ask you to rephrase

6   the question.  I think it misstates what she responded to.

7   BY MR. MADDEN:

8   Q.   What would you estimate as the typical time that Mr.

9   Chandler arrived at school Monday through Friday?

10  A.   That is a very difficult question because I'm usually --

11  with the routine that we have, I'm usually on the other side

12  of campus or something, or running back and forth, so that's

13  difficult to say.

14  Q.   Okay.

15  A.   But I would estimate maybe around 7:30 or so.

16  Q.   Okay.  All right.

17   Now, could you -- do you recall what the school

18  schedule was in terms of -- in the year 2011/2012, what the

19  schedule was at school in terms of recess and lunch and first

20  bell and end of school?

21  A.   Well, let's see.  We had staggered lunches according to

22  grade level, and we also -- so our schedules for lunches had

23  changed because we had, you know, some change in command as

24  far as principal and things like that.  So a recess -- I

25  could tell you -- maybe recess I will be more helpful to you.

26  Recess was usually Monday, Tuesday, Wednesday, and Friday

27  from 10:10 to 10:30, something like that.  On Thursdays,

28  10:00 o'clock to 10:15.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1228

1  Q.   Thursday was more of a compressed day?

2  A.   Yes, because we had an early day or shortened day.

3  Q.   Because there were meetings in the afternoon for

4  teachers?

5  A.   Early dismissal as a routine when there is meetings or

6  in-services for teachers.

7  Q.   Okay.  Then do you remember what time school started?

8  A.   School started at 8:30.  We had 8:30 -- that year it was

9  8:30, Thursdays 8:00 o'clock and -- Thursdays, because it was

10  early day, 8:00 o'clock.

11  Q.   But the normal day it was 8:30?

12  A.   8:30.

13  Q.   All right.  How about tardies?  Do you know what the

14  system was for tardies?

15  A.   Students would -- if they are tardy, they needed to go

16  through the office to the secretary to receive a tardy slip.

17  Q.   All right.  Was there some grace period between 8:30 and

18  8:45, where perhaps a student came during that time and

19  wouldn't get an official tardy?

20  A.   That's -- I think sometimes it was maybe a five-minute

21  period.

22  Q.   Okay.

23  A.   That's around a five-minute period.

24  Q.   All right.  So there was some leniency shown by some

25  people, even though a student was technically tardy?

26  A.   Some teachers.

27  Q.   Not you?

28  A.   No.

1   Q.   Okay.  All right.

2          Was there a place where the teachers gathered for

3   lunch or recess to socialize or have food?

4   A.   Yes.

5   Q.   What was that area called?

6   A.   The staff room, teachers' staff room.

7   Q.   All right.  Would it be fair and accurate to call you a

8   staff room person as a teacher?

9   A.   No.

10  Q.   All right.

11  A.   No.

12  Q.   You didn't hang out in the staff room?

13  A.   No, I did not.

14  Q.   All right.  So let me go over the times that teachers

15  would potentially go to the staff room.  I take it, one might

16  be before school?

17  A.   Before school, yes.

18  Q.   I take it, the next opportunity would be perhaps at the

19  morning recess?

20  A.   Recess, yes.

21  Q.   Which was, in essence, 20 minutes in duration?

22  A.   Yes.

23  Q.   All right.  And then perhaps again at lunch?

24  A.   Yes.

25  Q.   All right.  And would there be any other time during the

26  day that teachers would typically be in a staff room?

27  A.   Um, because of the different schedules between the grade

28  levels or the lunches, or sometimes there was prep --

1  different prep periods for upper grades, they may be in there

2  at that time.

3  Q.   All right.

4  A.   Or after school.

5  Q.   Okay.  But you tended not to go to the staff room during

6  any of those times; right?

7  A.   I only would walk through the staff room and make

8  greetings to people and then do my drive-by and then back to

9  the classroom.

10  Q.   All right.  So then it sounds like you spent almost all

11  of your day in the classroom itself?

12  A.   Most of it.

13  Q.   Now, there were times, for example, at the morning

14  recess period where teachers were periodically assigned yard

15  duty and such; correct?

16  A.   Yes.

17  Q.   Sometimes you were assigned duty in the morning before

18  school?

19  A.   Yes.

20  Q.   And sometimes you will be assigned duty after school

21  when the kids left?

22  A.   In the morning, after school, during school also.  A

23  week at a time we have to schedule -- that was scheduled for

24  a week.

25  Q.   All right.  So in situations where you didn't have any

26  assigned duty --

27  A.   Yes.

28  Q.   -- there were plenty of weeks when that was the case;

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1231

1  right?

2  A.    No.  It was every other week.

3  Q.    Every other week?

4  A.    Yes.

5  Q.    So half the time?

6  A.    Yes.

7  Q.    When you didn't have an assigned duty, you spent

8  essentially your days in your classroom during those periods

9  that I talked about:  recess, lunch; correct?

10  A.    Recess, lunch, unless I had to confer with a specialist

11  or something on the child.  So those I would have to take the

12  opportunity at the time to discuss a child.  If I had

13  meetings with a specialist or what we call SS team meetings

14  or IP meetings.

15  Q.    The door between your classroom and Mr. Chandler's

16  classroom, was it locked?

17  A.    No.

18  Q.    So all you had to do was turn the handle?

19  A.    Yes.

20  Q.    All right.  There was no key, no lock whatsoever;

21  correct?

22  A.    No.

23  Q.    That's correct?

24  A.    That's correct.  Sorry.  I'm sorry.

25  Q.    Thank you.  All right.

26         And during a typical week, would you ever have an

27  occasion to go into Mr. Chandler's classroom during school

28  hours?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1232

1   A.   No, not unless it was -- we had what we call, like, a

2   rainy day schedule, and then we would have yard duty turn.

3   If I did not have yard duty, there would be persons that

4   would circulate to give restroom breaks, things like that.

5   So, you know, we open the doors between the classrooms, and

6   that's the only opportunity.

7   Q.   Do you recall Mr. Chandler ever coming into your class

8   to cut through your class to go anywhere?

9   A.   He always did.

10  Q.   Now, when you say "he always did," what did you mean?

11  A.   He would open the door and just walk through.

12  Q.   All right.  Would that be just any random time or were

13  there specific times that you would --

14  A.   Recess time or, you know, if he was coming back from

15  somewhere.  My door would be open, the door opposite our --

16  you know, adjoined doors would be open, so he'd walk through

17  if he saw that my door was open and just walk straight

18  through to his classroom.

19  Q.   All right.  Going through from his class through your

20  door and then out your main door, that was a bit of a

21  shortcut for him to go to the teachers' parking lot or to the

22  office; right?

23  A.   Yes.

24  Q.   Okay.  And he often did that?

25  A.   Yes.

26  Q.   You recall morning recess as a time when he often went

27  through your class?

28  A.   It wasn't just morning recess.  It's -- yes.

1   Q.   First of all, let's limit it to morning recess?

2   A.   Morning recess.

3   Q.   You have a distinct recollection it was common for him

4   to go through the class morning recess?

5   A.   Not all of the time, but sometimes.

6   Q.   Okay.  What other times did you see him going through

7   your --

8   A.   Well, I mean, not specifically all -- you know, every

9   morning recess.  Only every once in a while he will go

10   through.

11   Q.   Okay.  What other times do you remember him going

12   through your class?

13   A.   Sometimes after school, a couple of times.  So after

14   school it would only be -- you know, that only occurred about

15   a couple of times he'd come through.

16   Q.   You also recall him coming into your class through your

17   main door and through the adjoining door into his classroom

18   many times too; right?

19   A.   Mainly he would come from his classroom and walk through

20   my classroom door.

21   Q.   Okay.  Did you ever have to exchange teacher materials

22   with him, like keys, test keys, or answers, or anything like

23   that you remember?

24   A.   No.

25   Q.   Supplies or anything like that?

26   A.   No.

27   Q.   Okay.  Now, in photograph A-1 and A-3, it appears that

28   Mr. Chandler's desk is very near the wall, next to the door;

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1234

1    correct?

2    A.    Yes.

3    Q.    And we don't have any photographs of your class

4    depicting the desk during the year -- school year 2011/2012.

5    Where was your desk in your room relative to Mr. Chandler's

6    desk?

7    A.    Actually, I didn't have a desk.

8    Q.    You didn't have a desk?

9    A.    I have a table where I worked with small groups.  I

10   didn't use a desk because I didn't sit at a desk.

11   Q.    Where was your table located in your room relative to

12   Mr. Chandler's desk?

13   A.    My table was located on -- just beyond that wall.  If

14   you walk into the classroom, you go left, my table where I

15   work in a small group was right there against that wall.

16   Q.    So you are referring to Exhibit A-3?

17   A.    Yes.

18   Q.    You're referring to the door between your classes?

19   A.    Yes.

20   Q.    If that door was open, would your desk -- your table be

21   more or less in the same relative position as Mr. Chandler's?

22   A.    Yes.  It was just -- well, actually, yes.

23   Q.    Okay.  So what would you estimate as the -- I will take

24   an estimate -- the distance from the corner of Mr. Chandler's

25   desk to the corner of your table?

26   A.    It would have to be about ten feet.

27   Q.    Okay.  Thank you.

28            Unless you had a specific duty in terms of

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1235

1  supervising children during the morning recess, during

2  morning recesses you were in your classroom, probably at your

3  table; correct?

4  A.    No.

5  Q.    No?  Where were you?

6  A.    Most likely -- I only worked at that table if I had a

7  small group of children.

8  Q.    Okay.

9  A.    Okay.  And during recess, most likely -- I was very

10  dynamic, so I was doing chores and things like that, doing

11  little tasks that I had to do for the day.

12  Q.    You were all over the classroom?

13  A.    Yes.

14  Q.    There was no particular place where you kept your stuff?

15  A.    No.

16  Q.    All right.  It was all over?

17  A.    I was tidy, but it wasn't all over.

18  Q.    I'm not suggesting otherwise.

19  A.    Yes.

20  Q.    All right.  At lunchtime, you were not a person that

21  joined the other teachers for lunch.  So I would assume you

22  had lunch in your classroom?

23  A.    I had lunch in my classroom often, yes.

24  Q.    All right.  Unless you had some specific duty or meeting

25  or something?

26  A.    Yes.

27  Q.    Okay.  So absent that, you could be found in your

28  classroom?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1236

1    A.    I could be found in my classroom, yes.

2    Q.    All right.  At any time during the school year

3    2011/2012, for that matter, 2010/2011, the year before, do

4    you recall ever hearing anything unusual coming from Mr.

5    Chandler's classroom during either the morning recess or the

6    lunch recess?

7    A.    No.

8    Q.    All right.  Thank you.

9            MR. MADDEN:  I have no further questions.

10           THE COURT:  Thank you.

11           Cross-examination, Ms. Filo.

12           MS. FILO:  Thank you, Your Honor.

13                     CROSS-EXAMINATION

14   BY MS. FILO:

15   Q.    Good afternoon, Ms. Catangay.

16   A.    Good afternoon.

17   Q.    So school did not have a recognized curriculum; is that

18   correct?

19   A.    Yes, you -- what do you mean by recognized?

20   Q.    Did every third grade teacher teach the same thing every

21   day that another third grade teacher would teach?

22   A.    I see.  We had what we call differentiated instructions.

23   So, of course, by the state and district curriculum, you

24   know, we had to go by that curriculum, but sometimes the

25   make-up of the classroom would dictate what is taught at a

26   certain time and what level it's taught.

27   Q.    Okay.  So teachers had some discretion as to what it was

28   that they could teach on a daily basis within their

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1237

1   classroom?

2   A.    It depends on where the students were.  If you had a

3   higher-achieving student or combination classroom where there

4   were more independent students from, say, second-graders that

5   were independent and there were no behavior problems, or

6   third-graders that were in the same -- you know, not

7   necessarily high-achieving, but independent workers, that

8   would dictate the instruction.

9   Q.    Okay.  So, Ms. Catangay, in the -- you were a teacher

10  for 20 years; is that right?

11  A.    Yes.

12  Q.    And did you always teach in the sort of second/third

13  grade age group?

14  A.    Yes.

15  Q.    Ms. Catangay, have you ever heard of a student being in

16  a classroom blindfolded alone with a teacher while things

17  where being put in their mouth other than this case?

18  A.    No.

19  Q.    Could you think of any educational purpose that that

20  would serve at all?

21  A.    No.

22  Q.    Ms. Catangay, in the several years that you shared this

23  door with Mr. Chandler's classroom, did you ever walk into

24  his classroom during school hours:  recess, lunch, or

25  otherwise, unannounced?

26  A.    There were times where I'd open the door if I -- like I

27  said, the rainy days schedules, where if I -- you know,

28  teachers would relieve each other to go out to the restroom,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1238

1    something like that, if we do not have a yard duty person

2    circulating.  And that's the only time.

3    Q.    But that was scheduled; right?

4    A.    Yes, that was a scheduled.

5    Q.    I mean --

6    A.    Yes.  But unscheduled, no, I can't recall.

7    Q.    Can't think of a single incident you would have walked

8    into his classroom unannounced?

9    A.    No.

10   Q.    Thank you.

11           MS. FILO:  Nothing further, Your Honor.

12           THE COURT:  Redirect?

13           MR. MADDEN:  Nothing, Your Honor.

14           THE COURT:  May this witness be excused?

15           MR. MADDEN:  Yes.  Thank you.

16           THE COURT:  Thank you, ma'am.  You are excused and

17   you are free to leave.

18           THE WITNESS:  Okay.  Thank you.

19           THE COURT:  Next witness?

20           MR. MADDEN:  Your Honor, may I have a few minutes?

21           THE COURT:  Yes.

22           MR. MADDEN:  Your Honor, I need about ten minutes.

23   I apologize.

24           THE COURT:  Am I correct, there are witnesses

25   outside?

26           MR. MADDEN:  Yes, I have two.

27           THE COURT:  I understand.  Based on our earlier

28   conversations, ladies and gentlemen, we're going to take a

1  short break and we'll call you back up before 2:30.  So

2  hopefully we'll try to make it close to ten minutes as

3  possible.

4       I'll order the jurors to please report to the jury

5  assembly room on the second floor.

6       (Whereupon, a brief recess was taken.)

7       THE COURT:  We'll go back on the record.  Both

8  counsel are present, Mr. Chandler is present, and all members

9  of the jury are present.

10       Mr. Madden.

11       MR. MADDEN:  Your Honor, our first witness is --

12  did you need last names for the children witnesses?

13       THE COURT:  Yes.

14       MR. MADDEN:  Okay.  Our --

15       THE COURT:  No objection, why don't we use first

16  names?

17       MR. MADDEN:  That's fine.

18       MS. FILO:  That's fine.

19       MR. MADDEN:  Veronica will be our first witness.

20                 VERONICA DOE,

21       Being called as a witness on behalf of the

22  Defendant, having been first duly sworn, was examined and

23  testified as follows:

24       MR. MADDEN:  There is couple of steps up there.

25  Why don't you see if you could get up there and get into the

26  chair.  Okay?  Very good.

27       Now, would you do me a big favor and scoot the

28  chair forward so I could get the microphone, you know, maybe

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1240

1    about this close to your mouth?  That's perfect.  Okay?  All
2    right.
3            THE COURT:  First of all, Veronica, we need you to
4    spell your name.
5            THE WITNESS:  V-e-r-o-n-i-c-a.
6            THE COURT:  You know, the lawyers are going to ask
7    you some questions.  When they ask you a question, you need
8    to say yes or no or talk so we could all hear you.  And most
9    children that come into a courtroom are very nervous, so it's
10   okay to be nervous.  Okay?  And Mr. Madden will go over a few
11   rules with you, if he hasn't already done that.  Okay?
12           Mr. Madden, direct.
13           MR. MADDEN:  Thank you.  Yes.
14                      DIRECT EXAMINATION
15   BY MR. MADDEN:
16   Q.   Veronica, I want to go over some of the rules with you,
17   okay, to make sure you understand before we start?
18   A.   (Shakes head up and down.)
19   Q.   You are shaking your head.  So the first rule I want you
20   to think about is that if I ask you a question and the answer
21   is yes, don't shake your head up and down.  And if the answer
22   is no, don't shake your head left and right.  And the reason
23   for that is that the lady in front of you has to get down all
24   of the words that are spoken in court, and she could only get
25   down words.  In other words, she can't get down gestures,
26   like shaking your head.  Okay?
27   A.   Okay.
28   Q.   So if you forget and you shake your head up and down

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1241

1  when you mean yes, I'll probably say something like:  Do you

2  mean yes.  Okay?

3  A.    Okay.

4  Q.    Okay.  All right.

5          Now, if I ask you a question and you do not

6  understand my question, just tell me you don't understand it

7  and I'll ask another question that you do understand.  Okay?

8  A.    Okay.

9  Q.    All right.  What grade are you in, Veronica?

10  A.    I'm going to fourth.

11  Q.    And are you at O.B. Whaley?

12  A.    Yes.

13  Q.    Okay.  And you walked into court.  That's your mother

14  here in the chair with the smile on her face?

15  A.    Yes.

16  Q.    All right.  You know she's right here.  Okay?

17  A.    Yes.

18  Q.    Okay.  Did you have Mr. Chandler as a teacher one of the

19  years that you went to O.B. Whaley?

20  A.    Yes.

21  Q.    What grade did you have Mr. Chandler for?

22  A.    Second.

23  Q.    Okay.  So when you were in the second grade with Mr.

24  Chandler, was your classroom, if you remember, room 18?

25  A.    Yes.

26  Q.    Okay.  And classroom 18, Mr. Chandler's class, that year

27  actually had second grade students in it and third grade

28  students; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1242

1    A.    Yes.

2    Q.    This was known as a combination class?

3    A.    Yes.

4    Q.    Okay.  And you were one of the second-graders; right?

5    A.    Yes.

6    Q.    So that probably -- let me guess, that you probably sat

7    on the side of the classroom by the sink and by the

8    computers?

9    A.    Yes.

10   Q.    With all of the other second-graders; right?

11   A.    Yes.

12   Q.    Okay.  Now, do you remember playing a game that year in

13   Mr. Chandler's class, where you have your eyes covered and

14   you try to guess an object?

15   A.    Yes.

16   Q.    Okay.  And do you remember what you had to feel the

17   object with?  That is, what part of your body?

18   A.    Yes.

19   Q.    What part was that?

20   A.    Um, feet and mouth.

21   Q.    Okay.  Feet and mouth.

22         So you felt -- you were blindfolded for both of

23   them; right?

24   A.    Yes.

25   Q.    And we'll call the mouth one the taste game.  Is that

26   okay?

27   A.    Yes.

28   Q.    And then we'll call the foot one the feel game.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1243

1   A.   Okay.

2   Q.   But with both of them you are trying to guess what the

3   object was; right?

4   A.   Yes.

5   Q.   Okay.

6        So the game that we talked about, the taste game

7   and the feel game, is that a game that everyone in the class

8   played?

9   A.   Yes.

10   Q.   So that means boys and girls?

11   A.   Yes.

12   Q.   Okay.  And do you remember how many times you played the

13   game that year?

14   A.   Once.

15   Q.   Okay.  And that was in front of the whole class?

16   A.   Yes.

17   Q.   Okay.  Now, did you do both the taste part of the game

18   and the feel part of the game?

19   A.   Yes.

20   Q.   Okay.  And there was some sort of blindfold put over

21   your eyes so you couldn't see?

22   A.   Yes.

23   Q.   Do you remember what the blindfold was made of?

24   A.   Um, a leather thing.

25   Q.   I'm sorry?

26   A.   Leather.

27   Q.   Leather?  Okay.

28        And when you played the taste game, was something

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1244

1    in your mouth?

2    A.    Yes.

3    Q.    Were you standing or seated or in some other position?

4    A.    Sitting on the ground.

5    Q.    Okay.  And then would that have been in the middle of

6    class?

7    A.    By the water is where we were sitting.

8    Q.    By the water?

9    A.    (Shakes head up and down.)

10   Q.    You mean where the sink is?

11   A.    Yes.

12   Q.    Okay.  And in terms of feeling objects, do you remember

13   where you were in the class when you were feeling objects on

14   your feet?

15   A.    In the same spot.

16   Q.    Okay.  Over by the --

17   A.    Desk and sinks.

18   Q.    I'm sorry?  I didn't hear you?

19   A.    Desk and sinks.

20   Q.    Desk and sinks.  Okay.

21           And let's talk about the foot game or the feel

22   game.  Okay?

23   A.    Yes.

24   Q.    Okay.  So you had a blindfold on of some type?

25   A.    Yes.

26   Q.    And then the objects that you felt on your feet, what

27   part of your feet do you remember feeling the object being

28   placed on?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1245

1    A.    On the center.

2    Q.    The center.  Now, the center of your foot or part of

3    your leg?

4    A.    Foot, foot.

5    Q.    The foot.  On top of your foot or on the bottom of your

6    foot?

7    A.    In the center of the foot.

8    Q.    Let me get you to do this.  I'm not quite sure I

9    understand what you mean, so I'm going to come up here and I

10   am going to ask you to point where on your feet you mean by

11   the center, then I will describe it.  Maybe you could scoot

12   out just a little bit for me and -- a little bit more,

13   please.  Go ahead and --

14   A.    (Indicating.)

15   Q.    So the middle of the bottom of your foot?

16   A.    Yes.

17   Q.    Like, in the arch of your foot; right?

18   A.    Yes.

19   Q.    Okay.  And were you wearing shoes when that happened?

20   A.    No.

21   Q.    All right.  Were you wearing socks when that happened?

22   A.    Yes.

23   Q.    Okay.  Do you remember the objects that were placed

24   against the arch or the bottom of your foot?

25   A.    Yes.

26   Q.    Could you tell me what they were?

27   A.    A pencil, a pen, and safety scissors.

28   Q.    Okay.  I'm not sure what safety scissors means.  Like,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1246

1  children scissors?

2  A.   Yes.

3  Q.   They didn't have sharp ends?

4  A.   No.

5  Q.   Is that what you mean by safety?

6  A.   Yes.

7  Q.   I guessed that.  Okay.

8       And did you ever feel a ball on your foot?

9  A.   No.

10 Q.   Okay.  So when the object that you couldn't see was

11 placed against the bottom of your foot, did the object just

12 stay against that part of your foot or did Mr. Chandler move

13 it around?

14 A.   Moved it around.

15 Q.   Okay.  And you were able to guess what that -- the

16 objects were?

17 A.   Sometimes.

18 Q.   And sometimes you couldn't; right?

19 A.   Yes.

20 Q.   Okay.  Now, how about the game with -- the taste game?

21 We'll talk about that.  Okay?

22 A.   Okay.

23 Q.   And that game you were blindfolded; right?

24 A.   Yes.

25 Q.   Was it the same way?  In other words, you talked about a

26 leather blindfold before.  Was it the same?

27 A.   Yes.

28 Q.   Was it the same blindfold that was used on the feel

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1247

1    game?

2    A.    Yes, it was.

3    Q.    Okay.  And did both of those things happen, like, on the

4    same day?

5    A.    Yes.

6    Q.    Okay.  And so you couldn't see anything, but Mr.

7    Chandler then put some food or candy or something in your

8    mouth; correct?

9    A.    Yes.

10    Q.    Do you remember -- you couldn't see what he put in your

11    mouth; right?

12    A.    No.

13    Q.    And do you remember how many different things he put in

14    your mouth?

15    A.    Only one.

16    Q.    Only one that you remember?

17    A.    Yes.

18    Q.    What do you remember that being?

19    A.    Um, Wonka candy.

20    Q.    Wonker [sic] candy?  I'm pretty sure, Veronica, I've

21    never had Wonker candy before.  Could you tell me what Wonker

22    is?

23    A.    It's kind of, like, normal candy, except it was kind of,

24    like, different colors of candy.

25    Q.    Could you tell me the shape of it?

26    A.    It was round.

27    Q.    Okay.  Could you -- was it like a lollipop?

28    A.    No.  It was like a Smartie, like a little round one.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1248

1    Q.    Like the shape -- like a ball?

2    A.    No.  Like a flat one.

3    Q.    Flat?

4    A.    Yes, like a circle.

5    Q.    Okay.  And how do you know that it was a Wonker candy?

6    A.    Because I remembered when we were watching a movie about

7    it and he handed out some candy.

8    Q.    Oh.  So you actually one time in class tasted a Wonker

9    before this game; right?

10   A.    Yes.

11   Q.    You remembered -- when it was in your mouth and you

12   couldn't see it, you remembered tasting the same thing;

13   right?  Before?

14   A.    Yes.

15   Q.    That's why you guessed it was a Wonker candy?

16   A.    Yes.

17   Q.    Were you right?

18   A.    Yes.

19   Q.    How do you know?  Did you get to see it?

20   A.    Yes.

21   Q.    All right.  Now, do you remember ever telling a police

22   officer about the game that you played in the class?

23   A.    No -- yes.

24   Q.    Okay.  That happened a pretty long time ago; right?

25   A.    Yes.

26   Q.    More than a year and a half ago; right?

27   A.    Yes.

28   Q.    Okay.  You remember telling him just some food, like

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1249

1  candy bars or chips?

2  A.    No.

3  Q.    Okay.  As you sit here today, do you -- does that help

4  you remember whether or not there were any chips or candy

5  bars that you had to taste also?

6  A.    Yes.

7  Q.    You think you may have?

8  A.    Yes.

9  Q.    Okay.  Do you remember what kind of chips?

10  A.    Um, no.

11  Q.    Okay.  How did you know they were chips?

12  A.    Because they were crunchy.

13  Q.    Okay.  And when the objects were in your mouth, did Mr.

14  Chandler ask you to describe them?  Whether they were smooth

15  or crunchy or hard?

16  A.    Yes.

17  Q.    Okay.  So he wanted you to describe them while you're

18  trying to figure out what it is; right?

19  A.    Yes.

20  Q.    Okay.  And then at the same time, did he ask you about

21  the taste of them?

22  A.    No.

23         MS. FILO:  Objection, Your Honor.  Calls for

24  hearsay.

25         THE COURT:  Objection is sustained.  The answer is

26  stricken.

27  BY MR. MADDEN:

28  Q.    So on both of these games, both the feel game and the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1250

1  taste game, it was Mr. Chandler who put the objects either

2  against your feet or in your mouth; right?

3  A.  Yes.

4  Q.  Okay.  Thank you.

5          MR. MADDEN:  I have no further questions.

6          THE COURT:  Cross, Ms. Filo.

7          MS. FILO:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9  BY MS. FILO:

10  Q.  Hi, Veronica.

11  A.  Hello.

12  Q.  So how many times did you play the game?

13  A.  Once.

14  Q.  Just one time?

15  A.  Yes.

16  Q.  Did you see people -- other people play the game?

17  A.  Yes.

18  Q.  Was that on the same day or a different day?

19  A.  Same day.

20  Q.  Okay.  So you were in Mr. Chandler's class all year

21  long; right?

22  A.  Yes.

23  Q.  Then the game was only played one time?

24  A.  Yes.

25  Q.  In the classroom?

26  A.  Yes.

27  Q.  Okay.  Veronica, were you ever asked to stay behind in

28  Mr. Chandler's classroom during lunchtime?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1251

1    A.    No.

2    Q.    How about recess?

3    A.    No.

4    Q.    You never had to stay behind?  No?

5    A.    No.

6    Q.    Okay.  You never had to -- you never practiced this

7    game, did you?

8    A.    No.

9    Q.    No?  The whole point was you weren't supposed to know

10   what he was using; right?

11   A.    Right.

12   Q.    Well, if you practiced, that would kind of defeat the

13   purpose, huh?

14   A.    Yes.

15   Q.    Okay.  That's all the questions I have.  Thank you,

16   Veronica.

17   A.    You're welcome.

18           THE COURT:  Redirect?

19           MR. MADDEN:  None, Your Honor.  Thank you.

20           THE COURT:  Veronica, thank you very much.  You

21   could step down and go with your mother and you could leave.

22           THE WITNESS:  Okay.

23           THE COURT:  Thank you.  You're all done.

24           MR. MADDEN:  Your Honor, I could be excused for a

25   moment, Your Honor?

26           THE COURT:  Yes.  Thank you.

27   ///

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1252

1                      LY DOE,

2            Being called as a witness on behalf of the

3  Defendant, having been first duly sworn, was examined and

4  testified as follows:

5            MR. MADDEN:  All right, Ly.  I'm going to ask you

6  to do me a favor.  If you would scoot your chair forward a

7  little bit.  What I want you to do is to get in far enough

8  forward so that the microphone is just about like this.  So

9  if you would keep your mouth about that close to the

10 microphone, we'll all be able to hear you.  Okay?

11            THE WITNESS:  Yes.

12            MR. MADDEN:  You're a little nervous, it's okay.

13            THE COURT:  Okay.  Good afternoon.

14            THE WITNESS:  Good afternoon.

15            THE COURT:  What's your name?

16            THE WITNESS:  Ly.

17            THE COURT:  How do you spell it?

18            THE WITNESS:  L-y.

19            THE COURT:  Ly, the lawyers are going to ask you

20 some questions.  Mr. Madden will go over the rules about how

21 you answer the question.

22            THE WITNESS:  Yes.

23            THE COURT:  As he already asked you, if you're

24 nervous, that's okay.  Most kids your age are nervous when

25 they come into the courtroom.  Okay?

26            THE WITNESS:  Yes, sir.

27            THE COURT:  Direct, Mr. Madden.

28            MR. MADDEN:  Thank you, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1253

<u>DIRECT EXAMINATION</u>

BY MR. MADDEN:

Q.   All right, Ly.  I want to just tell you a couple of rules and I want you to listen.  I want to make sure you understand.  Okay?

A.   Okay.

Q.   So the first thing I want to talk about is that when I ask you a question, if the answer is yes, I want you to say yes out loud, not shake your head up and down.  Okay?

A.   Yes.

Q.   All right.  Then if the answer is no, I want you to say no out loud, not to shake your head left and right.  Okay?

A.   Yes.

Q.   Okay.  And then finally, I want to tell you that I want to make sure before you answer that you understand my question.  Okay?

A.   Yes.

Q.   So if I ask a question and you don't understand it, tell me to stop, tell me that you don't understand, and I'll ask the question in a different way so that you do understand.  Okay?

A.   Yes.

Q.   All right.  Now, Ly, what grade are you in?

A.   I'm in third grade and I'm about to turn fourth.

Q.   Okay.  So you are going to start the fourth grade actually next month; right?

A.   Yes.

Q.   Okay.  Do you go to O.B. Whaley?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1254

1    A.    Yes.

2    Q.    Okay.  So you were in Mr. Chandler's class when you were

3    in what grade?

4    A.    Second.

5    Q.    Do you remember what Mr. Chandler's classroom number

6    was?

7    A.    Um, no.

8    Q.    Okay.  If I were to tell you that Mr. Chandler was in

9    the room 18, would that help you remember what classroom it

10   was?

11   A.    Yes.

12   Q.    Was it room 18?

13   A.    Yes, it was room 18.

14   Q.    Okay.  Now, that year that you were in the second grade,

15   you were in a class that actually had second-graders and

16   third-graders; right?

17   A.    Yes.

18   Q.    So as a second-grader, you probably sat on the side of

19   the classroom near the computer and the same side that the

20   sink was on, because that's where all the second-graders sat;

21   right?

22   A.    Yes.

23   Q.    The third-graders were on the other side of the

24   classroom; right?

25   A.    Yes.

26   Q.    Okay.  I'm going to ask you some questions about a taste

27   game and a feel game that you played in Mr. Chandler's class

28   when you were in the second grade.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1255

1   A.   Yes.

2   Q.   All right.  Do you remember about a year and a half ago

3   talking to a police officer about the taste game and the feel

4   game and Mr. Chandler's class?

5   A.   No.

6           MS. FILO:  Objection, Your Honor.  Calls for

7   hearsay.

8           MR. MADDEN:  No, it doesn't, Your Honor.

9           THE COURT:  Um, I'm going to allow the answer to

10  remain.  He said no.

11          MR. MADDEN:  Okay.

12  BY MR. MADDEN:

13  Q.   You don't remember that?

14  A.   No.

15  Q.   Okay.  That's all right.  It was a pretty long time ago

16  that you were in Mr. Chandler's class; right?

17  A.   Yes.

18  Q.   All right.  Now, do you remember playing a game where

19  you were blindfolded and had to guess what an object was?

20  A.   No.

21  Q.   Do you remember playing a game where you were

22  blindfolded and had to taste something that was in your mouth

23  and try to guess what it was?

24  A.   Yes.

25  Q.   Okay.  Tell me about that game.  Were your eyes covered?

26  A.   No.  We didn't use a blindfold, but, like, he used his

27  hand to cover my eyes and then, like, we took turns trying to

28  taste what food that we had.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1256

1   Q.   Okay.  That's very good, but I want to sort of break

2   that into parts.  You don't -- you remember something being

3   over your eyes, but it wasn't a blindfold?

4   A.   Yes.

5   Q.   You know what a blindfold is; right?

6   A.   Yes.

7   Q.   Okay.  I think you said that you remember Mr. Chandler's

8   hands being over your eyes; is that right?

9   A.   Yes.

10   Q.   Yes?

11   A.   Yes, that's right.

12   Q.   Okay.  Was this game played that you're talking about in

13   front of the whole class?

14   A.   Yes.

15   Q.   And did -- sometimes did you play this game alone with

16   Mr. Chandler?

17   A.   No.

18   Q.   Okay.  Could you tell me, this game that was played in

19   front of the whole class, did everyone play?

20   A.   Yes, everyone played.

21   Q.   And that meant boys and girls?

22   A.   Yes, boys and girls.

23   Q.   Okay.  Do you remember how many times you played this

24   game?

25   A.   No.

26   Q.   Okay.  But we know you played it at least one time;

27   right?

28   A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1257

1    Q.   Okay.  So do you remember times when you didn't play the

2    game, but you watched others play the game?

3    A.   Yes.

4    Q.   That was the whole class?

5    A.   Yes, that was the whole class.

6    Q.   Okay.  Do you think you remember seeing the game played

7    more than ten times?

8    A.   No.

9    Q.   Less than ten times?

10   A.   Yes.

11   Q.   But you're not sure how many times?  Just some number

12   less than ten?

13   A.   Yes.

14   Q.   Okay.  Now, let's talk about the game where you have to

15   taste something.  Tell me how that worked.

16   A.   So he would go in his cabinet behind the board.  There

17   would be some food in there, but it hadn't expired.  He

18   would, like, open a ziplock or so --

19   Q.   I'm sorry.  I didn't hear what you just said?

20   A.   He would, like, open a ziplock or something else, and

21   then he would, like, make us open our mouth, he would put it

22   in, and says -- tell us to chew it, and then we would have to

23   guess what it is.

24   Q.   Okay.  Now, when you said "he would tell us," how many

25   people would there be that were doing the taste game?

26   A.   24.

27   Q.   Everybody in the class?

28   A.   Yes.

1  Q.   Okay.  So how did he cover your eyes?

2  A.   He didn't touch our eyes, but he just covered it.

3  Q.   You remember what he covered it with?

4  A.   Just his bare hands.

5  Q.   So he just put his -- he didn't touch your face, but he

6  put his hands so you couldn't see what the object was?

7  A.   Yes.

8  Q.   Okay.  And then when the object went into your mouth, he

9  told you to chew it?

10  A.   Yes.

11  Q.   Did he tell you to taste it?

12  A.   Yes.

13  Q.   Did he tell you to lick it?

14  A.   No.

15  Q.   All right.  And was the idea to try to guess what it

16  was?

17  A.   Yes.

18  Q.   And how many different types of candy or food do you

19  remember going into your mouth to try to guess what it was?

20  A.   One.

21  Q.   Okay.  And did you guess?

22  A.   Yes.

23  Q.   Did you guess right?

24  A.   Sometimes.

25  Q.   Okay.  Sometimes you couldn't guess it?

26  A.   Yes.

27  Q.   All right.  Do you remember having to play a game to

28  have to walk without bumping into something?

1   A.   Yes.

2   Q.   Tell me about that game.

3   A.   So he would clear out the desks and then he would make

4   us close our eyes.  We couldn't cheat.  So then we would walk

5   up straight and then, like, try to touch his hands.  And then

6   if we touched his hands, then the team that the person first

7   touched the hand would win.

8   Q.   Okay.  Do you remember a game where you lied down and

9   then feel something with either your hand or your foot and

10  trying to guess what it was?

11  A.   Yes.

12  Q.   Did this happen in front of the whole class?

13  A.   Yes.

14  Q.   Okay.  Tell me about that game.

15  A.   He would make us lay on the carpet.  He would put

16  either, like, a glove, his hands, or something, or -- so

17  something.  And then he would try to, like, let us feel it

18  for a while and then ask what it is.

19  Q.   Okay.  And would you feel things with both your hands

20  and your feet?

21  A.   He would use one object and then switch hands and then

22  switch feet.

23  Q.   So he would use one object and then let you feel it on

24  your hand and then let you feel the same object on your feet?

25  A.   Yes.

26  Q.   Okay.  When you have the object on your feet, were you

27  wearing shoes or no shoes?

28  A.   No shoes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1260

1    Q.    Were you wearing socks or no socks?

2    A.    No socks so we could, like, feel it.

3    Q.    Okay.  Do you remember Mr. Chandler ever putting sort of

4    like a plastic bag over your face so you couldn't see?

5    A.    No.

6    Q.    Okay.  So when you're doing the taste part of the game,

7    are you seated or standing or on the floor?

8    A.    All three.

9    Q.    All three?

10   A.    Yes.

11   Q.    Okay.  So sometimes he would put a piece of food or

12   candy in your mouth when you were standing, sometimes when

13   you were seated, and sometimes when you were on the floor?

14   A.    Yes.

15   Q.    Okay.  Do you remember what kind of food was used in

16   putting in your mouth?  Could you describe it at all?

17   A.    No.  No, I don't remember what food he put in.

18   Q.    Okay.  Do you remember guessing right sometimes?

19   A.    Yes.

20   Q.    Do you remember guessing wrong sometimes?

21   A.    Yes.

22   Q.    Okay.  But when the candy or the food or the snack item

23   was put into your mouth, Mr. Chandler told you to chew it;

24   right?

25   A.    Yes.

26   Q.    Okay.  Did he also ask you to describe whether the

27   object was soft or crunchy?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1261

1  Q.   Can't remember that?  Did he ask you --

2         MS. FILO:  Objection, Your Honor.  Misstates the

3  testimony.

4         THE COURT:  Sustained.  That last comment is

5  stricken.

6         MR. MADDEN:  Thank you.

7  BY MR. MADDEN:

8  Q.   Do you recall Mr. Chandler asking you to describe the

9  taste?

10  A.   No.

11  Q.   Okay.  Now, were there ever any drinks that were used to

12  put liquid into a student's mouth and have them try to guess

13  what was in their mouth from the liquid?

14  A.   No.

15  Q.   Do you remember ever telling a police officer that

16  liquid was placed in a red cup and then into the student's

17  mouth?

18  A.   No.

19  Q.   Okay.  You don't remember telling a police officer it

20  was water that was in a red plastic cup?

21         MS. FILO:  Objection, Your Honor.  Asked and

22  answered.

23         THE COURT:  Sustained.

24  BY MR. MADDEN:

25  Q.   Do you ever remember staying in during recess to play

26  the game with Mr. Chandler by yourself?

27  A.   No.

28  Q.   Do you remember ever telling a police officer that you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1262

1   did that?

2   A.   No.

3   Q.   Okay.  Thank you, Ly.  I have no further questions.

4   However, Ms. Filo may have some questions for you.

5                THE COURT:  Cross-examination.

6                MS. FILO:  Thank you.

7                        CROSS-EXAMINATION

8   BY MS. FILO:

9   Q.   Hi, Ly.

10  A.   Hi.

11  Q.   I just have a few questions for you.  Okay?

12  A.   Yes.

13  Q.   So you said that sometimes you were able to guess what

14  the food was that was put in your mouth and sometimes you

15  didn't know; right?

16  A.   Yes.

17  Q.   Was it always food?

18  A.   Yes.

19  Q.   It was always something you could chew up, right, and

20  swallow?

21  A.   Yes.

22  Q.   Okay.  So there was never anything that Mr. Chandler put

23  in your mouth that you weren't able to actually get in your

24  mouth; right?  That you weren't able to close your mouth

25  around?

26  A.   Yes.

27  Q.   Is that correct?  Am I making sense or am I confusing

28  you?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1263

1  A.   Kind of confusing.

2  Q.   Okay.  That's fine.

3        So, Ly, like, if you take an M&M, you could put the

4  whole M&M in your mouth and you eat the whole thing; right?

5  A.   Yes.

6  Q.   In one bite you could eat the whole thing?

7  A.   Yes.

8  Q.   Did Mr. Chandler ever put anything in your mouth that

9  you couldn't eat?  I mean, that wasn't eatable?  Was

10 everything eatable?

11 A.   Yes.

12 Q.   Everything was eatable?  Okay.

13        So, Ly, you said that all of the kids in the class

14 played the game; right?

15 A.   Yes.

16 Q.   Was that all on the same day?

17 A.   Yes.

18 Q.   Yeah?  And was the game played more than one day or just

19 that one day?  Does that make sense?

20 A.   Yes.

21 Q.   Yeah?  So was it played just one day or did the game get

22 played lots of days?

23 A.   Um, only, like, once a week.

24 Q.   Once a week?  Okay.

25        Do you remember what time of year it was?

26 A.   Yes.

27 Q.   What time of year was it?

28 A.   2012.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1264

1  Q.   Okay.  Do you know if it was before Christmas break or

2  after Christmas break?

3  A.   It was before.

4  Q.   Before Christmas break?  Okay.

5       After Christmas break, did you play the game again,

6  or was Christmas break the -- that wasn't a very good

7  question.  I'm going to start over.  Okay?

8  A.   Yes.

9  Q.   Okay.  So you said that the game was played with the

10  class before Christmas break?

11  A.   Yes.

12  Q.   Okay.  Do you remember how far before Christmas break?

13  A.   No.

14  Q.   No?  Okay.

15       Ly, you've never had to stay behind at recess by

16  yourself with Mr. Chandler; right?

17  A.   Yes.

18  Q.   That's correct?

19  A.   Yes.

20  Q.   Thank you.  That's all the questions I have, Ly.  Thank

21  you.

22       THE COURT:  Redirect?

23       MR. MADDEN:  Nothing, Your Honor.

24       THE COURT:  Okay.  Thank you, Ly.  You could step

25  down.  You are excused and you could go back with your

26  parents.

27       MR. MADDEN:  Could we approach the bench, Your

28  Honor?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1265

1    THE COURT:  Yes.

2    (Whereupon, there was a discussion at the bench.)

3    THE COURT:  You have another witness, Mr. Madden?

4    MR. MADDEN:  I have one more, Your Honor.

5    THE COURT:  Okay.

6    MR. MADDEN:  One moment, please.

7    Thank you, Your Honor.  I apologize.

8                    KEVIN DOE,

9    Being called as a witness on behalf of the

10   Defendant, having been first duly sworn, was examined and

11   testified as follows:

12   MR. MADDEN:  We're going to climb up these stairs

13   around the corner here.  There you go.  Now -- good.  Now,

14   I'm going to ask you to try to sit up straight, if you can.

15   Good.  And scoot the chair in a little bit.  I'm going to

16   keep the microphone about this far from your face so we could

17   all hear you.  Okay?

18   THE WITNESS:  (Shakes head up and down.)

19   MR. MADDEN:  Could you say okay?

20   THE WITNESS:  Okay.

21   MR. MADDEN:  All right.  I'm going to do -- in case

22   you need to blow your nose.  Sounds like you have a little

23   cold.  Feel free to use it.

24   THE COURT:  Good afternoon.  Hi.

25   THE WITNESS:  Hi.

26   THE COURT:  What's your name?

27   THE WITNESS:  Kevin.

28   THE COURT:  And could you spell your name for me,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1266

1    Kevin?

2              THE WITNESS:  K-e-v-i-n.

3              THE COURT:  Okay.  Lawyers are going to ask you

4    some questions.  Okay?  And if you're nervous, everyone that

5    sits in that chair talking in the courtroom gets nervous.

6    Okay?  So it's okay.  All right?

7              THE WITNESS:  Yes.

8              THE COURT:  So all you have to do is listen to the

9    question and try to speak up.  And the lawyer asks you a

10   question and says:  Are you a boy?  You would say yes, but

11   you can't nod your head up and down.  You have to say yes.

12   Okay?

13             THE WITNESS:  Yes.

14             THE COURT:  Mr. Madden will talk to you about some

15   other rules before he starts asking you some questions.  All

16   right?

17             Mr. Madden, when you are ready.

18             MR. MADDEN:  I'm not sure if I am or not, Your

19   Honor.  We may have the wrong Kevin.  I'm trying to work that

20   out.  May I have a moment to confer?

21             THE COURT:  Yes.

22             MR. MADDEN:  I think we do have the right one, Your

23   Honor.  We'll give it a go.

24             THE COURT:  Direct examination whenever you are

25   ready.

26             MR. MADDEN:  We'll soon find out.

27   ///

28   ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1267

1                     DIRECT EXAMINATION

2   BY MR. MADDEN:

3   Q.   Kevin, your middle name is Paul; right?

4   A.   Yes.

5   Q.   Very good.  Thank you.

6            Now, just a couple of rules.  I talked about these

7   out in the hallway with you.  So far you have been perfect.

8   Okay?  So I ask you a question and the answer is yes, I want

9   you to answer out loud the word yes and not to shake your

10  head up and down.  Okay?

11  A.   Okay.

12  Q.   And if I ask you a question and the answer is no, I want

13  you to answer out loud rather than shake your head left and

14  right.  Okay?

15  A.   Okay.

16  Q.   And I'm doing that because the nice lady in front of

17  you, her job is to write down every word that we say in this

18  courtroom, but she could only write down words.  She can't

19  write down shakes of the head.  Okay?

20  A.   Okay.

21  Q.   All right.  Then finally, if I ask you a question,

22  Kevin, and if you don't understand it, I want you to stop me

23  and to tell me that you don't understand my question.  And if

24  you tell me you don't understand, I'll ask the question in a

25  different way so that you will understand it.  Okay?

26  A.   Okay.

27  Q.   All right.  That's the rules.

28           So what grade are you in, Kevin?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1268

1    A.    Um, going to fifth grade.

2    Q.    Okay.  Do you go to O.B. Whaley?

3    A.    Yes.

4    Q.    Okay.  And did you have Mr. Chandler for a teacher when

5    you were at O.B. Whaley sometime ago?

6    A.    Yes.

7    Q.    And do you remember what grade you were in when you were

8    in Mr. Chandler's class?

9    A.    Yes.

10   Q.    What grade was that?

11   A.    Third grade.

12   Q.    And when you were in third grade, were all of the

13   students in the class in the third grade?

14   A.    No.

15   Q.    Were there some second-graders?

16   A.    Yes.

17   Q.    All right.  So this was a combination class?

18   A.    Yes.

19   Q.    Okay.  Do you remember in Mr. Chandler's class playing a

20   game where you tried to guess an object?

21   A.    Yes.

22   Q.    All right.  Was that something that Mr. Chandler had you

23   do, to guess what an object was?

24   A.    Yes.

25   Q.    Okay.  Do you remember if the game was played by the

26   whole class?

27   A.    I think only some students played.

28   Q.    Did you play?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1269

1    A.    Yes.

2    Q.    Okay.  Do you remember any time where the whole class

3    watched the game?

4    A.    No.

5    Q.    But you do remember playing the game, but you don't

6    remember playing it in front of the whole class?

7    A.    I don't know if I played it in front of the whole class

8    or not because I was blindfolded.

9    Q.    Good answer.  So let's start with the blindfold.  Could

10   you describe the blindfold for me?

11   A.    Yes.

12   Q.    Tell me a little bit about it.

13   A.    It was black and --

14   Q.    Basically, covered your eyes?

15   A.    Yes.

16   Q.    Okay.  And did you put the blindfold on or did Mr.

17   Chandler put the blindfold on?

18   A.    We did.

19   Q.    He did?

20   A.    I.

21   Q.    You did?  Okay.

22         Do you remember who was in the class with you when

23   you put it on?

24   A.    Yes.

25   Q.    Who was that?

26   A.    I think it was everyone in the class.

27   Q.    Okay.  So you think it was basically the whole class

28   when you put the blindfold on?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1270

1    A.    Yes.

2    Q.    Okay.  Now, do you remember having to touch an object

3    and try to guess what it was?

4    A.    Yes.

5    Q.    All right.  So I'm going to call that the feel game.

6    Okay?  Are we talking about the same thing?

7    A.    Yes.

8    Q.    Okay.  And do you remember how many different objects

9    you were asked to touch?

10   A.    No.

11   Q.    Was it more than one?

12   A.    Yes.

13   Q.    All right.  Could it have been a paper clip and a

14   pencil?

15   A.    Yes.

16   Q.    Okay.  And did both boys and girls play the game?

17   A.    Yes.

18   Q.    And when you had to feel this object, did you feel it

19   with your hand or some other part of your body?

20   A.    I think one time we touched it with our hand and one

21   time we touched it with our feet.

22   Q.    Okay.  Now, when you say "we," what do you mean by "we"?

23   A.    Um, the boys and girls.

24   Q.    Okay.  So there were many students in your class playing

25   this game; right?

26   A.    Yes.

27   Q.    Does that mean yes?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1271

1    Q.    Okay.   Thank you.

2          When you played this game, were you standing or

3    seated or on the ground?   If you remember?

4    A.    I think we were sitting on the ground.

5    Q.    Okay.   Would Mr. Chandler be next to the person who was

6    feeling the object?

7    A.    Yes.

8    Q.    Okay.   Now, we talked about the feel game; right?

9    A.    Yes.

10   Q.    Was there also a taste game?

11   A.    Yes.

12   Q.    All right.   Tell me about the taste game.

13   A.    We just had to taste something and then guess what it

14   was.

15   Q.    And how did the thing that you had to taste get into

16   your mouth?   Who put it there?

17   A.    I think Mr. Chandler put it in our hand and we put it in

18   our mouth.

19   Q.    But you're not sure?

20   A.    Yes.

21   Q.    Okay.   That's fair.

22          So was the object of that game to taste the food

23   and guess what the food was?

24   A.    Yes.

25   Q.    All right.   And do you remember if chips and water were

26   used?

27   A.    Yes.

28   Q.    Okay.   Do you remember what kind of chips?

1    A.    No.

2    Q.    And what about water?  How did the water get into your

3    mouth?

4    A.    I can't remember.

5    Q.    Was it in a bottle or a cup, if you remember?

6    A.    I think it was in a small cup.

7    Q.    Okay.  Did you ever see any cups before you put your

8    blindfold on?

9    A.    No.

10   Q.    And after you took your blindfold off, did you see any

11   cups?

12   A.    Yes.

13   Q.    And that's how you know it came from a cup; right?

14   A.    Yes.

15   Q.    All right.  Was it just water or was it flavored water?

16   A.    I think it was just regular water.

17   Q.    It was regular water, but you're not sure?

18   A.    Yes.

19   Q.    Okay.  Thank you, Kevin.

20              MR. MADDEN:  I have no further questions.

21              THE COURT:  Cross-examination.

22              MS. FILO:  Thank you, Your Honor.

23                     CROSS-EXAMINATION

24   BY MS. FILO:

25   Q.    Hi, Kevin.

26   A.    Hi.

27   Q.    I have a few questions.  Okay?

28   A.    Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1273

1   Q.   Okay.  Kevin, you said that all of the kids in the

2   class, or lots of the kids in the class would play this game?

3   A.   Yes.

4   Q.   Do you know whether it happened -- whether the game

5   happened on one day or did it happen many days?

6   A.   I think it was only on one day.

7   Q.   Okay.  Kevin, you said that you remember chips, like

8   potato chips; right?

9   A.   Yes.

10  Q.   Yeah?  And do you remember anything else that Mr.

11  Chandler used?

12  A.   No.

13  Q.   No?  He never put anything in your mouth that made you,

14  like, gag; right?  That made you choke all the way back in

15  your throat?

16  A.   No.

17  Q.   No?  Anything that squirted out liquid?  Like, salty,

18  warm liquid?

19  A.   No.

20  Q.   No?  And, Kevin, were you ever asked -- did Mr. Chandler

21  ever make you stay in at recess to be blindfolded with him

22  all by himself?

23  A.   No.

24  Q.   That never happened to you; right?

25  A.   No.

26  Q.   No?  Okay.  Thank you, Kevin.

27          MS. FILO:  I don't have any other questions.

28          THE COURT:  Redirect?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1274

1          MR. MADDEN:  Thank you, Your Honor.

2                   REDIRECT EXAMINATION

3    BY MR. MADDEN:

4    Q.   Kevin, when you say chips, there are many chips besides

5    potato chips; right?

6    A.   Yes.

7    Q.   Tell me some other ones.

8    A.   Um, I can't remember.

9    Q.   Well, I mean, you don't remember then?  I mean, now what

10   are some other kinds of chips?

11   A.   Hot Cheetos, regular chips that don't taste like

12   anything, and --

13   Q.   You said hot Cheetos.  Are there regular Cheetos?

14   A.   Yes.

15   Q.   That aren't hot?

16   A.   Yeah, and --

17   Q.   You know what pork rinds are?

18   A.   Oh, yes.  And I don't know any other chips.

19   Q.   And did you see some pork rinds being tasted in the

20   classroom demonstration?

21   A.   No.

22   Q.   But you know what they are?

23   A.   Yes.

24   Q.   Thank you.

25          MR. MADDEN:  I have no further questions.

26          THE COURT:  Recross?

27          MS. FILO:  No.  Thank you, Your Honor.

28          THE COURT:  Kevin, thank you.  You could step down.

1   Go back with your mother.  You are done.  You could leave.

2           MR. MADDEN:  Your Honor, those are all the

3   witnesses that I have this afternoon.

4           THE COURT:  Okay.

5           MR. MADDEN:  There will be time for recess to talk

6   about what we're going to do.

7           THE COURT:  Okay.  Are we going to recall Officer

8   Pierce this afternoon?

9           MS. FILO:  We could do that.

10          THE COURT:  Because we hadn't been in session that

11  long, why don't we start with Officer Pierce and then we'll

12  take a recess soon.

13          MS. FILO:  Okay.

14          THE COURT:  Is that agreeable?  Okay.

15          Then, Officer Pierce, if you'd retake the witness

16  stand.  We're not going to re-administer the oath, Officer,

17  because you are still under oath and you haven't been

18  excused.

19          I know last time we stopped, you were finished with

20  redirect.  I was -- before we start cross, did you have any

21  additional questions you wanted to ask?

22          MS. FILO:  I do, Your Honor.  Actually, could we

23  approach quickly?

24          THE COURT:  Sure.

25          (Whereupon, there was a discussion at the bench.)

26          THE COURT:  When you are ready, Ms. Filo, you could

27  continue with redirect -- excuse me -- just direct.

28          MS. FILO:  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1276

1          CONTINUED DIRECT EXAMINATION

2   BY MS. FILO:

3   Q.    Det. Pierce, did you have an occasion to meet with Craig

4   Chandler, or I should say, to speak with Craig Chandler in

5   the sort of lobby area of the San Jose Police Department on

6   January 9th --

7   A.    I did.

8   Q.    -- 2012?

9   A.    Yes.

10  Q.    Approximately what time did that occur?

11  A.    Somewhere after eight.  I know it was dark out or

12  getting dark.

13  Q.    Det. Pierce, at that time, did you say anything to Mr.

14  Chandler about returning to school?

15  A.    Yes, I did.

16  Q.    What did you tell Mr. Chandler about returning to

17  school?

18  A.    I told him that he should not return to school and he

19  should contact his principal in the morning and seek further

20  instruction.

21  Q.    One last question, Det. Pierce.  Did you take some

22  information about Mr. Chandler's height?

23  A.    Yes.

24  Q.    What did you determine his height to be?

25  A.    6'1".

26          MS. FILO:  That's all the questions I have, Your

27  Honor.

28          THE COURT:  Thank you.

1              Cross-examination, Mr. Madden.

2              MR. MADDEN:  Just a minute, please, Your Honor.

3              THE COURT:  Yes.

4                        CROSS-EXAMINATION

5    BY MR. MADDEN:

6    Q.    Det. Pierce, let me start with -- I want to go back to

7    your previous testimony concerning your training, which

8    included how to -- I believe in your words -- how to

9    interview and investigate child molestation cases; correct?

10   A.    That's correct.

11   Q.    Okay.  And this involved on-the-job training and

12   classes; correct?

13   A.    That's correct.

14   Q.    Classes inside and outside the San Jose Police

15   Department?

16   A.    That's correct.

17   Q.    All right.  And I believe you testified that you went

18   through perhaps hundreds of hours in training on the subject

19   of how to interview and investigate witnesses, or is that not

20   correct?

21   A.    That's correct, yes.  Interviewing and investigating

22   these types of cases, yes.

23   Q.    Okay.  Now, you used the word "protocol" I believe in

24   your direct testimony to describe the procedure that the San

25   Jose Police Department's sexual assault investigation unit;

26   is that correct?

27   A.    That's correct, yes.

28   Q.    Title.  All right.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1278

1          The acronym for that is SAIU?

2   A.   That's correct.

3   Q.   So that's a unit in the -- within the San Jose Police

4   Department dedicated to the investigation of child abuse

5   cases; correct?  Involving allegations of sexual abuse?

6   A.   Well, it's -- yes, but it is split into three areas.

7   Q.   One of them is the area you are in now, which is the

8   child exploit unit?

9   A.   Yes.  The SAIU you are referring to would be the big

10  umbrella that handles general crimes, but --

11  Q.   Okay.

12  A.   -- split into others.

13  Q.   All right.  So the protocol that you were referring to

14  by Ms. Filo, I think, was essentially an internal San Jose

15  Police Department protocol and what you do when you have to

16  do a large number of interviews from the same location, and

17  you have sports teams, schools, big groups; correct?

18  A.   That's correct.

19  Q.   All right.  Now, I want to talk more about the -- well,

20  before I get to that.

21          Tell me a little bit about that protocol, generally

22  speaking, what you tried to do?

23  A.   Well, the protocol I'm talking -- maybe protocol is not

24  the right word.  It's the common practice that we use in our

25  unit.  So I work in the child exploitation detail, and our

26  sergeant has set up a common practice.  Since we specifically

27  handle cases like this that have potential for multiple

28  victims, just a common practice that we use, that we go by,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1279

1   where we interview -- try to interview as many students as

2   early as possible, or as many people, not necessarily

3   students.  It could be soccer players, baseball, church.

4   Q.   And the general principle behind that is to try to do as

5   many simultaneous interviews as possible to avoid the

6   contamination of those statements; correct?

7   A.   That's correct.

8   Q.   In other words, if you did them serially, one after the

9   other after the other, it might take days or weeks to get

10  through it; right?

11  A.   That's correct.  Yes.

12  Q.   Then the danger of a later period of time is that the

13  later children may be influenced by things that they heard or

14  read about that the other kids said or did; right?

15  A.   That's correct.

16  Q.   Okay.  And that would also apply to like, for example,

17  media contamination?

18  A.   Yes.

19  Q.   All right.  Now, in this particular case, I believe you

20  indicated -- I think your words were that the vast majority

21  of the interviews in this case took place basically at the

22  same time?

23  A.   We did a large portion of the interviews on January

24  10th.

25  Q.   Okay.  And I won't hold you to it, but I believe I heard

26  the number 77 as the number of interviews that were conducted

27  in total of children in this case?

28  A.   Somewhere in that area, yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1280

1    Q.    I'm not expecting you to have the exact number, and I

2    don't want to put words in your mouth, so I won't.  But the

3    first day the interviews began on what date?

4    A.    The very first interview was done on January 9th.

5    Q.    Okay.  And that interview would have been Isabell?  She

6    would have been ground zero; correct?

7    A.    That's correct.

8    Q.    Okay.  Isabell and her mother, Luisana?

9    A.    That's correct.

10   Q.    All right.  And that is in connection with also at the

11   time the then principal, Lea Peery; correct?

12   A.    Yes.

13   Q.    All right.  The second interview was of Becky; correct?

14   A.    Becky was interviewed -- I'm not sure in the exact

15   order, but, yeah, she was interviewed the next day.

16   Q.    I need to be more fair with you here.  Right now I'm

17   trying to -- I'm going to do it this way.  I just want to get

18   a sense of the dates.  If we go through the five counts and

19   the five children, could you, if you feel comfortable enough

20   from memory, tell me when the interviews were and who did the

21   interviewing?  Or would you like to have the reports?

22   A.    Not all of them because I did not interview all five

23   children, but I could do my best.

24   Q.    Let's see where we could go with your memory and see if

25   we have to do anything with that after that.  So I put the

26   names up here in order from top to bottom for Counts 1, 2, 3,

27   4, and 5.  So that's Isabell, Becky, Laurie, Wendy, and

28   Arleth.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1281

1   A.   Yep.

2   Q.   So let's start at the top.  So Isabell was interviewed

3   the first time, if you remember, by whom?

4   A.   I believe patrol made first contact with her, and then I

5   interviewed her.

6   Q.   Do you remember who in patrol?

7   A.   I do not.

8   Q.   You remember what day that was?

9   A.   That was on the 9th.  I know Officer Koenig was the

10  responding officer, but I don't know if he did the interview.

11  Q.   I believe he had a sergeant with him named Bishop.

12  Sound familiar?

13  A.   Bishop?

14  Q.   No?

15  A.   Never heard that name.

16  Q.   This is patrol that would have been on the --

17  A.   9th.

18  Q.   -- 1/9/12; correct?

19  A.   That's correct.

20  Q.   All right.  Then your first interview, or your interview

21  with Isabell, was on what date?  The 9th?

22  A.   I believe I did the interview the same day, later on

23  that day.

24  Q.   Do you remember where that interview -- your interview

25  of Isabell took place?

26  A.   CIC.

27  Q.   Okay.  That would be the acronym for the Children's

28  Investigation Center?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1282

1   A.   Children's Interview Center.

2   Q.   I'm sorry.  Children's Interview Center.  That is over

3   on First Street in the Bank of America building?

4   A.   It is.

5   Q.   Not far from this courthouse?

6   A.   No.  Right on the corner.

7   Q.   Okay.  All right.

8        Do you remember if there were any additional

9   interviews of Isabell on the 9th?

10  A.   I don't believe so.

11  Q.   Okay.  Do you remember if there were any additional

12  interviews of Isabell by any members of the San Jose Police

13  Department after the 9th?

14  A.   I believe I interviewed Isabell later, I'm not sure what

15  date it was, to clarify some things, but I'm not sure the

16  date.

17  Q.   Could you look at your report and tell me?

18  A.   I could, yeah.

19  Q.   You have that in front of you?

20  A.   I don't know if I have that portion.  I only have

21  portions.

22  Q.   It was in January?

23  A.   Yeah, it was in January.

24  Q.   Was it before January 17th?

25  A.   Off the top of my head, I couldn't tell you.

26  Q.   Okay.  What was the physical location of that interview?

27  A.   I believe it was at her aunt's house.

28  Q.   Do you remember her aunt's name?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1283

1  A.   It was her support person when she was up here
2  testifying.  I don't remember her name offhand.
3  Q.   Okay.  And would that be a complete list of the
4  interviews of Isabell?
5  A.   I believe so.
6  Q.   Okay.  So let's move to Becky.  Do you remember what
7  member of the San Jose Police Department first interviewed
8  Becky?
9  A.   That would be me.
10  Q.   Okay.  Where would that have been?
11  A.   At O.B. Whaley.
12  Q.   What date?
13  A.   The 10th.
14  Q.   Okay.  And that was at O.B. Whaley.  And was there a
15  second interview on the 10th or another day by you?
16  A.   Yes, same day.
17  Q.   All right.  That would have been at the CIC?
18  A.   That's correct.
19  Q.   Later that same day; right?
20  A.   Yes.  It was actually directly after her interview at
21  O.B. Whaley.
22  Q.   Now, the interview that you did of Becky at O.B. Whaley,
23  was that video recorded?
24  A.   No.
25  Q.   Was it audio recorded?
26  A.   It was.
27  Q.   And the interview of Becky at the CIC was video and
28  audio recorded; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1284

1  A.    Video and audio, yes.

2  Q.    And going back to Isabell, basically, the CIC interviews

3  are always video and audio?

4  A.    Yeah.  Unless there is any kind of equipment

5  malfunction, yeah, the room is wired with sound and video.

6  Q.    And broadening this to include all five of the children

7  who are interviewed at the CIC, we know those were all audio

8  and video recorded because we've seen all of those exhibits

9  in court; correct?

10  A.    Yes, that's correct.

11  Q.    And were there any additional interviews of Becky by you

12  or anyone else at SJPD?

13  A.    I did not.  If someone else did, I didn't know about it.

14  Q.    Okay.  All right.

15        Moving to Laurie.  Do you recall the first person

16  from the San Jose Police Department to interview Laurie?

17  A.    I do not.  No.

18  Q.    Do you know where that interview took place?

19  A.    Um, I do not know.

20  Q.    Do you believe that an interview -- strike that.

21        You interviewed Laurie at some point?

22  A.    I did not interview --

23  Q.    You never interviewed Laurie?

24  A.    I interviewed Becky and Isabell.  That's it.

25  Q.    You never interviewed Laurie, Wendy, or Arleth?

26  A.    They were interviewed by other detectives.

27  Q.    I won't torture you by going through that list.  These

28  are the two that you did.  Have you ever -- obviously, you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1285

1    know that there were CIC interviews of these three children;

2    correct?

3    A.    Yes.

4    Q.    Have you ever viewed the CIC tapes?

5    A.    Yes.

6    Q.    Have you read transcripts of the CIC interviews?

7    A.    Um, well, we went over them in court here.  Yes.

8    Q.    Was that the first time you read them?

9    A.    Yes.

10   Q.    Okay.  Now, do you know what date Laurie was

11   interviewed?

12   A.    I know that a large portion of the children were

13   interviewed on the 10th.  I know some of the girls were

14   interviewed on the 17th, but I could not testify which date

15   it was.  I'm sure it's in the report, but I don't recall off

16   the top of my head.

17   Q.    So you think it was either the 10th or the 17th?

18   A.    Somewhere in there, yes.

19   Q.    How about Wendy and Arleth?  Do you know when they were

20   interviewed?

21   A.    I believe Wendy was interviewed on the 17th, and

22   Arleth -- I'm not sure.

23   Q.    If I were to suggest to you that the 17th was also on

24   the date that Arleth was interviewed, would that be

25   consistent with your understanding of the process?

26   A.    Yes.  I know we did go back on the 17th.  There was

27   quite a few interviews on the 17th as well.

28   Q.    Now, you were in court when Mr. Lara testified, the --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1286

1    A.    The vice principal, yes.

2    Q.    Administrator from O.B. Whaley School?

3    A.    Yes.

4    Q.    He testified being at O.B. Whaley I believe on the

5    morning of January the 9th; correct -- January the 10th?

6    A.    10th, yes.

7    Q.    Thank you.  Thanks for the correction.

8          I remember him telling that they were expecting an

9    onslaught of reporters.  You remember that testimony?

10   A.    I do.

11   Q.    So this case had significant media coverage; correct?

12   A.    Yes, it did.

13   Q.    It was all over the newspapers and it was all over the

14   TV; correct?

15   A.    It was.

16   Q.    And do you remember if the media coverage would have

17   begun on the 9th or the 10th?

18   A.    It did not.  It did not begin on the 9th because we

19   didn't -- I don't know when we did our press release.  We

20   didn't do our press release right away.

21   Q.    As you sit here today, does it seem likely you probably

22   did that on or about the 10th?

23   A.    Um, you know what, I could not testify.  My sergeant is

24   the one that works with our PIO.  I didn't do a press

25   release.  I did not release anything to the press.

26   Q.    I understand, but --

27   A.    It was somewhere around there.  I don't believe it was

28   the 9th because we were still in the middle of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1287

1    investigation.

2    Q.    Fair enough.  Probably the 10th?

3    A.    Probably.

4    Q.    Okay.  So it was on every TV station?  Media's all over

5    the police department?

6    A.    Yes.

7    Q.    All right.  Media all over the school?

8    A.    I don't know.  I didn't see any media in the school when

9    I was there.

10   Q.    That first week, do you remember seeing Mr. Chandler's

11   face on the TV broadcast?  The news broadcast?

12   A.    I do.

13   Q.    Basically, was his booking photograph?

14   A.    I would assume that's what it was.  Yes.

15   Q.    Okay.  And were you also aware that week that there were

16   letters sent by the administrators at O.B. Whaley School to

17   the parents of O.B. Whaley students?

18          MS. FILO:  Objection, Your Honor.  Calls --

19          MR. MADDEN:  Concerning this subject.

20          MS. FILO:  Calls for speculation and lack of

21   personal knowledge.

22          MR. MADDEN:  I don't know if it does or not.

23          THE COURT:  Um, I'm going to sustain the objection.

24          MR. MADDEN:  All right.

25   BY MR. MADDEN:

26   Q.    So with respect to the first three children, assuming

27   Laurie was interviewed on or about the 10th, those first

28   three children were basically interviewed in the first wave

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1288

1   that you were talking about; correct?

2   A.   That's correct, yes.

3   Q.   By the first responders, so to speak?

4   A.   Yes.

5   Q.   Okay.  However, children four and five, Wendy and

6   Arleth, were a week later?

7   A.   That's correct.

8   Q.   And in their case, after all of the media events

9   surrounding this case had been in the media for a week?

10  A.   Yes.

11  Q.   All right.  So tell me about -- strike that.

12       Does the San Jose Police Department teach a

13  particular protocol for the forensic interviews of children

14  suspected as being victims of child molestation?

15  A.   Yes.

16  Q.   And could you tell me something about that protocol?

17  You know the name of it?

18  A.   We use Dr. Lyon.

19  Q.   Dr. Lyons?

20  A.   Lyon.  I think it's L-y-a-n [sic].  First name is

21  Thomas.

22  Q.   L-y-a-n?

23  A.   L-y-a-n, yes.

24  Q.   Is there a name associated with this protocol?

25  A.   I don't believe so.

26  Q.   Have you ever heard of the acronym NICHD?

27  A.   I have.

28  Q.   What does that stand for?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1289

1   A.   I believe it's the National Institute for Child Health

2   and Development.  Dr. Lyon's program is an offshoot of that.

3   Q.   Are you familiar with both protocols?

4   A.   I'm familiar with Dr. Lyon's, the one we use.

5   Q.   I notice that -- I believe it was Det. Perez's

6   interview, he referred to a modified version of the NICHD

7   protocol.  Does that sound familiar?

8   A.   Yeah, that's what he's referring to, Dr. Lyon.

9   Q.   But to your -- you don't know what the name of Dr.

10  Lyon's protocol is, or it doesn't have a name?

11  A.   I don't know the answer to that.

12  Q.   Are there any textbooks that you're provided or study

13  materials concerning Thomas Lyon's protocol?

14  A.   Um, I do not know.  I didn't go to the Thomas Lyon -- if

15  there is any protocol or training, I did not go to his

16  training, so I can't testify to that.

17  Q.   What training did you go to?

18  A.   I went to -- my last training for interviewing children

19  was quite a while ago.  I have been to several trainings

20  across the country for our Internet crimes against children

21  task force.  I have not been to his.

22  Q.   To Dr. Lyon's?

23  A.   No.

24  Q.   You've never been to Dr. Lyon's.  Does he teach a class?

25  A.   I don't know if he teaches it or someone else teaches

26  it.  We just have the -- go by the questionnaire that we go

27  through.

28  Q.   What did you mean "go by the questionnaire"?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1290

1    A.    It's a list of different questions to ask.

2    Q.    That's something that the San Jose Police Department

3    provides the officers?

4    A.    That's at the CIC center, yes.

5    Q.    Does it have a title?

6    A.    Um, I actually have one here.  I could look and see if

7    it has a title, if you want?

8    Q.    Is that an extra copy?

9    A.    You could have this copy.

10   Q.    Great.

11             MR. MADDEN:  Then I will mark that as defense next,

12   Your Honor.  May I have this marked as defense next, and it's

13   entitled "10 Step Investigative Interview."  Thank you.

14             (Whereupon, Defense Exhibit G was marked for

15   identification.)

16             THE COURT:  That will be G.

17             MR. MADDEN:  That will be G, yes.  Let me staple

18   this together.  Could you give me a moment to read this, Your

19   Honor, then I will ask him some questions?

20             THE COURT:  Yes.

21   BY MR. MADDEN:

22   Q.    So this basically appears to me, correct me if I'm

23   wrong, be sort of bare-bones questions to ask a child?

24   A.    That's correct.

25   Q.    In a forensic interview; right?

26   A.    That's correct.

27   Q.    And it doesn't seem to talk about anything, but

28   questions to ask a child; correct?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1291

1    A.    That's correct.

2    Q.    And you're not really familiar with the NICHD protocol

3    for forensic interviews?

4    A.    I've heard of it.  I know this is a form of it.

5    Q.    But you couldn't sit there and recite it to me?

6    A.    Absolutely not.

7    Q.    Okay.  To your knowledge, have you ever read it?

8    A.    Um, if I had, it's been a while.

9    Q.    Okay.  Does the Thomas Lyon protocol, we're going to

10   call it a protocol, address the issue of determining whether

11   or not the child has been influenced by any sources?

12   A.    I don't believe so.  It's just questions.

13   Q.    Okay.

14   A.    I don't believe that's a question on it.

15   Q.    Would you agree with me, that a goal of a forensic

16   interview is not only to ask the child questions that will

17   elicit information; correct?

18   A.    That's correct.

19   Q.    But at the same time, the goal is to make sure that what

20   the child is saying is a product of his or her memory rather

21   than something that she's learned from some other source?

22   A.    That will be fair to say.

23   Q.    Okay.

24             MR. MADDEN:  Your Honor, I have no other questions

25   at this time.

26             THE COURT:  Okay.  Thank you.

27             Ms. Filo, redirect?

28             MS. FILO:  Yes.  Thank you, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1292

<u>REDIRECT EXAMINATION</u>

BY MS. FILO:

Q.   Det. Pierce, you said you have been to hundreds of hours of training, all of which some level involved interviewing children; right?

A.   Interviewing and investigating child molestation cases, yes.

Q.   So irrespective of the various schools of thought -- strike that.

        You are aware, are you not, that there are several schools of thought about specifically how to interview children?

A.   That's correct.

Q.   And all of them have some basic tenets; correct?

A.   Yes.

Q.   What are they?

A.   Could you -- I'm sorry.  Could you ask the first question?

Q.   Sure.  Regardless of the specific developer of the protocol, or whatever you want to call it, all experts who talk about interviewing children will tell you what?

A.   Well, first, we always in the beginning of the interview determine whether the child knows the difference between a truth and lie, and then we just ask questions and let them talk.

Q.   Okay.  So you want to know if the child can even tell the difference between a truth and a lie; right?

A.   That's correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1293

1  Q.    And sometimes with, you know, three-year-olds that could

2  be a problem; right?

3  A.    It can.

4  Q.    Okay.  And you need to impress upon the child that

5  telling the truth is important?

6  A.    That's correct.

7  Q.    Is there any suggestion about using leading questions?

8  A.    Yes.  They do not like leading questions.  Just ask

9  basic questions, let the child answer, and then you could

10  expand on the child's answer.

11  Q.    So one of the most fundamental basic principles of child

12  interviewing is let the child talk; right?

13  A.    That's correct.

14  Q.    Have them talk more than you talk?

15  A.    That's correct.

16  Q.    Okay.  So use non-leading questions?

17  A.    Yes.

18  Q.    You would want to do things like:  Little girl, can you

19  tell me why you're here?

20  A.    That's correct.

21  Q.    Could you tell me what happened to you?

22  A.    Yes.

23  Q.    Who was there?

24  A.    That's correct.

25  Q.    And let them give you as much information as possible?

26  A.    That's true.

27  Q.    Okay.  Is it recommended that you use yes or no

28  questions?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1294

1   A.   No.

2   Q.   Again, you're trying to get them to give you as much

3   information as possible?

4   A.   That's correct.

5   Q.   Okay.  Are you -- is it recommended that you use what's

6   commonly referred to as closed questions, where the child

7   only has a choice between saying this happened or that

8   happened?

9   A.   No.  We ask them open-ended questions and just let them

10  explain it and then we could expand on that.

11  Q.   All right.  And you have personally never conducted the

12  perfect interview; right?

13  A.   I don't think anybody has.

14  Q.   You've seen dozens of interviews conducted?

15  A.   Way more than dozens, yes.

16  Q.   Is each interview a little bit different?

17  A.   Yes.  It's -- you got to think -- it depends on the

18  child and it depends on the interview.  Every interview has a

19  different style.  Every child is going to be different.  Some

20  children are very easy to elicit information from and some

21  children it's very hard.  Some children will not give you any

22  information, even though you know something happened.

23  Q.   Okay.  Det. Pierce, have you ever gone into an interview

24  with a child hoping a -- trying to get information that this

25  child is a victim?

26  A.   No.

27  Q.   No?  So you're -- what is your goal in interviewing

28  children?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1295

1   A.   My goal is just to find out if something happened.

2   That's it.

3   Q.   You don't get paid more if they make disclosures to you;

4   right?

5   A.   Absolutely not.  I don't like talking to children about

6   this, but it's my job.  I do not get paid extra for eliciting

7   information from anybody.  No.

8   Q.   Okay.  Your job is simply to find out what happened?

9   You have no stake in the outcome of any of these cases?

10  A.   Absolutely not.

11  Q.   Thank you.

12        MS. FILO:  Nothing further, Your Honor.

13        THE COURT:  Recross?

14        MR. MADDEN:  Thank you, Your Honor.

15                    RECROSS-EXAMINATION

16  BY MR. MADDEN:

17  Q.   Officer Pierce, is there a process within the San Jose

18  Police Department for evaluating interviews by sexual assault

19  investigators?

20  A.   Is there a process for evaluating?

21  Q.   Yeah.

22  A.   I don't believe so.

23  Q.   Okay.  So, for example, as Ms. Filo indicated, you

24  really want to avoid leading questions; right?

25  A.   That's correct.

26  Q.   Because you are suggesting the answers there; right?

27  A.   That's correct.

28  Q.   And you want to really avoid close-ended questions

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1296

1   because you have a limited universe of choices, which is not

2   good; right?

3   A.   That's correct.

4   Q.   Those are a couple of examples.  Now -- so you are

5   trained not to do that; right?

6   A.   Correct.

7   Q.   But subsequent to the training, when you get out on the

8   field and start doing these interviews, there is no process

9   at the San Jose Police Department to find out if, in fact,

10  that is what you are doing?

11  A.   You mean, like an evaluation process?

12  Q.   Yes.

13  A.   I don't know of any.  I mean, our sexual assault unit

14  handles over 4,500 cases a year, so I don't think it will be

15  feasible to have an evaluation, but I don't know if they do.

16  Q.   So does that mean your volume is so big that you just

17  really don't have time to evaluate your work?

18  A.   That's not a question for me.  I wouldn't be evaluating

19  my own.  I don't know if they have an evaluation process.  I

20  have never heard of an evaluation process, but I can't answer

21  that one.

22  Q.   Have any of your interviews been evaluated, to your

23  knowledge?

24  A.   By?

25  Q.   Anybody at the San Jose Police Department?

26  A.   Not to my knowledge.

27  Q.   Thank you.

28          MS. MADDEN:  I have no further questions.

1        THE COURT:  Redirect?

2        MS. FILO:  Thank you.

3                FURTHER REDIRECT EXAMINATION

4  BY MS. FILO:

5  Q.    Det. Pierce, when you bring over your cases to be filed

6  at the District Attorney's Office, if the interview is

7  horrible, I mean, if the interview doesn't provide any

8  information, or the officer was so suggestive in the

9  interview that the interview has no evidentiary value, that

10 would be an evaluation; right?

11 A.    Yes.

12 Q.    Yes?  I mean, we could reject a case and not file it

13 because the officer has provided us with such a poor

14 interview that it's not worth bringing to court?

15 A.    That's true.

16 Q.    Thank you.

17       THE COURT:  Recross?

18       MR. MADDEN:  None, Your Honor.

19       THE COURT:  Thank you, Officer Pierce.  You could

20 step down.

21       THE WITNESS:  Thank you, Your Honor.

22       THE COURT:  Ladies and gentlemen, at this time,

23 we're going to take the evening recess, and I have to address

24 an issue in the morning.  So it's my expectation we won't get

25 started until about 9:15.  I will make every effort to start

26 at 9:15.

27       I will order all members of the jury to report to

28 the jury assembly room tomorrow morning by 9:15, and have a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1298

1　good evening.  Thank you very much.

2　　　　　　　(Whereupon, the jurors were excused and the

3　proceedings were had outside the presence of the jury.)

4　　　　　　　THE COURT:  We'll go back on the record.  The jury

5　has left the courtroom.  As I recall, during Ms. Cardosa's

6　testimony, Ms. Filo, you made reference to various photos of

7　the chairs, which are now marked as 10 and 11.  Those are the

8　physical chairs, and you indicated that you would get hard

9　copies later and have them marked as exhibits; correct?

10　　　　　　　MS. FILO:  Correct, Your Honor.

11　　　　　　　THE COURT:  Okay.  You provided the hard copies,

12　which are being marked 17 through 22 and --

13　　　　　　　THE CLERK:  23.

14　　　　　　　THE COURT:  I'm sorry.  23.

15　　　　　　　(Whereupon, People's Exhibits 17 through 23 were

16　marked for identification.)

17　　　　　　　THE COURT:  I will note just for the record,

18　People's 17 is a front view picture of item SYO-01, which is

19　People's 10.  People's 18 is a picture of the back of item

20　SYO-01.  There is a close-up of the back of a chair, which is

21　marked People's 19, and am I correct in assuming with the tag

22　this is SYO-01?

23　　　　　　　MS. FILO:  Correct.

24　　　　　　　THE COURT:  Okay.  Thank you.  And then People's 20

25　is a front view photo of the chair, which is item SYO-02,

26　which is marked as People's 11.  And then People's 21 is a

27　close-up picture of the back of a chair, which is also

28　SYO-02?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1299

1      MS. FILO:  Yes, Your Honor.

2      THE COURT:  Okay.  Then People's 22 is another back

3  photo of SYO -- is this 01 or 02?

4      MS. FILO:  02, Your Honor.

5      THE COURT:  02, which is People's 11.  And then a

6  close-up picture of a photograph, People's 23, of the chair,

7  which is SYO --

8      MS. FILO:  02.

9      THE COURT:  02.  And for the record, that's a

10  description of the photos that have been marked at this time.

11      MS. FILO:  Your Honor, each of those photos was

12  actually shown to Ms. Cardosa during her testimony, and they

13  are in the order in which they were shown to her.

14      THE COURT:  Thank you.

15      MS. FILO:  The last thing I had intended to do was

16  bring a hard copy of the photograph of Sgt. Warden standing

17  next to Mr. Chandler's chair.  And I promised the Court I

18  would do that over the lunch hour and then left the disk in

19  the courtroom that had that photograph on it.  So I will take

20  that back with me now and have that for the Court in the

21  morning.

22      THE COURT:  Okay.  I believe this was a photo of

23  the gentleman that was 6'1"?

24      MS. FILO:  Correct.

25      THE COURT:  That was Sgt. Warden?

26      MS. FILO:  Right.

27      THE COURT:  We said that we were going to mark that

28  People's 14.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1300

1              MS. FILO:  Thank you.

2              THE COURT:  We'll be in recess.  I will order

3  counsel here tomorrow morning at 9:00 a.m.  I have to leave.

4  So see you tomorrow morning 9:00 a.m.

5              (Whereupon, the Court took the evening recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1301

1  STATE OF CALIFORNIA      )
                           )
2  COUNTY OF SANTA CLARA    )

3

4           I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5           The foregoing is a full, true, and correct

6  transcript of the testimony given and proceedings had in the

7  above-entitled action taken on the above-entitled date; that

8  it is a full, true, and correct transcript of the evidence

9  offered and received, acts and statements of the Court, also

10 all objections of counsel, and all matters to which the same

11 relate; that I reported the same in stenotype to the best of

12 my ability, being the duly appointed and official

13 stenographic reporter of said Court, and thereafter had the

14 same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16 237(a)(2) in that all personal juror identifying information

17 has been redacted if applicable.

18

19          Dated:

20

21                        _____

22                        Jamie L. Mixco, C.S.R.
                           Certificate No. 12708
23

24 ATTENTION:
   CALIFORNIA GOVERNMENT CODE
25 SECTION 69954(D) STATES:

26 "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
   MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27 A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
   ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28 PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
   PERSON."