1   XAVIER BECERRA
    Attorney General of California
2   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
3   JILL M. THAYER
    Deputy Attorney General
4   State Bar No. 166428
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA 94102-7004
      Telephone: (415) 703-5954
6     Fax: (415) 703-1234
      E-mail: Jill.Thayer@doj.ca.gov
7   *Attorneys for Respondent*

8

9                   IN THE UNITED STATES DISTRICT COURT

10             FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                        SAN FRANCISCO DIVISION

12

13   **CRAIG RICHARD CHANDLER,**              17-cv-00325-EMC

14                           Petitioner,      **EXHIBITS**

15          v.

16   **SCOTT FRAUENHEIM, Warden,**

17                           Respondent.

18

19

20      Exhibit 3       State Court Reporter's Transcript (Vols. 14-20)

21

22

23

24

25

26

27

28

# EXHIBIT 3
# (Vol. 14)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1302

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

THE PEOPLE OF THE STATE OF CALIFORNIA,            )
                                                  )
        Plaintiff - Respondent,                   )
                                                  )
        v.                                        )        No. C1223754
                                                  )
CRAIG RICHARD CHANDLER,                           )
                                                  )
        Defendant - Appellant.                    )
_____/

COPY

VOLUME 14

PAGES 1302 - 1433

JULY 24, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:        OFFICE OF THE ATTORNEY GENERAL
                                 BY:  KAMALA D. HARRIS,
                                 Attorney General of the State
                                 of California

FOR DEFENDANT-APPELLANT:         In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1303

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

DEPARTMENT NO. 37

---o0o---

THE PEOPLE OF THE
STATE OF CALIFORNIA,          )
                              )
              PLAINTIFF,      )
                              )         CASE NO.  C1223754
     v.                       )
                              )
                              )
CRAIG RICHARD CHANDLER,       )
                              )
                              )
              DEFENDANT.      )
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JULY 24, 2013

---o0o---

APPEARANCES:

| | |
|---|---|
| FOR THE PEOPLE: | ALISON FILO<br>Deputy District Attorney |
| FOR THE DEFENDANT: | BRIAN MADDEN<br>Attorney at Law |
| OFFICIAL COURT REPORTER: | JAMIE L. MIXCO<br>C.S.R. No. 12708 |

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1304

# INDEX

## EXAMINATION

**Witness Name**                                                    **Page**

**DIEGO DOE**
　　Direct By Mr. Madden  .....................................1327
　　Cross By Ms. Filo      .....................................1333

**CHRIS DOE**
　　Direct By Mr. Madden  .....................................1334
　　Cross By Ms. Filo      .....................................1342

**MARY DOE**
　　Direct By Mr. Madden  .....................................1347
　　Cross By Ms. Filo      .....................................1355

**JORGE DOE**
　　Direct By Mr. Madden  .....................................1357
　　Cross By Ms. Filo      .....................................1367

**CARL DOE**
　　Direct By Mr. Madden  .....................................1369
　　Cross By Ms. Filo      .....................................1376

**MARCUS DOE**
　　Direct By Mr. Madden  .....................................1379
　　Cross By Ms. Filo      .....................................1388

**ANNIE DOE**
　　Direct By Mr. Madden  .....................................1391
　　Cross By Ms. Filo      .....................................1409
　　Re-Direct By Mr. Madden  ..................................1424

## DEFENSE EXHIBITS

**Exhibits**     **Description**                                    **Page**
C-1 Marked    document                                             1322

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1305

1  San Jose, California                    July 24, 2013

2                       PROCEEDINGS

3          THE COURT:  We'll go on the record.  Record will

4  reflect both counsel are present, Mr. Chandler is present in

5  the courtroom, jury is not here.

6          We have an issue related to, I believe it's Defense

7  C, concerning Ms. Lyn Vijayendran's typewritten account of

8  her interview with Becky, and I just wanted to make some

9  tentative comments on the record and then I'll allow counsel

10 an opportunity to respond.

11         We did discuss this briefly.  I believe it was

12 yesterday informally.  Mr. Madden referred me to *People v.*

13 *Cowan* at 50 Cal. App.4th 401.  I have reviewed that case, and

14 as both parties know, that was a different fact-situation

15 that we have here.  Just briefly, in *Cowan* the witness made a

16 statement to the police officer related to a homicide that

17 occurred in September right after Labor Day, and he made the

18 statements to the officer approximately three months after

19 the events he was talking about.  And in that particular

20 case, he testified that what -- when he told the officer

21 three months, that the events were fresh in his mind.

22         So we discussed this earlier about past

23 recollection recorded and that Ms. Vijayendran had written

24 this typewritten report three months after talking with

25 Becky.  So *Cowan* really doesn't apply, because 1237 focuses

26 on the witness's statement, which in this case, it's Becky.

27 Becky makes a statement in October and we're dealing with a

28 principal recording statements three months later.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1306

1        So was it fresh in her mind at the time?  I think

2   that has some relevance, but it appears to me, and I'm making

3   reference to *People v. Hess* at 10 Cal.App.3rd 1071, which

4   basically made reference to saying that a third person may

5   record what the witnesses said, and he has kind of changed

6   it, because at that time it basically said the witness

7   doesn't necessarily have to have seen the recording and

8   personally looked at it.  But *Hess* did say:  But the accuracy

9   and the contents is verified by the testimony of the

10  recorder, that he/she recorded accurately what the

11  witness/declarant said.

12       So I think that is the issue before us, although I

13  do have some reservations about past recollection recorded

14  here.  As I recall, number one, Becky did testify.  It seemed

15  like she had some sufficient recollection about her interview

16  with the principal.  That's one issue.

17       The other issue that concerns me, that when I look

18  at Defense C, it appears to me this is basically a statement

19  about the principal's investigation.  There is a lot in here

20  what Becky's mom tells the principal, then what the principal

21  does to investigate the incident.  For example, on page one

22  of Defense C, the only portion that talks about Becky giving

23  a statement to the principal is the fourth paragraph, and

24  then on page two, the first half of that page, and then the

25  second to the last paragraph starts talking about Ms. Lyn

26  Vijayendran's investigation.  So those are problematic to the

27  Court.

28       However, what concerns me is that when the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1307

1    principal was testifying, she was asked a number of

2    questions:  Is your statement based on a number of

3    recollections?  Yes.  And she was sort of like, I thought, a

4    little evasive about whether it was detail and accurate.  At

5    one time she was asked:  And at that time, did you believe

6    you had a full and complete recollection of your

7    conversations with Becky in October?  And her response is:  I

8    wouldn't say that I even then believed that I had the entire

9    conversation documented in this report because there were

10   things that I wasn't -- that weren't as clear in my mind as

11   time has passed, but I did my best to create a report that

12   was based on my recollection, had details in it that I

13   remember.  So I have reservations, based on the principal's

14   testimony, the accuracy of the statements.

15          So that is -- those are my preliminary comments

16   right now.  I have reservations allowing it under 1237.  I'm

17   not comfortable that 1237 applies.  I will hear comments from

18   both sides.

19          MR. MADDEN:  Thank you, Your Honor.

20          THE COURT:  Sure.

21          MR. MADDEN:  Let me first address a concern the

22   Court expressed about Exhibit C, which contained the total of

23   her typewritten notes.  This morning, I redacted that

24   document and copied it.  I gave a copy to the People and I

25   will be happy to give a copy to the Court at this point, if I

26   may approach.  If I may be clear, the redacted portion is the

27   same report.  There is an initial paragraph that details her

28   conversation with Becky, sort of her preliminary conversation

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1308

1   with Becky in her office and Becky's mother.  Then Becky's

2   mother and Becky stepped out of the office and they returned,

3   and the second part of this is the second paragraph.

4           THE COURT:  Okay.

5           MR. MADDEN:  So this is really a more -- it's a

6   properly redacted typewritten statement.  That is, I've

7   only -- I would ultimately ask that be substituted for --

8   however the Court wants to do it.  Either substitute it for C

9   or add it as C-1.  We could address that as this matter

10  unfolds.

11          I also -- I don't have a transcript of what was

12  said by Ms. Vijayendran, but I want to point out to the Court

13  that this is critical to the defense.  I mean, there is a --

14  the thrust of this, the main point is that her typewritten

15  notes are inconsistent -- somewhat inconsistent with her

16  testimony, because as the Court properly noted, I don't think

17  she was being evasive.  I don't think she really remembered,

18  but I'll take the Court's description in face value.  It

19  doesn't really matter, but whether she's being evasive or

20  whether she doesn't remember, it's a prior inconsistent

21  statement.

22          THE COURT:  Let me ask you a question.  Prior

23  inconsistent statement with?

24          MR. MADDEN:  Her testimony.

25          THE COURT:  With -- well, hold on.  With her

26  written notes, which is People's 3?

27          MR. MADDEN:  With her -- what note?

28          THE COURT:  Her written notes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1309

1        MR. MADDEN:  Yes, it's inconsistent with her

2   written notes.  Yes, those have been admitted as an exhibit.

3        THE COURT:  See, that even gives me more pause to

4   the reliability and accuracy of this, because these written

5   notes were written contemporaneously with the interview,

6   which would seem they would be very accurate.

7        MR. MADDEN:  Let's put things in perspective.

8        THE COURT:  Okay.

9        MR. MADDEN:  The handwritten notes are very -- are

10  comparatively speaking, brief.  And her testimony was that --

11  I believe that her testimony, as I recall it, was that she

12  recalled the handwritten notes maybe included a third of the

13  conversation.  A third comes to mind.  And that four weeks

14  later she did these typed notes, which obviously -- I mean,

15  the original typed notes were and are four single-space

16  pages.

17       MS. FILO:  I'm sorry, Your Honor.  I just have to

18  correct the record at least.  It wasn't four weeks; it's

19  three months afterwards.

20       MR. MADDEN:  I thought I said four pages.

21       MS. FILO:  You said it happened four weeks later

22  and it's three months later and --

23       MR. MADDEN:  Absolutely correct.  You're right.

24       MS. FILO:  Then you're referencing a four-page

25  typed document, but there is only one page of that typed

26  document that actually reflects her conversation with Becky.

27  The other three pages are what she did subsequent to that,

28  which included a bunch of stuff that has nothing to do with

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1310

1    her conversation with Becky.  I just want the record --

2             MR. MADDEN:  It included a large part of -- the

3    four pages included her conversation with Mr. Chandler, which

4    of course we're not allowed to get into.  That's why it had

5    to be redacted.  It also included back and forth

6    communication she was having with the school district, which

7    is not relevant to this case and is not a part of that.

8             I'm not trying to get anything by her.  If I said

9    four weeks, I misspoke.  I didn't intend to do that.

10   Clearly, it speaks for itself.  The handwritten notes were

11   written in mid-October and the typewritten notes were written

12   in mid-January, so it is three months later.  No question

13   about it.

14            *Cowan* is still valid law for the principal, and the

15   delay of three months is not too long.  That was the People's

16   initial objection, and at the time the People made that

17   objection, the only objection is past recollection recorded,

18   was that it was too long.  *Cowan*, even though it was

19   different, the principal of the delay from the event to

20   writing down this statement is still relevant in this case.

21   Relevant and good law.  Okay.

22            But my difficulty is this, and I think I have to

23   spell it out by -- sorry.  I don't think I have it with me

24   here.  You have to bear with me, Your Honor.  I have to dig

25   it out.  I will -- it's very important.  Here I go.

26            I'm just reading here from my notes of trial

27   testimony.

28            THE COURT:  Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1311

1      MR. MADDEN:  And we may have to get a re-read of

2  that to have complete accuracy concerning what she said.  But

3  my notes reflect that on cross Ms. Filo stated that her typed

4  notes were written 10 to 12 weeks after the interview with

5  Becky.  She stated there are -- I'm quoting here -- possibly

6  things in there she doesn't remember.  She thinks she has a

7  good memory, and that's all she said.

8      And I think this dovetails with the Court's comment

9  about her not remembering, or in the past being evasive.  I

10  mean, she said she has a good memory.  I think she was

11  referring to, one, her ability to write the four-page

12  document three months later.  And I think she was also

13  referring to her ability on the stand to recall the events

14  that were surrounding Becky's statement to her.  Of course

15  she had both her handwritten notes and typewritten notes

16  there, but what I'm saying is that the comment in the -- if

17  we take a look at -- I want to refer the Court to the

18  typewritten notes, the redacted version that I provided the

19  Court this morning, I want to read from that.

20      By the way, the child's name -- mother's name are

21  not in here.  It was redacted.  The Court knows what I'm

22  talking about.

23      THE COURT:  Right.

24      MR. MADDEN:  So it doesn't say this, but for

25  purposes of understanding my point, I have Becky and her

26  mother come back into my office, and I had Becky start over

27  again and explain what happened.  Her account was as follows:

28      After about ten minutes of playing out at recess,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1312

1  recess is 20 minutes long, Becky was called back to the

2  classroom.  Becky saw Mr. Chandler go into the closet and

3  take out a blue blindfold.  He then went to a basket near the

4  door and got a blanket.  The blanket was white.  Becky put

5  the blindfold on after Mr. Chandler asked her to.  Mr.

6  Chandler told Becky to lie down on the floor right here.

7  That's in quotes.  She did.

8       He took the blanket and put it over her head.  Mr.

9  Chandler asked Becky to take off her shoes.  She was wearing

10 silver flats.  Becky felt something gooey on her feet and on

11 her leg.  She felt Mr. Chandler moving near her and he asked

12 her to move her legs.  Becky initially said Mr. Chandler told

13 her to move her legs, but then she said to open her legs.  I

14 asked her which it was, and she said she couldn't remember.

15 I asked if she felt anything between her legs, and she said

16 no.

17      Mr. Chandler was next to her.  Mr. Chandler lifted

18 the blanket up to about her nose and then put something in

19 her mouth and made her drink something.  She explained the

20 drink as salty and that the bottle was gooey.  I asked her if

21 she felt the same as what was on her foot, and she said no.

22 It felt different, but also gooey.  Becky said some of the

23 drink fell out of her mouth because she was lying down and it

24 got onto her jacket.  Mr. Chandler removed the blanket and

25 blindfold, and Becky went to the sink to wash off her hands

26 and Mr. Chandler gave her a damp paper towel to help.  He

27 opened up a Wonka chocolate and put it in her mouth.  The

28 bell rang and Mr. Chandler went to the door to open it.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1313

1          I asked Becky to try to remember what, if anything,

2    Mr. Chandler has said during the incident, but she said she

3    couldn't really remember.  When I asked her how she felt

4    about what had happened, she said she just think it's weird

5    and that she didn't like him putting things in her mouth.

6    Her demeanor was calm and matter of fact.  She said she was

7    not angry or scared.

8          All right.  So again, this statement, this written

9    statement by Ms. Vijayendran, is different from her

10   handwritten notes, which is an exhibit of the People, and has

11   been exhibited at the beginning and through this trial by the

12   People.  And it is categorically unfair to use -- to allow

13   the handwritten notes to come in without having the jury see

14   as an exhibit the redacted typewritten notes, because that is

15   inconsistent with two things:

16          It's inconsistent with her memory.  She doesn't

17   seem to remember about the bottle, and I'm not quoting the

18   testimony.  I'm just quoting from my notes and recollection,

19   so it may not be accurate.  I think -- I see the nodding of

20   the head, I think the Court has the same sense, that it's

21   inconsistent with her testimony and it's also inconsistent

22   with the handwritten notes.  It's an inconsistent statement

23   and it does qualify under past recollection recorded.

24          And the jury -- if the Court does not allow this, a

25   terrible injustice will occur because the jury will be

26   allowed to consider an incomplete -- an admittedly incomplete

27   handwritten statement.  The more complete written statement

28   is expanded and explains it, and I think that was also her

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1314

1  testimony, that she wanted to expand on that.  And although I

2  don't remember her being asked about this, I honestly don't.

3  Maybe the Court could help me.  I have to believe that she

4  must have had her handwritten notes and referring to those

5  when she made the handwritten statement and she remembered

6  more, as she indicated here, but she also indicated that she

7  thinks she has a good memory, but she's not quite sure.

8          So for all of those reasons, it's a prior

9  inconsistent statement and it qualifies under past

10  recollection recorded, under all legs of that requirement.

11  And as to the time, I think the point of law in *Cowan* on the

12  delay from the event to writing of the report is very good

13  law and is on this point.

14          THE COURT:  Well, basically, *Cowan* is relevant as

15  far as the Court saying three months --

16          MR. MADDEN:  Yes.

17          THE COURT:  -- isn't a period of time where it's

18  fresh in the person's mind.  That was the point they were

19  making there, that three months by itself is too long a

20  period.

21          Let me just make a few comments.  You talk about

22  her memory, and she said:  I wrote this written statement

23  based on my memory.  Okay.  And even then she -- as I made

24  the comment, she was concerned about whether she remembered

25  everything, but it was just based on her memory.  And then

26  for her to testify that she didn't know if she had the

27  handwritten notes while she wrote this written report, I

28  mean, to me, Mr. Madden, that is I think a very important

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1315

1  fact.  The fact that she had them or didn't have them, number

2  one.

3          Number two, when I read her total written report,

4  it almost seems like she's bias and trying to justify her

5  conduct.  And there was no testimony really about how this

6  written statement incorporated everything she got from Mr.

7  Chandler, his explanations of what was going on.

8          In any event, I have some reservations, even if

9  we're looking at this as a 1237 report on the accuracy, and

10  as I think about it, even the reliability because of Ms.

11  Vijayendran's bias.  I mean, she was basically preparing a

12  report it sounds, to me, to justify her conduct because of

13  her actions because that's the sense I get.  But I will allow

14  Ms. Filo to respond.

15          MS. FILO:  Thank you.  So, first of all, I want to

16  say sort of two things.

17          THE COURT:  One more thing.  I apologize.

18          MS. FILO:  No.

19          THE COURT:  When we talk about inconsistencies,

20  it's -- really, we're talking about the principal

21  inconsistent with herself and not really the inconsistency of

22  Becky.  So that was just a point that Mr. Madden had

23  mentioned.

24          MR. MADDEN:  But before you go, Ms. Filo, just --

25  Your Honor, it clearly refers to the inconsistency of Becky.

26          THE COURT:  Right.  She said she didn't remember,

27  or there was no mention of a bottle during her testimony,

28  correct.  But we're talking about --

1          MR. MADDEN:  She doesn't recall the mentioning of a

2   bottle.  She didn't say there wasn't a bottle.  How could she

3   say that?  Because in the handwritten statement, there was a

4   bottle -- excuse me -- in the type -- in her report there was

5   a bottle.

6          THE COURT:  Wait.  The principal said that --

7          MR. MADDEN:  Yes.

8          THE COURT:  -- not Becky.  Becky never said there

9   was a bottle.

10          MR. MADDEN:  I understand.  Becky didn't say it was

11   a bottle, and that statement itself is inconsistent with

12   Becky's statement and comes in as a prior inconsistent

13   statement concerning Becky because the principal obviously

14   got that information from Becky.

15          THE COURT:  Okay.  Ms. Filo.

16          MS. FILO:  Your Honor, I mean, I can't agree with

17   the Court any more.  First and foremost, past recollection

18   recorded is to be used in the following circumstances:

19          The witness has no memory of the event, and in

20   order to -- and there is nothing that has been or could be

21   used to refresh that witness's recollection.  And at that

22   point, a document created at or near the time of the event

23   can be substituted.  I mean, it is in fact their memory.

24   We've had people -- we've had Ms. Vijayendran testify, and

25   she talked about all of those things.  In fact, her memory

26   was refreshed on almost all of these topics.

27          My concern is exactly what the Court has described.

28   I mean, putting aside the quadruple levels of hearsay, we're

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1317

1   now into 1360 statement.  Becky is not the declarant of the

2   document itself, and it is an inconsistent statement of a

3   hearsay statement, not being offered by the declarant, which,

4   I mean, I think that's enough to be problematic.  I think the

5   Court is exactly right, that this document was created at the

6   request of the Human Resources Department after they process

7   in their heads that this is going to be a huge problem.

8            Ms. Vijayendran herself not only faced criminal

9   liability, but was convicted for her failure to act.  The

10  school district is being sued by at least three of these

11  victims.  I don't know -- at least three of them.  It is

12  unconceivable to me that everybody and their mother isn't

13  trying to run for cover in the creation of a document that

14  tries to talk about what they did three months earlier.

15           So, I mean, it's -- this is a document that was

16  created in anticipation of litigation, and there is just

17  no -- there is no other reason for the document to be

18  created.  The document is created at the request of the Human

19  Resources Department:  Please justify what you did because

20  we're going to get sued.  You're going to get prosecuted.

21  That's why the document is created.  In and of itself it

22  lacks reliability, so --

23           MR. MADDEN:  Your Honor, that is speculation of the

24  most -- of the tallest order.  There is no evidence of that.

25           THE COURT:  Of what?

26           MR. MADDEN:  Of what Ms. Filo just said in terms of

27  anticipation of investigation.  There is no evidence of that

28  here.

1          MS. FILO:  I mean, would you have to believe that

2     the school district is -- I mean, of course they know that

3     they are going to get sued.  I mean, she --

4          MR. MADDEN:  Well --

5          MS. FILO:  I mean, these are large public entities

6     that constantly deal with liability.  I mean, her entire --

7     the entire document is:  I made this phone call.  I then went

8     and did this.  I did that.  I mean, there is no reason for

9     any of that other than to justify her failure to report.

10          THE COURT:  Yes.

11          MR. MADDEN:  With respect to -- we're getting lost

12    here in the -- within the forest.  It's like -- what I'm

13    concerned about here is the water bottle statement.  Does the

14    Court for a moment think that she's making that up to protect

15    herself?

16          THE COURT:  No.  I'm not saying she's making it up.

17    Okay.  What I'm concerned with is that we have the quotes in

18    the People's exhibit about this.  I mean, she talks about,

19    quote -- on the second page -- I believe third page, quote,

20    First he put the gooey something in my mouth, then he wiggled

21    my body back and forth and my head.  Becky felt some salty

22    water in her mouth and then it dripped out into her hand and

23    her jacket.  She wiped her hands on her jeans.  Mr. Chandler

24    removed the blindfold and blanket.  Becky did not see where

25    he put them.

26          My concern with the written statement, when we talk

27    about the bottle and based on her trial testimony is, did

28    this information come from Becky or is it a combination of

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1319

1    Becky and Mr. Chandler and her investigation?  It's unclear

2    to me, which raises my concern about the accuracy, as well

3    as -- the reality is that when she wrote this written

4    statement three months after she interviewed Becky, there was

5    a lot of attention being given to this incident at the

6    school.  I mean, we can't ignore that fact.  I mean, that was

7    part of I believe the reasons why she was directed to give an

8    accounting of her conduct.  This is her conduct and her

9    explanations of what she did and why she did it.

10            MR. MADDEN:  That doesn't take away from the fact

11   that she's talking about an -- in this part of her report

12   only what Becky told her.

13            THE COURT:  Okay.

14            MR. MADDEN:  This exhibit as redacted has nothing

15   to do with those things.  It has to do with the recitation of

16   the facts, the bottle itself, and I asked her on cross -- it

17   was on page 208 of the preliminary examination, she

18   testified --

19            MS. FILO:  She didn't testify at the preliminary

20   hearing.

21            MR. MADDEN:  I'm sorry.

22            MS. FILO:  She didn't testify at the preliminary

23   examination.

24            MR. MADDEN:  I apologize, at her trial.  She

25   testified on page 208 of her trial testimony, starting at

26   line 5:

27            Answer:  I think, if I remember correctly, it was

28   to describe the item delivered.  She described the bottle as

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1320

1    gooey.

2         All right.  And so we have her testimony under oath

3    at trial.  We have her testimony, her report -- there is no

4    reason to be suspicious of the entry of the word "bottle."

5    That would not -- when that was -- I might add, this was not

6    part of the trial -- of her trial.  All right.  There is

7    absolutely no reason to be suspicious of her use of the word

8    "bottle."  What advantage would she have had by that?  I

9    mean, it would not have changed anything.  All right.

10        So I'm concerned -- I'm concerned about the Court's

11   categorizing her testimony as evasive.  Like everybody else

12   in this case, being straightforward, over a period of time

13   your memory is not that accurate.  She says:  I have a good

14   memory, but there may be things in that report that I don't

15   remember, and that has to do with the bottle.

16        THE COURT:  When I said evasive, I meant that even

17   when she testified here, she said -- when asked about is this

18   complete and accurate, she would continually say:  Well, it

19   was to the best of my memory at the time.  She kept referring

20   to when she wrote it.

21        MR. MADDEN:  Correct.

22        THE COURT:  But as I already said before, what

23   troubled me was her testimony when she says, and I quoted

24   this before:  I wouldn't say that I even then believe that I

25   had the entire conversation documented in this report because

26   these were things that I wasn't -- that weren't as clear in

27   my mind as time had passed, but I did my best to create a

28   report that was based on my recollection and details in it

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1321

1    that I remembered.

2            So she was saying at the time she wrote the report

3    even then she didn't know because time had passed.  She tried

4    her best.

5            MR. MADDEN:  Well, nobody could possibly write a

6    report anytime -- no report could possibly detail a hundred

7    percent of a conversation.  I don't care how recent or close

8    to the conversation it was.  You could make that statement

9    about all written statements.

10            THE COURT:  Well, when she's -- well, I have to say

11    that the statement that she wrote out as she's interviewing

12    Becky contemporaneously is more accurate and specific as to

13    her records because she's putting quotes.

14            MR. MADDEN:  Not as to the bottle.

15            THE COURT:  Okay.

16            MS. FILO:  Maybe Becky didn't ever say bottle.  I

17    guess that's the problem.  She doesn't write it down in the

18    context of that conversation.  She doesn't write it down at

19    the time that she's making the notes contemporaneous with the

20    discussion.

21            MR. MADDEN:  Well, obviously these are notes.  They

22    are in quotes.  She's writing down quotes.  She's not writing

23    down all the quotes, just the ones as they unfolded were

24    memorable to her.  Later, she obviously thought about this,

25    and it's reasonable to assume she would have looked at that

26    as a reference point to refresh her recollection.

27            THE COURT:  The written notes?

28            MR. MADDEN:  Yeah, the handwritten notes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1322

1      THE COURT:  We can't make that assumption.

2      MR. MADDEN:  What I would like to do is, I think we

3  need a more clearer record, I think we need Ms. Vijayendran

4  to return to court.

5      MS. FILO:  Your Honor, my -- I would just say we

6  did ask her very specifically.  Ms. Vijayendran was on

7  maternity leave at the time she created the typed notes.  She

8  did testify that she wrote the typed notes from home.  Det.

9  Pierce is here.  He personally obtained handwritten notes

10  from her office.  She was still on maternity leave and not --

11  the typed notes were created at home.  So she -- I believe

12  she testified that she didn't think she had those notes, but

13  I mean, they were at the school.  They were recovered from

14  the school.  She created the typed notes at home while on

15  maternity leave.

16      MR. MADDEN:  Whether or not she had them in her

17  typewritten notes, she specifically stated that there was a

18  bottle that put gooey liquid into her mouth and it was the

19  bottle that was gooey.  That is very, very specific and

20  obviously critical to the defense.  It's the defense's [sic]

21  position what was put in her mouth was a male erect penis.

22      MS. FILO:  I assume that's the prosecution's

23  position, not the defense's.

24      THE COURT:  The redacted copy that Mr. Madden gave

25  me, I'm going to mark that as C-1 so we have it as part of

26  the record.  It's C-1.

27      (Whereupon, Defense Exhibit C-1 was marked for

28  identification.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1323

1          MR. MADDEN:  Your Honor, if I could make one

2    additional legal point?

3          THE COURT:  Sure.  Yes.

4          MR. MADDEN:  One moment, please.  I also would like

5    to submit to the Court that this also comes under 771 of the

6    Evidence Code, production of writing to refresh your memory.

7    And the Court -- you did mention the *Hess* case; correct, Your

8    Honor?

9          THE COURT:  Um-hum.

10          MR. MADDEN:  All right.  A leading case on 771 is

11    *People v. Hess*, 1970, 10 Cal.App.3d 1071.  There, a witness

12    while testifying was allowed to refresh her memory with a

13    written memorandum she prepared a few days before trial, but

14    more than a year after some of the events referred to in the

15    memorandum.

16          The defendant contended that it was error to permit

17    the use of the notes because Section 1237 requires that the

18    writing be made at the time when the fact recorded in the

19    writing actually occurred or was fresh in the witness's

20    memory.  Court of Appeal rejected the contention because the

21    requirements of 1237 does not apply to refresh a witness's

22    memory.

23          So it's admissible, in my opinion, under all of

24    those theories for the reasons that I stated and for the case

25    law that I cited, and I can't be more emphatic about how

26    unfair it is to have handwritten notes talking about

27    something in my mouth and at the same time rejecting a typed

28    report clarifying what that something was, and that something

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1324

1    was a bottle.  And that's essentially what I want it for and

2    obviously it's critical to this case.

3            THE COURT:  Any final comments, Ms. Filo?

4            MS. FILO:  Submitted, Your Honor.

5            THE COURT:  Based on everything the Court has heard

6    at this particular hearing, Ms. Vijayendran's testimony and

7    prior comments about this issue before --

8            MR. MADDEN:  It's Defense C-1.

9            THE COURT:  Yes.  Defense C-1, the defense's

10   request to have that read into the record or introduced into

11   evidence as an exhibit is denied for the reasons I've

12   indicated.  A number of reasons the Court raised about the

13   accuracy and the reliability, and obviously this is over Mr.

14   Madden's objection.

15           MR. MADDEN:  Would the Court allow the defense to

16   recall Ms. Vijayendran to clarify these issues?

17           THE COURT:  When you mentioned that earlier, I

18   thought about that, and I think that we have exhausted this

19   issue.  That request is denied as well.

20           MR. MADDEN:  Well, I don't think we exhausted the

21   actual basis for these notes.  I don't think we did it at the

22   hearing.  Counsel for the People has speculated as to a lot

23   of things that could be clarified by -- in a 402 hearing.  I

24   would ask an opportunity to bring Ms. Vijayendran in to

25   clarify the factual issues concerning this report, and I

26   think that it may indeed change the Court's mind.

27           MS. FILO:  Your Honor, may I be heard on that

28   issue?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1325

1    THE COURT: Um-hum.

2    MS. FILO: My concern with doing that is, I can't

3  imagine that a witness is ever going to acknowledge that a

4  document was created for the specific purposes of kind of

5  covering themselves in the event of future litigation. I'm

6  fully -- yes, I believe that Ms. Vijayendran herself had and

7  ultimately did suffer criminal consequences as a result of

8  her inaction. But this is a much bigger issue. I mean, this

9  involves now the Human Resources Department. Do they know

10  they are going to get sued? Are they trying to get her to

11  recreate events? I mean, it's just -- this is a 352 issue

12  that -- I mean, it could be -- it could take days to resolve.

13    I just don't -- I mean, she has now -- I mean,

14  she's been prosecuted. She testified at her own trial. She

15  has testified here. I mean, these issues have been explored

16  at nauseam.

17    THE COURT: Okay. Actually, what I was doing is I

18  was just reflecting on her testimony and going through it in

19  my own head and I have given her testimony a lot of thought

20  and consideration. And based on what I've heard to this

21  point, the request for a 402 hearing will be denied. I don't

22  do this lightly. I know this is important to the defense,

23  but I think that that is the correct ruling.

24    We'll be in recess for just a restroom break, in

25  case anyone wants to use the restroom, then we'll call the

26  jury up.

27    (Whereupon, a brief recess was taken.)

28    THE COURT: Thank you. The record will reflect all

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1326

1    members of the jury are present, both counsel are present,

2    Mr. Chandler is present.

3              Mr. Madden, your next witness.

4              MR. MADDEN:  Yes.  My next witness is Diego, Your

5    Honor.  Thank you.  And I would like the record to reflect to

6    his mother is present in the first row behind my counsel

7    table, along with a Spanish interpreter to aid in the

8    interpretation.

9              THE COURT:  Okay.  Thank you very much.

10                        DIEGO DOE,

11             Being called as a witness on behalf of the

12   Defendant, having been first duly sworn, was examined and

13   testified as follows:

14             MR. MADDEN:  Diego, please do me a favor, scoot the

15   chair in as far as you can, and then try, if you can, to sit

16   up straight.  Could you do that?  I know it's probably -- the

17   chair is a little too big for you.  All right?  Are you okay

18   there?  Now I'm going to move this microphone over.  I'm

19   going to put it down so it's at the level of your mouth.

20   Okay?  I'm going to leave it here because I think that's --

21   we'll be able to hear you the best if you speak into this

22   microphone.  All right?

23             THE WITNESS:  (Shakes head up and down.)

24             MR. MADDEN:  Now?

25             THE WITNESS:  Yes.

26             MR. MADDEN:  Thank you.  So I'm going to come back

27   here and ask you some questions.  I know you're a little

28   nervous; right?  That's why you're pulling on your shirt.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1327

1   It's okay to be nervous.  All right?  It's not a problem.

2   All right.  So --

3           THE COURT:  Hold on, Mr. Madden.

4           Would you state your name?

5           THE WITNESS:  Diego.

6           THE COURT:  And would you spell your first name?

7           THE WITNESS:  D-i-e-g-o.

8           THE COURT:  Very good.

9           Direct, Mr. Madden.

10          MR. MADDEN:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12  BY MR. MADDEN:

13  Q.   So, Diego, I'm going to go over some of the rules.

14  Okay?

15  A.   (Shakes head up and down.)

16  Q.   The first rule is, I want you always -- if you mean yes

17  to use the word yes?

18  A.   Okay.

19  Q.   In other words, if I ask you a question and the answer

20  is yes, I don't want you to answer by shaking your head up

21  and down.

22  A.   Okay.

23  Q.   All right.  The reason that I want you to do that is the

24  lady in front of you is a court reporter and she has to write

25  down all of the words that I'm saying and that you are

26  saying, and it doesn't work if you are shaking your head for

27  yes or shaking your head for no.  You have to either say yes

28  or no.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1328

1    A.    Okay.

2    Q.    So sometimes in a courtroom, especially when we've never

3    been there before, we forget the rules.  So if you start to

4    shake your head or anything, I'll probably say something

5    like:  Do you mean yes or do you mean no.  Okay?

6    A.    (Shakes head up and down.)

7    Q.    So don't worry about it.  You just do your best to use

8    words.  Okay?

9    A.    Okay.

10   Q.    All right.  Also, if I ask you a question and you don't

11   understand my question, tell me you don't understand it and

12   I'll use other words to make sure that you do understand the

13   question.  Okay?

14   A.    Okay.

15   Q.    All right.

16         Diego, where do you go to school?

17   A.    O.B. Whaley School.

18   Q.    Did you just finish -- what grade did you just finish?

19   A.    Third.

20   Q.    So you are going into the fourth grade?

21   A.    Yes.

22   Q.    All right.  And was Mr. Chandler your teacher for the

23   second grade?

24   A.    Yes.

25   Q.    Do you remember what classroom number you were in when

26   you were in Mr. Chandler's class?

27   A.    Yes.

28   Q.    What number was that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1329

```
 1   A.    18.
 2   Q.    Good.  Was that a combination class of second-graders
 3   and third-graders?
 4   A.    Yes.
 5   Q.    All right.  So that would mean that you sat on the side
 6   of the class where the computers and where the sink was;
 7   right?
 8   A.    No.
 9   Q.    Did you --
10   A.    I mean, yes.
11   Q.    Yes.  All of the second-graders sat on that side of the
12   class; right?
13   A.    Yes.
14   Q.    The third-graders sat on the other side?
15   A.    Yes.
16   Q.    Okay.  Now, during that year, did you remember playing a
17   game where you were blindfolded and tried to guess an object?
18   A.    Yes.
19   Q.    Okay.  And did you see your friends playing this game in
20   class?
21   A.    Yes.
22   Q.    Did you play it in class?
23   A.    Yes.
24   Q.    Did both boys and girls play the game?
25   A.    Yes.
26   Q.    Did everybody play the game?
27   A.    Yes.
28   Q.    All right.  Do you remember how many times you played
```

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1330

1    the game?

2    A.    Two times.

3    Q.    Okay.  You saw the other students play it also; right?

4    A.    Yes.

5    Q.    Okay.  Do you know if other classes played the game?

6    A.    No.

7    Q.    Do you remember any other classes playing the game?

8    A.    No.

9    Q.    Do you remember telling a police officer that

10   Ms. D'Arcy's class plays the game too?

11   A.    No.

12   Q.    Okay.  You don't remember that?

13   A.    (Shakes head side to side.)

14   Q.    Okay.  So the game that you're blindfolded, how did that

15   work?  How -- what were you blindfolded with?

16   A.    A book.

17   Q.    A book?

18   A.    (Shakes head up and down.)

19   Q.    Tell me how that worked.

20   A.    They put a book in my lap and I was trying to guess what

21   it was, but I didn't get it right.

22   Q.    Okay.  So maybe I asked a bad question.  Do you know

23   what a blindfold is?

24   A.    (Shakes head up and down.)

25   Q.    What does that -- I'm sorry.  You didn't answer yes or

26   no.

27   A.    Yes.

28   Q.    Okay.  What does a blindfold do?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1331

1   A.   Covers your eyes.

2   Q.   So you couldn't see; right?

3   A.   Yes.

4   Q.   Okay.  So when the book was in your lap, were your eyes

5   covered so you couldn't see?

6   A.   Yes.

7   Q.   What was covering your eyes, if you remember?

8   A.   A black strap.

9   Q.   A black strap.  Okay.

10          Were you sitting down when that happened?

11  A.   Yes.

12  Q.   Okay.  Now, you remember a book; right?

13  A.   Yes.

14  Q.   Do you remember -- did you feel this book with your

15  hands?

16  A.   Yes.

17  Q.   All right.  Did you feel any objects with your feet?

18  A.   No.

19  Q.   Okay.  Do you remember having any other objects in your

20  hands other than a book?

21  A.   No.

22  Q.   Do you remember telling a police officer that -- let me

23  ask a better question.  I'm going to start again.

24          How many objects do you remember touching yourself?

25  A.   Two.

26  Q.   What were the objects?

27  A.   A book and a pencil.

28  Q.   A pencil?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1332

1   A.   (Shakes head up and down.)

2   Q.   You're shaking your head.  Does that mean yes?

3   A.   Yes.

4   Q.   Okay.  Thank you.

5         Did the teacher use other objects with other

6   students?

7   A.   Yes.

8   Q.   He used lots of different objects; right?

9   A.   Yes.

10  Q.   All right.  Could you remember what some of those other

11  objects were?

12  A.   A pen, a notebook -- that's all I remember.

13  Q.   Okay.  Do you remember crayons or paper?

14  A.   Oh, yeah.  Crayons and papers, too.

15  Q.   Do you remember if the teacher had a taste game that you

16  played, where you taste something in your mouth?

17  A.   No.

18  Q.   Do you remember telling an officer that he used water --

19  A.   No.

20  Q.   -- to put in someone's mouth?  You don't remember that?

21  A.   No.

22  Q.   Okay.  Could you remember anything else about anything

23  that was put into anybody's mouth?

24  A.   No.

25  Q.   So you couldn't remember seeing anything go into

26  anybody's mouth in your class?

27  A.   No.

28  Q.   You don't recall playing the taste game yourself?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1333

1    A.    No.

2    Q.    Okay.  All right.

3              MR. MADDEN:  I have no further questions.

4              THE COURT:  Cross-examination.

5                        CROSS-EXAMINATION

6    BY MS. FILO:

7    Q.    Hi, Diego.

8    A.    Hi.

9    Q.    I just have one question for you.  So you saw the game

10   played with all of the other class people there, all your

11   classmates?

12   A.    Yes.

13   Q.    Did you ever have to stay back at recess to play the

14   game with Mr. Chandler all by yourself?

15   A.    No.

16   Q.    No?  Okay.  Thank you, Diego.

17             THE COURT:  Recross -- I mean, redirect?

18             MR. MADDEN:  Nothing, Your Honor.

19             THE COURT:  Okay.  Thank you, Diego.  You could

20   step down, go back with your mother, and you are free to

21   leave.  Thank you very much.

22             MR. MADDEN:  Your Honor, I have a couple of

23   witnesses, at least one of whom was lost.  I hope they are

24   found.  If I may be excused?  It may take me a couple of

25   minutes.

26             THE COURT:  Yes.

27                        CHRIS DOE,

28             Being called as a witness on behalf of the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1334

1    Defendant, having been first duly sworn, was examined and

2    testified as follows:

3         MR. MADDEN:  So I'm going to put this microphone --

4    don't be scared by this.  We have to hear you.  Okay?  You

5    see your mom out there; right?

6         THE WITNESS:  (Shakes head up and down.)

7         MR. MADDEN:  Okay.  All right.

8         The record reflect that Chris' mother is here.

9    There is also a Spanish translator.  Although I don't think

10   it's necessary for purposes of my direct of this witness, it

11   may be necessary and we'll adjust, if that's okay with the

12   Court?

13        THE COURT:  That's fine.

14        Good morning.

15        THE WITNESS:  Good morning.

16        THE COURT:  What's your name?

17        THE WITNESS:  Chris.

18        THE COURT:  Could you spell it for me, Chris?

19        THE WITNESS:  C-h-r-i-s.

20        THE COURT:  Okay.  Lawyers, as you know, are going

21   to ask you some questions.  Nothing to be nervous about.

22   This shouldn't take very long.  Okay?

23        THE WITNESS:  (Shakes head up and down.)

24        THE COURT:  Mr. Madden.

25        MR. MADDEN:  Thank you.

26                    DIRECT EXAMINATION

27   BY MR. MADDEN:

28   Q.  All right.  Chris, my name is Mr. Madden.  We just met

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1335

1  in the hallway; right?

2  A.    Yes.

3  Q.    All right.  So I want to go over some rules with you.

4  There aren't very many rules, but here's what they are.

5  First, I want to make sure when you answer a question, and if

6  the answer is yes or the answer is no, I want you to tell me

7  the word yes or the word no instead of shaking your head up

8  and down if it's yes, and instead of shaking your head left

9  to right if it's no.  Do you understand what I mean?

10  A.    Yes.

11  Q.    Okay.  So even though we say these are rules, sometimes

12  when we start to ask witnesses questions, they kind of forget

13  the rules and they might not use words.  And so if you forget

14  to use the word yes or no, I'll ask you:  Do you mean yes or

15  do you mean no.  Okay?

16  A.    Yes.

17  Q.    Okay.  And then finally, I want you to make sure that

18  you understand my question before you give me an answer.

19  Okay?

20  A.    Yes.

21  Q.    If I ask a question that you do not understand the

22  answer, just tell me that you don't understand and I'll use

23  other words so that you will understand.  Okay?

24  A.    Yes.

25  Q.    All right.  So just do your best.  Okay?

26  A.    Yes.

27  Q.    All right.  Chris, what grade are you going into?

28  A.    Fourth.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1336

1  Q.   So you just finished the third grade?

2  A.   Yes.

3  Q.   All right.  You go to O.B. Whaley?

4  A.   Yes.

5  Q.   All right.  You are doing a good job.

6        Do you remember who your teacher was for the second

7  grade at O.B. Whaley?

8  A.   Ms. Lippell (phonetic).

9  Q.   Do you ever have Mr. Chandler as your teacher?

10  A.   Yes.

11  Q.   Was that at O.B. Whaley?

12  A.   Yes.

13  Q.   Do you remember what grade you were in then?

14  A.   No.

15  Q.   It's okay.  When you were in Mr. Chandler's class, were

16  there second-graders and third-graders there?

17  A.   Yes.

18  Q.   So it was a combination class?  Had you heard that word

19  before?

20  A.   Yes.

21  Q.   And that's what it was, a combination class?

22  A.   Yes.

23  Q.   You think you might have been a second-grader then?

24  A.   Yes.

25  Q.   Okay.  So as a second-grader, you would have sat with

26  the students along the side of the classroom that had the

27  sink and the computers?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1337

1  Q.   Because that's the side the second-graders sat on;
2  right?
3  A.   Yes.
4  Q.   Okay.  Now, do you remember when you were in the second
5  grade with Mr. Chandler playing a game where you tried to
6  guess what something is that you are holding?
7  A.   Yes.
8  Q.   And did you play that with Mr. Chandler?
9  A.   Yes.
10  Q.   Did the whole class play that?
11  A.   Yes.
12  Q.   Boys and girls?
13  A.   Yes.
14  Q.   Do you remember how many times you saw that game played
15  in the class?
16  A.   No.
17  Q.   Was it more than one time?
18  A.   Yes.
19  Q.   Okay.  And was a blindfold used in that game?
20  A.   Yes.
21  Q.   Okay.  Do you know what a blindfold is?
22  A.   Yes.
23  Q.   Tell me what a blindfold is.
24  A.   It's when you wrap it around right here and you can't
25  see anything.
26  Q.   So you put your hands behind your head like it's --
27  something that goes over your eyes and ties in the back?
28  A.   Um-hum.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1338

1   Q.   Okay.  Now, do you remember something like that being

2   used in the game?

3   A.   No.

4   Q.   You don't remember a blindfold?

5   A.   No.

6   Q.   Do you remember a blanket being used to cover your eyes?

7   A.   No.

8   Q.   But something was used to cover your eyes; right?

9   A.   Yes, something, but I forgot.

10   Q.   Okay.  Fair enough.

11        So there were two different kinds of games, right,

12   where you were trying to guess things?

13   A.   Yes.

14   Q.   One is when you were trying to guess what something felt

15   like; right?

16   A.   Yes.

17   Q.   And the other game was that you were trying to guess

18   what something tasted like?

19   A.   Yes.

20   Q.   All right.  So let's talk about the one where you were

21   trying to guess what something felt like.  We'll call that

22   the feel game.  Okay?

23   A.   Yes.

24   Q.   Okay.  You played this game yourself?

25   A.   No.

26   Q.   You did the feel game or you just saw the feel game

27   played?

28   A.   I don't know.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1339

1    Q.    Okay.  You don't know if you actually tried to feel

2    objects on you, but some students did?

3    A.    Yes.

4    Q.    Okay.  Where were the students?  Were they standing or

5    sitting or laying down when they felt the objects?

6    A.    Standing.

7    Q.    Were any students ever laying down when they felt the

8    objects?

9    A.    Some students.

10   Q.    Some students?

11   A.    Yeah.

12   Q.    So you remember some students actually laying down?

13   A.    Yes.

14   Q.    And they were blindfolded?

15   A.    Yes.

16   Q.    Okay.  So while they were blindfolded, whether it was

17   standing or laying down, do you remember any of the objects

18   or things that they had to feel to guess?  I'm sorry.  It

19   looks like you're not sure?

20   A.    (Shakes head up and down.)

21   Q.    Is that correct?

22   A.    (Shakes head up and down.)

23   Q.    Yes?

24   A.    Yes.

25   Q.    Okay.  Do you remember telling a police officer that

26   some of the objects that you saw during the feel game

27   included small paper, paper clips, mini post and pencils?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1340

1 Q. You remember telling a police officer that?

2 A. Yes.

3 Q. Okay. Does that help you remember about the things that

4 you saw people trying to guess?

5 A. Yes.

6 Q. Okay. And when they were laying down trying to feel

7 objects, the objects were put against their feet?

8 A. No.

9 Q. What were they -- what did the objects touch? What part

10 of the student's body?

11 A. The arms.

12 Q. Their arms. Okay.

13 So you remember the objects touching their arms,

14 and who was putting the objects against their arms?

15 A. I'm not sure.

16 Q. Would that have been Mr. Chandler?

17 A. Oh, yes.

18 Q. Okay. And do you remember telling a police officer that

19 the children feel it on their feet?

20 A. No.

21 Q. Okay. You don't remember that?

22 A. No.

23 Q. You don't remember telling a police officer that?

24 A. No.

25 Q. That doesn't help you remember if you saw that or not?

26 I think I confused you with a bad question. You don't

27 remember telling the police officer and you don't remember if

28 that happened; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1341

1    A.    Yes.

2    Q.    Yes.   Thank you.   So let's talk about the taste game.

3    Okay?   That's the second one?

4    A.    Yes.

5    Q.    All right.   And do you remember the taste game?

6    A.    Yes.

7    Q.    And was that kind of the same as the feel game?

8    A.    Yes.

9    Q.    But instead of feeling an object with the part of your

10   body, some kind of candy or food or something was put in a

11   student's mouth and they had to try to guess what the food or

12   candy was; right?

13   A.    Yes.

14   Q.    Okay.   And do you remember the kinds of things that you

15   saw put in students' mouths?   What kind of snack or candy or

16   food or anything?

17   A.    I don't remember.

18   Q.    Do you remember telling a police officer chips?

19   A.    Yes.

20   Q.    And does that help you remember that maybe you saw some

21   chips being placed in students' mouths?

22   A.    Yes.

23   Q.    Okay.   And Mr. Chandler also put during the taste game

24   water into some students' mouths; right?

25   A.    Yes.

26   Q.    And how did he put the water in their mouth?

27   A.    I don't know.

28   Q.    Well, I mean, was it out of a cup or a bottle or --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1342

1    A.    I think a cup.

2    Q.    So the water that went into the students' mouths came

3    out of a cup?

4    A.    Um-hum.

5    Q.    Okay.  And were there different flavors of waters that

6    the students tasted?

7    A.    No.

8    Q.    Okay.  But it was in a cup?  Do you remember the color

9    of the cup?

10   A.    No.

11   Q.    Okay.

12         MR. MADDEN:  I have no further questions, Your

13   Honor.

14         THE COURT:  Cross-examination.

15         MS. FILO:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17   BY MS. FILO:

18   Q.    Hi, Chris.

19   A.    Hi.

20   Q.    So you played the game in the classroom with all of the

21   other kids there; right?

22   A.    Yes.

23   Q.    That's when you saw the game happening too?

24   A.    Yes.

25   Q.    Yeah?  Do you remember you said that the game was played

26   more than one time; is that right?

27   A.    Yes.

28   Q.    Did the game happen more than one time on the same day

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1343

1  or were they different days?

2  A.  Same day.

3  Q.  Okay.  So just played -- the different kids got to play

4  it, but all on the same day?

5  A.  Yes.

6  Q.  Okay.  So this is a harder question.  Do you remember

7  what time of year it was that the game was played?

8  A.  No.

9  Q.  No?  Okay.

10       And, Chris, you never had to stay in at recess time

11  and play the game all by yourself, did you?

12  A.  No.

13  Q.  No?  Okay.  Thank you.

14       MS. FILO:  Nothing further.

15       THE COURT:  Redirect?

16       MR. MADDEN:  Nothing, Your Honor.

17       THE COURT:  Okay.  Thank you, Chris.  You could

18  step down.  You could go back with your mother and you are

19  free to leave.

20       MR. MADDEN:  I have one more, Your Honor.

21       THE COURT:  Okay.  Thank you.

22       MR. MADDEN:  Could we approach the bench, Your

23  Honor?

24       THE COURT:  Yes.

25       (Whereupon, there was a discussion at the bench.)

26       THE COURT:  Would counsel come back again.

27       (Whereupon, there was a discussion at the bench.)

28       THE COURT:  Sorry for the delay, ladies and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1344

1  gentlemen.  I have been talking with the lawyers, trying to

2  get a sense of how the case is proceeding.  I'm very

3  comfortable that Mr. Madden is making every effort to have

4  his witnesses he wishes to call here and arranged.  A number

5  of issues have come up with certain witnesses that have

6  caused many delays.

7       In any event, the point I'm trying to make, we're

8  going to be taking a recess shortly until 1:30.  It's my

9  sense that we'll have witnesses here for the entire

10  afternoon, and I wanted to let you know that based on some

11  discussions I've had with the lawyers and my sincere belief,

12  sometime next week this case is going to be given to you for

13  your deliberations.  I expect sometime next week the evidence

14  will be concluded.  You will hear instructions of law and you

15  will hear closing remarks sometime next week.  Tomorrow at

16  the end of the day, before we break for the weekend, I'll try

17  to give you a better assessment of when next week, but it's

18  going to happen sometime next week.

19       I'm telling you this because, you know, at least

20  this week we've have many delays.  We've had some times where

21  we're not in session and I know that could be frustrating for

22  you.  I wanted to give you an update that the lawyers, as far

23  as I'm concerned, are making every effort to get the

24  witnesses here.  Thank you for your patience.  I hope you

25  benefit from the long lunch hour and we'll see you at 1:30.

26       The jury has left the courtroom.  I don't think

27  there is anything for us to address on the record other than

28  we'll see you at 1:30.  I will order both attorneys and Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1345

1    Chandler here at 1:30 and we'll continue with the trial.

2              MR. MADDEN:    Thank you, Your Honor.

3              (Whereupon, the Court took the noon recess.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1346

1          AFTERNOON PROCEEDINGS

2          THE COURT:  Thank you, ladies and gentlemen.

3    Record will reflect all members of the jury are present, both

4    counsel are present.

5          And, Mr. Madden, ready to call your next witness?

6          MR. MADDEN:  Yes, Your Honor.  May I be excused?

7          THE COURT:  Yes.  Thank you.

8                    MARY DOE,

9          Being called as a witness on behalf of the

10   Defendant, having been first duly sworn, was examined and

11   testified as follows:

12         MR. MADDEN:  Watch your step.  If you would sit in

13   this chair.  Scoot it up a little bit so it's a little closer

14   to the desk here.  Perfect.  If you could sit up straight,

15   that will be perfect.  Move the microphone a little higher so

16   it's the same level as your mouth.  If you could stay in

17   about this position.  Could you see your mom from here?

18         THE WITNESS:  Yes.

19         MR. MADDEN:  Your Honor, may the record reflect the

20   witness's mother is in the front room behind the railing

21   assisted by a Spanish speaking interpreter.

22         THE COURT:  Great.  Thank you.

23         Good afternoon.

24         THE WITNESS:  Good afternoon.

25         THE COURT:  What is your name?

26         THE WITNESS:  Mary.

27         THE COURT:  Mary?

28         THE WITNESS:  Um-hum.

1        THE COURT:  Could you spell your name, Mary?

2        THE WITNESS:  M-a-r-y.

3        THE COURT:  Okay.  Your voice is kind of soft, so

4  when the lawyers ask you questions, I need you to try to

5  speak a little louder.  Talk into the microphone so we could

6  hear you.  So Mr. Madden is going to go over a few little

7  rules with you before you start testifying.  Okay?

8        THE WITNESS:  Okay.

9        THE COURT:  Thank you.

10                  DIRECT EXAMINATION

11  BY MR. MADDEN:

12  Q.   All right, Mary, I moved the microphone because I wanted

13  to be aligned between you and me.  Okay?

14  A.   Okay.

15  Q.   Then I think we'll pick up your voice a little better.

16  That's better for me.

17        Okay.  Now, let me review some basic rules with

18  you.  I think you know what they are, but I want to make sure

19  that you understand.  When I ask you questions and if the

20  answer is yes, I would like you to answer out loud yes.

21  Okay?

22  A.   Okay.

23  Q.   I want you to do that instead of shaking your head up

24  and down when you mean yes.  Okay?

25  A.   Okay.

26  Q.   And if I ask you a question and the answer is no, I want

27  you to say no rather than shake your head to the left and to

28  the right when you mean no.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1348

1  A.   Okay.

2  Q.   The reason that I'm asking you to do that is the lady in

3  front of you, the court reporter, has to take everything we

4  say and she could only write down words that she hears.

5  Okay?

6  A.   Okay.

7  Q.   So sometimes even though we know what the rules are, we

8  may forget them.  You may shake your head up and down, left

9  or right.  If you do that, I will stop you and I'll say:  Do

10  you mean yes or do you mean no.  Okay?

11  A.   Okay.

12  Q.   All right.  You don't have to be perfect.  Nobody is

13  perfect.  I'm sure you're nervous; right?

14  A.   Yes.

15  Q.   All right.  It won't be so hard.  You are going to just

16  answer questions as best you can.  Okay?

17  A.   Okay.

18  Q.   All right.  Mary, what grade are you going into?

19  A.   Fifth.

20  Q.   Okay.  Do you go to O.B. Whaley?

21  A.   Yes.

22  Q.   When did you start going to O.B. Whaley?  What grade

23  were you in?

24  A.   Um, kindergarten.

25  Q.   Good.  So you've been there all through grammar school;

26  right?

27  A.   Yes.

28  Q.   All right.  One year was Mr. Chandler your teacher?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1349

1    A.    Yes.

2    Q.    Do you remember what grade you were in the year that Mr.

3    Chandler was your teacher?

4    A.    Third grade.

5    Q.    Third grade.  Okay.

6          Do you remember what the classroom number was for

7    the room that was Mr. Chandler's when you were in the third

8    grade?

9    A.    No.

10   Q.    Okay.  That year, there were second-graders and

11   third-graders in Mr. Chandler's class; right?

12   A.    Yes.

13   Q.    So if you were in the third grade, I'll bet you sat over

14   on the side of the classroom by the U-shaped or C-shaped

15   table; right?

16   A.    Yes.

17   Q.    And that's the side of the classroom that the

18   third-graders sat on; right?

19   A.    Yes.

20   Q.    Third-graders sat on the right side of the room when the

21   second-graders sat on the left; right?

22   A.    Yes.

23   Q.    Okay.  Now, the year that you were in Mr. Chandler's

24   class, do you remember playing a game in the classroom that

25   involved being blindfolded and trying to guess what an object

26   was?

27   A.    Yes.

28   Q.    Okay.  Your answer was yes?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1350

1   A.   Yes.

2   Q.   Okay.  I'm asking you to speak up a little louder

3   because your voice is soft.  That's okay.

4   A.   Okay.

5   Q.   All right.  So did you watch other students play this

6   game?

7   A.   Yes.

8   Q.   Did you also play the game yourself?

9   A.   I just told the kid where to go and do other stuff.

10  Q.   You told the kid where to go and do other stuff?

11  A.   Yeah, like, to go straight or right or left.

12  Q.   That sounded like it was kind of a guiding game?

13  A.   Yes.

14  Q.   Is that what it was?

15  A.   Yes.

16  Q.   Where the student that you were guiding would be

17  blindfolded?

18  A.   Yes.

19  Q.   And you would tell that student whether to go straight

20  or left or right?

21  A.   Yes.

22  Q.   That student had to kind of trust you; right?

23  A.   Yes.

24  Q.   Okay.  So you remember doing that?

25  A.   Yes.

26  Q.   You remember who the other student was?

27  A.   No.

28  Q.   Okay.  So do you remember other parts of that game?  For

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1351

1  example, a part of the blindfold game where students were

2  blindfolded and then they had different types of food or

3  snacks or candy put in their mouth and had to guess what it

4  was?

5  A.   Yes.

6  Q.   All right.  Did you remember another form of that game

7  where students were blindfolded and they had to feel certain

8  objects that they couldn't see on either their hands or their

9  feet and guess what those objects were?

10  A.   Yes.

11        MS. FILO:  Objection, Your Honor.  Compound.

12        THE COURT:  Sustained.  I'll strike the answer.  If

13  you could break it down for her.

14        MR. MADDEN:  All right.

15  BY MR. MADDEN:

16  Q.   So I made that too big.  Let's break it down a little

17  bit.

18        Do you remember playing or seeing a feel game where

19  the students had to feel objects in their hands?

20  A.   Yes.

21  Q.   Do you remember a feel game where the students had to

22  feel an object against their foot or their leg?

23  A.   Yes.

24  Q.   Okay.  So let's start with the feel game.  Okay?

25  A.   Okay.

26  Q.   Do you remember how the students were blindfolded?

27  A.   Yes.

28  Q.   Could you describe the blindfold that you remember

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1352

1    seeing?

2    A.    It was like something for to go to sleep.

3    Q.    Okay.

4    A.    The blindfolded thing.

5    Q.    Like a sleep mask?

6    A.    Yes.

7    Q.    Okay.  All right.  And for the feel game, was it always

8    that sleep mask type of blindfold, or were there other types

9    of blindfolds?

10   A.    Other types of blindfolds.

11   Q.    Okay.  Hang on for a minute.  Your voice is slipping a

12   little bit.  I think that you said there are also -- were

13   other types of blindfolds?

14   A.    Yes.

15   Q.    What other types of blindfolds do you remember?

16   A.    Like, I forgot the word, but there was, like, this, um,

17   kind of like a blanket.

18   Q.    A blanket?

19   A.    Yeah.

20   Q.    Okay.  And that would cover a student's eyes?

21   A.    Yes.

22   Q.    Could you remember anything else that was used to cover

23   the student's eyes?

24   A.    No.

25   Q.    Okay.  So the students that were feeling these objects,

26   were they standing or seated or lying on the ground?

27   A.    Lying on the ground.

28   Q.    Okay.  Were they seated sometimes in a chair also?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1353

1   A.   I don't remember.

2   Q.   Okay.  Now, the objects that they were feeling in their

3   hands, do you remember what these objects were?

4   A.   I remember some.

5   Q.   Tell me what you could remember.

6   A.   Paper clips, water bottle --

7   Q.   Water bottle?

8   A.   Yeah, and a toilet paper.

9   Q.   Toilet paper.  Anything else?

10  A.   No.

11  Q.   Do you remember whether there were any pencils or

12  crayons or erasers?

13  A.   There was some pencils, crayon, and eraser.

14  Q.   Pencil, crayon, and eraser?

15  A.   Yes.

16  Q.   Okay.  So the students who would play, would some of

17  them feel the objects with their hands?  Let me ask it a

18  different way.

19          The students that were feeling the objects, were

20  these objects placed on their hands and their feet?

21  A.   Yes.

22  Q.   So they -- each student who was doing this game had some

23  unknown objects placed on or around their hands and on or

24  around their feet; right?

25  A.   Yes, and some under their head.

26  Q.   Some what?

27  A.   On their head.

28  Q.   Where on their head?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1354

1   A.   On right, like, on the hair.

2   Q.   Like on top of their head?

3   A.   Yeah.

4   Q.   Okay.  On their hair?

5   A.   Yes.

6   Q.   Okay.  Now, let's move over to the tasting game.  Okay?

7   A.   Okay.

8   Q.   By the tasting game, do you understand that to be where

9   a blindfolded student had something put in his or her mouth

10  and had to guess what it was?

11  A.   Yes.

12  Q.   Okay.  And do you remember what kinds of things you saw

13  being placed into this student's mouth?

14  A.   A -- chips.

15  Q.   Okay.  Anything else?

16  A.   Granola bars.

17  Q.   A whole granola bar or a piece of one?

18  A.   A piece of one.

19  Q.   Okay.  Anything else?

20  A.   Candy.

21  Q.   What kind of candy do you remember?

22  A.   I don't remember what kind.

23  Q.   Just candy?

24  A.   Yeah.

25  Q.   Okay.  Do you remember anybody stays behind -- I'm

26  sorry.  I will try that question again.

27        The things that you've been talking about, the feel

28  game with the hands and the feet and the taste game, did you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1355

1    actually do either of those games?

2    A.    No.

3    Q.    Or do you -- you just did the guiding game?

4    A.    Yeah.

5    Q.    Okay.  So then you just saw other kids do the feel game

6    and the taste game?

7    A.    Yes.

8    Q.    Okay.  Was everybody in the class --

9    A.    Yes.

10   Q.    -- participating?

11   A.    Yes.

12   Q.    Okay.

13           MR. MADDEN:  I have no further questions.

14           THE COURT:  Thank you.

15           Cross.

16           MS. FILO:  Thank you, Your Honor.

17                      CROSS-EXAMINATION

18   BY MS. FILO:

19   Q.    Hi, Mary.

20   A.    Hi.

21   Q.    So, Mary, you didn't -- you said you never played this

22   taste game; right?

23   A.    I don't remember.

24   Q.    Okay.  But you saw it played in the class?  You saw some

25   other kids play it?

26   A.    Yes.

27   Q.    Do you know who played it?

28   A.    I don't remember.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1356

1    Q.   Okay.  You said that you remembered chips and candy and

2    a granola bar; right?

3    A.   Yes.

4    Q.   Okay.  Mary, did you ever see Mr. Chandler use anything

5    or put anything in a student's mouth that was like the size

6    of a banana?

7    A.   No.

8    Q.   What?

9    A.   No.

10   Q.   Anything that he would push in and out of one of your

11   classmate's mouths?

12   A.   No.

13   Q.   No?  Anything where water came spurting out?

14   A.   No.

15   Q.   No?  Okay.  Thank you, Mary.

16        MS. FILO:  Nothing further.

17        THE COURT:  Okay.

18        MR. MADDEN:  Thank you.

19        THE COURT:  Okay.  Thank you, Mary.  You could step

20   down and go return to your mother and you are free to leave.

21        THE WITNESS:  Okay.

22        THE COURT:  Thank you.

23        MR. MADDEN:  I will get the next witness.  I

24   believe we have three more.

25        THE COURT:  Thank you.

26                 JORGE DOE,

27        Being called as a witness on behalf of the

28   Defendant, having been first duly sworn, was examined and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1357

1  testified as follows:

2  MR. MADDEN:  Okay.  Scoot your chair up close to

3  the table here.  Good.  Perfect.  Are you all right?

4  THE WITNESS:  Yes.

5  MR. MADDEN:  All right.

6  THE COURT:  Good afternoon.

7  THE WITNESS:  Good afternoon.

8  THE COURT:  What is your name?

9  THE WITNESS:  Jorge.

10  THE COURT:  How do you spell it?

11  THE WITNESS:  J-o-r-g-e.

12  THE COURT:  Thank you, Jorge.  Mr. Madden is going

13  to be asking you some questions.  He's going to explain to

14  you a few rules.  Okay?  And it's okay to be nervous.  Most

15  people are nervous when they come into the courtroom and take

16  that witness stand -- excuse me -- witness seat.  Okay?

17  THE WITNESS:  (Shakes head up and down.)

18  THE COURT:  Mr. Madden, when you are ready, direct.

19  MR. MADDEN:  One moment please, Your Honor.

20  Thank you.

21  DIRECT EXAMINATION

22  BY MR. MADDEN:

23  Q.   Jorge, again, my name is Mr. Madden.  Okay?

24  A.   Okay.

25  Q.   So I'm going to have to go over a couple of rules.  I

26  know you heard about those out there, but since I wasn't

27  there, I want to make sure that you understand.  Okay?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1358

1   Q.   So you have a good voice, but it's soft.  All right?  So

2   I would like you to try to speak up a little more when you

3   answer questions so that we could hear you.  Okay?

4   A.   Okay.

5   Q.   When I ask you a question, if the answer is yes, I would

6   like you to say yes rather than shake your head up and down

7   meaning yes.  Okay?

8   A.   Okay.

9   Q.   And if I ask you a question and the answer is no, I

10  would like you to say no rather than shaking your head left

11  and right.  Okay?

12  A.   Okay.

13  Q.   And the reason that I'm doing that is that the lady in

14  front of you, the court reporter, has to get down everything

15  that we say and she could only get down actual words.  Okay?

16  A.   Okay.

17  Q.   So if you forget -- that's okay.  If you forget, I will

18  remind you, but you need to know.  Okay?

19  A.   Sounds good.

20  Q.   Then the final thing that I want you to know, or make

21  sure that you know, is that if I ask you a question and you

22  don't understand my question, let me know and I'll use other

23  words and ask a question that you do understand.  Okay?

24  A.   Okay.

25  Q.   All right.  So, Jorge, what grade are you going into?

26  A.   I'm going to go to sixth grade.

27  Q.   To the sixth grade.  Who is your teacher going to be?

28  A.   I'm not sure yet.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1359

1   Q.   Okay.  You haven't been assigned teachers yet?

2   A.   No.

3   Q.   Okay.  And you go to O.B. Whaley?

4   A.   Yes.

5   Q.   How long have you attended O.B. Whaley School?

6   A.   Since kindergarten.

7   Q.   Okay.  So you have been there all along?

8   A.   Yes.

9   Q.   All right.  O.B. Whaley goes up to the sixth grade?

10  A.   Uh, yeah.

11  Q.   So then after the sixth grade, you go to junior high

12  school?

13  A.   Yes.

14  Q.   Okay.  Was Mr. Chandler ever your teacher at O.B.

15  Whaley?

16  A.   Yes.

17  Q.   What grade were you in when he was?

18  A.   Third grade.

19  Q.   One more rule.  Always one more rule.  Please wait until

20  I ask my whole question before you give an answer.  Okay?

21  A.   Okay.

22  Q.   All right.  Thank you.

23       So you had Mr. Chandler for the third grade?

24  A.   Yes.

25  Q.   And do you remember what classroom number Mr. Chandler

26  had?

27  A.   No.

28  Q.   Okay.  That year that you were in the third grade, there

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1360

1    were also second-graders in Mr. Chandler's class; correct?

2    A.    Um, no.

3    Q.    You don't remember any second-graders in the class that

4    year?

5    A.    No.

6    Q.    Okay.  So that was the school year 2010/2011; correct?

7    A.    Yes.

8    Q.    So you were in the straight third grade class?

9    A.    Yes.

10   Q.    No second-graders in your class?

11   A.    No.

12   Q.    Okay.  All right.

13          Do you remember that year playing a game where you

14   were blindfolded and tried to guess the thing was -- that you

15   were holding?

16   A.    Um, yes.

17   Q.    Okay.  Sounds like you remember it a little bit, but

18   you're not so sure?

19   A.    Um, not so sure, but I remember something like that.

20   Q.    Okay.  We'll see what you remember.  I will ask you some

21   more questions about it.  Did you watch this game?  That is,

22   watch other students play this game?

23   A.    Yes.

24   Q.    And do you remember if you actually played the game

25   yourself?

26   A.    Yes.

27   Q.    You did?

28   A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1361

1    Q.    Okay.  So you played it and you watched others play it?

2    A.    Yes.

3    Q.    Okay.  Did all of the students in the class play it?

4    A.    Well, yeah.

5    Q.    Okay.  Boys and girls?

6    A.    Yes.

7    Q.    Okay.  How many times do you think you remember playing

8    that game in the third grade?

9    A.    I remember playing it once or twice.

10    Q.    Okay.  How about watching other kids play the game?  How

11    many times you think you saw them do that?

12    A.    Once or twice.

13    Q.    Now, was a blindfold used on the students as part of

14    this game?

15    A.    Yes.

16    Q.    Could you tell me a little bit what the blindfold looked

17    like and what it was made out of?

18    A.    Um, like the things you put on to sleep, like cover your

19    eyes and stuff.

20    Q.    Okay.  I think I heard you say the kinds of things you

21    put on to sleep and cover your eyes?

22    A.    Yeah.

23    Q.    Could you speak up a little bit?

24    A.    Yes.

25    Q.    Okay.  Have you ever heard of the expression "a sleep

26    mask"?

27    A.    No.

28    Q.    Okay.  But it's something that goes over your eyes that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1362

1  you can't see out of it; correct?

2  A.  Yes.

3  Q.  That's what you mean by blindfold?

4  A.  Yes.

5  Q.  Okay.  Now, were there different kinds of things that

6  students did when they were blindfolded?

7  A.  Um, no.

8  Q.  Did the -- as part of the -- when the students were

9  blindfolded, did they sometimes taste things in their mouth?

10  A.  Yes.

11  Q.  Okay.  And as part of the things that they did when they

12  were blindfolded, did they feel things that were placed

13  against either their hands or their feet?

14  A.  Against their hands.

15  Q.  Against their hands.  Okay.

16      Was there anything -- any other kind of a game that

17  was played that you remember when the kids were blindfolded?

18  A.  No.

19  Q.  Okay.  So we could talk about the same thing, I'll talk

20  about the game where things are put in the mouth as the taste

21  game.  Okay?

22  A.  Okay.

23  Q.  Then, later I will talk about the game where objects

24  were put in or on the hands of the student as the feel game.

25  Okay?

26  A.  Okay.

27  Q.  All right.  So let's talk about the taste game first.

28  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1363

1   A.   Okay.

2   Q.   For the taste game, would the students be standing or

3   sitting in a seat or laying on the ground?

4   A.   Standing.

5   Q.   Okay.  Where would Mr. Chandler be when the kids were

6   standing?

7   A.   In the front or to the side.

8   Q.   And what would he be doing?

9   A.   Like, putting the stuff in their mouth.

10   Q.   So he would be standing in front of the students or to

11   the side of the students or behind the students?

12   A.   To the side or to the front.

13   Q.   To the side?

14   A.   To the side or in the front.

15   Q.   Or in the front?

16   A.   Yes.

17   Q.   So again, we're talking about the taste game; right?

18   A.   Yes.

19   Q.   So what kinds of things would be put in the students'

20   mouths for them to taste?

21   A.   Lollipops.

22   Q.   Okay.  Just lollipops or maybe something else?

23   A.   Just lollipops.

24   Q.   That's all you remember is lollipops?

25   A.   Yes.

26   Q.   And were there different flavors of lollipops?

27   A.   Yes.

28   Q.   Okay.  So the idea was to guess the flavor of whatever

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1364

1    lollipop was in your mouth?

2    A.    Yes.

3    Q.    Okay.  And when the lollipop -- you remember doing that

4    game yourself; right?

5    A.    Yes.

6    Q.    And then would you lick the lollipop?

7    A.    Yes.

8    Q.    That's how you tasted it; right?

9    A.    Yes.

10   Q.    Did he tell you to lick the lollipop?

11   A.    Yes, and he explained the rules before we played.

12   Q.    I'm sorry.  You are going a little bit too fast.  Could

13   you say that again?

14   A.    He explained the rules before we played the game.

15   Q.    He explained the rules to you before you played the

16   game?

17   A.    Yes.

18   Q.    Tell me what he explained to you.

19            MS. FILO:  Objection, Your Honor.  Hearsay.

20            THE COURT:  Sustained.  Hold on.  He's going to ask

21   you another question.

22            MR. MADDEN:  All right.

23   BY MR. MADDEN:

24   Q.    Do you remember telling a police officer that besides

25   the lollipops, he used drinks and crackers?

26   A.    No.

27   Q.    As you sit here today, if you think hard, do you think

28   maybe he used some drinks too?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1365

1    A.    Yes.  Yeah, I remember that.

2    Q.    You are sort of remembering that now?

3    A.    Yes.  Well --

4    Q.    Could you -- what drinks do you remember?

5    A.    I remember water, juice, and I think Snapple.

6    Q.    Water, juice, and Snapple?

7    A.    Yes.

8    Q.    And were those drinks put in a student's mouth?

9    A.    Yes.

10   Q.    And how did the drinks get into the student's mouth?

11   A.    He put them in their hand and he told them to drink it.

12   Q.    All right.  I want you to do me a favor, Jorge.  You are

13   speaking low and too fast.  I want you to slow down a little

14   bit and speak up.  I know that it's odd.  Could you do that

15   for me?

16   A.    He put the drink in their hands and he told them to

17   drink from it.

18   Q.    So the student -- was it a drink in a bottle or a cup or

19   what?

20   A.    It was in a bottle.

21   Q.    What kind of a bottle?

22   A.    Like for the water, a water bottle, the Snapple, a

23   Snapple, and juice, like a juice box, or something like that.

24   Q.    The juice was in a juice box; right?

25   A.    Yes.

26   Q.    And the Snapple was in what?

27   A.    The Snapple cup.

28   Q.    A Snapple cup.  You mean the bottle that you buy it in?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1366

1    A.    Yeah.

2    Q.    The bottle that you buy it in, you screw the cap off?

3    A.    Yes.

4    Q.    Okay.  And the water, what was that in?

5    A.    It was in a water bottle.

6    Q.    Like a water bottle you have on the desk to drink during

7    the day?

8    A.    Yes.

9    Q.    Okay.  Now, what about crackers?  If you think hard,

10   could you remember some crackers being in your mouth?

11            MS. FILO:  Objection, Your Honor.  May we approach,

12   please?

13            THE COURT:  Yes.

14            (Whereupon, there was a discussion at the bench.)

15            THE COURT:  Thank you.  You were going to continue,

16   Mr. Madden.

17            MR. MADDEN:  Thank you, Your Honor.

18   BY MR. MADDEN:

19   Q.    So I think you said earlier that the teacher would --

20   did the teacher demonstrate for you how to do the taste game?

21   A.    Um, no.

22   Q.    What did he say about the taste game?

23            MS. FILO:  Objection, Your Honor.  Hearsay.

24            THE COURT:  Sustained.  He's going to ask you

25   another question.

26            THE WITNESS:  Okay.

27            THE COURT:  Just wait for the next question.

28            MR. MADDEN:  I have no further questions of this

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1367

1    witness, Your Honor.  Thank you.

2              THE COURT:  Thank you.

3              Cross.

4              MS. FILO:  Thank you.

5                        CROSS-EXAMINATION

6    BY MS. FILO:

7    Q.   Hi, Jorge.

8    A.   Hi.

9    Q.   Hi.  So Mr. Madden asked you if you remembered some

10   drinks; right?

11   A.   Yes.

12   Q.   So do you actually remember that, or do you remember

13   because Mr. Madden asked you about it?

14   A.   I remember the drinks.

15   Q.   Okay.  And you said that the teacher would give it to

16   the student and the student would drink it?

17   A.   Yes.

18   Q.   Okay.  So he handed the student a water bottle or a

19   juice bottle or something and told them to drink it?

20   A.   Yes.

21   Q.   Okay.  So, Jorge, you never had to stay back at recess

22   and practice this game, did you?

23   A.   No.

24   Q.   No?  Jorge, do you remember Mr. Chandler putting

25   anything in a student's mouth that was like the size of a

26   banana and pushing it back and forth into the child's mouth?

27   A.   No.

28   Q.   No?  Anything that had any -- anything that was gooey or

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1368

1  had like a gooey liquid that came out?

2  A.    No.

3  Q.    No?  Okay.  That's all the questions I have.  Thank you,

4  Jorge.

5          THE WITNESS:  You're welcome.

6          THE COURT:  Redirect?

7          MR. MADDEN:  Nothing, Your Honor.

8          THE COURT:  Thank you, Jorge.  You could step down.

9  You could go with your mother and you are free to leave the

10  courtroom.  Okay?

11          THE WITNESS:  Okay.

12          THE COURT:  Thank you.

13                    CARL DOE,

14          Being called as a witness on behalf of the

15  Defendant, having been first duly sworn, was examined and

16  testified as follows:

17          MR. MADDEN:  His Honor is going to say something to

18  you, then I'm going to ask you some questions from my table.

19          THE COURT:  Good afternoon.

20          THE WITNESS:  Good afternoon.

21          THE COURT:  What's your name?

22          THE WITNESS:  Carl.

23          THE COURT:  How do you spell your name, Carl?

24          THE WITNESS:  C-a-r-l.

25          THE COURT:  Okay.  Thank you.  Mr. Madden and Ms.

26  Filo are going to ask you some questions.  We're going to

27  start with Mr. Madden, and he's going to go over a few rules

28  about how we answer questions in the courtroom.  Okay?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1369

1    THE WITNESS:  (Shakes head up and down.)

2    THE COURT:  Thank you.

3    When you are ready, Mr. Madden.

4    MR. MADDEN:  Just a minute, Your Honor.  Thank you.

5                    DIRECT EXAMINATION

6    BY MR. MADDEN:

7    Q.   Just a minute, Carl.  I need a sip of something.

8         Okay.  Carl, my name is Mr. Madden.  I'm going to

9    ask you some questions.  Okay?

10   A.   Okay.

11   Q.   The voice is good and deep and loud.  What I would like

12   you to do is to make sure that you answer my questions with

13   the word yes when you mean yes.  Okay?

14   A.   Okay.

15   Q.   And with the word no when you mean no.  Okay?

16   A.   Okay.

17   Q.   Please don't shake your head up and down when you mean

18   yes, or shake your head left and right when you mean no?

19   A.   Okay.

20   Q.   You might wonder why that is, because the court reporter

21   in front of you has to write down all of the words that we're

22   saying, and she could only write down words.  Okay?

23   A.   Okay.

24   Q.   So if you forget while I'm asking you questions, I will

25   just remind you.  Okay?

26   A.   Okay.

27   Q.   And then the other thing is, I want to make sure that

28   you understand my question before you give me an answer.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1370

1    Okay?

2    A.    Okay.

3    Q.    So if I ask you a question and you don't understand the

4    question, you just tell me you don't understand it and I'll

5    ask a question that you do understand.  Okay?

6    A.    Okay.

7    Q.    All right.  What grade are you going into, Carl?

8    A.    Fifth grade.

9    Q.    Where do you go to school?

10   A.    O.B. Whaley.

11   Q.    Okay.  Have you gone to O.B. Whaley since you were a

12   kindergartner?

13   A.    No.

14   Q.    What grade did you start O.B. Whaley?

15   A.    Um, first grade.

16   Q.    Okay.  Did you ever have Mr. Chandler as a teacher?

17   A.    Yes.

18   Q.    And for what grade was that?

19   A.    Third.

20   Q.    And when you had Mr. Chandler, was every student in the

21   class a third-grader or were there some second-graders?

22   A.    Some were second-graders.

23   Q.    But you were a third-grader?

24   A.    Yes.

25   Q.    Then if you were in the back of the class looking at the

26   white board, if -- do you know what I'm talking about?

27   A.    Yes.

28   Q.    If you were looking forward towards the white board, you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1371

1    were probably sitting over on the right side; right?

2    A.    Yes.

3    Q.    Okay.  Because that's where the third-graders were on,

4    the right side; right?

5    A.    Yes.

6    Q.    The second-graders were on the left side?

7    A.    Okay.

8    Q.    That year, do you remember playing a game where the

9    students were blindfolded and they had to guess certain

10   things?

11   A.    Yes.

12   Q.    And what kind of things would be involved that you had

13   to guess?

14   A.    Um, some were, like, paper clips and pennies and,

15   like --

16   Q.    I asked a bad question.  I will ask you another

17   question.  That wasn't your fault.  That was mine.

18            Did you play a blindfold game where you had to feel

19   things?

20   A.    Yes.

21   Q.    Did you play a blindfold game where you had to taste

22   things?

23   A.    I forgot.

24   Q.    Okay.  That's all right.

25            Did you play a blindfold game that was like a

26   guiding game?

27   A.    No.

28   Q.    Okay.  Just a minute.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1372

1          Do you remember seeing a game played where a

2    blindfold of the student had to taste food or candy in their

3    mouth?

4    A.    Um, I forgot.

5    Q.    Okay.  You remember telling a police officer that you

6    saw a game where students had to taste things in their mouth?

7    A.    I forgot.

8    Q.    Okay.  Do you remember telling a police officer that you

9    played a blindfold game where you had to feel things?

10   A.    Yes.

11   Q.    Okay.  So you do remember telling the officer that?

12   A.    Um, yes.

13   Q.    Do you remember actually doing that?

14   A.    Yes.

15   Q.    Okay.  And is it something that you would do yourself

16   with the class?

17   A.    Um, maybe.

18   Q.    Or was it something that you just saw other people in

19   the class do?

20   A.    Other people.

21   Q.    Okay.  Maybe you played it yourself, but you think you

22   saw other kids do that; right?

23   A.    Yes.

24   Q.    Tell me what you saw.

25   A.    Um, I saw some kids feel, like, some socks and then,

26   like, some paper clips and pennies.

27   Q.    So what were they using to feel these things?

28   A.    Um, their hands.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1373

1   Q.   Did they ever use their feet?

2   A.   Sometimes, yeah.

3   Q.   So they used both their hands and their feet?

4   A.   Yes.

5   Q.   And were they blindfolded?

6   A.   Yes.

7   Q.   Do you remember if they were standing or sitting or

8   lying down when they did any of those things?

9   A.   I think they were mostly, um, laying down.

10  Q.   Okay.  Did they have their shoes and socks on or off?

11  A.   Um, on.

12  Q.   Both of their shoes and socks were on?

13  A.   Their shoes were off, but their socks were on.

14  Q.   Okay.  Could you tell me the things that you remember

15  them feeling?

16  A.   I forgot.

17  Q.   Do you recall telling the police officer that the

18  objects included a penny, a paper clip, an eraser, a pen?

19  A.   Yes.

20  Q.   You remember telling the police officer that?

21  A.   Yes.

22  Q.   Was that true?

23  A.   Uh, yeah.

24  Q.   Okay.  And do you remember telling a police officer that

25  you saw a taste game where students tasted chips, candy, and

26  water?

27  A.   I forgot.

28  Q.   Okay.  You forgot if you told the police officer or you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1374

1   forgot if that happened?

2   A.   I forgot if that happened.

3   Q.   So you are not sure if it happened?

4   A.   Um, I'm not sure.

5   Q.   Okay.  But you're not saying that it didn't happen?

6   A.   No.

7   Q.   Okay.  Do you remember a game where there was a pencil

8   by the door?

9   A.   No.

10  Q.   You don't remember a guiding game or any type?

11  A.   No.  I forgot.

12  Q.   Okay.  And do you remember telling a police officer that

13  the food included chocolate, candy, and Cheetos?

14  A.   I think, um, we had to taste some chips and, like,

15  drinks.

16  Q.   Okay.  What kind of drinks do you remember?

17  A.   Um, water and, like, Snapple.

18  Q.   Just those two?

19  A.   Yes.

20  Q.   And what was the Snapple in?  That is, could you

21  describe the container for me?

22  A.   Um, I forgot.

23  Q.   Okay.  Can?  Cup?  Bottle?  Do you remember?

24  A.   Oh; it was a glass bottle.

25  Q.   And was it the kind of bottle that Snapple comes in when

26  you buy it from the store?

27  A.   Yes.

28  Q.   Okay.  Just the shelf bottle from a store; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1375

1   A.   Yes.

2   Q.   And what about the water?  Was that in -- what contained

3   the water?

4   A.   I think a foam cup.

5   Q.   A foam cup?

6   A.   Yes.

7   Q.   Like a white styrofoam cup?

8   A.   Yes.

9   Q.   Okay.  And the objects that were put in the students'

10   mouths, did they -- were they told -- strike that.

11          Do you remember any food or candy put in your

12   mouth?

13   A.   No.

14   Q.   But do you remember seeing it in other students' mouths?

15   A.   Yes.

16   Q.   All right.  And when the food was in their mouth, what

17   did they do with the food?

18   A.   Um, like, some of them just, like, put it in their mouth

19   and try to guess what it was.

20   Q.   But what were they doing with their mouth?  Could you

21   see?

22   A.   No.

23   Q.   Did you see when they were chewing?

24   A.   Uh, yes.

25   Q.   Were they chewing?

26   A.   Yes.

27   Q.   Were they licking the candy?

28   A.   Uh, yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1376

1    Q.   Okay.  You remember seeing that; right?

2    A.   Yes.

3    Q.   Okay.  And the objects that were put in the students'

4    mouths -- when I say the objects, the candy or the food, who

5    put that in their mouths?

6    A.   Um, I forgot.

7    Q.   My question is, do you remember if the student put it in

8    their mouth or Mr. Chandler put it in their mouth?

9    A.   I think it was -- I think it was Mr. Chandler.

10   Q.   Okay.  But you're not sure?

11   A.   Yes.

12   Q.   This happened a long time ago; right?

13   A.   Yes.

14   Q.   Okay.  All right.

15        MR. MADDEN:  I have no further questions.  Thank

16   you.

17        THE COURT:  Thank you.

18        Cross-examination.

19        MS. FILO:  Thank you.

20                 CROSS-EXAMINATION

21   BY MS. FILO:

22   Q.   Hi, Carl.  Do you remember any -- what kind of candy was

23   used?

24   A.   No.

25   Q.   No?  You said that you saw students licking something?

26   A.   Um, the candy.

27   Q.   Like, what kind of thing?

28   A.   I think it was, like, a hard candy.

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1377

1   Q.    Like what?

2   A.    I forgot.

3   Q.    So was it something that -- I mean, were these little

4   bites of something that the student could put in their mouth?

5   A.    Yes.

6   Q.    Okay.  So you never saw anything that was like the size

7   of a banana?

8   A.    No.

9   Q.    No?  Nothing like that?

10  A.    No.

11  Q.    Anything that had to go kind of in and out of the

12  student's mouth?

13  A.    No.

14  Q.    No?  Anything where some liquid came out when the

15  student had in their mouth?

16  A.    No.

17  Q.    No?  Okay.  That's all I have, Carl.  Thank you very

18  much.

19          MR. MADDEN:  Thank you.

20          THE COURT:  Thank you.  You could step down, return

21  to your mother, and you are free to leave the courtroom.

22  Thank you very much.

23          MR. MADDEN:  I'll walk you out, Carl.

24                  MARCUS DOE,

25          Being called as a witness on behalf of the

26  Defendant, having been first duly sworn, was examined and

27  testified as follows:

28          THE COURT:  Good afternoon.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1378

1      THE WITNESS:  Good afternoon.

2      THE COURT:  What's your name?

3      THE WITNESS:  Marcus.

4      THE COURT:  Marcus?

5      THE WITNESS:  Yes.

6      THE COURT:  And, Marcus, do you know -- could you

7  spell your first name for me?

8      THE WITNESS:  M-a-r-c-u-s.

9      THE COURT:  Okay.  Thank you.  And, Marcus, how old

10  are you?

11      THE WITNESS:  I'm eight.

12      THE COURT:  You're eight years old?

13      THE WITNESS:  Yes.

14      THE COURT:  Okay.  Mr. Madden is going to ask you

15  some questions -- just a minute.  Ms. Filo will ask you some

16  questions, and I'm going to allow Mr. Madden -- he will

17  explain some of the rules on how to answer questions in the

18  courtroom.  Okay?

19      THE WITNESS:  Okay.

20      THE COURT:  I want to let you know, everyone I have

21  ever seen has come into the courtroom and sat down in that

22  chair, they are very nervous.  So if you are nervous, it's

23  okay.  All right?  And if you need anything, just let me

24  know.  Okay?

25      THE WITNESS:  Okay.  Yes.

26      THE COURT:  Okay.  You are going to -- your voice

27  is kind of soft.  I will ask you to try to speak up so

28  everybody could hear what you have to say, because what you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1379

1    have to say is very important.

2                    THE WITNESS:  Okay.

3                    THE COURT:  Okay?  Thank you.

4                    Direct examination.

5                    MR. MADDEN:  Thank you, Your Honor.

6                         DIRECT EXAMINATION

7    BY MR. MADDEN:

8    Q.   Okay.  Marcus, could you see me?

9    A.   Yes.

10   Q.   Good.  So I'm going to ask you some questions about when

11   you were in Mr. Chandler's class.  But before I do that, I

12   kind of want to go over some rules with you.  Okay?

13   A.   Yes.

14   Q.   All right.  So you're doing a good job.  You have a very

15   nice voice, but sometimes a little bit soft, so what I want

16   you to do is when you answer speak up if you can.  Okay?

17   A.   Yes.

18   Q.   If I can't hear you, I will tell you to please speak up

19   a little bit.  Okay?

20   A.   Okay.

21   Q.   All right.  Okay.  If I ask you a question and if the

22   answer to my question is no, I would like you to use the word

23   no.  Okay?

24   A.   Yes.

25   Q.   In other words, I don't want you to shake your head left

26   or right because you mean no.  Okay?

27   A.   Yes.

28   Q.   Could you answer a little louder?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1380

1    A.    Yes.

2    Q.    Thank you.  Then, when we go through with this, when I

3    ask you questions, if your voice gets too low, I'm going to

4    ask you to speak up.  And if you don't say yes or you don't

5    say no, I will ask you to do that.  Okay?

6    A.    Okay.

7    Q.    I'm only doing that because -- if I have to do it, it's

8    only because we have to get words out because the lady in

9    front of you, the court reporter, could only get down words.

10   She can't get down shakes of our heads.  Okay?

11   A.    Okay.  Yes.

12   Q.    All right.  Okay.

13            Marcus, what grade are you in now?

14   A.    Um, I was in, um, third grade now.  I'm going into

15   fourth grade.

16   Q.    You just finished the third grade and you are going into

17   fourth grade; is that right?

18   A.    Yes.

19   Q.    Thank you.  All right.

20            Do you remember who your teacher was in the second

21   grade?

22   A.    Um, Mrs. Lippell (phonetic).

23   Q.    Did you ever have Mr. Chandler for a teacher?

24   A.    Yeah.

25   Q.    And do you remember what grade you were in when you were

26   in Mr. Chandler's class?

27   A.    Yes.

28   Q.    What grade was that?

1    A.    Second grade.

2    Q.    Okay.  Thank you.

3          Do you remember what classroom number Mr. Chandler

4    had when you were in the second grade with him?

5    A.    Um, probably don't remember.

6    Q.    That's fine.  By the way, if I ask you a question and

7    you don't remember, "I don't remember" is the right answer.

8    Okay?

9    A.    Okay.

10   Q.    Okay.  Now, the year that you were in the second grade

11   with Mr. Chandler, were there also third-graders in the

12   class?

13   A.    Yes.

14   Q.    So it was a combination class?  That is, a combination

15   of second-graders and third-graders; right?

16   A.    Yes.

17   Q.    All right.  Since you were in the second grade, you

18   probably sat on the left side of the classroom by the wall

19   that had the sink and the computers; right?

20   A.    Um, I forgot, but I think I sat on the left side.

21   Q.    Yes.  All of the second-graders sat on the left side;

22   right?

23   A.    Yes.

24   Q.    And all of the third-graders sat on the right side?

25   A.    Yes.

26   Q.    Okay.  Do you remember when you were in Mr. Chandler's

27   class playing a game or games where the students were

28   blindfolded?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1382

1  A.    Yes.

2  Q.    Were there different types of games when the students

3  were blindfolded?

4  A.    Um, I think so, but I only remember one.

5  Q.    Well, tell me what one you remember.  We'll start with

6  that one.

7  A.    I remember one with two people.  One was blindfolded and

8  one had to walk across the room with the other one that was

9  helping us.

10 Q.    Okay.  So that's a game where one of the students was

11 blindfolded; right?

12 A.    Yes.

13 Q.    And one of the other students in the class had to give

14 him or her directions on where to walk; right?

15 A.    Yes.

16 Q.    They couldn't see.  You had to tell them how many steps

17 to take; right?

18 A.    Yes.

19 Q.    You had to tell them whether they should step left or

20 step right or step straight ahead; right?

21 A.    Yes.

22 Q.    You were guiding them; right?

23 A.    Yes.

24 Q.    They had to depend on the person who doesn't have a

25 blindfold on to help them; right?

26 A.    Yes.

27 Q.    Is that right?

28 A.    (Shakes head up and down.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1383

1   Q.   Yes?

2   A.   Yes.

3   Q.   Okay.  Now, besides that type of blindfold game, do you

4   remember a blindfold game where a student was blindfolded and

5   had to taste things put into his or her mouth?

6   A.   Yes.

7   Q.   All right.  Do you also remember a blindfold game where

8   the student had to feel something either on their -- that was

9   placed against their hand or their foot or their leg?

10   A.   Yes.

11   Q.   Okay.  So we're going to call that first game that you

12   talked about the guiding game.  Okay?

13   A.   Yes.

14   Q.   So you know what I'm talking about?

15   A.   Yes.

16   Q.   Then -- so let's talk about one of the other games.

17   Let's talk about the feel game.  Okay?

18   A.   Yes.

19   Q.   Do you remember ever playing that game yourself?

20   A.   Um, I think so, but I probably forgot.

21   Q.   Okay.  Fair enough.

22          Do you remember seeing any other children play the

23   feel game?

24   A.   Yes.

25   Q.   Okay.  So when you saw children playing the feel game

26   where they were feeling an object and they were blindfolded,

27   were the children standing up or sitting in a chair or laying

28   on the ground?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1384

1   A.   They were, um, standing up.

2   Q.   Standing up.  Okay.  Were they standing up in some

3   particular part of the classroom?

4   A.   Um, yes.

5   Q.   What part of the classroom do you remember them standing

6   in?

7   A.   I think I remember them standing on the right side.

8   Q.   Where the third-graders were?

9   A.   Yes.

10  Q.   Okay.  And so were they standing next to a desk or to a

11  table?

12  A.   Um, the classroom was cleaned.  We moved all of the

13  desks so we could play the game.

14  Q.   Okay.  I'm sorry.  Your voice is getting too low for me

15  to hear, so could you say that again loudly?

16  A.   Um, all of the desks were placed in -- like, so it was

17  kind of cleaned out, so they were pushed.

18  Q.   So if I understand what you said, the desks were sort of

19  pushed back?

20  A.   Yeah.

21  Q.   So that the students could kind of be in the middle and

22  do this?

23  A.   Yes.

24  Q.   Okay.  Then, would Mr. Chandler be putting these objects

25  for them to feel against their -- some part of their body?

26  A.   Yes.

27  Q.   And what parts of their body do you remember Mr.

28  Chandler putting these objects against?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1385

1    A.    The hand.

2    Q.    Hands?

3    A.    And the feet.

4    Q.    A hand?

5    A.    Yeah.

6    Q.    What about their foot or their leg?

7    A.    Their foot, but I don't remember the leg.

8    Q.    You don't remember the leg.  You remember the hand and

9    you remember the foot?

10   A.    Yes.

11   Q.    Okay.  What kind of objects do you remember -- did you

12   see being placed either in their hand or on their hand or on

13   their feet?  What do you remember seeing?

14   A.    Um, eraser.

15   Q.    Eraser?  Hang on for a second.  I got to catch up with

16   you here.  Just a minute.  Hold that thought.

17         Go ahead.  What else besides an eraser?

18   A.    Pencil.

19   Q.    Pencil.  What else?

20   A.    Um, all -- I just remember eraser and pencil.

21   Q.    Okay.  Do you remember telling a police officer that you

22   also saw a paper clip and a piece of paper used?

23   A.    Yes.

24   Q.    Does that help you remember?

25   A.    Yes.

26   Q.    Okay.  And then what happens when the object goes into

27   the hand or the hands of the student?  What are they supposed

28   to do?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1386

1   A.   They are supposed to try to figure out what the object

2   is.

3   Q.   By just feeling it; right?

4   A.   Yes.

5   Q.   And did some students guess right and some students not

6   right?

7   A.   Yes.

8   Q.   Was everybody laughing?

9   A.   No.

10   Q.   Okay.  Was everybody having a good time?

11   A.   Yes.

12   Q.   Okay.  Now, let's move to the taste game that we talked

13   about.  When you saw the taste game, when things were put

14   into the mouths of students, were they standing or sitting or

15   laying on the ground, if you remember?

16   A.   They were sitting on a chair.

17   Q.   Okay.  One of the student chairs or Mr. Chandler's

18   chair?

19   A.   One of the student chairs.

20   Q.   Okay.  Was this game sort of played in the same place?

21   Sort of the middle of the classroom?

22   A.   Yes.

23   Q.   After the desks had been moved back?

24   A.   Yes.

25   Q.   Okay.  And could you remember some of the food that you

26   saw that was placed into the students' mouths?

27   A.   Um, like, I sort of forgot.

28   Q.   Okay.  Do you remember telling a police officer that you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1387

1    saw hot Cheetos, marshmallow, and candy?

2    A.    Yes.

3    Q.    And does that help you remember?

4    A.    Yes.

5    Q.    So you did see those types of candy, hot Cheetos,

6    marshmallows?

7    A.    Yes.

8    Q.    That is not a type of candy -- some other type of candy

9    that you can't remember; is that right?

10   A.    Yes.

11   Q.    Okay.  Then once the food goes into the student's, or

12   the candy goes into the student's mouth, what is the student

13   supposed to do?

14   A.    They are supposed to figure out what kind of food it is.

15   Q.    Okay.  And does Mr. Chandler put the food in their

16   mouth?

17   A.    Um, yes.

18   Q.    Yes?

19   A.    Yes.

20   Q.    And is he standing -- where is he standing when he's

21   putting the food in their mouth, if they are seated at their

22   student chair?

23   A.    I forgot, but, um, I think I remember him standing up

24   next to the student.

25   Q.    Next to the student?

26   A.    Yes.

27   Q.    Was he to the side of the student or in front of the

28   student?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1388

1    A.    The side.

2    Q.    Okay.

3    A.    I think.

4    Q.    Thank you.

5                MR. MADDEN:   I have no further questions.

6                THE COURT:   Thank you.

7                Cross-examination.

8                MS. FILO:   Thank you.

9                          CROSS-EXAMINATION

10   BY MS. FILO:

11   Q.    Hi, Marcus.

12   A.    Hi.

13   Q.    Marcus, when you saw Mr. Chandler play the taste game in

14   the classroom, you said that you remember hot Cheetos and

15   marshmallow and candy; right?

16   A.    Yes.

17   Q.    So everything was something that the student could put

18   in their mouth and chew up and swallow; right?

19   A.    Yes.

20   Q.    Yeah?  You remember anything that was like the size of a

21   banana, like kind of big?

22   A.    Um, no.

23   Q.    No?  Anything that Mr. Chandler had to push in and out

24   of the student's mouth?

25   A.    No.

26   Q.    No?  Anything where gooey stuff came out of the

27   student's mouth?

28   A.    No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1389

1  Q.   No?  Okay.  That is all the questions I have.  Thank

2  you, Marcus.

3          THE COURT:  Thank you, Marcus.  You can step down,

4  go with your mother, and you could leave the courtroom now.

5          MR. MADDEN:  Your Honor, this might be a good time

6  for a break.

7          THE COURT:  At this time, ladies and gentlemen,

8  we'll take the afternoon recess.  We'll call you back in

9  approximately 15 to 20 minutes and we'll begin with the next

10  witness.

11          (Whereupon, a brief recess was taken.)

12          THE COURT:  Record will reflect all members of the

13  jury are present, both counsel are present, Mr. Chandler is

14  in the courtroom.

15          Mr. Madden, your next witness.

16          MR. MADDEN:  Yes, Your Honor.  I will get her.

17  However, I wanted to indicate we'll not be using this

18  witness's last name for purposes of this hearing.  We'll

19  refer to her as Annie Doe, D-o-e.

20          THE COURT:  Ms. Filo?

21          MS. FILO:  That's fine.

22          THE COURT:  You agree to that?

23          MS. FILO:  Yes.

24          THE COURT:  Annie.

25          MR. MADDEN:  I'll be right back, Your Honor.

26                  ANNIE DOE,

27          Being called as a witness on behalf of the

28  Defendant, having been first duly sworn, was examined and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1390

1  testified as follows:

2  　　　　MR. MADDEN:  Why don't you sit down.  I'm going to

3  adjust the microphone.  If you could maybe scoot forward a

4  little bit.  Would you like some water?  All right.  So,

5  thank you very much.  Just try to keep your voice up and I'll

6  help you if you don't.  Okay?

7  　　　　THE WITNESS:  Thank you.

8  　　　　THE COURT:  Good afternoon.  Could you state your

9  name for the record, please?

10  　　　　MR. MADDEN:  Please tell her just her first name,

11  Your Honor.

12  　　　　THE WITNESS:  Annie.

13  　　　　THE COURT:  Annie?  And would you spell it, Annie?

14  　　　　THE WITNESS:  A-n-n-i-e.

15  　　　　THE COURT:  Thank you.  The attorneys have agreed

16  that we'll just use your first name for the purposes of this

17  hearing.  Okay?

18  　　　　THE WITNESS:  Yes.

19  　　　　THE COURT:  So you are okay with them referring to

20  you by your first name?

21  　　　　THE WITNESS:  Yes.

22  　　　　THE COURT:  Now, as you know, the lawyers are going

23  to be asking some questions.  It's important that you let

24  them finish the question before you begin your answer.

25  　　　　THE WITNESS:  Yes.

26  　　　　THE COURT:  And that's the next thing.  If the

27  question calls for a yes or no response, we need to have you

28  say yes or no as opposed to nodding your head up and down to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1391

1    mean yes.

2              THE WITNESS:  Yes.

3              THE COURT:  Listen to the question carefully and

4    just answer what is being asked.  If you hear one of the

5    lawyers say objection, don't answer the question.  I will

6    rule.  And if I overrule the objection, I'll say you could

7    answer it.  If I sustain the objection, I will tell you the

8    lawyers are going to ask you another question.  Okay?

9              THE WITNESS:  Yes.

10             THE COURT:  Thank you.

11             We'll begin with direct examination, Mr. Madden.

12             MR. MADDEN:  Thank you, Your Honor.

13                     DIRECT EXAMINATION

14   BY MR. MADDEN:

15   Q.   Annie, again, my name is Mr. Madden.  I'm Mr. Chandler's

16   attorney.  I want to review some rules about testifying.  I

17   don't think you have ever been in a courtroom before, have

18   you?

19   A.   No.

20   Q.   So everyone who comes into the courtroom is a witness

21   and never been here before is always nervous?

22   A.   Yes.

23   Q.   All right.  That's normal and that's okay.  So I'm going

24   to ask you some questions, and there is certain rules that we

25   have in a courtroom that I want you to try to obey.  Okay?

26   A.   Yes.

27   Q.   And the main ones are -- they are simple.  If I ask you

28   a question and the answer is yes, please answer out loud

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1392

1   using the word yes.  Okay?

2   A.   Yes.

3   Q.   In other words, if the answer is yes, but you only shake

4   your head up and down, that's not good in a courtroom.  Okay?

5   A.   Yes.

6   Q.   It's not good because the lady in front of you, the

7   court reporter, could only get down words.  She can't get

8   down gestures or shakes or movements.  Okay?

9   A.   Yes.

10  Q.   Okay.  Also, English is not your first language, is it?

11  A.   Yes -- no.  Sorry.  English is not my language.

12  Q.   You understand it well enough to answer my questions;

13  right?

14  A.   Yes.

15  Q.   But if one of my questions -- if in my questioning I ask

16  you a question that you don't understand any of the words

17  that I'm using, or you don't understand my question, please

18  just stop me and tell me you don't understand and I'll ask

19  the question in a different way so that you can understand

20  it.  Okay?

21  A.   I will.

22  Q.   I don't want you to answer any question that you don't

23  understand.

24  A.   Okay.

25  Q.   So if you answer a question of mine and you don't say

26  anything, I'm going to assume that you understood the

27  question.  Okay?

28  A.   Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1393

1   Q.   All right.

2        And then finally, I want to say this, I know this

3   is awkward for you, all right, and it's difficult, so -- but

4   it is necessary.  And I'll need you to answer my questions as

5   best you can.  Okay?

6   A.   Yes.

7   Q.   All right.  Okay.

8        So, Annie, you know Craig Chandler; correct?

9   A.   Yes.

10  Q.   And do you remember when you first met Craig Chandler?

11  A.   Yes.

12  Q.   When did you first meet Craig Chandler?

13  A.   At O.B. Whaley School.

14  Q.   Was he a teacher there then?

15  A.   He was my daughter's teacher.

16  Q.   Okay.  And what grade was your daughter in at that time?

17  A.   She was in the third grade.

18  Q.   So this would have been the school year 2010 and 2011?

19  A.   I don't remember.

20  Q.   Okay.  But she was in the third grade then; right?

21  A.   Yes.

22  Q.   And Mr. Chandler's class that year was a straight third

23  grade class?

24  A.   Um, yes.

25  Q.   Okay.  So Mr. Chandler was your daughter's third grade

26  teacher?

27  A.   Yes.

28  Q.   At O.B. Whaley School?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1394

1    A.    Yes.

2    Q.    All right.  And that school year, did you go to

3    back-to-school night?

4    A.    Yep.

5    Q.    And did you meet Mr. Chandler at back-to-school night?

6    A.    Yes.  That was the first time I met him.

7    Q.    Okay.  So you had a pleasant conversation with him?

8    A.    Yeah.  I didn't remember, but I just -- I didn't

9    remember that much.

10   Q.    Okay.  Fine.  But sometime after that, you started

11   communicating with Mr. Chandler; right?

12   A.    Yeah, he asked my phone number.

13   Q.    All right.  And so you started having conversations --

14   phone conversations with him?

15   A.    Yeah.

16   Q.    And were these phone conversations live phone

17   conversations or were those text conversations?

18   A.    I did not remember that well.

19   Q.    It was one or the other or both?

20   A.    Yes.

21   Q.    And would it be fair to state that you and he both

22   struck up a relationship?

23   A.    Uh, we didn't go there yet.  We just -- he asked me out

24   for a date.

25   Q.    Okay.

26   A.    I think I remember that day, after the first day meeting

27   him, and he asked my daughter -- he asked my daughter give

28   the phone number to him and then we were meeting somehow.  I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1395

1   don't know where, but I remember in school, in class, and --

2   Q.   Okay.  Let me stop you there.

3            So you went to back-to-school night, you met him,

4   and then sometime after that he called you; right?

5   A.   Yeah.  I don't -- I could not remember everything.  I

6   don't know he called me or text me or talking on the phone or

7   something like that.  I do not remember, but I remember after

8   that, we met one time in the class or somehow --

9   Q.   Well --

10  A.   -- we were talking.

11  Q.   We'll get to that.  So at some point during the year he

12  asked you out; correct?

13  A.   That's correct.

14  Q.   On a date?

15  A.   Yes.

16  Q.   And you went with him?

17  A.   I went with him because he seemed like going into a

18  serious relationship because he separate and I was single.

19  So --

20  Q.   So you liked him, he appeared to like you, and sooner or

21  later he asked you out; right?

22  A.   Yes.

23  Q.   And as time went by, from the time that you first met

24  him until the time that he asked you out, your relationship

25  was growing and you thought it might grow into something

26  important?

27  A.   Yes.

28  Q.   Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1396

1    A.    I thought going to be serious.

2    Q.    You thought that the relationship would become serious?

3    A.    Yeah.

4    Q.    Do you know how long it was approximately from the time

5    that you first met him until you went out on the date?

6    A.    Um, I could not remember.  It's too long ago.

7    Q.    Was it a matter of days or weeks or months?

8    A.    I think weeks.

9    Q.    Weeks?

10   A.    Like --

11   Q.    Okay.  In the weeks that followed?

12   A.    No.  I think it's more than a week.  Like, about a

13   month.

14   Q.    About a month.

15         From the time that you met him until the time you

16   went out about a month later with him, how many times do you

17   think that you called each other and either spoke or text

18   over the phone?

19   A.    I did not remember that well.

20   Q.    Lots?

21   A.    I do not remember.  I'm sorry.

22   Q.    That's okay.  But in any event, by the time he asked you

23   out, you thought the relationship was getting more serious?

24   A.    Yeah.

25   Q.    You liked him?

26   A.    Uh, and then he showing that he -- he was showing that

27   he liked me too.

28   Q.    Exactly.  Just -- okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1397

1  A.   And I think that -- that's my thinking.  I was thinking

2  that he's the teacher and of course he not going to be doing

3  something bad to me.

4  Q.   Sure.

5  A.   Because I trusted teacher.

6  Q.   Okay.  All right.

7        Now -- so you went out.  Do you remember where you

8  went out on your date?

9  A.   In Mountain View.

10  Q.   Mountain View?

11  A.   On Castro Street in Mountain View or something.

12  Q.   Castro Street?

13  A.   Yeah.  I don't know the street or avenue.

14  Q.   That's the main restaurant business street in Mountain

15  View?

16  A.   And then it was a sushi restaurant.

17  Q.   You went to a sushi restaurant?

18  A.   Yeah.

19  Q.   Okay.  Did he pick you up at your home?

20  A.   Yeah.  He brought flower over.

21  Q.   He brought flowers?

22  A.   And he picked me up at my home and then we went there.

23  Q.   Okay.  So you had a nice dinner?

24  A.   Yeah, it was nice dinner.

25  Q.   And you had a pleasant conversation?

26  A.   Yes, and I like him a lot.

27  Q.   And he appeared to like you a lot?

28  A.   Yeah.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1398

1    Q.    And so did he take you back home?

2    A.    He did.

3    Q.    And did he go into your house with you?

4    A.    Yes.

5    Q.    And did he stay the night with you?

6    A.    He stayed until 3:00; 2:30 or 3:00 o'clock in the

7    morning.

8    Q.    Okay.

9    A.    And he left.

10   Q.    Okay.  Hang on.  And would it be fair to state that you

11   essentially had sexual relations with him that night?

12   A.    Um, we kissing, but we not really perform.

13   Q.    All right.  Did you both have your clothes off?

14   A.    Yeah.  We kissing, but we did not perform.

15   Q.    All right.  And he was in your bed with you?

16   A.    Yeah.  I watching movie with him.

17   Q.    Okay.  All right.

18         And then after that, did you continue to have

19   communication with Mr. Chandler?

20   A.    I did texting him, calling him, but he did not respond

21   to me, and I was upset.  I say -- I asked him what's going

22   on, but he didn't answer me.  He didn't text me or call me

23   back and he just -- I don't know if he tell me the truth or

24   he not telling me the truth.  He never answered me back, or

25   if he answers, it just really wasn't nice answer back.  So I

26   don't know.

27   Q.    Okay.

28   A.    And I feel like he used me after that.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1399

1  Q.    Okay.  Now, at some point you went down and had a

2  conference with Mr. Chandler?  Parent/teacher conference;

3  right?

4  A.    Yes.

5  Q.    Was that conference in the classroom at O.B. Whaley?

6  A.    Yes.

7  Q.    And do you remember approximately how long it was from

8  the time that you had dinner with Mr. Chandler and he came

9  back to your house until the parent/teacher conference?

10 A.    It's a while.  It's a long time.  It's like more than

11 six months.

12 Q.    More than six months.

13        Do you remember -- when you went to the teacher

14 conference, do you remember what time your conference was?

15 A.    That's about 6:00 o'clock.

16 Q.    Okay.  6:00 p.m.?

17 A.    Yeah.

18 Q.    Was it dark outside or was it light?

19 A.    It was -- the sunset was down.  It's not too dark.  It

20 just not too dark completely.

21 Q.    Okay.  And was it your understanding that you were the

22 last parent/teacher conference scheduled in his room that

23 night?

24 A.    No.

25 Q.    You don't know?

26 A.    I did not know.

27 Q.    Okay.

28 A.    Sorry.  He told me after that.  Like, oh, you know, he

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1400

1    wanted me to be the last person, but I did not know.

2    Q.   He told you he wanted you to be the last person?

3    A.   He told me after I get into the room.

4    Q.   Okay.  Now, do you remember -- well, strike that.  Let

5    me ask another question.

6             Did you have a conference with Mr. Chandler about

7    school and your daughter?

8    A.   Um, I went in.  We just say a couple of words.

9    Q.   About your daughter?

10   A.   Yeah.

11   Q.   About school?

12   A.   Yeah, not a lot.

13   Q.   Okay.  Now, when you went, you went by yourself; right?

14   A.   Of course I go -- went by myself.  I wanted my kid -- I

15   want to know how she's doing.

16   Q.   Sure.  But the point is, it was just you and Mr.

17   Chandler in the room?

18   A.   Yes, and the dog.

19   Q.   Whose dog?

20   A.   And the little dog.  I don't know whose dog it is.

21   Q.   There was a dog in the classroom?

22   A.   Yes.

23   Q.   Wasn't your dog?

24   A.   No.

25   Q.   Do you have a dog?

26   A.   Back then I did not have a dog.

27   Q.   Okay.  So I take it that when you went into the

28   classroom, you sat down with Mr. Chandler briefly to talk

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1401

1    about your daughter?

2    A.    Yes.

3    Q.    Okay.

4    A.    But I did not remember clearly.

5    Q.    That's all right.  Well, we're going to take a step at a

6    time.  And if you don't remember any parts of it, you tell

7    me.  But I want to make sure that if the truth is you don't

8    remember, just say that, but I don't want you to tell me "I

9    don't remember" if it's only because it's too difficult to

10   remember.  Do you understand what I mean?

11   A.    Yes.

12   Q.    Okay.  I know this is hard.  Okay?

13   A.    Yes.

14   Q.    So you sat down; correct?

15   A.    Yes, at the corner.

16   Q.    We'll get to that in a minute.

17             And was Mr. Chandler sitting down?

18   A.    Yes.

19   Q.    And can you -- it's a classroom; right?  Or, it was a

20   classroom?

21   A.    It was a classroom.

22   Q.    So there were desks and little desks because these are

23   third-graders with little chairs; right?

24   A.    Yes.

25   Q.    Children chairs and children desks?

26   A.    Yes.

27   Q.    But were there two adult size chairs for you and Mr.

28   Chandler to sit in?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1402

1    A.    No.

2    Q.    You didn't sit in an adult size chair?

3    A.    No.

4    Q.    What did you sit in?

5    A.    I sit on the student chair.

6    Q.    Okay.  And where was Mr. Chandler sitting?

7    A.    He sit -- he was sitting across from me right at the

8    corner, close to the corner of the classroom inside -- like,

9    for example, the door in here and I sit right -- corner right

10   there.

11   Q.    Okay.  That's -- this is -- I'm going to go up and show

12   you some pictures and have you point to things, and I think

13   that will be more helpful.  Okay?

14   A.    Yes.

15   Q.    So I'm going to first point to what has been marked

16   Defense Exhibit A-2.  This is a big blow-up photo, and that

17   appears to be a photograph of Mr. Chandler's classroom in one

18   corner where his desk was; right?

19   A.    Yes.

20   Q.    You recognize that?  Just answer me if you recognize

21   that?

22   A.    I recognize that.

23   Q.    Then I'm going to show you another photograph, and this

24   photograph has been marked Defense A-1.  And do you recognize

25   this photograph?

26   A.    No.

27   Q.    All right.  When --

28   A.    But it wasn't this one over there.  I did not recognize

1  that one, the corner over there.

2  Q.  Hang on.  Do you understand this to be Mr. Chandler's

3  classroom?  You can't tell?

4  A.  (Shakes head side to side.)

5  Q.  Okay.  So when you walked into Mr. Chandler's classroom,

6  there is a classroom door; right?

7  A.  Yeah.

8  Q.  Was the door open or closed when you walked into the

9  teacher conference?

10  A.  The door is closed.

11  Q.  The door --

12  A.  After that, after I walked in.

13  Q.  No.  Before you went in, do you walk through an open

14  door or do you knock and go through a closed door?

15  A.  I did not remember.

16  Q.  That's fine.  So when you went through the door, would

17  you have seen the view from Photograph A-1, Defense Exhibit

18  A-1, you would look straight across and see his desk and then

19  the inside door.  Is that what you saw?

20  A.  No.  It's different than I see it, because it was the

21  student chair like that one, right there around me.

22  Q.  You're pointing to the chair -- the black chair or the

23  blue chair?

24  A.  Yeah.

25  Q.  In --

26  A.  Around me a lot with the table and stuff.  I just

27  remember that it was a chair right here, and the table, chair

28  and the table right here is around me.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1404

1  Q.   All right.  Hang on.  Let me see if I could help you.

2  One of the problems, I think the table you are talking about

3  we really don't have a photograph of it, but we do have a

4  diagram.

5              MS. FILO:  Objection, Your Honor.  Leading.

6              THE COURT:  Sustained.

7  BY MR. MADDEN:

8  Q.   All right.  Do you remember a table that was kind of a

9  U-shaped table?

10  A.   The U-shaped table was on the other side.

11  Q.   The other side of what?

12  A.   The corner, the other corner, the opposite corner.

13  Q.   All right.  Do you remember seeing a sink or any wall

14  with computers?

15  A.   I did not remember.

16  Q.   Do you remember seeing a wall across the front that had

17  white boards?  You know, blackboards that were white?

18  A.   It was like this size.

19  Q.   When you walked in, it was off to your left?

20  A.   On my left, and I sit right on that corner on the right.

21  Q.   Okay.  So if I understand your testimony, when you

22  walked into the classroom, the white board -- white boards

23  across the wall would have been off to your left?

24  A.   Yeah.

25  Q.   And that would have been the front of the class; right?

26  A.   Yes.

27  Q.   So the door into the class basically came into the back

28  of the class; right?  Or the far back end of the class?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1405

1   A.   I go all the way in and I did not -- it's just --

2   Q.   Hang on for a second.

3            MS. FILO:  Objection, Your Honor.  May we approach?

4            THE COURT:  Yes.

5            (Whereupon, there was a discussion at the bench.)

6   BY MR. MADDEN:

7   Q.   So I'm going to continue to ask you some questions, but

8   I'm not going to ask you about the photographs.  All right?

9   A.   Yes.

10  Q.   Okay.  So you sat down in a chair, Mr. Chandler was

11  sitting in a chair, I take it you were close to each other?

12  A.   Across, face-to-face to each other.

13  Q.   And how far was the chair Mr. Chandler was in from your

14  chair?  I mean, what would you say the distance was?

15  A.   Beginning, it was a little distance, and then later on,

16  he scoot his chair over to me.

17  Q.   Scooted his chair over?

18  A.   Yeah.

19  Q.   Okay.  And when he scooted his chair over, how close was

20  his chair to your chair?

21  A.   I think it's face-to-face like this.  Like, my knees and

22  his knees touching.

23  Q.   It was close enough for your knees to actually be

24  touching?

25  A.   Yes.

26  Q.   Okay.  So you had a conversation about your daughter;

27  right?

28  A.   Very short.  It -- it was short.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1406

1    Q.    And then Mr. Chandler and you began physically touching

2    each other?

3                MS. FILO:  Objection, Your Honor.  That's leading.

4                THE COURT:  Sustained.

5    BY MR. MADDEN:

6    Q.    What's next thing that happened?

7    A.    It's -- it was -- he was kissing me.

8    Q.    Okay.

9    A.    But I didn't like it, but I just -- and then somebody

10   was knocking on the door on the back of the classroom, and I

11   asked him who is this, and it was a janitor.

12   Q.    All right.  Then what did Mr. Chandler do?

13   A.    He did not open the door or nothing.

14   Q.    Okay.  And then what happened?

15   A.    And then he tried to, you know, touch me and kissing me,

16   and then, you know, I think I feel uncomfortable because

17   my -- that's my daughter classroom.

18   Q.    Right.

19   A.    It wasn't a good idea to do like -- or something like

20   that.  It's not good, you know, for my culture or myself.

21   Q.    Okay.  So would it be a fair statement that soon after

22   that, you had sexual intercourse with Mr. Chandler?

23                MS. FILO:  Objection, Your Honor.  Leading.

24                THE COURT:  Sustained.

25   BY MR. MADDEN:

26   Q.    Did you have sexual intercourse with Mr. Chandler?

27   A.    I did not want to.

28   Q.    My question is, did you have sexual intercourse with Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1407

1    Chandler in the classroom?

2              MS. FILO:  Objection, Your Honor.  Leading.

3              THE COURT:  Sustained.

4    BY MR. MADDEN:

5    Q.   Tell me what happened next.

6    A.   He kissed me and he tried to pull my pants down.

7    Q.   Okay.

8    A.   I never was -- it's winter.  I was wearing leggings.

9    Q.   Leggings?

10   A.   Yes.

11   Q.   Okay.

12   A.   It's easy to pull down.

13   Q.   Okay.

14   A.   And he tried to kiss me and he tried to pull down.  I

15   didn't want it because my kid classroom and how long I didn't

16   see him.  It's been four months --

17   Q.   All right.

18   A.   -- I did not see him.

19   Q.   Did you have sex with Mr. Chandler?

20   A.   And then after that.

21   Q.   You did?

22   A.   No.  After that, he turned me over.

23   Q.   On what?

24   A.   He just turned me around.

25   Q.   All right.  And where was the top part of your body?

26   Was that on something or against something?

27   A.   No, not against something.  He turned me over.  My pant

28   already down because it was leggings.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1408

1  Q.   Okay.

2  A.   And he just push his thing in there, and within a

3  minute -- I don't know what the hell he did -- fast, and

4  he --

5  Q.   Okay.  So you had sexual intercourse?

6  A.   He came, yeah, but I did not like it.

7  Q.   Okay.  All I'm trying to establish is the fact that you

8  had intercourse.  Okay?

9  A.   It's correct.

10  Q.   Okay.  Then did you leave the classroom?

11  A.   I left immediately, but I wasn't happy.  I was crying

12  when I got home.

13  Q.   When you got home?

14  A.   When I waking home.

15  Q.   All right.  But were you crying in the classroom?

16  A.   No.  I just leave.

17  Q.   Okay.  And did you leave by yourself?

18  A.   Yes.

19  Q.   All right.  Did you have communication with Mr. Chandler

20  any time after that?

21  A.   He text me again next day.

22  Q.   And did you text him back?

23  A.   No.

24  Q.   Did you ever talk to him after that?

25  A.   Because I did not like it.  I feel like -- he just

26  considered not -- if you -- sorry.

27  Q.   Okay.  Now --

28          MS. FILO:  Objection, Your Honor.  Has the witness

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1409

1    finished her statement -- her answer?

2              THE COURT:  Were you done?  You could finish your

3    answer.

4              THE WITNESS:  Sorry.  Just let me --

5              MS. FILO:  That's okay.

6    BY MR. MADDEN:

7    Q.   Would you like either a cup of water or a tissue?

8    A.   I'm okay.

9    Q.   Okay.

10             THE COURT:  Were you done with your answer, ma'am?

11             THE WITNESS:  I -- when I was walking home, I

12   cried.  And next day he text me and he say how pleasure he

13   was with me, but I did not text him back.  And he got mad at

14   me and he text me, and I said I'm busy because I didn't want

15   to talk to him.

16             MR. MADDEN:  Okay.  All right.  Thank you.  I have

17   no further questions at this time.

18             THE COURT:  Cross-examination, Ms. Filo.

19             MS. FILO:  Thank you.

20                     CROSS-EXAMINATION

21   BY MS. FILO:

22   Q.   Hi, Annie.  I have a couple of questions for you.  Okay?

23             You said that you met Mr. Chandler at

24   back-to-school night; is that right?

25   A.   That's correct.

26   Q.   Okay.  How did Mr. Chandler get your phone number?

27   A.   I think he asked my daughter.

28   Q.   Okay.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1410

 1           MR. MADDEN:  Objection.  Speculation.

 2           THE COURT:  Sustained.  I will strike the answer.

 3   BY MS. FILO:

 4   Q.   Did you give him your phone number?

 5   A.   And then I gave him the number to my daughter and give

 6   to him.

 7   Q.   Okay.  So that was at back-to-school night; right?

 8   A.   That's correct.

 9   Q.   Okay.  That happens right after your daughter got

10   assigned to the classroom; right?

11   A.   Yes.

12   Q.   When you -- when you first started talking to him, did

13   you tell Mr. Chandler that you were a single mom?

14   A.   I did.

15   Q.   So you're raising your daughter by yourself?

16   A.   Yes.  I have her as a custody full time.

17   Q.   Okay.  And what did Mr. Chandler tell you about his

18   marriage?

19   A.   He say he -- he's single.  He was single.  He told me

20   that he's single.  He just separated with his wife, and the

21   kid, it was just two-year-old child.  He has a child.

22   Q.   So he told you that he was a single parent too?

23   A.   That's correct.

24   Q.   And you trusted him?

25   A.   I trusted him as the teacher and as a parent.

26   Q.   So you said that you either talked on the phone or

27   texted for about a month?

28   A.   I'm not really remember that much.  It's around that,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1411

1    about a month.

2    Q.    Okay.  What sort of things would you talk about?

3    A.    I do not remember.

4    Q.    But there was nothing about those conversations that

5    made you suspicious in any way?

6    A.    No.

7    Q.    No?  You thought he was actually interested in you?

8    A.    Exactly.

9    Q.    Okay.  You went on a date with him to this sushi

10   restaurant?

11   A.    Yes.

12   Q.    And you said you came back to your house?

13   A.    Yes.

14   Q.    You said that you were in your bedroom; is that right?

15   A.    Watching movie.

16   Q.    So, Annie, I don't want to embarrass you, but I need to

17   ask you some questions about that.  All right?

18   A.    Yes.

19   Q.    You were kissing?

20   A.    Yes.

21   Q.    Did you have your clothes on or were you naked?

22   A.    In the beginning, of course, I had my clothes on, but

23   when you kissing and then it just -- I'm -- so both of us

24   have clothes off.

25   Q.    But then you said you did not perform?

26   A.    None of us perform because I did not know what happened.

27   But we did not have sex that night.

28   Q.    Did you try to have sex that night?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1412

1    A.    I think we kissing, but -- naturally, but I don't know.

2    I did not see us having sex because I have -- I don't know.

3    We tried, or we did try, but it's just not really happen.   I

4    don't know if we try or not trying, but we kissing naturally,

5    so --

6    Q.    Okay.  So maybe I'm not understanding.  What wasn't

7    happening?

8    A.    Sex.  We not -- we did not perform.

9    Q.    How come?

10   A.    He was sweating and he was shaking.  He was nervous.

11   That's it.

12   Q.    Okay.  Did you -- was he trying to have sex with you?

13   A.    I saw him, he was nervous more than trying to have sex.

14   Q.    Okay.

15   A.    He was sweating and he just -- something is not normal.

16   Q.    So he was kind of sweating and shaking?

17   A.    Not shaking.  Nervous.

18   Q.    Nervous.  Okay.

19          So can you tell me what stopped you from having sex

20   that night?

21   A.    That's it.

22   Q.    Okay.  You've said in the past, have you not, that Mr.

23   Chandler could not get erect; is that right?

24   A.    That night, I don't know.  He's nervous or something.

25   Q.    Okay.  But --

26   A.    That's why he could not.  I have -- yeah, he could not.

27   I don't know how he nervous, so --

28   Q.    Okay.  Couldn't get hard; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1413

1   A.   Yeah.

2   Q.   All right.  I want to make sure that I'm understanding

3   correctly.

4   A.   Yes.

5   Q.   Okay.  So you did not have sexual intercourse that

6   night?

7   A.   (Shakes head side to side.)

8   Q.   But you were a willing participant; is that right?

9   A.   That's correct, because I think he's serious and I'm

10  serious and I think we are going to have future together.

11  Q.   Okay.  So, Annie, you said after that, you would text

12  him or call him and you got no response; right?

13  A.   One time or two times he respond with me, but it wasn't

14  the nice response.  He say he was with his mom and something.

15  I just tried to text him and call him because I thought,

16  like, we're more than friends or whatever, you know, so

17  that's why I tried to call and then -- do you want to see

18  more often.

19  Q.   So at some point you get the message; right?  You get

20  the hint that he's disappeared, he's not --

21  A.   Yeah, he disappeared.

22  Q.   He's not going to be a serious person in your life?

23  A.   And then I feel like he used me.

24  Q.   Were you upset about that?

25  A.   I was upset about that in the beginning because I think

26  it's just, like, why you disappear after that day?  You talk

27  for a month, we met each other, we excited to each other, and

28  he was a single parent, I am a single parent.  I thought I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1414

1    have a -- I'm going to have a date and a boyfriend.  I don't

2    want to play around.

3    Q.    Okay.  He had told you at the time that he was single?

4    A.    Yes.

5    Q.    Okay.  Annie, when you got the notice for parent/teacher

6    conference, how did that happen?  Is it by e-mail or a

7    letter?  How did you find out that?

8    A.    I think by letter.

9    Q.    Okay.  Was a time assigned to you?

10   A.    I think every parent needs to do the parent conference.

11   Q.    Okay.  But I'm saying, did you get to pick the time or

12   was the time assigned?

13   A.    Because I get out of work by 5, 5:30, so I have to

14   assign the time, or, you know, mostly the teacher very

15   flexible hours with me after my work.

16   Q.    Okay.

17   A.    And then he give me last call.

18   Q.    Okay.  So you came to the parent/teacher conference and

19   you said that the door when you got there -- is the door

20   closed or open?  I don't remember what you said?

21   A.    I do not remember.

22   Q.    Okay.  When you came into the classroom, then what

23   happened to the door?

24   A.    The door was shut.  The door is shut.

25   Q.    Who shut it?

26   A.    Mr. Chandler.

27   Q.    Okay.  Did he use a key or anything with the door?

28   A.    I did not remember, and I don't know how the system of

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1415

1  the door in the school -- the classroom.

2  Q.   Okay.  So, Annie, I'm going to ask you to do me a favor.

3  Okay?

4  A.   Yes.

5        MS. FILO:  Your Honor, may I approach?

6        THE COURT:  Yes.  Thank you.

7  BY MS. FILO:

8  Q.   Okay.  Annie, so I've just drawn -- very poorly, but

9  I've just drawn a little diagram.  Okay?  And I think when

10  you said that you came into Mr. Chandler's classroom, if you

11  look to the left, there was the white board up at the front

12  of the class; right?

13  A.   That's correct.

14  Q.   Okay.  Annie, could you just -- could you tell me where

15  it was that you met with Mr. Chandler?  Where was your

16  conference?

17  A.   It's right on the corner of the right side, like that,

18  on your right side.

19  Q.   Here or here?

20  A.   No.  It's right there.  It's right there.

21  Q.   How about this?  I'm going to give you -- can I give you

22  a pen and ask you to tell me right where you were?

23  A.   It's right here.

24        MS. FILO:  Your Honor, the witness has put a circle

25  there.

26  BY MS. FILO:

27  Q.   Annie, what was in that circle?  What -- you said you

28  were sitting at a student's chair?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1416

1   A.   It's correct.

2   Q.   And what else was there?

3   A.   It's the table of the children and the chair around me.

4   That's what I remember.

5   Q.   Say it one more time.  A table --

6   A.   The tables, student tables and chairs.

7   Q.   Okay.  And --

8   A.   And a dog.

9   Q.   Okay.  So students -- like student desks?

10  A.   Student desk.

11  Q.   Okay.  So in Defense A-2, in this left-hand corner there

12  is a student desk; right?

13  A.   Exactly.

14  Q.   And that's what you were sitting at?

15  A.   Yes.

16  Q.   Was it your daughter's desk or was it another desk?

17  A.   I did not know who the desk it is.

18  Q.   You said that Mr. Chandler was sitting across from you?

19  A.   Yeah, face-to-face like that.

20  Q.   So he was sitting on the other side of the desk?

21  A.   Yes.

22  Q.   Okay.  And you said you talked very briefly about your

23  daughter; right?

24  A.   Yes.

25  Q.   Okay.  So how did Mr. Chandler -- you said that then he

26  kissed you.  Yes?

27  A.   Yes.

28  Q.   How did that happen?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1417

1  A.   I don't know how it happened, but we were talking and

2  then he wrapped the hand on me and then he kissing me.  And

3  then I heard the janitor, or something, try to open the door.

4  I said:  No, janitor.  I didn't want it because it was in my

5  daughter's classroom.

6  Q.   So you said that he -- what you did is, you put your arm

7  out and around like in a semicircle.  Yes?

8  A.   Yes.

9  Q.   So was he still across this table from you?

10  A.   Not the table.  It's just the two chairs, the two

11  chairs, but the table behind us.

12  Q.   So he was on -- I think you started to say -- you

13  originally said he was across a desk from you; right?

14  A.   No desk in between.

15  Q.   You were just sitting across from each other?

16  A.   Yes.

17  Q.   But not --

18  A.   No desk in between.

19  Q.   He was just right across from you?

20  A.   Yeah.

21  Q.   Okay.  When he put his arm around -- you said he put his

22  arm around you?

23  A.   Yeah.

24  Q.   And he kissed you?

25  A.   (Shakes head up and down.)

26  Q.   Were you sitting down or standing up?

27  A.   I was sitting down.

28  Q.   Okay.  And did you say anything to him about that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1418

1   A.    I just got nervous because it's, like, long time I

2   didn't see him and then it just happened like that.  I didn't

3   like it and in the bathroom -- in the classroom.  Sorry.

4   Q.    So did you say anything to him?

5   A.    I say just like:  Oh, the janitor, so -- and then I

6   just -- I -- and then I said:  No.  Janitor are going to

7   come.  And he said don't worry.  He locked the door.

8   Q.    Okay.

9   A.    He can't get in.

10  Q.    What happened after that?

11  A.    And then I stand up.

12  Q.    Why did you stand up?

13  A.    Because I didn't want it.

14  Q.    Were you planning to leave?

15  A.    No.  I just didn't want it.  And then just he hug around

16  me and then he kissed me and he pulled my pants down.

17  Q.    Did you say anything to him?

18  A.    I said no.  Just the janitor -- I just said the janitor

19  come, you know, I just -- I just say that.

20  Q.    Okay.  So, Annie, what I'm trying to figure out is, did

21  you ever tell Mr. Chandler:  No, I don't want to do this.

22  This is my daughter's classroom, I don't like this?

23  A.    I said no, that's it, but the janitor here.  And he

24  said:  Don't worry.  I lock the door.  I just say that.

25  Q.    Okay.  Did you ever say to him:  I don't want to do

26  this?

27  A.    I did not remember.

28  Q.    Okay.  So --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1419

1    A.    But I just know that I told him that:  No.  The janitor

2    is here.  And it's a lot of time.  It's not one time.  I

3    mean, I didn't want it.

4    Q.    Okay.  I understand you didn't want it.  I'm just trying

5    to figure out if you ever said that to him?

6    A.    I do not remember.  No.

7    Q.    Okay.  And then you said he turned you around; is that

8    right?

9    A.    He kissed me and then I tried to turn around and then it

10   just -- I tried to get away and then -- I don't know.  It

11   just --

12   Q.    What did you mean you tried to get away?

13   A.    I don't want it.  I don't want him to kiss me.  He

14   kissed me everywhere.

15   Q.    Okay.

16   A.    I didn't want it.

17   Q.    You said you tried to get away?

18   A.    I'm not fighting all that, but I just tried to, like --

19   and then he just turned me around.

20   Q.    Okay.  So he turned you around and then what happened?

21   A.    I didn't know that his pants is -- I don't know

22   when -- I don't remember.  It's just --

23   Q.    Okay.  You said that he put his penis inside your

24   vagina; right?

25   A.    Yes, within a minute.

26   Q.    All right.  Within a minute.  So this didn't seem very

27   nice to you?

28   A.    (Shakes head side to side.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1420

1   Q.   Yes or no?

2   A.   It's not nice.

3   Q.   Okay.  And did Mr. Chandler ejaculate?

4   A.   Within a minute, very fast.

5   Q.   No condom was used; is that right?

6   A.   Yes.

7   Q.   Correct?

8   A.   Yes.

9   Q.   So, Annie, I have to ask this question.  Did he

10  ejaculate inside your vagina?

11  A.   Yes.

12  Q.   Okay.  So was there -- did he ejaculate any place else

13  that you could see?

14  A.   (Shakes head side to side.)

15  Q.   All inside you?

16  A.   Yep.  I could not see because it just -- when I was

17  walking home, it's all wet.

18  Q.   Okay.  Annie, you have -- when you said you were walking

19  home, you were crying?

20  A.   Yes, because I did not like it.

21  Q.   Okay.  Did you --

22  A.   I asked him that:  How many woman you did in this

23  classroom?

24  Q.   Because that's what it felt like to you?

25  A.   Yes.

26  Q.   Not something --

27  A.   I asked him after that.

28  Q.   Were you upset?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1421

1  A.   I did.

2  Q.   Why?  Tell me why you were upset.

3  A.   Because I feel like he disrespect me.

4  Q.   You said you cried on the way home?

5  A.   Um-hum.

6  Q.   Yes?

7  A.   (Shakes head up and down.)

8  Q.   And did you tell anybody about this?

9  A.   No.

10  Q.   No?

11  A.   It's not a good thing to tell everyone.

12  Q.   Okay.  So, Annie, you brought your daughter in January

13  of 2012 to be interviewed by some police officers; right?

14  A.   It's correct.

15  Q.   And you told the officer that -- one of the officers

16  that was there while your daughter was being interviewed that

17  you were raped?

18  A.   I feel like that.  That's what I felt because I don't

19  like the way he did that to me.  I didn't see him for six

20  months later, he disappear more than six months, and he came

21  to me just like that?  How you think -- how you think that

22  person?  I'm not.  I have my job.  I'm working.  I'm not

23  waiting for someone to do that to me.

24  Q.   Okay.

25  A.   Would you mind to do that -- for someone that you trust

26  and then disappear and then just do it again to you?  It's

27  just not -- it's disrespect, and plus in my kid's room, my

28  kid's classroom?

1    Q.    Okay.

2    A.    I don't go around and do that.

3    Q.    I understand.  So --

4    A.    I feel like that, that's why I crying.  But during that

5    time, I start dating with someone.  I started dating, but we

6    are not going anywhere yet.

7    Q.    Okay.  So, Annie, I have to just be clear, you told him:

8    No.  The janitor's coming --

9    A.    Yes.

10   Q.    -- right?  And you tried to get up; right?

11   A.    Yes, and he pulled my pants down.

12   Q.    And did you -- I thought you said on direct that you

13   tried to pull your pants back up?

14   A.    Yeah, because it was legging, it was legging, I could

15   not pull it up.

16   Q.    Okay.  So --

17   A.    It was legging.

18   Q.    Why did you try to pull your pants back up?

19   A.    Because he pulled my pants down.

20   Q.    You didn't want them down?

21   A.    Exactly.

22   Q.    So you tried to pull them back up?

23   A.    Yes.

24   Q.    And then what happened?  That's when he turned you

25   around?

26   A.    Yeah -- no.  That's when he tried to kiss me.

27   Q.    Okay.  When he was kissing you, did you ever push him

28   away and say no?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1423

1  A.    I just said:  No.  This is janitor.  But I don't -- I

2  can't scream so people hear me that I was in the room because

3  both my children in that school.  I did not let anyone know

4  that:  Oh, your mom is a whore.

5  Q.    That's why you didn't scream?

6  A.    Exactly.

7  Q.    You didn't want to be found like that?

8  A.    Exactly.

9  Q.    Okay.

10  A.    Would you mind?  I live there.  I bought my house there.

11  My kid go to that school.

12  Q.    Okay.  So I just want to be clear, you told him no, you

13  tried to pull up your pants, and you got up --

14  A.    Yes.

15  Q.    -- to try to stop this?

16  A.    Yes, I tried to say no, and then he pushed it in and

17  that's done.  It's finish.

18  Q.    It was over in a second?

19  A.    Yes.

20  Q.    Okay.  Mr. Chandler had no problems being erect there in

21  the classroom; right?

22          MR. MADDEN:  Objection.  Speculation.

23          THE WITNESS:  Do you --

24          THE COURT:  Rephrase your question.

25  BY MS. FILO:

26  Q.    Mr. Chandler was able to successfully have intercourse

27  with you in that classroom; right?

28  A.    Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1424

1  Q.   Okay.  I don't have any further questions, Annie.  Thank

2  you.

3          THE COURT:  Thank you.

4          Redirect?

5          MR. MADDEN:  Thank you, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MR. MADDEN:

8  Q.   Annie, do you know who Marsha Edick is?

9  A.   Yes.

10 Q.   Who is Marsha Edick?

11 A.   The assistant.

12 Q.   My investigator?

13 A.   Yes.

14 Q.   Blond lady?

15 A.   (Shakes head up and down.)

16 Q.   Yes?

17 A.   Yes.

18 Q.   I'm sorry.  Are you okay?  You need a break, or you need

19 a glass of water?

20 A.   I'm okay.

21 Q.   Okay.  Do you remember her coming to your condominium

22 and having a conversation with you about Craig Chandler?

23 A.   Yes.

24 Q.   And you gave her a statement; correct?

25 A.   Yes.

26 Q.   And you talked about the night that you went out to

27 dinner and coming back to your apartment; right?

28 A.   It's correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1425

1  Q.   And when you spoke with Ms. Edick the first time, you

2  told her that you had sex in your apartment; correct?

3  A.   That's correct.

4  Q.   Okay.

5  A.   But I did not remember the whole thing.

6  Q.   Okay.  But that's what you told Ms. Edick; correct?

7  A.   Yes.

8  Q.   All right.  And you also told Ms. Edick that you had sex

9  with Mr. Chandler in his classroom; right?  The first night

10 that she came?

11 A.   She told me.  She asked me.

12 Q.   Yes.

13 A.   And then I said yes.

14 Q.   Yes.  All right.

15       Now, when you had that first meeting with

16 Ms. Edick, you never told her that Craig Chandler raped you

17 in the classroom, did you?

18 A.   I -- because I did not --

19 Q.   Excuse me.  Could you just --

20       MR. MADDEN:  Your Honor, would the Court please

21 direct the witness to answer the question?

22       THE COURT:  First, listen to Mr. Madden's question

23 and just try to answer just what he's asking.

24       THE WITNESS:  Oh.

25 BY MR. MADDEN:

26 Q.   Let me ask the question again.  Please just answer the

27 question.

28       When Ms. Edick met with you, you told her that Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1426

1   Chandler had sex with you in his classroom; right?

2   A.   That's correct.

3   Q.   And at that meeting with Ms. Edick, you never told

4   Ms. Edick that you felt like he raped you, did you?

5   A.   I did not tell her.

6   Q.   Okay.  All right.

7            Now, at a later time, she came out to speak with

8   you again; right?

9   A.   It's correct.

10  Q.   And she had you review a report that she made of her

11  first meeting with you; right?

12  A.   It's correct.

13  Q.   And she sat down with you and asked you to read the

14  report; right?

15  A.   It's correct.

16  Q.   And you read the report with her; right?

17  A.   It's correct.

18  Q.   And she asked if you would sign it and date it; is that

19  right?

20  A.   Yes, but I told her different.

21  Q.   All right.  So you admitted to Ms. Edick that what you

22  told her was accurate when she first met with you, but you

23  wanted to make some changes?

24  A.   No.  It's inaccurate.

25  Q.   I'm sorry?

26  A.   It was not accurate.

27  Q.   You wanted to make some changes in her report?

28  A.   I did want her to change it.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1427

1  Q.   And she did make those changes; right?

2  A.   That's correct.

3  Q.   And she actually printed on the report the changes that

4  you wanted her to make; right?

5  A.   It's correct.

6  Q.   Okay.  And then she made every change that you asked her

7  to make; right?

8  A.   She did.

9  Q.   And then you did date and sign the report; right?

10  A.   She did.

11  Q.   But after she did, after she changed the report, you did

12  date and sign it; correct?

13  A.   She asked me to date it and sign it.

14  Q.   Okay.  So do you remember the date that you first spoke

15  with her?

16  A.   I did not remember.

17  Q.   You think it could have been on or about January the

18  9th?

19  A.   I remember after I met the police sheriff.

20  Q.   Okay.  And then do you recall her coming to see you

21  about three months later?

22  A.   I did not recall.  She waiting when I'm home.  She come

23  to my house.  I do not know who she is.

24  Q.   The second time you didn't know who she was?

25  A.   No.  The first time, and the second time she came

26  without notice.

27  Q.   All right.  Okay.

28       And has Ms. Edick been fair with you?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1428

1    A.    Marsha?

2    Q.    Yes.

3    A.    She seemed nice lady.

4    Q.    Did you actually ask her to be in court with you if she

5    could?

6    A.    Yes.

7    Q.    Okay.  Now, I think that you testified that after you

8    heard something at the door in the classroom, Mr. Chandler

9    told you it was the janitor; right?

10   A.    Behind the back -- where we stand, behind that, next to

11   where we sit.

12   Q.    Okay.

13   A.    It was something that tried to open the door.

14   Q.    At some point after that, did you see Mr. Chandler go

15   over to the door and lock it or anything?

16   A.    It was locked.  It locked already.

17   Q.    How do you know that?

18   A.    He say that.

19   Q.    He said it was locked?  Okay.  All right.

20              MR. MADDEN:  One moment, please, Your Honor.

21              THE COURT:  Yes.

22   BY MR. MADDEN:

23   Q.    When Mr. Chandler was kissing you, prior to having

24   sexual intercourse in the classroom, you weren't struggling

25   with him physically at all, were you?

26   A.    What did you mean?

27   Q.    Were you struggling to get away or push him away or

28   anything?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1429

1   A.   It was a janitor, so I was so nervous, I said:  No,

2   janitor.  I said:  No, janitor.  That's it, but it wasn't --

3   Q.   But my question is, you weren't -- you didn't say no to

4   Mr. Chandler and you were not struggling?

5   A.   I said:  No, janitor.

6           MS. FILO:  Objection, Your Honor.

7           THE WITNESS:  I said:  No, janitor.

8   BY MR. MADDEN:

9   Q.   You said:  No, janitor?

10  A.   Yeah, they coming.

11  Q.   Okay.

12  A.   I feel awkward.

13  Q.   Okay.  Thank you.

14          MR. MADDEN:  I have no further questions.

15          THE COURT:  Ms. Filo, recross, or do you have --

16          MS. FILO:  No, Your Honor.  No further questions.

17          THE COURT:  Okay.  Annie, you may step down.  You

18  are done and you are free to leave.

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you.

21          Ladies and gentlemen, at this time, we're going to

22  take the evening recess.  I'll order all members of the jury

23  to report to the jury assembly room on the second floor

24  tomorrow morning at nine, and we'll continue with the

25  testimony tomorrow at nine.

26          MR. MADDEN:  I need to have a witness ordered back.

27  May I do that after the jury leaves, or do we do it before

28  the jury leaves?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1430

1          THE COURT:  Well, I'll -- I want to excuse the

2    jurors.

3          MR. MADDEN:  That will be fine.

4          THE COURT:  They don't need to be here.  Thank you

5    for letting me know about that.

6          All members of the jury, you are excused.  See you

7    tomorrow morning.

8          (Whereupon, the jurors were excused and the

9    proceedings were had outside the presence of the jury.)

10         MR. MADDEN:  Your Honor, the witness is Maria Leon.

11   She's under subpoena.  She's Arleth's mother.  I would like

12   her ordered back tomorrow morning.  I'm sorry.  She's being

13   assisted by a Spanish speaking woman.  She's not an official

14   interpreter; correct?  Or are you?  She's -- I apologize.

15   Your name, please.

16         MS. ORNALES:  Monica Ornales.

17         THE COURT:  Okay.  Ms. Leon, I have to order you

18   back tomorrow morning, or sometime tomorrow.  Is coming back

19   tomorrow morning the best time for you?

20         MS. LEON:  That's fine.

21         THE COURT:  Okay.  It's better for you in the

22   morning rather than the afternoon?

23         MS. LEON:  Yes, for me in the morning, that's fine,

24   or what time in the afternoon?

25         THE COURT:  Well, I'm asking you what is best for

26   you.

27         MS. LEON:  It's best in the afternoon.

28         THE COURT:  Counsel, is there any reason why I

1  couldn't bring her in the afternoon and start with your

2  doctor in the morning?

3         MR. MADDEN:  Um, I guess that will work.

4         THE COURT:  Ms. Filo, any comment about that?

5         MS. FILO:  No.  That's fine, Your Honor.

6         THE COURT:  My concern is that we we've had her

7  here today, and I would like to try to make it convenient for

8  her.

9         MR. MADDEN:  I understand.

10         THE COURT:  And if it's not a disruption for

11  anybody, I would prefer to accommodate her.

12         MR. MADDEN:  Okay.

13         THE COURT:  How long is she going to be?

14         MR. MADDEN:  I don't know, Your Honor.  I'm

15  thinking perhaps an hour, maybe less.

16         THE COURT:  See, my concern is starting with her at

17  nine and delaying getting to your expert.

18         MR. MADDEN:  That's true.

19         THE COURT:  Because if we start late with your

20  expert and not finish with your expert, that could create

21  some problems --

22         MR. MADDEN:  Yes.

23         THE COURT:  -- for your expert.

24         MR. MADDEN:  That's true.  Whatever the Court

25  prefers.

26         THE COURT:  So, ma'am, you prefer the afternoon?  I

27  could bring you back in the morning, get you first thing in

28  the morning, have you finish, or bring you back in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1432

1    afternoon?

2         MS. LEON:  Okay.  That's fine.  In the morning,

3    sorry.  That's fine.

4         THE COURT:  No.  I appreciate your willingness to

5    come in the morning or the afternoon.  I want to do as much

6    as I can to make it as convenient for you.  Then, what I'm

7    going to do is order you here at 9:00 o'clock in the morning.

8    Please be right outside the courtroom, and I'm going to ask

9    you to come a little earlier in case there is a line outside.

10   And what I mean a little earlier, if you get outside by, you

11   know, 20 to nine, that give you more than enough time to get

12   into the court facility.  Okay?

13        MS. LEON:  Okay.  That's fine.

14        THE COURT:  When you testify, we're going to get

15   you the services of a Spanish interpreter.  So when you are

16   testifying in court, I'm assuming that would make you feel

17   more comfortable, even though I get the sense you understand

18   English?

19        MS. LEON:  Yes.

20        THE COURT:  Okay.  Then we'll do that.  Thank you.

21        I'll order counsel and Mr. Chandler here tomorrow

22   at 9:00 a.m.  We'll be in recess.  I will start with this

23   witness.

24        MR. MADDEN:  Thank you, Your Honor.

25        (Whereupon, the Court took the evening recess.)

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1433

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA CLARA    )

 3

 4          I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

 5          The foregoing is a full, true, and correct

 6   transcript of the testimony given and proceedings had in the

 7   above-entitled action taken on the above-entitled date; that

 8   it is a full, true, and correct transcript of the evidence

 9   offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and official

13   stenographic reporter of said Court, and thereafter had the

14   same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted if applicable.

18

19          Dated:

20

21                           _____

22                           Jamie L. Mixco, C.S.R.
                             Certificate No. 12708
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."
```

# EXHIBIT 3
# (Vol. 15)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1434

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

THE PEOPLE OF THE STATE OF         )
CALIFORNIA,                        )
                                   )
      Plaintiff - Respondent,      )
                                   )
      v.                           )      No. C1223754
                                   )
CRAIG RICHARD CHANDLER,            )
                                   )
      Defendant - Appellant.       )
_____/

COPY

VOLUME 15

PAGES 1434 - 1541

JULY 25, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:      OFFICE OF THE ATTORNEY GENERAL
                               BY:  KAMALA D. HARRIS,
                               Attorney General of the State
                               of California

FOR DEFENDANT-APPELLANT:       In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1435

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             IN AND FOR THE COUNTY OF SANTA CLARA

3      BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4                     DEPARTMENT NO. 37

5
                         ---o0o---
6

7    THE PEOPLE OF THE
     STATE OF CALIFORNIA,                )
8                                        )
                    PLAINTIFF,           )
9                                        )     CASE NO.  C1223754
          v.                             )
10                                       )
                                         )
11    CRAIG RICHARD CHANDLER,            )
                                         )
12                                       )
                    DEFENDANT.           )
13   _____/

14

15
                         ---o0o---
16

17        REPORTER'S TRANSCRIPT OF PROCEEDINGS

18
                     JULY 25, 2013
19

20
                         ---o0o---
21

22

23
     APPEARANCES:
24
     FOR THE PEOPLE:              ALISON FILO
25                                Deputy District Attorney

26
     FOR THE DEFENDANT:           BRIAN MADDEN
27                                Attorney at Law

28   OFFICIAL COURT REPORTER:     JAMIE L. MIXCO
                                  C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1436

## INDEX

### EXAMINATION

**Witness Name**                                                    **Page**

**MARIA LEON**
   Direct By Mr. Madden   ....................................1438
   Cross By Ms. Filo      ...................................1446
**DR. WILLIAM O'DONOHUE**
   Direct By Mr. Madden   ....................................1452
   Cross By Ms. Filo      ...................................1494

### PEOPLE'S EXHIBITS

**Exhibits**      **Description**                               **Page**
24 Marked      document                                       1512

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1437

1   San Jose, California                          July 25, 2013

2                           PROCEEDINGS

3           THE COURT:  Thank you, ladies and gentlemen.  The

4   record will reflect all members of the jury are present, both

5   counsel are present, Mr. Chandler is present in the courtroom

6   as well.

7           And, Mr. Madden, your next witness.

8           MR. MADDEN:  Thank you, Your Honor.  The defense

9   calls Maria Leon.

10                          MARIA LEON,

11          Being called as a witness on behalf of the

12  Defendant, having been first duly sworn, was examined and

13  testified as follows:

14          THE CLERK:  For the record, ma'am, please state and

15  spell your first and last name.

16          THE WITNESS:  Maria Leon.  You spell it M-a-r-i-a,

17  L-e-o-n.

18          MR. MADDEN:  Good morning, ma'am.

19          THE COURT:  Good morning.  The lawyers are going to

20  be asking you questions.  It's important that you listen to

21  the question and only answer what is being asked.  You must

22  wait for the question to be interpreted from English into

23  Spanish and answer in Spanish because you're using the

24  interpreter.  Even though you understand English, you feel

25  more comfortable in the court to use the interpreter; is that

26  correct?

27          THE WITNESS:  Yes.  Thank you.

28          THE COURT:  Okay.  Thank you.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1438

1          Direct, Mr. Madden.

2          MR. MADDEN:  Thank you, Your Honor.

3                DIRECT EXAMINATION

4    BY MR. MADDEN:

5    Q.   Good morning, Ms. Leon.  My name is Brian Madden.

6    A.   Good morning.

7    Q.   You are Arleth's mother; correct?

8    A.   Yes.

9    Q.   And I want to ask you some questions, beginning with the

10   time in January of 2012 where you saw Mr. Chandler on the TV.

11   A.   Yes.

12   Q.   All right.  Did you see Mr. Chandler on the news

13   sometime near January the 10th of 2012?

14   A.   My sister saw him first on the news, and then she told

15   me about it, and then I saw him on the news.

16   Q.   Okay.  Did you see his picture?

17   A.   Yes.

18   Q.   And you knew that the man on the news had been arrested

19   for molesting children at O.B. Whaley Elementary School?

20   A.   Yes, correct.

21   Q.   And later you learned that the person you saw on TV was

22   your daughter's teacher when she was in the third grade?

23   A.   Yes.

24   Q.   And in January of 2012, your daughter was in the fourth

25   grade at O.B. Whaley; correct?

26   A.   Yes.

27   Q.   Okay.  Did you then begin asking your daughter about

28   whether Mr. Chandler did anything to her?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1439

1   A.   Yes.

2   Q.   And did you continue to ask her about whether Mr.

3   Chandler did anything over a period of three days?

4           MS. FILO:  Objection, Your Honor.  Leading.

5           THE COURT:  Sustained.  Rephrase.

6           MR. MADDEN:  All right.

7           THE COURT:  If there was an answer, I will strike

8   it.

9   BY MR. MADDEN:

10   Q.   For how many days did you question your daughter about

11   whether Mr. Chandler did anything to her?

12           MS. FILO:  Objection.  Assumes facts not in

13   evidence.

14           THE COURT:  If you could rephrase your question,

15   Mr. Madden.

16   BY MR. MADDEN:

17   Q.   How many days did you talk to your daughter about her

18   interaction with Mr. Chandler?

19   A.   I don't remember how many days I continued asking her.

20   I don't remember exactly how many days, but when I asked her,

21   she denied it.  She continued denying it.

22   Q.   She repeatedly denied it for the whole period that you

23   were questioning her; right?

24   A.   Yes.

25   Q.   All right.  But you kept questioning her; right?

26   A.   Yes.

27   Q.   All right.  And have you had a chance to read -- strike

28   that.  Let me ask another question.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1440

1          Do you remember going to the San Jose Police
2    Department on or about January 17th to talk about your
3    daughter with the police?
4    A.   Yes, I did.  I don't remember the exact date, but I do
5    remember having gone to the police department.  Yes.
6    Q.   All right.  And this morning before you testified, did
7    you review with the interpreter three pages of a transcript
8    of a conversations between you and Officer Emilio Perez?
9    A.   Yes.  I did go to the police department, but I don't
10   remember the name of the person that interviewed me.
11   Q.   Were the words that you read the words that you spoke on
12   the 17th with the officer?
13   A.   Some, but not all words are there.
14   Q.   So you don't think that this transcript is complete?
15   A.   No, because I remember having said other things besides
16   those.
17          MS. FILO:  Your Honor, could we approach, please?
18          THE COURT:  Yes.
19          (Whereupon, there was a discussion at the bench.)
20   BY MR. MADDEN:
21   Q.   Do you remember when you first asked your daughter if
22   anything happened and her saying:  No, Mommy.  He didn't do
23   anything?
24   A.   Yes, she said that nothing had happened.
25   Q.   Okay.  And she also said:  He gives me lollipops.  He
26   gives me lollipops?
27   A.   Yes.
28   Q.   Okay.  You remember telling her:  Mija, you got to tell

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1441

1   me the truth because there are things that older, bad people

2   do and it's not okay?

3         MS. FILO:  Objection, Your Honor.  Hearsay.

4   Leading.

5         THE COURT:  Sustained.  If you'd rephrase your

6   question.

7   BY MR. MADDEN:

8   Q.   Do you remember asking your daughter about telling her

9   about telling you the truth?

10  A.   Yes.

11  Q.   And did your daughter say -- do you remember your

12  daughter saying:  Well, Mommy --

13        MS. FILO:  Objection, Your Honor.  Calls for

14  hearsay and leading.

15        THE COURT:  Sustained.

16        MR. MADDEN:  It's a prior inconsistent statement,

17  Your Honor.

18        THE COURT:  It's leading.

19  BY MR. MADDEN:

20  Q.   Do you remember your daughter saying anything about

21  turning off the lights?

22  A.   Yes.

23  Q.   What did she say?

24  A.   She said that -- that he would turn off the lights, and

25  then after he would turn off the lights, he would have her

26  touch some of his parts.

27  Q.   She actually said he would have her touch his parts?

28  A.   Sorry.  I'm confused.  She just said that at first, but

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1442

1    she didn't want to tell me anything else.

2    Q.   After she told you that, did she tell you:  No, Mommy,

3    it's not true.  It's a lie?

4             MS. FILO:  Objection, Your Honor.  Leading.  Calls

5    for hearsay.

6             MR. MADDEN:  Prior inconsistent statement, Your

7    Honor.

8             THE COURT:  Okay.  It is leading.  If you could

9    rephrase it.

10   BY MR. MADDEN:

11   Q.   What did your daughter tell you about the truth of her

12   statement about turning the lights off?

13   A.   She said that that was true, but she didn't tell me

14   anything else.

15   Q.   Did she tell you that about -- the part about touching

16   his parts was a lie?

17            MS. FILO:  Objection, Your Honor.  Leading.  Calls

18   for hearsay.

19            THE COURT:  Sustained.

20   BY MR. MADDEN:

21   Q.   Did you continue to question your daughter?

22   A.   Yes.

23   Q.   Every day?

24   A.   Yes.

25   Q.   How many times would you question her throughout the

26   day?

27   A.   I don't remember, but I asked her many times.  And she

28   would get upset, you know, actually, because I was continuing

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1443

1    asking her.

2    Q.   She was getting tired of telling you it wasn't true, it

3    didn't happen?

4          MS. FILO:  Objection, Your Honor.  Leading.  Calls

5    for hearsay.

6          THE COURT:  I'm going to sustain the objection.

7    It's misstating her testimony.

8          MR. MADDEN:  All right.

9    BY MR. MADDEN:

10   Q.   Do you remember the things that she would say about

11   being tired of you asking?

12   A.   She said that she didn't want to say anything else.

13   Q.   But you kept asking her; right?

14   A.   Yes.

15   Q.   All right.  Did you also have a conversation with her,

16   where you clarified whether she was talking about his part or

17   her part?

18          MS. FILO:  Objection, Your Honor.  Leading.

19          THE COURT:  Sustained.  He's going to rephrase his

20   question.

21   BY MR. MADDEN:

22   Q.   Did she ever tell you anything about her part?

23   A.   That was when she talked to my niece.

24   Q.   Would it be fair to state that during these days that

25   you were questioning your daughter, you were interrogating

26   her?

27          MS. FILO:  Objection, Your Honor.  Leading.

28          MR. MADDEN:  No, it's not.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1444

1    THE COURT:  Overruled.  I will allow you to answer

2    that question.

3    THE WITNESS:  Could you repeat the question?

4    BY MR. MADDEN:

5    Q.   Yes.  Would it be fair to describe -- your questioning

6    of your daughter over this period of time, would it be fair

7    to describe that as interrogating her?

8    A.   I say I was interrogating her.  I wanted her to tell me.

9    Q.   I understand, but interrogating is a fair word; correct?

10   A.   Well, not quite.  I mean, I guess I was pressing her to

11   tell me because I wanted to know if she is being abused

12   because of her behavior.

13   Q.   All right.  Did you use the word "interrogating" to the

14   police officer to describe your questioning?

15   MS. FILO:  Objection.  Hearsay.

16   THE COURT:  Sustained.

17   BY MR. MADDEN:

18   Q.   What did you tell the police officer, if anything, about

19   interrogating?

20   MS. FILO:  Objection, Your Honor.  Hearsay, and I

21   will ask for an admonishment.

22   THE COURT:  Sustained.  The objection is sustained.

23   BY MR. MADDEN:

24   Q.   At some point, did you ask your daughter again anything

25   about if her parts were touched?

26   A.   After I found out about the truth or before?

27   Q.   Any time after?

28   A.   Well, if it was after I found out the truth, I mean, she

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1445

1  told me everything afterwards.

2  Q.   By afterwards, you mean after Noemi contacted you?

3  A.   Yes.

4  Q.   And at the time that this questioning of your daughter

5  was going on, was Naomi -- excuse me -- Noemi living with you

6  at your house?

7  A.   Yes.

8  Q.   All right.  Did you ever hear Noemi questioning your

9  daughter about Mr. Chandler?

10 A.   No, because what happened was that I -- I had to go to

11 work, so I left my daughter with this lady who looked after

12 her.  I left my nieces, my nephews, and my daughters with

13 this lady, and then later my niece called me and she told me

14 what happened.

15 Q.   Were you aware that Noemi was also questioning your

16 daughter during the time that you were questioning your

17 daughter?

18 A.   No.  I mean, they would play and I think -- I don't

19 think she would interrogate her or anything.  I think while

20 playing, Noemi would ask her if -- you know, if she had been

21 touched in school or something.

22 Q.   You didn't personally hear any of the conversations

23 between your daughter and Noemi about Mr. Chandler?

24 A.   No, because these conversations happened when my

25 daughter was with this lady who looked after her.  And, in

26 fact, they -- you know, the people who watched her found out

27 themselves because that's when she said everything.

28 Q.   And that person was Claudia; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1446

1    A.    Yes, yes.

2    Q.    Okay.

3              MR. MADDEN:  I have no further questions, Your

4    Honor.

5              THE COURT:  Cross-examination.

6              MS. FILO:  Thank you.

7                        CROSS-EXAMINATION

8    BY MS. FILO:

9    Q.    Good morning, Ms. Leon.

10   A.    Good morning.

11   Q.    So, Ms. Leon, I want to ask you a little bit about

12   Arleth in general.  Okay?

13   A.    Yes, that's fine.

14   Q.    You said something about Arleth's behavior changing?

15   A.    Yes.

16   Q.    And you said that was one of the reasons that you were

17   especially concerned?

18   A.    Yes.

19   Q.    What did you mean?

20   A.    Because, I mean, she started having dreams.  In fact,

21   like, she would fall asleep on the sofa and she -- then she

22   would get up and she would say:  Don't touch me.  Don't touch

23   me.  And then sometimes -- my husband also found out, you

24   know, he would see my daughter wake up.

25             MR. MADDEN:  Objection, Your Honor.  That's

26   hearsay.

27             THE COURT:  Okay.  What the husband saw I will

28   strike.  Continue with your answer.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1447

1    THE WITNESS:  So I feel bad because, you know, she

2  wake up and she would be, like, feverish, you know, when you

3  have a fever, and then I would hug her and I say:  It's okay.

4  It's okay.  It's me.  Then she would be like:  Don't touch

5  me.  Don't touch me.

6  BY MS. FILO:

7  Q.   This was new behavior for her?

8  A.   Yes, it was new.  And there were -- there was a time

9  also that she didn't want to go to school anymore.  She

10  didn't want to go.

11  Q.   When was that time?

12  A.   Well, it was -- honestly, I don't remember exactly when

13  this was, but she'd be -- she'd start crying and she said,

14  like:  I don't want to go to school.  I don't want to go to

15  school.

16  Q.   Okay.  Ms. Leon, is -- you know Arleth better than

17  anyone in the world.  Yes?

18  A.   Yes.

19  Q.   Is Arleth an honest child?

20  A.   Yes.

21  Q.   She's not a troublemaker, is she?

22  A.   No.

23  Q.   She doesn't lie to you?

24  A.   No, she's not a liar.

25  Q.   She didn't make things up?

26  A.   No, she didn't.

27  Q.   Never known her to do that?

28  A.   No.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1448

1  Q.   You've taught her the difference between the truth and a

2  lie?

3  A.   Yes.

4  Q.   Have you told her every time that she's talked to the

5  police to tell the truth?

6  A.   Yes.

7  Q.   Whenever she comes to court, your instruction to her has

8  been to tell the truth?

9  A.   Yes.

10  Q.   Okay.  Ms. Leon, when you were asking Arleth about

11  whether or not Mr. Chandler had done anything to her, did you

12  have any idea what conduct was even being alleged?

13  A.   You mean after I found out?

14  Q.   No.  So when you were asking her, you know, whether or

15  not Mr. Chandler had done anything to her, did you know what

16  "done" would mean?

17             MR. MADDEN:  Objection.  That is speculation, Your

18  Honor.

19             THE COURT:  Excuse me?  The objection?

20             MR. MADDEN:  Speculation.

21             THE COURT:  Overruled.  You may answer the

22  question.

23             THE WITNESS:  Well, I saw, you know, something on

24  the news, but I never thought that had happened to my

25  daughter.

26  BY MS. FILO:

27  Q.   Okay.  I guess what I'm trying to ask you is this.  You

28  knew that Mr. Chandler had been accused of child molestation;

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1449

1    right?

2    A.    Yes.

3    Q.    But you had no idea what kind; right?

4    A.    No, I have no idea.

5    Q.    I mean, child molestation could include everything

6    from --

7              MR. MADDEN:  Objection, this is a speech, Your

8    Honor.  It's not a question.

9              THE COURT:  I will sustain the objection.  If you

10   could rephrase it.

11             MS. FILO:  Sure.

12   BY MS. FILO:

13   Q.    Did you have any idea what the conduct was, or did you

14   just have the general description child molestation?

15             MR. MADDEN:  Objection.  Compound.

16             THE COURT:  Overruled.  You may answer the

17   question.

18             THE WITNESS:  Well, all I saw was that he had

19   abused some children.

20   BY MS. FILO:

21   Q.    Okay.  So when you were asking Arleth whether anything

22   happened to her, you were asking her whether or not he ever

23   touched her body parts; right?

24   A.    Yes.

25   Q.    Because that's what you suspected when you hear child

26   molestation?

27   A.    Yes.

28   Q.    So Arleth never told you that she was blindfolded in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1450

1    classroom by herself while things were put in her mouth?

2    A.    No, she didn't.  She didn't tell me that at first.  She

3    told me that after, after I found out the whole truth.

4    Q.    Because she had no idea that that was child molestation?

5              MR. MADDEN:  Objection, Your Honor.  Speculation.

6              THE COURT:  Sustained.

7    BY MS. FILO:

8    Q.    You never knew to ask her:  Arleth, were you blindfolded

9    in a classroom by yourself while things were put in your

10   mouth?

11             MR. MADDEN:  Objection.  Speculation.

12             THE COURT:  I'll sustain the objection.

13             MR. MADDEN:  Also calls for a statement, Your

14   Honor.

15             THE COURT:  Well --

16             MS. FILO:  I could ask another question.

17             THE COURT:  The way you phrased it, I will sustain

18   the objection.

19   BY MS. FILO:

20   Q.    You never asked her:  Arleth, were you blindfolded in a

21   classroom by yourself with Mr. Chandler while things were put

22   in your mouth?

23   A.    No, I never asked her that.

24   Q.    Ms. Leon, does Arleth receive some special services at

25   school?

26   A.    Not in the school.

27             MR. MADDEN:  Objection, Your Honor.  Relevance,

28   Your Honor.  May we approach?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1451

1    THE COURT:  Yes.  I think I know the relevancy, but
2  you may approach.
3          (Whereupon, there was a discussion at the bench.)
4          THE COURT:  Objection is overruled, but, Ms. Filo,
5  I would ask you to rephrase the last question.
6          MS. FILO:  Sure.
7  BY MS. FILO:
8  Q.   Ms. Leon, does Arleth have what's called an IEP?
9  A.   Frankly, I don't know.  I haven't asked her that
10 specifically.
11 Q.   Okay.  Does she get -- is she taken out of the class for
12 about an hour a few times a week to get some special --
13 almost tutoring help?
14 A.   Yes.  Oh, yes.  And, yes, she's aware of that, that she
15 goes to this special class.  She knows.
16 Q.   Okay.  Ms. Leon, could you tell me how Arleth has
17 reacted to being involved in the court process?
18 A.   It -- it hasn't been good.
19         MR. MADDEN:  Your Honor, I'm going to object.  This
20 question calls for narrative.  Sounds like we're about to get
21 a narrative.
22         THE COURT:  Let me hear your response.
23         THE WITNESS:  Well, she's become, like, angry, you
24 know.  She gets angry with her sister.  She hits her -- well,
25 not really hitting her, just not treating her well, you know.
26 And not so much now, because she's been going to a lot of
27 therapy, but she was like that at first.
28 ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1452

1    BY MS. FILO:

2    Q.    Does she enjoy coming to court?

3    A.    No.

4    Q.    This isn't a fun process for her?

5    A.    No.

6          MS. FILO:  That's all the questions I have.  Thank

7    you, Your Honor.

8          THE COURT:  Redirect?

9          MR. MADDEN:  Nothing, Your Honor.

10         THE COURT:  Thank you, ma'am.  You are excused and

11   you may step down.  You are free to leave.

12         Your next witness available, Mr. Madden?

13         MR. MADDEN:  Yes.  One moment, please, Your Honor.

14         THE COURT:  Yes.

15               DR. WILLIAM O'DONOHUE,

16         Being called as a witness on behalf of the

17   Defendant, having been first duly sworn, was examined and

18   testified as follows:

19         THE CLERK:  For the record, sir, please state and

20   spell your first and last name.

21         THE WITNESS:  My name is Dr. William O'Donohue.

22   William is W-i-l-l-i-a-m.  O'Donohue is O-'-D-o-n-o-h-u-e.

23         THE COURT:  Thank you.

24         Direct examination, Mr. Madden.

25         MR. MADDEN:  Thank you, Your Honor.

26                  DIRECT EXAMINATION

27   BY MR. MADDEN:

28   Q.    Dr. O'Donohue, what is your occupation?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1453

1    A.    I'm a licensed clinical psychologist in the state of

2    Nevada, and I'm a professor of clinical psychology at the

3    University of Nevada, Reno.

4    Q.    Could you tell the jury about your educational

5    background?

6    A.    Yes.  I have a bachelor's degree in psychology from the

7    University of Illinois at Champaign-Urbana.  I have a

8    master's degree in clinical psychology at the State

9    University of New York at Stony Brook.  I have a PhD in

10   clinical psychology at the State University of New York at

11   Stony Brook, and then I have a master's degree in philosophy

12   from Indiana University.

13   Q.    And what is your current employment?

14   A.    I'm employed by the University of Nevada, Reno, where

15   I'm a professor in the Department of Psychology.  I'm also a

16   professor there in the National Judicial College where judges

17   go to get continuing education.  I'm also the director of a

18   clinic that treats sexual assault victims, treats both

19   children who have been sexually abused and women who have

20   been sexually assaulted.

21   Q.    So you have been personally involved in therapy with

22   child victims of sexual abuse?

23   A.    Yes, during my entire 30-year career.  And for the past

24   17 years, I have written a grant to the National Institute of

25   Justice, a federal agency, to support this clinic.  And

26   again, we've treated children and women who have been raped

27   for free, and I've treated over 2,000 children who have been

28   sexually abused.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1454

1   Q.   You personally treated over 2,000 children over the
2   course of your career?
3   A.   Yes.
4   Q.   Okay.  So you mentioned a grant in a current clinic.  Is
5   there a grant connected with that work?
6   A.   Yes.  It's a victim's of crime grant by the Department
7   of Justice in Washington, and we've had it for 17 years and
8   it just was renewed for another three years.
9   Q.   Do you have any other current grants that you're working
10  under?
11  A.   No.  Just that grant.
12  Q.   Okay.  Have you published in the area of child sexual
13  abuse?
14  A.   Yes.
15  Q.   Tell me about your publications.
16  A.   I have -- I published 70 books.  Approximately a dozen
17  of those are about child sexual abuse or sexual deviance.  I
18  have published over 200 journal articles.  Again, about a
19  quarter of those will be about child sexual abuse, including
20  the treatment of sexually abused children, assessment of
21  sexually abused children, how to do proper forensic
22  interviews of sexually abused children, how to analyze child
23  sexual abuse allegations, how to prevent -- technologies to
24  try to prevent child sexual abuse.  Those will the major
25  topics.
26  Q.   All right.  Have you ever qualified as an expert in the
27  courts of California before?
28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1455

1    Q.    In what areas?

2    A.    On child sexual abuse, on forensic interviewing of

3    children, on suggestibility and child sexual abuse

4    allegations, on pedophilia, and the typical patterns of child

5    molestation.

6    Q.    Okay.  How many times approximately where you estimate

7    you've qualified as an expert in California on those

8    subjects?

9    A.    I haven't done a count, but I would say between 80 and

10   100.

11   Q.    Have you ever been asked by law enforcement or judges to

12   interview children on the subject of child sexual abuse?

13   A.    Yes, in Nevada.

14   Q.    Could you tell me more about that?

15   A.    I have had judges request that I interview children, do

16   a forensic interview, and write a report to them about their

17   abuse status.  I have had police officers, especially in the

18   rural counties of Nevada, send children and their mothers to

19   me to do forensic interviews and write reports.  And I've

20   trained police officers and mental health professionals in

21   Nevada about how to do forensic interviews of children.

22   Q.    What is a forensic interview?

23   A.    Forensic interview is in contrast to a clinical

24   interview.  Clinical interview you are trying to find out

25   what sort of psychological problems a person has.  The

26   forensic interview in contrast you are trying to find out

27   about historical events, their statements about historical

28   events, did these things occur, and you're looking at trying

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1456

1  to get as much detail about these without biasing them.

2  Q.   All right.  So police officers when they investigate

3  allegations of child sexual abuse interviewing child

4  witnesses, those are -- is that a form of a forensic

5  interview?

6  A.   Yes.

7  Q.   And the word "forensic" is connected with legal

8  purposes?

9  A.   Yes.

10  Q.   I believe you indicated earlier that you treated --

11  personally treated more than 2,000 children who have been

12  sexually abused?

13  A.   Yes.

14  Q.   All right.

15       MR. MADDEN:  Your Honor, I offer Dr. O'Donohue as

16  an expert in the area of child sexual abuse of children and

17  forensic interviewing of children concerning sexual abuse.

18       THE COURT:  Ms. Filo, do you wish to question the

19  doctor --

20       MS. FILO:  No.

21       THE COURT:  -- on his qualifications?  Okay.

22       Then the Court will recognize him as an expert in

23  the areas requested by the defense.

24       MR. MADDEN:  Thank you, Your Honor.

25  BY MR. MADDEN:

26  Q.   Dr. O'Donohue, as part of your work in this case for me,

27  for the defense, have you been provided with certain material

28  to read and to listen to to help you in your work?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1457

1  A.   Yes.

2  Q.   All right.  And could you briefly summarize what you

3  have been provided?

4  A.   I was given documents, legal:  The People of the State

5  of California v. Craig Richard Chandler information summary,

6  5/30/12; transcript of interview of Isabell by Det. Pierce;

7  interview of -- second interview of Isabell by Det. Pierce;

8  interview of Isabell's mother by Det. Pierce; interview of

9  Becky by Det. Pierce; interview of Kim To; interview of

10  Laurie at school by Lisa and Dave; interview of Laurie,

11  second one, by Lisa and Dave; interview of Wendy; interview

12  of Maria Leon; interview of Arleth; interview of Noemi;

13  interview of Ashlyn; another interview of Ashlyn; Melissa

14  questionnaire; Isabell preliminary examination testimony;

15  Becky preliminary examination testimony; Laurie preliminary

16  examination testimony; Wendy preliminary examination

17  testimony; Arleth preliminary examination testimony, and the

18  San Jose Police Department narrative and supplemental

19  reports.

20  Q.   All right.  So as part of that material, you were given

21  CD's of all of the interviews that were recorded, either by

22  audio or by video; correct?

23  A.   Correct.

24  Q.   You were also given transcripts of the contents of those

25  CD's; correct?

26  A.   Correct.

27  Q.   At the core, they included everything that the defense

28  has been provided concerning the five complaining witness;

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1458

1   correct?

2   A.   Correct.

3        MS. FILO:   Objection, Your Honor.  Calls for

4   speculation.

5        THE COURT:   Sustained.

6   BY MR. MADDEN:

7   Q.   You assumed you were given everything?

8        THE COURT:   The last answer is stricken?  Did you

9   hear the last question?

10  BY MR. MADDEN:

11  Q.   You reviewed what I gave you and you assumed that was

12  everything?

13  A.   I assumed it was everything you gave me.  I know there

14  is other documents related to the case.

15  Q.   All right.  So you've spent a considerable amount of

16  time, I assume, listening to each and every one of those CD's

17  and reading all of the transcripts that were provided?

18  A.   Correct.

19  Q.   All right.  Now, have you prepared in this case a

20  report, a child sexual abuse investigation report?

21  A.   Yes.

22  Q.   That's a 70 page single-spaced document?

23  A.   Correct.

24  Q.   You will be relieved to know I will not ask you to read

25  that this morning.

26  A.   Okay.

27  Q.   Rather than have you read it, I would like to cover

28  perhaps eight categories that you address in your letter.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1459

1    Are you okay with that?

2    A.    In my report?

3    Q.    Yes.  I mean in your report.  I apologize.

4          And these would be areas that you, as a

5    psychologist, as an evaluator, had concerns about with

6    respect to the forensic interviews; correct?

7    A.    Correct.

8    Q.    All right.

9    A.    Or the children's allegations themselves.

10   Q.    Right.

11   A.    That emerged in the forensic interviews.

12   Q.    Right.

13         Now, let's begin with the category of

14   inconsistencies.  I believe in your report you actually

15   created a table of inconsistencies; correct?

16   A.    Correct.

17   Q.    And do you have that report in front of you?

18   A.    Yes.

19   Q.    Okay.  So this table begins on page 27 of your report;

20   is that correct?

21   A.    Yes.

22   Q.    All right.  Could you tell me generally what the

23   significance of inconsistent allegations is?

24   A.    It has two major -- it's important in two -- important

25   in two majors ways:  One, most children when they make

26   allegations of sexual abuse do not have any inconsistencies

27   regarding core details.  Core details being defined as the

28   central features of the abuse.  So a core detail would be who

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1460

1    abused them, how many times, roughly where it occurred, what

2    were the acts, what the acts felt like.

3            This is in contrast to peripheral details such as

4    the color of the walls, the exact time of day, exactly what

5    they were wearing.  These are less central.  But because

6    sexual abuse is traumatic, children are focused on this, and

7    the major features of what happened to them are remembered

8    and then told consistently across tellings.  So the number

9    one reason is usually children are consistent in reciting

10   core details of their abuse.

11           The second important reason is that an

12   inconsistency by logic we know that some statement is false.

13   If I tell you I'm exactly six foot tall and I tell you I'm

14   exactly seven foot tall, you know that one of those

15   statements is false.  I can't be both.

16   Q.   At the same time?

17   A.   At the same time.  So when a child says something

18   inconsistent, contradictory, we know that some of their

19   allegations by logic has to be false, and now we're trying to

20   figure out what is false and what is true.  So that's the

21   second important reason why you have to examine

22   contradictions, inconsistencies.

23   Q.   All right.  So let let me ask you to turn your attention

24   to the chart.  The chart is apparently laid out essentially

25   as the information with Isabell being addressed first and

26   Becky, then Laurie, followed by Wendy and Arleth; correct?

27   A.   Right.

28   Q.   All right.  So with respect to inconsistencies now, the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1461

1  inconsistencies are directed to something specific like

2  allegations of something; correct?

3  A.   Correct.

4  Q.   All right.  So let's -- let me ask you about the

5  allegation of how many times this occurred concerning -- all

6  of these are concerning Isabell; correct?

7  A.   Correct.

8  Q.   What were your findings concerning inconsistencies in

9  Isabell's statement about how many times this occurred?

10  A.   Um, basically again, she gave different numbers across

11  the interviews.

12  Q.   Interview one, what did she say?

13  A.   Um, I'm not sure what she said on interview one.

14  Q.   I'm sorry.  In your chart, did you make a notation as to

15  the inconsistency?

16  A.   Not that I have in my chart.  No.

17  Q.   All right.

18        MR. MADDEN:  May I approach, Your Honor?

19        THE COURT:  Yes.

20        (Whereupon, there was a discussion off the record.)

21  BY MR. MADDEN:

22  Q.   How about the allegation about whether the subject --

23  the object made her choke?

24  A.   Yes.  In one interview she said that it made her choke.

25  According to the mother's interview, she, the mother, was

26  told by her it did not make her choke.  And then in the

27  preliminary testimony she says the object made her choke.

28  And she is -- she told her mother that the object made her

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1462

1    choke.  So that's inconsistent in terms of her reporting to

2    the mother and reporting between interview two and the

3    preliminary testimony.

4    Q.   And inconsistent as to a core detail?

5    A.   Yes.  Whether something makes you choke is something

6    central to the abuse and something that would be remembered.

7    Q.   So let me ask you, core details as opposed to peripheral

8    details; correct?

9    A.   Correct.

10   Q.   Core details are something that a child remembers over

11   time?

12   A.   Yes, because they are central.  And because they are

13   traumatic, they are hurtful.  They are --

14   Q.   So if something occurred, those core details should

15   remain consistent?

16   A.   Correct.

17   Q.   Is this your opinion or is this supported by scientific

18   literature?

19   A.   It's supported by the scientific literature, that one

20   differentiating criterion, and it's not perfect, but it tends

21   to be associated with false memories is that core detail

22   change across the interviews.  In cases where abuse actually

23   occurred, these core details tend to remain consistent across

24   interviews.

25   Q.   All right.  Okay.  May we move to the allegation

26   concerning the taste of the object Mr. Chandler put in

27   Isabell's mouth.  Could you find any inconsistencies in that

28   allegation?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1463

1   A.    Yes.   In the first interview, she said it tasted like

2   strawberry, kind of like strawberry, faint strawberry.

3   Second interview she said it did not taste like strawberry.

4   In the preliminary testimony, she doesn't mention anything

5   about the taste.

6   Q.    Again, core details?

7   A.    Yes.

8   Q.    Taste of the object in your mouth, if the object was an

9   object of sexual abuse, you would remember?

10  A.    Or if it wasn't, yeah.   If this unusual thing that is

11  happening to you, you would remember.   She did, you know,

12  apparently remember in the sense that she says in interview

13  one that it tasted like strawberry, but then she contradicts

14  herself.

15  Q.    Okay.   Let's move on to another allegation, Isabell's

16  allegation about sounds that she heard while Mr. Chandler had

17  the object in her mouth.

18  A.    Okay.

19  Q.    Did you find key inconsistencies here?

20  A.    Yes.

21  Q.    Could you describe them?

22  A.    In interview two, when she was asked directly about

23  this, she said she didn't hear anything.   And in the

24  preliminary testimony, she said she heard keys.   And when

25  asked why she didn't tell the detective, she said she simply

26  forgot.

27  Q.    All right.   Dr. O'Donohue, if I were to tell you that at

28  trial Isabell testified that after he took the object out of

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1464

1  her mouth, she heard keys and heard him zip up his pants,

2  would that be a new inconsistency?

3  A.   Yes, that would be a new inconsistency regarding core

4  details.  Because again, in the second interview she said she

5  didn't hear anything and now she's saying she heard two

6  distinct sounds, the keys and zipping up pants.  And that's

7  inconsistent.

8  Q.   Well, actually three:  I didn't hear anything; I heard

9  the sound of keys; I heard the sound of keys and pants being

10  zipped; correct?

11  A.   Correct.

12          THE COURT:  Excuse me.  Would counsel approach.

13          (Whereupon, there was a discussion at the bench.)

14          THE COURT:  Thank you, Counsel.

15          Mr. Madden, I apologize for the interruption.

16          MR. MADDEN:  Not at all.

17  BY MR. MADDEN:

18  Q.   Dr. O'Donohue, I want to move in the consistency table

19  to Becky, if I may?

20  A.   Okay.

21  Q.   Let's address first Becky's allegation that Mr. Chandler

22  put something in her pants.

23  A.   Okay.

24  Q.   Did you find inconsistencies within the materials you

25  were provided on that subject?

26  A.   Yes.  In the first interview, she didn't mention that

27  allegation.  In the second interview, she did make that

28  allegation, that Mr. Chandler put something in her pants

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1465

1   while she was laying down, but in the preliminary

2   testimony -- and again, she fails to make that allegation.

3   Again, that is also a core detail.  When a teacher puts

4   something in a child's pants, it's something they would

5   remember and something that they would generally find, you

6   know, problematic.

7   Q.   All right.  Let's move to another allegation, her

8   allegation concerning the color of the gooey stuff.  What

9   inconsistencies did you find concerning that allegation?

10  A.   She was inconsistent on what color she alleged it was.

11  In the first interview, she said it was white, yellow, or

12  green.  In the second, she said it was crystal clear, white,

13  yellow, and then she said she doesn't remember.  In the

14  preliminary testimony, she says it was crystal clear.  So the

15  color changes across tellings.

16  Q.   All right.  Do you find those inconsistencies to concern

17  core details?

18  A.   Yes.

19  Q.   Concerning her allegation about how she felt when Mr.

20  Chandler put an object in her mouth, what inconsistency did

21  you find?

22  A.   Um, in the first and second interview, she never

23  mentions that it felt like she was going to choke, and only

24  in the preliminary testimony does she say that it feels like

25  he was going to make her choke.  And again, that is

26  inconsistency.

27  Q.   All right.  And let's move to the allegation of how far

28  the object went into her mouth.  What inconsistency did you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1466

1   find there?

2   A.   In the first interview, she said it went all the way in

3   her mouth.  On the second interview, she didn't mention

4   anything like that.  And in the preliminary testimony, she

5   denied it and said it didn't go all the way in her mouth.

6   Q.   All right.  Let's move to Laurie and her allegation

7   concerning a description of the objects as she felt with her

8   feet when she was alone with Mr. Chandler.  What

9   inconsistency did you find?

10  A.   First interview, she said she felt like a marker, pen,

11  or a glue stick; second interview, the top of a scissors or a

12  glue stick; and then the preliminary testimony, a glue stick

13  or a pen.

14  Q.   All right.  Again, core detail?

15  A.   Yes.

16  Q.   Move please to the allegation of whether she remembered

17  who Helen Keller was, or if she had read about Helen Keller.

18  A.   First interview, she doesn't mention anything about that

19  topic, second interview said she did remember, and then a

20  preliminary testimony said she does not remember.

21  Q.   All right.  Let's move to the allegation concerning

22  whether she told her mom about staying behind at recess and

23  feeling objects with her feet.

24  A.   First interview, she said she told her mom, second

25  interview said she also told her mom, and then preliminary

26  testimony said she doesn't remember telling her mom.

27  Q.   Okay.  Core details?

28  A.   Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1467

1  Q.   Concerning the allegation how she ended up in the

2  classroom.   What inconsistency did you find?

3  A.   In the first interview, she said she was held back in

4  the classroom while other kids went to recess.   In the second

5  interview, she said she was held back in the classroom while

6  other kids went to recess, but in the preliminary testimony,

7  she says the yard supervisor brought her back to the

8  classroom.

9  Q.   Now, do you recall in your review Laurie consistently

10 saying at interview one and at the preliminary examination

11 that Mr. Chandler never put anything in her mouth?

12 A.   Correct.   She said that.

13 Q.   All right.   And if I were to tell you that a

14 psychiatrist, a Dr. Lynn, who was seeing Laurie for an

15 evaluation testified that Laurie told her that he put objects

16 in her mouth, that the doctor concluded -- the doctor

17 concluded the object was a penis, would that be an

18 inconsistent -- a new inconsistency?

19 A.   Yes.

20 Q.   Would that be a significant new inconsistency?

21 A.   That will be about a core detail, yes.

22 Q.   All right.   Let's move to Wendy concerning her

23 allegation about what the object Mr. Chandler put in her

24 mouth felt like.   What inconsistency did you find?

25 A.   Interview she said it felt like a gummy bear, and in the

26 preliminary testimony she says it felt like skin.

27 Q.   All right.   Let's move to the allegation concerning

28 Wendy's description of the taste of the object Mr. Chandler

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1468

1  put in her mouth.  What inconsistency did you find?

2  A.   In interview one, she did not describe it, the taste,

3  and in the preliminary testimony, she said it was a faint

4  strawberry taste.

5  Q.   Let's move to the allegation concerning whether Mr.

6  Chandler held the object inside her mouth.  What

7  inconsistency did you find?

8  A.   Interview one, she said that he held it and moved it

9  inside her mouth, and in the preliminary testimony, said she

10  never felt her hand on the object inside her mouth.

11  Q.   Finally, concerning Wendy, I would like you move to the

12  allegation concerning whether Mr. Chandler told her anything

13  when this object was inside her mouth.

14  A.   First interview, she didn't mention anything.  In the

15  preliminary testimony, she said she bit the object and he

16  told her not to bite it.

17  Q.   All right.  Then finally, let's move to Arleth.  Would

18  you please address Arleth's allegation about to whom she

19  disclosed the incidents?

20  A.   In interview one, she said she didn't tell her cousin,

21  then she said she told her cousin.  And then she said she

22  told her mother first.  In the preliminary testimony, she

23  said she told her cousin first, then she was wrong previously

24  when she told the detective that she didn't tell her cousin.

25  Q.   All right.  Please, the allegation of Arleth concerning

26  whether she saw Mr. Chandler's penis when she was down on the

27  ground.

28  A.   She said in interview one that she didn't see his

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1469

1  weenie.  Next, she said:  I think I saw this, and pointed to

2  the penis on the anatomical drawing.  In the preliminary

3  testimony, she doesn't mention this.

4  Q.  All right.  Let's move to the allegation of Arleth

5  concerning the object used by Mr. Chandler to push Arleth

6  from behind when she was on the ground.

7  A.  In interview one, she said it was Mr. Chandler's head

8  pushing her, and in the preliminary testimony, she says it

9  was a bouncy ball.

10  Q.  Then if I were to tell you that at trial she testified

11  that it was both her head and -- excuse me -- both his head

12  and a red bouncy ball but on two different occasions, would

13  that also be a further inconsistency on that subject?

14  A.  Yes.

15  Q.  Then if you would please turn your attention to Arleth's

16  allegation about what the water in her mouth tasted like.

17  What inconsistency did you find?

18  A.  In interview one, first she said that it didn't taste

19  like anything, then she said it tasted bad.  The interview

20  with Noemi reported that Arleth told her that it tasted like

21  pee.  And then in the preliminary testimony, she says it

22  tasted like pee.

23  Q.  And then finally, her allegation concerning whether the

24  lights were on or off during the incident?

25  A.  Interview one, she said Mr. Chandler possibly turned off

26  the lights on two occasions, and then in the preliminary

27  testimony, she said the lights were on for all four

28  occasions.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1470

1   Q.   All right.  Let's move to another category about details

2   that don't make sense.  Could you tell me what you mean by

3   "details that don't make sense"?

4   A.   In children's recounting of their allegations, in

5   children's narratives, it's usually a case that when they

6   have been abused, they are not telling any detail that would

7   be inconsistent with the way the abuse is typically carried

8   out.  When they do tell such a detail, that would need an

9   explanation of why they are saying something like that.

10  Q.   Is it kind of a common sense thing?

11  A.   It's partly common sense, but also it's partly the

12  result of hearing a lot of allegations and understanding what

13  is standard.

14  Q.   Okay.  So could you give some examples of what you mean

15  by, in this particular evaluation, details that don't make

16  sense?

17  A.   For example, Arleth reported that she was told to bite

18  the object in her mouth.  If the object in her mouth at that

19  point was a penis, that's an unusual detail for a perpetrator

20  to tell a child to bite their penis.  I have not seen that.

21  It would be painful.  When I did -- have seen children making

22  this feature of their allegation, the abuse usually stops.

23  They usually do this spontaneously to stop being abused

24  early, but I have never seen the case where a perpetrator

25  places a penis in a child's mouth and asks the child to bite

26  it.

27  Q.   That would be -- when you say you've never seen that,

28  that would be in the 2,000-plus cases that you have actually

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1471

1  treated sexual abuse victims in?

2  A.    Yes, and in the literature.

3  Q.    Okay.

4  A.    Reading about other cases.

5  Q.    And what about the directive, "chew it"?

6  A.    Becky made that part of her allegation and that's the

7  same kind of concerns.  I've not seen that before.  It would

8  be painful and it's unusual.  If the abuse is oral, you know,

9  the child's being abused orally, it would be a very unusual

10  thing for a perpetrator to say, you know:  Chew my penis when

11  it's in your mouth.

12  Q.    So we'll get back to the list.  But these details that

13  don't make sense, when you see a detail that doesn't make

14  sense, is that a red flag?

15  A.    It's a red flag, and in the forensic interview, it needs

16  to be explored more to try to understand what is happening at

17  that point.

18  Q.    You mean the person doing the interview should follow

19  up?

20  A.    Try to -- exactly.  Try to follow up to gather more

21  information to try to understand an explanation for this very

22  unusual feature if abuse is actually occurring.

23  Q.    All right.  What about the description about a gummy

24  bear, like a gummy bear?

25  A.    Yes.  A child saying that it felt like a gummy bear in

26  my mouth is also an unusual feature.  Not heard that before.

27  Gummy bears tend to be small and, you know, not shaped and

28  not the same size as a penis.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1472

1    Q.    All right.

2    A.    So that will be an unusual descriptor.

3    Q.    Mainly because of the disparity in size between the

4    gummy bear and a penis?

5    A.    Correct.

6    Q.    What other items you have on your list that are involved

7    in details that don't make sense?

8    A.    Isabell describing it like a cheese -- like a cracker or

9    a cheese cracker.  That has a different texture and shape and

10   taste.  I have never heard a child describe oral abuse in

11   those terms, and that would have to be understood.  Becky

12   describing it as a buttery thingy.  That needs more

13   explanation.  That's not a direct sort of description of oral

14   abuse that most children make.  Isabell talking about it

15   tasting like strawberry, a faint strawberry taste.  Also an

16   unusual feature.  Arleth describing that it tastes like

17   smoke.  Again, an unusual feature.

18              MS. FILO:  Your Honor, may we approach briefly?

19              THE COURT:  Yes.

20         (Whereupon, there was a discussion at the bench.)

21              THE COURT:  Ladies and gentlemen, we're going to

22   take the morning recess at this time.  We'll call you back up

23   before 11:00 o'clock, so hopefully by five 'til -- actually,

24   11:00 o'clock.  I've got to address an issue.  Please report

25   to the jury assembly room on the second floor.  Thank you.

26         (Whereupon, the jurors were excused and the

27   proceedings were had outside the presence of the jury.)

28              THE COURT:  Jury has left the courtroom.  Counsel

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1473

1    are present.  Mr. Chandler is present.

2              Ms. Filo, at sidebar you indicated that you had

3    concerns that this doctor was testifying about details that

4    aren't included in his apparently 70-page report.  And is

5    that your concern, Ms. Filo?

6              MS. FILO:  It is.

7              THE COURT:  Mr. Madden.

8              MR. MADDEN:  Your Honor, it's -- I'm not quoting

9    from a page or line here that I'm keeping it from counsel.

10   It's my belief that all of these items are referred to in the

11   various parts of Dr. O'Donohue's report.  But I'll ask, Dr.

12   O'Donohue, are those things referenced in your report?

13             THE WITNESS:  Yes, in the conclusions under the

14   logistical details, and they are all described in the report

15   and the summary of the narratives.

16             MR. MADDEN:  Okay.

17             MS. FILO:  Judge, maybe I could just state:

18   According to the document reviewed, it's my opinion that the

19   alleged abuse occurred during school time, the isolated

20   children, the details were impoverished, who was present.  I

21   mean, I have no information about -- I mean, these are very

22   specific statements, and all of these inconsistencies have

23   been detailed in a chart that was provided in this report,

24   but this is -- I mean, none of that is referenced in the

25   logistical details.

26             MR. MADDEN:  If I may respond, Your Honor?

27             THE COURT:  Yes.

28             MR. MADDEN:  Number one, the doctor previously

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1474

1    testified that he's received all of the CD's and transcripts

2    of the interviews.  That is the sum total of the allegations

3    by these kids.  And by the transcript, I mean, the transcript

4    of the preliminary examination, transcripts of the CIC

5    interview.  Of course, some of this has to be supplemented by

6    elements throughout the trial, but I know all of these things

7    appear within the confines of what he was provided.

8              You have something to say before, Doctor?

9              THE WITNESS:  Also, you didn't read the entire

10   paragraph on the logistical details.  The last sentence says:

11   In addition, it is my opinion some of the details given are

12   not consistent with abuse, for example, the shape of the

13   objects given or taste or textures reported, and these need

14   to be considered, along with details that are consistent with

15   abuse.

16             THE COURT:  The concern I have is that the

17   impression I'm getting is that the doctor's testifying about

18   these inconsistencies from all of these materials that were

19   presented to me, which is different than was presented in

20   this trial.  So it has to be clear to the jury this is his

21   opinion based on all of the information that he has, number

22   one, about these areas he's talking about, the eight core

23   areas, are one area of inconsistencies, and now we're talking

24   about details that don't make sense.

25             The thing is, that I get the sense that he's

26   pointing out specific pieces of evidence, and the inference

27   is that this has been presented in the trial these are

28   inconsistencies.  He's basically pointing out to the jury the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1475

1    evidence.  And I indicated to you, Mr. Madden, I didn't have

2    a problem with you using some examples to make the point, but

3    I think you have to let your doctor know that if you are

4    going into these types of details, Ms Filo is going to be

5    allowed to go into details without restriction, and this is

6    going to take a few days.

7            MR. MADDEN:  Ms. Filo is entitled to cross-examine

8    what she wants.

9            THE COURT:  Absolutely.  But my concern is that

10   we're talking about his opinion about a core area and then

11   we're going over example after example.  And he's talking

12   about the evidence, which is, you know, for the jury to

13   decide based on his opinion.  So I think it's going beyond

14   what's necessary to form his opinion or give his opinion to

15   the jurors.

16           MR. MADDEN:  Your Honor, I disagree with the Court.

17   I need to be able to establish a basis for his opinion.  His

18   opinion means nothing without indicating what it's based on,

19   and I'm not using everything.  I think we've done probably on

20   this particular subject about half of the items I wanted to

21   discuss.  These items don't take a long time to discuss.

22           MS. FILO:  But the problem I have, Your Honor, we

23   addressed this in motions in limine.  The doctor is not

24   entitled to testify as to the veracity of the children.

25   Not -- I mean, that is -- that much is clear.  So his opinion

26   about whether they are telling the truth or not is not

27   admissible in this trial.

28           MR. MADDEN:  He's --

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1476

1          MS. FILO:  May I finish, Mr. Madden?

2          So we talked specifically about whether or not

3   inconsistent statements could be presented to the jury, and

4   what we talked specifically about was in the context of:

5   Should it be considered in -- you know, in the grand scheme

6   of the allegations?  Yes.  But I made this motion in limine.

7   It is not outside the province of the jury to determine

8   whether these inconsistencies occurred.  What's happening now

9   is Mr. Madden is presenting facts as inconsistencies that

10  were never testified to at this trial and are not part of

11  this record.

12          MR. MADDEN:  That's incorrect.  To be begin with,

13  the CIC interview, tapes of all five of the children, are

14  part of the record.

15          THE COURT:  Well, that's one piece of evidence.

16          MR. MADDEN:  Very significant one.

17          THE COURT:  Well, but he has before him, or he's

18  been presented a lot of information that isn't evidence.  I

19  guess my concern is that your expert could testify and you

20  could use examples to make his point, but I think we're going

21  beyond the point of necessity.

22          MR. MADDEN:  I think the Court is concerned with

23  the volume of the examples.

24          THE COURT:  Exactly.

25          MR. MADDEN:  All right.  Let me sit down with Dr.

26  O'Donohue at the recess here and see if I could trim this

27  back a little bit to try to address the Court's concern.

28  Let's see how it works out.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1477

1          THE COURT:  And I think it's important that the

2     doctor or yourself sit down with Ms. Filo and point out in

3     his report where all of this information is coming from,

4     because it seems like it's a little unclear to her.   In

5     fairness to her, I think that's important.

6          So we'll recess until 11:00 o'clock.

7          (Whereupon, a brief recess was taken.)

8          THE COURT:  Record will reflect the jury is present

9     in the courtroom, both counsel and Mr. Chandler is here, as

10    well as our witness is on the witness stand.

11         And, Mr. Madden, you were continuing with direct.

12         MR. MADDEN:  Thank you, Your Honor.

13    BY MR. MADDEN:

14    Q.   Dr. O'Donohue, I apologize.  I distracted myself.  We

15    just concluded which category?

16    A.   The one about details, second category.

17    Q.   So we haven't covered impoverished narratives yet?

18    A.   Correct.

19    Q.   Let's move to that.  What did you mean by impoverished

20    narrative?

21    A.   Um, when children are sexually abused, they usually tell

22    detailed narratives that is consistent with the major

23    features of sexual acts.  An impoverished narrative would be,

24    for example, a vague description like:  He molested me.  Not

25    describing any of the details of the alleged molestation.

26    Vague, non-detailed narrative could be something like:

27    Something was placed in my mouth and something came out of it

28    later on.  Very impoverished.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1478

1            It's not describing the friction that is usually

2    necessarily related to the ejaculation and abuse.  It's not

3    usually describing kind of the changes and the repeated acts

4    associated with ejaculation, the amount of time associated

5    for the male to ejaculate, et cetera.  Usually, children --

6    because again, they've never experienced something like this,

7    this is horrible for them, but they are attending to these

8    details and reporting it.

9    Q.   All right.  So the fact that details that you would

10   expect are not there, that's what you mean by impoverished

11   details?

12   A.   Yes.

13   Q.   All right.  So you certainly wouldn't expect the child

14   to describe an unknown sexual act using adult words in

15   detail; correct?

16   A.   Correct.

17   Q.   So it's quite possible for a child, or it's -- it would

18   be normal for a child to be able to give a detailed account

19   in their own words?

20   A.   Correct.

21   Q.   All right.  And would that in part depend on the skill

22   of the person who was interviewing the child?

23   A.   Yes.

24   Q.   Did you form an opinion concerning whether or not the

25   children in this case gave impoverished details?

26   A.   Yes, with the exception of Arleth, that was my view.

27   Q.   So you don't believe that Arleth gave -- you would not

28   criticize Arleth's narrative as impoverished?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1479

1  A.   Correct.

2  Q.   You have other comments later about Arleth; correct?

3  A.   Correct.

4  Q.   All right.  I believe the next category I would like to

5  talk about would be isolation or lack of good isolation.

6  What do you mean by that?

7  A.   Child abusers know that child abuse is wrong, that it's

8  a crime, that it highly stigmatizes an act.  They attempt to

9  isolate the victims so that they are not discovered kind of

10  in the act, no witnesses, that sort of thing.

11  Q.   And is there abundant literature discussing the issue of

12  the isolation in child molestation?

13  A.   Yes.

14  Q.   So concerning this case, the allegations in this case,

15  could you give me some examples of what you would consider to

16  be lack of good isolation?

17  A.   Yes.  There was some isolation occurring in terms of

18  taking the child into a classroom.  That was part of the

19  allegation; right, with no one else present.  Sometimes some

20  of the children reported that the door remained open.

21  Sometimes again the children --

22          MS. FILO:  Actually, objection, Your Honor.  That

23  is not part of the record in this case.

24          THE COURT:  Sustained.

25          MR. MADDEN:  All right.

26          THE COURT:  You may continue with your answer.

27  That portion is stricken.

28          MR. MADDEN:  That's fine.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1480

1          THE WITNESS:  The children -- only Arleth reported

2     that she was told by Mr. Chandler not to tell anyone.  That's

3     part of the isolation, to try to make sure no one else hears

4     about this.

5     BY MR. MADDEN:

6     Q.   So the subject of -- let's talk about this telling a

7     child not to tell.  Does that take different forms in your

8     experience and in the literature?

9     A.   Yes.  Sometimes it's a threat.  Sometimes it's a bribe.

10    Sometimes it's a simple instruction:  Don't tell anybody.

11    It's our secret.

12    Q.   But the general idea is obviously not to have a child

13    disclose what just happened?

14    A.   Correct.

15    Q.   All right.  And does the subject of the blindfold in

16    this case apply to the area of not good isolation?

17    A.   Yes.

18    Q.   How so?

19    A.   One, the children usually reported putting the blindfold

20    on themselves as opposed to Mr. Chandler putting it on.  That

21    could allow some, you know, imperfect, you know, placement of

22    the blindfold in terms of restricting vision.  They also

23    reported that there was no test or anything afterwards to

24    make sure they couldn't see anything, you know:  How many

25    fingers am I holding up?  Anything like that.

26          They reported various substances being used as a

27    blindfold.  Sometimes things like scarves.  That again may

28    not, you know, be actually, you know, good at restricting

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1481

1   vision.  So again, there was no real thorough description of

2   a child's vision being restricted and being tested in a way

3   that's, you know, 100 percent sure that they wouldn't see

4   what was happening.

5   Q.    So, for example, having children affix or apply their

6   own blindfold is a little casual for someone about to molest

7   them; right?

8   A.    I would say so, yes.

9   Q.    And likewise, someone telling a child to take their

10  blindfold off and then be doing things such as pulling up

11  their pants or zipping their pants or hiking up their pants,

12  that would be a little casual for a person who just

13  blindfolded a child and molested them; right?

14  A.    Right.  That would be the same sort of lack of typical

15  care that a molester would take in terms of when the

16  blindfold was removed.  Correct.

17  Q.    After the molest, is it your experience that not getting

18  caught is of prime importance for someone who is molesting

19  someone?

20  A.    Yes.

21  Q.    All right.  Let's move to another area.  Are there

22  various types of approved interviewing techniques for

23  forensic interviews of children suspected of being victims of

24  sexual abuse?

25  A.    Yes, there is protocols out there.

26  Q.    That's what a protocol is?

27  A.    Yes.

28  Q.    All right.  And there -- how many are there?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1482

1   A.    Um, about six to eight, depending on how you -- what

2   criteria you want to use to define a protocol.

3   Q.    Six to eight valid protocols are typically used

4   throughout the country?

5   A.    Yes.  Although these even often have much missing

6   psychometric information, like the sensitivity and

7   specificity, how accurate they are, but six is the field

8   tends to generate --

9   Q.    Notwithstanding the protocol that a particular

10   jurisdiction is using, are there generally accepted poor

11   interviewing techniques versus generally accepted good

12   interviewing techniques?

13   A.    Yes.

14   Q.    That would go across all protocols; correct?

15   A.    Yes.

16   Q.    All right.  So could you generally describe what good

17   interviewing techniques involve?

18   A.    Major principle is establishing good rapport; major

19   principle is setting appropriate ground rules, like:  It's

20   okay to say I don't know.  Special importance of the truth,

21   making sure they know what the truth means.  Not asking

22   leading questions.  Not asking repetitive questions.  Not

23   using conformity press like:  You said this before.  Or:

24   Tommy said Bobby said this.  What about you?  Not

25   disconfirming what the child says.  Not --

26   Q.    What does disconfirming mean?

27   A.    Just telling the child that what they said was wrong.

28   Q.    Not accepting a child's answer?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1483

1  A.   Correct.  Not using repeated questions.  And another set

2  of important principles is relying, especially in the

3  beginning of the interview, on open-ended questions.  You

4  want the child to tell a narrative.  You want the child to

5  kind of respond:  Tell me everything you could remember about

6  what happened.  Could you tell me more?  Is there anything

7  else you remember?  Did anything else happen next?  As

8  opposed to close-ended questions:  Did he touch you?  Did he

9  touch you on your knee?  Did that hurt?  These are yes/no

10  questions, and the research has shown that children make more

11  mistakes, provide much more erroneous information to

12  close-ended questions than to open-ended questions.

13  Q.   Somewhat easier for a child to answer closed-ended

14  questions; right?

15  A.   Yes.  It's easier because it's a yes/no as opposed to

16  filling in all of the blanks in a narrative.  Yes.

17  Q.   Yes, no, or multiple choice; right?

18  A.   Correct.

19  Q.   As opposed to writing an essay or having to use your own

20  words to describe something?

21  A.   Correct.

22  Q.   All right.

23  A.   Another principle associated with good interviewing is

24  to explore alternative hypotheses and try to clear up

25  inconsistencies; try to clear up any gaps in detail; try to

26  make any -- to make sense out of the children's statements

27  that don't make sense.  Some of the things I talked about

28  before.  Inquire more.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1484

1   Q.   So would the opposite of that be a rush to judgment?

2   A.   Yes.

3   Q.   Deciding early on what happened and looking for ways to

4   confirm your conclusion?

5   A.   Yes.

6   Q.   Not keeping an open-mind?

7   A.   Not being objective and exploring both incriminating and

8   exculpatory hypothetical.  That's the way Ceci and Cornell

9   talk about it.  Yes, looking at both sides.

10   Q.   And who are Ceci and Cornell?

11   A.   Stephen Ceci is a noted psychologist who wrote a very

12   influential book, *Jeopardy in the Courtroom*, about

13   suggestibility and allegations.  He published dozens of

14   articles on child abuse allegations and false memory and --

15   Q.   Suggestability of children?

16   A.   Suggestability of children, proper interviewing

17   techniques.

18   Q.   All right.  So I think you mentioned a lot of these when

19   you talked about the good interviewing techniques.  But bad

20   interviewing techniques would include?

21   A.   The opposite of those things.  Not doing those things,

22   yes.

23   Q.   Did you find poor interviewing techniques in this case?

24   A.   Yes.  I found a reliance on close-ended questions as

25   opposed to open-ended questions and listening narratives.  I

26   found a lack of following up on the sort of problems, trying

27   to resolve these inconsistent statements, attempting to fill

28   in the gaps on impoverished narratives.  Attempting to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1485

1   understand children's features of their allegations that

2   restrain logistical details.

3   Q.   So what is the net effect of using poor interviewing

4   techniques in forensic interviewing of children?

5   A.   They are -- the children's allegations are less clearly

6   understood, and rival hypotheses exist to explain these

7   allegations.  So they are what we call confounded, the

8   subject of multiple interpretations.

9   Q.   And that effect could be avoided if you ensure that

10  you're using proper interviewing techniques; correct?

11  A.   It could be minimized.  Sometimes it's just very

12  difficult to achieve these ends, but it's an attempt to

13  minimize that unwanted outcome.

14  Q.   So again, you found in this case that the poor

15  interviewing techniques were seen throughout the forensic

16  interviews of these children?

17  A.   Yes.

18  Q.   Let's talk about outside contamination.  What does that

19  mean?

20  A.   What adults have talked to the children about, the

21  possibility of them being abused, or when others have talked

22  to the child, for example, other children, and this could

23  influence the children's statement.  So we're not just

24  getting a child being a historian of events that actually

25  occurred when they are recounting the narratives, but we're

26  getting a child influenced by an adult, and this influence by

27  the adult could be deliberate or not deliberate.

28  Q.   So the most well-meaning and loving adult could wind up

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1486

1   causing a poor forensic interview?

2   A.    Unintentionally by asking repeated questions or leading

3   questions or also a poor meeting with an adult.  For example,

4   another form of outside contamination, when a perpetrator

5   says:  Don't ever tell anybody.  If you ever do tell

6   somebody, I will hurt you, your mother, or your dog.  Now the

7   child's report also is not an accurate historian by it being

8   impeded by that threat from the perpetrator.  Their statement

9   is not a description.  Their statement could be something

10  like nothing happened because they are afraid of the

11  perpetrator.  So that's another example of outside

12  contamination.

13  Q.    Did you find evidence of outside contamination in

14  forensic interviews of any of these children?

15  A.    Yes, especially will Arleth.

16  Q.    What is your opinion concerning Arleth?

17  A.    There was a description of multiple days of talking to

18  her about this.  There was some indication that at first she

19  was denying that anything occurred, and that her -- this was

20  her mother talking to her about this, and that over these

21  days her statement changed and that could be concerning.

22  Q.    And with respect to Arleth, there was also evidence of

23  her being questioned by an older cousin?

24  A.    Correct.

25  Q.    If I were to tell you that the older cousin testified at

26  this trial and acknowledged that she had to help her cousin

27  with some of the words to describe the molest, would that be

28  consistent with your opinion concerning evidence of outside

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1487

1  contamination?

2  A.   Yes.   There is two possibilities:  There is benign

3  helping, giving the child vocabulary to things that they

4  don't have; but the other possibility is that, quote/unquote,

5  help could be suggestive.  That the cousin could influence

6  the report by the words she suggests, by her reactions to

7  certain statements.

8  Q.   So if you have outside contamination in forensic

9  interviews, is there anything you could do to unwind the

10  damage?

11  A.   You can't unwind the damage, but you need to ask in the

12  forensic interview the child's memories of those

13  conversations.  So in this case, Arleth's memory of her

14  conversation with the cousin and Arleth's memory of the

15  conversation with the mother.  And sometimes you get very

16  benign information from the child, like:  My mother just

17  asked me did anything happen, and then I told her the whole

18  story.

19       Sometimes you get less benign things:  My mother

20  said did anything happen, and I said no.  I said no 50 times

21  because she kept asking.  She seemed disappointed about it.

22  She said:  You know, I know this is hard to talk about.  I

23  will take you to McDonald's if you tell me, and then finally

24  I told her.  That is more concerning because, again, we have

25  about 120 peer-review studies showing that repeated

26  questioning, suggestibility, awards could give rise to false

27  allegations and false memories.

28  Q.   Tell me a little bit more about that.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1488

1    A.    People -- scholars in the '70s got interested in how

2    children could make false allegations because there was some

3    high-profile cases where clearly false allegations were made.

4    So they tried to understand this.

5              The view wasn't that these children are lying.

6    They are intentionally telling false information.  The view

7    is there is something going wrong with their information in

8    processing that.  They would say things, for example,

9    fantastical claims that we know are not true:  I was abused

10   in a secret room below a toilet, and that witches were flying

11   around the room while I was abused.  I was taken in a plane

12   over the ocean and abused.  Babies were fed to sharks.  We

13   knew a lot of these features were false because they were

14   fantastical.  Researchers try to understand how could

15   children -- but these children were not lying.  They were

16   convinced these things happened to them.

17             Researchers started doing studies to try to

18   understand what could go wrong with their information

19   processing that children could have these false memories,

20   make these false allegations.  So they started looking at

21   things like leading questions, suggestive questions,

22   repetitive questioning, conformity press:  Bobby said this.

23   Tommy said this.  Sue said this.  What about you?

24   Disconfirmation, subtle re-enforcement, you know.  Sort of:

25   Now that's good that you told me that.  You are being a good,

26   you know, person that you told me that kind of thing.

27             And the typical paradigm is to have a child

28   experience something and randomly have a group of children

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1489

1    experiencing something and randomly assign half to a

2    condition that is hypothesized, non-biasing, asking

3    reasonable questions:  Tell me what happened.  And the other

4    half are assigned a potentially biasing, you ask repeated

5    questions.  You ask suggestive questions.  You disconfirm.

6           And they found in these studies that the younger

7    the child, the more likely they will have this interference

8    and their information processing and have false memories and

9    make false allegations.  And some of these occurred at a very

10   high rate.  Eighty to 90 percent will say they saw something

11   that did not happen.

12          They've done research where mothers, for example,

13   have a particular large influence on children in terms of

14   forming false memories.  So in general, these are these large

15   bodies of research showing that children are highly

16   suggestible.  Again, there is research on even adults are

17   suggestible.  It's not confined to children.  That is

18   Elizabeth Lawson's (phonetic) research at Irvine.

19   Q.   Is there any debate in the scientific community or the

20   scientific literature whether or not children are

21   suggestible?

22   A.   No.

23   Q.   I will move to another area that you addressed in your

24   report.  That is the issue of stake.  You addressed it, but

25   what is your -- what does stake mean?

26   A.   I said in my report that it -- there was no stake

27   observed that an adult or someone else, but particularly an

28   adult in their life, has a vested interest in the allegation.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1490

1   So, for example, in a custody dispute, because one of the

2   parents have a vested interest in gaining custody, more

3   visitation, and therefore an allegation could help them with

4   their object -- with their objective, and I initially saw

5   that there was no stake.  I couldn't see any stake by any

6   adults in this case.

7   Q.   All right.  If I were to tell you subsequent to you

8   authoring this report, the parents of three of the five

9   children have filed civil lawsuits for money damages, would

10  that modify your -- change your opinion about whether or not

11  there might be potential stake issues in this case?

12  A.   Yes.

13  Q.   On the other hand, you would agree that any stake

14  interest presently there were not applied to anything that

15  was said prior to those lawsuits being filed?

16  A.   Correct.

17  Q.   Okay.  However, if I were to ask you to assume that all

18  of those lawsuits were filed before the three children

19  testified in this case, you would consider stake is something

20  that needs to be considered; correct?

21  A.   Yes.

22  Q.   All right.  Then finally, I would like to talk about

23  spontaneous outcries.  You discussed this in your report.

24  What does spontaneous outcry mean?

25  A.   Outcry is the first reporting, the very first time a

26  child reports it, and it being a clear sexual abuse

27  allegation.  And spontaneous means it comes from them.  They

28  just out of the blue tell their mother or tell a friend, you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1491

1  know:  Mr. X has been touching me in bad ways.

2  Q.   I would like you to limit this response just to your

3  general opinion based on your experience with 2,000 children

4  and your experience in your clinic and your teaching and

5  education.  Generally speaking, is there a difference

6  between -- what is the opposite of spontaneous outcry?  I

7  guess that is a better question.

8  A.   A first reporting that occurs when an adult or someone

9  is questioning the child about the possibility of abuse.

10  Q.   So in terms of reliability, if I'm understanding this

11  correctly, by definition, a spontaneous outcry is seeing it

12  in a much different way because there is no prompting?

13  A.   Correct.  And there is no possibility of this outside

14  contamination, poor interviewing technique, because this

15  child spontaneously without any adult bringing up the

16  questions, questioning them, responding in a certain way to

17  their answers, so you don't have any worry about that.  So

18  generally regard is more reliable.

19  Q.   In the example, most simplistic form would be:  Mr.

20  Jones touched my wee-wee?

21  A.   Spontaneously.  Again, when no one is questioning about

22  that exactly.  There is no news reports about Mr. Jones.

23  There is no media reports.  There is nobody saying bad things

24  about Mr. Jones.  It just comes out of the blue, yes, that's

25  spontaneous.

26  Q.   And forensic interviews are potentially problematic with

27  respect to spontaneous outcries?

28  A.   If the child has not made an allegation before the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1492

1   interview, yes.  If the first -- if the outcry, the first

2   reporting occurs in an interview, then that wouldn't be a

3   spontaneous outcry.

4   Q.   That is one of the reasons why it's so important for

5   forensic interviews to be done using proper interviewing

6   techniques; correct?

7   A.   Yes.

8   Q.   The fact that a police officer has been trained on the

9   difference between good interviewing and bad interviewing

10  techniques, does that in your experience ensure that they are

11  going to be using good interviewing techniques in the future?

12  A.   No, it doesn't ensure.  Increase the likelihood, but

13  doesn't entail --

14  Q.   Within the scientific community, are there

15  recommendations concerning how police departments should

16  operate with officers who have been properly trained?  In

17  other words, should there be some sort of follow-up or

18  evaluation?

19  A.   I don't know about in police departments.  I'm not an

20  expert about police departments.  But in the field in

21  general, it is.

22  Q.   In the field in general involved in therapy and doing

23  what?

24  A.   Doing forensic interviews, yes.

25  Q.   Okay.  And what does that follow-up involve in the

26  community?

27  A.   Keeping up with the literature.  See if there is

28  protocols that have changed.  Making sure that you keep

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1493

1  following the protocols.  Having peer review to look at the

2  protocols to see if -- how close you are saying to them.

3  Q.    Tell me a little bit about peer review when it comes to

4  what you talk about seeing and hearing to what you are

5  supposed to be doing?

6  A.    The interview should be videotaped and, you know, so

7  other people who are trained can look at these videotapes and

8  could give you feedback.  We do that in my clinic, to say,

9  you know, maybe here's another idea how you could have

10  handled that.  Or at this point, it was difficult, but maybe

11  you were asking a repeated question at this time.  Maybe if

12  you did this, you could have asked open-ended questions.

13  Their quality improvement that you continually try to make

14  sure you're not slipping back to any bad habits.

15  Q.    All right.  Okay.

16            MR. MADDEN:  I have no further questions at this

17  time.

18            THE COURT:  Okay.

19            MS. FILO:  Your Honor, may we approach?

20            THE COURT:  Sure.

21            (Whereupon, there was a discussion at the bench.)

22            THE COURT:  Ladies and gentlemen, we're going to

23  take the noon break at this time.  I will order all members

24  of the jury to report to the jury assembly room on the second

25  floor at 1:30, and at that time we'll continue with the

26  doctor's testimony.  Thank you.

27            We'll be in recess until 1:30.

28            (Whereupon, the Court took the noon recess.)

1                      AFTERNOON PROCEEDINGS

2              THE COURT:  Thank you, ladies and gentlemen.

3    Record will reflect all members of the jury are present, both

4    counsel are present, Mr. Chandler is present in the

5    courtroom, as well as our witness is on the witness stand.

6              Ms. Filo, you were going to begin cross.

7              MS. FILO:  Thank you, Your Honor.

8                      CROSS-EXAMINATION

9    BY MS. FILO:

10   Q.   Good afternoon, Dr. O'Donohue.

11   A.   Good afternoon.

12   Q.   Dr. O'Donohue, could you tell me what your hourly rate

13   is?

14   A.   It's $450 an hour for all work and half that for travel.

15   Q.   Okay.  So that's the rate you charged in this case?

16   A.   Correct.

17   Q.   Approximately how many hours have you spent working on

18   this case to date?

19   A.   Between 40 and 50.

20   Q.   So that's not at all my strong suit, but $18,000 total;

21   is that about right?

22   A.   I think it's somewhat higher.  I think it's around

23   $20,000.

24   Q.   $20,000.  What about for courtroom testimony?  What is

25   your hourly or what is your charge for courtroom testimony?

26   A.   Same rate.

27   Q.   Same rate.  So today's billing will be added onto the 20

28   incurred?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1495

1    A.    No.  My estimate included that in that time.

2    Q.    Okay.  So, Dr. O'Donohue, unless your findings are

3    helpful to the defense, you aren't called as a witness to

4    testify on their behalf; right?

5    A.    Um, I would assume the lawyer wouldn't call me if it's

6    not helpful.  That's correct.

7    Q.    Okay.  You've served as an expert witness in

8    approximately how many cases?

9    A.    My life?

10   Q.    Yes.

11   A.    Probably 150 to 170.

12   Q.    And approximately what percentage of those cases have

13   been on behalf of defense?

14   A.    Uh, the vast majority; 99 percent of those.

15   Q.    Have you ever written a report for the defense where

16   you -- where ultimately it wasn't used in court?

17   A.    Yes.

18   Q.    And you -- the case hasn't proceeded to trial or you

19   haven't been called as a witness?

20   A.    Both.

21   Q.    Okay.

22         Dr. O'Donohue, I would like to ask you some

23   questions about your testimony from this morning.  You sort

24   of started by talking about inconsistencies in the girls'

25   disclosures as areas that were problematic; is that right?

26   A.    Yes.

27   Q.    Okay.  So I just want to make sure you are not here and

28   it would be unethical for you to testify that these

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1496

1    allegations are false?

2    A.   Correct.

3    Q.   Okay.  And all you can say is that these are things that

4    people might want to consider in evaluating a child's

5    allegation; is that accurate?

6    A.   That's not all I could say, but it's part of what I

7    could say.

8    Q.   Sorry.  That's what I meant.  I mean you agree with me

9    that some children -- what you wrote in your report, some

10   children can experience multiple biasing influences and

11   continue to provide very accurate reports; is that right?

12   A.   Correct.

13   Q.   Okay.  And the presence of bias in one question does not

14   mean that the entire interview was contaminated; correct?

15   A.   Correct.

16   Q.   Okay.  And you have some -- you talked in your report

17   about these sort of ways in which you should, or we can look

18   at a forensic interview; correct?

19   A.   Correct.

20   Q.   It is your opinion that most allegations of child sexual

21   abuse are true?

22   A.   Is that a question?  Sorry.  I don't --

23   Q.   Yes.

24   A.   Yes, it is my opinion.

25   Q.   Okay.  And you've actually written that that abuse is

26   actually far -- sexual abuse is far more frequent than even

27   the general population would know or believe?

28   A.   Correct.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1497

1   Q.   So you talked a little bit about the inconsistencies of

2   the kids, and I want to ask you about those inconsistencies.

3   You said that Isabell -- you talked first about Isabell and

4   some of the inconsistencies in her various reports; is that

5   right?

6   A.   Correct.

7   Q.   And you talked about interview one, interview two,

8   interview three, and her preliminary testimony; is that

9   right?

10  A.   Correct.

11  Q.   Okay.  So I just want to make sure that I have that

12  correct.  Interview one is when the patrol officers responded

13  out to the scene?

14  A.   Yes.

15  Q.   Interview two was a detailed videotaped interview with

16  Det. Pierce?

17  A.   Correct.

18  Q.   Interview three was a very brief interview with Det.

19  Pierce?  I think he was primarily asking her about the chair

20  that she sat in; is that right?

21  A.   Correct.

22  Q.   And preliminary hearing testimony was when she came in

23  and testified in court; right?

24  A.   Correct.

25  Q.   So you said that in interview -- and when you put

26  together this sort of chart of these inconsistencies, what is

27  your purpose?

28  A.   To show the number of inconsistencies and how they are

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1498

1    inconsistent.

2    Q.   So you talked about -- strike that.

3         You actually scoured the record for what you

4    thought were the most important inconsistencies; right?

5    A.   Well, I wouldn't use the word "scoured."  When I read

6    the record, these were the ones that I saw.

7    Q.   These were the inconsistencies that you thought were

8    worthy of putting in this report?

9    A.   Yes.

10   Q.   Okay.  So you talked about the importance of these

11   inconsistencies because you said that children who are

12   victims of child sexual abuse will remember these details

13   because they are traumatic?

14   A.   Yes.

15   Q.   And that they are sort of imprinted in their mind;

16   right?

17   A.   I didn't say imprinted in their mind, but they

18   remembered.

19   Q.   Because the events are traumatic?

20   A.   Yes.

21   Q.   They are memorable?

22   A.   Yes.

23   Q.   Okay.  So, Dr. O'Donohue, you would agree with me that

24   the children in this case didn't realize they were being

25   abused; right?

26   A.   That's an interesting question.  I think some did not;

27   correct.  That question wasn't asked directly of the

28   children, but I think that's a reasonable inference to make.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1499

1   Q.   Okay.  So it is a reasonable inference; right, that

2   these kids didn't -- they didn't know that this was a -- I

3   mean -- let me start over.

4          Let's assume these allegations are true, that the

5   defendant blindfolded children and either touched them

6   inappropriately or put his penis in their mouth, by a

7   duplicity, by blindfolding them, they didn't know what was

8   happening to them; right?

9   A.   Correct.

10  Q.   So they wouldn't have the kind of memory that you're

11  talking about because they haven't experienced that kind of

12  traumatic event; right?

13  A.   That's partially correct.

14  Q.   Why is it only partially correct?

15  A.   Because children also have the ability to remember other

16  unusual events as opposed to mundane events.  Like, what they

17  have for breakfast in the morning.  The teacher blindfolding

18  them and placing objects in their mouth, it would be a very

19  unusual, salient event.  Also, some of the children reported

20  they didn't like that.  Even when they didn't realize that it

21  was sexual abuse, they thought it was hurtful.  And children

22  were -- remember, there is other pathways besides sexual

23  abuse where children -- where an event becomes salient and

24  remembered.

25  Q.   Okay.  But you would agree with me that when we talk

26  about typical childhood sexual abuse; right?  Stepfather

27  comes into a bedroom and wakes a child up and forces the

28  child to orally copulate him and then says:  Don't tell

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1500

1  anybody.  That child has vision, hearing?  I mean all of the

2  senses that surround that event there, they are able to use;

3  right?

4  A.    Yes.

5  Q.    And they would be able to use that language?

6  A.    Yes.

7  Q.    Okay.  You also talked about core inconsistencies or

8  core facts and peripheral facts; correct?

9  A.    Correct.

10  Q.    When you talked about core facts, you talked about who,

11  where, how often, acts, and what they feel like; is that

12  right?

13  A.    Yes, those were examples, but those are the major

14  parameters, yes.  How many times I think I also said.

15  Q.    Right.  How often I think is what I said.  Same thing?

16  A.    Okay.

17  Q.    So you would agree with me that with the possible

18  exception of how often, those core facts in this case are all

19  consistent?

20  A.    Let's see --

21  Q.    They identified the perpetrator as Craig Chandler;

22  correct?

23  A.    Correct.

24  Q.    They have all said this happened in their classroom

25  while they were students of Craig Chandler's?

26  A.    Correct.

27  Q.    They have all described being blindfolded or otherwise

28  having their eyes closed?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1501

1    A.    Correct.

2    Q.    They have all described items being put in their mouth?

3    A.    Eventually, yes, all of them did.  Yes.

4    Q.    Yes.  And they have all described with the best of their

5    ability that they have -- what that felt like to them?

6    A.    Yes.

7    Q.    So all of those core facts are entirely consistent?

8    A.    Not the last one.

9    Q.    You mean what it felt like?

10   A.    Correct.

11   Q.    Because they all used their own language to describe

12   this object; right?

13   A.    Well, and sometimes it was inconsistent.

14   Q.    Okay.  You described peripheral facts or circumstances

15   as things like:  the time of day, the clothing that they

16   wore, again, the color of the walls, things like that; right?

17   A.    Correct.

18   Q.    Okay.  So I would like to ask you specifically about

19   Isabell.  So you talked about Isabell -- I don't think you

20   were asked this on direct examination, so I will ask it.  You

21   said in the first interview she was never asked the shape of

22   the object put in her mouth; right?

23   A.    She doesn't describe it.  Correct.

24   Q.    Well, you said "not applicable;" right?  The question

25   was not asked in the interview?

26   A.    Correct.  No, I'm just saying there was no description

27   of it in the interview.

28   Q.    Okay.  And then in interview two, she described it as

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1502

1  round?  Interview three, she described it as round?

2  A.    Yes.

3  Q.    And in her preliminary hearing testimony, she described

4  it as curved?

5  A.    Correct.

6  Q.    So, Doctor, could you think of any object that occurs in

7  nature that is round that's not also curved?

8  A.    No, but I could think of objects that are curved but not

9  round.

10  Q.    Right.  So that's a primary inconsistency?

11  A.    It's inconsistent, yes.  She could have said round.

12  It's not a major one, but it's inconsistently described.

13  Q.    Would you expect even an adult to describe an object

14  with the exact same word every time?

15  A.    She did two out of the three times.  But, yeah, it is

16  inconsistent.  I'm not making a big deal out of it, but it

17  is -- round and curved are not the same description.

18  Q.    So you would describe anything as an inconsistency when

19  the exact same word isn't used?

20  A.    Well, they are not the exact same word, no.  I mean a

21  basketball is round and curved, but a hot dog is not round

22  and curved.  They are different properties.  They describe

23  different geometrical objects.

24  Q.    Okay.  And then you said also with Isabell that it

25  happened -- she's trying to describe how many times this

26  happened to her, and she says in the same sentence:  It

27  happened one time on Friday, then it happened -- she says it

28  happened multiple times in addition to that.  Once the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1503

1   previous week, but multiple times before Christmas break;

2   right?

3   A.    Right.

4   Q.    That's all on the same sentence?

5   A.    Right.

6   Q.    And then she said it happened on Friday but multiple

7   times before Christmas break.  And then she says in total it

8   happened more than ten times; right?

9   A.    Correct.

10  Q.    Aren't those -- what is inconsistent about that?

11  A.    One time she gives much more specificity, saying ten

12  times.  The other instances she's not saying ten times.

13  Q.    Well, she doesn't say it happened ten times.  She said

14  it happened more than ten times; right?

15  A.    More than ten times, yes.

16  Q.    Right.  So each time she's saying this happened to me

17  more than once?

18  A.    Yes.

19  Q.    Okay.  So you also talk about whether the object in her

20  mouth made her choke or gag; right?

21  A.    Correct.

22  Q.    Again, in interview one and two, it's just addressed;

23  right?  It's just not addressed; right?

24  A.    No.  Interview one it's not addressed, but interview

25  two, she said the object made her choke.

26  Q.    I have that as interview three.  Am I on the wrong --

27  A.    I have that as interview two.

28  Q.    Okay.  And then told her mother that the object didn't

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1504

1    make her choke.  And then at her prelim, she said the object

2    did make her choke, and that she told her mother that; right?

3    A.   Correct.

4    Q.   So every time she was asked about it, she has said that

5    the item made her choke; right?

6    A.   Let's see.  Not according to her mother.

7    Q.   Right.  And if I told you that her mother testified that

8    if she said that, if she ever suggested that the item didn't

9    make her daughter choke, she was mistaken, she just misspoke,

10   that would take away that inconsistently entirely; right?

11   A.   Yes.

12   Q.   Okay.  So you also asked about the taste of the -- or

13   talked about the taste of the object that Mr. Chandler put in

14   Isabell's mouth; right?

15   A.   Correct.

16   Q.   Okay.  So you said in the first interview with the

17   patrol officers there was no information about that?

18   A.   Correct.

19   Q.   And in the second interview you said that it tasted like

20   strawberry; right?

21   A.   Right.

22   Q.   Okay.  So, Dr. O'Donohue, I spent my lunch hour scouring

23   that transcript, and actually on page 11, lines 21 through

24   25, Isabell was asked by Det. Pierce:  Does it have any

25   taste?  Does it taste like anything?  And she shakes her head

26   from side to side.  And Det. Pierce says:  No?  Okay.  And I

27   scoured through this entire transcript and didn't find even

28   the word "strawberry" in here.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1505

1  A.   I don't have the transcript with me.  Let me see if I
2  could find it in my summary.
3         I don't see it in my summary.  I can't respond to
4  that.
5  Q.   Okay.  So you would agree with me that could be an
6  inaccuracy?
7  A.   Could be, yes.  I don't have the transcript.
8  Q.   Then in the third interview with Isabell, you said that
9  it did not taste like strawberry.  You attributed that
10  statement to her?
11  A.   Right.
12  Q.   So I did the same thing with that interview, and the
13  only mention he heard of anything tasting like strawberry in
14  that third interview is when he asked her on page 7, lines 4,
15  5 -- essentially through 18, he asks her about other items:
16            "Like, other than the thing we have been talking
17            about, he used some other items.  You remember
18            talking about that?
19            "Yes.
20            "Do you remember him putting something in your
21            mouth and you said it tasted like strawberry?
22            "Yeah."
23            So she's talking about something totally different?
24  A.   Well, she was asked if she remembered him putting
25  something in her mouth that tasted like strawberry, and she
26  said yes.
27  Q.   Right.  But they are talking about the other items;
28  right?  I mean the question -- I will read it to you:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1506

1         "Do you remember what the other items are?  Other

2         than the item we're talking about, do you remember

3         what these other items are that he put into your

4         mouth?  Were there other items?

5         "Something that did taste like something.

6         "Do you remember him putting something in your

7         mouth like beef jerky?

8         "No.

9         "Do you remember him putting something in your

10        mouth like strawberry?

11        "Yeah."

12 A.   Correct.

13 Q.   Not talking about the object that she's described as

14 round, sometimes hard, sometimes soft.  This is a different

15 subject; right?

16 A.   Well, that question is not clearly referring to the

17 other objects.  At that point, it just says:  "Do you

18 remember him putting something in your mouth that tastes like

19 strawberry?"  And she said yes to it.

20 Q.   It will be the question immediately preceding that was

21 the other objects; right?

22 A.   She could view it as having that context; right.

23 Q.   Regardless it can't be an inconsistency because she

24 never said in the interview that it tasted like strawberry;

25 right?

26 A.   Well, again, I don't have the transcripts, but I thought

27 I saw that assertion.

28 Q.   Okay.  So, Dr. O'Donohue, with respect to Becky, you

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1507

1    said that you reviewed -- make sure I've got it.

2          The interview of Becky by Det. Pierce, and then

3    another interview of Becky, and then you did review the

4    interview of her mother; right?

5    A.   Let's see.  Interview of Becky, yes.

6    Q.   Were you provided with notes from the principal who took

7    a statement from Becky almost immediately after these

8    incidents occurred to her?

9    A.   No, I don't believe so.

10   Q.   Handwritten notes that include quotations of what Becky

11   said happened to her?

12   A.   I don't believe I was provided those.  No.

13   Q.   When she was talking about the gooey, salty stuff?  No

14   notes?

15   A.   I don't believe so.

16   Q.   Okay.  When -- so again, with respect to Becky, you

17   analyzed how it felt when he put the object in her mouth.

18   And it says in interview one and interview two, it was not

19   addressed?

20   A.   Um-hum.

21   Q.   And then in the prelim, it said it made her feel like it

22   was going to make her choke?

23   A.   Yes.

24   Q.   You find that as an inconsistency?

25   A.   Yes.

26   Q.   If she wasn't asked those questions, how could that be

27   an inconsistency?

28   A.   Well, she was given plenty of opportunity to describe

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1508

1   what happened.  This goes back to the open-ended questions;

2   right?  The notion is that children don't respond simply to

3   close-ended questions like:  Did it make you choke or not?

4   She was given an opportunity to describe what did happen, and

5   the point is that choking is a very salient thing that

6   children would remember and would tell about.  And the fact

7   that she doesn't mention it in two interviews and only

8   mentions it in prelim, I think is an inconsistent report.

9   Q.   Okay.  So if she was asked the open-ended question and

10  she didn't provide the answer that she was choked, that's

11  what you would consider an inconsistency?

12  A.   Right.  She didn't mention a detail in one interview,

13  but then she mentions the salient interview in a subsequent

14  interview.  Correct.

15  Q.   So children -- particularly children -- do sort of

16  disclose more as time goes; right?  Disclosure for them could

17  be a process; is that right?

18  A.   Could be a process, but they could disclose more based

19  on a lot of variables such as how comfortable they are with

20  the interviewer, how close it is, you know, with respect to

21  time.  And disclosing more doesn't's mean disclosing more

22  accurate information.  That's the, you know, problem.

23  Q.   Okay.  With respect to Laurie, you put in your little

24  chart that in interview one, she talked about the item that

25  was on her foot, and she said marker, pen, or glue stick.

26  And then in interview two, top of scissors and glue stick,

27  and then in the prelim, she talked about a glue stick and a

28  pen; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1509

1  A.   Correct.

2  Q.   So the only new item that ever got included there was in

3  interview number two, top of scissors?

4  A.   Correct.

5  Q.   But other than that, those are all consistent

6  statements?

7  A.   Correct.

8  Q.   I mean you listed that as a primary inconsistency?

9  A.   Yes.  I mean if you've given me presents, let's say, and

10  I am asked:  What presents did you give me?  And I say

11  basketball, radio, and shoes; right?  And I'm asked again:

12  What presents did you give me?  And I say a basketball,

13  radio, and a car.  And I'm asked again, I say basketball,

14  radio, and shoes, it's pretty significant that in the second

15  interview, the second time I'm told -- I mention an entirely

16  different object than I did in two of the other interviews,

17  especially because top of scissors is nothing like a pen or a

18  glue stick.

19  Q.   Okay.  So you asked -- you analyzed whether she told her

20  mom about staying behind at recess.  And in interview one,

21  she said she told her mom; interview two, she said she told

22  her mom; and then at the preliminary hearing, she said she

23  doesn't remember telling her mom; right?

24  A.   Correct.

25  Q.   You identified those as primary inconsistencies?

26  A.   Yes.

27  Q.   So the preliminary hearing was almost six months after

28  her first interview; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1510

1   A.    Yes.

2   Q.    So it's inconsistent to say:  I don't remember that now?

3   A.    When you asserted before that you did tell your mom and

4   you remember, it's inconsistent.  It may have a benign

5   explanation, maybe forgetting, but it's still inconsistent.

6   Q.    I mean the -- she's like a seven-year-old little girl;

7   right?  So for her six months is like a lifetime; right?

8   A.    Um, isn't she more like nine?

9   Q.    She is now.

10  A.    Got you.  Yeah, it's still inconsistent.  Whether there

11  is a benign explanation is another matter, but it's

12  inconsistent.  I could -- again, if you ask me, you know,

13  what did I do -- what school did I go to, or something, and I

14  could say this school.  I went to this school.  I went to

15  this school.  And then if I say I don't remember which school

16  I went to, that's inconsistent; right?  Now, it could have a

17  benign explanation.  I could have forgotten, but, you know,

18  it's still not the same answer.

19  Q.    So you're attributing it as an inconsistency, not a

20  failure of memory?

21  A.    I'm saying it's an inconsistency.  It's a separate

22  question of what caused that inconsistency and it could be a

23  failure of memory.

24  Q.    Okay.  So same thing when she says she was held back in

25  the classroom while the other kids went to recess.

26  Interviewed again, she says the exact same thing, and then at

27  the prelim she says that the yard duty supervisor brought her

28  back to the classroom to spend recess there; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1511

1   A.   Correct.

2   Q.   So the only inconsistency is who brought her back to the

3   classroom?

4   A.   Um, and what held back meant.  She stayed in the

5   classroom versus somebody -- she left the classroom and then

6   was brought back there.

7   Q.   You would agree with me, wouldn't you, that probably the

8   most salient fact to a child under this circumstance would be

9   that she missed her recess, not who got her there; right?

10  A.   That would be another salient fact, yes.

11  Q.   She's consistent about that?

12  A.   Correct.

13  Q.   You talked a little bit about Wendy, and you said that

14  the object in her mouth at some point she described like a

15  gummy bear?

16  A.   Yes.

17  Q.   But she immediately said right in that same sentence:

18  But it wasn't a gummy bear; right?

19  A.   Correct.

20  Q.   So the texture of a gummy bear, something kind of chewy,

21  it's entirely possible; right, that she's describing the

22  texture not the size?

23  A.   Correct.

24  Q.   Okay.  So with respect to Arleth, you talked about

25  whether or not she saw Mr. Chandler's penis; right?

26  A.   Correct.

27  Q.   And you said at the preliminary hearing testimony she

28  didn't mention that.  It wasn't addressed; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1512

1    A.    Correct.

2    Q.    So, Dr. O'Donohue, are you aware that Arleth drew a

3    picture of what she saw at the preliminary hearing?

4    A.    Um, I don't remember.

5    Q.    Have you been provided with a copy of the drawing that

6    Arleth made?

7    A.    I don't remember at this point.

8         MS. FILO:  Your Honor, if I might have marked as

9    the People's next in order?

10        THE COURT:  Yes, that will be --

11        MS. FILO:  Sorry.  This is a piece of binder paper

12   that has a drawing on the front of it.  It still has the

13   preliminary hearing exhibit tab from May 22, 2012.

14        THE COURT:  Okay.  We'll mark that next in order.

15   I believe it's People's 17.

16        THE CLERK:  It should be 24.

17        THE COURT:  24?

18        THE CLERK:  Yes.

19        (Whereupon, People's Exhibit 24 was marked for

20   identification.)

21   BY MS. FILO:

22   Q.    So, Dr. O'Donohue, I'm going to show you what's now been

23   marked as People's Exhibit 24.  You've never seen any drawing

24   like that?  That wasn't provided to you by the defense?

25   A.    I don't believe so.  No.

26   Q.    And a very similar one that Arleth drew for the officer

27   in the course of her interview with him?

28   A.    Sorry.  What was the question?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1513

1    Q.    Sorry.  There was --

2              MS. FILO:  Rhonda, could I see People's Exhibit 7,

3    please?

4              Your Honor, may I approach?

5              THE COURT:  Yes.  Thank you.

6    BY MS. FILO:

7    Q.    Again, Dr. O'Donohue, People's Exhibit 7, I'll represent

8    to you that that was the drawing that Arleth made when she

9    was interviewed by the detective in the case.  You remember

10   her doing that?  You saw that on the video; right?

11   A.    Correct, yeah.

12   Q.    And then at the preliminary hearing, she was asked again

13   to describe or -- sorry -- to draw what she saw and she did a

14   slightly bigger version in now People's Exhibit 24.

15   A.    Okay.

16   Q.    So your report had indicated that she wasn't asked what

17   she saw.  But, I mean she was not only asked, she drew a

18   picture of it at the prelim?

19   A.    That doesn't mean not asked.  Doesn't -- it means not

20   applicable.  I don't remember a clear statement describing

21   what she saw in the preliminary testimony.

22   Q.    She just drew it?

23   A.    (Shakes head up and down.)

24   Q.    Yes?

25   A.    She drew something, yes.

26   Q.    Okay.  And, for instance, you talked about the substance

27   that was in Arleth's mouth, and she said in the first

28   interview that it tasted bad.  And then Noemi reported that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1514

1   Arleth had told her it tasted like pee.  And at the

2   preliminary hearing she said it tasted like pee; right?

3   A.   Correct.  Well, interview one she said first it doesn't

4   taste like anything, and then she said it tasted bad.

5   Q.   Again, in the same sentence; right?

6   A.   Or following one another, yes.

7   Q.   Yeah.  You would agree with me that, I mean, hopefully

8   she hasn't tasted it, but most people would say the taste of

9   pee is bad; right?

10  A.   Correct, but they wouldn't say it didn't taste like

11  anything.

12  Q.   Okay.  So that level of inconsistency, each of those

13  inconsistencies that we've talked about, if they even exist,

14  there are, as you described, explanations for those

15  inconsistencies; right?

16  A.   There are a range of explanations, possible

17  explanations.  Part of my point is, again, the interview

18  failed to ask more questions to try to see which ones were

19  more relevant or not.

20  Q.   Okay.  So you're talking about the inconsistencies as

21  examples of potentially planted memory; is that correct?

22  A.   No.  I'm saying that planted memories or suggested

23  memories that lead, you know, to false accusations.  False

24  memory tends to have more inconsistencies because they didn't

25  actually happen, so the child has less of a vivid memory of

26  that.  So they have a harder time describing it consistently.

27  Q.   Okay.  So through the records of what you have been able

28  to review, what we've gone over and what you went over on

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1515

1  direct, those are sort of the best examples, examples you

2  found more worthy to put in your report of the

3  inconsistencies of the children?

4  A.    Yes.

5  Q.    Okay.  Doctor, you would agree with me that in

6  evaluating a child or determining how to conduct an

7  interview, certainly the best practice is to meet the child;

8  right?

9  A.    Yes.

10  Q.    And you didn't meet any of these children?

11  A.    Correct.

12  Q.    Did you ever ask to meet with any of them?

13  A.    No.

14  Q.    Why not?

15  A.    Um, my task that I was given is to evaluate the

16  allegations that they have made so far.

17  Q.    Okay.  So asked to evaluate what they've said to date?

18  A.    Correct.

19  Q.    All right.  So you also talked about one of the things

20  you want to look at in a child's description of sexual abuse

21  is fantastical details; right?

22  A.    Correct.

23  Q.    What I think you described is being fed to sharks,

24  flying over the Pacific Ocean, things like that?

25  A.    Correct.

26  Q.    These disclosures contained none of those; right?

27  A.    Correct.

28  Q.    That's not something you considered to be a huge

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1516

1    indicator in this case of some problem in the disclosure;

2    correct?

3    A.    Correct.

4    Q.    So you also talked a little bit about impoverished

5    details, and you said other than Arleth, the children were

6    really -- that their details were lacking in some way?

7    A.    Correct.

8    Q.    In what way?  What else could children who have been

9    blindfolded have described at their cognitive developmental

10   level that would have been anymore clear?

11   A.    They could have more consistently described the taste

12   and shape of the objects that were placed on their mouth or

13   on their feet.  They were often again, as we kind of went

14   over, inconsistent about that.  They could have described

15   again more clearly the narrative from the beginning to the

16   end of their interactions.  They could have added, you know,

17   kind of more spontaneous details about it.  So it was -- for

18   example, if a key point is they could have described more

19   sexual details, that would be consistent, for example, with

20   oral sex leading to ejaculation.

21   Q.    Okay.  So the words that they were able to use:  round,

22   gooey, about the size of a banana, at least two of the

23   children described spontaneously him putting his hand on the

24   back of their head and pushing their head forward; right?

25   Isn't --

26   A.    Well, but your head went forward rhythmically.  They

27   never reported anything like that.  They reported pushing the

28   head forward, but not in any kind of rhythm, for example,

1    that's more consistent with oral sex.

2    Q.    Well, Isabell actually demonstrated on the video,

3    putting that -- Mr. Chandler put his hand behind her head and

4    rhythmically pushed her head forward?

5    A.    Yes, that one child did.  Yes.

6    Q.    And Wendy did the same; right?

7    A.    Um, I don't remember that.

8    Q.    So you think that otherwise their stories are

9    impoverished in detail?

10   A.    Yes.  For example, usually, you know, the reports were

11   more like:  He put something in my mouth, and then, you know,

12   fluid, you know, came out.  I'm not quoting, but, you know,

13   that was the kind of notion.  And again, children who have

14   been abused with oral sex often report things like, you know,

15   the rhythm, the motion, they describe the motion's increasing

16   in intensity.  They could describe often the -- they won't

17   use this word, but the penis pulsating, and this is, you

18   know, kind of not reported by these children.

19   Q.    Okay.  So children at this age level could talk about a

20   penis pulsating?

21   A.    I'm not saying they use that word, but, you know, they

22   could describe some sort of throbbing or something like that.

23   Q.    Like the item kind of shaking in their mouth?

24   A.    Yes, could be one.

25   Q.    Okay.  And when you say that they don't describe

26   rhythmic, I mean children at that level would never be able

27   to -- I mean they don't know what rhythm is; right?

28   A.    But again, I said not to use exactly these words.  I'm

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1518

1   trying to convey to you in adult language that they could

2   describe it start out slow and then it went faster and

3   faster.

4   Q.   Okay.  You talked about -- you talked about it being

5   somewhat improbable that this would happen in sort of a

6   classroom setting; right?

7   A.   I don't think so.

8   Q.   That it -- you talked in your report about Mr. Chandler

9   guarantee no one would walk in; right?

10  A.   I would say yes.

11  Q.   Okay.  So if I told you that in each occasion the

12  children reported that the door was locked, would that matter

13  to you?

14  A.   Yes.

15  Q.   You talked a lot about -- not a lot, but -- I'm sorry.

16  You mentioned on your direct examination some of this

17  behavior seems somewhat casual for your average child

18  molester?

19  A.   The placing of the blindfold and taking off the

20  blindfold, yes.

21  Q.   Right.  You said that, you know, it would -- allowing

22  the child to do that would actually give the child the

23  opportunity to skew the blindfold or would make it possible

24  for a child maybe to peek or see; right?

25  A.   It could, yes.

26  Q.   At least one child described that exact thing happened;

27  correct?

28  A.   Correct; one out five.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1519

1    Q.   Described as what she saw was being round with black

2    hair around it?

3    A.   Correct.

4    Q.   You said that one of the things that's important to

5    child molesters, they don't want to get caught; right?

6    A.   Correct.

7    Q.   Tell me a little bit more about what you meant by that.

8    A.   That when they molest children, they take steps so they

9    won't get caught.  They seclude the child.  They often

10   seclude the child, not only for when the abuse is occurring,

11   but afterwards when the child is acting differently, you

12   know, acting harmed.  They often tell or threaten the child

13   or bribe the child not to tell anyone about that.  It is an

14   unusual feature in this case about putting a blindfold on a

15   child, or asking a child to put a blindfold on.  That doesn't

16   happen in the typical case of child molestation.

17          But again, if the task were to -- if the object of

18   putting the blindfold on was to restrict them seeing a penis

19   was going into their mouth, the casualness that I'm talking

20   about is that he didn't take any steps to make sure that the

21   blindfold fit them well, that it was on so they couldn't see.

22   Didn't test to see that, you know, it was working.  That they

23   couldn't see anything.  And again, didn't give instructions

24   to the children to say:  Keep it on.  Keep it on while he

25   zipped himself or cleaned off or something.  Children

26   reported they took it off themselves and he never gave

27   instructions about that.

28   Q.   Okay.  So he did actually seclude these victims; right?

1    A.    If he took them alone in a room that was locked, yes,

2    with the door closed.  Yes, secluded in that sense.

3    Q.    And child molesters choose their victims very carefully;

4    right?

5    A.    Yes.

6    Q.    I mean, they don't molest every child they come in

7    contact with?

8    A.    Correct.

9    Q.    They choose certain ones?

10   A.    Correct.

11   Q.    Well, what do they look for?

12   A.    Well, we don't know precisely, but they usually look for

13   children that they think won't tell; that are more

14   vulnerable; that maybe are more needy; that are having

15   problems; they could manipulate.  Sometimes they are choosing

16   children that they are attracted to.

17   Q.    So in this particular case, all girls; right?

18   A.    Correct.

19   Q.    No boys?

20   A.    Correct.

21   Q.    And each one of the victims in this case, at least I

22   would describe, is somewhat meek, would you agree?

23   A.    You know, I only saw their behavior during the

24   interview, so I couldn't -- I'm not in a position to describe

25   their personality.

26   Q.    What if I told you all of them but one have a parent

27   that doesn't speak English as a native language, would that

28   be a relevant consideration?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1521

1   A.   No.

2   Q.   No?

3   A.   No.

4   Q.   Looking for children maybe who have special education

5   needs, something like that?

6   A.   Yes.

7   Q.   Child molesters going to extreme measures to cover their

8   tracks; is that right?

9   A.   Most do, yes.

10  Q.   They do actually build in defenses to what they are

11  doing?

12  A.   What do you mean by defenses?

13  Q.   They want to have an innocent explanation for their

14  conduct; right?  We were playing, we were in the pool, we

15  were horsing around, we were playing the tickle game, these

16  sort of --

17  A.   Rationales.

18  Q.   -- rationales for their behavior?

19  A.   Yes.

20  Q.   Very common?

21  A.   Yes.

22  Q.   One of the things that is common to most of these cases;

23  right, is that they desensitize the child to what is

24  happening?

25  A.   Yes.

26  Q.   So in other words, playing the game in front of other

27  people, or making this a normalizing behavior is central to

28  getting that child to submit to what you are doing?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1522

1    A.    No.

2    Q.    Not central?

3    A.    No.

4    Q.    Let me take it back.  Certainly, could be accomplished

5    without that?

6    A.    Correct.

7    Q.    But it is part -- I mean that's part of the process;

8    right?

9    A.    It could be a pathway, yes.

10   Q.    Okay.  You said that there were poor interviewing

11   techniques conducted or occurring in all of these interviews?

12   A.    Did you say core or poor?

13   Q.    Poor.

14   A.    Yes.

15   Q.    Okay.  Now, was that throughout the interviews or there

16   specific examples?

17   A.    Both.

18   Q.    You would agree with me that you have never reviewed the

19   perfect interview?

20   A.    Correct.

21   Q.    Never happened?

22   A.    Correct.

23   Q.    Okay.  Things like whether they build a rapport with the

24   child is one of the things you said was most important;

25   correct?

26   A.    Correct.

27   Q.    That was actually getting the child comfortable to

28   disclosing the information; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1523

1    A.    Correct.

2    Q.    If they are not comfortable with you, they won't tell

3    you bad things happened to them?

4    A.    Correct.

5    Q.    You talked about whether or not the kids knew the

6    difference between a truth and a lie, for instance?

7    A.    In my report, I did.  Yes.

8    Q.    Did any of these kids demonstrate any difficulty with

9    that concept?

10   A.    No.

11   Q.    And did any of them demonstrate any difficult with how

12   important it was to tell the truth?

13   A.    I don't believe so.  No.

14   Q.    Okay.  And all of them understood that they were talking

15   to the police; right, to investigate what's happened to them?

16   Each one of them was asked:  What's happened to you and I

17   need to know that; right?

18   A.    Yes.

19   Q.    You talked in your report about disclosure inhibitions.

20   Are the kids inhibited from disclosing somehow?

21   A.    Yes.

22   Q.    Again, that would be a concern about whether or not

23   there is more out there to tell; right?

24   A.    But not necessarily more abuse.

25   Q.    But that's the primary concern; right?

26   A.    It is a concern.  Or again, a parent could say, you

27   know, go in there, and if you say X, Y, and Z, we'll take you

28   to McDonald's.  That could -- if you don't say X, Y, and Z,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1524

1   you know, we'll take you to McDonald's.  So again, you are

2   looking for any of these external forces that the child could

3   feel.  I can't talk about something because, you know, I will

4   get in trouble or somebody else will get in trouble.

5           You are right in the sense that often what you are

6   worried about is a threat from a perpetrator.  So I'm not

7   going to tell you that my stepfather touches me because he

8   said he was going to hurt me.  But you could also worry

9   about:  I'm not going to tell you what my mother told me to

10  tell you these kinds of things because she'll get mad if I

11  tell you that.

12  Q.   Would external forces be things like:  Other children

13  are going to make fun of me on the playground?

14  A.   Yes.

15  Q.   I don't want to be a victim of sexual abuse because

16  other kids are going to say I'm -- I did bad things with the

17  teacher?

18  A.   Yes.  You are trying to find out anything that could

19  inhibit them telling you anything that is relevant.  Yes.

20  Q.   Okay.  You talk about threats or bribes.  That's a

21  little bit like:  I will take you to McDonald's if you say

22  this; correct?

23  A.   That's the bribe, and the threats is, you know, aversive

24  corollary to that.

25  Q.   You have no evidence in this case that any threats or

26  bribery was used?

27  A.   Right.  Although they weren't asked directly about that.

28  Q.   So you talked about open-ended questions; right?  That's

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1525

1   the best way to get information?

2   A.   Correct.

3   Q.   And the officers did a lot of that in these interviews;

4   correct?

5   A.   They did some of it.  I won't say a lot.  Most of the

6   responses were to close-ended questions as opposed to a free

7   narrative, you know, lasting, you know, dozens of sentences

8   telling the story.  Most of them were answers to, you know:

9   What did it taste like?  How many objects?  What happened,

10  you know, next?  More close-ended questions than the

11  recounting of the narrative.

12  Q.   So once the child has said that he put something in my

13  mouth; right?  I mean they spontaneous say:  He put something

14  in my mouth, it would be inappropriately to say:  Well, how

15  big was it?

16  A.   Well, not inappropriate, but we find in research that

17  that could result in more inaccurate information.  A better

18  question to say:  Tell me all about that.  Tell me everything

19  that you could remember.  Could you remember more?  Tell me

20  what happened before.  Tell me what happened after.  You are

21  trying to be very vague and therefore non-directive so the

22  child could then tell you as many details without you at all

23  asking these close-ended questions that lead to, you know,

24  the research shows more false information.

25  Q.   Okay.  So you talked about authority pleasing.  Like

26  there was a need to please an authority figure; right?

27  A.   Correct.

28  Q.   These children all said no to certain questions; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1526

1   A.    Correct.

2   Q.    So all of them were able to tell an interviewer no that

3   didn't happen?

4   A.    Correct.

5   Q.    With respect to leading questions, those are -- what's

6   your definition of a leading question?

7   A.    When the question contains information that ought to be,

8   you know, only in the answer.  So if I say, you know:  He hit

9   you, didn't he?  That is putting pressure for the yes answer

10  more than the no answer.  Or, if I say to you:  You went to

11  Florida.  Tell me what the weather was like before you told

12  me you went to Florida, that would be leading.

13  Q.    And you're aware that on cross-examination leading

14  questions are allowed; right?

15  A.    Legally?

16  Q.    Correct.

17          MR. MADDEN:  Objection.  That's not relevant to a

18  forensic interview, Your Honor, what goes on in the

19  courtroom.

20          THE COURT:  I'll sustain the objection.

21  BY MS. FILO:

22  Q.    So I would like to give you an example.  I would like to

23  read this to you and could you tell me whether or not this is

24  leading:

25          "The times that you were alone with Mr. Chandler in

26          the classroom, those times were all before you saw

27          the whole class game; right?

28          "Answer:  I don't remember.  I'm not sure.

1      "Question:  Fair enough.  And last year you told

2      the Court that those times were before the

3      classroom demonstration; right?

4      "Answer.  Yes.

5      "Question:  Do you play the taste game in front of

6      the whole class?

7      "Answer:  Yes.

8      "Question:  All right.  Because that's what you

9      practice with Mr. Chandler right?

10      "Answer.  Yes."

11      Those are examples of leading questions; right?

12  A.   Well, there were a lot of those -- kind of read them

13  fast.  My mind wasn't working that fast.

14          MR. MADDEN:  Your Honor, counsel advise these

15  questions were asked in a courtroom, not in a forensic

16  interview?

17          THE COURT:  I think the question is simply:  Was it

18  a leading question?  And you could answer yes or no.

19          THE WITNESS:  Which question?  There were multiple

20  questions.

21          THE COURT:  I think that's fair.

22          MS. FILO:  Okay.

23  BY MS. FILO:

24  Q.   So, for instance:

25      "Did you play the taste game in front of the whole

26      class?

27      "Answer:  Yes.

28      "Question:  Because that's what you practiced with

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1528

1          Mr. Chandler; right?

2          "Answer:  Yes."

3    A.    That's leading, yes.

4    Q.    Because you're actually not only suggesting the answer;

5    correct?

6    A.    Correct.  It's leading if the child first didn't say,

7    that's what I practiced with Mr. Chandler.

8    Q.    Right.  Because you're assuming something that -- what

9    the child was doing with Mr. Chandler was practicing the

10   game; right?

11   A.    Correct.  If the child hadn't said that before, that if

12   the child said -- if you said to me first:  I went to

13   Florida, I could then say:  When you went to Florida, what

14   was the weather like?  That's not leading; right?  But if you

15   never said to me:  I went to Florida.  I say:  When you went

16   to Florida, what was the weather like?  That's leading.

17          In this example, if the child had not said:  I

18   practiced the taste game with Mr. Chandler, that would be

19   leading.

20   Q.    Okay.  So I would like to give you a few other examples?

21   A.    Could you do it slower a little bit?  So one at a time?

22   Thank you.

23   Q.    Sure, for instance, asking someone:

24          "You had to suggest words to her; right?

25          "Answer.  Yes" --

26          MR. MADDEN:  Your Honor --

27          MS. FILO:  -- it could be --

28          MR. MADDEN:  I'm going to object.  These are

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1529

1  questions that --

2           THE COURT:  What's the basis of the objection?

3           MR. MADDEN:  Not relevant.  These questions are

4  being asked in the courtroom --

5           THE COURT:  Hold on.

6           MR. MADDEN:   -- as evidence.

7           THE COURT:  Mr. Madden, I will let you approach if

8  you want to argue your point.

9           MR. MADDEN:  I'm sorry.

10          THE COURT:  You want to come to sidebar?

11          MR. MADDEN:   Yes.

12          (Whereupon, there was a discussion at the bench.)

13          THE COURT:  Thank you, Ms. Filo.  You are going to

14  continue.

15          MS. FILO:  Thank you.

16  BY MS. FILO:

17  Q.   Doctor, you would agree with me that fact-leading

18  questions make answers questionable?

19  A.   I'm not sure what you mean fact-leading, but leading

20  questions makes the response questionable because it could

21  lead to more error.  Yes.

22  Q.   Okay.  And in using your question with facts,

23  particularly to a child, is giving them information; is that

24  accurate?

25  A.   Facts by definition to anybody would be giving them

26  information, yes.

27  Q.   Okay.  So if you said:  What was the weather like in

28  Florida, that would be an appropriate question; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1530

1    A.    It's not leading.

2    Q.    Not leading.  That's what I meant to say.  Sorry.

3          If you said:  When you were in Florida, it was

4    raining and overcast and you had to carry umbrellas, you are

5    providing information in your question; correct?

6    A.    Yes, so that could be leading.

7    Q.    You talk also about conformity press; is that right?

8    A.    Correct.

9    Q.    Conformity press is kind of reminding kids of previous

10   statements; right?

11   A.    Or previous statements that they made or other people,

12   other children, have made:  Tommy said he was abused by Joe.

13   Sally said she was abused by Joe.  Now what about you?

14   Q.    So you have suggested that one of the flaws in the

15   interviews here was that inconsistent statements weren't

16   addressed?

17   A.    Correct.

18   Q.    So how do you address those inconsistent statements

19   without engaging in conformity press?

20   A.    You ask for explanations of that.  You don't in your

21   question imply that they should revert back to the previous

22   answer.  So you could say -- here will be the difference.

23   Let's say you told me you went to Florida, then you told me

24   you didn't go to Florida.  Conformity press would be:  You

25   told me before you went to Florida, and you're not saying

26   that now?  Why aren't you telling me what you first told me?

27   Okay.

28          Trying to clear up the inconsistencies doesn't have

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1531

1  that same demand characteristic.  You could say:  I heard you

2  say two different things:  When you went to Florida and when

3  you didn't go to Florida.  Could you help me understand what

4  you're saying here?

5  Q.   Okay.  So in this case, almost all of the officers that

6  did any of these interviews asked the children:  Could you --

7  do you have any idea what it was that was in your mouth;

8  right?

9  A.   Yes.

10  Q.   And other than the words that they were able to use to

11  describe the object, not a single one of them could point to

12  a thing?

13  A.   I don't understand your question.

14  Q.   Not a single one of them was able to say:  Well, I think

15  it was this?

16  A.   Let's see.  Um, none of the students -- none of the

17  students made a definite statement like:  I'm pretty sure it

18  was a banana or something like that.  Correct.

19  Q.   Okay.  I'm going to ask you about one last topic.  You

20  talked about some studies where children were given

21  information by trusted sources and they incorporated that

22  into events that had actually happened and then presented

23  them as truth; correct?

24  A.   Or they actually experienced that information.  They saw

25  a clown come in a room and knock over a book.  Yes.

26  Q.   Right.  So the one I remember is Mr. Science; right?

27  There is the experiment with Mr. Science, where the children

28  come in and they experience this kind of science experiment

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1532

1   and then they leave.  And then a -- why don't you tell me.

2   You know better than I do.

3   A.   Half the children, their mothers are told accurate

4   information about what happened in the science demonstration.

5   Half of the mothers are told some inaccurate information,

6   that they saw certain demonstrations that didn't occur and

7   then a wipe was on the side of their mouth and went into the

8   mouth and it tasted yucky.  They had to put a wipe because

9   the science demonstration said they had something on the

10  face.

11       They then had all of the mothers read these stories

12  to the child once a week.  I think it was for a couple of

13  months.  Then they brought the children back.  And the

14  children where the mothers were given accurate information,

15  none of those children had any false memories of the wipe

16  going into their mouth or seeing science demonstrations she

17  didn't see.  And about 40 percent of the children whose

18  mother was given inaccurate information about the wipe going

19  into the mouth and inaccurate information about the details

20  of the science demonstration that they saw, now the children

21  had false memories and they said:  Yes, a wipe was placed on

22  the sides of my face, went in my mouth, it tasted yucky, and

23  I saw a science experiment that they didn't actually see.

24       So the conclusion was that providing mothers with

25  false information, having mothers repeat this to their

26  children can cause false memories in children, including

27  about tactile sensations.

28  Q.   What age were the children who were originally involved

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1533

1  in the original study?

2  A.    Original study -- there were two studies.  I think the

3  original study was preschoolers, four or five years old.

4  Q.    Between the ages of three and five?

5  A.    Yes.

6  Q.    Then they did a second study; right?

7  A.    Right.

8  Q.    Older children between five and nine years old, around

9  there?

10  A.    Correct.

11  Q.    And they did the exact same thing; right?

12  A.    Correct.

13  Q.    And with those children, although they may have

14  originally reported the inaccurate detail happening, almost

15  all of the children when asked were then able to say:  No.

16  My mom just told me about that.  It didn't really happen to

17  me?

18  A.    That's correct.

19        MS. FILO:  That's all the questions I have, Your

20  Honor.  Thank you.

21        THE COURT:  Thank you.

22        Redirect, Mr. Madden?

23        MR. MADDEN:  No, Your Honor.

24        THE COURT:  Okay.  Doctor, thank you very much.

25  You may step down.  You are excused and free to leave.  If

26  you could hand that document to me.  Thank you.

27        Before I forget, ladies and gentlemen, in case I

28  confused you, earlier we marked an exhibit as People's 24,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1534

1    and I mistakenly -- it was next in order, which was 17.  I'm

2    not sure if we did this in your presence, but when Ms. Filo

3    was showing computer prints or pictures to the DNA expert,

4    Kristin Cardosa, of various parts of the chair, she indicated

5    later she will bring hard copies and have them marked.  So 17

6    through 23 were marked as individual photographs, which I

7    would like at this time, Ms. Filo, if you could just note

8    them for the record, show them to the jurors, because I don't

9    think we showed them to you; is that correct?

10          MS. FILO:  Your Honor, we showed them to the jury

11   on the screen.  I just didn't have the --

12          THE COURT:  Right.  That I recall, but the actual

13   photos you've never seen; correct?  Okay.  Then, I don't

14   think it's necessary to show, you are right, because they

15   were up on the screen.  They weren't the clearest up on the

16   screen, but you will have the individual photos that Ms. Filo

17   said.

18          At this time, ladies and gentlemen, we're going to

19   take a recess until 3:00 o'clock.  I will order all members

20   of the jury to report to the jury assembly room on the second

21   floor.  Counsel could stay in the courtroom.

22          (Whereupon, the jurors were excused and the

23   proceedings were had outside the presence of the jury.)

24          THE COURT:  Jury has stepped outside the

25   courtroom.  Mr. Chandler and both counsel are present.  I

26   just wanted to put on the record that we had a sidebar

27   conversation this afternoon.  Mr. Madden had objected to

28   certain questions as examples of leading questions being

1  asked the doctor.  There were a few questions asked before we

2  approached the bench, and the doctor did respond that those

3  were examples of leading questions.

4         At sidebar, Ms. Filo wanted to ask some additional

5  questions, and it appeared to the Court that the additional

6  questions she wished to ask were examples of some questions

7  Mr. Madden had asked on cross-examination [sic].  I indicated

8  that I wasn't going to allow any additional questions, and

9  that if Mr. Madden objected, I would sustain the objection.

10  And that's the reason Ms. Filo didn't ask any questions and

11  you moved on.

12         Mr. Madden, you want to supplement the record at

13  all?

14         MR. MADDEN:  I think that your recitation of the

15  order is correct, so I guess there is really nothing to

16  object to at this point.  But my -- I'll indicate that my

17  objection at the bench was that it was inappropriate to allow

18  Ms. Filo to ask an expert testifying about appropriate

19  questioning in forensic interviews and to give her

20  hypotheticals of leading questions being asked by an

21  attorney.

22         According to Rules of Evidence, in a courtroom

23  where, of course, on cross-examination leading questions are

24  perfectly permissible, but obviously cross-examination has a

25  much different purpose in a much different universe.  Has

26  nothing to do with suggestibility of children.  You're just

27  asking about things that actually did happen, things that

28  they did say.  You are summarizing, for example, which is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1536

1   what was happening here.  I objected on relevancy grounds.

2   I'm satisfied with the Court's ruling.

3           THE COURT:  Ms. Filo, you want to --

4           MS. FILO:  Yes, Your Honor.  I do think that I

5   should have been allowed to continue the questioning with the

6   expert.  And I'll say this, Mr. Madden didn't limit his

7   direct examination of this expert to just forensic

8   interviews.  He talked about contamination by parents.  He

9   talked about influence, external influences of other

10  children.  I mean, he talked about, not just forensic

11  interviews, but what other factors will affect a child's

12  disclosure or information provided, and a parent asking a

13  child what's happened to you is certainly legal.  It's

14  certainly appropriate.  It's certainly permissible.  But it

15  may lead -- in Mr. Madden's argument, it may lead to an

16  inaccurate disclosure of information.

17          I think I'm equally as entitled to say that.  Mr.

18  Madden is asking questions that are legal, they are

19  permissible, they are available to be used, but they may be

20  leading to inaccurate information, and I think to restrict my

21  ability to ask the expert those questions, restricting my

22  ability to cross-examine on these exact subjects -- he wasn't

23  just called as an expert on forensic interviewing, he was

24  called as an expert in disclosure in general.

25          THE COURT:  I don't disagree with a lot of what you

26  are saying, and because of the direct, there wasn't

27  objections during your cross, nor did I limit your cross.

28  However, the difference with the cross-examination by Mr.

1    Madden, it was presented in front of the jury.  They were

2    here to hear the questions, see the demeanor of the

3    witnesses, and basically all of those issues of credibility

4    to evaluate in the courtroom, unlike everything else that

5    occurred outside the courtroom.  That was the distinction I

6    see.

7         And it also puts Mr. Madden in a difficult

8    situation, trying to justify his defense or why he asked

9    certain questions.  As he said, you know, they are proper and

10   allowable.  How the jury interprets the answers in various

11   situations is up to them.  They could give whatever weight

12   they want.  I think that the examples you gave, in my

13   opinion, were sufficient, and that's why I restricted you any

14   further.  I appreciate you following the Court's ruling.

15   Okay.

16        With that said, it's my understanding, Mr. Madden,

17   that you don't have any additional witnesses this afternoon?

18   And your expectation is, if you have another witness, it will

19   be Mr. Chandler?

20        MR. MADDEN:  It's currently my expectation.

21        THE COURT:  Okay.  Mr. Chandler, since we have a

22   moment, I want to make sure that you understand that, you

23   know, you've heard this a number of times.  You have a

24   constitutional right to remain silent.  It is your decision

25   whether you decide to take the stand and testify, obviously,

26   with the advice of your attorney.  Ultimately, if you choose

27   to testify, it's your decision.  You choose not to testify,

28   it's your decision.  You understand that?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1538

1      THE DEFENDANT:  Yes, Your Honor.

2      THE COURT:  Okay.  I'm not going to ask you this

3  again.  If you take the stand, I'm assuming that's your

4  choice.  And if you don't, that's your choice.

5      Again, Mr. Madden, I'm assuming you don't have

6  additional witnesses this afternoon?

7      MR. MADDEN:  I do not.

8      THE COURT:  Okay.

9      MS. FILO:  May I be heard, Your Honor?

10     THE COURT:  Yes.

11     MS. FILO:  I guess I would ask at this point a

12  decision be made.  I mean, this case has now been pending for

13  a year and a half.  We have been in -- actually in trial for

14  three weeks.  I object being given the weekend to sort of

15  think about whether or not he's going to testify.  He could

16  do it at any point.  It's just at this point, I mean, it's

17  still 3:00 o'clock.  We have at least an hour and a half that

18  we could use today.  If he's going to testify, it seems like

19  now is the time to do it.

20     THE COURT:  Well, I'm anticipating, Mr. Madden, you

21  are going to ask the Court to recess?

22     MR. MADDEN:  Yes.

23     THE COURT:  You are going to ask that I not require

24  to call your next witness?

25     MR. MADDEN:  Correct.

26     THE COURT:  The only reservation I have, Ms. Filo,

27  I think if Mr. Madden talks to his client and represents to

28  you that it appears that he's going to testify, there is no

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1539

1    remedy if on Monday he shows up and says I'm not going to.

2    He could change his mind at any time.

3            Off the record.

4            (Whereupon, there was a discussion off the record.)

5            THE COURT:  The record will reflect the jury has

6    returned into the courtroom.  Both counsel and Mr. Chandler

7    are present in the courtroom.

8            Ladies and gentlemen, thank you for your patience.

9    After discussing with counsel, the state of the case -- first

10   of all, we're about to take the evening recess for the

11   weekend.  Second of all, it's my understanding that there is

12   at least one potential witness that will be called Monday,

13   and then sometime next week you will receive the case and you

14   will start deliberating.  Okay?  So next week you are going

15   to begin to deliberate.

16           So I wanted to remind you, and I'm not sure the

17   specific date you are going to start deliberating, because

18   when the lawyers do their closing remarks, I don't restrict

19   the length of time that they argue.  Okay?  It could be an

20   hour, it could be two hours they will give closing remarks to

21   you.  I read the instructions of law first to you, then you

22   hear closing remarks, and then you'll be escorted into the

23   jury room to begin your deliberations.

24           So that will happen next week sometime.  And also,

25   keep in mind that since you will start deliberating, out of

26   abundance of caution, keep Friday available because we'll be

27   in session next Friday, although maybe not in court, in the

28   courtroom, you will be deliberating.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1540

1        So we're going to recess at this time.  I'm doing

2   this as a courtesy to counsel.  As you know, throughout this

3   trial, at least in my opinion, I think I have been generous

4   to counsel, giving them the time they need to properly put

5   their case to the jury.  I do that on every case because I

6   think it's important to both sides.  So I know it could be

7   frustrating for you for the delays, and I apologize for that.

8   But every time there is a delay there is a reason.

9        With that said, Monday morning it is my intent to

10  call you up at 9:00 o'clock.  And if Mr. Madden or Ms. Filo

11  are not here when you come in, that's because they are

12  running late.  Okay?  So I told you that there was going to

13  be a time that we start this trial at 9:00 o'clock.  I'm

14  shooting for Monday.  Okay?

15        MR. MADDEN:  Your Honor, before you finish, I would

16  like to approach the bench with Ms. Filo on one matter.  We

17  may be able to do that?

18        THE COURT:  Sure.

19        (Whereupon, there was a discussion at the bench.)

20        THE COURT:  So we'll be in recess.  I'll order all

21  members of the jury to report to the jury assembly room

22  Monday morning at 9:00 a.m.  Please have a safe weekend and

23  we'll see you all on Monday morning.  Thank you.

24        Record will reflect the jury has left the

25  courtroom.  I will order both counsel and Mr. Chandler here

26  Monday morning at 9:00 a.m., and we'll be in recess.

27        (Whereupon, the Court took the evening recess.)

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1541

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA CLARA    )

 3

 4          I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

 5          The foregoing is a full, true, and correct

 6   transcript of the testimony given and proceedings had in the

 7   above-entitled action taken on the above-entitled date; that

 8   it is a full, true, and correct transcript of the evidence

 9   offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and official

13   stenographic reporter of said Court, and thereafter had the

14   same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted if applicable.

18

19          Dated:

20

21                            _____

22                            Jamie L. Mixco, C.S.R.
                              Certificate No. 12708
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."
```

# EXHIBIT 3
# (Vol. 16)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1542

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


---o0o---


THE PEOPLE OF THE STATE OF       )
CALIFORNIA,                      )
                                 )
     Plaintiff - Respondent,     )
                                 )
     v.                          )     No. C1223754
                                 )
CRAIG RICHARD CHANDLER,          )
                                 )
     Defendant - Appellant.      )
_____/

COPY


VOLUME 16

PAGES 1542 - 1570

JULY 29, 2013


---o0o---


REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY


---o0o---

APPEARANCES:


FOR PLAINTIFF-RESPONDENT:      OFFICE OF THE ATTORNEY GENERAL
                               BY:  KAMALA D. HARRIS,
                               Attorney General of the State
                               of California

FOR DEFENDANT-APPELLANT:       In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1543

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           IN AND FOR THE COUNTY OF SANTA CLARA

3      BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4               DEPARTMENT NO. 37

5

6                  ---o0o---

7  THE PEOPLE OF THE
    STATE OF CALIFORNIA,          )

8                     )

9            PLAINTIFF,   )
                     )    CASE NO.  C1223754

10     v.                )
                     )

11  CRAIG RICHARD CHANDLER,    )
                     )

12                     )

13          DEFENDANT.   )
    _____/

14

15                  ---o0o---

16

17       REPORTER'S TRANSCRIPT OF PROCEEDINGS

18

19             JULY 29, 2013

20

21                  ---o0o---

22

23

24  APPEARANCES:

25  FOR THE PEOPLE:         ALISON FILO
                     Deputy District Attorney

26

27  FOR THE DEFENDANT:      BRIAN MADDEN
                     Attorney at Law

28  OFFICIAL COURT REPORTER:   JAMIE L. MIXCO
                     C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1544

1                              <u>INDEX</u>

2

3                          PEOPLE'S EXHIBITS

| <u>Exhibits</u> | <u>Description</u> | <u>Page</u> |
|---|---|---|
| 25 Marked | diagram | 1561 |
| 1 through | | 1562 |
| 25 Received | | |

6

7                          DEFENSE EXHIBITS

| <u>Exhibits</u> | <u>Description</u> | <u>Page</u> |
|---|---|---|
| A-1 through | | 1563 |
| A-13 | | |
| Received | | |
| B Received | | 1563 |
| D Received | | 1563 |
| E-1 through | | 1563 |
| E-4 | | |
| Received | | |
| F-1 | | 1563 |
| Received | | |
| F-2 | | 1563 |
| Received | | |
| G Received | | 1563 |

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1545

1   San Jose, California                          July 29, 2013

2                          PROCEEDINGS

3          THE COURT:  Thank you, ladies and gentlemen.

4   Record will reflect both counsel are present, Mr. Chandler is

5   present in the courtroom, the jury is not in the courtroom

6   yet.

7          Mr. Chandler, on Thursday we had talked about your

8   right to testify.  Mr. Madden represented to the Court that

9   you decided not to testify, so I'm assuming that is correct.

10  Correct?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  So it's your decision not to testify at

13  this time?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Okay.  At this time, we're going to

16  call the jury up.  We're going to do the stipulation, and as

17  I understand it, at that point both sides will rest, subject

18  to going over the exhibits and the Court making decisions

19  what exhibits will be admitted into evidence.  I will bring

20  the jury back tomorrow morning to instruct them and then

21  Wednesday morning for closing remarks.  And if we have one

22  more piece of evidence, we're going to introduce it into

23  evidence, if I didn't already say that.

24         Is that all correct, Counsel?

25         MR. MADDEN:  Yes.  Is that -- you are referring to

26  the stipulation?

27         THE COURT:  Yes.

28         MR. MADDEN:  Yes.

1    THE COURT:  Then once I excuse the jurors, I will

2  ask Juror No. 8 to stick around, and I'm going to ask him a

3  few questions.  Okay?  So we'll be in recess.  We'll call the

4  jury up now.

5    (Whereupon, a brief recess was taken.)

6    THE COURT:  Thank you, ladies and gentlemen.

7  Record will reflect all members of the jury are present, both

8  counsel are present, Mr. Chandler is present in the

9  courtroom.

10    As I understand it, Counsel, there is a

11  stipulation.

12    MR. MADDEN:  Yes, Your Honor.  I will be happy to

13  read it for the record.

14    THE COURT:  Yes, please.

15    MR. MADDEN:  Your Honor, the parties make the

16  following stipulation:

17    The parties hereby stipulate that the families of

18  Laurie Doe, Wendy Doe, and Arleth Doe have filed civil

19  lawsuits seeking money damages against Craig Chandler and the

20  Evergreen School District.  Each of these lawsuits was filed

21  after the children made statements to law enforcement and/or

22  gave prior testimony in court, which has been referenced in

23  this trial.

24    THE COURT:  Thank you.

25    Ms. Filo, do you enter into that stipulation?

26    MS. FILO:  So stipulated.

27    THE COURT:  Once again, ladies and gentlemen, the

28  stipulation that Mr. Madden just read to you is not in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1547

1    dispute and you must accept that stipulation is true.

2           Subject to the Court and counsel discussing all of

3    the exhibits that haven't been introduced into evidence yet,

4    which we'll do at the recess, does the defense rest, Mr.

5    Madden?

6           MR. MADDEN:  Yes, Your Honor.

7           THE COURT:  And, Ms. Filo, do the People rest at

8    this time, subject to introductions of the exhibits?

9           MS. FILO:  Yes, Your Honor.

10          THE COURT:  Ladies and gentlemen of the jury, both

11   sides having rested, you have heard all of the evidence that

12   you are going to hear in this particular trial.  At this

13   stage of the trial, what will occur is I will first instruct

14   you on the law that applies to this case and attorneys will

15   give closing remarks.  You will hear from Ms. Filo, then Mr.

16   Madden and Ms. Filo will give rebuttal.  I will give you one

17   last instruction and then you will begin deliberating.

18          The schedule is going to be as follows:

19          We're going to recess in just a moment for the

20   balance of the day.  Now that all of the evidence has been

21   presented to you, it's at that stage that I could meet with

22   the attorneys and make a decision of what instructions of the

23   law I'm required to read to you.  Okay?  As I told you

24   before, each one of you will have a copy of the instructions,

25   but I'm required to read it to you, so I will read it to you

26   in open court.  You will each have that instruction as your

27   personal copy to take into the jury room while you are

28   deliberating.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1548

1    I'm going to read the instructions to you tomorrow

2  morning at 9:00 a.m.  Once I finish reading the instructions,

3  we're going to take a recess for the rest of the day and

4  we're going to come back Wednesday morning at 9:00 o'clock.

5  You will hear Ms. Filo give her closing remarks, Mr. Madden

6  Ms. Filo, and then you will begin deliberating.

7    Once you start deliberating, let's assume that is

8  on Wednesday, you know, if you haven't reached a decision by

9  the end of the day Thursday, then you'll be required to come

10  back on Friday.  Just a reminder to keep Friday available

11  just in case.

12    So with that, we're going to take a recess until

13  tomorrow morning at 9:00 o'clock.  I could tell you for

14  planning purposes, and I apologize for breaking up your day

15  in such a manner, the instructions will take less than an

16  hour, an hour or less.  The benefit for you, and hopefully

17  you could benefit from this, you will have the balance of the

18  day to yourself and you will return Wednesday morning at 9:00

19  o'clock.

20    We'll recess at this time.  I will order all

21  members of the jury to report the jury assembly room tomorrow

22  morning at 9:00 a.m.  At this time you are all excused.

23  Please leave your notebooks on your chair.

24    I'm going to ask Juror No. 8, Mr. -- I'm going to

25  mispronounce your name, I apologize, [Juror No. 8].

26    JUROR NO. 8:  Yes.

27    THE COURT:  Okay.  If you could just remain in the

28  courtroom.  Everyone else may leave.  See you tomorrow

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1549

1    morning at 9.

2              MR. MADDEN:  Your Honor, may we approach?

3              THE COURT:  Sure.

4              (Whereupon, there was a discussion at the bench.)

5              THE COURT:  The record should reflect that both

6    counsel are present, Mr. Chandler is present, Juror No. 8,

7    [Juror No. 8], is present, all other jurors have left the

8    courtroom.

9              [Juror No. 8], the reason I asked you to stay

10   behind is because I wanted to ask you a few questions.  Based

11   on my observations -- as you know, you know, I usually scan

12   the courtroom.  I look at jurors, and sometimes when I notice

13   something, I will ask a juror about it.  For example, if I

14   notice a juror with their eyes closed, sometimes I'm not sure

15   if they are concentrating on what's being said, or maybe they

16   dozed off, so I have to ask them to find out.  And, you know,

17   oftentimes I hear, you know, I worked all night.  I'm very

18   tired.  I apologize I dozed off.  Or, I was listening to what

19   was being said and it helps me to close my eyes, whatever the

20   reason.

21             The reason I asked you to stay behind is because at

22   certain times of the trial, I think when some of the children

23   were testifying, I noticed that when Mr. Madden was asking

24   questions, you were looking at Mr. Madden which was fine.

25   But when the witness responded, you continued to look at him,

26   and I was just wondering, was there a reason for that?

27             JUROR NO. 8:  No, sir.

28             THE COURT:  No?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1550

1          JUROR NO. 8:  No, sir.  None whatsoever.

2          THE COURT:  Okay.  I notice with other witnesses

3   you didn't do it.

4          JUROR NO. 8:  No particular reason at the time, no.

5          THE COURT:  Okay.  Was there a reason why you

6   wouldn't look at the children when they were responding?  Was

7   it anything to do with, you know, evaluating their

8   credibility?

9          JUROR NO. 8:  No.  I did turn around occasionally,

10  but Mr. Madden was here at the podium, so it was very

11  convenient.  I did turn around several times, enough to

12  follow what was going on very closely.

13         THE COURT:  Okay.  So throughout the entire trial

14  you've heard everything?

15         JUROR NO. 8:  Everything I got, pretty much.

16         THE COURT:  You made some detailed notes?

17         JUROR NO. 8:  (Shakes head up and down.)

18         THE COURT:  You know, some jurors don't take notes,

19  and you obviously did, which is fine.  We all do things

20  differently.  Okay.  So no explanation about that.

21         JUROR NO. 8:  No.  It's just Mr. Madden was right

22  there, it was convenient for me to look in this direction,

23  but I occasionally looked up to see how the ladies were

24  doing.

25         THE COURT:  Okay.

26         JUROR NO. 8:  I have no problems.

27         THE COURT:   Okay.  And, you know, obviously at

28  this point it's very important for every juror to keep an

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1551

1  open mind until you start deliberating and then we exchange

2  ideas.

3          JUROR NO. 8:  Yes.

4          THE COURT:  You still capable of keeping an open

5  mind?

6          JUROR NO. 8:  Absolutely.

7          THE COURT:  Okay.  Then at this time, [Juror No.

8  8], I wanted to ask you about that because I wanted to get an

9  explanation, and I could note that your responses seemed to

10  be pleasant.  You are smiling to me, so you are not taking it

11  personally that I'm asking you about this?

12          JUROR NO. 8:  No, not personal.

13          THE COURT:  Okay.  What I'm going to do is ask you

14  if you'd stay outside the courtroom just for a minute.  What

15  I'm going to do, just to let you know, I'm going to ask the

16  lawyers do they want me to follow up on any further questions

17  before I excuse you.  Take a minute.  Thank you for your

18  patience.

19          JUROR NO. 8:  Okay.

20          THE COURT:  Record should reflect [Juror No. 8],

21  Juror No. 8, has just stepped outside the courtroom.

22          Counsel want me to inquire in a certain manner some

23  additional questions?  Mr. Madden.

24          MR. MADDEN:  Your Honor, I don't think that

25  additional questions would be productive at this point since

26  he was denying any reason whatsoever for his conduct, which

27  to me is apparently incredible, given the facts which we talk

28  about when we are done.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1552

1    THE COURT:  Okay.  Mr. Madden what I'm going to do

2    is -- I don't intend to cut you off, but I want to excuse

3    him, then we could put on the record our informal

4    of-the-record discussions.

5    MR. MADDEN:  Certainly.

6    THE COURT:  [Juror No. 8], that's fine right there.

7    I wanted to bring you right back in and say see you tomorrow

8    morning.  Obviously, I was going to talk to the lawyers.

9    They didn't have any additional questions.

10    JUROR NO. 8:  Thank you, sir.

11    THE COURT:  Thank you.  Have a good day.

12    JUROR NO. 8:  You bet.

13    THE COURT:  [Juror No. 8] has left the courtroom.

14    Mr. Madden do you want to put on the record what we

15    discussed at this point, and I cut you off earlier, but I

16    think it's important to give you an opportunity to put on the

17    record your observations and comments.

18    MR. MADDEN:  Thank you, Your Honor.

19    I've asked the Court to question this juror, which

20    the Court did, and I'm asking the Court to discharge this

21    juror for good cause for the following reasons:

22    During my cross-examination of the five complaining

23    witnesses, I intentionally located and placed myself

24    essentially where this podium is right now, at the far end of

25    the jury box, and I did this for one reason.  I think in a

26    case of this nature, I think it's important to keep the

27    child's line of sight to me and to me alone and not have them

28    confused or intimidated by the presence of my client.  So I

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1553

1  typically don't do this from the counsel table, and I do that

2  out of respect for the children.

3       [Juror No. 8] from the jury panel is 9 feet

4  approximately from the front of this podium.  And his conduct

5  during my cross-examination of each of the children was

6  incredibly off-putting to me personally, and it was

7  off-putting because at all times, and later on I'm happy

8  to -- I'm sure the Court could make its on observations and I

9  have no objection to Ms. Filo making hers.  But all jurors

10  during my questioning were, as one would expect, directed

11  towards the witness stand and they were listening and

12  observing.  In essence, doing things that you need to do to

13  determine the credibility of witnesses.  First and foremost,

14  you have to pay attention to them.

15       [Juror No. 8] didn't just look at me, he turned his

16  chair as far as could be allowed, and he essentially was

17  staring at me during all of my questioning.  He essentially

18  had his back turned on the jurors.  Like I said, that's a

19  tremendously off-putting experience as an attorney, and I

20  could not fathom any reason that he would be doing that,

21  other than to intimidate me or express his displeasure to me

22  or to the defense.

23       It didn't happen once, it happened for all of these

24  witnesses.  And his statement this morning, he didn't do it

25  for a particular reason.  I think he said it was convenient.

26  He said he had no reason for it.

27       Now, I think as the Court noted earlier in

28  chambers, I could imagine valid reasons why a juror would do

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1554

1    that.  For example, if it was too hard for the juror

2    personally to look at a child and it was easier to kind of

3    look away or close their eyes and just listen.  I think

4    that's a valid tactic for a juror to use.  That's a personal

5    thing.  But there is no way that turning to someone 9 feet

6    away and looking up and staring at them, a lawyer, for the

7    whole time he's cross-examining a child, there is no way he

8    would have been paying attention to these children.  It makes

9    no sense whatsoever, and his statement that it certainly had

10   no reason for it is bizarre in height of his conduct, which

11   is in itself bizarre.

12        Penal Code 1089 relates to a removal of the juror

13   during trial.  I think his explanation for what he was doing

14   is insufficient, highly suspect, and I ask that he be

15   removed.  I would cite another case as authority for this.

16   When a juror exhibits hostility towards one of the attorneys,

17   the Court has the discretion to remove the juror under

18   Section 1089.  This is *People v. McManus*, M-c-M-a-n-u-s, 1960

19   case, 180 Cal.App.2d, page 19, at pages 30 and 31.

20        So I will submit the matter based on those comments

21   and that authority.

22        THE COURT:  Thank you, Mr. Madden.

23        Ms. Filo, response?

24        MS. FILO:  Briefly, Your Honor.  I think that the

25   juror has been questioned.  The juror has committed no

26   misconduct.  He hasn't communicated with me.  I haven't

27   received, you know, e-mails, phone calls.  He hasn't

28   communicated with any other jurors, as far as we know.  There

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1555

1  has been no indication that he's inappropriately reviewed

2  media, done Internet searches.  He's committed no misconduct.

3       What he seems to have done is made Mr. Madden

4  uncomfortable.  And although I'm sympathetic with that as a

5  lawyer, I'm trying to imagine the reverse situation where the

6  People come in and the deputy district attorney is asking

7  that a juror be removed because he or she makes me feel

8  uncomfortable.  He was questioned about it.  He was affable,

9  he was pleasant.  He indicated no hostility to anyone.  He

10 referred to Mr. Madden appropriately and answered the Court's

11 questions as forthrightly as I think he could have.

12       So at this point, there is no basis to excuse him.

13       THE COURT:  Mr. Madden any additional comments?

14       MR. MADDEN:  Not beyond my original comments, Your

15 Honor.  I mean, clearly this was done to intimidate me, and

16 his explanation gives no explanation.

17       THE COURT:  Thank you.  I will note that

18 [Juror No. 8] did say that, you know, he was looking at Mr.

19 Madden and I think his term was it was convenient.  He did

20 say he occasionally looked at the witnesses while they were

21 testifying, then he turned back.  It's clear to me that he's

22 paid very, very close attention to the testimony of this

23 case, and it's reflected by his response when I asked him a

24 question and he lifted his notebooks and he had two notebooks

25 of notes.  He's one of the jurors that has taken more notes

26 than any other juror, it appears to me.

27       I also mentioned in chambers that when Mr. Madden's

28 expert testified, Dr. O'Donohue, [Juror No. 8] was taking

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1556

1   almost verbatim notes.  I mean, he was writing everything

2   down.  He was very engaged, and it just seemed to me that I

3   noted, and I shared this with counsel my observation, that if

4   there was that much hostility by this juror towards the

5   defense and Mr. Madden, it would seem like he would not be

6   very interested in a defense witness.  So I just say that for

7   observation purposes.

8           He's represented to me that the reason why he

9   looked at Mr. Madden while he was asking questions of certain

10  witnesses, that he's open-minded, he could continue to do his

11  job as a juror.  And although him looking at Mr. Madden may

12  have made Mr. Madden uncomfortable, it doesn't appear to me

13  that it had any impact on Mr. Madden's effective

14  cross-examination, which was effective and detailed.  I

15  simply cannot find that [Juror No. 8] has committed any

16  misconduct that would warrant his removal based on what I

17  heard at this point.  So Mr. Madden's motion to have him

18  removed at this time will be denied for those reasons.

19          With that said, we still have the exhibits that we

20  need to go over, and I don't believe any exhibit has been

21  introduced into evidence.  Do counsel have a copy of the

22  exhibits?  Do you have a list of all of the exhibits?

23          MR. MADDEN:  I think I had one as of the -- one day

24  last week, Your Honor.

25          THE COURT:  I'm going to ask our clerk to run off a

26  copy of our exhibit list.  It might make it easier for

27  counsel to go through it to see if they have any concerns

28  about any of the exhibits.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1557

1    MS. FILO:  Judge, I'm confident that the only

2   exhibit we had any dispute about was the one exhibit that was

3   shown to Ms. Vijayendran that constituted her typewritten

4   notes and --

5    THE COURT:  That was Defense C, and C-1 was the

6   redacted copy.

7    MS. FILO:  Right.

8    MR. MADDEN:  I agree with Ms. Filo.  I think that

9   was our only practical dispute with any of the evidence and

10   she objected to it.  The Court made its ruling.  I'm

11   sufficient we have a record of my position on that.

12    THE COURT:  Right.

13    MR. MADDEN:  And I would assume the Court's not

14   going to allow that I will be offering it.  But if that's the

15   case, we might be able to shortcut it.  I would like perhaps

16   an opportunity to go over exhibits with Ms. Filo and the

17   Court maybe in chambers.  I think she's probably right.

18    THE COURT:  Right.  No.  I just wanted to make sure

19   before counsel indicates we have no objections to any of the

20   exhibits and they are admitted into evidence, I want to make

21   sure you have a chance to look through them first.

22    MR. MADDEN:  Could we do that in chambers?

23    THE COURT:  Sure.  What I will do is -- I want to

24   put it on the record.

25    MR. MADDEN:  Sure, of course.

26    THE COURT:  I will step off, let you have a moment

27   to look through them, and then I need to make copies of the

28   CALCRIM instructions that I have that I want to go over with

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1558

1    you.  And then during the recess, we'll do that informally.

2    Okay?

3              MR. MADDEN:  Okay.  Exhibits informally, you mean?

4    Or the instructions?

5              THE COURT:  The instructions informally.  We could

6    do the exhibits on the record maybe after we preliminarily go

7    over the instructions, but we're going to be in recess.

8              MR. MADDEN:  That's fine, Your Honor.

9              THE COURT:  Until -- so I will meet with counsel in

10   a moment, and we'll be in recess until, I'm going to say,

11   1:30, because what I do, Mr. Madden, I do it informally with

12   counsel and then I go on the record to put on the record the

13   instructions.  And if you want your client present for that,

14   then I'm going to have to keep him here until the afternoon.

15             MR. MADDEN:  I would assume let him go.  I don't

16   see any reason.  I will waive his appearance for that, Your

17   Honor.

18             THE COURT:  Mr. Chandler, what we're going to do is

19   preliminarily discuss the instructions.  Once we do that, I

20   will go on the record what instructions we're going to read,

21   what objections there may be to any particular instruction.

22   You have the right to be present for that portion of the

23   trial, or if you choose, as Mr. Madden has indicated, you

24   could waive your appearance and we'll do the instructions

25   formally without your presence.

26             So you wish to waive your presence?

27             THE DEFENDANT:  That's okay, Your Honor.  Yes.

28             THE COURT:  Pardon me?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1559

1        THE DEFENDANT:  Yes, Your Honor.

2        THE COURT:  You join in that, Mr. Madden?

3        MR. MADDEN:  Yes, I do.

4        THE COURT:  What I will do, I will simply order Mr.

5    Chandler here tomorrow morning at 9:00 a.m.  So take a look

6    at the exhibits.  I'm going to need about 15 minutes to make

7    a copy of the instructions for you.  I have one for you.  I

8    need to copy it.  We'll be in recess.

9        (Whereupon, the Court recessed.)

10       THE COURT:  We'll go on the record, and the record

11   will reflect that both counsel are present, Mr. Chandler is

12   present, too.

13       Mr. Chandler, I had to bring you back because I

14   forgot that your attorney, Mr. Madden, is going to be asking

15   that I give the jury a lesser included offense to the crimes

16   charged of battery, which is a misdemeanor.  And because it's

17   a misdemeanor, the statute of limitations period for a

18   misdemeanor is one year.  And in the event the statute of

19   limitations period has run, on each count you would have to

20   waive the statute of limitations period for the jury to

21   consider that.  You understand all of that?

22       THE DEFENDANT:  Yes.

23       THE COURT:  You've had time to speak with Mr.

24   Madden about it?

25       THE DEFENDANT:  Yes, Your Honor.

26       MR. MADDEN:  One moment please, Your Honor.

27       THE COURT:  Okay.

28       MR. MADDEN:  He has -- we discussed it, Your Honor.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1560

1    THE COURT:  Okay.  Thank you.

2         At this time, Mr. Chandler, are you prepared to

3    waive the statute of limitations period as to each count so

4    that the Court could give the misdemeanor battery?

5         THE DEFENDANT:  Yes, Your Honor.

6         THE COURT:  Okay.  You agree, Mr. Madden?

7         MR. MADDEN:  Yes, Your Honor.

8         THE COURT:  Okay.  Thank you.  Then I'll note the

9    waiver, and there will be misdemeanor batteries given as

10   lesser included offenses.

11         So that concludes this matter.

12         THE DEFENDANT:  Thank you.

13         THE COURT:  So we're done.

14         (Whereupon, there was a discussion off the record.)

15         THE COURT:  We're going to do the exhibits, Mr.

16   Chandler.  You waive your right as far as the exhibits go?

17         MR. MADDEN:  Yes, Your Honor.

18         THE COURT:  Thank you.

19         Counsel, have you had a chance to look over the

20   exhibit list?

21         MS. FILO:  I have.

22         MR. MADDEN:  I have, Your Honor.

23         THE COURT:  Let's start with the People's.  Are

24   there any objections to any of the People's exhibits?

25         MR. MADDEN:  I don't believe so, Your Honor.  24

26   was just Det. Chubon's diagram?

27         MS. FILO:  No.  I think number 24 is the --

28         THE COURT:  Copy of a drawing by Arleth.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1561

1      MR. MADDEN:  Okay.  That's fine.

2      MS. FILO:  The only exhibit we didn't mark is the

3  one that I had Annie Doe draw.  I don't really care.

4      THE COURT:  You want it at least marked for

5  identification for the record?

6      MS. FILO:  I think it should be marked for

7  identification for the record, and I guess I feel like at

8  this point, now that I think about it, we should move it in.

9  The only reason I say that is because the witness was shown

10  some photographs by defense counsel, which she appeared to

11  take issue with, which is why I had her draw the exhibit

12  that's on the easel.  And of course she's testified that she

13  was in a classroom in the spring of 2011, and the photographs

14  that she was being shown were actually taken in January of

15  2012, in a totally different school year.  So I think what

16  the witness drew is really the only representation we have of

17  the classroom when she was in it.

18      THE COURT:  Well, the record is clear that during

19  her cross, she did draw the diagram and makes reference to it

20  during her testimony.  So for the purposes of clarity for the

21  record it's clear.  So I will allow that be marked at this

22  point as People's 25 for identification, and you're moving

23  that into evidence as well?

24      (Whereupon, People's Exhibit 25 was marked for

25  identification.)

26      MS. FILO:  Please.

27      THE COURT:  Mr. Madden, you have any response?

28      MR. MADDEN:  No, Your Honor.  I have no objection.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1562

1     THE COURT:  Okay.  So People's one through 25 are

2 admitted into evidence, and that includes 1-A, 5-A, 6-A, 8-A,

3 and 15-A, which are transcripts of the various children's

4 audio/video interview pursuant to the earlier stipulation by

5 counsel.

6     (Whereupon, People's Exhibits 1 through 25 were

7 received into evidence.)

8     THE COURT:  And as to the defense exhibits, I know,

9 Ms. Filo, you objected to Defense C and C-1, and those two

10 will not be admitted into evidence.  I will note for the

11 record, specifically C-1 are the notes that Mr. Madden was

12 asking to be introduced into evidence.  C-1 are the redacted

13 portions of the notes he wanted in.  C -- Defense C were the

14 typewritten notes unredacted.  So over the Defense objection,

15 C-1 is not admitted into evidence.  And Defense C was not

16 being asked to be moved into evidence because they were not

17 redacted.  So that's over defense objection.

18     Any objection to any of the other defense exhibits,

19 Ms. Filo?

20     MS. FILO:  No, Your Honor.

21     THE COURT:  Mr. Madden, are you moving all of them

22 into evidence?

23     MR. MADDEN:  Yes, Your Honor.

24     THE COURT:  Okay.  Then without objection, all

25 defense exhibits are introduced into evidence, except for C

26 and C-1.

27 ///

28 ///

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1563

1      (Whereupon, Defense Exhibits A-1 through A-13, B,

2  D, E-1, E-2, E-3, E-4, F-1, F-2, and G were received into

3  evidence.).

4      THE COURT:  Just keep in mind during argument, that

5  Defense E-1, 2, 3, and 4, I don't recall if we had any

6  testimony about those other than them being marked.

7      MR. MADDEN:  The testimony from Chubon, that he

8  took them.

9      THE COURT:  Right.  Okay.

10      MS. FILO:  They were shown to Det. Chubon and he

11  acknowledged having taken those photos.

12      THE COURT:  Okay.  All right.  Then that takes care

13  of the exhibits.  And I gave you copies of the instructions

14  and I have some other instructions here for you that we'll

15  address.  And if you want to use an extra copy of the

16  CALCRIM, I have it up here in case you want it.

17      We're off the record.

18      (Whereupon, the Court recessed.)

19      THE COURT:  On the record.  Jury is not present.

20  Mr. Chandler is not present.  Having waived his appearance,

21  we discussed the instructions informally.  I'm going to put

22  them on the record.  If you have an objection to a particular

23  instruction, let me know.

24      Court is going to give CALCRIM 121 as modified; 200

25  as modified; 201 as modified; 202 as modified; 207 as

26  modified; 208 as modified; CALCRIM 220, the reasonable doubt

27  instruction, the Court is going to give that as modified

28  pursuant to Mr. Madden's request.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1564

1           Is that correct, Mr. Madden?

2           MR. MADDEN: It is, yes.

3           THE COURT: Okay. Just so the record is clear, the

4  modification applies to the second paragraph of that

5  instruction, and the second sentence of the second paragraph

6  it reads:

7           This presumption requires that the People prove a

8  defendant guilty beyond a reasonable doubt.

9           The Court is going to go modify it at defense

10  request:

11           This presumption requires that the People prove

12  each element of a crime and special allegation beyond a

13  reasonable doubt.

14           222, the Court will give as modified; 223 will be

15  given without modification; 225, 226 -- well, hold on. 225

16  will be given as modified; 226 will be given as modified; 252

17  will be given as modified; 300 given without modification;

18  301 given with modifications; 302 without modifications will

19  be given. Parties agree that 303 will not be given. 318

20  will be given as modified; 330 will be given without

21  modification; 332 and 333 will be given as modified; 355 will

22  be given without modification; 357, 358 and 359 will not be

23  given.

24           Also, 350 -- 251 will not be given. The Court is

25  giving 252. 370 will be given as modified. At the defense

26  request, the Court will give 960, which is battery, a lesser

27  included. 11 -- excuse me -- 1110 will be given as modified;

28  1190 will be given without modification; 3181 will be given

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1565

1    as modified; 3500 will not be given; 3501 will be given as

2    modified; 3502 will not be given; 3515 will be given as

3    modified; 3516 will not be given; 3517 will be given as

4    modified; 3519 will not be given; 3530 will not be given.  I

5    will give 3550.

6             MR. MADDEN:  5-0?

7             THE COURT:  3550.  Yeah, 5-0; 3550, which is the

8    pre-deliberation, will be given as modified.  3577 I will

9    give as modified, and 3590 I will give as modified.

10            Mr. Madden, during our informal discussions of the

11   instructions, you asked the Court, I think with any

12   instruction and the verdict form, to not refer to the lesser

13   included battery as a misdemeanor battery.  If the Court

14   identifies it's a misdemeanor battery, it would be over your

15   objection.

16            Just tentatively, I'm inclined to refer to it as a

17   misdemeanor battery for the following reasons:

18            One, the lewd and lascivious act, which is charged,

19   is identified in the verdict forms as a felony, as well as a

20   felony in the instructions.  And it's my intent to identify

21   the battery as a misdemeanor in the verdict forms as well,

22   and the instructions there is reference to this.  This is

23   over your objection.  I will allow you to make any additional

24   comments you wish at this time.

25            MR. MADDEN:  I would ask that substitution of the

26   word "misdemeanor," the Court insert the word or words "crime

27   of misdemeanor" as opposed to -- excuse me -- "crime of

28   battery" other than misdemeanor battery.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1566

1        THE COURT:  Any comment, Ms. Filo?

2        MS. FILO:  I'll submit it, Your Honor.  I think

3   it's inappropriate.  I think a battery could be charged as

4   either a felony or a misdemeanor.  I think the jury has to be

5   told whether it's being submitted to them as a felony or a

6   misdemeanor.

7        MR. MADDEN:  It's -- an LIO is a felony or

8   misdemeanor.  They don't have to be told.

9        THE COURT:  Okay.  Thank you.  Over Mr. Madden's

10  objection, I will identify it as a misdemeanor battery.

11        Then finally, Ms. Filo asked that the Court give

12  instruction 371, specifically making reference to:

13        If the defendant tried to hide evidence, that

14  conduct may show that he was aware of his guilt if --

15  conclude, the defendant made such an attempt, it is up to you

16  to decide its meaning and importance.  However, evidence of

17  such attempt could not prove guilt by itself.

18        Mr. Madden, you objected to this instruction;

19  correct?

20        MR. MADDEN:  I do.  The reason that I object is

21  that there is a time frame that is not limited.  As the

22  People suggest, the time frame they are pointing to is the

23  morning of January 10th of 2012.  And what I'm saying is,

24  according to this witness's own testimony, the events with

25  her are alleged to have happened a week before, before Mr.

26  Chandler was a suspect.  And it is equally possible that if

27  there was a blindfold, that it was taken out at that --

28  before he was a suspect, before he was arrested or even

1    questioned, and I think it is completely unfair to allow the

2    jury to draw inference of hiding evidence, when if it was

3    taken the week before, that would be a totally inappropriate

4    instruction.  The evidence is ambivalent and does not support

5    that instruction.

6           MS. FILO:  Could I add one thing, Judge?  When we

7    broke I thought about.  It's not just there is actual missing

8    evidence, which the People think there is, there is a missing

9    blindfold someplace.  But the instruction actually says

10   "whether the defendant tried to hide evidence."  And

11   certainly the People intend to argue that the defendant

12   arrived on campus that morning and was found with cleaning

13   supplies in his classroom.  So, I mean, we clearly intend to

14   argue that the defendant was there that morning 45 minutes to

15   an hour earlier than he's ever arrived previously, with the

16   specific intent of hiding evidence or attempting to clean up

17   evidence within his classroom.  That's why the evidence was

18   admitted.

19          MR. MADDEN:  The evidence is the contrary, Your

20   Honor.  There is no evidence whatsoever that he was cleaning

21   anything, direct or circumstantial.  The only evidence is

22   that when he was asked to leave, having been told he's on

23   administrative leave, he asked if he could take items.  He

24   took two items that I would assume are in every teacher's

25   class and every grade, every grammar school, every junior

26   high school, and every high school in this country, Handi

27   Wipes and a cleaning product.  I mean, that's just

28   something -- there is no evidence that it was brought in.  No

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1568

1    evidence that he had used it.  There wasn't a sufficient

2    period of time for any of those things to occur, nor was

3    there any circumstantial evidence that they had occurred.

4            MS. FILO:  But the question was, was he intending

5    for them to occur?

6            MR. MADDEN:  That's a leap, Your Honor.  That is

7    not supported by the facts, and the People could argue

8    whatever they want to argue.

9            THE COURT:  Okay.  Thank you.  I agree, Mr. Madden,

10   that the People are entitled to argue this.  I think that is

11   reasonable inferences.  Everything that Ms. Filo has stated

12   this morning about this particular issue that, you know,

13   there is a blindfold, there is objects that were described by

14   the children that apparently weren't found.  So, yes, she

15   will be allowed to argue that without restrictions based on,

16   you know, reasonable interpretations, inferences of the

17   evidence.

18           Over the defense objection, I will not give 371 out

19   of abundance of caution.

20           MR. MADDEN:  You mean over the --

21           THE COURT:  I said I'm not going to give it out of

22   abundance of caution.

23           MR. MADDEN:  Okay.

24           THE COURT:  I'm giving the instruction.  Over their

25   objection, I'm giving it -- their objection, I will not give

26   it.  I'm ruling in your favor.

27           MR. MADDEN:  That's what I thought.

28           THE COURT:  So that's the ruling on that particular

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1569

1   point.  So that concludes that.  The instructions will be

2   ready sometime this afternoon.  If you want to see if they

3   are ready, if you want to pick it up, that's fine.  I will

4   make every effort to have it done as soon as possible.  If

5   you are not here, they will be there first thing in the

6   morning.

7          MR. MADDEN:  I don't want anybody to press.  There

8   is no need for me to have it tonight.  They will be read

9   tomorrow.  As long as there is a set on my table tomorrow,

10   I'm satisfied.

11          THE COURT:  You will have the instructions I read

12   to the jury to incorporate into your closing remarks as well.

13          MR. MADDEN:  Thank you, Your Honor.

14          THE COURT:  That concludes -- I will note for the

15   record too, we did take a break.  Ms. Filo and Officer Pierce

16   talked to Mr. Madden about this new information.  I indicated

17   it wasn't necessary to put this on the record, but there has

18   been discussion.

19          MR. MADDEN:  Thank you, Your Honor.  Nine o'clock?

20          THE COURT:  Nine a.m.

21          (Whereupon, the Court recessed.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1570

1  STATE OF CALIFORNIA        )
                              )
2  COUNTY OF SANTA CLARA      )

3

4          I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5          The foregoing is a full, true, and correct

6  transcript of the testimony given and proceedings had in the

7  above-entitled action taken on the above-entitled date; that

8  it is a full, true, and correct transcript of the evidence

9  offered and received, acts and statements of the Court, also

10  all objections of counsel, and all matters to which the same

11  relate; that I reported the same in stenotype to the best of

12  my ability, being the duly appointed and official

13  stenographic reporter of said Court, and thereafter had the

14  same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16  237(a)(2) in that all personal juror identifying information

17  has been redacted if applicable.

18

19          Dated:

20

21

22                              Jamie L. Mixco, C.S.R.
                                Certificate No. 12708
23

24  ATTENTION:
    CALIFORNIA GOVERNMENT CODE
25  SECTION 69954(D) STATES:

26  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
    MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27  A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
    ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28  PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
    PERSON."

# EXHIBIT 3
# (Vol. 17)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1571

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

---o0o---

THE PEOPLE OF THE STATE OF        )
CALIFORNIA,                       )
                                  )
    Plaintiff - Respondent,       )
                                  )
    v.                            )        No. C1223754
                                  )
CRAIG RICHARD CHANDLER,           )
                                  )
    Defendant - Appellant.        )
_____/

COPY

VOLUME 17

PAGES 1571 - 1597

JULY 30, 2013

---o0o---

REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

---o0o---

APPEARANCES:

FOR PLAINTIFF-RESPONDENT:        OFFICE OF THE ATTORNEY GENERAL
                                 BY:  KAMALA D. HARRIS,
                                 Attorney General of the State
                                 of California

FOR DEFENDANT-APPELLANT:         In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1572

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF SANTA CLARA

3    BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4    DEPARTMENT NO. 37

5

6    ---o0o---

7    THE PEOPLE OF THE
     STATE OF CALIFORNIA,                )
8                                        )
                  PLAINTIFF,             )
9                                        )     CASE NO.  C1223754
          v.                             )
10                                       )
                                         )
11    CRAIG RICHARD CHANDLER,            )
                                         )
12                                       )
                  DEFENDANT.             )
13    _____/

14

15    ---o0o---

16

17    REPORTER'S TRANSCRIPT OF PROCEEDINGS

18    JULY 30, 2013

19

20    ---o0o---

21

22

23

24    APPEARANCES:

25    FOR THE PEOPLE:              ALISON FILO
                                   Deputy District Attorney
26

27    FOR THE DEFENDANT:           BRIAN MADDEN
                                   Attorney at Law

28    OFFICIAL COURT REPORTER:     JAMIE L. MIXCO
                                   C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1573

1   San Jose, California                 July 30, 2013

2                    <u>PROCEEDINGS</u>

3         THE COURT:  We'll go on the record, and the record

4   will reflect that both counsel are present, Mr. Chandler is

5   present, the jury is not present in the courtroom at this

6   time.

7         This morning, the Court met with counsel about an

8   issue regarding one of the instructions, and it's my

9   understanding that, Mr. Madden, yesterday we discussed the

10   instructions and it was the Court's intent to give CALCRIM

11   225 and not CALCRIM 224.  This morning, you provided me with

12   a memo, and you indicated you thought based on the facts and

13   circumstances of our case, that you thought 224 should be

14   given rather than 225, and that you were making that

15   particular request.

16         And as I understand it, Ms. Filo, you indicated you

17   had no objection to 224 being given, since it was the

18   defendant's request, and removing 225.  That's basically a

19   summary as I understand what we talked about this morning.

20         Mr. Madden, you want to supplement the record?

21         MR. MADDEN:  No, Your Honor.  That's accurate.  I'm

22   sure the Court has a copy of my memo in the file, in which I

23   offered a legal justification for my request, and that's all

24   I will add.

25         THE COURT:  Okay.

26         Ms. Filo, any comments?

27         MS. FILO:  Submitted, Your Honor.

28         THE COURT:  Okay.  So both sides more or less agree

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1574

1  with my accounts of our discussion.  At the defense's

2  request, and no objection by the People, the Court will

3  substitute 224 from 225.

4  I may have made the record a little confusing.  Ms.

5  Filo had requested that the Court give CALCRIM 371 dealing

6  with hiding evidence.  Mr. Madden objected to that

7  instruction being given.  And after listening to comments by

8  counsel, considering that particular instruction, the Court

9  decided that I was not going to give 371 based on the

10  defense's objection, over the People's request.  I wasn't

11  sure if I confused the record a little bit yesterday about

12  the basis for not giving 371, but I just wanted to make those

13  comments.

14  Also, it's my understanding, Ms. Filo, you have the

15  amended Information you want to file.

16  MS. FILO:  I do, Your Honor.  Just for the

17  Court's -- just for the record, we just included the time

18  frame of Count 1 and Count 2 to be the beginning of the

19  school year, which is September 1, 2011, and in each of the

20  counts we went ahead and named the victims with just their

21  first name.  We used that terminology throughout the course

22  of the trial, and I think at this point there is no reason

23  why they need to be referred to Jane Doe One and Jane Doe

24  Two.  They have been identified in the record.  I think it's

25  cleaner to have the Information reflect at least their first

26  names, and those are the only two changes in the Information.

27  THE COURT:  Thank you.  We'll have that filed at

28  this time.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1575

1     MS. FILO:  Thank you, Your Honor.

2     THE COURT:  You've provided Mr. Madden a copy?

3     MS. FILO:  Not yet.

4     MR. MADDEN:  Somebody did.  You sent it to the

5  Court?

6     MS. FILO:  That's the clean copy, Your Honor.  I

7  did -- just so the record is clear, I e-mailed a copy to

8  Court and counsel yesterday of what I refer to as the "clean

9  Information," which is the Information that could be read

10  with the jury instructions to the jury.  That doesn't include

11  things like probation, limitations, and 290 registration,

12  things like that.

13     THE COURT:  Right.  So the amended Information is

14  being filed with the court.  It's occurring right now, and

15  we'll hand you a copy in just a minute, Mr. Madden.

16     MR. MADDEN:  The clean copy that's put in the

17  package, what's going to be read to the jurors?

18     THE COURT:  Right.  The clean copy is consistent

19  with the amended copy.  While we're having that filed,

20  getting you a copy, Mr. Madden, you waive formal arraignment,

21  advisement of rights to the amended Information?

22     MR. MADDEN:  Yes, Your Honor.

23     THE COURT:  Mr. Chandler, your plea to the amended

24  Information is not guilty and you deny the allegations?

25     THE DEFENDANT:  Yes, Your Honor.

26     THE COURT:  Thank you.  We'll go off the record.

27     (Whereupon, there was a discussion off the record.)

28     THE COURT:  Thank you, ladies and gentlemen.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1576

1   Record will reflect all members of the jury are present, both

2   counsel are present, Mr. Chandler is present in the

3   courtroom.

4        As I mentioned yesterday, I'm required to read the

5   instructions to you.  You each should have a copy, and I will

6   proceed.

7        This Information alleges that Count 1, on or about

8   and between September 1, 2011 and January 6, 2012, in the

9   county of Santa Clara, state of California, the crime of lewd

10  and lascivious act on a child under 14, in violation of Penal

11  Code §288(a), a felony, was committed by Craig Richard

12  Chandler, who did willfully and lewdly commit a lewd and

13  lascivious act upon and with the body and certain parts and

14  members thereof Isabell Doe, a child under the age of 14

15  years, namely, 7, with the intent of arousing, appealing to,

16  and gratifying the lusts, passions, and sexual desires of the

17  defendant and of the child.

18        It is further alleged that the defendant, Craig

19  Richard Chandler, multiple victims, within the meaning of

20  Penal Code §667.61(b) and 667.61(e).

21        Count 2, on or about and between September 1, 2011

22  and November 1, 2011, in the county of Santa Clara, state of

23  California, the crime of lewd and lascivious act on a child .

24  under 14, a felony, was committed by Craig Richard Chandler,

25  who did willfully and lewdly commit a lewd and lascivious act

26  upon and with the body and certain parts and members thereof

27  Becky Doe, a child under the age of 14 years, namely, 7, with

28  the intent of arousing, appealing to, and gratifying the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1577

1    lusts, passions, and sexual desires of the defendant and of

2    the child.

3          It is further alleged that the defendant, Craig

4    Richard Chandler, multiple victims, within the meaning of

5    Penal Code §667.61(b) and 667.61(e).

6          Count 3, on or about and between September 1, 2011

7    and January 10, 2012, in the county of Santa Clara, state of

8    California, the crime of lewd and lascivious act on a child

9    under 14, in violation of Penal Code §288(a), a felony, was

10   committed by Craig Richard Chandler, who did willfully and

11   lewdly commit a lewd and lascivious act upon and with the

12   body and certain parts and members thereof Laurie Doe, a

13   child under the age of 14 years, namely, 8, with the intent

14   of arousing, appealing to, and gratifying the lusts,

15   passions, and sexual desires of the defendant and of the

16   child.

17         It is further alleged that the defendant, Craig

18   Richard Chandler, multiple victims, within the meaning of

19   Penal Code §667.61(b) and 667.61(e).

20         Count 4, on or about and between September 1, 2010

21   and June 1, 2011, in the county of Santa Clara, state of

22   California, the crime of lewd and lascivious act on a child

23   under 14, in violation of Penal Code §288(a), a felony, was

24   committed by Craig Richard Chandler, who did willfully and

25   lewdly commit a lewd and lascivious act upon and with the

26   body and certain parts and members thereof Wendy Doe, a child

27   under the age of 14 years, namely, 9, with the intent of

28   arousing, appealing to, and gratifying the lusts, passions,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1578

1  and sexual desires of the defendant and of the child.

2         It is further alleged that the defendant, Craig

3  Richard Chandler, multiple victims, within the meaning of

4  Penal Code §667.61(b) and 667.61(e).

5         Count 5, on or about and between September 1, 2010

6  and June 1, 2011, in the county of Santa Clara, state of

7  California, the crime of lewd and lascivious act on a child

8  under 14, in violation of Penal Code §288(a), a felony, was

9  committed by Craig Richard Chandler, who did willfully and

10 lewdly commit a lewd and lascivious act upon and with the

11 body and certain parts and members thereof Arleth Doe, a

12 child under the age of 14 years, namely, 8, with the intent

13 of arousing, appealing to, and gratifying the lusts and

14 sexual desires of the defendant and of the child.

15        It's further alleged the defendant, Craig Richard

16 Chandler, multiple victims, within the meaning of Penal Code

17 §667.61(b) and 667.61(e).

18        Members of the jury, I will now instruct you on the

19 law that applies to this case.  Each of you has a copy of

20 these instructions to use in the jury room.  The instructions

21 that you receive may be typed -- excuse me -- may be printed,

22 typed, or written by hand.  Certain sections may have been

23 crossed out or added.  Disregard any deleted sections and do

24 not try to guess what they might have been.  Only consider

25 the final version of the instructions in your deliberations.

26        You must decide what the facts are.  It is up to

27 all of you, and you alone, to decide what happened based only

28 on the evidence that has been presented to you in this trial.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1579

1    Do not let bias, sympathy, prejudice, or public

2   opinion influence your decision.  Bias includes, but is not

3   limited to, bias for or against the witnesses, attorneys,

4   defendant or alleged victims, based on disability, gender,

5   nationality, national origin, race or ethnicity, religion,

6   gender identity, sexual orientation, age, or socioeconomic

7   status.

8    You must follow the law as I explain it to you,

9   even if you disagree with it.  If you believe that the

10   attorneys' comments on the law conflicts with my

11   instructions, you must follow my instructions.

12    Pay careful attention to all of these instructions

13   and consider them together.  If I repeat any instruction or

14   idea, do not conclude that it is more important than any

15   other instruction or idea just because I repeated it.

16    Some words or phrases used during this trial have

17   legal meanings that are different from their meanings in

18   everyday use.  These words and phrases will be specifically

19   defined in these instructions.  Please be sure to listen

20   carefully and follow the definitions that I give you.  Words

21   and phrases not specifically defined in these instructions

22   are to be applied using their ordinary, everyday meanings.

23    Some of these instructions may not apply, depending

24   on your findings about the facts of the case.  Do not assume

25   just because I gave a particular instruction that I'm

26   suggesting anything about the facts.  After you have decided

27   what the facts are, follow the instructions that do apply to

28   the facts as you find them.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1580

1    Do not use the Internet or any other electronic

2    source, such as Facebook or Twitter, a dictionary, or any

3    other source of information or means of communication in any

4    way in connection with this case, either on your own or as a

5    group.  Do not investigate the facts or the law or do any

6    research regarding this case, either on your own or as a

7    group.  Do not conduct any tests or experiments or visit the

8    scene of any event involved in this case.  If you happen to

9    pass by the scene, do not stop or investigate.

10    You have been given notebooks and may have taken

11    notes during the trial.  You may use your notes during

12    deliberations.  Your notes are for your own individual use to

13    help you remember what happened during the trial.  Please

14    keep in mind that your notes may be inaccurate or incomplete.

15    If there is a disagreement about the testimony and

16    stipulations at trial, you may ask that the court reporter's

17    record be read to you.  It is the record that must guide your

18    deliberations, not your notes.  You must accept the court

19    reporter's record as accurate.

20    Please do not remove your notes from the jury room.

21    At the end of the trial, your notes will be

22    collected and destroyed.

23    It is alleged that the crime charged in Count 1

24    occurred on or about and between September 1, 2011 and

25    January 6, 2012; the crime charged in Count 2 occurred on or

26    about and between September 1, 2011 and November 1, 2011; the

27    crime charged in Count 3 occurred on or about and between

28    September 1, 2011 and January 10, 2012; and the crimes

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1581

1    charged in Counts 4 and 5 occurred on or about and between

2    September 1, 2010 and June 1, 2011.

3         The People are not required to prove that the crime

4    took place on any particular day.  Only that it occurred

5    during the time period alleged from each count.

6         In this case, persons were called by their first

7    names, and occasionally the last name "Doe" was used.  The

8    last name "Doe" was used only to protect their privacy.  The

9    fact that a person was identified in this way is not

10   evidence.  Do not consider this fact for any purpose.

11        Some testimony was given in Cantonese and Spanish.

12   An interpreter provided a translation for you at the time the

13   testimony was given.  You must rely on the translation

14   provided by the interpreter, even if you understood the

15   language spoken by the witness.  Do not retranslate any

16   testimony for other jurors.

17        The fact that a criminal charge has been filed

18   against the defendant is not evidence that the charge is

19   true.  You must not be biased against the defendant just

20   because he has been arrested, charged with a crime, or

21   brought to trial.

22        A defendant in a criminal case is presumed to be

23   innocent.  This presumption of innocence requires that the

24   People prove each element of the crime and special allegation

25   beyond a reasonable doubt.  Whenever I tell you the People

26   must prove something, I mean they must prove it beyond a

27   reasonable doubt unless I specifically tell you otherwise.

28        Proof beyond a reasonable doubt is proof that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1582

1  leaves you with an abiding conviction that the charge is

2  true.  The evidence need not eliminate all possible doubt

3  because everything in life is open to some possible or

4  imaginary doubt.

5          In deciding whether the People have proved their

6  case beyond a reasonable doubt, you must impartially compare

7  and consider all of the evidence that was received throughout

8  the entire trial.  Unless the evidence proves a defendant

9  guilty beyond a reasonable doubt, he is entitled to an

10 acquittal and you must find him not guilty.

11         Evidence is a sworn testimony of witnesses, the

12 exhibits admitted into evidence, and anything else I told you

13 to consider as evidence.  Nothing that the attorneys say is

14 evidence.  In their opening statements and closing arguments,

15 the attorneys discuss the case, but their remarks are not

16 evidence.  Their questions are not evidence.  Only the

17 witness's answers are evidence.  The attorneys' questions are

18 significant only if they help you to understand the witness's

19 answers.  Do not assume that something is true just because

20 one of the attorneys asked a question that suggested it was

21 true.

22         During the trial, the attorneys may have objected

23 to questions or move to strike answers given by the

24 witnesses.  I ruled on objections according to the law.  If I

25 sustained an objection, you must ignore the question.  If the

26 witness was not permitted to answer, do not guess what the

27 answer might have been or why I ruled as I did.  If I order

28 testimony stricken from the record, you must disregard it and

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1583

1  must not consider that testimony for any purpose.

2    You must disregard anything you saw or heard when

3  the court was not in session, even if it was done or said by

4  one of the parties or witnesses.

5    During the trial, you were told that the People and

6  the defense agreed or stipulated to certain facts.  This

7  means that they both accept those facts as true.  Because

8  there is no dispute about those facts, you must also accept

9  them as true.

10    Facts may be proved by direct or circumstantial

11  evidence or by a combination of both.  Direct evidence could

12  prove a fact by itself.  For example, if a witness testifies

13  he saw it raining outside before he came into the courthouse,

14  that testimony is direct evidence that it was raining.

15    Circumstantial evidence also may be called indirect

16  evidence.  Circumstantial evidence does not directly prove

17  the fact to be decided, but is evidence of another fact or

18  group of facts from which you may logically and reasonably

19  conclude the truth of the fact in question.  For example, if

20  a witness testifies that he saw someone come inside wearing a

21  raincoat covered with drops of water, that testimony is

22  circumstantial evidence because it may support a conclusion

23  that it was raining outside.

24    Both direct and circumstantial evidence are

25  acceptable types of evidence to prove or disprove the

26  elements of a charge, including intent and mental state and

27  acts necessary to a conviction, and neither is necessarily

28  more reliable than the other.  Neither is entitled to any

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1584

1   greater weight than the other.  You must decide whether a

2   fact in issue has been proved based on all of the evidence.

3          Before you may rely on circumstantial evidence to

4   conclude that a fact necessary to find the defendant guilty

5   has been proved, you must be convinced that the People have

6   proved each fact essentially to that conclusion beyond a

7   reasonable doubt.

8          Also, before you may rely on circumstantial

9   evidence to find the defendant guilty, you must be convinced

10  that the only reasonable conclusion supported by the

11  circumstantial evidence is that the defendant is guilty.  If

12  you could draw two or more reasonable conclusions from the

13  circumstantial evidence, and one of those reasonable

14  conclusions points to innocence and another to guilt, you

15  must accept the one that points to innocence.  However, when

16  considering circumstantial evidence, you must accept only

17  reasonable conclusions and reject any that are unreasonable.

18         You alone must judge the credibility or

19  believability of the witnesses.  In deciding whether

20  testimony is true and accurate, use your common sense and

21  experience.  You must judge the testimony of each witness by

22  the same standards, setting aside any bias or prejudice you

23  may have.

24         You may believe all, part, or none of any witness's

25  testimony.  Consider the testimony of each witness and decide

26  how much of it you believe.

27         In evaluating a witness's testimony, you may

28  consider anything that reasonably tends to prove or disprove

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1585

1  the truth or accuracy of that testimony.  Among the factors

2  that you may consider are:

3          How well could the witness see, hear, or otherwise

4  perceive the things about which the witness testified?

5          How well was the witness able to remember and

6  describe what happened?

7          What was the witness's behavior while testifying?

8          Did the witness understand the questions and answer

9  them directly?

10          Was the witness's testimony influenced by a factor

11  such as bias or prejudice, a personal relationship with

12  someone involved in the case, or a personal interest in how

13  the case is decided?

14          What was the witness's attitude about the case or

15  about testifying?

16          Did the witness make a statement in the past that

17  is consistent or inconsistent with his or her testimony?

18          How reasonable is the testimony when you consider

19  all of the other evidence in the case?

20          Did other evidence prove or disprove any fact about

21  which the witness testified?

22          Do not automatically reject testimony just because

23  of inconsistencies or conflicts.  Consider whether the

24  differences are important or not.  People sometimes honestly

25  forget things or make mistakes about what they remember.

26  Also, two people may witness the same event yet see or hear

27  it differently.

28          If you do not believe a witness's testimony that he

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1586

1    or she to longer remembers something, that testimony is

2    inconsistent with the witness's earlier statement on that

3    subject.

4         If you decide that a witness deliberately lied

5    about something significant in this case, you should consider

6    not believing anything that witness says.  Or, if you think

7    the witness lied about some things, but told the truth about

8    others, you may simply accept the part that you think is true

9    and ignore the rest.

10        Neither side is required to call all witnesses who

11   may have information about the case or to produce all

12   physical evidence that might be relevant.

13        The testimony of only one witness could prove any

14   fact.  Before you conclude that the testimony of one witness

15   proves a fact, you should carefully review all of the

16   evidence.

17        If you determine there is a conflict in the

18   evidence, you must decide what evidence, if any, to believe.

19   Do not simply count the number of witnesses who agree or

20   disagree on a point and accept the testimony of the greater

21   number of witnesses.  On the other hand, do not disregard the

22   testimony of any witness without a reason or because of

23   prejudice or a desire to favor one side or the other.  What

24   is important is whether the testimony or any other evidence

25   convinces you, not just the number of witnesses who testify

26   about a certain point.

27        You have heard evidence of statements that a

28   witness made before the trial.  If you decide that the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1587

1  witness made those statements, you may use those statements

2  in two ways:

3      One, to evaluate whether the witness's testimony in

4  court is believable;

5      and two, as evidence that the information to those

6  earlier statements is true.

7      You have heard testimony from a child who was age

8  10 or younger.  As with any other witness, you must decide

9  whether the child gave truthful and accurate testimony.

10      In evaluating the child's testimony, you should

11  consider all of the factors surrounding that testimony,

12  including the child's age and level of cognitive development.

13      When you evaluate the child's cognitive

14  development, consider the child's ability to perceive,

15  understand, remember, and communicate.

16      While a child and adult witness may behave

17  differently, that difference does not mean that one is any

18  more or less believable than any other.  You should not

19  discount or distrust the testimony of a witness just because

20  he or she is a child.

21      Witnesses were allowed to testify as experts and to

22  give opinions.  You must consider the opinions, but you are

23  not required to accept them as true or correct.  The meaning

24  and importance of any opinion are for you to decide.  In

25  evaluating the believability of an expert witness, follow the

26  instructions about the believability of witnesses generally.

27  In addition, consider the expert's knowledge, skill,

28  experience, training and education, the reasons the expert

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1588

1   gave for any opinion, and the facts or information on which

2   the expert relied in reaching that opinion.  You must decide

3   whether information on which the expert relied was true and

4   accurate.  You may disregard any opinion that you find

5   unbelievable, unreasonable, or unsupported by the evidence.

6        An expert witness may be asked a hypothetical

7   question.  A hypothetical question asks the witness to assume

8   certain facts are true and to give an opinion based on the

9   assumed facts.  It is up to you to decide whether an assumed

10  fact has been proved.  If you conclude that an assumed fact

11  is not true, consider the effect of the expert's reliance on

12  that fact in evaluating the expert's opinion.

13       Withins who were not testifying as experts gave

14  their opinions during the trial.  You may, but are not

15  required to, accept those opinions as true or correct.  You

16  may give the opinion whatever weight you think is

17  appropriate.  Consider the extent of the witness's

18  opportunity to perceive -- excuse me -- to perceive the

19  matters on which his or her opinion is based, the reasons the

20  witness gave for any opinion, and the facts or information on

21  which the witness relied in forming that opinion.  You must

22  decide whether information on which the witness relied is

23  true and accurate.  You may disregard all or any part of an

24  opinion that you find unbelievable, unreasonable, or

25  unsupported by the evidence.

26       A defendant has an absolute constitutional right

27  not to testify.  He or she may rely on the state of the

28  evidence and argue that the People have failed to prove the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1589

1  charges beyond a reasonable doubt.  Do not consider for any

2  reason at all the fact that the defendant did not testify.

3  Do not discuss that fact during your deliberations or let it

4  influence your decision in any way.

5         The People are not required to prove that the

6  defendant had a motive to commit any of the crimes charged.

7  In reaching your verdict, you may, however, consider whether

8  the defendant had a motive.  Having a motive may be a factor

9  tending to show that the defendant is guilty.  Not having a

10 motive may be a factor tending to show the defendant is not

11 guilty.

12         Conviction of a sexual assault crime may be based

13 on the testimony of a complaining witness alone.

14         The crimes charged in Counts 1, 2, 3, 4, and 5 and

15 the lesser included crime require proof of union or joint

16 operation of act and wrongful intent.

17         The following crime requires general criminal

18 intent:  Battery.

19         For you to find a person guilty of this crime, that

20 person must not only commit the prohibited act, but must do

21 so with wrongful intent.  A person acts with wrongful intent

22 when he or she intentionally does a prohibited act.  However,

23 it is not required that he or she intend to break the law.

24 The act required is explained in the instructions for that

25 crime.

26         The crime of lewd and lascivious act on a child

27 under 14 years requires a specific intent.  For you to find a

28 person guilty of this crime, that person must not only

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1590

1    intentionally commit the prohibited act, but must do so with

2    a specific intent.  The act and the specific intent required

3    are explained in the instructions for that crime.

4            The defendant is charged in Counts 1, 2, 3, 4 and 5

5    with committing a lewd and lascivious act on a child under

6    the age of 14, in violation of Penal Code §288(a).

7            To prove that the defendant is guilty of this

8    crime, the People must prove that:

9            1(a), the defendant willfully touched any part of a

10   child's body, either on the bare skin or through the

11   clenching;

12           or 1(b), the defendant willfully caused a child to

13   touch the defendant's body, either on the bare skin or

14   through the clothing;

15           2, the defendant committed the act with the intent

16   of arousing, appealing to, or gratifying the lusts, passions,

17   or sexual desires of himself or the child;

18           and 3, the child was under the age of 14 years at

19   the time of the act.

20           The touching need not be done in a lewd or sexual

21   manner.

22           Someone commits an act willfully when he or she

23   does it willfully or on purpose.  It is not required that he

24   or she intend to break the law, hurt someone else, or gain

25   any advantage.  Actually arousing, appealing to, or

26   gratifying the lusts, passions, or sexual desires of a

27   perpetrator or child is not required.

28           It is not a defense the child may have consented to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1591

1   the act.

2          If you find the defendant guilty of two or more sex

3   offenses, as charged in Counts 1, 2, 3, 4 and 5, you must

4   decide whether the People have proved the additional

5   allegation that those crimes were committed against more than

6   one victim.

7          The People have the burden of proving this

8   allegation beyond a reasonable doubt.  If the People have not

9   met this burden, you must find that this allegation has not

10  been proved.

11         The crime of battery, violation of Penal Code

12  §243(a), a misdemeanor, is a lesser included offense of lewd

13  and lascivious act of a child under 14 years, in violation of

14  Penal Code §288(a), a felony, as charged in Counts 1, 2, 3,

15  4, and 5.

16         To prove that the defendant is guilty of this

17  crime, the People must prove that:

18         One, the defendant willfully and unlawfully touched

19  Isabell, Becky, Laurie, Wendy, or Arleth Doe in a harmful or

20  offensive manner.

21         Someone commits an act willfully when he or she

22  does it willingly or on purpose.  It is not required that he

23  or she intend to break the law, hurt someone else, or gain

24  any advantage.

25         The slightest touching could be enough to commit a

26  battery if it is done in a rude or angry way.  Making contact

27  with another person, including through his or her clothing,

28  is enough.  The touching does not have to cause pain or

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1592

1   injury of any kind.

2           The touching can be done indirectly by causing an

3   object to touch the other person.

4           For the offenses alleged, Counts 1 through 5, the

5   People have presented evidence of more than one act to prove

6   that the defendant committed these offenses.  You must not

7   find the defendant guilty unless:

8           One, you all agree that the People have proved that

9   the defendant committed at least one of these acts and you

10  all agree on which act he committed for each offense;

11          Or two, you all agree that the People have proved

12  that the defendant committed all of the acts alleged to have

13  occurred during this time period and proved that the

14  defendant committed at least the number of offenses charged.

15          Each of the counts charged in this case is a

16  separate crime.  You must consider each count separately and

17  return a separate verdict for each one.

18          If you all find that the defendant is not guilty of

19  a greater charged crime, you may find him guilty of a lesser

20  crime if you are convinced beyond a reasonable doubt that the

21  defendant is guilty of that lesser crime.  A defendant may

22  not be convicted of both a greater and lesser crime for the

23  same conduct.

24          I will explain to you which charges are affected by

25  this instruction:

26          Misdemeanor battery, a violation of Penal Code

27  §243(a), is a lesser crime of felony lewd or lascivious act

28  on a child under 14 years, a violation of Penal Code §288(a)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1593

1  as charged in Counts 1, 2, 3, 4 and 5.

2          It is up to you to decide the order in which you

3  consider each crime and the relevant evidence, but I can

4  accept a verdict of guilty of a lesser crime only if you have

5  found the defendant not guilty of the corresponding greater

6  crime.

7          You will receive verdict forms of guilty and not

8  guilty of the greater crime and also verdict forms of guilty

9  and not guilty of the lesser crime.  Follow these directions

10  before you give me any completed and signed, final verdict

11  form.  Return any unused verdict forms to me unsigned:

12          One, if all of you agree the People have proved

13  that the defendant is guilty of the greater crime, complete

14  and sign the verdict form of guilty for that crime.  Do not

15  complete or sign any other verdict form for that count.

16          Two, if all of you cannot agree whether the People

17  have proved that the defendant is guilty of the greater

18  crime, inform me only that you could not reach an agreement

19  and do not complete or sign any verdict form for that count.

20          Three, if all of you agree that the People have not

21  proved that the defendant is guilty of the greater crime and

22  you also agree that the People have proved that he is guilty

23  of the lesser crime, complete and sign the verdict form for

24  not guilty of the greater crime and the verdict form for

25  guilty of the lesser crime.

26          Four, if all of you agree that the People have not

27  proved that the defendant is guilty of the greater crime --

28  excuse me -- not guilty -- defendant is guilty of the greater

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1594

1    or lesser crime, complete and sign the verdict form of not

2    guilty -- let me re-read number four.

3          Number four, if all of you have agreed that the

4    People have not proved that the defendant is guilty of the

5    greater or lesser crime, complete the signed form for not

6    guilty of the greater crime and the verdict form for not

7    guilty of the lesser crime.

8          Five, if all of you agree that the People have not

9    proved that the defendant is guilty of the greater crime, but

10   all of you cannot agree on a verdict for the lesser crime,

11   complete and sign the verdict form of the greater crime and

12   inform me only that you cannot reach an agreement about the

13   lesser crime.

14         Whenever I tell you the People must prove

15   something, I mean they must prove it beyond a reasonable

16   doubt unless I specifically tell you otherwise.

17         Ladies and gentlemen, that concludes the reading of

18   the instructions I'm going to give you at this time.  The

19   next instruction, which is at page 33 of your packet, 3550, I

20   will read to you after the attorneys have finished their

21   closing remarks and you begin your deliberations.

22         If there is nothing further, Counsel, I'm going to

23   excuse the jurors.  Okay.

24         All members of the jury, you are excused at this

25   time, and I would ask you to please leave your jury

26   instructions and notebooks on your chairs.  They will be

27   there tomorrow morning when you come back.  I'll order all

28   members of the jury to report to the jury assembly room

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1595

1  tomorrow morning at 9:00 a.m.  At that time, we'll bring you

2  into the courtroom and you will hear Ms. Filo give her

3  closing remarks, we'll take a recess, Mr. Madden will give

4  his closing remarks, we'll take a recess, and then Ms. Filo

5  will give her rebuttal, I will read the last instruction, you

6  will begin deliberating, and we'll send all of the exhibits

7  into the deliberation room.

8           I could tell you, yesterday after the discussions

9  with attorneys, all of the exhibits were admitted into

10  evidence, except one defense exhibit.  Okay.

11           And with that, I'll excuse you all.  Please have a

12  good rest of the day and we'll see you tomorrow morning at

13  9:00 a.m.  Thank you.

14           Okay.  Record will reflect that the jury has left

15  the courtroom.  Both counsel and Mr. Chandler is present.

16  I'll order both counsel here tomorrow morning at 9:00 a.m.,

17  and please try to get here a little earlier.  It's my

18  expectation to have the jurors called up exactly at 9 so we

19  could proceed.

20           MR. MADDEN:  Thank you, Your Honor.

21           MS. FILO:  Judge, it still seems there is some

22  problem with the Information as it relates to the allegation.

23  It's reading:

24           It is further alleged that the defendant, Craig

25  Richard Chandler, multiple victims.  So this is how our

26  computer system generates the allegation, but that's still

27  clearly not correct.  So I'm going to have to go back to my

28  office and figure out what it's supposed to say, because

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1596

1  clearly some word is missing there, but I'll do that and let

2  the Court know as soon as I can.

3          THE COURT:  Yes.  Go off the record.

4          (Whereupon, the Court recessed.)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1597

1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF SANTA CLARA    )

3

4          I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5          The foregoing is a full, true, and correct

6   transcript of the testimony given and proceedings had in the

7   above-entitled action taken on the above-entitled date; that

8   it is a full, true, and correct transcript of the evidence

9   offered and received, acts and statements of the Court, also

10  all objections of counsel, and all matters to which the same

11  relate; that I reported the same in stenotype to the best of

12  my ability, being the duly appointed and official

13  stenographic reporter of said Court, and thereafter had the

14  same transcribed into typewriting as herein appears.

15         I further certify that I have complied with CCP

16  237(a)(2) in that all personal juror identifying information

17  has been redacted if applicable.

18

19         Dated:

20

21                          _____

22                          Jamie L. Mixco, C.S.R.
                            Certificate No. 12708
23

24  ATTENTION:
    CALIFORNIA GOVERNMENT CODE
25  SECTION 69954(D) STATES:

26  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
    MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27  A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
    ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28  PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
    PERSON."

# EXHIBIT 3
# (Vol. 18)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1598

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


---o0o---


THE PEOPLE OF THE STATE OF      )
CALIFORNIA,                     )
                                )
       Plaintiff - Respondent,  )
                                )
       v.                       )      No. C1223754
                                )
CRAIG RICHARD CHANDLER,         )
                                )
       Defendant - Appellant.   )
_____/

COPY


VOLUME 18

PAGES 1598 - 1671

JULY 31, 2013


---o0o---


REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY


---o0o---

APPEARANCES:


FOR PLAINTIFF-RESPONDENT:      OFFICE OF THE ATTORNEY GENERAL
                               BY:  KAMALA D. HARRIS,
                               Attorney General of the State
                               of California

FOR DEFENDANT-APPELLANT:       In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1599

1     IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF SANTA CLARA

3    BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4                  DEPARTMENT NO. 37

5

6                    ---o0o---

7  THE PEOPLE OF THE
   STATE OF CALIFORNIA,              )
8                                    )
                 PLAINTIFF,          )
9                                    )      CASE NO.   C1223754
       v.                            )
10                                   )
                                     )
11  CRAIG RICHARD CHANDLER,          )
                                     )
12                                   )
                 DEFENDANT.          )
13  _____/

14

15

16                    ---o0o---

17       REPORTER'S TRANSCRIPT OF PROCEEDINGS

18

19                  JULY 31, 2013

20

21                    ---o0o---

22

23

24  APPEARANCES:

25  FOR THE PEOPLE:           ALISON FILO
                              Deputy District Attorney
26
27  FOR THE DEFENDANT:        BRIAN MADDEN
                              Attorney at Law
28  OFFICIAL COURT REPORTER:  JAMIE L. MIXCO
                              C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1600

1   San Jose, California                    July 31, 2013

2                          PROCEEDINGS

3        THE COURT:  We'll go on the record.  Record will

4   reflect that both counsel are present.  Mr. Chandler is

5   present.  The jury is not present in the courtroom.

6        Yesterday, Mr. Madden and Ms. Filo contacted the

7   Court, indicated she wanted to file another amended

8   Information, number one.  And number two, she was going to

9   ask for an additional jury instruction, which is basically a

10  sentence.

11       Is that more or less correct, Ms. Filo?

12       MS. FILO:  It is, Your Honor.  Just so the record

13  is clear, I copied Mr. Madden on that e-mail as well.

14       THE COURT:  Thank you.

15       MS. FILO:  The second amended Information has the

16  proper language as it relates to the special allegation.  For

17  some reason, when our computer was generating that language

18  in the previous versions of the Information, it was leaving

19  out some language, so we actually had to input it by hand.

20  We've done that.  It's the only change in the Information,

21  and I sent both the formal second amended Information and the

22  clean one to go to the jury, should that be necessary.

23       THE COURT:  Have you had a chance to look at that,

24  Mr. Madden?

25       MR. MADDEN:  Um, I actually haven't.  She e-mailed

26  it to me, but I'm -- it's only adding words; right?  I mean,

27  it's a --

28       MS. FILO:  Judge, all it says is:  Further alleged

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1601

1    that the defendant, Craig Chandler, and then adds the

2    language, has been convicted in the present case or cases of

3    committing an offense specified in the (c) against, and then

4    picks up where it left off, multiple victims, within the

5    meaning of Penal Code §667.61(b).

6              MR. MADDEN:  I have no objection to that.

7              THE COURT:  That is a proper amendment.  What I'm

8    going to do, if there is no objection, I'm going to provide

9    each juror with a copy of page 1 and 2 that they have in

10   their packet, has the current information.  We're going to

11   replace that with pages 1, 2, and 2-A because the last

12   allegation is on the last page.  I'm going to ask each juror

13   to substitute it in.  I'm going to read it to them, I'm going

14   to explain to them what the change is, and I'll clarify the

15   fact that this is an allegation and it still has to be

16   proven.  That issue is addressed.

17             Your next issue, Ms. Filo.

18             MS. FILO:  In thinking upon the jury instructions

19   and creating my closing argument, it occurs to me that the

20   definition of evidence that's currently in CALCRIM talks

21   about testimony and writings, and it gives an example of both

22   direct and circumstantial evidence.  The one thing it doesn't

23   address is, the evidence is anything that could be presented

24   to the senses, and that really is the definition of the

25   Evidence Code that is really left out of the CALCRIM

26   instruction.  And I would ask that the Court provide that

27   further definition to the court.  The actual definition in

28   the Evidence Code is, quote, Evidence is testimony, writings,

1   material objects, or things presented to the senses that are

2   offered to prove the existence or non-existence of the act.

3        MR. MADDEN:  I have no objection.

4        THE COURT:  What I will do, Ms. Filo, if there is

5   no objection, CALCRIM 222, the first paragraph:  Evidence is

6   the sworn testimony of witnesses, the exhibits admitted into

7   evidence, and anything else I told you to consider as

8   evidence.

9        MR. MADDEN:  I'm sorry, I will let you finish.

10       THE COURT:  Okay.  That's what the instruction

11  reads right now that I read to them.  What I was going to

12  propose to add was the next, like, paragraph sentence:

13  Evidence also means writings, material objects, or other

14  things presented to the senses that are offered to prove the

15  existence on non-existence of a fact, which is right out of

16  the Evidence Code, which is 140.

17       MS. FILO:  Thank you.  That will be fine.

18       THE COURT:  What I'm going to do with CALCRIM 222

19  is ask the jurors to replace their page 10 with this page,

20  and I will read to them and say this was inadvertently left

21  out and I apologize.

22       MS. FILO:  Okay.  Thank you.

23       THE COURT:  So I'm going to ask the clerk, if you

24  could put each copy and take the last one, which is 240.

25       (Whereupon, there was a discussion off the record.)

26       THE COURT:  We'll go back on the record.  Earlier,

27  Ms. Filo indicated she had an amended Information.  We're

28  going to have that filed with the court.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1603

1          Mr. Madden, do you waive formal arraignment,
2   advisement of rights?
3          MR. MADDEN:  Yes, Your Honor.
4          THE COURT:  Mr. Chandler, to the amended
5   Information, to all charges, your pleas are not guilty?
6          THE DEFENDANT:  Yes, Your Honor.
7          THE COURT:  And you deny the allegations?
8          THE DEFENDANT:  Yes, Your Honor.
9          THE COURT:  Okay.  Thank you.
10          We'll call the jury up at this time.
11          (Whereupon, a brief recess was taken.)
12          THE COURT:  Thank you, ladies and gentlemen.  The
13   record will reflect all members of the jury are present, both
14   counsel are present, Mr. Chandler is present.
15          Before we begin with closing remarks, ladies and
16   gentlemen of the jury, you will notice that we left some
17   documents on your chair.  There is basically four pages.
18   Pages 1, 2, and 2-A are the copy of the Information.  And I'm
19   going to ask each juror if you could please take pages 1, 2
20   and 2-A out and replace those with your present page 1 and 2
21   and remove page 1 and 2.  I will explain why I'm doing that
22   in just a moment.
23          It appears that you all have done that.  Thank you
24   very much.  The pages 1, 2 and 2-A reflect an amended
25   Information that was filed by the People.  Again, the
26   Information contains the alleged charges and allegations.
27   The reason for the change is the special allegation in Counts
28   1, 2, 3, 4, and 5, there were some words missing, so we

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1604

1    amended it to correctly allege the allegation.

2    Now I'm going to re-read that.  The counts remain

3    exactly the same.  There has been no change.

4    The allegation in Count 1 -- this is on page 1 --

5    states, it is further alleged that the defendant, Craig

6    Chandler, has been convicted in the present case or cases of

7    committing an offense specified in (c) against multiple

8    victims, within the meaning of Penal Code §667.61(b) and

9    667.61(e).

10    That allegation is identical in Counts 2, 3, 4, and

11    5, which is reflected in the new pages 1, 2, and 2-A.

12    The next change, ladies and gentlemen, is as to

13    page 10 of your instructions, CALCRIM 222.  I'm going to ask

14    you to replace the new page from what we gave you with your

15    old page and have that page removed.  And I'll explain the

16    reason for that in just a moment.

17    The new page 10 at CALCRIM 222 there was

18    essentially a sentence that was inadvertently left out, and

19    that sentence is now included in lines 5 and 6.  The entire

20    instruction remains the same.  There is no changes to it.

21    It's just this addition.

22    And I'm going to read the addition, starting with

23    the beginning at line 3, it says:

24    Evidence is the sworn testimony of witnesses, the

25    exhibits admitted into evidence, and anything else I told you

26    to consider as evidence.  Evidence also means writings,

27    material objects, or other things presented to the senses

28    that are offered to prove the existence or non-existence of

1    the fact.

2            So with that addition, that particular instruction

3    remains the same, but as I said, that sentence was

4    inadvertently left out.  So we're including it at this time.

5            With those modifications, ladies and gentlemen,

6    those are all the instructions that I have to read to you at

7    this point.  As I mentioned, there will be one more

8    instruction I will read to you after closing remarks are

9    concluded and before you begin your deliberations.

10           So with that, Ms. Filo, are you prepared to proceed

11   with closing remarks?

12           MS. FILO:  Thank you, Your Honor.

13           Seven- and eight-year-old little girls in a locked

14   classroom with their male teacher while they are blindfolded

15   and something is put in their mouth.  They describe the thing

16   as round, gooey, kind of hard, kind of soft.  It felt like

17   skin.  It went all the way back into her mouth and it made

18   her gag or choke.  It tasted bad.  After a minute, the gooey,

19   salty, stuff came out.  It dripped onto her jacket, onto her

20   pants.  She had to clean herself up.

21           The hairs on the back of your neck should be

22   standing on end.  You should be mortified and horrified by

23   the very basic facts of this case.  In every case I've ever

24   tried, in every case I've ever watched, I see this phenomenon

25   where we come into the courtroom and we dissect things.  We

26   talk about:  Well, how long was it there?  What color was the

27   carpet?  What were you wearing?  What happened right before?

28   What happened right after?  And we talk about things like,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1606

1    the decedent or the victim, and we talk a lot about trees and

2    we forget to talk about the forest.

3            These little girls sat in a classroom alone,

4    blindfolded, while a teacher put something in their mouth.

5    We ask you to be fair and impartial judges of the facts.  I

6    stand up every time you walk in and out of the courtroom

7    because you judge, just like Judge Bocanegra does, you judge

8    the facts.  But there is no box outside these courtroom doors

9    where we say please deposit your common sense here and then

10   take a seat as a juror.  You are here because we want you to

11   use your common sense.  We want you to use your everyday

12   experience.  We want you to listen to your gut.

13           .  Blindfolded, alone in a classroom with a male

14   teacher while something is put in their mouth.

15           You all have the jury instructions now.  Those jury

16   instructions are really the language and the mechanism by

17   which you get to give your gut a name.  It's the way you get

18   to process that information and legally put a name on it, and

19   the name on it is child molestation.  That's the name.

20   That's what you know in your gut happened every single time

21   Craig Chandler pulled one of these little girls into that

22   classroom and did those unspeakable things to them.

23           What's the law?  What's the law that you will have

24   to follow in order to find him guilty?  Craig Chandler is

25   charged with five counts of lewd and lascivious acts on a

26   child under 14.  It is the touching of any part of a child's

27   body -- bare skin or through the clothing does not matter --

28   with the intent of arousing, appealing to, or gratifying the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1607

1  lusts, passions, or sexual desires of himself or the child.

2  The child was under the age of 14 years old, and there is no

3  defense that the child may have consented to the act that she

4  didn't fight back in any way.

5          So why charge that?  First of all, the charging

6  decisions are made by the office of the District Attorney.

7  We make those decisions.  These girls describe lots of acts.

8  Why just one?  Why are you just asked to decide one?  Because

9  you only have to unanimously agree that one act occurred.

10  Only one act is alleged per victim.  You can believe that

11  many acts occurred.  As long as you unanimously agree that

12  one act occurred as to each victim and you believe that

13  beyond a reasonable doubt, your verdict is guilty.  It's

14  called a unanimity instruction.  It's in your packet.  But as

15  long as you all agree at least one act occurred beyond a

16  reasonable doubt as to each victim, that is your verdict.

17          Any lascivious contact is sufficient.  Anything.

18  Touching an arm, touching a leg, touching a foot, if it is

19  done with lascivious intent, with sexual intent, the crime

20  has been proven.

21          So how do you evaluate that testimony and how do

22  you decide whether or not those elements have been met?  This

23  has been in the grand scheme of sexual assault trials kind of

24  a longer trial.  It was over two weeks ago that young Isabell

25  came in to testify for you, and I want to put their names up

26  there and I want to remind you of those girls, of those

27  children that came in here to the courtroom.

28          Isabell was that precious, precious baby who came

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1608

1   in and said, "Well, my name is Isabell."  And His Honor said,

2   "So, can I call you Isabella?"  And she said, "Well, you can,

3   but that's not my name."

4         Becky can't remember anything.  She doesn't want to

5   remember anything.  She told you that when I came to her

6   house to serve her with a subpoena, her entire family started

7   crying.  They want no part of this, but she said a few things

8   I found interesting; right?  "I have dreams about Mr.

9   Chandler's classroom that I don't like."

10        You heard from little Laurie, who could just barely

11  say her own name.  She has no power.  That poor little girl

12  could barely say her own name.  She did her best.  But what

13  she told you over and over and over again is, "I have always

14  told the truth.  I'm not lying about anything."

15        Wendy, that smart, smart, smart little

16  nine-year-old who says, "Well, I bit down and I thought that

17  was kind of curious when he said 'don't bite' because I

18  thought:  How did he know I bit down?"  Excellent point.

19  Excellent, excellent point.

20        And poor Arleth, who thought she was going to go to

21  jail for telling her story.

22        We're going to talk a lot more about what the girls

23  individually said, but I think it's important for all of us

24  to reach back in our memories to two, two and a half weeks

25  ago and remember each one of those girls as individuals and

26  as little people.

27        So you did hear their statements here in court.

28  Some of them were relatively incomplete.  Remember, that for

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1609

1  some of these girls, this now happened almost three years

2  ago.  That's forever to a child.  Think about when your

3  cognitive memory really starts.  Most people will say it's

4  about five years old where they have first memories of being

5  a child.  These girls are now nine and ten.  Something

6  happened to them when they were seven.  In their cognitive

7  lifetime, that's 50 percent of their lifetime ago.  If

8  somebody asked me what I was doing -- I won't tell you how

9  old I am -- but more than 20 years ago, that I will be in

10  trouble, you know.  You just don't remember those kinds of

11  things in the kind of detail we're asking them to recall.

12       And our -- the California legislature knows this

13  and they passed a special Evidence Code, Evidence Code §1360.

14  And what it says is, it is fair for our jurors to hear

15  statements from children under ten given as close in time as

16  possible to those events.  That's why you get to hear those

17  videotapes.  That's why you get to hear their descriptions of

18  sexual assault as soon in time as possible to the events

19  having occurred, because we all know that children's memories

20  lapse, all of our memories lapse, but theirs particularly.

21       So you have the videotapes, which I submit to you

22  is probably some, if not the most, important evidence in this

23  entire case.

24       What is evidence?  What are you looking at?  What

25  are you trying to determine?  We talked a lot during this

26  trial, over the course of the trial, even in jury selection,

27  about the difference between direct and circumstantial

28  evidence.  But evidence is anything presented to the senses:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1610

1  touch, smell, sound, sight.  Do not believe that just because

2  these girls couldn't see what was happening to them, that

3  they weren't experiencing and recounting direct evidence,

4  because they were.

5          Circumstantial -- sorry.  Direct evidence is

6  evidence that could prove a fact by itself.  It is the fact I

7  saw the gun go off.  I -- but it could also be, I heard the

8  rain.  I know what rain sounds like and I heard rain.  I

9  heard my sister.  I know it's her voice because I know her

10  voice.  Hearing, sight, touch, smell, those are all perfectly

11  acceptable forms of direct evidence.

12          Circumstantial evidence is evidence of another fact

13  or group of facts where you have to interpret them in order

14  to get to your primary fact.  They're little pieces of the

15  puzzle, but both of them are totally acceptable ways of

16  proving a case.  We have cases that are entirely

17  circumstantial evidence.  We have cases that are entirely

18  direct evidence.  But His Honor has already told you that

19  both forms of evidence are completely acceptable and carry

20  the same weight.  It's contrary to what we hear on television

21  or what we might think, but it is, in fact, the law.

22          So, in this case I want to talk first actually

23  about the circumstantial evidence and how we could

24  distinguish it from what really is direct evidence.

25          Mary Montgomery.  She had the classroom right next

26  to Mr. Chandler and said that she heard a student pounding on

27  the door and it was enough to catch her attention, so she

28  went outside.  She saw Mr. Chandler's kids playing, and she

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1611

1  looked at the student and said, "What are you doing?  And he

2  said, "Well, the door is locked."  She could see them trying

3  to get the door open, and then the door opens.

4       This is circumstantial evidence that Mr. Chandler

5  will be and has been found in his room with the locked door.

6  We don't know if another child was in there.  We don't know

7  if one of our victims was in there.  What we know is he's in

8  a classroom with the door locked while his kids are just out

9  playing.

10      Dorothy Catangay.  She shares that adjoining door

11  that goes between Mr. Chandler's classroom and the one behind

12  it.  What did she say?  Never in eight years, not one single

13  time did she walk through that door unannounced.  That door

14  was for all practical purposes locked.  Craig Chandler was

15  totally isolated and alone in that room.

16      She also gave us another interesting piece of

17  circumstantial evidence.  I asked her, As a second grade

18  teacher, with 20 years of experience, can you think of any

19  educational purpose for blindfolding a child in a classroom

20  alone and putting something in their mouth?  No.

21  Unequivocally, she said no.

22      Then, lastly, she says that Craig Chandler would

23  normally arrive at school about 7:30.  She was one of the

24  first three teachers to arrive on the school grounds every

25  morning.  And Mr. Madden tried awfully hard to say, Oh, he

26  was one of the ones that came early.  No, he wasn't.  She

27  repeatedly said, No.  No, he wasn't one of the early

28  teachers.  He got there around 7:30.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1612

1          Why is that important?  It's important because of
2     what Armando Lara tells us.  Armando Lara was the vice
3     principal, and he says on January 10th, the day after Luisana
4     made a report to law enforcement, the very next day, Mr.
5     Chandler is in his classroom at least 45 minutes, probably an
6     hour earlier than he's ever been there before, in a locked
7     classroom with cleaning supplies.
8          Not only is he there in a locked classroom with
9     cleaning supplies, but he's there after Sean Pierce tells him
10     do not to go back to campus.  And I guarantee you we will
11     hear Det. Pierce didn't have the authority to tell my client
12     not to go back to school.  He's not authorized to give that
13     kind of command to someone.  You're being investigated for
14     child molestation by the San Jose Police Department, and a
15     guy with handcuffs, a badge, and a gun tells you don't go
16     back to the campus, you know what, No problem, dude.  I'm not
17     going back there.  You have to be a desperate man to violate
18     that kind of order.
19          Other circumstantial evidence that we have in this
20     case is Hilda Keller.  She's even a little bit hard to
21     remember because the defense had no questions for her.  Let's
22     get that woman in and out of here as quickly as possible,
23     says the defense.  Because what she says is, Based on the
24     entirety of my relationship with Mr. Chandler, I felt like he
25     was being overly sexual towards me.  And you know what he
26     wanted to ask about?  My feet.  He wanted to take pictures
27     and massage my feet and it made me highly uncomfortable.
28          So Annie Doe was shockingly a defense witness.  We

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1613

1    didn't call her.  They did.  I assume that they called her

2    because they thought she would provide some evidence, some

3    explanation for the semen that's found in the classroom.  She

4    didn't.  But what she did give us is some other very

5    interesting circumstantial evidence.  The defendant can't get

6    an erection in a consensual encounter with a woman at her

7    home.  Remember she said, "We couldn't perform?"  That's not

8    his preferred location.  But in a classroom with little

9    chairs, with artwork all over the place, ejaculation is

10   almost immediate and uncontrollable.  She says that the

11   entire episode is over within a minute.  She said it was

12   unbelievably fast.

13           And Mr. Madden asked Kristin Cardosa, remember the

14   DNA expert, and said, Ms. Cardosa, I would like to give you a

15   hypothetical.  Let's assume that Mr. Chandler had consensual

16   sex in a classroom with an adult woman and touched himself

17   afterwards, then somehow put his hands on the chairs, move

18   these chairs around, would that explain the semen that was on

19   the chairs?  No.  Well, why not?  Because these aren't

20   transfer stains.  This isn't like she described a ketchup

21   packet, where you smear your finger, you get a smear.  It's

22   called a transfer stain.  It's something decidedly different

23   than what you could view with the naked eye on these chairs,

24   which are drops.  She called them direct deposits.

25           We have some other circumstantial evidence in this

26   case.  Lyn Vijayendran was the principal at the time of

27   October of 2011, when Becky's mother came to her with a

28   jacket on it that had a Monica Lewinsky-type stain.  Brought

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1614

1    it to the principal and said, He's doing this thing to my

2    daughter.  I don't like it.  Move her to another classroom.

3    And they get a full statement from Becky.  And I would submit

4    to you that that statement, which you all will have in

5    evidence.  It's the three pages of handwritten notes.  Some

6    of them are quoted here on the bottom.  They are in

7    quotation.  This is exactly what the child told her.

8         "First, he put the gooey something in my mouth.

9    Then he wiggled my body back and forth and my head.  Becky

10   felt some salty water in her mouth and it dripped out onto

11   her hand and her jacket.  She wiped her hands on her jeans."

12        That's just a little part of that three-page

13   document where she refers to it as round and gooey.  Said he

14   told her to move her two legs.  It's a pretty detailed

15   account.  She takes this account from this child and the very

16   next day Becky is moved to another classroom.  That's kind of

17   a big deal.  I mean, a child gets moved from this classroom

18   to that classroom because a teacher has done something really

19   offensive and inappropriate with the child.  I don't know, if

20   I'm a well-meaning teacher, I would think:  Oh, my God.  I

21   don't ever want to put a child in that position.  I'm so

22   sorry she felt like that, and I would never ever want that to

23   happen.  But he doesn't.  He just waits.  He waits for Lyn

24   Vijayendran to go on maternity leave.  As soon as she does,

25   he does it again.

26        So once he does it again, Luisana does what a

27   responsible, loving, and caring mother would do, she goes to

28   the principal and says, What is going on here?  And she calls

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1615

1  the authorities.  They were the right people to call.

2  Luisana did nothing wrong.  She did everything could have

3  asked her as a responsible parent.

4  The children are interviewed by the San Jose Police

5  Department, and these are the words that they know to use.

6  This is their vocabulary:

7  Round and gooey.  He tells me to move my tongue

8  around.  I felt like I was going to choke.  Bigger than a

9  finger, smaller than a banana.  Kind of hard, kind of soft.

10  No taste or smell.  After one minute, gooey, salty water came

11  out.  Several of the girls describe hearing metal clicking:

12  a belt, keys, zipper.

13  Those are the words that they know that they can

14  use.  That's their vocabulary.  Imagine for a moment trying

15  to describe an item that you may never have even seen, that

16  you have no language to describe.  Even if you could describe

17  it, you wouldn't as a seven-year-old girl have any idea that

18  that body part is used in a mouth for sexual pleasure.  You

19  just wouldn't know that.  Children would never know that.

20  They use the words they know because there is the

21  word they don't know, "oral copulation."  They don't know

22  that word.  He touched me with his penis.  They don't know

23  that word.  They have the vocabulary that they have and they

24  are telling you with everything in them what happened to

25  them.

26  They not only tell you, they show you.  And I

27  want -- I'm going to play these again because I think it's

28  super important to think about how these interviews

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1616

1    transpired.  These are the children's words, not the

2    officers' words, their descriptions, their language.

3              Deputy, could I get you to --

4              (Whereupon, a tape was played, not reported.)

5              MS. FILO:  Your Honor, for the record, those were

6    two clips of Isabell, one of Becky, and one of Arleth.

7              Ladies and gentlemen, that is a photo that Arleth

8    drew that day.  That's what she saw when she peeked under

9    that blindfold.  Ask yourselves this:  Does a nine-year-old

10   know how to draw that?  Does a nine-year-old have any idea

11   what that is?

12             Forensic search was done of the defendant's

13   computer and only one item was found of any evidentiary value

14   in this case.  This was it.

15             (Whereupon, a tape was played, not reported.)

16             MS. FILO:  It's easy to miss, but it's there.

17             (Whereupon, a tape was played, not reported.)

18             MS. FILO:  Right here, what's he doing?  There is

19   little Isabell wearing the exact same scarf that she

20   described in a classroom while Mr. Chandler is trying to get

21   rid of the other kids and he's got a camera set up for it.

22   He turns it on as the child walks right into the line of

23   sight, she turns away to sit down, and it is not until other

24   children come into that classroom that that camera goes off.

25   All of which corroborates everything that Isabell has told

26   us.

27             All right.  So I said we would talk a little bit

28   about what the kids themselves have said.  Isabell did not

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1617

1    want to go to school.  This was a decided change in her

2    behavior.  She had always been eager to go to school, and

3    what her mother saw when she looked down at her little girl

4    was that Isabell was scared.  She said, "Mama, I have to tell

5    you something."  She says to the police department that he

6    uses his hand on the back of her head to bob her head

7    forward.  What seven-year-old knows that?  What is the

8    explanation for that?  Taste the candy.  Taste the candy.  I

9    mean, this is the universal language of oral copulation.  She

10   says, "Round, kind of hard, hurts my mouth, and he tells me

11   to move my tongue around.  Sometimes he gives me candy and

12   has me guess."  But he never once has her guess what the big

13   round object is.  Never.

14            Becky in her tape said, "I heard the keys."  She

15   describes it both to the police and to the principal as round

16   and gooey.  She says, "I could feel it all the way in my

17   mouth.  After one minute, the salty water came out."  She too

18   says, "He used to give me candy, but not anymore.  Now it's

19   just the C thing."  Tells her you could bite the chocolate,

20   but don't bite the gooey thing.  She said she could feel his

21   hands at the end of the gooey thing holding it as he's

22   pushing it in and out of her mouth.

23            Laurie describes a glue stick to the police.  Glue,

24   round, smooth, and little bit bumpy.  But do you all remember

25   Dr. Lynn who came in and testified?  An amazing woman; right?

26   And she says she spent three and a half hours with Laurie.

27   Had to get on the floor with her, play in a garden with her,

28   make her feel comfortable, and really get passed this

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1618

1    absolute wall that she had put up where she wouldn't

2    disclose.   To Dr. Lynn, Laurie talks about the thing in her

3    mouth as strange, kind of wet, sticky, somewhat hard.

4            Dr. Lynn described a child who was shaking, crying,

5    and terrified by what had happened to her.  What she told us

6    is that little Laurie will never again repeat what happened

7    to her.  She's just not going to say it, not going to do it.

8    She talked about how Laurie discussed with her that Laurie

9    was being called names on the playground.  She asked Dr.

10   Lynn, "Am I a slut?"  A seven-year-old little girl asking a

11   child psychiatrist, "Am I a slut?"  Most horrifying, this

12   little girl thinks this is her problem; right?  She thinks

13   she was chosen because she's a good student and she does what

14   teachers ask her to do.

15           And last, Wendy talked about being grossed out.  It

16   was round and oval.  Felt like skin.  It was too long to

17   close her mouth all the way around.  She never ever played

18   this game in front of the whole class.  "I bit down and he

19   said don't bite, but I thought to myself:  How did he know

20   that I bit down?"

21           Then Arleth.  He told her to lick it.  It felt

22   nasty.  It felt like skin.  She tried to peek and saw skin

23   with hair around it.  Her pants were down.  The drink came

24   out of the thing while the thing was still in her mouth.  It

25   just tasted bad.  Again, poor Arleth thought she would go to

26   jail for telling someone what had happened to her.

27           Ladies and gentlemen, you have heard all of the

28   evidence in this case.  I know you listened to each and every

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1619

1    witness that has come in to testify.  There is really nothing

2    more that I could tell you at this point, but this:  Craig

3    Chandler selected his victims very carefully.  He chose

4    quiet, meek girls, almost all of whom have parents who speak

5    a language other than English.  At least one child who had

6    some special education needs.  This is a selection process.

7    This is a methodical, sociopathic deviant who chose children

8    in the most vulnerable condition to inflict this horrific

9    crime on.

10          You are not only the judges of the facts, you are

11   the conscience of our community.  You are the people who get

12   to say, We condemn you.  We as a society will not tolerate

13   you.  We do not accept you.  We condemn you.  And that is

14   what you do with a guilty verdict in this case, and I ask you

15   to return that verdict.  Thank you.

16          THE COURT:  Thank you, Ms. Filo.

17          Ladies and gentlemen of the jury, we're going to

18   take a short recess before we begin Mr. Madden's closing

19   remarks.  I'm going to ask all members of the jury to report

20   to the jury assembly room.

21          Folks in the audience, I would ask you to please

22   remain seated until the jury leaves the courtroom.  We will

23   call you back just before 10:15, and we'll hear Mr. Madden's

24   closing remarks.

25          We'll be in recess for about 15 minutes.

26          (Whereupon, a brief recess was taken.)

27          THE COURT:  Record will reflect all members of the

28   jury are present, both counsel are present, Mr. Chandler is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1620

1    present.

2              Mr. Madden, you ready to proceed?

3              MR. MADDEN:  I am, Your Honor.

4              THE COURT:  Okay.

5              MR. MADDEN:  If my voice will cooperate.

6              I first want to talk with you about a subject that

7    we covered often in the jury selection process, and the

8    subject is keeping an open mind.  This case in particular,

9    all cases that involve allegations of child molestation, are

10   the most difficult cases for anyone to keep an open mind.

11             The reason is obvious.  We want to protect our

12   children, ours and others.  There is a tendency to do that.

13   It's the human condition.  It's good.  But not withstanding

14   that human need, that human feeling to protect, this is a

15   courtroom, and here we're not sending anybody any message

16   about the social conscience of the community.  You are here

17   simply and plainly and only to decide whether or not the

18   People, the District Attorney, the prosecutor, has proved

19   this case beyond a reasonable doubt.  That is it.

20             In the 18th Century, English essayists wrote

21   something about the consequences of not keeping an open mind.

22   I read this 20, 25 years ago.  And it's something that I try

23   to make a part of my life, and I think it's a good thing for

24   all of us to do.  His name was Herbert Spencer, and he said:

25             "There is a principle which is a bar against all

26   information, which is proof against all arguments, and which

27   cannot fail to keep a man in everlasting ignorance.  That

28   principle is contempt prior to investigation."

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1621

1          And that's what happens in cases of this nature.

2    Good-hearted, well-intention people, whether it be parents or

3    police, panic.  There is a rush to judgment and we had that

4    in this case.  Two extreme cases of it:  One, Isabell's

5    mother, Luisana; and the other, Arleth's mother, Maria Leon.

6    We'll get to that in due course.

7          You had the instructions.  You were read the

8    instructions yesterday, but I'm going to the next instruction

9    that I think is critical in this case.  That is this, it's

10   the circumstantial evidence instruction.  I put it on the

11   easel.  You could look it up in your jury instructions, or

12   you could just listen.  It doesn't matter.

13         Before you may rely on circumstantial evidence to

14   conclude that a fact necessary to find the defendant guilty

15   has been proved, you must be convinced that the People have

16   proved such -- each fact essential to that conclusion beyond

17   a reasonable doubt.  Also, before you may rely on

18   circumstantial evidence to find the defendant guilty, you

19   must be convinced that the only reasonable conclusion

20   supported by the circumstantial evidence is that the

21   defendant is guilty.

22         If you could draw two or more reasonable

23   conclusions from the circumstantial evidence, and one of

24   those reasonable conclusions points to innocence and the

25   other to guilt, you must accept the one that points to

26   innocence.  However, when considering circumstantial

27   evidence, you must accept only reasonable conclusions and

28   reject any that are unreasonable.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1622

1    I would like to now turn my attention to CALCRIM

2  instruction 220, which involves the presumption of innocence

3  and a concept of beyond a reasonable doubt.

4    The defendant in a criminal case is presumed to be

5  innocent.  This presumption requires that the People prove

6  each element of a crime and special allegation beyond a

7  reasonable doubt.  Whenever I tell you the People must prove

8  something, I mean they must prove it beyond a reasonable

9  doubt, unless I specifically tell you otherwise.  Proof

10  beyond a reasonable doubt is proof that leaves you with an

11  abiding conviction that the charge is true.  The evidence

12  need not eliminate all possible doubt, because everything in

13  life is open to some possible or imaginary doubt.

14    In deciding whether the People have proved their

15  case beyond a reasonable doubt, you must impartially compare

16  and consider all of the evidence that was received throughout

17  the entire trial.  Unless the defendant -- excuse me.  Unless

18  the evidence proves the defendant guilty beyond a reasonable

19  doubt, he is entitled to an acquittal, and you must find him

20  not guilty.

21    So I want to talk about three words within that

22  instruction.  The words are "an abiding conviction."  They

23  are simple enough, but these are powerful words.  I would

24  like you all to think about some of the most important

25  decisions you have ever made.  Your list will not necessarily

26  match mine, but I'll refer to my own personal experiences.

27    Where was I going to go to college?  What my major

28  was going to be?  What my occupation was going to be?  Who

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1623

1  was I going to marry?  Where did I want to buy a house?

2  You've all had, if not identical, similar experiences, and

3  each of those experiences involved for you and for me

4  considerable thought and deliberation.  We did not take those

5  decisions lightly, but we made decisions.

6  I'm suggesting to you, ladies and gentlemen, that

7  the decision that you are going to try to make in this case

8  is more important than any of those that I just described.

9  And the reason for that is this:  In all of the situations I

10  described, I had the ability to admit that I made a mistake,

11  that I was wrong.  I went to the wrong college, I chose the

12  wrong major, I picked the wrong occupation, I bought the

13  wrong house, God forbid I married the wrong woman.  I

14  volunteer that isn't correct.  I married the right woman.  In

15  September, we'll be married for 40 years.

16  There are no do overs in a jury trial.  That's why

17  they use the words "an abiding conviction."  This has to stay

18  with you.  You know that you can't -- you have to have a

19  feeling where you are totally comfortable and you know that

20  you will never be second-guessing yourself.  That's what an

21  abiding conviction means, one that will stay with you.  All

22  right.

23  I want to talk about one more instruction and then

24  we'll talk about some other things.  This needs no

25  explanation or comment.  I'm just going to read it to you:

26  A defendant has an absolute constitutional right

27  not to testify.  He or she may rely on the state of the

28  evidence and argue that the People have failed to prove the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1624

1  charges beyond a reasonable doubt.  Do not consider for any

2  reason at all the fact that the defendant did not testify.

3  Do not discuss this fact -- that fact during your

4  deliberations or let it influence your decision in any way.

5          So let's talk about the evidence.  The first person

6  I want to talk about is Dr. William O'Donohue, an incredibly

7  credentialed expert.  Professor of psychology; runs -- has a

8  grant to run a clinic for victims of sexual abuse; has

9  personally treated over 2,000 victims of child sexual abuse;

10  he is familiar with all of the literature on child sexual

11  abuse; is familiar with all of the literature on the forensic

12  interviewing of children.  In fact, he wrote a considerable

13  body of that literature.

14          Dr. O'Donohue knows what he's talking about.  He

15  was asked to review this case, and he was provided with audio

16  and videotapes of all of the recorded interviews of the

17  children, together with transcripts of those interviews.  The

18  same evidence that you are going to have.  Additionally, he

19  was provided with a transcript of the preliminary

20  examination, but of course the trial had not occurred, so he

21  did not have that information at his disposal when he wrote

22  his report.

23          So he identified eight categories that caused him

24  concern in this case about this evidence, all of which, I

25  might add, the prosecution has ignored.  He first talked

26  about inconsistencies in children's allegations.  What he

27  told you is that inconsistencies are red flags, they are not

28  to be ignored, especially when they involve core details:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1625

1   who, what, when, how it felt, those kinds of things.

2          He made a table, an inconsistencies table, and we

3   reviewed most of that during his testimony.  I'm not going to

4   read that table for you now, but you heard it in evidence.

5   Should you need to hear any of it again, you could ask for a

6   re-read of that testimony.

7          Dr. O'Donohue was able to tell you that all of the

8   children gave inconsistent statements within each interview

9   and across all interviews.  And a little bit later here, I'm

10  going to talk about their trial testimony, and they gave yet

11  other inconsistent statements at this trial.  These are not

12  to be ignored.

13         The next area that troubled him were the details

14  that didn't make sense.  Let's face it, this case is about

15  oral copulation.  The object is about oral copulation.  The

16  thing is about oral copulation.  Plain and simple, the People

17  are alleging that Craig Chandler put his penis in the mouth

18  of five girls.  Until this trial, it was four.  But as of

19  this trial, there is a fifth, and that's Laurie.  We'll talk

20  about her in a moment.

21         That allegation surfaces for the first time in this

22  trial after she spent, not three and a half hours, but

23  basically one hard hour talking with Dr. Lynn, who basically

24  was not doing a forensic interview, but was doing an

25  evaluation for a personal injury attorney who is pursuing a

26  civil lawsuit.

27         She had no information whatsoever about Laurie's

28  previous statements in terms of what she said.  And in all

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1626

1    previous statements, she was very clear about this, Mr.

2    Chandler never put anything in her mouth.

3         The details that don't make sense.  The instruction

4    to someone in whose mouth rests your penis, the instruction:

5    Chew it or bite it.  Ladies and gentlemen, that makes no

6    sense.  That a penis felt like a gummy bear.  That makes no

7    sense.  That it felt like a glue stick.  That makes no sense.

8    That it tasted like strawberry.  That makes no sense.  That

9    it tasted like smoke.  That makes no sense.

10        MS. FILO:  Objection, Your Honor.  That misstates

11   the evidence.

12        THE COURT:  Um, ladies and gentlemen, if either

13   attorneys misstate the evidence and it conflicts with your

14   recollection, follow your recollection.  And what the

15   attorneys say is not evidence.

16        MR. MADDEN:  It tasted like juice makes no sense.

17   It tasted like pee makes no sense.  In fact, Dr. O'Donohue

18   said that in 2,000 cases he's never heard that from a child

19   who was a victim of sexual abuse.

20        Impoverished narratives.  He gave an example:

21   Something was in my mouth.  Something came out of it.  If

22   this is an impoverished narrative, you would expect someone

23   who truly had been a victim of sexual abuse to be able to

24   give a much broader description.  In the child's words, no

25   one would expect a child to know the word "oral copulation"

26   or anything else adult-like, but she could use her own words

27   to describe movement and motions and speed and friction.  Her

28   own words.  None of these children did that.  None.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1627

1    There is no detail unfolding.  There was one

2  exception.  When I asked the doctor, "Did you find that all

3  of the children gave impoverished narratives throughout their

4  interviews and their testimony?"  He said all but one, and

5  that one was Arleth.  We'll get to Arleth in a moment, but

6  Arleth is the child that you all remember, who does not

7  remember the teacher she had this year.  I'm not faulting

8  Arleth.  I'm not making fun of Arleth.  Arleth has limited

9  capacity.  It's not her fault.  She, like all of the girls in

10  this case, is a sweet, innocent child.

11    When it comes to credibility, I want you to

12  understand this.  I want you to understand my position with

13  total clarity.  It is not my position that any of these

14  children lied.  I do not believe any of these children lied.

15  But there were things that happened to those children that

16  shouldn't have happened that resulted in the negative -- it

17  resulted in bias, bias that has affected their ability to be

18  relied on as accurate historians of what occurred.  They have

19  been influenced by other people.

20    Lack of good isolation.  What does that mean?

21  People who molest children don't do it in public.  They take

22  extraordinary steps not to get caught.  The things that they

23  do are really common sense.  Some are actual, actual

24  isolations of children.  Others are verbal.  Example of

25  verbal is telling a child not to tell anyone; threatening to

26  do something to the child if she does tell anyone; bribing

27  the child; scaring the child; giving gifts to the child.

28  There is all kinds of things that one could do verbally.  It

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1628

1    is significant, according to Dr. O'Donohue, that the children

2    have all denied that Mr. Chandler told any of them not to

3    tell anyone.

4            Another item that sounds small, but is not small,

5    is the fact that the universal evidence in this case, whether

6    it came from the five complaining witnesses or from any of

7    the students that were called essentially randomly by me to

8    establish general principles of the feel and the touch game

9    and the objects that were used, universally across all

10   testimony, the evidence is Mr. Chandler was as casual as

11   casual could be about blindfolds.  In fact, he gave the

12   blindfolds himself, or had the kids pick up the blindfolds.

13   And each of the children, all of them, put on their own

14   blindfolds.

15           And does that make sense?  No.  What would make

16   sense if you were molesting a child would be to make sure

17   that you are in charge of the blindfold; that you could

18   adjust it so no one could peek.  These are seven- and

19   eight-year-old kids, why would you ever possibly assume

20   everyone's blindfold fit and that you could trust them to do

21   this?  That is a very, very, very significant piece of

22   circumstantial evidence, and it's common sense.

23           Additionally, Mr. Chandler is the one who told the

24   kids to take their blindfolds off.  Didn't take it off

25   himself.  Several of these children are claiming they saw Mr.

26   Chandler pulling up his pants or his zipper or all of these

27   kinds of things after they'd taken their blindfolds off.

28   Does that make any sense?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1629

1    Poor interviewing techniques.  He indicated and
2  described what good interviewing techniques were and what
3  poor interviewing techniques were.  Good interviewing
4  techniques involved not asking leading or closed-end
5  questions.  And I suggest, ladies and gentlemen, that as you
6  listen to the CIC interviews, read along with the tapes,
7  throughout these interviews there is an extraordinary amount
8  of leading and closed-end questions.  In fact, Det.
9  Pierce's -- I think it's a two-page document with questions
10  on there.  Those are all closed-end questions, all of them.
11  They aren't asking -- there is no effort for a free-flowing
12  narrative.  Let's get right to it.
13    Repetitive questions.  Repetitive questions occur
14  when a child doesn't give you an answer that you wanted to
15  get, so you go back to it and you go back to it and you go
16  back to it.  Those are seen throughout the interviews.
17    Disconfirming questions.  What's important here
18  when you have poor interviewing techniques is that -- Dr.
19  O'Donohue said that the effect of a poor interviewing
20  techniques is you create unresolved questions and multiple
21  interpretations.
22    Outside contamination.  This was the sixth of his
23  eight concerns.  Outside contamination is when adults or
24  others have talked with children and influenced a child's
25  statement.  And, of course, out of all of the children
26  involved in this case, no one was more a victim of outside
27  contamination than Arleth.  Her mother for three days, and
28  the mother's own word "interrogated" her child.  Not only was

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1630

1  the mother interrogating the child, the media circus in this

2  case began on or about January the 9th.  Arleth was not

3  interviewed until the 17th of January, eight days later.

4          During that time, she'd seen, in her own words, Mr.

5  Chandler's face on TV.  When she's not seeing it -- several

6  times.  When she's not seeing it on TV, a neighbor is asking

7  if the person that the neighbor saw on TV was her teacher.

8  Arleth for three days denies that anything happened.  "No,

9  nothing happened.  Mr. Chandler is a good man."  Out of the

10 mouths of babes.  But her mother kept pushing, and that

11 wasn't enough to do the trick.  Her cousin Noemi, who lived

12 with the family, also questioned her twice.  And what you

13 wind up at the end with is a child yielding to the pressure

14 of her mother and to her cousin.  That cannot be denied.

15         Stake.  When Dr. O'Donohue wrote his report, no

16 civil suits had been filed in this case.  And he indicated in

17 his report it was his opinion that stake was not an element

18 that concerned him.  When I explained to him that three civil

19 lawsuits have been filed, one on behalf of Wendy, one on

20 behalf of Arleth, and the other -- uh-oh, I done it --

21 Laurie, that changes things.  And nowhere is it more evident

22 than Laurie.  We'll talk about Dr. Lynn in a moment.

23         Finally, spontaneous outcries:  Uncle Bobby put his

24 weenie in my mouth.  Spontaneous outcry by a child.  The

25 strongest evidence.  The spontaneity of that is significant

26 to a therapist.  On the other hand, when outcries are really

27 not outcries, but come as a result of questioning, whether

28 it's by family or by police, that's not the same thing.  In

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1631

1  this case, Dr. O'Donohue told you that none of the children

2  gave a spontaneous outcry.  Not one.

3       Let's turn our attention to the children.  I'm

4  going to talk about Becky first.  Here's the reason.  Becky

5  didn't say much in this trial, and because of that, you not

6  only have a CIC, Children's Interview Center, video and

7  transcript in evidence, you also have a -- you heard her

8  testimony at the preliminary examination, and that was

9  legally proper, so I will let you compare those two in the

10  jury room.  And you will find inconsistencies within and

11  between those statements.

12       On the other hand, both Becky and her mother said

13  two things that I thought were very impressive in their

14  statement in this trial.  Ms. Filo asked Becky, "Did

15  something bad happen there?"  And she said, "I don't know."

16  I think in a lot of ways that is truly speaking for all of

17  the children in this case.  They don't know.  That, in and of

18  itself, is troublesome, because if Mr. Chandler did the acts,

19  the unspeakable acts, the sociopathic, maniacal, twisted,

20  bent sexual acts that she's suggesting have been proved, what

21  would have been the response of those children?  I will talk

22  about that at the end of my comments.

23       The mother said this:  "My daughter has been

24  transferred.  She's so small.  I don't want her to deal with

25  this because the matter is not black and white."  That was a

26  reserved, measured statement.  That actually is someone who

27  appears to be making every effort to keep an open mind.  The

28  matter is not black and white.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1632

1   Couple of more things about Becky that I do want to

2   comment on.  Much has been made to-do about this exhibit, Lyn

3   Vijayendran's handwritten notes.  Very little has been

4   discussed about a later report.  Ms. Vijayendran in this

5   trial in her own words cleared up three very important

6   points.  She indicated that the expression "open your legs"

7   was inconsistent with another statement that Becky told her,

8   which was "move your legs."  And she acknowledged, and we

9   would all agree, there is a world of difference between move

10  your legs and open your legs.

11      Equally important, the gooey something in Becky's

12  mouth was a bottle.  That is her testimony:  "The vessel

13  carrying the liquid was a gooey bottle."  That is a

14  clarification Ms. Vijayendran had of the thing that went --

15  and I might add, and you listen to this tape, not into her

16  mouth, but to her mouth.  There is a big difference.  Listen

17  to that tape.  You will hear it.

18      Equally important, Ms. Vijayendran looked at the

19  document.  She's a grown woman, a married woman.  She's not

20  an expert in DNA, but she can be asked as a lay person

21  questions all lay persons know about, and the question was:

22  Was the semen -- was the stain that you saw on that jacket a

23  semen stain?  It was not a semen stain.

24      I would like to talk about Luisana, her trial

25  testimony and her trial testimony of her daughter, Isabell.

26  Luisana stated that Becky [sic] said she gagged when the

27  object was in her mouth.  However, she was impeached when I

28  quoted her preliminary examination testimony, in which Mr.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1633

1    Schumb asked Luisana, "Did you say to Det. Pierce that you

2    asked Isabell if she kind of choked or something?"  And she

3    said, "No."  "Did you ever tell that statement to Det.

4    Pierce?"  Answer:  "I did."

5         Luisana admitted her daughter did not know what was

6    going on.  Luisana acknowledged that Isabell has never told

7    her mother that the object was curved.  Luisana acknowledged

8    that Isabell told her that Mr. Chandler said, Go ahead, move

9    your tongue around.  Is that a sexual directive?  Or, is that

10   a directive telling someone who has a food item in their

11   mouth to move your tongue around so could you taste it and

12   tell me what you taste, a person who is blindfolded.

13        We all know the language of oral copulation.  It's

14   not present here.  Isabell told her mother that there was

15   never anything in her mouth, but the same thing.  The same

16   thing.  That position is impeached by Isabell's preliminary

17   examination testimony and her trial testimony, that she

18   played the game in front of the whole class and there were

19   clearly other things in her mouth, including candy and

20   crackers.

21        Luisana also admitted that she told her daughter

22   what Mr. Chandler did was bad, and she told her that before

23   Isabell first testified at the preliminary examination.  The

24   mother admitted asking her child, "Did you feel any liquid?"

25   The answer, "No."  "Did you feel anything?"  "No."  Mom

26   admitted Isabell did not mention anything about Mr. Chandler

27   making any noises while he was doing this.  The only word

28   used to describe the object was "round."  That was it.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1634

1    Isabell.  She testified on July 15th.  Isabell said

2  she can't remember how many times he put the object, she

3  couldn't identify it in her mouth, but it was more than one

4  time.  She said he put something in her mouth; it was, like,

5  curvy.  That's the first time that word appears in this case,

6  at trial.  An expansion -- an expansion of a memory a couple

7  of years old.  No one's memory gets better with time.  Not

8  yours, not nine, not a child's.  That isn't how the mind

9  works.  What is behind this?

10    She said he pushed her head always the same.

11  Sometimes he used candy.  There is another new addition at

12  trial, another expansion of her allegations.  At trial, she

13  stated after he took the object out of her mouth when they

14  were alone, she heard keys, and she said that before, but she

15  added that she heard him zip up his pants.  That comes out of

16  nowhere.  This is a radical new allegation.

17    In contrast, during your deliberations, I would ask

18  that you go back to the CIC interview on the subject of

19  noises.  Det. Pierce gave Isabell a number of opportunities

20  to describe if Chandler made any noises or talk.  She

21  repeatedly told him, He never made any noises or said

22  anything other than to move my tongue.

23    Again, she continued to receive continuing

24  opportunities to describe noises, and she always said no

25  noises were made.  This is to Det. Pierce.  She admitted she

26  did not cry or get angry or act upset in any way when Mr.

27  Chandler put the object in her mouth.  And, in fact, ladies

28  and gentlemen, that is the testimony of each and every one of

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1635

1  these children.  And at the end of my remarks, I'm going to

2  address that subject.

3       Isabell admitted Chandler never told her not to

4  tell anyone, never told her to wait a minute, or hold it when

5  she was taking her blindfold off.  Never said she should not

6  tell her friends, her parents, or anything like that.

7       She admitted she tasted candy and crackers.  She

8  admitted no liquid every came out of anything.  She admitted

9  you had to sit on the wall when you got in trouble.  She

10  admitted and acknowledged that she told Ms. Peery that this

11  only happened one time.

12       Let's turn our attention to Laurie.  At the

13  preliminary examination, she testified that she was only

14  alone with Mr. Chandler one time.  At the school interview,

15  that is the first interview at O.B. Whaley, she told the

16  officer Mr. Chandler never put anything in her mouth.  At the

17  preliminary examination in May of last year, she testified

18  under oath that Chandler did not tell her not to tell anyone.

19  At the CIC interview, she stated she did not hear anything

20  when Mr. Chandler was putting objects on her.  At the

21  preliminary examination, she testified she heard cabinets

22  opening.  At the CIC interview, the police asked her if she

23  heard anything opening, or any zippers, belt, or anything,

24  and she said no.

25       This is perfect.  This is about as close and bad an

26  example of leading closed-end questions as you could have.

27  You're basically giving the child a multiple choice, pick

28  your answer, any or all of them, and yet she says no.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1636

1    At the CIC interview, she says, We had a book about

2  a story about Helen Keller.  She can't see and had to feel

3  stuff to know what it is.  He said we're going to learn the

4  same things.  On the other hand, at the preliminary

5  examination in May of last year, she testified they were not

6  reading the Helen Keller book.  At the trial before you, she

7  stated, I don't remember to -- the question by Ms. Filo, "Did

8  he put anything in your mouth?"  She also said at this trial

9  she couldn't remember him putting anything in her mouth, but

10  she said it's kind of fuzzy.

11    It's time to get back to Dr. Lynn.  Dr. Lynn is not

12  an amazing person.  Dr. Lynn has no interest in seeing police

13  reports or transcripts or audiotapes relative to the child's

14  prior positions.  No interest in that.  She has the child and

15  the child's parents to her office, yes, for three and a half

16  hours, but her time with the child was one hour.  I believe

17  she said, hard time one hour with the child.  I don't want to

18  quibble about that.  That is not important.  I'm much more

19  concerned about the fact that she seems to have no interest

20  in understanding what the facts are.

21    Lynn (Redacted) -- Dr. Lynn for the first time in

22  the case presents evidence that the child said Chandler put

23  things in her mouth and moved them around.  How could that

24  be?  She did not -- Dr. Lynn did not receive or consider any

25  police reports, any audio or video CD's of Laurie's

26  statements to the police at the school and at the CIC

27  interview.  Did not review a transcript of Laurie's

28  preliminary examination.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1637

1      I took her through the quoted portion of her report

2  and she waffled and resisted.  For example, her report does

3  not mention Mr. Chandler touching Laurie's feet with any

4  objects, but that's what Laurie has always said.  In fact,

5  what Laurie always said, that's the only part of this game

6  she ever did, the feel part of the game, with objects on her

7  feet.

8      Additionally, the report stated that Laurie

9  mentioned her hands touching things.  But in all previous

10  police and courtroom statements and testimony, she denied

11  that her hands touched anything on Mr. Chandler and also

12  denied that her hands touched any objects, period.

13      Her report does mention that things were, quote,

14  moved around in her mouth, closed quote.  That's why Dr.

15  (Redacted) concluded that Mr. Chandler had put his penis in

16  her mouth.  Before Laurie came to court, she spent obviously

17  time with Dr. (Redacted).

18      MS. FILO:  Your Honor, I will move to strike the

19  name, Your Honor.

20      MR. MADDEN:  I'm sorry.  I apologize.  Dr. Lynn.

21      THE COURT:  That portion is stricken.

22      MR. MADDEN:  Please forgive me.

23      When Laurie comes to court, she still doesn't say

24  that he put anything in her mouth.  Only Dr. (Redacted)

25  concludes that.

26      MS. FILO:  Again, Your Honor.

27      MR. MADDEN:  I'm sorry.  Dr. Lynn.  Please forgive

28  me.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1638

1    THE COURT:  Name is stricken.

2    MR. MADDEN:  I think I will just move on.  I won't

3  make that mistake again.

4    Arleth and her mother.  I apologize.  Let's talk

5  about Noemi Gonzalez, the cousin.  Ms. Gonzalez acknowledged

6  that the two families were living together during the 2011 --

7  2010/2011 school year, the year that Arleth was in the third

8  grade.  After a week or so, she said, I knew something

9  happened.  Of course, she had been watching the news.  Mr.

10  Chandler's face was all over the news.  He had been arrested.

11  And I told Arleth, You have to tell me.  In addition to the

12  media barrage, Arleth came home one day with the letter from

13  the school talking about Mr. Chandler and that there was an

14  investigation going on that he had been arrested.

15    Her testimony is important in terms of what she

16  says Arleth told her, because she is clearly using words and

17  attributing these words to Arleth that Arleth doesn't know.

18  She's helping Arleth.  Noemi acknowledged that during lunch,

19  Arleth went into Chandler's class and he would cover her

20  eyes, then stick something in her mouth and tell her to bite

21  it and he would be moaning.  You think Arleth would use the

22  word "moaning"?  No, no, no.  He would tell her to keep doing

23  it.  She also said that Arleth described that she was sitting

24  down and he would be behind her and hump her.  You think

25  Arleth ever used the word "hump"?  No.  No way.

26    Noemi acknowledged she was fully aware of the TV

27  coverage of Chandler's arrest.  And in cross-examination I

28  asked her, You had to help her?  And she said yes.  Noemi

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1639

1   said that Arleth said it was like something -- something

2   hard, like it wasn't hard, but he kept on telling her, Oh,

3   bite it.  Is that a sexual directive by a man who is being

4   orally copulated, telling someone to bite their penis?

5          She admitted she had to help Arleth with the words.

6   Noemi admitted, She was telling me, but at the same time I

7   started asking her questions, too.  At the end I asked her

8   questions.  On cross-examination, she admitted that Arleth

9   did not use the word.  Important is Noemi's admission that

10  she asked Arleth if Chandler ever told Arleth that she

11  couldn't say anything.  And Arleth said, No.  He never told

12  me that.

13         Let's move to Arleth.  She described being with

14  Chandler alone five or six times.  I submit to you that the

15  most she was with Chandler alone is on two occasions.  The

16  other two occasions involved the exercises, and are basically

17  as bazaar as any testimony in this case.  Starting with the

18  fact that during the exercises she was not, repeat, not

19  wearing a blindfold.  She is describing -- I'm not exactly

20  sure what the People's position is on this, but being on her

21  hands and knees with Mr. Chandler behind her pushing her with

22  his head while holding her ankles or shoes.  At the

23  preliminary examination, the object wasn't a head; it was a

24  red, squishy ball.  And at trial, it was both.  Two different

25  instances.

26         Arleth described this last time that something went

27  in her mouth when she was in a blue student's chair, which

28  was already in place next to Mr. Chandler's desk.  She said,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1640

1  "He put something in my mouth.  It was on my mouth, inside my

2  mouth.  It was candy."  Was -- she said the shape was a

3  circle.  She said the thing had no taste.  Ms. Filo asked

4  Arleth about the object in her mouth about it moving.  The

5  question was:  "Did it move?"  Arleth responded:  "Just

6  stayed there.  It didn't move at all."  Is this an act of

7  oral copulation?  No.

8         Ms. Filo went on to ask her another question.  "Was

9  it hot?  Was it cold?"  "No.  It was normal."  When the

10  object was in her mouth, the only thing Mr. Chandler said was

11  to lick it.  He didn't say anything else.  Later on

12  cross-examination, Arleth admitted she was not upset and did

13  not cry during any of these times alone with Mr. Chandler.

14  Of course, that is consistent with her own testimony, that

15  she did not come to the conclusion that anything she did the

16  year with Chandler was wrong until Chandler was arrested and

17  the TV coverage and interrogation by her mother and cousin

18  began.

19         Again, show acknowledged no blindfolding on the

20  two, quote, exercises.  She said she was on her hands and

21  knees, and he was holding my leg, like, all the way down on

22  my feet over my shoes.  She was wearing shoes and socks.  She

23  said, He said to stay there, and with his head he was pushing

24  me all the way back.  Pushing her bottom with his head, she

25  said.  She saw water dripping in back of her.  You remember

26  that?  She's on her hands and knees, and I asked her to show

27  me or tell me what her point of view was, and it appeared to

28  me there were only three choices:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1641

1    One, she was looking over her left shoulder; two,

2 looking over her right shoulder; or three, looking down

3 between her legs. And, of course, she said looking down

4 between her legs. Right behind her legs was standing Mr.

5 Chandler, pants on and in place. And then she said she saw

6 water. Where was it? Behind Mr. Chandler. I believe that's

7 what Dr. O'Donohue would consider a fantastical detail.

8    Then after they did the affirmation exercises, she

9 did jumping jacks, all with no blindfolds. To the extent, if

10 any, that this was some sort of sexual molestation, Mr.

11 Chandler would do that without a blindfold? Does that make

12 sense?

13    The other time she was alone with Mr. Chandler --

14 excuse me. The other time she was alone with Mr. Chandler,

15 she had her eyes covered. Additionally, she later admitted

16 that she was in the classroom demonstration, and she admitted

17 that all of the times she was in class alone with Chandler,

18 all of the times she was alone with Chandler, were before the

19 classroom demonstration. She acknowledged she was practicing

20 with Chandler.

21    She said she was blindfolded another two or three

22 times. She was not able to peek, but she could look under a

23 little bit. She said she saw a circle, but did not see

24 anything else. She said she did not begin to think something

25 bad had happened until she saw the news.

26    Arleth was asked -- strike that. Arleth admitted

27 she played the game in front of the class one time. She

28 tasted something grape, strawberry, lollipop. She said

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1642

1  sometimes it tasted the same.  Arleth was asked if -- when

2  the liquid came out of the thing in her mouth if she ever

3  told anyone it tasted like pee.  She responded, "I don't

4  remember."  I submit, ladies and gentlemen, that if you ever

5  tasted anything that you thought was pee in your mouth, you

6  would remember it the rest of your life.  You would not

7  forget that.

8       Arleth acknowledged during cross-examination that

9  at the preliminary examination, she did say that the thing

10  was shaped like a cone-like ice cream.  Arleth acknowledged

11  that she did not hear any other noises while the thing was in

12  her mouth.  She acknowledged that -- at the preliminary

13  examination, she did say that what came out of the thing in

14  her mouth was kind of like water.

15       She also said that after Mr. Chandler -- after the

16  blindfold was taken off, Mr. Chandler never said anything to

17  her after she took off the blindfold, which gets to another

18  very important point.  She's saying that she's -- Chandler

19  had his pants down and was pulling them up.  Is he so casual

20  or so sociopathic that he doesn't really care about the

21  blindfold?  Go ahead, take the blindfold off.  I'm going to

22  rearranged here.  That makes no sense.  Again, there is no

23  evidence that Arleth was in any way in fear of or upset with

24  Chandler when these events occurred in the classroom.

25       At trial, she thought everything was normal.  She

26  acknowledged that at no time during or after the time she was

27  taking off her blindfold that Chandler ever say, Wait a

28  minute, or, Don't take off your blindfold yet, or anything

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1643

1  like that.  He never said anything like that.  If you were

2  molesting a child and she was blindfolded during that period

3  of time and you were in her presence and she started to take

4  off the blindfold, would you ignore that?  No, you wouldn't.

5        Arleth admitted that before she talked to her

6  cousin, Arleth told her mother that Mr. Chandler had never

7  touched her or done anything to her.  At trial, Arleth said

8  Mr. Chandler told her to bite it three times.  However, she

9  also acknowledged that on none of those three occasions did

10  Mr. Chandler ever say "ow" or "ouch" or "stop that," which,

11  of course, is exactly what a man would do if someone bit

12  their penis while they were orally copulating them.

13        I want to talk a little bit about Wendy.  Wendy is

14  interesting, for this reason.  With Wendy, it was not her and

15  Mr. Chandler.  It was her and Melissa and Mr. Chandler.  When

16  you look at the CIC interview and read the transcript, you'll

17  see the words flowing through, the pronouns flowing through

18  that transcript of "we" and "us" repeatedly.  And, in fact,

19  Wendy said that she was always with Melissa, always with

20  Melissa when she was alone with Chandler doing the feeling

21  with their feet.  She never did this game alone with her.

22  Does that alone cause you concern?  Because it should.  To

23  accept that, now Mr. Chandler is going for doubleheaders.

24        It's also interesting to note, that at trial Wendy

25  said that all of the times with Melissa and Mr. C were within

26  the first five minutes of recess.  Recess is 20 minutes long.

27  So he's molested two children within five minutes and sending

28  them to recess?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1644

1    She never said anything that what was in her mouth

2  filled up her mouth or that she choked or gagged.  She also

3  said that all but one of the times when she was doing the

4  taste game Melissa was also with her.  So what I'm curious

5  about is, why isn't Melissa a named complaining witness?  Why

6  didn't Melissa testify at this trial, who could have been a

7  more obvious and clear percipient witness?

8    She admitted on cross-examination that the whole

9  class played the game.  Admitted the whole class played the

10  games after the times she and Melissa were blindfolded.

11  Again, consistent with practicing for the whole class

12  demonstration.  At trial, she said she was alone with Mr.

13  Chandler a little over ten times.  All previous testimony,

14  one time.

15    Two different things went into her mouth.  She

16  doesn't know what it was, but he said it was candy.  One was

17  candy, the other kind of a C, and tasted a little bit -- and

18  tasted a little strawberry.  So if the prosecutor's position

19  was that this thing was his penis, now we have a strawberry

20  tasting penis in her mouth, which is ridiculous.

21    He said it was candy, so I thought I was supposed

22  to eat it.  She bit it.  She makes no mention of Mr. Chandler

23  expressing any pain.  She doesn't describe a banana, not a

24  banana.  She doesn't describe anything tubular or

25  cylindrical.  She doesn't use the word "hot dog"  She doesn't

26  describe any heaviness or weight of the object in her mouth.

27  No liquid described whatsoever.

28    Always with Melissa, except one time.  No sex

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1645

1    noises, no sex commands, no sex words.  Admits during

2    cross-examination that there were other objects, and she

3    remembered glue sticks, erasers, and scissors.  She admits

4    she saw the whole class play the game, and she saw the whole

5    class play the game after she saw the feel game and the taste

6    game she played with Melissa and Mr. C.  Admits Mr. C showed

7    her and Melissa a blue cloth and a red cloth after touching

8    something on their feet.

9        All right.  I actually ironically wanted to cover

10   the same witnesses that Ms. Filo wanted to cover, but

11   obviously for different reasons.  Let's talk about the

12   iPhone.  When we talk about the iPhone videotape, we have to

13   include more than the iPhone because we have a stipulation,

14   ladies and gentlemen.  And the stipulation is that forensic

15   interview -- excuse me -- forensic testing was done on the

16   computers of Mr. Chandler and his iPhone.  Forensic searches.

17   This isn't someone stumbling around on an iPhone.  This is

18   using police software to search computers and phones.

19       What do you think they are looking for?  You know

20   what they are looking for in a child molestation case.  They

21   are looking for child pornography.  The only item of

22   evidentiary value in the stipulation is this photograph.

23   What does this photograph really show?  It's not a

24   photograph.  This video, what did it really show?  It shows

25   Mr. Chandler's classroom, it shows Isabell, it shows an open

26   door, it shows chairs on top of student desks.  What time

27   would that suggest to you it is?  After school?  She has

28   homework of some sort she's working on.  You only have a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1646

1    partial view of the class.

2           What nefarious thing did Mr. Chandler do?  As he

3    turned his back to the students, he put his hand down to his

4    crotch area.  I don't want to intrude, gentlemen, is that an

5    uncommon thing for a male to do during the day?  No.  Was

6    there something sexual about that thing?  No.  There are

7    other boys or kids running around.  There is nothing sexual

8    about it whatsoever.  The only significance of it is Isabell

9    is in the photograph.

10           I think the People are asking you to speculate

11    wildly about what Mr. Chandler must have meant when he

12    touched himself.  You're not to speculate.  If that doesn't

13    make sense, if doesn't clearly have purpose of sexual intent,

14    don't make it into something that it's not.

15           Hilda Keller and Annie Doe.  Mr. Chandler showed

16    incredibly poor judgment in what he said to Hilda Keller.  It

17    was inappropriate.  You all know that.  It clearly had sexual

18    overtones to it.  Ms. Keller is an adult woman, however, an

19    attractive adult woman.  Obviously, not interested in Mr.

20    Chandler, but he had some interest in her.  Clearly, he did.

21           On that evidence that he asked, he said he was in a

22    massage class and he'd like to photograph her feet and

23    massage her feet.  You're going to conclude he had a foot

24    fetish?  Do we have any psychiatric or psychological evidence

25    of this trial to that effect?  No.  Again, wild speculation.

26    What it does show clearly is circumstantial evidence of Mr.

27    Chandler's sexual orientation; that is, he likes adult woman.

28           Annie Doe.  I'm sure that Ms. Doe's testimony was

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1647

1   as painful for you to hear as it was me.  Mr. Chandler showed

2   incredibly poor judgment.  Well, before we get to that, he

3   used it, he did, plain and simple.  Not once, but twice.  And

4   unsavory as that is, it is also very strong circumstantial

5   evidence of his sexual orientation, a nice looking adult

6   woman.

7        Ms. Catangay.  There is no lock in the door between

8   these two rooms.  If you were serially molesting children in

9   your class right next to that door, wouldn't you take some

10  steps to make sure that nobody was on the other side of the

11  door, or locked the door in some way?  This is under the

12  description of good isolation that was discussed by Dr.

13  O'Donohue.

14       More importantly, let's talk about the school

15  room -- door to room 18.  That does have a lock.  It could

16  only be locked by a key on both sides.  It's not like our

17  homes, where you just push a button.  The reason for that is

18  safety purposes.  Every teacher has a key to his or her own

19  room, but everybody's key is a master key to the inside of

20  someone else's room.  In case there is some sort of school

21  invasion, you could duck into a room and lock the door.

22       And if you were molesting children, would you

23  not -- and it was in that classroom, would you not before you

24  started to walk across the courtroom, put your key in the

25  door and lock it?  And when it was over, would you not return

26  and unlock it?  I challenge you, ladies and gentlemen, to

27  find any evidence of any of these children describing that.

28  None.  That is not good isolation.  Child molesters do not

1   want to get caught.  After having sex with the child, it's

2   the next item on the agenda, the most important thing.

3        Ms. Montgomery.  I'm not exactly sure what this

4   shows.  Not much.  For example, the time frame that she's

5   talking about is sometime from August, that is the beginning

6   of school, to December.  No idea what day or anything.  She

7   also said she was not concerned.  She also said she heard a

8   knocking and she went out and Mr. Chandler's students had, I

9   believe, balls with them, PE balls.  They looked like they

10   were waiting for him.  And there is zero evidence as to

11   whether he was alone or with someone in the classroom.

12   Wouldn't you have to have a few more details before you drew

13   some conclusion about that episode?  Why was it even offered?

14   It proves nothing.  Without that information, it's not

15   relevant.

16        Armando Lara.  The People took some serious

17   liberties with their position on this.  I'm not denying that

18   Officer Pierce told Mr. Chandler, Call your principal in the

19   morning.  Don't go to school.  But Mr. Chandler was not

20   placed on administrative leave until Dan Deguara did that

21   within ten minutes of Mr. Chandler's arrival that next

22   morning.  Mr. Chandler obviously missed school on the 9th, a

23   significant part of it.  He didn't leave the San Jose Police

24   Department until late at night.  The police had his iPhone.

25   He went to school the next day, so what?  Was that against

26   the directive of Det. Pierce?  Yeah.  Is that a crime?  No.

27   Was it unwise?  Was it bad judgment?  I think it was.  But

28   then to take the leap that he was there to destroy evidence

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1649

1    or clean or something is totally inconsistent with the facts,

2    which are these:

3         Walked to his classroom right by the office.  The

4    normal way he would go to his class.  Parked in the teachers'

5    parking lot.  He was an early arriver.  I don't want to

6    quibble, but I think Ms. Catangay said between 7 and 7:30.

7    So he went to school a half hour, 45 minutes earlier that

8    morning.  So what?  He has a white bag.  I don't know, I used

9    the expression "Zanatto's" to talk about this bag.  I don't

10   know if any of you are familiar with it.  It's a market over

11   on Naglee, kind of a hangout Rose Garden place.  Great

12   sandwiches in case you don't know about.  He has a

13   eight-by-ten inch plastic bag, something consistent with

14   having your lunch inside it.

15        Within ten minutes, less than ten minutes, Mr.

16   Deguara and Mr. Lara are -- they are not knocking on his

17   door, but open up the door with the key, I believe was the

18   testimony.  Mr. Chandler is at his desk.  Papers, books,

19   those kinds of things out on top of his desk.  He doesn't

20   have any cleaning supplies in his hands.  Those are in

21   another location against the wall, that he took with him when

22   he left, after being asked if he could take any personal

23   items, after being told he was on administrative leave and he

24   had to leave the campus.

25        When I say the word "lysol," does everyone have a

26   picture of what that smells like?  Or Clorox?  Of course, you

27   do.  Those are pungent, powerful cleaning smells.  We

28   remember them since we were little kids.  Is there any

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1650

1  testimony about smelling any of those products?  This is

2  within ten minutes.  What would the prosecutor have you

3  speculate as to what was going on in that ten minutes?  This

4  feverish cleaning, this feverish destruction of evidence.

5  There is no evidence to support it.  None.

6           The last point I want to make, it was mentioned by

7  the People, use your common sense.  If you imagine an over

8  six-foot-tall, 230-pound man, thrusting his erect penis into

9  the mouth of seven- or eight-year-old, four or five of them,

10  however you measure the allegations, and they are blindfolded

11  and then ejaculates in their mouth, could you for one minute

12  possibly imagine an involuntary reactive movement of those

13  children?

14           I suggest that it will be something like this:  Oh,

15  Mr. Chandler, what is that?  What are you doing?  Not one

16  child has described anything like that.  Not one.  It would

17  be visceral, it would be immediate.  I don't care what your

18  IQ is, I don't care how clever you are, I don't care what

19  disabilities you have, it would be overwhelming and

20  involuntary and immediate.  Not one, not one.

21           Ladies and gentlemen, Mr. Chandler did not molest

22  any of these children.  The People have failed to keep their

23  burden of proving their case beyond a reasonable doubt.  Do

24  not convict an innocent man.  Thank you.

25           THE COURT:  Thank you, Mr. Madden.

26           Ladies and gentlemen, we're going to take the noon

27  recess at this time.  I will order all members of the jury to

28  report to the jury assembly room on the second floor at 1:30,

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1651

1   and at that time we'll continue with the closing remarks.

2           We'll be in recess.

3           (Whereupon, the Court took the noon recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1652

1          AFTERNOON PROCEEDINGS

2          THE COURT:  Thank you, ladies and gentlemen.  The

3   record will reflect all members of the jury are present, both

4   counsel are present, Mr. Chandler is present as well.

5          And as I understand it, Mr. Madden, you wanted to

6   resume your closing remarks?  You had a few comments you

7   wanted to make?

8          MR. MADDEN:  Thank you, Your Honor.

9          THE COURT:  Okay.

10         MR. MADDEN:  Ladies and gentlemen, I apologize.

11  There was one subject I didn't cover this morning that I

12  wanted to cover.  It will take a couple of minutes.  That's

13  the subject of the DNA.  The two stains on these two chairs

14  contain semen, no other bodily fluid, and it's Mr. Chandler's

15  semen.  I disagree with Ms. Filo concerning Ms. Cardosa.

16  Ms. Cardosa said that the one particular stain did not appear

17  to be a transfer stain, but scientists would never make an

18  absolute statement that it wasn't a transfer stain.  She said

19  it doesn't appear to be because there were droplets.

20         The most important part of her analysis, however,

21  has less to do with the transfer stain than the fact there

22  was no saliva found in either stain.  What that means is very

23  clear, and it is this, that semen was never in the mouth of

24  any child.  Otherwise, there would be saliva in that stain --

25  in those stains, and it's not there.

26         MS. FILO:  Objection, Your Honor.  That misstates

27  the evidence.  May we approach?

28         THE COURT:  Yes.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1653

1        (Whereupon, there was a discussion at the bench.)

2        MR. MADDEN:  Let me restate that, ladies and

3   gentlemen.  There is no mixture of other DNA in that stain.

4   There are no other epithelial cells saliva from --

5        MS. FILO:  Objection, Your Honor.

6        THE COURT:  The last comment is stricken.

7        Ms. Filo, do you wish to give rebuttal at this

8   time?

9        MS. FILO:  Thank you.

10       So, rebuttal is really my opportunity to talk to

11  you about what it is the defense attorney has raised.  It's

12  really my opportunity to respond to what he's tried to argue

13  to you.  It's always hard for me to organize because now I'm

14  responding to them instead of using my own format.

15       But I want to start exactly where he started,

16  because I think it's the clearest way to talk about what 90

17  percent of the closing argument from the defense was all

18  about, and it's about their expert.  I want you to remember

19  and start with the premise that this man was paid $20,000 to

20  come and talk to you; 20K.  That's an insane amount of money

21  to give an opinion that lasted, what, three hours?

22       He talked to you about core versus secondary facts.

23  Okay.  By the time that guy was done testifying, I had no

24  idea what a core fact was and what a secondary fact was,

25  because he started by telling us that core facts were who,

26  what, where, how often, and what it felt like.  But they were

27  all consistent about that; right?

28       What he says is that kids will remember traumatic

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1654

1   events, they won't have those kinds of inconsistencies.

2   Well, first of all, they don't know it's a traumatic event.

3   They are blindfolded.  That's the whole problem.  And for

4   $20,000 he comes up with those kinds of inconsistencies.

5   Isabell said it was round, in another interview she said it

6   was round, and in a third statement she said it was curved.

7   I mean, I racked my brain to think of an item that is round,

8   but not curved.

9        Isabell said it tasted like strawberry.  Really,

10  Doctor?  Because I spent my whole lunch hour looking through

11  that transcript, my entire lunch hour looking just for the

12  word "strawberry."  I couldn't find it.  For $20,000, you

13  can't even quote her interviews properly?  There is a

14  transcript.  It's in writing.

15       He identifies as an inconsistency.  Laurie said,

16  Well, I told my mom in a first interview.  Told my mom in a

17  second interview.  Seven months later, she says, I don't

18  remember telling my mom.  I don't remember if I told my mom.

19  So?  Don't we just -- I mean, don't we assume that's just a

20  child who doesn't remember telling her mom?  No, no, no.  To

21  Dr. O'Donohue, that's now a primary inconsistency.  I'm

22  sorry, I thought primary core facts were:  who, what, where,

23  when, and how?  That's what I thought the primary

24  inconsistencies were.

25       Arleth wasn't asked what she saw under the

26  blindfold.  Really?  Dr. O'Donohue, were you not provided

27  with the picture that she drew of what appears to be

28  testicles with hair surrounding it?  Were you not given that

1    picture?  No, Counsel.  I don't think I have ever seen this

2    before.  Huh.

3            Whether the item made Isabell choke.  Again, this

4    is one of his primary core inconsistencies.  Well, Doctor, if

5    I told you that Luisana has said that if she ever said that

6    to anyone, she was just mistaken.  She has always meant to

7    say that, and that is what Isabell has always said, was that

8    the item made her choke.  Yes, that would clear up that

9    inconsistency.  Oh.

10           So, Mr. Madden suggests to you that Dr. Lynn just

11   doesn't really want to know the truth because she doesn't ask

12   for all of those other reports.  She doesn't ask for police

13   reports, things like that.  But, Dr. O'Donohue never met the

14   kids.  How can you possibly talk about whether a child is

15   telling you the truth when you've never met them?  He never

16   even asked to meet with them.  Why?  Well, that wasn't part

17   of my assignment.  99 percent of his work is for the defense

18   bar.  He knows who pays his mortgage.

19           Never reviewed any of the drawings by Arleth.

20   Never.  Never given information about the semen in the

21   classroom.  I mean, you're talking about information that is

22   central to this case, and you're not given possibly the

23   single, most important piece of evidence in this case?

24           Dr. Lynn's job, what she told you is, I saw Laurie

25   in order to find out what happened to her.  That's my only

26   role, is just to find out from this child what's happened.

27           Dr. O'Donohue's job is to criticize the

28   investigation on behalf of the defendant.  It's not to get at

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1656

1    the truth.  It's not to find out what happened.  It's to

2    criticize the investigation, and he's being paid handsomely

3    to do it.

4         What Mr. Madden's closing argument really talked

5    about were inconsistencies.  There is actually a jury

6    instruction, it will be in your packet.  You will be able to

7    see it when you go back into the jury room.

8         Do not automatically reject testimony just because

9    of inconsistencies or conflicts.  Consider whether the

10   differences are important or not.  People sometimes honestly

11   forget things or make mistakes about what they remember.  Two

12   people may witness the same event, yet hear it or see it

13   differently.

14        I will suggest this to you, wouldn't it be more

15   concerning to you if the children came in robotically and

16   said the same thing over and over and over and weren't able

17   at any level to expand, give any greater detail?  Wouldn't it

18   be more coached if they were said:  Here, baby, say this.

19   Make sure you get these words in.  In always say the same

20   thing.  That's what a coached witness sounds like.  These are

21   children.

22        You are responsible for deciding whether or not

23   there are inconsistencies.  It is incredibly difficult for me

24   to sit in my chair and maintain my composure when the defense

25   is talking to you about inconsistencies in this trial that

26   never occurred.  No child at any time in this trial has ever

27   said that anything tasted like smoke.  I don't know where

28   that came from.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1657

1    Isabell has never, never in an interview with Det.

2  Pierce said that the item tasted like strawberry.  She hasn't

3  said that.  These things are inaccuracies.  He's asking you

4  to read things into this trial and read things into the

5  record that didn't happen.  You are the sole judges of what

6  is or isn't an inconsistency and whether or not it ever even

7  happened in this record.

8    What about those consistencies?  None of what he's

9  talked about actually suggest that these children weren't

10  assaulted.  Nothing.  Not a single inconsistency that the

11  defense has identified would suggest these children were not

12  assaulted.  Not one.

13    They give an amazing amount of detail to describe

14  an object they've never seen.  There is no evidence that

15  these children even know what this item is.  What's shocking,

16  I mean, really, if you think about it, is that they give

17  those descriptions and you know what they are talking about.

18  You know.  You know exactly what they are talking about.

19  Even in their young words, with their level of cognitive

20  development, they are able to communicate consistently and

21  repeatedly and they are able to tell you what it was.  They

22  just don't have anything to compare it to.  How could you

23  compare an adult penis to anything that a seven-year-old has

24  ever put in their mouth?

25    Impoverished details.  I mean, I want you to think

26  about an important event in your life.  I usually think

27  about, you know, the birth of my child.  And, I mean, I

28  remember some things really very clearly.  I remember being

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1658

1  in the hospital.  I remember my OBGYN was there.  I remember
2  my husband was there.  I'm 100 percent confident that the
3  anaesthesiologist was male.  If you asked me if he had hair,
4  no hair, blond hair, brown hair, I have no idea.  I have no
5  idea.  I don't know what color my hospital gown was.  I don't
6  know how long I was in there.  I have no idea any of those
7  facts, but I am 100 percent confident that I left that
8  hospital with my baby.  That, I know.  You remember the
9  details that are important to you.
10        Now, imagine you have to remember those details
11  without the benefit of your sight.  It's suggested that we
12  should have gotten a free-flowing narrative from a
13  seven-year-old.  Have you tried to have a conversation with a
14  seven-year-old?  I mean, I asked my seven-year-old:  Hey,
15  what did you do at school?  Let me tell you what kind of
16  shoes Janie was wearing, what kind of pants I want to get
17  tomorrow.  I mean, these are the things that are important to
18  them.  It is not possible to have a free-flowing narrative
19  with a seven-year-old or eight-year-old child about an event
20  that happened two years ago to them.  It's just not possible.
21        You have to ask children the right question.  Mr.
22  Madden's very offended that Isabell had never before said
23  that after this event she heard a zipper.  Never asked.  She
24  was never asked.  Found it.  It's here.  On page 13 of her
25  transcript, Det. Pierce asks her, "And before he puts it in
26  your mouth, do you hear anything?"  And she says, "No."
27  "Could you hear him do anything?"  "No."  See, nobody ever
28  asked her about after.

1    This is a true story.  My nephew came home from

2  school and he's got a Band-Aid on his finger.  He tells my

3  sister that Jeremy bit him.  So my sister says, That seems

4  bad.  What did you do to Jeremy?  And he says, Well, I put my

5  finger in Jeremy's face.  Why did you do that?  I don't know.

6  I just wanted to.  So my sister, of course, can't remember

7  who Jeremy is, calls me and has my nephew explain to me what

8  the -- my nephew had done.  Don't put your finger's in

9  people's faces anymore.  It's not a good thing to do.  Okay,

10  Auntie, I won't.

11    Next day, we all get the class picture, we all sit

12  around Trevor, Which one is Jeremy?  Jeremy is not there.

13  What do you mean Jeremy is not there?  He's not there.  He's

14  not in the picture.  Third day, Okay, Trevor, I want you to

15  go to school, you need to apologize to Jeremy.  You need to

16  tell Jeremy, I'm sorry that I put my finger in your face and

17  I won't do it anymore.  Okay?

18    Comes home.  Third day, Do you apologize to Jeremy?

19  Yes.  What did Jeremy say?  Jeremy does not speak.  Jeremy is

20  non-verbal?  What do you mean Jeremy doesn't speak?  What did

21  Jeremy say when you said, I'm sorry?  Well, Jeremy doesn't

22  speak.  Jeremy is the hamster.

23    See, you have to ask the right questions of

24  children or they won't give you the information.  They're not

25  trying to trick you.  They're not trying to hide something

26  from you.  They are responding to your questions, and if you

27  don't ask the right question, they won't give you the

28  information.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1660

1    Mr. Madden's suggestion of how someone would react

2  to an act of oral copulation is exaggerated, unrealistic, and

3  frankly offensive.  I'm going to go out on a limb here and

4  say, I don't think he has any idea how someone reacts to an

5  act of oral copulation.

6    He wants to talk to you about details that don't

7  make sense.  Like, he didn't tell them not to tell anyone.

8  He says, Well, where is the child porn?  Right.  We did this

9  forensic interview of the phone, where is all this child

10  porn?  Good question.  Where are the texts?  Annie tells you

11  that they spent quite some time texting back and forth.

12  Didn't find those either.  They are not there.  What happened

13  to them?  I'm going to guess anything that he didn't want us

14  to find wasn't there.

15    He isolates the children.  He says, Well, of

16  course, he really didn't because that door could have been

17  opened or the door -- the adjoining door.  You know, that's

18  very sloppy.  Well, it's really not that sloppy.  He never

19  got caught.  Not once.  Let's be clear, the defense in this

20  case is not that these incidents didn't occur at all.  It's

21  just that it wasn't his penis.  I mean, it's not like

22  somebody walked into his classroom and said, Hey, probably

23  not a good idea to be giving a Snickers bar to a kid.  He

24  never got caught.  So either that door was locked or he knew

25  he was safe.  It's not like anybody even found him doing

26  anything innocent.

27    So the other thing I will suggest to you is this.

28  When you talk about details that don't make sense in the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1661

1   context of committing a crime, I will tell you my one other

2   favorite story.  I had a witness on the stand once, Kevin

3   Abrazeme (phonetic) from the San Jose Police Department.  He

4   was excellent.  He's being ripped by the defense attorney:

5   Are you seriously telling me that my client gave you consent

6   to search the glove box, knowing that he had 15 bindles of

7   heroin in there?  Sergeant Abrazeme looked at him and said,

8   "Sure.  We don't catch the smart ones."  Not suggesting to

9   you that Craig Chandler was smart about any of this.  This is

10  all absurd, that none of us could even imagine happening.

11  But don't think that just because he got a little sloppy,

12  that he didn't do what he's accused of doing.  It's how he

13  got caught doing what he was doing.

14          So let's talk about the details that do make sense.

15  Dr. O'Donohue did actually give us a little bit of

16  information about some of these things.  Child molesters

17  don't want to get caught, so they create games.  They create

18  stories.  Plausible deniability they call it; right?  The

19  horsy game, the tickle game, the blindfold game, it's a way

20  that you could explain your conduct.

21          You choose your victims very carefully; right?  All

22  of these little girls are remarkably similar; right?  All

23  same age group, same basic size, relatively meek, not super

24  outspoken, all good girls.

25          He's in the classroom with the door locked to give

26  him access to them, he blindfolds them so they can't see and

27  describe what's happening to them, and he desensitized them

28  by exposing them to a blindfold in a neutral setting; right?

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1662

1   I mean, I say we don't catch the smart ones, but actually,

2   this is pretty well thought out; right?  This is someone who

3   has planned his ultimate capture.  This is someone who's

4   actually planned that far ahead and has desensitized these

5   children to this happening so that they won't cry, they

6   couldn't scream out, they won't tell anybody.  They don't

7   know they have anything to tell.

8          Five girls.  Mr. Madden won't call them a liar, but

9   that's exactly what he's doing.  You would have to believe

10  that these children came in here and lied to you in order to

11  acquit this man.  It's easier to criticize the investigation

12  or parents.  Don't call little girls liars.  It's not a good

13  strategy.  Rely on the defense expert's report.  For $20,000,

14  we got to figure he could come up with something.

15         Facts that you just can't teach.  How do they come

16  up with the same thing?  But how do they all know to describe

17  it as round?  As gooey?  I couldn't close my mouth around it?

18  Something -- I mean, how do they all know to have the same

19  description?

20         These are girls that come from two separate class

21  years.  I mean, to suggest that these girls have made this up

22  for what?  Because they are motivated by money because they

23  filed civil lawsuits?  I mean, these parents have allowed

24  their children to go through this horrible process, this

25  process is horrible for children, to set them up to be

26  victims?  Every statement they gave was made before any

27  lawsuit was filed.

28         You know, there was a principal at this school on

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1663

1  actual notice that this was going on.  This is blood curdling

2  anger.  She could have stopped this.  This woman did nothing.

3  It's outrageous.  It's criminal.  She did nothing to stop

4  this.  She didn't report it to anyone.  Of course, they are

5  suing.

6  And Mr. Madden wants to talk to you about the notes

7  she created later.  You mean, after everybody gets in a

8  storm?  After everybody knows they are going to get sued?

9  Those are the notes that are more reliable as opposed to the

10  ones that she's taking with the child standing right in front

11  of her, handwriting down in quotations.  You'll notice those

12  second notes are not in evidence.  They are not going with

13  you to the jury room because they are not reliable.

14  He wants to suggest to you that this is a valid

15  lesson plan.  Where are the boys?  I mean, he actually put on

16  a defense; right?  We marched, what, eight little boys in

17  here.  I had one question for each of them:  "Did he ever

18  pull you into your room all by yourself and put something in

19  your mouth, have it choke you a little, push your head back

20  and forth?  Did that ever happen to you?"  "No, Ms. Filo,

21  that didn't happen."  "Okay, Marcus.  Thank you very much for

22  coming in."  Where are the boys that he had to do this with?

23  What's the thing?  What is it?  Has a

24  constitutional right not to testify, but he put on a defense.

25  He put on witnesses.  Where is the child who was, like, you

26  mean, the whatever?  Well, that makes sense, then we would

27  all understand it.  Where is that child?  We interviewed 77

28  children from his classroom.  He has all of that information.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1664

1   If a single one of them could give any plausible explanation

2   of what was put in those five children's mouth, they will be

3   in here.  You would have heard from them.

4          There is no evidence in this record at all that the

5   crime laboratory could test for saliva.  No evidence in the

6   record at all.  I will tell you what is in the record, that

7   Craig Chandler's semen is found on one spot on SYO-01,

8   confirmed on one spot on SYO-02, and presumptively confirmed

9   on four other spots on that chair.

10          I'm going to leave with you two final thoughts:

11   First, what are the chances?  I mean, what are the chances?

12   Statistically, how many classrooms across the country do you

13   think have the teachers sperm in them?  I mean, I could only

14   pray that it's one.  I mean, a second-grader's classroom with

15   the teacher's sperm in it, I mean, it's inconceivable to most

16   people.  And that happens to be the one teacher that these

17   five little girls come in and say, "He put something in my

18   mouth."  What are the chances of that?  Zero.  I submit to

19   you that there is no other reasonable explanation to any of

20   the evidence that you have heard.  None that will explain

21   this conduct.

22          So you're left with this, and it is the thing that

23   has always concerned me the most about this particular case.

24   What happened in this case is unimaginable; it's horrifying.

25   People do not want to believe that this happens.  They don't

26   want to believe it.  We don't want to believe that we send

27   our children into the hands of monsters like that.  It's

28   horrifying, but it happens.  Sean Pierce looks like that

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1665

1  because he buys and sells children for sex.  This happens.

2  It happens in the most horrifying and awful places

3  unimaginable.  No one wants to believe that the monsters walk

4  amongst us, but they do.

5       I started this case by telling you that Craig

6  Chandler was a wolf in sheep's clothing.  He's not anymore.

7  He's just a wolf.  Thank you.

8       THE COURT:  Thank you, Ms. Filo.

9       Ladies and gentlemen of the jury, I have one final

10  instruction to read to you.  That's page 33 on your packet.

11  It's CALCRIM 3550, which I'll read to you at this time.

12       When you go to the jury room, the first thing you

13  should do is choose a foreperson.  The foreperson should see

14  to it that your discussions are carried on in an organized

15  way and that everyone has a fair chance to be heard.

16       It is your duty to talk with one another and to

17  deliberate in the jury room.  You should try to agree on a

18  verdict if you can.  Each of you must decide the case for

19  yourself, but only after you have discussed the evidence with

20  the other jurors.  Do not hesitate to change your mind if you

21  become convinced that you are wrong.  But do not change your

22  mind just because other jurors disagree with you.

23       Keep an open mind and openly exchange your thoughts

24  and ideas about this case.  Stating your opinions too

25  strongly at the beginning or immediately announcing how you

26  plan to vote may interfere with an open discussion.

27       Please treat each other with consideration.  Your

28  role is to be an impartial judge of the facts, not to act as

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1666

1    an advocate for one side or the other.

2              As I told you at the beginning of the trial, do not

3    talk about the case or about any of the people or any subject

4    involved in it with anyone, including, but not limited to,

5    your spouse or other family, or friends, spiritual leaders or

6    advisors, or therapist.  You must discuss the case only in

7    the jury room and only when all jurors are present.  Do not

8    discuss your deliberations with anyone.  Do not communicate

9    any electronic device during your deliberations.

10             It is very important that you not use the Internet

11   or any other source in any way in connection with this case

12   during your deliberations.

13             During the trial, several items were received into

14   evidence as exhibits.  You may examine whatever exhibits you

15   think will help you in your deliberations.  These exhibits

16   will be sent into the jury room with you when you begin to

17   deliberate.

18             If you need to communicate with me while you are

19   deliberating, send a note through the bailiff, signed by the

20   foreperson or by one or more members of the jury.  To have a

21   complete record of this trial, it is important that you not

22   communicate with me except by written note.  If you have

23   questions, I will talk with the attorneys before I answer, so

24   it may take some time.  You should continue your

25   deliberations while you wait for my answer.  I will answer

26   any questions in writing or orally here in open court.

27             Do not reveal to me or anyone else how the vote

28   stands on the question of guilt or other issues in this case

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1667

1  unless I ask you to do so.

2          Your verdict on each count and any special findings

3  must be unanimous.  This means that, to return a verdict, all

4  of you must agree to it.  Do not reach a decision by the flip

5  of the coin or any similar act.

6          It is not my role to tell you what your verdict

7  should be.  Do not take anything I said or did during the

8  trial as an indication of what I think about the facts, the

9  witnesses, or what your verdict should be.

10          You must reach your verdict without any

11  consideration of punishment.

12          You will be given verdict forms.  As soon as all

13  jurors have agreed on a verdict, the foreperson must date and

14  sign the appropriate verdict forms and notify the bailiff.

15  If you are able to reach a unanimous decision on only one or

16  only some of the charges, fill in those verdict forms only

17  and notify the bailiff.

18          Return any unsigned verdict forms.

19          Ladies and gentlemen of the jury, in just a moment,

20  you will be escorted into the jury room where you'll begin

21  your deliberations.  We will send in the exhibits as soon as

22  possible.  It will be shortly after you leave.  We will also

23  send verdict forms in there after as well.

24          I want to go off the record briefly to talk about

25  your schedule.

26          (Whereupon, there was a discussion off the record.)

27          THE COURT:  We will swear in the deputy at this

28  time.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1668

1            (Whereupon, the Deputy was sworn to take charge of

2     the jury.)

3            THE COURT:  To our four alternate jurors, the jury

4     is now deliberating, but you are still alternate jurors and

5     are bound by my earlier instructions about your conduct.

6            Do not talk about the case or about any of the

7     people or any subject involved in it with anyone, not even

8     your family or friends and not even with each other.

9            Do not have any contact with the deliberating

10    jurors.

11           Do not decide how you would vote if you were

12    deliberating.

13           Do not form or express an opinion about the issues

14    of this case unless you are substituted for one of the

15    deliberating jurors.

16           I'm going to go off the record briefly with the

17    four remaining jurors.

18           (Whereupon, there was a discussion off the record.)

19           THE COURT:  The Court's had an off-the-record

20    discussion with our four alternate jurors.  Each juror has

21    represented to the Court that they want to be on telephone

22    standby, and they will be on call and appear in court within

23    a reasonable period of time if their presence is required.

24    All four have requested to be present for the verdicts if and

25    when they are rendered.

26           So, all four jurors, now that you have given us

27    your contact information, you are free to leave, but you are

28    ordered to be on telephone standby between 9 and 5.  You are

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1669

1    welcome to call the court at any time if you are wondering

2    what is going on or if there is a status.  Feel free to call

3    us.  Okay?  Otherwise, you are all free to leave.  Thank you

4    very much.

5            The record will reflect that the four additional

6    jurors have left the courtroom.  All members of the jury are

7    now out of the courtroom.  Counsel and Mr. Chandler are

8    present.

9            I just handed proposed verdict forms to Ms. Filo,

10   and I'm going to ask both counsel to take a look at them.

11   And if they are comfortable with the verdict forms, we'll

12   send them into the jury.  If they are not, we'll discuss it

13   further.

14           I'm going to ask the lawyers to be on telephone

15   standby as well.  If you give us your contact numbers, you're

16   free to leave.  As I hope you both know, if there is a

17   question from the jurors -- excuse me.  If there is a

18   question from the jury, I will contact both counsel and share

19   with you what the question is.  And depending on the nature

20   of the question, we could decide when we contact you whether

21   your presence will have to be here or not.  Some things could

22   be taken care of over the phone.  And -- off the record.

23           (Whereupon, there was a discussion off the record.)

24           THE COURT:  Counsel is looking over the verdict

25   forms.  Is there anything further we need to address before

26   we recess?

27           MR. MADDEN:  No, Your Honor.

28           MS. FILO:  No, Your Honor.  The verdict forms look

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1670

1   fine to me.

2            THE COURT:  You've shown Mr. Madden?

3        MR. MADDEN:  I'm good.

4            THE COURT:  Okay.  Thank you.  We'll be in recess

5   at this time.

6            (Whereupon, the Court recessed.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1671

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA CLARA    )

 3

 4            I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

 5            The foregoing is a full, true, and correct

 6   transcript of the testimony given and proceedings had in the

 7   above-entitled action taken on the above-entitled date; that

 8   it is a full, true, and correct transcript of the evidence

 9   offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and official

13   stenographic reporter of said Court, and thereafter had the

14   same transcribed into typewriting as herein appears.

15            I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted if applicable.

18

19            Dated:

20

21                          _____

22                              Jamie L. Mixco, C.S.R.
                                Certificate No. 12708
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."
```

# EXHIBIT 3
# (Vol. 19)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1672

1        TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2             SIXTH APPELLATE DISTRICT

3

4                  ---o0o---

5

6  THE PEOPLE OF THE STATE OF    )
   CALIFORNIA,                )

7                      )
       Plaintiff - Respondent,  )

8                      )
       v.               )    No. C1223754

9                      )
   CRAIG RICHARD CHANDLER,      )

10                    )
       Defendant - Appellant.  )

11  _____/   COPY

12

13

14                  VOLUME 19

15              PAGES 1672 - 1685

16             AUGUST 1, 2013

17

18                  ---o0o---

19          REPORTER'S TRANSCRIPT ON APPEAL
       FROM THE JUDGMENT OF THE SUPERIOR COURT

20          OF THE STATE OF CALIFORNIA
      IN AND FOR THE COUNTY OF SANTA CLARA

21   BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

22

23                  ---o0o---

   APPEARANCES:

24

25  FOR PLAINTIFF-RESPONDENT:    OFFICE OF THE ATTORNEY GENERAL
                          BY:  KAMALA D. HARRIS,

26                        Attorney General of the State
                        of California

27

28  FOR DEFENDANT-APPELLANT:     In Propria Persona

JAMIE L. MIXCO, C.S.R. NO. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1673

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

DEPARTMENT NO. 37

---o0o---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| PLAINTIFF, | ) ) ) | |
| v. | ) ) | CASE NO.  C1223754 |
| CRAIG RICHARD CHANDLER, | ) ) ) ) | |
| DEFENDANT. | ) ) / | |

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

AUGUST 1, 2013

---o0o---

APPEARANCES:

FOR THE PEOPLE:                 ALISON FILO
                               Deputy District Attorney


FOR THE DEFENDANT:             BRIAN MADDEN
                               Attorney at Law

OFFICIAL COURT REPORTER:       JAMIE L. MIXCO
                               C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1674

1   San Jose, California             August 1, 2013

2                      PROCEEDINGS

3        THE COURT:  We'll go on the record on the matter of

4   the People v. Chandler.  Record should reflect all 12 jurors

5   who are deliberating are present in the courtroom.  I brought

6   you out here because the jury room is a little tight and I

7   just thought it might be more comfortable.

8        I have read and considered your question.  I called

9   the attorneys.  They both came down here.  We discussed your

10   question and they both agreed that they would waive their

11   appearances and Mr. Chandler's appearance, and based on our

12   discussions, allow me to answer your question.  And I told

13   them specifically what I was going to say to you, and they

14   were in agreement with it.

15        First of all, I want to indicate that Penal Code

16   §667.61(e) says the following:

17        The defendant has been convicted in the present

18   case of committing an offense specified in (c) against more

19   than one victim.  667.61(c) simply lists the type of offenses

20   that apply to 667.61(e).  The crimes charged in this case,

21   the Penal Code §288(a), is a crime that's listed in

22   667.61(e).

23        Now, the attorneys indicated they were comfortable

24   with me giving you an example of what this means because this

25   is the law.  In a case where you have five charges, like in

26   our case, and these are hypotheticals, if you found a

27   defendant guilty of Count 1 that involved Isabell, let's say,

28   and not guilty of Counts 2, 3, 4, and 5, which involved four

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1675

1  different victims, then the multiple victim allegation

2  wouldn't apply because we only have one Isabell.  If the jury

3  found the defendant guilty of Counts 1 and 2, Isabell and I

4  will say just Becky, because I don't remember the names off

5  the top of my head, and not guilty of 3, 4 and 5, well, then

6  the multiple victim would apply to Counts 1 and 2 because you

7  have two victims, multiple victims.

8          Another example.  Hypothetically, let's say you

9  have five charges of 288(a) and the Victim A was charged in

10  Counts 1 and 2, and Victim B was charged in Counts 3, 4 and

11  5, and you found the defendant guilty of Counts 1 and 2 and

12  not guilty of 3, 4 and 5, you have one victim, Victim A.  So

13  it wouldn't apply in that case, the allegation.

14          If you found the person guilty of Counts 1 and 2 of

15  A, Count 3 of Victim B, and not guilty of the rest of the

16  counts, well, you have multiple victims, it would apply to

17  Counts 1, 2 and 3.

18          Does that kind of clear up your question and if I

19  answered it?  Once -- and I see some jurors nodding their

20  head.  Once you get back into the jury room, if there is

21  still some confusion, if you would just send me another

22  question written formally try to clarify it again.  Okay?

23          JUROR NO. 12:  Your Honor, it is preliminarily an

24  issue of multiple victims --

25          THE COURT:  Right.

26          JUROR NO. 12:  -- in this case.

27          THE COURT:  In this case, right.  And your question

28  about multiple counts was an excellent question because there

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1676

1  was confusion, I think, because it wasn't very clear.

2         Now, what I'm going to is ask you to go back in the

3  jury room to deliberate, and just so you know, my court

4  reporter is going to read back to the lawyers exactly what I

5  told you, plus your follow-up questions.  And if they believe

6  I said anything that was inaccurate or incorrect, I will

7  bring you back immediately and clarify that.  Okay?  Thank

8  you very much.

9         (Whereupon, the Court recessed.)

10        THE COURT:  Let's go on the record.  The record

11  will reflect that the jury went back into the jury

12  deliberation rom.  Both counsel are here.  One thing I didn't

13  discuss with you, Counsel, I told the jury that I discussed

14  this with you, and with your agreement, I am going to answer

15  your question orally in court without their presence.  They

16  both waived their appearance, as well as Mr. Chandler's

17  appearance, and you did not specifically say that, Mr.

18  Madden, but I --

19        MR. MADDEN:  Had you asked, I would have.

20        THE COURT:  I assumed his presence was waived as

21  well.  My court reporter is going to pull up what I told them

22  and going to read it back to you.  And I told the jurors that

23  this was going to occur.  If I said anything that was

24  inaccurate, not correct based on our discussions, the lawyers

25  will point it out to me and I will clarify it immediately.

26        There was a follow-up question, took me by

27  surprise.  Juror No. 12 said basically this allegation deals

28  primarily with just multiple victims, and I said yes.  Okay?

1   My exceptional court reporter is going to pull this up and

2   read it back to you.

3        (Whereupon, the Court recessed.)

4        THE COURT:  Thank you, ladies and gentlemen.  The

5   record will reflect all members of the jury are present, both

6   counsel are present, Mr. Chandler is present.

7        It's my understanding that the jury has reached a

8   verdict; is that correct?  Who is the foreperson?  That's

9   Juror No. 3.  Is that correct, jury has reached verdicts?

10        JUROR NO. 3:  Yes, Your Honor.

11        THE COURT:  Would you please hand the verdicts --

12   you already handed the verdicts to my deputy.  Thank you very

13   much.

14        At this time, I'll ask our clerk to please read the

15   verdicts.

16        THE CLERK:  In the Superior Court of California,

17   county of Santa Clara, case number C1223754, People of the

18   State of California v. Craig Richard Chandler, verdict of the

19   jury:

20        Count 1, we the jury, in the above-entitled cause,

21   find the defendant, Craig Richard Chandler, guilty of lewd

22   and lascivious act on a child under 14, in violation of Penal

23   Code §288(a), a felony, as charged in the Information.  Dated

24   August 1, 2013.  Signed by the foreperson.

25        In the same court and cause, allegation to Count 1:

26        We, the jury, having found the defendant, Craig

27   Richard Chandler, guilty of the crime of lewd and lascivious

28   act on a child under 14, as charged in Count 1, further find

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1678

1    the allegation, that the defendant has been convicted in the

2    present case or cases of committing an offense specified in

3    (c) against more than one victim, within the meaning of Penal

4    Code §667.61(b) and 667.61(e) to be true.  Dated August 1,

5    2013.  Signed by the foreperson.

6            In the same court and cause, Count 2, verdict of

7    the jury:

8            We, the jury, in the above-entitled cause, find the

9    defendant, Craig Richard Chandler, guilty of lewd and

10   lascivious act on a child under 14, in violation of Penal

11   Code §288(a), a felony, as charged in the Information.  Dated

12   August 1, 2013.  Signed by the foreperson.

13           The same court and cause, allegation Count 2:

14           We, the jury, having found the defendant, Craig

15   Richard Chandler, guilty of the crime of lewd and lascivious

16   act on a child under 14, as charged in Count 2, further find

17   the allegation, that the defendant has been convicted in the

18   present case or cases of committing an offense specified in

19   (c) on more than one victim, within the meaning of Penal Code

20   §667.61(b) and 667.61(e) to be true.  Dated August 1, 2013.

21   Signed by the foreperson.

22           In the same court and cause, verdict of the jury,

23   Count 3:

24           We, the jury, in the above-entitled cause, find the

25   defendant, Craig Richard Chandler, guilty of lewd and

26   lascivious act on a child under 14, in violation of Penal

27   Code §288(a), a felony, as charged in the Information.  Dated

28   August 1, 2013.  Signed by the foreperson.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1679

1          In the same court and cause, allegation to Count 3:

2          We, the jury, having found the defendant, Craig

3     Richard Chandler, guilty of the crime of lewd and lascivious

4     act on a child under 14, as charged in Count 3, further find

5     the allegation, that the defendant has been convicted in the

6     present case or cases of committing an offense specified in

7     (c) against more than one victim, within the meaning of Penal

8     Code §667.61(b) and 667.61(e) to be true.  Dated August 1,

9     2013.  Signed by the foreperson.

10          In the same court and cause, verdict of the jury,

11     Count 4:

12          We, the jury, in the above-entitled cause, find the

13     defendant, Craig Richard Chandler, guilty of lewd and

14     lascivious act on a child under 14, in violation of Penal

15     Code §288(a), a felony, as charged in the Information.  Dated

16     August 1, 2013.  Signed by the foreperson.

17          In the same court and cause, allegation to Count 4:

18          We, the jury, having found the defendant, Craig

19     Richard Chandler, guilty of the crime of lewd and lascivious

20     act on a child under 14, as charged in Count 4, further find

21     the allegation, that the defendant has been convicted in the

22     present case or cases of committing an offense specified in

23     (c) against more than one victim, within the meaning of Penal

24     Code §667.61(b) and 667.61(e) to be true.  Dated August 1,

25     2013.  Signed by the foreperson.

26          In the same court and cause, verdict of the jury,

27     Count 5:

28          We, the jury, in the above-entitled cause, find the

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1680

1  defendant, Craig Richard Chandler, guilty of lewd and

2  lascivious act on a child under 14, in violation of Penal

3  Code §288(a), a felony, as charged in the Information.  Dated

4  August 1, 2013.  Signed by the foreperson.

5           In the same court and cause, allegation to Count 5:

6           We, the jury, having found the defendant, Craig

7  Richard Chandler, guilty of the crime of lewd and lascivious

8  act on a child under 14, as charged in Count 5, further find

9  the allegation, that the defendant has been convicted in the

10 present case or cases of committing an offense specified in

11 (c) against more than one victim, within the meaning of Penal

12 Code §667.61(b) and 667.61(e) to be true.  Dated August 1,

13 2013.  Signed by the foreperson.

14          Thank you, Mr. Clerk.

15          Ladies and gentlemen of the jury, at this time I'm

16 going to poll you.  I'm going to ask each juror one through

17 12 are these your verdicts.  Your response should be yes or

18 no.  I'm going to start with Juror No. One, are these your

19 verdicts?

20          JUROR NO. 1:  Yes.

21          THE COURT:  Juror No. 2, are these your verdicts?

22          JUROR NO. 2:  Yes.

23          THE COURT:  Juror No. 3, are these your verdicts?

24          JUROR NO. 3:  Yes.

25          THE COURT:  Juror No. 4, are these your verdicts?

26          JUROR NO. 4:  Yes.

27          THE COURT:  Juror No. 5, are these your verdicts?

28          JUROR NO. 5:  Yes.

1    THE COURT:  Juror No. 6, are these your verdicts?

2    JUROR NO. 6:  Yes.

3    THE COURT:  Juror No. 7, are these your verdicts?

4    JUROR NO. 7:  Yes.

5    THE COURT:  Juror No. 8, are these your verdicts?

6    JUROR NO. 8:  Yes.

7    THE COURT:  Juror No. 9, are these your verdicts?

8    JUROR NO. 9:  Yes.

9    THE COURT:  Juror No. 10, are these your verdicts?

10   JUROR NO. 10:  Yes.

11   THE COURT:  Juror No. 11, are these your verdicts?

12   JUROR NO. 11:  Yes.

13   THE COURT:  Juror No. 12, are these your verdicts?

14   JUROR NO. 12:  Yes.

15   THE COURT:  Thank you.  Court will order that the

16   verdicts read will be recorded at this time.

17          Ladies and gentlemen of the jury, I have one

18   additional instruction I will read to you.

19          You have now completed your jury service on this

20   case.  On behalf of all of the judges in this court, please

21   accept my thank you for your time and effort.

22          Now that the case is over, you may choose whether

23   or not to discuss the case and your deliberations with

24   anyone.  Let me tell you about some rules the law puts in

25   place for your convenience and protection.  The lawyers in

26   this case, the defendant, or their representatives may now

27   talk to you about the case, including your deliberations or

28   verdicts.  Those discussions must occur at a reasonable time

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1682

1  and place and with your consent.  Please tell me immediately

2  if anyone unreasonably contacts you without your consent.

3  Anyone who violates these rules is violating a court order

4  and may be fined.

5          I will order that the court's record of personal

6  juror identifying information, including names, addresses,

7  and telephone numbers be sealed until further order of this

8  court.

9          You have completed your service as jurors.  In a

10  moment I will be excusing you.  Before I do that, ladies and

11  gentlemen, I'm going to ask all jurors, all 16 of you, to

12  please follow Deputy Armenta.  He's going to escort you into

13  the jury room and get your personal belongings, whatever you

14  might have left in there.  I will bring you back and release

15  you in a few minutes.  Okay?  If you would please follow

16  Deputy Armenta.  You could come, I believe, right here in

17  front of the bench.  Just be careful that you don't trip over

18  anything, please.  Thank you.  Again, you are free to discuss

19  the case with anyone while your in there, including the

20  alternates.

21          The record will reflect the jury has exited the

22  courtroom.  Mr. Madden, it's my intent to refer this matter

23  to Adult Probation for a full probation report and have the

24  matter return for pronouncement of judgment on a Friday at

25  9:00 a.m.  Do you have a date you would request, Mr. Madden?

26          MR. MADDEN:  Um, sometime in mid- or late September

27  be acceptable?

28          THE COURT:  Yes.  Mr. Madden, I could set this

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1683

1  either on September 13th or September 27th.

2          MR. MADDEN:  Let's do the 27th.

3          THE COURT:  Okay.  And since you're requesting that

4  date, I'm assuming time for sentencing is waived.

5          Is that date acceptable to you, Ms. Filo?

6          MS. FILO:  It is, Your Honor.  Thank you.

7          THE COURT:  Okay.  Then the matter is set for

8  September 27th at 9:00 a.m. in this department for

9  pronouncement of judgment.  I will order both attorneys and

10  Mr. Chandler here on that date and time.

11          At this time, the Court will remand Mr. Chandler

12  into custody, no bail, and he may be removed from the

13  courtroom at this time.  Actually, we are going to be in

14  recess in a minute.  We're going to clear the courtroom, so

15  I'm going be asking all members of the public to leave the

16  courtroom since we're in recess, and that concludes this

17  matter.

18          Mr. Chandler is remanded into custody.  So the

19  Court is going to be in recess for a few minutes.  I did

20  communicate your request, Mr. Madden, to our deputy.  We'll

21  address that momentarily.

22          MR. MADDEN:  Fine.

23          THE COURT:  Okay.  So we'll be in recess.

24          MR. MADDEN:  You mean including his family?

25          THE COURT:  Yes, that's what I'm referring to.

26          MR. MADDEN:  Thank you.

27          (Whereupon, the Court recessed.)

28          THE COURT:  Record will reflect that Ms. Filo is

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1684

1  present, Officer Pierce is present, and the two chairs, which

2  are exhibits what?

3          THE CLERK:  10 and 11.

4          THE COURT:  10 and 11.  Court is going to take

5  photographs of both chairs and return both chairs to the San

6  Jose Police Department.

7          MS. FILO:  Please, Your Honor.

8          THE COURT:  And I'm going to order Officer Pierce

9  to return Monday by 5:00 o'clock to pick up the chairs.

10          DET. PIERCE:  Any time Monday?

11          THE COURT:  Any time Monday.  I would just suggest

12  that you call before you come so we're expecting you in case,

13  you know, everything is ready.  That will be the order.

14          (Whereupon, the Court recessed.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1685

1   STATE OF CALIFORNIA    )
                           )
2   COUNTY OF SANTA CLARA  )

3

4           I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5           The foregoing is a full, true, and correct

6   transcript of the testimony given and proceedings had in the

7   above-entitled action taken on the above-entitled date; that

8   it is a full, true, and correct transcript of the evidence

9   offered and received, acts and statements of the Court, also

10  all objections of counsel, and all matters to which the same

11  relate; that I reported the same in stenotype to the best of

12  my ability, being the duly appointed and official

13  stenographic reporter of said Court, and thereafter had the

14  same transcribed into typewriting as herein appears.

15          I further certify that I have complied with CCP

16  237(a)(2) in that all personal juror identifying information

17  has been redacted if applicable.

18

19          Dated:

20

21                         _____

22                         Jamie L. Mixco, C.S.R.
                           Certificate No. 12708
23

24  ATTENTION:
    CALIFORNIA GOVERNMENT CODE
25  SECTION 69954(D) STATES:

26  "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
    MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27  A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
    ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28  PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
    PERSON."

# EXHIBIT 3
# (Vol. 20)

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1686

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


---o0o---


THE PEOPLE OF THE STATE OF          )
CALIFORNIA,                         )
                                    )
      Plaintiff - Respondent,       )
                                    )
      v.                            )     No. C1223754
                                    )
CRAIG RICHARD CHANDLER,             )
                                    )
      Defendant - Appellant.        )
_____/

COPY


VOLUME 20

PAGES 1686 - ~~1706~~ 1705

NOVEMBER 22, 2013


---o0o---


REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY


---o0o---


APPEARANCES:


FOR PLAINTIFF-RESPONDENT:     OFFICE OF THE ATTORNEY GENERAL
                              BY:  KAMALA D. HARRIS,
                              Attorney General of the State
                              of California

FOR DEFENDANT-APPELLANT:      In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1687

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF SANTA CLARA

3    BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4    DEPARTMENT NO. 37

5    ---o0o---

6

7    THE PEOPLE OF THE
     STATE OF CALIFORNIA,            )
8                                    )
                    PLAINTIFF,       )
9                                    )        CASE NO.  C1223754
          v.                         )
10                                   )
                                     )
11   CRAIG RICHARD CHANDLER,         )
                                     )
12                                   )
                    DEFENDANT.       )
13   _____/

14

15

16

17   ---o0o---

18   REPORTER'S TRANSCRIPT OF PROCEEDINGS

19   NOVEMBER 22, 2013

20

21   ---o0o---

22

23

24   APPEARANCES:

25   FOR THE PEOPLE:              ALISON FILO
                                  Deputy District Attorney
26

27   FOR THE DEFENDANT:           BRIAN MADDEN
                                  Attorney at Law
28   OFFICIAL COURT REPORTER:     JAMIE L. MIXCO
                                  C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1688

1   San Jose, California                  November 22, 2013

2                     PROCEEDINGS

3        THE COURT:  Thank you, ladies and gentlemen.

4   Welcome to Department 37.  We'll call the matter of the

5   People v. Chandler.

6        Counsel, state your appearances for the record.

7        MR. MADDEN:  Brian Madden appearing for Mr.

8   Chandler, Your Honor.  He's present.

9        MS. FILO:  Good morning, Your Honor.  Alison Filo

10   for the People.

11        THE COURT:  Thank you.

12        Mr. Madden, before we proceed, is there any legal

13   cause why judgment should not now be imposed?

14        MR. MADDEN:  No, Your Honor.

15        THE COURT:  Do you waive formal arraignment for

16   pronouncement of judgment?

17        MR. MADDEN:  Yes, I do.

18        THE COURT:  Okay.  I'll note for the record that I

19   have reviewed and considered the probation report, all of the

20   documents filed by counsel --

21        MR. MADDEN:  May I interrupt, Your Honor?

22        THE COURT:  Yes.

23        MR. MADDEN:  Just so that I'm clear, I'm certain

24   that this is the case, but I want to ensure that the Court

25   has read my sentencing memorandum, that the Court also read

26   the character reference letters submitted by my client's

27   family and my client's letter.  They were sent to the

28   probation department on October 2nd, and I assume the Court

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1689

1  had a chance to see those.  And the third document that I

2  want to confirm the Court has read and reviewed is the

3  defense reply to the People's response to the defendant's

4  sentencing memorandum.

5  THE COURT:  Yes, Mr. Madden, I have read and

6  considered the probation report, the supplemental memos filed

7  by probation, the written statement by Mr. Chandler, the 18

8  character letters that were submitted on Mr. Chandler's

9  behalf by family members and friends, the sentencing

10  memorandum filed by yourself, the People's response, and your

11  reply.

12  MR. MADDEN:  Thank you.

13  THE COURT:  So I think I have read everything that

14  has been submitted to the court.

15  MR. MADDEN:  I believe that's an accurate statement

16  of the documents that were submitted.

17  THE COURT:  Thank you, Mr. Madden.

18  Is there any -- initially, any corrections to the

19  probation report?

20  MR. MADDEN:  I don't believe so, Your Honor.  Not

21  that are significant.

22  THE COURT:  Okay.

23  MS. SHANNON:  Good morning, Your Honor.  I have

24  updated custody credits if the Court would like those now?

25  THE COURT:  Yes, thank you.

26  MS. SHANNON:  As to Count 1, the defendant has 683

27  actual days, plus 102 days of 2933.1, for a total of 785

28  days.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1690

1          THE COURT:  Thank you, Ms. Shannon.

2          Ms. Filo, before I ask for comments by counsel, are

3   there any victims in the court that wish to address the

4   Court?

5          MS. FILO:  No, Your Honor.

6          THE COURT:  Okay.  Thank you.  Then I will invite

7   comments by counsel.

8          MR. MADDEN:  Thank you, Your Honor.

9          I won't go over the legal comments that I made in

10  my sentencing memorandum or my reply.  However, it is clear

11  that the law gives the Court discretion in this case.  And

12  not withstanding the People's position, the legislature, case

13  law, the courts, there is no -- there has been no previous

14  guidance to the courts in these matters that would suggest

15  that the Court could impose consecutive sentences.

16          Every matter is case specific.  I'm sure the Court

17  has read points and authorities on that, and the Court knows

18  that is the case.  But I think we have to look at the

19  realities of this case in terms of what any sentence means.

20  No matter what sentence the Court chooses, whether it's 15 to

21  life, 30 to life, 45 to life, 60 to life, or 75 years to

22  life, the Court indeed is giving a life sentence.  Period.

23  Certainly, if the Court imposes either 45 or 60 or 75 to

24  life, the reality of it is that Mr. Chandler at age 37 is

25  never going to be released from prison.

26          On the other hand, if the Court imposes either 15

27  or 30 years to life, there is that glimmer of hope that he

28  may be.  And I want to emphasize "may be" because there are

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1691

1  obviously two safeguards in place that will protect the

2  public, should the Court choose to either impose the sentence

3  of either 15 to life or 30 to life.

4          Those safeguards are these:

5          The first and the immediate safeguard is the Parole

6  Board.  Fifteen to life means that Mr. Chandler would not be

7  eligible for consideration for parole until he serves 85

8  percent of that 15 years.  He's now 37.  He would be 50 years

9  old at that time.

10          Likewise, if the Court imposes 30 years to life,

11  Mr. Chandler is now 37, will be 63 when he's first eligible

12  for consideration of parole.

13          The Court is well aware that the fact that a

14  life -- someone doing 15 or 30 to life is eligible for parole

15  does not mean they are going to be released at that minimum

16  eligibility date, and in fact history has indicated that that

17  never happens.  The Parole Board's in place to protect the

18  public.  Life sentence, they are never going to release

19  someone who they feel is a danger to the public.  If Mr.

20  Chandler never meets that threshold, not withstanding

21  receiving a 15 to life sentence, he's never going to be

22  released from prison.  That's the first safeguard that is

23  available.  There is a second one.

24          Should the Parole Board at some distant time in the

25  future decide to grant parole to Mr. Chandler, the People are

26  free to file an SVP petition in this court.  If they do so,

27  those proceedings will ensue.  There will be a trial on issue

28  of his dangerousness.  If he's found to be a danger by a

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1692

1  jury, then he will be incarcerated in the state hospital

2  potentially for the rest of his life.  In any event, until

3  the authorities decide that he's not a danger.

4       My point is, is that the public is protected even

5  on a 15 to life sentence.  More importantly or -- excuse

6  me -- equally importantly, if we look at Mr. Chandler's

7  history just in this case in terms of since he's been

8  incarcerated, he has been a model prisoner.  He has helped

9  other inmates incarcerated obtain their GED's.  Before this,

10  he was a teacher for 9 years.  No evidence of misconduct

11  until the period of time that surrounds this case.

12       Mr. Chandler has done many, many, many good things

13  in his life.  He chose a profession that is not financially

14  rewarding, as did his wife.  Mr. Chandler has indicated to

15  you in his statement, and I submit that he's being sincere

16  when he says, that when he is sentenced he's going to try to

17  lead the most productive life that he can while incarcerated.

18  That means taking advantage of whatever educational or

19  rehabilitation classes or courses are available to him, and

20  he's not going to give up.

21       I think if the Court imposes a sentence that gives

22  him a glimmer of hope there may be a day when he's released,

23  that will aid him in that effort, and I think others will

24  greatly benefit from that, not just his family and friends to

25  Mr. Chandler.  Again, there is no guarantee that he's going

26  to be released, and there are two very important safeguards

27  in place that ensure that he will never be released unless

28  the authorities find that he's no longer a danger.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)   1693

1          I will submit the matter at this point.  I will not

2    submit the matter, but I will defer to Ms. Filo at this

3    point.

4          THE COURT:  Thank you, Mr. Madden.

5          Ms. Filo.

6          MS. FILO:  Your Honor, I agree with counsel that

7    this court has the discretion to run these sentences either

8    consecutively or concurrently.  And that the Court does have

9    to employ a case-by-case analysis to determine whether or not

10   those sentences should be run consecutively or concurrently

11   in this particular case.

12         And when you think about the facts that played out

13   in this courtroom over the course of a month, I cannot

14   envision any case more deserving of consecutive sentences

15   than what we heard in this courtroom.  We heard testimony

16   from five individual victims, who were selected, chosen,

17   brought into a courtroom -- brought into a classroom,

18   blindfolded, and had unspeakable and horrific things done to

19   them by the defendant.  He put his penis in their mouths.  A

20   jury unequivocally found him guilty of those offenses.

21         Mr. Chandler may have done other good things in his

22   life, but they are wholly and entirely overshadowed by his

23   conduct in the charged counts that are before this court.

24   Mr. Chandler deserves to spend the rest of his life in

25   prison, and the single greatest way to ensure that is the

26   sentence that is issued by this court at this time.  There is

27   no reason to leave that determination to a future date to a

28   parole board or to a future SVP filing.  This court has both

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1694

1    the opportunity, and I believe the obligation, to accurately

2    reflect the conduct involved in this case, and this court has

3    the opportunity in this case to say this is that bad, this is

4    that horrible, and you deserve every single minute of time in

5    prison that I can give you.  And the People ask that you

6    issue that sentence.

7         THE COURT:  Okay.  Thank you.

8         Mr. Madden, any final comments?

9         MR. MADDEN:  Just a couple, Your Honor.

10        Mr. Chandler, as he sits before you today, he's 37

11   years old.  You're making a decision today that potentially

12   will prevent others from measuring who he is and his

13   dangerousness at some time in the future.  I think that will

14   be a terrible mistake.  It's unnecessary for the reasons I

15   previously stated.  The public will be protected.  This is

16   what the Parole Board does and that is what the SVP

17   proceedings are all about.

18        Should the Parole Board -- should the Court impose,

19   for example, a 15 to life sentence, and should the Parole

20   Board at some distant time in the future give him a date for

21   parole, because obviously that would mean they did not feel

22   he was a danger, the People, I would assume, would respond

23   with SVP proceedings.  And assuming that he was found not to

24   be SVP, at that point Mr. Chandler should be released because

25   both the Parole Board and the proceedings in this court,

26   should they be found not to be true, or should the People

27   fail to meet their burden of proof, at that point he should

28   be released.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1695

1        All I'm asking is for the Court to impose the

2   sentence to allow the possibility for others in the distant

3   future to conclude that he's salvageable, he's demonstrating

4   by years and years in prison that he should be released and

5   allowed to return to society, and that's the glimmer of hope

6   that I think is important.  I believe in redemption of human

7   beings.  I believe this court does also.

8        This case -- the worst of the worst cases, Your

9   Honor, are cases that involve force and violence.  This is

10  not a case about force and violence.  Force and violence

11  cases mandate consecutive sentences; non-forcible cases

12  don't.  I don't believe the Court is taking any danger or any

13  risk by imposing a sentence that gives Mr. Chandler hope,

14  glimmer of hope and encouragement to live a productive life

15  in prison.  Thank you.

16        THE COURT:  Ms. Filo, anything further?

17        MS. FILO:  Submitted, Your Honor.

18        MR. MADDEN:  Your Honor, one moment, please.  May I

19  have just a moment to confer with two members of the -- in

20  the audience?

21        THE COURT:  Yes.

22        MR. MADDEN:  Thank you.  Your Honor, both Mr.

23  Chandler's mother and father would like to address the Court

24  if that will be acceptable?

25        THE COURT:  Do you have any response, Ms. Filo?

26  They are not entitled to.

27        MS. FILO:  I'll submit it to Your Honor.

28        THE COURT:  Mr. Madden, I'm assuming that they both

1    submitted letters on behalf of Mr. Chandler.

2         MR. MADDEN:  They did.  Both Terry Chandler, his

3    father, and his mother, (unintelligible), she also submitted

4    a letter.  I believe after Mr. Chandler in his letter, I

5    think they are the first two in the packet you received.

6         THE COURT:  Well, Mr. Madden, you appreciate that

7    there is no authority to allow them to make comments to the

8    Court.

9         MR. MADDEN:  I will submit the matter, Your Honor.

10        THE COURT:  I spent a substantial amount of time

11   doing this particular case, reviewing this particular case.

12   As I mentioned, I did review every letter.  This case, like

13   many, many others that I have seen, when an individual

14   commits a crime, it doesn't only impact that person that you

15   all know.  The ripple effects are extremely broad.  The

16   impact on the family of Mr. Chandler is enormous.  The

17   ripples will continue long after this particular hearing.

18   But that applies to the victims and their families as well.

19   The impact and ripples they will have will last and continue

20   for many, many, many years after this particular date.

21        Although there is no right to address the Court,

22   I'm going to allow brief comments, Mr. Madden, by the mother

23   and father, which is quite frankly unusual, but they must be

24   brief.

25        MR. MADDEN:  I will emphasize that, Your Honor.

26        THE COURT:  And I may cut them off after a point if

27   I think I'm hearing things that are inappropriate or too

28   lengthy.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1697

1      MR. MADDEN:  Thank you, Your Honor.

2      THE COURT:  With that understanding, I will allow

3   it.

4      MR. MADDEN:  Thank you.

5      Apparently, only Mr. Chandler would like to address

6   the Court.

7      THE COURT:  Right at the -- thank you, sir.

8      MR. TERRY CHANDLER:  Your Honor, I just have a

9   statement that's not too long.  My name is Terry Chandler.

10  I'm Craig's father.  You have in your possession a letter to

11  you by Craig's family and friends.  I could only hope that

12  you understand what we all are asking of you.  Craig is a

13  good man, a very good father.  He's made mistakes in his

14  marriage to which I know he regrets with all of his heart.

15  But, Your Honor, to no disrespect to this Court, he will

16  never harm a child.  Craig loved being a teacher so much that

17  he put himself in precarious situations without thinking what

18  it might look like to others.

19      682 days ago we all prayed that the legal system

20  would see this for what it was, a mistake.  After 30 years of

21  law enforcement, it's hard for me to accept the outcome or

22  make any sense of all of this.  We're hoping for the truth,

23  and unfortunately this is not what happened.  Craig lost his

24  home, his family, his career, now possibly a future.  That

25  part is up to you, Your Honor.  I speak for his family and

26  friends when I say that it serves no purpose in sending my

27  son to prison for the rest of his life, despite what anyone

28  here may lead you to believe.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1698

1        Your Honor, I ask you for leniency in giving Craig

2   the minimum concurrent sentence.  Give him a chance to

3   rebuild his life, give his family a chance to have their

4   husband, their father, son, and brother back.  Your Honor, we

5   thank you for your consideration.

6        THE COURT:  Thank you, sir.

7        Counsel, I'm going to take a short recess.  I ask

8   you to please remain in the courtroom.  I will be right back.

9        (Whereupon, a brief recess was taken.)

10       THE COURT:  The record will reflect that both

11   counsel are present, Mr. Chandler is present.  I will note

12   that as both parties know, everything -- what this Court does

13   is authorized or provided or guided by case law, statutory

14   authority, or Rules of Court.  As I mentioned earlier, I

15   considered all of the information that has been provided and

16   I've also considered the comments made here this morning by

17   the parties.  The punishment that must be imposed for the

18   crimes that Mr. Chandler was convicted of by the jury are

19   terms that are prescribed by law.  The primary issue is

20   whether the terms should be concurrent or consecutive.  The

21   probation report and the sentencing memorandums filed by the

22   parties address the various factors the Court should consider

23   and not consider and why.

24       In this particular case, the Court has discretion

25   to impose the concurrent or consecutive terms.  The factors

26   mentioned by counsel and probation regarding whether

27   concurrent or consecutive sentences should be imposed are as

28   follows:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1699

1    The aggravating factors noted relate to Rule of

2  Court 4.421(a)(3), (a)(8), and (a)(11).

3    The factors in mitigation noted relate to Rule of

4  Court 4.423(b)(1), (b)(6), and Rule of Court 4.408(a).

5    Rule of Court 4.425 list criteria affecting the

6  decision to impose consecutive rather than concurrent

7  sentences.

8    Regarding circumstances in aggravation, I agree

9  with the People -- excuse me.  Rule of Court, as I mentioned,

10  4.425 lists criteria affecting the decision to impose

11  consecutive rather than concurrent sentences.

12    4.425(a)(1)(2) and (3) list the criteria relating

13  to the crimes.

14    4.425(b) states that any circumstances in

15  aggravation or mitigation may be considered in deciding

16  whether to impose consecutive rather than concurrent

17  sentences.

18    In deciding whether to impose consecutive sentences

19  rather than concurrent sentences, I found that Rule of Court

20  4.425(a)(1), the crimes and their objectives were

21  predominantly independent of each other applies here; and

22  (a)(3), the crimes were committed at different times rather

23  than being committed so closely in time and place as to

24  indicate a single period aberrant behavior applies.

25    I did not consider 4.425(a)(2), the crimes involve

26  separate acts of violence or threats of violence.

27    I have considered all factors in mitigation

28  suggested by the defense; specifically, per Rule of Court

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)  1700

1  4.423(b)(1), Mr. Chandler has an insignificant record of

2  criminal conduct;

3          (b)(6), defendant's prior performance on probation

4  was satisfactory.  And the factors presented by the defense

5  pursuant to Rule 4.408(a) that Mr. Chandler has been a

6  productive member of society.

7          Defendant's family, including his three young

8  children, will suffer severely if the minimal sentence is

9  imposed, and will suffer much more greatly if any additional

10  sentence is imposed.

11          And third, defendant's risk assessment score on the

12  Static-99R reveal a total score of one.

13          Regarding the circumstances in aggravation, I agree

14  with the People, that Rule 4.421(a)(8), the manner in which

15  the crime was carried out indicates planning, sophistication,

16  and professionalism.

17          I presided over the trial, and the record speaks

18  for itself.  However, in my opinion, the crimes committed by

19  Mr. Chandler clearly demonstrated planning and

20  sophistication.

21          Based on the defense objection, I did not consider

22  (a)(3), the victim was particularly vulnerable.  Although I

23  believe the facts and circumstances could support that this

24  aggravating factor applies, I nevertheless did not consider

25  this factor.

26          I also considered (a)(11), the defendant took

27  advantage of a position of trust to commit the crimes.

28          Mr. Chandler violated one of our most valued

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1701

1   relationships in our society, the student/teacher

2   relationship.  He took advantage of a position of trust.  We

3   send our children to school and we believe the school is a

4   safe place.  Once the child arrives at the school and enters

5   their classroom, they are in a safer place.  And once their

6   teacher is present, the classroom becomes safer.  There are

7   few places where a child should feel safer other than perhaps

8   their home.

9           Mr. Chandler used his position of authority to

10  sexually abuse each child in a closed classroom.  As their

11  second and third grade teacher, the children trusted Mr.

12  Chandler.  Each child victim in this case, because of the

13  defendant's position of authority and trust, and the trust

14  that they had for their teachers, obeyed and followed his

15  directions and allowed him to commit various sexual acts on

16  them while blindfolded.

17          As counsel knows, balancing the mitigating and

18  aggravating factors is not a mathematical process.  One

19  factor of greater significance may outweigh a number of other

20  factors having lesser weight.

21          Having weighed the factors supporting consecutive

22  sentences with factors supporting concurrent sentences, I

23  find that the factors favor in consecutive sentences outweigh

24  the factors favor in concurrent sentences.  I also find the

25  factors in aggravation outweigh the factors in mitigation.

26  And, specifically, I find that the defendant, having violated

27  a position of trust, standing alone, outweighs all of the

28  factors in mitigation presented and considered.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1702

1          Therefore, at this time probation, will be denied.

2          Mr. Chandler is ineligible for probation pursuant

3     to Penal Code §1203.066(a)(7).

4          As to Count 1, the Court will impose a term

5     prescribed by law of 15 years to life.

6          As to Count 2, the Court will impose a term of 15

7     years to life consecutive to Count 1.

8          As to Count 3, the Court will impose a term of 15

9     years to life consecutive to Count 2.

10         Count 4, the Court will impose a term of 15 years

11    to life consecutive to Count 3.

12         Count 5, the Court will impose a term of 15 years

13    to life consecutive to Count 4 for a total term of 75 years

14    to life.

15         Defendant is advised of a parole period of ten

16    years pursuant to Section 3000(b)(2) of the Penal Code.

17         Court will order a general order of restitution to

18    any victim for any injuries or damages caused by his conduct.

19         Court will specifically order restitution in the

20    amount of $14,197.50 to the Victim Compensation and

21    Government Claims Board.

22         The director of the California Department of

23    Corrections and Rehabilitation is directed to collect this

24    restitution from the defendant's earnings in prison or while

25    on parole or post-release community supervision.

26         The defendant shall not own, knowingly possess, or

27    have within his custody or control any firearm or ammunition

28    for the rest of his life pursuant to Section 29800 and 30305

1  of the Penal Code.

2  Defendant is ordered to register pursuant to

3  Section 290 of the Penal Code, and comply with Section 290.85

4  of the Penal Code.

5  Number 9, the Court is not going to impose the $300

6  fine pursuant to 290.3.

7  The defendant shall submit to a blood test for

8  evidence of antibodies to the probable causative agent of

9  acquired immune deficiency syndrome, AIDS, pursuant to

10  Section 1202.1 of the Penal Code.

11  Court issues an order prohibiting visitation to the

12  defendant and any child victim pursuant to 1202.05 of the

13  Penal Code.

14  Restitution fund fine of $10,000 is imposed

15  pursuant to Section 1202.4.

16  Additional restitution fine of an amount equal to

17  that imposed under Section 1202.4 is imposed and suspended

18  per Section 1202.45 of the Penal Code.

19  Defendant is ordered to supply buccal swab samples,

20  prints, blood specimens, and/or other biological samples

21  pursuant to Penal Code 296.

22  Court security fee of $200 is imposed pursuant to

23  section 1465.8 of the Penal Code.

24  A criminal conviction assessment of $150 is imposed

25  pursuant to Section 70373 of the Government Code.

26  $129.75 criminal justice administrative fee to the

27  City of San Jose is imposed per Government Code 29550, 550.1

28  and 550.2.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1704

1          Credits as to Count 1 are 683 actual days, plus 102

2     days 2933.1 credits, for a total of 785 days.

3          Mr. Chandler is advised that he must file notice of

4     appeal within 60 days of today's date.

5          That concludes this matter.

6          MR. MADDEN:  Your Honor, I have one statement, if I

7     could?

8          THE COURT:  Yes.

9          MR. MADDEN:  Before the Court leaves the bench, I

10    know I would like to approach the bench on a brief matter

11    with Ms. Filo when I'm done with that.

12         THE COURT:  Okay.

13         MR. MADDEN:  I would like the record to reflect

14    that I object to the sentences running consecutively.  I

15    object to the factors the Court is relying on to justify the

16    consecutive sentences.  Although we covered most of this in

17    our memoranda, I want to state for the record the factors the

18    Court is relying on imposing consecutive sentences are

19    factually unsupported and legally inapplicable.

20         I would ask to approach the bench briefly.

21         THE COURT:  Yes, your objection is noted.

22         MR. MADDEN:  Thank you.

23         (Whereupon, a brief recess was taken.)

24         THE COURT:  Thank you, Counsel.  We'll be in

25    recess.

26         MS. FILO:  Thank you, Your Honor.

27         (Whereupon, the Court recessed.)

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d) 1705

1    STATE OF CALIFORNIA       )
                               )
2    COUNTY OF SANTA CLARA     )

3

4            I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

5            The foregoing is a full, true, and correct

6    transcript of the testimony given and proceedings had in the

7    above-entitled action taken on the above-entitled date; that

8    it is a full, true, and correct transcript of the evidence

9    offered and received, acts and statements of the Court, also

10   all objections of counsel, and all matters to which the same

11   relate; that I reported the same in stenotype to the best of

12   my ability, being the duly appointed and official

13   stenographic reporter of said Court, and thereafter had the

14   same transcribed into typewriting as herein appears.

15           I further certify that I have complied with CCP

16   237(a)(2) in that all personal juror identifying information

17   has been redacted if applicable.

18

19           Dated:

20

21                                    _____

22                                    Jamie L. Mixco, C.S.R.
                                      Certificate No. 12708
23

24   ATTENTION:
     CALIFORNIA GOVERNMENT CODE
25   SECTION 69954(D) STATES:

26   "ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
     MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
27   A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
     ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
28   PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
     PERSON."