1  XAVIER BECERRA
   Attorney General of California
2  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
3  JILL M. THAYER
   Deputy Attorney General
4  State Bar No. 166428
    455 Golden Gate Avenue, Suite 11000
5   San Francisco, CA 94102-7004
    Telephone: (415) 703-5954
6   Fax: (415) 703-1234
    E-mail: Jill.Thayer@doj.ca.gov
7  *Attorneys for Respondent*

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12

13 | **CRAIG RICHARD CHANDLER,** | 17-cv-00325-EMC

14 | Petitioner, | **EXHIBITS**

15 | **v.**

16 | **SCOTT FRAUENHEIM, Warden,**

17 | Respondent.

18

19

20  Exhibit 4      Augmentation to State Court Reporter's Transcript

21  Exhibit 5      Appellant's Opening Brief

22  Exhibit 6      Supplemental Appellant's Opening Brief

23  Exhibit 7      Respondent's Brief

24  Exhibit 8      Appellant's Reply Brief

25  Exhibit 9      Opinion of the California Court of Appeal, Sixth Appellate District, filed
26                 November 30, 2015

27  Exhibit 10     Petition for Review

28

                              1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 11  Denial of Petition for Review

Exhibit 12  Petition for Writ of Habeas Corpus

Exhibit 13  Docket Report for California Supreme Court Case No. S237533

# EXHIBIT 4

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)     1

TO THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


---o0o---


THE PEOPLE OF THE STATE OF          )
CALIFORNIA,                         )
                                    )
        Plaintiff - Respondent,     )
                                    )
        v.                          )        No. C1223754
                                    )
CRAIG RICHARD CHANDLER,             )
                                    )
        Defendant - Appellant.      )
_____/

COPY


AUGMENTATION

PAGES 1 - 19

JULY 15, 2013


---o0o---


REPORTER'S TRANSCRIPT ON APPEAL
FROM THE JUDGMENT OF THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA
BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY


---o0o---


APPEARANCES:


FOR PLAINTIFF-RESPONDENT:        OFFICE OF THE ATTORNEY GENERAL
                                 BY:  KAMALA D. HARRIS,
                                 Attorney General of the State
                                 of California

FOR DEFENDANT-APPELLANT:         In Propria Persona

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)      2

1       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF SANTA CLARA

3   BEFORE THE HONORABLE ARTHUR BOCANEGRA, JUDGE, AND JURY

4            DEPARTMENT NO. 37

5

6             ---o0o---

7  THE PEOPLE OF THE
     STATE OF CALIFORNIA,         )

8                      )

9         PLAINTIFF,     )
                      )   CASE NO.   C1223754

10     v.              )

11  CRAIG CHANDLER,        )

12                      )

             DEFENDANT.     )

13  _____/

14              ---o0o---

15

16       REPORTER'S TRANSCRIPT OF PROCEEDINGS

17

18          OPENING STATEMENTS

19           JULY 15, 2013

20

21              ---o0o---

22

23  APPEARANCES:

24  FOR THE PEOPLE:         ALISON FILO
                          Deputy District Attorney

25

26  FOR THE DEFENDANT:      BRIAN MADDEN
                          Attorney at Law

27

28  OFFICIAL COURT REPORTER:   JAMIE L. MIXCO
                          C.S.R. No. 12708

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)      3

1    San Jose, California                        July 15, 2013

2                            PROCEEDINGS

3              THE COURT:  Thank you, ladies and gentlemen.  The

4    record will reflect that both counsel are present, Mr.

5    Chandler is present, all members of the jury are present.

6              And at this time, Ms. Filo, are you ready to

7    present opening remarks?

8              MS. FILO:  I am.

9              THE COURT:  You may proceed.

10             MR. MADDEN:  Could we have a few minutes, Your

11   Honor?  My client's family was not aware the doors are open.

12   May I let them in?

13             THE COURT:  Yes.

14             MR. MADDEN:  Thank you.  I apologize, Your Honor.

15             THE COURT:  Thank you.

16             Ms. Filo, when you are ready.

17             MS. FILO:  Thank you, Your Honor.

18             This should have been a classroom like any other

19   classroom across this country, a second/third grade

20   combination classroom where children came to learn, to grow,

21   to develop.  To do that, they were left in the care of this

22   man, Craig Chandler.  Every day parents dropped their

23   children off and expected them to be cared for by Mr.

24   Chandler.  And instead of being a classroom of learning,

25   growth, and development, this became the classroom of

26   nightmares.  Craig Chandler became the ultimate wolf in

27   sheep's clothing.

28             Mr. Chandler worked in room 18 at O.B. Whaley

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)      4

1    Elementary School.  It's in the Evergreen School District,

2    kind of in the southeast part of the city of San Jose.  His

3    classroom was not that different than any other classroom

4    that you would expect to see:  bookshelves, storage cabinets,

5    children's desks, and children's chairs.  But when the San

6    Jose Police Department came out to this school on January 9,

7    2012, they found this area right by Mr. Chandler's desk and

8    learned from student after student after student that the

9    unimaginable had occurred right there.

10           The felony Information in this case alleges that

11   five young girls, ranging in age from seven to nine, were

12   molested by Craig Chandler.  They are very real, little

13   people with very real stories.  You will hear from each and

14   every one of them:  Isabell, Becky, Laurie, Wendy, and

15   Arleth.  Wendy and Arleth attended O.B. Whaley Elementary and

16   were students of Mr. Chandler in the 2010/2011 school year.

17   Isabell, Becky, and Laurie were students of Mr. Chandler in

18   the 2011/2012 school year.

19           What you'll hear from them is that Mr. Chandler was

20   doing something to them that they didn't like.  It felt bad

21   to them, but he blindfolded them so they couldn't see.  They

22   couldn't see what he was having them touch and they couldn't

23   see what he was putting in their mouths.  So, now imagine

24   seven-, eight-, nine-year-old children having to describe

25   what that thing was.  These are the words of the children

26   that you will hear from.  When you're listening to the

27   testimony of a child, His Honor already instructed you, and

28   you'll hear again that you're to judge a child by the same

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)     5

1   standards as you would judge any other witness, but they have

2   cognitive and developmental skills that adults just don't

3   have.

4          So what are they going to say here in court in

5   front of you?  Opening statement is my opportunity to tell

6   you what I believe the evidence will be, what you should

7   expect in this trial.  Always makes me nervous, because even

8   with adults, even with excellent -- even expert witnesses,

9   you never really know what someone is going to say until they

10  say it.  That's particularly true with children who are

11  trying to describe events that they didn't see and that

12  happened a year to a year and a half, sometimes two and a

13  half years ago.  For them, 30 percent of their lifetime ago.

14         So if we're not sure what they're going to say

15  here, what other evidence are you going to have?  Well, you

16  are going to have in this case -- I think what will be the

17  most compelling evidence to you in this case are the previous

18  statements of the children.  Those were captured on video and

19  audio by the San Jose Police Department.  You will see each

20  and every one of those interviews, and I am going to ask you

21  to do one thing when those videos are playing, watch the

22  video.

23         Our local court rules require us to give you all

24  transcripts so you could read and follow along, which is

25  always very helpful.  But I have seen jury after jury just do

26  the reading and not see what's really happening on that

27  video.  And in this case, it makes all of the difference,

28  because the evidence that you are going to see, and that's

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)      6

1   what it is.  When we play those videos for you, it is

2   evidence just as if it were being given here in court.  It is

3   being presented here in court.  What you'll see is children

4   giving completely organic statements.  They are drawing and

5   doodling, scratching, and they are asked questions and they

6   just answer.  No manipulation, no thought process, just

7   answers to the best of their abilities.

8          You'll hear that those statements were taken in

9   January of 2012, over a year and a half ago, so much closer

10  in time to their testimony as to will be presented here in

11  this courtroom.

12          So what did they say when they are interviewed by

13  the San Jose Police Department and what -- how do they

14  describe that thing?  The children use words like round and

15  gooey.  Chandler tells me to move my tongue around.  I felt

16  like I was going to choke.  Bigger than a finger, smaller

17  than a banana.  It was kind of hard, but kind of soft and had

18  no taste, no smell, and after a minute, while the object is

19  still in my mouth, the salty water came out.  Some of the

20  children describe hearing something metal:  a belt, keys.

21  Those descriptions are different for each child, but they

22  have some great consistency amongst them.

23          Those descriptions were also memorialized by a

24  witness you'll hear from named Lyn Vijayendran.  Ms.

25  Vijayendran was the principal of O.B. Whaley Elementary

26  School.  In October of 2011, Becky, victim number two in the

27  Information, came to Ms. Vijayendran, and here's what she

28  said:

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)      7

1      Becky was standing up.  Mr. Chandler went in the

2   closet and took out a blindfold.  It was blue with with a

3   black string or band.  He handed Becky the blindfold.  He

4   went to the basket where the balls and jump ropes are.  He

5   took a blue and white basket out of it.  Becky put the

6   blindfold on herself after Mr. Chandler told her to.  Mr.

7   Chandler said lie down on the floor right there and she did.

8   Mr. Chandler took the blanket and put it over Becky's head.

9   Becky was wearing silver flats.  Mr. Chandler asked her to

10  take them off and she took them off.  Becky's pants were

11  capri sweatpants in a silverish gray.

12      Becky told Mr. Chandler she was hot.  He didn't

13  answer.  She felt something gooey.  She said it felt like

14  maybe it was his tongue on her feet, on the bottom of her

15  foot, for 20 seconds or so.  Then Becky felt the same thing

16  on her pants.  She felt Mr. Chandler moving.  He told her,

17  quote, open your two legs.

18      Mr. Chandler lifted the blanket up to about her

19  nose and then Becky felt something in her mouth.  First, Mr.

20  Chandler said, I'm going to put something in your mouth.  He

21  put the gooey something in her mouth and he wiggled my body

22  back and forth and my head.  Becky felt some salty water in

23  her mouth and it dripped out onto her hand and onto her

24  jacket.  She wiped her hands on her jeans.  Mr. Chandler

25  moved the blindfold and blanket.  Becky did not see where he

26  put them.

27      The bell rang.  Becky stood up.  Mr. Chandler

28  opened the door and Wendy walked to the sink and got a damp

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)     8

1  paper towel.  He cleaned up her pants and then he gave her a

2  Wonka candy.

3         That was Becky's description to Ms. Vijayendran in

4  October of 2011.

5         This is Isabell.  She's the first witness we'll

6  present to you, the first of the victims that we'll present

7  to you.  You will hear from her today.  These are her words.

8  Well, they should be her words.

9         (Whereupon, a tape was played, not reported.)

10         MS. FILO:  Those are just three of the victims that

11  you are going to hear from in the case.  That is the picture

12  that Arleth drew that day at the San Jose Police Department.

13         The San Jose Police Department was notified on

14  January 9, 2012 by Luisana.  Luisana is Isabell's mother.

15  She'll come in and tell you about how that morning unfolded,

16  why she called the police, the circumstances that surrounded

17  her life on that day and since then.

18         What you will hear through the course of this trial

19  is that the San Jose Police Department did an outstanding job

20  in investigating this case.  Getting that call, they then

21  blanketed the school.  They attempted, and actually did,

22  interview every single one of Craig Chandler's students for

23  years.  They filed an abbreviated statement of the case with

24  the court.  They did not file even the entire police report

25  with the court, so is not to taint the general public.

26  Police report was not released to the media.

27         Sean Pierce is the investigating officer of the

28  case.  You will hear from Det. Pierce.  He will be here at

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    9

1    points throughout this trial.  You'll hear about his

2    impressive training and expertise in conducting an

3    investigation of this magnitude so that we get the truth, the

4    whole truth, and nothing but the truth.

5           You'll hear that in Det. Pierce's interview with

6    Isabell, that first little girl you saw, she described

7    sitting in Craig Chandler's chair, different from the student

8    chairs in the classroom.  And somebody very early on in the

9    first day or so of this investigation said:  You know what,

10   let's grab those chairs.  Who knows?  Let's grab them.  It's

11   a piece of evidence in the case.

12          Oh, was it.  Those are the chairs, minus the legs,

13   that were found that -- actually, two chairs were taken from

14   Mr. Chandler's classroom.  Semen is found on that chair.  I

15   don't know if you could see it, but this is actually evidence

16   item SY-01.  The crime laboratory identifies each piece of

17   evidence.  This is chair SY-01.  Semen is found along the

18   backside of that chair.  It's actually naked to the visible

19   eye.  By the way, ladies and gentlemen, this is not just

20   semen.  This is Craig Chandler's semen.

21          On an entirely different chair, but also considered

22   a teacher chair, this is item number SY-02, semen is found in

23   five separate locations on that chair.  And again, it's not

24   just anybody's semen, it's Craig Chandler's semen.

25          We'll have an expert from the crime laboratory,

26   Ms. Kristin Cardosa, come in and explain to you the process

27   by which we could determine that this is DNA, that it's

28   semen.  It's actually spermatozoa deposited by Craig

1  Chandler.

2          You are going to hear that evidence and a lot more

3  throughout the course of this trial.  And when we get to the

4  end of it, I believe you will have ample, compelling evidence

5  beyond any doubt that Craig Chandler molested five of his

6  students in his classroom at O.B. Whaley Elementary School,

7  and the People will ask you to hold him accountable for that

8  aberrant behavior.  Thank you very much for your time.

9          THE COURT:  Thank you, Ms. Filo.

10          Mr. Madden, do you wish to give opening remarks at

11  this time?

12          MR. MADDEN:  I do.  If I could take --

13          THE COURT:  Okay.  Thank you.  You may proceed

14  whenever you are ready.

15          MR. MADDEN:  Good morning, ladies and gentlemen.  I

16  also want to speak with you briefly this morning about what I

17  think the evidence will show and many ways we'll be talking

18  about the same evidence.  We'll be talking about different

19  conclusions, however, dramatically different conclusions.

20          Craig Chandler is 36 years old.  He's married to

21  Maria Chandler.  They have three young children:  Landon

22  five, Gabriella three, and Allison one.  They met when they

23  were undergraduate students at UC -- at Cal. State Monterey

24  Bay.  Upon graduation, each had decided that they wanted to

25  be elementary school teachers and went to UC Davis together.

26  They obtained their K through eight teaching credentials at

27  UC Davis, did their student teaching in UC Davis, lived

28  together in UC Davis.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    11

1    They completed their education, came to San Jose,

2  were married, and they started teaching in the same school

3  district, the Evergreen School District.  They, however, did

4  not teach at the same school.  Craig Chandler taught at O.B.

5  Whaley School, and he taught there until January 10th of

6  2012, at the time of his arrest.  He actually was arrested

7  briefly on the 9th, but he was arrested again on the 10th,

8  and he has not been a teacher since that date.

9    Craig has while at O.B. Whaley taught either second

10  grade or third grade or a combination of those two grades.

11  Always those two grades.  In the year -- in the 2011/2012

12  school year, he was teaching a combination class, half

13  second-graders and half third-graders.  The students that he

14  was teaching, who are complaining witnesses in this case, in

15  that year, are Isabella [sic], Becky, and Laurie.  Those

16  three are from the year he was teaching when he was arrested.

17  The 2010 -- excuse me -- 2011/2012 school year.

18    Two additional students, Wendy and Arleth, he

19  taught the year before.  The same classroom, room 18,

20  however, the year before he was teaching a straight third

21  grade class.  So when Arleth and -- excuse me.  When Arleth

22  and Wendy were interviewed -- by the way, their interviews

23  were on or about January 17th of 2012.  They had not been

24  current students, but from the year before, and they were

25  grade third -- when they were interviewed, they were in the

26  fourth grade.  That sort of sets the table for you.  It will

27  become crystal clear later, but I want to give you an

28  overview at this point.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    12

1    Craig's wife was also a grade school teacher, but

2  she taught first and second grade.  Craig was a very good

3  teacher.  He was a popular teacher.  Got along, not only well

4  with his students who really liked him because of the way he

5  taught.  There were lots of games that were played in his

6  teaching.  But it's been a long time since I have been in the

7  second or third grade, as you could tell, but obviously

8  children at that age learned many times by playing games, by

9  doing things, by experiments, by demonstration.  That's a

10  very important thing to remember in this case.

11    Early in his teaching career at O.B. Whaley, Craig

12  had an experience where he witnessed two of his students

13  essentially bullying a special needs child.  Bully might be

14  too strong a word, but making fun of them.  This bothered

15  Craig, as it would bother any adult, but especially bothered

16  Craig because Craig is dyslexic.  Craig knows the experience

17  of being made fun of, made feel to be -- made to feel less

18  than, made to feel stupid.  So he really decided that he was

19  going to try to do something about this, and so he came up

20  with a plan to teach about Helen Keller, which you all know

21  is the famous woman who was blind and deaf and came to teach

22  millions of people at how to overcome her disabilities.

23    The Helen Keller lesson plan is a completely valid

24  mainstream story or lesson to teach to children of this age.

25  That will be confirmed by either Ms. Vijayendran, one of the

26  principals at one time at O.B. Whaley, or Ms. Perry, another

27  principal at a later time.  She actually was the principal

28  after Ms. Vijayendran left for maternity leave.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)     13

1          So he decided to create this lesson plan, and the

2    idea taken from the Helen Keller book was to deprive children

3    of their sight and have them engage in activity that involved

4    tasting and identifying objects in their mouth and feeling

5    and identifying objects that were touched on either their

6    hands or their feet.  And the object in both instances was to

7    identify the object, and that's what happened in this case.

8    It happened again and again and again.  And, in fact, it

9    happened for almost the entire time Craig Chandler was

10   teaching at O.B. Whaley.

11         It wasn't until January the 9th of 2012 that

12   everything changed.  January the 9th, 2012 is basically

13   ground zero of this case.  Now, on that day, Isabell, who was

14   one of Craig's current students at the time, had told her

15   mother she didn't want to go to school.  Her mother talked to

16   her, and Isabell gave a very brief description, with very

17   little detail about Mr. Chandler and why she didn't want to

18   go to school.  Her mother, understandably so, all she had to

19   hear was the words:  Blindfold, put something in my mouth.

20   What was it?  I don't know.  And she was off to the races and

21   this case was off to the races.

22         These tests -- excuse me.  These games connected

23   with the Helen Keller lesson were fun.  The children enjoyed

24   these games.  All of them did.  The evidence will show that

25   at no time during any of these games, whether it was the

26   object in the mouth to taste and identify test or game, or

27   the object on either the top of their foot or their leg, at

28   no time did any student ever exhibit any concern, any

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    14

1    hesitation, any fear, any choking, any gagging, any spitting.

2          It is inconceivable that children would have sat

3    there and allowed Mr. Chandler to do what they are claiming

4    he did without evoking immediate physical, non-thinking,

5    reactive motions and words by these children.  There will not

6    be one incident -- one instance of that occurring in their

7    testimony, at least I don't expect it to be.  But as Ms. Filo

8    said, you never really know what's going to be said.

9          Craig Chandler has no sexual interest in children.

10   He does not.  Nor has he ever had any sexual interest in

11   children.  He never put his tongue on any part of any

12   student, ever.  He never exposed his penis to any student,

13   ever.  He never put his penis in any student's mouth, ever.

14   And, of course, necessarily follows that, he never ejaculated

15   into the mouth of any student, period.

16          However, there was an occasion in the class in the

17   year before, 2010/2011 school year, in which Craig Chandler

18   did have consensual sex with an adult woman.  That's

19   certainly not something that he's proud of.  Certainly

20   something that he has to be ashamed of.  It shows incredibly

21   poor judgment, and obviously he was unfaithful to his wife.

22          That woman will come to court and testify.  She is

23   not a woman who has committed a crime.  She hasn't done

24   anything illegal, and I deeply regret having to bring her

25   into this courtroom to testify.  However, the People have

26   indicated in their opening statement that they are offering

27   evidence of Craig Chandler's semen being on adult chairs in

28   the classroom as proof of their conclusion that Craig

1    molested these children by putting his penis in their mouth.

2           I might add that the People were aware of this

3    woman.  In January of 2012, a police report was made, a brief

4    police report.  A number was assigned to that police report

5    other than the police report number in this case.  The police

6    essentially buried this report --

7           MS. FILO:  Objection, Your Honor.  May we approach?

8           THE COURT:  Sustained.  Yes.

9           (Whereupon, there was a discussion at the bench.)

10          THE COURT:  The objection is sustained.  The last

11   comment is stricken.

12          MR. MADDEN:  Thank you, Your Honor.

13          THE COURT:  Jury is ordered to disregard the

14   comment.

15          MR. MADDEN:  The San Jose police did not do a

16   crackerjack job in investigating this case.  To help you

17   understand why they didn't, the defense is going to call a

18   psychologist who is an expert in this field.  His name is

19   William O'Donohue.  I'm going to read his credentials to you.

20          Dr. William O'Donohue is an expert in the area of

21   sexual abuse of children.

22          Dr. O'Donohue is a professor of psychology at the

23   University of Nevada, Reno.

24          Since 1996, he has been the director of the

25   victim's -- excuse me -- the director of the Victim of Crime

26   Treatment Center at the University of Nevada, Reno.

27          He received a BS in psychology from the University

28   of Illinois at Urbana-Champaign, and has an MS and a PhD in

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    16

1    clinical psychology from State University of New York at

2    Stony Brook.

3            From 1996 to 2008, he was the director of Sexual

4    Assault Prevention and Counseling Services at the University

5    of Nevada, Reno.

6            He is an advisor to the DSM-5 work group on sexual

7    gender identity disorders of the American Psychiatric

8    Association, focusing on the diagnoses of pedophilia.

9            He is a member of the Nevada Attorney General's

10   Victims of Crimes Subcommittee.

11           He's on the editorial board of the Journal of

12   Academy of Medical Psychology.

13           He has received several grants and awards related

14   to the study and treatment of sexually abused children.

15           He's the co-editor of a two-volume book dealing

16   with theory research and clinical issues involving sexually

17   abused children, and the author or co-author of numerous

18   articles dealing with sexually abused children.

19           Dr. O'Donohue, I submit, ladies and gentlemen, you

20   will find to be an eminently qualified witness.  Among the

21   areas in which Dr. O'Donohue is an expert is the interviewing

22   of victims of child sexual abuse.  He is an expert in the

23   field.  Particularly, the distinction between proper

24   interviewing techniques designed solely to elicit information

25   the victim actually remembers, and suggestive interviewing

26   techniques that implant information and result in children

27   claiming things occurred when in fact they did not.

28           There are five specific areas that he will talk to

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)     17

1   you about:  One, he will talk about the descriptions of the

2   general nature of proper and improper techniques for

3   interviewing children about allegations of sexual abuse;

4          Two, he will talk about descriptions of the sorts

5   of improper interview techniques employed during the

6   interviews of the children in this case;

7          Three, he will talk about the identification of

8   some specific instances in the interviews showing the use of

9   improper interviewing techniques employed in this case;

10          He will also talk about identification of other

11   potentially suggestive influences to which the children were

12   exposed outside of the interview setting, such as questioning

13   by school officials and family members;

14          And finally, we'll talk about identification of

15   potential areas of bias in the allegations of the complaining

16   children.

17          Dr. O'Donohue is an extremely competent and

18   knowledgeable man.  He has spent and has reviewed all of the

19   interviews of the children, all of the forensic interviews.

20   When I say forensic interviews, that is another way --

21   forensic is another word for police interviews, children who

22   are interviewed by police officers for legal purposes to

23   gather evidence for legal purposes.

24          He has spent hour, upon hour, upon hour listening

25   to those tapes, most of which are video, some of which are

26   audio, reading transcripts of the preliminary examination,

27   and he will be talking to you at length on the subjects that

28   I just talked to you about.

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    18

1   And ultimately, when you reach the end of this case

2 and you have heard all of the evidence, you will find that

3 the evidence does not support a conclusion that Craig

4 Chandler molested any of these children.  Thank you.

5   THE COURT:  Thank you, Mr. Madden.

6   (Whereupon, the Court recessed.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIS TRANSCRIPT IS PROTECTED UNDER GOVERNMENT CODE SECTION 69954 (d)    19

STATE OF CALIFORNIA        )
                           )
COUNTY OF SANTA CLARA      )


        I, JAMIE L. MIXCO, HEREBY CERTIFY THAT:

        The foregoing is a full, true, and correct

transcript of the testimony given and proceedings had in the

above-entitled action taken on the above-entitled date; that

it is a full, true, and correct transcript of the evidence

offered and received, acts and statements of the Court, also

all objections of counsel, and all matters to which the same

relate; that I reported the same in stenotype to the best of

my ability, being the duly appointed and official

stenographic reporter of said Court, and thereafter had the

same transcribed into typewriting as herein appears.

        I further certify that I have complied with CCP

237(a)(2) in that all personal juror identifying information

has been redacted if applicable.


        Dated:




                        _____

                        Jamie L. Mixco, C.S.R.
                        Certificate No. 12708


ATTENTION:
CALIFORNIA GOVERNMENT CODE
SECTION 69954(D) STATES:

"ANY COURT, PARTY, OR PERSON WHO HAS PURCHASED A TRANSCRIPT
MAY, WITHOUT PAYING A FURTHER FEE TO THE REPORTER, REPRODUCE
A COPY OR PORTION THEREOF AS AN EXHIBIT PURSUANT TO COURT
ORDER OR RULE, OR FOR INTERNAL USE, BUT SHALL NOT OTHERWISE
PROVIDE OR SELL A COPY OR COPIES TO ANY OTHER PARTY OR
PERSON."

# EXHIBIT 5

# IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA,** | ) | No. H040429 |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CRAIG RICHARD CHANDLER,** | ) | |
| | ) | |
| Defendant and Appellant. | ) | |

## APPELLANT'S OPENING BRIEF

Appeal from the Superior Court of California
County of Santa Clara No. C1223754
Honorable Arthur Bocanegra, Judge



AOB filed 9/2/14

DOCKETED
SAN FRANCISCO

SEP 02 2014
CS

By _____
No.

SF 2014407253
RT filed 2,298 pgs
1384

JEFFREY S. KROSS
State Bar No. 142882
P.O. Box 2252
Sebastopol, CA 95473-2252
(707) 823-8665
kross142882@gmail.com

Attorney for Appellant
CRAIG RICHARD CHANDLER

By appointment of the Court
of Appeal under the Sixth
District Appellate Program
Independent Case System

# TABLE OF CONTENTS

Page

TABLE OF CASES AND AUTHORITIES ............................................ iii

STATEMENT OF APPEALABILITY ...................................................... 1

STATEMENT OF THE CASE ................................................................ 1

STATEMENT OF FACTS ...................................................................... 2

ARGUMENT ........................................................................................ 24

    I. APPELLANT WAS DENIED HIS CONSTITUTIONAL
    RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL
    BY TRIAL COUNSEL'S FAILURE TO PROPERLY CROSS-
    EXAMINE A CRITICAL PROSECUTION WITNESS TO
    PROVIDE AVAILABLE EXCULPATORY EVIDENCE,
    AND ALSO BY PROMISING TO PRESENT
    EXCULPATORY EVIDENCE IN HIS OPENING
    STATEMENT AND FAILING TO PRODUCE THAT
    EVIDENCE ..................................................................................... 24

    A. Relevant law and standard of review. ................................ 24

    B. Failure to properly cross-examine the DNA expert. ......... 26

    C. Failure to present evidence promised in the opening
    statement. ..................................................................................... 38

    II. THE COURT IMPROPERLY EXCLUDED EVIDENCE
    OF APPELLANT'S EXPLANATION AFTER ALLOWING
    THE PROSECUTION TO INTRODUCE EVIDENCE THAT
    THE PRINCIPAL WARNED HIM NOT TO BLINDFOLD
    AND BE ALONE WITH STUDENTS WITH THE DOOR
    CLOSED ......................................................................................... 43

    A. Relevant procedural and factual matters. ......................... 43

    B. Appellant's explanation for his conduct was
    admissible under Evidence Code section 356. ......................... 45

    C. The court's exclusion of this evidence prejudiced
    appellant. ..................................................................................... 47

i

**TABLE OF CONTENTS**
(continued)

Page

III.  THE COURT BY EXCLUDING FROM EVIDENCE
PRINCIPAL VIJAYENDRAN'S TYPEWRITTEN NOTES
AS INADMISSIBLE UNDER EVIDENCE CODE
SECTION 1237 .................................................................... 49

A.  Relevant procedural matters. ............................................... 49

B.  Vijayendran's typewritten notes were admissible
under Evidence Code section 1237. ........................................ 53

C.  The exclusion of this evidence prejudiced appellant. ....... 54

IV.  THE COURT IMPROPERLY PREVENTED THE
DEFENSE FROM INTRODUCING PORK RINDS
AS AN EXHIBIT ................................................................. 55

A.  Relevant procedural matters. ............................................... 55

B.  The improperly excluded evidence was relevant. .............. 57

C.  Exclusion of the proffered evidence was prejudicial. ....... 58

V.  THE COURT ERRED BY ALLOWING TESTIMONY
THAT APPELLANT PREVIOUSLY OFFERED TO
MASSAGE AND PHOTOGRAPH A FEMALE ADULT
TEACHER'S FEET .............................................................. 59

A.  Relevant procedural and factual matters. .......................... 59

B.  The court improperly admitted Keller's testimony
under Evidence Code section 1101, subdivision (b)
to prove intent. .................................................................... 61

VI.  THE CUMULATIVE ERRORS DEPRIVED
APPELLANT OF HIS CONSTITUTIONAL RIGHTS
TO DUE PROCESS ............................................................. 65

VII.  THE ABSTRACT OF JUDGMENT SHOULD BE
AMENDED TO DELETE THE REFERENCES TO
"ENHANCEMENTS" .......................................................... 66

CONCLUSION ......................................................................... 67

WORD COUNT CERTIFICATION ...................................... 68

ii

# TABLE OF CASES AND AUTHORITIES

**Cases** **Pages**

*Beck v. Alabama* (1980) 447 U.S. 625 ........................ 66
*Davis v. Alaska* (1974) 415 U.S. 308 ........................ 59
*Delaware v. Van Arsdall* (1986) 475 U.S. 673 ........................ 59
*Donnelly v. DeChristoforo* (1974) 416 U.S. 637 ................... 65,66
*Hart v. Gomez* (9th Cir. 1999) 174 F.3d 1067 ........................ 25
*In re Avena* (1996) 12 Cal.4th 694 ........................ 65
*In re Gay* (1998) 19 Cal.4th 771 ........................ 25
*In re Hall* (1981) 30 Cal.3d 408 ........................ 25
*In re Handy* (2007) 41 Cal.4th 977 ........................ 26
*In re Hill* (1998) 17 Cal.4th 800 ........................ 65
*In re Hill* (2011) 198 Cal.App.4th 1008 ........................ 26
*In re Jones* (1996) 13 Cal.4th 552 ........................ 25
*In re Reno* (2012) 55 Cal.4th 428 ........................ 65
*In re Vargas* (2000) 83 Cal. App.4th 1125 ........................ 26
*In re Visciotti* (1996) 14 Cal.4th 325 ........................ 25,26
*People v. Arias* (1996) 13 Cal.4th 92 ........................ 46,47
*People v. Burnett* (2003) 110 Cal.App.4th 868 ........................ 42
*People v. Chism* (2014) 58 Cal.4th 1266 ........................ 37
*People v. Corona* (1978) 80 Cal.App.3d 684 ........................ 41
*People v. Cowan* (2010) 50 Cal.4th 401 ........................ 37,51,54
*People v. Cuccia* (2002) 97 Cal.App.4th 785 ........................ 65
*People v. Earle* (2009) 172 Cal.App.4th 372 ........................ 63,64
*People v. Edward S.* (2009) 173 Cal.App.4th 387 .................... 25,26,33
*People v. Ewoldt* (1994) 7 Cal.4th 380 ........................ 62
*People v. Frierson* (1979) 25 Cal.3d 142 ........................ 25
*People v. Ghebretensae* (2013) 222 Cal.App.4th 741 ................... 55,59
*People v. Hamilton* (2009) 45 Cal.4th 863 ........................ 58
*People v. Homick* (2012) 55 Cal.4th 816 ........................ 30
*People v. Jandres* (2014) 226 Cal.App.4th 340 ........................ 63,64,65
*People v. Johnson* (1992) 3 Cal.4th 1183 ........................ 37
*People v. Johnson* (2010) 183 Cal.App.4th 253 ........................ 46
*People v. Jones* (2009) 47 Cal.4th 566 ........................ 66
*People v. Ledesma* (1987) 43 Cal.3d 171 ........................ 24,43
*People v. Lee* (2011) 51 Cal.4th 620 ........................ 58
*People v. Mai* (2013) 57 Cal.4th 986 ........................ 26,33,38
*People v. Malone* (1988) 47 Cal.3d 1 ........................ 64
*People v. Mayfield* (1993) 5 Cal.4th 142 ........................ 25,43
*People v. Mendoza Tello* (1997) 15 Cal.4th 264 ........................ 26,33,38
*People v. Mills* (2010) 48 Cal.4th 158 ........................ 58
*People v. Peggese* (1980) 102 Cal.App.3d 415 ........................ 58
*People v. Perez* (2010) 182 Cal.App.4th 231 ........................ 66
*People v. Rivas* (2013) 214 Cal.App.4th 1410 ........................ 65
*People v. Stanley* (2006) 39 Cal.4th 913 ........................ 42
*People v. Thimmes* (2006) 138 Cal.App.4th 1207 ........................ 25,33

# TABLE OF CASES AND AUTHORITIES
## (continued)

**Cases**                                                    **Pages**

*People v. Vernon* (1979) 89 Cal.App.3d 853 .......................... 58
*People v. Watson* (1956) 46 Cal.2d 818 ....................... 47,55,59,64
*People v. Williams* (2008) 43 Cal.4th 584 ............... 58
*People v. Williams* (2009) 170 Cal.App.4th 587 .................... 65
*People v. Zapien* (1993) 4 Cal.4th 929 ............................. 46,47
*Reynoso v. Giurbino* (9th Cir. 2006) 462 F.3d 1099 ............... 25
*Rios v. Rocha* (9th Cir. 2002) 299 F.3d 796 ...................... 25,26
*Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446 ..................... 25
*Taylor v. Kentucky* (1978) 436 U.S. 478 ........................... 65
*Strickland v. Washington* (1984) 466 U.S. 668 .................... 24
*United States v. Owens* (1988) 484 U.S. 554 ......................... 30

## Constitutional Authority

California Const., art. I, § 15 ............................... 24
U.S. Const., Fifth Amendment .......................... 65
U.S. Const., Fourteenth Amendment ............................. 59,65
U.S. Const., Sixth Amendment ...................... 24,59

## Statutes

Evidence Code § 210 ................................ 58
Evidence Code § 350 ................................ 57
Evidence Code § 352 ................................ 56,64
Evidence Code § 356 ................................ 44,45,46,47
Evidence Code § 402 ................................ 60
Evidence Code § 770 ................................ 37
Evidence Code § 1101 ................................ 60,61,64
Evidence Code § 1108 ................................ 59,60,63
Evidence Code § 1235 ................................ 37
Evidence Code § 1237 ................................ 49,51,53,54
Penal Code § 288 ................................ 60
Penal Code § 667.61 ................................ 66,67

iv

# IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA,   )   No. H040429
            )
     Plaintiff and Respondent,   )
            )
v.             )
            )
CRAIG RICHARD CHANDLER,   )
            )
     Defendant and Appellant.   )

Appeal from the Superior Court of California
Santa Clara County No. C1223754

## APPELLANT'S OPENING BRIEF

## STATEMENT OF APPEALABILITY

This appeal is from a judgment after trial by jury that finally disposes of all issues between the parties, and is authorized by Penal Code section 1237.[1]

## STATEMENT OF THE CASE

Appellant Craig Richard Chandler was charged in a second amended information, filed on July 31, 2013 (the 20th day of jury trial), with five counts of committing a lewd or lascivious act on a child under the age of 14 years, in violation of section 288, subdivision (a). The information alleged appellant committed the

---

1. All further statutory references are to the Penal Code, unless otherwise indicated.

1

offenses against multiple victims, in this case against five different girls, pursuant to section 667.61, subdivisions (b) and (e).  (Clerk's Transcript on Appeal ["CT"], vol. 6, pp. 1382-1386.)

On August 1, 2013, a jury convicted appellant on all five counts and found the multiple victim allegation to be true.  (6CT 1392-1401, 1404-1405.)

The court sentenced appellant to five consecutive terms of 15 years to life on November 22, 2013, imposed statutory fines, fees, and assessments, ordered him to pay $14,197.50 in victim restitution, and awarded him presentence credit for a total of 785 days.  (7CT 1559-1563, 1565.)

Appellant filed a timely notice of appeal on November 22, 2013.  (7CT 1564.)

## STATEMENT OF FACTS

**Prosecution case**

### O.B. Whaley Elementary School

Appellant taught a combined second- and third-grade class at the O.B. Whaley Elementary School in San Jose.  (Reporter's Transcript on Appeal ["RT"], vol. 9, pp. 672, 685-686.)  His classroom, number 18, was at the very back of the school; years earlier, the lower panes of the classroom windows in that part of the school were replaced with painted boards.  (9RT 716-717; 10RT 881, 888-889.)

2

Classroom 18 had a door connecting it to an adjacent classroom. The connecting door did not have a lock on it. (13RT 1197-1198.) A playground was adjacent the building housing classroom 18. (13RT 1199.)

<u>Becky "Doe" (count 2)</u>

Becky was born March 4, 2003. (9RT 685.) She was in the third grade in appellant's combined second- and third-grade class. (9RT 685-686.)

One day in October 2011, Becky came home from school and told her mother Kim that appellant asked her to go into the classroom, where he blindfolded her and rubbed something on her feet. Kim noticed a small white spot, resembling nasal mucous, on the front of Becky's jacket. Kim went to the school, showed the stained jacket to the principal, and asked that Becky be transferred to a different third grade class. (9RT 672-678, 681.)

Lyn Vijayendran was a principal at O.B. Whaley during the 2011/2012 school year. In mid-October 2011, Becky's mother Kim came to school to report that Becky was alone with appellant and appellant blindfolded her and put something in her mouth. Kim requested that Becky be transferred to a different classroom. (9RT 723-725.) Kim showed Vijayendran Becky's hooded sweatshirt, which had a quarter-sized stain resembling saliva on the front. (9RT 730-731.) Vijayendran did not think it resembled a semen stain. (9RT 754.)

3

Vijayendran spoke with Becky and took contemporaneous notes of their conversation. (9RT 726, 767.) Becky reported that another student told her appellant needed her, so she went back to the classroom, where appellant got a blue blindfold and a blue-and-white blanket. Appellant told Becky to put on the blindfold and lie down on the floor. He put the blanket over her head and told her to take off her shoes. Becky felt something gooey or scratchy, like a tongue (but not a tongue), on the bottom of her feet for about 20 seconds. Becky felt appellant moving. He either told her to move her legs or open her legs -- Becky could not remember which -- but she never felt anything between her legs. Then appellant lifted the blanket to her nose and said he was going to put something in her mouth. He put a gooey thing in her mouth and wiggled her body and head back and forth. Becky felt some salty water in her mouth, some of which dripped on her hand and jacket, so she wiped her hand on her jeans. Appellant then removed the blindfold and blanket. The bell rang and Becky stood up. Appellant opened the door, went to the sink, got a damp paper towel, and cleaned up Becky's pants, after which he put a Willy Wonka candy in her mouth.[2] (9RT 726-728, 741, 745-746.)

_____

2. At trial in July 2013, Becky remembered her friend calling her in from recess and sitting in a chair in the classroom, near appellant's desk but without rollers. She also remembered that water got on her

(continued...)

4

Vijayendran granted Kim's request and transferred Becky to a different class the following day. (9RT 673, 679, 732.) Vijayendran did not report the matter to the police; instead, she told appellant not to have students alone and blindfolded in the classroom with the door closed. (9RT 732-733.)

Vijayendran acknowledged that Helen Keller's story was commonly taught at Becky's grade level. Teachers did not have to submit a lesson plan for approval, but they did have to teach to prevailing standards. (9RT 752-753.)

Vijayendran went on maternity leave during the winter break of the 2011/2012 school year. (10RT 892.)

<u>Isabell "Doe" (count 1)</u>

Isabell was born on November 11, 2003 and was in the second grade in appellant's combined second- and third-grade class at O.B. Whaley during the 2011/2012 school year. (8RT 562-564, 569, 575, 607-610.) In the classroom, appellant played a game with the

───────────────

(...continued)
jacket, but she mostly forgot everything else that happened. (9RT 687-696.) The prosecutor and a reader read Becky's May 21, 2012 preliminary hearing testimony, during which Becky stated appellant put a round thing most of the way into her mouth and something gooey and salty came out of it. (9RT 791-792 to 10RT 798-799; see 1CT 7-56, and 1CT 25-27.) A recording of Becky's interview was played for the jury. In that interview, Becky reported that appellant said, "Don't bite it" when the "gooey" thing was in her mouth. (10RT 836; see People's Exhibit 6A, 6CT 1180-1213.)

students in which he blindfolded them and had them feel objects with their hands, feet, and legs and guess what the object was. (8RT 654.) Appellant also did a "taste game" in class in which he blindfolded students and had them guess what kind of candy they were given; Isabell volunteered for that and it was "sort of fun." (8RT 646, 648-650.)

However, about once a week appellant kept Isabell in the classroom during recess when all the other students were outside playing. The classroom door would be closed. Appellant would put Isabell in a chair with rollers and blindfold her, then put something curvy in her mouth. The curvy thing took up almost all of her mouth and she could not close her teeth on it. It was kind of hard and kind of soft, but she could not really describe it. Appellant would put his hand behind her head, push her head back and forth, and tell her to move her tongue around. Then appellant would say, "Hold on" and go behind his desk and she would hear a sound "like a pants zipper." Sometimes appellant would give her candy afterwards. He also gave her crackers, but she did not like them and spit them out. (8RT 611-618, 622-623, 647, 650-653, 655-657.)

According to Luisana "Doe," Isabell's mother, Isabell always looked forward to going to school. However, prior to the winter break in the 2011/2012 school year Isabell's attitude changed and she started dawdling and complaining she did not want to go to school. (8RT 564-566.) On January 9, 2012, Isabell refused to walk to school.

6

When Luisana asked what was wrong, Isabell said appellant was doing stuff to her, then started crying and said appellant put something round in her mouth, which made her gag. (8RT 566-568, 594-595.)

Hearing Isabell's description, Luisana immediately concluded appellant was putting his penis in her daughter's mouth. (8RT 582.) She "went crazy" and started yelling. She drove to school and repeated what Isabell told her to Lea Peery, the new principal at O.B. Whaley for the second half of the 2011/2012 school year. Peery responded, "Oh my God, not again!" Luisana asked what Peery meant. Peery said she had a meeting with some parents concerning the same situation and they had resolved the matter. (8RT 568-571.)

Lea Peery denied that she responded "Oh no, not again," to Luisana's extremely emotional report on January 9, 2012. Peery asked Luisana to go home and get Isabell. Isabell then told Peery she had to stay in at recess two times, during which appellant blindfolded her and put a big, round thing in her mouth and made her move her tongue around. (9RT 774-777, 787-788.)

Luisana felt the school was not adequately acting upon her daughter's complaint, so she called the police. The police came and briefly interviewed Isabell, then took her to a different location for a more detailed interview. (8RT 572.)

San Jose Police Detective Sean Pierce interviewed Isabell and

Luisana that same day, January 9, 2012.[3]  (9RT 709-711; 13RT 1280-1281.)  Later that day, Pierce and other officers simultaneously interviewed approximately 40 students at O.B. Whaley in order to reduce the opportunities for witness contamination.  Over that and the following day, officers interviewed a total of 77 students, including Becky "Doe" on January 10, 2012.  (9RT 712-714; 13RT 1279, 1283.)

Appellant was arrested and released on January 9, 2012.  (13RT 1276.)  There was extensive media coverage beginning on January 10, and appellant's booking photo was shown on all the TV broadcasts.  (13RT 1286-1287.)

Arleth "Doe" (count 5)

Arleth, born June 20, 2002, had been in appellant's third grade class in the 2010/2011 school year.  (11RT 989-990, 1022.)  Arleth's cousin Noemi G. was 13 years old when appellant was arrested in January 2012.  Noemi saw daily articles and TV news stories regarding allegations of appellant's sexual misconduct with O.B. Whaley students.  Noemi started asking Arleth if appellant ever did anything to her.  After repeatedly inquiring for about a week, Arleth asked Noemi if she would be arrested if she told her what appellant did.  (11RT 941-943, 954-955, 981-982.)  Noemi assured Arleth she would not get in trouble.  Over the course of two conversations a

---

3.  A recording of Isabell's interview with Pierce was played for the jury.  (8RT 660; see People's Exhibit 1A, 5CT 1113-1145.)

week or so apart, Arleth revealed that on five or six or more occasions, appellant made her go into the classroom by herself at recess, covered her eyes, and put something in her mouth. Arleth said the object was hairy and "tasted like pee." (11RT 944-947, 958-959, 968.) Arleth said she was able to peek and see a little bit, and described what she saw as looking like a "guy's thing" or "weenie." (11RT 946, 949, 970.) Noemi asked Arleth to draw a picture of what she saw and Arleth sketched what resembled a penis. (11RT 973-974.)

After her second conversation with Arleth, Noemi called her aunt (Arleth's mother). Noemi eventually was interviewed by Detective Pierce. (11RT 943, 947-948, 957, 963, 983.)

Arleth testified that appellant's third grade class played a game in which a student sat in a chair in front of the whole class and appellant put something in the student's mouth and asked him or her to guess what it was. Arleth remembered tasting grape-, strawberry-, and coconut-tasting lollipops. The class also played a game in which the students got on the floor in front of the whole class and had to feel things with their feet. Arleth remembered playing that game and feeling a marker and a water bottle. (11RT 1040-1043.)

On five or six occasions, appellant also had Arleth go into the classroom by herself at recess. Two or three of those times, appellant made her sit in a blue chair and blindfolded her. (11RT 991-996,

9

1000, 1106.)  Appellant first put a type of candy, like a lollipop, in her mouth; or he gave her sweet or salty liquids and asked her to taste them.  Then appellant put something else in her mouth, which she could not identify.  It was oval and she could only close her mouth a little bit; it was soft and slippery, and appellant told her to keep on licking it.  A bad-tasting type of liquid came out of it, which she spit out.  (11RT 996-1001, 1007, 1025, 1028, 1035, 1049-1054.)  When Arleth played the tasting game in front of the class, liquid did not come out of the thing in her mouth.  This made her feel as if something was wrong when she did it with appellant alone.  (11RT 1001, 1056.)

One time Arleth was able to see below the blindfold and she saw something circular, which she thought was a "weenie."  She drew a picture of what she saw for the police, with the lines surrounding the circular thing representing hair.  (11RT 1007-1009, 1017; see People's Exhibit 7, Augmented Clerk's Transcript on Appeal ["ACT"], pp. 1-2.)[4]  One time, after she took off her blindfold, she saw appellant pulling up his pants and she heard a noise like a zipper.  (11RT 1044-1047.)

Two other times, appellant had her do an exercise on her

_____

4. Arleth drew a similar picture (People's Exhibit 24) at the preliminary hearing.  (15RT 1512; see ACT 3-4.)  During argument, the prosecutor characterized this drawing as representing "testicles with hair surrounding it."  (18RT 1654.)

10

hands and knees.  Her eyes were not covered these times, and appellant would be behind her, holding her feet.  He pushed against her bottom with his head or a "bouncy ball"; then Arleth saw some water dripping to the ground behind her.  (11RT 1002-1006, 1030, 1037-1040.)

Arleth was at a friend's house when she saw a news report with appellant's picture on TV.  (11RT 1020-1021.)  She told her cousin Noemi what appellant had done to her and asked if she would get arrested.[5]  (11RT 1013-1016.)

### Laurie "Doe" (count 3)

Laurie was born November 18, 2003.  She was in the third grade in appellant's combined second- and third-grade class.  (10RT 800, 805.)  Appellant read a book to the class about a woman who could not see and who had to feel things to know what they were.  (10RT 823-824.)  Appellant had the class play a game in which the students were blindfolded and had to feel things to guess what they were.  (10RT 809-810.)

During a lunch recess, the yard duty person came and told Laurie to go to appellant's classroom, number 18.  Appellant closed the door behind her and blindfolded her.  Laurie sat in a chair and put her feet, still in socks, up on her desk.  Appellant then had her feel things with her feet.  Laurie did not remember how many times

---

5. Arleth's January 17, 2012 interview with the police was played for the jury.  (12RT 1140; see People's Exhibit 8A, 6CT 1224-1304.)

11

she did this, and she did not remember appellant putting anything in her mouth. (10RT 807-812, 817.) She remembered telling the police she felt a glue stick against her feet.[6] (10RT 831.)

Dr. Lynn "Doe" interviewed Laurie at her home office on November 29, 2012.[7] Laurie became very upset and embarrassed and started crying when the doctor asked her about being a student in appellant's class. Laurie said she had been alone in appellant's classroom five to ten times and appellant blindfolded her about five times. When she was blindfolded, something hard and gooey was put into her mouth. She also had to touch something hard and then there was sticky stuff in her mouth. That happened between one and five times. (10RT 856-859.) The doctor's notes reflected Laurie reporting two episodes when she touched something hard and two episodes when something sticky was in her mouth; she was blindfolded during all these episodes. (10RT 863-864, 866.) The doctor's notes did not contain any mention of Laurie's feet. (10RT 869.)

Laurie told the doctor she hated school and never wanted to go back; other kids made fun of her and said she had been raped and

_____

6. Laurie's interview was played for the jury. (10RT 835; see People's Exhibit 5A, 6CT 1157-1179.)

7. Lynn "Doe" was a psychological consultant retained for purposes of the civil suit against the school. The court limited her testimony to Laurie's prior inconsistent statements. (10RT 838-851.)

12

called her a slut, but she did not know what that meant.  (10RT 856-857.)

<u>Wendy "Doe" (count 4)</u>

Wendy, eleven years old at the time of trial, had appellant as her third grade teacher during the 2010/2011 school year.  (12RT 1075-1077.)

On approximately fifteen occasions during that school year, appellant kept Wendy and her friend Melissa back at the morning recess when the other students went out to play.  On these occasions, appellant would make Wendy and Melissa take off their shoes and socks and lie down on the floor on their stomachs, so the bottoms of their feet faced the ceiling.  Appellant then put soft fabric bags over their heads and rubbed something round he got from the supply cabinet -- perhaps a glue stick or an eraser -- between Wendy's feet. Melissa was with her every time this happened.  (12RT 1087-1090, 1094, 1103-1112.)

On about ten occasions following the fifteen involving the foot-touching exercises, appellant kept Wendy in at recess and made her sit in a blue student chair, where he either blindfolded Wendy or had her don a blindfold herself.  Appellant then put two things which he said were candy in her mouth.  The first object felt and tasted like candy.  Wendy could not identify the second object, which was round, "kind of big," felt and tasted like skin, and was slippery.  Although that object sometimes tasted a little like

13

strawberry, it did not taste like any food she knew.  When appellant put the second item in her mouth, he put his hand behind her head and pushed for about five minutes, so that both her head and the thing in her mouth moved back and forth.  (12RT 1078-1085, 1124, 1127, 1130.)  Once, Wendy bit down on that object because she thought it was candy and appellant told her not to bite.  Wendy wondered how appellant could know she bit down on the object if it were candy.  (12RT 1084-1085.)  Sometimes Wendy heard metal hitting together, which sounded like a belt.  She also heard footsteps and water running in the sink.  (12RT 1085-1086.)

The classroom door was always closed on these occasions. (12RT 1085.)  More than half the time Wendy did the chair exercise Melissa was there, too.  (12RT 1090-1091.)  Afterwards, appellant gave her a lollipop and sent her out to play.  (12RT 1085.)  One time after they finished and they were walking down the hallway, Melissa told Wendy she saw appellant pick up his belt from the desk.  (12RT 1091.)

One day, after these individual sessions with Wendy and Melissa, the entire class played a taste and feel game in which the students were blindfolded and had to guess what was in their mouths.  Appellant did not have the students feel anything with their feet.  (12RT 1113-1116.)  Wendy did not recall a class discussion regarding Helen Keller or a girl who could not see or hear.  (12RT 1123.)

14

The first adult Wendy told about this was the officer who came to the school.[8]  (12RT 1092, 1097-1098.)

<u>Appellant's Arrest and Aftermath</u>

Armando Lara was acting assistant principal at O.B. Whaley. On the morning of January 9, 2012 he was called to the office to assist Peery in investigating a parent's complaint.  The police were called that same day.  (10RT 892-893.)

Detective Pierce met appellant in the police department lobby on the evening of January 9, 2012 after he was arrested and released. Pierce told appellant not to return to the school, but to contact the principal in the morning and seek further instructions.  (13RT 1276.)

Assistant Principal Lara arrived before 6:00 a.m. the following day, January 10.  Although school began at 8:30 a.m., appellant arrived at about 6:45, carrying one or more items in a plastic grocery bag, and went to his classroom.  No other teachers were on campus that early.  (10RT 894-896, 907-908.)  Lara and Dan Deguara, from the school district office, went to appellant's classroom.  Finding the classroom door locked, they used the master key to enter.  Appellant was standing near his desk and Deguara told him he needed to leave.  Appellant asked if he could take his personal belongings and Deguara said yes.  Appellant gathered items, including cleaning supplies, from the desk, shelves, and cabinets in the classroom, after

_____

8. Wendy's interview was played for the jury.  (13RT 1216-1217; see People's Exhibit 15A, 6CT 1310-1353.)

15

which he was escorted off campus.  (10RT 895-899, 910, 918.)

<u>Forensic Investigation and Evidence</u>

San Jose Police Officer Russell Chubon arrived at the school near noon on January 10, 2012.  He thoroughly searched classroom 18, but did not find any blindfolds.  (13RT 1183-1188, 1194-1195.) Using an alternate light source, Chubon seized two chairs, both with wheels, which had suspicious stains: a chair near a horseshoe-shaped table, marked SYO-01, and a chair from appellant's desk, marked SYO-02.  (13RT 1189-1193.)  Both chairs had a thick plastic base with fabric-covered seats and backs.  (13RT 1171.)  Chubon did not use the alternate light source on any of the student chairs, except incidentally when he searched the carpeted floor, which revealed nothing of evidentiary value.  (13RT 1209-1212, 1214.)

Forensic biologist Kristin Cardosa used an alternate light source and detected areas of fluorescence of both chairs seized by Chubon.  Chair SYO-01 had multiple areas of fluorescing stains, only one of which tested positive for semen with a presumptive chemical test.  Cardosa swabbed that stain for DNA, which revealed the presence of spermatozoa.  She compared the DNA with a known sample of appellant's DNA (obtained from a cup in his classroom) and conclusively determined a white stain on SYO-01 contained appellant's sperm.  The stain revealed only a single profile, and contained only semen, no epithelial cells.  (12RT 1141-1155; 13RT 1173, 1176.)

16

Cardosa found five stains presumptively testing positive for semen on chair SYO-02.  She tested one of those five stains for DNA and determined that stain contained appellant's semen and sperm. Again, the stain contained semen only, no epithelial cells.  (12RT 1155-1162; 13RT 1176.)

The stain on SYO-01 was less than a quarter-inch wide by four to five inches long, and looped back on itself.  The stain on SYO-02 was about the size of a nickel.  Both stains appeared to have been directly deposited on the chairs, as opposed to transfer stains, but the chairs would have had to have been flipped over to have received direct deposits of semen.  (13RT 1173-1178.)

Other Incidents at the School

Mary Montgomery taught at the O.B. Whaley School during the 2011/2012 school year.  Her classroom, number 19, was adjacent appellant's classroom.  (10RT 873.)  One day in the autumn semester of that school year, during one of the lunch periods, Montgomery heard a knocking on appellant's classroom door.  The knocking became incessant.  She looked out her door and saw a former student named Chris, who was now in appellant's class, knocking on the door.  Montgomery asked where appellant was.  Chris said he was in the classroom.  Montgomery asked if the door was stuck. Chris pushed the door handle down but the door was locked. Moments later the door opened and appellant walked out by himself.  His students were standing unsupervised in the area

17

outside the classroom, where he often had them play at recess. (10RT 873-877, 882-886, 888.)

Hilda Keller taught kindergarten and first grade at O.B. Whaley between 2000 and 2005. She knew appellant as a fellow teacher, not as a friend. (11RT 1058-1059.) One day, when Keller left her classroom door open, appellant entered her room, closed the door behind him, and stood in the corner of the room for about a minute. Keller asked appellant what was going on. Appellant started walking towards her and said he was taking a massage therapy class and asked to take pictures of her feet and give her a foot massage. He did not offer to rub her shoulder or neck. Keller felt very uncomfortable, stood up, and tried to make light of the situation. She opened the door and appellant left the classroom. Keller found the incident very unusual and in the context of their relationship was concerned appellant's request was sexually motivated. (11RT 1059-1061.)

**Defense case**

Dorothy Catangay taught the third grade in classroom number 16 at O.B. Whaley. Her classroom was adjacent appellant's for eight years. A connecting door adjoined their classrooms. The door had no lock and one could pass through the door simply by turning the handle. (13RT 1221-1225, 1231.) Appellant often passed through the connecting door because it was a shortcut to the parking lot and school office. (13RT 1232-1233.)

Catangay typically arrived at school between 6:15 and 6:30 a.m. and appellant typically arrived about 7:30; classes usually started around 8:30, and 8:00 on Thursdays.  (13RT 1226-1228.) Every other week, teachers had assigned duty at recess and lunch. During recesses, she was "all over" her classroom and she often ate her lunch in her classroom rather than the staff room.  (13RT 1231, 1235.)  Catangay never heard anything unusual coming from appellant's classroom during morning or lunch recesses in the 2010/2011 and 2011/2012 school years.  (13RT 1235-1236.)  She never walked into appellant's classroom during school hours unless she was scheduled to do so on a rainy day.  (13RT 1232, 1237-1238.)

In the twenty years she had been teaching, Catangay never heard of a teacher blindfolding students alone in the classroom and putting things in their mouths; nor could she think of any educational purpose for doing that.  (13RT 1237.)

Several of appellant's former students testified that appellant played the tasting/feeling game in class.  Veronica "Doe," in fourth grade at the time of trial, described a game in appellant's second grade class in which boys and girls were blindfolded and given a candy to taste, and another game in which blindfolded students were asked to describe items such as marker pens, pencils, and safety scissors they felt with their stockinged feet.  Appellant never asked Veronica to stay behind during lunch or recess and she never practiced the game before the one time the students played it in

19

class.  (13RT 1241-1251.)

A male student, Ly "Doe," also now in fourth grade, played the tasting and feeling game in appellant's second grade class.  Ly covered his eyes with his hands, not a blindfold, and he never was alone with appellant.  The students played one game by tasting various food items appellant provided from a ziplock bag: appellant told the students to chew the item and guess what it was.  In another game, students lay on the carpet and felt things with their hands and stockinged feet.  In yet another game, appellant would move the students' desks from the center of the room and a student would close his or her eyes and be directed by the other students towards appellant's hand.  (13RT 1253-1264.)

Several other former students -- Kevin, Diego, Chris, Mary, Jorge, Carl, and Marcus -- described playing similar tasting and feeling games while blindfolded and seated or lying down in appellant's second or third grade classes.  None of these students played the game by him- or herself alone in the classroom during recess.  None of these students had something oblong-shaped put in his or her mouth that made them choke or which released a salty liquid or moved in and out.  (13RT 1268-1274; 14RT 1328-1333, 1335-1343, 1348-1356, 1358-1368, 1370-1377, 1380-1388.)

Annie "Doe," whose daughter was in appellant's third grade class, met appellant at a back-to-school night.  Annie told appellant she was single and appellant said he had a two-year-old child and

recently separated from his wife. Appellant asked for Annie's phone number and they subsequently spoke on the phone. Annie trusted appellant as a teacher and as a parent and believed a serious relationship might develop with him. (14RT 1393-1396, 1410, 1413.)

About a month after they met, Annie and appellant went on a date in a sushi restaurant. Afterwards, they returned to Annie's house, where they took off their clothes and kissed; they tried to have sex, but appellant was nervous and sweating and could not get an erection, so he left around 2:30 or 3:00 a.m. Annie continued calling and texting appellant for some time afterwards, but he did not respond and she felt as if he had used her. (14RT 1396-1398, 1411-1413.)

Four to six months later Annie attended a parent-teacher conference with appellant at O.B. Whaley. Her meeting was scheduled for 6:00 p.m. When she arrived appellant told her he wanted her appointment to be the last one of the day. A small dog was running around the classroom, but Annie did not know whose dog it was. Annie sat in a student chair. After saying just a few words about her daughter's performance in school, appellant scooted his chair close to hers so their knees were touching. Appellant put his arm around her and began kissing her. Someone tried to get in the classroom door. Annie got nervous and appellant said it was just the janitor, reassuring her the door was locked. (14RT 1399-1407, 1414-1418, 1428.)

21

Appellant began pulling Annie's leggings down.  Annie resisted and tried pulling them back up, afraid the janitor would enter.  Then appellant turned her around, succeeded in pulling her leggings down, and put his penis in her vagina from behind.  He ejaculated very quickly.  Annie pulled her leggings back up and walked home, extremely upset and crying.  The next day appellant sent her a text message saying how pleasurable it was with her, but she did not respond.  Appellant then sent her an angry text message, so she replied that she was busy and did not want to talk to him. (14RT 1407-1409, 1418-1423.)

Annie brought her daughter to the police for an interview in January 2012.  Annie told the police appellant had raped her, because it felt like that.  (14RT 1421.)

Maria L., Arleth's mother, saw appellant's photo in news stories in January 2012 regarding allegations that he molested students at O.B. Whaley.  She later learned appellant had been Arleth's third grade teacher.  Maria began "interrogating" Arleth, asking whether appellant ever did anything to her.  Arleth repeatedly denied that appellant ever did anything and said he gave her lollipops.[9]  Maria's niece Noemi was living at their house at the

---

9. Partially because of the many objections interposed by the prosecutor, Maria's testimony was somewhat garbled and inconsistent.  Maria also testified Arleth said appellant turned off the
(continued...)

22

time, and Noemi called her at work.  (15RT 1438-1445.)

William O'Donohue, a licensed clinical psychologist recognized by the court as an expert in child sexual abuse and forensic interviewing techniques, reviewed the interviews of the five named victims in this case.  He prepared a 70-page report listing the myriad inconsistencies and nonsensical details in all the girls' interviews and outlined several of these in his testimony.  Except for Arleth's statements, O'Donohue found the girls' statements to be insufficiently detailed and "impoverished narratives," largely as a result of poor interviewing techniques and deviations from standard interviewing protocols.  Moreover, several of the girls were subject to outside contamination by prior reports.  (15RT 1453-1486.)

O'Donohue could not state the girls' allegations were not true, and acknowledged that most allegations of child sexual abuse are true.  (15RT 1495-1496.)  On cross-examination, he recognized the many consistencies between the girls' reports and conceded that several of his perceived inconsistencies were not truly inconsistent.  He also admitted he had been paid about $20,000 for his services.  (15RT 1494, 1500-1532.)

The parties stipulated that civil suits against appellant and the school district seeking monetary damages were filed on behalf of Laurie, Wendy, and Arleth.  The lawsuits were filed after the

_____

(...continued)
lights and made her "touch some of his parts."  (15RT 1441.)

23

children gave their statements to the police and/or after they previously testified in court.  (16RT 1546.)

## ARGUMENT

### I.

**APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO PROPERLY CROSS-EXAMINE A CRITICAL PROSECUTION WITNESS TO PROVIDE AVAILABLE EXCULPATORY EVIDENCE, AND ALSO BY PROMISING TO PRESENT EXCULPATORY EVIDENCE IN HIS OPENING STATEMENT AND FAILING TO PRODUCE THAT EVIDENCE**

A.    **Relevant law and standard of review.**

The Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the effective assistance of counsel.  In claiming the ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  (*Strickland v. Washington* (1984) 466 U.S. 668, 693-695; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*People v. Ledesma, supra,* 43 Cal.3d at p. 218.)  "The defendant must make the showings of deficient performance and resulting prejudice by a preponderance of the evidence. [Citation.]  The defendant need not, however, show that it is more likely than not that he or she would have obtained a

24

better result.  [Citation.]"  (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

In *People v. Frierson* (1979) 25 Cal.3d 142, our state Supreme Court stated, "There is a risk of 'second-guessing' trial counsel after the event.  Nonetheless, while acknowledging the wide latitude and discretion necessarily vested in trial counsel in the area of tactics and strategy, we stress that the exercise of that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and founded upon reasonable investigation and preparation."  (*Id.*, 25 Cal.3d at p. 166, emphasis added; see also  *In re Hall* (1981) 30 Cal.3d 408, 426.)

"A standard of reasonable competence requires defense counsel to diligently investigate the case and research the law." (*People v. Thimmes* (2006) 138 Cal.App.4th 1207, 1212.)  In *People v. Edward S.* (2009) 173 Cal.App.4th 387, the court stated: "[A] defense attorney who fails to investigate potentially exculpatory evidence . . . renders deficient representation.  (See, e.g., *In re Jones* (1996) 13 Cal.4th 552, 564-565; *Reynoso v. Giurbino* (9th Cir. 2006) 462 F.3d 1099, 1112; *Rios v. Rocha* (9th Cir. 2002) 299 F.3d 796, 805; *Hart v. Gomez* (9th Cir. 1999) 174 F.3d 1067, 1070; *Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446, 1456.)  California case law makes clear that counsel has an obligation to investigate all possible defenses and should not select a defense strategy without first carrying out an adequate investigation.  (*In re Gay* (1998) 19 Cal.4th 771, 790; *In re Visciotti*

(1996) 14 Cal.4th 325, 334; *In re Vargas* (2000) 83 Cal.App.4th 1125, 1133; *Rios v. Rocha, supra,* 299 F.3d at pp. 805-806.)"  (*People v. Edward S., supra,* 173 Cal.App.4th at p. 407, parallel citations omitted; see also *In re Hill* (2011) 198 Cal.App.4th 1008, 1017-1023 [child molest convictions reversed for counsel's failure to properly investigate and prepare for trial]; *In re Handy* (2007) 41 Cal.4th 977, 1018, 1036 [vacating death penalty based on attorney's failure to investigate and present exculpatory evidence].)

On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

B.  **Failure to properly cross-examine the DNA expert.**

1.  The meaning of the lack of epithelial cells in the stains on the chairs.

The prosecutor's theory of the case was that appellant blindfolded the five girl witnesses and, unbeknownst to them, made them orally copulate him.  (18RT 1605-1606, 1615-1618.)  Because none of the five girls named as victims actually saw what appellant was doing while they were blindfolded, the most crucial, objective prosecution witness was Kristin Cardosa, the forensic biologist who

unequivocally testified she found stains containing appellant's sperm and DNA on two chairs in the classroom.

Via the testimony of Annie "Doe," defense counsel, Mr. Madden, presented evidence that Annie and appellant had intercourse in the classroom to explain the presence of appellant's sperm and semen on two of the chairs.

     a. <u>Preliminary hearing testimony</u>.

Defense counsel Steven Clark cross-examined Kristin Cardosa during appellant's preliminary hearing. Cardosa testified that she analyzed DNA in more than one hundred sexual assault cases, many of which involved oral copulation. (3CT 432.)

Cardosa did not find any DNA in this case other than appellant's. (3CT 433-434.) Cardosa explained that because epithelial cells are more fragile than sperm cells, epithelial cells break open during the DNA testing process, resulting in epithelial fractions. Cardosa stated that "in this case, the epithelial fraction contained the same profile as the sperm cell fraction[,]" which was associated with appellant. (3CT 435.) Cardosa detected no other DNA. (3CT 436.)

Clark then elicited from Cardosa that human adults and children have epithelial cells in their mouths, and had it been present in the stains on the chairs, Cardosa would have seen the DNA of someone other than appellant. (3CT 436, 438.)

Clark thereafter returned to this subject and elicited from

Cardosa that the reason DNA sample swabs are obtained from people's mouths is because of the abundance of epithelial cells. (3CT 455-456.)  Cardosa then testified that epithelial cells in the mouth are easily transferred to another object, and can be transferred in multiple ways.  (3CT 456.)  Cardosa would expect to find the epithelial cells from a female's mouth transferred onto a man's penis during oral copulation.  (*Ibid.*)  Cardosa also would expect to find the epithelial cells from the female's mouth in a sample if the man touched his penis after the oral copulation and there was ejaculate on his penis.  (*Ibid.*)  Moreover, if the male ejaculated into the female's mouth and the female then spit out that semen, Cardosa would expect to find a mixture of the female's saliva in the sample containing the male's semen.  (3CT 457.)

  b.  <u>Trial testimony and argument</u>.

  Defense counsel Madden began his cross-examination of Cardosa at trial by questioning about the locations and sizes of the semen stains on the two chairs.  (13RT 1170-1175.)  He then elicited that she "did not test for saliva."  (13RT 1175.)  She agreed that saliva contains epithelial cells, and when she was looking for spermatozoa she also looked for epithelial cells; however, she found no "intact epithelial cells."  (13RT 1176.)  Cardosa found only one body fluid -- semen -- in both of the stains tested.  (*Ibid.*)  To summarize, Cardosa found a small amount of semen on the underside of chair SYO-01, unmixed with any other body fluid or DNA, and also found a small

amount of semen on the left side of chair SYO-02, unmixed with any other body fluid or DNA.  (13RT 1177.)

Madden presented his closing argument without once mentioning the DNA evidence, after which the court took the noon recess.  (18RT 1620-1651.)

Immediately following the noon recess, the court allowed Madden to reopen his argument, and he apologized for neglecting to cover the subject of the DNA.  (18RT 1652.)  Counsel then stated, "The two stains on these two chairs contain semen, no other bodily fluid, and it's Mr. Chandler's semen."  (*Ibid.*)  He soon continued, "The most important part of her analysis [was] the fact there was no saliva found in either stain.  What that means is very clear, and it is this, that semen was never in the mouth of any child.  Otherwise, there would be saliva in that stain -- in those stains, and it's not there."  (*Ibid.*)  At that point, the prosecutor, Ms. Filo, objected that Madden's argument misstated the evidence and the parties approached the bench for a discussion.  (18RT 1652-1653.)

Upon returning from the bench conference, Madden continued, "Let me restate that, ladies and gentlemen.  There is no mixture of other DNA in that stain.  There are no other epithelial cells saliva from --"  (18RT 1653.)  The prosecutor again objected, and the court struck Madden's last comment.  (*Ibid.*)  At that point, Madden apparently gave up and sat down and Ms. Filo began her rebuttal argument.  (*Ibid*)

29

During rebuttal argument, the prosecutor stated, "There is no evidence in this record at all that the crime laboratory could test for saliva. No evidence in the record at all. I will tell you what is in the record, that Craig Chandler's semen is found on one spot on SYO-01, confirmed on one spot on SYO-02, and presumptively confirmed on four other spots on that chair." (18RT 1664.)

c. Trial counsel's failure to properly cross-examine.

The federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer. (*People v. Homick* (2012) 55 Cal.4th 816, 861; *United States v. Owens* (1988) 484 U.S. 554, 559.) Nevertheless, the cross-examination must be "effective" in order to meet constitutional standards of competence. (*Ibid.*) Given the high-quality impeachment testimony elicited by defense counsel Clark during the preliminary hearing, Madden's failed attempts at cross-examining Cardosa, followed by his aborted attempt to explain her testimony, were inexcusable.

As stated above, none of the five female students saw what appellant put in their mouths, and there were significant inconsistencies between the girls' descriptions of the object(s). The prosecution theory was that appellant made the girls orally copulate him and he ejaculated in some of their mouths. It is hardly arguable that the most inculpating evidence was the presence of appellant's semen, sperm, and DNA on two of the chairs.

30

Clark's cross-examination of Cardosa to a great extent undermined the prosecution theory. He first elicited an explanation as to why the samples did not contain complete epithelial cells: they were less robust than sperm cells and were destroyed during the DNA testing process. (3CT 435.) He then confirmed that appellant's DNA alone was found in the epithelial cell fraction. (3CT 435-436.) He next effectively established that epithelial cells are found in the mouths of adults and children; in fact, the abundance of epithelial cells in the mouth is the reason DNA sample swabs are obtained from that location. (3CT 346, 455-456.) Clark then debunked the exact prosecution theory: positing a hypothetical in which a female orally copulates a male, who ejaculates into the mouth of the female, who then spits out that semen, Cardosa testified she would expect to find a mixture of the female's epithelial cells and the male sperm cells. (3CT 456-457.) Again, however, the stains on the chairs contained only appellant's DNA. (3CT 435-436.)

By stark contrast, Madden's cross-examination of Cardosa failed to make the critical links for the jury's consideration. He confirmed from Cardosa that saliva contains a lot of epithelial cells, but also elicited that she did not test for saliva. (13RT 1175-1176.) Thus, when Cardosa testified she did not find any intact epithelial cells in the stains on the chairs (13RT 1176), and that she did not find any other bodily fluids mixed with the semen stains (13RT 1177), the jury could have been left with the impression the reason for that was

31

because Cardosa did not test for saliva. (13RT 1175.)

Madden's "afterthought" argument regarding the DNA only exacerbated the error. He first noted the two stains on the two chairs contained appellant's semen, no other bodily fluid. (18RT 1652.) But his earlier cross-examination of Cardosa failed to explain the importance of this fact, particularly in light Cardosa's testimony that she did not test for saliva. Madden then sought to make an untenable and unsupported leap: he argued the fact no saliva was found in either stain meant semen was never in the mouth of any child. (*Ibid*.) But having failed to elicit this evidence from Cardosa, the prosecutor properly objected that this misstated the evidence. (*Ibid*.) After apparently being admonished at the bench, Madden sought to "restate that," and argued there were no other "epithelial cells saliva [*sic*]," at which point the prosecutor again objected and the court struck counsel's last comment. (18RT 1653.) Evidently conceding defeat, Madden made no further comments and the prosecutor began her rebuttal argument. (*Ibid*.) And during her rebuttal, the prosecutor reminded the jury there was "no evidence in this record at all that the crime laboratory could test for saliva" (18RT 1664), thereby destroying whatever negligible vestige of impeachment value Madden's cross-examination and argument might have contained.

Again, prior counsel established from Cardosa that the mouth had an abundance of epithelial cells, and that had a female orally

32

copulated a male who ejaculated in her mouth, Cardosa would have expected to find a mixture of both parties' genetic material in the resulting stain. This was the exact scenario posited by the prosecution. Yet neither of the stains contained that expected mixture.

As this court has observed, "A standard of reasonable competence requires defense counsel to diligently investigate the case and research the law." (*People v. Thimmes,* 138 Cal.App.4th at p. 1212; see also *In re Edward S., supra,* 173 Cal.App.4th at p. 407 ["a defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach prosecution witnesses, renders deficient representation"].) Here, it is reasonable to expect that trial counsel reviewed the preliminary hearing transcript and made himself aware of available prior testimony that directly undermined the prosecution theory. Counsel failed to elicit this available evidence and instead presented a garbled and wholly ineffective argument based on his inadequate cross-examination. There simply could be no satisfactory explanation for counsel's failure. (*People v. Mai, supra,* 57 Cal.4th at p. 1009; *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

2. The defense "transfer" theory.

a. Preliminary hearing testimony.

During cross-examination, defense counsel Clark elicited from Cardosa that the semen stain was found "on the underside of the

seat portion" of chair SYO-01.  (3CT 437.)  Clark continued, "So is it possible if someone has semen on their hand, if they sit in their chair and move their chair, you could transfer the semen in that way?" Cardosa responded, "Yes, it's a possibility."  (*Ibid.*)  Clark then asked if Cardosa thought that happened, or whether she knew.  (*Ibid.*) Cardosa responded, "It is hard to determine based on the pattern of the stain."  (3CT 438.)

Continuing this train of thought, Clark later asked Cardosa whether the stain on SYO-01 was "consistent with what's commonly known as a transfer stain."  (3CT 450.)  Cardosa answered, "Based on the shape of the stain, I cannot tell whether it's a transfer.  You mean a secondary transfer from something else?"  (*Ibid.*)  When Clark responded, "Yes," Cardosa replied, "Based on the stain, I can't determine that."  (3CT 451.)  She then expanded, "It looks to be a straight stain from a straight liquid, but whether it was just deposited on there or wiped from something else, if it was a liquid transferred, it could be a transfer."  (*Ibid.*)

b.  Trial testimony and argument.

After reaffirming the small amounts of semen found on chairs SYO-01 and SYO-02 were unmixed with any other body fluid (13RT 1177), defense counsel Madden proposed to Cardosa the following hypothetical: "A man and a woman have sex in a room containing the two chairs, SYO-01 and SYO-02.  Immediately afterward, some semen gets onto the hands of the man, and the man then moves both

of these chairs, transferring the semen on his hand to the chairs. [¶]
Is that scenario a reasonable explanation for the finding that you
made here?" (13RT 1178.)

Cardosa replied, "Based on the appearance of the stains, they
don't appear to be transfer stains. They appear to be directly
deposited onto the chairs." (13RT 1178.) Apparently surprised by
Cardosa's response, Madden re-asked the question: "They don't
appear to be transfer stains?" Cardosa reaffirmed her previous
answer: "They don't." (*Ibid.*) Madden questioned, "Why not?" and
Cardosa replied, "They don't appear to be smeared or in any kind of
way disturbed. They appear to be just a pure liquid placed on the
chairs." (*Ibid.*)

During her opening argument, Ms. Filo highlighted Madden's
tactical error: "And Mr. Madden asked Kristin Cardosa, remember
the DNA expert, and said, Ms. Cardosa, I would like to give you a
hypothetical. Let's assume that Mr. Chandler had consensual sex in
a classroom with an adult woman and touched himself afterwards,
then somehow put his hands on the chairs, move[d] these chairs
around, would that explain the semen that was on the chairs? No.
Well, why not? Because these aren't transfer stains. This isn't like
she described a ketchup packet, where you smear your finger, you
get a smear. It's called a transfer stain. It's something decidedly
different than what you could view with the naked eye on these
chairs, which are drops. She called them direct deposits." (18RT

35

1613.)

After realizing he had neglected to discuss the DNA evidence during argument and was allowed to reopen his argument, Madden told the jury, "I disagree with Ms. Filo concerning Ms. Cardosa.  Ms. Cardosa said that the one particular stain did not appear to be a transfer stain, but scientists would never make an absolute statement that it wasn't a transfer stain.  She said it doesn't appear to be because there were droplets."  (18RT 1652.)

c.  <u>Trial counsel's failure to properly cross-examine.</u>

Cardosa's testimony at the preliminary hearing directly contradicted her trial testimony on an extremely critical point: during the preliminary hearing, Cardosa agreed the semen stain on the chair could have been a transfer stain, placed there after a sexual encounter if the person had semen on his hand and moved the chair. (3CT 437, 450-451.)  This was the defense theory of the case: that appellant placed the stains on the chair after his sexual encounter with Annie in the classroom.

At trial, defense counsel Madden proposed this exact scenario to Cardosa.  Now, however, Cardosa emphatically disagreed the stain could have been a transfer stain, and insisted it must have been directly deposited on the chair, thereby undermining the defense theory.  (13RT 1178.)  Evidently conceding defeat, counsel terminated his cross-examination after eliciting this testimony. (*Ibid.*)

36

Counsel failed to impeach Cardosa's testimony with her prior testimony allowing for the possibility of a transfer stain. "'A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.' (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219[.])"[10] (*People v. Chism* (2014) 58 Cal.4th 1266, 1294.)  The test for whether a witness's prior statement is inconsistent with prior testimony is whether the statement is inconsistent in effect rather than an express contradiction of terms.  (*People v. Cowan* (2010) 50 Cal.4th 401, 462; see also *People v. Chism, supra,* at p. 1295.)

Again, counsel should have been familiar with this critical prosecution witness's earlier testimony on this crucial point.  Instead of effectively impeaching her with her prior inconsistent testimony, however, counsel just abdicated and figuratively threw up his hands.  Counsel's failure left him with nothing to argue on this point

---

10.   Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."  Evidence Code section 770 states, in relevant part: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶ ] ... [t]he witness was so examined while testifying as to give him an opportunity to explain or to deny the statement[.]"  (Evid. Code, § 770, subd. (a).)

except to feebly claim that "scientists would never make an absolute statement that it wasn't a transfer stain." (18RT 1652.) The problem is, unlike her preliminary hearing testimony, that is exactly what Cardosa stated at trial. (13RT 1178.) Moreover, the prosecutor took advantage of counsel's tactical error during argument, highlighting how his hypothetical backfired and instead supported the prosecution theory. (18RT 1613.)

As with counsel's failure to properly cross-examine Cardosa about the significance of the lack of another person's epithelial cells, there can be no satisfactory explanation for counsel's failure to impeach Cardosa with her prior inconsistent testimony on this critical point. (*People v. Mai, supra,* 57 Cal.4th at p. 1009; *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

## C.   Failure to present evidence promised in the opening statement.

After informing the jurors he wanted to give them "an overview," trial counsel continued his opening statement:

> Craig's wife was also a grade school teacher, but she taught first and second grade. Craig was a very good teacher. He was a popular teacher. Got along, not only well with his students who really like him because of the way he taught. There were a lot of games that were played in his teaching. But it's been a long time since I have been in the second or third grade, as you could tell, but obviously children at that age learned many times by playing games, by doing things, by experiments, by demonstration. That's a very important thing to remember in this case.
>
> Early in his teaching career at O.B. Whaley, Craig had an experience where he witnessed two of his

38

students essentially bullying a special needs child. Bully might be too strong a word, but making fun of them. This bothered Craig, as it would bother any adult, but especially bothered Craig because Craig is dyslexic. Craig knows the experience of being made fun of, made feel to be -- made to feel less than, made to feel stupid. So he really decided that he was going to try to do something about this, and so he came up with a plan to teach about Helen Keller, which you all know is the famous woman who was blind and deaf and came to teach millions of people at how to overcome her disabilities.

The Helen Keller lesson plan is a completely valid mainstream story or lesson to teach to children at this age. That will be confirmed by either Ms. Vijayendran, one of the principals at one time at O.B. Whaley, or Ms. Perry [sic], another principal at a later time. She actually was the principal after Ms. Vijayendran left for maternity leave.

So he decided to create this lesson plan, and the idea taken from the Helen Keller book was to deprive children of their sight and have them engage in activity that involved tasting and identifying objects in their mouth and feeling and identifying objects that were touched on either their hands or their feet. And the object in both instances was to identify the object, and that's what happened in this case. It happened again and again and again. And, in fact, it happened from almost the entire time Craig Chandler was teaching at O.B. Whaley.

(Augmented Reporter's Transcript of July 15, 2013 opening statements, vol. 1 of 1 ["ART"], pp. 12-13.)

Notwithstanding counsel's promises, virtually none of the evidence predicted in his opening statement was presented to the jury. There was no evidence appellant was a very good teacher and/or that he was a popular teacher. Counsel presented absolutely no evidence regarding appellant's dyslexia or the incidents

39

involving the bullied or harassed students, which purportedly motivated him to develop the "Helen Keller lesson plan." While counsel promised one of the principals would confirm that appellant's Helen Keller lesson plan -- i.e., a lesson plan in which the student is blindfolded and asked to taste or feel something -- was a "completely valid mainstream story or lesson to teach to children at this age," neither of the two principals testified to that.

During his cross-examination of Vijayendran, Madden changed subjects and said he wanted to ask the principal about the "Helen Keller lesson plan." (9RT 752.) He then asked, "Is the Helen Keller story an appropriate story to be telling second- or third-graders?" Vijayendran responded, "Yes." Counsel continued, "Why is it an appropriate story?" The principal replied, "It's a commonly used story in that grade level." (*Ibid*.) Counsel then elicited from Vijayendran that there was nothing unusual about a lesson plan that involves the Helen Keller story. (9RT 752-753.) Vijayendran also stated teachers at O.B. Whaley were not required to submit lesson plans to the administration. (9RT 753.)

Thus, Vijayendran's testimony simply confirmed it was appropriate to tell second- and third-graders the story of Helen Keller, and it would not be unusual to develop a lesson plan based on that story. That testimony, however, was a long way from evidence that school administration considered it appropriate to blindfold students and put objects in their mouths or rub objects on

their bodies, as indicated in counsel's opening statement. Rather, Vijayendran ultimately testified that after Becky reported the blindfold incidents in October 2011, the principal expressly admonished appellant not to have blindfolded students alone in his classroom with the door closed.[11]  (9RT 733.)

Moreover, as explained in greater detail below (see Argument issue II, *infra*), on July 11, 2013 -- four days before counsel's July 15, 2013 opening statements -- the court expressly forbade him from presenting evidence of appellant's conversation with Vijayendran concerning the lesson plan.  Thus, by the time counsel made his comments in the opening statement, he should have known one major avenue for presenting this evidence was closed to him.

Counsel did not even ask Peery any questions about a "Helen Keller lesson plan."  Nor did counsel present any other evidence that such a plan existed.  And, of course, counsel was unable to draw either from the prosecution or defense student witnesses a link between the blindfold/taste activities and the Helen Keller story.

A defense attorney's failure to present evidence promised in the opening statement can deal a "devastating blow" to the client. (*People v. Corona* (1978) 80 Cal.App.3d 684, 725-726.)  "Whether the

---

11.  Given that Becky was transferred to another class in October 2011 as a result of appellant's conduct, counsel also was mistaken when he told the jury, "It wasn't until January the 9th of 2012 that everything changed."  (ART 13.)

failure to produce a promised witness amounts to ineffective assistance of counsel is a fact-based determination that must be assessed on a case-by-case basis. [Citation.] Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case. [Citations.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 955.) "Making promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885.)

In this case, however, defense counsel promised the jury it would hear evidence that appellant's conduct was based on accepted pedagogical techniques and methods and, moreover, was motivated by appellant's personal experiences as an impaired person and as a witness to the harassment of special needs students. None of this evidence was forthcoming. This inevitably must have created an impression in the jurors' minds that counsel's defense theory was groundless or untenable, thus dealing a "devastating blow" to appellant.[12] (*People v. Corona, supra*, 80 Cal.App.3d at pp. 725-726.)

_____

12. In *People v. Corona, supra*, 80 Cal.App.3d at p. 725, the court observed, "Although the opening statement by counsel at the close of the prosecutor's opening statement is permitted by statute (§ 1093, [subd. (b)]), since such statement commits the defense to the pursuit of certain conduct even before the prosecution's evidence is fully

(continued...)

42

D.     **Counsel's failures prejudiced appellant.**

Under the circumstances and in consideration of the evidence presented at trail, as described above, it is reasonably probable that counsel's omission's and tactical miscalculations prejudiced appellant. (*People v. Ledesma, supra,* 43 Cal.3d at p. 218; *People v. Mayfield, supra,* 5 Cal.4th at p. 199.)  This court therefore should reverse appellant's convictions and remand this matter for a new trial.

## II.
### THE COURT IMPROPERLY EXCLUDED EVIDENCE OF APPELLANT'S EXPLANATION AFTER ALLOWING THE PROSECUTION TO INTRODUCE EVIDENCE THAT THE PRINCIPAL WARNED HIM NOT TO BLINDFOLD AND BE ALONE WITH STUDENTS WITH THE DOOR CLOSED

A.     **Relevant procedural and factual matters.**

Prior to trial, the prosecutor sought to introduce evidence that after Becky's mother complained about appellant in October 2011, Vijayendran told him not to have children alone in the classroom. (7RT 539.)  The prosecutor observed that "we know a lot more about these conversations" because Vijayendran had been prosecuted for, and ultimately was convicted by a jury of failing to report an incident of suspected child abuse.  (7RT 539-540.)  Defense counsel Madden clarified that at her trial, Vijayendran testified she

---

(...continued)
known or submitted, the making of such statement is ill advised, ...."

43

specifically advised appellant he was not have children in his classroom with the doors closed with the children blindfolded, putting things in their mouths.  (7RT 550.)  The prosecutor moved to exclude from evidence appellant's "entire explanation of the activity or what they are going to allege is the test which caused a child to be in the classroom alone."  (7RT 540.)

Defense counsel responded by explaining that Vijayendran testified there was a lengthy conversation surrounding her admonition to appellant, during which appellant discussed "exactly what he did on the incident involving Becky, why he did it, what the purpose was.  And it was at the end of that conversation" that Vijayendran stated she did not feel appellant was engaged in inappropriate sexual activity, but advised him it was inappropriate to put things in students' mouths while alone and blindfolded.  (7RT 541-752.)  During that conversation appellant asked that he be able to continue with and complete the lesson, insofar as it taught empathy for disabled children, but that he would modify the lesson plan and show her the new plan in the next day or two.  (7RT 543.)  Counsel therefore moved to allow the entirety of the discussion, pursuant to Evidence Code section 356, in order to place Vijayendran's statement in context.  (*Ibid.*; see also counsel's arguments re: placing Vijayendran's statement in the proper context at 7RT 544-550.)

The court ultimately allowed the prosecutor to introduce what

44

the court believed was the only relevant statement -- Vijayendran's admonition to appellant not to be alone with students -- and excluded from evidence any of appellant's statements of explanation. (7RT 543-544, 546-547, 551-552.) The court specifically warned counsel that if he attempted to introduce any of appellant's statements, the court would sustain a prosecution objection. (7RT 546, 551-552.)

During the trial, the prosecutor asked Vijayendran if after she had the conversation with Becky, she told appellant he was not to have students in his classroom along, particularly blindfolded, with the door closed. Vijayendran responded, "I told him he was not to have students in his classroom alone with the door closed[,] blindfolded. And I told him if he had students in his room alone doing work -- I highly recommend he not have students in his room alone, but that if he did, that they would be sitting at a desk working and the door should be open." The prosecutor concluded her direct examination with that statement. (7RT 732-733.)

B.    **Appellant's explanation for his conduct was admissible under Evidence Code section 356.**

Evidence Code section 356 states, in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; ...." "The purpose of this section is to prevent the use of selected aspects of a conversation, act,

45

declaration, or writing, so as to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission ... in evidence.' [Citations.]"  (*People v. Arias* (1996) 13 Cal.4th 92, 156.)  "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry."  (*People v. Vines* (2011) 51 Cal.4th 830, 861; *People v. Zapien* (1993) 4 Cal.4th 929, 959.)

According to defense counsel's offer of proof -- based on the reporter's transcript of Vijayendran's testimony at her own trial for misdemeanor failure to report suspected child abuse -- after Becky's mother's complaint in October 2011, appellant explained his lesson plan underlying his blindfolding students while alone in his classroom.  The principal then advised him not to do so in the future.  This conversation occurred in a single occasion.  (Cf. *People v. Johnson* (2010) 183 Cal.App.4th 253, 287 [court does not abuse  discretion under Evidence Code section 356 by refusing to admit statements from conversation or interrogation to explain statements made in previous distinct and separate conversation]; and see cases cited therein.)

Thus, because the prosecutor was allowed to introduce evidence that Vijayendran told appellant not to be behind closed

doors with blindfolded children, appellant was entitled to place that statement in the proper context of the greater conversation. (*People v. Zapien, supra,* 4 Cal.4th at p. 959 [in the event a statement admitted in evidence constitutes part of a conversation, the opponent is entitled to have placed in evidence all that was said by or to the declarant in the course of such conversation, provided the other statements have some bearing upon, or connection with, the declaration in evidence].)

Instead, stripped of its contextual setting, the jury was left with the "misleading impression" (*People v. Arias, supra,* 13 Cal.4th at p. 156) that Vijayendran gave appellant his warning directly in response to Becky's and her mother's complaints, as opposed to in the aftermath of appellant's explanation of his lesson plan, which, according to her misdemeanor trial testimony, Vijayendran did not believe had sexual connotations.  The court failed to properly apply Evidence Code section 356 in excluding the context for Vijayendran's warning to appellant.

C.     **The court's exclusion of this evidence prejudiced appellant.**

The improper exclusion of evidence proffered under Evidence Code section 356 is reversible if it is reasonably probable the admission of the excluded evidence would have resulted in a more favorable verdict.  (*People v. Arias, supra,* 13 Cal.4th at p. 157, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, the court improperly excluded evidence which could

47

have provided a viable explanation for appellant's conduct in the classroom with blindfolded students.  Deprived of that evidence, the jury simply learned appellant was admonished not to conduct himself in this manner, without understanding the valid and plausible reason for his conduct.

Moreover, the prejudice to appellant was compounded when the prosecutor (over earlier defense objection; 9RT 755-766) asked Vijayendran whether the information conveyed by Becky caused her concern that Becky was describing an act of sexual molestation, to which the principal responded, "There were times that I was concerned that that was the case, yes."  (9RT 769.)  Vijayendran next testified she did not have any other explanation for appellant's behavior.  (9RT 770.)

According to counsel's offer of proof, however, Vijayendran *did* have another explanation for appellant's conduct, as put forth by appellant himself.  Whether Vijayendran believed the explanation was immaterial -- that was a judgment for the jury to make.  Unfortunately, the court's ruling denied the jury that knowledge, leaving it with the false, and ultimately damning impression that appellant's conduct was sexually, rather than pedagogically motivated.

Had the court not improperly excluded the remainder of appellant's conversation with Vijayendran, there is a reasonable probability appellant would have obtained a more favorable verdict.

(*People v. Arias, supra,* 13 Cal.4th at p. 157.)  The judicial error

therefore must be considered prejudicial.


## III.

### THE COURT ERRED BY EXCLUDING FROM EVIDENCE PRINCIPAL VIJAYENDRAN'S TYPEWRITTEN NOTES AS INADMISSIBLE UNDER EVIDENCE CODE SECTION 1237

A.     **Relevant procedural matters.**

Principal Vijayendran testified on direct that she took

contemporaneous notes while conversing with Becky on, or shortly

after October 14, 2011.  The handwritten notes contained only about

one-third of what they discussed.  The prosecutor introduced

Vijayendran's handwritten notes, which were both read to the jury

and admitted into evidence, as People's Exhibit 3.  Vijayendran

wrote, inter alia, that Becky reported appellant said he was going to

put something in her mouth, and then "he put the gooey something

in my mouth."  (9RT 724-729.)  By trial in mid-July 2013, Vijayendran

did not "recall the exact details of the conversation at this point."

(9RT 729.)

On cross-examination, counsel Madden marked as Defense

Exhibit C typewritten notes documenting Vijayendran's October

2011 conversation with Becky, prepared by the principal about three

months later, in January 2012.  (9RT 734, 737.)  Reaffirming that her

handwritten notes (People's Exhibit 3) reflected about one-third of

her discussion with Becky, Vijayendran described her typewritten

49

notes as "a different set of notes," which were "done later, so they were done more from memory, but they are more detailed."  (9RT 737-738.)  She would not say the typewritten notes were more accurate than the handwritten notes.  (9RT 738.)  She described the typewritten notes as "expanded from my memory compared with the handwritten notes, which were being done while I was talking with the child."  (9RT 745.)  She added details in her typewritten notes based upon her reflection upon the handwritten notes.  (7RT 746.)  Vijayendran had her typewritten notes in front of her for reference during her cross-examination.  (9RT 739, 745.)

Counsel also ascertained that Vijayendran testified in a legal proceeding relating to this matter in October or November 2012. Counsel produced, though did not introduce, the transcript from that testimony.[13]  (9RT 735-736.)

Counsel asked the principal whether Becky talked about the vessel from which the drink came.  Vijayendran replied, "I don't remember that clearly, what she said, except that she was describing gooey[,]" and she used the word "gooey."  (9RT 746-747.)  Counsel asked Vijayendran to review her testimony from the prior legal proceeding, then asked whether she remembered Becky discussing a bottle being gooey.  Vijayendran responded that she remembered

---

13. Although the court identified this proceeding as the preliminary examination (9RT 736), the parties later clarified the transcript was of Vijayendran's testimony during her own criminal trial.  (14RT 1319.)

50

Becky using the word "'gooey,' but the rest of the conversation at that point is not that clear." (9RT 747-748.) The court then inquired of the witness whether it would help to refresh her memory if she reviewed the transcript of her prior testimony. Vijayendran replied, "No." (9RT 748-749.)

On redirect, Vijayendran further explained she prepared the typewritten notes after appellant was arrested in January 2012, when the school district asked her to prepare an account of what happened. (9RT 766.) She clarified that by the time of appellant's trial, she did not have an independent recollection of some matters stated in her typewritten notes: "I think I have an independent recollection of the general outline of how things happened, but when it comes to specific words, things like that, I may not have such a clear memory." (9RT 767.) Vijayendran could not specify whether she prepared her typewritten notes based on her recollection alone or whether she had her handwritten notes available for reference. She prepared the typewritten notes while at home on maternity leave. (9RT 767-769.)

Citing *People v. Cowan, supra,* 50 Cal.4th 401, defense counsel later moved to read into evidence the redacted contents of Vijayendran's typewritten notes, under Evidence Code section 1237. (14RT 1305-1311.) At issue here is the portion of Vijayendran's typewritten notes following Becky's description of appellant putting something gooey on her feet and leg: "Mr. Chandler was next to her.

51

Mr. Chandler lifted the blanket up to about her nose and then put something in her mouth and made her drink something. She explained the drink as salty and that the bottle was gooey. I asked her if she felt the same as what was on her foot, and she said no. It felt different, but also gooey. Becky said some of the drink fell out of her mouth because she was lying down and it got onto her jacket."
(14RT 1312.)

Counsel argued that because Vijayendran could not remember Becky stating the drink came from a gooey bottle, her typewritten notes were admissible both as a prior inconsistent statement and a past recollection recorded; therefore, her more complete typewritten notes should be read into the record. (14RT 1313-1314.)

The court expressed its concern that Vijayendran's typewritten notes were prepared from her memory, three months after the conversation with Becky, and the principal was unsure whether she had her handwritten notes at the time. That, and the fact Vijayendran prepared the report "basically . . . to justify her conduct because of her actions," caused the court to question the reliability of the typewritten notes. (14RT 1314-1315; and see 1318-1319.)

Counsel pointed out that during her own trial testimony, Vijayendran confirmed Becky described a bottle as gooey. (14RT 1319-1320.) The court again expressed its concern that Vijayendran's typewritten report was prepared from her recollections of the conversations three months earlier. (14RT 1320-1321.) For those

52

reasons, the court ultimately denied counsel's request to read
Vijayendran's redacted typewritten notes into the record or
introduced into evidence as an exhibit. (14RT 1324.)

B.     **Vijayendran's typewritten notes were admissible under
       Evidence Code section 1237.**

        Evidence Code section 1237 provides, in relevant part: "(a)
Evidence of a statement previously made by a witness is not made
inadmissible by the hearsay rule if the statement would have been
admissible if made by him while testifying, the statement concerns a
matter as to which the witness has insufficient present recollection to
enable him to testify fully and accurately, and the statement is
contained in a writing which: [¶] (1) Was made at a time when the
fact recorded in the writing actually occurred or was fresh in the
witness' memory; [¶] (2) Was made (i) by the witness himself ....; [¶]
(3) Is offered after the witness testifies that the statement he made
was a true statement of such fact; and [¶] (4) Is offered after the
writing is authenticated as an accurate record of the statement."

        Here, Vijayendran's typewritten statement qualified under all
the conditions required by Evidence Code section 1237. Although
she prepared the typewritten notes three months after conversing
with Becky, they were done from memory and were more detailed
than her contemporaneous handwritten notes, which reflected only
about one-third of the conversation. (9RT 738-739, 745.) Although
Vijayendran would not say the typewritten notes were more

accurate than the handwritten notes (9RT 738), she never said they were *less* accurate than the handwritten notes admitted into evidence as People's Exhibit 3.  Moreover, the state Supreme Court stated it was not aware of any authority that would render inadmissible under Evidence Code section 1237 a recorded statement prepared three months after the events recorded.  (*People v. Cowan, supra,* 50 Cal. 4th at pp. 465-466, and cases cited therein.)  And finally, "the [typewritten] statement concern[ed] a matter as to which the witness ha[d] insufficient present recollection to enable [her] to testify fully and accurately" (Evid. Code, § 1237, subd. (a)): after defense counsel attempted to refresh her memory that Becky used the word "bottle" to describe the gooey thing, the court specifically asked Vijayendran whether reviewing her prior testimony to this effect would help refresh her memory.  The principal responded, "No." (9RT 748-749.)

Under the circumstances, the court erred by preventing appellant from introducing into evidence the contents of Vijayendran's typewritten statement after admitting the People's exhibit of her handwritten statement.

C.    **The exclusion of this evidence prejudiced appellant.**

Given no plausible alternative, the jury could only interpret the gooey thing in Beck's mouth as appellant's penis.  This, of course, was the prosecution's theory of the case.

However, several defense witnesses -- Mary, Jorge, Carl -- specified appellant used a bottle to have the students taste various

54

liquids in class or feel the object.  (14RT 1353, 1365, 1374.)  Arleth,
too, remembered appellant using a water bottle in class.  (11RT
1042.)

Had the jury learned Becky described the gooey thing in her
mouth as a bottle, rather than some undefined gooey thing, there is a
reasonable probability appellant would have obtained a more
favorable verdict.  (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741,
751-752 [if trial court erroneously excludes evidence, defendant must
show on appeal it is reasonably probable he would have received
more favorable result had that evidence been admitted, citing *People
v. Watson, supra,* 46 Cal.2d at p. 836].)


IV.

THE COURT IMPROPERLY PREVENTED THE DEFENSE
FROM INTRODUCING PORK RINDS AS AN EXHIBIT

A.    **Relevant procedural matters.**

Isabell was the first child witness for the prosecution.  She
testified that while she was blindfolded, appellant put a big, curvy
thing in her mouth, but she did not know what it was.  (8RT 615-
616.)  It was kind of hard, and kind of soft, but she could not really
describe it.  (8RT 647.)  No liquid ever came out of it.  (*Ibid.*)

Isabell also remembered appellant giving her crackers to taste
while she was alone with appellant.  She did not like the taste and
spit it out.  (8RT 650.)  She could not remember what they tasted like.

55

(8RT 655.)

While cross-examining Isabell, defense counsel attempted to introduce into evidence "a bag containing maybe a half a dozen chips." (8RT 655.) The prosecutor objected and the parties had a conference at the bench, after which counsel moved to a different subject. (*Ibid.*)

The court later put on the record it had excluded from evidence counsel's proffered item contained in a clear plastic bag, pursuant to Evidence Code section 352.[14] (8RT 663.)

Counsel made the following offer of proof:

> . . . The items within the exhibit consist of pork rinds, a chip-type snack. I believe the Court indicated in its ruling that it was ruled against me on 352 grounds. I will indicate to start that this witness is describing objects physically consistent with those: that they are similar length, they are certainly curvy, they have certainly a roundness to them.
>
> I will also indicate to the Court that Mr. Chandler had a -- this is in terms of my good faith, Mr. Chandler was interviewed by Det. Pierce for several hours on the evening of the 9th and specifically mentioned pork rinds. He also mentioned crackers and also mentioned another type of candy. Officer Pierce the next day re-interviewed Isabell and asked about all of those items.
>
> Mr. Chandler had told Det. Pierce the evening before that he gave her pork rinds, but she didn't get it. She guessed beef jerky. And that the next day,

---

14. Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

apparently with that information, Det. Pierce re-interviewed Isabell, went through all of those things, and she confirmed two of the three, but she didn't confirm beef jerky. But of course it wasn't beef jerky.

What I'm saying is that I, in good faith, believe that these items are the items -- the item that was put in her mouth when she was alone with Mr. Chandler, and that she should be allowed to look at it, to hold the outside of the bag. I will not ask her to put it in her mouth and taste it. I would ask her questions such as, has she ever had something like this. I had never tasted a pork rind until this case. I know what they taste like now. Many people are quite fond of them. It's my understanding that Mr. Chandler has been eating rinds since he was a little boy. They were offered in his class. I think there is plenty of relevance to this. I'm at a loss as to why the probative value is outweighed by the prejudicial effect. If she even recognizes it and she says it's consistent or not.

(8RT 663-664.)

The prosecutor objected that Isabell was asked to describe the object in her mouth, she did so as best she could, and she said she never saw the object. (8RT 664-665.) The court reaffirmed its earlier ruling excluding this evidence, stating that in the court's opinion, "the relevance . . . would only apply in this particular situation if she was allowed to put that particular food item in her mouth[,]" and the court was not going to allow that. (8RT 665.)

B.   **The improperly excluded evidence was relevant.**

Only relevant evidence is admissible. (Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of

57

consequence to the determination of the action."  (Evid. Code, § 210;
*People v. Lee* (2011) 51 Cal.4th 620, 642; *People v. Mills* (2010) 48
Cal.4th 158, 193.)  To be admissible, evidence need not absolutely
confirm anything; it is axiomatic that its weight is for the jury.
(*People v. Vernon* (1979) 89 Cal.App.3d 853, 869; *People v. Peggese*
(1980) 102 Cal.App.3d 415, 420.)

A trial court has broad discretion in determining whether
evidence is relevant and whether Evidence Code section 352
precludes its admission.  (*People v. Mills, supra,* 48 Cal.4th at p. 195;
*People v. Williams* (2008) 43 Cal.4th 584, 634.)  Rulings regarding
relevancy and Evidence Code section 352 are reviewed under the
abuse of discretion standard.  (*People v. Lee, supra,* 51 Cal.4th at p.
643; *People v. Hamilton* (2009) 45 Cal.4th 863, 929-930.)

C.   **Exclusion of the proffered evidence was prejudicial.**

Again, no child was able to state definitely what was in her
mouth.  As with the old parable about the blind men and the
elephant, each of the children described the object in different terms.
Isabell described it as curvy.  Wendy described the object as tasting
like skin.  (12RT 1127, 1130.)  Becky described the flavor of the liquid
in her mouth as salty.  (9RT 728.)  All of these terms could have
applied to pork rinds (or the resulting salivary action produced by a
salty object such as a pork rind).

Counsel simply requested to have the witness observe and feel
the pork rinds to determine whether this or these objects were

58

familiar.  Insofar as no witness could actually identify the object in her mouth while blindfolded, had Isabell (or any subsequent child witness) positively identified the pork rinds as one of the objects utilized by appellant in the classroom, this testimony conceivably could have raised a reasonable doubt the object in the girls' mouths was a penis, as argued by the prosecution.

The court's exclusion of the pork rind evidence unfairly limited defense counsel's ability to effectively cross-examine the witness, in violation of appellant's Sixth and Fourteenth Amendments confrontation rights.  (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680; *Davis v. Alaska* (1974) 415 U.S. 308, 318.)  Even under the lower state standard of review, it is reasonably probable appellant would have received a more favorable result had the court not improperly excluded the pork rind evidence.  (*People v. Ghebretensae, supra*, 222 Cal.App.4th at pp. 751-752; *People v. Watson, supra*, 46 Cal.2d at p. 836.)


## V.

### THE COURT ERRED BY ALLOWING TESTIMONY THAT APPELLANT PREVIOUSLY OFFERED TO MASSAGE AND PHOTOGRAPH A FEMALE ADULT TEACHER'S FEET

A.   **Relevant procedural and factual matters.**

Appellant moved in limine to exclude evidence of his offers to massage and photograph the feet of Hilda Keller, another teacher at O.B. Whaley, as inadmissible under Evidence Code section 1108

59

(sexual propensity evidence) or Evidence Code section 1101 (character evidence).  (5CT 1029-1045.)

The prosecutor argued the evidence regarding Keller was relevant and probative because one of the named victims, Laurie (count 3), only described appellant touching her feet.  The prosecutor also argued that absent appellant's apparent sexual interest in Keller's feet, she would not have charged a violation of section 288 as to Laurie.  (3RT 415-416.)

Defense counsel objected that appellant's evident sexual interest in Keller was entirely irrelevant to a charge involving a defendant's apparent sexual interest in a child's body parts.  (3RT 416-417.)

The prosecutor countered by noting she was not seeking to introduce this evidence under Evidence Code section 1108; rather, she argued, it was admissible under Evidence Code section 1101, subdivision (b) to prove intent, i.e., as probative of appellant's intentions "when he sees a foot."  (3RT 420.)

The court tentatively ruled to allow only evidence of appellant's offer to massage and photograph Keller's feet as probative of his intent towards "Victim No. 3" (Laurie).  (4RT 455-464.)

After hearing Keller's testimony in a pretrial session conducted pursuant to Evidence Code section 402, the court affirmed its tentative ruling and excluded other instances of

60

appellant's alleged sexual harassment of Keller.  (7RT 502-538.)

As described above, Laurie testified that appellant blindfolded her, while alone in the classroom during recess, and had her feel things with her feet.  Laurie did not remember appellant putting anything in her mouth.  (10RT 807-817.)

The psychologist, Dr. Lynn, then testified Laurie reported appellant putting something hard and gooey in her mouth, but did not mention appellant touching her feet.  (10RT 856-869.)

Keller subsequently testified that on a prior occasion, appellant entered her classroom, closed the door behind him, approached her, and asked to photograph her feet and give her a foot massage because he was taking a massage therapy class.  In the context of their entire relationship, Keller was concerned appellant's request was sexually motivated.  (11RT 1060-1061.)

**B.    The court improperly admitted Keller's testimony under Evidence Code section 1101, subdivision (b) to prove intent.**

Evidence Code section 1101 states, in relevant part: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.  [¶]  (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove

61

some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . . .) other than his or her disposition to commit such an act." In *People v. Ewoldt* (1994) 7 Cal.4th 380, the state Supreme Court explained:

> In determining whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan, it is useful to distinguish the nature and degree of similarity (between uncharged misconduct and the charged offense) required in order to establish a common design or plan, from the degree of similarity necessary to prove intent or identity. [Footnote omitted.] [¶] The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] [T]he recurrence of a similar result ... tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act .... [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant probably harbor[ed] the same intent in each instance. [Citations.]

(*Id.* at p. 402, internal quotation marks omitted.)

As argued by defense counsel, evidence that appellant offered to massage and photograph the feet of an adult woman was not sufficiently similar to evidence that appellant touched the stockinged feet of a second-grade child. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) This evidence simply was not probative of appellant's intent with respect to Laurie.

Moreover, although Laurie described appellant touching her feet with what she described as a glue stick (10RT 831), the

62

psychologist who interviewed Laurie, and whose testimony was admitted as prior inconsistent statements, noted nothing about appellant touching Laurie's feet. (10RT 869.) Keller's foot-related testimony, which later followed both these witnesses, therefore became even less probative.

In *People v. Jandres* (2014) 226 Cal.App.4th 340, this court recently ruled it was improper to admit prior act evidence involving the defendant's kidnapping of an 11-year-old girl, during which he put his finger in her mouth, in the defendant's trial on charges he forcibly raped an 18-year-old woman. (*Id.* at pp. 355-357.) Although *Jandres* involved prior act evidence admitted as sexual propensity evidence under Evidence Code section 1108, this court inquired "whether evidence that defendant exhibited sexual interest in an 11-year-old girl by putting his finger in her mouth rationally supports an inference that defendant is predisposed to rape an 18-year-old woman. Given the many differences between the two offenses -- including the circumstances (daytime attempted burglary in one case, possible stalking and attack at night in the other); the ages of the victims (11 and 18); and the nature of the conduct (inappropriate touching of the mouth in one case, rape in the other) -- we think not." (*Id.,* 226 Cal.App.4th at p. 356; see also *People v. Earle* (2009) 172 Cal.App.4th 372, 396-398 [this court found the commission of indecent exposure does not rationally support inference that perpetrator has propensity or predisposition to

63

commit felony sexual assault].)

As in *People v. Jandres, supra,* and *People v. Earle, supra,* this
court should conclude evidence of appellant's apparent interest in
Keller's feet was insufficiently similar to the alleged conduct with
Laurie to be admissible under Evidence Code section 1101,
subdivision (b).

C.    **The court's ruling prejudiced appellant.**

The erroneous admission of other acts evidence is harmless if
it does not appear reasonably probable that without the error a
result more favorable to the defendant would have been reached.
(*People v. Malone* (1988) 47 Cal.3d 1, 22 [error in admitting Evid.
Code, § 1101 evidence tested by *People v. Watson, supra,* 46 Cal.2d
818, 836 harmless error standard].)

In this matter, evidence that appellant offered to massage and
photograph Keller's feet only could have made appellant seem
somehow "creepy" to the jury, and therefore more prone to convict
him based on a character trait rather than sufficient evidence of guilt.
Because this evidence was irrelevant to the issue of appellant's intent
towards Laurie, its prejudicial effect outweighed its negligible
probative value.  (Evid. Code, § 352.)  The erroneous admission of
this evidence cannot be considered harmless.  (*People v. Malone,
supra,* 47 Cal.3d at p. 22.)

///

///

64

# VI.

## THE CUMULATIVE ERRORS DEPRIVED APPELLANT OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS

A series of trial errors, even if independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.  (*In re Reno* (2012) 55 Cal.4th 428, 483; *People v. Hill* (1998) 17 Cal.4th 800, 844.)  "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to the defendant absent a combination of errors.  (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)" (*People v. Jandres, supra,* 226 Cal.App.4th at p. 361, parallel citations omitted.)  The "litmus test" for cumulative error is whether defendant received due process and a fair trial.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436; *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

While some of the evidentiary errors claimed here -- e.g., regarding the pork rinds, Keller's feet, or Vijayendran's typewritten notes -- by themselves might not have adversely affected the outcome of appellant's trial, his due process rights were violated because the cumulative effect of the trial court's and defense counsel's errors was sufficiently prejudicial to violate his Fifth and Fourteenth Amendment's guarantees of fundamental fairness.  (See *Taylor v. Kentucky* (1978) 436 U.S. 478, 487, fn. 15; *Donnelly v.*

65

*DeChristoforo* (1974) 416 U.S. 637, 643; *Beck v. Alabama* (1980) 447 U.S. 625, 637-638.)  Appellant's convictions therefore should be reversed on the basis of the cumulative errors which occurred in his trial.

<div align="center">VII.</div>

<div align="center">THE ABSTRACT OF JUDGMENT SHOULD BE AMENDED TO<br>DELETE THE REFERENCES TO "ENHANCEMENTS"</div>

The court sentenced appellant to five consecutive terms of 15-years-to-life pursuant to section 667.61, subdivisions (b) and (e) [the "One Strike" law].  Those five indeterminate terms properly were listed on the indeterminate abstract of judgment.  (7CT 1561.) However, the abstract of judgment also, and improperly, lists section 667.61, subdivisions (b) and (e) under "Enhancements" in section 2 of the abstract.  (*Ibid.*)

Unlike an enhancement, which provides for an additional term of imprisonment, a penalty provision sets forth an alternate penalty for the underlying felony itself, when, as here, the jury has determined the defendant satisfied the conditions specified in the statute.  (*People v. Jones* (2009) 47 Cal.4th 566, 578.)  As this court has observed, the "One Strike sentencing scheme is an alternate penalty scheme," not an enhancement.  (*People v. Perez* (2010) 182 Cal.App.4th 231, 238.)

Therefore, the trial court improperly characterized and listed section 667.61, subdivisions (b) and (e) as enhancements under

<div align="center">66</div>

section 2 of the abstract of judgment.  Instead, the section 667.61

sentencing provision should be noted in section 8, as appropriate.

This court should direct the superior court to prepare an amended

abstract of judgment accordingly.

## CONCLUSION

For the reasons stated above, appellant respectfully requests

that this court reverse his convictions and remand this matter for a

new trial.  Should the court nevertheless affirm the judgment, the

trial court should be directed to prepare an amended abstract of

judgment in which the section 667.61 sentencing provision is listed

under item 8 rather than item 2.

Dated: September 1, 2014

<div style="margin-left: 40%;">

Respectfully submitted,


_____

JEFFREY S. KROSS
State Bar No. 142882
Attorney for Appellant
CRAIG RICHARD CHANDLER

</div>

## WORD COUNT CERTIFICATION

Pursuant to Rule 8.360(b), California Rules of Court, I hereby certify, under penalty of perjury, that according to the word count function of my computer's word processing program, appellant's opening brief contains 15,659 words.

Executed this 1st day of September 2014 at Sebastopol, California.

_____

JEFFREY S. KROSS

68

## PROOF OF SERVICE BY MAIL AND EMAIL

I declare under penalty of perjury that I am a citizen of the United States, over the age of eighteen years, an active member of the State Bar of California, and not a party to the within action. My business address is P.O. Box 2252, Sebastopol, California 95473-2252. On this date I served the attached APPELLANT'S OPENING BRIEF by placing true copies thereof in a sealed envelope which I deposited in the United States mail at Sebastopol, California with the postage thereon fully prepaid, addressed as follows:

Sixth District Appellate Program
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

Office of the Clerk
Santa Clara County Superior Court
191 N. First Street
San Jose, CA 95113-1090

Office of the District Attorney
70 W. Hedding Street
San Jose, CA 95110

Craig Richard Chandler
AS0209
Pleasant Valley State Prison
P.O. Box 8500
Coalinga, CA 93210

Also on this date I served a true PDF copy of the attached appellants' opening brief via electronic service on the Office of the Attorney General at: *Docketing6DCASFAWT@doj.ca.gov*.

Executed this 2nd day of September 2014 at Sebastopol, California.

JEFFREY S. KROSS

# EXHIBIT 6

IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA,    )          No. H040429
)
    Plaintiff and Respondent,    )
)
v.    )
)
CRAIG RICHARD CHANDLER,    )
)
    Defendant and Appellant.    )
_____    )

## SUPPLEMENTAL APPELLANT'S OPENING BRIEF

Appeal from the Superior Court of California
County of Santa Clara No. C1223754
Honorable Arthur Bocanegra, Judge



AOB FILED ON 9/25/14

DOCKETED
SAN FRANCISCO
SEP 2 5 2014
By _____ gp
No. CR2014407253

JEFFREY S. KROSS
State Bar No. 142882
P.O. Box 2252
Sebastopol, CA 95473-2252
(707) 823-8665
kross142882@gmail.com

Attorney for Appellant
CRAIG RICHARD CHANDLER

By appointment of the Court
of Appeal under the Sixth
District Appellate Program
Independent Case System

B

# TABLE OF CONTENTS

Page

TABLE OF CASES AND AUTHORITIES ............................................. ii

INTRODUCTION ..................................................................... 1

ARGUMENT ........................................................................... 1

    I.  APPELLANT WAS DENIED HIS CONSTITUTIONAL
    RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL
    BY TRIAL COUNSEL'S FAILURE TO PROPERLY CROSS-
    EXAMINE A CRITICAL PROSECUTION WITNESS TO
    PROVIDE AVAILABLE EXCULPATORY EVIDENCE,
    AND ALSO BY PROMISING TO PRESENT
    EXCULPATORY EVIDENCE IN HIS OPENING
    STATEMENT AND FAILING TO PRODUCE THAT
    EVIDENCE ................................................................. 1

    II.  THE COURT IMPROPERLY EXCLUDED EVIDENCE
    OF APPELLANT'S EXPLANATION AFTER ALLOWING
    THE PROSECUTION TO INTRODUCE EVIDENCE THAT
    THE PRINCIPAL WARNED HIM NOT TO BLINDFOLD
    AND BE ALONE WITH STUDENTS WITH THE DOOR
    CLOSED .................................................................... 4

    III.  THE COURT BY EXCLUDING FROM EVIDENCE
    PRINCIPAL VIJAYENDRAN'S TYPEWRITTEN NOTES
    AS INADMISSIBLE UNDER EVIDENCE CODE
    SECTION 1237 ........................................................... 4

    IV.  THE COURT IMPROPERLY PREVENTED THE
    DEFENSE FROM INTRODUCING PORK RINDS
    AS AN EXHIBIT ......................................................... 5

    V.  THE COURT ERRED BY ALLOWING TESTIMONY
    THAT APPELLANT PREVIOUSLY OFFERED TO
    MASSAGE AND PHOTOGRAPH A FEMALE ADULT
    TEACHER'S FEET ....................................................... 6

CONCLUSION ........................................................................ 7

WORD COUNT CERTIFICATION ......................................... 7

i

# TABLE OF CASES AND AUTHORITIES

**Cases**                                                                  **Pages**

*Crane v. Kentucky* (1986) 476 U.S. 683 ...................................................  4,5
*Donnelly v. DeChristoforo* (1974) 416 U.S. 637 ........................................  4
*Estelle v. McGuire* (1991) 502 U.S. 62 ...................................................  5,6
*Holley v. Yarborough* (9th Cir. 2009) 568 F.3d 1091 ...............................  6
*People v. Ledesma* (1987) 43 Cal.3d 171 .................................................  2
*People v. Mai* (2013) 57 Cal.4th 986 ......................................................  3
*Strickland v. Washington* (1984) 466 U.S. 668 .......................................  2,3
*Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355 ........................................  4

## Constitutional Authority

U.S. Const., Fifth Amendment ..........................................................  4,5,6
U.S. Const., Fourteenth Amendment .............................................  4,5,6
U.S. Const., Sixth Amendment .......................................................  4,5,6

## California Rules of Court

Rule 8.200(a)(5) .............................................................................  1,4,5,6
Rule 8.360(a) ..................................................................................  1,4,5,6

# IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA,** | ) | No. H040429 |
| Plaintiff and Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CRAIG RICHARD CHANDLER,** | ) | |
| | ) | |
| Defendant and Appellant. | ) | |

Appeal from the Superior Court of California
Santa Clara County No. C1223754

### SUPPLEMENTAL APPELLANT'S OPENING BRIEF

### INTRODUCTION

Pursuant to Rules 8.200(a)(5) and 8.360(a), California Rules of Court, appellant hereby adopts by reference the entirety of his appellant's opening brief, filed in this matter on September 4, 2014. The additional arguments presented herein should be incorporated into each of the individual subsections designated below.

### ARGUMENT

### I.

APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO PROPERLY CROSS-EXAMINE A CRITICAL PROSECUTION WITNESS TO PROVIDE AVAILABLE EXCULPATORY EVIDENCE, AND ALSO BY PROMISING TO PRESENT EXCULPATORY EVIDENCE IN HIS OPENING STATEMENT AND FAILING TO PRODUCE THAT EVIDENCE

Pursuant to Rules 8.200(a)(5) and 8.360(a), California Rules of

1

Court, appellant hereby adopts by reference the entirety of his argument concerning the ineffective assistance of trial counsel at pages 24 to 43 of his opening brief.

### D.   Counsel's failures prejudiced appellant.

A defendant claiming the ineffective assistance of counsel must show that counsel's performance was deficient and there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  (*Strickland v. Washington* (1984) 466 U.S. 668, 693-695; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

The prosecution's theory was that appellant had the five blindfolded girls orally copulate him.  Among the most, if not *the* most inculpatory evidence was the presence of appellant's semen and sperm on two of the classroom chairs.  At the preliminary hearing, defense counsel Clark elicited testimony from the DNA expert that under the scenario presented by the prosecution, one would expect to find a mixture of the male's and female's cells; however, the stains on the chair contained only appellant's genetic material.

Trial counsel Madden failed to elicit this potentially exculpatory evidence during his cross-examination of the DNA expert at trial.  Instead, unlike predecessor counsel at the preliminary hearing, Madden's cross-examination failed to satisfactorily undermine the prosecution's theory of the case.

2

Moreover, defense counsel sought to explain the presence of semen stains on two of the chairs by eliciting trial testimony that appellant had sexual intercourse with an adult in the classroom. At the preliminary hearing, defense counsel Clark elicited testimony from the DNA expert that the stains on the chairs could have been transferred there by someone with semen on his hands. At trial however, defense counsel posed a hypothetical in which a man had intercourse with a female and afterwards, with semen on his hands, moved the chairs. The DNA expert now testified the stains could *not* have been transfer stains, thereby completely undermining the defense theory. Counsel inexplicably failed to impeach the prosecution's DNA expert with her prior testimony that the stains could have resulted from a transfer.

In addition, trial counsel failed to present a significant amount of exculpatory evidence promised in his opening statement. This failure reasonably could have left the impression in the jurors' minds that the defense theory was untenable and unsupported by evidence.

Because there could be no reasonable explanation for counsel's omissions and tactical mistakes (*People v. Mai* (2013) 57 Cal.4th 986, 1009), and because it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Strickland v. Washington, supra,* 466 U.S. at pp. 693-695), this court should reverse appellant's convictions and

remand this matter for a new trial.

## II.
### THE COURT IMPROPERLY EXCLUDED EVIDENCE OF APPELLANT'S EXPLANATION AFTER ALLOWING THE PROSECUTION TO INTRODUCE EVIDENCE THAT THE PRINCIPAL WARNED HIM NOT TO BLINDFOLD AND BE ALONE WITH STUDENTS WITH THE DOOR CLOSED

Pursuant to Rules 8.200(a)(5) and 8.360(a), California Rules of Court, appellant hereby adopts by reference the entirety of his argument concerning the court's improper exclusion of his explanation at pages 43 to 49 of his opening brief.

**C.     The court's exclusion of this evidence prejudiced appellant.**

The court's exclusion of appellant's explanation for his conduct after Vijayendran warned him not to be alone with students with the door closed violated appellant's constitutional right to present a defense, in violation of his Sixth and Fourteenth Amendment rights (*Crane v. Kentucky* (1986) 476 U.S. 683, 690-691) and his Fifth and Fourteenth Amendment rights to due process. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643; *Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355, 1357.)

## III.

### THE COURT ERRED BY EXCLUDING FROM EVIDENCE PRINCIPAL VIJAYENDRAN'S TYPEWRITTEN NOTES AS INADMISSIBLE UNDER EVIDENCE CODE SECTION 1237

Pursuant to Rules 8.200(a)(5) and 8.360(a), California Rules of

4

Court, appellant hereby adopts by reference the entirety of his argument concerning the court's improper exclusion of Vijayendran's typewritten notes at pages 49 to 55 of his opening brief.

### C.   The exclusion of this evidence prejudiced appellant.

The court's exclusion of Vijayendran's typewritten notes violated appellant's constitutional right to present a defense, in violation of his Sixth and Fourteenth Amendment rights (*Crane v. Kentucky, supra,* 476 U.S. at pp. 690-691) and his Fifth and Fourteenth Amendment rights to due process. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70.)


## IV.

### THE COURT IMPROPERLY PREVENTED THE DEFENSE FROM INTRODUCING PORK RINDS AS AN EXHIBIT

Pursuant to Rules 8.200(a)(5) and 8.360(a), California Rules of Court, appellant hereby adopts by reference the entirety of his argument concerning the court's improper exclusion of the pork rinds evidence pages 55 to 59 of his opening brief.

### C.   Exclusion of the proffered evidence was prejudicial.

In addition to unfairly limiting defense counsel's ability to effectively cross-examine the witness, in violation of appellant's Sixth and Fourteenth Amendments confrontation rights (as argued at appellant's opening brief, p. 59), the court's exclusion of the pork

rind evidence also denied appellant his Fifth and Fourteenth Amendment rights to due process.  (*Estelle v. McGuire, supra,* 502 U.S. at p. 70.)

## V.

### THE COURT ERRED BY ALLOWING TESTIMONY THAT APPELLANT PREVIOUSLY OFFERED TO MASSAGE AND PHOTOGRAPH A FEMALE ADULT TEACHER'S FEET

Pursuant to Rules 8.200(a)(5) and 8.360(a), California Rules of Court, appellant hereby adopts by reference the entirety of his argument concerning the admission of evidence concerning appellant's offer to massage another teacher's feet at pages 59 to 64 of his opening brief.

**C.      The court's ruling prejudiced appellant.**

The court's admission of irrelevant and prejudicial evidence that appellant offered to massage and photograph another teacher's feet deprived appellant of constitutional rights to due process and a fair trial under his Fifth and Fourteenth Amendment rights to due process.  (*Estelle v. McGuire, supra,* 502 U.S. at p. 70; *Holley v. Yarborough* (9th Cir. 2009) 568 F.3d 1091.)

6

## CONCLUSION

For the reasons stated above, as well as those stated in his opening brief, appellant respectfully requests that this court reverse his convictions and remand this matter for a new trial. Should the court nevertheless affirm the judgment, the trial court should be directed to prepare an amended abstract of judgment in which the section 667.61 sentencing provision is listed under item 8 rather than item 2.

Dated: September 25, 2014

Respectfully submitted,

JEFFREY S. KROSS
State Bar No. 142882
Attorney for Appellant
CRAIG RICHARD CHANDLER

## WORD COUNT CERTIFICATION

Pursuant to Rule 8.360(b), California Rules of Court, I hereby certify, under penalty of perjury, that according to the word count function of my computer's word processing program, appellant's supplemental opening brief contains 1,216 words.

Executed this 25th day of September 2014 at Sebastopol, California.

JEFFREY S. KROSS

7

## PROOF OF SERVICE BY MAIL AND EMAIL

I declare under penalty of perjury that I am a citizen of the United States, over the age of eighteen years, an active member of the State Bar of California, and not a party to the within action. My business address is P.O. Box 2252, Sebastopol, California 95473-2252. On this date I served the attached SUPPLEMENTAL APPELLANT'S OPENING BRIEF by placing true copies thereof in a sealed envelope which I deposited in the United States mail at Sebastopol, California, with the postage thereon fully prepaid, addressed as follows:

Sixth District Appellate Program
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

Office of the Clerk
Santa Clara County Superior Court
191 N. First Street
San Jose, CA 95113-1090

Office of the District Attorney
70 W. Hedding Street
San Jose, CA 95110

Craig Richard Chandler
AS0209
Pleasant Valley State Prison
P.O. Box 8500
Coalinga, CA 93210

Also on this date I served a true PDF copy of the attached appellants' opening brief via electronic service on the Office of the Attorney General at: *Docketing6DCASFAWT@doj.ca.gov*.

Executed this 26th day of September 2014 at Sebastopol, California.

_____
JEFFREY S. KROSS

# EXHIBIT 7

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

Case No. H040429

v.

**CRAIG R. CHANDLER,**

Defendant and Appellant.

Santa Clara County Superior Court, Case No. C1223754
The Honorable Arthur Bocanegra, Judge

**RESPONDENT'S BRIEF**

KAMALA D. HARRIS
Attorney General of California
GERALD A. ENGLER
Chief Assistant Attorney General
JEFFREY M. LAURENCE
Acting Senior Assistant Attorney General
CATHERINE A. RIVLIN
Supervising Deputy Attorney General
ALLAN YANNOW
Deputy Attorney General
State Bar No. 63257
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5955
  Fax:  (415) 703-1234
  E-mail:  Allan.Yannow@doj.ca.gov
*Attorneys for Respondent*

# TABLE OF CONTENTS

**Page**

Statement of the Case ........................................................................1

Statement of Facts..............................................................................1

    I.    Overview .................................................................1

    II.   The prosecution's case .........................................2

         A.    Becky.................................................2

         B.    Isabell ...............................................3

         C.    Arleth ...............................................4

         D.    Wendy...............................................6

         E.    Laurie...............................................9

         F.    Other evidence.................................10

         G.    Defense case ....................................11

Argument ...........................................................................................15

    I.    Defense counsel was not prejudicially ineffective ..............15

         A.    Basic principles .........................................16

         B.    The alleged defective performance with respect to the cross-examination of Cardosa was not prejudicial ...............................................................17

         C.    Counsel's alleged failure to produce evidence to substantiate what he had stated in his opening statement was not prejudicially ineffective ...............22

    II.   The court did not abuse its discretion in refusing to admit under evidence code section 356, evidence that appellant made a statement to Vijayendran before she directed him not to be alone with the door closed with a blindfolded student ...........................................................24

    III.   The court did not abuse its discretion in refusing to admit Vijayendran's handwritten notes of her conversation with Becky ....................................................28

    IV.   The court did not abuse its discretion in refusing to allow the admission of a bag of pork rinds in  evidence ......34

i

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|

V.   The court did not abuse its discretion in allowing the admission of evidence of appellant's conversation with Hilda Keller ..................................................................37

VI.   There was no cumulative error ...........................................39

VII.   The abstract of judgment should be amended .....................39

Conclusion ..................................................................................40

# TABLE OF AUTHORITIES

Page

CASES

*Crane v. Kentucky*
    (1986) 476 U.S. 683 ................................................................................................27

*Doers v. Golden Gate Bridge etc. Dist.*
    (1979) 23 Cal.3d 180................................................................................................32

*Donnelly v. DeChristoforo*
    (1974) 416 U.S. 637 ................................................................................................27

*Harrington v. Richter*
    (2011) 562 U.S. 86 ................................................................................................17

*Jammal v. Van de Kamp*
    (9th Cir.1991) 926 F.2d 918................................................................................38

*Paulus v. Bob Lynch Ford, Inc.*
    (2006) 139 Cal.App.4th 659................................................................................32

*People v. Arias*
    (1996) 13 Cal.4th 92 ................................................................................................25

*People v. Cleveland*
    (2004) 32 Cal.4th 704 ................................................................................16

*People v. Cornwell*
    (2005) 37 Cal.4th 50 ................................................................................................27

*People v. Cowan*
    (2010) 50 Cal.4th 401 ................................................................................31, 32

*People v. Cummings*
    (1993) 4 Cal.4th 1233 ................................................................................31, 32

*People v. Ewoldt*
    (1994) 7 Cal.4th 380, 402. ................................................................................37

*People v. Gilbert*
    (1992) 5 Cal.App.4th 1372................................................................................36

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Greenberger*
　　(1997) 58 Cal.App.4th 298...........................................................27

*People v. Hajek*
　　(2014) 58 Cal.4th 1144 .........................................................27

*People v. Lewis*
　　(2001) 26 Cal.4th 334 .......................................................35

*People v. Lucas*
　　(1995) 12 Cal.4th 415 ......................................................32

*People v. Mai*
　　(2013) 57 Cal.4th 986 .................................................17, 22

*People v. McDermott*
　　(2002) 28 Cal.4th 946 ...................................................16

*People v. Mincey*
　　(1992) 2 Cal.4th 408 ...................................................35, 37

*People v. Morrison*
　　(2004) 34 Cal.4th 698 ...................................................35

*People v. Parrish*
　　(2007) 152 Cal.App.4th 263..............................................25

*People v Perez*
　　(2010) 1982 182 Cal.App.4th 231......................................39

*People v. Pitts*
　　(1990) 223 Cal.App.3d 606..............................................33

*People v. Raley*
　　(1992) 2 Cal.4th 870 .................................................20, 33, 36

*People v. Williams*
　　(1975) 13 Cal.3d 559......................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*Steinhofer v. Georgeson*
(1921) 54 Cal.App. 550............................................................32

*Strickland v. Washington*
(1984) 466 U.S. 668 ...............................................................16

*Walters v. Maass*
(9th Cir. 1995) 45 F.3d 1355....................................................28

*Witt v. Jackson*
(1961) 57 Cal.2d 57.................................................................25

STATUTES

Evidence Code
§ 352.......................................................................................35
§ 356.................................................................................24, 25
§ 403 subd. (a).......................................................................32
§ 1237.........................................................................29, 31, 33

Penal Code
§ 288.................................................................................26, 33
§ 288 subd. (a)........................................................................1
§ 667.61..................................................................................39
§ 667.61 subd. (b)...................................................................1
§ 667.61 subd. (e)...................................................................1

CONSTITUTIONAL PROVISIONS

Federal Constitution.............................................................34, 37

## STATEMENT OF THE CASE

The Santa Clara County District Attorney filed an Information, which, as amended, charged appellant with five counts of committing a lewd and lascivious act on a child under 14. (Pen. Code, § 288 subd. (a)). The District Attorney alleged multiple victim enhancements as to each count. (Pen. Code, § 667.61 subds. (b) and (e)). (3 CT 642-646; 6 CT 1382-1387.)

The first taking of evidence occurred on July 15, 2013. (5 CT 1148.)

On August 1, 2013, the jury found appellant guilty as charged on all five counts, and found that the multiple victim allegations were true. (6 CT 1383-1405.)

On November 22, 2013, the court imposed five consecutive terms of 15 years to life. Appellant's total unstayed term was 75 years to life. (7 CT 1561.)

On November 22, 2013, appellant filed a Notice of Appeal. (7 CT 1564.)

## STATEMENT OF FACTS

### I.   OVERVIEW

Appellant was a teacher in a San Jose Elementary School. He would have his students play a game in front of the class in which he would blindfold students and ask them to identify objects by tasting or feeling them. When the game was played in front of the class, those items had no sexual component. However, he would also call individual students into his class (or have someone call them into his class) during recess or lunch. When he was alone with the student, he closed the door, blindfolded the student, and had her taste various items. One of those items was his penis. Appellant would also touch their feet for sexual gratification.

1

The conduct occurred with five different students--Isabell, Becky, Arleth, Wendy, and Laurie--who were either second or third graders at the time.

## II.   THE PROSECUTION'S CASE

### A.   Becky

During the 2011-2012 school year, appellant taught the combined second and third grade class at O.B. Whaley Elementary School.  In October 2011, a student named Becky came home with a stain on her sweatshirt that was deposited there when Becky was alone with appellant. Her mother complained to the principal, Lyn Vijayendran, about the stain and about the fact that Becky was alone with appellant in the classroom when her sweatshirt was stained.  (9 RT 724, 729.)

Vijayendran spoke to Becky, who told her that when she was alone in a classroom with appellant, he had blindfolded her and had put a blanket over her head.  Becky said she felt something gooey or scratchy on her feet that felt like a tongue but she did not think it was a tongue.  Becky also said that appellant put a gooey thing in her mouth, wiggled her head back and forth, and that she then felt a salty liquid come out.  (9 RT 726-728.)

Becky, who was in third grade when she was in appellant's class, testified before the jury that she could not remember what had occurred other than water coming out of her mouth because her "brain tells [her] to forget" what happened in appellant's class.  (9 RT 686, 694, 696.)

A video of an interview Becky had with a detective was played to the jury.  (9 RT 836.)  During the interview Becky said that appellant blindfolded her when no one else was in the classroom.  (6 CT 1194.)  He put something in her mouth that she described as "weird," "round," and "gooey."  (6 CT 1199-1200.)  After about a minute, water came out.  The water tasted salty.  (6 CT 1201.)  When he put the object in her mouth, he

told her not to bite it. (6 CT 1205.) He told her he could not tell her what the object was. (6 CT 1206.) This happened three times. (6 CT 1203.)

Becky's preliminary hearing testimony was read to the jury. She stated that appellant had blindfolded her during recess when no one else was in the classroom. (1 CT 13-14.) He put something round in her mouth that filled her mouth, was gooey, and ejected crystal clear salty water. (1 CT 25-29, 35-36.) This happened three times. (1 CT 37.) Appellant told her it was a science experiment. (1 CT 30.)

After Becky's mother complained and requested a transfer to a different class, Vijayendran transferred Becky to another class. (9 RT 732.) Afterwards, Vijayendran told appellant that he should not be alone with a blindfolded child with the door closed. (9 RT 733.)

**B.    Isabell**

On January 9, 2012, Luisana, the mother of Isabell, a student in appellant's class, contacted Lea Peery, the assistant principal, and said that Isabell did not want to go to school because her teacher was "doing stuff" to her. (8 RT 568.) Isabell told her mother that appellant blindfolded her, had put things in her mouth, and did not tell her what they were. (8 RT 568-571, 774-775.)

Peery spoke to Isabell who told her that on two occasions appellant blindfolded her, put something in her mouth that was big and round, and then had her move her tongue. (8 RT 588.)

Isabell testified that she would be blindfolded in front of the class and that when this happened she would taste candy. Appellant did not have his hand in the back of her head when that happened and would not tell her to move her tongue around. (9 RT 647-650.) However, he had also called her into the classroom during recess, would blindfold her, put something curvy in her mouth and then push on her head. (9 RT 611-617.) He would also

tell her to move her tongue.  (9 RT 622.)  This happened once a week.  (9 RT 621.)  Appellant would give her candy afterwards.  (9 RT 622.)

Isabell was interviewed by the police.  That interview was video recorded and was played to the jury.   She said that her teacher had her stay in at recess, and put something over her eyes.  (5 CT 1122.)  He made her sit in a chair and then he put something in her mouth when no one else was in the classroom.  (5 CT 1123.)  She did not know what he put in her mouth, but it was round, kind of hard, and did not taste like anything.  (5 CT 1123-1124, 1140-1141.)  When it was in her mouth, appellant told her to move her tongue around, and would put his hands on the back of her head.  (5 CT 1125.)  He pushed her head back and forth.  (5 CT 1125, 1139.)  This would last for 10 or 15 minutes.  (5 CT 1126.)

She would then take off the blindfold, and he would tell her that she could go to recess.  (5 CT 1127.)  She did not think that what was in her mouth was a lollipop.  (5 CT 1128.)  She described the object as bigger than a finger, but smaller than a banana.  (5 CT 1135-1136.)  This happened more than five times.  (5 CT 1142-1143.)

Isabell also stated that appellant would also play a game in front of the class where students would be blindfolded and feel and taste things.  (5 CT 1131-1134.)

### C.   Arleth

Arleth was in appellant's third grade class.  (11 RT 989-990.)  She was alone with appellant five or six times.  (11 RT 992.)  Once when she was sitting in a chair and was alone with appellant, he blindfolded her, and put something in her mouth.  (11 RT 993-996.)  She could tell one object he put in her mouth was candy.  (11 RT 997.)

He then put something else in her mouth that was squishy, circular, had no taste, and was soft and slippery.  (11 RT 997- 998.)  It did not feel like anything she had in her mouth before and felt like skin.  (11 RT 1054-

4

1056.) He told her to keep licking it. (11 RT 1000-1035.) On two occasions a liquid came out of it (11 RT 998, 1052), but one time he put the thing in her mouth and the liquid did not come out. (11 RT 998, 1007, 1052.) He put the round thing in her mouth three times that she remembered. (11 RT 1051.)

On other occasions when he was alone with her, she would be on the floor with appellant holding her feet. He was pushing back so that his head touched her back. (11 RT 1003-1004, 1006.) She then saw water dripping from the back of her when he was behind her. (11 RT 1005.) That happened twice. (11 RT 1005.) Once she was able to peek under the blindfold and saw something circular that had hair. (11 RT 1008-1009.)

The first person she told this to was her cousin Neomi. (11 RT 1013.) She did not tell anyone else because she thought it was normal and thought she might get in trouble. (11 RT 1015.) Neomi used the term "weenie" to describe what Arleth told her she saw under the blindfold. (11 RT 1017.)

Arleth did not remember studying about a girl who could not see or hear. (11 RT 1040.) During class, the entire class would sometimes play "feeling" games, which involved a student being blindfolded and asked to identify something by feeling it. (11 RT 1041-1042.)

Arleth was interviewed by the police and a recording of her interview was played to the jury. She said that on two consecutive days, she was alone in a classroom with appellant. He blindfolded her and put something in her mouth. (6 CT 1230-1236, 1260-1263.)

Appellant told her that he was going to give her a drink. She did not know what it was but it tasted "weird." (6 CT 1232.) She described it as a bottle. It was squishy and then a liquid came out while the object was still in her mouth. (6 CT 1237-1240, 1266-1267.) Appellant told her to lick on it. (6 CT 1239-1240.) As she did so, he made different sounds. (6 CT 1241-1243.)

The object felt like skin and had hair around it that she could both see under the blindfold and feel. (6 CT 1244-1245, 1264.) She saw underneath the blindfold that appellant's pants were down. (6 CT 1246.) Once when she took the blindfold off, she saw him pulling his pants up. (6 CT 1268.)

This happened four times. (6 CT 1272.) Each occasion was similar to the first two. (6 CT 1273.)

Appellant never did this when they were playing the game in front of the class. (6 CT 1277.) Arleth stated that she first told her mother a little bit, then told her cousin the whole sequence, and then told her mother the whole story. (6 CT 1283-1285.)

Arleth also described an incident in which she was alone with appellant. He told her to put her feet back and hands in front of her so that she was on her hands and knees. (6 CT 1291-1292.) He pushed her with his head and touched her ankles with his hands. (6 CT 1294.) He pushed her for about three minutes. (6 CT 1295.) This made her feel nasty. (6 CT 1297.) He also pushed on her butt. (6 CT 1298.) She saw "water going something [sic]." (6 CT 1299- 1300.)

Arleth's older cousin, Neomi, testified that Arleth disclosed to her that appellant would blindfold her, put something hairy in her mouth, and that something would come out that tasted like urine. (11 RT 942-945.) Arleth told her that appellant would be moaning when this happened. (11 RT 947, 968.)

When she was interviewed by the police, Arleth drew a picture of the body part she had seen. The picture resembled a penis. (11 RT 974.)

**D.   Wendy**

Wendy testified that appellant was her third grade teacher. (12 RT 1074.) When she was alone in the classroom with appellant with the door closed, she would be sitting in a chair blindfolded, and appellant would put something in her mouth. (12 RT 1078, 1085.) He did not tell her why he

was doing this. He would say it was candy. (12 RT 1081.) One of the things actually was candy, but she did not know what the other thing was. (12 RT 1082.)

She demonstrated its shape by putting her fingers into a "C" that was not completely closed. (12 RT 1082.) He put that in her mouth, and would then put his hands on her head and rock back and forth. (12 RT 1083.) This happened over a few months and would last about 5 minutes each time. (12 RT 1084.) When she bit down on it, he would say "don't bite." (12 RT 1084.) She asked herself how did appellant know she was biting. (12 RT 1085.) He would then give her a lollipop and she would go out to recess. (12 RT 1085.)

When Wendy bit into the object appellant did not say "ouch" or anything like that. (12 RT 1124.) He did not pull it out of her mouth. (12 RT 1124.) Appellant was pushing her head when he put the object in her mouth. That object felt like skin and was slippery and soft. (12 RT 1124, 1127, 1130.) Appellant did not ask her to guess what the object was. (12 RT 1128.)

There were times when appellant would have Wendy and her friend Melissa in the room together, with bags over their heads so they could not see. She and Melissa would lie down on their stomachs. (12 RT 1087-1089.) Appellant took her feet and rubbed them together with something that was round. (12 RT 1088.) The object on her feet felt like skin. (12 RT 1118.) The foot contact happened about 15 times, and would always happen during recess. (12 RT 1090, 1094, 1106-1107.) Her shoes and socks were off whenever appellant put something on her feet. (12 RT 1112.) Appellant did not ask her to guess what the object was. (12 RT 1128.)

Wendy stated that the whole class played what she described as a feeling and tasting game. (12 RT 1114-1115.) When the whole class

played the game, they did not do anything with their feet. (12 RT 1117.)
Appellant once told her not to tell anyone. (12 RT 1117.)  Nothing came
out of the thing he put in her mouth. (12 RT 1119.)  She did not remember
a lesson about Helen Keller. (12 RT 1123.)

In an interview with the police that was video recorded, Wendy stated
that appellant would blindfold her and put something in her mouth. (6 CT
1315.)  Sometimes during lunch he made her and her friend come back to
the classroom, put sacks over their heads, have them lie down next to each
other.  He would have them take their socks off and would rub some body
part against their feet. (6 CT 1316-1317, 1320-1325.)  She could not see
what he was doing because the sack was on her head. (6 CT 1326-1327.)

After appellant did that for a couple of weeks, he called Wendy and
Melissa in during recess, had them sit in chairs and blindfolded them. (6
CT 1327-1329.)  When they were blindfolded, appellant put something in
Wendy's mouth. (6 CT 1332.)  It did not have a taste.  It felt like a gummy
bear, but she knew it was not a gummy bear because gummy bears have a
flavor. (6 CT 1333.)  She described it as being bigger than a gummy bear,
as being oval and she was not able to close her mouth. (6 CT 1334.)
Appellant pushed it in and was about an inch away from her at the time. (6
CT 1334, 1343-1344.)

Afterwards, appellant would go to the sink and do something. (6 CT
1334.)  He then walked over to Melissa and did the same thing. (6 CT
1336.)  When he finished he would give them lollipops. (6 CT 1336.)  She
thought that she played each of these games more than ten times. (6 CT
1347.)  When they played the lying down game, she would hear the storage
door close and would hear something like a belt being taken off.  She heard
the same clicking sound when they played both games. (6 CT 1350.)

### E.   Laurie

Laurie, who was a third grader in appellant's class (10 RT 805), stated that once during recess she was told to come to appellant's classroom. When she went in, he closed the door and blindfolded her.  (10 RT 808-809.)  He had her feel things with her feet when she had her socks on.  (10 RT 810.)  She did not remember how often this happened or whether appellant put something in her mouth.  (10 RT 808, 811, 826.)

In her recorded interview with the police, Laurie said that once during recess, she had to stay in the classroom.  Appellant blindfolded her so that she could not see anything.  (6 CT 1161.)  Appellant told her to take off her shoes.  (6 CT 1162.)  She had to feel what she described as the top of a pair of scissors and a glue stick with her feet. (6 CT 1162.)  She explained that she could not see the objects.  She touched them through the blindfold.  The object she described as a glue stick felt smooth, hard and bumpy.  (6 CT 1163-1164.)  Appellant was standing next to her feet at the time.  (6 CT 1166.)  One time the glue stick was sticky on the sides.  Another time, the glue stick wasn't sticky.  (6 CT 1168, 1177.)  Appellant never told her why she was playing that game.  She stated that the class studied about Helen Keller, and she had to feel things to know what they were.  (6 CT 1169.)

Dr. Lynn Doe, a psychiatrist, conducted an interview with Laurie.  (10 RT 853.)  When appellant's name was mentioned, Laurie became tearful and had a blank look over her face, which suggested disassociation to Dr. Doe.  Laurie's hands then started shaking.  (10 RT 855.)  Laurie told her that she was alone with appellant five times when he blindfolded her.  (10 RT 855.)

Laurie said that during those times, something hard and gooey had come into her mouth and that she had been asked to touch something that was hard.  She did not want to tell anybody about this ever again.  (10 RT

856-858, 863.) She was crying and shaking when she spoke about the incidents. (10 RT 856, 866.)

Laurie told her that she was afraid of school and did not want to go back there. (10 RT 856.) Other children made fun of her, and called her a "slut." (10 RT 857.) Laurie did not say anything about a touching of the feet. (10 RT 869.)

### F.   Other Evidence

Kristin Cardosa, a criminalist, examined a stain on a blue chair that the police seized from appellant's classroom. (12 RT 1145.) On the underside of one of those chairs, she found one area that tested positive with a presumptive test for semen. (13 RT 1169.) She was able to confirm the existence of spermatozoa. (12 RT 1151.) The sample matched appellant's DNA. (12 RT 1153.) She did not test for saliva. (12 RT 1178.) Saliva contains epithelial cells. She did not see any intact epithelial cells. (13 RT 1176.)

Cardosa was asked whether it was possible that the semen containing appellant's DNA could have been deposited if a man and woman had sex, the semen afterwards gets onto the man's hands and the man then transferred semen from his hand to the chair. Cardosa stated that the stain did not appear to be a transfer stain, and that it appeared to have been directly deposited because it was not smeared and looked like a droplet. (13 RT 1178, 1181.) The only way that could happen on the bottom of a chair is if the chair had been flipped over. (13 RT 1178.)

She also stated that there was no way to date when the semen was deposited. (13 RT 1181-1182.)

Hilda Keller, who taught at the school between 2000 and 2005, testified to an incident in which appellant entered her classroom, closed the door, and asked her if he could take a photo of her feet and massage her feet. He explained that it was for a massage therapy class. Keller declined

10

and appellant left the room.  She thought the request was sexually motivated.  (11 RT 1059-1061.)

After appellant was arrested, he was released and returned to his school room early the next morning.  He asked school personnel if he could take personal possessions home and took some items with him.  (10 RT 899-902.)

### G.    Defense Case

Dorothy Catangay, who taught in the classroom adjacent to appellant's (13 RT 1221), testified that there was a door between the classrooms that was not locked, and through which appellant would sometimes pass.  (13 RT 1226, 1231-1233.)  When she was not on assigned duty, she would spend recess in her classroom.  She often had lunch in her classroom.  (13 RT 1231, 1235.)

She never heard of a student being blindfolded in a classroom while things were being put in their mouth.  (13 RT 1237.)

Several children in appellant's class testified that appellant would play a game in front of the class in which he would blindfold children and have them taste candy, or would have them feel objects like pens, pencils or safety scissors with their feet.  None of these students played the games alone with appellant.  (13 RT 1241-1251, 1268-1274; 14 RT 1328-1333, 1335-1343, 1348-1356, 1358-1377, 1380-1388.)

Annie Doe, the mother of one of the children in appellant's class, testified that she and appellant had dated, and that at one time they attempted to have sex but appellant was unable to maintain an erection.  (14 RT 1393-1398, 1413.)  She texted him afterwards but he did not respond.  (14 RT 1398.)

About six months later, she had a parent teacher conference with appellant.  She sat on a student chair.  After speaking about her daughter, he started kissing her.  He then tried to pull her pants down, turned her over

and had sexual intercourse with her even though she did not want to have sex. (14 RT 1402-1406, 1408, 1418-1423.) Appellant ejaculated inside of her. (14 RT 1420.) He texted her the next day and she did not text him back. (14 RT 1408-1409.)

Arleth's mother testified that after appellant's arrest was reported, and before she knew the details of the accusations, she asked Arleth if anything had happened to her. Arleth initially denied it. (15 RT 1439, 1449.) Arleth however would fall asleep and say in her sleep "don't touch me." (15 RT 1446.)

William O'Donohue, a clinical psychologist (15 RT 1452), testified as an expert on child sexual abuse of children and forensic interviewing of children. (15 RT 1456.) He prepared a report in which he listed what he perceived to be inconsistencies in the childrens' claims regarding appellant's conduct. Examples of the inconsistencies he found were that Isabell was inconsistent as to the number of times the events occurred, whether the object made her choke, what the object tasted like, and the sounds she heard while appellant had the object in her mouth. (15 RT 1461-1463.)

As to Becky, he believed she gave inconsistent statements as to whether appellant put something in her pants. (15 RT 1464.) She described the color of the "gooey stuff" in different ways and gave different responses as to whether she was going to choke. (15 RT 1465.)

Laurie gave different accounts as to whether the object went all the way into her mouth or only part way. She gave different accounts of the objects she felt with her feet, whether she read about Helen Keller, and whether she had been held back in classroom or whether the yard supervisor brought her back. (15 RT 1466-1467.)

Wendy's statements were inconsistent about the texture of the thing put in her mouth, the taste, and whether she felt a hand on the object inside her mouth. (15 RT 1468.)

Arleth gave inconsistent accounts of who she told first, whether she saw a penis, the object used to push her from behind, the taste of the object, and whether the lights were on or off when the events occurred. (15 RT 1469.)

Some of the things the children reported about the object inserted in their mouths did not make sense if the object was a penis. (15 RT 1470-1471.) The children sometimes reported that they put the blindfold on themselves. (15 RT 1480.) There was no report of a test after the blindfold was put on to make sure the children could not see. (15 RT 1480.)

Dr. O'Donohue also discussed proper interviewing techniques. (15 RT 1482-1484.) He concluded that there were many closed end questions in the interviews, a lack of follow up on inconsistent statements, as well as attempts by the interviewers to fill gaps in the childrens' accounts. (15 RT 1484.)

Dr. O'Donohue thought there was outside contamination of the interviews. (15 RT 1485.) For example, Arleth's account could have been affected by her cousin's suggestions. (15 RT 1486-1487.) The victims also had a potential interest in the litigation because their parents filed lawsuits. (15 RT 1490.)

His hourly rate is $450 for testifying and reviewing the reports. He is paid half that rate for travel. He was paid in total about $20,000. (15 RT 1494.) He served as an expert in 150-170 cases, and testified for the defense 99 per cent of the time. (15 RT 1495.)

On cross-examination, Dr. O'Donohue acknowledged that the inconsistencies in Isabell's account stemmed from a first report to a patrol officer. There was then a more detailed interview with the investigating

13

officer, and then a third brief interview. (15 RT 1497.) He acknowledged that if a child does not realize she is being abused, the details would not have been imprinted on her because she did not perceive the event as traumatic. (15 RT 1499.)

Isabell also was not asked to describe the object at the first interview (15 RT 1501), but she described it in the same way in the second and third interviews. (15 RT 1502.) An alleged inconsistency in whether the object choked her was attributable to the fact that she was not asked that in two interviews and was asked about it in another. (15 RT 1503.) One inconsistency he reported about the taste of the object could be a mistaken interpretation by him. (15 RT 1505.)

As to Becky, he did not get the notes of what Becky told the principal when she was asked about what appellant had done. (15 RT 1507.) Whether she had been choked was not addressed in some interviews, so when she said she had been choked by the object, he considered it to be an inconsistency. (15 RT 1507.) He stated that if Becky was asked an open ended question and did not provide an answer that she gave later, he would consider that to be an inconsistency. (15 RT 1509.)

He stated that Laurie was inconsistent in stating whether she felt scissors, but he acknowledged that Laurie always described one object as a glue stick. (15 RT 1509.) Another inconsistency he found was that Laurie said twice that she told her mother and then another time said she did not remember whether she told her mother. (15 RT 1509.) Wendy was consistent about missing recess, even though she once said that the yard monitor brought her back to the classroom. (15 RT 1511.)

As to Arleth, he admitted that one of the inconsistencies he found was an omission that could have been attributable to the fact that Arleth had not been asked the question that would have called for the answer that was omitted. He also stated that he had not received information that Arleth

14

drew a picture of a penis when she was interviewed by a detective. (15 RT 1512.)

He thought that Arleth was also inconsistent in describing what the liquid tasted like. Once she said it did not taste like anything, but then she said it tasted "bad" and then later said that it tasted like "pee." (15 RT 1514.)

He acknowledged that the disclosures did not contain any of the fantasy elements that would be an indication of a false report. (15 RT 1515.) He admitted that the officers asked open ended questions, but he would not say that they asked "a lot" of open ended questions. (15 RT 1525.) He thought the officers should have phrased the questions as "tell me about that," or "tell me everything you remember." (15 RT 1525.) He acknowledged that all of the children said "no" at times to questions by authority figures. (15 RT 1526.)

The parties stipulated that the families of three of the victims had filed civil suits seeking damages from the school district. (15 RT 1546.)

## ARGUMENT

**I.   DEFENSE COUNSEL WAS NOT PREJUDICIALLY INEFFECTIVE**

Appellant contends that counsel provided ineffective assistance by failing to properly cross examine the prosecution's forensic expert, Kristin Cardosa. One basis for this claim is that counsel's cross examination would have left the jury with the impression that she did not find evidence of any of the victim's DNA on the stain in which she found appellant's DNA, because she did not test for saliva, when her testimony at the preliminary hearing was that if a female spit out ejaculate, she would expect to find the female and male's epithelial cells.

Appellant also claims that counsel failed to bring to the jury's attention a prior inconsistent statement by Cardosa, who testified that an

examination of the stains on the underside of a chair in appellant's classroom revealed sperm with appellant's DNA. (12 RT 1155-1162; 13 RT 1176.) The inconsistency pertains to whether the stain could have been a transfer stain. The other claim of ineffective assistance is that counsel failed to present evidence that he mentioned during his opening statement. [1]

As we will explain, none of these alleged failures, either separately or in combination, could reasonably have prejudiced appellant.

### A.    Basic Principles

To show ineffective assistance of counsel, a defendant must show a deviation from professional norms and prejudice, i.e. a reasonable probability of a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-691, 694.) The defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id.* at p. 688.) "Judicial scrutiny of counsel's performance must be highly deferential," a court must evaluate counsel's performance "from counsel's perspective at the time" without the "the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.)

"[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make. [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 746; *People v. McDermott* (2002) 28 Cal.4th 946, 993 [manner of cross-examination is matter within counsel's discretion and rarely implicates ineffective assistance of counsel].)

---

[1]  Appellant has also raised a claim of ineffective assistance of counsel in his Supplemental Opening Brief. The argument in that brief appears to be substantially the same his argument in his Opening Brief.

"It is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (*Harrington v. Richter* (2011) 562 U.S. 86,, 111.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

To sustain his burden of showing prejudice, appellant must show that the likelihood of a different result was "substantial, not just conceivable." (*Harrington, supra*, 131 S.Ct. at p. 792.)

## B. The Alleged Defective Performance with Respect to the Cross-Examination of Cardosa Was Not Prejudicial

Appellant argues that counsel ineffectively cross examined Cardosa in two respects. First, he claims that defense counsel failed to bring out that if a victim had allowed semen to drip from her mouth, the testing Cardosa undertook would likely have discovered the existence of DNA of someone other than appellant in the sample she tested.

The basis for this claim is the following: At the preliminary hearing defense counsel elicited testimony that Cardosa had tested the stains for the presence of semen, and did not find the DNA of anyone other than appellant. She explained that the process she used results in the separation of epithelial cells from sperm cells, that sperm cells are more robust than epithelial cells, and that the epithelial fraction that was tested did not contain anyone else's DNA. (3 CT 433-436.) She also stated that if someone had semen on his hand, and he sat in the chair and moved the chair he could transfer semen to the underside of the chair in that way, but

it would be hard to determine if that occurred based on the pattern of the stain. (3 CT 437- 438.) She also stated that if someone had been orally copulated, she would expect that person's epithelial cells to be transferred onto the penis, and that if the female had spit out semen, it is likely that the sample would contain the male's sperm cells and the female's epithelial cells. (3 CT 456 457.) On the other hand if a man were to rub his penis against a person's foot, and then ejaculate into his own hand it is possible but "very unlikely" that the epithelial cells would transfer because that would be a tertiary transfer of a low level sample into a highly robust DNA sample. (3 CT 458-459.)

At trial Cardosa testified that one of the stains on the bottom of a chair that was seized from appellant's classroom was a semen stain that contained appellant's DNA alone. (13 RT 1153, 1173.) Another chair had a semen stain on the left side just below the seat that also contained appellant's DNA and not that of any other donor. (13 RT 1175, 1177.) She did not test for saliva. (13 RT 1175.) She did not find any intact epithelial cells. (13 RT 1176.) Since the stains appeared to have been directly deposited, they could have been directly deposited if the chairs were flipped over. (13 RT 1178.) She did not test for the presence of epithelial cells that would be present in saliva, and she did not test the other stains on the bottom of the chair. She also stated that she could not determine when the stains were put on the chair. (13 RT 1181-1182.)

Appellant contends that trial counsel failed to adequately bring out the fact that Cardosa stated at the preliminary hearing that if a female had spit out semen, an examiner would expect to find her DNA in the samples that were tested. Appellant also argues that counsel was ineffective because he did not, either through cross examination or through other means, bring out the fact that Cardosa had previously testified that she could not determine if the stain was a transfer stain.

Appellant asserts that this is significant because "it is hardly arguable that the most inculpating evidence was the presence of appellant's semen, sperm, and DNA on two of the chairs." (AOB 30.) Appellant also asserts that counsel's failure was significant because Cardosa was "the most crucial, objective prosecution witness." (AOB 26.)

This, however, is an overstatement.  The threshold problems with appellant's argument are that 1, he overstates the significance of the semen stains;  2, there was little practical difference between what counsel elicited at the preliminary hearing and what counsel elicited at trial, and 3, appellant was convicted of lewd and lascivious conduct not unlawful oral copulation. The DNA analysis showed only that appellant engaged in at least two acts of sexual release in the classroom, at a time and under circumstances that could only be speculated, and that might be related or unrelated to any of the events comprising the lewd and  lascivious conduct the jury found.

The People's case did not rest on the assumption that the stains that were tested could be connected with any particular incident of lewd and lascivious conduct.  The People's case was based on the testimony of five children who claimed that they had been subjected to unlawful touchings, only some of which involved oral copulation, and not even all of those (if there were even any) involved the dripping or spitting of semen onto a chair.

The victims described various types of unlawful touchings, many of which did not involve the spitting of semen.  They described substantially similar conduct and substantially the same type of scenario.  The jury had an opportunity to see them testify, and knew the circumstances under which the victims reported the molestations.  The jury also saw and heard recordings of the interviews with the victims.

Moreover, there was little to be gained if counsel had brought out to the jury anything more about the semen stain analysis than he already had

done.  Appellant was charged with-- and convicted of-- lewd and lascivious conduct, not oral copulation.  All that was necessary for the jury to so find was an improper touching as to each count, i.e. a touching with the specific intent of arousing gratifying or arousing the lust of the accused.  (*People v. Raley* (1992) 2 Cal.4th 870, 907.)

There is no reason to believe that any of the victims would have been impeached had counsel elicited the evidence to which appellant refers While the People's case would likely have been stronger, in the sense that there would have been more corroboration had someone else's DNA been found along with appellant's in the semen stains, it was already strong.

Since the jury knew that no one else's DNA was found in the semen, and that many of touchings would not have manifested themselves in the spitting or dripping of semen, they had no reason to give much weight to the presence of the semen stains, other than to wonder what semen stains were doing there in the first place.  As a practical matter, once the jury knew the results of the testing, it made no difference whether they knew all the detailed information about the testing process that was brought out during the preliminary hearing.

Moreover, one sample was taken from the lower left part of the seat and the other sample was from the underside of the seat.  There was no substantial evidence that any child either spit out the semen or allowed the semen to drip out onto a chair, much less onto the underside or lower part of a seat.

The point is that had the jurors known everything appellant claims defense counsel should have elicited, they would not have had any more reason to have a reasonable doubt as to the childrens' testimony than they did on the existing record.  The jury knew that testing disclosed two semen deposits in a place where they had no business being, but did not know the

occasion for the deposits, and knew that no other person's DNA was in the tested sample.

Viewed from the standpoint of the prosecution's burden, the evidence at trial regarding the semen stain analysis was not more supportive of the childrens' testimony than was the evidence at the preliminary hearing. Viewed from the standpoint of the defense, the evidence at the preliminary hearing regarding the semen stain analysis would not have impeached the childrens' testimony any more than the evidence at trial.

Had the additional evidence to which appellant refers been elicited, the jurors would have had a more through explanation of what the samples could be expected to show if they had been in someone else's mouth.  But they would not have had any more reason than they already had from the evidence at trial, to assume that if the children had actually spit out the semen, that spitting would have manifested itself in the semen stains that were tested.

Thus, there is no basis to conclude that there would have been a reasonable probability of a more favorable result if counsel had elicited the preliminary hearing testimony regarding the likelihood that the female's epithelial cells would have been in the sample had the semen been in her mouth.

Nor can appellant prevail on the theory that counsel was ineffective for failing to elicit Cardosa's prior statement that she could not determine if one of the stains was a transfer stain.  Whether the stain was a transfer stain or a direct deposit, was immaterial.   The jury knew that appellant's DNA was the only DNA found in the stain, and there was no evidence as to the circumstances that led to the arousal that ultimately led to the deposit of the stain.

Even if the jury knew Cardosa previously stated it could have been a transfer stain, there was no evidence to support the speculation that after

appellant had sex with Annie Doe, he placed semen on his hand and then touched the underside of a chair without wiping or rinsing his hand. Appellant did not testify, and Annie Doe testified that during their encounter in the classroom appellant ejaculated inside of her. (14 RT 1420.)

Thus, even if the jurors had learned that Cardosa had previously stated that the stain could have been a transfer stain, they would not have known anything more than they already knew about the circumstances in which the stain was placed on the chair. They certainly would not have known anything that would have impeached the children's statements. Whether the stain was a transfer stain or had been directly deposited had nothing to do with the children's testimony.

Accordingly, there is no basis to conclude that if counsel had established that Cardosa had previously testified that she could not determine if the stain was a transfer stain, there would have been a reasonable probability of a more favorable result. Therefore any alleged omission in the cross examination on this point was not prejudicial.

Nor can appellant cannot make a sufficient showing of error to prevail on appeal. If the record on appeal does not show the basis for counsel's deficient act or omission, appellant's remedy could only be on habeas corpus. (*People v. Mai, supra*, 57 Cal.4th at p. 1009.)

Here the record on appeal does not show the reason that counsel did not elicit the matters appellant contends should have been elicited. To the contrary, there could many tactical reasons for not delving on cross-examination into evidence that is reasonably likely to increase in the minds of jurors the number and type of inappropriate sexual encounters appellant conducted in his third grade classroom.

### C. Counsel's Alleged Failure to Produce Evidence to Substantiate What He Had Stated in His Opening Statement Was Not Prejudicially Ineffective

In his opening statement, appellant told the jurors that appellant was a good teacher and that early in appellant's career he had seen two students making fun of a disabled child and that this bothered him because he was dyslexic, so that appellant decided to come up with a plan to teach about Helen Keller. He would deprive children of their sight and have them engage in activities that would involve tasting and identifying objects that they touched on either their hands or their feet. (Aug. RT (7/15/13) 12-13.)

Appellant contends that counsel was ineffective for failing to present evidence that he actually was a good teacher, that he suffered from dyslexia, or that he had developed the "Helen Keller lesson plan" in response to an insensitive incident he had seen. Appellant acknowledges that the failure to present evidence promised in an opening statement is not necessarily ineffective assistance and can be a reasonable tactical decision. (AOB 42 citing *People v. Stanley* (2006) 39 Cal.4th 868, 885.)

There was no reasonable probability of a more favorable result had counsel presented all the evidence appellant claims he failed to present. The jury heard evidence that learning about Helen Keller would be appropriate for second or third graders, and that there would be nothing unusual about teaching them about her. (9 RT 752-753. ). The jury also knew that students would, in front of the class as a whole, be blindfolded and asked to identify objects that they touched or tasted. Whether this was identified to the jury as being part of a Helen Keller lesson plan developed by a good teacher who had previously witnessed students making fun of a disabled student, is a purely collateral matter.

The blindfolding of students followed by non-sexual conduct that was part of a regular class session, was not the basis for the conviction. The basis for the conviction was the conduct when appellant was alone with students that could not reasonably be viewed as part of a legitimate lesson

23

plan by an unusually assiduous teacher who was simply overly enthusiastic about insuring that his students would have empathy for disabled students.

Whether appellant was otherwise a good teacher, or whether he might have seen the incident counsel described was irrelevant, and would not have rebutted the evidence describing appellant's actions when the children were alone and were blindfolded. That evidence could not reasonably be explained away as part of a Helen Keller lesson plan. The core evidence that counsel stated would be elicited was in fact elicited, even if all the peripheral aspects to that evidence were not elicited.

Thus, any failure to produce evidence to support statements made in opening statement did not leave a gap in the defense that the prosecution exploited to appellant's detriment. The core showing was presented to the jury, and since the jury evidently concluded that the circumstances of the unlawful touchings the children described were to gratify appellant's lust, whether he was or was not otherwise a good teacher, and whether he had seen the incident counsel described, would not reasonably have affected the jury's verdict.

## II. THE COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO ADMIT UNDER EVIDENCE CODE SECTION 356, EVIDENCE THAT APPELLANT MADE A STATEMENT TO VIJAYENDRAN BEFORE SHE DIRECTED HIM NOT TO BE ALONE WITH THE DOOR CLOSED WITH A BLINDFOLDED STUDENT

During in limine proceedings the People represented that they wanted to introduce evidence that Becky's mother complained in October 2011 to Vijayendran and that afterwards Vijayendran told appellant not be alone in a classroom with children. (7 RT 539-540.) Defense counsel responded that appellant said that this was not fair, that all the teachers did that, and that appellant and Vijayendran discussed the matter and that appellant explained what he did and that the purpose was to teach empathy for

disabled children.  (7 RT 541-543.)   Defense counsel based his argument on the provisions of Evidence Code section 356.  (7 RT 544-546.).

The court ruled that the prosecutor could introduce evidence of Vijayendran's admonition and that there was no risk of a misleading impression.  (7 RT 546-547.)  The court informed defense counsel that it would sustain a hearsay objection to any statements appellant made in response to the directive, but that counsel could ask about the reasons she gave the directive.  (7 RT 551-552.)

The prosecutor ultimately elicited evidence that Vijayendran told appellant not to be alone with blindfolded student. (9 RT 733.)  There was no evidence presented to the jury of the discussion between appellant and Vijayendran.  Appellant contends that the court abused its discretion in excluding the evidence of appellant's statements.

Evidence Code section 356 provides that if part of an act, conversation, declaration, or writing is placed in evidence, the adverse party may inquire into "the whole on the same subject."

"The purpose of the section is to prevent a misleading impression caused by presenting selective portions of evidence without the entire context." (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

Evidence Code section 356 "only makes admissible such parts of an act, declaration, conversation, or writing as are relevant to the part thereof previously given in evidence." (See, e.g., *Witt v. Jackson* (1961) 57 Cal.2d 57, 67 [the rule "is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced"].)

"A trial court's determination of whether evidence is admissible under section 356 is reviewed for abuse of discretion." (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

Appellant argues that the court erred because the jury could have been left with the impression that the directive was given in response to Becky's and her mother's complaints rather than in the aftermath of appellant's explanation as to what he had done.[2]

However, the evidence of Vijayendran's directive to appellant was simply background information that had little bearing on any element of the offense or on the credibility of the victims. Appellant was convicted of violations of Penal Code section 288, based on the testimony of the victims. The directive was simply background information. There was no reason to give any more context to the directive than what was already before the jury.

Moreover, the court could reasonably conclude that its ruling would not result in a misleading impression of what Vijayendran intended to convey, or what she actually conveyed. There was nothing misleading about the directive itself, or the fact that Becky's mother's complaint precipitated the directive.

Appellant argues that he was prejudiced by the ruling because on redirect the prosecutor elicited that Vijayendran did not have any explanation for appellant's activities, when appellant at least purported to give an explanation. Actually the statement to which appellant refers followed a question pertaining to whether Vijayendran was concerned about sexual molestation when Becky was describing appellant's classroom conduct. Vijayendran stated "there were times that I was concerned that that [i.e., sexual molestation] was the case, yes." (9 RT 769.) The

---

[2] The evidence would be admissible to show context notwithstanding its hearsay nature. (*People v. Williams* (1975) 13 Cal.3d 559, 565.) Whether it would be admissible for the truth of the matter asserted is not clear from the case law.

prosecutor then asked "At the time, did you have any other explanation for that behavior?" She replied "no." (9 RT 779.)

The prosecutor's question was directed to the time Becky complained to Vijayendran, so the jury would not reasonably have expected Vijayendran to have had an explanation at that specific time. The question did not pertain to any explanation Vijayendran might have had afterwards.

What may be more relevant to the issues on appeal is that whether Vijayendran had an explanation for appellant's behavior, or what she might have suspected, was beside the point. The evidence implicating appellant was the testimony of the children he victimized.

There was a clear pattern of conduct here that could reasonably be interpreted in only one way, and could not reasonably have been interpreted differently even if the jurors knew that appellant gave Vijayendran an explanation for his conduct with Becky. If anything, such evidence would show how strong appellant's desires were, because he continued with the molestations even after the risk that he would be reported had been brought home to him.

Appellant contends in his Supplemental Opening Brief that the court's ruling deprived him of his federal constitutional right to present a defense. He does not claim that counsel raised a constitutional argument at trial, so he cannot raise it here. (*People v. Hajek* (2014) 58 Cal.4th 1144, 1213– 1214 [issue forfeited when no timely objection is raised on the basis asserted on appeal].) Moreover, a state court's application of the ordinary rules of evidence do not generally infringe on a defendant's right to present a defense. (*People v. Cornwell* (2005) 37 Cal.4th 50, 82.)  Nor has appellant established that the jury would have had a significantly different impression of the witness's credibility had he been permitted to elicit such evidence. (See e.g. *People v. Greenberger* (1997) 58 Cal.App.4th 298, 350.)

The citations appellant provides, *Crane v. Kentucky* (1986) 476 U.S. 683, 690-691; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643; *Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355, 1357, discuss general principles of law that appellant has not attempted to relate to the situation here. Thus there is no basis to find a constitutional violation.

## III. THE COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO ADMIT VIJAYENDRAN'S HANDWRITTEN NOTES OF HER CONVERSATION WITH BECKY

Appellant contends that the court abused its discretion in failing to allow the admission of Vijayendran's report to the School District prepared three months after she spoke to Becky, in which used the term "bottle" to describe what appellant had inserted in Becky's mouth. As we will explain the court did not err.

At the beginning of the session of July 24, 2013, defense counsel sought to admit in evidence Vijayendran's handwritten typed report of her conversation which she prepared three months after she spoke to Becky. She prepared the notes in response to a request by the School District. (14 RT 1305.) The typed report included the following:

> Mr. Chandler was next to her. Mr. Chandler lifted the blanket up to about her nose and then put something in her mouth and made her drink something. She explained the drink as salty and that the bottle was gooey. I asked her if she felt the same as that was on her foot, and she said no. It felt different, but also gooey. Becky said some of the drink fell out of her mouth because she was lying down and it got onto her jacket. Mr. Chandler removed the blanket and blindfold, and Becky went to the wash off her hands and Mr. Chandler gave her a damp paper towel to help. He opened up a Wonka chocolate and put it in her mouth. The bell rang an Mr. Chandler went to the door to open it.
>
> I asked Becky to try to remember what, if anything, Mr. Chandler has said during the incident, but she said she couldn't really remember. When I asked her how she felt about what had happened, she said she just think it's weird and that she didn't

like him putting things in her mouth.  Her demeanor was calm
and matter of fact.  She said she was not angry or scared.

(14 RT 1312 –1313.)

The court stated that it had reservations about the reliability of the

typed report.  It stated:

> However, what concerns me is that when the principal was
> testifying, she was asked a number of questions:  is your
> statement based on a number of recollections?  Yes.  And she
> was sort of like, I thought, a little evasive about whether it was
> detail and accurate.  At one time she was asked:  And at that
> time, did you believe you had a full and complete recollection of
> your conversation with Becky in October?  And her response is:
> I wouldn't say that I even then believed that I had the entire
> conversation documented in this report because there were
> things that I wasn't – that weren't as clear in my mind as time
> has passed, but I did my best to create a report that was based on
> my recollection, had details in it that I remember.  So I have
> reservations, based on the principal's testimony, the accuracy of
> the statement.
>
> So that is – those are my preliminary comments right now.  I
> have reservations allowing it under [Evidence Code section]
> 1237.  I'm not comfortable that 1237 applies.  I will hear
> comments from both sides.

(14 RT 1306-1307.)

During the discussion on the issue the court stated the following:

> THE COURT:  No.  I'm not saying she's making it up.  Okay.
> What I'm concerned with is that we have the quotes in the
> People's exhibit about this.  I mean, she talks about, quote – on
> the second page – I believe third page, quote.  First he put the
> gooey something in my mouth, the he wiggled my body back
> and forth and my head.  Becky felt some salty water in her
> mouth and then it dripped out into her hand and her jacket.  She
> wiped her hands on her jeans.  Mr. Chandler removed the
> blindfold and blanket.  Becky did not see where he put them.
>
> My concern with the written statement, when we talk about the
> bottle and based on her trial testimony is, did this information
> come from Becky or is it a combination of Becky and Mr.

29

Chandler and her investigation?  It's unclear to me, which raises my concern about the accuracy, as well as – the reality is that when she wrote this written statement three months after she interviewed Becky, there was a lot of attention being given to this incident at the school.  I mean, we can't ignore that fact.  I mean, that was part of I believe the reasons why she was directed to give an accounting of her conduct.  This is her conduct and her explanations of what she did and why she did it.

MR. MADDEN:  that doesn't take away from the fact that she's talking about an – in this part of her report only what Becky told her.

(14 RT 1318-1319.)

Defense counsel argued that there was no reason to be suspicious of the term "bottle."

The exchange continued as follows:

THE COURT:  When I said evasive, I meant that even when she testified here, she said – when asked about is this complete and accurate, she would continually say:  Well, it was to the best of my memory at the time.  She kept referring to when she wrote it.

MR. MADDEN:  Correct.

THE COURT:  But as I already said before, what troubled me was her testimony when she says, and I quoted this before:  I wouldn't say that I even then believe that I had the entire conversation documented in this report because these were things that I wasn't – that weren't as clear in my mind as time had passed, but I did my best to create a report that was based on my recollection and details in it that I remembered.

So she was saying at the time she wrote the report even then she didn't know because time had passed.  She tried her best.

MR. MADDEN:  Well, nobody could possibly write a report anytime – no report could possibly detail a hundred percent of a conversation.  I don't care how recent or close to the conversation it was.  You could make that statement about all written statements.

THE COURT:  Well, when she's – well, I have to say that the statement that she wrote out as she's interviewing Becky contemporaneously is more accurate and specific as to her records because she's putting quotes.

MR. MADDEN:  No as to the bottle.

THE COURT:  Okay.

(14 RT 1320-1321.)

The court ultimately stated that the request for the admission of the handwritten notes was denied based on the court's concern about the accuracy and reliability of the notes.  (14 RT 1324.)  The court also denied the defense request to recall Vijayendran.  (14 RT 1324.)

Appellant contends that the typewritten statement (or at least the portion pertaining to Becky) is admissible under Evidence Code section 1237 (past recollection recorded), and that the alleged error was prejudicial. As we will explain there was no prejudicial error.

Evidence Code section 1237 permits evidence of a witness's past statement "if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1)[w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2)[w]as made ... (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3)[i]s offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4)[i]s offered after the writing is authenticated as an accurate record of the statement."

Whether an adequate foundation for admission of a statement under Evidence Code section 1237 has been established turns on whether the declarant's "testimony that the statement was true was reliable,"  The trial

court who hears the declarant's testimony has "the best opportunity" to assess its credibility. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1293-1294; see also *People v. Cowan* (2010) 50 Cal.4th 401, 464.)

The court's decision is reviewable under the abuse of discretion standard. (*Cowan, supra,* at p. 464.)[3]

Here the court did not abuse its discretion for the reasons it stated. The court could reasonably conclude that since the notes were written three months later in response to an inquiry by the School District in which there was an incentive to downplay the nature of the complaint, the statement about the "bottle" was not reliable.

Moreover, the reference to the "bottle" in the notes purported to describe a statement by Becky rather than a prior statement by Vijayendran. The notes could be admissible to show that Becky made a statement, but would not be admissible for the truth of the matter asserted, i.e. that the object in her mouth actually was a bottle. (*Steinhofer v. Georgeson* (1921)

---

[3] *Cummings* and *Cowan* both involved situations in which the court admitted evidence offered by the prosecution. The California Supreme Court had no need to decide in those cases whether the trial court determines actual reliability as opposed to whether it acts only as a "gatekeeper" and determines whether the foundation is sufficient to allow the evidence to go to the jury, so that the jury can determine ultimate reliability. (See Evidence Code section 403 subd. (a); *People v. Lucas* (1995) 12 Cal.4th 415, 467) . Here in contrast the court declined to admit evidence offered by the defense, so the role of the trial court that the *Cummings* and *Cowan* courts did not have to address, might have come into play here, had appellant raised the issue.

However neither at trial nor on appeal has appellant argued that the trial court should have determined only the foundational fact of whether the portion of the typewritten statement pertaining to Becky was sufficiently reliable to go to the jury. Since appellant did not raise this argument at trial and has not raised it on appeal, it has been waived or forfeited. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1;. *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.)

54 Cal.App. 550, 558-559 [discussing predecessor statute].)  Yet the point of admitting the evidence would be to show what was in her mouth—i.e., it was sought to be admitted for the truth of the matter asserted.  The evidence would not be admissible under section 1237 for this purpose.

Appellant also cannot show prejudice.  Appellant had the opportunity to cross examine Becky when she testified at trial and at the preliminary hearing.  The jury knew that Becky was blindfolded when the conduct she described occurred.  They could reasonably infer that even if she used the term "bottle" to describe what she could not see, and what she, as a young child, would be likely to assume was a bottle because her experience would not have led to her to believe it could have been something else, the conduct she described would be more consistent with sexual activity  than with the sticking of a bottle in her mouth.

Moreover, since appellant was convicted of lewd and lascivious conduct, all that was required to establish the offense was a touching with the specific intent of arousing gratifying or arousing the lust of the accused.  (*People v. Raley, supra,* 2 Cal.4th at p. 907.)  If he stuck a bottle in her mouth for the purpose of gratifying his lust, he violated section 288.  (*People v. Pitts* (1990) 223 Cal.App.3d 606, 890.)  Thus, it would not matter if appellant touched the blindfolded Becky with his penis or with a gooey object that Becky did not see but that to her felt like it was a bottle.  The also jury knew that another victim, Arleth, who was of a similar youthful age, had described what was in her mouth as feeling like a bottle, even though it was a penis. (6 CT 1238.)

If the jury knew that Becky used the term "bottle,"  they reasonably would have evaluated that statement in the light of Arleth's statement, Becky's age, appellant's overall pattern of conduct, as well as the circumstances under which the bottle was inserted in Becky's mouth, the actions that occurred when it was in her mouth, and the lack of any reason

33

to insert a bottle in her mouth.  The jury would have known that what Becky might have described once as a bottle, that was in her mouth when appellant was alone with her and when she was blindfolded, that she described as gooey and from which a salty liquid that looked like spit squirted out after he wiggled her body and head back and forth as part of what he described as a "science experiment," was unlikely to have been a bottle.

There is no reasonable basis to conclude that Becky's account would have been impeached had the jury heard evidence that she might have once described the matter inserted in her mouth as a bottle.  Nor is there any reasonable likelihood that the jury would have concluded whatever he touched her with that felt like a bottle was for some purpose other than sexual gratification.  Thus any error was harmless.

In his Supplemental Brief, appellant argues that the exclusion of the typewritten notes violated his federal constitutional right to present a defense.  Our response is the same as the previous argument.  Appellant has not alleged that appellant raised a federal constitutional argument at trial. Moreover, he has cast his constitutional argument only in generalities.  He has not cited any case holding that the exclusion of evidence based on a state hearsay rule and a finding that the evidence was unreliable, violates the federal constitution, especially when, as is the case here, the defendant had an opportunity to cross examine the declarant.

## IV. THE COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO ALLOW THE ADMISSION OF A BAG OF PORK RINDS IN EVIDENCE

During the cross examination of Isabell, appellant sought to introduce in evidence a bag of pork rinds.  Counsel represented to the court that he was acting in good faith because appellant had told Detective Pierce that he had given her pork rinds and that she guessed that what was in her mouth

was beef jerky.  Defense counsel argued that pork rinds were round and of a similar length to what Isabell described.   Counsel stated that he would ask Isabell if she ever had something like that, but he would not ask her to put it in her mouth. (8 RT 655, 663-664.)

There was no proffer of evidence that Isabell had stated that the object in her mouth was a pork rind, or that she had even seen the object appellant put in her mouth. The court stated that counsel would not be allowed to have the bag of pork rinds admitted in evidence. (8 RT 663-665.)[4] Appellant contends that the court abused its discretion.

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The court has broad discretion to balance the probative value of the evidence against its prejudicial effect, and its decision will not be reversed absent an abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)

"A defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference." (*People v. Mincey* (1992) 2 Cal.4th 408, 442.)  Evidence that leads only to speculative inferences is irrelevant. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

---

[4]  Appellant has phrased his argument so as to refer to the pork rinds as a proffered exhibit and as an item that was sought to be admitted in evidence.   Since Isabel was not actually shown the pork rinds, we presume that appellant's complaint is not directed to the failure to allow the pork rinds in evidence, but rather to the prohibition against the proffer of the pork rinds.

The court's ruling on demonstrative evidence is reviewable under the abuse of discretion standard. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1388.)

Here, since there was no affirmative evidence before the jury that appellant claimed that he gave Isabell a pork rind, there was no showing of relevance. Since Isabell was blindfolded and did not claim to have seen what appellant put in her mouth, and since counsel disclaimed any intention of asking Isabell to taste a pork rind, the court could reasonably conclude that the probative value of showing her a pork rind would be minimal or speculative.

Moreover, the court's exercise of discretion could properly be guided by the belief that it would be utterly inconceivable that appellant had blindfolded Isabel when they were alone just so that he could tell if she could identify a pork rind at least five times when he had his hands on her head. Appellant's conduct with her when they were alone was far more consistent with sexual activity than with an innocuous taste test. The court could also allow its discretion to be guided by the belief that there would be no educational value to having a child attempt to identify a pork rind by taste.

Furthermore, as we stated in connection with the previous argument, since appellant was convicted of lewd and lascivious conduct, all that was required is a touching for the purpose of arousing his lust. (*People v. Raley, supra,* 2 Cal.4th at p. 907.) If he touched her with his hand for the purpose of arousing his lust while she was tasting a pork rind, he was still guilty of the offense.

As with the other arguments appellant asserts in his supplemental brief that this issue is a federal constitutional violation. Our response is the same as we have previously stated. Appellant does not claim that counsel raised this as a federal constitutional argument at trial, and the cases he

cites are cited only for general principles of law that he has not related to the specific issue here. Moreover, the federal constitution does not give one a right to present a speculative inference to the jury. (*People v. Mincey supra*, 2 Cal.4th at p. 442.)

## V.   THE COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING THE ADMISSION OF EVIDENCE OF APPELLANT'S CONVERSATION WITH HILDA KELLER

Appellant contends that the court erred in allowing the admission of evidence to show intent with respect to the touching of Laurie on count 3. The court held an in limine hearing in connection with the defense objection to the prosecutor's request to admit evidence that appellant asked a female teacher Hilda Keller if he could massage her feet and take a photo of her feet evidence that appellant made that request, and that he also harassed her. (5 CT 1029-1045, 6 RT 415-417, 7 RT 502-538.)

The court ruled that the evidence of the request to massage the feet and take a photo was probative because feet were unique body parts. (7 RT 530.) The court also ruled that other evidence of alleged sexual harassment described by Keller in the limine hearing would be inadmissible. (7 RT 531.)

Keller testified before the jury that appellant entered her classroom and asked to photograph her feet and give her a foot massage because he was taking a massage therapy class. Keller thought that appellant's request was sexually motivated. (11 RT 1060-1061.) Appellant contends that the court abused its discretion in allowing the evidence to be admitted.

The court's ruling is reviewable under the abuse of discretion standard. In cases in which evidence of uncharged misconduct is admitted to demonstrate a common design or plan the least degree of similarity between the uncharged act and the charged offense is required to prove intent. (*People v. Ewoldt* (l994) 7 Cal.4th 380, 402.)

Appellant argues that the intent appellant might have had in touching the foot of an adult woman was not the same intent as the touching of the foot of a child. However, the court could reasonably conclude that the touching of the feet had a bearing on the intent with which appellant touched the feet of the children.

Moreover, there was nothing particularly inflammatory about the conduct at issue. If appellant was offering a foot massage to an adult woman to practice massage therapy, there was nothing that would prevent the jury from objectively weighing its evidentiary value. The conduct was certainly less inflammatory than the conduct at issue here, or the conduct to which Annie Doe testified.

In his Supplemental Opening Brief, appellant argues that the admission of the evidence violated his federal constitutional rights. The argument is based on the assumption that the evidence was improperly admitted, because it was prejudicial, and there was no legitimate inference the jury could draw from it. Appellant does not claim that he raised this as a federal constitutional issue at trial, so any such claim would be waived here.

Assuming arguendo, that he has preserved the issue, then his claim is unsound on the merits. "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920.)

As we have explained, the evidence did not result in an unfair trial. It was not more inflammatory than the evidence of the offenses, and the jury could draw a rational inference that was relevant to appellant's intent in touching the feet of his students.

## VI.   THERE WAS NO CUMULATIVE ERROR

Appellant contends that if one error was not prejudicial then they were cumulatively prejudicial. Appellant casts his argument in generalities and does not suggest how one alleged error combined with another to make the whole more than the sum of its parts. Even assuming for purposes of argument that some of appellant's claims of error are technically correct, they pertain only to tangential issues. The evidence implicating appellant was overwhelming.

Any alleged combination of errors that might exist would have pertained to collateral matters rather than to anything that was reasonably likely to have impeached the witnesses who incriminated appellant. There were multiple incidents involving five different children. Any defense based on an overenthusiastic approach to teaching a Helen Keller lesson was clearly implausible given the victims' description of the conduct appellant engaged in. Even if appellant were correct with respect to the technical aspects of every argument he raises, he would at best have shown errors on matters that had no significant potential to impeach the victim witnesses' accounts.

## VII.   THE ABSTRACT OF JUDGMENT SHOULD BE AMENDED

Appellant notes that there is an error in the Abstract of Judgment because it lists the sentencing provisions of Penal Code section 667.61 under item 2 as an enhancement rather than in the appropriate spot under item 8. (7 CT 1561.) We agree that the one-strike sentence is an alternative sentence rather than an enhancement. (*People v Perez* (2010) 1982 182 Cal.App.4th 231, 238). Respondent agrees that the box in item 8 pertaining to Penal Code section 667.61, should have been checked.

## CONCLUSION

For thee reasons stated, respondent requests that the judgment of conviction and sentence be affirmed and that the abstract of judgment be amended.

Dated: April 3, 2015                    Respectfully submitted,


                                        KAMALA D. HARRIS
                                        Attorney General of California
                                        GERALD A. ENGLER
                                        Chief Assistant Attorney General
                                        JEFFREY M. LAURENCE
                                        Acting Senior Assistant Attorney General
                                        CATHERINE A. RIVLIN
                                        Supervising Deputy Attorney General



                                        ALLAN YANNOW
                                        Deputy Attorney General
                                        Attorneys for Respondent

SF2014407253
41227148.doc

40

# CERTIFICATE OF COMPLIANCE

I certify that the attached RESPONDENT'S BRIEF uses a 13-point Times New Roman font and contains 12,668 words.

Dated:  April 3, 2015      KAMALA D. HARRIS
Attorney General of California


ALLAN YANNOW
Deputy Attorney General
Attorneys for Respondent

# EXHIBIT 8

IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | No. H040429 |
|     Plaintiff and Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG RICHARD CHANDLER, | ) | |
| | ) | |
|     Defendant and Appellant. | ) | |

APPELLANT'S REPLY BRIEF

Appeal from the Superior Court of California
County of Santa Clara No. C1223754
Honorable Arthur Bocanegra, Judge

JEFFREY S. KROSS
State Bar No. 142882
P.O. Box 2252
Sebastopol, CA 95473-2252
(707) 823-8665
kross142882@gmail.com

Attorney for Appellant
CRAIG RICHARD CHANDLER

By appointment of the Court
of Appeal under the Sixth
District Appellate Program
Independent Case System

# TABLE OF CONTENTS

Page

TABLE OF CASES AND AUTHORITIES ............................................... ii

INTRODUCTION .................................................................... 1

ARGUMENT ........................................................................ 2

    APPELLANT WAS PREJUDICED BY TRIAL
    COUNSEL'S INEFFECTIVE REPRESENTATION .................... 2

CONCLUSION ...................................................................... 6

WORD COUNT CERTIFICATION ...................................................... 6

## TABLE OF CASES AND AUTHORITIES

**Cases**                                                          **Pages**

*People v. Ledesma* (1987) 43 Cal.3d 171 ................................................ 5
*Strickland v. Washington* (1984) 466 U.S. 668 ......................................... 5

**Constitutional Authority**

Article I, § 15, California Constitution ................................................... 5
Sixth Amendment, United States Constitution .................................... 5

**Statutes**

Penal Code § 288(a) .............................................................................. 4

ii

IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | No. H040429 |
| Plaintiff and Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG RICHARD CHANDLER, | ) | |
| | ) | |
| Defendant and Appellant. | ) | |

Appeal from the Superior Court of California
Santa Clara County No. C1223754

APPELLANT'S REPLY BRIEF

INTRODUCTION

Appellant's reply brief is limited to answering the few
contentions raised in the respondent's brief ("RB") upon which
further discussion may be helpful to the court.  Appellant believes
those points not specifically addressed in the reply brief were
adequately discussed in his opening brief ("AOB"), and appellant
intends no waiver of the issues raised in the opening brief by not
expressly reiterating those arguments herein.

1

# ARGUMENT

## APPELLANT WAS PREJUDICED BY TRIAL
## COUNSEL'S INEFFECTIVE REPRESENTATION

In his opening brief, appellant argued he was denied the effective assistance of counsel by trial counsel's failure to elicit from the DNA expert evidence, adduced by prior counsel during the preliminary hearing examination, that one would expect to find epithelial cells among sperm cells in a stain deposited after a female orally copulated a penis, and that no such epithelial cells were detected in the stains found in this case.  (AOB 26-33.)

Respondent argues appellant failed to prove ineffective assistance of counsel because (1) evidence of the semen stains was relatively insignificant, (2) there was little practical value between what counsel elicited at the preliminary hearing versus what counsel elicited at trial, and (3) appellant was convicted of lewd and lascivious conduct, not unlawful oral copulation.  (RB 19.)

Appellant believes his opening brief effectively demonstrates the relative importance of the semen stains, as well as the stark difference between the evidence elicited at the preliminary hearing versus the trial, and no further explanation or argument on those two points is needed.

Respondent's third claim, however, appears somewhat disingenuous, insofar as the prosecutor clearly sought to convict appellant for making several of his female students orally copulate

2

him while they were blindfolded.  After summarizing the words
used by the students to describe what appellant put in their mouths,
the prosecutor continued: "They use the words they know because
there is the word they don't know, 'oral copulation.'  They don't
know that word.  He touched me with his penis.  They don't know
that word."  (18RT 1615.)  Moreover, after the prosecutor observed
that appellant told the students to taste the candy, she argued,
"Taste the candy.  I mean, this is the universal language of oral
copulation."  (18RT 1617.)

    The prosecutor further argued the picture Arleth drew of
what she saw beneath the blindfold "appears to be testicles with hair
surrounding it."  (18RT 1654.)  And after remarking on the
consistency of the descriptions among the students, the prosecutor
argued, "You know exactly what they are talking about.  Even in
their young words, with their level of cognitive development, they
are able to communicate consistently and repeatedly and they are
able to tell you what it was.  They just don't have anything to
compare it to.  How could you compare an adult penis to anything
that a seven-year-old has ever put in their mouth?"  (18RT 1657.)

    And finally, the prosecutor argued, "Mr. Madden's suggestion
of how someone would react to an act of oral copulation is
exaggerated, unrealistic, and frankly offensive.  I'm going to go out
on a limb here and say, I don't think he has any idea how someone
reacts to an act of oral copulation.  [¶]  [¶]  Let's be clear, the defense

3

in this case is not that these incidents didn't occur at all. It's just that it wasn't his penis." (18RT 1660.)

Undeniably, the prosecutor's theory in this case was that appellant was guilty of violating Penal Code section 288, subdivision (a) by having unwitting female students orally copulate him. To suggest that trial counsel's failure to properly cross-examine the prosecution DNA expert was harmless because appellant was convicted only of committing generic lewd and lascivious acts (RB 19-20) sounds a false note.[1]

Appellant also argued counsel was ineffective by failing to impeach the DNA expert's trial testimony that the semen stains were caused by direct deposits with her preliminary hearing testimony that allowed for the possibility the stains were transfer stains. (AOB 33-38.) Respondent seeks to minimize the prejudice by arguing, "Whether the stain was a transfer stain or a direct deposit, was immaterial. The jury knew that appellant's DNA was the only DNA found in the stain, and there was no evidence as to the circumstances that led to the arousal that ultimately led to the deposit of the stain."

---

1. Respondent makes a similar claim with respect to appellant's argument that the court improperly excluded evidence that Becky previously described the item in her mouth as a bottle (see AOB 49-55), arguing that appellant could have been convicted of committing a lewd and lascivious act even if he put a bottle in a student's mouth. (RB 33.) As shown above, however, the prosecutor repeatedly insisted the unlawful acts were oral copulation.

(RB 21.)

However, as respondent tacitly acknowledges in the very next paragraph, there *was* evidence "as to the circumstances that led to the arousal that ultimately led to the deposit of the stain" (RB 21): Anne Doe testified that appellant had vaginal intercourse with her in the classroom in which the stains were located.  Moreover, as explained in his opening brief (AOB 35), the prosecutor took advantage of trial counsel's error when, during her opening argument, she reiterated the DNA expert's testimony that the stains *must* have been the results of direct deposits of semen, thereby completely undermining the defense theory that appellant might have caused the stains by touching the chairs after having sex with Annie Doe.

As argued at greater length in his opening brief, but for counsel's deficient performance there was a reasonable probability that the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-695; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  Appellant thereby was denied his constitutional rights to the effective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution.

5

## CONCLUSION

For the reasons stated above, as well as those stated in his opening brief, appellant respectfully requests that this court reverse his convictions and remand this matter for a new trial. Should the court nevertheless affirm the judgment, the trial court should be directed to prepare an amended abstract of judgment in which the section 667.61 sentencing provision is listed under item 8 rather than item 2.

Dated: May 12, 2015

Respectfully submitted,

JEFFREY S. KROSS
State Bar No. 142882
Attorney for Appellant
CRAIG RICHARD CHANDLER

## WORD COUNT CERTIFICATION

Pursuant to Rule 8.360(b), California Rules of Court, I hereby certify, under penalty of perjury, that according to the word count function of my computer's word processing program, appellant's reply brief contains 1,152 words.

Executed this 12th day of May 2015 at Sebastopol, California.

JEFFREY S. KROSS

6

## PROOF OF SERVICE BY MAIL AND EMAIL

I declare under penalty of perjury that I am a citizen of the United States, over the age of eighteen years, an active member of the State Bar of California, and not a party to the within action.  My business address is P.O. Box 2252, Sebastopol, California 95473-2252. On this date I served the attached APPELLANT'S REPLY BRIEF by placing true copies thereof in a sealed envelope which I deposited in the United States mail at Sebastopol, California with the postage thereon fully prepaid, addressed as follows:

Sixth District Appellate Program
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

Office of the Clerk
Santa Clara County Superior Court
191 N. First Street
San Jose, CA 95113-1090

Office of the District Attorney
70 W. Hedding Street
San Jose, CA 95110

Craig Richard Chandler
AS0209
Pleasant Valley State Prison
P.O. Box 8500
Coalinga, CA 93210

Also on this date I served a true PDF copy of the attached appellants' opening brief via electronic service on the Office of the Attorney General at: *Docketing6DCASFAWT@doj.ca.gov.*

Executed this 13th day of May 2015 at Sebastopol, California.

_____
JEFFREY S. KROSS

# EXHIBIT 9

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

Court of Appeal, Sixth Appellate District

**FILED**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

NOV 3 0 2015

SIXTH APPELLATE DISTRICT

DANIEL P. POTTER, Clerk

By_____
DEPUTY

THE PEOPLE,

    Plaintiff and Respondent,

v.

CRAIG RICHARD CHANDLER

    Defendant and Appellant.

H040429
(Santa Clara County
Super. Ct. No. C1223754)

In a second amended information, filed on July 31, 2013, during the trial in this case, the Santa Clara County District Attorney charged appellant Craig Richard Chandler with five counts of committing a lewd or lascivious act on a child under the age of 14 years, in violation of Penal Code section 288, subdivision (a).[1]  Appellant was a teacher at a San Jose elementary school (hereafter the school).  In the information, pursuant to section 667.61, subdivisions (b) and (e), the district attorney alleged that appellant had committed the offenses against multiple victims.  In this case, it was against five different young girls.

On August 1, 2013, a jury convicted appellant on all five counts and found the multiple victim allegation to be true.

Subsequently, on November 22, 2013, the court sentenced appellant to five consecutive terms of 15 years to life.  The court imposed statutory fines, fees, and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

3B

assessments, and ordered appellant to pay $14,197.50 in victim restitution.  The court awarded appellant presentence credit of 785 days.

Appellant filed a timely notice of appeal on November 22, 2013.

On appeal, appellant claims that his trial counsel was ineffective in failing to properly cross-examine a critical prosecution witness, provide available exculpatory evidence, and produce the exculpatory evidence that he had promised to produce during his opening statement to the jury.  In addition, appellant contends that the court improperly excluded several pieces of evidence, improperly prevented the defense from introducing an exhibit, and erred by allowing testimony that previously appellant had offered to massage the feet of a female teacher and had offered to photograph her feet. Appellant asserts that the cumulative impact of all the aforementioned errors denied him his right to due process.  Finally, appellant requests that the abstract of judgment be amended to delete the references to "enhancements."  For reasons that follow, we agree that the abstract of judgment needs to be modified, but as so modified we affirm the judgment.

*Facts*

Appellant taught a combined second and third grade class at an elementary school in San Jose.  Appellant's classroom, No. 18, was at the very back of the school.  Years earlier, the lower panes of the classroom windows in that part of the school had been replaced with painted boards.  Classroom No. 18 had a door connecting it to an adjacent classroom but the connecting door did not have a lock on it.  A playground was adjacent to the building housing classroom No. 18.

2

*Count 2—Jane Doe I*[2]

Jane I was born in March 2003.  In 2011, she was in the third grade in appellant's combined second and third grade class.  One day in October 2011, Jane I came home from school and told her mother that appellant asked her to go into the classroom, where he blindfolded her and rubbed something on her feet.  Jane I's mother noticed a small white spot, resembling nasal mucous, on the front of Jane I's jacket.  Jane I's mother went to the school, showed the stained jacket to the principal, and asked that Jane I be transferred to a different third grade class.

During the 2011/2012 school year, Lyn Vijayendran was a principal at the elementary school.  In mid-October 2011, Jane I's mother came to school to report that Jane I had been alone with appellant, and that appellant had blindfolded her daughter and put something in her mouth.  Jane I's mother requested that her daughter be transferred to a different classroom.  Jane I's mother showed Vijayendran Jane I's hooded sweatshirt, which had a quarter-sized stain resembling saliva on the front.  It did not appear to Vijayendran that it was a semen stain.  Vijayendran spoke with Jane I and took contemporaneous notes of their conversation.

According to Vijayendran, Jane I told her that another student told Jane I that appellant needed her, so she went back to the classroom.  Appellant got a blue blindfold and a blue and white blanket out of a basket.  Then, appellant told Jane I to put on the blindfold and lie on the floor.  Appellant put the blanket over her head and told her to take off her shoes.  Jane I felt something "gooey" or "scratchy like a tongue" (but not a tongue), on the bottom of her feet for about 20 seconds.  Jane I felt appellant moving.  He told her to move her legs or open her legs—Jane I could not remember which—but she

---

[2]  We refer to the victims in this case as Jane Doe I, II, III, IV, and V to protect their anonymity.  For ease of reading we will refer to them as Jane I, Jane II, Jane III, Jane IV and Jane V.

never felt anything between her legs. Then, appellant lifted the blanket to her nose and said he was going to put something in her mouth. He put a "gooey" thing in her mouth and wiggled her body and head back and forth. Jane I felt some salty water in her mouth, some of which dripped on her hand and jacket. Jane I wiped her hand on her jeans. Appellant removed the blindfold and blanket. The bell rang and Jane I stood up. Appellant opened the door, went to the sink, got a damp paper towel, and cleaned up Jane I's pants, after which he put a "Wonka candy" in Jane I's mouth.

Vijayendran transferred Jane I to a different class the following day. Vijayendran did not report the matter to the police. Instead, she told appellant not to have students alone and blindfolded in the classroom with the door closed. Vijayendran acknowledged that Helen Keller's story was taught at Jane I's grade level. Teachers did not have to submit a lesson plan for approval, but they did have to teach to prevailing standards. Vijayendran went on maternity leave during the winter break of the 2011/2012 school year.

During the trial in July 2013, Jane I remembered few details of what had happened in 2011. She did remember her friend calling her in from recess. She remembered sitting in the classroom in a chair that did not have rollers that was near appellant's desk. She remembered that water got on her jacket. However, she forgot everything else that happened. The prosecutor and a reader read Jane I's May 21, 2012 preliminary hearing testimony, during which Jane I stated appellant put a round thing most of the way into her mouth and something gooey and salty came out of it. A recording of Jane I's interview with the police was played for the jury. In that interview, Jane I reported that appellant said, "Don't bite it" when the "gooey thing" was in her mouth.

*Count 1—Jane Doe II*

Jane II was born in November 2003. She was in the second grade in appellant's combined second and third grade class during the 2011/2012 school year. In the classroom, appellant played a game with the students in which he blindfolded them and

4

had them feel objects with their hands, feet, and legs and then guess what the object was. Appellant did a "taste game" in class in which he blindfolded students and had them guess what kind of candy they were given. Jane II volunteered for that game and said it was "sort of fun." However, about once a week appellant kept Jane II in the classroom during recess when all the other students were outside playing. At these times, the classroom door would be closed. Appellant would put Jane II in a chair with rollers and blindfold her; then, he put something "curvy" in her mouth. The curvy thing took up almost all of her mouth and she could not close her teeth on it. Jane II could not really describe it.[3] Appellant would put his hand behind her head, push her head back and forth, and tell her to move her tongue around. Then appellant would say, "Hold on" and go behind his desk and she would hear a sound "like a zipper." Sometimes appellant would give her candy afterwards. He gave her crackers, but she did not like them so she would spit them out.

According to Jane II's mother, Jane II always looked forward to going to school. However, just before the winter break in the 2011/2012 school year Jane II's attitude changed and she started dawdling and complaining she did not want to go to school. On January 9, 2012, Jane II refused to walk to school. When Jane II's mother asked her daughter what was wrong, Jane II said appellant was doing stuff to her; then, she started crying and said appellant had put something round in her mouth, which made her gag. Immediately upon hearing this, Jane II's mother concluded that appellant was putting his penis in her daughter's mouth. Jane II's mother said that she went "crazy" and started yelling. She drove to the school and repeated what Jane II told her to Lea Peery, the

---

[3] A recording of Jane II's interview with Detective Sean Pierce from the San Jose Police Department was played for the jury. In the interview, Jane II described the thing that appellant put in her mouth as "Kind of hard." However, it was not "hard like" a "can." When asked if it was "kind of soft" Jane II nodded her head. Jane II said the thing was bigger than the detective's finger, but smaller than a banana. She felt as if she was going to choke.

5

assistant principal at the school during 2011/2012 school year. Peery responded, "Oh, my God. Not again!" Jane II's mother asked what Peery meant. Peery said she had had a meeting with some parents concerning the same situation and they had resolved the matter.[4]

Jane II's mother felt the school was not adequately acting upon her daughter's complaint, so she called the police. The police came and briefly interviewed Jane II, then took her to a different location for a more detailed interview.

Detective Sean Pierce interviewed Jane II and her mother that same day—January 9, 2012. Later that day, Detective Pierce and other officers interviewed approximately 40 students at the school simultaneously in order to reduce the opportunities for witness contamination. Over a two-day period the officers interviewed a total of 77 students, including Jane I, who was interviewed on January 10, 2012.

On January 9, 2012, Detective Pierce met with appellant in the lobby of the San Jose Police Department and told him not to return to the school.

*Count 5—Jane Doe III*

Jane III was born in June 2002. She was in third grade in appellant's class in the 2010/2011 school year. Jane III's cousin Noemi G. was 13 years old when appellant was arrested in January 2012. Noemi saw daily articles and "TV" news stories regarding allegations of appellant's sexual misconduct with his students. Noemi started asking Jane III if appellant ever did anything to her. After repeatedly inquiring for about a week, Jane III asked Noemi if she would be arrested if she told her what appellant did to her. Noemi assured Jane III she would not get in trouble. Over the course of two conversations a week or so apart, Jane III revealed that on five or six or more occasions,

---

[4] When she testified, Peery denied that she responded, "Oh no, not again," to Jane II's mother. Peery asked Jane II's mother to go home and get Jane II. Jane II told Peery she had to stay in at recess two times, during which appellant blindfolded her and put a big, round thing in her mouth and made her move her tongue around.

appellant made her go into the classroom by herself at recess, covered her eyes, and put something in her mouth. Jane III said the object was hairy and "tasted like pee." Jane III said she was able to peek and see a little bit, and described what she saw as looking like a "guy's thing" or "weenie." Noemi asked Jane III to draw a picture of what she saw and Jane III drew an imaginary picture of what to Noemi resembled a penis.[5] After her second conversation with Jane III, Noemi called her aunt (Jane III's mother). Eventually, Naomi was interviewed by Detective Pierce.

Jane III testified that appellant's third grade class played a game in which a student sat in a chair in front of the whole class and appellant put something in the student's mouth and asked him or her to guess what it was. Jane III remembered tasting grape, strawberry, and coconut-tasting lollipops. The class played a game in which the students got on the floor in front of the whole class and had to feel things with their feet. Jane III remembered playing that game and feeling a marker and a water bottle.

However, on five or six occasions, appellant had Jane III go into the classroom by herself at recess.[6] Two or three of those times, appellant made her sit in a blue chair and he covered her eyes. Appellant first put a type of candy, such a lollipop, in her mouth, or he gave her sweet or salty liquids and asked her to taste them. Then appellant put something else in her mouth, which she could not identify. It was circular and she could only close her mouth a little bit. The thing was "squishy" and soft and slippery, and appellant told her to keep on licking it. A bad-tasting type of liquid came out of it, which she spit out. When Jane III played the tasting game in front of the class, liquid did not come out of the thing in her mouth. This made her feel as if something was wrong when she played the game with appellant alone.

---

[5] Noemi described Jane III's use of a stick to draw an imaginary drawing on the sidewalk.

[6] On cross-examination Jane III said she put on the blindfold herself.

One time Jane III was able to see below the blindfold and she saw something circular, which she thought was a "weenie." She drew a picture of what she saw for the police, with the lines surrounding the circular thing representing hair. One time, after she took off her blindfold, Jane III saw appellant pulling up his pants and she heard a noise "like a zipper or something."

Two other times, appellant had Jane III do an exercise on her hands and knees. Her eyes were not covered these times, and appellant would be behind her, holding her feet. He pushed against her bottom with his head or a "bouncy ball"; then as Jane III looked between her legs she saw some water dripping onto the ground behind her.

Jane III was at a friend's house when she saw a report on the television with appellant's picture. She told her cousin Noemi what appellant had done to her and asked if she would get arrested.

Jane III's January 17, 2012 interview with the police was played for the jury. In general her trial testimony was consistent with what she told the interviewer.

*Count 3—Jane Doe IV*

Jane IV was born in November, 2003. She was in the third grade in appellant's combined second and third grade class. Appellant read a book to the class about a woman who could not see and who had to feel things to know what they were. Appellant had the class play a game in which the students were blindfolded and had to feel things to guess what they were.

During a lunch recess, the yard duty person came and told Jane IV to go to appellant's classroom, No. 18. When Jane IV got to the classroom, appellant closed the door behind her and blindfolded her. Jane IV sat in a chair and put her feet up on a student's table. Jane IV did not have her shoes on, only her socks. Appellant had her feel things with her feet. Jane IV did not remember how many times she did this, and she did not remember appellant putting anything in her mouth. However, Jane IV did remembered telling the police she felt a glue stick against her feet.

8

Jane IV's interview with the police was played for the jury. In the interview, Jane IV told the interviewer that appellant had her feel things with her feet while she was blindfolded and he told her that one of the things was a glue stick. Jane IV described the glue stick as hard and smooth and a "[l]ittle bumpy." Jane IV said that at first the glue stick was sticky—she could feel this because it was sticking to her socks. Jane IV said that she thought she remembered appellant telling her not to tell anybody.

Dr. Lynn Doe,[7] a psychological consultant retained for purposes of a civil suit that had been filed against the school, was called as a witness by the prosecution. The court limited her testimony to Jane IV's prior inconsistent statements. Dr. Lynn interviewed Jane IV at her home office on November 29, 2012. Jane IV became very upset and embarrassed and started crying when the doctor asked her about being a student in appellant's class. Jane IV said she had been alone in appellant's classroom five to 10 times and appellant blindfolded her about five times. When she was blindfolded, something "hard and gooey" was put into her mouth. She had to touch something hard and then there was "sticky stuff" in her mouth. Jane IV said that she was alone with appellant approximately 10 times; five times she was blindfolded. The doctor's notes reflected that Jane IV reported two episodes when she touched something hard and two episodes when something sticky was in her mouth; she was blindfolded during all these episodes. The doctor's notes did not contain any mention of Jane IV's feet.

Jane IV told Dr. Lynn that she hated school and never wanted to go back; that other children had made fun of her and said she had been raped. They called her a slut, but she did not know what that meant.

---

[7] The psychologist's name has been redacted from the record. When she was called as a witness she was referred to as Dr. Lynn Doe. For ease of reading we refer to her as Dr. Lynn.

*Count 4—Jane Doe V*

At the time of trial Jane V was 11 years old. She had had appellant as her third grade teacher during the 2010/2011 school year. Jane V said that on approximately 15 occasions during that school year, appellant kept her and a friend back at the morning recess when the other students went out to play. On these occasions, appellant would make her and her friend take off their shoes and socks and lie down on the floor on their stomachs, so the bottoms of their feet faced the ceiling. Appellant put soft fabric bags over their heads and rubbed something round, which he got from the supply cabinet, between Jane V's feet. Jane thought that the something might have been a glue stick or an eraser. Jane V's friend was with her every time this happened.

On about 10 occasions following the 15 involving the foot-touching, appellant kept Jane V in at recess and made her sit in a blue student chair, where he either blindfolded Jane V or had her put on a blindfold. Appellant put two things, which he said were candy, in her mouth. The first object felt and tasted like candy, but Jane V could not identify the second object, which was round, "kind of big," felt and tasted like skin, and was slippery. Although that object sometimes tasted a little like strawberry, it did not taste like any food she knew. When appellant put the second item in her mouth, he put his hand behind her head and pushed for about five minutes, so that both her head and the thing in her mouth moved back and forth. One time Jane V bit down on that object because she thought it was candy and appellant told her not to bite. Jane V wondered how appellant could know she bit down on the object if it was only candy. Sometimes Jane V heard "metal hitting together"; to Jane V it sounded like a belt. She heard footsteps and water running in the sink. The classroom door was always closed on these occasions.

More than half the time that Jane V had something put into her mouth her friend was there too. Afterwards, appellant gave Jane V a lollipop and sent her out to play.

After one session as Jane V and her friend were walking down the hallway, Jane V's friend told Jane V that she saw appellant pick up his belt from the desk.

One day, after a session where Jane V and her friend were alone with appellant, the entire class played a "taste" and "feel" game in which the students were blindfolded and had to guess what appellant put in their mouths. Appellant did not have the students feel anything with their feet. Jane V did not recall a class discussion regarding Helen Keller or a girl who could not see or hear.

The first adult Jane V told about what had happened was the police officer who came to the school; she never talked to Jane III about what had happened while she was in third grade.

Jane V's interview with an interviewer was played for the jury. Jane V recounted the events in which appellant rubbed things on her feet and her friend's feet. Jane V did not know what appellant used to rub her feet, but thought it might be "a body" part that appellant was holding, but she did not know which part. As to the thing that was placed in her mouth, Jane V did not know what it was, but described it as feeling "like . . . a gummy bear" but it was bigger than a gummy bear. Appellant kept pushing the thing into her mouth for about two minutes. Then appellant would go to the sink and "clean something." She heard "the handle squeak and then water ran down." Jane V described the thing as being long and said she could not close her mouth.

*Other Events*

On the morning of January 9, 2012, Armando Lara, who was the acting assistant principal at the school, was called to the office to assist Lea Peery in investigating a parent's complaint. The police were called that same day.

Assistant Principal Lara arrived before 6:00 a.m. the next day. Although school began at 8:30 a.m., appellant arrived at about 6:45 a.m., carrying one or more items in a plastic grocery bag, and went to his classroom. No other teachers were on campus that early. Lara and Dan Deguara from the school district office went to appellant's

11

classroom.  The classroom door was locked, so they used the master key to enter.
Appellant was standing near his desk and Deguara told him he needed to leave.
Appellant asked if he could take his personal belongings; Deguara said yes.  Appellant
took some items, including cleaning supplies from the desk, shelves, and cabinets in the
classroom.  Appellant was escorted from the campus.

*Forensic Investigation and Evidence*

San Jose Police Officer Russell Chubon arrived at the school near 12:00 noon on
January 10, 2012.  He conducted a thorough search of classroom No. 18, but did not find
any blindfolds.  Officer Chubon seized two chairs, both with wheels.  One was a chair
near a horseshoe shaped table, marked SYO-01, and the other was a chair from
appellant's desk, marked SYO-02.  Both chairs had a thick plastic base with fabric-
covered seats and backs.

Forensic biologist Kristin Cardosa used an alternate light source and detected
areas of fluorescence of both chairs seized by Officer Chubon.  Chair SYO-01 had
multiple areas of fluorescing stains, only one of which tested positive for semen with a
presumptive chemical test.  Cardosa swabbed that stain for DNA, which revealed the
presence of spermatozoa.  She compared the DNA with a known sample of appellant's
DNA (obtained from a cup in his classroom) and conclusively determined a white stain
on SYO-01 contained appellant's sperm.  The stain revealed only a single profile, and
contained only semen, no epithelial cells.

Cardosa found five stains presumptively testing positive for semen on chair
SYO-02.  She tested one of those five stains for DNA and determined that the stain
contained appellant's semen and sperm.  Again, the stain contained only semen, no
epithelial cells.  The stain on SYO-01 was less than a quarter-inch wide by four to five
inches long, and looped back on itself.  The stain on SYO-02 was about the size of a
nickel.  Both stains appeared to have been directly deposited on the chairs, as opposed to

12

transfer stains, but the chairs would have had to have been flipped over to have received

direct deposits of semen because they were on the bottom of each of the seats.

*Other Incidents at the School*

Mary Montgomery taught at the school during the 2011/2012 school year.

Her classroom, No. 19, was adjacent to appellant's classroom. One day in the autumn

semester of that school year, during one of the lunch periods, Montgomery heard

someone knocking on appellant's classroom door. The knocking became incessant. She

looked out her door and saw one of her former students named Chris, who was at the time

in appellant's class, knocking on appellant's door. Montgomery asked where appellant

was. Chris said he was in the classroom. Montgomery asked if the door was stuck.

Chris pushed the door handle down but the door was locked. Moments later the door

opened and appellant walked out by himself. His students were standing unsupervised in

the area outside the classroom.

Hilda Keller taught kindergarten and first grade at the school between 2000 and

2005. She knew appellant as a fellow teacher, but not as a friend. One day, when Keller

left her classroom door open, appellant entered her room, closed the door behind him,

and stood in the corner of the room for about a minute. Keller asked appellant what was

going on. Appellant started walking towards her and said he was taking a massage

therapy class and asked to take pictures of her feet and give her a foot massage. Keller

felt very uncomfortable, stood up, and tried to make light of the situation. She opened

the door and appellant left the classroom. Keller found the incident very unusual and in

the context of their relationship was concerned that appellant's request was sexually

motivated.

*Defense Evidence*

Dorothy Catangay, who taught the third grade in classroom No. 16 at the school,

testified that a door connecting classroom Nos. 16 and 18 had no lock and one could pass

through the door simply by turning the handle. Appellant often passed through the connecting door because it was a shortcut to the parking lot and school office.

A male student, Ly Doe, who was at the time of trial in fourth grade, testified that students played the tasting and feeling game in appellant's second grade class. Ly covered his eyes with his hands, not a blindfold, and he never was alone with appellant. The students played one game by tasting various food items appellant provided from a ziplock bag. Appellant told the students to chew the item and guess what it was. In another game, appellant had the students lie down on the carpet and feel things with their hands and feet. In yet another game, appellant would move the students' desks from the center of the room and a student would close his or her eyes and be directed by the other students toward appellant's hand.

Several former students described playing similar tasting and feeling games while blindfolded and seated or lying down in appellant's second or third grade classes. None of these students played the game alone in the classroom during recess. None of these students had something oblong-shaped put in his or her mouth that made them choke or which released a salty liquid or moved in and out.

Annie Doe, whose daughter was in appellant's third grade class, met appellant at a back-to-school night. Annie told appellant she was single and appellant said he had a two-year-old child and recently had separated from his wife. Appellant asked for Annie's phone number. Subsequently, they spoke on the phone. Annie trusted appellant as a teacher and as a parent and believed a serious relationship might develop with appellant.

About a month after they met, Annie and appellant went on a date. Afterwards, they returned to Annie's house, where they took off their clothes and kissed. They tried to have sex, but appellant was nervous and sweating and could not get an erection, so he left around 2:30 or 3:00 a.m. Annie continued calling and texting appellant for some time afterwards, but he did not respond.

Four to six months later, Annie attended a parent-teacher conference with appellant at the school. Her meeting was scheduled for 6:00 p.m. When she arrived appellant told her he wanted her appointment to be the last one of the day. A small dog was running around the classroom, but Annie did not know to whom the dog belonged. Annie sat in a student chair. After saying just a few words about her daughter's performance in school, appellant moved his chair close to hers so their knees were touching. Appellant put his arm around her and began kissing her. Someone tried to get in the classroom door. Annie got nervous and appellant said it was just the janitor. Appellant reassured her that the door was locked. Appellant began pulling Annie's leggings down. Annie resisted and tried pulling them back up because she was afraid the janitor would enter. Appellant turned her around, succeeded in pulling down her leggings, and put his penis in her vagina from behind. He ejaculated very quickly. Annie pulled her leggings back up and walked home, extremely upset and crying. The next day appellant sent her a text message saying how pleasurable it was with her, but she did not respond. Thereafter, appellant sent her an angry text message. She replied that she was busy and did not want to talk to him.

In January 2012 Annie took her daughter to the police for an interview. At that time, Annie told the police about what appellant had done to her. She said she was raped.

In January 2012, Jane III's mother saw appellant's photograph in news stories reporting the allegations that appellant had molested some of his students. Later, she learned appellant had been her daughter's third grade teacher. Jane III's mother began asking her daughter questions about whether appellant ever did anything to her. Repeatedly, her daughter denied that appellant ever did anything and said he gave her lollipops.

Appellant called a licensed clinical psychologist, whom the court recognized as an expert in child sexual abuse and forensic interviewing techniques, to discredit the police investigation in this case. He catalogued all the inconsistencies in all the girls' interviews

15

and outlined several of these in his testimony.  Except for Jane III's statements, the psychologist found the girls' statements to be insufficiently detailed and "impoverished narratives."  He blamed this on poor interviewing techniques and deviations from standard interviewing protocols.  Moreover, he said that several of the girls were subject to outside contamination by prior reports.  However, the psychologist could not state that the girls' allegations were not true, and acknowledged that most allegations of child sexual abuse are true.  On cross-examination, he recognized the many consistencies between the girls' reports and conceded that several of his perceived inconsistencies were not truly inconsistent.  He admitted that he had been paid about $20,000 for his services.

The parties stipulated that civil suits against appellant and the school district seeking monetary damages had been filed on behalf of three of the victims.  The lawsuits were filed after the children gave their statements to the police and/or after they had previously testified in court.

The jury deliberated for less than six hours before returning the verdicts.[8]

<div align="center"><em>Discussion</em></div>

*Alleged Ineffective Assistance of Counsel*[9]

Since appellant makes several claims that his counsel was ineffective, we set forth the pertinent law regarding his claims.

A criminal defendant has a right to the assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*).)  This right "entitles the defendant not to some bare assistance but rather to *effective* assistance."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).)  "To establish entitlement to relief for

---

[8] The jury was not deliberating all this time because they did ask for clarification about the multiple victim allegations and were brought back into the courtroom to receive that clarification.

[9] Appellant has filed a supplemental opening brief in which he makes additional arguments on most of his issues.  Appellant's claim of ineffective assistance of counsel appears to be substantially the same as his argument raised in his opening brief.

ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citations.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at p. 694.)

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

"In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny . . ." and must "view and assess the reasonableness of counsel's acts or omissions . . . *under the circumstances as they stood at the time that counsel acted or failed to act.*" (*Ledesma, supra,* 43 Cal.3d at p. 216, italics added.) Although deference is not abdication (*id.* at p. 217), courts should not "second-guess" reasonable, if difficult, tactical decisions in the harsh light of hindsight. (*People v. Kelly* (1992) 1 Cal.4th 495, 522-523.)

"In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

*Failing to Elicit Testimony that was Elicited at the Preliminary Hearing*

*Background*

Appellant points out that the prosecutor's theory of the case was that he blindfolded the five victims and, unbeknownst to them, made them orally copulate him. He asserts, however, that since none of the five victims actually saw what he was doing while they were blindfolded, the most crucial, objective prosecution witness was

17

Cardosa, the forensic biologist, who unequivocally testified that she found stains containing appellant's sperm and DNA on two chairs from the classroom. In essence, appellant claims that testimony that was adduced by his counsel at the preliminary hearing was essential to his defense and his trial counsel was ineffective in not bringing out this evidence at trial.

*Preliminary Hearing Testimony*

Defense counsel Steven Clark cross-examined Cardosa during appellant's preliminary hearing. Cardosa testified that she had analyzed DNA in more than one hundred sexual assault cases, many of which involved oral copulation. Cardosa did not find any DNA in this case other than that belonging to appellant. Cardosa explained that because epithelial cells are more fragile than sperm cells, epithelial cells break open during the DNA testing process, resulting in epithelial fractions. Cardosa stated that "in this case, the epithelial fraction contained the same profile as the sperm cell fraction," which was associated with appellant. Cardosa detected no other DNA.

Thereafter, Clark elicited testimony from Cardosa that human adults and children have epithelial cells in their mouths, and had it been present in the stains on the chairs, Cardosa would have seen the DNA of someone other than appellant. Clark returned to this subject and elicited from Cardosa that the reason DNA sample swabs are obtained from the mouth is the abundance of epithelial cells. Cardosa testified that epithelial cells in the mouth are easily transferred to another object and can be transferred in multiple ways. Cardosa said she would expect to find the epithelial cells from a female's mouth transferred onto a man's penis during oral copulation. Further, she would expect to find the epithelial cells from the female's mouth in a sample if the man touched his penis after oral copulation and there was ejaculate on his penis. Moreover, if the male ejaculated into the female's mouth and the female then spit out that semen, Cardosa would expect to find a mixture of the female's saliva in the sample containing the male's semen.

Clark elicited from Cardosa that a semen stain was found "on the underside of the seat portion" of chair SYO-01. Clark asked if it was possible for someone with semen on his or her hand while moving a chair to transfer the semen to the chair. Cardosa responded, "Yes, it's a possibility." Clark then asked if Cardosa thought that had happened, or whether she knew. Cardosa responded, "It is hard to determine based on the pattern of the stain." Later, Clark asked Cardosa whether the stain on SYO-01 was "consistent with what's commonly known as a transfer stain." Cardosa answered, "Based on the shape of the stain, I cannot tell whether it's a transfer. You mean a secondary transfer from something else?" When Clark responded, "Yes," Cardosa replied, "Based on the stain, I can't determiner [sic] that." Cardosa continued, "It looks to be a straight stain from a straight liquid, but whether it was just deposited on there or wiped from something else, if it was a liquid transferred, it could be [a] transfer."

*Trial Testimony*

Defense counsel Brian Madden began his cross-examination of Cardosa at trial by questioning about the locations and sizes of the semen stains on the two chairs. Then he elicited testimony that she "did not test for saliva." She agreed that saliva contains epithelial cells, and when she was looking for spermatozoa she did look for epithelial cells; however, she found no "intact epithelial cells." Cardosa found only one body fluid—semen—in both of the stains tested. Cardosa found a small amount of semen on the underside of chair SYO-01, unmixed with any other body fluid or DNA, and found a small amount of semen on the left side of chair SYO-02, unmixed with any other body fluid or DNA.

After reaffirming that the small amounts of semen found on chairs SYO-01 and SYO-02 were unmixed with any other body fluid, Madden proposed to Cardosa the following hypothetical: "A man and a woman have sex in a room containing the two chairs, SYO-01 and SYO-02. Immediately afterward, some semen gets onto the hands of the man, and the man then moves both of these chairs, transferring the semen on his hand

to the chairs.  [¶]  Is that scenario a reasonable explanation for the finding that you made here?"  Cardosa replied, "Based on the appearance of the stains, they don't appear to be transfer stains.  They appear to be directly deposited onto the chairs."  Madden re-asked the question:  "They don't appear to be transfer stains?"  Cardosa reaffirmed her previous answer:  "They don't."  Madden questioned, "Why not?"; Cardosa replied, "They don't appear to be smeared or in any kind of way disturbed.  They appear to be just a pure liquid placed on the chairs."

During her opening argument, the prosecutor made the following observation: "And Mr. Madden asked Kristin Cardosa, remember the DNA expert, and said, Ms. Cardosa, I would like to give you a hypothetical.  Let's assume that Mr. Chandler had consensual sex in a classroom with an adult woman and touched himself afterwards, then somehow put his hands on the chairs, move[d] these chairs around, would that explain the semen that was on the chairs?  No.  Well, why not?  Because these aren't transfer stains.  This isn't like she described a ketchup packet, where you smear your finger, you get a smear.  It's called a transfer stain.  It's something decidedly different than what you could view with the naked eye on these chairs, which are drops.  She called them direct deposits."

Madden presented his closing argument without mentioning the DNA evidence, after which the court took the afternoon recess.  Immediately following the afternoon recess, the court allowed Madden to reopen his argument, and he apologized for neglecting to cover the subject of the DNA.  Madden started by telling the jury, "The two stains on these two chairs contain semen, no other bodily fluid, and it's Mr. Chandler's semen."  Madden continued, "I disagree with Ms. Filo concerning Ms. Cardosa. Ms. Cardosa said that the one particular stain did not appear to be a transfer stain, but scientists would never make an absolute statement that it wasn't a transfer stain.  She said it doesn't appear to be because there were droplets."  Madden explained that "[t]he most important part of her analysis, however, has less to do with the transfer stain than the fact

[that] there was no saliva found in either stain.  What that means is very clear, and it is this, that semen was never in the mouth of any child.  Otherwise, there would be saliva in that stain—in those stains, and it's not there."  At that point, the prosecutor objected that Madden's argument misstated the evidence and the parties approached the bench for a discussion.

Upon returning from the bench conference, Madden continued, "Let me restate that, ladies and gentlemen.  There is no mixture of other DNA in that stain.  There are no other epithelial cells saliva from—."  Again, the prosecutor again objected, and the court struck Madden's last comment.  At that point, Madden said no more.

During rebuttal argument, the prosecutor stated, "There is no evidence in this record at all that the crime laboratory could test for saliva.  No evidence in the record at all.  I will tell you what is in the record, that Craig Chandler's semen is found on one spot on SYO-01, confirmed on one spot on SYO-02, and presumptively confirmed on four other spots on that chair."

In essence, appellant's first claim of ineffective assistance of counsel is based on his assertion that Madden should have elicited the testimony from Cardosa at trial that his former defense counsel Clark elicited at the preliminary hearing concerning the semen stains on the chairs.  He claims that Madden failed to elicit this available evidence and instead presented a garbled and wholly ineffective argument based on his inadequate cross-examination.

"[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make.  [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 746; *People v. McDermott* (2002) 28 Cal.4th 946, 993 [manner of cross-examination is matter within counsel's discretion and rarely implicates ineffective assistance of counsel].)

21

"[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (*Harrington v. Richter* (2011) 562 U.S. 86, 111.)

The problem with appellant's ineffective assistance of counsel claim is his assertion that the DNA evidence adduced at the preliminary hearing was crucial to his defense.  First, appellant overstates the importance of the DNA evidence.  Certainly, if appellant had ejaculated into the mouth of one of his students and that student had spit out the ejaculate onto a chair and it dried leaving a stain, one would expect to find a mixture of DNA in any stain that was on the chair.  However, there was absolutely no evidence presented that one of the victims spit out ejaculate onto one or two of the chairs that were examined.

The DNA analysis showed only that at some point appellant had ejaculated in the classroom.  We can only speculate at what time and under what circumstances that happened.  Without any evidence that one of the children spit out ejaculate onto one or both of the chairs, one reasonable inference to be drawn from the evidence of the presence of the semen stains is that they were completely unrelated to any of the events involving the children.  Another reasonable inference to be drawn is that appellant was wearing a condom and the ejaculate from inside the condom, which would not have contained epithelial cells from the girls, dripped onto one or more of the chairs as appellant removed it.[10]

Moreover, the People's case did not rest on the assumption that the stains that were tested could be connected with any particular incident.  The People's case was based on the testimony of five children who claimed that they had been subjected to

---

[10] We base this conclusion on Jane V's testimony that one of the things appellant put in her mouth was round, "kind of big," felt and tasted like skin, was slippery and sometimes tasted a little like strawberry.

22

unlawful touching—none of which involved them dripping or spitting semen onto a chair.

There was little to be gained if Madden had brought out to the jury anything more about the semen stain analysis than he already had done. Counsel could reasonably have concluded that in the absence of any testimony by the victims that they spit out ejaculate onto one or two of the chairs, there was little point in pursuing the DNA evidence further. That is, since the jury knew that no DNA was found in the semen stains that belonged to anyone else, and that many of the incidents lacked evidence regarding the spitting or dripping of semen, they had no reason to give much weight to the presence of the semen stains, other than to wonder what semen stains were doing there in the first place.

In sum, we find that the record supports the conclusion that Madden made a reasonable tactical decision to limit his cross-examination of Cardosa.

In the alternative, appellant argues that Madden was ineffective because he did not, either through cross-examination or through any other means, draw out the fact that Cardosa had testified at the preliminary hearing that she could not determine if one of the stains was a transfer stain. In other words, Madden failed to impeach Cardosa's testimony with her prior testimony allowing for the possibility of a transfer stain.

Again, we find that the record supports the conclusion that Madden made a reasonable tactical decision to limit his cross-examination of Cardosa.

Whether the one stain was a transfer stain or directly deposited stain was immaterial. The jury knew that appellant's DNA was the only DNA found in all the stains, and there was no evidence as to the circumstances that ultimately led to the deposit of the stains. Even if the jury knew Cardosa had stated previously that one could have been a transfer stain, there was no evidence to support the speculation that after appellant had sex with Annie Doe, he placed semen on his hand and then touched the underside of a chair without wiping or rinsing his hand. Appellant did not testify, and Annie Doe testified that during their encounter in the classroom appellant ejaculated inside of her.

23

There was nothing to be gained by bringing out the evidence that at the preliminary hearing Cardosa had stated she could not determine if one semen stain was a transfer stain.

Furthermore, even if the jurors had learned that Cardosa had previously stated that one stain could have been a transfer stain, they would not have known anything more than they already knew about the circumstances under which all the stains were placed on the chairs. They certainly would not have known anything that would have impeached the children's statements. Whether one stain was a transfer stain or had been directly deposited had nothing to do with the children's testimony. Madden could reasonably have concluded that there was little or nothing to be gained by pursuing this line of inquiry further.

Even if we were to assume for the sake of argument that Madden's performance was deficient in this regard, appellant does not make a sufficient showing of error to prevail on appeal. The most damaging evidence against appellant was the testimony of five young girls. The girls described various types of unlawful touching involving substantially similar conduct. The only reasonable and rational conclusion to be drawn from the testimony of the girls was that appellant had placed his penis in each girl's mouth and then had them unwittingly orally copulate him.[11]

In sum, given the strength of the prosecution's evidence, it is not reasonably probable that a more favorable determination would have resulted in the absence of counsel's alleged failings.

---

[11] We recognize that Jane IV testified that appellant placed something against only her foot and never put something in her mouth. However, to some extent this testimony was impeached by Dr. Lynn's testimony that Jane IV had told her that on five occasions appellant put something "hard and gooey" in her mouth.

*Failure to Present Evidence Promised by Defense Counsel during his Opening Statement*
*Background*

      After informing the jurors that he wanted to give them "an overview," Madden continued his opening statement as follows. "Craig's wife was also a grade school teacher, but she taught first and second grade. Craig was a very good teacher. He was a popular teacher. Got along, not only well with his students who really liked him because of the way he taught. There were lots of games that were played in his teaching. But it's been a long time since I have been in the second or third grade, as you could tell, but obviously children at that age learned many times by playing games, by doing things, by experiments, by demonstration. That's a very important thing to remember in this case. [¶] Early in his teaching career at [the school], Craig had an experience where he witnessed two of his students essentially bullying a special needs child. Bully might be too strong a word, but making fun of them. This bothered Craig, as it would bother any adult, but especially bothered Craig because Craig is dyslexic. Craig knows the experience of being made fun of, made feel to be—made to feel less than, made to feel stupid. So he really decided that he was going to try to do something about this, and so he came up with a plan to teach about Helen Keller, which you all know is the famous woman who was blind and deaf and came to teach millions of people at how to overcome her disabilities. [¶] The Helen Keller lesson plan is a completely valid mainstream story or lesson to teach to children of this age. That will be confirmed by either Ms. Vijayendran, one of the principals at one time at [the school], or Ms. Perry [*sic*], another principal at a later time. She actually was the principal after Ms. Vijayendran left for maternity leave. [¶] So he decided to create this lesson plan, and the idea taken from the Helen Keller book was to deprive children of their sight and have them engage in activity that involved tasting and identifying objects in their mouth and feeling and identifying objects that were touched on either their hands or their feet. And the object in both instances was to identify the object, and that's what happened in this case. It

happened again and again and again.  And, in fact, it happened for almost the entire time Craig Chandler was teaching at [the school]."

Appellant contends that despite Madden's promises, "virtually none of the evidence predicted in his opening statement was presented to the jury.  There was no evidence appellant was a very good teacher and/or that he was a popular teacher. Madden presented absolutely no evidence regarding appellant's dyslexia or the incidents involving the bullied or harassed students, which purportedly motivated him to develop the 'Helen Keller lesson plan.'  While counsel promised [that] one of the principals would confirm that appellant's Helen Keller lesson plan—i.e., a lesson plan in which the student is blindfolded and asked to taste or feel something—was a 'completely valid mainstream story or lesson to teach to children at this age,' neither of the two principals testified to that."

Appellant points out that during his cross-examination of Vijayendran, Madden changed subjects and said he wanted to ask the principal about the "Helen Keller lesson plan."  Then he asked, "Is the Helen Keller story an appropriate story to be telling second- or third-graders?"  Vijayendran responded, "Yes."  Madden continued, "Why is it an appropriate story?"  The principal replied, "It's a commonly used story in that grade level."  Counsel then elicited from Vijayendran that there was nothing unusual about a lesson plan that involves the Helen Keller story.  Vijayendran stated that teachers at the school were not required to submit lesson plans to the administration.

Appellant argues that Vijayendran's testimony simply confirmed that it was appropriate to tell second and third graders the story of Helen Keller, and it would not be unusual to develop a lesson plan based on that story.  Appellant contends, however, that this testimony was a long way from evidence that the school administration considered it appropriate to blindfold students and put objects in a student's mouth or rub objects on a student's body, as indicated in counsel's opening statement.  Further, ultimately, Vijayendran testified that after Jane I reported the blindfold incidents in October 2011,

the principal expressly admonished appellant not to have blindfolded students alone in his classroom with the door closed.

Appellant acknowledges that the failure to present evidence promised in an opening statement is not necessarily ineffective assistance and can be a reasonable tactical decision. "Whether the failure to produce a promised witness amounts to ineffective assistance of counsel is a fact-based determination that must be assessed on a case-by-case basis. [Citation.] Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case. [Citations.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 955.)

On the record in this case, even if we were to conclude Madden's failure to present promised witnesses and testimony had no tactical justification and fell below the normal range of competency, we would find such error nonprejudicial. (*Ledesma, supra*, 43 Cal.3d at pp. 216-218.) The defense rested the guilt phase case two weeks after Madden delivered his opening statement. Given the strength of the evidence against appellant on all charged counts, we conclude that counsel's failure to present the witness testimony referred to in the opening statement did not prejudice the guilty verdicts. (*Ibid.*)

The jury heard evidence that learning about Helen Keller would be appropriate for second or third graders, and that there would be nothing unusual about teaching them about her. In addition, from appellant's own witnesses the jury knew that students would, in front of the class as a whole, be blindfolded and asked to identify objects that they touched or tasted. Whether the jury knew that this was part of a Helen Keller lesson plan developed by a good teacher, who had previously witnessed students making fun of a disabled student, was simply irrelevant.

The blindfolding of students followed by non-sexual conduct that was part of a regular class session was not the basis for appellant's convictions. The basis for the convictions was the conduct when appellant was alone with students, which could not reasonably be viewed as part of a legitimate lesson plan by a diligent teacher who was

27

simply overly enthusiastic about ensuring that his students would have empathy for disabled students.

Whether appellant was otherwise a good teacher, or whether he might have seen the incident counsel described, was irrelevant and would not have rebutted the evidence describing appellant's actions when the children were alone and were blindfolded.  That evidence could not reasonably be explained away as part of a Helen Keller lesson plan.  The core evidence that Madden stated would be elicited was in fact elicited, even if all the immaterial aspects to that evidence were not elicited.

Thus, any failure to produce evidence to support statements made by Madden did not leave a gap in the defense that the prosecution exploited to appellant's detriment.  Appellant's core evidence was presented to the jury.  Since, evidently, the jury concluded that the circumstances of the unlawful touching that the children described were to gratify appellant's lust, whether he was or was not a good teacher, and whether he had seen the incident counsel described, would not reasonably have affected the jury's verdict.

*Exclusion of Defense Evidence*

I.  *Appellant's Explanation for his Behavior with the Children to Vijayendran*

*Background*

In limine, the prosecutor sought to introduce evidence that after Jane I's mother complained about appellant in October 2011, Vijayendran told him not to have children alone in the classroom.  The prosecutor explained that "[w]e know a lot more about these conversations" because Vijayendran had been prosecuted for, and ultimately was convicted by a jury of, failing to report an incident of suspected child abuse.  Madden clarified that at her trial Vijayendran had testified that she specifically advised appellant he was not to have children in his classroom with the doors closed with the children blindfolded, while putting things in a student's mouth.  The prosecutor moved to exclude from evidence appellant's entire explanation as to why he was alone with a child in the classroom.

28

Madden responded by explaining that Vijayendran had testified that there was a lengthy conversation surrounding her admonition to appellant, during which appellant discussed "exactly what he did on the incident involving [Jane I], why he did it, what the purpose was. And it was at the end of that conversation" that Vijayendran stated "she did not feel" that what appellant did "was inappropriate in the sense of being sexual. She did not see any sexual connection whatsoever. She put [sic] that it was inappropriate in the sense of putting something in a child's mouth while blindfolded alone, and she thought that that was inappropriate, but she didn't see that as sexual." Madden explained that during that conversation appellant asked that he be able to continue with and complete the lesson, insofar as it taught empathy for disabled children, but that he would modify the lesson plan and show her the new plan in the next day or two. Madden asked that pursuant to Evidence Code section 356 he be allowed to introduce the entire discussion in order to place Vijayendran's statement in context. Ultimately, the court allowed the prosecutor to introduce what the court believed was the only relevant statement—Vijayendran's admonition to appellant not to be alone with students—and excluded from evidence any of appellant's statements explaining his actions. The court warned Madden that if he attempted to introduce any of appellant's statements, the court would sustain a prosecution objection.

During the trial, the prosecutor asked Vijayendran if, after she had the conversation with Jane I, she told appellant he was not to have students in his classroom alone, particularly blindfolded, with the door closed. Vijayendran responded, "I told him he was not to have students in his classroom alone with the door closed[,] blindfolded. And I told him if he had students in his room alone doing work—I highly recommended he not have students in his room alone, but that if he did, that they would be sitting at a desk working and the door should be open."

Appellant argues that the trial court improperly excluded the evidence of his explanation in response to Vijayendran's instruction that he was not allowed to have students in his classroom alone while blindfolded with the door closed.

Evidence Code section 356 provides in pertinent part, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ."

Appellant maintains that because the prosecutor was allowed to introduce evidence that Vijayendran told appellant not to be behind closed doors with blindfolded children, he was entitled pursuant to Evidence Code section 356 to place that statement in the proper context of the greater conversation.

A trial court's determination of whether evidence is admissible under Evidence Code section 356 is reviewed for abuse of discretion.  (See *People v. Pride* (1992) 3 Cal.4th 195, 235.)

" ' "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry.  'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with*, the admission or declaration in evidence. . . .' [Citation.]" ' [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 334-335.)

Nevertheless, "[b]y its terms [Evidence Code] section 356 allows further inquiry into otherwise inadmissible matter only, (1) *where it relates to the same subject*, and (2) it is necessary to make the already introduced conversation *understood*.  Thus it has been held:  the court must exclude such additional evidence if not relevant to the conversation already in evidence." (*People v. Gambos* (1970) 5 Cal.App.3d 187, 192-193.)  Thus, the rule that where part of a conversation has been shown in testimony the remainder of that conversation may be brought out by the opposing party is

necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items that have been introduced.  (*Witt v. Jackson* (1961) 57 Cal.2d 57, 66-67.)

Appellant's explanation of what he had been doing in the classroom was simply irrelevant; it was not needed to make Vijayendran's statements to appellant understood. Excluding appellant's explanation of what he was doing in the classroom did not result in a misleading impression of what Vijayendran was intended to convey or did convey.

In sum, the trial court did not abuse its discretion in excluding appellant's explanation of what he was doing in the classroom after Vijayendran told him not to be alone with a student, while blindfolded, with the classroom door closed.

In his supplemental opening brief, appellant contends that the court's ruling deprived him of his federal constitutional right to present a defense.  The People contend appellant forfeited this claim of error by failing to object at trial.  We disagree.

As a general rule, where no objection is made on a particular constitutional ground, the defendant forfeits his claim of error on such ground for the purpose of appellate review.  (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 718, fn. 4; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1253; *People v. Marshall* (1996) 13 Cal.4th 799, 830-831; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155 (*Rodrigues*); *People v. Mitcham* (1992) 1 Cal.4th 1027, 1044.)  An exception to forfeiture exists, however, where "it appears that either the appellate claim is the kind that required no trial court action to preserve it, or the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as each was wrong on grounds actually presented to that court, had the additional *legal consequence* of violating the Constitution."  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 990, fn. 5 (*Lewis and Oliver*).)  To that extent, appellant's new constitutional argument is not forfeited on appeal.  (*Ibid.*)

Here, appellant raises no new or different factual or legal theories in connection with his constitutional claim.  Rather, his position simply is that the trial court's ruling had the additional *legal consequence* of violating the Constitution.  Nonetheless, "rejection on the merits of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well.  No separate constitutional discussion is required in such cases . . . ." (*Lewis and Oliver, supra*, 39 Cal.4th at p. 990, fn. 5.)

Without doubt, a defendant has the general right to offer a defense through the testimony of his or her witnesses.  (*Washington v. Texas* (1967) 388 U.S. 14, 19.) However, generally, application of the ordinary rules of evidence does not infringe on a defendant's right to present a defense.  (E.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; see *Taylor v. Illinois* (1988) 484 U.S. 400, 410, [the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence].)

Since we have concluded that the trial court did not abuse its discretion in excluding appellant's statements to Vijayendran, there is no error on which to base appellant's constitutional claim.  (*People v. Roybal* (1998) 19 Cal.4th 481, 506, fn. 2 (*Roybal*).)

## II. *Vijayendran's Typewritten Notes*

Vijayendran testified on direct examination that she took contemporaneous notes while talking with Jane I on, or shortly after, October 14, 2011.  According to Vijayendran, the handwritten notes contained only about one-third of what they discussed.  The prosecutor introduced Vijayendran's handwritten notes, which were both read to the jury and admitted into evidence, as People's exhibit No. 3.  Among other things, Vijayendran wrote that Jane I reported that appellant said he was going to put something in her mouth, and then Jane I said " 'he put the gooey something in my mouth.' "

32

At trial in mid-July 2013, Vijayendran testified that she did not "recall the exact details of the conversation at this point." On cross-examination, Madden marked as exhibit C typewritten notes, which Vijayendran prepared about three months later in January 2012, and which purported to document her conversation with Jane I. Vijayendran testified that her handwritten notes reflected about one-third of her discussion with Jane I. Vijayendran described her typewritten notes as "a different set of notes," which were "done later, so they were done more from memory, but they are more detailed." She would not say the typewritten notes were more accurate than the handwritten notes. Vijayendran described the typewritten notes as "expanded from my memory compared with the handwritten notes, which were being done while I was talking to the child." She testified that she added details in her typewritten notes based upon her reflection upon the handwritten notes. Vijayendran had her typewritten notes in front of her for reference during cross-examination by Madden.

Madden ascertained that Vijayendran testified in a legal proceeding relating to this matter in October or November 2012. Madden produced, though did not introduce, the transcript from that testimony. Madden asked Vijayendran whether Jane I talked about the "vessel" from which the drink came. Vijayendran replied, "I don't remember that clearly, what she said, except that she was describing gooey," and she used "the word 'gooey.'" Madden asked Vijayendran to review her testimony from the prior legal proceeding; then he asked whether she remembered Jane I discussing a bottle being gooey. Vijayendran responded that she remembered Jane I using the word " 'gooey,' but the rest of the conversation at that point is not that clear." The court then asked Vijayendran whether it would help to refresh her memory if she reviewed the transcript of her prior testimony. Vijayendran replied, "No."

On redirect, Vijayendran explained that she prepared the typewritten notes after appellant was arrested in January 2012, when the school district asked her to prepare an account of what happened. She clarified that by the time of appellant's trial, she did not

have an independent recollection of some matters stated in her typewritten notes: "I think I have an independent recollection of the general outline of how things happened, but when it comes to specific words, things like that, I may not have such a clear memory." Vijayendran could not specify whether she had prepared her typewritten notes based on her recollection alone or whether she had her handwritten notes available for reference. She prepared the typewritten notes while at home on maternity leave.

Later, citing *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), Madden moved to read into evidence the redacted contents of Vijayendran's typewritten notes, pursuant to Evidence Code section 1237. He explained that the issue was the portion of Vijayendran's typewritten notes following Jane I's description of appellant putting something "gooey" on her feet and leg. Madden read from the notes as follows. "Mr. Chandler was next to her. Mr. Chandler lifted the blanket up to about her nose and then put something in her mouth and made her drink something. She explained the drink as salty and that the bottle was gooey. I asked her if she felt the same as what was on her foot, and she said no. It felt different, but also gooey. [Jane I] said some of the drink fell out of her mouth because she was lying down and it got onto her jacket."

Madden argued that because Vijayendran could not remember Jane I stating the drink came from a gooey bottle, her typewritten notes were admissible both as a prior inconsistent statement and a past recollection recorded; therefore, her more complete typewritten notes should be read into the record.

The court expressed its concern that Vijayendran's typewritten notes were prepared from her memory, three months after the conversation with Jane I, and Vijayendran was unsure whether she had had her handwritten notes to refer to at the time she typed her notes. The court noted the fact that Vijayendran prepared the report "basically . . . to justify her conduct because of her actions"; this caused the court to question the reliability of the typewritten notes.

Madden pointed out that during her own trial, Vijayendran confirmed that Jane I described a bottle as gooey. Again, the court expressed its concern that Vijayendran's typewritten report was prepared from her recollections of the conversation that happened three months earlier. Ultimately, the court denied counsel's request to read Vijayendran's redacted typewritten notes into the record or allow them to be introduced into evidence as an exhibit.[12]

Appellant contends that the typewritten notes were admissible under Evidence Code section 1237 and that the court erred in excluding the notes.

We review the trial court's decision to exclude the evidence under the abuse of discretion standard. (*People v. Hamilton* (2009) 45 Cal.4th 863, 913, 930-931.)

Evidence Code section 1237 provides, in relevant part: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself . . . ; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement."

However, as the California Supreme Court has explained, " 'whether an adequate foundation for admission' of a statement under Evidence Code section 1237 has been established turns on whether the declarant's 'testimony that [the] statement was true was

---

[12] We note that the typewritten notes could not be introduced into evidence as an exhibit. (Evid. Code §1237, subd. (b)).

reliable,' and the trial court who hears the declarant's testimony has 'the best opportunity' to assess its credibility. [Citation.]" (*Cowan, supra*, 50 Cal.4th at p. 467.)

Evidence Code section 1237 provides a hearsay exception for what is usually referred to as past recollection recorded.

Even if we were inclined to find that the exclusion of the evidence contained in the typewritten notes was an abuse of discretion, the error was not so prejudicial as to constitute a miscarriage of justice. (Evid. Code, § 354 [a verdict shall not be set aside, nor shall the judgment be reversed, by reason of the erroneous exclusion of evidence unless the court that passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice].)

First, the reference to a bottle in Vijayendran's typewritten notes purported to describe a statement that Jane I made, rather than a statement that Vijayendran made. Even if the notes had been read into the record, Jane I's statement would not be admissible for the truth of the matter asserted—i.e., that the object in her mouth was actually a bottle. (Evid. Code, § 1200 [hearsay evidence is evidence of a statement made other than by a witness while testifying at the hearing that is offered to prove the truth of the matter stated. Hearsay evidence is inadmissible unless an exception applies].)

Furthermore, again appellant overstates the importance of Jane I describing what was in her mouth as a bottle. The jury knew that Jane I was blindfolded when the conduct she described occurred. They could reasonably infer that even if she used the term "bottle" to describe what she could not see, the conduct she described would be more consistent with sexual activity than with appellant sticking a bottle in her mouth. This is so because as a young child she would be likely to assume it was a bottle. Her age and experience would not have led her to believe it could have been something else.

In sum, we find no prejudice under any standard of review in the trial court's preventing Vijayendran's typewritten notes from being read into the record.

III. *Pork Rinds*

Jane II was the first child witness for the prosecution. She testified that while she was blindfolded, appellant put a big, curvy thing in her mouth, but she did not know what it was. She agreed with Madden that "it was kind of hard, but kind of soft"; however, she could not really describe it. She agreed that no liquid ever came out of it. Jane II did remember that appellant gave her crackers to taste while they were alone together. She said she did not like the taste and so she spat them out, but she could not remember what the taste was like. While cross-examining Jane II, Madden attempted to introduce into evidence "a bag containing maybe a half a dozen chips." The prosecutor objected and the parties had a conference at the bench, after which counsel moved to a different subject.

Later the court made a record of why it had excluded from evidence Madden's proffered item that was contained in a clear plastic bag. The court stated that it was excluding the evidence pursuant to Evidence Code section 352. Madden made the following offer of proof: "The items within the exhibit consist of pork rinds, a chip-type snack. I believe the Court indicated in its ruling that it was ruled against me on 352 grounds. I will indicate to start that this witness is describing objects physically consistent with those; that they are similar length, they are certainly curvy, they have certainly a roundness to them. [¶] I will also indicate to the Court that Mr. Chandler had a—this is in terms of my good faith, Mr. Chandler was interviewed by Det. Pierce for several hours on the evening of the 9th and specifically mentioned pork rinds. He also mentioned crackers and also mentioned another type of candy. Officer Pierce the next day re-interviewed [Jane II] and asked about all of those items. [¶] Mr. Chandler had told Det. Pierce the evening before that he gave her pork rinds, but she didn't get it. She guessed beef jerky. And that the next day, apparently with that information, Det. Pierce re-interviewed [Jane II], went through all of those things, and she confirmed two of the three, but she didn't confirm beef jerky. But of course it wasn't beef jerky. [¶] What I'm saying is that I, in good faith, believe that these items are the items—the item that

37

was put in her mouth when she was alone with Mr. Chandler, and that she should be allowed to look at it, to hold the outside of the bag. I will not ask her to put it in her mouth and taste it. I would ask her questions such as, has she ever had something like this. I had never tasted a pork rind until this case. I know what they taste like now. Many people are quite fond of them. It's my understanding that Mr. Chandler has been eating rinds since he was a little boy. They were offered in his class. I think there is plenty of relevance to this. I'm at a loss as to why the probative value is outweighed by the prejudicial effect. If she even recognizes it and she says it's consistent or not."

The prosecutor objected. The prosecutor pointed out that Jane II was asked to describe the object in her mouth, she did so as best she could, and she said she never saw the object. The court reaffirmed its earlier ruling excluding this evidence. The court stated that in its opinion, "the relevance . . . would only apply in this particular situation if she [were] allowed to put that particular food item in her mouth." The court stated that it was not going to require that Jane II do that with the pork rinds or any other item.

Appellant argues that the court's exclusion of the pork rinds evidence unfairly limited his counsel's ability to effectively cross-examine Jane II, in violation of his Sixth and Fourteenth Amendments confrontation rights. We are not persuaded.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The court has broad discretion to balance the probative value of the evidence against its prejudicial effect, and its decision will not be reversed absent an abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.) Furthermore, "[o]nly relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in

reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence. [Citation.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)

"A defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference." (*People v. Mincey* (1992) 2 Cal.4th 408, 442.)

The court's ruling on demonstrative evidence is reviewable under the abuse of discretion standard. (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1388.)

Given that there was absolutely no evidence that Jane II had seen what it was that appellant put into her mouth, and no evidence that Jane II had handled what it was that appellant put in her mouth, producing a bag of pork rinds and asking her to feel the pork rinds and determine if she had ever had something similar put in her mouth would have produced nothing more than a speculative inference and was therefore irrelevant. Evidence that leads only to speculative inferences is irrelevant. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.) Since counsel stated he had no intention of asking Jane II to taste a pork rind, the court could reasonably conclude that the probative value of showing her a pork rind and asking her to feel one with her hand would reveal nothing more than a speculative inference.

As noted, " ' "[t]he trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.)

In sum, the trial court did not err in preventing Madden from producing a bag of pork rinds to show to Jane II and have her feel them with her hand.

*Hilda Keller's Testimony*

Appellant contends that the court erred in allowing Hilda Keller to testify about a conversation she had had with appellant for the purpose of showing his intent with respect to the touching of Jane IV in count 3. The court held an in limine hearing in connection with the defense objection to the prosecutor's request to admit evidence that appellant asked teacher Hilda Keller if he could massage her feet and take a photograph of her feet.

Madden based his objection on the premise that appellant's evident sexual interest in Keller was entirely irrelevant to a charge involving a defendant's apparent sexual interest in a child's body parts. The prosecutor countered by noting that she was not seeking to introduce the evidence under Evidence Code section 1108; rather, she argued, it was admissible under Evidence Code section 1101, subdivision (b) to prove intent, i.e., as probative of appellant's intentions "when he sees a foot."

The court ruled that the evidence of the request to massage the feet and take a photograph was probative because feet are unique body parts. As noted, Keller testified before the jury that appellant entered her classroom and asked to photograph her feet and give her a foot massage because he was taking a massage therapy class. Keller thought that appellant's request was sexually motivated.

Appellant contends that the court abused its discretion in allowing the evidence to be admitted.

Under Evidence Code section 1101, evidence of uncharged conduct is inadmissible to prove the criminal disposition of a defendant. However, such evidence *is* admissible to prove some relevant fact such as identity or common design, plan, or scheme. The admission of uncharged conduct lies within the trial court's discretion. The trial court must weigh the probative value of the evidence against its prejudicial effect. The trial court, in reviewing the admissibility of evidence of other conduct, must consider (1) the materiality of the fact to be proved or disproved, (2) the probative value of the

proffered evidence to prove or disprove the fact, and (3) the existence of any policy or rule requiring exclusion despite relevance. (*People v. Daniels* (1991) 52 Cal.3d 815, 856.) "We review the admission of evidence under Evidence Code section 1101 for an abuse of discretion. [Citation.]" (*People v. Memro* (1995) 11 Cal.4th 786, 864.)

The least degree of similarity between the uncharged act and the charged offense is required in order to prove intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) Appellant argues that the evidence that he offered to massage and photograph the feet of an adult woman was not sufficiently similar to evidence that he touched the "stockinged" feet of a second-grade child.

Appellant compares this case to two cases from this court, *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*) and *People v. Earle* (2009) 172 Cal.App.4th 372 (*Earle*) to argue that this court should conclude that evidence of his apparent interest in Keller's feet was insufficiently similar to the alleged conduct with Jane IV to be admissible under Evidence Code section 1101, subdivision (b).

In *Jandres*, this court ruled that it was improper to admit prior act evidence involving a defendant who kidnapped an 11-year-old girl and put his finger in her mouth, in the defendant's trial on charges he forcibly raped an 18-year-old woman. (*Jandres, supra,* 226 Cal.App.4th at pp. 355-357.) In *Earle,* this court concluded that the defendant was entitled to severance of charges of indecent exposure and assault with intent to commit rape. (*Earle, supra,* 172 Cal.App.4th at pp. 378-379.) In *Earle,* we addressed whether evidence of the indecent exposure charge was cross-admissible to show the defendant's propensity to commit the sexual assault charge under Evidence Code section 1108. We answered that question in the negative. (*Earle, supra,* at pp. 396-400.) We stated: "Does the commission of indecent exposure rationally support an inference that the perpetrator has a propensity or predisposition to commit rape? Not without some kind of expert testimony, it does not." (*Id.* at p. 398.) We determined that for a prior offense to be relevant, the jury must have evidence before it that the prior offense has

41

"some tendency in reason to show that the defendant is predisposed to engage in conduct *of the type charged.*" (*Id.* at p. 397.)

Appellant's reliance on *Jandres* and *Earle* is misplaced. The similarity between the uncharged and charged conduct here was far greater than in *Jandres* and *Earle*. Jane IV's testimony was that appellant touched her feet with something. Keller's testimony was that appellant wanted to massage (i.e., touch) her feet and photograph them. As the trial court found, "the feet are a unique body part." Furthermore, the evidence in *Jandres* was admitted under Evidence Code section 1108,[13] which allows evidence of other acts to prove a disposition or propensity to commit the charged crime or crimes. (*Jandres, supra*, 226 Cal.App.4th at pp. 352-353.) In *Jandres*, we found it questionable whether kidnapping and placing a finger in a child's mouth was a sexual offense at all. (*Id.* at p. 354.)

The evidence in this case was admitted under Evidence Code section 1101 only to prove appellant's intent in touching Jane IV's feet. Here the degree of similarity between what appellant did to Jane IV and what he wanted to do to Keller is much more significant. Furthermore, there is one other similarity. Both events took place when appellant was alone in a classroom with Jane IV and with Keller. Given the uniqueness of someone's wanting to touch another person's feet, there are sufficient similarities to render appellant's conduct with Keller probative of his intent with Jane IV.

---

[13] Evidence Code section 1101 prohibits the admission of character evidence, including evidence of specific instances of conduct, to prove a defendant's conduct on another occasion. (§ 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 913 (*Falsetta*).) Evidence Code section 1108, subdivision (a), provides in pertinent part, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 1108 expands "the admissibility of disposition or propensity evidence in sex offense cases." (*Falsetta, supra*, at p. 911.)

The trial court's admission of Keller's evidence was well within its broad discretion, which " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125.) Appellant has failed to make such a showing.

In his Supplemental Opening Brief, appellant argues that the admission of the evidence violated his federal constitutional rights to due process and a fair trial. The argument is based on the assumption that the evidence was improperly admitted, and there was no legitimate inference the jury could draw from it. Since we have found that the evidence was properly admitted, there is no error on which to base appellant's constitutional claim. (*Roybal, supra,* 19 Cal.4th at p. 506, fn. 2.)

*Cumulative Error*

Appellant concedes that some of the evidentiary errors claimed here—for example exclusion of the bag of pork rinds, evidence regarding his offer to massage Keller's feet, and exclusion of Vijayendran's typewritten notes—by themselves might not have adversely affected the outcome of his trial; nevertheless, he claims his due process rights were violated because the cumulative effect of the trial court's and his counsel's errors were sufficiently prejudicial to violate the Fifth and Fourteenth Amendment guarantees of fundamental fairness. We disagree.

"The concept of finding prejudice in cumulative effect, of course, is not new. Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)

Certainly, " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) However, as discussed *ante,* since we have found none of appellant's claims of error meritorious

and/or prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which, whether viewed individually or in combination, could possibly have affected the jury's verdicts. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.) Simply put, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.) Appellant was entitled to a fair trial, not a perfect one. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

*Errors in the Abstract of Judgment*

The court sentenced appellant to five consecutive terms of 15 years to life pursuant to section 667.61, subdivisions (b) and (e).

Appellant points out that there is an error in the abstract of judgment because it lists the sentencing provisions of section 667.61 under item 2 as an enhancement rather than in the appropriate box under item 8. The People concede that a one-strike sentence is an alternative sentence rather than an enhancement. We agree. Section 667.61 also known as the " 'One Strike' " law (*People v. Mancebo* (2002) 27 Cal.4th 735, 738) is "an alternative, harsher sentencing scheme for certain" sex crimes. (*Ibid.*) " ' "Unlike an enhancement, which provides for an additional term of imprisonment, [a one strike sentence] sets forth an alternate penalty for the underlying felony itself, when the jury has determined that the defendant has satisfied the conditions specified in the statute." ' [Citation.]" (*People v. Perez* (2010) 182 Cal.App.4th 231, 239.) The box in item 8 pertaining to section 667.61 should have been checked. We will order the abstract of judgment amended accordingly.

*Disposition*

The case is remanded to the lower court to modify the abstract of judgment to strike the references to enhancements and enter "a check mark in box 8 in front of PC 667.61." As so modified, the judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.

*The People v. Chandler*
H040429

# EXHIBIT 10

# IN THE SUPREME COURT

# FOR THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | Sixth District |
| Plaintiff and Respondent, | ) | Court of Appeal |
| | ) | No. H040429 |
| v. | ) | |
| | ) | |
| CRAIG RICHARD CHANDLER, | ) | |
| | ) | |
| Defendant and Appellant. | ) | |

## PETITION FOR REVIEW
## TO EXHAUST STATE REMEDIES

Appeal from the Superior Court of California
Santa Clara County Case No. C1223754
Honorable Arthur Bocanegra, Judge

JEFFREY S. KROSS
State Bar No. 142882
P.O. Box 2252
Sebastopol, CA 95473-2252
(707) 823-8665
kross142882@gmail.com

Attorney for Appellant
CRAIG RICHARD CHANDLER

By appointment of the Court
of Appeal under the Sixth
District Appellate Program
Independent Case System

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................... 2

TABLE OF CASES AND AUTHORITIES .............................. 4

PETITION FOR REVIEW TO EXHAUST STATE REMEDIES .............. 5

STATEMENT OF THE UNDERLYING PROCEEDINGS ........................ 6

STATEMENT OF FACTUAL AND LEGAL BASES OF CLAIMS ......... 7

I. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO PROPERLY CROSS-EXAMINE A CRITICAL PROSECUTION WITNESS TO PROVIDE AVAILABLE EXCULPATORY EVIDENCE ........ 7

A. Relevant law and standard of review. ......................................... 7

B. Failure to properly cross-examine the DNA expert. ................... 7

C. Counsel's failures prejudiced appellant. ................................... 17

II. THE COURT IMPROPERLY EXCLUDED EVIDENCE OF APPELLANT'S EXPLANATION AFTER ALLOWING THE PROSECUTION TO INTRODUCE EVIDENCE THAT THE PRINCIPAL WARNED HIM NOT TO BLINDFOLD AND BE ALONE WITH STUDENTS WITH THE DOOR CLOSED ...................................................................... 17

A. Relevant procedural and factual matters. ................................. 17

B. Appellant's explanation for his conduct was admissible under Evidence Code section 356. ................................................... 19

C. The court's exclusion of this evidence prejudiced appellant. ...................................................................... 21

III. THE COURT ERRED BY EXCLUDING FROM EVIDENCE PRINCIPAL VIJAYENDRAN'S TYPEWRITTEN NOTES AS INADMISSIBLE UNDER EVIDENCE CODE SECTION 1237 ............................................. 22

A. Relevant procedural matters. ................................................... 22

B. Vijayendran's typewritten notes were admissible under Evidence Code section 1237. ................................................. 25

## TABLE OF CONTENTS
(continued)

Page

C.  The exclusion of this evidence prejudiced appellant. ................  26

IV. THE COURT IMPROPERLY PREVENTED THE
DEFENSE FROM INTRODUCING PORK RINDS
AS AN EXHIBIT ........................................................................  27

A.  Relevant procedural matters. ....................................................  27

B.  Exclusion of the proffered evidence was prejudicial. ...............  28

V.  THE COURT ERRED BY ALLOWING TESTIMONY
THAT APPELLANT PREVIOUSLY OFFERED TO
MASSAGE AND PHOTOGRAPH A FEMALE ADULT
TEACHER'S FEET .....................................................................  29

A.  Relevant procedural and factual matters. .................................  29

B.  The court improperly admitted Keller's testimony
under  Evidence Code section 1101, subdivision (b)
to prove intent. ..........................................................................  30

C.  The court's ruling prejudiced appellant. ...................................  31

VI. THE CUMULATIVE ERRORS DEPRIVED
APPELLANT OF HIS CONSTITUTIONAL RIGHT
TO DUE PROCESS .....................................................................  32

CONCLUSION ...................................................................................  32

WORD COUNT CERTIFICATION .......................................................  33

COURT OF APPEAL'S OPINION .............................................  Appendix

# TABLE OF CASES AND AUTHORITIES

**Cases**                                                                 **Pages**

*Beck v. Alabama* (1980) 447 U.S. 625 ...................................................... 32
*Crane v. Kentucky* (1986) 476 U.S. 683 ............................................. 21,27
*Davis v. Alaska* (1974) 415 U.S. 308 ...................................................... 29
*Delaware v. Van Arsdall* (1986) 475 U.S. 673 ........................................ 29
*Donnelly v. DeChristoforo* (1974) 416 U.S. 637 ................................. 21,32
*Estelle v. McGuire* (1991) 502 U.S. 62 ......................................... 27,29,31
*Hart v. Gomez* (9th Cir. 1999) 174 F.3d 1067 ......................................... 7
*Holley v. Yarborough* (9th Cir. 2009) 568 F.3d 1091 ............................. 31
*People v. Arias* (1996) 13 Cal.4th 92 .............................................. 19,20
*People v. Chism* (2014) 58 Cal.4th 1266 ............................................... 16
*People v. Cowan* (2010) 50 Cal.4th 401 ................................................ 16
*People v. Ewoldt* (1994) 7 Cal.4th 380 ................................................. 31
*People v. Johnson* (2010) 183 Cal.App.4th 253 ...................................... 20
*People v. Vines* (2011) 51 Cal.4th 830 ................................................. 19
*People v. Zapien* (1993) 4 Cal.4th 929 ............................................ 19,20
*Reynoso v. Giurbino* (9th Cir. 2006) 462 F.3d 1099 ................................. 7
*Rios v. Rocha* (9th Cir. 2002) 299 F.3d 796 ........................................... 7
*Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446 ..................................... 7
*Taylor v. Kentucky* (1978) 436 U.S. 478 .............................................. 32
*Strickland v. Washington* (1984) 466 U.S. 668 .................................... 7,17
*United States v. Owens* (1988) 484 U.S. 554 ......................................... 11
*Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355 ..................................... 21

## Constitutional Authority

U.S. Const., Fifth Amendment ......................................................... 29,31,32
U.S. Const., Fourteenth Amendment .................................... 21,27,29,31,32
U.S. Const., Sixth Amendment ........................................................ 7,21,27,29

## Statutes

Evidence Code § 352 ......................................................................... 28
Evidence Code § 356 ............................................................... 18,19,20
Evidence Code § 1101 ................................................................... 29,30
Evidence Code § 1237 ............................................................. 24,25,26
Penal Code § 288 ............................................................................. 29

# IN THE SUPREME COURT

## FOR THE STATE OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA,** | ) |
| Plaintiff and Respondent, | ) |
| | ) |
| v. | ) |
| | ) |
| **CRAIG RICHARD CHANDLER,** | ) |
| | ) |
| Defendant and Appellant. | ) |

On Appeal from the Superior Court of California
Sixth District Court of Appeal No. H040429
Santa Clara County Case No. C1223754

## PETITION FOR REVIEW
## TO EXHAUST STATE REMEDIES

TO THE HONORABLE TANI CANTIL-SAKAUYE, CHIEF JUSTICE, AND THE HONORABLE JUSTICES OF THE SUPREME COURT:

Appellant Craig Richard Chandler hereby petitions this court for review, pursuant to Rule 8.508, California Rules of Court, from the Sixth District Court of Appeal's unpublished opinion in the above entitled matter, filed November 30, 2015. (The Court of Appeal's opinion is attached hereto as the appendix.) This case presents no grounds for review under Rule 8.500(b), California Rules of Court, and the petition is filed solely to exhaust state remedies for federal habeas corpus purposes.

Appellant did not file a petition for rehearing in the Court of Appeal.

## STATEMENT OF THE UNDERLYING PROCEEDINGS

Appellant Craig Richard Chandler was charged in a second amended information, filed on July 31, 2013 (the 20th day of jury trial), with five counts of committing a lewd or lascivious act on a child under the age of 14 years, in violation of Penal Code section 288, subdivision (a).  (Further undesignated statutory references are to the Penal Code.)  The information alleged appellant committed the offenses against multiple victims, in this case against five different girls, pursuant to section 667.61, subdivisions (b) and (e).  (Clerk's Transcript on Appeal ["CT"], vol. 6, pp. 1382-1386.)

On August 1, 2013, a jury convicted appellant on all five counts and found the multiple victim allegation to be true.  (6CT 1392-1401, 1404-1405.)  The court sentenced appellant to five consecutive terms of 15 years to life on November 22, 2013.  (7CT 1559-1563, 1565.)

In an unpublished opinion filed on November 30, 2015, the Sixth District Court of Appeal remanded the matter to the superior court to correct the abstract of judgment, and otherwise affirmed the judgment.  (See opinion at appendix.)

////

////

////

////

////

////

////

////

6

## STATEMENT OF FACTUAL AND LEGAL BASES OF CLAIMS

### I.

### APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO PROPERLY CROSS-EXAMINE A CRITICAL PROSECUTION WITNESS TO PROVIDE AVAILABLE EXCULPATORY EVIDENCE

A.  **Relevant law and standard of review.**

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the effective assistance of counsel. In claiming the ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-695.) A defense attorney who fails to investigate and present potentially exculpatory evidence renders deficient representation. (See, e.g., *Reynoso v. Giurbino* (9th Cir. 2006) 462 F.3d 1099, 1112; *Rios v. Rocha* (9th Cir. 2002) 299 F.3d 796, 805; *Hart v. Gomez* (9th Cir. 1999) 174 F.3d 1067, 1070; *Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446, 1456.)

B.  **Failure to properly cross-examine the DNA expert.**

    1.   <u>The meaning of the lack of epithelial cells in the stains on the chairs.</u>

The prosecutor's theory of the case was that appellant blindfolded the five girl witnesses and, unbeknownst to them, made them orally copulate him. (Reporter's Transcript on Appeal, vol. 18, pp. 1605-1606, 1615-1618.) Because none of the five girls named as victims actually saw what appellant was doing while they were blindfolded, the most crucial, objective prosecution witness was Kristin Cardosa, the forensic biologist

7

who unequivocally testified she found stains containing appellant's sperm and DNA on two chairs in the classroom.

Via the testimony of Annie "Doe," defense counsel, Mr. Madden, presented evidence that Annie and appellant had intercourse in the classroom to explain the presence of appellant's sperm and semen on two of the chairs.

    a. <u>Preliminary hearing testimony.</u>

Defense counsel Steven Clark cross-examined Kristin Cardosa during appellant's preliminary hearing. Cardosa testified that she analyzed DNA in more than one hundred sexual assault cases, many of which involved oral copulation. (3CT 432.)

Cardosa did not find any DNA in this case other than appellant's. (3CT 433-434.) Cardosa explained that because epithelial cells are more fragile than sperm cells, epithelial cells break open during the DNA testing process, resulting in epithelial fractions. Cardosa stated that "in this case, the epithelial fraction contained the same profile as the sperm cell fraction[,]" which was associated with appellant. (3CT 435.) Cardosa detected no other DNA. (3CT 436.)

Clark then elicited from Cardosa that human adults and children have epithelial cells in their mouths, and had it been present in the stains on the chairs, Cardosa would have seen the DNA of someone other than appellant. (3CT 436, 438.)

Clark thereafter returned to this subject and elicited from Cardosa that the reason DNA sample swabs are obtained from people's mouths is because of the abundance of epithelial cells. (3CT 455-456.) Cardosa then

testified that epithelial cells in the mouth are easily transferred to another object, and can be transferred in multiple ways. (3CT 456.) Cardosa would expect to find the epithelial cells from a female's mouth transferred onto a man's penis during oral copulation. (*Ibid*.) Cardosa also would expect to find the epithelial cells from the female's mouth in a sample if the man touched his penis after the oral copulation and there was ejaculate on his penis. (*Ibid*.) Moreover, if the male ejaculated into the female's mouth and the female then spit out that semen, Cardosa would expect to find a mixture of the female's saliva in the sample containing the male's semen. (3CT 457.)

     b. Trial testimony and argument.

     Defense counsel Madden began his cross-examination of Cardosa at trial by questioning about the locations and sizes of the semen stains on the two chairs. (13RT 1170-1175.) He then elicited that she "did not test for saliva." (13RT 1175.) She agreed that saliva contains epithelial cells, and when she was looking for spermatozoa she also looked for epithelial cells; however, she found no "intact epithelial cells." (13RT 1176.) Cardosa found only one body fluid -- semen -- in both of the stains tested. (*Ibid*.) To summarize, Cardosa found a small amount of semen on the underside of chair SYO-01, unmixed with any other body fluid or DNA, and also found a small amount of semen on the left side of chair SYO-02, unmixed with any other body fluid or DNA. (13RT 1177.)

     Madden presented his closing argument without once mentioning the DNA evidence, after which the court took the noon recess. (18RT 1620-1651.)

Immediately following the noon recess, the court allowed Madden to reopen his argument, and he apologized for neglecting to cover the subject of the DNA. (18RT 1652.) Counsel then stated, "The two stains on these two chairs contain semen, no other bodily fluid, and it's Mr. Chandler's semen." (*Ibid.*) He soon continued, "The most important part of her analysis [was] the fact there was no saliva found in either stain. What that means is very clear, and it is this, that semen was never in the mouth of any child. Otherwise, there would be saliva in that stain -- in those stains, and it's not there." (*Ibid.*) At that point, the prosecutor, Ms. Filo, objected that Madden's argument misstated the evidence and the parties approached the bench for a discussion. (18RT 1652-1653.)

Upon returning from the bench conference, Madden continued, "Let me restate that, ladies and gentlemen. There is no mixture of other DNA in that stain. There are no other epithelial cells saliva from --" (18RT 1653.) The prosecutor again objected, and the court struck Madden's last comment. (*Ibid.*) At that point, Madden apparently gave up and sat down and Ms. Filo began her rebuttal argument. (*Ibid*)

During rebuttal argument, the prosecutor stated, "There is no evidence in this record at all that the crime laboratory could test for saliva. No evidence in the record at all. I will tell you what is in the record, that Craig Chandler's semen is found on one spot on SYO-01, confirmed on one spot on SYO-02, and presumptively confirmed on four other spots on that chair." (18RT 1664.)

c. Trial counsel's failure to properly cross-examine.

The federal Constitution guarantees an opportunity for effective

10

cross-examination, not a cross-examination that is as effective as a defendant might prefer. (*United States v. Owens* (1988) 484 U.S. 554, 559.) Nevertheless, the cross-examination must be "effective" in order to meet constitutional standards of competence. (*Ibid.*) Given the high-quality impeachment testimony elicited by defense counsel Clark during the preliminary hearing, Madden's failed attempts at cross-examining Cardosa, followed by his aborted attempt to explain her testimony, were inexcusable.

As stated above, none of the five female students saw what appellant put in their mouths, and there were significant inconsistencies between the girls' descriptions of the object(s). The prosecution theory was that appellant made the girls orally copulate him and he ejaculated in some of their mouths. It is hardly arguable that the most inculpating evidence was the presence of appellant's semen, sperm, and DNA on two of the chairs.

Clark's cross-examination of Cardosa to a great extent undermined the prosecution theory. He first elicited an explanation as to why the samples did not contain complete epithelial cells: they were less robust than sperm cells and were destroyed during the DNA testing process. (3CT 435.) He then confirmed that appellant's DNA alone was found in the epithelial cell fraction. (3CT 435-436.) He next effectively established that epithelial cells are found in the mouths of adults and children; in fact, the abundance of epithelial cells in the mouth is the reason DNA sample swabs are obtained from that location. (3CT 346, 455-456.) Clark then debunked the exact prosecution theory: positing a hypothetical in which a female orally copulates a male, who ejaculates into the mouth of the female, who then spits out that semen, Cardosa testified she would expect to find a

mixture of the female's epithelial cells and the male sperm cells. (3CT 456-457.)  Again, however, the stains on the chairs contained only appellant's DNA. (3CT 435-436.)

By stark contract, Madden's cross-examination of Cardosa failed to make the critical links for the jury's consideration.  He confirmed from Cardosa that saliva contains a lot of epithelial cells, but also elicited that she did not test for saliva. (13RT 1175-1176.)  Thus, when Cardosa testified she did not find any intact epithelial cells in the stains on the chairs (13RT 1176), and that she did not find any other bodily fluids mixed with the semen stains (13RT 1177), the jury could have been left with the impression the reason for that was because Cardosa did not test for saliva. (13RT 1175.)

Madden's "afterthought" argument regarding the DNA only exacerbated the error.  He first noted the two stains on the two chairs contained appellant's semen, no other bodily fluid. (18RT 1652.)  But his earlier cross-examination of Cardosa failed to explain the importance of this fact, particularly in light Cardosa's testimony that she did not test for saliva. Madden then sought to make an untenable and unsupported leap: he argued the fact no saliva was found in either stain meant semen was never in the mouth of any child.  (*Ibid.*)  But having failed to elicit this evidence from Cardosa, the prosecutor properly objected that this misstated the evidence. (*Ibid.*)  After apparently being admonished at the bench, Madden sought to "restate that," and argued there were no other "epithelial cells saliva [*sic*]," at which point the prosecutor again objected and the court struck counsel's last comment. (18RT 1653.)  Evidently conceding defeat, Madden made no

12

further comments and the prosecutor began her rebuttal argument. (*Ibid.*) And during her rebuttal, the prosecutor reminded the jury there was "no evidence in this record at all that the crime laboratory could test for saliva" (18RT 1664), thereby destroying whatever negligible vestige of impeachment value Madden's cross-examination and argument might have contained.

Again, prior counsel established from Cardosa that the mouth had an abundance of epithelial cells, and that had a female orally copulated a male who ejaculated in her mouth, Cardosa would have expected to find a mixture of both parties' genetic material in the resulting stain. This was the exact scenario posited by the prosecution. Yet neither of the stains contained that expected mixture.

It is reasonable to expect that trial counsel reviewed the preliminary hearing transcript and made himself aware of available prior testimony that directly undermined the prosecution theory. Counsel failed to elicit this available evidence and instead presented a garbled and wholly ineffective argument based on his inadequate cross-examination.

2. The defense "transfer" theory.

a. Preliminary hearing testimony.

During cross-examination, defense counsel Clark elicited from Cardosa that the semen stain was found "on the underside of the seat portion" of chair SYO-01. (3CT 437.) Clark continued, "So is it possible if someone has semen on their hand, if they sit in their chair and move their chair, you could transfer the semen in that way?" Cardosa responded, "Yes, it's a possibility." (*Ibid.*) Clark then asked if Cardosa thought that

13

happened, or whether she knew. (*Ibid.*) Cardosa responded, "It is hard to determine based on the pattern of the stain." (3CT 438.)

Continuing this train of thought, Clark later asked Cardosa whether the stain on SYO-01 was "consistent with what's commonly known as a transfer stain." (3CT 450.) Cardosa answered, "Based on the shape of the stain, I cannot tell whether it's a transfer. You mean a secondary transfer from something else?" (*Ibid.*) When Clark responded, "Yes," Cardosa replied, "Based on the stain, I can't determine that." (3CT 451.) She then expanded, "It looks to be a straight stain from a straight liquid, but whether it was just deposited on there or wiped from something else, if it was a liquid transferred, it could be a transfer." (*Ibid.*)

b. Trial testimony and argument.

After reaffirming the small amounts of semen found on chairs SYO-01 and SYO-02 were unmixed with any other body fluid (13RT 1177), defense counsel Madden proposed to Cardosa the following hypothetical: "A man and a woman have sex in a room containing the two chairs, SYO-01 and SYO-02. Immediately afterward, some semen gets onto the hands of the man, and the man then moves both of these chairs, transferring the semen on his hand to the chairs. [¶] Is that scenario a reasonable explanation for the finding that you made here?" (13RT 1178.)

Cardosa replied, "Based on the appearance of the stains, they don't appear to be transfer stains. They appear to be directly deposited onto the chairs." (13RT 1178.) Apparently surprised by Cardosa's response, Madden re-asked the question: "They don't appear to be transfer stains?" Cardosa reaffirmed her previous answer: "They don't." (*Ibid.*) Madden

14

questioned, "Why not?" and Cardosa replied, "They don't appear to be smeared or in any kind of way disturbed. They appear to be just a pure liquid placed on the chairs." (*Ibid.*)

During her opening argument, Ms. Filo highlighted Madden's tactical error: "And Mr. Madden asked Kristin Cardosa, remember the DNA expert, and said, Ms. Cardosa, I would like to give you a hypothetical. Let's assume that Mr. Chandler had consensual sex in a classroom with an adult woman and touched himself afterwards, then somehow put his hands on the chairs, move[d] these chairs around, would that explain the semen that was on the chairs? No. Well, why not? Because these aren't transfer stains. This isn't like she described a ketchup packet, where you smear your finger, you get a smear. It's called a transfer stain. It's something decidedly different than what you could view with the naked eye on these chairs, which are drops. She called them direct deposits." (18RT 1613.)

After realizing he had neglected to discuss the DNA evidence during argument and was allowed to reopen his argument, Madden told the jury, "I disagree with Ms. Filo concerning Ms. Cardosa. Ms. Cardosa said that the one particular stain did not appear to be a transfer stain, but scientists would never make an absolute statement that it wasn't a transfer stain. She said it doesn't appear to be because there were droplets." (18RT 1652.)

c. Trial counsel's failure to properly cross-examine.

Cardosa's testimony at the preliminary hearing directly contradicted her trial testimony on an extremely critical point: during the preliminary hearing, Cardosa agreed the semen stain on the chair could have been a transfer stain, placed there after a sexual encounter if the person had semen

15

on his hand and moved the chair. (3CT 437, 450-451.) This was the defense theory of the case: that appellant placed the stains on the chair after his sexual encounter with Annie in the classroom.

At trial, defense counsel Madden proposed this exact scenario to Cardosa. Now, however, Cardosa emphatically disagreed the stain could have been a transfer stain, and insisted it must have been directly deposited on the chair, thereby undermining the defense theory. (13RT 1178.) Evidently conceding defeat, counsel terminated his cross-examination after eliciting this testimony. (*Ibid.*)

Counsel failed to impeach Cardosa's testimony with her prior testimony allowing for the possibility of a transfer stain. "'A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement ....'" (*People v. Chism* (2014) 58 Cal.4th 1266, 1294.) The test for whether a witness's prior statement is inconsistent with prior testimony is whether the statement is inconsistent in effect rather than an express contradiction of terms. (*People v. Cowan* (2010) 50 Cal.4th 401, 462; see also *People v. Chism, supra,* at p. 1295.)

Again, counsel should have been familiar with this critical prosecution witness's earlier testimony on this crucial point. Instead of effectively impeaching her with her prior inconsistent testimony, however, counsel just abdicated and figuratively threw up his hands. Counsel's failure left him with nothing to argue on this point except to feebly claim that "scientists would never make an absolute statement that it wasn't a transfer stain." (18RT 1652.) The problem is, unlike her preliminary

16

hearing testimony, that is exactly what Cardosa stated at trial. (13RT 1178.)

Moreover, the prosecutor took advantage of counsel's tactical error during

argument, highlighting how his hypothetical backfired and instead

supported the prosecution theory. (18RT 1613.)

C.     **Counsel's failures prejudiced appellant.**

Under the circumstances and in consideration of the evidence

presented at trail, as described above, counsel's omission's and tactical

miscalculations prejudiced appellant. (*Strickland v. Washington, supra,*

466 U.S. at pp. 693-695.)


## II.

### THE COURT IMPROPERLY EXCLUDED EVIDENCE OF APPELLANT'S EXPLANATION AFTER ALLOWING THE PROSECUTION TO INTRODUCE EVIDENCE THAT THE PRINCIPAL WARNED HIM NOT TO BLINDFOLD AND BE ALONE WITH STUDENTS WITH THE DOOR CLOSED

A.     **Relevant procedural and factual matters.**

Prior to trial, the prosecutor sought to introduce evidence that after

Becky's mother complained about appellant in October 2011, Vijayendran

told him not to have children alone in the classroom. (7RT 539.) The

prosecutor observed that "we know a lot more about these conversations"

because Vijayendran had been prosecuted for, and ultimately was convicted

by a jury of failing to report an incident of suspected child abuse. (7RT

539-540.) Defense counsel Madden clarified that at her trial, Vijayendran

testified she specifically advised appellant he was not have children in his

classroom with the doors closed with the children blindfolded, putting

things in their mouths. (7RT 550.) The prosecutor moved to exclude from

17

evidence appellant's "entire explanation of the activity or what they are going to allege is the test which caused a child to be in the classroom alone." (7RT 540.)

Defense counsel responded by explaining that Vijayendran testified there was a lengthy conversation surrounding her admonition to appellant, during which appellant discussed "exactly what he did on the incident involving Becky, why he did it, what the purpose was. And it was at the end of that conversation" that Vijayendran stated she did not feel appellant was engaged in inappropriate sexual activity, but advised him it was inappropriate to put things in students' mouths while alone and blindfolded. (7RT 541-752.) During that conversation appellant asked that he be able to continue with and complete the lesson, insofar as it taught empathy for disabled children, but that he would modify the lesson plan and show her the new plan in the next day or two. (7RT 543.) Counsel therefore moved to allow the entirety of the discussion, pursuant to Evidence Code section 356, in order to place Vijayendran's statement in context. (*Ibid.*; see also counsel's arguments re: placing Vijayendran's statement in the proper context at 7RT 544-550.)

The court ultimately allowed the prosecutor to introduce what the court believed was the only relevant statement -- Vijayendran's admonition to appellant not to be alone with students -- and excluded from evidence any of appellant's statements of explanation. (7RT 543-544, 546-547, 551-552.) The court specifically warned counsel that if he attempted to introduce any of appellant's statements, the court would sustain a prosecution objection. (7RT 546, 551-552.)

18

During the trial, the prosecutor asked Vijayendran if after she had the conversation with Becky, she told appellant he was not to have students in his classroom along, particularly blindfolded, with the door closed. Vijayendran responded, "I told him he was not to have students in his classroom alone with the door closed[,] blindfolded. And I told him if he had students in his room alone doing work -- I highly recommend he not have students in his room alone, but that if he did, that they would be sitting at a desk working and the door should be open." The prosecutor concluded her direct examination with that statement. (7RT 732-733.)

B.    **Appellant's explanation for his conduct was admissible under Evidence Code section 356.**

Evidence Code section 356 states, in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; ...." "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission ... in evidence.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 156.) "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry." (*People v. Vines* (2011) 51 Cal.4th 830, 861; *People v. Zapien* (1993) 4 Cal.4th 929, 959.)

According to defense counsel's offer of proof -- based on the reporter's transcript of Vijayendran's testimony at her own trial for

19

misdemeanor failure to report suspected child abuse -- after Becky's mother's complaint in October 2011, appellant explained his lesson plan underlying his blindfolding students while alone in his classroom.  The principal then advised him not to do so in the future.  This conversation occurred in a single occasion.  (Cf. *People v. Johnson* (2010) 183 Cal.App.4th 253, 287 [court does not abuse  discretion under Evidence Code section 356 by refusing to admit statements from conversation or interrogation to explain statements made in previous distinct and separate conversation]; and see cases cited therein.)

Thus, because the prosecutor was allowed to introduce evidence that Vijayendran told appellant not to be behind closed doors with blindfolded children, appellant was entitled to place that statement in the proper context of the greater conversation.  (*People v. Zapien*, *supra*, 4 Cal.4th at p. 959 [in the event a statement admitted in evidence constitutes part of a conversation, the opponent is entitled to have placed in evidence all that was said by or to the declarant in the course of such conversation, provided the other statements have some bearing upon, or connection with, the declaration in evidence].)

Instead, stripped of its contextual setting, the jury was left with the "misleading impression" (*People v. Arias*, *supra*, 13 Cal.4th at p. 156) that Vijayendran gave appellant his warning directly in response to Becky's and her mother's complaints, as opposed to in the aftermath of appellant's explanation of his lesson plan, which, according to her misdemeanor trial testimony, Vijayendran did not believe had sexual connotations.  The court failed to properly apply Evidence Code section 356 in excluding the context

20

for Vijayendran's warning to appellant.

C. **The court's exclusion of this evidence prejudiced appellant.**

The court's exclusion of appellant's explanation for his conduct after Vijayendran warned him not to be alone with students with the door closed violated appellant's constitutional right to present a defense, in violation of his Sixth and Fourteenth Amendment rights (*Crane v. Kentucky* (1986) 476 U.S. 683, 690-691) and his Fifth and Fourteenth Amendment rights to due process. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643; *Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355, 1357.)

Here, the court improperly excluded evidence which could have provided a viable explanation for appellant's conduct in the classroom with blindfolded students. Deprived of that evidence, the jury simply learned appellant was admonished not to conduct himself in this manner, without understanding the valid and plausible reason for his conduct.

Moreover, the prejudice to appellant was compounded when the prosecutor (over earlier defense objection; 9RT 755-766) asked Vijayendran whether the information conveyed by Becky caused her concern that Becky was describing an act of sexual molestation, to which the principal responded, "There were times that I was concerned that that was the case, yes." (9RT 769.) Vijayendran next testified she did not have any other explanation for appellant's behavior. (9RT 770.)

According to counsel's offer of proof, however, Vijayendran *did* have another explanation for appellant's conduct, as put forth by appellant himself. Whether Vijayendran believed the explanation was immaterial -- that was a judgment for the jury to make. Unfortunately, the court's ruling

denied the jury that knowledge, leaving it with the false, and ultimately damning impression that appellant's conduct was sexually, rather than pedagogically motivated.

### III.

### THE COURT ERRED BY EXCLUDING FROM EVIDENCE PRINCIPAL VIJAYENDRAN'S TYPEWRITTEN NOTES AS INADMISSIBLE UNDER EVIDENCE CODE SECTION 1237

A.    **Relevant procedural matters.**

Principal Vijayendran testified on direct that she took contemporaneous notes while conversing with Becky on, or shortly after October 14, 2011.  The handwritten notes contained only about one-third of what they discussed.  The prosecutor introduced Vijayendran's handwritten notes, which were both read to the jury and admitted into evidence, as People's Exhibit 3.  Vijayendran wrote, inter alia, that Becky reported appellant said he was going to put something in her mouth, and then "he put the gooey something in my mouth." (9RT 724-729.)  By trial in mid-July 2013, Vijayendran did not "recall the exact details of the conversation at this point." (9RT 729.)

On cross-examination, counsel Madden marked as Defense Exhibit C typewritten notes documenting Vijayendran's October 2011 conversation with Becky, prepared by the principal about three months later, in January 2012. (9RT 734, 737.)  Reaffirming that her handwritten notes (People's Exhibit 3) reflected about one-third of her discussion with Becky, Vijayendran described her typewritten notes as "a different set of notes," which were "done later, so they were done more from memory, but they are

22

more detailed." (9RT 737-738.) She would not say the typewritten notes were more accurate than the handwritten notes. (9RT 738.) She described the typewritten notes as "expanded from my memory compared with the handwritten notes, which were being done while I was talking with the child." (9RT 745.) She added details in her typewritten notes based upon her reflection upon the handwritten notes. (7RT 746.) Vijayendran had her typewritten notes in front of her for reference during her cross-examination. (9RT 739, 745.)

Counsel also ascertained that Vijayendran testified in a legal proceeding relating to this matter in October or November 2012. Counsel produced, though did not introduce, the transcript from that testimony. (9RT 735-736.)

Counsel asked the principal whether Becky talked about the vessel from which the drink came. Vijayendran replied, "I don't remember that clearly, what she said, except that she was describing gooey[,]" and she used the word "gooey." (9RT 746-747.) Counsel asked Vijayendran to review her testimony from the prior legal proceeding, then asked whether she remembered Becky discussing a bottle being gooey. Vijayendran responded that she remembered Becky using the word "'gooey,' but the rest of the conversation at that point is not that clear." (9RT 747-748.) The court then inquired of the witness whether it would help to refresh her memory if she reviewed the transcript of her prior testimony. Vijayendran replied, "No." (9RT 748-749.)

On redirect, Vijayendran further explained she prepared the typewritten notes after appellant was arrested in January 2012, when the

school district asked her to prepare an account of what happened.  (9RT 766.)  She clarified that by the time of appellant's trial, she did not have an independent recollection of some matters stated in her typewritten notes: "I think I have an independent recollection of the general outline of how things happened, but when it comes to specific words, things like that, I may not have such a clear memory."  (9RT 767.)  Vijayendran could not specify whether she prepared her typewritten notes based on her recollection alone or whether she had her handwritten notes available for reference.  She prepared the typewritten notes while at home on maternity leave.  (9RT 767-769.)

Defense counsel later moved to read into evidence the redacted contents of Vijayendran's typewritten notes, under Evidence Code section 1237.  (14RT 1305-1311.)  At issue here is the portion of Vijayendran's typewritten notes following Becky's description of appellant putting something gooey on her feet and leg: "Mr. Chandler was next to her.  Mr. Chandler lifted the blanket up to about her nose and then put something in her mouth and made her drink something.  She explained the drink as salty and that the bottle was gooey.  I asked her if she felt the same as what was on her foot, and she said no.  It felt different, but also gooey.  Becky said some of the drink fell out of her mouth because she was lying down and it got onto her jacket."  (14RT 1312.)

Counsel argued that because Vijayendran could not remember Becky stating the drink came from a gooey bottle, her typewritten notes were admissible both as a prior inconsistent statement and a past recollection recorded; therefore, her more complete typewritten notes should be read

24

into the record.  (14RT 1313-1314.)

The court expressed its concern that Vijayendran's typewritten notes were prepared from her memory, three months after the conversation with Becky, and the principal was unsure whether she had her handwritten notes at the time.  That, and the fact Vijayendran prepared the report "basically ... to justify her conduct because of her actions," caused the court to question the reliability of the typewritten notes.  (14RT 1314-1315; and see 1318-1319.)

Counsel pointed out that during her own trial testimony, Vijayendran confirmed Becky described a bottle as gooey.  (14RT 1319-1320.)  The court again expressed its concern that Vijayendran's typewritten report was prepared from her recollections of the conversations three months earlier.  (14RT 1320-1321.)  For those reasons, the court ultimately denied counsel's request to read Vijayendran's redacted typewritten notes into the record or introduced into evidence as an exhibit.  (14RT 1324.)

B.   **Vijayendran's typewritten notes were admissible under Evidence Code section 1237.**

Evidence Code section 1237 provides, in relevant part: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself ....; [¶] (3) Is offered after the witness testifies that the statement he made was a

true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement."

Here, Vijayendran's typewritten statement qualified under all the conditions required by Evidence Code section 1237. Although she prepared the typewritten notes three months after conversing with Becky, they were done from memory and were more detailed than her contemporaneous handwritten notes, which reflected only about one-third of the conversation. (9RT 738-739, 745.) Although Vijayendran would not say the typewritten notes were more accurate than the handwritten notes (9RT 738), she never said they were *less* accurate than the handwritten notes admitted into evidence as People's Exhibit 3. And "the [typewritten] statement concern[ed] a matter as to which the witness ha[d] insufficient present recollection to enable [her] to testify fully and accurately" (Evid. Code, § 1237, subd. (a)): after defense counsel attempted to refresh her memory that Becky used the word "bottle" to describe the gooey thing, the court specifically asked Vijayendran whether reviewing her prior testimony to this effect would help refresh her memory. The principal responded, "No." (9RT 748-749.)

C.    **The exclusion of this evidence prejudiced appellant.**

Given no plausible alternative, the jury could only interpret the gooey thing in Beck's mouth as appellant's penis. This, of course, was the prosecution's theory of the case.

However, several defense witnesses -- Mary, Jorge, Carl -- specified appellant used a bottle to have the students taste various liquids in class or feel the object. (14RT 1353, 1365, 1374.) Arleth, too, remembered

26

appellant using a water bottle in class. (11RT 1042.) The court's exclusion of Vijayendran's typewritten notes therefore violated appellant's constitutional right to present a defense, in violation of his Sixth and Fourteenth Amendment rights (*Crane v. Kentucky, supra,* 476 U.S. at pp. 690-691) and his Fifth and Fourteenth Amendment rights to due process. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70.)

IV.

### THE COURT IMPROPERLY PREVENTED THE DEFENSE FROM INTRODUCING PORK RINDS AS AN EXHIBIT

A.   **Relevant procedural matters.**

Isabell was the first child witness for the prosecution. She testified that while she was blindfolded, appellant put a big, curvy thing in her mouth, but she did not know what it was. (8RT 615-616.) It was kind of hard, and kind of soft, but she could not really describe it. (8RT 647.) No liquid ever came out of it. (*Ibid.*)

Isabell also remembered appellant giving her crackers to taste while she was alone with appellant. She did not like the taste and spit it out. (8RT 650.) She could not remember what they tasted like. (8RT 655.)

While cross-examining Isabell, defense counsel attempted to introduce into evidence "a bag containing maybe a half a dozen chips." (8RT 655.) The prosecutor objected and the parties had a conference at the bench, after which counsel moved to a different subject. (*Ibid.*)

The court later put on the record it had excluded from evidence counsel's proffered item contained in a clear plastic bag, pursuant to

27

Evidence Code section 352.[1]  (8RT 663.)  Counsel made an offer of proof

that the witness described an object consistent with the shape of pork rinds,

and that appellant mentioned the educational use of pork rinds in his police

interview.  Counsel therefore asked that the witness be allowed to *look* at

the pork rinds.  (8RT 663-664.)  The court reaffirmed its earlier ruling

excluding this evidence, stating evidence would be relevant only if she were

allowed to put the pork rind in her mouth, and the court would not permit

that.  (8RT 665.)

B.    **Exclusion of the proffered evidence was prejudicial.**

Again, no child was able to state definitely what was in her mouth.

Isabell described it as curvy.  Wendy described the object as tasting like

skin.  (12RT 1127, 1130.)  Becky described the flavor of the liquid in her

mouth as salty.  (9RT 728.)  All of these terms could have applied to pork

rinds (or the resulting salivary action produced by a salty object such as a

pork rind).

Counsel simply requested to have the witness observe and feel the

pork rinds to determine whether this or these objects were familiar.  Insofar

as no witness could actually identify the object in her mouth while

blindfolded, had Isabell (or any subsequent child witness) positively

identified the pork rinds as one of the objects utilized by appellant in the

classroom, this testimony conceivably could have raised a reasonable doubt

---

1. Evidence Code section 352 states: "The court in its discretion may
exclude evidence if its probative value is substantially outweighed by the
probability that its admission will (a) necessitate undue consumption of
time or (b) create substantial danger of undue prejudice, of confusing the
issues, or of misleading the jury."

28

the object in the girls' mouths was a penis, as argued by the prosecution.

The court's exclusion of the pork rind evidence unfairly limited defense counsel's ability to effectively cross-examine the witness, in violation of appellant's Sixth and Fourteenth Amendments confrontation rights (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680; *Davis v. Alaska* (1974) 415 U.S. 308, 318) and denied appellant his Fifth and Fourteenth Amendment rights to due process. (*Estelle v. McGuire, supra*, 502 U.S. at p. 70.)


V.

### THE COURT ERRED BY ALLOWING TESTIMONY THAT APPELLANT PREVIOUSLY OFFERED TO MASSAGE AND PHOTOGRAPH A FEMALE ADULT TEACHER'S FEET

A.   **Relevant procedural and factual matters.**

Appellant moved in limine to exclude evidence of his offers to massage and photograph the feet of Hilda Keller, another teacher at O.B. Whaley. (5CT 1029-1045.) The prosecutor argued the evidence regarding Keller was relevant and probative because one of the named victims, Laurie (count 3), only described appellant touching her feet. The prosecutor also argued that absent appellant's apparent sexual interest in Keller's feet, she would not have charged a violation of section 288 as to Laurie. (3RT 415-416.) Defense counsel objected that appellant's evident sexual interest in Keller was entirely irrelevant to a charge involving a defendant's apparent sexual interest in a child's body parts. (3RT 416-417.)

The prosecutor countered by noting the evidence was admissible under Evidence Code section 1101, subdivision (b) to prove intent, i.e., as

29

probative of appellant's intentions "when he sees a foot." (3RT 420.)

The court ultimately allowed only evidence of appellant's offer to massage and photograph Keller's feet as probative of his intent towards "Victim No. 3" (Laurie). (4RT 455-464;7RT 502-538.)

Laurie testified that appellant blindfolded her, while alone in the classroom during recess, and had her feel things with her feet. Laurie did not remember appellant putting anything in her mouth. (10RT 807-817.) The psychologist, Dr. Lynn, then testified Laurie reported appellant putting something hard and gooey in her mouth, but did not mention appellant touching her feet. (10RT 856-869.)

Keller subsequently testified that on a prior occasion, appellant entered her classroom, closed the door behind him, approached her, and asked to photograph her feet and give her a foot massage because he was taking a massage therapy class. In the context of their entire relationship, Keller was concerned appellant's request was sexually motivated. (11RT 1060-1061.)

B.   **The court improperly admitted Keller's testimony under Evidence Code section 1101, subdivision (b) to prove intent.**

Evidence Code section 1101 states, in relevant part: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent,

30

preparation, plan, knowledge, identity, absence of mistake or accident, . . . .)
other than his or her disposition to commit such an act."

As argued by defense counsel, evidence that appellant offered to
massage and photograph the feet of an adult woman was not sufficiently
similar to evidence that appellant touched the stockinged feet of a second-
grade child. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [least degree
of similarity (between the uncharged act and the charged offense) is
required in order to prove intent].) This evidence simply was not probative
of appellant's intent with respect to Laurie.

Moreover, although Laurie described appellant touching her feet
with what she described as a glue stick (10RT 831), the psychologist who
interviewed Laurie, and whose testimony was admitted as prior inconsistent
statements, noted nothing about appellant touching Laurie's feet. (10RT
869.) Keller's foot-related testimony, which later followed both these
witnesses, therefore became even less probative.

C.     **The court's ruling prejudiced appellant.**

Evidence that appellant offered to massage and photograph Keller's
feet only could have made appellant seem somehow "creepy" to the jury,
and therefore more prone to convict him based on a character trait rather
than sufficient evidence of guilt. The court's admission of this irrelevant
and prejudicial evidence deprived appellant of constitutional rights to due
process and a fair trial under his Fifth and Fourteenth Amendment rights to
due process. (*Estelle v. McGuire, supra*, 502 U.S. at p. 70; *Holley v.
Yarborough* (9th Cir. 2009) 568 F.3d 1091.)

////

31

## VI.

## THE CUMULATIVE ERRORS DEPRIVED APPELLANT OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS

While some of the evidentiary errors claimed here -- e.g., regarding the pork rinds, Keller's feet, or Vijayendran's typewritten notes -- by themselves might not have adversely affected the outcome of appellant's trial, his due process rights were violated because the cumulative effect of the trial court's and defense counsel's errors was sufficiently prejudicial to violate his Fifth and Fourteenth Amendment's guarantees of fundamental fairness. (See *Taylor v. Kentucky* (1978) 436 U.S. 478, 487, fn. 15; *Donnelly v. DeChristoforo, supra*, 416 U.S. at p. 643; *Beck v. Alabama* (1980) 447 U.S. 625, 637-638.) Appellant's convictions therefore should be reversed on the basis of the cumulative errors which occurred in his trial.

## CONCLUSION

For the reasons stated above, appellant respectfully requests that this court grant review in this matter.

Dated: December 31, 2015

JEFFREY S. KROSS
State Bar No. 142882
Attorney for Appellant
CRAIG RICHARD CHANDLER

32

## WORD COUNT CERTIFICATION

Pursuant to Rule 8.504(d)(1), California Rules of Court, I hereby certify, under penalty of perjury, that according to the word-count function of my computer's word processing program this petition for review to exhaust state remedies contains 7,022 words.

Executed this 31st day of December 2015 at Sebastopol, California.

JEFFREY S. KROSS

## PROOF OF SERVICE BY MAIL AND E-SERVICE

I declare under penalty of perjury that I am a citizen of the United States, over the age of eighteen years, an active member of the State Bar of California, and not a party to the within action. My business address is P.O. Box 2252, Sebastopol, California 95473-2252. On this date I served the attached PETITION FOR REVIEW TO EXHAUST STATE REMEDIES (without attached opinions) by placing true copies thereof in a sealed envelope which I deposited in the United States mail at Sebastopol, California with the postage thereon fully prepaid, addressed as follows:

Sixth District Court of Appeal
333 West Santa Clara Street
Suite 1060
San Jose, CA 95113

Sixth District Appellate Program
95 South Market Street, Suite 570
San Jose, CA 95113

Office of the District Attorney
70 W. Hedding Street
San Jose, CA 95110

Craig Richard Chandler
(at an address known to counsel)

Also on this date I served a true PDF copy of the attached petition for review via electronic service on the Office of the Attorney General at *Docketing6DCASFAWT@doj.ca.gov.*

Executed this 31st day of December 2015 at Sebastopol, California.

JEFFREY S. KROSS

# EXHIBIT 11

Court of Appeal, Sixth Appellate District - No. H040429

S231606

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

SUPREME COURT
FILED

THE PEOPLE, Plaintiff and Respondent,

FEB 1 7 2016

v.

Frank A. McGuire Clerk

CRAIG RICHARD CHANDLER, Defendant and Appellant.

Deputy

The petition for review is denied.

DOCKETED
SAN FRANCISCO

FEB 1 8 2016

By_____
No._____

**CANTIL-SAKAUYE**

*Chief Justice*

$\mathcal{B}$

# EXHIBIT 12

Name: Craig Richard Chandler **SUPREME COURT COPY** MC–275

Address: Pleasant Valley State Prison

PO BOX 8500

Coalinga, CA 93210

CDC or ID Number: A502209

**SUPREME COURT COPY**

**SUPREME COURT**
**FILED**

SEP 3 0 2016

Frank A. McGuire Clerk

_____
Deputy

_____
(Court)

Craig Richard Chandler

Petitioner

vs.

Warden Scott Frauenheim

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. **S 237533**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal and you are *not* represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

RECEIVED

SEP 3 0 2016

CLERK SUPREME COURT

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2010]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

MC–275

This petition concerns:

- [✓] A conviction
- [✓] A sentence
- [ ] Jail or prison conditions
- [ ] Other (specify): _____

- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

1. Your name: Craig Richard Chandler

2. Where are you incarcerated? Pleasant Valley State Prison PO BOX 8500, Coalinga 93210

3. Why are you in custody? [✓] Criminal conviction [ ] Civil commitment

*Answer items a through i to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Lewd or Lascivious Act

b. Penal or other code sections: Section 288 subdivision (a)

c. Name and location of sentencing or committing court: Santa Clara Superior Court of California

d. Case number: C1223754

e. Date convicted or committed: August 1, 2013

f. Date sentenced: November 22, 2013

g. Length of sentence: 5 consecutive terms 15 years to life

h. When do you expect to be released? N/A

i. Were you represented by counsel in the trial court? [✓] Yes [ ] No   *If yes, state the attorney's name and address:*

Brian Madden
1625 The Alameda Suite 801 San Jose, CA 95126

4. What was the LAST plea you entered? *(Check one):*

- [✓] Not guilty [ ] Guilty [ ] Nolo contendere [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

- [✓] Jury [ ] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

MC–275

6. GROUNDS FOR RELIEF
Ground 1: State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*

Ineffective Counsel

(see attachment)

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is, *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

(see attachment)

Pages 4-13

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(see attachment)

Pages 4-13

7. Ground 2 or Ground _____ *(if applicable)*:

Ground 2  5th and 6th Amendment Violations

Ground 3  Prosecutional Misconduct

Ground 4  Criminal Defendents Right To Testify

a.  Supporting facts:

Ground 2 (see attachment) Pages 13-17

Ground 3 (see attachment) Pages 17-29

Ground 4 (see attachment) Pages 30-32

b.  Supporting cases, rules, or other authority:

(see attachments for supporting cases for each ground)

MC–275

8. Did you appeal from the conviction, sentence, or commitment? ☑ Yes ☐ No   *If yes, give the following information:*

a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court"):

Court of Appeals, Sixth Appellate District

b. Result: Upheld     c. Date of decision: November 30, 2015

d. Case number or citation of opinion, if known: H040429

e. Issues raised: (1) Denied Constitutional Right Effective Counsel (2) Court Excluding Evidence

(3) Excluding Notes from Evidence (4) Improperly Preventing Evidence Introduced

(5) Court erred in allowing testimony (6) Cumulative errors deprived Due Process

f. Were you represented by counsel on appeal? ☑ Yes ☐ No   *If yes, state the attorney's name and address, if known:*

Jeffery Kross PO BOX 2252 Sebastopol CA 95473-7252

9. Did you seek review in the California Supreme Court? ☑ Yes ☐ No   *If yes, give the following information:*

a. Result: Upheld     b. Date of decision: February 17, 2016

c. Case number or citation of opinion, if known: H040429

d. Issues raised: (1) Denied Constitutional Rights to the Effective Assitance of Couns

(2) Court Improperly Excluded Evidence of Apellants Explanation

(3) Excluding evidence of type written notes by principle

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

The issues raised on Habeus Corpus are based on matters outside the record of appeal. Additionally, my lawyer was ineffective in failing to raise issues regarding Prosecutional Misconduct.

11. Administrative review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500.) Explain what administrative review you sought or explain why you did not seek such review:

Not Applicable

b. Did you seek the highest level of administrative review available? ☑ Yes ☐ No
   *Attach documents that show you have exhausted your administrative remedies.*

MC–275

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes   If yes, continue with number 13.   ☑ No   If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

                     (b) _____

   (4) Result (attach order or explain why unavailable): _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

                     (b) _____

   (4) Result (attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

I didn't have access to my transcripts during direct appeal, Plus scarci of relevant legal materials in prison, lack of legal training, and difficult obtaining facts in prison.

16. Are you presently represented by counsel? ☐ Yes   ☑ No   If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes   ☑ No   If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

Not Applicable

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:   9 – 22 – 2016       _Greg Richard Charles_
                                    (SIGNATURE OF PETITIONER)

Case Law:                                                                                        Page

Morgan v. Illinois, 504 U.S. 719(1992)...................................................................4

Duncan v. Lousiana, 391 U.S. 145 (1968)............................................................4

People v. Gonzalez, 68 N.Y. 2d @ 429.................................................................4

People v. Chism (2014) 58 Cal.4[th] 1266,1294..................................................5

People v. Cowan (2010) 50 Cal.4[th] 401,462.....................................................5

Rowe v. State, 174 So. 820,821 (1937)............................................................5,11

Caruley v. Cochran, 369 U.S. 506, 510-13 (1962)............................................10,31

U.S. v. Martinez, 883 F.2d 750,756 (9th Cir. 1989).........................................6

U.S. v. Ortiz, 82 F.3d 1066(D.C. Cir. 1996)........................................................7

People v. Corona (1978) 80 Cal.App.3d, 725-726.............................................8

Jones v. Barnes, 463 U.S. 745,751 (1983).......................................................9,30

Strickland v. Washington, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984)....................10

Brady v. Maryland, 174 So.850,821(1937).......................................................11

Kyles v. Whitley 514 U.S. 419 (1995)...............................................................12

People v. White (1997) 55 Cal.App.4[th], 914,917..........................................27

Donnelly v. DeChristoforo, 416 U.S. 637, 643 974)......................................23,27

Delaware v. Van Arsdall (1986) 475 U.S. 673..................................................29

Davis v Alaska(1974) 415 U.S. 308,318...........................................................29

United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994).................................. 25

United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991)...........................19,25

Davis v. Zant, 36 F.3d 1538, 1548 n. 15 (11th Cir. 1994)................................23

 Berger v. United States, 295 U.S. 78, 88 (1935)..........................................19,20

State v. Mageno, 762 F. 3d 933 (9th Cir. 2014)..............................................23

State v. Keenan, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993)................................17

State v. Hall, 106 Ohio App.3d 183, 190, 665 N.E.2d 728 (1995)................................26

Liberatore, 69 Ohio St.2d 583, 590, 433 N.E.2d 561 (1982)................................29

Griffin v. California, 380 U.S. 609 (1965)................................29

*Snyder v. State*, 893 So. 2d 482, 543 (Ala. Crim. App. 2001)................................25

Rogers v. State, 157 So. 2d 13 (Ala. 1963)................................28

*Quinlivan v. State*, 579 So. 2d 1386, 1387 (Ala. Crim. App. 1991) ................................29

United States v. Sanchez, 176 F.3d 1214 (9th Cir. 1999)................................26

United States v. Hermanek, 289 F.3d 1076 (9th Cir. 2002)................................26

Darden v. Wainwright, 477 U.S. 168, 181-82 (1986)................................28

United States v. McClinton, 135 F.3d 1178, 1188-89 (7th Cir. 1998)................................28

United States v. McClellan, 165 F.3d 535 (7th Cir. 1999)................................29

United States v. Ivy 83 F 3rd 1266 (1996)................................22

People v. Hill, supra, 17 Cal.4th at pp. 827-828................................23

People v. Huggins (2006) 38 Cal.4th 175, 206................................23

People v. Frye (1998) 18 Cal.4th 894, 971................................23

People v. Medina (1995 11 Cal.4th 694.757................................23

United States v. Bagley, 473 U.S. 667 (1985)................................15,20

United States v. Teague, 908 F.2d 752 (11th Cir. 1990)................................10,30

United States v. Martinez, 883 F.2d 750, 756 (9th Cir. 1989)................................31

Johnson v. Zerbst, 304 U.S. 458, 463-64 (1938) ................................31

United States v. Ortiz, 82 F.3d 1066 (D.C. Cir. 1996)................................31

HOE v. STATE of Delaware, No.  364, 1995................................14

United States v. Fry, No. CR-09-44-N-JLQ, 2009................................14

Smith vs Illinois 2 469 U.S. 91, 91 (1984)..................................................................15

People v. Smith (1982), 93 Ill.2d 179, 66 Ill.Dec. 412,442 N.E.2d 1325, .....................16

PEOPLE v. McCAULEY 645 N.E.2d 923 (1994)163 Ill.2d 414206 Ill.Dec. 671................16

*People v. Donovan,* 13 N.Y.2d 148, 193 N.E.2d 628......................................................17

United States V. Rodriquez 518 F3d 1072,1078-79 (9th Cir2008)............................16

State v. DePew, 38 Ohio St.3d 275, 288, 528 N.E.2d 542 (1988).................................23

People v. Visciotti (1992) 2 Cal. 4th 1, 80-81, 5 Cal. Rptr. 2d 495..............................27

People v. White (1954) 43 Cal.2d 740, 747................................................................27

People v. Fong Chung (1907) 5 Cal.App.587, 595).....................................................27

United States v. Park, No. CR 05-375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007)..............24

State v. Smith, 920 N.E.2d 949 (Ohio 2009) .............................................................24

Smallwood v. State_ So. 3d_, 2013 WL 1830961 (Fla. May 2, 2013)............................24

Edwards v. Arizona, 451 U.S 477 (1981).....................................................................15

**Riley v. California, 573 U.S.____ (2014)**.................................................................25

*California v. Hill, 1998* 17 Cal. 4[th]800................................................................19

*California v. Espinosa, 1992* 3 Cal. 4th 806..........................................................19

*California v. Price, 1991* Cal.4[th] 324....................................................................19

*California v. Pitts, 1990* 223 Cal.App 3d 1547..........................................................19

4

Ground 1: Ineffective Counsel

1. My attorney failed to object to the court about juror member who fell asleep during the trial and who, later, passed a note to another juror. I have two declarations from witnesses in that courtroom.  Towards the end of the trial the judge held a juror back on his own with concerns about conduct. This juror sat with his back to the witness stand and refused to observe the testimony of witnesses and the victims.  **_(Morgan v. Illinois, 504 U.S. 719 (1992), Duncan v. Louisiana, 391 U.S. 145 (1968).  Therefore, if any member of a jury engages in behavior that prevents a defendant from receiving a fair and impartial trial, that misconduct must be corrected; otherwise, the trial is unconstitutional._**

2. My attorney failed to subpoena key witnesses; Melissa Rodriquez, who was in the room when Wendy was participating in the lesson preparation. Rodriquez also took part in this lesson preparation but did not testify for the prosecution or my attorney. Rodriquez could have provided testimony that she was present during Wendy's testing and provided testimony that nothing inappropriate had occurred. She was never interviewed and could have provided testimony that I was innocent. **People v. Gonzalez, 68 N.Y.2d at 429 ("A missing witness charge would be appropriate however, if it is demonstrated that the party had the physical ability to locate and produce the witness, and there was such a relationship, in legal status or on the facts, as to make it natural to expect the party to have called the witness to testify in his favor.")**

3.  DNA expert, Cardoza, provided conflicting information pertaining to her testimony in the preliminary hearing and during the trial. My attorney did not object or try to impeach her on the stand. This would have shown that her statements showed that it was more than possible that the semen stain was a second hand touch and the semen was not connected to any of the victims. **(People v Chism(2014) 58 Cal.4[th] 1266,1294, A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement. The test for whether a witness's prior statement is inconsistent with prior testimony is whether the statement is inconsistent in effect rather than an express contradiction of terms. People v Cowan (2010) 50 Cal.4[th] 401,462)**

4.  My attorney did not impeach Annie Pham's testimony about a prior statement where she stated that they had sex in her apartment and she had her dog in the classroom. Pham also lied about sex texting after the classroom sex. My phone was checked and no evidence of this nature was found on my cell phone. ***Rowe v. State*, 174 So. 820, 821 (1937). Before a witness can be impeached with a prior inconsistent statement, counsel must call the witness' attention to the time, place and person to whom the statement was allegedly made.**

5.  My attorney refused to allow me to testify and refuse to prepare me for testimony. When I first hired my attorney, he told me he would prepare me to testify. He said in

6

order to win I had to get my side out. I asked him several times during the next few

months when we were going to start that preparation. He said it would be his decision.

My attorney in the preliminary hearing, Schumb, offered to assist in the preparation at

no charge to me. Madden refused and said he would do what he wanted. During jury

selection he told perspective jurors that it was his decision on whether or not I testified

and only his. Despite being called to a sidebar with the Judge and ADA, no action was

taken. Madden was dismissive when I asked about testifying. .*(Caruley v. Cochran, 369*

*U.S. 506, 510-13 (1962); Johnson v. Zerbst, 304 U.S. 458, 463-64 (1938).*Thus, forcing a

defendant to accept, against his will, his attorney's decision that he not testify, smacks

of the unfairness the case-by-case approach seeks to avoid.*United States v. Martinez,*

*883 F.2d 750, 756 (9th Cir. 1989);*The Eleventh Circuit, like the Ninth Circuit, held that a

defendant's constitutional right to testify is fundamental and personal and that only

the defendant may waive it. Citing Martinez, the court held that a waiver of this right

must be "knowing, voluntary and intelligent. ' The Eleventh Circuit, however, parted

company with Martinez in its interpretation of a silent record. The court found that

"the absence of an on the record objection by the defendant himself is of little, if any,

probative value in determining whether the decision that the defendant would not

testify was the defendant's own decision."" The court noted that "once a defendant

elects to take advantage of his right to counsel, he is told that all further

communications with the court and the prosecutor should be made through his attorney. ' The court also observed that defendants who speak out of turn are faced with swift reprimand from the trial court and face possible discipline . Rather than divining waiver from a silent record, the Eleventh Circuit focused on whether the defendant had in fact made an affirmative knowing, voluntary and intelligent waiver of his right to testify. It thus stated that the right to testify may not be unilaterally waived by counsel against the will of the defendant,  holding that only when "the defendant does not personally waive the right to testify and defense counsel fails to allow the defendant to take the stand, [is] the defendant's right to testify... violated.") *United States v. Ortiz, 82 F.3d 1066 (D.C. Cir. 1996)*(holding that a per se rule requiring court to inquire whether defendant knowingly and intelligently was waiving his right to testify would interfere with the attorney-client relationship, but that, if the court is alerted to a problem with the attorney-client relationship, court may have duty to ask defendant whether waiver was voluntary)

6. Madden continued to advise me during the trial that my lesson plan and story would come out during my defense. He then showed me a list of defense witnesses.  None of these witnesses were called; my lesson plan and my story were never explained to the jury. (Notwithstanding counsel's promises, virtually none of the evidence predicted in his opening statement was presented to the jury. There was no evidence appellant

was a very good teacher and/or that he was a popular teacher. Counsel presented

absolutely no evidence regarding appellant's dyslexia or the incidents 39 involving the

bullied or harassed students, which purportedly motivated him to develop the "Helen

Keller lesson plan." While counsel promised one of the principals would confirm that

appellant's Helen Keller lesson plan — i.e., a lesson plan in which the student is

blindfolded and asked to taste or feel something — was a "completely valid

mainstream story or lesson to teach to children at this age," neither of the two

principals testified to that. A defense attorney's failure to present evidence promised

in the opening statement can deal a "devastating blow" to the client. (People v.

Corona (1978) 80 Cal.App.3d 684, 725-726.) My attorney failed to produce evidence

that would contradict the prosecutions claim about my penis being placed in the

victim's mouths. He failed to contradict this claim by showing how or why this kind of

activity could not have been accomplished based on the physical evidence provided in

court.

7. After Annie Pham's testimony, things began to heat up between us. He told me that we

should take a deal and that he was throwing in the towel. This angered me and I told

him he should prepare me to testify. He told me it didn't matter, that if I looked nervous

or showed signs of sweating the jury would think I was lying and I would go away for life.

I left extremely upset and angry. The next day he was very apologetic about his behavior

and promised a strong showing from our expert witness.

8.  Madden's information provided to the expert witness was mixed up with other students. The expert witness was not present during the testimony of the victims, nor did he interview the victims prior to their testimony. He took no steps to rehabilitate this witness after cross examination by the prosecutor.

9.  My attorney advised that court that we had no further witnesses, despite showing me a list of witnesses prior to trial. I knew I needed to testify and I told Madden to come by the jail to prepare me over the weekend. Madden never showed up. The following Monday the judge asked me if I knew my rights about testifying. I was forced to say yes and that I waived those rights because I had not been prepared and my attorney was not ready to precede either. I had no choice. I was manipulated by him, I had trusted him, and therefore that decision was left in his hands, not mine. _Jones v. Barnes, 463 U.S. 745, 751 (1983)._ A criminal defendant's testimony can have a tremendous impact on the jury. It is important that defendants alone should hold the "ultimate authority to make certain fundamental decisions regarding [his or her] case," including whether or not to testify on their own behalves. While defense counsel bears the primary burden of advising the defendant of his right to testify or not to testify and the strategic implications of each choice, the decision on whether or not to testify ultimately rests with the defendant. _United States v. Teague, 908 F.2d 752 (11th Cir._

_**1990)**_**Held that a defendant's right to testify is fundamental and personal to the defendant himself, such that it may not be effectively waived by counsel against the defendant's will, and that the defendant in Teague was prejudiced by the denial of this right to testify, thus requiring a new trial.**

10. Madden failed to impeach witnesses. Wendy was in my classroom with Melissa Rodriquez practicing for the demonstration for the class. Melissa never agreed with Wendy's testimony. Melissa was never called to testify by my attorney or the prosecution. Her testimony could have refuted what Wendy had claimed. Wendy claimed to have seen my belt, but this fact did not show up in Melissa's statement during her interview. Ashlyn was another student interviewed by the police. She claimed to have been in my classroom alone and had been blindfolded and things placed in her mouth. She stated that nothing unusual happened, yet she was not a victim and she did not testify for the defense. Note that Ashlyn is the daughter of Annie Pham. Another boy, Kevin, was also in my classroom alone and blindfolded, he was not called to testify, as my attorney called the wrong "Kevin" to the stand and made no effort to correct his mistake. The Kevin that should have been called was from the year 2010-2011, he was in the classroom when Arleth was there. **Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, a defendant must demonstrate that 'counsel's representation fell below an objective standard of**

reasonableness,' with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance." Black, 962 F.2d at 401 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2064). Second, if counsel was ineffective, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. A claim of ineffective assistance of counsel will only merit habeas relief when a petitioner satisfies both prongs of the Strickland test.

11. Annie Pham's statements changed from the original statement taken by my attorney's investigator. By the time she got on the stand she made comments about a dog in the classroom and sex not happening in her apartment. These statements were in contradiction to her original statement, yet my attorney made no attempt to impeach her on the stand. Text messages sent to her by me on my phone were also erroneous. The police had my phone and found no such text messages made. She claimed later on that she had been raped by me and filed a report with the San Jose Police. My attorney made no attempt to clarify these issues. *Brady v. Maryland*, 373 U.S. 83 (1963) *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

12

**guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."**

12. Laurie's counselor claimed that Laurie told her that something was placed in her mouth several times and that she was called a "slut". At no time prior to this had Laurie mentioned any of these claims. It had always been a glue stick, ruler, or pen touching her feet. This counselor had never even been told about Laurie's feet. Madden made no attempt to impeach this testimony. Prior inconsistent statements by Laurie. . ***Rowe v. State***, **174 So. 820, 821 (1937). Before a witness can be impeached with a prior inconsistent statement, counsel must call the witness' attention to the time, place and person to whom the statement was allegedly made.**

13. Madden made no attempt to bring up "Brady" violations by the prosecution. The prosecutor was in possession of the police report concerning the semen in the classroom, reported by Annie Pham. The police and DA had this report and kept it from the defense until two weeks prior to trial. **Kyles v Whitley 514 US 419 (1995, Accused was entitled to a new trial because of the prosecutors failure to comply with the due process obligation to disclose material evidence favorable to the accused concerning his possible innocence of the crime for net effect of the evidence withheld by the state raised a reasonable probability that the evidence disclosure to competent counsel would have produced a different result.**

14. My attorney failed to object or make a statement to restitution that the judge declared.

13

**A defendant can forfeit an ex post facto claim by failing to raise the issue (see People v. White (1997) 55 Cal.App.4th 914, 917), particularly where any error could easily have been corrected if the issue had been raised at the sentencing hearing. We nevertheless address defendant's claim here because he argues defense counsel was ineffective for failing to object to the fine. To prevail on an ineffective assistance of counsel claim, the defendant must prove two elements: (1) defense counsel's performance was deficient and (2) prejudice resulted from that performance. (Strickland v. Washington (1984) 466 U.S. 668, 687; People v. Ledesma (1987) 43 Cal.3d 171, 216-218.) That is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (People v. Kelly (1992) 1 Cal.4th 495, 520.)**

### Ground 2: 5th,6th Admendment

*On January 9th 2012, I was talking to my father about a complaint filed at my school concerning a program that I was teaching in my classroom. I told him that the police may be involved and that they might want to speak to me about this program. My father told me to cooperate with the police as long as they were interviewing me about this program. He said that if things should change, i.e. if the interview became an interrogation or if I was arrested, I should ask for an attorney. During this conversation the San Jose Police department arrived and a female officer approached me and ordered me to get off the phone. I was arrested at my home in San Jose and transported to the San Jose Police Department. I was placed into an interview room*

and handcuffed to the desk. I was not advised as to why I had been arrested. I was then

questioned for several hours. When the investigator was done he walked me out the front door.

I was never told why I was arrested and I was released without signing any forms.

This in violation of the California Penal Code Section 849(b)(1), 849 (c), 851.6(a). If

this constitutes an unlawful arrest, then everything obtained from this interrogation should be

deemed illegal.

849(b) Any peace officer may release from custody, instead of taking such person before a

magistrate, any person arrested without a warrant whenever:

(1) He or she is satisfied that there are insufficient grounds for making a criminal complaint
(2) Against the person arrested.
 (c) Any record of arrest of a person released pursuant to paragraphs (1) and (3) of
subdivision (b) shall include a record of release. Thereafter, such arrest shall not be deemed
an arrest, but a detention only.

851.6 (a) In any case in which a person is arrested and released
pursuant to paragraph (1) or (3) of subdivision (b) of Section 849,
the person shall be issued a certificate, signed by the releasing
officer or his superior officer, describing the action as a detention.

Investigating officer was also in violation of his own department policy:
R1711 San Jose Police Manual
ISSUANCE OF DETENTION ONLY CERTIFICATES: In cases where a person is arrested and released
pursuant to P.C. 849 (a) and (b) (1) or (3) and no accusatory pleading was filed charging him/her
with a criminal offense, the Operations Support Services Division will mail a signed Certificate of
Release pursuant to P. C. 851.6 to the arrested party.

I was advised of my rights and when asked about whether or not I wanted an

Attorney, I remembered what my Dad had told me and said , "Okay, I think, my dad is a police

officer, he said to do that." Pierce continued with the rest of the warnings about an about

having an attorney appointed by the court if he could not afford one. I  said that I  understood

that and Detective Pierce immediately began to ask simple questions, that required a very short

*responses and had nothing to do with the investigation. Detective Pierce did not try to clarify*

*the attorney question.* ( HOE, v. STATE of Delaware, No. 364, 1995. The court held that an

ambiguous or equivocal request for counsel compels law enforcement officers in that State to

either cease all interrogation or resolve the ambiguity through clarifying questions, United

States v. Fry, No. CR-09-44-N-JLQ, 2009 WL 1687958 (D. Idaho June 16, 2009)When a suspect

makes an ambiguous request for counsel following an advice of rights, interrogators should

attempt to resolve the ambiguity by asking clarifying questions, Smith vs Illinois 2 469 U.S. 91,

91 (1984) questioning must cease where nothing about the request for counsel or the

circumstances leading up to the request is ambiguous. *Edwards v. Arizona*, 451 U.S 477 (1981), is a

decision by the United States Supreme Court holding that once a defendant invokes his

 Fifth Amendment right to counsel police must cease custodial interrogation. Re-interrogation is

only permissible once defendant's counsel has been made available to him, or he himself

initiates further communication, exchanges, or conversations with the police. Statements

obtained in violation of this rule are a violation of a defendant's Fifth Amendment rights.

*ADA Filo was aware of these facts from the police report. She was aware*

*that I had been arrested and released illegally and that I had not waived my rights to*

*an attorney.  She was also aware that my attorney was prohibited from seeing me. I was*

*never told that my attorney was present or that he was insisting that he be allowed to see me.*

( United States v. Bagley, 473 U.S. 667 (1985): a prosecutor's duty to disclose material favorable

evidence exists regardless of whether the defendant makes a specific request. The Court said

"favorable evidence" is "material" if there is a reasonable probability that disclosure of the

evidence would have produced a different outcome. A "reasonable probability" is "a probability

sufficient to undermine confidence in the outcome."   *United States V. Rodriquez 518 F3d*

*1072,1078-79 (9th.Cir2008)*If the accused request for a lawyer is ambiguous or equivocal at time

of Miranda rights given, the officers must clarify the request and/waiver before proceeding;)

*Unbeknownst to the myself, my attorney Chris Schumb arrived at the police station and*

*requested to see me . He was refused access to me. Schumb subsequently sent a fax*

*to the department requesting access to me and advised the department that they were*

*violating the law. After receiving said fax, I was released. I was not provided with a release*

*form nor did I sign any document advising that I had been detained only per 849(c) PC ,851.6(a)*

*PC  The fax was sent 19:42 hrs on 01/09/12. Schumb arrived at the police station 18:12 hrs, he*

*called the police number, spoke with someone whom he thought was Officer Miramontes, he*

*was advised that he would come get him. Schumb called again at 18:21 and got a different*

*officer, he was gain advised that they would be right down. At 18:28  Schumb called again and*

*got an answering machine, he left message. At 18:40 two plainclothes officers approached him*

*in the parking lot. Sgt Wharton and Sgt Lombardo.*

*Schumb advised them that he was my attorney. He was advised that I was talking and had*

*waived my Miranda Rights, and had not asked for him. They were not going to*

*let Schumb see me. Schumb requested that I be advised that he was there and he*

*was told "no". He was also advised that they no longer had 1538.5 motions and that I*

*had no right to counsel. They were advised that they were wrong. Schumb then sent a fax at*

*19:42. I was released shortly thereafter. (People v. Smith (1982), 93 Ill.2d 179, 66*

*Ill.Dec. 412,442 N.E.2d 1325, PEOPLE v. McCAULEY 645 N.E.2d 923 (1994)163 Ill.2d 414206*

*III.Dec. 671)* <u>police have failed to inform a custodial suspect that his attorney is present and</u> <u>available, seeking to consult with him.</u> *People v. Donovan,* <u>13 N.Y.2d 148, 193 N.E.2d 628</u> <u>"confession taken from a defendant, during a period of detention [prior to indictment], after his</u> <u>attorney had requested and been denied access to him" could not be used against him in a</u> <u>criminal trial. )  California Penal Code section 825 (b) states, after the arrest, any California</u> <u>attorney, may, at the request of the prisoner or any relative of the prisoner, visit the client in</u> <u>custody. Any officer who willfully refuses or neglects to allow that attorney to visit the client is</u> <u>guilty of a misdemeanor.</u>

## <u>Ground 3:Closing Argument ADA Alison Filo</u>

*"Seven and eight year- old little girls in a **locked** classroom." There was never any evidence that*

*the classroom was locked. No testimony to that affect. The door was closed but not one victim*

*stated that it was locked. Not one victim had to unlock the door to exit the classroom. The jury is*

*advised that on January 10; 2012 the Craig Chandler is locked in his classroom 45 to 60*

*minutes earlier than what is normal. He's locked in the room with cleaning supplies.  There is no*

*evidence of that, no evidence that cleaning supplies were used, no smell of any cleaning*

*materials or any signs that anything had been cleaned. The chairs were still there and there is no*

*evidence that cleaning materials were used on them. The jury is instructed to use common sense*

*and their gut feeling.*

<u>( State v. Keenan, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993)</u>The Court also stated that a</u> <u>prosecutor may not "saturate trial with emotion. . . . Excessively emotional arguments may</u> <u>deny due process. )</u>

*ADA Filo does not advise the jury to base their verdict on the evidence presented in court, but to*

*base it on the "conscience of the community, as a society we condemn you, and we do not accept*

*you." "You are hear to use your common sense. We want you to use your everyday experience.*

18

*We want you to listen to your gut. From the very beginning it was verbalized that it was a closed classroom (locked according to ADA Filo), the children were alone in the classroom, blindfolded, and something put in their mouths. What else could it be but child molestation? The prosecution did not want to hear about a classroom exercise, Helen Keller, or that many other children participated in this exercise, or that candy, crackers, pork rinds, water bottles that may have been used, and described by other students that were interviewed. ADA Filo focused on only one thought and one thought only and that was that I had put something else in these victim's mouths. ADA Filo told the jurors that these children were too young to remember or to describe the things put in their mouths, but that they all said the "thing" was round, soft or hard, made them choke, and filled their mouths. There could be no other explanation for this except for my penis. Yet there was another explanation, one I told the police on the first day of the investigation. The pork rinds, which the court would not allow the defense to introduce in court. Pork rinds which have a similarity to skin, salty taste, match the description of the "thing". Pork rinds found in drawer at the my desk and photographed by the police. ADA Filo mentions the time that another teacher observed a student of the mine, knocking on the classroom door. When asked, the student said the door was locked, but seconds later the door was opened by the me. There is no evidence that the door was locked, no testimony to that affect. The teacher did not try the door; she has no idea if it was just stuck or locked. ADA Filo would then tell the jury that the I was in the classroom, the door locked, and maybe a victim was inside. This is a mischaracterization of this incident. The classroom adjoining my classroom had an adjoining room. The door could not be locked and because the teacher next door said she never went through that door then the jury was told that I was totally isolated. Is that a statement of fact or is it used to make the jury believe that the I knew I would not be interrupted? ADA Filo told the*

*jury that this teacher also told her that there was no reason behind having a child blindfolded and putting something in their mouth. Yet there are at least three other teachers interviewed by the police who stated otherwise.*( *United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991)* "[i]t is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation."

*ADA Filo then discusses that I was ordered not to return to work on the evening of January 9th 2012 by Det. Pierce, and she alludes to the fact that I knew I was being investigated for child molestation and that you have to be a desperate man to return to the classroom. There is no evidence presented to show that the I was advised of the circumstances of this investigation or if or when I was advised by Det. Pierce. ADA Filo was responsible for being aware of constitutional errors made by law enforcement during the interrogation of me, violation of the 6th Amendment. Filo ignored these errors and then took steps during the trial to make sure the police report and the interrogation of me were not part of the trial. The preservation of federal and state constitutional rights; the rights of citizens as described in these constitutions may not be violated or taken away without strict adherence to the law. Evidence from this interrogation on January 9th 2012 should have been denied by the court. - the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (California v. Hill, 1998 17 Cal. 4th 800; California v. Espinosa, 1992 3 Cal. 4th 806; California v. Price, 1991 1 Cal.4th 324; California v. Pitts, 1990 223 Cal.App 3d 1547, Berger VS. United States(1935) ." the Supreme Court asserted that the government's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done," and that it is therefore a prosecutor's duty "to refrain from improper methods calculated to produce a wrongful conviction [even] as it is to use every*

legitimate means to bring about a just one. **United States v. Bagley (U.S. 1985):**

Refined *Brady* by holding that a prosecutor's duty to disclose material favorable evidence exists

regardless of whether the defendant makes a specific request. The Court said "favorable

evidence" is "material" if there is a reasonable probability that disclosure of the evidence would

have produced a different outcome. A "reasonable probability" is "a probability sufficient to

undermine confidence in the outcome.")

 ADA Filo discusses the circumstantial evidence regarding two adult females that I

had contact with. In one case ADA Filo claims that I made sexual comments and in the other

that I had sex with an adult female in the classroom. She uses the incidents to paint a picture of

of deviant behavior on my behalf and because of those circumstances in this case it warrants a

conclusion that I  molested these victims. With witness Annie Doe,  ADA Filo comments

that I was unable to obtain an erection at her apartment , but at the school with

little chairs, artwork all over place, ejaculation is immediate and uncontrollable, adding that

it was unbelievably fast. ( Berger v. United States, 295 U.S. 78, 88 (1935)("[W]e have not here a

case where the misconduct of the prosecuting attorney was slight or confined to a single

instance, but one where such misconduct was pronounced and persistent, with a probable

cumulative effect upon the jury which cannot be disregarded as inconsequential." the Supreme

Court asserted that the government's interest in a criminal prosecution "is not that it shall win a

case, but that justice shall be done," and that it is therefore a prosecutor's duty "to refrain from

improper methods calculated to produce a wrongful conviction [even] as it is to use every

legitimate means to bring about a just one.  *This is a misstatement of Annie's Doe's testimony and a complete conjecture on the part of ADA Filo to influence the jury into believing that I could only obtain an erection and ejaculation in the classroom. ADA Filo's characterization of uncontrollable and unbelievably fast ejaculation was also made to enhance her conjecture that I was sexually aroused by things associated with small female students. Annie's statement to a private investigator on January 16 2013 stated that they had gone to dinner and went back to her residence. We had consensual sex where I wore a condom and ejaculated. There was no contact for several months. During a parent/teacher conference she stated that I was "horny". That I persisted in "putting moves" on her and she acquiesced. We had sex in the classroom near my desk and I came inside her. She felt used by me and angered. She had filed a police report in January 2012 about the sex in the classroom in the last two weeks of school in 2011. This same woman filed a report with the San Jose Police Department 8 days after I was arrested and the story was in the newspaper. She claimed she was raped, but didn't want anything done, she was afraid her boyfriend would find out.  This report was not disclosed to the defense until May of 2013, a year after the Preliminary Hearing.  Her story began to change, she claimed she was raped by me, she claimed that I could not get an erection in her apartment, she claimed that I forced her to have sex with me in the classroom and I ejaculated almost immediately. She claims there was a small dog in the classroom and it wasn't hers. (I do not have a small dog.) She was*

*in a relationship that was serious and she was afraid that if this came out it would impact that*

*relationship. From this ADA Filo made the above comments to the jury in her closing*

*arguments. She had this information back in the beginning of 2013. Yet she chose to distort the*

*facts to the jury to picture me as a male with erectile problems who could only get*

*his gratification from having sex in his classroom. All intended to illicit the conclusion that Craig*

*Chandler is a deviant.* .(U.S. v. Ivy 83 F 3rd 1266 (1996)The California Supreme

Court held that counsel cannot make remarks in argument that are unsupported by the record

evidence.)

*ADA Filo would like the jury to believe that I waited for the Principal to go on*

*maternity leave to once again bring children into my classroom and resume these exercises.*

*ADA Filo in injecting her personal opinion and a conclusion on facts not in evidence.  She states,*

*"Any lascivious contact is sufficient. Anything.  Touching an arm, touching a leg, touching a foot,*

*if it is done with lascivious intent, with sexual intent, the crime has been proven. You only have*

*to believe that one act occurred and you believe that unanimously agree." So where is the*

*evidence to show that I committed these acts through lascivious contact.  Now all the jury has to*

*do is believe that I  touched the girls in any manner and the I was guilty. ADA Filo has given the*

*jury a way out, they don't have to agree that anything actually happened in that classroom, or*

*that anything was placed in the victims mouths of a sexual nature, they just have to believe*

*there was some kind of touching and according to ADA Filo that will constitute the crime of lewd*

*and lascivious behavior.*

*( Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)* A prosecutor's improper comments during

closing argument may "so infect [] the trial with unfairness as to make the resulting conviction a denial of due process.")

ADA Filo talks about the photo that one victim drew, the round or oval object with little lines on it. This is what the victim saw underneath the blindfold. The blindfold that the vitim says she was able to see underneath because she could move it with her eyes or eyelashes. This victim later stated that she could not move the blindfold with her eyes.  Also note this victim  has poor vision and was not wearing her glasses under the blindfold. ADA Filo comments,  *that Arleth's pants are down.* This is a complete falsehood. This statement was never made at any time and again prejudices the jury on facts not in evidence.

(Davis v. Zant, 36 F.3d 1538, 1548 n. 15 (11th Cir. 1994) Accordingly, prosecutors have an "obligation [ ] to avoid making statements of fact to the jury not supported by proper evidence introduced during trial," as "the interest of the Government in a criminal prosecution 'is not that it shall win a case, but that justice shall be done,' and that 'the average jury . . . has confidence that these obligations [of fairness and accuracy] will be faithfully observed.' State v. DePew, 38 Ohio St.3d 275, 288, 528 N.E.2d 542 (1988)"[k]nowingly make false statements of law or fact. States v. Mageno, 762 F. 3d 933 (9th Cir. 2014) Regardless of whether those misrepresentations were made intentionally or not, however, the prosecutors  were "exceedingly reckless, obligation' to seek a conviction only on the basis of facts in the record. *People v. Hill, supra,* 17 Cal.4th at pp. 827-828; accord, *People v. Huggins (2006) 38 Cal.4[th] 175, 206; People v. Frye (1998) 18 Cal.4th 894, 971; People v. Medina (1995 11 Cal.4th 694.757. A* prosecutor's reference to facts not in evidence constituted misconduct "because such statements 'tend[] to make the prosecutor his own witness–offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for

the prosecutor, thereby effectively circumventing the rules of evidence." - the use of deceptive
or reprehensible methods to attempt to persuade either the court or the jury."

ADA Filo presents a small video from my cell phone, which she claims I was trying to rid the

classroom of the other kids and it's not until the other children come into the

classroom that the camera is turned off and this somehow corroborates what another victim

has told us. Another fabrication of facts and events on a video which lasted only 10-15 seconds.

The only video that the prosecution could come up with out of hundreds of videos on that

camera. She has now told the jury that this video indicates that I was preparing the classroom

to do something with Isabell. There is absolutely no evidence to support this claim.  Once again

prejudicial  to the jury. Prior to being released, I was advised by Detective Pierce

that he was keeping my cell phone.  Detective Pierce did not ask me nor did he have a warrant

to take possession of the cell phone, nor did I give him permission.

( United States v. Park, No. CR 05-375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007)the court concluded
that a cell phone should be viewed not as an item immediately associated with the person, which
cannot be searched once the phone comes into the exclusive control of the police, absent exigent
circumstances. State v. Smith, 920 N.E.2d 949 (Ohio 2009), the Ohio Supreme Court  distinguished cell
phones from other "closed containers" that have been found searchable  incident to an arrest and
concluded that, because an individual has a high expectation of privacy in the contents of her cell phone,
any search thereof must be conducted pursuant to a warrant. Smallwood v. State,  So. 3d , 2013 WL
1830961 (Fla. May 2, 2013), the Florida Supreme Court held that the police cannot routinely search the
data within an arrestee's cell phone without a warrant.) As a result anything obtained from that cell
phone was illegally obtained by the police and subsequently should have not been used in his trial.
Riley v. California, 573 U.S.  (2014), was a landmark[1] United States Supreme Court case in

which the Court unanimously held that the warrantless search and seizure of digital contents of a cell phone during an arrest is unconstitutional.)

*ADA Filo tells the jury that a victim could feel my hands at the end of the gooey thing as I was pushing it in and out of her mouth Again this is a statement unsupported by evidence.*

( *United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994)*In closing arguments, the prosecution "is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991)*However, this latitude does not permit a prosecutor to make false and factually unsupported claims during closing arguments, as "[i]t is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation.")

*Once again there was no testimony to support this conjecture and it is only stated to get the kind of reaction ADA Filo intends to get from jury members. This is a total fabrication of the facts in this case. ADA Filo states, to paraphrase: that Craig Chandler chose quiet, meek girls, almost all whose parents speak language other than English. This was a selection process. This is methodical, sociopathic deviant who chose children in the most vulnerable condition to inflict this horrific crime on.*

*Snyder v. State, 893 So. 2d 482, 543 (Ala. Crim. App. 2001)*. "the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict." *I had been utilizing this program for nine years. Three of the 77 children made statements that they had been in the classroom alone, blindfolded, and things put in their mouths. These children were interviewed but never included in this case, never mentioned in this case in court.* (*United States v. Sanchez, 176 F.3d 1214 (9th Cir. 1999), and*

*United States v. Hermanek, 289 F.3d 1076 (9th Cir. 2002)[P]rosecutors' arguments not only must be based on facts in evidence, but should be phrased in such a manner that it is clear to the jury that the prosecutor is summarizing evidence rather than inserting personal knowledge and opinion into the case. )*

*On her rebuttal, ADA Filo attacks the defenses expert witness. Instead of discussing what the witness had to say, she starts out about how much he's getting paid. She goes to the extent to mention it several times and to calls it an insane amount of money. **She claims that he said that one victim said it tasted like strawberry. ADA Filo tells the jury that she spent her lunch hour looking for the word strawberry,** then points out that for $20,000 you'd expect him to quote her interview properly. Well in the preliminary hearing, Isabell is questioned during cross examination by the my attorney and she does claim that something tasted like strawberry. Filo by misrepresenting the facts draws a shadow of doubt on this expert witness which could or may have caused jury members to give less weight or no weight at all on his testimony. Filo asks why the witness was provided a picture of the drawing of what appears to be testicles and hair. There is nothing that resembles those but she can say in open court to the jury that is what it appears to be.  She states that his job is to criticize the investigation and he's being paid handsomely to do it. So again the only reason he is here is to make $20,000 dollars. (State v. Hall, 106 Ohio App.3d 183, 190, 665 N.E.2d 728 (1995)("[I]t is improper for a prosecutor to offer her personal opinion as to the veracity of a witness during closing argument, though she may properly suggest that the evidence in the record belies a witness's testimony.")*

On cross-examination, counsel may attack the expert's opinions by questions on material relevant to the opinion, but it is improper to denigrate the witness or make insinuations(. *People v. Visciotti* (1992) 2 Cal. 4th 1, 80-81, 5 Cal. Rptr. 2d 495. Questions

designed to engage the witness in an argument or debate and not to elicit testimony within the

personal knowledge of the witness are improper. (People v. White (1954) 43 Cal.2d 740, 747

Questions which unduly embarrass a witness or are designed to harass a witness are improper

(Evid.Code section 765; see People v. Fong Chung (1907) 5 Cal.App.587, 595))

ADA Filo claims that not one person could give any plausible explanation of what was put in

those five children's mouths, if there were they would be here, you would have heard from

them.

There are other children, they were interviewed, those interviews are in the police

report, yet they were never called, why? Because they would have been able to give an

explanation and Filo could not take that chance. The question of pork rinds was brought up by

the defense but strenuously objected to by ADA Filo. Pork rinds are oval, skin like with texture

that could resemble hair. Despite the fact the I told Det. Pierce I used porkrines

frequently in these exercises, and a photo taken by police also showed pork rinds in

my desk drawer, they were not allowed to be mentioned in the trial. Pork rinds are a

logical explanation to the object ADA Filo claims was placed in the children's mouth. They would

have confused the jury and the victims and were not allowed, so all that was left was the

prosecution's theory of what the thing was. Finally Filo expressed her opinion that because

sperm was found in the classroom, and she claims that throughout the country the chance of

that happening was zero, then there is no other reasonable explanation as to how the sperm

got there but from me  being orally copulated by the victims.( Donnelly v. DeChristoforo, 416

U.S. 637, 643 (1974)A prosecutor's improper comments during closing argument may "so infect

[] the trial with unfairness as to make the resulting conviction a denial  of due process.")

Theory based on what evidence. There is no evidence to link the sperm in the

28

*classroom to oral copulation by these victims . No evidence to show how long the sperm had*

*been in the classroom, no evidence to show how the sperm was directly deposited on the*

*underside of the my chairs. No explanation as to why no other sperm found on student chairs or*

*on the classroom rug, only underneath my chairs.( Rogers v. State, 157 So. 2d 13 (Ala.*

*1963) "Counsel should not be permitted to state as fact that which is damaging to defendant,*

*and of which there is no legal proof.")*

*ADA Filo:"What's the thing? What is it? Has a constitutional right not to testify, but he put on a*

*Defense .He put on witnesses. Where is the child who was, like, you mean, the whatever? Well,*

*that matter sense, then we would all understand it.  Where is that child? We interviewed 77*

*children from his classroom. He has all the information. Filo claims that not one person could*

*give any plausible explanation of what was put in those five children's mouths, if there were*

*they would be here, you would have heard from them . She has it clear that I chose not to testify*

*and that I was the only person that could explain what this " thing" was.*

*( Darden v. Wainwright, 477 U.S. 168,  181-82 (1986) and referring to United*

*States v. McClinton, 135 F.3d 1178, 1188-89 (7th Cir. 1998)The Seventh Circuit has stated that*

*there is a sixth factor in evaluating whether a prosecutor's improper comments deprived*

*defendant of a fair trial, namely whether the defendant had an opportunity to rebut the*

*prosecutor's comments.)  Filo is indicating that I had the chance to explain what*

*this "thing" was but elected not to do so. On the other hand there were other students, not*

*called by either attorneys that were in the classroom alone with me, blindfolded,*

*and had objects placed in their mouths. There was no complaint of a" thing "being put in their*

*mouths . Why weren't they called, why does the prosecution pick and choose witnesses solely*

*based on how they help or don't help with their case. Isn't the object of justice to find justice no*

*matter what?  It is not the requirement of the defense to prove something. It is the*

prosecutions duty to prove it without a shadow of doubt. The defense tried to show what the object was but the court would not let them produce that item. The court's exclusion of the pork rinds evidence unfairly limited defense counsel's ability to effectively cross-examine the witnesses, in violation of my Sixth and Fourteenth Amendments confrontation rights. (Delaware v. Van Arsdall (1986) 475 U.S. 673; Davis v Alaska (1974) 415 U.S. 308,318) and denied defendant his Fifth and Fourteenth Amendment rights to due process. (United States v. McClellan, 165 F.3d 535 (7th Cir. 1999). The Fifth Amendment also prohibits indirect commentary on the defendant's decision not to testify. Indirect comment on the defendant's decision not to testify occurs where the government characterizes its offer of evidence of as "uncontradicted", "undenied", "unrebutted", "undisputed", "unchallenged", or "uncontroverted" and the only person capable of contradicting, denying, rebutting, disputing, challenging, or controverting the evidence at issue is the defendant. Griffin v. California, 380 U.S. 609 (1965) the United 4 States Supreme Court held that the Fifth Amendment prohibits the use of an accuser's failure to testify as evidence of guilt. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another. Accordingly, the Court held that the Fifth Amendment "forbids either comment by the prosecution on the accuser's silence or instructions by the court that such silence is evidence of guilt.) Liberatore, 69 Ohio St.2d 583, 590, 433 N.E.2d 561 (1982) One factor relevant to the due-process analysis is whether the misconduct was an isolated incident in an otherwise properly tried case ..... That was not true here. To the contrary, the prosecutor's errors were part of a protracted series of improper arguments, 'a textbook example of what a closing argument should not be. Quinlivan v. State, 579 So. 2d 1386, 1387 (Ala. Crim. App. 1991) The Court stated that "we are of the opinion that the prosecutor's argument was nothing more than a blatant statement of his personal belief in the appellant's guilt.")

**Ground 4:A Criminal Defendant's Right to Testify:**

*The Defense Attorney, Brian Madden stipulated during the jury selection that he was the only person that would determine whether or not I would testify. "All right. Now, his Honor also touched on another subject, which is and is part of –it's a subpart of the fact that Mr. Chandler has no burden to prove anything. He has an absolute constitutional right not to testify. Now, this right is equally important to every other right that you heard about in this case, and what is meant by that is this: Number One, if Mr. Chandler doesn't testify, it will be because it was my decision. All right?  My decision if he doesn't testify." Although this statement was discussed by the Judge and attorneys, they chose not to do anything.*

*(Jones v. Barnes, 463 U.S. 745, 751 (1983).A criminal defendant's testimony can have a tremendous impact on the jury. It is important that defendants alone should hold the "ultimate authority to make certain fundamental decisions regarding [his or her] case," including whether or not to testify on their own behalves. While defense counsel bears the primary burden of advising the defendant of his right to testify or not to testify and the strategic implications of each choice, the decision on whether or not to testify ultimately rests with the defendant. United States v. Teague, 908 F.2d 752 (11th Cir. 1990)Held that a defendant's right to testify is fundamental and personal to the defendant himself, such that it may not be effectively waived by counsel against the defendant's will, and that the defendant in Teague was prejudiced by the denial of this right to testify, thus requiring a new trial.*

*From the very beginning this was how Mr. Madden represented me.  I tried to get Mr. Madden to use my first attorney(Chris Schumb) in preparing meto testify. Mr. Madden refused. Two months into the preparation for trial Madden sat down with me and told me that he would decide on whether I would testify or not. I was refused throughout the trial with regards to*

testimony preparation. At the end of the defenses case I once again requested that my attorney visit me over the weekend to prepare me to testify. Mr. Madden did not visit me and once back in court I had no choice but to advise the court I was not going to testify. *(Caruley v. Cochran, 369 U.S. 506, 510-13 (1962); Johnson v. Zerbst, 304 U.S. 458, 463-64 (1938).* Thus, forcing a defendant to accept, against his will, his attorney's decision that he not testify, smacks of the unfairness the case-by-case approach seeks to avoid. *United States v. Martinez, 883 F.2d 750, 756 (9th Cir. 1989);* The Eleventh Circuit, like the Ninth Circuit, held that a defendant's constitutional right to testify is fundamental and personal and that only the defendant may waive it. Citing Martinez, the court held that a waiver of this right must be "knowing, voluntary and intelligent. ' The Eleventh Circuit, however, parted company with Martinez in its interpretation of a silent record. The court found that "the absence of an on the record objection by the defendant himself is of little, if any, probative value in determining whether the decision that the defendant would not testify was the defendant's own decision."" The court noted that "once a defendant elects to take advantage of his right to counsel, he is told that all further communications with the court and the prosecutor should be made through his attorney. ' The court also observed that defendants who speak out of turn are faced with swift reprimand from the trial court and face possible discipline . Rather than divining waiver from a silent record, the Eleventh Circuit focused on whether the defendant had in fact made an affirmative knowing, voluntary and intelligent waiver of his right to testify. It thus stated that the right to testify may not be unilaterally waived by counsel against the will of the defendant, holding that only when "the defendant does not personally waive the right to testify and defense counsel fails to allow the defendant to take the stand, [is] the defendant's right to testify... violated.") *United States v. Ortiz, 82 F.3d 1066 (D.C. Cir. 1996)*(holding that a per se rule requiring court to inquire whether defendant knowingly and intelligently was

32

waiving his right to testify would interfere with the attorney-client relationship, but that, if the court is alerted to a problem with the attorney-client relationship, court may have duty to ask defendant whether waiver was voluntary)

I declare, under penalty of perjury, that I witnessed a
juror on bottom left, looking at the jury, fall asleep
during a prosecution witness testimony.  I saw the juror
asleep at 11:05a until 11:32am.. Upon awakening he whispered
to juror sitting next to him and in return received a note
from that juror.  I advised our attorney J.B. Madden at the
court recess.  He did nothing.  No one associated with the
court did anything.. I informed a friend, Barbara Lucido who
witnessed juror asleep.

*Peteranne Ushakoff* (signature)

Peteranne Ushakoff

Δ'snum
① mention
Sleeping Jura
in letter to
trial court

I declare, under penalty of perjury, that I witnessed a
juror sleeping during testimony at the trial of The People
vs. Craig Chandler.   This was brought to my attention by
Peteranne Ushakoff



Barbara Lucido

# EXHIBIT 13

## Appellate Courts Case Information

**CALIFORNIA COURTS**
THE JUDICIAL BRANCH OF CALIFORNIA

Supreme Court

Change court ▼

*Court data last updated: 06/23/2017 03:37 PM*

Docket (Register of Actions)
**CHANDLER (CRAIG RICHARD) ON H.C.**
**Case Number S237533**

| Date | Description | Notes |
|------|-------------|-------|
| 09/30/2016 | Petition for writ of habeas corpus filed | Petitioner: Craig Richard Chandler Pro Per |
| 11/30/2016 | Petition for writ of habeas corpus denied | |

**Click here** to request automatic e-mail notifications about this case.

Careers | Contact Us | Accessibility | Public Access to Records | Terms of Use | Privacy   © 2017
Judicial Council of California