UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG RICHARD CHANDLER, | Case No. 17-cv-00325-EMC |
| Petitioner, | |
| v. | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| SCOTT FRAUENHEIM, | |
| Respondent. | |

## I.    INTRODUCTION

Craig Richard Chandler filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction from Santa Clara County Superior Court. Respondent has filed an answer to the petition. For the reasons discussed below, the petition is denied.

## II.    BACKGROUND

The California Court of Appeal described the facts of the offenses and the evidence presented at trial:

> Appellant taught a combined second and third grade class at an elementary school in San Jose. Appellant's classroom, No. 18, was at the very back of the school. Years earlier, the lower panes of the classroom windows in that part of the school had been replaced with painted boards. Classroom No. 18 had a door connecting it to an adjacent classroom but the connecting door did not have a lock on it. A playground was adjacent to the building housing classroom No. 18.
>
> *Count 2—Jane Doe I*
>
> Jane I was born in March 2003. In 2011, she was in the third grade in appellant's combined second and third grade class. One day in October 2011, Jane I came home from school and told her mother that appellant asked her to go into the classroom, where he blindfolded her and rubbed something on her feet. Jane I's mother noticed a small white spot, resembling nasal mucous, on the front of

Jane I's jacket.  Jane I's mother went to the school, showed the stained jacket to the principal, and asked that Jane I be transferred to a different third grade class.

During the 2011/2012 school year, Lyn Vijayendran was a principal at the elementary school.  In mid-October 2011, Jane I's mother came to school to report that Jane I had been alone with appellant, and that appellant had blindfolded her daughter and put something in her mouth.  Jane I's mother requested that her daughter be transferred to a different classroom.  Jane I's mother showed Vijayendran Jane I's hooded sweatshirt, which had a quarter-sized stain resembling saliva on the front.  It did not appear to Vijayendran that it was a semen stain.  Vijayendran spoke with Jane I and took contemporaneous notes of their conversation.

According to Vijayendran, Jane I told her that another student told Jane I that appellant needed her, so she went back to the classroom.  Appellant got a blue blindfold and a blue and white blanket out of a basket.  Then, appellant told Jane I to put on the blindfold and lie on the floor.  Appellant put the blanket over her head and told her to take off her shoes.  Jane I felt something "gooey" or "scratchy like a tongue" (but not a tongue), on the bottom of her feet for about 20 seconds.  Jane I felt appellant moving.  He told her to move her legs or open her legs—Jane I could not remember which—but she never felt anything between her legs.  Then, appellant lifted the blanket to her nose and said he was going to put something in her mouth.  He put a "gooey" thing in her mouth and wiggled her body and head back and forth.  Jane I felt some salty water in her mouth, some of which dripped on her hand and jacket.  Jane I wiped her hand on her jeans.  Appellant removed the blindfold and blanket.  The bell rang and Jane I stood up.  Appellant opened the door, went to the sink, got a damp paper towel, and cleaned up Jane I's pants, after which he put a "Wonka candy" in Jane I's mouth.

Vijayendran transferred Jane I to a different class the following day.  Vijayendran did not report the matter to the police.  Instead, she told appellant not to have students alone and blindfolded in the classroom with the door closed.  Vijayendran acknowledged that Helen Keller's story was taught at Jane I's grade level.  Teachers did not have to submit a lesson plan for approval, but they did have to teach to prevailing standards.  Vijayendran went on maternity leave during the winter break of the 2011/2012 school year.

During the trial in July 2013, Jane I remembered few details of what had happened in 2011.  She did remember her friend calling her in from recess.  She remembered sitting in the classroom in a chair that did not have rollers that was near appellant's desk.  She remembered that water got on her jacket.  However, she forgot everything else that happened.  The prosecutor and a reader read Jane I's May 21, 2012 preliminary hearing testimony, during which Jane I stated appellant put a round thing most of the way into her mouth and something gooey and salty came out of it.  A recording of Jane I's interview with the police was played for the jury.  In that interview, Jane I reported that appellant said, "Don't bite it" when the "gooey thing" was in her mouth.

2

*Count 1—Jane Doe II*

Jane II was born in November 2003. She was in the second grade in appellant's combined second and third grade class during the 2011/2012 school year. In the classroom, appellant played a game with the students in which he blindfolded them and had them feel objects with their hands, feet, and legs and then guess what the object was. Appellant did a "taste game" in class in which he blindfolded students and had them guess what kind of candy they were given. Jane II volunteered for that game and said it was "sort of fun." However, about once a week appellant kept Jane II in the classroom during recess when all the other students were outside playing. At these times, the classroom door would be closed. Appellant would put Jane II in a chair with rollers and blindfold her; then, he put something "curvy" in her mouth. The curvy thing took up almost all of her mouth and she could not close her teeth on it. Jane II could not really describe it.[3] Appellant would put his hand behind her head, push her head back and forth, and tell her to move her tongue around. Then appellant would say, "Hold on" and go behind his desk and she would hear a sound "like a zipper." Sometimes appellant would give her candy afterwards. He gave her crackers, but she did not like them so she would spit them out.

> [Footnote 3:] A recording of Jane II's interview with Detective Sean Pierce from the San Jose Police Department was played for the jury. In the interview, Jane II described the thing that appellant put in her mouth as "Kind of hard." However, it was not "hard like" a "can." When asked if it was "kind of soft" Jane II nodded her head. Jane II said the thing was bigger than the detective's finger, but smaller than a banana. She felt as if she was going to choke

According to Jane II's mother, Jane II always looked forward to going to school. However, just before the winter break in the 2011/2012 school year Jane II's attitude changed and she started dawdling and complaining she did not want to go to school. On January 9, 2012, Jane II refused to walk to school. When Jane II's mother asked her daughter what was wrong, Jane II said appellant was doing stuff to her; then, she started crying and said appellant had put something round in her mouth, which made her gag. Immediately upon hearing this, Jane II's mother concluded that appellant was putting his penis in her daughter's mouth. Jane II's mother said that she went "crazy" and started yelling. She drove to the school and repeated what Jane II told her to Lea Peery, the assistant principal at the school during 2011/2012 school year. Peery responded, "Oh, my God. Not again!" Jane II's mother asked what Peery meant. Peery said she had had a meeting with some parents concerning the same situation and they had resolved the matter.[4]

> [Footnote 4:] When she testified, Peery denied that she responded, "Oh no, not again," to Jane II's mother. Peery asked Jane II's mother to go home and get Jane II. Jane II told Peery she had to stay in at recess two times, during which appellant blindfolded her and put a big, round thing in her mouth and made her move her tongue around.

Jane II's mother felt the school was not adequately acting upon her daughter's complaint, so she called the police. The police came and briefly interviewed Jane II, then took her to a different location for a more detailed interview.

Detective Sean Pierce interviewed Jane II and her mother that same day—January 9, 2012. Later that day, Detective Pierce and other officers interviewed approximately 40 students at the school simultaneously in order to reduce the opportunities for witness contamination. Over a two-day period the officers interviewed a total of 77 students, including Jane I, who was interviewed on January 10, 2012.

On January 9, 2012, Detective Pierce met with appellant in the lobby of the San Jose Police Department and told him not to return to the school.

*Count 5—Jane Doe III*

Jane III was born in June 2002. She was in third grade in appellant's class in the 2010/2011 school year. Jane III's cousin Noemi G. was 13 years old when appellant was arrested in January 2012. Noemi saw daily articles and "TV" news stories regarding allegations of appellant's sexual misconduct with his students. Noemi started asking Jane III if appellant ever did anything to her. After repeatedly inquiring for about a week, Jane III asked Noemi if she would be arrested if she told her what appellant did to her. Noemi assured Jane III she would not get in trouble. Over the course of two conversations a week or so apart, Jane III revealed that on five or six or more occasions, appellant made her go into the classroom by herself at recess, covered her eyes, and put something in her mouth. Jane III said the object was hairy and "tasted like pee." Jane III said she was able to peek and see a little bit, and described what she saw as looking like a "guy's thing" or "weenie." Noemi asked Jane III to draw a picture of what she saw and Jane III drew an imaginary picture of what to Noemi resembled a penis. After her second conversation with Jane III, Noemi called her aunt (Jane III's mother). Eventually, Naomi was interviewed by Detective Pierce.

Jane III testified that appellant's third grade class played a game in which a student sat in a chair in front of the whole class and appellant put something in the student's mouth and asked him or her to guess what it was. Jane III remembered tasting grape, strawberry, and coconut-tasting lollipops. The class played a game in which the students got on the floor in front of the whole class and had to feel things with their feet. Jane III remembered playing that game and feeling a marker and a water bottle.

However, on five or six occasions, appellant had Jane III go into the classroom by herself at recess. Two or three of those times, appellant made her sit in a blue chair and he covered her eyes. Appellant first put a type of candy, such as a lollipop, in her mouth, or he gave her sweet or salty liquids and asked her to taste them. Then appellant put something else in her mouth, which she could not identify. It was circular and she could only close her mouth a little bit. The thing was "squishy" and soft and slippery, and appellant

4

told her to keep on licking it. A bad-tasting type of liquid came out of it, which she spit out. When Jane III played the tasting game in front of the class, liquid did not come out of the thing in her mouth. This made her feel as if something was wrong when she played the game with appellant alone.

One time Jane III was able to see below the blindfold and she saw something circular, which she thought was a "weenie." She drew a picture of what she saw for the police, with the lines surrounding the circular thing representing hair. One time, after she took off her blindfold, Jane III saw appellant pulling up his pants and she heard a noise "like a zipper or something."

Two other times, appellant had Jane III do an exercise on her hands and knees. Her eyes were not covered these times, and appellant would be behind her, holding her feet. He pushed against her bottom with his head or a "bouncy ball"; then as Jane III looked between her legs she saw some water dripping onto the ground behind her.

Jane III was at a friend's house when she saw a report on the television with appellant's picture. She told her cousin Noemi what appellant had done to her and asked if she would get arrested.

Jane III's January 17, 2012 interview with the police was played for the jury. In general her trial testimony was consistent with what she told the interviewer.

*Count 3—Jane Doe IV*

Jane IV was born in November, 2003. She was in the third grade in appellant's combined second and third grade class. Appellant read a book to the class about a woman who could not see and who had to feel things to know what they were. Appellant had the class play a game in which the students were blindfolded and had to feel things to guess what they were.

During a lunch recess, the yard duty person came and told Jane IV to go to appellant's classroom, No. 18. When Jane IV got to the classroom, appellant closed the door behind her and blindfolded her. Jane IV sat in a chair and put her feet up on a student's table. Jane IV did not have her shoes on, only her socks. Appellant had her feel things with her feet. Jane IV did not remember how many times she did this, and she did not remember appellant putting anything in her mouth. However, Jane IV did remembered telling the police she felt a glue stick against her feet.

Jane IV's interview with the police was played for the jury. In the interview, Jane IV told the interviewer that appellant had her feel things with her feet while she was blindfolded and he told her that one of the things was a glue stick. Jane IV described the glue stick as hard and smooth and a "[l]ittle bumpy." Jane IV said that at first the glue stick was sticky—she could feel this because it was sticking to her socks. Jane IV said that she thought she remembered appellant telling her not to tell anybody.

Dr. Lynn Doe, a psychological consultant retained for purposes of a civil suit that had been filed against the school, was called as a witness by the prosecution. The court limited her testimony to Jane IV's prior inconsistent statements. Dr. Lynn interviewed Jane IV at her home office on November 29, 2012. Jane IV became very upset and embarrassed and started crying when the doctor asked her about being a student in appellant's class. Jane IV said she had been alone in appellant's classroom five to 10 times and appellant blindfolded her about five times. When she was blindfolded, something "hard and gooey" was put into her mouth. She had to touch something hard and then there was "sticky stuff" in her mouth. Jane IV said that she was alone with appellant approximately 10 times; five times she was blindfolded. The doctor's notes reflected that Jane IV reported two episodes when she touched something hard and two episodes when something sticky was in her mouth; she was blindfolded during all these episodes. The doctor's notes did not contain any mention of Jane IV's feet.

Jane IV told Dr. Lynn that she hated school and never wanted to go back; that other children had made fun of her and said she had been raped. They called her a slut, but she did not know what that meant.

*Count 4—Jane Doe V*

At the time of trial Jane V was 11 years old. She had had appellant as her third grade teacher during the 2010/2011 school year. Jane V said that on approximately 15 occasions during that school year, appellant kept her and a friend back at the morning recess when the other students went out to play. On these occasions, appellant would make her and her friend take off their shoes and socks and lie down on the floor on their stomachs, so the bottoms of their feet faced the ceiling. Appellant put soft fabric bags over their heads and rubbed something round, which he got from the supply cabinet, between Jane V's feet. Jane thought that the something might have been a glue stick or an eraser. Jane V's friend was with her every time this happened.

On about 10 occasions following the 15 involving the foot-touching, appellant kept Jane V in at recess and made her sit in a blue student chair, where he either blindfolded Jane V or had her put on a blindfold. Appellant put two things, which he said were candy, in her mouth. The first object felt and tasted like candy, but Jane V could not identify the second object, which was round, "kind of big," felt and tasted like skin, and was slippery. Although that object sometimes tasted a little like strawberry, it did not taste like any food she knew. When appellant put the second item in her mouth, he put his hand behind her head and pushed for about five minutes, so that both her head and the thing in her mouth moved back and forth. One time Jane V bit down on that object because she thought it was candy and appellant told her not to bite. Jane V wondered how appellant could know she bit down on the object if it was only candy. Sometimes Jane V heard "metal hitting together"; to Jane V it sounded like a belt. She heard footsteps and water running in the sink. The classroom door was always closed on these occasions.

More than half the time that Jane V had something put into her mouth her friend was there too. Afterwards, appellant gave Jane V a lollipop and sent her out to play. After one session as Jane V and her friend were walking down the hallway, Jane V's friend told Jane V that she saw appellant pick up his belt from the desk.

One day, after a session where Jane V and her friend were alone with appellant, the entire class played a "taste" and "feel" game in which the students were blindfolded and had to guess what appellant put in their mouths. Appellant did not have the students feel anything with their feet. Jane V did not recall a class discussion regarding Helen Keller or a girl who could not see or hear.

The first adult Jane V told about what had happened was the police officer who came to the school; she never talked to Jane III about what had happened while she was in third grade.

Jane V's interview with an interviewer was played for the jury. Jane V recounted the events in which appellant rubbed things on her feet and her friend's feet. Jane V did not know what appellant used to rub her feet, but thought it might be "a body" part that appellant was holding, but she did not know which part. As to the thing that was placed in her mouth, Jane V did not know what it was, but described it as feeling "like ... a gummy bear" but it was bigger than a gummy bear. Appellant kept pushing the thing into her mouth for about two minutes. Then appellant would go to the sink and "clean something." She heard "the handle squeak and then water ran down." Jane V described the thing as being long and said she could not close her mouth.

*Other Events*

On the morning of January 9, 2012, Armando Lara, who was the acting assistant principal at the school, was called to the office to assist Lea Peery in investigating a parent's complaint. The police were called that same day.

Assistant Principal Lara arrived before 6:00 a.m. the next day. Although school began at 8:30 a.m., appellant arrived at about 6:45 a.m., carrying one or more items in a plastic grocery bag, and went to his classroom. No other teachers were on campus that early. Lara and Dan Deguara from the school district office went to appellant's classroom. The classroom door was locked, so they used the master key to enter. Appellant was standing near his desk and Deguara told him he needed to leave. Appellant asked if he could take his personal belongings; Deguara said yes. Appellant took some items, including cleaning supplies from the desk, shelves, and cabinets in the classroom. Appellant was escorted from the campus.

*Forensic Investigation and Evidence*

San Jose Police Officer Russell Chubon arrived at the school near 12:00 noon on January 10, 2012. He conducted a thorough search of classroom No. 18, but did not find any blindfolds. Officer Chubon seized two chairs, both with wheels. One was a chair near a horseshoe shaped table, marked SYO–01, and the other was a chair

from appellant's desk, marked SYO–02. Both chairs had a thick plastic base with fabric-covered seats and backs.

Forensic biologist Kristin Cardosa used an alternate light source and detected areas of fluorescence of both chairs seized by Officer Chubon. Chair SYO–01 had multiple areas of fluorescing stains, only one of which tested positive for semen with a presumptive chemical test. Cardosa swabbed that stain for DNA, which revealed the presence of spermatozoa. She compared the DNA with a known sample of appellant's DNA (obtained from a cup in his classroom) and conclusively determined a white stain on SYO–01 contained appellant's sperm. The stain revealed only a single profile, and contained only semen, no epithelial cells.

Cardosa found five stains presumptively testing positive for semen on chair SYO–02. She tested one of those five stains for DNA and determined that the stain contained appellant's semen and sperm. Again, the stain contained only semen, no epithelial cells. The stain on SYO–01 was less than a quarter-inch wide by four to five inches long, and looped back on itself. The stain on SYO–02 was about the size of a nickel. Both stains appeared to have been directly deposited on the chairs, as opposed to transfer stains, but the chairs would have had to have been flipped over to have received direct deposits of semen because they were on the bottom of each of the seats.

*Other Incidents at the School*

Mary Montgomery taught at the school during the 2011/2012 school year. Her classroom, No. 19, was adjacent to appellant's classroom. One day in the autumn semester of that school year, during one of the lunch periods, Montgomery heard someone knocking on appellant's classroom door. The knocking became incessant. She looked out her door and saw one of her former students named Chris, who was at the time in appellant's class, knocking on appellant's door. Montgomery asked where appellant was. Chris said he was in the classroom. Montgomery asked if the door was stuck. Chris pushed the door handle down but the door was locked. Moments later the door opened and appellant walked out by himself. His students were standing unsupervised in the area outside the classroom.

Hilda Keller taught kindergarten and first grade at the school between 2000 and 2005. She knew appellant as a fellow teacher, but not as a friend. One day, when Keller left her classroom door open, appellant entered her room, closed the door behind him, and stood in the corner of the room for about a minute. Keller asked appellant what was going on. Appellant started walking towards her and said he was taking a massage therapy class and asked to take pictures of her feet and give her a foot massage. Keller felt very uncomfortable, stood up, and tried to make light of the situation. She opened the door and appellant left the classroom. Keller found the incident very unusual and in the context of their relationship was concerned that appellant's request was sexually motivated.

8

*Defense Evidence*

Dorothy Catangay, who taught the third grade in classroom No. 16 at the school, testified that a door connecting classroom Nos. 16 and 18 had no lock and one could pass through the door simply by turning the handle. Appellant often passed through the connecting door because it was a shortcut to the parking lot and school office.

A male student, Ly Doe, who was at the time of trial in fourth grade, testified that students played the tasting and feeling game in appellant's second grade class. Ly covered his eyes with his hands, not a blindfold, and he never was alone with appellant. The students played one game by tasting various food items appellant provided from a ziplock bag. Appellant told the students to chew the item and guess what it was. In another game, appellant had the students lie down on the carpet and feel things with their hands and feet. In yet another game, appellant would move the students' desks from the center of the room and a student would close his or her eyes and be directed by the other students toward appellant's hand.

Several former students described playing similar tasting and feeling games while blindfolded and seated or lying down in appellant's second or third grade classes. None of these students played the game alone in the classroom during recess. None of these students had something oblong-shaped put in his or her mouth that made them choke or which released a salty liquid or moved in and out.

Annie Doe, whose daughter was in appellant's third grade class, met appellant at a back-to-school night. Annie told appellant she was single and appellant said he had a two-year-old child and recently had separated from his wife. Appellant asked for Annie's phone number. Subsequently, they spoke on the phone. Annie trusted appellant as a teacher and as a parent and believed a serious relationship might develop with appellant.

About a month after they met, Annie and appellant went on a date. Afterwards, they returned to Annie's house, where they took off their clothes and kissed. They tried to have sex, but appellant was nervous and sweating and could not get an erection, so he left around 2:30 or 3:00 a.m. Annie continued calling and texting appellant for some time afterwards, but he did not respond.

Four to six months later, Annie attended a parent-teacher conference with appellant at the school. Her meeting was scheduled for 6:00 p.m. When she arrived appellant told her he wanted her appointment to be the last one of the day. A small dog was running around the classroom, but Annie did not know to whom the dog belonged. Annie sat in a student chair. After saying just a few words about her daughter's performance in school, appellant moved his chair close to hers so their knees were touching. Appellant put his arm around her and began kissing her. Someone tried to get in the classroom door. Annie got nervous and appellant said it was just the janitor. Appellant reassured her that the door was locked. Appellant began pulling Annie's leggings down. Annie resisted and tried pulling them back up because she was afraid the janitor would enter. Appellant turned her around, succeeded in pulling down her

9

leggings, and put his penis in her vagina from behind. He ejaculated very quickly. Annie pulled her leggings back up and walked home, extremely upset and crying. The next day appellant sent her a text message saying how pleasurable it was with her, but she did not respond. Thereafter, appellant sent her an angry text message. She replied that she was busy and did not want to talk to him.

In January 2012 Annie took her daughter to the police for an interview. At that time, Annie told the police about what appellant had done to her. She said she was raped.

In January 2012, Jane III's mother saw appellant's photograph in news stories reporting the allegations that appellant had molested some of his students. Later, she learned appellant had been her daughter's third grade teacher. Jane III's mother began asking her daughter questions about whether appellant ever did anything to her. Repeatedly, her daughter denied that appellant ever did anything and said he gave her lollipops.

Appellant called a licensed clinical psychologist, whom the court recognized as an expert in child sexual abuse and forensic interviewing techniques, to discredit the police investigation in this case. He catalogued all the inconsistencies in all the girls' interviews and outlined several of these in his testimony. Except for Jane III's statements, the psychologist found the girls' statements to be insufficiently detailed and "impoverished narratives." He blamed this on poor interviewing techniques and deviations from standard interviewing protocols. Moreover, he said that several of the girls were subject to outside contamination by prior reports. However, the psychologist could not state that the girls' allegations were not true, and acknowledged that most allegations of child sexual abuse are true. On cross-examination, he recognized the many consistencies between the girls' reports and conceded that several of his perceived inconsistencies were not truly inconsistent. He admitted that he had been paid about $20,000 for his services.

The parties stipulated that civil suits against appellant and the school district seeking monetary damages had been filed on behalf of three of the victims. The lawsuits were filed after the children gave their statements to the police and/or after they had previously testified in court.

*People v. Chandler*, No. H040429, 2015 WL 7726506, at *1-8 (Cal. Ct. App. Nov. 30, 2015) ("*Chandler*") (footnotes omitted). After deliberating less than six hours following the 20-day trial, the jury returned the verdicts. *Id.* at 8.

Following the jury trial in Santa Clara County Superior Court in 2013, Mr. Chandler was convicted of five counts of committing a lewd or lascivious act on a child under the age of 14 years, with sentence enhancement allegations for multiple victims. *See* Cal. Penal Code §§ 288(a), 667.61(b), (e). In November 2013, Mr. Chandler was sentenced to five consecutive terms of 15

10

1   years to life in prison.

2   Mr. Chandler appealed. The California Court of Appeal affirmed his conviction and the

3   California Supreme Court denied his petition for review. Mr. Chandler also filed an unsuccessful

4   petition for writ of habeas corpus in the California Supreme Court.

5   Mr. Chandler then filed this action, seeking a federal writ of habeas corpus. He alleges the

6   following claims for relief in his federal petition: (1) he was deprived of his Sixth Amendment

7   right to *effective* assistance of counsel; (2) he was denied his Sixth Amendment right to the

8   assistance of counsel at the police station; (3) prosecutorial misconduct deprived Mr. Chandler of

9   his right to due process; (4) his federal constitutional rights to present a defense and to due process

10  were violated by the exclusion of evidence of his explanation when the "principal warned him not

11  to blindfold and be alone with students with the door closed," Docket No. 1 at 48; and by the

12  exclusion of the principal's typewritten notes, *id.* at 51; (5) the trial court's refusal to allow the

13  defense to introduce pork rinds as an exhibit violated his Sixth Amendment right to confront and

14  cross-examine a witness; (6) the admission of evidence that Mr. Chandler "previously offered to

15  massage and photograph a female adult teacher's feet" violated his Fourteenth Amendment right

16  to due process, *id.* at 60; and (7) the cumulative effect of the foregoing errors supports federal

17  habeas relief.

18  Respondent has filed an answer. Mr. Chandler filed a traverse. The matter is now ready

19  for decision.

20  ### III.    JURISDICTION AND VENUE

21  This Court has subject matter jurisdiction over this action for a writ of habeas corpus under

22  28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition

23  concerns the conviction and sentence of a person convicted in Santa Clara County, California,

24  which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

25  ### IV.    STANDARD OF REVIEW

26  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

27  custody pursuant to the judgment of a State court only on the ground that he is in custody in

28  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).  "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803.  When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The presumption that a later summary denial rests on the same reasoning as the earlier reasoned

1  decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v.*

2  *Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016).

3       Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a

4  federal claim has been presented to a state court and the state court has denied relief, it may be

5  presumed that the state court adjudicated the claim on the merits in the absence of any indication

6  or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

7  When the state court has denied a federal constitutional claim on the merits without explanation,

8  and there is no lower state court decision to "look through" to, the federal habeas court "must

9  determine what arguments or theories supported or . . . could have supported, the state court's

10  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

11  arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme]

12  Court." *Id.* at 102.

13  **V.**    <u>**DISCUSSION**</u>

14  A.    <u>Ineffective Assistance Of Counsel Claims</u>

15      1.    <u>The DNA Expert</u>

16          a.    <u>Background</u>

17       Mr. Chandler contends that his trial counsel, Mr. Madden, provided ineffective assistance

18  of counsel in that he failed to elicit from the prosecution's DNA expert certain allegedly helpful

19  information on cross-examination that earlier had been elicited during the preliminary hearing.

20       At trial, the prosecution's DNA expert, Ms. Cardosa, testified that she found stains

21  containing Mr. Chandler's sperm and DNA on two chairs from the classroom. Mr. Chandler

22  contends that his trial counsel should have developed two pieces of information from Ms. Cardosa

23  about the DNA evidence. First, Ms. Cardosa testified at trial that she did not test for saliva in the

24  samples obtained from the stains on the two chairs. "She agreed that saliva contains epithelial

25  cells, and when she was looking for spermatozoa she did look for epithelial cells; however, she

26  found no 'intact epithelial cells.' Cardosa found only one body fluid--semen--in both of the stains

27  tested" and no other DNA. *Chandler*, at *10. Mr. Chandler argues that his attorney failed to

28  adequately cross-examine Ms. Cardosa to elicit evidence that Ms. Cardosa had testified at the

13

preliminary hearing that, if a female had been orally copulated and then spit out semen, a DNA examiner would expect to find the female's DNA in the samples containing semen. Second, Ms. Cardosa testified at trial that the stains did not appear to be transfer stains. Mr. Chandler argues that his attorney failed to adequately cross-examine Ms. Cardosa to elicit evidence that Ms. Cardosa had testified at the preliminary hearing that she could not determine if the stain on one chair was a transfer stain instead of a direct deposit from the source. At the preliminary hearing, Ms. Cardosa had testified that it was possible for someone with semen on his or her hand to transfer the semen to the chair while moving a chair and that she could not tell whether one stain on the chair was a transfer stain.

Mr. Chandler argues that the deficient cross-examination was exacerbated by trial counsel's limp closing argument about the DNA evidence which was confined to argument that (1) the stains on the two chairs "contain semen, no other bodily fluid, and it's Mr. Chandler's semen," and (2) Ms. Cardosa had said that one stain "did not appear to be a transfer stain, but scientists would never make an absolute statement that it wasn't a transfer stain." RT 1652.

Mr. Chandler contends that, because the prosecutor theorized that Mr. Chandler had made the girls orally copulate him and had ejaculated in some of their mouths, "the most inculpating evidence was the presence of defendant's semen, sperm, and DNA on two of the chairs." Docket No. 1 at 39. He also argues that the stain-transfer information was critical because the defense theory was that Mr. Chandler transferred the stains to the chair after his sexual encounter with Annie Doe, the mother of a student. Docket No. 1 at 42.

The California Court of Appeal rejected Mr. Chandler's ineffective-assistance-of-counsel claim when he presented it on appeal:

> The problem with appellant's ineffective assistance of counsel claim is his assertion that the DNA evidence adduced at the preliminary hearing was crucial to his defense. First, appellant overstates the importance of the DNA evidence. Certainly, if appellant had ejaculated into the mouth of one of his students and that student had spit out the ejaculate onto a chair and it dried leaving a stain, one would expect to find a mixture of DNA in any stain that was on the chair. However, there was absolutely no evidence presented that one of the victims spit out ejaculate onto one or two of the chairs that were examined.

14

The DNA analysis showed only that at some point appellant had ejaculated in the classroom. We can only speculate at what time and under what circumstances that happened. Without any evidence that one of the children spit out ejaculate onto one or both of the chairs, one reasonable inference to be drawn from the evidence of the presence of the semen stains is that they were completely unrelated to any of the events involving the children. Another reasonable inference to be drawn is that appellant was wearing a condom and the ejaculate from inside the condom, which would not have contained epithelial cells from the girls, dripped onto one or more of the chairs as appellant removed it.[10]

> [Footnote 10]: We base this conclusion on Jane V's testimony that one of the things appellant put in her mouth was round, "kind of big," felt and tasted like skin, was slippery and sometimes tasted a little like strawberry.

Moreover, the People's case did not rest on the assumption that the stains that were tested could be connected with any particular incident. The People's case was based on the testimony of five children who claimed that they had been subjected to unlawful touching--none of which involved them dripping or spitting semen onto a chair.

There was little to be gained if Madden had brought out to the jury anything more about the semen stain analysis than he already had done. Counsel could reasonably have concluded that in the absence of any testimony by the victims that they spit out ejaculate onto one or two of the chairs, there was little point in pursuing the DNA evidence further. That is, since the jury knew that no DNA was found in the semen stains that belonged to anyone else, and that many of the incidents lacked evidence regarding the spitting or dripping of semen, they had no reason to give much weight to the presence of the semen stains, other than to wonder what semen stains were doing there in the first place.

In sum, we find that the record supports the conclusion that Madden made a reasonable tactical decision to limit his cross-examination of Cardosa.

. . .

[W]e find that the record supports the conclusion that Madden made a reasonable tactical decision to limit his cross-examination of Cardosa [about the transfer stain].

Whether the one stain was a transfer stain or directly deposited stain was immaterial. The jury knew that appellant's DNA was the only DNA found in all the stains, and there was no evidence as to the circumstances that ultimately led to the deposit of the stains. Even if the jury knew Cardosa had stated previously that one could have been a transfer stain, there was no evidence to support the speculation that after appellant had sex with Annie Doe, he placed semen on his hand and then touched the underside of a chair without wiping or rinsing his hand. Appellant did not testify, and Annie Doe testified that during their encounter in the classroom appellant

ejaculated inside of her. There was nothing to be gained by bringing out the evidence that at the preliminary hearing Cardosa had stated she could not determine if one semen stain was a transfer stain.

Furthermore, even if the jurors had learned that Cardosa had previously stated that one stain could have been a transfer stain, they would not have known anything more than they already knew about the circumstances under which all the stains were placed on the chairs. They certainly would not have known anything that would have impeached the children's statements. Whether one stain was a transfer stain or had been directly deposited had nothing to do with the children's testimony. Madden could reasonably have concluded that there was little or nothing to be gained by pursuing this line of inquiry further.

Even if we were to assume for the sake of argument that Madden's performance was deficient in this regard, appellant does not make a sufficient showing of error to prevail on appeal. The most damaging evidence against appellant was the testimony of five young girls. The girls described various types of unlawful touching involving substantially similar conduct. The only reasonable and rational conclusion to be drawn from the testimony of the girls was that appellant had placed his penis in each girl's mouth and then had them unwittingly orally copulate him.

In sum, given the strength of the prosecution's evidence, it is not reasonably probable that a more favorable determination would have resulted in the absence of counsel's alleged failings.

*Chandler*, at *11-13 (footnote omitted).

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mr. Chandler is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

  b.  <u>Analysis</u>

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id*

16

at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

The California Court of Appeal's rejection of Mr. Chandler's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, *Strickland*.  That court correctly identified the *Strickland* standard and reasonably applied it.[1]  Although a different

---

[1] In the part of its opinion describing the deficient performance prong of an ineffective assistance of counsel claim, the California Court of Appeal stated, "'When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation'" *Chandler*, at *9 (quoting *People v. Anderson*, 25 Cal. 4th 543, 569 (Cal. 2001)).  This statement was not a modification of the *Strickland* standard.  The statement instead reflects the limitations of California appellate review and applies when an ineffective assistance claim is made on direct appeal rather than in a habeas petition, as was the situation with Mr. Chandler's claim presented on appeal.  That it is an appellate review standard can be discerned from *Anderson*'s citation to *People v. Pope*, 23 Cal. 3d 412, 426 (Cal. 1979), *overruled on other grounds in Berryman*, 6 Cal. 4th 1048, in support of the proposition.  *Pope* explained that, where the record on direct appeal sheds no light on the reason for counsel's conduct, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal" to avoid a reversal simply due an incomplete record where there may be legitimate reasons for counsel's conduct.  *Pope*, 23 Cal. 3d at 426.  *Pope* further explained that "[w]here the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus," where evidence can be developed as to counsel's reasons.  *Id.*

Here, had Mr. Chandler desired to present evidence outside the appellate record to prove ineffective assistance of counsel at trial, he could have filed a state court petition for writ of habeas corpus asserting that claim and presenting the evidence. He did not do so.  The California Court of Appeal's statement about direct appeal review of ineffective assistance of counsel claims did not render its decision contrary to, or an unreasonable application, of *Strickland*, which itself recognized that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689.  *Accord Tran v. Macomber*, 2016 WL 324348 (N.D. Cal. 2016).

1    attorney representing Mr. Chandler at the preliminary hearing had elicited testimony at

2    preliminary hearing that the DNA expert had found no epithelial cells mixed with the semen, and

3    attorney Madden did not elicit the same information at trial, that difference alone does not show

4    ineffective assistance.  There are "'countless ways to provide effective assistance in any given

5    case.  Even the best criminal defense attorneys would not defend a particular client in the same

6    way.'"  *Harrington*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689).

7         It was not an unreasonable application of *Strickland* for the California Court of Appeal to

8    conclude that the methods used by attorney Madden reflected reasonable tactical decisions.

9    Attorney Madden reasonably could have decided not to elicit testimony that the DNA expert

10   would expect to find epithelial cells mixed with semen in a stain that had been caused by a female

11   spitting the ejaculate out of her mouth because there was no evidence that connected the semen

12   found on the chairs to any particular act of lewd conduct charged against Mr. Chandler.  None of

13   the victims had testified to spitting out ejaculate in a way that would have caused it to end up on a

14   chair in the classroom.  Attorney Madden did elicit on cross-examination a crucial point that the

15   semen was not mixed with any other bodily fluid or DNA, thereby showing the absence of any

16   DNA evidence that definitively confirmed any particular lewd act against a child.  The jury was

17   given no evidence to suggest, and the prosecutor did not argue, that the semen stains were the

18   result of one or more victims spitting out Mr. Chandler's ejaculate.

19        The California Court of Appeal also did not unreasonably apply *Strickland* in determining

20   that counsel did not engage in deficient performance because he made a reasonable tactical

21   decision that there was nothing to gain by impeaching Ms. Cardosa with her prior testimony that

22   one of the stains could have been a transfer stain.  As the appellate court explained, it did not

23   really matter to the case whether the stain was a transfer stain (e.g., if Mr. Chandler had touched

24   semen and then touched the chair with his hand) or was a direct deposit (e.g., if Mr. Chandler's

25   ejaculate landed on the chair).  The presence of Mr. Chandler's semen on chairs in his classroom

26   was bad for the defense regardless of whether the semen was deposited directly or was transferred

27   there by touching.  Although Mr. Chandler suggests the semen came from his encounter with

28   Annie Doe, that is sheer speculation because her testimony was only that he ejaculated inside of

her and did not explain how the semen got on the chairs. Mr. Chandler did not testify or offer any explanation how his semen got on the chairs.

The California Court of Appeal's rejection of the claim for lack of prejudice also was not an unreasonable application of *Strickland*. The undeveloped evidence -- that there were no female epithelial cells as would be expected if a female spit out ejaculate and that the expert earlier testified that one stain might be a transfer stain -- was not very probative on any issue actually in dispute. Contrary to Mr. Chandler's assertion, the DNA evidence was far from the most inculpatory evidence against him. Mr. Chandler was found guilty based on the strength of the testimony of the five girls, whose credibility was bolstered by their independent descriptions of similar conduct by Mr. Chandler. Mr. Chandler's behavior after being told by a detective not to return to school also was incriminating -- as he returned to his classroom unusually early the next day and was in the classroom with the door locked before being told to leave. It was not an unreasonable application of *Strickland*'s prejudice prong for the California Court of Appeal to conclude that there was no reasonable probability of a different result if counsel had cross-examined Ms. Cardosa to develop information on the absence of epithelial cells and the possibility of a transfer stain.

Mr. Chandler is not entitled to the writ on this claim because he has not shown that the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

2. Failure To Object To A Dozing Juror

Mr. Chandler urges that his trial counsel provided ineffective assistance by failing to object to a juror who fell asleep during the trial. Mr. Chandler presents undated declarations from his mother and her acquaintance who allegedly saw the dozing juror. Mr. Chandler's mother declares:

> I witnessed a juror on bottom left, looking at the jury, fall asleep during a prosecution witness testimony. I saw the juror asleep at 11:05a until 11:32 am. Upon awakening he whispered to juror sitting next to him and in return received a note from that juror. I advised our attorney J.B. Madden at the court recess. He did nothing. No one associated with the court did anything. I informed a friend, Barbara Lucido who witnessed juror asleep.

19

Docket No. 9-8 at 291.  Ms. Lucido declares that she "witnessed a juror sleeping during testimony at the trial."  *Id.* at 292.

Mr. Chandler presented this claim for ineffective assistance of counsel in a petition for writ of habeas corpus to the California Supreme Court.  That court summarily denied relief.

Because the state court denied the federal constitutional claim on the merits without explanation, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

There are several theories that could have supported the California Supreme Court's rejection of this claim of ineffective assistance of counsel.  The California Supreme Court reasonably could have determined that it was a reasonable tactical decision by counsel not to object to the sleeping juror because counsel thought the juror's inattention during the prosecution's case was favorable to the defense, or because counsel wanted to avoid antagonizing or embarrassing the juror.  Moreover, there is no evidence that counsel was alerted to the sleeping juror before he woke up.  There also is no evidence that the juror fell asleep during the more than 20-day trial other than on this one 30-minute occasion.  The California Supreme Court also may have determined that Mr. Madden reasonably determined that objecting to or moving to dismiss the juror who dozed would be futile because falling asleep did not necessarily render the juror incompetent.  "[T]he failure to take a futile action can never be deficient performance."  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  The presence of a sleeping juror during trial does not, per se, deprive a defendant of the right to due process, a fair trial, or an impartial jury.  *See United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987), *abrogated on other grounds by United States v. Benally*, 843 F.3d 350, 353 (9th Cir. 2016) (no violation of due process or the right to a fair trial and impartial jury when juror slept through part of testimony); *see also United States v. Olano*, 62 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he presence of all awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to reliably serve its function as a vehicle for determination of guilt or innocence.  A single juror's slumber thus is not per se plain

error.") (internal quotation marks omitted).[2]  Because the juror had fallen asleep briefly and only

once, and the prosecution testimony that he missed was not identified, the California Supreme

Court reasonably could have determined that Mr. Chandler failed to show that counsel's

performance was deficient and fell below an "objective standard of reasonableness" under

prevailing professional norms. *Strickland*, 466 U.S. at 687-88.  Given the "doubly" deferential

standard that results when both *Strickland* and § 2254(d) apply in tandem, habeas relief is not

available because "there is [a] reasonable argument that counsel satisfied *Strickland*'s deferential

standard." *Harrington*, 562 U.S. at 105.

The California Supreme Court also reasonably could have rejected Mr. Chandler's

ineffective-assistance-of-counsel claim due to the lack of any showing by Mr. Chandler of a

"reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland,* 466 U.S. at 694.  Here, as in many claims, Mr. Chandler

just points to the perceived mistake and makes no effort to show how the error worked to his

detriment.  There is no evidence as to what the juror missed during his brief slumber and therefore

no evidence on which to find that counsel's failure to object to his slumber prejudiced Mr.

Chandler.

Mr. Chandler is not entitled to the writ on this claim because he has failed to show that the

California Supreme Court's rejection of the claim was contrary to, or an unreasonable application

of, any clearly established precedent from the U.S. Supreme Court.

---

[2] Under California law, the trial court "may discharge a juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty, ...' ([Cal. Penal Code] § 1089, 5th par.). . . . [T]he mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case." *People v. Bradford*, 15 Cal. 4th 1229, 1348 (Cal. 1997). There must be more than speculation that a juror has been sleeping to warrant inquiry by the court. *See People v. Espinoza*, 3 Cal. 4th 806, 821 (Cal. 1992) (trial counsel's statement that he had watched a juror for a few seconds and thought he appeared to be asleep amounted to "mere speculation that the juror *might* have been sleeping, which was insufficient to apprise the trial court that good cause to discharge might exist, [and] did not obligate the court to conduct any further inquiry").  Under federal law, although a sleeping juror is viewed as a type of juror misconduct, even if a juror has been found to have been asleep, "a new trial may not be required if he did not miss essential portions of the trial and was able fairly to consider the case." *United States v. Barrett*, 703 F.2d 1076, 1083 n.13 (9th Cir. 1983), *cited with approval in Anderson v. Terhune*, 409 F. App'x 175, 179 (9th Cir. 2011).

1    3.    Failure To Present Evidence About Mr. Chandler's Innocence

2        a.    Failure To Develop "Promised" Evidence

3    Mr. Chandler next contends that his trial counsel was ineffective in that he did not present

4    evidence about Mr. Chandler's innocence, despite promising to do so in his opening statement and

5    in statements to Mr. Chandler.  Docket No. 1 at 44.  Trial counsel allegedly failed to present

6    evidence that Mr. Chandler was a good teacher, that he was a popular teacher, that he had

7    dyslexia, that he was motivated to develop the Helen Keller lesson plan after observing incidents

8    of students being bullied, and that the Helen Keller lesson plan (i.e., a lesson in which students are

9    blindfolded in class and asked to taste or feel something) was a valid and mainstream lesson plan

10   for children in the second and third grade.  *Id.*

11   Defense counsel began his opening statement by painting a favorable picture of Mr.

12   Chandler as a family man and a devoted teacher.  RT 10-13.  After describing Mr. Chandler's

13   early years, defense counsel stated:

14           Craig's wife was also a grade school teacher, but she taught first and
             second grade.  Craig was a very good teacher.  He was a popular
15           teacher.  Got along, not only well with his students who really liked
             him because of the way he taught.  There were lots of games that
16           were played in his teaching.  But it's been a long time since I have
             been in the second or third grade, as you could tell, but obviously
17           children at that age learned many times by playing games, by doing
             things, by experiments, by demonstration.  That's a very important
18           thing to remember in this case.  [¶]  Early in his teaching career at
             [the school], Craig had an experience where he witnessed two of his
19           students essentially bullying a special needs child. Bully might be
             too strong a word, but making fun of them.  This bothered Craig, as
20           it would bother any adult, but especially bothered Craig because
             Craig is dyslexic.  Craig knows the experience of being made fun of,
21           made feel to be—made to feel less than, made to feel stupid.  So he
             really decided that he was going to try to do something about this,
22           and so he came up with a plan to teach about Helen Keller, which
             you all know is the famous woman who was blind and deaf and
23           came to teach millions of people at how to overcome her disabilities.
             [¶]  The Helen Keller lesson plan is a completely valid mainstream
24           story or lesson to teach to children of this age.  That will be
             confirmed by either Ms. Vijayendran, one of the principals at one
25           time at [the school], or Ms. Perry [sic], another principal at a later
             time.  She actually was the principal after Ms. Vijayendran left for
26           maternity leave.  [¶]  So he decided to create this lesson plan, and
             the idea taken from the Helen Keller book was to deprive children of
27           their sight and have them engage in activity that involved tasting and
             identifying objects in their mouth and feeling and identifying objects
28           that were touched on either their hands or their feet.  And the object

1

2

> in both instances was to identify the object, and that's what happened in this case. It happened again and again and again. And, in fact, it happened for almost the entire time Craig Chandler was teaching at [the school]."

3    *Chandler*, at *13 (alterations in original).

4         The California Court of Appeal determined that the failure to present evidence mentioned

5    in the above-quoted portion of defense counsel's opening statement did not result in prejudice,

6    even if one assumed there was deficient performance.

7

8

9

> The defense rested the guilt phase case two weeks after Madden delivered his opening statement. Given the strength of the evidence against appellant on all charged counts, we conclude that counsel's failure to present the witness testimony referred to in the opening statement did not prejudice the guilty verdicts.

10

11

12

13

14

> The jury heard evidence that learning about Helen Keller would be appropriate for second or third graders, and that there would be nothing unusual about teaching them about her. In addition, from appellant's own witnesses the jury knew that students would, in front of the class as a whole, be blindfolded and asked to identify objects that they touched or tasted. Whether the jury knew that this was part of a Helen Keller lesson plan developed by a good teacher, who had previously witnessed students making fun of a disabled student, was simply irrelevant.

15

16

17

18

> The blindfolding of students followed by non-sexual conduct that was part of a regular class session was not the basis for appellant's convictions. The basis for the convictions was the conduct when appellant was alone with students, which could not reasonably be viewed as part of a legitimate lesson plan by a diligent teacher who was simply overly enthusiastic about ensuring that his students would have empathy for disabled students.

19

20

21

22

23

> Whether appellant was otherwise a good teacher, or whether he might have seen the [bullying] incident counsel described, was irrelevant and would not have rebutted the evidence describing appellant's actions when the children were alone and were blindfolded. That evidence could not reasonably be explained away as part of a Helen Keller lesson plan. The core evidence that Madden stated would be elicited was in fact elicited, even if all the immaterial aspects to that evidence were not elicited.

24

25

26

27

> Thus, any failure to produce evidence to support statements made by Madden did not leave a gap in the defense that the prosecution exploited to appellant's detriment. Appellant's core evidence was presented to the jury. Since, evidently, the jury concluded that the circumstances of the unlawful touching that the children described were to gratify appellant's lust, whether he was or was not a good teacher, and whether he had seen the [bullying] incident counsel described, would not reasonably have affected the jury's verdict.

28    *Chandler*, at *14-15.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mr. Chandler is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

The California Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence presented. Much of the evidence that Mr. Chandler faults counsel for not presenting was simply irrelevant. Whether Mr. Chandler was in general a good and popular teacher or had dyslexia was irrelevant. The California Court of Appeal also determined that information about whether a Helen Keller lesson plan was a mainstream lesson for a classroom setting was irrelevant. The Helen Keller lesson plan was the only point on which defense counsel actually arguably "promised" to present a witness. Augmented RT 12 (arguing that the Helen Keller lesson plan is a "completely valid mainstream story or lesson to teach to children of this age" as "will be confirmed by" either the old principal or the new principal). Moreover, defense counsel did elicit testimony from principal Vijayendran that the Helen Keller lesson was commonly taught at the second- or third-grade level. RT 752-53. In any event, the general information about a classroom lesson plan was of virtually no probative value in evaluating Mr. Chandler's conduct when he was alone with the blindfolded victims. Contrary to Mr. Chandler's assertion, defense counsel did not promise in his opening statement that the principal would testify that it was appropriate to do Mr. Chandler's particular implementation of a Helen Keller lesson plan that involved blindfolding children and putting objects in their mouths and rubbing objects on their bodies, let alone doing this with a child who was alone in the classroom with Mr. Chandler.

Mr. Chandler suggests that some jurors may have held it against him that evidence promised to them was not presented. The alleged failure of counsel to deliver on the promised evidence also was not prejudicial because there really was not much of a "promise" in the above-quoted opening remarks of counsel (other than that a principal would confirm that a Helen Keller

24

1　lesson was an age-appropriate lesson).  The trial judge did not tell the jurors that opening

2　statements were promises of evidence to come, and simply invited the attorneys to make "opening

3　remarks."  *See* Augmented RT 3, 10.  The prosecutor also did not describe her opening remarks as

4　promised evidence and, at the end of trial, did not argue in her closing argument that the defense

5　had failed to deliver any evidence promised in the opening statement.  Defense counsel did not

6　begin his opening remarks with a promise to present evidence and mentioned only that he would

7　speak briefly "about what I think the evidence will show."  Augmented RT 10.  The beginning of

8　defense counsel's opening remarks – the part that Mr. Chandler zeroes in on and that is quoted

9　above – painted a favorable picture of Mr. Chandler as a family man and devoted teacher.  *See*

10　Augmented RT 10-13.  The language of defense counsel's opening remarks was not such that

11　jurors would have been thinking of broken promises twenty trial days later when they began

12　deliberations.

13　　　　The California Court of Appeal's determination that Mr. Chandler failed to show prejudice

14　as a result of counsel's failure to present all the evidence he mentioned in his opening statement

15　was not contrary to, or an unreasonable application of, *Strickland*'s prejudice prong.

16　　　　　　　　b.　　Other Alleged Failings Of Trial Counsel

17　　　　Since asserting the claim on direct appeal that trial counsel failed to present evidence

18　allegedly promised in the opening statement, Mr. Chandler has added several new subclaims to his

19　ineffective assistance of counsel claim regarding the presentation of evidence.  He contends that

20　defense counsel also failed to produce evidence to demonstrate the physical impossibility of the

21　alleged actions, failed to adequately prepare and examine the defense expert, failed to impeach

22　witnesses, failed to raise a *Brady* claim, failed to object to the restitution fine, and failed to

23　impeach Jane Doe IV's prior inconsistent statements.

24　　　　These subclaims were first presented to the California Supreme Court in a petition for writ

25　of habeas corpus.  Docket No. 9-8 at 253.  The California Supreme Court rejected the claim

26　without discussion.  Docket No. 9-8 at 294.

27　　　　Because the state court denied the federal constitutional claim on the merits without

28　explanation, this Court "must determine what arguments or theories supported or . . . could have

1  supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

2  could disagree that those arguments or theories are inconsistent with the holding in a prior

3  decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

4       These new subclaims can be quickly dispatched because Mr. Chandler provides such slight

5  argument and information that none of them could support habeas relief. First, he contends that

6  counsel failed to produce evidence to contradict the victims' testimony "by demonstrating how or

7  why this kind of act could not have been accomplished based on the physical evidence provided in

8  court." Docket No. 1 at 44. But Mr. Chandler does not state what the physical impossibility was

9  or identify the evidence that would have allowed counsel to make such a demonstration. Second,

10 Mr. Chandler claims that trial counsel inadequately prepared and handled the expert witness. But

11 Mr. Chandler does not specify what evidence counsel gave to the expert that was incorrect or

12 provide any evidence as to what the expert would have stated if he had interviewed the victims,

13 been present for their testimony, or been subject to redirect examination. *See Grisby v. Blodgett*,

14 130 F.3d 365, 373 (9th Cir. 1997) ("[s]peculation about what an expert could have said is not

15 enough to establish prejudice"). Third, Mr. Chandler claims that trial counsel failed to impeach

16 witnesses with testimony from other witnesses. He does not identify the particular witnesses that

17 further investigation by counsel would have revealed, submit their declarations to show what they

18 would have testified to, or demonstrate a reasonable probability that their testimony would have

19 changed the result of the proceeding. *See Matylinsky v. Budge,* 577 F.3d 1083, 1096-97 (9th Cir.

20 2009) (petitioner's general statement that 41 witnesses would have testified to his good character

21 failed to show that counsel's decision to call just a few character witnesses was unreasonable);

22 *Davis v. Woodford*, 384 F.3d 628, 650 (9th Cir. 2004) (rejecting claim that counsel should have

23 called 15 witnesses because allegations about the additional information they might provide were

24 conclusory). Fourth, Mr. Chandler claims that counsel did not adequately impeach Annie Doe, the

25 woman with whom he had sex in the classroom about her reporting of the incident, a dog, and text

26 messages. Attorney Madden did impeach her with information that she had told a defense

27 investigator that she had sex with Mr. Chandler in her apartment and had not told the defense

28 investigator that she had been raped in Mr. Chandler's classroom. RT 1425-26. Attorney Madden

26

reasonably could have chosen not to impeach Annie Doe (who had been called as a defense witness) about the claimed presence of a dog in the classroom because the dog's presence was unimportant.  Defense counsel reasonably could have chosen not to ask Annie Doe about text messages because there was evidence that Mr. Chandler's phone did not show text messages from her.  Fifth, Mr. Chandler claims that counsel failed to raise a *Brady* claim based on the prosecutor's disclosure a month before trial of a police report made by Annie Doe.  As explained in section C.1 below, there was no merit to a *Brady* claim because the disclosure of the report a month before trial gave the defense ample time to make use of the report.  Not making the meritless motion was not ineffective assistance.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel not ineffective for failing to file a meritless motion); *Rupe*, 93 F.3d at 1445 ("the failure to take a futile action can never be deficient performance.").  Sixth, Mr. Chandler claims that counsel failed to object to or make a statement about the restitution fine.  But Mr. Chandler does not show what that statement/objection should have been, or why it would have made any difference to the outcome.  Seventh, Mr. Chandler contends that counsel failed to impeach Jane Doe IV's prior inconsistent statements.  He errs.  Dr. Lynn Doe was questioned about Jane Doe IV's prior statements and the inconsistencies between those statements and the statements she made to Dr. Lynn Doe.  RT 866-869.  Mr. Chandler also fails to show that there was a reasonable probability of a different outcome if counsel had conducted further impeachment of Jane Doe IV with her prior inconsistent statements.  The California Supreme Court reasonably could have rejected each of these claims on both *Strickland* prongs.  Mr. Chandler is not entitled to the writ on any of these claims of ineffective assistance of counsel.

### 4.  Counsel's Failure To Allow Mr. Chandler To Testify

Mr. Chandler argues that trial counsel was ineffective in that he failed to prepare Mr. Chandler to testify, which he alleges led him to waive his right to testify.  Docket No. 1 at 47.

The trial court informed Mr. Chandler twice on the record that it was his decision whether or not to testify.  After the defense finished with its other witnesses, the court stated out of the presence of the jury that Mr. Chandler was the only remaining potential witness.  The court explained:

> Mr. Chandler, since we have a moment, I want to make sure that
> you understand that, you know, you've heard this a number of times.
> You have a constitutional right to remain silent. It is your decision
> whether you decide to take the stand and testify, obviously, with the
> advice of your attorney. Ultimately, if you choose to testify, it's
> your decision. You choose not to testify, it's your decision. You
> understand that?

RT 1537. Mr. Chandler responded affirmatively. RT 1538. The trial court then allowed Mr. Chandler a long weekend to think about the decision. RT 1538-39. Four days later, the court stated that defense counsel had represented that Mr. Chandler decided not to testify. Mr. Chandler responded that that was correct. RT 1545. The court asked, "So it's your decision not to testify at this time?" Mr. Chandler responded, "Yes." RT 1545.

Mr. Chandler first presented his claim that counsel was ineffective in leading him not to testify in his petition for writ of habeas corpus filed in the California Supreme Court. Docket No. 9-8 at 253. The California Supreme Court rejected the claim without discussion. Docket No. 9-8 at 294.

Because the state court denied the federal constitutional claim on the merits without explanation, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

A criminal defendant has a fundamental right to testify in his own behalf. *See Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). The right that "stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination." *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999). Waiver of the right may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so. *See United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). A defendant who wants to reject his attorney's advice and take the stand may do so by insisting on testifying, speaking to the court or discharging his lawyer. *See id.*

The *Strickland* standard applies to a claim that an attorney provided ineffective assistance

by dissuading a defendant from testifying.  *See Matylinsk*, 577 F.3d at 1097; *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007).

The record shows that Mr. Chandler was aware of his right to testify during trial and affirmatively chose not to testify.  The question is whether counsel was ineffective in not preparing him to testify, which allegedly led Mr. Chandler to choose not to testify.

The California Supreme Court reasonably could have determined that Mr. Chandler's claim failed on the deficient performance prong under *Strickland*.  First, the California Supreme Court could have determined that it was a reasonable tactical decision for counsel to recommend against testifying because Mr. Chandler was subject to impeachment with his prior criminal conviction.  The trial court earlier had ruled that Mr. Chandler could be impeached with his misdemeanor attempted burglary conviction if he testified.  *See* RT 405, 408.  "[T]he decision not to place [a defendant] on the stand in light of his prior criminal history is a judgment call of trial counsel which seldom, if ever, will support a challenge of ineffective assistance of counsel." *Jones v. Cain*, 227 F.3d 228, 231 (5th Cir. 2000); *see also Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (Dows' three prior convictions gave counsel a "very good reason for suggesting that Dows not testify").  Second, the California Supreme Court could have determined that it was a reasonable tactical decision to recommend against testifying because Mr. Chandler's physical appearance or demeanor caused concern for counsel.  According to Mr. Chandler, when he asked counsel to prepare him to testify, counsel "told me it didn't matter, that if I looked nervous or showed signs of sweating the jury would think I was lying and I would go away for life.  I left extremely upset and angry."  Docket No. 9-8 at 266.  Mr. Chandler being "extremely upset and angry" at the negative news from counsel reinforces the reasonableness of counsel's concern about his demeanor.  Defense counsel reasonably could have wanted to prevent the jury from seeing Mr. Chandler becoming upset and angry, or sweating or looking nervous during a cross-examination.

The California Supreme Court also reasonably could have determined that Mr. Chandler's claim failed on the *Strickland* prejudice prong.  Mr. Chandler fails to specify what the preparation would have consisted of and accomplished for his testimony.  He also completely fails to describe the substance of his intended testimony so as to show that his testimony would have had any

29

impact on the result of the trial.[3]

Mr. Chandler has not shown that the California Supreme Court's rejection of his claim that counsel failed to prepare him to testify amounted to ineffective assistance of counsel was contrary to, or an unreasonable application of, clearly established Supreme Court authority. He is not entitled to the writ on this claim.

B.    <u>Claim of Denial Of Assistance Of Counsel</u>

Mr. Chandler contends that his Sixth Amendment right to counsel was violated because he asked for an attorney at the police station, his attorney was denied access to him at the police station, and the police did not tell Mr. Chandler that his attorney was at the police station while they questioned him.[4]

---

[3] Mr. Chandler does not address the potential for impeachment with prior inconsistent statements if he testified. He had been interviewed at the police station when he was first arrested and could be cross-examined about any inconsistent statement made at that time. However, whether prior inconsistent statements would have been a genuine concern cannot be determined because the record includes no information about the content of Mr. Chandler's intended testimony or his prior statements to the police. If Mr. Chandler's claim was not rejected for all the reasons mentioned in the text, the issue of impeachment with prior inconsistent statements would have to be explored before any relief could be considered.

[4] Mr. Chandler also argues that the actions of the police during his arrest violated his rights under state law and the Fourth Amendment. Those claims cannot be entertained in a federal habeas action.

"[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). The Supreme Court has repeatedly held that federal habeas relief is unavailable for violations of state law or for alleged error in the interpretation or application of state law. *See Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). The state law claims are dismissed.

Federal habeas relief also is not available for Mr. Chandler's Fourth Amendment claim of an unreasonable search and seizure. The case of *Stone v. Powell*, 428 U.S. 465, 481-82 (1976) bars federal habeas review of Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation of those claims. The existence of a state procedure allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's actual use of those procedures, bars federal habeas consideration of those claims. *See Newman v. Wengler*, 790 F.3d 876, 880 (9th Cir. 2015); *Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990). California state procedures provide an opportunity for full litigation of any Fourth Amendment claim. *See Gordon*, 895 F.2d at 613-14 (whether or not defendant litigated Fourth Amendment claim in state court is irrelevant if he had opportunity to do so under California law). The Fourth Amendment claim therefore is dismissed. Mr. Chandler also cannot repackage his Fourth Amendment claim as a Fourteenth Amendment due process claim -- as he attempts to do by claiming the presentation of evidence obtained in violation of his Fourth Amendment rights

Mr. Chandler provides the following account of his initial arrest: On January 9, 2012, Mr. Chandler was arrested at his home and taken to the San Jose Police Department, where he was put in an interview room and handcuffed to a desk. He was "admonished verbally of his rights," although he did not sign any form. Docket No. 1 at 56. "When asked if [he] wish[ed] to have an attorney, [Mr. Chandler] answered by saying, 'Okay . . . I think . . . my Dad is a police officer, he said to do that.'" Docket No. 1 at 56 (ellipses in original). Detective Pierce, who was conducting the interrogation, "made no effort to clarify what [Mr. Chandler] had responded to with regards to the right to an attorney" and began questioning him. *Id.* Unbeknownst to Mr. Chandler, attorney Chris Schumb (who had been hired by Mr. Chandler's wife) arrived at the police station and requested to see Mr. Chandler, but was not allowed to see Mr. Chandler. About ninety minutes later, Mr. Schumb sent a fax to the police department demanding access to Mr. Chandler, at which point Mr. Chandler was released from custody. *Id.* at 57-58.

Mr. Chandler was formally charged a few days later in a felony complaint that was filed on January 13, 2012. CT 518.

Mr. Chandler did not testify at trial and does not dispute that none of the statements he made to the police were admitted at trial. *See* Docket No. 13 at 13. Indeed, he contends that the prosecutor "made every effort to make sure that the defendant's arrest and interrogation, on January 9, 2012, would not be discussed in front of the jury." Docket No. 1 at 64.

Mr. Chandler first presented his Sixth Amendment claim in a petition for writ of habeas corpus to the California Supreme Court. That court denied relief on the claim without discussion.

---

amounted to prosecutorial misconduct -- to obtain federal habeas review of the claim. "Even though due process violations, unlike some Fourth Amendment violations, are cognizable in a habeas proceeding in federal court, petitioner may not cloak his or her Fourth Amendment claim in due process clothing to circumvent *Stone v. Powell*." *Gilmore v. Marks*, 799 F.2d 51, 57 (3rd Cir. 1986) (citations omitted). Because the Fourth Amendment provides the constitutional protection against an unreasonable search or seizure, Mr. Chandler cannot rely on the more generalized notion of "substantive due process" to obtain relief for an allegedly improper search or seizure. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims'"). Habeas relief is not available for the allegedly unreasonable search, or for the presentation at trial of the evidence obtained.

31

Because the state court denied the federal constitutional claim on the merits without explanation, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

The Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against [a defendant]." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972). *Kirby* "forecloses application of the Sixth Amendment to events before the initiation of adversary criminal proceedings." *United States v. Ash*, 413 U.S. 300, 303 n.3 (1973). Adversary judicial proceedings are initiated by way of formal charge, preliminary hearing, indictment, information, or arraignment. *See United States v. Gouveia*, 467 U.S. 180, 188 (1984); *Brewer v. Williams*, 430 U.S. 387, 398 (1977). In *Gouveia*, the Supreme Court observed that it had "never held that the right to counsel attaches at the time of arrest." 467 U.S. at 190. The rule has not changed. *See generally Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) ("We have, for purposes of the right to counsel, pegged commencement to the 'initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'").

A suspect's Sixth Amendment rights are not violated by the failure of the police to let his attorney see him during an interrogation that takes place before adversary criminal proceedings have begun. *See Moran v. Burbine*, 475 U.S. 412, 429 (1986).[5] *Moran* held that the failure of the police to inform the suspect of the attorney's efforts to reach him did not taint the validity of the suspect's waiver of his *Miranda* rights because events "occurring outside of the presence of the

---

[5] *Moran* has facts quite similar to those present in Mr. Chandler's case. In *Moran*, the defendant was arrested and taken to the police station, where officers later interviewed him. Meanwhile, and unbeknownst to the defendant, a public defender (who had been contracted by his sister) telephoned the police department and stated that she would act as the defendant's counsel if the police intended to question him. The public defender was informed falsely that the defendant would not be questioned until the next day. Less than an hour later, the officers obtained a waiver of the defendant's *Miranda* rights and questioned him. The defendant confessed during the questioning. The defendant did not, however, request an attorney during the pre-arraignment interrogation. *See Moran*, 475 U.S. at 415-17.

suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran*, 475 U.S. at 422. *Moran* also rejected the defendant's argument that the Sixth Amendment required exclusion of his confession. *Id.* at 428-30. The Supreme Court explained that there simply was no Sixth Amendment right to counsel at the interrogation that followed an arrest but preceded the formal charging of the defendant: "[t]he difficulty for [defendant] is that the interrogation sessions that yielded the inculpatory statements took place *before* the initiation of 'adversary judicial proceedings.'" *Moran*, 475 U.S. at 428 (citation omitted).

Here, the California Supreme Court's silent rejection of Mr. Chandler's claim was not contrary to, or an unreasonable application of clearly established Supreme Court precedent because there was no Sixth Amendment violation. The adversary judicial proceedings did not commence against Mr. Chandler until the felony complaint was filed on January 13, 2012, four days after the arrest and interrogation occurred on January 9, 2012. The California Supreme Court reasonably could have relied on *Kirby* and *Moran* to conclude that no Sixth Amendment right to counsel had attached because he was interrogated on the day of his arrest, before adversary judicial proceedings were initiated against him. *See Anderson v. Alameida*, 397 F.3d 1175, 1180 (9th Cir. 2005) (no right to counsel attaches at arrest). The California Supreme Court also reasonably could have relied on *Moran* -- which held no Sixth Amendment violation under similar circumstances -- to conclude that the failure of the police to allow Mr. Chandler's attorney to see him before or during the interrogation did not violate Mr. Chandler's Sixth Amendment right to counsel because the events took place at a time when the Sixth Amendment right to counsel had not yet attached. *See Moran*, 475 U.S. at 428.

Mr. Chandler does not assert a claim under *Miranda*,[6] and with good reason: none of the

---

[6] A person subjected to custodial interrogation must be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The suspect's right to cut off police questioning is triggered only by an unambiguous and unequivocal invocation of either the right to remain silent or the right to counsel. *See Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (right to remain silent); *Davis v. United States*, 512 U.S. 452, 458-59 (1994) (right to counsel); *id.* at 461-62 (saying "Maybe I should talk to a lawyer" was not

statements he made to the police were admitted against him at trial. *Miranda v. Arizona,* 384 U.S. 436, 479 (1966), requires that a suspect be given certain warnings and must waive those warnings before he may be subjected to a custodial interrogation, and further holds that, "unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* at 479; *see also Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (referring to the "*Miranda* exclusionary rule"). Although statements obtained in violation of *Miranda* must be excluded in the prosecution's case-in-chief at a later trial, they may be used to impeach the credibility of a testifying defendant. *See Harris v. New York*, 401 U.S. 222, 225 (1971); *Jackson v. Giurbino*, 364 F.3d 1002, 1009-10 (9th Cir. 2004). *Miranda* goes no further than requiring that the defendant's statements to police be excluded at trial. *See, e.g., United States v. Patane*, 542 U.S. 630, 634 (2004) (failure to give *Miranda* warnings does not require suppression of the physical fruits of the suspect's unwarned but voluntary statements "[b]ecause the *Miranda* rule protects again violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements."); *Michigan v. Tucker*, 417 U.S. 433, 450 (1974) (where *Miranda* warnings were deficient in that they did not advise suspect he had the right to free counsel if he could not afford to hire counsel, and his statements were not admitted at trial, the use of a witness discovered as a result of his statement to police did not violate Fifth, Sixth or Fourteenth Amendment).[7]

A Supreme Court plurality observed that, even when statements are obtained in violation of a defendant's *Miranda* rights, "it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs." *Chavez v. Martinez*, 538 U.S. 760, 767 (2003). The Supreme Court explained that rules, such as *Miranda*, "designed to safeguard a constitutional right . . . do not extend the scope of the constitutional right itself." *Id.* at 772; *see, e.g., id.* (officer's failure to

---

unequivocal enough to invoke the right to counsel).

[7] There is no Supreme Court case holding or suggesting that *Miranda* would have any application in the facts present here, i.e., where counsel was not allowed to see the defendant but no statements made by the defendant were admitted at trial. Moreover, the Supreme Court has determined that "the exclusionary rule articulated in cases such as *Wong Sun* [involving fruit-of-the-poisonous-tree] does not apply" to *Miranda* violations. *United States v. Patane*, 542 U.S. 630, 637 (2004).

1  read *Miranda* warnings did not violate § 1983 plaintiff's constitutional rights and could not be

2  grounds for a § 1983 claim because the statements were never used at a trial).  The *Miranda* line

3  of cases would not help Mr. Chandler because, even if he invoked his right to counsel under

4  *Miranda,* his statement was not admitted as evidence at trial.  The California Supreme Court

5  reasonably could have concluded that the *Miranda* line of cases offered no relief to Mr. Chandler,

6  given that Mr. Chandler's statement to the police was not introduced into evidence at trial.

7      The California Supreme Court's rejection of Mr. Chandler's claim of a denial of his right

8  to counsel was not contrary to, or an unreasonable application of clearly established precedent

9  from the U.S. Supreme Court because the criminal proceedings against him had not yet begun, and

10  none of his statements were used against him at trial.  He is not entitled to the writ on this claim.

11  C.    Prosecutorial Misconduct Claim

12      Mr. Chandler asserts that the prosecutor repeatedly engaged in misconduct before and

13  during the presentation of evidence, as well as by making misstatements of law and fact during

14  closing argument.  The particular errors alleged will be discussed in detail below.

15      Mr. Chandler presented his prosecutorial misconduct claim in a petition for writ of habeas

16  corpus to the California Supreme Court.  That court denied relief on the claim without discussion.

17      Because the state court denied the federal constitutional claim on the merits without

18  explanation, this Court "must determine what arguments or theories supported or . . . could have

19  supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

20  could disagree that those arguments or theories are inconsistent with the holding in a prior

21  decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

22      The appropriate standard of review for a prosecutorial misconduct claim in a federal

23  habeas corpus action is the narrow one of due process and not the broad exercise of supervisory

24  power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutors'

25  remarks were undesirable or even universally condemned'"); *Smith v. Phillips*, 455 U.S. 209, 219

26  (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

27  fairness of the trial, not the culpability of the prosecutor.")  Under *Darden*, the inquiry is whether

28  the prosecutor's behavior or remarks were improper and, if so, whether they infected the trial with

35

unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (omission in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

      1.     <u>Alleged Misconduct Before And During Presentation Of Evidence At Trial</u>

Mr. Chandler faults the prosecutor for not disclosing to the defense until May 2013 a police report that Annie Doe (who was the mother of a student) had filed with the San Jose Police Department in January 2012 in which she accused him of sexually assaulting her. The report was disclosed to the defense more than a month before the trial took place, as the trial did not begin until July 1, 2013. CT 1081. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "[T]here is no *Brady* violation so long as the exculpatory or impeaching evidence is disclosed at a time when it still has value." *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011); *see, e.g., id.* (rejecting *Brady* claim where some evidence was disclosed "well in advance of trial" and other evidence was turned over during trial while cross-examination was ongoing); *Reiger v. Christensen*, 789 F.2d 1425, 1432 (9th Cir. 1986) (disclosure of fingerprint test results at pretrial conference did not violate *Brady*); *United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995) (midtrial disclosure of newly learned evidence did not violate *Brady* because the disclosure occurred "at a time when it was of value" to defendant). Mr. Chandler fails to identify any Supreme Court authority for the proposition that disclosing a document more than a month before trial is any sort of misconduct. The California Supreme Court reasonably could have concluded that the disclosure of the impeachment evidence more than a month before trial began did not amount to prosecutorial misconduct, particularly given the complete absence of any showing that disclosure left insufficient time for the defense to make use of the report.

Mr. Chandler contends that the prosecutor engaged in misconduct by filing a motion to exclude evidence of the pork rinds that were found in Mr. Chandler's desk drawer. The defense

wanted to introduce the pork rinds because they allegedly were consistent with what at least one of the girls described as having been put in her mouth. The trial court excluded the evidence. *See* Docket No. 1 at 63-64. (Later in this order, the Court discusses and rejects Mr. Chandler's separate argument that the exclusion of the pork rinds evidence violated his right to due process. *See* section E, below.) The U.S. Supreme Court has never held that it is prosecutorial misconduct to make a motion to exclude arguably inadmissible evidence.

Mr. Chandler faults the prosecutor for not calling as witnesses three teachers who allegedly would have said there was a "plausible reason to have a child blindfolded and something being placed in [her] mouth." Docket No. 1 at 64. But the prosecutor had no duty to call witnesses favorable to the defense, if such evidence existed and would have been favorable to the defense. Moreover, Mr. Chandler does not identify these teachers or provide any evidence that they would have testified that there was a plausible reason to blindfold a child and put something in her mouth *when that child was alone with the teacher*. The U.S. Supreme Court has never held that the prosecutor must present the defense case, if it exists.

Mr. Chandler complains that the prosecutor did not include in the prosecution case three additional students who allegedly had been in the classroom alone, blindfolded, and had things put in their mouths. Docket No. 1 at 70. The prosecutor had no duty to prosecute cases that she may have thought were weaker or that did not involve a crime.

Mr. Chandler also faults the prosecutor for *not* introducing police reports containing statements allegedly obtained in violation of Mr. Chandler's constitutional rights. He does not explain how the prosecutor's decision to *not* present the allegedly tainted evidence would itself violate his constitutional rights. The unused evidence is not shown to have had any effect on the jury.

The California Supreme Court's rejection of these claims of prosecutorial misconduct before and during the presentation of the evidence was not contrary to, or an unreasonable application of, any clearly established precedent from the U.S. Supreme Court. The California Supreme Court reasonably could have determined that these events did not make the trial "fundamentally unfair," *Darden*, 477 U.S. at 181.

2.    Allegedly Legally Incorrect Comments During Closing Argument

a.    Comment On Defense Evidence

In her rebuttal closing argument, the prosecutor argued that no boy testified that Mr. Chandler had put something in the boy's mouth while alone with the boy, and that eight boys who did testify each testified that he never had anything put in his mouth by Mr. Chandler while alone with Mr. Chandler.  RT 1663.  The prosecutor then argued that the defense had not produced any evidence to explain what the thing was that had been put in the five girls' mouths:

> What's the thing?  What is it?  Has a constitutional right not to testify, but he put on a defense.  He put on witnesses.  Where is the child who was, like, you mean, the whatever?  Well, that makes sense, then we would all understand it.  Where is that child?  We interviewed 77 children from his classroom.  He has all of that information.  If a single one of them could give any plausible explanation of what was put in those five children's mouth[s], they will be in here.  You would have heard from them.  (RT 1663-64.)

Mr. Chandler alleges that this argument amounted to an impermissible comment on his decision not to testify.

The self-incrimination clause of the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin v. California,* 380 U.S. 609, 615 (1965).  Although the prosecutor may not comment about a defendant's failure to testify, the prosecutor may argue about the gaps in the defense case.

> There is a distinction between a comment on the defense's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify. This Court has recognized that "'a prosecutor may properly comment upon the defendant's failure to present exculpatory evidence, as long as it is not phrased to call attention to defendant's own failure to testify.'"  It is equally clear that "'[a] comment on the failure of the *defense* as opposed to the *defendant* to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege.'"

*United States v. Mende,* 43 F.3d 1298, 1301 (9th Cir. 1995) (alteration in original) (citations omitted).  "Criticism of defense theories and tactics is a proper subject of closing argument."  *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997).  A prosecutor's comment in

38

1    rebuttal "must be evaluated in light of the defense argument that preceded it." *Darden, 477* U.S.

2    at 179.

3         The defense theory was that the thing that was put in the victims' mouths was not Mr.

4    Chandler's penis. Defense counsel argued that the victims' reports of what had been put in their

5    mouths were influenced by the people to whom the children had talked. *See* RT 1627. The

6    prosecutor's rebuttal argument was a permissible comment on the failure of the defense to call

7    logical witnesses, such as students, who could explain what the thing was that Mr. Chandler was

8    placing in girls' mouths when they were alone with him. "A prosecutor may, consistent with due

9    process, ask a jury to convict based on the defendant's failure to present evidence supporting the

10   defense theory." *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005). The prosecutor's

11   comments did not improperly call attention to Mr. Chandler's choice not to testify, and the

12   comments did not shift the burden of proof to the defense. The prosecutor's argument also did not

13   misstate the law or the facts. And the argument was preceded by the defense counsel's specific

14   mention that Mr. Chandler had a right not to testify. RT 1623-24.

15        The trial court's jury instructions also support a determination that the prosecutor's

16   arguments did not render the trial fundamentally unfair. "[A]rguments of counsel generally carry

17   less weight with a jury than do instructions from the court. The former are usually billed in

18   advance to the jury as matters of argument, not evidence, . . . and are likely viewed as the

19   statements of advocates," whereas the latter "are viewed as definitive and binding statements of

20   the law." *Boyde v. California*, 494 U.S. 370, 384-85 (1990). Here, the trial court instructed the

21   jury that "a defendant has an absolute constitutional right not to testify" and that the jury was not

22   to consider, for any reason, the fact that the defendant did not testify. CT 1430 (CALCRIM No.

23   355).

24        The California Supreme Court reasonably could have determined that this argument did

25   not amount to *Griffin* error or make the trial "fundamentally unfair" and therefore did not violate

26   due process. *See Darden,* 477 U.S. at 181.

27              b.    Jurors To Use "Common Sense" And Be "Conscience Of The Community"

28        The prosecutor argued to the jury that the jurors' role was to judge the facts, and then

39

1    continued:

2           But there is no box outside these courtroom doors where we say
             please deposit your common sense here and then take a seat as a
3            juror.  You are here because we want you to use your common
             sense.  We want you to use your everyday experience.  We want you
4            to listen to your gut.

5           Blindfolded, alone in a classroom with a male teacher while
             something is put in their mouth.
6
             You all have the jury instructions now.  Those jury instructions are
7            really the language and the mechanism by which you get to give
             your gut a name.
8

9    RT 1606.  As she finished her closing argument, the prosecutor stated:  "You are not only the

10   judges of the facts, you are the conscience of our community.  You are the people who get to say,

11   We condemn you.  We as a society will not tolerate you."  RT 1619.

12          Mr. Chandler argues that telling the jurors to use their "common sense" and that they were

13   the "conscience of our community" were unduly emotional arguments and did not tell the jurors of

14   the need to base the verdict on the evidence presented in court.  Docket No. 1 at 63.

15          "It is expected that jurors will bring their life experiences to bear on the facts of a case. "

16   *Hard v. Burlington N. Ry. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989); *see also Head v. Hargrave*,

17   105 U.S. 45, 49 (1881) ("far from laying aside their own general knowledge and ideas, the jury

18   should have applied that knowledge and those ideas to the matters of fact in evidence in

19   determining the weight to be given to the opinions expressed; and it was only in that way that they

20   could arrive at a just conclusion."); *United States v. Redlightning*, 624 F.3d 1090, 1123 (9th Cir.

21   2010) ("While empirical evidence has shown that at times innocent people have confessed to

22   crimes that they did not commit, a prosecutor should not be prevented from arguing in closing

23   remarks that common sense tells us that people do not confess to crimes they did not commit.").

24   The phrase "common sense" also is used in the Ninth Circuit's model instruction on reasonable

25   doubt, which suggests it is not inflammatory language and does not draw away from the jury's

26   duty to evaluate the evidence.  *See* Ninth Cir. Manual of Model Jury Instructions § 3.5 ("A

27   reasonable doubt is doubt based upon reason and common sense and is not based purely on

28   speculation.").

Here, calling upon the jurors to use their common sense was not inflammatory and did not call on the jury to overlook the evidence. Additionally, the judge instructed the jury: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." CT 1411. "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence . . . and are likely viewed as the statements of advocates," whereas the latter "are viewed as definitive and binding statements of the law." *Boyde v. California*, 494 U.S. 370, 384-85 (1990). Mr. Chandler has provided no reason to depart from the normal presumption that jurors follow the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

The prosecutor's statement that the jury was the conscience of the community also did not amount to misconduct. "[T]he general rule is that appeals for the jury to act as a conscience of the community are not impermissible, unless specifically designed to inflame the jury." *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984). The prosecutor's argument that the jury was the conscience of the community came at the end of a long discussion of the particular incidents of lewd touching and during the discussion in which the prosecutor argued that Mr. Chandler had selected particularly vulnerable children. The prosecutor's statement that the jury was the conscience of the community did not obviously inflame the jury, suggest that the jury was to base its decision on something other than the evidence, or pressure the jury to convict to keep the community safe from Mr. Chandler.

The jury instructions included instruction that the jury was to "decide what happened, based only on the evidence that has been presented to you in this trial," and was not to "let bias, sympathy, prejudice, or public opinion influence your decision," CT 1411. The jury also was instructed that "[i]n deciding whether testimony is true and accurate, use your common sense and experience," CT 1421, and "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions," CT 1411.

The California Supreme Court reasonably could have determined that the argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden*, 477

41

U.S. at 181.

c.    Argument About The Touching Necessary For The Offense

The prosecutor argued that a lewd and lascivious act "is the touching of any part of a child's body -- bare skin or through the clothing does not matter -- with the intent of arousing, appealing to, or gratifying the lusts, passions, or sexual desires of himself or the child."  RT 1606-07.  The prosecutor explained that the jury had to unanimously agree as to the act.  RT 1607.  The prosecutor continued:  "Any lascivious contact is sufficient.  Anything.  Touching an arm, touching a leg, touching a foot, if it is done with lascivious intent, with sexual intent, the crime has been proven."  RT 1607.

Mr. Chandler argues that this argument was improper because it made it unnecessary for the jury "to agree that anything actually happened in the classroom, or that anything was placed in the victim's mouths of a sexual nature, they just have to believe there was some kind of touching and according to the prosecutor that will constitute the crime of lewd and lascivious behavior."  Docket No. 1 at 67.

Contrary to Mr. Chandler's assertion, the prosecutor did not misstate the law.  Her argument was consistent with the elements of the offense as stated in the jury instructions.  The jury was instructed that, to prove an offense under California Penal Code § 288(a), the People had to prove:  (1) "The defendant willfully touched any part of a child's body either on the bare skin or through the clothing" or "willfully caused a child to touch the defendant's body, either on the bare skin or through the clothing"; (2) "The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child"; and (3) "The child was under the age of 14 years at the time of the act."  CT 1434.  Although the prosecution's theory was that Mr. Chandler had each victim orally copulate him, the § 288(a) offense did not actually require oral copulation for completion of the offense.  More importantly, contrary to Mr. Chandler's suggestion, the prosecutor did not suggest that innocent touching would suffice: the prosecutor specifically stated that the touching had to be done "with the intent of arousing, appealing to, or gratifying the lusts, passions, or sexual desires of himself or the child."  RT 1606-07; *see also* RT 1607 (touching "done with lascivious intent, with sexual

42

intent").

Mr. Chandler also errs in his assertion that the argument essentially told jurors they did not agree on what happened. The prosecutor stated that the jury had to "unanimously agree that one act occurred as to each victim," and referred the jurors to the "unanimity instruction. It's in your packet." RT 1607.

The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden,* 477 U.S. at 181.

3. Alleged Misstatements Of The Evidence During Closing Argument

a. The Locked Door

Mr. Chandler alleges that the prosecutor misstated the evidence when he argued that the children were touched "in a locked classroom." Docket No. 1 at 63. According to Mr. Chandler, "there was never any evidence that the classroom was locked." *Id.*

The prosecutor argued that Mr. Chandler's behavior was consistent with a child molester's normal desire to avoid getting caught in that he locked the door and, for plausible deniability, he had created a story (i.e., that the events in the classroom when he was alone with the child were an extension of a blindfold game that was played during a classroom session with the whole class present). The prosecutor argued: "He's in the classroom with the *door locked* to give him access to them, he blindfolds them so they can't see and describe what's happening to them, and he desensitized them by exposing them to a blindfold in a neutral setting; right? . . . This is someone who's actually planned that far ahead and has desensitized these children to this happening so that they won't cry, they couldn't scream out, they won't tell anybody. They don't know they have anything to tell." RT 1661-62 (emphasis added).

Although Mr. Chandler is correct that there was no direct evidence that the door to his classroom was locked while he was inside the classroom alone with the blindfolded victims, the prosecutor's comment amounted to a reasonable inference from the evidence. "The prosecutor may argue reasonable inferences from the evidence presented." *Menendez v. Terhune*, 422 F. 3d 1012, 1037 (9th Cir. 2005); *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)

43

**United States District Court**
For the Northern District of California

("prosecutors must have reasonable latitude to fashion closing argument, and thus can argue reasonable inference based on the evidence."). There was evidence that the door was at least always closed when Mr. Chandler was alone in the classroom putting something in the mouth of a blindfolded victim. Jane Does II, IV and V testified the door was closed when the incidents occurred. RT 623, 809, 1085. Jane Doe I said in her recorded statement that she could hear the sound of keys when he put something in her mouth, CT 1198, 1207, and Jane Doe III described a game in which Mr. Chandler locked the door to his classroom, CT 1258. There also was testimony by other witnesses who had observed Mr. Chandler in a locked classroom, albeit no evidence that a child was inside with him at the time the door was locked. Teacher Mary Montgomery once observed a student knocking on the door to Mr. Chandler's classroom and unable to open the locked door when children were standing outside the classroom, apparently waiting for Mr. Chandler. RT 876-77. Mr. Chandler eventually opened the door and emerged from the classroom alone. RT 876. An assistant principal testified that Mr. Chandler was in his classroom with the door closed and locked early on the morning of January 10, 2012, the day Mr. Chandler was put on administrative leave. RT 897-98.

The California Supreme Court reasonably could have determined that the prosecutor's argument that the lewd conduct took place while the classroom door was locked was a reasonable inference drawn from the evidence presented at trial. A prosecutor "is granted reasonable latitude to fashion closing arguments," and is "free to argue reasonable inferences from the evidence." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989). Moreover, if the jury did not find the door was in fact locked during these incidents, they were free to disregard the prosecutor's argument. The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden,* 477 U.S. at 181.

b.   <u>The Cleaning Supplies And A Locked Door</u>

Mr. Chandler contends that the prosecutor engaged in misconduct by arguing that Mr. Chandler was locked in his classroom with cleaning supplies because there was no evidence that the cleaning supplies had been recently used.

44

1    The prosecutor argued that, on the day after Jane Doe II's mother reported him to the

2    police, "Mr. Chandler is in his classroom at least 45 minutes, probably an hour earlier than he's

3    even been there before, in a locked classroom with cleaning supplies." RT 1612.

4         Contrary to Mr. Chandler's suggestion, the prosecutor did not argue that Mr. Chandler had

5    been cleaning his classroom that morning. Even if the prosecutor was suggesting that Mr.

6    Chandler did use the cleaning supplies, or was intending to use the cleaning supplies, it was a

7    permissible argument about a reasonable inference to be drawn from the evidence presented at

8    trial. The incident occurred the morning after the police investigation began. Assistant principal

9    Lara testified that Mr. Chandler was in his classroom with the door locked at 6:45 a.m., and that

10   Mr. Chandler took cleaning supplies out of his classroom when told that he was being placed on

11   administrative leave. RT 895, 898-99. Mr. Chandler usually did not arrive at school until about

12   7:30 a.m., according to another teacher. RT 1226-28.

13        The California Supreme Court reasonably could have determined that the prosecutor's

14   argument at most suggested a reasonable inference to be drawn from the evidence presented at

15   trial. The California Supreme Court reasonably could have determined that this argument did not

16   make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden, 477*

17   U.S. at 181.

18        c.    Whether Mr. Chandler Knew He Was Under Investigation

19        Mr. Chandler argues that the prosecutor improperly "allude[d] to the point that [Mr.

20   Chandler] knew he was being investigated for child molestation and was a desperate man to return

21   to the classroom." Docket No. 1 at 64. He does not identify where in the record this statement

22   may be found. He argues that there was no evidence to prove that he had been advised by

23   detective Pierce of the circumstances of the investigation. *Id.*

24        The evidence at trial included detective Pierce's statement that he had spoken to Mr.

25   Chandler on January 9, 2012, at the police department and "told him that he should not return to

26   school and he should contact his principal in the morning and seek further instruction." RT 1276.

27   There was evidence that the investigation was underway on January 9, 2012. RT 1286-87.

28   Detective Pierce testified that the authorities had interviewed 77 students, including interviewing

about 40 of them on the first day of the investigation. RT 713. Jane Doe II's mother testified that she and Jane Doe II were interviewed the day she first notified the police. RT 572. There also was evidence that Mr. Chandler's booking photograph was on the news as of January 10, 2012, RT 1285-87, and that assistant principal Lara arrived at school on the morning of January 10, 2012 expecting the news media to be there because of the incidents. RT 894. It would be highly unlikely that a large-scale police investigation at a grade school would not be the talk of the school community of which Mr. Chandler was a part. A reasonable inference from the record was that Mr. Chandler was aware that the police were investigating child molestation claims against him when Detective Pierce told him at the police station not to return to the campus.

The California Supreme Court reasonably could have determined that the prosecutor's arguments suggested a reasonable inference that could be drawn from the evidence presented at trial. The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden,* 477 U.S. at 181.

### d. Comment On Mr. Chandler's Sexual Arousal And Interests

Mr. Chandler argues that the prosecutor used Mr. Chandler's sexual comments to Hilda Keller (a fellow teacher) and his sexual liaison with Annie Doe (a student's mother) to "paint a picture of deviant behavior" that implied that he molested the children. Docket No. 1 at 65.

The argument to which this refers is the following: The prosecutor noted that Hilda Keller (a fellow teacher) had testified that Mr. Chandler was overly sexual toward her, and had asked to take photographs of and massage her feet, making her feel highly uncomfortable. RT 1612. The prosecutor then mentioned Annie Doe's testimony about her sexual encounters with Mr. Chandler.

> The defendant can't get an erection in a consensual encounter with a woman at her home. Remember she said, "we couldn't perform?" That's not his preferred location. But in a classroom with little chairs, with artwork all over the place, ejaculation is almost immediate and uncontrollable. She says that the entire episode is over within a minute. She said it was unbelievably fast. (RT 1613.)

The prosecutor's comment that contrasted Mr. Chandler's sexual arousal in his classroom with his lack of arousal while not in the classroom was a reasonable inference from the evidence.

Annie Doe had testified that Mr. Chandler was unable to perform sexually when they were at her home, but quickly ejaculated when they had sex in his classroom on another occasion. RT 1407-08, 1412, 1420. Though it was an unpleasant inference -- that he was sexually aroused by the classroom setting -- it was not unreasonable for the state court to determine that it was a reasonable inference drawn from the evidence.

The prosecutor's comment about Mr. Chandler's interest in Ms. Keller's feet was a permissible comment on the evidence, as it correctly reflected her testimony. It was not unreasonable for the California Supreme Court to determine that the statement urged a reasonable inference that Mr. Chandler's sexualized interest in Ms. Keller's feet supported an inference that his touching an object to Jane Doe I's feet was done with a lascivious intent. Jane Doe I had told her mother that Mr. Chandler rubbed something on her feet while she was blindfolded in the classroom alone with him. RT 677.

The California Supreme Court reasonably could have determined that the prosecutor's arguments suggested reasonable inferences that could be drawn from the evidence presented at trial. The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden, 477 U.S.* at 181.

          e.      <u>Mr. Chandler Waited Until Principal Left To Resume Molestations</u>

Mr. Chandler argues that it was improper for the prosecutor to suggest that he waited to resume his misconduct until the principal who had cautioned him went on maternity leave.

The prosecutor's comment that Mr. Chandler waited until the principal went on maternity leave to resume his inappropriate contact with the girls also was a reasonable inference from the evidence. The evidence showed that Jane Doe I made a report of inappropriate touching in mid-October 2011, when principal Vijayendran was still at the school. RT 723-25. Principal Vijayendran told Mr. Chandler not to have students alone and blindfolded in the classroom with the door closed. The next reports of misconduct were made in early January 2012, shortly after principal Vijayendran had gone on maternity leave. *See* RT 709-711, 892.

The California Supreme Court reasonably could have determined that the prosecutor's

47

argument suggested a reasonable inference that could be drawn from the evidence presented at trial. The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden, 477 U.S.* at 181.

f.    Statement That Jane Doe III's Pants Were Down

The prosecutor argued: "He told her to lick it. It felt nasty. It felt like skin. She tried to peek and saw skin with hair around it. *Her pants were down.* The drink came out of the thing while the thing was still in her mouth. It just tasted bad." RT 1618 (emphasis added).

Mr. Chandler argues that the prosecutor misstated the testimony when she said that Jane Doe III's "pants were down." Docket No. 1 at 68.

Respondent agrees that the prosecutor misstated the record. According to respondent, Jane Doe III had said that it was Mr. Chandler's pants rather than her pants that were pulled down, and that she had seen him pulling up his pants when she took off the blindfold. CT 1246, 1252-55, 1268.

The California Supreme Court reasonably could have determined that the prosecutor's misstatement did not render the trial fundamentally unfair. A misstatement of fact in the prosecutor's closing argument will not violate due process if it is minor or ambiguous and the jury has been instructed that arguments by attorneys are not evidence. *Trilo v. Biter,* 769 F.3d 995, 999-1000 (9th Cir. 2014). Although standing alone, the statement that a child's pants were down may look inflammatory, the statement did not stand out in the context of the evidence and surrounding argument about the events that occurred in Mr. Chandler's classroom while the girls were alone with him, as each had testified that he put something in their mouth (that the prosecutor argued was his penis). The prosecutor made the misstatement in the course of arguing how Mr. Chandler had committed a lewd act on Jane Doe III, and the lewd act involved his exposed penis being put in her mouth rather than making any contact with Jane Doe III's genitals, thus making her pants less relevant than his pants. Mr. Chandler also was not charged with any crime that required the touching of her genitals or that depended on her pants being down. Of course, neither his pants nor her pants being down looked good for the defense.

48

Additionally, the context of the statement suggests the prosecutor simply used the wrong pronoun and meant to argue that Mr. Chandler's pants were down: the preceding sentence referred to Jane Doe III's observing his skin with hair around it. The prosecutor did not repeat the mistake. There was no specific curative instruction because there was no objection from the defense. However, the jury was given a general jury instruction that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." CT 1418.

The California Supreme Court reasonably could have determined that this small mistake did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden*, 477 U.S. at 181.

### g.  Comments About Defense Expert Witness

Mr. Chandler argues that the prosecutor engaged in misconduct by disparaging the defense expert with argument that (1) challenged the correctness of the expert witness' statement that a victim described the thing in her mouth as tasting like strawberry by stating that she (the prosecutor) did not find the word "strawberry" after looking through the transcript and witness statements; and (2) attacked the amount of money the expert witness was paid for his testimony. Docket No. 1 at 70. Mr. Chandler argues that the prosecutor's misstatement of the facts "may have caused jury members to give less or no weight to the expert witness testimony." *Id.*

The prosecutor discussed at length the testimony of the defense expert, Dr. O'Donohue. At one point, the prosecutor criticized the expert for saying that Jane Doe II had said the thing in her mouth tasted like strawberry. The prosecutor said:

> [Jane Doe II] said it tasted like strawberry. Really, Doctor?
> Because I spent my whole lunch hour looking through that
> transcript, my entire lunch hour looking just for the word
> "strawberry." I couldn't find it. For $20,000, you can't even quote
> her interviews properly? There is a transcript. It's in writing. (RT
> 1654.)

The prosecutor mentioned two more times that the defense expert had been paid $20,000. *See, e.g.,* RT 1653 ("I want you to remember and start with the premise that this man was paid $20,000 to come and talk to you; 20K. That's an insane amount of money to give an opinion that lasted,

49

what, three hours?"), 1662 (defense counsel "rel[ied] on the defense expert's report. For $20,000, we got to figure he could come up with something").

The prosecutor's closing argument about the word "strawberry" harkened back to a particular line of questioning of Dr. O'Donohue. At trial, Dr. O'Donohue had testified that Jane Doe II's statement about the taste of the item Mr. Chandler put in her mouth was an inconsistency in her story that made the story less believable. RT 1463. According to Dr. O'Donohue, Jane Doe II said in her first interview that the thing tasted kind of like strawberry; said in her second interview that it did not taste like strawberry; and did not mention anything about the taste in her preliminary examination testimony. RT 1463; *see* RT 1497. On cross-examination, the prosecutor challenged this testimony and told Dr. O'Donohue that she (the prosecutor) could not find any statement by Jane Doe II in the second interview that the item did not taste like strawberry. RT 1504-05. Dr. O'Donohue was unable to point to the place in the transcript where the word "strawberry" was used.

Although the prosecutor may not have seen the reference in her review of the transcripts, the word "strawberry" did appear in the transcript of Jane Doe II's interview. Specifically, detective Pierce had asked Jane Doe II whether there was a taste like "strawberry or anything like that," and Jane Doe II shook her head from side to side in response. *See* CT 1128; *see also* CT 1124.[8] The prosecutor may have honestly missed detective Pierce's reference to the word "strawberry" during Jane Doe II's interview, so it is possible that the prosecutor did not misrepresent the facts at all -- as the prosecutor had only asserted she did not find the reference when she looked for it. Even if the prosecutor had seen the reference to strawberry and ignored it, the prosecutor stating that the word "strawberry" was not present was an isolated misstatement of the record. That the use of the word "strawberry" was a minor point is suggested by the fact that defense counsel did not object during the cross-examination or conduct any redirect examination of Dr. O'Donohue to show where the reference could be found and did not object during closing

---

[8] The word "strawberry" also appeared in the preliminary hearing transcript. There, however, it was used to describe the taste of the candy Mr. Chandler gave Jane Doe II and not to describe the taste of the "curved thing" he put in her mouth when she was alone with him. *See* CT 118-127, 132.

1   argument.  Moreover, the written transcript of Jane Doe II's recorded interview was sent to the

2   jury deliberation room, where jurors could have reviewed it to see if the word "strawberry" was

3   present.  *See* RT 1595 (exhibits would be sent to the deliberation room).  The California Supreme

4   Court reasonably could have determined that the prosecutor's assertion that she could not find the

5   word "strawberry" in Jane Doe II's interview transcript did not render Mr. Chandler's trial

6   fundamentally unfair because it was a minor point and the jury was instructed that arguments by

7   the attorneys were not evidence.

8        The prosecutor's references to the amount of money the expert had been paid were

9   permissible.  Both the prosecution and defense are allowed to suggest that an expert witness is

10   biased because he received payment for his testimony.  *See United States v. Preciado-Gomez*, 529

11   F.2d 935, 942 (9th Cir. 1976) ("The existence of bias or prejudice of one who has expressed an

12   expert opinion can always be examined into on cross-examination of such expert"); Christopher B.

13   Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:78 (3d ed. 2009) (noting that impeaching an

14   expert by inquiring about payment for their testimony is a common and permissible tactic).

15   California Evidence Code § 722(b) specifically allows inquiry into the area of an expert's

16   compensation:  "[t]he compensation and expense paid or to be paid to an expert by any party

17   calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the

18   witness and the weight of his testimony."  The defense expert testified that he had been paid about

19   $20,000 for his work in this case.  RT 1494.  The prosecutor's comment on the admissible

20   evidence about the expert's fee payment did not amount to misconduct because it sought to draw

21   the inference that the amount of fees received by the expert diminished the expert's credibility.  It

22   would not have been an unreasonable application of, or contrary to, clearly established precedent

23   from the U. S. Supreme Court for the California Supreme Court to conclude that the prosecutor's

24   digs about the expert witness' compensation did not render the trial "fundamentally unfair" and

25   therefore did not violate Mr. Chandler's right to due process.  *See Darden*, 477 U.S. at 181.

26        h.    The Drawing

27        Mr. Chandler argues that the prosecutor engaged in misconduct by arguing that a drawing

28   done by one of the victims appears to be testicles and hair because "[t]here is nothing that

resembles those body parts." *See* Docket No. 1 at 71. The drawing is at Docket No. 9-4 at 9 (augmented CT 4).

In the course of criticizing the testimony of defense expert Dr. O'Donohue, the prosecutor stated: "[Jane Doe III] wasn't asked what she saw under the blindfold. Really? Dr. O'Donohue, were you not provided with the picture that she drew of what appears to be testicles with hair surrounding it?" RT 1654.

The prosecutor's statement sought to draw a reasonable inference from the evidence. Jane Doe III had testified that when she was blindfolded without her glasses, she was able to see below the blindfold and saw something circular. She told her cousin she thought she had seen Mr. Chandler's "weenie." RT 1017. She drew a picture for the police, with lines surrounding the circular thing representing hair. RT 1007-09. The sketch was crudely drawn and was done by a young child who was attempting to draw what she had seen when peeking from under a blindfold. The prosecutor's description of the picture was not an unreasonable inference from the evidence. Moreover, the picture had been shown to the jury earlier in the prosecutor's closing argument (*see* RT 1616), making it unlikely that the prosecutor's interpretation of the photo would have had much of an impact on the jury. That is, if jurors did not believe the drawing looked like a child's drawing of a penis or testicles, the jurors surely would not have drawn the inference that it was such a drawing. If Mr. Chandler's complaint is that the prosecutor identified the drawing as showing testicles rather than a penis, that would be a distinction without any meaningful difference in the context of this case because either being visible to the student was highly incriminating.

The California Supreme Court reasonably could have determined that the prosecutor's argument suggested a reasonable inference as to what was depicted in the line drawing based on the evidence presented at trial. The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden,* 477 U.S. at 181.

i.    Semen In The Classroom

Mr. Chandler argues that it was misconduct for the prosecutor to argue that the presence of

52

Mr. Chandler's semen in the classroom supported the view that he had molested the girls. He argues that there was "no evidence to link the sperm in the classroom to oral copulation by these victims," or to show how long the semen had been on the chairs or how it had been deposited on the chairs. Docket No. 1 at 71-72.

The prosecutor argued that Mr. Chandler's semen was found on two chairs in the classroom:

> [W]hat are the chances? Statistically, how many classrooms across the country do you think have the teacher['s] sperm in them? I mean, I could only pray that it's one. I mean, a second-grader's classroom with the teacher's sperm in it, I mean, it's inconceivable to most people. And that happens to be the one teacher that these five little girls come in and say, "He put something in my mouth." What are the chances of that? Zero. I submit to you that there is no other reasonable explanation to any of the evidence that you have heard. None that will explain this conduct. (RT 1664.)

The California Supreme Court reasonably could have determined that the prosecutor's argument suggested a reasonable inference that could be drawn from the evidence presented at trial. A teacher's semen on chairs in his classroom is not a normal thing, as the prosecutor suggested. The presence of Mr. Chandler's semen in his classroom had a tendency to support the victims' testimony (e.g., that the item placed in the victims' mouths was "gooey" and that liquid came out of it) even though there was no direct evidence linking the semen found on the chairs to a particular act of lewd conduct against any of the victims. The California Supreme Court reasonably could have determined that this argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden,* 477 U.S. at 181.

j.    Argument That A Victim Could Feel Mr. Chandler's Hands

Mr. Chandler argues that the prosecutor incorrectly argued that a victim could feel his hands at the end of the "gooey thing" as he was pushing it in and out of her mouth. Docket No. 1 at 69.

He is wrong. Jane Doe I gave a statement in which she stated that Mr. Chandler's hands were "[i]n the gooey stuff" and that he "was holding it," which she knew because she felt his hand. CT 1209. Jane Doe I also had told the principal that Mr. Chandler had wiggled her body and head back and forth after he put the thing in her mouth. RT 728. The prosecutor's argument was a fair

1    summary of the evidence.  The California Supreme Court reasonably could have determined that

2    this argument did not make the trial "fundamentally unfair" and therefore did not violate due

3    process.  *See Darden,* 477 U.S. at 181.

4              k.    <u>Selecting Quiet And Meek Girls</u>

5         Mr. Chandler argues that the prosecutor engaged in misconduct by arguing that he had

6    selected quiet and meek girls whose parents spoke languages other than English, and that he was a

7    sociopathic deviant.  Docket No. 1 at 69-70.

8         The comment to which this claim refers was at the end of the prosecutor's closing

9    argument, after she had described the evidence for each victim:  "Chandler selected his victims

10   very carefully.  He chose quiet, meek girls, almost all of whom have parents who speak a language

11   other than English.  At least one child who had some special education needs.  This is a selection

12   process.  This is a methodical, sociopathic deviant who chose children in the most vulnerable

13   condition to inflict this horrific crime on."  RT 1619.

14        The California Supreme Court reasonably could have determined that the prosecutor's

15   argument about selecting vulnerable children suggested a reasonable inference that could be drawn

16   from the evidence.  Although the victims' meekness cannot be discerned from the written record,

17   other evidence provided a support for the inference.  Jane Doe I spoke Cantonese at home and her

18   mother testified with a Cantonese interpreter.  CT 1201; RT 671.  Jane Doe III spoke in English

19   and Spanish during her interview with police.  *See, e.g.,* CT 1276 .  Jane Doe III apparently had

20   "limited capacity," according to defense counsel's argument.  RT 1627.  The jurors were able to

21   see the victims and some of the parents for themselves during trial, and the jurors could judge the

22   witnesses' meekness and fluency in English.  The California Supreme Court reasonably could

23   have determined that the prosecutor's argument did not make the trial "fundamentally unfair" and

24   therefore did not violate due process.  *See Darden,* 477 U.S. at 181.

25        The California Supreme Court reasonably could have determined also that the argument

26   that Mr. Chandler was a deviant and a sociopath did not make the trial "fundamentally unfair" and

27   therefore did not violate due process.  *See Darden,* 477 U.S. at 181.  In *Darden*, the Supreme

28   Court found that the prosecutor's comments referring to the defendant as an "animal" and stating

he should not have been let out of his cell without a leash were offensive and improper, but held that such comments did not amount to a due process violation as they did not render the trial "fundamentally unfair," given the weight of the evidence against defendant and the court's instruction that the attorneys' arguments were not evidence. 477 U.S. at 179-80; *see also Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc) (no due process violation arising from prosecutor's comments that perpetrator of crime was a "monster of a human being"). Here, the prosecutor made both comments while discussing what Mr. Chandler had done to the five victims and that he had chosen students less likely to make a fuss about his behavior. Given the context of the statements, neither statement was nearly as inflammatory as the remarks held not to amount to a due process violation in *Darden*. Additionally, as in *Darden*, the trial court instructed the jury that the attorneys' arguments were not evidence. CT 1418.

### l. "No Plausible Reason" Comment

The prosecutor argued that a teacher, Ms. Catangay, "also gave us another interesting piece of circumstantial evidence. I asked her, As a second grade teacher, with 20 years of experience, can you think of any educational purpose for blindfolding a child in a classroom alone and putting something in their mouth? No. Unequivocally, she said no." RT 1611.

Mr. Chandler contends that this argument was improper because there were three other teachers who had stated otherwise to the police. Docket No. 1 at 44.

The prosecutor's argument was an accurate recitation of Ms. Catangay's testimony. Ms. Catangay had answered "no" when asked whether she had "ever heard of a student being in a classroom blindfolded alone with a teacher while things where [sic] being put in their mouth other than this case?" RT 1237. And Ms. Catangay had answered "no" when asked whether she could "think of any educational purpose that that would serve at all?" RT 1237.

The three other teachers did not testify, have not been identified by Mr. Chandler, and have not been shown to have had an opinion different from that of Ms. Catangay. Mr. Chandler argues that the three teachers would have testified that there was a plausible reason to have a child blindfolded and something being placed in her mouth, but omits the important qualifier that the

55

actions occurred while the student was alone in a classroom with a teacher.  He has not shown that those three unidentified teachers would have said there was a plausible educational purpose for a teacher to put something in a blindfolded girl's mouth while alone with her in the classroom.  Mr. Chandler has not shown prosecutorial misconduct in this comment, which correctly reflected the state of the evidence presented at trial. The California Supreme Court reasonably could have determined that the argument did not make the trial "fundamentally unfair" and therefore did not violate due process. *See Darden,* 477 U.S. at 181.

    m.    The Cell Phone Video

Mr. Chandler argues that it was misconduct for the prosecutor to argue that a video from Mr. Chandler's cell phone showed that he was clearing out his classroom to do something with Jane Doe II because "[t]here is no evidence to support this claim."  Docket No. 1 at 69.

During closing argument, the prosecutor showed the jury a video and then, in reference to the video, stated:  "Right here, what's he doing?  There is little [Jane Doe II] wearing the exact same scarf that she described in a classroom while Mr. Chandler is trying to get rid of the other kids and he's got a camera set up for it.  He turns it on as the child walks right into the line of sight, she turns away to sit down, and it is not until other children come into that classroom that that camera goes off.  All of which corroborates everything that [Jane Doe II] has told us."  RT 1616.

Defense counsel later argued the following about the video:

> This video, what did it really show?  It shows Mr. Chandler's classroom, it shows [Jane Doe II], it shows an open door, it shows chairs on top of student desks.  What time would that suggest to you it is?  After school?  She has homework of some sort she's working on.  You only have a partial view of the class.  [¶]  What nefarious thing did Mr. Chandler do?  As he turned his back to the students, he put his hand down to his crotch area.  I don't want to intrude, gentlemen, is that an uncommon thing for a male to do during the day?  No.  Was there something sexual about that thing?  No.  There are other boys or kids running around.  There is nothing sexual about it whatsoever.  The only significance of it is [Jane Doe II] is in the photograph. [¶]  I think the People are asking you to speculate wildly about what Mr. Chandler must have meant when he touched himself.  You're not to speculate.  If that doesn't make sense, if [it] doesn't clearly have purpose of sexual intent, don't make it into something that it's not.  (RT 1645-46.)

1     The video is not in the record before this Court, so this Court's analysis necessarily relies

2     on counsel's closing-argument description of the video.  Counsel's comments indicate that the

3     video showed the following in the classroom:  Jane Doe II coming into the picture and doing

4     paperwork; other students were running around in view of the camera; Mr. Chandler put his hand

5     down to his crotch area as he turned his back on the student(s); and the filming stopped when

6     other children came into the classroom.  On this record, it would not have been unreasonable for

7     the California Supreme Court to determine that the prosecutor's argument drew a reasonable

8     inference from the record, as the video apparently started when Jane Doe II came into the picture,

9     showed Jane Doe II in the same outfit she described in her statement regarding the touching by

10    Mr. Chandler, and showed Mr. Chandler touching his crotch area.  Moreover, the jury watched the

11    video immediately before the prosecutor's comment, making it much less likely that the

12    prosecutor's interpretation of the video had much of an impact on the jury if that argument did not

13    correctly reflect what the jurors had just watched.  And defense counsel offered a different

14    interpretation of the video for the jurors during his closing argument -- arguing that Mr.

15    Chandler's hand motion was not lecherous – for the jury to consider.

16    The California Supreme Court reasonably could have determined also that the argument

17    did not make the trial "fundamentally unfair" and therefore did not violate due process.  *See*

18    *Darden*, 477 U.S. at 181.

19    D.     Due Process Claim Based On Exclusion Of Evidence

20          1.     Exclusion Of Mr. Chandler's Offered Explanation After The Principal's Warning

21                 a.     Background

22    Before trial, the prosecution moved to admit evidence that, after [Jane Doe I] and her

23    mother complained about Mr. Chandler in October 2011, school principal Vijayendran directed

24    Mr. Chandler not to have children blindfolded and alone in his classroom with the door closed.

25    The prosecutor also moved to exclude testimony by principal Vijayendran regarding Mr.

26    Chandler's explanation when she gave him that directive.  (Mr. Chandler apparently had stated

27    that his actions were in accord with his efforts to teach a lesson about Helen Keller and empathy

28    for disabled children.  *Chandler*, 2015 WL 7726506, at *15.)  The defense argued that evidence of

57

Mr. Chandler's explanation was admissible pursuant to the rule of completeness in California Evidence Code § 356[9] to put the principal's admonition in context. The trial court disagreed and ruled that the evidence was hearsay that was not admissible under the rule of completeness because Mr. Chandler's statement was not necessary to avoid a misleading impression of what principal Vijayendran had told Mr. Chandler. The trial court further ruled that, for purposes of the rule of completeness, the only relevant part of Mr. Chandler's response was that he had heard and acknowledged the principal's directive, and therefore she could be questioned about that. RT 546-48, 551-52.

At trial, principal Vijayendran testified: "I told him he was not to have students in his classroom alone with the door closed, blindfolded. And I told him if he had students in his room alone doing work – I highly recommended he not have students in his room alone, but that if he did, that they would be sitting at a desk working and the door should be open." RT 733. Consistent with the court's pretrial ruling, she was not asked and did not testify as to Mr. Chandler's statements in response to her directive.

The California Court of Appeal rejected Mr. Chandler's state law and federal constitutional challenges to the exclusion of the evidence. The appellate court explained that courts had interpreted the rule of completeness in California Evidence Code § 356 to allow an opponent to put in evidence the rest of the statements made by or to the declarant if the statements "'*have some bearing upon, or connection with*, the admission or declaration in evidence,'" but evidence that is not relevant to the conversation must be excluded. *Chandler*, 2015 WL 7726506, at *16 (citation omitted). The appellate court concluded that Mr. Chandler's explanation was irrelevant because "it was not needed to make Vijayendran's statements to appellant understood. Excluding appellant's explanation of what he was doing in the classroom did not result in a misleading impression of what Vijayendran . . . intended to convey or did convey." *Chandler*, at *16.

The California Court of Appeal also rejected the federal due process claim.

---

[9] California Evidence Code § 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party."

> Without doubt, a defendant has the general right to offer a defense through the testimony of his or her witnesses. (*Washington v. Texas* (1967) 388 U.S. 14, 19.) However, generally, application of the ordinary rules of evidence does not infringe on a defendant's right to present a defense. (*E.g., People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103; *see Taylor v. Illinois* (1988) 484 U.S. 400, 410, [the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence].)
>
> Since we have concluded that the trial court did not abuse its discretion in excluding appellant's statements to Vijayendran, there is no error on which to base appellant's constitutional claim. (*People v. Roybal* (1998) 19 Cal.4th 481, 506, fn. 2.[)]

*Chandler,* at \*17 (first set of brackets in original).

### b.    Analysis

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute). A defendant "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (alteration in original) (quoting *Taylor*, 484 U.S. at 410). Even relevant evidence may be excluded on account of certain evidentiary rules. *See id.* at 42. "[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right"; rather, it means that the defendant has the heavy burden to show that the decision to exclude evidence "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* at 42-43 (citation omitted). Even if the exclusion of evidence was a constitutional error, habeas

59

relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

"Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).[10] In *Jackson*, the Supreme Court identified four cases where it had found such a violation: *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi*, 410 U.S. 284 (1973); and *Washington v. Texas*, 388 U.S. 14 (1967).

In *Holmes v. South Carolina*, 547 U.S. 319, the Supreme Court held that a criminal defendant's right to present a defense was violated by an evidence rule under which a defendant could not introduce proof of third-party guilt if the prosecution had introduced forensic evidence that, if believed, would strongly support a guilty verdict. The constitutional problem was that the general rule (i.e., allowing a defendant to offer evidence of third-party guilt if the evidence was inconsistent with his own guilt and was not speculative) had been "radically" changed by the South Carolina Supreme Court to be contingent on the strength of the prosecution's case. *Id.* at 328. As a result of the state court's radical change in the rule, the rule ceased to rationally serve the end that the general rule was "designed to promote, i.e., to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 330.

In *Rock v. Arkansas*, 483 U.S. 44, the Supreme Court held that Arkansas' *per se* rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict a defendant's right to testify. There, the Court explained that "[a] State's legitimate interest in

---

[10] In *Nevada v. Jackson*, the Supreme Court reversed the Ninth Circuit's decision granting habeas relief for a petitioner who had been barred from presenting extrinsic evidence of the victim's prior accusations of sexual assault at petitioner's trial for rape. The Ninth Circuit was faulted for viewing the Supreme Court's cases on the right to present a defense at too high a level of generality. *See* 569 U.S. at 512. Although the Supreme Court had held that certain restrictions on a defendant's ability to cross-examine a witness violate the Confrontation Clause, the Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Id.* "The Ninth Circuit elided the distinction between cross-examination and extrinsic evidence by characterizing the cases as recognizing a broad right to present 'evidence bearing on [a witness'] credibility.'" *Id.* (alteration in original).

barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61.

In *Chambers v. Mississippi*, 410 U.S. 284, the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime. It was the combination of the rigid application of the State's evidence rules and the fact that the proffered evidence bore considerable assurances of trustworthiness and reliability that led to the due process violation in *Chambers*. *See id.* at 302-03. The Supreme Court specifically pointed out that its holding did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.*

The challenged rule in *Washington v. Texas,* 388 U.S. at 15, provided that principals, accomplices and accessories in the same crime could not be used as witnesses for each other. This rule violated a defendant's right to compulsory process because "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23.

The California Court of Appeal's rejection of Mr. Chandler's claim that he was prevented from eliciting his statement to Vijayendran was not contrary to, or an unreasonable application of, these Supreme Court holdings. Mr. Chandler has not identified any Supreme Court holding that the right to present a defense or right to due process includes a right to present *irrelevant* evidence.[11] The requirement that evidence must be relevant to be admissible is a fundamental rule of evidence, and is found in both the Federal Rules of Evidence and the California Evidence Code.

---

[11] Mr. Chandler's statement was irrelevant for the purpose offered, i.e., it was irrelevant insofar as it purported to be necessary to avoid a misleading impression of what principal Vijayendran had told Mr. Chandler.

*See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible"); Cal. Evid. Code § 350 ("No evidence is admissible except relevant evidence"). Mr. Chandler also has not identified any Supreme Court holding to the effect that an evidentiary rule that (like California Evidence Code § 356) requires the exclusion of evidence when it is not relevant to complete the statement that has been admitted into evidence violates the constitutional rights to present a defense or due process. Trial courts have wide latitude in deciding what evidence comes in. *See, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"); *Montana v Egelhoff*, 518 U.S. at 42 (citing Federal Rule of Evidence 403 as an example of "familiar and unquestionably constitutional evidentiary rules" that "authorize the exclusion of relevant evidence."). Mr. Chandler has failed to show that either of the California rules at issue -- i.e., the rule excluding irrelevant evidence, and the rule of completeness -- "offend[] some 'fundamental principle of justice'" such that the rules themselves violate a criminal defendant's right to due process. *See Egelhoff*, 518 U.S. at 43.

It is debatable whether the above-mentioned Supreme Court precedents could support a finding of a violation of the right to present a defense based on a routine application of an otherwise permissible rule. Because "fairminded jurists could disagree" on whether the U.S. Supreme Court's cases on the right to due process and the right to present a defense extend to the routine application of an otherwise permissible rule, such as the rule requiring evidence to be relevant and the rule of completeness, the California Court of Appeal's rejection of the claim would not support relief under § 2254(d). *See Harrington*, 562 U.S. at 101; *see also id.* at 103 (petitioner must show the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

Even assuming *arguendo* that the right to due process and the right to present a defense could be violated by the state court's application of a rule that did not itself violate a constitutional right, Mr. Chandler still would not be entitled to relief because the state court's application of the

62

two rules was not unreasonable. The California Court of Appeal reasonably determined that Mr. Chandler had not shown that his statements in response to principal Vijayendran's warning were relevant to put her warning in context, i.e., his statements were not necessary to make her statements understood.

The state appellate court's rejection of the claim that Mr. Chandler's right to present a defense and right to due process were violated by the evidentiary ruling was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court. Mr. Chandler is not entitled to the writ on this claim.

2.     Exclusion Of The Principal's Typewritten Notes

Mr. Chandler contends that the exclusion of typewritten notes prepared by principal Vijayendran three months after she spoke to Jane Doe I violated his right to due process and his right to present a defense.

At trial, principal Vijayendran testified that she took contemporaneous notes while talking with Jane Doe I in October 2011. According to Ms. Vijayendran, the handwritten notes contained only about one-third of what they discussed. Those handwritten notes were read to the jury and admitted into evidence as an exhibit. The notes stated, among other things, that Jane Doe I "reported that appellant said he was going to put something in her mouth, and then Jane Doe I said 'he put the gooey something in my mouth.'" *Chandler*, at *17. Ms. Vijayendran further testified that she did not recall the exact details of the conversation. On cross-examination, Ms. Vijayendran stated that she had prepared typewritten notes about three months later, in January 2012, which purported to document the October 2011 conversation with Jane Doe I. She stated that the typewritten notes were a "'different set of notes,'" which were "'done later, so they were done more from memory, but they are more detailed.' She would not say that the typewritten notes were more accurate than the handwritten notes." *Chandler*, at *17. On redirect examination, Ms. Vijayendran explained that she prepared the typewritten notes after Mr. Chandler was arrested in January 2012, and after the school district had asked her to prepare an account of what happened, by which time she did not have a clear recollection of some of the specific words used by Jane Doe I. *Id.* at *18.

63

The trial court refused to admit the notes under the past-recollection-recorded exception to the hearsay rule, *see* California Evidence Code § 1237. The court expressed concern about the reliability of the typewritten notes: the notes had been prepared from memory three months after the conversation with Jane Doe I; Ms. Vijayendran was unsure whether she had her handwritten notes to refer to when she prepared the typewritten notes; and the circumstances suggested Ms. Vijayendran had prepared the typewritten notes at a time when she needed to justify her own conduct.

On appeal, the California Court of Appeal rejected Mr. Chandler's claims that the exclusion of the evidence was improper under state law and the federal constitution, but discussed only the state law claim. *See Chandler*, at *18-19. The appellate court rejected the state law claim as harmless error, if there was any error at all:

> Furthermore, again appellant overstates the importance of Jane I describing what was in her mouth as a bottle. The jury knew that Jane I was blindfolded when the conduct she described occurred. They could reasonably infer that even if she used the term "bottle" to describe what she could not see, the conduct she described would be more consistent with sexual activity than with appellant sticking a bottle in her mouth. This is so because as a young child she would be likely to assume it was a bottle. Her age and experience would not have led her to believe it could have been something else.
>
> In sum, we find no prejudice under any standard of review in the trial court's preventing Vijayendran's typewritten notes from being read into the record.

*Chandler*, at *19.[12]

Because the California Court of Appeal denied the constitutional claim on the merits without explanation, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

---

[12] The typewritten notes are not in the record. The portion of interest to the defense was read into the record at trial (outside the presence of the jury) by attorney Madden, who stated that Ms. Vijayendran's typewritten notes stated: "'Mr. Chandler was next to [Jane Doe I]. Mr. Chandler lifted the blanket up to about her nose and then put something in her mouth and made her drink something. She explained the drink as salty and that the bottle was gooey. I asked her if she felt the same as what was on her foot, and she said no. It felt different, but also gooey. [Jane I] said some of the drink fell out of her mouth because she was lying down and it got onto her jacket.'" *Chandler*, 2015 WL 7726506, at *18.

**United States District Court**
For the Northern District of California

1  in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102

2  The applicable law for this claim is the same as in the preceding section regarding the

3  exclusion of the evidence about Mr. Chandler's statement when the principal directed him not to

4  be alone with blindfolded children. That is, the U.S. Constitution gives a defendant a right to

5  present a defense and to due process. The constitutional right to present relevant testimony "may,

6  in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."

7  *Chambers*, 410 U.S. at 295. A defendant "'does not have an unfettered right to offer [evidence]

8  that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.'"

9  *Egelhoff*, 518 U.S. at 42-43 (plurality opinion) (alteration in original) (quoting *Taylor*, 484 U.S. at

10  410). The defendant has the heavy burden to show that the decision to exclude evidence "'offends

11  some principle of justice so rooted in the traditions and conscience of our people as to be ranked as

12  fundamental.'" *Id.* at 42-43.

13  Even if the exclusion of evidence was a constitutional error, habeas relief is not available

14  unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining

15  the jury's verdict.'" *Brecht*, 507 U.S. at 638. If a state court does not conduct a harmless error

16  analysis, a federal habeas court must find that the error was prejudicial under *Brecht* before it can

17  grant relief. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

18  It is debatable whether any Supreme Court precedent could support a finding of a violation

19  of the right to present a defense based on a routine application of an otherwise permissible rule.

20  Because "fairminded jurists could disagree" on whether cases on the right to due process and the

21  right to present a defense extend to the routine application of an otherwise permissible rule, such

22  as the hearsay rule, the California Court of Appeal's silent rejection of the federal constitutional

23  claim would not support relief under § 2254(d). *See Harrington*, 562 U.S. at 101; *see also id.* at

24  103 (petitioner must show the state court's decision "was so lacking in justification that there was

25  an error well understood and comprehended in existing law beyond any possibility for fairminded

26  disagreement").

27  Moreover, even assuming arguendo that the exclusion of the evidence violated Mr.

28  Chandler's right to due process or right to present a defense, any such error was harmless for the

same reasons explained in the California Court of Appeal's decision addressing the state law claim. The key information that Mr. Chandler wanted to present to the jury via the typewritten notes was that those notes stated that Jane Doe I had said that Mr. Chandler put a "bottle" in her mouth and made her drink something. *Chandler*, at *18. However, as the California Court of Appeal explained, the reference to a "bottle" in Ms. Vijayendran's notes was hearsay because it purported to describe Jane Doe I's statement rather than Ms. Vijayendran's statement. Thus, "[e]ven if the notes had been read into the record, Jane I's statement would not be admissible for the truth of the matter asserted—i.e., that the object in her mouth was actually a bottle." *Chandler*, at *19. In any event, as the California Court of Appeal explained, because Jane Doe I was a young child who had been blindfolded and did not see the object she described as a bottle, her use of the word "bottle" to describe the object Mr. Chandler put in her mouth would not have swayed the jury given the surrounding circumstances. "[T]he conduct she described would be more consistent with sexual activity than with appellant sticking a bottle in her mouth. This is so because as a young child she would be likely to assume it was a bottle. Her age and experience would not have led her to believe it could have been something else." *Id.* Those circumstances included Jane Doe I's statements that the thing was "gooey" and salty-tasting liquid came out of that thing, CT 1200-01; Jane Doe I's statement that Mr. Chandler told her not to bite the gooey thing, CT 1205; Jane Doe I's statement that some of the liquid dripped on her jacket, CT 1201-02; and Jane Doe I's mother's statement that she noticed a small white spot resembling nasal mucous on the front of Jane Doe I's jacket later that day, RT 676. The exclusion of the typewritten notes that contained a hearsay statement did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 638. Mr. Chandler is not entitled to the writ on this claim.

E.  Confrontation Clause Claim: Pork Rinds Evidence

    1.  Background

        Mr. Chandler contends that the trial court's refusal to allow cross-examination of Jane Doe II with a bag of pork rinds violated his Confrontation Clause right to cross-examine the witness.

        Jane Doe II testified that, while she was blindfolded, Mr. Chandler put a "curvy" thing in her mouth that was too big for her to close her mouth on, but she did not know what it was. *See*

66

RT 615-16.  On cross-examination, she agreed with defense counsel that the object "was kind of hard, but kind of soft."  RT 647.  She testified that no liquid came out of the object and did not recall anything tasting like strawberry.  RT 647.  She was unable to describe the object further, and had never seen the object because she had been blindfolded.  RT 647.

During cross-examination, defense counsel wanted to mark as an exhibit a plastic bag containing about ten pork rinds and question Jane Doe II about them.  RT 655.  An unreported sidebar conference was held, after which cross-examination continued on an unrelated subject.  Later in the day, outside the jury's presence, the trial court made a record of its ruling.  The trial court had excluded the evidence pursuant to California Evidence Code § 352 and permitted the attorneys to make a record of their positions.  Defense counsel stated that pork rinds, "a chip-type snack," were in the bag; he further stated that Jane II had described "objects physically consistent with those; that they are similar length, they are certainly curvy, they have certainly a roundness to them."  RT 663.  He also explained that Mr. Chandler had mentioned the pork rinds (as well as candy and crackers) to detective Pierce when he was interviewed and that Mr. Chandler had eaten pork rinds since childhood.  Counsel argued that he believed a pork rind was "the item that was put in her mouth when she was alone with Mr. Chandler, and that she should be allowed to look at it, to hold the outside of the bag. I will not ask her to put it in her mouth and taste it. I would ask her questions such as, has she ever had something like this."  RT 664.  The prosecutor objected, pointing out that Jane II had been asked to describe the object in her mouth, had done so, and had said she never saw the object put in her mouth.

The trial court reaffirmed its earlier ruling excluding this evidence. The court stated that in its opinion, "the relevance . . . would only apply in this particular situation if she [were] allowed to put that particular food item in her mouth." The trial court stated that it would not require that Jane Doe II do that with the pork rinds or any other item.  RT 665.

Mr. Chandler argues that the exclusion of the pork rinds evidence unfairly limited the defense's ability to effectively cross-examine Jane II, and that this violated his Sixth and Fourteenth Amendments confrontation rights.

The California Court of Appeal rejected Mr. Chandler's argument.  The appellate court

67

explained that the trial court's ruling under California Evidence Code § 352 was proper.[13]  Under

California law, a trial court has no discretion to admit irrelevant evidence.  *Chandler*, at *20.  "'A

defendant's rights to due process and to present a defense do not include a right to present to the

jury a speculative, factually unfounded inference.'"  *Id.* (quoting *People v. Mincey*, 2 Cal. 4th 408,

442 (Cal. 1992)).

> Given that there was absolutely no evidence that Jane II had seen
> what it was that appellant put into her mouth, and no evidence that
> Jane II had handled what it was that appellant put in her mouth,
> producing a bag of pork rinds and asking her to feel the pork rinds
> and determine if she had ever had something similar put in her
> mouth would have produced nothing more than a speculative
> inference and was therefore irrelevant.  Evidence that leads only to
> speculative inferences is irrelevant.  (*People v. Morrison* (2004) 34
> Cal.4th 698, 711.)  Since counsel stated he had no intention of
> asking Jane II to taste a pork rind, the court could reasonably
> conclude that the probative value of showing her a pork rind and
> asking her to feel one with her hand would reveal nothing more
> than a speculative inference.

*Chandler*, at *20.  The California Court of Appeal concluded that "the trial court did not err in

preventing [defense counsel] from producing a bag of pork rinds to show to Jane II and have her

feel them with her hand" because that evidence would have led only to an irrelevant, speculative,

inference.  *Id.*

    2.    <u>Analysis</u>

The Confrontation Clause guarantees an opportunity for effective cross-examination, not

cross-examination that is effective in whatever way, and to whatever extent, the defense might

wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Trial judges retain wide latitude to impose

reasonable limits on cross-examinations based on concerns about, among other things,

"harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A

defendant "can prove a violation of his Sixth Amendment rights by 'showing that he was

prohibited from engaging in otherwise appropriate cross-examination designed to show a

---

[13] California Evidence Code § 352 provides: "The court in its discretion may exclude evidence if
its probative value is substantially outweighed by the probability that its admission will (a)
necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of
confusing the issues, or of misleading the jury."

prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) (omission in original) (quoting *Van Arsdall*, 475 U.S. at 680). A showing of constitutional error under the Confrontation Clause only merits habeas relief if the error was prejudicial, that is, if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 1100 (9th Cir. 2009) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The California Court of Appeal's determination that there was no Confrontation Clause violation in the exclusion of the pork rinds evidence was not an unreasonable application of U.S. Supreme Court precedent, which itself accords trial judges "wide latitude" to impose reasonable limits on cross-examination based on concerns about questioning "that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; see, e.g., *Plascencia v. Alameida*, 467 F.3d 1190, 1201 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate Confrontation Clause or was harmless error); *United States v. Sua*, 307 F.3d 1150, 1153 (9th Cir. 2002) (Confrontation Clause not violated by exclusion of codefendant's guilty plea with dismissal of a charge when offered by defendant to establish government's belief in the codefendant's innocence (and, by inference, in defendant's innocence) based on dismissal of that charge because potential jury confusion and undue delay outweighed defendant's interest in presenting the marginally relevant evidence); *Bright v. Shimoda*, 819 F.2d 227, 229-30 (9th Cir. 1987) (no constitutional violation where substantial cross-examination permitted and excluded evidence was of collateral nature).

It was not unreasonable for the California Court of Appeal to determine that having Jane Doe II look at the bag of pork rinds and hold the bag of pork rinds would not have yielded any relevant evidence. The pork rinds were not relevant to Jane Doe II's potential bias or credibility, and she had consistently stated to police and on the witness stand that she had not seen or touched with her hands the object put in her mouth. It was reasonable for the appellate court to conclude that the federal constitution did not require the trial court to allow defense counsel to pursue the line of questioning that would have yielded only irrelevant speculation.

69

The trial court did not foreclose all examination of Jane Doe II.  The defense was allowed to cross-examine Jane Doe II on the circumstances surrounding the object being put in her mouth, as well as other background information.  Defense counsel probed her ability to describe the object Mr. Chandler put in her mouth and the circumstances surrounding those events; had her describe the layout of the classroom; cross-examined her about inconsistent statements (such as her testimony that she heard a zipper sound from Mr. Chandler after the object was removed from Jane II's mouth, *see* RT 652-55); and elicited testimony that she had been blindfolded and tasted something in front of the class on one occasion, RT 648.

Mr. Chandler is not entitled to relief on his Confrontation Clause claim because the state appellate court's determination that there was no constitutional error was not contrary to, or an unreasonable application of, any holding of the U.S. Supreme Court.

F.    Admission Of Evidence Regarding Defendant's Interest In A Teacher's Feet

Mr. Chandler contends that the admission of evidence that he offered to massage and photograph another teacher's feet violated his right to due process.  He urges that the evidence was irrelevant and "could have made [him] seem somehow 'creepy' to the jury," and therefore have led the jury to convict him based on a character trait rather than based on sufficient evidence of his guilt.  Docket No. 1 at 62.

1.    Background

Before trial, the defense filed a motion to exclude evidence that Mr. Chandler had offered to massage and photograph the feet of Hilda Keller, who taught at the same school as Mr. Chandler.  The court held an in limine hearing at which Ms. Keller testified that Mr. Chandler had done several things to her that she considered inappropriate for a work colleague and that she considered to be of a sexual nature, e.g., he had put his hands on her hips on one occasion, commented on her breasts on a different occasion, and had asked to massage and photograph her feet on yet another occasion.  RT 503-22.  Ms. Keller testified at the hearing that Mr. Chandler had entered her classroom, closed the door behind him, said he was taking a massage class, and asked to photograph and massage her feet.  RT 507.  She declined and led him out of the room.  RT 508.  When asked whether she perceived Mr. Chandler's requests to massage and photograph her feet as

being made with a sexual motivation, she responded, "yes and no" – yes in light of his other inappropriate conduct and no because maybe he actually was taking a class. RT 509. Defense counsel argued that Mr. Chandler's apparent sexual interest in an adult's feet was irrelevant to a charge involving his alleged sexual interest in a child's body parts. The prosecutor responded that the evidence was not being offered as propensity evidence but instead to prove intent, i.e., "as probative of defendant's intentions 'when he sees a foot,'" and here there was evidence that he had rubbed something against one blindfolded child's feet while alone with her. *Chandler*, 2015 WL 7726506, at *21. The trial court ruled that Ms. Keller's testimony about Mr. Chandler's offer to photograph and massage her feet, and her feelings in response thereto, would be admissible at trial because feet are unique body parts. RT 530-31. According to the trial court, that evidence was probative, given the anticipated evidence that Jane Doe IV would testify that Mr. Chandler had blindfolded her and made her touch with her feet a sticky object that felt to her like a glue stick. *See* RT 530-31.

At trial, Ms. Keller testified that Mr. Chandler came into her classroom, shut the door, stood for a moment, walked toward her, and talked "about how he would like to take pictures of my feet and give me a foot massage because he was taking a class, a massage therapy class, and I said no. I felt very uncomfortable at that point in time." RT 1060. Ms. Keller also testified that she was concerned at the time that the comment was sexually motivated. RT 1061.

On appeal, Mr. Chandler argued that the admission of the evidence was improper under the California Evidence Code and violated his right to due process. The California Court of Appeal rejected his arguments. First, the appellate court explained the state law rule that, although evidence of uncharged conduct generally is inadmissible to prove criminal disposition of a defendant, such evidence is admissible to prove a relevant fact, such as intent.[14] *Id.* at *21. The

---

[14] The general rule, stated in California Evidence Code § 1101(a), is that evidence of a person's character (such as a prior bad act) is generally inadmissible to prove a defendant's conduct on a specified occasion. Subsection (b) provides several exceptions to that general rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." Cal. Evid. Code § 1101(b).

admission of evidence of such uncharged conduct lies within the trial court's discretion, with the trial court weighing the probative value of the evidence against its prejudicial effect. *Id.* Under California law, "[t]he least degree of similarity between the uncharged act and the charged offense is required in order to prove intent." *Id.*

> The evidence in this case was admitted under Evidence Code section 1101 only to prove appellant's intent in touching Jane IV's feet. Here the degree of similarity between what appellant did to Jane IV and what he wanted to do to Keller is much more significant [than in the cases cited by appellant]. Furthermore, there is one other similarity. Both events took place when appellant was alone in a classroom with Jane IV and with Keller. Given the uniqueness of someone's wanting to touch another person's feet, there are sufficient similarities to render appellant's conduct with Keller probative of his intent with Jane IV.

> The trial court's admission of Keller's evidence was well within its broad discretion, which "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citations.]' [Citation.]" ([*People v.] Rodrigues,* 8 Cal.4th [1060,] 1124–1125 [(1994)].) Appellant has failed to make such a showing.

> In his Supplemental Opening Brief, appellant argues that the admission of the evidence violated his federal constitutional rights to due process and a fair trial. The argument is based on the assumption that the evidence was improperly admitted, and there was no legitimate inference the jury could draw from it. Since we have found that the evidence was properly admitted, there is no error on which to base appellant's constitutional claim.

*Chandler*, 2015 WL 7726506, at *22.

      2.    <u>Analysis</u>

To violate due process, the allegedly wrongful admission of evidence must be "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *see, e.g., id.* (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted); *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (petitioner who showed that a vigorous debate had sprung up as to the validity of the "triad-only" theory of shaken baby syndrome in the years since his murder conviction "failed to show that

72

permitting the prosecution's experts to testify based on a triad-only theory of [shaken baby syndrome] was 'so extremely unfair that it[] . . . violate[d] fundamental conceptions of justice.'") (alterations and omission in original).

The United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991). *Estelle v. McGuire* specifically left open the question regarding propensity evidence. *See id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she was brought to a hospital and died from numerous injuries suggestive of recent child abuse. The defendant told police the injuries were accidental. Evidence was admitted at trial that the coroner discovered during the autopsy older, partially healed, injuries that had occurred six or seven weeks before the child's death. *Id.* at 65. Evidence of the older injuries was introduced to prove "battered child syndrome," which "exists when a child has sustained repeated and/or serious injuries by nonaccidental means." *Id.* at 66. The state appellate court had held that the proof of prior injuries tending to establish battered child syndrome was proper under California law. *Id.* In federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its determination that the evidence was improperly admitted under state law. *Id.* at 66-67. The U.S. Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was properly admitted under state law because "'federal habeas corpus relief does not lie for errors of state law.'" *Id.* at 67. The Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point. [¶] Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial. We hold that McGuire's due process rights were not violated by the admission of the evidence. *See Spencer v. Texas*, 385 U.S. 554, 563–

564, 87 S. Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of prior convictions did not violate due process. The Supreme Court explained in *Spencer* that, although there may have been other, perhaps better, ways to adjudicate the existence of prior convictions (e.g., a separate trial on the priors after the trial on the current substantive offense resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did not violate due process. *Id.* at 563-64. "In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases." *Id.* at 564.

*Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law. *See Estelle v. McGuire*, 502 U.S. at 75. In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights. The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife. "We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at 228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights. No Supreme Court cases since

74

*Estelle v. McGuire* have undermined the holdings in these three cases.  In other words, there is no Supreme Court holding that the admission of prejudicial or propensity evidence violates due process.  When the U.S. Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.'  Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized."  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (alterations in original) (citation omitted) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

Circuit courts have recognized that the United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Foy v. Gipson*, 609 F. App'x 903 (9th Cir. 2015) (no habeas relief on claim that admission of propensity evidence (i.e., that defendant assaulted another woman after he assaulted victim in this case) violated defendant's right to due process because *Estelle v. McGuire's* reservation of the question whether propensity evidence violates due process "forecloses the conclusion that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law); *Munoz v. Gonzales*, 596 F. App'x 588 (9th Cir. 2015) (even if admission of evidence of prior auto theft was improperly admitted to show propensity, habeas relief foreclosed because *Estelle v. McGuire* reserved the question whether propensity evidence violated due process); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying habeas relief upon finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)); *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) (denying habeas relief on claim that due process was violated by admission of evidence of defendant's past violent actions and explosive temper to show propensity due to *Estelle v. McGuire's* reservation of the question whether propensity evidence violates due process); *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009) (because balancing test for excluding evidence was creation of Ninth Circuit law and Supreme Court had not directly considered whether trial court's exercise of discretion to exclude evidence violated defendants' constitutional right to present evidence, state court's failure to use Ninth Circuit's balancing test is not contrary to, or an unreasonable application of, clearly

established Supreme Court precedent).

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of Mr. Chandler's due process claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. *See generally Holley*, 568 F.3d at 1101 (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ") (citation omitted)).

In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are *no* permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." *Jammal*, 926 F.2d at 920 (citation and footnote omitted).[15]

---

[15] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car when they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000 (but no drugs) in the trunk of Jammal's car when they arrested Jammal. At trial, Willis said he had no idea the drugs and money were in the trunk of Jammal's stolen car until police opened it. The prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also with a large stash of cash in his trunk. Jammal unsuccessfully objected that this evidence effectively branded him a drug dealer and was therefore inadmissible character evidence. The

1    Here, Ms. Keller's testimony that Mr. Chandler asked to take pictures of her feet and

2 massage her feet – requests that she felt were made with a sexual intent -- was relevant to whether

3 Mr. Chandler acted with a sexual intent when he had Jane Doe IV touch something with her feet

4 while she was alone and blindfolded in his classroom with the door closed.  The jury could draw

5 the inference that Mr. Chandler acted with the same sexual intent when he touched an object to the

6 feet of blindfolded Jane Doe IV that he had acted with when he asked to massage and photograph

7 Ms. Keller's feet.  Because the inference was permissible, the state appellate court did not

8 unreasonably apply Supreme Court precedent in holding that the admission of the evidence of Mr.

9 Chandler's unusual interest in feet did not violate due process.  *See Jammal*, 926 F.2d at 920.

10 G.    Cumulative Error Claim

11    Mr. Chandler contends that the cumulative effect of the errors prevented him from

12 receiving a fair trial.  In some cases, although no single trial error is sufficiently prejudicial to

13 warrant reversal, the cumulative effect of several constitutional errors may still prejudice a

14 defendant so much that his conviction must be overturned. *See Alcala v. Woodford,* 334 F.3d 862,

15 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered

16 defendant's efforts to challenge every important element of proof offered by prosecution).  Here,

17 there were not multiple federal constitutional trial errors to accumulate.  Mr. Chandler therefore is

18 not entitled to relief under the cumulative error doctrine.

19 H.    Sealed Documents Issue

20

21 Ninth Circuit explained that state law evidence rules were beside the point in a federal habeas
proceeding and any problem in the jury inferring that Jammal had put the $47,000 and drugs in the
22 car earlier (even if impermissible under state law) was not a constitutional problem because the
inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a
23 "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his
24 trunk.  *Jammal*, 926 F.2d at 920.

25    *Jammal* is one of the few cases that provides any guidance as to what might amount to the
introduction of evidence that might amount to fundamental unfairness.  The Ninth Circuit
26 continues to use the *Jammal* "permissible inference" test in habeas cases governed by AEDPA.
*See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did
27 not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal*
and concluding that admission of graffiti evidence did not violate due process because there were
permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008)
28 (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

When Respondent filed his answer to the petition, he moved to file under seal more than 200 pages of transcripts of the video-recorded interviews the police had conducted with the five victims. The Court denied the motion because Respondent did not in that motion overcome the presumption favoring public access to court records. Docket No. 11. The transcripts thus did not become part of the record. In the course of evaluating the petition in this action, the Court has had to rely on materials in those transcripts because statements therein were important pieces of evidence against Mr. Chandler. In order to provide an adequate record for appeal, while at the same time giving some privacy to the child-victims (by not putting the entire transcript in the public record), the Court now directs that the clerk file as a court exhibit in the public record the pages of the transcripts that the Court has cited in this order. Specifically, the clerk shall file as a court exhibit the following pages from the clerk's transcript in the criminal case against Mr. Chandler: CT 1124, 1128, 1198, 1200-02, 1205, 1207, 1209, 1246, 1254-55, 1258, 1268, 1276.

I.    No Certificate Of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI.    **CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The clerk shall close the file.


**IT IS SO ORDERED**.


Dated: August 23, 2018

_____
EDWARD M. CHEN
United States District Judge